John H. Eickemeyer (JE-8302)
Daniel C. Green (DG-0059)
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019

Daniel J. Standish (*pro hac vice*)
Marc E. Rindner (*pro hac vice*)
Cara Tseng Duffield (*pro hac vice*)
WILEY REIN LLP
1776 K Street NW
Washington, D.C. 20006

*Attorneys for Plaintiff Arch Insurance Company*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ARCH INSURANCE COMPANY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **No. 08-CIV-5252 (GEL)** |
| ) | **ECF Case** |
| **JOHN D. AGOGLIA, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF**
**ARCH INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 2

ARGUMENT ............................................................................................................. 9

I.      BENNETT HAD KNOWLEDGE OF FACTS AND CIRCUMSTANCES
        GIVING RISE TO A CLAIM BEFORE AUGUST 11, 2005 ........................... 9

        A.      Bennett Has Stipulated to a Judgment that Both the AWAC Prior
                Knowledge Exclusion and Arch Prior Knowledge Exclusion Bar Coverage
                for the Underlying Matters....................................................................... 9

        B.      Bennett's Guilty Plea and Other Admissions in the Criminal Action
                Independently Establish His Prior Knowledge of Facts and Circumstances
                Giving Rise to a Claim......................................................................... 12

II.     EACH OF THE UNDERLYING MATTERS ARISES OUT OF THE FACTS
        AND CIRCUMSTANCES OF WHICH BENNETT HAD KNOWLEDGE
        PRIOR TO AUGUST 11, 2005 ..................................................................... 14

        A.      The RGHI Receivable Scheme Is Central to Each of the Underlying
                Matters .................................................................................................. 14

        B.      Certain Insureds and the New York Supreme Court Previously
                Recognized that the Underlying Matters Arise Out of the Facts and
                Circumstances of which Bennett Has Now Admitted He Had Knowledge
                Prior to August 11, 2005....................................................................... 17

        C.      Certain of the Underlying Matters Fall Outside the Scope of the Arch
                Policy's Insuring Agreement Unless They Are Deemed to Arise out of the
                RGHI Receivable Scheme ..................................................................... 19

III.    NEITHER THE AWAC NOR ARCH PRIOR KNOWLEDGE EXCLUSION IS
        SEVERABLE ................................................................................................ 20

CONCLUSION....................................................................................................... 24

i

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*A.D. Juilliard & Co. v. Johnson*, 166 F. Supp. 577 (S.D.N.Y. 1957)...............................11

*American Int'l Specialty Lines Ins. Co. v. Towers Financial Corp.*, No. 94 CIV 2727 (WK)(AJP), 1997 WL. 906427 (S.D.N.Y. 1997) .................................13, 22, 24

*Axis Reinsurance Co. v. Bennett et al.*, No. 07-CV-7924 (GEL), 2008 WL. 2485388 (S.D.N.Y. Jun. 19, 2008) ................................................21, 22, 23

*McKithen v. Brown*, 481 F.3d 89 (2d Cir. 2007) ...............................................11

*Mishkin v. Ageloff*, 299 F. Supp. 2d 249 (S.D.N.Y. 2004) ................................12

*New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82 (2d Cir. 2000)...........................12

*Northfield Insurance Co. v. Derma Clinic, Inc.*, 440 F.3d 86 (2d Cir. 2006)....................14

*Peralta v. Vasquez*, 467 F.3d 98 (2d Cir. 2006) ................................................19

*Pizzuto v. County of Nassau*, 239 F. Supp. 2d 301 (S.D.N.Y. 2003)................................12

*SEC v. Haligiannis*, 470 F. Supp. 2d 373 (S.D.N.Y. 2007)................................12

*Sales v. State Farm Fire & Casualty Co.*, 849 F.2d 1383 (11th Cir. 1988) .....................21

*Shapiro v. America Home Assurance Co.*, 584 F. Supp. 1245 (D. Mass. 1984) ..............22

*Spezialetti v. Pacific Employers Insurance Co.*, 759 F.2d 1139 (3d Cir. 1985)...............21

*Stichting Ter Behartiging v. Schreiber*, 327 F.3d 173 (2d Cir. 2003) ..............................12

*TIG Specialty Insurance Co. v. Pinkmonkey.com Inc.*, 375 F.3d 365 (5th Cir. 2004) .........................................................................................................21

*Westport Insurance Corp. v. Hanft & Knight, P.C.*, 523 F. Supp. 2d 444 (M.D. Pa. 2007) ........................................................................................23

*Westport Resources Investment Serv., Inc. v. Chubb Custom Ins. Co.*, No. 02 CIV 3096 (TPG), 2003 WL. 22966305 (S.D.N.Y. Dec. 16, 2003), *aff'd* 110 Fed. Appx. 172 (2d Cir. Sep. 23, 2004) .............................................................13

ii

**STATE CASES**

*All Terrain Properties, Inc. v. Hoy*, 265 A.D.2d 87, 705 N.Y.S.2d 350 (1st Dep't 2000) .................................................................................................................19

*Allstate Insurance Co. v. Mugavero*, 79 N.Y.2d 153, 589 N.E.2d 365 (N.Y. 1992).........21

*Canfield v. Elmer E. Harris & Co.*, 252 N.Y. 502, 170 N.E. 121 (N.Y. 1930)................11

*D&L Holdings LLC v. RCG Goldman Co. LLC*, 287 A.D.2d 65, 734 N.Y.S.2d 25 (1st Dep't 2001)...........................................................................................................19

*Fifty CPW Tenants Corp. v. Epstein*, 16 A.D.3d 292, 792 N.Y.S.2d 58 (1st Dep't 2005) .................................................................................................................11

*Maroney v. N.Y. Central Mut. Fire Ins. Co.*, 5 N.Y.3d 467, 805 N.Y.S.2d 533 (N.Y. 2005) ...............................................................................................................15

*Northville Industrial Corp. v. National Union Fire Insurance Co.*, 89 N.Y.2d 621, 679 N.E.2d 1044 (N.Y. 1997)....................................................................................13

*Pennsylvania Millers Mutual Insurance Co. v. Rigo*, 256 A.D.2d 769, 681 N.Y.S.2d 414 (3d Dep't 1998) ..................................................................................13

*Salamina v. Tartaglia*, 106 N.Y.S.2d 487 (N.Y. Sup. Ct. 1951) ......................................11

*Schwartzreich v. E.P.C. Carting Co.*, 246 A.D.2d 439, 668 N.Y.S.2d 370 (1st Dep't 1998)...............................................................................................................11

*Technicon Electronics Corp. v. America Home Assurance Co.*, 74 N.Y.2d 66, 542 N.E.2d 1048 (N.Y. 1989)..........................................................................................13

*Town of Moreau v. Orkin Exterminating Co.*, 165 A.D.2d 415, 568 N.Y.S.2d 466 (3d Dep't 1991) .........................................................................................................13

*U.S. Fire Insurance Co. v. N.Y. Marine & General Insurance Co.*, 268 A.D.2d 19, 706 N.Y.S.2d 377 (1st Dep't 2000)......................................................................15

NEWYORK/#197902.1

## <u>INTRODUCTION</u>

In this insurance coverage action, plaintiff Arch Insurance Company ("Arch") seeks a declaration that the directors and officers liability insurance policy (the "Arch Policy") it issued to Refco, Inc. ("Refco") affords no coverage for various former Refco directors and officers (the "D&Os") in connection with various criminal and civil proceedings (the "Underlying Matters").

