John H. Eickemeyer (JE-8302)
Daniel C. Green (DG-0059)
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019

Daniel J. Standish (*pro hac vice*)
Marc E. Rindner (*pro hac vice*)
Cara Tseng Duffield (*pro hac vice*)
WILEY REIN LLP
1776 K Street NW
Washington, D.C. 20006

*Attorneys for Plaintiff Arch Insurance Company*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **ARCH INSURANCE COMPANY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 08-CIV-5252 (GEL)** |
| | ) | **ECF Case** |
| **JOHN D. AGOGLIA, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**DECLARATION OF JOHN H. EICKEMEYER IN SUPPORT OF PLAINTIFF**
**ARCH INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

I, John H. Eickemeyer, do hereby declare as follows:

1.     I am counsel for Plaintiff Arch Insurance Company.

2.     Exhibits 1 through 31 are as follows:

| IJX 1 | *In re Refco, Inc. Securities Litigation,* No. 05 Civ 8626 (GEL) (S.D.N.Y.) - Second Amended Consolidated Class Action Complaint (dated December 3, 2007) |
|---|---|
| IJX 2 | *American Financial International Group, et al. v. Bennett, et al.,* No. 05 Civ. 8988 (GEL) (S.D.N.Y.) - Third Amended Class Action Complaint (dated January 8, 2008) |

| IJX 3 | *BAWAG v. Refco, et al.,* No. 05-60006, Adv. Pro. 05-03161 (Bankr. S.D.N.Y.) - Complaint (dated 11/16/2005) |
|---|---|
| IJX 4 | *Capital Management Select Fund Ltd. v. Bennett, et al.*, No. 07 Civ. 8688 (GEL) (S.D.N.Y.) - Complaint (dated October 9, 2007) |
| IJX 5 | *Fine v. Bennett*, et al., No. 05 Civ. 8701 (GEL) (S.D.N.Y.) - Complaint (dated October 13, 2005) |
| IJX 6 | *In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, No. 06 Civ. 643 (GEL) (S.D.N.Y.) - Second Amended Consolidated Class Action Complaint (dated December 21, 2007) |
| IJX 7 | *Kirschner v. Agoglia, et al.*, No. 05-60006, Adv. Pro. No. 07-3060 (Bankr. S.D.N.Y.) - Complaint (dated October 15, 2007) |
| IJX 8 | *Kirschner v. Bennett, et al.*, No. 07 Civ. 8165 (GEL) (S.D.N.Y.) - Complaint (dated August 27, 2007) |
| IJX 9 | *Kirschner v. Grant Thornton LLP, et al.*, No. 07 Civ. 11604 (GEL) (S.D.N.Y.) - Complaint (dated August 21, 2007) |
| IJX 10 | *Kirschner v. Hackl, et al.*, No. 07 Civ. 9238 (GEL) (S.D.N.Y.) - Complaint (dated October 15, 2007) |
| IJX 11 | *Kirschner v. Thomas H. Lee Partners, LP. et al.*, No. 07 Civ. 7074 (GEL) (S.D.N.Y.) - Complaint (dated November 20, 2007) |
| IJX 12 | *Krys, et al. v. Sugrue, et al.*, No. 08-3065 (GEL) (S.D.N.Y.) & No. 08-3086 (GEL) (S.D.N.Y.) - Complaint (dated March 5, 2008) |
| IJX 13 | *Mehta v. Bennett*, No. 05 Civ. 8748 (GEL) (S.D.N.Y.) - Complaint (dated October 14, 2005) |
| IJX 14 | *Thomas H. Lee Equity Fund V, L.P. v. Bennett, et al.*, No. 05-9608 (GEL) (S.D.N.Y.) - Complaint (dated November 14, 2005) |
| IJX 15 | *Unovalores Ltd. v. Bennett*, No. L1564-05 (Sup. Ct. N.J.) - Complaint (dated November 1, 2005) |
| IJX 16 | *V.R. Global Partners, L.P. v. Bennett, et al.*, No. 07 Cir. 8686 (GEL) (S.D.N.Y.) - Complaint (dated October 9, 2007) |
| IJX 17 | Criminal Information in *United States of America v. Maggio* No. 07 Cr. 1196 (SHS) (S.D.N.Y.) |

NEWYORK/#197885.1

| IJX 18 | S3 Indictment in *United States of America v. Bennett, Trosten and Grant*, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) |
| --- | --- |
| IJX 19 | S4 Indictment in *United States of America v. Grant*, 05 Cr. 1192 (NRB) (S.D.N.Y.) |
| IJX 20 | Plea Allocution Transcript in *United States of America v. Maggio*, No. 05 Cr. 1196 (NRB) (S.D.N.Y.) - Dated December 19, 2007 (caption reads No. 07 SD 312 (RLE)) |
| IJX 21 | Plea Allocution Transcript in *United States of America v. Bennett*, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) - dated February 15, 2008 |
| IJX 22 | Plea Allocution Transcript in *United States of America v. Trosten*, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) - dated February 20, 2008 |
| IJX 23 | Transcript of Sentencing of Phillip Bennett in *United States of America v. Bennett*, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) - dated July 3, 2008 |
| IJX 24 | Transcript of Proceeding dated April 17, 2008 in *United States of America v. Grant*, No. 05 Cr. 1192 (NRB) (S.D.N.Y.), pages 3095 – 3097 |
| IJX 25 | [Intentionally omitted at the present time] |
| IJX 26 | U.S. Specialty Insurance Company - Policy No. 24-MGU-05-A10821 (Primary Policy) |
| IJX 27 | Lexington Insurance Company - Policy No. 1620924 (First Excess Policy) |
| IJX 28 | Axis Reinsurance Company - Policy No. RNN 506300 (Second Excess Policy) |
| IJX 29 | Allied World Assurance Company (U.S.), Inc. - Policy No. AW0418197 (Third Excess Policy) |
| IJX 30 | Arch Insurance Company - Policy No. DOX0009322-00 (Fourth Excess Policy) |
| IJX 31 | XL Specialty Insurance Company - Policy No. ELU089673-05 (Fifth Excess Policy) |

True and correct copies of these exhibits have been filed this day in the action *XL Specialty Insurance Company v. Agoglia, et al.*, No. 08-civ-3821 (GEL) (S.D.N.Y.) and are incorporated into this declaration by reference.

3

3.    Exhibits A through K are as follows:

| A | Press Release, "Refco Announces Undisclosed Affiliate Transaction" (Oct. 10, 2005) |
|---|---|
| B | Press Release, "Refco Supplements Prior Disclosure" (Oct. 11, 2005) |
| C | *Arch Insurance Company v. Bennett*, No. 06/600805 (N.Y. Sup. Ct.) – First Amended Complaint (Jun. 22, 2006) |
| D | *Arch Insurance Company v. Bennett*, No. 06/600805 (N.Y. Sup. Ct.) – Reply Brief in Support of Bennett Motion to Stay Action (Oct. 31, 2006) |
| E | *Arch Insurance Company v. Bennett*, No. 06/600805 (N.Y. Sup. Ct.) – Reply Memorandum in Support of Officer Defendants' Motion to Dismiss or Stay Amended Complaint (Oct. 31, 2006) |
| F | *Arch Insurance Company v. Bennett*, No. 06/600805 (N.Y. Sup. Ct.) – Order (Feb. 22, 2007) |
| G | *United States of America v. Bennett*, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) – Sentencing Memorandum of Phillip R. Bennett (May 30, 2008) |
| H | Stipulation of Judgment against Defendant Phillip R. Bennett (Apr. 17, 2008) |
| I | Judgment Against Phillip R. Bennett (Apr. 24, 2008) |
| J | Arch Insurance Group Binder of Insurance (Aug. 11, 2005) |
| K | Allied World Assurance Company Binder Confirmation (Aug. 10, 2005) |

A true and correct copy of each document is attached hereto.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 11, 2008.


s/  John H. Eickemeyer_____
John H. Eickemeyer (JE-8302)

NEWYORK/#197885.1

# EXHIBIT A

EX-99.1 2 a05-17426_1ex99d1.htm EX-99.1

Exhibit 99.1

## Refco Announces Undisclosed Affiliate Transaction

NEW YORK, October 10, 2005 - Refco Inc. (NYSE: RFX) today announced that it had discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities. Independent counsel and forensic auditors have been retained to assist the Audit Committee in an investigation of these matters.

This receivable from the entity controlled by Mr. Bennett was reflected on the Company's prior period financials, as well as on the Company's May 31, 2005 balance sheet. The receivable was not shown as a related party transaction in any such financials. For that reason, and after consultation by the Audit Committee with the Company's independent accountants, the Company determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon.

At the request of the Board of Directors Mr. Bennett has taken a leave of absence. William M. Sexton, who recently announced his impending resignation as Executive Vice President and Chief Operating Officer of Refco Inc. and Refco Group Ltd., LLC, will remain with the Company and has been appointed as Chief Executive Officer of Refco Inc. Mr. Sexton said, "I am staying at Refco because I believe in our employees, customers and franchise. I am excited about the opportunities ahead and am eager to work with our management team to help the Company achieve even greater success." Joseph J. Murphy, Chief Executive Officer of Refco Global Futures and President of Refco LLC, has been appointed President of Refco Inc.

and Refco Capital Markets, Ltd. Mr. Murphy said, "We continue to see strong momentum across our businesses with record derivative contract and foreign exchange volume in the quarter." Mr. Sexton and Mr. Murphy have been leaders of the senior management team at Refco for the past six years, and have been instrumental in the Company's growth and success. Also at the request of the Board, Santo C. Maggio, President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd., has taken a leave of absence. Peter McCarthy has been appointed President of Refco Securities, LLC.

In light of the Audit Committee's investigation, the Company, Refco Group Ltd., LLC and Refco Finance Inc. each will likely delay the filing of its Quarterly Report on Form 10-Q for the quarterly period ending August 31, 2005, due on October 17, 2005. The Company cannot estimate at this time when the Fiscal 2006 second quarter Form 10-Q filings will be made or when the Audit Committee investigation will be concluded.

Business Highlights

For the quarter ended August 31, 2005, derivatives brokerage and clearing contract volumes increased by 61 million contracts, or 40.3%, to 212 million contracts for the second quarter compared to the same quarter a year ago, and by 5 million contracts, or 2.5%, compared to the quarter ended May 31, 2005.

Foreign exchange dollar volumes increased by $172 billion, or 56.4%, to $477.4 billion for the second quarter compared to the same quarter a year ago, and by $67.6 billion, or 16.5%, compared to the quarter ended May 31, 2005.

The average net customer securities financing portfolio, or average domestic net repo book, increased by 27.4% for the quarter ended August 31, 2005 to $47.0 billion from $36.9 billion for the quarter ended August 31, 2004.

As of August 31, 2005, cash and cash equivalents were $648.6 million (of which approximately $230 million was subsequently used to redeem a portion of the Company's subordinated debt), and regulated subsidiaries reported net capital of $665.8 million and excess

2

regulatory capital of $279.3 million. These figures do not reflect the $433 million received today from Mr. Bennett to settle his outstanding receivable.

### About Refco Inc.

Refco Inc. (NYSE: RFX) is a diversified financial services organization with operations in 14 countries and an extensive global institutional and retail client base. Refco's worldwide subsidiaries are members of principal U.S. and international exchanges, and are among the most active members of futures exchanges in Chicago, New York, London and Singapore. In addition to its futures brokerage activities, Refco is a major broker of cash market products, including foreign exchange, foreign exchange options, government securities, domestic and international equities, emerging market debt, and OTC financial and commodity products. Refco is one of the largest global clearing firms for derivatives. For more information, visit www.refco.com.

### Cautionary Note Regarding Forward-Looking Statements

This press release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of the 1995. In this press release, all statements other than statements of historical fact are forward looking statements that involve risks and uncertainties and actual results could differ. These forward looking statements are based on assumptions that we have made in light of our experience and on our perceptions of historical events, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. Although we believe that these forward looking statements have a reasonable basis, you should be aware that numerous factors, including the outcome of the Audit Committee's investigation; changes in domestic and international market conditions; competition; our ability to attract and retain customers; our relationships with introducing brokers; retention of our management team; our ability to manage our growth or integrate future acquisitions, our exposure to significant credit risks with respect to our customers, international operations and expansion, system failures, the performance of third-party suppliers, changes in regulations or exchange membership requirements, the effectiveness of compliance and risk

3

management methods, potential litigation or investigations, employee or introducing broker misconduct or errors, reputational harm, and changes in capital requirements, could cause actual results to differ materially from our expectations. Because of these factors, we caution that you should not place undue reliance on any of our forward looking statements. Further, any forward looking statement speaks only as of today. It is impossible for us to predict how new events or developments may affect us. The Company disclaims any intention or obligation to update or revise any forward-looking statements, either to reflect new information or developments or for any other reason.

4

# EXHIBIT B

EX-99.2 3 a05-17426_1ex99d2.htm EX-99.2

Exhibit 99.2

### Refco Supplements Prior Disclosure

NEW YORK, October 11, 2005 - Refco Inc. (NYSE: RFX) today supplemented its disclosure yesterday regarding its discovery of a receivable owed to the Company by an entity controlled by Phillip R. Bennett. The receivable in the amount of approximately $430 million was repaid yesterday in full. Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998. These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable from that entity, rather than a receivable from the originating accounts. The fact that the receivable was from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual reporting periods by reason of transfers to a third party customer account that we currently believe is unaffiliated with Mr. Bennett or anyone else at the Company. The nature and facts surrounding these transfers are being investigated by the Audit Committee.

The Company confirms that it has adequate liquidity to run the business in the ordinary course.

The Company also announced that it had voluntarily contacted the United States Securities and Exchange Commission, the Commodity Futures Trading Commission, the New York Stock Exchange, and other regulators and is cooperating fully with them.

### About Refco Inc.

Refco Inc. (NYSE: RFX) is a diversified financial services organization with operations in 14 countries and an extensive global institutional and retail client base. Refco's worldwide subsidiaries are members of principal U.S. and international exchanges, and are

among the most active members of futures exchanges in Chicago, New York, London and Singapore. In addition to its futures brokerage activities, Refco is a major broker of cash market products, including foreign exchange, foreign exchange options, government securities, domestic and international equities, emerging market debt, and OTC financial and commodity products. Refco is one of the largest global clearing firms for derivatives. For more information, visit www.refco.com.

### Cautionary Note Regarding Forward-Looking Statements

This press release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of the 1995.  In this press release, all statements other than statements of historical fact are forward looking statements that involve risks and uncertainties and actual results could differ. These forward looking statements are based on assumptions that we have made in light of our experience and on our perceptions of historical events, current conditions, expected future developments and other factors we believe are appropriate under the circumstances.  Although we believe that these forward looking statements have a reasonable basis, you should be aware that numerous factors, including the outcome of the Audit Committee's investigation; changes in domestic and international market conditions; competition; our ability to attract and retain customers; our relationships with introducing brokers; retention of our management team; our ability to manage our growth or integrate future acquisitions, our exposure to significant credit risks with respect to our customers, international operations and expansion, system failures, the performance of third-party suppliers, changes in regulations or exchange membership requirements, the effectiveness of compliance and risk management methods, potential litigation or investigations, employee or introducing broker misconduct or errors, reputational harm, and changes in capital requirements, could cause actual

results to differ materially from our expectations. Because of these factors, we caution that you should not place undue reliance on any of our forward looking statements. Further, any forward looking statement speaks only as of today. It is impossible for us to predict how new events or developments may affect us. The Company disclaims any intention or obligation to update or revise any forward-looking statements, either to reflect new information or developments or for any other reason.

EXHIBIT C

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

|  |  |  |
|---|---|---|
| ARCH INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Index No.: 06/600805 |
| | ) | |
| v. | ) | |
| | ) | |
| PHILLIP R. BENNETT, LEO R. | ) | **AMENDED SUMMONS** |
| BREITMAN, NATHAN GANTCHER, | ) | |
| TONE GRANT, DAVID V. HARKINS, | ) | |
| SCOTT L. JAECKEL, DENNIS A. | ) | |
| KLEJNA, THOMAS H. LEE, SANTO C. | ) | |
| MAGGIO, JOSEPH MURPHY, RONALD | ) | |
| L. O'KELLEY, PERRY ROTKOWITZ, | ) | |
| SCOTT A. SCHOEN, WILLIAM M. | ) | |
| SEXTON, GERALD SHERER, PHILIP | ) | |
| SILVERMAN and ROBERT C. | ) | |
| TROSTEN | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

NEW YORK
COUNTY CLERK'S OFFICE

JUN 2 2 2006

NOT COMPARED
WITH COPY FILED

**TO THE ABOVE NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your answer, or if the Complaint is not served with this summons, to serve a notice of appearance on plaintiff's attorneys, within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you in the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint. Plaintiff designates New York County as the place of trial.

The basis for venue is that plaintiff Arch Insurance Company's principal place of business is located at One Liberty Plaza, 53rd Floor, New York, NY 10006, and the County of New York is therefore the proper venue for trial pursuant to CPLR §503(a).

Dated:  June 22, 2006

<div style="margin-left:40%">

Respectfully submitted,

VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.

By: _____
     John H. Eickemeyer

805 Third Avenue
New York, New York  10022-2203
(212) 407-7700

Of Counsel:

Daniel J. Standish
Cara Tseng Duffield
Kimberly M. Melvin
WILEY REIN & FIELDING LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Attorneys for Plaintiff*
*Arch Insurance Company*

</div>

To:

Phillip R. Bennett
125 Colt Lane
Gladstone, NJ  07934

Leo R. Breitman
7767 Wind Key Drive
Boca Raton, FL  33434

Nathan Gantcher
86 Birchall Drive
Scarsdale, NY  10583

Tone Grant
680 North Lake Shore Drive, Apt. 1620
Chicago, IL  60611

David V. Harkins
Corn Point Road
Marblehead, MA  01945

Scott L. Jaeckel
151 Tremont Street, Apt. 25E
Boston, MA  02111

Thomas H. Lee
322 E. 57th Street
New York, NY  10022

Santo C. Maggio
1825 8th Street South
Naples, FL  34102

Joseph Murphy
1038 Bloom Street
Hoboken, NJ  07030

Ronald L. O'Kelley
6001 Trophy Drive, Apt. 1002
Naples, FL  34110

Scott A. Schoen
191 Kings Grant Road
Weston, MA  02493

William M. Sexton
816 SE Kensington Road
Ankeny, IA  50021

Gerald Sherer
333 Central Park West, Apt. 81
New York, NY  10025

Dennis Klejna
2301 E Street NW, Apt. A1010
Washington, DC 20037-2829

Perry Rotkowitz,
1980 Cynthia Road
Merrick, NY 11566-5110

Philip Silverman
3 Edie Drive
Marlboro, NJ 07746

Robert Trosten
895 Scioto Drive
Franklin Lakes, NJ 07417

NEW YORK
COUNTY CLERK'S OFFICE

JUN 2 2 2006

NOT COMPARED
WITH COPY FILED

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |  |
|---|---|---|
| ARCH INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Index No.: 06/600805 |
| | ) | |
| v. | ) | |
| | ) | |
| PHILLIP R. BENNETT, LEO R. | ) | **AMENDED COMPLAINT FOR** |
| BREITMAN, NATHAN GANTCHER, | ) | **DECLARATORY JUDGMENT** |
| TONE GRANT, DAVID V. HARKINS, | ) | |
| SCOTT L. JAECKEL, DENNIS A. | ) | |
| KLEJNA, THOMAS H. LEE, SANTO C. | ) | |
| MAGGIO, JOSEPH MURPHY, RONALD | ) | |
| L. O'KELLEY, PERRY ROTKOWITZ, | ) | |
| SCOTT A. SCHOEN, WILLIAM M. | ) | |
| SEXTON, GERALD SHERER, PHILIP | ) | |
| SILVERMAN and ROBERT C. | ) | |
| TROSTEN | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Arch Insurance Company ("Arch") bound coverage for an excess directors,

officers and corporate liability insurance policy issued to Refco, Inc. ("Refco" or the

"Company") for the period from August 11, 2005 to August 11, 2006 (the "Arch Policy").  Since

August 11, 2005, various lawsuits and governmental and/or regulatory investigations (the

"Underlying Matters") involving certain individuals insured under the Arch Policy have been

instituted and those individuals have tendered the Underlying Matters to Arch for coverage under

the Arch Policy.  Arch brings this action against the defendants named herein ("Defendants")

and seeks a declaration that the Arch Policy affords no coverage for the Defendants in

connection with the Underlying Matters.  In support of its Amended Complaint, Arch alleges as

follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to resolve an actual controversy between Arch and the

Defendants pursuant to the New York Declaratory Judgment Act, CPLR § 3001.

2.    Personal jurisdiction over Defendants is proper pursuant to CPLR § 301 and § 302.

Defendants possess sufficient minimum contacts with the state of New York to render the

exercise of jurisdiction by a New York court permissible under traditional notions of fair play

and substantial justice.  Defendants were directors or officers of Refco, Inc., a corporation with

its principal place of business in New York.  As directors and/or officers of Refco, Inc.,

Defendants transacted business in the state of New York.  In addition, Defendants seek coverage

under the Arch Policy for the Underlying Matters.  Accordingly, Defendants have an ongoing

contractual relationship with Arch, a corporation with its principal place of business in New

York.  Finally, most of the lawsuits comprising the Underlying Matters were filed in the federal

courts located in New York.  These lawsuits allege that Defendants committed acts in the state of

New York and/or acts outside the state of New York that could reasonably be expected to have

consequences in the state of New York.

3.    Venue is proper in this County under CPLR § 503 because Arch has its principal

place of business in this County.

## PARTIES

4.    Arch is an insurance company that is organized and exists pursuant to the laws of the

state of Missouri.  Arch has its principal place of business in New York County, New York.

5.    Defendant Phillip R. Bennett ("Bennett") served as the Chairman, President and

Chief Executive Officer of Refco until October 2005, when he took a leave of absence at the

request of the Refco board of directors.  Upon information and belief, Bennett is a citizen of New

Jersey.

2

6.    Defendant Leo R. Breitman ("Breitman") served as a Director of Refco at times relevant to this action.  Upon information and belief, Breitman is a citizen of Florida.

7.    Defendant Nathan Gantcher ("Gantcher") served as a Director of Refco at times relevant to this action.  Upon information and belief, Gantcher is a citizen of New York.

8.    Defendant Tone Grant ("Grant") served as President of Refco Group Ltd., LLC at times relevant to this action.  Upon information and belief, Grant is a citizen of Illinois.

9.    Defendant David V. Harkins ("Harkins") served as a Director of Refco at times relevant to this action.  Upon information and belief, Harkins is a citizen of Massachusetts.

10. Defendant Scott L. Jaeckel ("Jaeckel") served as a Director of Refco at times relevant to this action.  Upon information and belief, Jaeckel is a citizen of Massachusetts.

11. Defendant Dennis A. Klejna ("Klejna") served as Executive Vice President and General Counsel of Refco Group Ltd., LLC at times relevant to this action.  Upon information and belief, Klejna is a citizen of Washington, D.C.

12. Defendant Thomas H. Lee ("Lee") served as a Director of Refco at times relevant to this action.  Upon information and belief, Lee is a citizen of New York.

13. Defendant Santo C. Maggio ("Maggio") served as President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd. at times relevant to this action. Upon information and belief, Maggio is a citizen of Florida.

14. Defendant Joseph Murphy ("Murphy") served as President of Refco from October 2005 to November 28, 2005, when he resigned.  Murphy also served as Chief Executive Officer of Refco Global Futures and President of Refco, LLC at times relevant to this action.  Upon information and belief, Murphy is a citizen of New Jersey.

15. Defendant Ronald L. O'Kelley ("O'Kelley") served as a Director of Refco at times relevant to this action.  Upon information and belief, O'Kelley is a citizen of Florida.

16. Defendant Perry Rotkowitz ("Rotkowitz") served as Secretary of Refco Capital LLC at times relevant to this action.  Upon information and belief, Rotkowitz is a citizen of New York.

17. Defendant Scott A. Schoen ("Schoen") served as a Director of Refco at times relevant to this action.  Upon information and belief, Schoen is a citizen of Massachusetts.

18. Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer of Refco at times relevant to this action.  Upon information and belief, Sexton is a citizen of Iowa.

19. Defendant Gerald Sherer ("Sherer") served as Executive Vice President and Chief Financial Officer of Refco at times relevant to this action.  Upon information and belief, Sherer is a citizen of New York.

20. Defendant Philip Silverman ("Silverman") served as Secretary of Refco at times relevant to this action.  Upon information and belief, Silverman is a citizen of New Jersey.

21. Robert C. Trosten ("Trosten") served as Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC  at times relevant to this action.  Upon information and belief, Trosten is a citizen of New Jersey.

## FACTUAL ALLEGATIONS

### The Arch Policy

22. The Arch Policy is an excess directors, officers and corporate liability policy.  It has a policy period of August 11, 2005 to August 11, 2006 and a limit of liability of $10 million excess of $40 million in underlying insurance.  A copy of the Arch Policy is attached as Exhibit A.

23. Various other insurers issued underlying insurance policies to Refco. U.S. Specialty Insurance Company issued a primary policy with limits of $10 million excess of applicable retentions (the "Primary Policy"). A copy of the Primary Policy is attached as Exhibit B. Lexington Insurance Company issued a first excess policy with limits of $7.5 million excess of $10 million (the "Lexington Policy"). A copy of the Lexington Policy is attached as Exhibit C. Axis Reinsurance Company issued a second excess policy with limits of $10 million excess of $17.5 million (the "Axis Policy"). A copy of the Axis Policy is attached as Exhibit D. Allied World Assurance Company issued a third excess policy with limits of $12.5 million excess of $27.5 million (the "AWAC Policy"). A copy of the AWAC Policy is attached as Exhibit E. Each of the underlying policies has a policy period of August 11, 2005 to August 11, 2006.

24. In general, the Arch Policy applies in conformance with the terms and conditions of the Primary Policy and in conformance with the terms and conditions in the Arch Policy or any other underlying insurance "further limiting or restricting coverage." Arch Policy, Section I.C. The Arch Policy provides that "[i]n no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the Underlying Insurance." *Id*.

25. Subject to all of its terms and conditions, the Arch Policy affords five types of specified coverage. First, the Arch Policy affords specified coverage to Insured Persons for "**Loss** arising from **Claims** first made during the **Policy Period** . . . for **Wrongful Acts**, except when and to the extent that the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement." Primary Policy, Insuring Agreement (A). [1]

---

[1] Policy language appearing herein in bold typeface is defined in the policy being quoted, and appears in bold typeface in that policy.

26. Second, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the Company for "**Loss** arising from . . . **Claims** first made during the **Policy Period** . . . against the **Insured Persons** for **Wrongful Acts**, if the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement." Primary Policy, Insuring Agreement (B)(1).

27. Third, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the Company for "**Loss** arising from **Securities Claims** first made during the **Policy Period** . . . against the **Company** for **Wrongful Acts**." Primary Policy, Insuring Agreement (B)(2).

28. Fourth, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the "**Controlling Shareholder**," defined as Bennett, for "**Loss** arising from a **Securities Claim** first made during the **Policy Period** . . . against such **Controlling Shareholder** for **Wrongful Acts**, provided, that one or more **Insured Persons** and/or the **Company** are and remain co-defendants in such **Securities Claim** along with such **Controlling Shareholder**." Primary Policy, Endorsement No. 15.

29. Fifth, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the Company for "all **Derivative Demand Investigation Costs** incurred by the **Company** as a result of a **Derivative Demand** first received by the **Company's** Board of Directors and reported in writing to the Insurer during the **Policy Period** . . . up to the amount of the **Derivative Demand Investigation Costs Sub-Limit**" of $250,000. Primary Policy, Endorsement No. 11.

30. The Lexington Policy contains the following provision: "The word 'Loss' shall be understood to mean the sums paid or payable in settlement of claims for which the Insured is

liable after making deductions for all other recoveries, salvages or other insurance (other than recoveries under underlying insurance, whether recoverable or not) and shall exclude all expenses and costs." Lexington Policy, Section XII. The Lexington Policy further provides that the word "Costs" shall mean "interest on judgments, investigations, adjustments and legal expenses." *Id.*

31. The AWAC Policy contains the following provision: "It is hereby understood and agreed that the **Insurer** shall not be liable for **Loss** in connection with any claim or claims made against the **Insureds** alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which any Insured had knowledge as of inception and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage hereunder; or (ii) which indicate the probability of any such claim." AWAC Policy, Endorsement No. 3 ("AWAC Prior Knowledge Exclusion").

32. The Arch Policy contains the following provision: "If any **Insured** as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a **Claim** under this Policy, the **Excess Insurer** shall not be liable to make any payment under this Policy as a result of a **Claim** arising out of, based upon or attributable to any such act, error, omission, fact, matter or circumstance." Arch Policy, Endorsement No. 4 (the "Arch Prior Knowledge or Information Exclusion").

33. The Arch Policy and underlying insurance policies contain other terms, conditions and limitations that may ultimately be implicated in this action.

**The Events at Refco**

34. The Arch Policy incepted on August 11, 2005. On the same day, Refco conducted its initial public offering.

35. On October 10, 2005, Refco issued a press release.  The press release announced that the Company had been carrying an undisclosed receivable of $430 million from an entity controlled by Bennett.  Refco stated that "[b]ased on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible."  Moreover, the company stated that although the receivable "was reflected on the Company's prior period financials, as well as on the Company's May 31, 2005 balance sheet," the receivable "was not shown as a related party transaction in any such financials.  For that reason, and after consultation by the Audit Committee with the Company's independent accountants, the Company determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

36. On October 11, 2005, Refco issued a second press release.  The press release announced that Bennett had repaid the $430 million receivable in full.  The press release also provided further information on the nature of the receivable:  "Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998.  These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable from that entity, rather than a receivable from the originating accounts.  The fact that the receivable was from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual

reporting periods by reason of transfers to a third party customer account that we currently

believe is unaffiliated with Mr. Bennett or anyone else at the Company."

37. On October 17, 2005, Refco and certain of its unregulated subsidiaries filed for

Chapter 11 bankruptcy protection.

38. On November 10, 2005, Bennett was indicted on charges of securities fraud,

conspiracy to commit securities fraud, false filings to the SEC, and wire fraud.  A copy of the

indictment (the "Bennett Indictment") is attached as Exhibit F.

39. According to the Bennett Indictment, Bennett "sought to hide from, among others,

Refco's auditors and investors, losses sustained by Refco through its own and its customers'

trading in the financial markets.  To that end, Bennett transferred losses from Refco to a

company controlled by Bennett, directed a repeated series of transactions designed to conceal

those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make

false and fraudulent public filings with the [SEC]."  Bennett Indictment ¶ 4.

40. The Bennett Indictment alleges that, as part of its brokerage business, Refco extended

credit to customers for their securities and commodities trading.  When certain customers were

unable to repay that credit, rather than noting the losses on Refco's balance sheet, Bennett

directed the transfer of those losses to an entity called Refco Group Holdings, Inc. ("RGHI"),

which he controlled.  As a result, Refco's balance sheet showed a receivable from RGHI.

41. According to the Bennett Indictment, beginning in or around 1999, Bennett took steps

to hide the RGHI receivable from Refco's auditors.  Specifically, Bennett arranged transactions

with third parties to temporarily pay down the RGHI receivable at quarter- or year-end and mask

the related-party nature of the RGHI debt.

42. According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2004 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2004 Transactions"). On or about February 20, 2004, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $720 million to a Refco customer. On the same day, the customer loaned $720 million to RGHI. RGHI then used the $720 million to pay down its debt to Refco. These loans were unwound on or about March 4, 2004, after Refco's fiscal year-end.

43. According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $720 million if RGHI defaulted.

44. According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2005 Transactions"). On or about February 23, 2005, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $345 million to a Refco customer. On the same day, the customer loaned $345 million to RGHI. RGHI then used the $345 million to pay down its debt to Refco. These loans were unwound on or about March 8, 2005, after Refco's fiscal year-end.

45. According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $345 million if RGHI defaulted.

46. According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal first quarter end for 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "May 2005 Transactions"). On or about May 25,

2005, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $450 million

to a Refco customer.  On the same day, the customer loaned $450 million to RGHI.  RGHI then

used the $450 million to pay down its debt to Refco.  These loans were unwound on or about

June 6, 2005, after Refco's fiscal first quarter-end.

47. According to the Bennett Indictment, Bennett executed the loan agreement between

the Refco customer and RGHI.  In addition, Bennett allegedly signed a letter of guaranty stating

that Refco Group, Ltd. would repay the customer $450 million if RGHI defaulted.

48. Based on his knowledge of the RGHI receivables to Refco, the February 2004

Transactions, the February 2005 Transactions and the May 2005 Transactions, as of August 11,

2005, Bennett had knowledge of or information concerning any acts, errors, omissions, facts,

matters or circumstances that might give rise to a Claim under the AWAC Policy or the Arch

Policy.

**The Underlying Matters**

49. Beginning on October 12, 2005, various lawsuits were filed against the Defendants.

50. The suit *United States v. Bennett*, No. 05-1720 (S.D.N.Y.), is a criminal action

against Bennett (the "Bennett Criminal Action").  Bennett was subsequently indicted on or about

November 10, 2005 by the Grand Jury for the Southern District of New York.

51. The complaint in the Bennett Criminal Action alleges that Bennett knowingly "hid

from investors in [Refco's] August 2005 initial public offering of stock . . . the existence of

hundreds of millions of dollars of related party transactions between Refco and a company

controlled by Bennett, including causing Refco to file a false and fraudulent S-1 registration

statement with the Securities and Exchange Commission."  Bennett Criminal Action Complaint,

¶ 9.  As set forth more fully above, the Bennett Indictment expanded the allegations of criminal

conduct against Bennett.

52. The Bennett Criminal Action was tendered to Arch for coverage under the Arch Policy on or about October 13, 2005. The Bennett Indictment was tendered to Arch for coverage on or about February 22, 2006.

53. The suits *Mazur et al. v. Refco, Inc. et al.*, No. 05-8626 (S.D.N.Y.), *Frontpoint Fin. Serv., Inc. v. Refco, Inc. et al.*, No. 05-8663 (S.D.N.Y.), *Lieber v. Refco, Inc. et al.*, No. 05-8667 (S.D.N.Y.), *Weiss v. Refco, Inc. et al.*, No. 05-8691 (S.D.N.Y.), *Glaubach v. Refco, Inc. et al.*, No. 05-8692 (S.D.N.Y.), *Gross v. Refco, Inc. et al.*, No. 05-8697 (S.D.N.Y.), *Salamone v. Refco, Inc. et al.*, No. 05-8716 (S.D.N.Y.), *RD Partners LLC v. Refco, Inc. et al.*, No. 05-8737 (S.D.N.Y.), *Wakefield v. Refco, Inc. et al.*, No. 05-8742 (S.D.N.Y.), *Gaugler v. Bennett et al.*, No. 05-8886 (S.D.N.Y.), *Baker v. Bennett et al.*, No. 05-8923 (S.D.N.Y.), *Nathanson v. Bennett et al.*, No. 05-8926 (S.D.N.Y.), *Becker v. Refco, Inc. et al.*, No. 05-8929 (S.D.N.Y.), *Mettupatti v. Bennett et al.*, No. 05-9048 (S.D.N.Y.), *Weiss v. Bennett et al.*, No. 05-9126 (S.D.N.Y.), *Weit v. Bennett et al.*, No. 05-9611 (S.D.N.Y.), *Esses v. Bennett et al.*, No. 05-9654 (S.D.N.Y.), *City of Pontiac General Employees Retirement System v. Bennett et al.*, No. 05-9941 (S.D.N.Y.), *Gensheimer v. Bennett*, No. 05-10318 (S.D.N.Y) and *Teachers' Retirement System of the State of Illinois et al. v. Lee, et al.*, No. 05-10403 (S.D.N.Y.) are purported class action securities fraud lawsuits (the "Securities Litigation"). The suits comprising the Securities Litigation have been consolidated for pre-trial purposes under Case No. 05-8626. The First Amended Consolidated Class Action Complaint ("FAC") was filed in the consolidated proceedings on May 5, 2006.