The Court is well-versed in the events underlying this lawsuit. In October 2005, shortly after it conducted its initial public offering, Refco announced that it had been carrying an undisclosed $430 million receivable from Refco Group Holdings, Inc., an entity controlled by Refco's CEO Phillip Bennett (the "RGHI Receivable"). Refco revealed that the receivable consisted of uncollectible debts originating in the late 1990s and that the related-party nature of the receivable had been hidden from the company's auditors at the end of Refco's quarterly financial reporting periods. The company announced that, as a result of the RGHI Receivable, its financial statements, including those incorporated into its IPO registration statement, could not be relied upon. Refco entered bankruptcy shortly thereafter, and the Underlying Matters soon followed. Most of those actions are proceeding before this Court on a coordinated basis.

On February 15, 2008, Phillip Bennett pleaded guilty to numerous federal criminal charges against him. The factual predicate for all of the crimes was Bennett's knowledge of and participation in the scheme by which Refco packaged its uncollectible debts into a receivable from RGHI and disguised the nature of the debt through a series of transactions at the end of each financial quarter (the "RGHI Receivable Scheme"). On July 3, 2008, Bennett was sentenced to a sixteen year prison term.

The Arch Policy period incepted on August 11, 2005, the day of Refco's IPO. The present summary judgment motion concerns two "prior knowledge" exclusions in the Arch Policy. Both exclusions provide that if ***any*** person insured under the Arch Policy had knowledge

1

as of August 11, 2005 of facts or circumstances that might give rise to a claim under the policy, the policy will afford no coverage for any subsequently made claim based upon, arising out of or attributable to those facts and circumstances of which any insured had prior knowledge.

Application of the prior knowledge exclusions in the Arch Policy involves issues that readily can be determined as a matter of law on summary judgment.  First, in light of Bennett's sworn statements before Judge Buchwald in connection with his guilty plea regarding his role in the RGHI Receivable Scheme, it is beyond question that, as of August 11, 2005, Bennett had knowledge of facts and circumstances that might give rise to a claim under the Arch Policy.  Not only has Bennett pleaded guilty to criminal charges stemming from his role in the RGHI Receivable Scheme, he also has stipulated to a judgment against him in this coverage action based on the prior knowledge exclusions.  Second, the pleadings in the Underlying Matters clearly demonstrate that each lawsuit arises out of the RGHI Receivable Scheme.  Indeed, several of the D&Os who presently seek coverage from Arch already have admitted as much in prior coverage proceedings.  Third, the prior knowledge exclusions unambiguously preclude coverage for all insureds on the basis of Bennett's knowledge alone.  In its recent opinion in the case *Axis Reinsurance Company v. Bennett et al.*, No. 07-7924 (GEL), this Court squarely rejected the D&Os' arguments that Bennett's knowledge would be insufficient to vitiate coverage for all insureds under a prior knowledge exclusion.

Accordingly, Arch respectfully requests that the Court grant Arch's motion for summary judgment.

## STATEMENT OF FACTS

***The Arch Policy.***  The Arch Policy issued to Refco is an excess directors, officers and corporate liability policy.  The Arch Policy has a limit of liability of $10 million excess of $40

2

million in underlying insurance.  IJX 30.[1]  Various other insurers issued underlying insurance policies to Refco.  U.S. Specialty Insurance Company issued a primary policy with limits of $10 million excess of applicable retentions (the "Primary Policy").  IJX 26.  Lexington Insurance Company issued a first excess policy with limits of $7.5 million excess of $10 million (the "Lexington Policy").  Axis Reinsurance Company issued a second excess policy with limits of $10 million excess of $17.5 million (the "Axis Policy").  Allied World Assurance Company issued a third excess policy with limits of $12.5 million excess of $27.5 million (the "AWAC Policy").  IJX 29.

In general, the Arch Policy applies in conformance with the terms and conditions of the Primary Policy and in conformance with the terms and conditions of the Arch Policy or any other underlying insurance "further limiting or restricting coverage."  Arch Policy, IJX 30, Section I.C. The Arch Policy specifically provides that "[i]n no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the Underlying Insurance."  *Id*.

Two policy provisions have particular relevance to this case.  First, the Arch Policy contains the following provision:

> If **any** Insured as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a Claim under this Policy, the [] Insurer shall not be liable to make any payment under this Policy as a result of a Claim arising out of, based upon or attributable to any such act, error, omission, fact, matter or circumstance.

Arch Policy, IJX 30, Endorsement No. 4 (the "Arch Prior Knowledge Exclusion") (emphasis added).  Second, the AWAC Policy contains the following exclusion:

---

[1]    All cited exhibits refer to exhibits incorporated in the Declaration of John H. Eickemeyer in Support of Plaintiff Arch Insurance Company's Motion for Summary Judgment.  The designation "IJX" ("Insurers' Joint Exhibits") refers to those exhibits relied upon by the insurers in the actions *XL Specialty Insurance Company v. Agoglia, et al.*, No. 08-civ-3821 (GEL) (S.D.N.Y.), *Murphy, et al. v. Allied World Assurance Co. (U.S.), Inc. and Arch Ins. Co.*, No. 08-Civ-4196 (GEL), and the instant action.  True and correct copies of the IJX exhibits have been filed in the *XL Specialty* action and are incorporated by reference into the Eickemeyer Declaration.

3

> the Insurer shall not be liable for Loss in connection with any
> claim or claims made against the Insureds . . . alleging, arising out
> of, based upon, in consequence of, or attributable to facts or
> circumstances of which **any** Insured had knowledge as of inception
> and (i) which a reasonable person would suppose might afford
> valid grounds for a claim which would fall within the scope of the
> coverage hereunder, or (ii) which indicate the probability of any
> such claim.

AWAC Policy, IJX 29, Endorsement No. 3 (the "AWAC Prior Knowledge Exclusion")

(emphasis added).[2]

    *The Underlying Matters.*  Refco conducted its initial public offering on August 11, 2005.

The Arch Policy and the AWAC Policy incepted the same day.

    On October 10, 2005, Refco issued a press release announcing that the public should not

rely upon certain of Refco's financial statements included in its initial public offering registration

statement and prospectus because it had been carrying an undisclosed receivable of $430 million

from an entity controlled by its CEO Phillip Bennett.  *See* Ex. A, "Refco Announces Undisclosed

Affiliate Transaction" (Oct. 10, 2005).  On October 11, 2005, Refco issued a second press

release, stating that "the Company believes that the receivable consisted in major part of

uncollectible historical obligations owed by unrelated third parties to the Company, that arose as

far back as at least 1998.  These obligations were transferred periodically to the entity controlled

by Mr. Bennett, and the Company's books and records then reflected a receivable from that

entity, rather than a receivable from the originating accounts.  The fact that the receivable was

from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual

---

[2]      Arch believes that the Arch Prior Knowledge Exclusion and the AWAC Prior Knowledge are equally broad in scope and that both apply to bar coverage for the Underlying Matters.  To the extent the D&Os contend that the AWAC Prior Knowledge Exclusion is somehow broader than the Arch Prior Knowledge Exclusion, however, the Arch Policy would follow form to the AWAC Prior Knowledge Exclusion as a provision "further limiting or restricting coverage."  Accordingly, Arch moves for summary judgment based on both exclusions.

reporting periods." *See* Ex. B, "Refco Supplements Prior Disclosure" (Oct. 11, 2005).  On

October 17, 2005, Refco filed for Chapter 11 bankruptcy protection.