54. The FAC alleges that Refco's initial public offering registration statement and prospectus were materially false and misleading. Specifically, the FAC alleges that the registration statement and prospectus failed to disclose the existence of large receivables owed to Refco by an entity controlled by Bennett. The FAC further alleges that the Refco financial

statements incorporated in Refco's registration statement and prospectus were inaccurate because they failed to disclose the related-party transactions between Refco and the entity controlled by Bennett. All of the Defendants other than Rotkowitz are named as defendants in the FAC.

55. Beginning on or about October 14, 2005, some of the lawsuits comprising the Securities Litigation were tendered to Arch for coverage under the Arch Policy. The FAC was tendered to Arch by letter dated April 28, 2006.

56. The suits *David Fine v. Bennett, et al.*, No. 05-8701 (S.D.N.Y), and *Mehta v. Bennett et al.*, No. 05-8748 (S.D.N.Y.), are shareholder derivative complaints (the "Derivative Litigation"). Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen, Sexton and Murphy, among others, are named as defendants in the Derivative Litigation.

57. The complaints in the Derivative Litigation allege that Refco's initial public offering registration statement and prospectus were materially false and misleading. Specifically, the complaints allege that the registration statement and prospectus failed to disclose the existence of large receivables owed to Refco by an entity controlled by Bennett. The complaints further allege that the Refco financial statements incorporated in its registration statement and prospectus were inaccurate because they failed to disclose the related-party transactions between Refco and the entity controlled by Bennett.

58. The *Mehta* complaint was tendered to Arch for coverage under the Arch Policy on or about October 17, 2005.

59. The suit *Bawag P.S.K. Bank v. Refco Inc. et al.*, No. 05-60006 (S.D.N.Y. Bkr.), Adv. No. 05-03161, was filed on November 16, 2005 (the "Bawag Action"). The Bawag Action names Bennett (among others) as a defendant.

60. The complaint in the Bawag Action alleges that the plaintiff was fraudulently induced to loan approximately $420 million to Bennett on October 10, 2005. The complaint alleges that Bennett failed to disclose that he sought the loan to pay off RGHI's receivable to Refco, a "related-party receivable resulting from the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to Refco [that] likely was impaired and not collectible." Bawag Action Complaint, § 17. The complaint alleges that Bennett "knew that if BAWAG had been aware of any of the key facts set forth in [Refco's] October 10, 2005 Press Release, BAWAG would not have made the Loan." *Id.*, § 30.

61. The Bawag Action was tendered to Arch for coverage under the Arch Policy on or about November 30, 2005.

62. The suit *Thomas H. Lee Equity Fund V, L.P. et al. v. Bennett et al.*, No. 05-9608 (S.D.N.Y.), was filed on November 14, 2005 (the "THL Funds Action"). The THL Funds Action names Bennett, Grant and Maggio, among others, as defendants.

63. The complaint in the THL Funds Action alleges that in June 2004, the plaintiffs invested approximately $507 million in Refco. The complaint alleges that despite the plaintiffs' due diligence efforts, they were unaware that "Bennett intentionally and deliberately engaged in accounting fraud in order to mask a group of largely worthless receivables, bad debts and questionable obligations that, if accurately portrayed on the Company's financial statements, would have materially reduced Refco's value." THL Funds Action Complaint, § 4. Specifically, the complaint alleges that Bennett "nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of million dollars [sic] of customer losses and obligations that would never be repaid to the Company." *Id.*, § 30. The complaint alleges

that the Refco financial statements provided to the plaintiffs during their due diligence review in

2003 and 2004 were materially false and misleading.

64. The THL Funds Action was tendered to Arch for coverage under the Arch Policy on

or about February 13, 2006.

65. The complaint in *Unovalores Ltd. v. Bennett,* No. L1564-05 (Sup. Ct. of New Jersey,

Somerset County, Law Division) (the "Unovalores Action") was filed in New Jersey state court

on or about November 1, 2005.

66. The plaintiff in the Unovalores Action, which identifies itself as a Refco Capital

account holder, names only Mr. Bennett as a defendant.  Plaintiff alleges that it entered into a

Repurchase Transaction with Refco on August 31, 2005, in reliance upon representations in

Refco's registration statement and other filings concerning Refco's financial health.  Those

representations were false, according to the complaint, because they concealed massive

receivables owed by an entity controlled by Mr. Bennett and at least one-half billion dollars of

related party transactions with Mr. Bennett.

67. The Unovalores Action was tendered to Arch for coverage under the Arch Policy on

or about February 13, 2006.

68. The complaint in *American Financial International Group v. Refco, Inc. et al.,* No.

05-8988 (S.D.N.Y.) (the "American Financial Action"), was filed in the Southern District of

New York on or about October 21, 2005, and an amended complaint was filed on April 13, 2006.

69. The plaintiff in the American Financial Action identifies itself as a Delaware LLC

that traded currencies through an account at Refco F/X Associates, LLC ("RefcoFX").  The suit

is a purported class action brought on behalf of all persons who traded currencies through, or had

currency trading accounts with, RefcoFX from August 11, 2005 through the date the amended

complaint was filed and who have been damaged.  Included among the defendants named in the amended complaint are Bennett, Sherer, Sexton, Maggio, Murphy and Klejna.  The amended complaint generally alleges the same conduct that is the subject of the Bennett Criminal Complaint and the Securities Litigation.

70. The complaint in the American Financial Action was tendered to Arch for coverage under the Arch Policy on or about October 25, 2005, and the amended complaint was tendered to Arch in May 2006.

71. The complaint in *Global Management Worldwide Limited v. Philip R. Bennett, et al.*, No. 06-0643 (S.D.N.Y.) (the "Global Management Action"), was filed in the Southern District of New York on or about January 26, 2006.

72. The plaintiff in the Global Management Action identifies itself as a corporation organized under the laws of Nassau, the Bahamas, that was a brokerage customer of Refco Capital Markets, Ltd. ("RCM").  The suit is a purported class action brought on behalf of all brokerage customers of RCM who, at any time from October 17, 2000 to October 17, 2005, entrusted securities to RCM and/or Refco Securities, LLC, directly or indirectly, as custodian and broker for safe-keeping, and continued to hold positions with RCM on October 17, 2005 or thereafter.  The complaint names as defendants all the Defendants herein other than Grant, Silverman and Trosten.  The complaint generally alleges that, during the purported class period, Refco, either directly or through its affiliates, incurred billions of dollars in losses, and tried to hide those losses by surreptitiously selling securities held by RCM in custody for class members.  Plaintiffs allege that the financial statements filed by the Refco Group with the SEC during the purported class period were false and misleading because they fraudulently omitted these losses, as well as the scheme to cover the losses by selling securities stolen from plaintiffs.  Plaintiffs

further allege that they relied upon these false and misleading financial statements and the purported financial integrity of the Refco Group in entrusting securities to RCM.

73. The Global Management Action was tendered to Arch for coverage under the Arch Policy on or about March 14, 2006.

74. Upon information and belief, various governmental and/or regulatory investigations of or proceedings involving one or more of the defendants are ongoing, and one or more of the defendants has sought or may seek coverage for such matters (the "Regulatory Matters").

75. The Bennett Criminal Action, the Bennett Indictment, the Securities Litigation, the Derivative Litigation, the Bawag Action, the THL Funds Action, the Unovalores Action, the American Financial Action, the Global Management Action, and the Regulatory Matters collectively are referenced herein as the "Underlying Matters."

## COUNT I

### DECLARATORY JUDGMENT THAT THE AWAC PRIOR KNOWLEDGE EXCLUSION BARS COVERAGE FOR THE UNDERLYING MATTERS

76. Arch incorporates by reference each of the allegations of paragraphs 1 through 75 above.

77. As alleged herein, as of August 11, 2005, Bennett possessed knowledge of facts and circumstances that a reasonable person would suppose might afford valid grounds for a claim or that would indicate the probability of any such claim.

78. The Underlying Matters consist of Claims alleging, arising out of, based upon, in consequence of, or attributable to such facts and circumstances.

79. Arch seeks a declaration that as a result of the AWAC Prior Knowledge Exclusion, the Arch Policy does not provide coverage for any loss arising out of the Underlying Matters.

## COUNT II

### DECLARATORY JUDGMENT THAT THE
### ARCH PRIOR KNOWLEDGE OR INFORMATION EXCLUSION
### BARS COVERAGE FOR THE UNDERLYING MATTERS

80. Arch incorporates by reference each of the allegations of paragraphs 1 through 79 above.

81. As alleged herein, as of August 11, 2005, Bennett possessed knowledge or information concerning acts, errors, omissions, facts, matters or circumstances that might give rise to a Claim under the Arch Policy.

82. The Underlying Matters consist of Claims arising out of, based upon, or attributable to such acts, errors, omissions, facts, matters or circumstances.

83. Arch seeks a declaration that, as a result of the Arch Prior Knowledge or Information Exclusion, the Arch Policy does not provide coverage for any loss arising out of the Underlying Matters.

## COUNT III

### DECLARATORY JUDGMENT THAT THE ARCH POLICY AFFORDS NO
### COVERAGE FOR DEFENSE COSTS FOR THE UNDERLYING MATTERS

84. Arch incorporates by reference each of the allegations of paragraphs 1 through 83 above.

85. The Lexington Policy does not afford any coverage for "expenses and costs," including "legal expenses." Lexington Policy, Section XII.

86. The Arch Policy applies in conformance with the terms and conditions of any underlying insurance policy "further limiting or restricting coverage" beyond that provided by the Primary Policy. Arch Policy, Section I.C.

18

87. The Arch Policy provides that "[i]n no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the Underlying Insurance." Arch Policy, Section I.C.

88. Arch seeks a declaration that the Arch Policy does not afford coverage for any defense fees or costs incurred by Defendants in connection with the Underlying Matters.

## **OTHER COVERAGE DEFENSES**

89. Other Arch Policy terms and conditions may ultimately be implicated. Nothing in this Amended Complaint should be construed as a waiver by Arch of any other coverage defenses under the Arch Policy or underlying policies with respect to any claim or potential claim and Arch reserves the right to raise all other terms and conditions of the Arch Policy and underlying policies as defenses to coverage as appropriate.

WHEREFORE, Arch requests that the Court enter a declaration and judgment in its favor:

A.    Declaring that, for the reasons set forth in Count I, the Arch Policy does not provide coverage to any Defendant for any Loss incurred in connection with the Underlying Matters;

B.    Declaring that, for the reasons set forth in Count II, the Arch Policy does not provide coverage to any Defendant for any Loss incurred in connection with the Underlying Matters;

C.    Declaring that, for the reasons set forth in Count III, the Arch Policy does not provide coverage to any Defendant for defense fees or costs in the Underlying Matters;

D.    Awarding Arch such additional declaratory and other relief as shall be found to be appropriate under the circumstances; and

E.    Awarding Arch its fees and costs incurred in prosecuting this action.

Dated:  June 22, 2006

Respectfully submitted,

VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.

By: _____
    John H. Eickemeyer

805 Third Avenue
New York, New York  10022-2203
(212) 407-7700

Of Counsel:

Daniel J. Standish
Jonathan M. Jacobs
Cara Tseng Duffield
WILEY REIN & FIELDING LLP
1776 K Street, NW
Washington, DC 20006
202-719-7000

*Attorneys for Plaintiff*
*Arch Insurance Company*

EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------------- x

ARCH INSURANCE COMPANY,

                                     Index No.  06/600805

        Plaintiff

   - against -

PHILLIP R. BENNETT, LEO R. BREITMAN, NATHAN
GANTCHER, TONE GRANT, DAVID V. HARKINS,
SCOTT L. JAECKEL, DENNIS A. KLEJNA, THOMAS
H. LEE, SANTO C. MAGGIO, JOSEPH MURPHY,
RONALD L. O'KELLEY, PERRY ROTKOWITZ,
SCOTT A. SCHOEN, WILLIAM M. SEXTON,
GERALD SHERER, PHILIP SILVERMAN and
ROBERT C. TROSTEN.

        Defendants.


--------------------------------------------------------------------- x


**REPLY BRIEF IN SUPPORT OF DEFENDANT PHILLIP R. BENNETT'S MOTION TO
STAY ACTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

ARGUMENT ................................................................................................................... 1

A.    THE COURT SHOULD EXERCISE ITS DISCRETION TO GRANT A STAY
      PENDING COMPLETION OF BENNETT'S RELATED CRIMINAL TRIAL ................. 1

B.    ALL THE RELEVANT FACTORS WEIGH IN FAVOR OF GRANTING A STAY ........ 3

      1.  Arch Will Not Suffer Prejudice From A Stay Of This Action ........................................ 3

      2.  A Stay Has The Potential To Determine All Questions In This Action .......................... 4

CONCLUSION ................................................................................................................. 7

## TABLE OF AUTHORITIES

### CASES

*Access Capital, Inc. v. DeCicco*, 302 A.D.2d 48, 752 N.Y.S.2d 658 (1st Dept. 2002)...................3

*Britt v. International Bus Services, Inc.*, 255 A.D.2d 143,
    679 N.Y.S.2d 616 (1st Dept. 1998) ...........................................................................1

*Budget Mortgage Bankers, Ltd. v. Maza*, 5 Misc.3d 1031, 799 N.Y.S.2d 159, 2004 WL
    2952870 (N.Y. Sup.)...............................................................................................5

*DeSiervi v. Liverzani*, 136 A.D.2d 527, 523 N.Y.S.2d 147 (2d Dept. 1988) ..............................3, 5

*Employers Insurance Of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122 (Ill. 1999) ..........3

*Garden City Irrigation, Inc. v. Salamanca*, 7 Misc.3d 1014,
    801 N.Y.S.2d 234, 2005 WL 927001 (April 18, 2005, N.Y. Sup.)......................................5, 6

*In re Kopf*, 169 A.D.2d 428, 564 N.Y.S.2d 149 (1st Dept. 1991)..................................................2

*Oleshkeo v. NY Liquor Authority*, 21 N.Y.2d 778, 228 N.Y.S.2d 474,
    235 N.E.2d 447 (1968) .............................................................................................2

*Pierre Associates Incorporated v. Citizens Casualty Co.*, 32 A.D.2d 495,
    304 N.Y.S.2d 158 (1st Dept. 1969) .............................................................................4

*Somoza v. Pechnik*, 3 A.D.3d 394, 772 N.Y.S.2d 2 (1st Dept. 2004) ...........................................4

*State v. Carey Resources, Inc.*, 97 A.D.2d 508, 467 N.Y.S.2d 876 (2d Dept. 1983)....................2

*Stolowski v. 234 East 178th Street LLC*, 12 Misc.3d 1159, 2006 WL 1408410 (N.Y.Sup.)
    (May 22, 2006) .....................................................................................................1

*Stuart v. Tomasino*, 148 A.D.2d 370 (1st Dept. 1989) ...............................................................2

*Zonghetti v. Jeromack*, 140 A.D.2d 561, 541 N.Y.S.2d 235 799 N.Y.S.2d 159,
    2004 WL 2952870 (N.Y. Sup.) ..................................................................................1

### STATUTES

C.P.L.R. § 2201 ...................................................................................................................5

Defendant Phillip R. Bennett submits this Reply Brief in support of his motion for a stay of plaintiff Arch Insurance Company's ("Arch") action for declaratory judgment that it is not obligated to advance defendant Bennett's defense fees and costs in connection with his defense of various lawsuits brought against him arising out of the demise of Refco, Inc. (Hereinafter, these lawsuits are collectively referred to as the "underlying litigations.")

## ARGUMENT

### A.    The Court Should Exercise Its Discretion to Grant a Stay Pending Completion of Bennett's Related Criminal Trial.

As demonstrated in Bennett's opening brief, it is well settled that the Court has broad discretion to grant a stay of a civil action pending completion of a related criminal action in order to avoid the risk of inconsistent adjudications, application of proof and potential waste of judicial resources. *Zonghetti v. Jeromack*, 140 A.D. 2d 561, 541 N.Y.S.2d 235 (1st Dept. 1989; *Budget Mortgage Bankers, Ltd. v. Maza*, 5 Misc.3d 1031(A), 799 N.Y.S.2d 159, 2004 WL 2952870 at *3-4 (N.Y. Sup.).

The law is also clear that a defendant's intention to invoke his constitutional right against self incrimination is a compelling factor in the court's exercise of its discretion. *Britt v. International Bus Services, Inc.*, 255 A.D.2d 143, 144, 679 N.Y.S.2d 616 (1st Dept. 1998). Public poicy strongly favors disposition of cases on their merits. Forcing Bennett to litigate this action while invoking his right not to testify would be contrary to this policy. *Stolowski v. 234 East 178th Street LLC*, 12 Misc.3d 1159(A), 2006 WL 1408410 (N.Y.Sup.) (May 22, 2006) (granting a limited stay of a civil action as to individuals against whom criminal actions were pending). Only through a stay of this action can Bennett's constitutional right against self-incrimination *and* his right to mount a proper defense against the charges asserted by Arch be preserved.

Arch argues that the Court is not *obligated* to grant a stay, a point defendant does not dispute. *See* Opposition at 2. In support of its argument that the Court should exercise its discretion to deny a stay, Arch cites a number of cases in which the courts have declined to grant stays, but without exception these cases are inapposite, and are distinguishable both factually and legally.

For example, in *Oleshkeo v. NY Liquor Auth.*, 21 N.Y.2d 778, 228 N.Y.S.2d 474, 235 N.E.2d 447 (1968), the court refused to enjoin the State Liquor Authority from proceeding with a hearing to revoke the plaintiff's liquor license, despite the fact that the plaintiff was facing a criminal trial arising out of related events, because the plaintiff "had not shown exhaustion of his rights to protect himself in other ways or satisfactorily explained an inordinate delay in bringing his criminal prosecution to trial, or why he had not moved for dismissal of the indictment because of such delay." *Id* at 780. In this case, Bennett's criminal trial is scheduled to commence this coming March, and a stay during the  pendency of the criminal proceeding would not plainly not create an inordinate delay

Arch also mistakenly relies upon *In re Kopf*, 169 A.D.2d 428, 429, 564 N.Y.S.2d 149 (1st Dept. 1991), and *Stuart v. Tomasino*, 148 A.D.2d 370, 373 (1st Dept. 1989). The court in both cases declined to issue stays pending the completion of criminal *investigations*; however, there were no criminal *actions* pending against either defendant. Thus, unlike in Bennett's circumstances, it was unclear whether there would in fact be criminal proceedings commenced, and if so, when they might start or end.

Arch's additional citations address varying points of law that are not relevant here. *See State v. Carey Resources, Inc.*, 97 A.D.2d 508, 467 N.Y.S.2d 876 (2d Dept. 1983) (remitting case to Supreme Court to conduct an *in camera* inquiry to assess the validity of the

assertion of the privilege against self-incrimination where officer of corporation was invoking the privilege to decline to produce records and documents of the corporation over which he had custody in a representative capacity); *Access Capital, Inc. v. DeCicco*, 302 A.d.2d 48, 51-53, 752 N.Y.S.2d 658, (1st Dept. 2002) (ruling on whether summary judgment is appropriate where a defendant asserts the privilege against self-incrimination and fails to present evidence on his own behalf in a civil case).

This action is most similar to *DeSiervi v. Liverzani*, 136 A.D.2d 527, 523 N.Y.S.2d 147 (2d Dept. 1988), in which the Appellate Division upheld the trial court's grant of the defendant's motion to stay pending the resolution of a criminal prosecution against him. The court in *DeSiervi* found that while the stay of the civil action "may cause inconvenience and delay to the plaintiff, the protection of [defendant's] constitutional right against self-incrimination is the more important consideration." *Id.* at 148. The situation here is identical. The protection of Bennett's constitutional right against self-incrimination is plainly of greater importance than the plaintiff's interest in avoiding a short delay.

## B.    All the Relevant Factors Weigh in Favor of Granting a Stay.

### 1.    Arch will not suffer prejudice from a stay of this action.

In its Opposition, Arch identifies two ways in which it claims it would suffer prejudice if this action is stayed. Both are meritless.

*First*, Arch claims that Defendants may argue that under Illinois law, Arch has waived its ability to deny coverage for the underlying litigations if Arch fails to prosecute this declaratory judgment action. *See* Opposition at 5. That principal of Illinois law, however, already has been satisfied by this action. Arch relies upon *Employers Ins. Of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122, 1138 (Ill. 1999), which holds that "(w)here an insurer waits to bring its declaratory judgment until after the underlying action has been resolved by judgment

or settlement, the insurer's declaratory judgment is untimely as a matter of law." Arch has brought its declaratory judgment action, thus satisfying the requirement articulated by the court in *Ehlco*. Arch does not explain how a stay issued by the Court, over Arch's objection, would somehow make Arch's declaratory judgment action untimely, where the action was brought before the underlying litigations have been resolved.

*Second*, Arch argues that it will be prejudiced if it faces a settlement demand for its limits and has not obtained a declaration of its rights. *See* Opposition at 5. This claim is entirely speculative. There have been no such settlement demands, and Arch has not presented the Court with any basis to believe that this will occur at any time in the near future. Indeed, the underlying litigations have only just begun.

Moreover, Arch has not demonstrated that the potential judgment, settlement and defense costs in connection with the underlying litigations will ever amount to more than the Arch excess floor. There is certainly no need for Arch to resolve these issues before the criminal trial has been completed.

In short, Arch has not demonstrated that it would be prejudiced by a delay of this case until the upcoming criminal proceeding is completed. In sharp contrast, there can be no dispute that Bennett would be seriously prejudiced if he were forced to choose between his constitutional right against self-incrimination and responding to the merits of Arch's claims.

### 2.    A stay has the potential to determine all questions in this action.

In its Opposition, Arch argues that the Court should deny the stay because the resolution of the criminal case will not dispose of **all** the issues in this action. *See* Opposition at 7. Arch relies upon *Pierre Associates Incorporated v. Citizens Cas. Co.*, 32 A.D.2d 495, 496, 304 N.Y.S.2d 158, 160 (1st Dept. 1969) and *Somoza v. Pechnik*, 3 A.D.3d 394, 394, 772 N.Y.S.2d 2, 3 (1st Dept. 2004) for the proposition that a stay of one action is appropriate only

where the decision in one will determine all the question in the other. But neither of these cases involve a stay requested for the pendency of a criminal proceeding, and thus the important constitutional right to the Fifth Amendment was not at stake in either case. These cases do not overrule the authority cited in Bennett's opening brief stating that, in exercising its discretion under C.P.L.R. § 2201, the Court should consider whether a stay would serve to reduce the scope of discovery and to simplify the issues. See *DeSiervi v. Liverzani*, 136 A.D.2d 527, 528, 523 N.Y.S.2d 147 (2d Dept. 1988); *Budget Mortgage Bankers, Ltd. v. Maza*, 5 Misc.3d 1031(A), 799 N.Y.S.2d 159, 2004 WL 2952870 at *3-4 (N.Y. Sup.).

Arch also argues that the Court should deny a stay because "a verdict *in favor* of Bennett would be unlikely to have any impact on this case." Opposition at 8, *emphasis added*. But the fact that a verdict *against* Bennett would resolve many of the issues in this case is enough to warrant a stay. In evaluating whether to grant a stay, "the Court must consider the collateral estoppel effect that would result *if* [defendant] were to be found guilty after trial or plead guilty," *Garden City Irrigation, Inc. v. Salamanca*, 7 Misc.3d 1014(A), 801 N.Y.S.2d 234, 2005 WL 927001 (April 18, 2005, N.Y. Sup.), *emphasis added*.[1] Thus the Court does not require certainty that a criminal proceeding will result in collateral estoppel in order to stay the proceeding.

The court in *Garden City* stayed the prosecution of the civil case pending the final determination of the criminal action against the same defendant, where the defendant indicated

---

[1] In its Opposition, Arch attempts to distinguish *Garden City Irrigation, Inc. v. Salamanca* from the instant case on the grounds that in *Garden City*, the court considered that the defendant might be required to make restitution if she pleads guilty or is convicted, which would "affect or possibly obviate the need to conduct discovery or have a trial of this action." Id. at *4. While Arch is correct that a determination that Bennett needs to make restitution would not have an impact on Arch's claims, a determination that Bennett had "prior knowledge" would affect or possibly obviate the need to conduct discovery or have a trial of this action. As a result, the decision in *Garden City* is squarely on point with this case.

that she would assert her Fifth Amendment right if required to testify in the civil action, and because "the resolution of the criminal action _may_ result in this case either not requiring discovery or a trial or significantly simplify and streamline discovery and trial." _Id._ at *4, _emphasis added._ The possibility of a guilty verdict, and the resulting collateral estoppel effect, are factors for the Court to consider, regardless that the defendant might in fact be found not guilty.

Finally, Arch argues that resolution of the criminal case will not dispose of issues regarding the other Insured's prior knowledge. Arch's own pleadings belie this argument. Arch's Amended Complaint does not include a single allegation that any of the other Insureds had prior knowledge. Instead, Arch seeks a declaration that it need not provide coverage for any loss arising out of the underlying litigations based solely on the allegation that Bennett possessed "prior knowledge." _See_ Amended Complaint, ¶¶ 77-83. Thus if the criminal proceeding establishes that Bennett had "prior knowledge," the knowledge of the other Insureds will be moot.

In summary, Arch fails to rebut the argument that allowing the criminal action to proceed prior to the civil action will preserve judicial resources, and may obviate the need for a trial or simplify the issues to be tried in this action. In a last, desperate, and nonsensical attempt to forestall a stay, Arch argues that a stay prior to discovery is premature, and that nothing "would prevent Bennett from seeking a stay or an appropriate protective order at some further stage of this case." Opposition at 9. Arch misses the point. In order to preserve Bennett's Fifth Amendment rights, as well as his ability to defend against this action, a stay is required _before_ he is required to respond to the merits of Arch's amended complaint or engages in discovery.

## CONCLUSION

For the reasons set forth above, this Court should grant Bennett's motion and stay

this action pending completion of the criminal case against Bennett.


Dated: October 31, 2006
New York, New York

GOLENBOCK, EISEMAN, ASSOR, BELL
& PESKOE

By: _Deborah A. Adler_____
           Jeffrey T. Golenbock, Esq.
           Deborah A. Adler, Esq.


437 Madison Avenue, 35th Floor
New York, New York 10022
(212) 907-7300

# EXHIBIT E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| ARCH INSURANCE COMPANY, | INDEX NO. 600805/06 |
| Plaintiff, | |
| -against- | |
| PHILLIP R. BENNETT, LEO R. BREITMAN, NATHAN GANTCHER, TONE GRANT, DAVID V. HARKINS, SCOTT L. JAECKEL, DENNIS A. KLEJNA, THOMAS H. LEE, SANTO C. MAGGIO, JOSEPH MURPHY, RONALD L. O'KELLEY, PERRY ROTKOWITZ, SCOTT A. SCHOEN, WILLIAM M. SEXTON, GERALD SHERER, PHILIP SILVERMAN and ROBERT C. TROSTEN, | |
| Defendants. | |

## REPLY MEMORANDUM IN SUPPORT OF OFFICER DEFENDANTS' MOTION TO DISMISS OR STAY THE AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

Ona T. Wang
Helen B. Kim
Joseph L. Chairez (*pro hac vice* to be filed)
BAKER & HOSTETLER LLP
666 Fifth Avenue
New York, NY 10103
Tel: 212-589-4200; Fax: 212-589-4201
*Attorneys for Defendants Dennis Klejna and Joseph Murphy*

Holly Kulka
HELLER EHRMAN LLP
7 Times Square
New York, NY 10036
Tel: 212-847-8601; Fax: 212-763-7600
*Attorneys for Defendant Philip Silverman*

Stuart I. Friedman
Ivan O. Kline
Elizabeth D. Meacham
FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Tel: 212-750-8700; Fax: 212-223-8391
*Attorneys for Defendants Gerald Sherer and William M. Sexton*

Barbara Moses
Rachel Korenblat
MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO & BOHRER, P.C.
565 Fifth Avenue
New York, NY 10071
Tel: 212-856-9600; Fax: 212-856-9494
*Attorneys for Defendant Robert C. Trosten*

Laura Neish
ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604
New York, NY 10036
Tel: 212-704-9600; Fax: 212-704-4256
            -and-

Michael T. Hannafan (*pro hac vice* filed)
Blake T. Hannafan (*pro hac vice* filed)
HANNAFAN & HANNAFAN, LTD.
One East Wacker Drive, Suite 1208
Chicago, IL 60601
Tel: 312-527-0055; Fax: 312-527-0220
*Attorneys for Defendant Tone N. Grant*

# TABLE OF CONTENTS

Page

ARGUMENT ................................................................................................................ 1

I.    THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE A
      JUSTICIABLE CONTROVERSY .................................................................... 1

      A.    The Entire Complaint Should Be Dismissed As Premature Because No
            Actual Controversy Now Exists Between Arch And Defendants ...................... 1

      B.    At The Very Least, Count III, For A Declaration That The Arch Policy
            Affords No Coverage For Defense Costs, Should Be Dismissed As
            Premature .......................................................................................................... 4

      C.    Counts I And II Are Also Not Ripe Because They Are Based On A
            Contention Of Fact – Bennett's Alleged Prior Knowledge – That Will Be
            Determined In The Underlying Matters ............................................................. 6

            1.    Bennett's Alleged Prior Knowledge Will Be Determined In The
                  Underlying Matters ................................................................................ 6

            2.    Arch Will Not Be Prejudiced By Dismissal Of Counts I And II .............. 8

            3.    In The Alternative, Counts I And II Should Be Stayed Because
                  Bennett Will Invoke His Fifth Amendment Rights ................................. 10

II.   COUNT I SHOULD ALSO BE DISMISSED OR STAYED BECAUSE OF THE
      AWAC DISPUTE RESOLUTION CLAUSE, WHICH BINDS ARCH ........................ 10

CONCLUSION ............................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACandS, Inc. v. Aetna Cas. & Sur. Co.,*
  666 F.2d 819 (3d Cir. 1981).......................................................................................... 3

*Access Capital, Inc. v. DeCicco,*
  302 A.D.2d 48, 752 N.Y.S.2d 658 (1st Dep't 2002) ............................................... 10

*Allstate Ins. Co. v. Santiago,*
  98 A.D.2d 608, 469 N.Y.S.2d 343 (1st Dep't 1983) ................................................. 7

*Am. Ins. Assoc. v. Chu,*
  64 N.Y.2d 379, 487 N.Y.S.2d 311 (1985) ................................................................. 1

*Bd. of Educ., Utica School Dist. # 1 v. Delle Cese,*
  65 Misc. 2d 473, 318 N.Y.S.2d 46 (Sup. Ct. Oneida Co. 1971)........................... 14

*Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.,*
  90 F.3d 671 (2d Cir. 1996)......................................................................................... 4

*Clarendon Nat'l Ins. Co. v. Lan,*
  152 F. Supp. 2d 506 (S.D.N.Y. 2001).............................................................. 11, 12

*Continental Casualty Co. v. PPG Indus., Inc.,* No. 86 C 6076, 1987 WL 6601
  (N.D. Ill. Feb. 6, 1987)............................................................................................. 5

*Corbetta Constr. Co. v. George F. Driscoll Co.,*
  17 A.D.2d 176, 233 N.Y.S.2d 225 (1st Dep't 1962) ............................................. 12

*Cutro v. Sheehan Agency, Inc.,*
  96 A.D.2d 669, 466 N.Y.S.2d 733 (3d Dep't 1983) ................................................ 4

*Fagnani v Am. Home Assur. Co.,* 64 N.Y.2d 967, 488 N.Y.S.2d 646 (1985) .............................. 5

*First State Ins. Co. v. J&S United Amusement Corp.,*
  67 N.Y.2d 1044, 504 N.Y.S.2d 88 (1986) ........................................................... 8, 9

*General Re Corp. v. Foxe,*
  177 Misc. 2d 867, 678 N.Y.S.2d 459 (Sup. Ct. N.Y. Co. 1998) ......................... 11

*Gulf Underwriters Ins. Co. v. Verizon Commc'ns., Inc.,*
  -- N.Y.S.2d --, 2006 WL 2621039 (1st Dep't Sept. 14, 2006) ............................ 11

*Hanna v. Zumpano,*
  267 A.D.2d 1028, 701 N.Y.S.2d 553 (4th Dep't 1999).......................................... 14

*Household Mfg., Inc. v. Liberty Mutual Ins. Co.,* No. 85 C 8519, 1986 WL 4121
  (N.D. Ill. March 27, 1986)........................................................................................ 5

*Kalisch-Jarcho, Inc. v. City of New York,*
  72 N.Y.2d 727, 536 N.Y.S.2d 419 (1988) ........................................................... 14

*Little v. Willis,*
  55 A.D.2d 854, 390 N.Y.S.2d 347 (4th Dep't 1976)....................................... 14, 15

## TABLE OF AUTHORITIES
### (continued)

<div align="right">Page</div>

*Nardi v. Povich,*
   No. 105554/06, 2006 WL 2127714 (Sup. Ct. N.Y. Co. July 31, 2006)
   (Fried, J.) ................................................................................................................... 13

*Nat'l Recreational Prods., Inc. v. Gans,*
   46 A.D. 618, 359 N.Y.S.2d 803 (1st Dep't 1974) ................................................. 12

*Prashker v. United States Guarantee Co.,*
   1 N.Y.2d 584, 154 N.Y.S.2d 910 (1956) ................................................................ 7

*President v. Jenkins,*
   180 N.J. 550, 853 A.2d 247 (2004) .......................................................................... 5

*Rhinestone v. New York City Transit Auth.,*
   142 A.D.2d 562, 530 N.Y.S.2d 227 (2d Dep't 1988) .................................... 14, 15

*Smith Barney Shearson Inc. v. Sacharow,*
   91 N.Y.2d 39, 666 N.Y.S.2d 990 (1997) ............................................................... 12

*Special Jet Serv., Inc. v. Federal Ins. Co.,* 83 F.R.D. 596 (W.D. Pa. 1979) ................... 5

*State of New York v. Philip Morris Inc.,*
   30 A.D.3d 26, 813 N.Y.S.2d 71 (1st Dep't 2006) ........................................... 12, 13

*United States v. South-Eastern Underwriters Assn.,*
   322 U.S. 533 (1944) ................................................................................................ 13

*Utica Mutual Ins. Co. v. Gulf Ins. Co.,*
   306 A.D.2d 877, 762 N.Y.S.2d 730 (4th Dep't 2003) ........................................... 13

*Verizon New York Inc. v. Broadview Networks, Inc.,*
   5 Misc. 3d 346, 781 N.Y.S.2d 211 (Sup. Ct. N.Y. Co. 2004) .............................. 13

## OTHER AUTHORITIES

18 Couch on Insurance (2d rev. ed. 1983) ....................................................................... 5

9 U.S.C. § 2 ...................................................................................................................... 13

9 U.S.C. §§ 1 *et seq.* ....................................................................................................... 13

Defendants Tone Grant, Dennis A. Klejna, Joseph Murphy, William M. Sexton, Gerald Sherer, Philip Silverman and Robert C. Trosten (collectively, the "Officer Defendants")[1] respectfully submit this Reply Memorandum of Law in support of their motion, pursuant to CPLR 3211 (a)(1), (a)(2) and (a)(7), to dismiss the Amended Complaint For Declaratory Judgment (the "Amended Complaint") in its entirety or, in the alternative, for a stay pursuant to CPLR 2201.