Following Refco's October 2005 announcements, numerous lawsuits were filed against

the former directors and officers of Refco.  Central to all of these lawsuits are the allegations

that, prior to Refco's August 11, 2005 initial public offering, Bennett and others at Refco

concealed Refco's true financial position by means of the RGHI Receivable Scheme.  The

lawsuits include *United States v. Bennett, et al.*, No. 05-1192 (S.D.N.Y.) (the "Criminal

Action"); *In re Refco, Inc. Securities Litigation*, No. 05-8626 (S.D.N.Y.) (the "Securities

Litigation"); *Thomas H. Lee Equity Fund V, L.P. v. Bennett, et al.*, No. 05-9608 (S.D.N.Y.) (the

"TH Lee Action"); *American Financial International Group v. Bennett et al.*, No. 05-8988

(S.D.N.Y.) (the "American Financial Action"); *In re Refco Capital Markets Ltd. Brokerage*

*Customer Securities Litigation*, No. 06-643 (S.D.N.Y.) (the "RCM Action"); *VR Global Partners*

*L.P. v. Bennett et al.*, No. 07-8686 (S.D.N.Y.) (the "VR Global Partners Action"); *Capital*

*Management Select Fund Ltd. v. Bennett et al.*, No. 07-8688 (S.D.N.Y.) (the "Capital

Management Action");  *Kirschner v. Thomas H. Lee Partners, L.P. et al.*, No. 07-7074

(S.D.N.Y.) (the "TH Lee Trustee Action"); *Kirschner v. Grant Thornton LLP et al.*, No. 07-

11604 (S.D.N.Y.) (the "Grant Thornton Trustee Action"); *Kirschner v. Agoglia, et al.*, No. 05-

60006, Adv. Pro. No. 07-3060 (Bankr. S.D.N.Y.) (the "Agoglia Action"); and *Krys, et al. v.*

*Sugrue, et al.*, No. 08-3065 (GEL) (S.D.N.Y.), No. 08-3086 (GEL) (S.D.N.Y.) (the "Sphinx

Action").  Collectively, these actions are referenced herein as the "Underlying Matters."

**The First Arch Coverage Action.**  Arch denied coverage for the Underlying Matters

based on the Arch and AWAC Prior Knowledge Exclusions.  On March 9, 2006, Arch filed a

declaratory judgment action in the New York Supreme Court seeking a declaration that the Arch

Policy did not afford coverage for the Underlying Matters.  *See Arch Ins. Co. v. Bennett, et al.,*

Index No. 06/600805 (Supreme Court of the State of New York, New York County) ("Arch I").

In September 2006, the defendant insureds filed motions to stay and/or dismiss Arch's

coverage action.  ***First***, Bennett moved to stay the action in light of his pending criminal trial.

Specifically, Bennett conceded that a "verdict against Bennett [in the Criminal Action] would

resolve many of the issues in this case" and "obviate the need to conduct discovery or have a trial

of this action."  Ex. D, Reply Br. in Supp. of Bennett Mot. to Stay at 5 & n.1.  Bennett urged the

court to stay Arch's action in the interests of judicial efficiency given the "possibility of a guilty

verdict, and the resulting collateral estoppel effect."  *Id*. at 6.  ***Second***, a number of former Refco

officers (Grant, Klejna, Murphy, Silverman, Sexton, Sherer and Trosten) moved to dismiss the

action on the grounds that the action was not ripe, arguing that the Arch Policy would not attach

until $40 million in underlying insurance had been exhausted and that the possibility of such

exhaustion was speculative and remote.  In addition, the officer defendants emphasized the

overlap between the issues central to the Arch and AWAC Prior Knowledge Exclusions and the

Underlying Matters:

> [Arch's] Amended Complaint specifically alleges . . . that Bennett
> had knowledge as of August 11, 2005 of facts and circumstances
> relating to Refco's financial condition so as to trigger the prior
> knowledge exclusions . . . ***Arch cannot dispute that Bennett's***
> ***knowledge of Refco's financial condition is one of the key factual***
> ***questions that must be determined in the Underlying Matters***.
> Indeed, the allegations against Bennett in the Amended Complaint
> are essentially the same as those made against him in the
> Underlying Matters.  Accordingly, the issue of Bennett's
> knowledge must be determined in the Underlying Matters.

Ex. E, Reply Mem. in Supp. of Officer Defs.' Mot. to Dismiss at 6-7 (emphasis added).  ***Third***,

the director defendants moved to dismiss on the grounds that the Arch Policy unequivocally

required Arch to advance defense costs until a judicial coverage determination occurred.

In an order dated February 20, 2007, the state court dismissed Arch's coverage action without prejudice. Ex. F, Feb. 20, 2007 Order. The court granted the officer defendants' motion to dismiss, holding that Arch's action was not ripe because the possibility that the underlying insurance would be exhausted was remote. The court also held that facts necessary to adjudicate application of the Arch and AWAC Prior Knowledge Exclusions were "central to the Underlying Matters and must be adjudicated in those actions." *Id*. at 3. The court declined to reach Bennett's motion to stay or the director defendants' motion to dismiss. *Id*. at 3-4.

**Bennett's Guilty Plea.** On February 15, 2008, Bennett pleaded guilty to all charges against him in the Criminal Action as set forth in the third superseding indictment (the "S3 Indictment"), including conspiracy, money laundering, making false statements to the SEC, and securities, wire and bank fraud. The S3 Indictment alleged, among other things, that Bennett had knowledge of, and actively participated in, the RGHI Receivable Scheme before August 11, 2005. IJX 18, S3 Indictment, ¶¶ 7-9, 13-17, 21-25, 31-36, 38-55. At his plea allocution, Bennett explicitly admitted his knowledge of and role in the RGHI Receivable Scheme. IJX 21, Feb. 15, 2008 Hr'g Tr. 16-20. The court found that Bennett's plea was made voluntarily and knowingly and that a sufficient factual basis for the plea existed.[3] *Id*. at 20.

In his sentencing memorandum to the court, Bennett reconfirmed his role in the RGHI Receivable Scheme. The memorandum states that "[i]n the late 1990s, Mr. Bennett — recognizing that Refco's very existence was at stake following several business reversals, including the Asia and Neiderhoffer losses described in the indictment — came up with a plan,

---

[3]     Other Refco officers also have pleaded guilty to criminal charges against them stemming from their knowledge of and participation in the RGHI Receivable Scheme. On December 19, 2007, Maggio pleaded guilty to a four-count criminal information charging him with conspiracy, securities fraud and wire fraud. IJX 20. On February 20, 2008, Trosten pleaded guilty to conspiracy, money laundering and securities, wire and bank fraud. IJX 22. A fourth superseding indictment was filed against Tone Grant in the Criminal Action on February 26, 2008 (the "S4 Indictment"). IJX 19. On April 17, 2008, a jury found Grant guilty on all counts.

admittedly ill-conceived, and indeed unlawful, to keep the company in business, by eventually absorbing these losses into the RGHI receivable and then disguising the related-party nature of the receivable." Ex. G, Bennett Sentencing Memorandum at 20.  Bennett further acknowledged that he committed a "colossal error of judgment — indeed, a crime — [by] deal[ing] with the problems . . . by eventually shifting these losses into the RGHI receivable, and then engaging in transactions at the end of reporting periods to make a portion of that receivable balance appear to be from an independent, third-party customer." *Id*. at 22.

On July 3, 2008, Bennett received a sentence of sixteen years in prison.  IJX 23.