## ARGUMENT

## I.    THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE A JUSTICIABLE CONTROVERSY

### A.    The Entire Complaint Should Be Dismissed As Premature Because No Actual Controversy Now Exists Between Arch And Defendants

Arch does not dispute that, in order to maintain a declaratory judgment action, there must be an actual controversy, involving "present, rather than hypothetical, contingent or remote, prejudice to plaintiffs." *Am. Ins. Assoc. v. Chu,* 64 N.Y.2d 379, 383, 487 N.Y.S.2d 311 (1985). Nor does Arch dispute that it is a fourth-tier excess carrier, with no obligation to provide any coverage until $40 million in Underlying Insurance[2] has been exhausted. Arch maintains, however, that there is presently an "actual controversy" between it and the Defendants based on the amount of damages claimed by the plaintiffs in certain of the Underlying Matters. (Opp. at 9.) But Arch ignores a number of critical facts demonstrating that it is entirely speculative whether the Arch Policy will ever be triggered.

---

[1]  The Officer Defendants are all former officers of Refco, Inc. ("Refco") or its affiliates. In addition to the Officer Defendants, the Defendants in this action include former Refco CEO Phillip Bennett, Santo C. Maggio, Perry Rotkowitz, and seven former directors of Refco. With respect to Rotkowitz, Arch has indicated that it would not oppose Rotkowitz's motion to dismiss to the extent that his motion is without prejudice. (Opp. at 6 n.3.)

[2]  All terms defined in the Memorandum in Support of Officer Defendants' Motion to Dismiss or Stay, dated September 18, 2006 ("Initial Br."), are assigned the same meaning here. "Opp." refers to Arch's Memorandum In Opposition to the Officer Defendants' Motion to Dismiss or Stay.

First, there has been no showing as to which, if any, of the claims in the Underlying Matters has any merit as against one or more of the Defendants in this action, many of whom have moved to dismiss some or all of the claims against them. Indeed, the Amended Complaint does not even allege that Defendants' liability will exceed $40 million so as to trigger the Arch Policy.

Equally significantly, the plaintiffs in the Underlying Matters have many sources of recovery other than from the Defendants herein (the "Officer/Director Defendants"). To begin, the Officer/Director Defendants are far from the only defendants in the Underlying Matters. Rather, there are numerous "deep pocket" defendants who are not insureds under the Arch Policy (or any of the Underlying Insurance), thus significantly reducing the realistic exposure of the Officer/Director Defendants. For example, in the consolidated class action securities litigation (the "Securities Litigation") referred to by Arch (Opp. at 9), there are 28 defendants other than the Officer/Director Defendants, including Refco's auditing firm (Grant Thornton) and fifteen investment banking firms that served as underwriters for Refco's securities. (*See* Reply Affirmation of Rachel Korenblat ("Korenblat Reply Aff."), Ex. 1.)

Additionally, one of the non-Officer/Director Defendants, BAWAG P.S.K. Bank für Arbeit und Wirschaft und Österreichische Postsparkasse Aktiengesellschaft ("BAWAG"), has already reached a "global settlement" with the creditors committee in the Refco bankruptcy, the plaintiffs in the Securities Litigation, and Thomas H. Lee entities (the plaintiffs in another of the Underlying Matters specifically cited by Arch (Opp. at 9)) pursuant to which BAWAG will make payments of at least $683 million. (*See* Korenblat Reply Aff., Ex. 2.)   At least $108 million from BAWAG's payments will go to the plaintiffs in the Securities Litigation; at least $84 million will go to Thomas H. Lee entities; and, remaining amounts will go to the Refco creditors, many of whom are the plaintiffs in other Underlying Matters. *Id.*  Further, the Refco creditors will be receiving significant payments in the bankruptcy proceedings from other Refco assets, which will greatly reduce their damages. For example, Refco senior subordinated

noteholders, who are part of the plaintiff class in the Securities Litigation, are expected to receive a distribution which constitutes 83.4% of the outstanding balance on these notes. (*Id.* at p. 55 and pp. 12-13 of the Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries.)

Accordingly, notwithstanding the amounts sued for in the Underlying Matters, there is substantial uncertainty as to whether the Arch Policy will ever be triggered, and thus a decision on Arch's claims may well be merely advisory.

None of the cases cited by Arch compels a finding that its action is justiciable. Rather, each of those cases turned on the particular facts before the court, which showed a sufficient likelihood that the policy or policies at issue would be triggered. None of those cases allowed a fourth-tier excess carrier to bring its own declaratory judgment action prior to exhaustion of even the primary insurance, and, none appears to have allowed any insurer with a coverage threshold anywhere near $40 million to maintain such a declaratory judgment action based solely on the amount of damages claimed in an underlying action.

Finally, Arch essentially ignores the public policy concerns raised in our Initial Brief (p. 15) as to the unnecessary burden Arch seeks to impose on the individuals who are supposed to be the beneficiaries of the Arch Policy. Rather, Arch asserts, without elaboration, that "significant policy considerations" support its request for declaratory relief.[3] In actuality, there is no need for Arch to now maintain this action. Most telling in this regard is the fact that none of the other excess insurers in the tower of Directors & Officers liability insurance, including the three beneath Arch, has felt it necessary to bring an action against any of the Officer/Director Defendants, even though each could seek to assert some or all of the same claims as are brought by Arch.

---

[3] The case cited by Arch, *ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 666 F.2d 819 (3d Cir. 1981), is factually inapposite, as it involved a dispute between two insurers as to their obligations to a single insured that was a defendant in several underlying actions.

In sum, the underlying primary policy limits of the U.S. Specialty Policy have yet to be exhausted, none of the excess policies has been triggered, and it remains purely speculative whether Arch's $10 million fourth-tier excess policy will ever be tapped. Thus, Arch's action is premature, and should be dismissed. *See, e.g., Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.,* 90 F.3d 671, 673, 675 (2d Cir. 1996); *Cutro v. Sheehan Agency, Inc.,* 96 A.D.2d 669, 466 N.Y.S.2d 733, 734 (3d Dep't 1983).

## B.    At The Very Least, Count III, For A Declaration That The Arch Policy Affords No Coverage For Defense Costs, Should Be Dismissed As Premature

In our Initial Brief (p. 16), we showed that Count III of the Amended Complaint fails to allege an "actual controversy," as it is entirely speculative whether Arch's fourth-tier excess policy will ever be triggered for defense fees or costs incurred by Defendants. In response, Arch contends that, in view of the number of Underlying Matters and the number of law firms involved, defense costs alone could exceed the $40 million threshold required to trigger the Arch policy. (Opp. at 12.) But even if this unlikely scenario were ever to occur, it would occur years from now, and thus Arch's claim remains premature. At present, the $10 million primary policy is not even close to being exhausted. U.S. Specialty Insurance Company recently made payments totaling approximately $1.2 million, covering an additional two month period, thereby bringing its total payments to approximately $4.9 million. (*See* Korenblat Reply Aff. Ex. 3.) Even if the pace of $600,000 per month of defense costs continues,[4] which is by no means certain or even likely, the $40 million threshold required to trigger the Arch Policy will not be met for another five years.

Arch also argues that Count III presents an actual controversy because the Defendants' potential liability, combined with their Defense Costs, could exceed the $40 million of Underlying Insurance. (Opp. at 12.) Arch has not articulated, however, how this could cause its

---

[4]    The number of law firms involved may soon decrease since, as noted above, many of the Officer/Director Defendants have moved to dismiss some or all of the claims against them.

- 4 -

policy to be triggered for Defense Costs, and it is plainly speculative as to any such scenario ever occurring.

In any event, even if this Court were to conclude that Count III is somehow justiciable, it should stay Count III pursuant to CPLR 2201. Count III is premised on the definition of "Loss" in the policy issued by Lexington Insurance Company ("Lexington"), the first-tier excess carrier. It is plainly preferable to have the interpretation of the Lexington Policy adjudicated in an action to which Lexington is a party.[5] In that regard, on October 17, certain of the Officer/Director Defendants filed an action against Lexington in the Superior Court of the State of New Jersey, Hudson County, seeking a declaration that the Lexington Policy covers Defense Costs. (*See* Korenblat Aff. Ex. 4.)[6] The other Officer/Director Defendants have been named as additional defendants in that action. In these circumstances, this Court should stay Count III, so that the

---

[5]  Indeed, as a general proposition, courts and commentators agree that additional or excess insurers are not necessary parties to a suit between an insured and its primary or first layer excess insurer. *See, e.g., Continental Casualty Co. v. PPG Indus., Inc.,* No. 86 C 6076, 1987 WL 6601, at * 2 (N.D. Ill. Feb. 6, 1987); *Household Mfg., Inc. v. Liberty Mutual Ins. Co.,* No. 85 C 8519, 1986 WL 4121, at *3 (N.D. Ill. March 27, 1986); 18 Couch on Insurance § 74:618 (2d rev. ed. 1983) ("An excess insurer is not a necessary party to a declaratory judgment proceeding brought by the primary insurer.") *Cf. Special Jet Serv., Inc. v. Federal Ins. Co.,* 83 F.R.D. 596, 599 (W.D. Pa. 1979) (citing 18 Couch, supra, at § 74:505) ("'The fact that an insurer is concerned with the results of a lawsuit does not mean that it is . . . a necessary party therein.'"). Moreover, where, as here, the language of the Lexington Policy concerning coverage of Defense Costs is ambiguous on its face, the New Jersey court may review extrinsic evidence submitted by the parties to resolve the ambiguity so it comports with the reasonable expectations of the insureds. *See Fagnani v Am. Home Assur. Co.,* 64 N.Y.2d 967, 488 N.Y.S.2d 646 (1985); *President v. Jenkins,* 180 N.J. 550, 853 A.2d 247 (2004). Clearly, Arch, as a non-party to the Lexington Policy, is in no position to submit such extrinsic evidence. It is Lexington, not Arch, that is in the best position to litigate the meaning of the Lexington Policy.

[6]  As set forth in our Initial Brief (p. 5), while Lexington has agreed to advance Defense Costs once the U.S. Specialty Policy is exhausted, it has reserved its rights to seek repayment of such advances on the ground that Defense Costs are not covered. In contrast to the Arch Policy, there is little question but that the Lexington Policy will be triggered for Defense Costs.

question of whether the Lexington Policy covers Defense Costs may be determined in the action against Lexington.[7]

### C. Counts I And II Are Also Not Ripe Because They Are Based On A Contention Of Fact – Bennett's Alleged Prior Knowledge – That Will Be Determined In The Underlying Matters

#### 1. Bennett's Alleged Prior Knowledge Will Be Determined In The Underlying Matters

Our Initial Brief (pp. 18-19) set forth the well-established rule that an action for declaratory relief regarding coverage may not be maintained where coverage turns on a factual issue that will be determined in the underlying action. This rule applies squarely to Counts I and II in the Amended Complaint, which seek a declaration that the Arch Policy does not provide coverage for any of the Underlying Matters based on Arch's contention that Bennett possessed knowledge of facts regarding Refco so as to trigger "prior-knowledge" exclusions in the AWAC and Arch Policies.

Arch seeks to downplay or obscure the significance of Bennett's "prior knowledge" in assessing whether the prior-knowledge exclusions are applicable. Arch argues that the exclusions turn on whether the Underlying Matters are claims "arising out of, based upon or attributable to" any "act, error, omission, fact, matter or circumstance that might give rise to a Claim" and of which "any Insured as of August 11, 2005 has any knowledge." (Opp. at 14-15.) However, Arch ignores the fact that the "knowledge" of an insured that it must prove for this purpose in this case is the very same "knowledge" that is at issue in the Underlying Matters.

Arch cannot dispute that Counts I and II of its Amended Complaint are premised on allegations as to what Bennett knew and when he knew it. The Amended Complaint specifically alleges (*see* Am. Compl. ¶¶ 48, 77, 81) that Bennett had knowledge as of August 11, 2005 of facts and circumstances relating to Refco's financial condition so as to trigger the prior

---

[7] As set forth in our Initial Brief (p. 16 n.8), if not dismissed, all Counts in the Amended Complaint should also be stayed under CPLR 2201 until such time as the Arch Policy is close to being triggered, to avoid prejudice to the Defendants.

knowledge exclusions.[8] In addition, Arch cannot dispute that Bennett's knowledge of Refco's financial condition is one of the key factual questions that must be determined in the Underlying Matters. Indeed, the allegations against Bennett in the Amended Complaint are essentially the same as those made against him in the Underlying Matters. Accordingly, the issue of Bennett's knowledge must be determined in the Underlying Matters, not in this action for declaratory relief. *See, e.g., Allstate Ins. Co. v. Santiago*, 98 A.D.2d 608, 469 N.Y.S.2d 343 (1st Dep't 1983).

Arch also contends that dismissal of Counts I and II is not required because the factual issue they raise is "far narrower" than the factual issues in the Underlying Matters. (Opp. at 13.) However, the presence of additional factual issues in the Underlying Matters is irrelevant. The test is whether the factual matter at issue in the coverage action will be determined in the underlying action, as will occur here. *See, e.g., Prashker v. United States Guarantee Co.*, 1 N.Y.2d 584, 590-93, 154 N.Y.S.2d 910, 915-17 (1956).

Arch's position also ignores the very substantial risk of inconsistent factual findings if the declaratory action proceeds, which risk is just as great even when there are additional factual issues in the underlying actions. As the Court of Appeals has recognized in dismissing a request for declaratory relief:

> The facts might be decided in one manner in the declaratory judgment action, and differently in the principal actions, with the consequence that the liability of the carrier or lack of it might be decided on facts other than those to be established between the parties in the main action or actions.

*Id.* at 591, 154 N.Y.S.2d at 915.

Notably, Arch has not cited a single relevant case in support of its position. Rather, Arch cites five out-of-state cases applying the laws of other jurisdictions (Opp. at 15-16), each of

---

[8] While Arch cites (Opp. at 15, 16) to the language in the policies as to the knowledge of "any Insured" precluding coverage, it has not alleged prior knowledge by any other Defendant. (Am. Compl. at ¶¶ 48, 77, 81.) Moreover, even if Arch does seek to amend its complaint so as to add allegations as to prior knowledge of any other Insured, the analysis set forth above and in our Initial Brief will still be fully applicable as long as that person's knowledge is also an issue in the Underlying Matters.

which addressed whether the particular facts known to an insured were sufficient to trigger a "prior knowledge" exclusion – an issue not germane to this motion. None of these cases discusses justiciability, or whether declaratory relief regarding "knowledge" is foreclosed by the inevitable litigation of that very same "knowledge" in the underlying action.

Ultimately, Arch cannot escape the legion of New York cases cited by Defendants, holding that a declaratory judgment of an insurer's obligation to indemnify may be granted before the trial of the underlying action "only if it can be concluded as a matter of law that there is no possible factual or legal basis on which the insurer may eventually be held liable under its policy." (*See* Initial Br. at 17.) Here, the possibility exists that Bennett did not have "prior knowledge" as alleged by Arch, which would render the exclusions on which Arch relies inapplicable. That factual issue must be resolved in the Underlying Matters.

### 2.    Arch Will Not Be Prejudiced By Dismissal Of Counts I And II

Arch contends in the alternative that Counts I and II should not be dismissed because it will be left without an adequate remedy. (Opp. at 16.) Arch is wrong.

Of course, this Court need not even address this contention, since the fact that Bennett's prior knowledge will be determined in the Underlying Matters requires dismissal of these counts for non-justiciability in any event, as we have shown above. *First State Ins. Co. v. J&S United Amusement Corp.,* 67 N.Y.2d 1044, 504 N.Y.S.2d 88 (1986), relied on by Arch, is not to the contrary. In contrast to the case at bar, the exclusion on which the insurer sought to rely in *First State* turned on a factual issue that would not necessarily be determined in the underlying action. Thus, the insurer was given the opportunity to avoid dismissal if it could show that it would consequently be left without an adequate remedy. *Id.* at 1046, 504 N.Y.S.2d at 89.

Even if the availability of another remedy for Arch must be considered, Counts I and II must still be dismissed. Arch has already denied coverage based on the prior knowledge exclusions. *See* Opposition Affirmation of John H. Eickemeyer ("Eickemeyer Aff."), Ex. 1 (denial letter), pp. 12-15. In the context, its remedy is quite clear and adequate: in

conformance with its denial letter, it may simply refuse to indemnify any of the Defendants when and if their liability ever does exceed $40 million so as to trigger the Arch Policy. *See, e.g., First State Ins. Co.*, 67 N.Y.2d at 1046, 504 N.Y.S.2d at 89 (defense of indemnity action by insured is normal remedy for insurer relying on an exclusion).

Arch asserts nonetheless that it may not have an adequate remedy if Counts I and II are dismissed because settlement demands in the Underlying Matters "could occur at any time," and it will then be forced to address such demands "in a climate of substantial uncertainty about the key coverage issues." (Opp. at 17.) However, that identical argument could be made by *any* insurer seeking to pursue a declaratory judgment action to establish the absence of coverage, as there could always be "settlement demands" in any underlying action. Indeed, the entire line of cases cited above and in our Initial Brief as to the non-justiciability of claims such as Counts I and II would be rendered meaningless if Arch's argument were accepted.[9]

Not surprisingly, Arch has not cited to a single case from New York to support its argument as to the absence of an adequate remedy.[10] Moreover, as noted above, the fact that the other excess carriers which have denied coverage based on one or more of the same exclusions cited by Arch have not felt compelled to commence a declaratory judgment action belies any claim of prejudice by Arch.

In contrast to the lack of harm to Arch from a dismissal of Counts I and II, the Defendants will be burdened with needless, extensive, and likely duplicative, costs should these claims go forward. It is indisputable that this declaratory action will involve many of the same

---

[9]  If Arch ever does face "settlement demands" in any of the Underlying Matters, it, like any litigant, will simply have to assess the strength of its position, as set forth in its letter denying coverage, in deciding whether to contribute towards a settlement.

[10]  Moreover, the Third Circuit case cited by Arch, *ACandS, Inc.*, is inapposite, as noted above (n.2). Arch also cites to the decision by the Refco Bankruptcy Court to lift the automatic stay so as to allow Arch to pursue this action. (Opp. at 18.) That decision, however, did not address justiciability, or any other issue under New York law. Rather, the Bankruptcy Court relied on Arch's representations, based on "duty to defend" cases under Illinois law, on potential prejudice to Arch if it did not pursue an action challenging the directors' and officers' right to coverage. (Eickemeyer Aff., Ex. 2, at 100-01.)

facts and evidence as the Underlying Matters. Discovery will thus not only be lengthy and expensive, and will encompass numerous non-parties, but it will also duplicate much of the discovery in the Underlying Matters.   Imposing such costs on the Defendants – who are supposed to benefit from Arch's Policy, not be victimized by it – is particularly inappropriate in light of the fact that Arch's coverage obligation is $35 million from being triggered.

### 3.   In The Alternative, Counts I And II Should Be Stayed Because Bennett Will Invoke His Fifth Amendment Rights

Bennett, on whom Arch relies on for the "prior knowledge" exclusion, has stated that he will assert his Fifth Amendment privileges if this matter proceeds. (*See* Bennett's Mtn. to Stay.) In Arch's Memorandum of Law in Opposition to Defendant Bennett's Motion to Stay, Arch argues that a stay is not proper if the Fifth Amendment is invoked to benefit oneself.  However, Arch cites case law that holds it is appropriate to grant a stay pending the resolution of a criminal case for the benefit of other parties.  (Arch Opp. to Bennett at 4) (citing *Access Capital, Inc. v. DeCicco*, 302 A.D.2d 48, 52, 752 N.Y.S.2d 658, 662 (1st Dep't 2002).)   Arch thus recognizes the logic of staying a declaratory action involving other parties whose rights will depend on the knowledge and testimony of one person, who has stated that he will not testify.

Arch seeks to use the "prior knowledge" exclusions – and thus seeks to use Bennett's alleged knowledge – to avoid coverage for all Defendants, not just for Bennett. The Officer Defendants cannot present a proper defense in this action without Bennett's testimony, yet he has declared that he will assert his Fifth Amendment rights pending the resolution of criminal charges against him.   The prejudice to the Officer Defendants based on Bennett's position is obvious.  Accordingly, even if Counts I and II are not dismissed, they should be stayed as to the Officer Defendants until such time as Bennett will no longer assert his Fifth Amendment rights.

### II.   COUNT I SHOULD ALSO BE DISMISSED OR STAYED BECAUSE OF THE AWAC DISPUTE RESOLUTION CLAUSE, WHICH BINDS ARCH

Arch contends that it is not bound by the ADR provision found in the AWAC policy because "the only parties to the AWAC ADR provision are AWAC and the insureds." (Opp.

at 19.) AWAC and the insureds are the only signatories to the AWAC Policy. But Arch agreed to "follow the form" of the AWAC Policy, and is thereby bound by its ADR clause. *See Gulf Underwriters Ins. Co. v. Verizon Commc'ns., Inc.*, -- N.Y.S.2d --, 2006 WL 2621039, at *1 (1st Dep't Sept. 14, 2006).[11]

Arch agreed in its Policy with the insureds that "the insurance coverage afforded by this Policy shall apply in conformance with the terms and conditions of the Followed Policy [the U.S. Specialty Policy] and in conformance with any terms and conditions further limiting or restricting coverage in this Policy or **in any other Underlying Insurance**." (Am. Compl. Ex. A (Section 1 C of the Arch Policy; emphasis added).) The term "Underlying Insurance" includes the AWAC Policy. *Id.* (Section III C, D; Item 5 of the Declarations Page). Thus, Arch is bound to the "terms and conditions" of the AWAC Policy, which includes the ADR clause, just as if it was a party to the AWAC Policy. *See Clarendon Nat'l Ins. Co. v. Lan*, 152 F. Supp. 2d 506, 520 (S.D.N.Y. 2001) ("A nonsignatory to an agreement containing an arbitration provision can be compelled to arbitrate when the nonsignatory is a party to a separate contractual relationship with the signatory to the arbitration agreement which incorporates the existing arbitration clause"); *General Re Corp. v. Foxe*, 177 Misc. 2d 867, 880, 678 N.Y.S.2d 459, 468 (Sup. Ct. N.Y. Co. 1998) (finding that nonsignatory to arbitration agreement was bound to agreement because, in part, nonsignatory agreed to ensure a signatory's obligations under the contract).

Courts routinely find that arbitration and other ADR clauses, such as the AWAC clause, bind nonsignatories like Arch when the clauses broadly provide that "[a]ny and all disputes or

---

[11]  In *Gulf Underwriters Ins. Co.*, the First Department squarely held that the plaintiff excess insurance carrier was bound to the primary insurance policy's arbitration clause "by operation of [the carrier's] excess coverage policy." 2006 WL 2621039, at *1. The court went on to rule that the insured defendant, Verizon, did not have a right to compel the plaintiff to arbitrate the plaintiff's declaratory action, but only because the arbitration clause in question narrowly provided that only claims **by the insured against the insurer** were subject to arbitration, not vice versa. *Id.* Thus, the court explained that "[s]ince Verizon is not the insurer, there is no arbitration requirement which conditions plaintiff's ability to seek judicial review." *Id.* In sharp contrast, the AWAC ADR provision broadly provides that "[a]ny and all disputes" rising under the policy "shall be subject to [ADR]." (Am. Compl. Ex. E at 5.)

differences which may arise under the policy . . . shall be subject to [ADR]." (Am. Compl. Ex. E at 5.) *See Clarendon Nat'l Ins. Co.*, 152 F. Supp. 2d at 520-21 (finding arbitration clause similar to the AWAC clause to be binding on a nonsignatory). Undeniably, Count I is a dispute "arising under" the AWAC policy, because Arch seeks to utilize the AWAC prior knowledge exclusion to avoid its contractual duties to the insureds. (*See* Am. Compl. ¶ 79.)

The cases relied upon by Arch for its proposition that "courts exercise caution to avoid foisting the obligations of ADR agreements upon non-parties" (*see* Opp. at 19) are inapposite. Specifically, in *Corbetta Constr. Co. v. George F. Driscoll Co.*, 17 A.D.2d 176, 179, 233 N.Y.S.2d 225, 228 (1st Dep't 1962), unlike here, the plaintiff did not execute any agreements incorporating the terms and conditions of the contract that contained the arbitration clause. *Id.* (subcontract at issue did not "incorporate[] the main contract [which provided for arbitration] [or] its terms either directly, by reference or even by implication"). In *Nat'l Recreational Prods., Inc. v. Gans*, 46 A.D. 618, 619, 359 N.Y.S.2d 803, 805 (1st Dep't 1974), the issue was whether a guarantor to an employment contract containing an arbitration clause needed to be a party to an arbitration between the employer and employee. The First Department held that the guarantor need not be a party so long as the guarantor was bound to the results of the arbitration. *Id.* Here, the insureds are not seeking to require that Arch be a party to an ADR proceeding with AWAC; rather, Arch is seeking to negate the ADR provision altogether.

Arch cannot selectively utilize what it deems to be the benefits of the AWAC Policy (*i.e.*, the prior knowledge exclusion) while ignoring the insureds' contractual right to ADR in the same Policy. Nor should this Court permit Arch to eviscerate the insureds' rights through a declaratory judgment action. Indeed, it is well established that New York public policy strongly favors enforcing arbitration clauses. *Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 49, 666 N.Y.S.2d 990, 995 (1997) ("[t]his decision [upholding enforcement of an arbitration clause] fortifies and advances the long and strong public policy favoring arbitration"); *State of New York v. Philip Morris Inc.*, 30 A.D.3d 26, 31, 813 N.Y.S.2d 71, 75 (1st Dep't 2006) ("Arbitration is

strongly favored under New York law."). Federal law is in accord. Recently, in *Nardi v. Povich*, No. 105554/06, 2006 WL 2127714, at *4-5 (Sup. Ct. N.Y. Co. July 31, 2006) (Fried, J.), this Court reemphasized the strong federal policy favoring arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("FAA").[12] In a decision holding that a nonsignatory was bound to an arbitration agreement, Justice Fried noted that "any ambiguities as to the scope of an arbitration provision governed by the FAA would be properly resolved in favor of arbitration." *Id.* at 5 (internal quotations omitted). Likewise, the court in *Verizon New York Inc. v. Broadview Networks, Inc.*, 5 Misc. 3d 346, 350 n.4, 781 N.Y.S.2d 211, 214 n.4 (Sup. Ct. N.Y. Co. 2004), stressed that "courts should construe arbitration clauses as broadly as possible and any doubt or ambiguity as to the scope of the arbitration agreement should be resolved in favor of arbitration." *Id.* (internal quotations and citations omitted); *see also Philip Morris, Inc.*, 30 A.D.3d at 31, 813 N.Y.S.2d at 75 ("[a]ny doubts as to whether an issue is arbitrable will be resolved in favor of arbitration").

Arch's position – that it may cherry-pick certain provisions of the AWAC Policy while disregarding the ADR clause – would not only negate the Officer Defendants' right to ADR; if adopted by the courts, it would set an untenable precedent, whereby one insurance carrier in a tower could easily override the contractual rights of insureds under other policies. Indeed, the carrier which did sign the ADR agreement could, as a practical matter, avoid its ADR obligations altogether by arranging for an excess carrier to litigate the dispute by proxy. Such a result would open the door to enormous mischief and offend the strong public policy in favor of ADR.

---

[12] The FAA provides in pertinent part that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Nardi*, 2006 WL 2127714, at *3 (quoting 9 U.S.C. § 2). The FAA is applicable to insurance contracts because "insurance transactions constitute commerce within the meaning of the Commerce Clause." *Utica Mutual Ins. Co. v. Gulf Ins. Co.*, 306 A.D.2d 877, 878, 762 N.Y.S.2d 730, 732 (4th Dep't 2003) (citing *United States v. South-Eastern Underwriters Assn.*, 322 U.S. 533, 553 (1944)).

Arch next contends that this Court should not dismiss or stay Count I because the Officer Defendants have not yet commenced an ADR proceeding against AWAC. (Opp. at 19.) But New York courts have long recognized that defendants need not take affirmative steps to initiate ADR. *See Bd. of Educ., Utica School Dist. # 1 v. Delle Cese*, 65 Misc. 2d 473, 478, 318 N.Y.S.2d 46, 51 (Sup. Ct. Oneida Co. 1971) ("one who does not wish to take the affirmative of compelling arbitration still has the right to have the action at law stayed"). Indeed, the court in *Bd. of Educ., Utica School Dist. # 1* reasoned that "[i]t is traditional that a defendant may ordinarily let a sleeping dog lie until he is in danger of being bitten." *Id.* at 477, 318 N.Y.S.2d at 50 (internal quotations omitted). The insureds are not in immediate danger of "being bitten" by AWAC, which is the third-tier insurance carrier – one tier below Arch. (*See* Officer Defs' Mem. at 6.) Defendants would need to exhaust approximately $22.6 million before the AWAC Policy is triggered. Defendants' "failure" to initiate a premature ADR proceeding against AWAC – to resolve a dispute which is still entirely speculative – cannot be used to justify Arch's attempt to end-run the ADR clause entirely. Tellingly, AWAC has not initiated any ADR proceeding either. This means one of two things: either AWAC (like the insureds) believes that the "dispute" is premature, or else AWAC is in collusion with Arch to avoid its ADR obligations.

Finally, Arch erroneously asserts that Count I cannot be dismissed before the ADR process has been completed. (Opp. at 20.) But the weight of the law is overwhelmingly to the contrary. In actions seeking a declaratory judgment, such as Count I, New York courts routinely "decline to exercise jurisdiction over such an action in favor of the contractual arbitration provisions," regardless of whether those proceedings are completed, pending, or not yet begun. *Hanna v. Zumpano*, 267 A.D.2d 1028, 1028-29, 701 N.Y.S.2d 553, 554 (4th Dep't 1999) (quoting *Little v. Willis*, 55 A.D.2d 854, 390 N.Y.S.2d 347, 348 (4th Dep't 1976)). *See also Kalisch-Jarcho, Inc. v. City of New York*, 72 N.Y.2d 727, 731-32, 536 N.Y.S.2d 419, 421 (1988) (declaratory action was improper in light of arbitration agreement between the parties); *Rhinestone v. New York City Transit Auth.*, 142 A.D.2d 562, 563, 530 N.Y.S.2d 227, 228 (2d

- 14 -

Dep't 1988) (Supreme Court "should have declined to exercise jurisdiction over the claim . . . in deference to the pending arbitration proceeding") (internal citations omitted); *Little*, 55 A.D.2d at 854, 390 N.Y.S.2d at 348 (upholding Supreme Court's dismissal of declaratory action as "proper" because of arbitration clause).

For all of these reasons, Count I should be dismissed, or in the alternative, stayed in accordance with the AWAC ADR provision.

## CONCLUSION

Based on the foregoing, and the reasons discussed in the Officer Defendants' Initial Brief, the Officer Defendants' motion to dismiss or, in the alternative, for a stay should be granted in its entirety.

Dated:  October 31, 2006

Respectfully submitted,

_Robert Korenblat_

Barbara Moses
Rachel Korenblat
**MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO & BOHRER, P.C.**
565 Fifth Avenue
New York, NY 10071
Telephone:    212-856-9600
Facsimile:     212-856-9494

*Attorneys for Defendant Robert C. Trosten*

_Helen Kim / Rank_

Ona T. Wang
Joseph L. Chairez (*pro hac vice* to be filed)
Helen B. Kim
**BAKER & HOSTETLER LLP**
666 Fifth Avenue
New York, NY 10103
Telephone:    212-589-4200
Facsimile:     212-589-4201

*Attorneys for Defendants*
*Dennis Klejna and Joseph Murphy*

- 15 -

_Ivan Kline / emk_

Stuart I. Friedman
Ivan O. Kline
Elizabeth D. Meacham
**FRIEDMAN & WITTENSTEIN**
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone:    212-750-8700
Facsimile:    212-223-8391

*Attorneys for Defendants Gerald Sherer and William M. Sexton*


_Holly Kulka / emk_

Holly Kulka
**HELLER EHRMAN WHITE & MCAULIFFE, LLP**
7 Times Square
New York, NY 10036
Telephone:    212-847-8601
Facsimile:    212-763-7600
*Attorneys for Defendant Philip Silverman*


_Laura Neish / emk_

Laura Neish
**ZUCKERMAN SPAEDER LLP**
1540 Broadway, Suite 1604
New York, New York 10036
Telephone:    212-704-9600
Facsimile:    212-704-4256

-and-

Michael T. Hannafan (*pro hac vice* to be filed)
Blake T. Hannafan (*pro hac vice* to be filed)
**HANNAFAN & HANNAFAN, LTD.**
One East Wacker Drive, Suite 1208
Chicago, IL  60601
Telephone:    312-527-0055
Facsimile:    312-527-0220
*Attorneys for Defendant Tone N. Grant*

- 16 -

EXHIBIT F

02/22/2007  13:05 FAX 212 589 4201          BAKER & HOSTETLER                    ☐002/005

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:  _____  **HELEN E. FREEDMAN** _____          PART __39__
                              *Justice*

| | |
|---|---|
| Arch Ins. Co., | |
| | INDEX NO. 600805/06 |
| Plaintiff, | |
| | MOTION DATE _____ |
| - v - | |
| Phillip R. Bennett et al., | |
| | MOTION SEQ. NO. 005 |
| Defendants | |
| | MOTION CAL. NO. _____ |

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause · Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits | _____ |

<div style="text-align:center">

## Cross-Motion:   ☐ Yes   ☒ No

</div>

*MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):*

    The motions with sequence numbers 001, 002, and 005 are consolidated for joint disposition.

    In this lawsuit, plaintiff Arch Insurance Company ("Arch") seeks declaratory judgments that its excess liability insurance policy does not afford coverage to former directors and officers of a now-bankrupt corporation, Refco, Inc. ("Refco, Inc."), and Refco affiliates.  Defendants now move for orders dismissing or staying this action primarily on the grounds that it is premature and unripe, and that it should await the outcome of a related criminal trial.  For the reasons set forth below, the motions are granted to the extent that the complaint is dismissed without prejudice.

    *Background* — Refco, a publicly-traded corporation which provided services to financial markets, collapsed immediately after the company announced on October 10, 2005 that its financial statements failed to disclose that it carried an undisclosed receivable of $ 430 million from an entity that Refco's CEO, Phillip Bennett, controlled.  On the following day, Refco announced that the receivable derived largely from uncollectible debt that that third parties owed to Refco.

    Refco filed for bankruptcy on October 12.  In November 2005, a federal grand jury indicted Bennett on charges of securities fraud and related charges; the indictment alleged that Bennett

    sought to hide from, among others, Refco's auditors and investors, losses sustained by Refco through its own and its customers' trading in the financial

<div style="text-align:center">

Page 1 of  4

</div>

markets. To that end, Bennett transferred losses from Refco to a company controlled by Bennett, directed a repeated series of transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make false and fraudulent public filings with the [SEC].

In addition, Refco shareholders, bondholders, customers, and others have filed at least six civil lawsuits (the "Underlying Lawsuits") which, like the criminal proceeding, accuse Bennett of concealing Refco's bad debt through a series of sham transactions. The defendants in this action are defendants in some or all the Underlying Lawsuits.

*Insurance Policies* – Refco and its affiliates simultaneously held five primary and excess "Directors and Officers" insurance policies that provided one year of coverage beginning on August 11, 2005. The primary carrier, U.S. Specialty Insurance Company ("U.S. Specialty"), covers liability of up to an aggregate of $ 10 million for a number of types of claims. The first tier excess carrier, Lexington Insurance Company ("Lexington"), covers the next $ 7.5 million of liability; Lexington and its insureds dispute whether the policy covers legal defense costs. The second tier excess carrier, Axis Reinsurance Company ("Axis"), covers the next $ 10 million of aggregate liability, inclusive of defense costs. The third tier excess carrier, Allied World Assurance Company ("AWAC"), provides an aggregate liability limit of $ 12.5 million, including defense costs.