***The Present Coverage Proceedings.***  Following Maggio's guilty plea, Arch reinstated its coverage action in the New York Supreme Court on January 4, 2008.  After Bennett and Trosten similarly pleaded guilty, Arch filed a first amended complaint on February 21, 2008.  *See* First Am. Compl.  Arch's first amended complaint presents two separate and independent bases for denying coverage for the Underlying Matters.  Count I seeks a declaration that, based on the AWAC Prior Knowledge Exclusion, the Arch Policy does not afford coverage for any loss arising out of the Underlying Matters.  Count II seeks a judicial declaration that, based on the Arch Prior Knowledge Exclusion, the Arch Policy does not provide coverage for any loss arising out of the Underlying Matters.

On April 17, 2008, Bennett stipulated "that the Arch Policy does not afford him any coverage whatsoever for any of the Underlying Matters."  Ex. H, Stipulation of Judgment against Defendant Phillip R. Bennett.  Bennett also "agree[d] to the entry of judgment against him on Counts I and II of [Arch's Amended Complaint]." *Id*.  Judgment was entered against Bennett on April 24, 2008.  Ex. I, Judgment Against Phillip R. Bennett.

8

On June 4, 2008, Eric Lipoff, one of the defendants in the action, removed the proceedings to this Court. Arch now moves for summary judgment against the D&Os presently seeking coverage for the Underlying Matters.[4]

## ARGUMENT

Coverage under the Arch Policy for the Underlying Matters clearly is excluded by both the Arch Prior Knowledge Exclusion and the AWAC Prior Knowledge Exclusion. Application of both exclusions turns on three questions. *First*, as of August 11, 2005, did Bennett have knowledge of facts and circumstances that might give rise a Claim under the Arch and AWAC Policies? *Second*, do the Underlying Matters arise out of, or are they based upon or attributable to, the facts and circumstances of which Bennett had knowledge? *Third*, does Bennett's knowledge operate to bar coverage for all insureds? As demonstrated below, the answer to each of these three questions is an unequivocal "yes."

## I. BENNETT HAD KNOWLEDGE OF FACTS AND CIRCUMSTANCES GIVING RISE TO A CLAIM BEFORE AUGUST 11, 2005

### A. Bennett Has Stipulated to a Judgment that Both the AWAC Prior Knowledge Exclusion and Arch Prior Knowledge Exclusion Bar Coverage for the Underlying Matters.

On April 17, 2008, Bennett stipulated to the entry of judgment against him in this action. Specifically, Bennett agreed that he was not entitled to any coverage under the Arch Policy and that Arch is entitled to the declarations it seeks in Counts One and Two of its First Amended Complaint. Count One of Arch's first amended complaint is titled "Declaratory Judgment that

---

[4]    The D&Os presently seeking coverage include Agoglia, Breitman, Dhillon, Gantcher, Grant, Harkins, Jaeckel, Klejna, Lee, Lipoff, McCarthy, Murphy, Mutterer, Outridge, O'Kelley, Schoen, Sexton, Sherer and Silverman. As noted above, Bennett is no longer seeking coverage from Arch. Similarly, Maggio, Trosten, Dittmer, Grady and Cox either have agreed that they are not entitled to coverage under the Arch Policy or that they are not seeking and do not intend to seek coverage under the Arch Policy.

9

the AWAC Prior Knowledge Exclusion Bars Coverage for the Underlying Matters" and alleges,

in relevant part, as follows:

> 114.    As of August 11, 2005, Bennett, Trosten and Maggio
> possessed knowledge of facts and circumstances that a reasonable
> person would suppose might afford valid grounds for a claim or
> that would indicate the probability of any such claim.

> 115.    The Underlying Matters consist of Claims alleging, arising
> out of, based upon, in consequence of, or attributable to such facts
> and circumstances.

> 116.    Arch seeks a declaration that based upon the AWAC Prior
> Knowledge Exclusion, the Arch Policy does not provide coverage
> for any loss arising out of the Underlying Matters.

First Am. Compl. ¶¶ 114-16.  Count Two of the first amended complaint is titled "Declaratory

Judgment that the Arch Prior Knowledge or Information Exclusion Bars Coverage for the

Underlying Matters" and alleges, in relevant part, as follows:

> 118.    As of August 11, 2005, Bennett, Trosten and Maggio
> possessed knowledge or information concerning acts, errors
> omissions, facts, matters or circumstances that might give rise to a
> Claim under the Arch Policy.

> 119.    The Underlying Matters consist of Claims arising out,
> based upon, or attributable to such acts, errors, omissions, facts,
> matters or circumstances.

> 120.    Arch seeks a declaration that, based upon the Arch Prior
> Knowledge or Information Exclusion, the Arch Policy does not
> provide coverage for any loss arising out of the Underlying
> Matters.

*Id*. ¶¶ 118-20.  On April 21, 2008, Justice Freedman of the New York Supreme Court signed the

parties' stipulation, and the judgment was entered on April 24, 2008.  Exs. H, I.

By specifically stipulating that Arch was entitled to judgment on Counts One and Two as

pled in the first amended complaint, Bennett agreed that, as of August 11, 2005, he had

knowledge of facts and circumstances triggering the Arch and AWAC Prior Knowledge

10

Exclusions, *i.e.*, knowledge of facts and circumstances that might give rise to a claim.  A

stipulated judgment is a "conclusive adjudication of all matters embraced in it."  *Canfield v.*

*Elmer E. Harris & Co.*, 252 N.Y. 502, 505, 170 N.E. 121, 122 (N.Y. 1930).  *See also A.D.*

*Juilliard & Co. v. Johnson*, 166 F. Supp. 577, 585 (S.D.N.Y. 1957) (stipulated judgment "has the

same force and effect as any other judgment," constitutes a "final adjudication" and is

"equivalent to an admission that the facts exist on which the [stipulation] rests"); *Salamina v.*

*Tartaglia*, 106 N.Y.S.2d 487, 488 (N.Y. Sup. Ct. 1951) (stipulated judgment "is binding . . . with

the same force and effect as though . . . rendered after a trial . . . The stipulation act[s] as a

substitute for evidence").  Moreover, a stipulated judgment has the "same preclusive effect as a

judgment on the merits."  *Schwartzreich v. E.P.C. Carting Co.*, 246 A.D.2d 439, 441, 668

N.Y.S.2d 370, 372 (1st Dep't 1998); *see also Fifty CPW Tenants Corp. v. Epstein*, 16 A.D.3d

292, 293-94, 792 N.Y.S.2d 58, 59-60 (1st Dep't 2005) (party that stipulated to discontinuance of

first action with prejudice precluded from bringing second action concerning claims arising out

of same facts as first action).[5]  Accordingly, the judgment entered against Bennett conclusively

establishes that, as of August 11, 2005, Bennett had knowledge of facts and circumstances

triggering the Arch and AWAC Prior Knowledge Exclusions.

Bennett's stipulation is consistent with his earlier arguments in the Arch I Action that a

guilty verdict in the Criminal Action would have "collateral estoppel effect" and "obviate the

need to conduct discovery or have a trial" in Arch's coverage action.  Ex. D, Reply Br. in Supp.

of Bennett Mot. to Stay at 5 & n.1.  Had Bennett not stipulated to the judgment and remained a

party to the case, Arch could have moved for summary judgment on the issue that Bennett was

collaterally estopped, by virtue of his guilty plea, to deny that he had knowledge of facts or

---

[5]    Because the stipulated judgment against Bennett was entered by a New York court, New York law governs
the effect of the judgment.  *See, e.g., McKithen v. Brown*, 481 F.3d 89, 103-04 (2d Cir. 2007).

circumstances giving rise to a claim.[6]  Bennett's knowingly false statements in connection with

Refco's financials made inaccurate by the RGHI Receivable Scheme constitute an element of

each of the counts for conspiracy, securities fraud, false filings with the SEC and bank fraud

included in the S3 Indictment.  Rather than put the parties and the Court to the time and expense

of such motion practice, Bennett simply stipulated to the judgment against him.