The fourth tier excess carrier, plaintiff Arch, issued a policy that limits liability, including defense costs and expenses, to an aggregate of $ 10 million for "Claims." The Arch policy also states that its coverage extends no further than that provided by the most restrictive underlying policy.

Certain defendants have tendered their defense of the Underlying Lawsuits to, and demanded indemnification from, the aforementioned insurers. U.S. Specialty has reserved its rights to deny coverage but has paid or reimbursed several defendants for defense costs totaling about $ 4.9 million as of October 2006. None of the excess coverage has been reached. Lexington initially reserved its rights and denied coverage for defense costs on the ground that its policy did not cover them. However, Lexington later agreed to advance defense costs if defendants agreed to repay them if they were later determined not to be covered.

AWAC denied coverage, in part, based on its policy's "Prior Knowledge Exclusion," which excludes coverage for all of its insureds with respect to claims that arose from circumstances which any insured knew about as of August 11, 2005, if the insured expected or should have expected those circumstances to lead to future insurance claims against AWAC. In addition, the AWAC policy mandates that any coverage disputes under its policy are subject to alternative dispute resolution ("ADR").

Arch responded to defendants' coverage demands by filing this declaratory judgment action. The first count in the amended complaint seeks a declaration that, since Arch's policy incorporates any coverage restrictions in the underlying insurance policies, the AWAC's Prior Knowledge Exclusion bars coverage for the Underlying Lawsuits. Arch asserts that the AWAC Prior Knowledge Exclusion applies because of what Bennett knew as of August 11, 2005.

In the second count, Arch seeks a declaration that the Prior Knowledge Exclusion in its own policy bars coverage, due to Bennett's knowledge as of August 11, 2005.

The third count seeks a declaration that the Arch policy does not cover defense costs because the Lexington policy excludes them.

*Motions: Officer Defendants* – In motion number 001, defendants Tone Grant, Dennis A. Klejna, Joseph Murphy, Perry Rotkowitz, William M. Sexton, Gerald Sherer, Philip Silverman and Robert C. Trosten (the "Officer Defendants") move for an order dismissing the complaint on the ground that no justiciable dispute currently exists between Arch and the movants, because it is unlikely that coverage under the Arch policy will ever be reached. That could not occur until defendants' claims exceed $ 40 million and exhaust the coverage that U.S. Specialty, Lexington, Axis, and AWAC provide.

To maintain a declaratory judgment action, a plaintiff must have an "interest sufficient to constitute standing to maintain the action," and must face "present, rather than hypothetical, contingent or remote, prejudice." *Am. Ins. Assoc. v. Chu*, 64 N.Y.2d 379, 383 (1985). This lawsuit is dismissed as premature because at present the chances of Arch's policy being triggered are too remote. The primary carrier has paid out less than half of its policy limit, and none of the other excess carriers' coverage has been reached. Moreover, Arch fails to show that potential judgments, settlements and defense costs related to the Underlying Lawsuits are likely to exceed $ 40 million. It is particularly unlikely that the movants will incur defense costs that exceed $ 40 million, and accordingly the third count in Arch's complaint, which pertains only to defense costs, is especially unripe.

As an additional ground for dismissal, the Officer Defendants point out that the first and second counts, which invoke the Prior Knowledge Exclusion in the AWAC and Arch policies, are unripe because they are predicated on claims against Bennett that will be determined in the Underlying Lawsuits. "The general rule is that a declaratory judgment as to a carrier's obligation to indemnify may be granted in advance of trial of the underlying tort action only if it can be concluded as a matter of law that there is no factual or legal basis on which the insurer may eventually be held liable under its policy." *First St. Ins. Co. v. J & S United Amusement Corp.*, 67 N.Y.2d 1044, 1046 (1986). If a carrier's obligation to indemnify its insured turns on an issue of fact that the underlying action will determine, the carrier cannot bring a declaratory judgment action to determine the issue. *See Allstate Ins. Co. v. Santiago*, 98 A.D.2d 608, 608 (1st Dept. 1983). Arch seeks a declaration that the Prior Knowledge Exclusion bars coverage because Bennett concealed related party transactions and uncollectible receivables, and accordingly knew that Refco's financial statements were misleading. However, these accusations against Bennett are central to the Underlying Lawsuits and must be adjudicated in those actions.

The Officer Defendants' final argument is that the first count, which invokes the AWAC policy's Prior Knowledge Exclusion, should be dismissed or stayed because litigating Arch's claim would conflict with the Officer Defendants' right to resolve coverage issues with AWAC through ADR. This issue does not need to be reached because the Prior Knowledge Exclusion in the Arch policy, which the second count invokes, does not afford movants a right to ADR, and because the first count is dismissed for other reasons.

*Director Defendants* – In motion number 002, defendants Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen (the "Director Defendants") seek dismissal on the ground that "Arch has ignored that it is contractually obligated to advance defense costs." In support, the Director Defendants cite to *Fed. Ins. Co. v. Kozlowski*, 18 A.D.3d 33 (1st Dept. 2005), in which the Appellate Division

<div align="center">Page 3 of 4</div>

recognized that a liability insurer must pay defense costs as they are incurred, and cannot defer payment because the claims against the insured in the underlying litigation, if proven, would bar coverage. However, the Director Defendants' argument does not provide an independent basis for dismissing the complaint. As discussed above, this action is unripe and it would be premature to determine the merits in favor of Arch or against it. Also, it is unlikely that Arch's obligations to pay defense costs will ever be triggered, and its duty to pay defense costs, if any, has no bearing upon its duty to indemnify defendants in the Underlying Lawsuits.

*Stephen Bennett* – In motion 005, defendant Stephen Bennett separately moves for a stay of this action on the ground that he is being criminally prosecuted, and defending Arch's lawsuit would require him to waive his right against self-incrimination and jeopardize his criminal defense. While it appears that the relevant factors weigh in favor of staying this action until the criminal proceedings against Bennett conclude, this action is being dismissed as premature and accordingly the question of a stay need not be reached.

ORDERED that the motions are granted to the extent that the complaint is dismissed without prejudice, and it is further

ORDERED that the Clerk is directed to enter judgment accordingly.

Dated:  __February 20, 2007__

_____
Helen E. Freedman, *J.S.C.*

**Check one:**  ☒ **FINAL DISPOSITION**      ☐ **NON-FINAL DISPOSITION**

**Check if appropriate:**      ☐ **DO NOT POST**

Page 4 of 4

EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————— x

UNITED STATES OF AMERICA,

             - against -

                    S3 05 Cr. 1192  (NRB)

PHILLIP R. BENNETT,
ROBERT C. TROSTEN and
TONE N. GRANT,

                Defendants.

———————————————— x

## SENTENCING MEMORANDUM
## OF PHILLIP R. BENNETT

TABLE OF AUTHORITIES ...........................................................................................................v

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND ...........................................................................................................................5

I.     Personal Background ............................................................................................................5

       A.  Mr. Bennett's Background.........................................................................................6

       B.  The Bennett Family ...................................................................................................8

             1.  Mr. Bennett and Valerie...............................................................................9

             2.  Mr. Bennett and his children.......................................................................10

       C.  Phillip Bennett's Character......................................................................................11

             1.  Friends and neighbors .................................................................................12

             2.  Business associates .....................................................................................13

       D.  Kind Deeds and Charitable Works ..........................................................................15

             1.  Vice Chairman and Trustee of the Pingry School Board of Trustees....................17

             2.  Duke University Library Advisory Board ...................................................18

             3.  St. Philip's Academy ..................................................................................19

             4.  New Jersey SEEDS program .......................................................................19

II.    Background to Offense Conduct.........................................................................................20

       A.  Growth of Refco under Mr. Bennett's Leadership ........................................................21

       B.  Mr. Bennett's Substantial Payments Toward the Receivable........................................32

       C.  Mr. Bennett's Conduct when Confronted Regarding the Receivable Balance.............34

       D.  Market Reaction to Disclosure of Receivable Balance ................................................36

ANALYSIS OF § 3553(a) FACTORS ........................................................................................41

I.     Required Sentencing Considerations Following *Booker*, *Gall*, and *Kimbrough* ................41

II.    The Advisory Guidelines Calculation................................................................................43

       A.  Mr. Bennett's Advisory Guidelines Range...............................................................43

B. The Court Should Reject Mr. Bennett's Advisory Guidelines Range and Impose a Non-Guidelines Sentence No Greater Than Necessary to Accomplish the Goals of § 3553(a) in This Case ..........................................................44

III.   Consideration of All of the § 3553(a) Factors Supports the Conclusion that a Sentence Substantially Below the Advisory Guidelines Range is Appropriate .................49

   A. Section 3553(a)(1):  History and Characteristics of Phillip Bennett ............................51

      1. Mr. Bennett's exemplary personal life and dedication to his community merit a sentence substantially below the advisory Guidelines calculation of life.................................................................................................................................51

      2. Mr. Bennett's extraordinarily close relationship with his wife and two children warrants a sentence substantially below the advisory Guidelines calculation of life .........................................................................................................52

      3. Mr. Bennett's ameliorative efforts and acceptance of responsibility warrant a sentence substantially below the advisory Guidelines range.................53

         a.   Mr. Bennett's offers to cooperate with the government ...............................53

         b.   The impact of Mr. Bennett's guilty plea.......................................................54

         c.   Mr. Bennett's cooperation with the Refco Litigation Trustee and the Class Action Plaintiffs...........................................................................55

         d.   Mr. Bennett's agreement to forfeit all of his assets .....................................57

   B. Section 3553(a)(1):  Nature and Circumstances of the Offense ...................................59

      1. Mr. Bennett was trying to save the company, he was not stealing, and he did not intend for anyone to lose money.................................................................59

      2. The losses associated with Refco's collapse are not a fair reflection of Mr. Bennett's wrongdoing ....................................................................................66

   C. A Custodial Sentence Well Short of Life Imprisonment is "Just Punishment," Sufficiently Severe So as to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Deter Future Wrongdoing .................................70

      1. Sentences in serious fraud cases have historically been significantly lower than the sentence called for by the advisory Guidelines.......................................70

      2. Even in a generally harsher sentencing environment, a sentence well short of the advisory Guidelines "range" of life imprisonment is appropriate ..............73

      3. Mr. Bennett's deportation after his sentence adds further support to the conclusion that a custodial sentence well below the advisory Guidelines range is sufficient to effectuate the goals of § 3553(a)..........................................76

4. A non-Guidelines sentence will be sufficient to provide specific and general deterrence ................................................................................................. 77

    a. Specific deterrence ........................................................................................ 77

    b. General deterrence ........................................................................................ 78

CONCLUSION ............................................................................................................. 79

KL3 2660606.1

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Gall v. United States*,
128 S.Ct. 586 (2007)................................................................................................ *passim*

*Koon v. United States*,
518 U.S. 81 (1996).........................................................................................................44

*Mistretta v. United States*,
488 U.S. 361 (1989).......................................................................................................45

*Rita v. United States*,
127 S.Ct. 2456 (2007)..............................................................................................42, 43

*United States v. Adelson*,
441 F.Supp.2d 506  (S.D.N.Y. 2006).............................................................. *passim*

*United States v. Booker*,
543 U.S. 220 (2005)..................................................................................................41, 43

*United States v. Brennick*,
134 F.3d 10 (1st Cir. 1998) .........................................................................................61

*United States v. Carboni*,
204 F.3d 39 (2d Cir. 2000)...........................................................................................43

*United States v. Emmenegger*,
329 F.Supp.2d 416 (S.D.N.Y. 2005).................................................................61, 66, 77

*United States v. Fernandez*,
443 F.3d 19 (2d Cir. 2006)...........................................................................................54

*United States v. Forchette*,
220 F.Supp.2d 914 (E.D. Wis. 2002)...........................................................................61

*United States v. Garcia*,
926 F.2d 125 (2d Cir. 1991).....................................................................................55, 56

*United States v. Jaber*,
362 F.Supp.2d 365 (D. Mass. 2005) ..........................................................................47

*United States v. Kimbrough*,
128 S.Ct. 558 (2007)............................................................................................... *passim*

*United States v. Milne*,
    384 F.Supp.2d 1309 (E.D. Wisc. 2005)...........................................................................51, 58

*United States v. Milken*,
    1992 WL 196797 (S.D.N.Y. Aug. 5, 1992) ........................................................................72

*United States v. Nellum*,
    No. 2:04-CR-30-PS, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005)..........................................53

*United States v. Ranum*,
    353 F.Supp.2d 984 (E.D. Wisc. 2005).................................................................................52

*United States v. Restrepo*,
    999 F.2d 640 (2d Cir. 1993)................................................................................................77

*United States v. Smirlock,*
    2005 WL 975875 (GEL) (S.D.N.Y. Apr. 22 2005) .............................................................75

*United States v. Wills*,
    476 F.3d 103 (2d Cir. 2007)................................................................................................77

*United States v. Yeaman*,
    248 F.3d 223 (3d Cir. 2001)................................................................................................78

## STATUTES

18 U.S.C. § 3553 ............................................................................................................ *passim*

28 U.S.C. § 991(b) ...................................................................................................................47

## MISCELLANEOUS

*Federal Sentencing Under "Advisory" Guidelines: Observations by District Judges,* 75
    Fordham L. Rev. 1 ...........................................................................................................43

Frank O. Bowman, III, *Pour encourager les autres? The Curious History and
    Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and
    the Sentencing Guidelines Amendments That Followed*, 1 Ohio St. J. Crim. Law 373..........46

Government Sentencing Memorandum, *United States v. Kumar*, No. CR-04-864
    (E.D.N.Y 2006)................................................................................................................59

Grant Trial Tr................................................................................................................ *passim*

Guidelines Manual Appendix C Amendment 647 (2003) ...........................................................48

KL3 2660606.1

Jose Cabranes & Kate Stith, *Fear of Judging: Sentencing Guidelines in the Federal Courts* ............................................................................................................46, 47

Kurt Eichenwald, *Term is Longest of Any Given in Scandal,* N.Y. Times, Nov. 22, 1990 ..........72

Paul J. Hofer & Mark H. Allenbaugh, *Perspectives on the Federal Sentencing Guidelines and Mandatory Sentencing,* 40 Am.Crim.L.Rev. 19 ......................................................46, 78

S. Rep.No. 104-98 (1995), ...............................................................................................69

Sentencing Transcript, *United States v. Armstrong,*
No. 99 Cr. 997 (JFK) (S.D.N.Y. 2007) .................................................................74

Sentencing Transcript, *United States v. Fastow*,
No. CR-H-665 (S.D. Tex. Sept. 26, 2006) ...........................................................57

Sentencing Transcript, *United States v. Humphreys*,
No. 02 Cr. 1559 (S.D.N.Y. 2007) .........................................................................63

Sentencing Transcript, *United States v. Kumar*,
No. CR-04-864 (E.D.N.Y 2006) ...........................................................................59

Sentencing Transcript, *United States v. Strafaci*,
No. 03 Cr. 1182 (S.D.N.Y.  2005) ........................................................................65

Sentencing Transcript, *United States v. Walder*,
No. 02 Cr. 469 (RMB) (S.D.N.Y 2003).................................................................75

U.S. Sentencing Commission's Sourcebook of Federal Sentencing Statistics,
http://www.ussc.gov/ANNRPT/ .........................................................70, 71, 73, 76

U.S.S.G. § 3E1.1 ..............................................................................................................58

U.S.S.G. § 5K1.1 ..............................................................................................................54

U.S.S.G. § 5K2.0 ..............................................................................................................55

U.S.S.G. § 5K2.1 ..............................................................................................................55

Phillip Bennett, by and through his undersigned counsel, respectfully submits this memorandum to assist the Court in determining an appropriate sentence following his plea of guilty to the 20 counts alleged in the indictment.  For the reasons set forth below, we respectfully submit that an appropriate sentence in this case would be a period of incarceration substantially below the life sentence called for by the advisory Guidelines, or any term of years amounting to a life sentence for Mr. Bennett, a 60-year-old man.

## PRELIMINARY STATEMENT

Having pleaded guilty and accepted responsibility for his actions, Mr. Bennett stands before this Court for sentencing.  Your Honor recently presided over the month-long trial of Mr. Bennett's co-defendant Tone Grant, at which it was in the interest of both the government and Mr. Grant to portray Mr. Bennett, who of course was not present, in as poor a light as possible.  The image that emerged was not a flattering one.  Nor, however, was it entirely accurate, and it was certainly not complete.  While Mr. Bennett, as he has candidly admitted, did commit a serious financial crime, the person vilified at Mr. Grant's trial is not the person Your Honor will be sentencing on June 19.

The Court, of course, following *United States v. Booker* and, more recently, *Gall v. United States*, must give due consideration to all of the factors set forth in 18 U.S.C. § 3553.  The statute mandates imposition of a sentence that is "sufficient, but not greater than necessary" to comply with the purposes enumerated in its subsections, including deterrence, protecting the public, and promoting respect for the law.  We respectfully submit that the sentence of life imprisonment called for by one of the § 3553 factors – the advisory Guidelines – would be, as Judge Rakoff concluded in sentencing another defendant convicted of a financial fraud with a large monetary loss, nothing short of "barbarity."  The same holds true, we suggest, for any sentence that is the functional equivalent of life for a 60-year-old man who, at the end of his

incarceration will be left stripped of his assets, and then deported from his and his family's home of 30 years and separated from his children.

The only reason that Mr. Bennett is now facing the prospect, under the advisory Guidelines, of a life sentence, is because of the loss amount associated with his offense. As the result of recent amendments, the Guidelines for fraud crimes are driven by the loss amount to the exclusion of all of the other § 3553(a) factors. For this reason, and because the extreme sentences yielded by the fraud Guidelines are not based upon a reasoned assessment of empirical sentencing data, the Guidelines do not produce anything approaching a fair and just sentence in this case. Indeed, the effect of the current Guidelines regime is to generate extraordinarily long sentences in most white-collar cases – and life sentences in virtually all cases of public company fraud – without regard to the specific facts of the case, the characteristics of the offender, or the purposes of sentencing.[1]

Accordingly, in fashioning a "sufficient, but not greater than necessary" sentence for Mr. Bennett, we respectfully urge Your Honor to consider not only the totality of Mr. Bennett's life and character – as described by his family, friends and colleagues who know him best and have written on his behalf – but also several important mitigating facts that bear on determining just punishment in this case:

- Mr. Bennett pleaded guilty and, as the government has acknowledged, accepted responsibility for his actions. Indeed, from the moment the Refco Group Holdings, Inc. ("RGHI") receivable was discovered – when Mr. Bennett flew back from Japan to deal with the issue, met initially with the Refco Board of Directors without counsel, and volunteered to pay off the receivable in full – Mr. Bennett has not shirked responsibility. This is in stark contrast to the conduct of other high-profile white-collar defendants who put the government and the Court

---

[1]     By way of example, a loss amount of more than $7 million would produce an advisory Guidelines sentence (absent any departures) of 30 years to life. Were it not for the loss amount in this case, Mr. Bennett's advisory Guidelines sentence would be 41 to 51 months.

through the time and expense of a trial, and, in a number of cases, obstructed justice or committed perjury.

- Mr. Bennett's efforts to take responsibility and, in some measure, make amends for his crimes began in late 2005, shortly after his indictment. The government declined Mr. Bennett's offers to cooperate in its ongoing investigations, both then and at various times throughout the 2006 – early 2008 period. Nor were we able to agree upon a negotiated disposition of the case; as a result, Mr. Bennett took the extreme course of pleading guilty to the entire indictment.

- Since pleading guilty Mr. Bennett has been cooperating with the Trustee of the Refco estate and counsel for the Refco Class Action Plaintiffs (both of whom have submitted letters attesting to the uniqueness and value of Mr. Bennett's cooperation, *see* Exhs. 1 and 2, respectively), and is helping to return millions of dollars to those who lost money in the Refco bankruptcy.[2]

- Mr. Bennett has forthrightly acknowledged that concealing the related-party nature of the RGHI receivable was wrong and unlawful. Yet this was not a crime born of sheer personal avarice, but one engendered by a misguided effort to deal with a series of customer losses and business reversals that threatened the company's existence had they been fully disclosed.

- During the six years he was CEO of Refco, Mr. Bennett directed hundreds of millions of dollars – monies he could have taken for personal use – to paying down the receivable balance, in a manner that he hoped and believed would eliminate the issue without harming Refco's lenders and investors. At the same time, Mr. Bennett, believing he could rescue Refco from financial oblivion, worked extraordinarily hard to build the company into one of the largest futures brokerages in the United States, turning it into a market leader in a growth industry.

- Mr. Bennett's intention to retire the receivable balance is perhaps best illustrated by his use of the bulk of the proceeds he received in Refco's IPO – the transaction characterized by the government as the culmination of the fraud – to pay down the RGHI receivable balance and other debts to Refco. This payment of more than $100 million by Mr. Bennett occurred prior to the discovery of the receivable.

As set forth in the second half of this memorandum, courts in comparable cases

have relied on facts akin to these in concluding that a non-Guidelines sentence was warranted.

Indeed, courts have found that a sentence substantially short of life imprisonment would

---

[2]     The exhibits referenced herein are bound in a separate volume accompanying this memorandum.

accomplish all of the goals of § 3553(a) in cases involving crimes of pure greed, with few or no mitigating factors, and where the defendant compounded the wrong, and demonstrated contempt for the justice system, by obstructing justice. We respectfully submit that to impose a life sentence in this case – or a term of years amounting to a life sentence for Mr. Bennett, a 60-year-old man – would be at odds with a full and fair assessment of the considerations set forth in the statute; would deprive Mr. Bennett of any credit for accepting responsibility, pleading guilty, and cooperating with the civil plaintiffs to return money to victims of the Refco fraud; and would be inconsistent with sentences imposed on similarly situated white-collar defendants, including those who pleaded guilty to significant financial frauds in this district.

# BACKGROUND

> But, surely, if ever a man is to receive credit for the good he has
> done, and his immediate misconduct assessed in the context of his
> overall life hitherto, it should be at the moment of his sentencing,
> when his very future hangs in the balance.  This elementary
> principle of weighing the good with the bad, which is basic to all
> the great religions, moral philosophies, and systems of justice, was
> plainly part of what Congress had in mind when it directed courts
> to consider, as a necessary sentencing factor, "the history and
> characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006) (Rakoff, J.).

## I.      Personal Background

Mr. Bennett is a first time offender who, as attested by the family, friends and

colleagues who have submitted letters on his behalf, has lived his life with integrity, compassion,

and an intellectual engagement with the world evident since his early days growing up in

England.  What emerges from these letters, which we have excerpted in part here but urge the

Court to read in their entirety, is a picture of a man with a strong work ethic, sense of honor and

personal morality, commitment to his community, and deep love for his family.[3]  Through hard

work and determination, Phillip Bennett rose beyond his modest beginnings, yet he has always

retained the basic values learned in his youth, conducted himself with decency towards people

from all walks of life, and freely extended a helping hand to those in need or less fortunate than

himself.  In this regard, it is significant that the letters submitted on Mr. Bennett's behalf come in

substantial part not from the wealthy and powerful, but from ordinary people who have known

him and his family over the many years they have lived in New Jersey.

---

[3]     Letters in support of Mr. Bennett are bound in a separate volume accompanying this
memorandum, referenced herein as "*Letters*."

### A.      Mr. Bennett's Background

Phillip Bennett and his wife Valerie left England shortly after completing their university education 37 years ago.  They have lived in the United States for 30 years.  It is in this country that Mr. Bennett has raised his family and made his life.  As Valerie puts it, "our path led us to America which has been and will remain our adopted country."  (*Letters*, Tab 8).

Born in 1948, Mr. Bennett grew up in Leonard Stanley, a village in Gloucestershire, England.  He came from a middle-class home; his father was an engineer who had served in the Royal Air Force during World War II, and his mother an administrative assistant.  The family lived in government housing until Mr. Bennett was sixteen, by which point his father had earned enough money to afford a modest home of their own.  Mr. Bennett's parents, now in their late eighties, recall:  "Those days were frugal for working people like us but we persevered to provide for our three children as well as we were able.  It was very important to us that we established a sound family foundation and that we instilled in Phillip and our other children, strong values of determination, perseverance, loyalty and a strong work ethic."  (*Letters*, Tab 7).  Mr. Bennett's work ethic – which would be part of the bedrock of his character for the remainder of his life – developed during this period.  On the weekends, he earned money delivering meat for the local butcher, and during the summertime worked in farms and local factories.

Mr. Bennett distinguished himself at Marling School in Stroud, England, a local grammar school that selected students on the basis of academic merit.  Mr. Bennett's younger brother, Mark Bennett, remembers that Mr. Bennett "was an exemplary student, he did everything asked of him and more.  He participated energetically in sports activities and in the debating society and was ultimately captain of rugby and cricket and head boy [senior class president] of the school.  The teachers trusted him completely, he was popular and respected and

motivated his fellow pupils to win on the sports field and in the classroom."  (*Letters*, Tab 6).

Mr. Bennett's schoolmate and life-long friend, Paul Neale, recalls that even as a young man, Mr.

Bennett displayed the same quality of leadership – accompanied by basic decency and integrity –

that would characterize his later life:  "Phillip quickly emerged as a natural and gifted leader.

Throughout his school life, he was the person appointed with acclaim as class, sports team and

ultimately school captain.  He was respected for his honesty and openness, his personal and

intellectual courage and for a fair and even handed approach in dealing with people."  (*Letters*,

Tab 29).

   At age 18, Mr. Bennett was accepted into the University of Cambridge.  He

worked the year prior to enrolling as a teacher at a local school to help finance his education.

Mr. Bennett was the first member of the Bennett family to attend university – an accomplishment

that his parents attribute to "sheer determination, hard work, and aspiration."  (*Letters*, Tab 7).

He studied from 1967 to 1970, earning a Master of Arts degree in Geography, and distinguishing

himself in rugby, also a passion.  And it was at Cambridge, studying late one night in the library,

that Mr. Bennett met the woman who would become his wife of 36 years, Valerie.  Valerie was

also a Geography student, near the top of her class at Cambridge.

   Upon graduating, Mr. Bennett entered into a training program with Chase Bank in

London.  His job soon took him, and then Valerie (after she graduated from Cambridge, two

years after Mr. Bennett), to Brussels, then to New York briefly and Toronto, and finally to New

Jersey, where they settled in 1978.  As he rose steadily in the Chase organization, Mr. Bennett

earned a reputation, once again, for hard work and determination, but also one for kindness and

respect towards his fellow employees.  (*See*, *e.g*., *Letters*, Tab 29 (Paul Neale) ("There was one

individual [in Phil's department at Chase] in particular who was suffering the acute personal

distress of a relationship breakdown.  Not only did Phillip ease his burden by personally taking on some of his work duties, but he also welcomed him into his own home in Summit, New Jersey – an act of instinctive decency and humanity.")).

It was at Chase, in New York, that Mr. Bennett first developed a relationship with Refco, at the time a client of the bank's commodities financing unit.  Mr. Bennett's career at Refco is described in further detail below, *infra* 21-32.

## B.    The Bennett Family

The most single important thing in Mr. Bennett's life has always been his family, which has, understandably, been deeply affected by the indictment, the press it has generated, and Mr. Bennett's subsequent guilty plea.  Mr. Bennett and Valerie have been together since they were teenagers, forty years ago, at Cambridge; they left their home country together and built their lives here together, raising their children in this country, and instilling in them the same respect for integrity, hard work, and kindness that they themselves learned while growing up in England.  As Valerie writes in her letter to the Court, "Because we left England and our families to come to America so many years ago, Phil and I are not only father and mother to our children, but also grandfather and grandmother, uncle and aunt.  Phil and I have developed an inseparable bond."  (*Letters*, Tab 8).

While they have lived comfortably in undeniable affluence, the Bennetts are a reserved and intimate family, who enjoy simple pleasures in life, and have a small circle of friends.  Recognizing that they are about to experience some period of separation, the Bennett family hopes that they will one day be reunited, and permitted to spend part of Mr. Bennett's remaining years quietly together.

### 1.     Mr. Bennett and Valerie

In her letter to the Court, Valerie Bennett describes the devastating impact that any prolonged period of separation from Mr. Bennett will have on her: "I am, quite simply, scared to death at the thought of life without him by my side." (*Letters*, Tab 8). By nature an introverted person, Valerie's life revolves around Mr. Bennett; over the years he has become to her "a bridge [to] the outside world." (*Id*.; *see also* Pre-Sentence Report ("PSR") at § 122 ("Mrs. Bennett reported that she is not as social a person as the defendant and has relied heavily upon him, both emotionally and practically, throughout their 35-year marriage.")).[4] Valerie, who is 57 years old, has not worked full-time in decades, having spent most of the Bennetts' thirty years in this country raising the children and taking care of the home. Valerie writes, "[W]e have always lived a quiet life: we do not belong to country clubs, attend cocktail parties or entertain. Since our children have grown older, our weekends have been spent working together in our perennial garden, to which we have become enslaved, walking our dogs across the fields, and sharing a glass of wine and a home cooked meal." (*Letters*, Tab 8). The Bennetts' son Colin explains that "[my parents] are each other's best friend and have always chosen to spend their free time quietly together or with me and my sister, rarely joining in more formal social occasions. . . . How my mother will cope with being separated from my dad worries me. . . . I can only imagine how alone and isolated my mother will feel without him around." (*Letters*, Tab 4; *see also* Tab 5 (Jessica Bennett) ("My parents always dreamed of spending their golden years together enjoying gardening and traveling. . . . It is a common enough dream and one that

---

[4]     All references to the PSR are to the initial Pre-Sentence Report provided to the defense on April 14, 2008. Mr. Bennett's objections to the initial PSR are due on June 6, 2008.

reflects their roots and demonstrates the kind of people they are.  They deserve the happiness and

the grace of growing old together and I would do anything to give it back to them.")).

### 2.    Mr. Bennett and his children

Mr. Bennett has always been deeply involved in the lives of his two children, with

whom he maintains close relationships even though they are now starting out on their own.

Valerie describes Mr. Bennett's devotion to Jessica and Colin when they were younger:

> He was and is a family man to the core and his love for his two
> children, Colin and Jessica, is boundless. . . .  During their early
> years and despite the other demands on his time, including a
> periodically intense travel schedule, daddy was there to play with
> them, to read to them, to tuck them in at night, to help coach their
> baseball and soccer teams and to work on their school projects
> with them.  . . .
>
> As the children grew older Phil always insisted that they both show
> discipline in their school work and their athletic endeavors by
> allotting the time and work ethic necessary for success. . . . .  I
> credit his devoted hands-on fathering for the fact that both our
> children are now successfully navigating the early years of their
> careers as young professionals and never succumbed to any of the
> typical teenage problems.

(*Letters*, Tab 8; *see also* PSR at § 121 ("[Mrs. Bennett] reported that, although he worked very

hard, [Mr. Bennett] always made sure that he was home by 8:00 or 8:30 p.m. and never missed

family or school events.  She described him as a wonderful father who has always been there for

his children and who 'never brought the work home with him.'")).

Mr. Bennett's daughter, Jessica, is now a young woman embarking on a career in

the law at a large firm.  To Jessica, her father is "the person I look up to most in the world.  He is

my mentor, he is my best friend, and he is my biggest supporter in every aspect of my life."

(*Letters*, Tab 5).  In her letter to the Court, Jessica writes of how her father taught her to work

hard and excel in every endeavor she has undertaken, and of her experience of him as "an

incredibly sweet, decent man whose integrity and kindness are the two qualities I love most

about him." (*Id.*). One of Jessica's closest friends, Megan Barnet, observes of Mr. Bennett's relationship with his daughter: "From first meeting Jess it was clear she had a very close relationship with her family, particularly her Dad, whose advice she sought regularly and whose opinions, expressed or covert, would often guide her to make the morally upstanding decision." (*Letters*, Tab 1; *see also* Tab 28 (Lewis Moore) ("[Phil] openly expressed his joy in being allowed to attend his daughter's [law school] graduation [despite his bail conditions]. You could hear the pain in his voice when he spoke about the possibility of not being there, the very thought of Phil not being able to share that important milestone would have been devastating.")).

Mr. Bennett's son, Colin, is employed at a major financial services firm; like his sister, Colin recounts in his letter to the Court not only the time, love, and effort Mr. Bennett invested in his upbringing, but the values he conveyed to the children: "Throughout my life [my father] has taught me and shown me by example that honesty, hard work, dedication and accountability are key virtues in being a successful and contributing member of society. . . . Without his love, friendship and support, I would not be the person I am today nor would I have the future ahead of me that I am fortunate enough to have." (*Letters*, Tab 4). Mr. Bennett's devotion to his children has remained paramount even as he has struggled under the weight of indictment and conviction, and now awaits the prospect of incarceration and deportation. (*Letters*, Tab 4 (Colin Bennett) ("Even in the last few years when his own life has been so completely destroyed and his future so uncertain, my father has been there in every way he could for me and my sister and has done his best to protect us emotionally from turmoil.")).

## C.    Phillip Bennett's Character

Although his devotion to family and commitment to Refco absorbed much of Mr. Bennett's time and energy during the past 25 years, Mr. Bennett has always been a man of boundless energy, profoundly engaged with the world and the people in his life. Those who

know Mr. Bennett personally describe him as a man of integrity and kindness, with a strong

moral code and commitment to others, notwithstanding the concededly wrongful conduct at

Refco to which he has pleaded guilty.  We have excerpted below several testimonials designed to

give the Court a better sense of the character of the man whom it will be sentencing.

### 1.    Friends and neighbors

- "We know Phillip to be a compassionate, loyal, friendly, yet take-charge person with a strong sense of responsibility to others.  Phillip is a private and unassuming person who has not used his wealth or business prominence to promote his own or his family's social position."  (*Letters*, Tab 11 (Robert Diemar, family friend)).

- "In every way that I knew Phil Bennett he was generous, thoughtful, and never avoided responsibility.  . . .  I know that Phil Bennett is a good and caring person who, if allowed, can and will be a contributing member of our society in truly meaningful ways."  (*Letters*, Tab 34 (Barbara Sabia, Director of Development at local school)).

- "I hold Phil Bennett in the highest esteem and hope to live my life with the kind of integrity and grit that I have seen him demonstrate over the past 9 years.  His dedication to providing his family with a wonderful life, his success in instilling his moral values in his children and his unwavering sense of obligation to others, have taught me much about the value of conducting oneself by the highest standards throughout life."  (*Letters*, Tab 1 (Megan Barnet, family friend)).

- "[Phil] is a hard worker who doesn't understand the meaning of taking it easy or quitting.  These are lessons he has instilled in his family and those around him. . . . Everything I know about Mr. Bennett revolves around his kindness, generosity, good humor and sensitivity.  He is always concerned about friends, family, and those in need."  (*Letters*, Tab 39 (Sarah Uhran, family friend)).[5]

- "Phil has been an excellent neighbor, a warm and helpful friend, and a very generous person to the people around him."  (*Letters*, Tab 23 (Michael Johnston, neighbor of 17 years)).

---

[5]    Ms. Uhran, who is one of Jessica Bennett's closest friends and has known Mr. Bennett for years, tells in her letter of how, when she was 17 years old and her father became terminally ill, Mr. Bennett provided much-needed support, acting as a surrogate father for her.  She describes Mr. Bennett as "one of the most generous and wonderful men I have ever known."  (*Letters*, Tab 39).

- "The Philip Bennett that I know is a decent, philanthropic, and civic-minded man who would never knowingly cause harm to others. He has always appreciated his success and looked for ways to give back to the society that has given him so much." (*Letters*, Tab 22 (Jim Jacobs, art dealer and friend)).

- "[Phil] is a man of intellect in that he thinks very hard about the world around him. But most of all he is a decent, decent man who works in every way that he can to improve the lot of other people. He is a man whom you would want in your community; he is a man whom you would want as a friend." (*Letters*, Tab 20 (John Hanly, friend and former headmaster of local school)).