### B.    Bennett's Guilty Plea and Other Admissions in the Criminal Action Independently Establish His Prior Knowledge of Facts and Circumstances Giving Rise to a Claim.

Even if Bennett had not stipulated to a judgment against him, Bennett's guilty plea and

other admissions in the Criminal Action independently would establish his prior knowledge of

facts and circumstances that might give rise to a claim.  On February 15, 2008, Bennett pleaded

guilty to all charges against him in the S3 Indictment.  The predicate for each count involved

Bennett's knowledge of and/or participation in the RGHI Receivable Scheme before August 11,

2005.  IJX 18, S3 Indictment ¶¶ 7-9, 13-17, 21-25, 31-36, 38-55.  In addition, in his plea

allocution, Bennett specifically admitted to his role in the RGHI Receivable Scheme, which was

used to falsify Refco's financials in 2004 and in connection with Refco's IPO.  IJX 21, Feb. 15,

2008 Hr'g Tr. at 16-20.  Finally, in his sentencing memorandum, Bennett again admitted to

devising the RGHI Receivable Scheme in the late 1990s, a scheme he readily conceded was

"unlawful" and "criminal."  Ex. G, Bennett Sentencing Mem. at 20, 22.

---

[6]    *See, e.g., New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 86 (2d Cir. 2000) ("criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel . . . in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case"); *Stichting Ter Behartiging v. Schreiber*, 327 F.3d 173, 180 (2d Cir. 2003) ("guilty plea is an admission of all the elements of a formal criminal charge" and "collaterally estop[s] [the defendant] from proceeding with a [] claim requiring it to prove a fact that is contrary to any one of the elements of the crime to which it pleaded guilty"); *see also Pizzuto v. County of Nassau*, 239 F. Supp. 2d 301, 308-09 (S.D.N.Y. 2003); *Mishkin v. Ageloff*, 299 F. Supp. 2d 249, 253-54 (S.D.N.Y. 2004); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 382 (S.D.N.Y. 2007) (all granting summary judgment based on collateral estoppel effect of defendant's prior guilty plea in subsequent civil litigation).

12

New York courts routinely consider admissions by insureds in underlying actions to determine the existence of insurance coverage. *See Northville Indus. Corp. v. Nat'l Union Fire Ins. Co.*, 89 N.Y.2d 621, 635, 679 N.E.2d 1044, 1049 (N.Y. 1997) (in determining duty to defend, "court may look to judicial admissions in the insured's responsive pleadings in the underlying tort action or other formal submissions in the current or underlying litigation to confirm or clarify the nature of the underlying claims"); *Technicon Electronics Corp. v. Am. Home Assurance Co*., 74 N.Y.2d 66, 72, 542 N.E.2d 1048, 1049 (N.Y. 1989) (insurer owed no duty to defend where insured's certified answer in underlying proceedings established that pollution was intentional, not accidental); *Pennsylvania Millers Mut. Ins. Co. v. Rigo*, 256 A.D.2d 769, 681 N.Y.S.2d 414 (3d Dep't 1998) (considering plea allocution in determining whether insured's conduct was intentional and insurer therefore had no duty to defend); *Town of Moreau v. Orkin Exterminating Co*., 165 A.D.2d 415, 418, 568 N.Y.S.2d 466, 468 (3d Dep't 1991) (no duty to defend where insured's guilty conviction in prior proceedings established that pollution was intentional; "while it is true that a court should be hesitant to leave the boundaries of the complaint in making its determination on an insured's duty to defend . . . it need not ignore positive proof, extrinsic to the complaint, that assists in clarifying an ambiguous allegation. . . . Accordingly, applying the principle of collateral estoppel, the Supreme Court properly considered Abalene's criminal convictions for knowingly dumping hazardous waste . . . and determined that the convictions precluded defendants from contending that the burial of pesticides was unintentional"); *see also Westport Resources Investment Serv., Inc. v. Chubb Custom Ins. Co*., No. 02 CIV 3096 (TPG), 2003 WL 22966305 (S.D.N.Y. Dec. 16, 2003) (one insured's criminal conviction established application of dishonesty exclusion to another insured), *aff'd* 110 Fed. Appx. 172 (2d Cir. Sep. 23, 2004); *Am. Int'l Specialty Lines Ins. Co. v. Towers*

*Fin. Corp.*, No. 94 CIV 2727 (WK)(AJP), 1997 WL 906427, at *4 n.7 (S.D.N.Y. 1997) (plea allocutions of certain insureds admissible to establish insurer's right to rescind policy as to all insureds).

Not only is New York law established on this point, it is dispositive on the issue of the effect Bennett's guilty plea and other judicial admissions have on these coverage proceedings. *See Northfield Ins. Co. v. Derma Clinic, Inc.*, 440 F.3d 86, 91 (2d Cir. 2006) (noting that question whether insured's "plea of *nolo contendere* and the resulting conviction [could] be used to trigger an insurance policy's criminal acts exclusion" turned on state law and certifying question to Connecticut Supreme Court).  Accordingly, even if Bennett had not stipulated to a judgment in this action, his guilty plea and other admissions still would conclusively establish his prior knowledge of facts and circumstances giving rise to a claim.

## II.    EACH OF THE UNDERLYING MATTERS ARISES OUT OF THE FACTS AND CIRCUMSTANCES OF WHICH BENNETT HAD KNOWLEDGE PRIOR TO AUGUST 11, 2005

### A.    The RGHI Receivable Scheme Is Central to Each of the Underlying Matters.

The Arch and AWAC Prior Knowledge Exclusions bar coverage for "Claims" arising out, based upon or attributable to the facts and circumstances of which Bennett had knowledge as of August 11, 2005, *i.e.*, the RGHI Receivable Scheme.  Each of the Underlying Matters constitutes a "Claim."  IJX 26, Primary Policy, Definitions (B)(2), (B)(3) (defining "Claim," in relevant part, as a "any civil proceeding commenced by service of a complaint or similar pleading" or "any criminal proceeding commenced by return of an indictment").  Thus, the question is whether each of the Underlying Matters arises out of, or is based upon or attributable to, the RGHI Receivable Scheme.

Each of the Underlying Matters unquestionably arises out of the RGHI Receivable Scheme.  New York courts interpret the phrase "arising out of" in an insurance exclusion broadly

14

to mean "originating from, incident to, or having connection with." *Maroney v. N.Y. Central Mut. Fire Ins. Co.*, 5 N.Y.3d 467, 472, 805 N.Y.S.2d 533, 536 (N.Y. 2005); *U.S. Fire Ins. Co. v. N.Y. Marine & Gen. Ins. Co.*, 268 A.D.2d 19, 21-22, 706 N.Y.S.2d 377, 378-79 (1st Dep't 2000). None of the Underlying Matters would have been filed but for Refco's implosion following disclosure of the RGHI Receivable.  Moreover, allegations concerning the RGHI Receivable Scheme form the centerpiece of each of the operative complaints in the Underlying Matters.