### 2. Business associates

- "I have known Phil for almost 20 years having represented Refco in certain litigations. I had the opportunity over those years to observe him, his work ethic, his sense of responsibility, and his interactions with many of his colleagues, my colleagues and his family. Phil is a responsible, decent, kind and caring person." (*Letters*, Tab 12 (Therese Doherty, partner at the Herrick law firm)).

- "At all times during our relationship, we have found him to be unfailingly professional, dedicated and conscientious. . . . The collapse of Refco and subsequent arrest of Mr. Bennett was a huge shock to the company, as they seemed totally out of character to the man we admired and respected." (*Letters*, Tab 41 (Manny Weiss and Chris Smith, Chairman and Managing Director of Manro Haydan Trading, a Refco client since 1993)).

- "In [the seventeen year period I have known him] I can say without qualification that Phil was one of the few people in the industry that I found I could rely on. He behaved with integrity, fairness, and respect for others in all matters of business." (*Letters*, Tab 21 (Adam Haut, of A.M. Haut Commodities, former Refco customer and employee)).

- "[Phil's] work ethic was legendary in the industry, with prodigious travel commitments and routinely long days. But he was also known in his local community as a concerned and engaged resident." (*Letters*, Tab 26 (Harvey McGrath, former Chairman of the Man Group)).

- "Phil's reputation amongst the brokers and traders I dealt with was one of honesty and integrity. He was widely respected." (*Letters*, Tab 19 (Michael Gooch, former Refco employee)).

- "[Phil] always demonstrated a strong sense of obligation; he never avoided responsibility, and often stepped in to resolve problems and help." (*Letters*, Tab 24 (Barry Lind, former owner of Lind Waldock & Co., acquired by Refco in 2000)).

- "Several times I have observed how much [Phil] valued his family, shunning the high profile social scene in the city and instead devoting whatever little discretionary time he had to his wife and children." (*Letters*, Tab 38 (Sierd Tilma, former Refco employee)).

The letters submitted on Mr. Bennett's behalf also make clear that, throughout his life, he has conducted himself with respect and grace towards all kinds of people – be they business associates, neighbors, employees, or strangers – regardless of where they stand in the social spectrum. Karen Fleming, who was Mr. Bennett's secretary at Refco for over 22 years, writes:

> I can say with certainty that [Mr. Bennett] has always been a man of outstanding values. He always treated his employees with respect and dignity and it didn't make a difference if you were part of the mail room staff, back office staff or part of the management team, he always treated every one equally and always took the time to greet everyone. . . . If he was in the office, he always made the time for you that may account for the fact that we never had a significant turnover of staff. Everyone looked up to him with respect. He was the glue that kept us together.

(*Letters*, Tab 15; *see also* Tab 43 (Carol Williams, secretary of eight years to Mr. Bennett) (describing Mr. Bennett's "extraordinary commitment" to Refco's employees); Tab 21 (Adam Haut, Refco customer and former employee) ("Phil spoke to everyone with attentive respect, regardless of whether you were a high level executive or an administrative assistant. Staff in the London office often commented that when Phil gave them an assignment, he spoke to them as an equal rather than as an employee.")).

This is a trait confirmed by Alex Belsky, a local carpenter who has known Mr. Bennett for 18 years:

> I have worked in the construction trade for 52 years, 42 years in Princeton, NJ. In those years most of our clients were profesionals [sic], doctors, lawyers, professors, and so on. Phillip Bennett by far has been the most appreciative and understanding of any of them. I have never heard him or seen him show ill temperament to anyone. . . . Knowing him as I do it is hard for me to believe that

> he could comitt [sic] any act that would bring hardship to anyone
> intentionally, especially his family, bussiness [sic] associates, and
> co-workers.

(*Letters*, Tab 3). Lewis Moore, who runs a local lawn service company and is a volunteer fire-

fighter in the Bennetts' community, has known them for 15 years and become a family friend.

Mr. Moore describes Mr. Bennett, with whom he shares a passion for gardening and the

outdoors, as "just a regular guy who works the land, spends time nurturing rose bushes, mulching

and trimming trees, chasing geese from the pond. This is a wonderful man who doesn't spend

his time rubbing elbows with the rich and stuffy. His family is what is important, not what he

makes in a paycheck." (*Letters*, Tab 28; *see also* Tab 33 (Frank Robinson, local electrician)

(recounting the Bennetts' kindness)).

### D.    Kind Deeds and Charitable Works

The nature of Phil Bennett's character is reflected in both the many small acts of

kindness described in letters written on his behalf, as well as in the more formal charitable

commitments he has made during the course of his life. We ask that the Court consider these in

assessing the totality of the man, viewing his conduct at Refco in the context of a life that has

done a great deal of good in the world.

In 2004, for example, Mr. Bennett came to the aid of John McLoughlin, an old

friend who was at the time living in Atlanta. After Mr. McLoughlin suffered a massive stroke

and slipped into a coma, Mr. Bennett immediately organized and paid for medical transport back

to England, so that Mr. McLoughlin could be closer to his son. Eva Salleck, Mr. McLaughlin's

companion at the time (Mr. McLaughlin has since passed away), recalls that "neither John nor I

or his family had been in any financial condition to take care of the high costs of the necessary

medical equipped plane transport. The moment Phil Bennett became aware of the situation he

stepped in, took care of everything, and made all the arrangements himself.  Phil Bennett never

expected anything in return." (*Letters*, Tab 35).

        Throughout his life, quietly and without recompense, Mr. Bennett has

demonstrated similar concern for the welfare of those around him:

- Mr. Bennett paid the contractor bill for a widowed neighbor who could not afford to do so.  A letter Mr. Bennett subsequently received from the contractor notes: "Just a few lines to thank you for your concern and payment in regards to Mrs. Pfeiffer's account.  We had just about given up on collecting payment after discussing it with our attorney and Mr. Piancone. . . .  I have been in business for 56 years, with this one exception, has [sic] never had a person pay another's [sic] person's bill.  Thank you very much, we consider you an exceptional person, which we will never forget." (*Letters*, Tab 8 (attached to letter of Valerie Bennett)).

- When Mr. Bennett learned that a heating salesman with whom the Bennetts had developed a friendship was fighting for custody of his children and needed a second mortgage to keep his family home, Mr. Bennett came to his aid and provided the financing, even though the banks had refused.  (*Letters*, Tab 8).

- Michael Gooch, a former Refco employee and now the Chairman and CEO of GFI Group, a derivatives brokerage, writes of how when his trading desk was shut down and he lost his job, Mr. Bennett honored an earlier commitment made by Mr. Gooch's managers to pay him his bonus.  Mr. Gooch recalls that "[p]lenty of Wall Street managers would have let a person in my situation go with nothing. Since my young wife and I had become parents for the first time in 1986 and bought a home with a mortgage, Phil's honorable treatment of me made it possible for me to pursue a new business venture with confidence." (*Letters*, Tab 19).

- Michael Johnston, the Bennetts' neighbor, recalls how Mr. Bennett took a personal interest in the future of David Zaikowski, the son of a local tree pruner. Mr. Bennett hired David as an intern at Refco and eventually as a full-time employee.  Mr. Johnston writes that "[Phil] taught him the skills and knowledge necessary to be successful in the trading/financial business.  David and his father feel, and I think rightly so, that without Phil's willingness to take a risk on David, his chances of success would have been much more limited." (*Letters*, Tab 23; *see also* Tab 46 (Stephen Zaikowski)).

        Mr. Bennett has also, over the years, been active in more formal charitable

activities, donating not simply money, but his time, effort, and the same qualities of passion and

commitment that he has demonstrated to his family and community, and in his professional

career.  In particular, Mr. Bennett has concentrated his efforts on educational causes, believing

that education and hard work – by virtue of which he became the first member of his family to

attend university and then rose beyond his working-class roots in England – are a crucial

predicate to a full engagement with and enjoyment of life.  We highlight a selection of Mr.

Bennett's efforts in this regard below.

> **1.      Vice Chairman and Trustee of the Pingry School Board of Trustees**

Mr. Bennett devoted nearly ten years of service to the Pingry School, from which

his two children graduated, and which is generally considered one of the top K-12 educational

institutions in New Jersey.  While serving as Vice Chairman and Trustee, Mr. Bennett "spent

countless hours sharing his passion for education, the school and its ethos with alumni and

parents."  (*Letters*, Tab 8 (Valerie Bennett)).  During this period, Mr. Bennett also chaired the

school's first capital campaign, taking time from his busy work schedule to raise money and

awareness of Pingry's core values.  John Brescher, a fellow member of the Pingry Board, recalls

that "the strong sense of purpose and enthusiasm that [Phil] manifested reflected very well on the

School.  In many respects, he was the 'face' of the School to the rest of the world; and, his strong

sense of purpose combined with his good humor and grace, left the School in a much stronger

position when viewed by the School community."  (*Letters*, Tab 9).  In her letter, Victoria

Brooks, Chair of the Pingry Board of Trustees, describes the degree of Mr. Bennett's

commitment and the impact it had on Pingry:

> In 1995 the School embarked on its first capital campaign.  As we
> had not had one before, there was great caution among Board
> members as to whether or not we would be successful in fund-
> raising.  Phil, as Chairman of the Campaign as well as Vice
> Chairman of the Board, was its outstanding leader.  Through
> tireless efforts, passionate speeches, focused strategy, and
> unwavering belief in Pingry's core values, Phil helped Pingry to
> raise twice the amount it initially thought it would be able to do.

> Clearly we would not have been successful without Phil's leadership and hard work to accomplish our goals. The funds were used to double our financial aid, to increase faculty compensation and professional development and to build a state-of-the-art arts/music/drama building. In short, Phil's efforts helped to strengthen the very fabric of the school for generations to come.

(*Letters*, Tab 10).

Letters submitted by those familiar with Mr. Bennett's work for Pingry emphasize, moreover, Mr. Bennett's commitment to the school and his community came without any sense of entitlement or expectation of reward. Barbara Sabia, for example, who was Director of Development at Pingry, notes that "[w]hat was particularly unique about Phil Bennett was his complete lack of egotism. He accomplished a great deal on behalf of the Pingry School and had no interest in receiving any credit or accolades. He always found a way to empower others and to share success." (*Letters*, Tab 34; *see also* Tab 4 (Colin Bennett ("[M]y father's efforts were so great that my high school honored his dedication at my sister's graduation which, to be frank, made him incredibly uncomfortable as he has never been one to seek out or enjoy the spotlight.")).

### 2. Duke University Library Advisory Board

Mr. Bennett and his wife Valerie served for five years on the Duke University Library Advisory Board, helping the Library to raise nearly $50 million, and creating a preservation endowment for the conservation and restoration of the Library's special collections. David Ferriero – now the Andrew M. Mellon Director of The New York Public Libraries, but at the time the director of the Duke Library – recalls that "[o]ver the course of the five years that I worked with Mr. Bennett, I visited him several times a year . . . . I spent enough time with him to develop a sense of his character, his love of family, his passion for all things Duke, and his willingness to work on behalf of my libraries. He understood the importance of strong libraries

18

and, more importantly, the essential role that libraries play in the life of a campus." (*Letters*, Tab 14).

### 3.    St. Philip's Academy

For several years, Mr. Bennett anonymously underwrote tickets to a fund-raising event for St. Philip's Academy, an inner-city school in Newark, New Jersey. (*Letters*, Tab 11 (Robert Diemar) ("[Phil] believes strongly that he has an obligation to make it possible for others to have the same educational opportunities that have been available to his family, particularly with generous support of St. Philip's Academy an urban K-8 independent school in Newark."); Tab 4 (Colin Bennett); Tab 20 (John Hanley)). Mr. Bennett's quiet contribution not only provided much-needed funds for the school, but also helped raise awareness among the many younger members of Mr. Bennett's community who were able to attend the event because of Mr. Bennett's generosity and encouraged to support St. Philip's themselves in the future.

### 4.    New Jersey SEEDS program

For more than four years, Mr. Bennett funded a full scholarship for a student in the New Jersey SEEDS program, which provides educational and employment opportunities for lower-income children. Mr. Bennett also offered summer internships at Refco to participants in the program. (*Letters*, Tab 13 (William Engel) ("[Phil] understood the importance of giving a child with great potential but limited family resources the assistance to better him or herself. His faith has not been misplaced as many SEEDS students have gone on not only to graduate from college, but to lives in the professions and active work in many charities.")).

19

II.      **Background to Offense Conduct**

The nature of Mr. Bennett's character – decent, hard-working, and caring – is important not only as an independent consideration under § 3553(a), but also because it provides context for understanding Mr. Bennett's involvement in the fraud at Refco.  In the late 1990s, Mr. Bennett – recognizing that Refco's very existence was at stake following several business reversals, including the Asia and Niederhoffer losses described in the indictment – came up with a plan, admittedly ill-conceived, and indeed unlawful, to keep the company in business, by eventually absorbing these losses into the RGHI receivable and then disguising the related-party nature of the receivable.  The receivable continued to grow over time as interest accrued on the balance, as other expenses were absorbed into it, and as revenues were improperly inflated to meet budgetary targets.  But it was always Mr. Bennett's intention to make good on this obligation and pay off the receivable in full, rather than simply walk away from the company.  And indeed, during the six years he was CEO, Mr. Bennett paid hundreds of millions of dollars towards the receivable in an effort to retire it, including the lion's share of the proceeds he received in Refco's initial public offering.

Mr. Bennett believed that, by virtue of hard work, dedication, and his own strategic vision, he could pull Refco out of the financial straits into which it had foundered by the late 1990s.  There were, in effect, two parallel economic realities at Refco during Mr. Bennett's tenure as CEO.  For as Mr. Bennett struggled, admittedly through deception, to keep Refco afloat and shed the legacy of its past, he devoted his life to the company, working tirelessly in an effort to build it into a market leader in a growth industry.  At the time Refco sold shares to the public in August of 2005, it was – as measured by metrics that are not implicated by the allegations in this case – one of the largest futures brokerages in the world, as well as a rising force in foreign exchange brokerage.  Indeed, a large portion of the business Mr. Bennett built is prospering

20

today under the aegis of other companies that gathered up the pieces after Refco was broken

apart following its bankruptcy in October 2005. Mr. Bennett deeply regrets that he chose to

deceive others in his effort to fix the problems at Refco, and we certainly do not suggest that his

hard work building the company excuses his misbehavior, or that Mr. Bennett did not profit

substantially from this fraud. Yet a fair assessment of the conduct in this case indicates that Mr.

Bennett's motives were mixed, and his crime was not born of naked greed or carried out with the

knowledge that others would suffer financial harm.

### A.    Growth of Refco under Mr. Bennett's Leadership

Mr. Bennett joined Refco in 1981, having been recruited from the Chase

commodities financing unit by Refco's then owner, Thomas Dittmer. Dittmer offered Mr.

Bennett the opportunity to join the company and build an internal financing unit, eventually

known as Refco Capital LLC, in which Mr. Bennett would own an equity stake.

Mr. Bennett rose rapidly at Refco, due in large part to his dedication to the

company and work ethic, which would remain a defining part of Mr. Bennett's leadership style

throughout his career at Refco. Adam Haut, a former Refco employee, recalls: "I always

marveled at how hard Phil, even in his senior position, seemed to work. . . . I remember

commenting on his hours and he explained that he believed it was his responsibility to, as much

as possible, lead by example by being the first one in and the last one out of the Refco office."

(*Letters*, Tab 21; *see also* Tab 26 (Harvey McGrath, former Chairman of Refco-competitor Man

Group) ("His work ethic was legendary in the industry, with prodigious travel commitments and

routinely long days"); Tab 8 (Valerie Bennett) ("[Phil] worked tremendously long hours, leaving

home in the dark each morning at 4:45 a.m. in any and all conditions to drive himself to New

York because he believed in the need to lead by example and so be in his office before the rest of

the team. He took only two sick days in 24 years.")).

By 1983, Mr. Bennett had become CFO of Refco's futures unit, and, in 1985, was appointed CFO of the entire Refco group of companies. It was also in 1985 that Mr. Bennett acquired an equity stake in RGHI, in which he would share ownership with Dittmer (the majority owner, at 51%) and Tone Grant (24.5%) until 1999.

During this period, Refco was in many ways a reflection of its majority owner, Mr. Dittmer, who was interested primarily in trading futures, not managing and growing a business. Risk and compliance controls were lax, financial reporting systems were weak, and there was little management structure. It is in this context that the Asia and Niederhoffer losses described in the indictment occurred.[6] Those losses – resulting from uncollectible loans or advances to Refco customers – were not caused by Mr. Bennett. Once it became evident, however, that Refco had to assume these client losses, it was Mr. Bennett who tried to find a way to deal with the issue.

It was, as Mr. Bennett has acknowledged in pleading guilty, a colossal error of judgment – indeed, a crime – to deal with the problems of the late 1990s as Refco did, *i.e.*, by eventually shifting these losses into the RGHI receivable, and then engaging in transactions at the end of reporting periods to make a portion of that receivable balance appear to be from an independent, third-party customer. It was a decision made, however, in a particular context, and under extremely difficult circumstances. With respect to the losses arising from trading by Victor Niederhoffer, for example, Mr. Bennett, as CFO, did not know that Niederhoffer had been

---

[6]    Several of the other large expenses that Mr. Bennett has acknowledged improperly absorbing into the RGHI receivable also had their origins during the 1990s, even if, in some cases, their financial impact was not felt until years later. In 2002, for example, RGHI absorbed a $43 million expense arising from an arbitration award relating to regulatory issues in Refco's futures unit during the 1990s. In 1999-2000, RGHI absorbed $27 million in litigation settlement expense and professional fees also related to conduct occurring years earlier.

taking risky positions on the Chicago Mercantile Exchange ("CME") and that the Refco

employee in charge of Niederhoffer's account had waived Niederhoffer's compliance with an

initial margin call on that account.  Yet it became Mr. Bennett's problem when he learned, the

following week, that Niederhoffer could not make payment on an even larger margin call and

that the CME was threatening to shut down Refco's trading on the exchange unless it posted the

margin for the trades.  Had the CME done so, or had word gotten out of the full extent of the loss

Refco had sustained as a result of Niederhoffer's trading, Refco's customers could have pulled

their business from Refco, and the company might not have survived.  It is true, of course, that

Mr. Bennett had a personal interest in Refco's survival, as he was at the time a 24.5% equity

owner.  But Refco, while still private, was in the late 1990s a company of roughly 1,400

employees, whose livelihoods were also at stake.  Mr. Bennett arranged to send the margin to the

CME, and eventually transferred to RGHI the preponderance of Niederhoffer's obligation to

repay Refco.  Once assumed by RGHI, it was an obligation that accrued interest and that Mr.

Bennett believed he would be able to pay down over time.  The practice of concealing the

related-party nature of the receivable began in this context – not out of avarice, but out of Mr.

Bennett's refusal to see the company he had helped build during the previous 15 years fall apart.

   In managing this crisis, Mr. Bennett received little help from his partners Tom

Dittmer and Tone Grant.[7]  Following the Niederhoffer and Asia losses, Mr. Dittmer distanced

---

[7] So, too, with regard to the Asia losses referenced in the indictment.  Mr. Bennett learned about the Asia crisis while traveling in Europe, and immediately returned to New York to deal with the issue.  Over the next several months, he, Santo Maggio, and Gary Weiss (another RCM executive) traveled to Asia in an effort to resolve the problem and collect payment from Asian clients who had defaulted.  Eventually unable to collect approximately $160 million of Asian losses, Refco assumed responsibility for those losses in an account that was eventually incorporated into the RGHI receivable; by that point, the balance, due to interest alone, had grown to roughly $337 million.

himself from Refco, but did so in a manner that would allow him to profit should Mr. Bennett

ultimately succeed in turning the company around.  Dittmer sold his direct equity stake in Refco

to Messrs. Bennett and Grant, but continued to hold an interest in future proceeds of any sale of

the company, which, by separate agreement, he was obligated to share with his partner Edward

Cox.[8]  Mr. Grant, having been pushed out of management by Cox, continued as a 50% owner of

RGHI.  Mr. Bennett, however, stayed on and stepped into the role of CEO.

Even before he became CEO in October 1998, it was clear that Mr. Bennett,

rather than Grant or Dittmer, was the partner most focused on turning Refco around.  He was

committed to building Refco into a larger force in the futures industry, rationalizing the

company's operations, and broadening its business into international markets and new financial

products where he saw the opportunity for growth.  As CFO, Mr. Bennett had attempted to

formalize the management structure and impose limits on personal expenditures, particularly

those by Dittmer.  In a memorandum to Mr. Dittmer of March 1998 (shortly after the

Niederhoffer debacle), Mr. Bennett wrote:

> In the past the lack of a clear understanding has created many of
> the problems with which we are now dealing.  Without guidelines,
> there is little prospect of organizing this effort.  Incidentally, the
> same thing applies to the management of our business and we will
> have to make a more effective effort to be realistic about
> performance and create the means of measuring performance and
> developing accountability.  . . .
>
> The earnings challenge for the group is quite considerable and we
> all recognize the jeopardy that exists in the absence of these
> changes.  However a greater jeopardy arises from the lack of our
> own self discipline and this should come first.  A segregation of

---

[8]    Messrs. Dittmer and Cox, who were well aware of the true financial condition of Refco and
the manner in which it was being handled, cashed out following the Lee transaction in August
2004, each collecting tens of millions of dollars.

personal and corporation interests is essential if any value is to be
created.

(Exh. 3; *see also* Exh. 4 (4/9/98 memo from Bennett to Grant and Dittmer) ("Our major

weakness has not been business opportunity but a fundamental lack of management process in

which people have been permitted to exercise too much judgment without any control.")).  After

he became CEO, Mr. Bennett continued his efforts to transform Refco, by bringing in new

management, implementing better risk controls over trading operations, strengthening regulatory

compliance, and making a series of strategic acquisitions designed to diversify and grow Refco's

business.  (*See Letters*, Tab 38) (Sierd Tilma, former Refco employee) ("Phil was the architect of

Refco's financial infrastructure, bringing order where there had been little, against the backdrop

of an extremely challenging corporate culture.  His expertise in banking and capital markets then

also became the basis for Refco's growth that followed in the next two decades.")).

      We recognize it may seem anomalous to claim that Mr. Bennett was seeking to

improve risk controls and regulatory compliance, while at the same time continuing to employ

and hide the RGHI receivable.  Yet it is true.  In 1999, for example, under Mr. Bennett's

leadership, Refco hired Dennis Klejna as Refco's general counsel.  Klejna had been the Director

of Enforcement at the CFTC, Refco's chief regulator, and he was tasked at Refco with

eliminating many of the compliance issues that had plagued the company's reputation in the

1990s.  And over the next five years, Refco made dramatic improvements in its compliance

efforts.  The compliance department grew from 3 to 19 people, and regulatory incidents dropped

dramatically.  (*See* Declaration of Dr. Frederick Dunbar, Senior Vice President, National

Economic Research Associates, Inc. ("NERA") (attached as Exh. 5) at 19-20).[9]  Similarly, as

CEO, Mr. Bennett built Refco's risk management department, hiring a global head of risk, and

growing that department to 48 people.  This was a particular area of focus as Mr. Bennett worked

to improve Refco's operations, given the problems of the late 1990s.  And indeed, during the

seven years Mr. Bennett was Refco's CEO, the company never again incurred client losses

approaching the scale of those in the 1990s.  Because the Asia and Niederhoffer losses had, to a

significant extent, engendered the receivable problem at Refco, Mr. Bennett was committed to

preventing a recurrence of the same kind of crisis.[10]

   During his tenure as Refco's CEO, Mr. Bennett developed and implemented a

strategic vision for the company's future, eventually building Refco into one of the largest

futures brokerages in the United States.  In 1998, Refco's futures operation was stagnant – there

were only 12,000 customer accounts, concentrated among agribusiness clients, large individual

speculators, and a small number of institutional clients.  Over the next five years, Refco, under

Mr. Bennett's leadership, acquired twelve companies, growing Refco's core futures business

dramatically, to 200,000 customer accounts, and expanding its client base into the retail market.

---

[9] The metrics and the statistics cited in Dr. Dunbar's declaration and throughout this memorandum are not, to our knowledge, materially implicated by the allegations in the indictment, the preliminary forensic analysis provided to the defense, or the evidence presented at Mr. Grant's trial.  We cite them here not to contradict the government's allegation that Mr. Bennett, along with his co-conspirators, misrepresented revenue and expense items, but to demonstrate that, even acknowledging those misrepresentations, Refco's business did grow and improve under Mr. Bennett's leadership.

[10] Santo Maggio, the government's primary cooperating witness, acknowledged during the trial of Tone Grant that during the period of Mr. Bennett's leadership, Refco's risk controls and management improved, and that "in certain aspects, the company did change to the better."  (*See*, *e.g.*, Grant trial transcript ("Grant Trial Tr.") at 2252 ("So in certain aspects we no longer had the huge credit losses that we had previous, like Asia and so forth, and we seemed to be managing the company better, more like a company.")).

Revenue in the futures business is driven in substantial part by the number of customer

derivative contracts traded (with respect to which Refco earned a commission) and the level of

customer funds deposited in connection with this activity (with interest accruing on these funds).

Between 1998 and 2005, customer segregated funds under Refco's management increased from

$1.5 billion to $6.5 billion – a 24% compound annual growth rate – moving Refco from the

eighth-largest futures commission merchant, in 1998, to the fourth-largest by 2005 (indeed,

excluding the major investment banks, the largest). (*See* Dunbar Decl. at 8-9). The volume of

derivatives contracts cleared by Refco increased from 81 million in 2001 to 654 million in 2005,

a 69% compound annual growth rate. (*Id.* at 9).

Through acquisitions and joint ventures, Mr. Bennett also dramatically expanded

Refco's international operations. Following its investment in futures broker Friedberg Group,

Refco became the largest independent derivatives broker in Canada. Mr. Bennett set up joint

ventures in Taiwan, Korea, and India, capturing growth in the derivatives markets overseas. In

November 2004, a letter Mr. Bennett received from Robert Tan, manager of Refco's Asia

operations, expressed the extent to which the company had grown globally and realized Mr.

Bennett's strategic vision:

> My greatest award has been the satisfaction of building up Refco's
> business in Singapore and Asia to what it is today – a successful
> operation commanding wide respect, name recognition, and
> satisfied customers that has a wide footprint for us to build upon
> for the next twenty years.
>
> I am tremendously proud that Refco in the USA and globally has
> under your dedicated and able leadership reached a pinnacle of
> market leadership and enterprise value never thought possible five
> years ago . . . .

(Exh. 6).[11]

      In leading Refco into new markets, aggregating customer accounts, and increasing transaction volumes, Mr. Bennett positioned the company to capture market share in an industry – exchange-traded derivatives brokerage – that was booming.  Between 1998 and 2005, the number of futures and options contracts traded globally on derivatives exchanges grew from 2.2 billion to 10 billion, a 25% compound annual growth rate.  Between 1998 and 2005, the number of contracts traded on the CME – on which Refco was, in 2002, 2003, and 2004, the leading futures broker by customer volume – increased from 227 million to 1.1 billion, a 25% compound annual growth rate.  Since 2005, the industry has continued to grow.  (*See* Dunbar Decl. at 3-7).

      Refco's Prime Brokerage / Capital Markets division, which brokered and financed fixed income securities (primarily U.S. Treasuries) and foreign exchange instruments, also expanded significantly during Mr. Bennett's tenure as CEO.  The operating metrics used to measure growth in the Prime Brokerage / Capital Markets portion of Refco's business were primarily foreign exchange and U.S. Treasury transaction volume, and the size of the company's financing portfolio for fixed income transactions (measured as domestic net repo book).  From

---

[11]   In his letter to the Court, Harvey McGrath, former Chairman of the Man Group (which would eventually purchase Refco's derivatives brokerage operations) observes that "[a]t Refco, [Mr. Bennett] was generally held to have been key to improving the standing and reputation of the firm and building the value of its franchise."  (*Letters*, Tab 26).

Mr. McGrath's comments regarding Mr. Bennett's contributions to Refco are echoed by Therese Doherty, an attorney at the Herrick law firm, who worked with Mr. Bennett and Refco for almost twenty years:  "Phil has always had a very strong work ethic and fully dedicated himself to developing and growing the business of the company.  Many aspects of Refco's business were industry leaders having been developed through Phil's initiatives of a global network, market leading products, and expanding into foreign markets including India."  (*Letters*, Tab 12; *see also* Tab 44 (Wollenberg) ("As I followed Refco's worldwide expansion, it was clear to me that Philip's huge work ethic and his commitment and sense of responsibility to the growth of his group and its joint-venturers, created manifold opportunities for employees, partners and professionals alike.")).

2001 to 2005, the dollar-value volume of foreign exchange transactions processed by Refco grew from $406 billion to $1.2 trillion, a 32% compound annual growth rate. (*See* Dunbar Decl. at 14-17). From 2001 to 2003, U.S. government securities transaction volume climbed from $281 billion to $619 billion, a 49% compound annual growth rate. (*Id.* at 17-18). And from 2001 to 2005, Refco's domestic average net repo book grew from $14 billion to $32 million, a 23% compound annual growth rate. (*Id.*)[12]

Internal Refco documents generated in the months leading up to the IPO further confirm that Refco's business was growing during this period. A June 2005 e-mail from an employee in the futures group, for example, notes that "the 4.9 million contracts cleared on 6/1/2005 set a new daily record for Refco Derivatives Brokerage." (Exh. 7). A September 2005 e-mail from Refco Capital Markets Chief Operating Officer Stephen Dispenza to Sandy Maggio notes that "Refco's name has come up more in the past year than ever before. Partly due to our IPO, but more specifically due to the volume of business we are doing in the FX market both [prime broker], direct and electronically . . . all good stuff!! Rewarding to see that the business model that has been in development since 1997 has finally become a realization. Nice Work!!" (Exh. 8; *see also* Exh. 9 (10/6/05 e-mail from Kevin Grady to Joe Murphy: "I just received the September volumes for our Comex Handhelds. We executed 131,322 total contracts electronically. Our previous record was 97,280 set in august of this year. We have executed just under 800,000 contracts [year to date]. I am expecting another record this year. I will keep you up on the numbers."); Exh. 10 (10/5/05 e-mail from Scott Love to Gerry Sherer ("Derivatives

---

[12]    As with the derivatives brokerage side of Refco's business, the company's Capital Markets operations benefited from industry-wide growth. Average daily turnover in foreign exchange markets between 2001 and 2007 rose from $1.2 trillion to $3.1 trillion. (*See* Dunbar Decl. at 12-

Brokerage contract volume climbed to a quarterly record of 211.8 million, due primarily to rapid volume growth in foreign markets and volatility in oil prices.")).

Indeed, Refco's internal financial statements for September 2005 – the month before the RGHI receivable balance was disclosed – indicate that Refco was operating above budget for the month, even after backing out a contribution of roughly $4 million in RGHI interest and adding in $3 million of computer expenses.  (*See* Exh. 11).[13]  The September results reflected, for the first time, the inclusion of results from Cargill Investor Services, which Refco had acquired the previous month.  Cargill was at the time one of the largest independent derivatives brokerages, and would have contributed significantly to Refco's futures transaction volumes and segregated customer balances going forward.

After Refco collapsed in October 2005, the business Mr. Bennett helped build was broken apart, but by no means destroyed.  Roughly half of Refco's business – the derivatives brokerage – was purchased by Man Group and is now operating successfully as part of MF Global, a Man subsidiary that went public in July 2007 at a valuation of $3 billion.  A year after the Refco bankruptcy, Man reported that "[t]he successful integration and build-out of the first-class professionals and assets that we acquired in the Refco acquisition has been a particularly significant contributor in the first half [of Man's fiscal year]."  (*See* Exh. 12 ("Refco fuels record returns for Man Group")).  And in MF Global's offering statement, the company noted that "the

---

14).  Average daily trading volume of U.S. Treasury securities rose from $227 billion in 1998 to $555 billion in 2005.  (*Id.* at 15-16).

[13]     Our understanding is that the latter figure represents six months of computer expenses that, if charged to Refco, would have been amortized over a six month period, resulting in a roughly $500,000 decrease in net income for the month of September.  But even if the entire $3 million were to be absorbed in a single month, the September 2005 financial statements reflect that Refco would have been operating at budget.

KL3 2660606.1

Refco assets have become an important part of our business.  During fiscal 2007, they accounted for approximately 11.3% of our total revenues, approximately 18.8% of our revenues, net of interest and transaction-based expenses, and approximately 12.3% of our income before provision for income taxes."  (*See* Exh. 13; *see also* Dunbar Decl. at 20-22).  The offering statement further notes that MF Global "hired a substantial number of Refco brokers and other employees."  (*See* Exh. 13).

Refco's retail foreign exchange operations – which were part of the Refco Capital Markets business and consisted primarily of minority investments in Forex Capital Markets LLC ("FXCM") and Advanced Currency Markets ("ACM") – are also prospering despite Refco's demise.  FXCM has reported continued growth during the last two years (*see* Exh. 14 ("FXCM Ranked As One of America's Fastest Growing Companies; "Record Breaking Month:  FXCM Trades Over Half a Trillion Dollars in Notional FOREX Volume")), and the 35% owned by Refco has been purchased by Lehman Brothers, together with a private equity firm.  ACM repurchased Refco's stake in its business in April 2007, reporting that "[d]espite the unfortunate incident with Refco since the 3rd quarter of 2005 the company has almost tripled its client base and revenues have increased considerably."  (*See* Exh. 15 ("ACM Advanced Currency Markets SA re-possesses ex-Refco shareholding")).

The post-bankruptcy success of Refco's regulated futures and unregulated retail foreign-exchange operations are further evidence of the strength of the business Mr. Bennett built during his tenure as CEO, despite the conduct to which he has pleaded guilty.  We do not dispute the government's allegation that there were material accounting improprieties even as late as 2005, and Mr. Bennett accepts full responsibility for misrepresenting Refco's financial condition during the entire period of his tenure as CEO.  But, at the same time, the metrics cited

31

herein are evidence that the years of hard work and dedication Mr. Bennett put into Refco had,

by 2005, positioned Refco as a market leader in a rapidly growing industry.

### B.    Mr. Bennett's Substantial Payments Toward the Receivable

As noted, from the time he became CEO in late 1998, Mr. Bennett's goal was to

figure out a way to pay down the receivable balance over time, and to eventually eliminate it

altogether.  Mr. Bennett did not believe that Lee, the bank lenders, or anyone else would

ultimately suffer loss as a result of the fraud, because he thought that he could retire the

receivable before it became a public issue.  And, in fact, during the years Refco was a private

company (until April 2005), and up until the receivable was disclosed in October 2005, Refco

had made good on all obligations to its investors and lenders, including the pre-2004 private

placement note holders, all of whom had been repaid in full by August 2004.