- **The Criminal Action.**  Grant is the only remaining defendant.  The operative pleading is the S4 Indictment.  The S4 Indictment alleges that Grant had knowledge of the RGHI Receivable Scheme before August 11, 2005.  *See* S4 Indictment, IJX 19, ¶¶ 6-8, 15-17, 19-24, 25-26, 32, 54-60, 62, 64, 66, 68.

- **The Securities Litigation.**  The defendants include Breitman, Gantcher, Grant, Harkins, Jaeckel, Klejna, Lee, Murphy, O'Kelley, Schoen, Sexton, Sherer, and Silverman.  The operative pleading is the second amended complaint.  The suit is a purported class action on behalf of all persons or entities who purchased publicly traded shares, bonds or notes of Refco and its affiliates between July 1, 2004 and October 17, 2005.  The plaintiffs allege that the defendants' failure to disclose the RGHI Receivable Scheme resulted in materially false SEC filings.  *See* Second Am. Compl., IJX 1, ¶¶ 1-10; 96-97, 232-36, 425-587.

- **The T.H. Lee Action**.  Grant is the only defendant seeking coverage.  The initial complaint is the operative pleading.  The plaintiffs allege that defendants failed to disclose the RGHI Receivable Scheme in connection with the plaintiffs' 2004 leveraged buyout of Refco.  *See* Compl., IJX 14, ¶¶ 4-6, 30-37, 51.

- **The American Financial Action**.  The defendants presently seeking coverage include Mutterer, Sexton and Sherer.  The operative pleading is the third amended complaint.  The suit is an alleged class action on behalf of all persons who traded currency through Refco FX.  The plaintiffs allege that, through the RGHI Receivable Scheme, defendants created the false impression that Refco FX and Refco were safe and reputable businesses.  *See* Third Am. Compl., IJX 2, ¶¶ 4-9, 17-18, 77-86 (describing RGHI Receivable Scheme).  The plaintiffs also allege that the defendants wrongfully used customer accounts at Refco FX to fund Refco's daily operations and cover up trading losses.  *Id.* ¶¶ 87-92.  The plaintiffs further allege that these schemes operated in tandem.  *Id.* ¶ 196.  The plaintiffs allege they were damaged when their accounts were frozen after Refco FX and Refco entered bankruptcy.  *Id.* ¶¶ 14-15, 175-83, 228-40.

- **The RCM Action**.  The defendants seeking coverage include Grant, Harkins, Jaeckel, Lee, Outridge and Schoen.  The operative pleading is the second amended complaint.  The RCM Action is brought on behalf of securities

15

brokerage customers of Refco Capital Markets ("RCM"). The plaintiffs allege that the defendants regularly and without customer consent "converted [customer] securities to cash . . . to finance Refco's daily operations, trading losses and significant acquisitions." *See* Second Am. Compl., IJX 6, ¶ 5. The plaintiffs allege that this scheme operated in conjunction with the RGHI Receivable scheme to make Refco's finances appear stronger than they actually were. *Id*. ¶¶ 72, 73, 109. The plaintiffs also allege that RCM customer funds were used in connection with the round-trip transactions in the RGHI Receivable Scheme. *Id*. ¶ 73. The plaintiffs contend that their losses were caused when the schemes were revealed and Refco filed for bankruptcy. *Id*. ¶¶ 28-29, 152-61.

- ▪ ***The V.R. Global Partners Action.*** The defendants include Sexton, Murphy, Silverman, Outridge, Grant, Lee, Harkins, Jaeckel and Schoen. The initial complaint is the operative pleading. The plaintiffs, private investment funds that maintained accounts at RCM, allege that defendants hid Refco's true financial condition via the RGHI Receivable Scheme in order to induce plaintiffs to entrust their securities with RCM for safekeeping. *See* Compl., IJX 16, ¶¶ 30-44, 111, 113, 126-148, 181-82, 185-190, 196-203. Plaintiffs allege that they lost hundreds of millions of dollars as a result of defendants' actions when the RGHI Receivable Scheme was revealed and RCM entered bankruptcy and disclosed that it did not possess sufficient funds to return customer property. *Id*. ¶¶ 236-41, 243.

- ▪ ***The Capital Management Action.*** The defendants include Sexton, Murphy, Silverman, Outridge, Lee, Harkins, Jaeckel and Schoen. The initial complaint is the operative pleading. As in the VR Global Partners Action, the plaintiffs are private investment funds that maintained accounts at RCM. The plaintiffs allege that defendants improperly converted RCM customer funds to use in connection with the RGHI Receivable Scheme. *See* Compl., IJX 4, ¶¶ 62, 63. The plaintiffs allege that the defendants painted a false picture of financial strength that induced plaintiffs to entrust their funds to RCM. *Id*. ¶¶ 117-19. The plaintiffs allege that their losses resulted when the defendants' fraudulent scheme was revealed when Refco disclosed the existence of the RGHI Receivable and entered bankruptcy. *Id*. ¶ 25, 155-60.

- ▪ ***The T.H. Lee Trustee Action***. The defendants include Harkins, Jaeckel, Lee and Schoen. The initial complaint is the operative pleading. The plaintiff alleges that the defendants overlooked problems at Refco and breached their fiduciary duties in proceeding with the Refco initial public offering. The plaintiff alleges that had defendants fulfilled their fiduciary duties, they would have uncovered the RGHI Receivable Scheme and halted the IPO. *See* Compl., IJX 11, ¶¶ 57-61, 83-89, 192-223

- ▪ ***The Grant Thornton Trustee Action.*** The only defendant presently seeking coverage is Grant. The initial complaint is the operative pleading. The plaintiff alleges that the RGHI Receivable Scheme was part of a plan by certain Refco insiders, including Grant, to create the illusion of financial strength and then cash out their interests. *See* Compl., IJX 9, ¶¶ 1-2, 4-6, 59-93.

16

- ▪ ***The Agoglia Action***.  The defendants presently seeking coverage include Agoglia, Dhillon, Grant, Lipoff, McCarthy, Murphy, Mutterer, and Sexton.  The operative pleading is the initial complaint.  The plaintiff alleges that the defendants engaged in a scheme to "enrich themselves by creating a false appearance of financial stability and success [at Refco] . . . through fraud."  *See* Compl., IJX 7, ¶ 2.  The RGHI Receivable Scheme is alleged to have been central to this plan.  *Id*. ¶¶ 5, 59-81.  The defendants allegedly used the RGHI Receivable Scheme to prop up Refco's finances until they could cash out their interests through a leveraged buyout transaction in 2004 and the IPO in 2005.  *Id*. ¶ 4.

- ▪ ***The Sphinx Action.***  The defendants presently seeking coverage include Grant, Klejna, Lee, Harkins, Jaeckel and Schoen.  The operative pleading is the initial complaint.  The plaintiffs are liquidators and trustees of various entities affiliated with the SPhinX family of hedge funds, as well as the SPhinX funds themselves.  The plaintiffs allege a fraudulent scheme involving the "diversion of hundreds of millions of dollars of SPhinX's cash from protected, customer-segregated accounts" into unprotected offshore accounts where the money was "used to support a massive fraud orchestrated by Phillip Bennett."  *See* Compl., IJX 12, ¶ 1.  Specifically, the complaint alleges that SPhinX monies were used to support the RGHI Receivable Scheme.  *Id*. ¶¶ 6-8, 162-92, 193-99, 213-43.