During the six years of his tenure, Mr. Bennett succeeded in paying down

hundreds of millions of dollars of the RGHI receivable with money that he could have used for

his own purposes.  This included all of the proceeds RGHI received from the Lee transaction and

the vast majority of the proceeds that Mr. Bennett received from the Refco IPO.  During Refco's

time as both a private and a public company, Mr. Bennett demonstrated his intention to try to

solve the receivable problem at Refco:

- In 2002, DF Capital, an entity associated with BAWAG, purchased the right to share in the proceeds of any future sale of Refco.  This "Proceeds Participation Agreement" contemplated payments to Refco in three tranches, monies to which RGHI (at that point owned by Mr. Bennett and Grant), as Refco's primary shareholder, was entitled.  In November 2003, following the second payment by DF Capital, Mr. Bennett applied $172 million towards the receivable balance. (Exh. 16 (11/25/03 entry)).[14]

---

[14]    The DF Capital agreement provided that $350 million of the proceeds from the three payments would be used to reduce the RGHI receivable.  Proceeds from the first payment, in February 2003, were used primarily to reduce external debt owed by Refco, but also in part to

- Following the Lee transaction, RGHI paid another $306 million in cash towards the RGHI receivable. (Exh. 17 (8/5/04 entries)). This represented all of the money RGHI received from the Lee deal, after making payments to the other constituencies owed money from the transaction. These proceeds received by RGHI from Lee are monies which Mr. Bennett, as a co-owner of RGHI, could have put into his own pocket, but instead chose to apply against the receivable balance, in an effort to eliminate it as an issue at Refco.[15]

- As a condition of the Lee transaction, a Refco asset management entity, Tilney Holdings, was transferred to RGHI. Mr. Bennett, by then the 100% owner of RGHI, sold Tilney for roughly $185 million, and applied $151 million of those proceeds to the RGHI receivable balance in May 2005. (Exh. 18 (5/17/05 entry)).[16]

- On August 18, 2005, the day that Mr. Bennett received proceeds from the sale of his stock in Refco's IPO, he wired $110 million of those proceeds back to Refco to pay down the RGHI receivable balance and other debts to Refco. He did so of his own volition, before the receivable balance had been disclosed to the Refco Board or to the public. (Exh. 19).[17]

- Four days later, on behalf of RGHI, Mr. Bennett executed a security agreement with Refco Capital Markets, the Refco subsidiary where the RGHI receivable was maintained, pledging all of the Refco stock that RGHI had been issued following the IPO, as collateral against the receivable balance. Thus, Mr. Bennett's first

---

reduce the receivable. The third DF Capital payment was never made, due to the Lee transaction.

[15]    The $306 million payment, along with a $390 million non-cash debit to Refco's equity – also applied against the receivable balance – retired virtually all of the approximately $720 million RGHI principal balance with Refco Capital LLC then outstanding following the Lee transaction. Roughly $337 million in bad customer debt – which had been carried in another account since the late 1990s as a result of the Asia losses, and had been accumulating interest – was, following the Lee transaction in 2004, assumed by RGHI into an account with Refco Capital Markets, and constituted the great bulk of the receivable balance going forward.

Like other key members of management, Mr. Bennett personally received a payment following the Lee deal for his profits participation interest in Refco, amounting, in Mr. Bennett's case, to $25 million.

[16]    Approximately $34 million of the Tilney proceeds were subsequently paid out to Messrs. Dittmer and Cox, as part of their contractual agreement with RGHI.

[17]    Mr. Bennett wired $95 million to Refco Capital Markets to pay down the RGHI receivable at RCM and $15.5 million to Refco Capital LLC to pay off various personal debts to Refco.

33

action upon receiving cash and stock in the IPO was to use these assets to reduce and collateralize the receivable.  (Exh. 20).

- And finally, following the discovery of the RGHI receivable by the Refco Board in October 2005, Mr. Bennett obtained a $420 million loan, using his stock as collateral, to pay down the receivable.  On top of that, on October 7 Mr. Bennett paid $13 million from his personal bank account, to eliminate the $433 million receivable balance in its entirety.  (Exh. 21).

Mr. Bennett's conduct following the IPO and in the days after the receivable balance was ultimately disclosed in October 2005, although in no way excusing Mr. Bennett's crime, is indicative of his desire and intent – borne out by his actions over the six years he was Refco's CEO  – to pay down the balance in full and permanently eliminate it as an issue at Refco.  His goal was to gradually retire the receivable balance over time until RGHI had the wherewithal to pay it off in its entirety.  In the meantime, Mr. Bennett put his heart and soul into trying to build and improve Refco's business.

### C.    Mr. Bennett's Conduct when Confronted Regarding the Receivable Balance

It is significant that following the discovery of the receivable by Refco, Mr. Bennett did not deny knowledge of the receivable, obstruct justice, or attempt to flee the jurisdiction.  To the contrary, he flew back from Japan where he had been on business; agreed to meet with the Refco Board of Directors; offered to stay on to help manage the crisis; and then organized a $420 million loan, using his Refco stock as collateral, to retire the receivable balance in its entirety.

Upon first being approached by Gerald Sherer, Refco's CFO, about the RGHI receivable balance in late September, Mr. Bennett told Mr. Sherer that he would take steps to eliminate the balance.  As Mr. Bennett was scheduled to leave on a business trip to Asia on October 3, he told Mr. Sherer that they would discuss the issue further upon his return.

Mr. Bennett flew to Tokyo on October 3.  After learning from Mr. Maggio that Mr. Sherer had spoken to members of the Refco Board about the receivable and had scheduled a conference call to discuss it, Mr. Bennett spoke with Scott Schoen, a Refco Board member and executive at Thomas H. Lee.  Mr. Bennett explained the history of the RGHI receivable to Mr. Schoen and told him that "he would immediately get on a plane and be back in New York" on the night of Wednesday, October 5.  (*See* Grant Trial Tr. at 1452 (Schoen testimony)).  Later that evening, Mr. Bennett participated in a conference call with other members of the Refco Board, in which he again discussed the RGHI receivable.  Mr. Bennett asked the Weil Gotshal attorney on the phone to deliver his Refco stock certificates so that he might move forward with obtaining a loan to pay off the balance.[18]  He also told those on the call that he would return to New York immediately to help deal with the issue.  (*See* Exh. 22 (Schoen e-mail (sent by assistant Markie Parker)) ("Bennett is being cooperative and claims to be close to obtaining financing to repay the loan in full.")).  On the plane ride back from Tokyo, Mr. Bennett spoke with Mr. Maggio and told him to begin making arrangements with BAWAG for repayment of the RGHI receivable.

Mr. Bennett returned to New York on the evening of October 5.  The following morning, he met with Mr. Schoen, Scott Jaeckel (also of Thomas H. Lee), and Ronald O'Kelley (Chairman of the Refco Audit Committee) and again explained the history of the receivable balance.  Later that day, Mr. Bennett faxed a loan proposal to BAWAG, formally proposing that the bank lend him funds to pay down the receivable, with Mr. Bennett's Refco stock pledged as collateral.  That evening, and again on the following day, Mr. Bennett met with the full Refco Board and again took responsibility for the loan balance, and expressed his desire to pay it off.

---

[18]    Mr. Bennett could not sell his shares at that time to pay off the receivable balance because they were subject to a lock-up period following the Refco IPO.

Mr. Bennett also offered to stay on at Refco, in a subordinate role, to help manage any crisis that ensued following disclosure of the receivable. Mr. Maggio suggested to the Board that it would be in Refco's best interest to permit Mr. Bennett to do so. (Grant Trial Tr. 1457 (Schoen: "[Maggio] believed that Mr. Bennett, because of his knowledge and expertise and leadership of the company, was essential to being able to keep the company operating in the normal course.")). Instead, the Board decided to suspend Mr. Bennett and exclude him from further discussions about handling the fallout from the receivable.

On Friday, October 7, Mr. Bennett wired $13 million from his personal bank account to Refco toward payment of the receivable balance. On Monday, October 10, the $420 million loan that Mr. Bennett had requested from BAWAG came through, and the outstanding RGHI receivable balance of $433 million was retired in its entirety.

### D.     Market Reaction to Disclosure of Receivable Balance

Mr. Bennett had thus paid off the RGHI receivable in cash by Monday, October 10, 2005. Nonetheless, Refco's announcement that same day that the company had discovered a previously undisclosed related-party receivable, and that Refco's financial statements for the prior three years should no longer be relied upon, set in motion a panic in the marketplace that – exacerbated by events later in the week – ultimately resulted in the sale of Refco's futures business and the initiation of bankruptcy proceedings the following Monday. Refco's rapid collapse was not the product of a rational market reaction to the disclosure of Mr. Bennett's improprieties, or a rational assessment by the marketplace of the financial consequences of those improprieties. Rather, Refco collapsed because customers of the company's unregulated subsidiary Refco Capital Markets – lacking information and fearing the worst – sought to pull their cash and securities out of the company all at once, engendering a run on the bank and liquidity crisis that the company ultimately could not withstand.

KL3 2660606.1

Following the disclosure of the RGHI receivable on October 10, Refco shares fell, by market close, to $15.90, down from $28.56 the previous Friday.[19]  In the after market, however, the shares were trading slightly higher, suggesting the possibility of a rebound the following day; there was still the sense that the company would weather the crisis.  (*See* Exh. 23).  Indeed, according to Refco Board member Scott Schoen, by Monday evening the company "had not seen customers calling up in waves to withdraw their money so they hadn't yet concluded that the company was in financial distress, and we hadn't yet seen counterparties, the financial institutions with whom we did business around the world, withdrawing their willingness to do business with the company."  (Grant Trial Tr. at 1463).

On the morning of October 11, the NYSE suspended trading in Refco shares until later in the day, pending the release of additional information by Refco about the RGHI receivable.  In the early afternoon, Refco issued a supplemental press release stating again that the receivable was a result of historical obligations that had been transferred to an entity controlled by Mr. Bennett, and confirming that the company had adequate liquidity to run the business in the ordinary course.  (*See* Exh. 24).  Following the press release, trading in Refco stock resumed, and the stock traded down another $2.00, to $13.85 by market-close.

---

[19]    The stock price had risen during the course of the prior two months from the IPO price of $22.

That evening, Mr. Bennett was arrested at his New Jersey home.[20]  News of his

arrest and arraignment on securities fraud charges began circulating the next day, October 12,

setting off another intense sell-off.  (*See* Grant Trial Tr. at 1467 (Schoen:  "[T]he final thing that

happened, in terms of triggering the problems at the company, was that Mr. Bennett was shown

on television being arrested at his home by representatives of the government led away in

handcuffs.")).  As news of the arrest spread, Refco shares plunged to $10.85.  (*See, e.g.*, Martha

Graybow and Chris Sanders, *Former Refco CEO charged, shares sinking*, Reuters, Oct. 12 ,

2005 ("The former chief executive of Refco Inc. was charged with securities fraud on

Wednesday as shares of one of the world's largest commodities and futures brokers continued to

plummet and have now lost over 60 percent in three days."); Nightly Business Report, Oct. 12,

2005 ("The U.S. attorney in New York moves quickly, charging Refco`s former CEO with

securities fraud as Refco shares continue their downward spiral."); MidnightTrader, *Refco*

*Plunging 20% in Late Trading -- Ex-CEO Arrested, Charged With Securities Fraud*, Oct. 12,

2005 ("Refco (RFX) is plunging 20.29% in late regular session trading.  Refco Inc.'s former

CEO, Phillip R. Bennett, was charged with securities fraud today, accused of hiding up to $545

million in bad debts from federal regulators and investors, the Associated Press reports, citing a

Justice Department prosecutor.")).

---

[20]    The government has stated that Mr. Bennett was arrested because of a fear that he planned to
flee to Austria.  Mr. Bennett did have a long-scheduled trip to Austria during the week of
October 10 (*see* Exh. 25), and in a taped conversation the previous day with Maggio (who had
begun cooperating with the government), Mr. Bennett mentioned he would be going there.  As
we understand it, this was the sole basis for seeking an arrest warrant.  Yet the evidence suggests
the opposite of an intention to flee.  After being told by Maggio, on October 4, that the Refco
Board had discovered the existence of the receivable, Mr. Bennett, who had the use of a private
plane, immediately and voluntarily flew back to the United States.

Even more significantly, Refco customers began pulling out their funds at a frenzied pace. As Mr. Schoen testified during the Grant trial, Mr. Bennett's arrest, along with the NYSE's earlier decision to suspend trading in Refco's stock and the announcement that Refco's auditor had withdrawn its audit opinions for the company's prior-year financial statements, "led to an enormous concern, something on the verge of panic among counterparties and customers, and customer requests to get their money back, to take their money out of the company came pouring in over the course of Tuesday and into Wednesday. . . . And we had what is often referred to as run on the bank." (Grant Trial Tr. at 1467). Mr. Schoen's account of the panic leading to Refco's collapse is confirmed by Refco's Bankruptcy Disclosure Statement:

> [C]ustomers of all [Refco] businesses sought to withdraw cash, securities, and other property on deposit with the company which rapidly turned into a "run on the bank." Refco's regulated companies, principally Refco, LLC and Refco Securities, LLC maintained customer property in segregated accounts, and in accordance with [SEC] and [CFTC] regulations, had sufficient excess capital to satisfy all customer demands, even at the extraordinarily elevated levels of withdrawal. . . . The Company's unregulated business, principally RCM, however, was not required to and did not in fact maintain property received from customers in segregated accounts; nor did it maintain cash reserves beyond those which, based on its experience, were required to satisfy customer requests for withdrawal in the normal course plus a reasonable cushion. *Accordingly, demands by customers to withdraw property from RCM, including several large withdrawals . . ., seriously and rapidly depleted RCM's liquidity, leading the Board of Directors on October 13, 2005 to declare a moratorium on further customer withdrawals from RCM for fifteen days.*

(Exh. 26, at 35-36 (emphasis added)).[21]

---

[21]    Excerpts from Refco's Disclosure Statement with Respect to Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries filed in United States Bankruptcy Court for the Southern District of New York on October 20, 2006 are attached as Exh. 26.

On Thursday, October 13, following the announcement of a moratorium on customer withdrawals at RCM, Refco stock fell to $9.10, at which point the NYSE halted trading in the shares.  At the same time, the CME advised Refco that it would invoke its emergency powers to seize and transfer to another registered commodities broker all of the customer accounts of Refco's regulated futures business (Refco LLC) if Refco did not stabilize the company to its satisfaction by Monday, October 17.  The CME issued this ultimatum despite the fact that Refco LLC, unlike RCM, maintained customer funds in segregated accounts and had sufficient liquidity to meet withdrawal requests.  Understanding that such action by the CME might result in Refco losing its flagship business for no consideration, Refco quickly shifted its strategy from attempting to solve the liquidity problem at RCM to seeking to sell Refco LLC. (*See* Exh. 26 at 35-36).  And by the morning of October 17, Refco had in fact reached an agreement to sell Refco LLC.  The proposed transaction required that Refco's unregulated businesses file bankruptcy protection as promptly as possible.  (*Id.*)  That same evening, Refco filed for bankruptcy, its hand forced by the pace of customer withdrawals and pressure from the CME.

## ANALYSIS OF § 3553(a) FACTORS

**I.     Required Sentencing Considerations Following *Booker*, *Gall*, and *Kimbrough***

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the

mandatory Sentencing Guidelines system violated the Sixth Amendment.  Pursuant to the *Booker*

remedial opinion (and as further explained in subsequent Supreme Court cases), the sentencing

court is to apply the factors set forth in 18 U.S.C. § 3553(a).  Section 3553(a), "as modified by

*Booker*, contains an overarching provision instructing district courts to 'impose a sentence

sufficient, but not greater than necessary' to accomplish the traditional goals of sentencing."

*United States v. Kimbrough*, 128 S. Ct. 558, 570 (2007) (citing sentencing goals set forth at 18

U.S.C. § 3553(a)(2)(A)-(D)).

The statute provides that, in determining the appropriate sentence, the court is to

consider a number of factors.  The first factor, reflecting the critical component of any sensible

sentencing regime that the district judge "make an individualized assessment based on the facts

presented," is "a broad command to consider 'the nature and circumstances of the offense and

the history and characteristics of the defendant.'"  *Gall v. United States*, 128 S. Ct. 586, 596-97

& n.6 (2007).  The second factor requires consideration of the "general purposes of sentencing,"

that is, imposition of a sentence reflecting the seriousness of the offense, promoting respect for

the law, and providing "just punishment" as well as specific and general deterrence.  *Id*.;

*Kimbrough*, 128 S. Ct. at 570.  The Court must also consider the sentencing range established by

the Guidelines, as well as "any pertinent policy statement" issued by the Sentencing Commission

(§ 3553(a)(4), (5)); and the "need to avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct" (§ 3553(a)(6)).

Although a district judge "should begin all sentencing proceedings by correctly

calculating the applicable Guidelines range," *Gall*, 128 S. Ct. at 596, the advisory Guidelines are

KL3 2660606.1

only one of the factors to be considered in imposing sentence, *id*. at 602.  Indeed, the district

court may not presume the Guidelines range is reasonable, and it must make an individualized

evaluation of the facts and circumstances before it.  In so doing, the sentencing court should

consider the possibility that a Guidelines sentence is not just unnecessary to accomplish the goals

set forth in § 3553(a), but that such a sentence would be "greater than necessary" – put

differently, that a Guidelines sentence will actually thwart application of § 3553(a)'s command

to impose the minimum sentence necessary to achieve the goals of sentencing.  *Rita v. United*

*States*, 127 S. Ct. 2456, 2465 (2007).  The court is "free to make its own reasonable application

of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines."

*Kimbrough*, 128 S. Ct. at 577 (Scalia, J., concurring).

        Indeed, based on its evaluation of all of the § 3553(a) factors, the court may elect

to impose a non-Guidelines sentence – including a sentence substantially deviating from the

advisory Guidelines range – "based solely on policy considerations, including disagreements

with the Guidelines."  *Kimbrough*, 128 S. Ct. at 570.  Among other reasons, such a disagreement

may be based upon the court's conclusion that a particular Guidelines analysis reflects an

unsound judgment (or no considered judgment at all) by the Sentencing Commission.  *Id*.; *Gall*,

128 S. Ct. at 594.  As the Supreme Court has explained, where particular Guidelines ranges were

formulated by the Sentencing Commission on the basis of political considerations (that is, by

following the perceived desires of the Congress), rather than reflecting the Commission's

"exercise of its characteristic institutional role" to "take account of empirical data and national

[sentencing] experience," there is a heightened risk that the resulting Guidelines sentence will be

"greater than necessary" to achieve the sentencing purposes of § 3553(a), even in a "mine-run"

case.  *See Kimbrough*, 128 S. Ct. at 568-70.

<div align="center">42</div>

II.      **The Advisory Guidelines Calculation**

A.      **Mr. Bennett's Advisory Guidelines Range**

As noted, the Court is directed to begin the sentencing proceeding by correctly

calculating the applicable Guidelines range, including applicable downward departures.  *Gall*,

128 S. Ct. at 596 (citing *Rita v. United States*, 127 S. Ct. 2456, 2465 ("sentencing judges, as a

matter of process, will normally begin by considering the presentence report and its

interpretation of the Guidelines," and may then determine that the Guidelines sentence should

not apply because, for example, it "fails properly to reflect § 3553(a) considerations, or perhaps

because the case warrants a different sentence regardless")).[22]

As the Court is aware, in financial fraud cases, the economic loss amount drives

the Guidelines calculation.  Although we and the government may well have a disagreement

about the reasonably foreseeable loss amount in this case, the fact is that given the panic set off

in the marketplace following the public disclosure of the RGHI receivable, the loss amount will

be large enough to yield an advisory Guidelines sentence of life.[23]  Indeed, a loss of more than

---

[22]     This procedural requirement is not statutorily mandated.  *See Booker*, 543 U.S. at 304-05
(Scalia, J., dissenting in part) ("The statute provides no order of priority among all th[e]
factors").  Moreover, as Southern District Judge Lynch, among others, has noted, it may have the
effect of improperly elevating the impact of what should be just one of several statutory
sentencing considerations, thereby creating a bias toward harsher sentences.  *See Federal
Sentencing Under "Advisory" Guidelines: Observations by District Judges*, 75 Fordham L. Rev.
1, 17-18 (Oct. 2006) (psychological studies suggest that when a judge is given an advisory
guidelines range as a baseline, even if the number is arbitrary, it may have undue influence on
the sentencing outcome.)

[23]     The Presentence Report states that "[t]he intended loss directly attributable to the
defendant's criminal conduct is more than $400,000,000."  (PSR ¶ 94).  As we argue in this
memorandum, Mr. Bennett did not "intend" (in the normal sense of the word) to cause any loss
at all, although we recognize that the Guidelines term "intended loss" may be broad enough to
include losses that were "probable."  *See United States v. Carboni*, 204 F.3d 39, 47 (2d Cir.
2000).  In any event, it is not necessary for the Court to resolve the issue, as we acknowledge that
the "actual loss" (*i.e.*, "the reasonably foreseeable pecuniary harm that resulted from the

just $7 million would produce an advisory Guidelines sentence (absent any departures) of 30 years to life in Mr. Bennett's case.

Under these circumstances, we will not burden the Court with an extensive submission on the loss issue under the Guidelines. We respectfully submit that, because the Guidelines range is driven by the loss amount to the exclusion of all of the other § 3553(a) factors, it does not produce anything approaching a fair and just sentence in this case, much less one that is "no greater than necessary" to achieve the goals of sentencing.[24]

**B.    The Court Should Reject Mr. Bennett's Advisory Guidelines Range and Impose a Non-Guidelines Sentence No Greater Than Necessary to Accomplish the Goals of § 3553(a) in This Case**

This Court's authority "to reject . . . the advice of the Guidelines," *Kimbrough*, 128 S. Ct. at 577 (Scalia, J., concurring), and to impose a non-Guidelines sentence based on all of the § 3553(a) factors, has particular relevance here. As was the case with the crack versus powder cocaine Guidelines considered in *Kimbrough*, the Sentencing Commission's treatment of loss in fraud cases is not rooted in either "empirical data" or "national [sentencing] experience," and the resulting advisory Guidelines yield sentences greater than necessary to achieve the goals of sentencing.

---

offense," Commentary Note 3(A)(i) to § 2B1) is high enough to yield an advisory Guidelines range of life imprisonment.

[24]    Because the Court is required to conduct a Guidelines analysis, we state for the record our view that a substantial downward departure is warranted. As more fully developed in discussion of the § 3553(a) factors below, the nature and circumstances of the offense reflect a number of positive, mitigating facts that argue for a meaningful period of incarceration, but one well short of the rest of Mr. Bennett's life. Within the framework and terminology of the Guidelines, these factors may be said to demonstrate that the dollar loss overstates the seriousness of the offense (§ 2B1.1, Application Note 19(C)), or that the conduct was "atypical," *Koon v. United States*, 518 U.S. 81, 94 (1996).

The Sentencing Commission was intended to be an independent body of experts, "devoted exclusively to the development of rules to rationalize a process that has been and will continue to be performed exclusively by the Judicial Branch." *Mistretta v. United States*, 488 U.S. 361, 407 (1989). As the Supreme Court has noted, the Commission was meant to perform a function not within the institutional capacity of courts: to evaluate "empirical data and national [sentencing] experience, guided by a professional staff with appropriate expertise," and on that basis to formulate Guidelines ranges for individual federal offenses. It was not expected to promulgate Guidelines ranges merely carrying out the perceived will of the Congress. Where the Commission carries out its proper function, the resulting Guidelines ranges are deserving of consideration by sentencing courts because, at least in theory, they can be expected to "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 128 S. Ct. at 574) (citation omitted). Where, however, the Sentencing Commission abrogates this reasoned evaluative role, the result in individual cases may well be sentences violative of the statute. *See id.* at 575 (as the Sentencing Commission itself has acknowledged, tying crack cocaine sentencing ranges to mandatory minimum statutory sentences, rather than considering empirical data and national experience, resulted in "disproportionately harsh sanctions, *i.e.*, sentences . . . 'greater than necessary' in light of the purposes of sentencing set forth in § 3553(a)").

The recent trend toward longer sentences in white-collar cases – including some extraordinarily harsh sentences beyond imagining as recently as ten years ago – is a direct result of the 2001 and 2003 amendments to the Guidelines. Yet there is broad consensus that the Sentencing Commission based neither of these Guidelines range increases on empirical evidence that more severe sentences are more effective – much less necessary – in achieving the goals of

sentencing. Frank O. Bowman, III, *Pour encourager les autres? The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and the Sentencing Guidelines Amendments That Followed*, 1 Ohio St. J. Crim. Law 373, 419 (2003-2004). With respect to the post-Sarbanes-Oxley amendments relating to fraud crimes, "the Commission was not permitted to perform its proper role because the dominant political actors in the sentencing universe – Congress and the Justice Department – were unwilling to defer to the Commission's judgment." *Id.* at 435.

Neither the empirical evidence nor the national sentencing data available for the Commission's review at the time of the 2001 increases suggested that higher sentences for economic crimes were necessary. For example, figures published by the Justice Department's Bureau of Justice Statistics in 2001 showed a significant drop in property crimes, a strong suggestion that sentences being imposed in business crime cases in the 1990s were having a sufficient deterrent effect. *Id.* at 419-423. "A deterrence researcher advising the Commission [before the 2001 increases] concluded that the available data suggest that the certainty of punishment is more important to deterrence than is severity." Paul J. Hofer & Mark H. Allenbaugh, *Perspectives on the Federal Sentencing Guidelines and Mandatory Sentencing*, 40 AM. CRIM. L. REV. 19, 64, n. 192 (2003) (citation omitted). Nor did trends in national sentencing data counsel in favor of the significant increases in sentences for fraud crimes that the Commission mandated in the 2001 revisions to the Guidelines. Between 1994 and 2001 the average length of sentences imposed by judges barely increased from 19 months in 1994 to 20.8 months in 2001. *See* Bowman, at 424.[25] In sum, the loss table which yields Mr. Bennett's

---

[25]    It is not surprising that the average sentences in 2001 do not evidence a trend indicating that judges perceived a need to impose substantially longer sentences in white-collar cases. The 1994

advisory Guidelines range of life imprisonment was not the product of a review of national

sentencing trends, or of any other empirical data supporting such a sentence.[26]

Moreover, as with the crack/powder cocaine weight-based scheme discussed in

*Kimbrough*, tying the fraud Guidelines ranges to the single sentencing enhancement of economic

loss virtually invariably yields harsh results, to the detriment of proportionality and to the

exclusion of the other statutory goals of sentencing. *See Kimbrough*, 128 S. Ct. at 575. These

infirmities have been cited as warranting imposition of a non-Guidelines sentence. *See*, *e.g.*,

*United States v. Adelson*, 441 F. Supp. 2d at 509 ("As many have noted, the Sentencing

Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend

to place great weight on putatively measurable quantities, such as the weight of the drugs in

narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why

it is appropriate to accord such huge weight to such factors.") (citing Second Circuit Judge

Cabranes, in *Fear of Judging*, at 53 (concluding that the Commission has never presented

---

base average of 19 months itself reflected the significant impact of the Guidelines, beginning
from their effective date in 1987, in increasing the length of sentences for economic crimes. And
even these original increases were the result of political considerations not tied to either
empirical research or national data. *See* Jose Cabranes & Kate Stith, *Fear of Judging:
Sentencing Guidelines in the Federal Courts* 60 (1998) at 60 ("The Commission further
acknowledged that it had sought to increase sentence severity for 'white collar' crimes,
apparently on the assumption that Congress was referring to this type of crime when it inserted
the oracular statement that 'in many cases, current sentences do not accurately reflect the
seriousness of the offense.'") (internal citations omitted).

[26]    As Judge Nancy Gertner has observed, the Commission's mandate was to "develop means
of measuring the degree to which the sentencing, penal, and correctional practices are effective
in meeting the purposes of sentencing as set forth in section 3553(a)(2)." *United States v. Jaber*,
362 F. Supp. 2d 365, 374 (D. Mass. 2005) (citing 28 U.S.C. § 991(b)(2)). Yet, "with few
exceptions, the Commission has done no such analysis," and has not even "tr[ied] to justify its
Guidelines in any meaningful way." *Id.*

empirical evidence or substantial argument to support the proposition that its rules achieve, even imperfectly, any of the four well-established possible objectives of criminal sentencing)).

Indeed, in one respect, the treatment of loss in fraud cases reflects an even more extreme abdication of independent analysis on the part of the Sentencing Commission than the 100-1 disparity for crack versus powder cocaine criticized in *Kimbrough*. The latter was tied to mandatory minimum statutory sentences. The 2003 amendments to the fraud Guidelines were intended to "more fully effectuate increases in statutory *maximum* penalties for wire fraud and mail fraud offenses from five to 20 years set forth in section 903 of the Act." *See* Guidelines Manual Appendix C Amendment 647, pg. 1375 (2003) (emphasis added). In other words, the decision to increase fraud sentencing ranges following Sarbanes-Oxley was not based on any empirical evidence supporting such an increase; rather, the Commission's actions were designed to yield a greater number of sentences at or approaching the statutory maximum penalty set by Congress, without regard to whether these dramatically harsher sentences would be sufficient but not greater than necessary to fulfill the sentencing goals of § 3553(a). Indeed, these increases are directly contrary to the Commission's own stated goal of "ensur[ing] a short but definite period of confinement for a larger proportion of . . . 'white collar' cases, both to ensure proportionate punishment and to achieve adequate deterrence." 15 Year Report 56 (internal quotation marks and citations omitted).[27] The effect of these increases is that virtually every defendant in a case involving disclosure of a fraud at a public company will face an advisory Guidelines sentence of life. *See United States v. Adelson*, 441 F. Supp. 2d at 514 (noting this result based upon the undue Guidelines emphasis on loss combined with the fact that public companies typically issue

---

[27]    Cites to the "15 Year Report" refer to the Sentencing Commission's November 2004 report reviewing the experience of the first 15 years of federal Guidelines sentencing.

millions of shares; even a modest decline in stock price when combined with the multiplier effect leads to levels that are "off the charts").

This result is not rational, implying as it does that all such defendants should presumptively be punished alike, and punished literally as severely as possible. It also runs afoul of the requirement of § 3553(a) and recent Supreme Court cases that each offender and offense be assessed individually. Accordingly, we respectfully submit that the advisory Guidelines sentence in Mr. Bennett's case – driven, as it is, by the loss amount to the exclusion of all other statutory factors – is an irrational and unnecessary result, one that effectively ignores the requirement of individualized sentencing and disserves the general sentencing goals set forth in § 3553(a).[28]

### III. Consideration of All of the § 3553(a) Factors Supports the Conclusion that a Sentence Substantially Below the Advisory Guidelines Range is Appropriate

We respectfully submit that an evaluation of all of the § 3553(a) factors supports a sentence of incarceration for a meaningful term of years, yet one well short of life or any period so lengthy as to amount to a *de facto* life sentence.

*First*, Mr. Bennett's personal history and characteristics, as well as the nature and circumstances of his offense, warrant such an outcome:

---

[28]    The Supreme Court's recent decisions make clear that the sentencing judge has discretion to sentence anywhere within the statutory range, as long as "the § 3553(a) factors, on the whole, justif[y] the sentence." *Gall*, 128 S. Ct. at 602 (sentence of probation was a "reasoned and reasonable decision"). In directing district courts to "give serious consideration to the extent of any departure from the Guidelines," the Supreme Court was particularly addressing the situation in which a substantial deviation from the Guidelines range would result in "an unusually lenient or an unusually harsh sentence." *See id.* at 594. We respectfully submit that here, even a substantial deviation from the Guidelines range of life – that is, a deviation to a meaningful period of incarceration but one well short of a *de facto* life sentence – would not be a "lenient" outcome, much less an "unusually lenient" one.

- Mr. Bennett has been a productive and giving member of his community for decades. He has an exceptionally close relationship with his wife and two children.

- Immediately upon discovery of the RGHI receivable, Mr. Bennett took responsibility for his conduct, including arranging for repayment. Shortly after his indictment, Mr. Bennett engaged the government in an effort to reach a consensual disposition, including cooperation and a guilty plea exposing him to a substantial prison term. Although the government declined these offers of cooperation and we were not able to reach agreement on a negotiated plea, Mr. Bennett pleaded guilty to the entire indictment and has accepted full responsibility for his actions. His guilty plea precipitated the guilty plea of co-defendant Robert Trosten and aided the government's case against Tone Grant.

- Mr. Bennett has made further efforts to undue some of the harm he caused. He volunteered his cooperation to the Refco Litigation Trustee and to the Refco Class Action Plaintiffs, in their efforts to collect hundreds of millions of dollars for those who lost money in the Refco bankruptcy. As both attest, Mr. Bennett's cooperation has been extremely helpful to their efforts. In addition, Mr. Bennett will be voluntarily forfeiting the entirety of his assets, amounting to over $70 million dollars, which we understand will go to the victims of the fraud.

- The crime committed here was not the product of pure greed. Mr. Bennett was motivated in significant part by a desire, however misguided, to save Refco and to build it into a stronger company.

- Mr. Bennett made substantial payments toward the RGHI receivable before it was discovered, and immediately after being confronted with it.

- Refco's collapse was the product of an irrational panic, and did not accurately reflect Refco's value as a going concern following the disclosure of the fraud. Refco was not an Enron-like house of cards.

*Second*, the traditional sentencing goals codified in § 3553(a)(2) will be amply served by a sentence well below one that results in Mr. Bennett spending the rest of his life in prison. As courts have noted, the outcomes yielded by application of the current advisory Guidelines for economic crimes go far beyond what is necessary to reflect the seriousness of the offense, to punish justly, and to deter. They can equal or exceed the sentences historically reserved by our society for the most heinous crimes, including rape, murder and treason, committed by those with few or no redeeming qualities and little or no hope of rehabilitation.

50

Such a sentence is not necessary to either fully and fairly punish Mr. Bennett, or to deter others who might be contemplating similar misconduct.

Recognizing that Mr. Bennett has pleaded guilty to a fraud that resulted in significant financial harm, we respectfully submit that a sentence of incarceration substantially below one amounting to life imprisonment, accompanied by financial ruin and public humiliation and followed by deportation from the United States, will be more than sufficient to accomplish the enumerated sentencing goals of § 3553(a).

**A.    Section 3553(a)(1): History and Characteristics of Phillip Bennett**

**1.    Mr. Bennett's exemplary personal life and dedication to his community merit a sentence substantially below the advisory Guidelines calculation of life**

As described at length above by the many family, friends, neighbors, and colleagues who have submitted letters on his behalf, Mr. Bennett is a highly educated, hard-working, and decent man, who has, apart from the conduct to which he has pleaded guilty, led an exemplary life.  He has been a productive member of his community, giving of his time, enthusiasm, and resources; a caring friend to those in need; and a loving father and husband.  *See supra* 9-21.  His charitable acts and kindness towards others, moreover, have come without thought of public recognition or acclaim.  *See Adelson*, 441 F. Supp. 2d at 513 ("[The defendant's] good deeds were not performed to gain status or enhance his image.  Most of them were unknown to all but a few people until the time of sentencing.") (citation omitted)).  Locking Mr. Bennett away for the remainder of his life will serve neither society nor justice, and we submit that Mr. Bennett's character and good works merit a sentence substantially below that provided for by the advisory Guidelines.  *See id*. ("As for 'the history and characteristics of the defendant,' it was undisputed at the time of sentencing that [the defendant's] past history was exemplary"); *United States v. Milne*, 384 F. Supp. 2d 1309, 1311 (E.D. Wisc. 2005) (imposing

non-Guidelines sentence in bank fraud case based, in part, on fact that "[a]side from this offense,

defendant had led a praiseworthy life, and numerous friends, neighbors and family members

wrote letters attesting to his good character, helpful nature and community involvement");

*United States v. Ranum*, 353 F. Supp. 2d 984, 990-91 (E.D. Wisc. 2005) (imposing non-

Guidelines sentence in financial fraud case based, in part, on fact that defendant was "fifty years

old, had no prior record, a solid employment history, and [was] a devoted family man," and

noting defendant's "outstanding character").

### 2. Mr. Bennett's extraordinarily close relationship with his wife and two children warrants a sentence substantially below the advisory Guidelines calculation of life

Mr. Bennett and Valerie, his wife of 36 years, have formed an extraordinarily

close bond during the many years since they left their home country of England and settled in the

United States.  The Court will sense from Valerie's letter how much she has come to rely upon

Mr. Bennett, who, as the "love of her life" and "best friend," is at the center of her emotional and

practical world.  (*See Letters*, Tab 8; *see also* PSR at ¶ 123).  To be sure, Mrs. Bennett is not an

invalid or without means of supporting herself.  But the Court can and should consider that

imposing an unduly long sentence on Mr. Bennett will have the effect of emotionally devastating

an innocent spouse who seeks only the assurance that her husband will rejoin her for some part

of the final chapter of their lives.  As Valerie explains, "I know that there is no avoiding the hard

reality that Phil and I must be separated for some period of time, but I do humbly request that

when deciding upon his sentence [the Court] contemplate the totality of the man and beseech

[the Court] for leniency such that I may sustain myself with the hope that we may be reunited at

some time not too far in the future."  (*Letters*, Tab 8).