Accordingly, each of the Underlying Matters arises out of the RGHI Receivable Scheme of which Bennett had knowledge before August 11, 2005.[7]

   **B.     Certain Insureds and the New York Supreme Court Previously Recognized that the Underlying Matters Arise Out of the Facts and Circumstances of which Bennett Has Now Admitted He Had Knowledge Prior to August 11, 2005.**

   In the Arch I Action, certain of the D&Os — specifically, Grant, Klejna, Murphy, Silverman, Sexton, Sherer — argued that Arch's coverage action must be stayed or dismissed because the declarations Arch sought would require determination of disputed fact issues in the Underlying Matters.  In doing so, they readily admitted that the Underlying Matters at issue

---

[7]     Moreover, as set forth above in Section I.A, Bennett has stipulated that Arch is entitled to judgment on Counts I and II of its first amended complaint, *i.e.*, that the Arch and AWAC Prior Knowledge Exclusions bar coverage for the Underlying Matters.  The judgment constitutes a conclusive adjudication that, as of August 11, 2005, Bennett had knowledge of the facts and circumstances that gave rise to each of the Underlying Matters included in Arch's first amended complaint.

17

arose out of Bennett's (then-alleged) knowledge of the RGHI Receivable Scheme.[8]  In urging the

New York Supreme Court to dismiss or stay Arch's coverage action in favor of the Underlying

Matters, the officer defendants contended that

> [Arch's] Amended Complaint specifically alleges . . . that Bennett
> had knowledge as of August 11, 2005 of facts and circumstances
> relating to Refco's financial condition so as to trigger the prior
> knowledge exclusions . . . ***Arch cannot dispute that Bennett's
> knowledge of Refco's financial condition is one of the key factual
> questions that must be determined in the Underlying Matters***.
> Indeed, the allegations against Bennett in the Amended Complaint
> are essentially the same as those made against him in the
> Underlying Matters.  Accordingly, the issue of Bennett's
> knowledge must be determined in the Underlying Matters.

Ex. E, Reply Mem. in Supp. of Officer Defs.' Mot. to Dismiss at 6-7 (emphasis added).

In its February 20, 2007 Order dismissing the Arch I Action without prejudice, the New

York Supreme Court agreed with the officer defendants.  The court recognized the overlap

between the allegations against Bennett in the Criminal Action and the Underlying Matters:

> In November 2005, a federal grand jury indicted Bennett on
> charges of securities fraud and related charges; the indictment
> alleged that Bennett "sought to hide from, among others, Refco's
> auditors and investors losses sustained by Refco through its own
> and its customers' trading in the financial markets.  To that end,
> Bennett transferred losses from Refco to a company controlled by
> Bennett, directed a repeated series of transactions designed to
> conceal those losses at year- and quarter-end from Refco's auditors
> and others, and caused Refco to make false and fraudulent public
> filings with the [SEC]."
>
> ***In addition, Refco shareholders, bondholders, customers and
> others have filed at least six civil lawsuits (the "Underlying
> Lawsuits") which, like the criminal proceeding, accuse Bennett
> of concealing Refco's bad debt through a series of sham
> transactions***.

---

[8]    When Arch instituted the Arch I Action, certain of the Underlying Matters presently at issue in this suit had
not yet been filed.  However, the Criminal Action, the Securities Litigation, the T.H. Lee Action, the American
Financial Action, and the RCM Action all were pending at the time of Arch's first action and were the subject of the
officer defendants' motion.  *See* Ex. C, First Amended Complaint.

Ex. F at 1-2 (emphasis added).  In ruling that Arch's action was premature, the Court further

noted that "Arch seeks a declaration that the Prior Knowledge Exclusion bars coverage because

Bennett concealed related party transactions and uncollectible receivables, and accordingly knew

that Refco's financial statements were misleading.  However, ***these accusations against Bennett***

***are central to the Underlying Lawsuits*** and must be adjudicated in those actions."  *Id*. at 3.

In light of the state court's February 20, 2007 Order and their own arguments, the officer

defendants cannot now deny that the Underlying Matters "arise out of" the facts and

circumstances of which Bennett had knowledge prior to August 11, 2005.  The doctrine of

judicial estoppel "preclude[s] a party who assumed a certain position in a prior legal proceeding

and who secured a judgment in his or her favor from assuming a contrary position in another

action simply because his or her interests have changed."  *D&L Holdings LLC v. RCG Goldman*

*Co. LLC*, 287 A.D.2d 65, 71-72, 734 N.Y.S.2d 25, 30-31 (1st Dep't 2001); *see also All Terrain*

*Properties, Inc. v. Hoy*, 265 A.D.2d 87, 93, 705 N.Y.S.2d 350, 355 (1st Dep't 2000) (holding

same); *Peralta v. Vasquez*, 467 F.3d 98, 105 (2d Cir. 2006) (judicial estoppel applies where "(1)

the party against whom it is asserted [ ] advanced an inconsistent position in a prior proceeding,

and (2) the inconsistent position [was] adopted by the court in some matter").  Having advocated

and prevailed upon this position in the Arch I Action, the officer defendants are judicially

estopped from taking a contrary position.

### C.    Certain of the Underlying Matters Fall Outside the Scope of the Arch Policy's Insuring Agreement Unless They Are Deemed to Arise out of the RGHI Receivable Scheme.

The Arch Policy affords coverage only for Claims first made during the Policy Period.

*See* IJX 26, Primary Policy, Insuring Agreement (A).  Certain of the Underlying Matters were

filed after the Arch Policy expired on August 11, 2006.  The Trustee Actions (the T.H. Lee

Trustee Action, the Grant Thornton Trustee Action and the Agoglia Action), the VR Global

19

Partners Action and the Capital Management Action were filed in 2007. IJX 4, 7, 9, 11, 16. The Sphinx Action was filed in March 2008. IJX 12. Because these six actions were filed after the Policy Period ended, they do not constitute Claims "first made" during the Policy Period.

The only way in which these six, later-filed suits potentially could fall within the scope of the Arch Policy's coverage grant is if they can be deemed a "single Claim" with a lawsuit filed during the Policy Period. The Primary Policy provides that "[a]ll Claims alleging, arising out, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single Claim and will be considered to have been made at the time the earliest such Claim was made." Primary Policy, Conditions (C). Arch's position is that the VR Global Partners Action, Capital Management Action, Sphinx Action and Trustee Actions should be deemed Claims first made during the Policy Period because, like the Underlying Matters filed during the Policy Period, the actions arise out of the RGHI Receivable Scheme. To the extent the D&Os attempt to argue that the six actions do not arise out of the RGHI Receivable Scheme, however, they must concede that those actions would not constitute Claims first made within the Policy Period and thus would not be covered in any event.

## III.    NEITHER THE AWAC NOR ARCH PRIOR KNOWLEDGE EXCLUSION IS SEVERABLE

Both the Arch and AWAC Prior Knowledge Exclusions provide that the knowledge of any one Insured will serve to vitiate coverage for all Insureds with respect to the claim at issue. The Arch Prior Knowledge Exclusion states that "if *any Insured*" possesses the requisite knowledge, then Arch "shall not be liable to make any payment" as a result of the Claim arising from the facts and circumstances about which the Insured had knowledge. IJX 30, End. 4 (emphasis added). Similarly, the AWAC Prior Knowledge Exclusion provides that AWAC

20

"shall not be liable for Loss in connection with any claim or claims made against the Insureds alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which **any Insured** had knowledge . . . ."  IJX 29, End. 3 (emphasis added).