Mr. Bennett also has an exceptionally close relationship with his children, both of

whom, as described above and as is apparent from their letters to the Court, will be profoundly

affected should their father be imprisoned for the remainder of his life. The children have already had to come to terms with the fact that Mr. Bennett will, whatever his sentence, be deported as a result his conviction, and therefore that they likely will never again live within close proximity of him. Should the Court impose a sentence equating to life, Colin and Jessica Bennett will have to accept the additional prospect that they will never again see their father outside the confines of a prison facility. (*See Letters*, Tab 5 (Jessica Bennett) ("[My father] may not be there for my wedding or for my brother's wedding, he may not be there for any children I may have, he may not be there for our birthdays or my parents' wedding anniversary, he simply won't be where he's needed and where we so want him to be.")). The bond between Mr. Bennett and his children, combined with the impending fact of deportation, are further reason for the Court to impose a non-Guidelines sentence. *See United States v. Nellum*, No. 2:04-CR-30-PS, 2005 WL 300073, at *4 (N.D. Ind. Feb. 3, 2005) ("Under the guidelines, family ties are not ordinarily relevant to determining the sentence. But under § 3553(a), the history and characteristics of the defendant, including his family ties, are pertinent to crafting an appropriate sentence.") (citation omitted)).

3. **Mr. Bennett's ameliorative efforts and acceptance of responsibility warrant a sentence substantially below the advisory Guidelines range**

a. **Mr. Bennett's offers to cooperate with the government**

Mr. Bennett's decision, on February 15, 2008, to plead guilty to all of the counts in the indictment was the first time the Court and the public became aware of Mr. Bennett's willingness to take responsibility for his actions at Refco and to do what he could to make amends for his conduct. But Mr. Bennett's plea came after more than two years of negotiations with the government, during which time he repeatedly offered to cooperate with the U.S. Attorney's Office and to plead guilty under terms that would expose him to a substantial prison

term.  The government declined Mr. Bennett's offers to cooperate and was unwilling to agree to

a meaningful limitation as to the counts of conviction or Mr. Bennett's potential sentence.  After

the government's decision became clear, Mr. Bennett chose to plead guilty to the full indictment

and accept responsibility for his actions, with no promises of any kind from the government as to

the position it would take at sentencing.  In fact, following his guilty plea, Mr. Bennett again

offered his cooperation to the government.  Although there is no dispute that Mr. Bennett would

have provided information helpful to the government's investigation, this post-plea offer was

also rejected.  The Second Circuit has recognized that, in considering the "history and

characteristics of the defendant" under § 3553(a)(1), district courts should consider whether the

defendant made efforts to cooperate, "even if those efforts did not yield a Government motion

for a downward departure pursuant to U.S.S.G. 5K1.1 ('non-5K cooperation')." *United States v.

Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006).  We submit that Mr. Bennett's willingness to

cooperate with the government – expressed numerous times over a two-year  period – and his

decision to plead "open" to the indictment after he was rebuffed, are factors, among many, that

warrant imposition of a non-Guidelines sentence.

### b.      The impact of Mr. Bennett's guilty plea

As well as saving the government and the Court the time and expense of a trial (as

acknowledged in the government's *Pimental* letter), Mr. Bennett's plea precipitated the plea of

his co-defendant Robert Trosten, who chose to plead guilty and enter into a cooperation

agreement a week after Mr. Bennett's decision.  As the Court is aware, the government accepted

Mr. Trosten's offer to testify at the trial of Tone Grant and cooperate in its ongoing investigation

of Refco.  Mr. Grant was convicted following what the government will acknowledge was a case

that had been substantially slimmed down and shortened from what the government planned to

present had Mr. Bennett decided to put the government to its proof, and which was aided by Mr.

Trosten's testimony. Despite the government's declination of Mr. Bennett's direct assistance, then, Mr. Bennett's plea was nonetheless of significant aid to the government's prosecution of Mr. Bennett's co-defendants. We submit, therefore, that Mr. Bennett's plea "facilitate[ed] the proper administration of justice," a further factor supporting imposition of a non-Guidelines sentence. *See United States v. Garcia*, 926 F.2d 125, 127 (2d Cir. 1991) (in mandatory Guidelines case, affirming downward departure under § 5K2.0, despite fact that government did not file § 5K1.1 motion, where defendant's plea and cooperation led to pleas of two co-defendants).

> **c.    Mr. Bennett's cooperation with the Refco Litigation Trustee and the Class Action Plaintiffs**

Mr. Bennett has also offered his cooperation to the both the Litigation Trustee of the Refco Estate and the Refco Class Action Plaintiffs, in their efforts to return hundreds of millions of dollars to those who lost money in the Refco bankruptcy. As Refco's former CEO and a hands-on executive who was exceptionally familiar with the company's operations, Mr. Bennett is, of course, uniquely positioned to render assistance in this regard. The Trustee and the Class Action Plaintiffs agreed to accept Mr. Bennett's offer and are currently using information provided by him in prosecuting the cases they have filed against several of the defendants in the Refco matter.

In his letter to the Court, the Trustee explains that "Mr. Bennett has provided information . . . that will be of material assistance to the Trustee's claim against a number of defendants against whom [he] is pursuing claims." (Exh. 1, at 2). The Trustee notes that during his meetings and telephone calls with Mr. Bennett, Mr. Bennett has given a "detailed recollection" of conversations with others involved in the Refco fraud, which the Trustee expects to be "very significant evidence" in the his efforts to recover funds for the Refco Estate. (*Id.*)

Mr. Bennett has also assisted the Trustee by providing "very helpful analysis regarding certain accounting entries on the books and records of Refco and its affiliates," taking considerable time away from their meetings to respond to questions raised by the Trustee and his counsel.  (*Id.*) Mr. Bennett has been "willing to answer any and all questions" put to him, and agreed to make himself available to the extent the Trustee requires his assistance in the future.  (*Id.*)  And in fact, Mr. Bennett's work with the Trustee has already been cited in the Trustee's case against a number of former Refco insiders, in an effort to resist motions to dismiss presently pending in the bankruptcy court.  (*See id.* at 2-3.)  Finally, Mr. Bennett has agreed to waive RGHI's rights to millions of dollars of assets that the Trustee is currently pursuing, obviating the need for the Trustee to engage in "extensive and costly litigation."  (*See id.* at 3).

Mr. Bennett has also had several "highly productive," "wide-ranging," and "detailed" meetings with counsel for the Refco Class Action Plaintiffs, during which he has made "a substantial effort to assist the investors hurt by the collapse of Refco."  (Exh. 2, at 1).  In this regard, lead counsel for the Class Action Plaintiffs note that "Mr. Bennett's assistance has materially strengthened the Class' claim against a number of defendants in the *Refco* Investor Class Action," and "substantially enhanced the ability of Lead Plaintiffs to hold those defendants more fully accountable for their role in the events" at Refco.  (*Id.* at 2).  Mr. Bennett offered his assistance to the Plaintiffs (and to the Litigation Trustee) without any guarantee that they would agree to write to the Court on his behalf.  Because the Plaintiffs found their debriefings of Mr. Bennett "significant, complete, and credible," they decided to do so, emphasizing that the opportunity to sit down with Mr. Bennett has been "unique" in their experience.  (*Id.*)

Mr. Bennett expects to continue rendering assistance to the Trustee and Class Action Plaintiffs during the period he serves his sentence.  His ongoing efforts to do so are an

indication of the extent to which Mr. Bennett has sought to make amends for the harm he has

caused, and further reason for the Court to impose a sentence well below an actual or *de facto*

term of life in prison.  (*See* Sentencing Transcript, *United States v. Fastow*, No. CR-H-665 (S.D.

Tex. Sept. 26, 2006) at 46 (citing defendant's cooperation with civil plaintiffs as one of several

grounds for imposing non-Guidelines sentence of six years) (attached hereto as Exh. 27)).

### d.      Mr. Bennett's agreement to forfeit all of his assets

Finally, Mr. Bennett has agreed to forfeit to the government the entirety of his

assets, amounting to over $70 million, saving the government the time and expense of litigating

this issue, and providing additional funds for Refco's investors, customers, and lenders.  Mr.

Bennett has agreed to forfeit not only cash held in bank accounts, his share of the Bennetts' New

York apartment, and his interest in all assets acquired during the entire eight-year period of the

Refco fraud, but also assets acquired before the fraud period.  This, of course, is in addition to

the $433 million in cash that Mr. Bennett voluntarily wired to Refco after the fraud was

uncovered by the Refco Board in October 2005, $420 million of which Mr. Bennett obtained via

a loan from Bawag.  Mr. Bennett undertook to obtain the loan without any promises of leniency

from the Board – indeed, the bulk of the money was wired to Refco on October 10, after Mr.

Bennett had been suspended from the company, on the very day the fraud was publicly

disclosed.

* * *

In sum, Mr. Bennett's acceptance of responsibility was prompt, unqualified and

productive.  His guilty plea, his offers to cooperate with the government, his cooperation with the

Refco Litigation Trustee and the Class Action Plaintiffs, his agreement to forfeit all of his assets,

and his payment of $433 million to Refco after the fraud was uncovered – all of these taken

together, and even before consideration of the other § 3553(a) factors, support imposition of a

57

sentence substantially below the life sentence calculated under the advisory Guidelines (or a term

of years so long as to amount to life imprisonment).  Indeed, if the Court does not impose a non-

Guidelines sentence based on Mr. Bennett's post-offense conduct, Mr. Bennett will, as a

practical matter, receive no credit for his efforts to accept responsibility and make amends.

While the PSR and the government acknowledge that Mr. Bennett is entitled to a three-point

reduction in his offense level under the Guidelines pursuant to U.S.S.G. § 3E1.1, in this case that

reduction is meaningless given the size of Mr. Bennett's offense level.  As calculated by the

PSR, Mr. Bennett's offense level prior to the § 3E1.1 adjustment (and any downward departures)

is 55, which yields a sentence of life imprisonment.  A three-point reduction, to 52, also yields a

sentence of life imprisonment, affording Mr. Bennett no benefit at all.

      The purpose of § 3E1.1 is to further "legitimate societal interests" by encouraging

defendants to plead guilty and accept responsibility for their actions.  Background Note,

U.S.S.G. § 3E1.1.  The Guidelines thus reflects the long-standing notion that our criminal justice

system should recognize that defendants who accept responsibility and plead guilty should

receive a reduced sentence.  Mr. Bennett will be denied this benefit – afforded to defendants

every day in this country, even to violent criminals – unless the Court, in imposing sentence,

credits his acceptance of responsibility separate and apart from § 3E1.1.[29]  In fact, Mr. Bennett

will be denied this benefit if he is sentenced to a prison term equivalent to those received by

---

[29]   *See United States v. Milne*, 384 F. Supp. 2d 1309, 1312 (E.D. Wisc. 2005) ("Where
appropriate, courts may grant additional consideration to defendants who demonstrate
acceptance beyond that necessary to obtain a two or three level reduction under § 3E1.1.  This is
so because such conduct bears directly on their character, § 3553(a)(1), and on how severe a
sentence is necessary to provide deterrence and punishment, § 3553(a)(2).  Further, courts should
encourage offenders to mitigate their conduct voluntarily, whether by admitting it, paying
restitution or making efforts to address substance abuse, mental health or other problems that
contributed to it.").

other white-collar criminal defendants who, also faced with Guidelines of life, either did not plead guilty and decided instead to proceed to trial, or pleaded guilty but obstructed justice and did not unqualifiedly accept responsibility.[30]

### B.    Section 3553(a)(1):  Nature and Circumstances of the Offense

Just as the Court is to "consider every convicted person as an individual," so, too, must the Court evaluate "every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Gall*, 128 S. Ct. at 598 (*quoting Koon v. United States*, 518 U.S. 81, 113 (1996)).  The nature and circumstances of Mr. Bennett's offense are, we respectfully submit, more nuanced, and more mixed, than the highly publicized demise of Refco might suggest.

### 1.    Mr. Bennett was trying to save the company, he was not stealing, and he did not intend for anyone to lose money

The government's theory of this case is that Mr. Bennett and his co-conspirators used the RGHI receivable and the "round trip" transactions in order to hide the true financial condition of Refco, with the ultimate goal of selling the company and becoming rich.  We do not dispute that Mr. Bennett was handsomely paid while at Refco, and did indeed stand to become wealthy from the Lee and IPO transactions.  But the government's view of the case is incomplete.  It is equally true that the misconduct in this case started at a time when the

---

[30]    The latter category includes, for example, Sanjay Kumar, who received a 12-year sentence despite having engaged in what the government characterized as "one of the most coordinated, comprehensive obstructions of justice in the modern era of corporate crime."  (Government Sentencing Memorandum, *United States v. Kumar*, CR-04-864 (E.D.N.Y.) at 2-3 (excerpts attached hereto as Exh. 28)).  Moreover, far from accepting responsibility for his crime even upon pleading guilty, Kumar contested the government's loss calculation in a two-day *Fatico* hearing, and he was ultimately denied even the modest offense-level reduction for acceptance of responsibility under § 3E1.1.  (*See* Transcript of Sentencing Proceeding, *United States v. Kumar*, CR-04-864 (E.D.N.Y. Nov. 2, 2006) at 59-62 (excerpts attached hereto as Exh. 29)).

immediate goal was to save the company from potentially going out of business, and its approximately 1,400 employees from losing their livelihoods. It is also the case that the Asian and Niederhoffer trading losses that created jeopardy for Refco were not caused by Mr. Bennett. Moreover, he worked extraordinarily hard to remake, and strengthen, the company so that the problems would not recur. Accordingly, although the decision to remedy the problem caused by the Niederhoffer and Asian trading losses (and other losses and expenses thereafter) by use of the RGHI receivable was undeniably criminal, that decision was not one made for immediate financial gain, or for purely selfish motives.

It was demonstrably Mr. Bennett's intention to eventually pay off the receivable in full. It was never his plan to sell Refco, pocket the proceeds, and simply walk away from the company. Having built up the company, Mr. Bennett believed in its future success. He remained substantially invested in Refco following the T.H. Lee deal and, following the IPO, he retained a 34% interest in the company.[31] Moreover, as described *supra* 33-35, Mr. Bennett made payments totaling hundreds of millions of dollars to reduce, although not fully retire, the debt throughout the period of the fraud:

- $172 million that he received in connection with the DF Capital transaction in 2003;

- $306 million following the Lee transaction in 2004;

- $151 million of the proceeds from the sale of Tilney Holdings;

- $95 million of the proceeds he received from the sale of his stock in the IPO.

---

[31]    As Mr. Schoen testified in the Grant trial, "Well, it's really a vote of confidence in the future of the company when you see the person who is running the business saying that he wants to commit most of his ownership position to reinvest it back into the business. That's a tremendous vote of confidence." (Grant Trial Tr. at 1340).

These are vast sums.  Mr. Bennett could have put all or a significant part of them in his pocket.

Instead, he paid them toward the receivable, reflecting his intention and desire to pay it off in

full.  He even volunteered, without condition, to obtain funds to pay off the remaining $433

million balance, in October 2005 – and used $13 million of his own funds, in addition to the

BAWAG loan, to do so.

These facts and circumstances, we respectfully submit, should inform the Court's

assessment of Mr. Bennett's moral culpability and the appropriate sentence in this case.  As

Judge Lynch has noted – in a case involving outright stealing, with no mitigating explanation for

the defendant's conduct – the Guidelines place excessive weight on an "overly-rigid loss table,"

as part of a flawed effort to "fit the infinite variations on the theme of greed into a limited set of

narrow sentencing boxes."  *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y.

2005).[32]  Indeed, even under the mandatory Guidelines regime, a particularized assessment of the

defendant's intent was properly considered (as a potential downward departure) in arriving at an

appropriate sentence.  *See*, *e.g.*, *United States v. Brennick*, 134 F.3d 10 (1st Cir. 1998)

(recognizing, in tax fraud case, that a departure may be appropriate where defendant "did not

intend permanently to deprive the government of the funds he failed to pay over," but finding

decision to depart not adequately explained by district judge); *United States v. Forchette*, 220 F.

Supp. 2d 914, 925 (E.D. Wis. 2002) (whether a defendant's "intent in involving himself in the

scheme may have been significantly different than of the usual fraud defendant, e.g. he may have

---

[32]     The defendant in *Emmenegger* was an employee of a registered broker dealer who engaged
in a premeditated "cherry-picking" scheme, allocating winning trades to himself and losers to the
firm or clients.  Judge Lynch nevertheless found a number of reasons for regarding the loss-
driven Guidelines sentencing range as unduly harsh.  *Emmenger* was, however, a post-
*Blakely*/pre-*Booker* case, and the Court (having found no applicable authorized departure)
believed it was required to sentence within the Guidelines.

entered the scheme with honest intentions or with *the intent to make good on his obligations*" is an appropriate sentencing consideration that may provide a basis for a departure) (emphasis added).

Viewed in this fashion, Mr. Bennett resembles in material respects the defendant in *United States v. Adelson*. Adelson was the Chief Operating Officer and, later, President of Impath, Inc. He became aware of an accounting fraud initiated some time earlier by various other company executives and employees; "rather than expose it, [Adelson] chose to conceal it and to participate in its continuation." 441 F. Supp. 2d at 507. He did so "because as President of the company, he feared the effects of exposing what he had belatedly learned was a substantial fraud perpetrated by others." *Id*. at 513. That is, Adelson, like Mr. Bennett, was afraid that disclosure of the actual financial condition of the company would endanger its existence. Although Mr. Bennett, unlike Adelson, was not a latecomer to a fraud started by others (which we recognize was an important consideration for Judge Rakoff in determining Adelson's sentence), he does resemble Adelson on the crucial issue of motivation, that is, a fear that disclosure would risk destroying the company. Unlike many of the defendants in white-collar cases familiar to this Court, neither Mr. Adelson nor Mr. Bennett acted out of pure greed, understanding and expecting that others would be victimized as a result. And, in at least one respect, Mr. Bennett compares favorably to Adelson: Adelson, unlike Mr. Bennett, put the government to its proof and was convicted of the counts relating to the latter stages of the conspiracy.

Adelson faced a Guidelines sentencing "range" of life imprisonment as a result of the loss amount, which Judge Rakoff found was between $50 and $100 million. The Court engaged in an exchange with the government, revealing the absurdity of this Guidelines result,

and the government's inability to seriously defend it. *Id*. at 511-512 (setting forth colloquy between the Court and the government). Judge Rakoff concluded (pre-*Gall*) that a non-Guidelines sentence was compelled by both the particular circumstances of the offender and the offense, as well as by common sense. He sentenced Adelson to 42 months in prison, commenting that "the calculations under the guidelines have so run amok that they are patently absurd on their face." *Id*. at 515. Anticipating the Supreme Court's subsequent decisions in *Gall*, *Rita* and *Kimbrough*, the court determined "to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human beings who will bear the consequences." *Id*.

Like *Adelson*, *United States v. Humphreys*, 02 Cr. 1559 (LTS) (S.D.N.Y.), presents a fact pattern strikingly similar to the facts of this case. Paul Humphreys was the Chief Financial Officer of Safety-Kleen Corp., one of the largest U.S. providers of industrial waste collection and disposal services. He orchestrated and directed what the government described as a "monumental" accounting fraud by materially overstating the company's revenue and earnings in Forms 10-Q and 10-K and in an S-4 registration statement. The scheme, which began during the lead up to a 44% investment in Safety-Kleen by another public company, was designed to hide Safety-Kleen's failure to meet anticipated cost savings from the merger. Humphreys systematically made and directed other Safety-Kleen employees to make a series of false accounting entries to effectuate a wide range of financial statement manipulations: (i) improper revenue recognition, (ii) improper capitalization and deferral of operating expenses, (iii) improper treatment of reserves and accruals, and (iv) improper recording of derivatives transactions. The fraud lasted for three years and came to an end after the accounting irregularities were brought to the attention of the company's Audit Committee. After the fraud

63

was discovered, Safety-Kleen was forced to restate three years of audited financial statements by a total of $543 million. The restatements showed that Humphreys had caused the company to overstate income by between 40% and 158% in the falsely reported quarters. Shortly thereafter the company filed for Chapter 11 bankruptcy. Victim losses were substantial: the secured creditors in the bankruptcy suffered out-of-pocket losses of $1.7 billion, and the unsecured creditors lost approximately $1 billion. The common stockholders lost their entire investment. (*See* Transcript of Sentencing Proceeding, *United States v. Humphreys* (Nov. 8, 2007), attached hereto as Exh. 30).

　　　　　Significantly – and in sharp contrast to Mr. Bennett – Humphreys showed no apparent remorse or intent to remedy his wrongdoing. As pointed out by the government in its sentencing submission, Humphreys was ordered to pay a fine of $65,562 in the SEC's civil case and $190 million in a civil suit brought by the bondholders. While awaiting sentencing, Humphreys was earning over $16,000 per month, yet instead of making even the comparatively small payment owed to the SEC, he paid nothing, and purchased a $271,698 town house for himself. In light of these facts, Judge Swain concluded that although Humphreys had "been forthcoming about his past behavior with his employers," it was nevertheless the fact that

> there was no evidence of any effort to pay any amount towards satisfying the civil judgment or the SEC penalty until the eve of sentencing . . . [a]nd the only actual payment thus far was made specifically in connection with these sentencing proceedings and in order to avoid the imposition of a fine as part of the sentence in this case.
>
> . . . [T]his failure to seek to address his financial obligations and the financial import of his crime, while continuing seeking to maintain the prior lifestyle, undermines the argument for mitigation on the basis of remorse.
>
> Therefore, while the Court takes into account in determining ultimately the length of the sentence, the Court does not find this to

be a factor that argues for a substantial mitigation of an otherwise reasonable sentence.

(*Id.* at 10-11).

Accordingly, the court found that "[a] significant custodial sentence" was necessary and appropriate, further concluding that the indicated advisory Guidelines sentencing range (calculated under the much less harsh 1998 Guidelines) was both reasonable and sufficient but no greater than necessary to satisfy the statutory purposes of sentencing. On this basis – and notwithstanding the defendant's failure to make any efforts to mitigate the victims' economic loss – she sentenced Humphreys, in November 2007, to a term of 70 months, the very bottom of the advisory Guidelines range of 70-87 months.[33]

As with each of the defendants, in varying degrees, in *Adelson*, *Humphreys*, and *Strafaci*, Mr. Bennett's conduct was devoid of any intent to cause economic harm and his crime was not one of sheer stealing. Rather, his motives were mixed, and included, in significant

---

[33]    Also germane is *United States v. Strafaci*, No. 03 Cr. 1182 (S.D.N.Y.), in which the defendant was sentenced to 72 months. Strafaci was a fund manager at Lipper Funds who knowingly used fraudulent valuation methods to overstate the funds' net worth, in order to induce investors to remain in the funds and, in some cases, to invest additional money based on those false valuations. The fraud was discovered after Strafaci left Lipper, and the funds' positions had to be liquidated, resulting in $89 million in investor losses. This loss amount yielded an advisory Guidelines range of 210 to 262 months, although Strafaci faced a total statutory maximum term of 10 years. Notwithstanding that Strafaci's crime resulted from his desire to increase his compensation, Judge Swain, after considering all of the § 3553(a) factors, concluded that it was "clearly not [the defendant's] motive simply to maximize his own financial gain." The court went on to find that "[t]his statutory sentence [*i.e.*, 10 years] would be the maximum custodial sentence available to cover crimes far more deliberate and to cover even far more harmful behavior. . . . Accordingly, the court finds that the 120 month guideline sentence does substantially overstate the seriousness of the offense conduct here, and that a suitable, reasonable sentence appropriately reflective of all of the [18 U.S.C. §] 3553(a) factors can and should involve a somewhat shorter although still substantial period of imprisonment." (*See* Transcript of Sentencing Proceeding, *United States v. Strafaci* (May 20, 2005) at 42-43, attached hereto as Exh. 31).

measure, the intent to solve the company's problems and avoid business disaster.  The fraud at

Refco began, not with the artificial inflation of Refco's earnings for personal gain, but rather in

reaction to his learning of significant losses that endangered the existence of the company.  Mr.

Bennett's intention in concealing the RGHI receivable was to buy time so that he could pay it

down before it was discovered, and without anyone losing money as a result.  It was not Mr.

Bennett's intention to permanently deprive Thomas H. Lee, or the purchasers of stock in the IPO,

or anyone else, of money or property.  As reflected in the Dunbar declaration accompanying this

sentencing submission, and as described *supra* 21-32, he worked extraordinarily hard to remake,

and strengthen, the company so that the problems would not recur.

> ### 2.    The losses associated with Refco's collapse are not a fair reflection of Mr. Bennett's wrongdoing

The losses that followed disclosure of the RGHI receivable are not reflective of

Mr. Bennett's culpability, and he should not be punished as though the losses were a necessary

result of his conduct.  Mr. Bennett acknowledges that he is responsible for significant losses

resulting from his conduct – and they are plainly a relevant factor that the Court should consider

in fashioning a just sentence.  *See*, *e.g*., *Emmenegger*, 329 F. Supp. 2d at 427.  But Refco's

collapse was a result of an irrational market panic going well beyond that conduct, and contrary

to Refco's actual financial and operational condition.  Put differently, the overall economic

losses in this case do not reflect a reasoned response to either the company's financial position or

the seriousness of the fraud, but were instead the result of a perfect storm of initial market

overreaction, panic following Mr. Bennett's arrest, and an unusual and unanticipated exercise by

the Chicago Mercantile Exchange of its regulatory power.  The losses should be viewed in this

context, and not as a proxy for the seriousness of the offense.

As described above, by the time the RGHI receivable balance was discovered, Mr. Bennett had accomplished much of what he set out to do in October 1997:  transforming Refco from a company with a narrow client base, significant customer losses, and few compliance or risk controls, into one of the largest futures brokerages in the world, with better management oversight and without "huge credit losses."  (Grant Trial Tr. at 2252 (Maggio testimony)).  Much of the historical debt had been paid down, notwithstanding the outstanding RGHI receivable balance of approximately $433 million.  Refco was a leading player in a growing industry.

On the same day that the existence of the RGHI receivable was publicly disclosed, it was paid down in its entirety by Mr. Bennett.  Although some decline in the stock price was a rational market reaction to disclosure of the fraud, the steep drop in market value and massive customer withdrawals that occurred were not consistent with any information about Refco's financial condition or viability that had been released into the marketplace.  Although it is of course impossible to know what would have transpired had there not been a dramatic and highly visible arrest the day after the public disclosure of the RGHI receivable (that is, had the matter become subject to a more ordinary pace of investigation and ultimate indictment), what is clear, as testified to by Refco director Scott Schoen, is that the toxic combination of disclosure, brief suspension of trading in the common stock, and the "final . . . triggering" event of the arrest, led to "something on the verge of panic among counterparties and customers, and customer requests to get their money back, to take their money out of the company came pouring in over the course of Tuesday and into Wednesday," in short, "a run on the bank."  (Grant Trial Tr. 1467 (Schoen testimony)).

The CME's response to this panic sounded a death knell for the company. Despite Refco's continuing ability to satisfy all customer demands for withdrawal in its regulated businesses, on Thursday, October 13, representatives of the CME advised Refco that the agency would invoke its emergency powers to seize and transfer the customer accounts of Refco, LLC (the entity under its regulatory jurisdiction, which was not experiencing any such liquidity concerns) to another registered commodities broker if Refco did not sell off that flagship business by the opening of business on Monday, October 17, 2005. (*See* Exh. 26, at 36). This ultimatum from the CME put Refco to the choice of either selling Refco LLC at what was sure to be a fire sale price, or losing it for no consideration at all. Accordingly, rather than continuing in its efforts to implement liquidity enhancing measures, the company began to seek a buyer of Refco LLC. (*Id*.) By Monday morning, October 17, Refco had in fact reached an agreement to sell Refco LLC. That same evening, Refco filed for bankruptcy (as required by the terms of the proposed transaction), its decision forced by the pace of customer withdrawals and pressure from the CME. (*Id*.)[34]

Thus, in the single week between disclosure of the RGHI receivable and the filing of Refco's bankruptcy petition, the investing public and Refco's counterparties and customers learned no facts about Refco's actual financial condition other than the fact of the (now fully repaid) receivable. The rapid implosion that occurred in that brief period did not reflect, indeed could not have reflected, a reasoned judgment about the company's condition. Any chance that the initial stock price drop would have been reversed in part, and that the company's liquidity

---

[34] Even on that Monday, October 17, the deadline imposed by the CME, Refco LLC still had $5.7 billion in customer deposits, and was in no danger of defaulting on customer demands for withdrawals. (*See* Exh. 26 at 35.)

problems could have been resolved in an orderly fashion, was dashed by the unanticipated actions of the CME.[35]

This is not to say that the stock would have recovered to its pre-disclosure level, and it is certainly not to say that no loss would have been caused by Mr. Bennett's wrongdoing or that no shareholder would have suffered. Mr. Bennett acknowledges that tangible harm to that effect would have occurred, and did occur. But Refco was, even with the existence of a related-party receivable in the hundreds of millions of dollars (and certainly following repayment of that receivable) a viable entity, as measured by relevant metrics unaffected by Mr. Bennett's misconduct.

\* \* \*

As the government put it in the Grant trial, Mr. Bennett plainly made the wrong choice in responding to the Niederhoffer and Asian losses in the manner he chose. His response constituted a crime, but one accompanied by factors in mitigation. Similarly, Mr. Bennett does not contend that the disclosure of his misconduct did not result in any losses. It did. But Refco's bankruptcy, and the extent of the losses associated with that bankruptcy, are fairly viewed as the

---

[35]     The law recognizes that the market typically overreacts to a corrective disclosure of bad news. Defendants in civil securities actions are entitled to the benefit of the 90-day "bounce-back" or "look-back" provision enacted by Congress as part of the Private Securities Litigation Reform Act. *See* S. Rep.No. 104-98, at 20 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 699. This provision places a ceiling on recoverable damages by limiting a private plaintiff's potential recovery to the difference between the price paid for a security and "the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *Id*. Refco's stock, of course, never had an opportunity to "bounce back" because of the panic that set in following Mr. Bennett's arrest and the CME's subsequent action forcing Refco to sell Refco LLC. Again, although we do not contest that Mr. Bennett is responsible for economic harm to shareholders and others, we respectfully submit that the Court should consider what was likely a market overreaction, and which could not be ameliorated over the passage of time, in deciding upon a just sentence reflecting all of the facts and circumstances of the offense.

result of a market panic. They are not a good measure of his culpability, and they should be considered in context and in conjunction with the other statutory factors.

C.    **A Custodial Sentence Well Short of Life Imprisonment is "Just Punishment," Sufficiently Severe So as to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Deter Future Wrongdoing**

A period of incarceration well short of a term of years amounting to life imprisonment for a 60-year old man will vindicate all of the goals of sentencing codified at § 3553(a)(2) – that is, imposition of a sentence reflecting the seriousness of the crime, promoting respect for the law, imposing "just punishment," and providing for both specific and general deterrence. *Gall v. United States*, 128 S. Ct. at 596-97 & n.6. This conclusion is supported by common sense, the empirical evidence of the impact of custodial sentences in white-collar cases, and judicial decisions. And it is especially true given that, upon his release, Mr. Bennett will be deported from his adopted home of more than 30 years.

1.    **Sentences in serious fraud cases have historically been significantly lower than the sentence called for by the advisory Guidelines**

In 2001, the mean sentence for a defendant convicted of fraud in the Southern District of New York was 23.5 months. By 2007, following the 2001 and post-Sarbanes-Oxley amendments to the Guidelines, that number had increased to 31.7 months.[36] This significant increase in the average length of sentences was not reflective of an increase in the number of white-collar crimes, which might have suggested a need to impose harsher sentences to deter

---

[36]    U. S. Sentencing Commission's Sourcebook of Federal Sentencing Statistics (hereinafter "Commission's Sourcebook"), http://www.ussc.gov/ANNRPT/. The number of sentences in the higher ranges increased materially. For example, the number of sentences over sixty months more than doubled from 12 in 2001 to 28 in 2007. The number of sentences between 37 and 60 months jumped from 27 to 40. *Id.*

70

potential wrongdoers; the number of frauds has stayed fairly consistent.[37]  Nor has there been a

finding that white-collar criminals are likely to recidivate and that longer sentences are therefore

necessary to provide specific deterrence and protect the public.  Instead, the dramatic increases in

Guidelines ranges (and, thereby, length of sentences) appear to be mostly attributable to the

sensationalizing of the Enron bankruptcy and Congress's need to appear "tough on corporate

crime."  To our knowledge, neither Congress nor the Sentencing Commission has ever

articulated any rationale or empirical support for the proposition that these longer sentences are

necessary to achieve any of the mandatory sentencing goals of § 3553(a).  Indeed, we are not

aware of any study providing support for such a claim.  *See United States v. Adelson*, 441 F.

Supp. 2d at 515 (noting, in imposing a 3 ½ year sentence, that "the Government at no time here

presented any evidence or cited any studies indicating that a sentence of more than three-and-a-

half years was necessary to achieve the retributive and general deterrence objectives applicable

to a case like this one").

      It was not very long ago that a sentence of 10 years was an extraordinary

sentence, even for the largest frauds, and one that was understood to fulfill all of the goals of

sentencing.  For example, in 1989, Michael Milken was charged in a 98-count indictment

describing a wide ranging scheme, pervasive to the business and operations of a major Wall

Street firm, and including allegations of insider trading, stock parking, market manipulation, tax

evasion, bribes and kickbacks.  Indeed, the entire high yield ("junk bond") market, and much of

the related merger and acquisition activity, was alleged to have been controlled and corrupted

under the leadership of Milken and his colleagues at Drexel.  In connection with his guilty plea,

---

[37]    In 2001 there were 351 fraud cases in the Southern District of New York.  In 2007, there
were 317 fraud cases.  *See* Commission's Sourcebook, http://www.ussc.gov/ANNRPT/.

Milken agreed to pay $200 million in fines and disgorgement of $400 million.  Under the current

Guidelines, these sums (particularly the $400 million of admitted ill-gotten gains reflected by the

disgorgement amount) would have called for a sentence of life imprisonment.  At Milken's

sentencing, Judge Wood told him:

> When a man of your power in the financial world, at the head of
> the most important department of one of the most important
> investment banking houses in this country, repeatedly conspires to
> violate, and violates, securities and tax laws in order to achieve
> more power and wealth for himself and his wealthy clients, and
> commits financial crimes that are particularly hard to detect, a
> significant prison term is required.

(Kurt Eichenwald, *Term is Longest of Any Given in Scandal*, N.Y. Times, Nov. 22, 1990, at A1).

In what she believed was in fact such a "significant prison term," Judge Wood

imposed a 10-year sentence, but recommended that Milken be released on parole after serving 40

months.  *See United States v. Milken*, 1992 WL 196797 *1 (Aug. 5, 1992, S.D.N.Y.).  She later

reduced Milken's sentence to 24 months, *id*. at *1, and he was released after 22 months, the last

four months of which were spent in a community corrections facility.

This sentence vindicated all of the goals of sentencing, and, after finishing his

term of imprisonment, Milken has gone on to lead an exemplary life.  After serving his sentence,

he began devoting much time and money to charity.  In a 2004 cover story describing his efforts

on behalf of medical research, *Fortune* magazine called Milken "The Man Who Changed

Medicine."  Had Milken committed his crimes just a few years later, he would have faced a life

sentence under the mandatory Guidelines.  As was the case with Milken, a meaningful but not

excessive period of years in prison is just and sufficient punishment for Mr. Bennett, who is

significantly older than Milken was at the time of his sentencing and equally deserving of an

opportunity to do some good following his incarceration.