It is clear from the use of the phrase "any Insured" that both Prior Knowledge Exclusions take full effect if any one Insured has the requisite knowledge.  If a lawsuit arises out of facts and circumstances about which only one Insured had knowledge, the exclusions nevertheless bar coverage for all Insureds who are defendants in the lawsuit.  This interpretation is fully in accord with established law regarding interpretation of the phrase "any Insured" in an insurance exclusion.  *See, e.g., Axis Reinsurance Co. v. Bennett et al.*, No. 07-CV-7924 (GEL), 2008 WL 2485388, at *15 (S.D.N.Y. Jun. 19, 2008) (use of phrase "any Insured" in prior knowledge exclusion means that coverage is barred for all Insureds based on knowledge of one Insured); *Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153, 164, 589 N.E.2d 365, 371 (N.Y. 1992) (construing intentional acts exclusion to "clearly and unambiguously exclude[] from coverage all claims which arise out of the intentional acts of any one of the insureds"); *TIG Specialty Ins. Co. v. Pinkmonkey.com Inc.*, 375 F.3d 365, 371 (5th Cir. 2004) (use of phrase "any Insured" in personal profit exclusion means "coverage is excluded for all Insureds, not merely the Insured who profited"); *Sales v. State Farm Fire & Cas. Co.*, 849 F.2d 1383, 1385 (11th Cir. 1988) ("any insured" language "unambiguously expresses a contractual intent to create joint obligations and to prohibit recovery by an innocent coinsured"); *Spezialetti v. Pacific Employers Ins. Co.*, 759 F.2d 1139, 1141-42 (3d Cir. 1985) (exclusion barring coverage for loss resulting from dishonest acts of "any insured" precluded coverage for innocent co-insured).  Nothing in the text of the Prior Knowledge Exclusions can be read to suggest that the exclusions preclude coverage only for those Insureds with the requisite knowledge.  In the absence of any language that specifically

21

preserves coverage for so-called "innocent insureds," the exclusion applies to all Insureds.  *See, e.g., Towers Financial*, 1997 WL 906427, at *9-10; *Shapiro v. Am. Home Assurance Co.*, 584 F. Supp. 1245, 1252 (D. Mass. 1984).

The Primary Policy contains two severability provisions, but neither is applicable to the Arch or AWAC Prior Knowledge Exclusions.  Indeed, in its recent opinion concerning coverage for the D&Os under the third-level excess policy issued to Refco by Axis Reinsurance Company, this Court properly rejected the D&Os' arguments that the two severability provisions contained in the Primary Policy could render a prior knowledge exclusion in the Axis Policy severable, *i.e.*, effective to bar coverage only as to those Insureds with requisite prior knowledge.[9]  The Primary Policy form contains a section entitled "Exclusions."  *See* Primary Policy, at 4-5.  The section includes nine exclusions (A through J).  Below the last exclusion, the Primary Policy states that

> For purposes of determining the application of the ***above*** EXCLUSIONS, no Wrongful Act of any Insured Person will be imputed to any other Insured Person who did not have actual knowledge of, or directly participate in the commission of, such Wrongful Act and, except for Wrongful Acts of the Company's chairman of the board, chief executive officer, president, chief financial officer or general counsel, no Wrongful Act of any Insured Person will be imputed to the Company.

*Id*. at 5.  As this Court held, the provision explicitly states that it applies only to the "above" nine exclusions in the policy form of the Primary Policy.  *See Axis Reinsurance Co.*, 2008 WL 2485388, at *14.  The Arch Prior Knowledge Exclusion is an exclusion in the Arch Policy, and the AWAC Prior Knowledge Exclusion is an exclusion in the AWAC Policy.  Neither exclusion is one of the "above" exclusions in the Primary Policy form.

---

[9]      Unlike the issues the D&Os have raised concerning the prior knowledge exclusion in the Axis Policy, there is no dispute that the Arch and AWAC Prior Knowledge Exclusions were intended to be included in the Arch and AWAC Policies.  *See* Arch Binder and AWAC Binder, Exs. J, K to Eickemeyer Decl.

The Primary Policy also contains an endorsement titled "Representations and Severability." *See* Primary Policy, End. No. 10. The endorsement reads as follows:

> Representations and Severability
>
> The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any Insured will be imputed to any other Insured. If any of the particulars or statements in the Application is untrue, this Policy will be void with respect to any Insured who knew of such untruth.

*Id*. The provision concerns specific representations — *i.e.*, those made in the Application for insurance — and a specific remedy — *i.e.,* the insurer's ability to rescind the policy as void *ab initio* based on misrepresentations in the Application. As this Court held in *Axis Reinsurance*, the severability provision must be read in its entirety. *Id*. at *10. So read, it is clear that the provision says nothing about the insurer's ability simply to enforce the contract by denying coverage based on a contractual provision that concerns any Insured's knowledge of facts or circumstances that might give rise to a claim. *See id*. ("The severability provision thus has no bearing on whether Axis may rely on the Warranty Letter to deny coverage to the Insureds."). Similarly, another federal district court recently recognized the distinction between rescission and denial of coverage based on a prior knowledge exclusion. *See Westport Ins. Corp. v. Hanft & Knight, P.C.*, 523 F. Supp. 2d 444, 457-58 (M.D. Pa. 2007) ("the prior knowledge exclusion operates to bar coverage independent of any policy application. Westport is not seeking to rescind or void the policy based on misrepresentations or non-disclosures in the application. . . . Rather, pursuant to the plain language of the subject exclusion, Westport seeks to exclude coverage for claims arising out of acts occurring prior to the effective date of the policy which

NEWYORK/#197902.1

any insured could have reasonably foreseen might be the basis of a claim, regardless of whether those acts were disclosed on an application.").

Not only do the two severability provisions discussed above not apply to the Arch and AWAC Prior Knowledge Exclusions, their existence buttresses the fact that those exclusions are not severable. The parties clearly knew how to contract for severability when they desired it. The existence of these provisions makes the absence of any severability provision for the Arch and AWAC Prior Knowledge Exclusions even more notable. *See, e.g., Towers Financial*, 1997 WL 906427, at *10.

There is no basis to distinguish the analysis in the Court's June 19 *Axis Reinsurance* opinion from the present issues. As the Court already has held, the severability provisions in the Primary Policy are unambiguous. Indeed, having themselves moved for summary judgment on the basis that the severability provisions are unambiguous, the D&Os cannot be heard to avoid summary judgment now by arguing that the provisions somehow are ambiguous and that discovery is required.

## CONCLUSION

For the foregoing reasons, Arch respectfully requests that the Court grant its motion for summary judgment and enter a declaration that the Arch Policy affords no coverage for the Underlying Matters because (1) the Arch Prior Knowledge Exclusion bars coverage for the

24

Underlying Matters and (2) the AWAC Prior Knowledge Exclusion bars coverage for the

Underlying Matters.

Date:  July 11, 2008

Respectfully submitted,

By:    s/  John H. Eickemeyer
     John H. Eickemeyer  (JE-8302)
     jeickemeyer@vedderprice.com
     Daniel C. Green  (DG-0059)
     dgreen@vedderprice.com
     VEDDER PRICE P.C.
     1633 Broadway, 47th Floor
     New York, NY 10019
     (212) 407-7700

     Daniel J. Standish (*pro hac vice*)
     dstandish@wileyrein.com
     Marc E. Rindner (*pro hac vice*)
     mrindner@wileyrein.com
     Cara Tseng Duffield (*pro hac vice*)
     cduffield@wileyrein.com
     WILEY REIN LLP
     1776 K Street, N.W.
     Washington, D.C. 20006
     (202) 719-7000

     *Counsel for Plaintiff Arch Insurance Company*

25