2.    **Even in a generally harsher sentencing environment, a sentence well short of the advisory Guidelines "range" of life imprisonment is appropriate**

Despite sentences for white-collar crimes having gone up significantly in the past several years, sentences of more than 60 months are still not the norm.  For example, in 2007, only 28 sentences out of 317 imposed on fraud defendants were longer than 60 months.[38]  A review of large-scale fraud cases in the past four years resolved by guilty pleas in the Southern and Eastern Districts of New York reveals that lengthy prison sentences are reserved for fraud offenders of great and unmitigated moral culpability (whose crimes are, in some instances, compounded by obstruction of justice), and a lack of remorse and acceptance of responsibility.  Those characteristics do not describe Mr. Bennett.  And even in such cases, courts have determined that sentences well short of life are significant sentences, sufficiently severe to satisfy the statutory goals of sentencing.

We respectfully submit that the Court may find the following cases useful in fashioning a custodial sentence that is "just punishment" in this case.

In *United States v. Kumar*, the defendant's accounting fraud "wiped out billions in shareholder value."  Moreover, as the government argued, Kumar engaged in "one of the most coordinated, comprehensive obstructions of justice in the modern era of corporate crime," including lying to the government; influencing Computer Associates employees to lie to the government; inducing the company's general counsel to coach witnesses to lie to the government; destroying data on his laptop; deleting references to the fraud from an employee's laptop; and paying off a witness.  (Exh. 27, at 2-3, 9).

---

[38]    *See* Commission's Sourcebook, http://www.ussc.gov/ANNRPT/2007/SBTOC07.htm.

Kumar's conduct compares unfavorably with Mr. Bennett's behavior in this case. Far from undertaking a "comprehensive obstruction of justice," Mr. Bennett has accepted responsibility, made all possible efforts to repair the harm he caused, and sought to cooperate with the government. Yet notwithstanding Kumar's obstruction, Judge Glasser determined that a sentence of 12 years was sufficient to accomplish the statutory mandate of § 3553(a).[39]

*United States v. Armstrong*, 99 Cr. 997 (JFK) (S.D.N.Y.), is relevant as well. Defendant Martin Armstrong engaged in a seven-year long, $3 billion Ponzi scheme, described by the government as the "the largest Ponzi scheme in history," causing losses of $737 million. (*See* Sentencing Tr. at 36-37, attached hereto as Exh. 32). Armstrong exhibited no remorse or concern for his victims. To the contrary, he refused to surrender more than $14.9 million of gold bars and rare coins he had obtained as part of his scheme. He was jailed for civil contempt, and spent seven years refusing to acknowledge or turn over his ill-gotten gains. Armstrong never accepted responsibility for his actions – once again, to the contrary, he spent half an hour at his sentencing hearing rationalizing his behavior. Nevertheless, the government agreed to permit Armstrong to plead guilty to a single conspiracy count of conspiracy, effectively capping his sentence at 60 months, the sentence Judge Keenan imposed (in addition to the 7 years he had spent in prison for his continuing civil contempt).[40]

---

[39]    The Court should also consider that Mr. Bennett likely has many fewer years left to live than the average defendant, and that any sentence will, in that respect, have a disproportionate impact in terms of punishment. For example, Kumar was only 44 years old when he was sentenced. He will emerge from prison a younger man than Mr. Bennett is today. Upon release from prison, Mr. Bennett can expect to have far less time remaining in which to rebuild his life or spend time with his family. Even that relatively brief period will be compromised further by Mr. Bennett's mandatory deportation, which will result in virtual isolation from his children, who have established their lives in the United States.

[40]    The government agreed to dismiss the remaining 24 counts, in a departure from what we understand to be the stated policy of the U.S. Attorney's Office in this district. This suggests that

The defendant in *United States v. Smirlock,* 2005 WL 975875 (GEL) (Apr. 22, 2005 S.D.N.Y.), was a similarly unrepentant con artist. Smirlock was a money manager who defrauded investors by misrepresenting the success of the investment strategy he was pursuing. That strategy was in fact disastrous, costing investors an amount estimated to be somewhere between $12.6 million and $77 million. Moreover, Smirlock was a recidivist, with "a previous regulatory record, [a] high degree of education and sophistication, and [an] arguable lack of appreciation of the seriousness of his conduct" – conduct the Court characterized as "extraordinarily serious." The court imposed a sentence of 48 months. *Id.* at *3.

The defendant in *United States v. Walder*, 02 Cr. 469 (RMB) (Jan. 10, 2003 S.D.N.Y.), engaged in what the court described as "a systematic looting or embezzling of UBS clients over a 20-year period of [sic] in excess of $70 million dollars." (Sentencing Transcript at 2, attached hereto as Exh. 33). The only apparent motive for Walder's conduct was greed. Operating under the pre-2001 Guidelines, the Court sentenced him to 8 years.

Finally, as noted, *United States v. Humphreys* is a case involving quite similar offense conduct and ultimate harm, but in which the defendant never accepted responsibility for his actions or tried, as Mr. Bennett has been doing, to make amends for his misconduct. Considering all the facts and circumstances, Judge Swain imposed a 70-month sentence.

Nor are these white-collar fraud cases the only relevant touchpoints. All federal sentences are required to fulfill the dictates of § 3553(a), including sentences punishing the most reprehensible acts in the U.S. Criminal Code, including terrorism, murder, and sexual abuse of minors. Earlier this year, Jose Padilla, a man once accused of plotting to detonate a dirty bomb

---

the government was persuaded that a total sentence of 12 years was sufficient to fulfill all of the § 3553(a) sentencing goals in the case of an utterly unrepentant defendant who had

in Chicago, and who was convicted of supporting terrorism, was sentenced to 17 years in prison. In 2007, the mean term of imprisonment nationwide, for a defendant convicted of federal murder charges (with a Criminal History I), was 218 months.  The mean term of imprisonment for a Criminal History I defendant convicted of kidnapping/hostage taking was 134 months.[41]  The fact that the advisory Guidelines call for Mr. Bennett to be sentenced more severely than the "mean" murderer or kidnapper, or than the terrorist Padilla, exemplifies how, in certain circumstances, the Guidelines are "absurd on their face."  "Put differently," as stated by Judge Rakoff, "an Offense Level of 55 is a level normally only seen in cases involving major international narcotics traffickers, Mafia dons, and the like.  How could it possibly apply here?" *Adelson*, 441 F. Supp. 2d at 509.

### 3. Mr. Bennett's deportation after his sentence adds further support to the conclusion that a custodial sentence well below the advisory Guidelines range is sufficient to effectuate the goals of § 3553(a)

Mr. Bennett will be deported at the conclusion of his prison sentence.  Unlike many cases involving deportation, this is not one in which the defendant committed a crime after having been in the United States for only a short time.  Nor is this a case in which the defendant has ongoing ties to his country of origin.  Mr. Bennett left England 40 years ago and has lived in the United States for nearly as long.[42]  After Mr. Bennett has completed his time in jail, he will be released at an advanced age, stripped of most, if not all, of his assets, and left with no meaningful job prospects, only to be deported to what is no longer his native land in any

---

masterminded the largest Ponzi scheme in history.

[41]    *See* Commission's Sourcebook, http://www.ussc.gov/ANNRPT/2007/SBTOC07.htm.

[42]    Mr. Bennett is also a citizen of Canada, where he lived for several years in the 1970s.  He has no ties to that country.

meaningful sense.  Moreover, he will not be able to be reunited with his children, unless they are

prepared to give up their lives in the United States and join him in a country to which they have

never had any ties.[43]  His deportation, under these circumstances, is an aspect of his punishment

that is "extraordinary in nature and degree," and therefore a proper consideration for this Court.

*United States v. Restrepo*, 999 F.2d 640, 644 (2d Cir. 1993); *United States v. Wills*, 476 F.3d

103, 109 (2d Cir. 2007) (noting that the fact of deportation may be properly considered in giving

a non-Guidelines sentence "in light of [a specific] defendant's individual circumstances").

### 4.    A non-Guidelines sentence will be sufficient to provide specific and general deterrence

#### a.    Specific deterrence

Specific deterrence has already been achieved.  The crime that Mr. Bennett

committed was directly tied to his employment.  He will never work as an officer or a director of

a public company again. *See Emmenegger*, 329 F. Supp. 2d at 428 (noting "[t]hat [defendant's]

career is over, and his potential to commit this particular type of crime has been eliminated"); *see

also Adelson*, 441 F. Supp. 2d at 514 (neither the government nor the defendant even addressed

"specific deterrence" because "his reputation [having been] ruined by his conviction, it was

extremely unlikely that [Adelson] would ever involve himself in future misconduct"). [44]

---

[43]    As described *supra* 6-7, Mr. Bennett has lived permanently in the United States since 1978. Both of his children were born here , have always lived here, and have made lives for themselves as young professionals in New York.  Mr. Bennett's wife, Valerie, is a naturalized United States citizen, who – like Mr. Bennett – has not spent meaningful time in England for almost forty years.

[44]    Following Mr. Bennett's guilty plea, the SEC filed a complaint seeking injunctive relief and a director and officer bar.  Mr. Bennett has consented to judgment in the SEC's case.

### b.    General deterrence

There is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective white-collar offenders. *See, e.g., Adelson*, 441 F. Supp. 2d at 514; *United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("It is widely recognized that the duration of incarceration provides little or nor general deterrence for white collar crimes. . . .  [T]here is not a scintilla of evidence here that longer sentences will deter anyone from committing mail and wire fraud."); Paul J. Hofer & Mark H. Allenbaugh, *Perspectives on the Federal Sentencing Guidelines and Mandatory Sentencing*, 40 AM. CRIM. L. REV. 19, 64, n. 192 (2003) ("A deterrence researcher advising the Commission prior to the 2001 amendments concluded that the available data suggest that the certainty of punishment is more important to deterrence than is severity.") (citation omitted).

KL3 2660606.1

## CONCLUSION

For the foregoing reasons, we respectfully submit that all of the goals set forth in

18 U.S.C. § 3553(a) can and will be fulfilled by a custodial sentence for a term of years well

short of the remainder of Mr. Bennett's life.


Dated: May 30, 2008



Respectfully submitted,

Kramer Levin Naftalis & Frankel LLP


By: _____
Gary P. Naftalis (GN-5489)
David S. Frankel (DF-6815)
Adam C. Ford (AF-5203)
Darren LaVerne (DL-9502)
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100
Fax: (212) 715-8000

*Attorneys for Phillip R. Bennett*

EXHIBIT H

COURTESY
COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |  |
|---|---|---|
| ARCH INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Index No.: 08/600029 |
| v. | ) ) | |
| JOHN D. AGOGLIA, *et al.*, | ) ) ) | **STIPULATED ORDER FOR ENTRY OF JUDGMENT AGAINST** |
| Defendants. | ) ) ) ) | **DEFENDANT PHILLIP R. BENNETT** |
| | ) | |

Plaintiff Arch Insurance Company ("Arch") and Defendant Phillip R. Bennett ("Bennett"), by and through their undersigned attorneys, jointly file this Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett.

**WHEREAS,** Bennett previously sought coverage under the "Arch Policy" for the "Underlying Matters," as those terms are defined in the First Amended Complaint for Declaratory Judgment (the "FAC") filed by Arch on February 22, 2008;

**WHEREAS,** Bennett has since acknowledged that he is not entitled to any coverage under the Arch Policy for the Underlying Matters or for any action, proceeding, investigation or other matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

**NOW, THEREFORE,** Arch and Bennett stipulate and agree as follows:

1.  Bennett waived formal service of process under C.P.L.R. 308 and acknowledged service and receipt of Arch's Amended Summons and the FAC on February 28, 2008;

2.  Bennett stipulates and agrees that the Arch Policy does not afford him any coverage whatsoever for any of the Underlying Matters or for any action, proceeding, investigation or other matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

**FILED**

APR 2 4 2008

NEW YORK
COUNTY CLERK'S OFFICE

3.    Bennett stipulates, agrees and consents to the entry of judgment against him on Counts I and II of the FAC in the form annexed hereto as Exhibit A;

4.    Bennett waives any right to appeal the judgment entered against him pursuant to this stipulation;

5.    Arch and Bennett stipulate and agree that each party is to bear its or his respective attorneys' fees and costs incurred in connection with this action and any other coverage litigation between the parties.

Date:  April 17, 2008                          Respectfully submitted,


_____              _____
Jeffrey T. Golenbock                          John H. Eickemeyer
GOLENBOCK EISMAN ASSOR BELL              Daniel C. Green
   & PESKOE                                   VEDDER PRICE P.C.
437 Madison Avenue                           1633 Broadway, 47th Floor
New York, NY  10022                          New York, New York 10019
(212) 907-7373                               (212) 407-7700

*Attorneys for Defendant Phillip R. Bennett*

                                             Daniel J. Standish
                                             Marc E. Rindner
                                             Cara Tseng Duffield
                                             WILEY REIN LLP
                                             1776 K Street, N.W.
                                             Washington, D.C. 20006
                                             (202) 719-7000

                                             *Attorneys for Plaintiff Arch Insurance Company*


**SO ORDERED,** this 21 day of April 2008

By: _____

**FILED**
APR 24 2008
NEW YORK
COUNTY CLERK'S OFFICE

-2-

EXHIBIT I

COURTESY
COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARCH INSURANCE COMPANY,                )
                                        )
                                        )
                Plaintiff,              )        Index No.: 08/600029
                                        )
v.                                      )
                                        )
JOHN D. AGOGLIA, et al.,                )        **STIPULATED ORDER FOR ENTRY**
                                        )        **OF JUDGMENT AGAINST**
                Defendants.             )        **DEFENDANT PHILLIP R. BENNETT**
                                        )
                                        )
                                        )
_____)

Plaintiff Arch Insurance Company ("Arch") and Defendant Phillip R. Bennett

("Bennett"), by and through their undersigned attorneys, jointly file this Stipulated Order for

Entry of Judgment against Defendant Phillip R. Bennett.

**WHEREAS,** Bennett previously sought coverage under the "Arch Policy" for the

"Underlying Matters," as those terms are defined in the First Amended Complaint for

Declaratory Judgment (the "FAC") filed by Arch on February 22, 2008;

**WHEREAS,** Bennett has since acknowledged that he is not entitled to any coverage

under the Arch Policy for the Underlying Matters or for any action, proceeding, investigation or

other matter based upon, arising out of, or involving the facts and circumstances underlying or

alleged in any of the Underlying Matters;

**NOW, THEREFORE,** Arch and Bennett stipulate and agree as follows:

1.   Bennett waived formal service of process under C.P.L.R. 308 and acknowledged
     service and receipt of Arch's Amended Summons and the FAC on February 28,
     2008;

2.   Bennett stipulates and agrees that the Arch Policy does not afford him any
     coverage whatsoever for any of the Underlying Matters or for any action,
     proceeding, investigation or other matter based upon, arising out of, or involving
     the facts and circumstances underlying or alleged in any of the Underlying
     Matters;



FILED
APR 2 4 2008

NEW YORK
COUNTY CLERK'S OFFICE

3.    Bennett stipulates, agrees and consents to the entry of judgment against him on Counts I and II of the FAC in the form annexed hereto as Exhibit A;

4.    Bennett waives any right to appeal the judgment entered against him pursuant to this stipulation;

5.    Arch and Bennett stipulate and agree that each party is to bear its or his respective attorneys' fees and costs incurred in connection with this action and any other coverage litigation between the parties.

Date:  April 17, 2008

Respectfully submitted,

Jeffrey T. Golenbock
GOLENBOCK EISMAN ASSOR BELL
   & PESKOE
437 Madison Avenue
New York, NY  10022
(212) 907-7373

*Attorneys for Defendant Phillip R. Bennett*

John H. Eickemeyer
Daniel C. Green
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019
(212) 407-7700

Daniel J. Standish
Marc E. Rindner
Cara Tseng Duffield
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Attorneys for Plaintiff Arch Insurance Company*

**SO ORDERED,** this _21_ day of _April_, 2008

By: _____

**FILED**
APR 24 2008
NEW YORK
COUNTY CLERK'S OFFICE

STATE OF NEW YORK, COUNTY OF
SS: I, NORMAN GOODMAN, COUNTY CLERK
CLERK OF THE SUPREME COURT,
COUNTY, DO HEREBY CERTIFY

2008 JUN 25  P 2: 24

THAT I HAVE PREPARED
WITH THE ORIGINAL FILED IN MY

AND THAT THE SAME IS

3 1 2 4 1 9

COUNTY CLERK AND CLERK OF THE
SUPREME COURT, NEW YORK COUNTY

-2-

EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARCH INSURANCE COMPANY,                    )
                                           )
                    Plaintiff,             )        Index No.: 08/600029
                                           )
v.                                         )
                                           )
JOHN D. AGOGLIA, *et al.*,                 )        **[PROPOSED] JUDGMENT AGAINST**
                                           )        **DEFENDANT PHILLIP R. BENNETT**
                    Defendants.            )
                                           )
                                           )
_____        )

      Before the Court is Plaintiff Arch Insurance Company ("Arch") and Defendant Phillip R.

Bennett ("Bennett")'s Stipulated Order for Entry of Judgment against Defendant Phillip R.

Bennett. The Parties' Stipulated Order having been "so ordered" and entered by the Court, it is

hereby adjudged and declared that:

1.    Bennett waived formal service of process under C.P.L.R. 308 and acknowledged service and receipt of Arch's Amended Summons and the FAC on February 28, 2008;

2.    Pursuant to the Parties' stipulation, Bennett is not entitled to any coverage whatsoever under the Arch Policy for any of the Underlying Matters or for any action, proceeding, investigation or other matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

3.    Pursuant to the Parties' stipulation, judgment is entered against Bennett on Count I of the FAC;

4.    Pursuant to the Parties' stipulation, judgment is entered against Bennett on Count II of the FAC;

5.    Bennett has waived any right to appeal the judgment entered against him; and

6.    Each party shall bear its or his respective attorneys' fees and costs incurred in connection with this action and any other coverage litigation between the parties.

By: _____
      Clerk

FILED
APR 24 2008
NEW YORK
COUNTY CLERK'S OFFICE

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                         ) ss.:
COUNTY OF NEW YORK  )

FRANCINE TORMEY, being sworn, says:

1.    I am not a party to the action, am over 18 years of age and reside in Queens, New York.

2.    On April 17, 2008, I caused a true copy of the within **STIPULATED ORDER FOR ENTRY OF JUDGMENT AGAINST DEFENDANT PHILLIP R. BENNETT, WITH ANNEXED PROPOSED JUDGMENT AGAINST PHILLIP R. BENNETT** to be served by electronic and U.S. mail upon each defendant in this action through their counsel as follows:

| Defendant(s) | Counsel |
| --- | --- |
| Agoglia, John D.<br>McCarthy, Peter J. | William Fleming<br>Gage Spencer & Fleming, LLP<br>410 Park Avenue<br>New York, NY 10022<br>(212) 768-4900<br>wfleming@gagespencer.com |
| Bennett, Phillip R. | Jeffrey T. Golenbock<br>Golenbock Eisman Assor Bell &<br>Pesko LLP<br>437 Madison Avenue<br>New York, NY 10022<br>(212) 907-7373<br>jgolenbock@golenbock.com |

| | |
|---|---|
| Breitman, Leo R.<br>Gantcher, Nathan<br>Harkins, David V.<br>Jaekel, Scott L.<br>Lee, Thomas H.<br>O'Kelley, Ronald L.<br>Schoen, Scott A. | Paul A. Ferrillo<br>Weil Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>(212) 310-8372<br>Paul.ferrillo@weil.com |
| Cox, Edwin | Martin R. Bennett, Esq.<br>Kugle, Skelton & Bennett<br>130 E. Corsicana, Ste. 302<br>Athens, TX 75751<br>(903) 675-5151<br>mbennett@ksbpc.com |
| Dhillon, Sukhmeet<br>Lipoff, Eric | Neil A. Goteiner<br>Farella, Braun & Martel<br>235 Montgomery Street, 30th Floor<br>San Francisco, CA 94104<br>(415) 954-4485<br>ngoteiner@fbm.com |
| Dittmer, Thomas H. | Thomas C. Wolford<br>Neal Gerber & Eisenberg, LLP<br>2 North LaSalle Street<br>Chicago, IL 60602<br>(312) 269-5675<br>Twolford@ngelaw.com |
| Grady, Stephen | Lawrence J. Kotler<br>Duane Morris & Heckscher, LLP<br>30 South 17th Street<br>Philadelphia, PA 19103<br>(215) 979-1514<br>ljkotler@duanemorris.com |

| | |
|---|---|
| Grant, Tone | William A. Schreiner, Jr., Esq.<br>Zuckerman Spaeder LLP<br>1800 M Street, NW, Suite 1000<br>Washington, D.C. 20036<br>(202) 778-1858<br>wschreiner@zuckerman.com |
| Klejna, Dennis | Helen Kim<br>Katten Muchin Rosenman, LLP<br>2029 Century Park East, Suite 2600<br>Los Angeles, CA 90067<br>(310) 788-4525<br>Helen.kim@kattenlaw.com |
| Maggio, Santo C. | Scott E. Hershman<br>Hunton & Williams<br>200 Park Avenue, 43rd Floor<br>New York, NY 10166<br>(212) 309-1053<br>shershman@hunton.com |
| Mutterer, Frank | Janet Costello<br>Gibbons, P.C.<br>One Gateway Center<br>Newark, NJ 07102<br>973-596-4825<br>jcostello@gibbonslaw.com |
| Murphy, Joseph | John R. Jerome<br>Saul Ewing, LLP<br>245 Park Avenue<br>24th Floor<br>New York, NY 10167<br>jjerome@saul.com |

| | |
|---|---|
| Outridge, Richard N. | Claire P. Gutekunst<br>Proskauer Rose, LLP<br>1585 Broadway<br>New York, NY 10036<br>(212) 969-3421<br>cgutekunst@proskauer.com |
| Sexton, William M.<br><br>Sherer, Gerald | Ivan Kline<br>Friedman & Wittenstein, P.C.<br>600 Lexington Avenue<br>New York, NY 10022<br>(212) 750-8700<br>ikline@friedmanwittenstein.com |
| Silverman, Philip | Richard Cashman<br>Heller Ehrman, LLP<br>Times Square Tower<br>7 Times Square<br>New York, NY 10036<br>(212) 847-8796<br>Richard.cashman@hellerehrman.com |
| Trosten, Robert C. | Barbara Moses<br>Morvillo, Abramowitz, Grand, Iason<br>& Silberberg, PC<br>565 Fifth Avenue<br>New York, NY 10017<br>(212) 880-9540<br>bmoses@magislaw.com |

3.     On April 17, 2008, I caused a true copy of the within **STIPULATED ORDER FOR ENTRY OF JUDGMENT AGAINST DEFENDANT PHILLIP R. BENNETT, WITH ANNEXED PROPOSED JUDGMENT AGAINST PHILLIP R. BENNETT** to be served by U.S. mail upon Richard N. Outridge at 24 Pennbrook Drive, Lincoln University, Pennsylvania 19352.

FRANCINE TORMEY

Sworn to before me this
17th day of April, 2008

Notary Public

NANCY J. NEUBAUER
Notary Public, State of New York
No. 01NE5041602
Qualified in New York County
Commission Expires April 10, _____

EXHIBIT J

# ✳ Arch
# Insurance Group

**Arch Insurance Company**

**(A Missouri Corporation)**

**Home Office Address:**
One Liberty Plaza
53rd Floor
New York, NY 10006
212-651-6500

**Administrative Address:**
245 Park Avenue
32nd Floor
New York, NY 10167
646-822-6700

### Binder of Insurance - Revision 1

| | |
|---|---|
| **Binder Period:** | Effective Date 08/11/05 Expiration Date 11/09/05 |
| **Agent / Broker Contact:** | James Schneider |
| **Agent / Broker Firm:** | Marsh USA, Inc. |
| **Address:** | 1166 Avenue of the Americas |
| | New York, NY 10036 |
| **Insured:** | Refco, Inc. |
| **Address:** | 550 W. Jackson Blvd. Suite 1300 |
| | Chicago, IL 60661 |
| **Issuing Company:** | Arch Insurance Company (the Company) |
| | Admitted Policy |
| **Policy Type:** | Directors and Officers |
| **Policy Form Number:** | 00DOX0112000403 / Arch Excess Follow Form |
| **Policy Number:** | DOX0009322-00 |
| **Policy Period:** | Inception Date 08/11/05 Expiration Date 08/11/06 |
| | (12:01 A.M. Standard time at the address of the Insured shown above) |

**Directors and Officers Limit:** $10,000,000 Per Policy Period xs $40,000,000

Defense Costs Included in the limits

Defense Costs Included within the Retention

**Coverage for Certified Acts of Terrorism:** Elected

**Underlying Coverage:**

| Primary : U.S. Specialty Insurance Company | Directors and Officers | $10,000,000 Aggregate |
|---|---|---|
| | | $300,000 Per Claim SIR $500,000 Retention for Securities Claims |

**This binder replaces in its entirety the immediately preceding binder issued by the Company, which is now void in its entirety as of its inception date.**

Binder of Insurance

Policy D     )009322-00 Eff. Date 08/11/05

- Revision 1

Binder Period: 08/11/05 to 11/09/05

| | | |
|---|---|---|
| Other Underlying : Lexington Insurance Company | Directors and Officers | $7,500,000 xs $10,000,000 Aggregate |
| Other Underlying : AXIS Reinsurance Company | Directors and Officers | $10,000,000 xs $17,500,000 Aggregate |
| Other Underlying : Allied World Assurance Company, Ltd | Directors and Officers | $12,500,000 xs $27,500,000 Aggregate |

**Forms / Endorsements:** Pending and Prior Litigation Exclusion - at inception

Prior Notice Exclusion

Application Endorsement

Prior Knowledge or Information Exclusion - at inception

IL Amendatory

**Subject to:** Copies of all Underlying Binders and Policies (when issued)

Copies of all Underlying subjectivities (if applicable)

Copy of final Form S-1

**This binder replaces in its entirety the immediately preceding binder issued by the Company, which is now void in its entirety as of its inception date.**

Binder of Insurance

- Revision 1

Policy D. /009322-00 Eff. Date 08/11/05

Binder Period: 08/11/05 to 11/09/05

|  |  | **Premium Amount:** |
|---|---|---|
| **Gross Premium:** |  | $241,693 |
| **Commission:** | 12.50% | $(30,212) |
| **Net Premium:** |  | $211,481 |
| **Total Due:** |  | $211,481 |

This binder will remain in force for ninety (90) days from its effective date unless extended in writing by the Company, or until replaced by the policy. Please read all terms and conditions shown herein carefully.

If this binder is conditioned upon the receipt, review and approval of additional information, all of this additional information must be provided to the Company within thirty (30) days of the effective date of this binder or the Company may, at its sole option, terminate this binder as of its effective date and cancel any policy which was issued pursuant to the binder.

If, between the date of the original submission and the effective date of this binder, there is a material change in any of the information (including but not limited to claims or potential claims) originally submitted or subsequently requested by the Company, the Insured is required to notify the Company immediately. The Company reserves the right to terminate or modify the terms of this binder in the event of a material change in such information.

Payment of premium is due within 30 days of the effective date of this binder. Should the premium not be received by the date due, this binder will be cancelled as of its effective date.

Authorized by:  Michael Fisher

**This binder replaces in its entirety the immediately preceding binder issued by the Company, which is now void in its entirety as of its inception date.**

Binder of Insurance

- Revision 1

Policy D      )009322-00 Eff. Date 08/11/05

Binder Period: 08/11/05 to 11/09/05

## TERRORISM COVERAGE DISCLOSURE NOTICE

### TERRORISM COVERAGE PROVIDED UNDER THIS POLICY

The Terrorism Risk Insurance Act of 2002 established a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. The Act provides that, to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States.

In accordance with the Terrorism Risk Insurance Act of 2002, we are required to offer you coverage for losses resulting from an act of terrorism **that is certified under the federal program** as an act of terrorism committed by an individual(s) acting on behalf of a foreign person or foreign interest. The policy's other provisions will still apply to such an act. Your decision is needed on this question: do you choose to pay the premium for terrorism coverage stated in this offer of coverage, or do you reject the offer of coverage and not pay the premium? You may accept or reject this offer.

If your policy provides commercial property coverage, in certain states, statutes or regulations may require coverage for fire following an act of terrorism. In those states, if "terrorism" results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements that apply to those coverage forms, or to Legal Liability coverage forms or Leasehold Interest coverage forms.

**Your premium <u>will</u> include the additional premium for terrorism as stated in the section of this Notice titled DISCLOSURE OF PREMIUM.**

### DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. **The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.**

### DISCLOSURE OF PREMIUM

Your premium for terrorism coverage is: $0

(This charge/amount is applied to obtain the final premium.)

**You may choose to reject the offer by signing the statement below and returning it to us. Your policy will be changed to exclude the described coverage.** If you chose to accept this offer, this form does not have to be returned.

### REJECTION STATEMENT

| I hereby decline to purchase coverage for certified acts of terrorism. I understand that an exclusion of certain terrorism losses will be made part of this policy. |
| --- |

_____

Policyholder / Legal Representative / Applicant's Signature

_____

Print Name of Policyholder / Legal Representative / Applicant

Date: _____

**Refco, Inc.**

Named Insured

**Arch Insurance Company**

Insurance Company

Policy Number:  **DOX0009322-00**

**This binder replaces in its entirety the immediately preceding binder issued by the Company, which is now void in its entirety as of its inception date.**

EXHIBIT K

 

199 Water Street, 16th Floor, New York, NY  10038   Tel 212-635-5300  Fax 212-635-5532

# Binder Confirmation

| To:<br><br>  Kenneth Li<br>Company:<br><br>  Marsh USA, Inc.<br>  1166 Avenue of the Americas<br>  New York, NY  10036 | From:<br><br>  Jerome Brendle<br>Date:<br><br>  8/10/2005 |
|---|---|

It is hereby understood and agreed that coverage is bound as follows:

| Insured Name: | Refco Inc. |
|---|---|
| Insured Address: | 550 West Jackson Boulevard, Suite 1300, Chicago, IL  60661 |
| Insurance Company: | Allied World Assurance Company (U.S.), Inc. |
| Issuing Carrier: | Allied World Assurance Company (U.S.), Inc |
| Underwriter: | Jerome Brendle |
| Type of Insurance | Excess D&O Insurance & Company Reimbursement |
| Policy Form: | Excess D&O Insurance (09/04) |
| Policy No: | AW0418197 |
| Policy Period: | 8/11/2005 to 8/11/2006 |
| Discovery Period: | 1 year at 150% |
| Pending and Prior Litigation Date: | 6/4/2004 |

| AWAC Limits: | | | |
|---|---|---|---|
| | USD | $12,500,000 | Per Claim (Inclusive of defense costs) |
| | USD | $12,500,000 | Annual Aggregate Inclusive of defensive costs |
| | Excess of | | |
| | USD | $27,500,000 | Per Claim (Inclusive of defense costs) |
| | USD | $27,500,000 | Annual Aggregate Inclusive of defensive costs |

| AWAC Premium: | US$ | $339,445 | Plus any applicable surplus lines taxes and/or stamping Fees |
|---|---|---|---|
| Terrorism Premium: | US$ | $0 | If Terrorism Coverage is elected.  This charge will be in addition to the Policy Premium.  (See item #7 of Terms and Conditions below) |
| Commission: | 12.5% | | |
| Applicable Endorsements: | Terrorism Exclusion (if coverage not elected)<br><br>Split P&P Litigation Date - 6/4/2004 for $2.5M xs $27.5M; and at inception for 10MM xs 30MM<br><br>Inverted Warranty Exclusion as of Inception<br>Service of Suit Clause | | |

| Follow Policy: | a) Company: | U.S. Specialty Insurance Company |
|---|---|---|
| | b) Policy No.: | 24-MGU-05-A10821 |
| | c) Policy Period: | 8/11/2005 to 8/11/2006 |
| | d) Policy Limits: | $10,000,000     Per Claim |
| | | $10,000,000     Annual Aggregate |
| | e) Retention: | $500,000 |
| | f) Premium: | $395,000 |
| | g) Policy Form: | TBD |
| | h) Date of Binder: | 8/10/2005 |

| **Underlying Limits:** | a) Company: | Lexington Insurance Company |
| | b) Policy No.: | 162-0924 |
| | c) Policy Period: | 8/11/2005 to 8/11/2006 |
| | d) Policy Limits: | $7,500,000 |
| | e) Attachment Point: | $10,000,000 |
| | f) Premium: | $251,813 |
| | g) Policy Form: | Excess Directors & Officers Liability |
| | h) Date Of Binder: | 6/22/2005 |
| | a) Company: | AXIS Reinsurance Company |
| | b) Policy No.: | TBD |
| | c) Policy Period: | 8/11/2005 to 8/11/2006 |
| | d) Policy Limits: | $10,000,000 |
| | e) Attachment Point: | $17,500,000 |
| | f) Premium: | $302,176 |
| | g) Policy Form: | Axis SecurExcess Form Number SE 0001 (Ed. |
| | h) Date Of Binder: | 6/22/2005 |

## Terms and Conditions

1. Binder is subject to no material change in the risk and no submission being made to the insurer of a claim or circumstance that might give rise to a claim between the date of this binder and the effective date.

2. Any restrictive policy terms and/or conditions that apply to underlying policies that are in excess of the followed policy but underlying to the AWAC (U.S.) excess policy will also apply to the AWAC (U.S.) excess limit of liability. Any additional endorsements to the AWAC (U.S.) policy will be determined upon review of the required documentation.

3. All other terms and conditions as per AWAC's Policy Form and appropriate endorsements referenced herein.

*(Premium Payment)*

4. Binding is subject to payment of premium on or before    30 days from the coverage effective date. If premium is not received by the Company within such time, the Policy will be cancelled automatically retroactively to the coverage effective date.

*(Surplus Lines Taxes & Filings)*

5. The above binder does not include any amount with respect to Surplus Lines Taxes and/or fees. The broker named above is responsible for the filing, collection and payment of all Surplus Lines Taxes and Fees.

6. Please advise your client that we cannot release Policy documentation without receipt of the following information:
   a) Completed and signed application, if required.
   b) Copy of the Followed Policy.
   c) All underlying binders, if any.

7. Premium for Certified Acts of Terrorism under Terrorism Risk Insurance Act 2002 ("TRIA") is not included in policy premium. Any coverage provided for losses caused by an act of terrorism as defined by TRIA ("TRIA Losses") may be partially reimbursed by the United States under a formula established by TRIA as follows: 90% of TRIA Losses in excess of the insurer deductible mandated by TRIA, the deductible to be based on a percentage of the insurer's direct earned premiums for the year preceding the act of terrorism.

A copy of the TRIA disclosure is attached hereto.

| Subjectivities: | Due Date: |
|---|---|

This binder is subject to satisfactory receipt, review and acceptance of the following requirements within ten (10) days of the effective date:

1  Copies of all information provided to the underlying carriers        8/18/2005

2  Copy of Original HCC Directors & Officers Liability Appliaction (properly signed and dated)    8/18/2005

3  Finalized and executed FORM S-1 Registration Statement        8/18/2005

4  Reliance on Primary Application Endorsement        8/18/2005

5  Confirmation that the claims/suits referenced in the Paris High Court Suit    8/18/2005

6  are excluded by Wells Notice/SEC Investigation Exclusion or that they

7  will be expressly excluded in policy.

8  Copy of Wells Notice, if available for distribution        8/18/2005

If we do not receive and accept such items listed above on or before the due date(s), we reserve the right to amend or void this conditional binder.

## Additional Comments

Thank you for the opportunity to bind this account!

_Jerome Brendle_

_____
Jerome Brendle

212-635-5304

jerome.brendle@awac.com