John H. Eickemeyer (JE-8302)
Daniel C. Green (DG-0059)
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019

Daniel J. Standish (*pro hac vice*)
Marc E. Rindner (*pro hac vice*)
Cara Tseng Duffield (*pro hac vice*)
WILEY REIN LLP
1776 K Street NW
Washington, D.C. 20006

*Attorneys for Plaintiff Arch Insurance Company*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ARCH INSURANCE COMPANY,** )<br><br>**Plaintiff,** )<br><br>v. )<br><br>**JOHN D. AGOGLIA, et al.,** )<br><br>**Defendants.** ) | **No. 08-CIV-5252 (GEL)**<br>**ECF Case** |

Annexed hereto are true copies of filings originally made in the Supreme Court of the State of New York, County of New York, in the action *Arch Insurance Co. v. Agoglia, et al.*, Index No. 08/600029, which was removed to this Court on or around June 9, 2008.

The record is supplemented by the undersigned counsel for the plaintiff Arch Insurance Company, pursuant to a letter from such counsel which was So Ordered by the Court on July 21, 2008 and entered into the docket on July 22, where it was assigned ECF No. 26. The supplementary filings are as follows:

| Document Number | Document Title |
|---|---|
| | |
| 1. | Summons and Complaint (and Exhibits A-G thereto) |
| 2. | Amended Summons and First Amended Complaint for Declaratory Judgment (and Exhibits A-J thereto) |

1

| 3. | Affidavit of Service of Summons and Complaint and of Amended Summons and Complaint Upon Enumerated Defendants (and Exhibits 1-15 thereto) |
| 4. | Request for Judicial Intervention |
| 5. | Statement in Support of Request for Assignment to Commercial Division (and Exhibit A thereto) |
| 6. | Notice of Motion for the *Pro Hac Vice* Admission of Cara Tseng Duffield, Marc E. Rindner and Daniel J. Standish |
| 7. | Affirmation of Daniel C. Green in Support of the *Pro Hac Vice* Admission of Cara Tseng Duffield, Marc E. Rindner and Daniel J. Standish (and Exhibits 1-3 thereto) |
| 8. | Affidavit of Service of Enumerated Filings Upon Defendant Cox |
| 9. | So Ordered Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett with annexed Judgment Entered by Clerk |
| 10. | Notice of Discontinuance as to Defendant Cox |
| 11. | Stipulation of Partial Discontinuance with Prejudice as against Defendant Trosten |
| 12. | Notice of Motion and Affirmation of Richard Cashman (and Exhibits A-Z thereto) |
| 13. | Memorandum of Law in Support of the Insureds' Motion to Dismiss the First Amended Complaint for Declaratory Judgment |
| 14. | Corrected Notice of Motion |
| 15. | Corrected Memorandum of Law in Support of the Insureds' Motion to Dismiss the First Amended Complaint for Declaratory Judgment |
| 16. | Notice of Appearance of Zuckerman Spaeder LLP on Behalf of Defendant Grant |
| 17. | Notice of Motion for Admission *Pro Hac Vice* of Norman L. Eisen and Affirmation of Laura E. Neish in Support Thereof |
| 18. | Affirmation of John H. Eickemeyer in Support of Arch Insurance Company's Opposition to Certain Defendants' Motion to Dismiss the First Amended Complaint (and Exhibits A-M thereto) |

NEWYORK/#198626.1

| 19. | Plaintiff Arch Insurance Company's Opposition to Certain Defendants' Motion to Dismiss the First Amended Complaint |
|---|---|
| 20. | Notice of Entry of So Ordered Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett (annexed as Exhibit A thereto) |
| 21. | Corrected Affidavit of Service of Notice of Entry Upon Enumerated Defendants |
| 22. | Reply Affirmation of Richard Cashman (and Exhibits A-D thereto) |
| 23. | Reply Memorandum of Law in Support of the Insureds' Motion to Dismiss the First Amended Complaint for Declaratory Judgment |
| 24. | Affidavit of Service of Summons and Complaint and of Amended Summons and Complaint upon Defendants Dhillon and Lipoff |
| 25. | Notice of Motion for Voluntary Discontinuance as Against Defendants Thomas H. Dittmer and Stephen Grady; Affirmation of Daniel C. Green in Support of Motion for Voluntary Discontinuance as Against Defendants Thomas H. Dittmer and Stephen Grady |
| 26. | So Ordered Stipulation of Partial Discontinuance with Prejudice as against Defendant Maggio |
| 27. | Order Granting *Pro Hac Vice* Admission of Cara Tseng Duffield, Marc E. Rindner, and Daniel J. Standish |
| 28. | Order Granting *Pro Hac Vice* Admission of Norman Eisen |
| 29. | Notice of Filing of Notice of Removal (annexed as Exhibit A thereto) |

NEWYORK/#198626.1

Date:  July 31, 2008

Respectfully submitted,


By:     s/  John H. Eickemeyer
     John H. Eickemeyer  (JE-8302)
     jeickemeyer@vedderprice.com
     Daniel C. Green  (DG-0059)
     dgreen@vedderprice.com
     VEDDER PRICE P.C.
     1633 Broadway, 47th Floor
     New York, NY 10019
     (212) 407-7700

     Daniel J. Standish (*pro hac vice*)
     dstandish@wileyrein.com
     Marc E. Rindner (*pro hac vice*)
     mrindner@wileyrein.com
     Cara Tseng Duffield (*pro hac vice*)
     cduffield@wileyrein.com
     WILEY REIN LLP
     1776 K Street, N.W.
     Washington, D.C. 20006
     (202) 719-7000

     *Counsel for Plaintiff Arch Insurance Company*

NEWYORK/#198626.1

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

ARCH INSURANCE COMPANY,

        Plaintiff,

v.

JOHN D. AGOGLIA, PHILLIP R.
BENNETT, LEO R. BREITMAN, EDWIN
L. COX, SUKHMEET DHILLON,
THOMAS H. DITTMER, NATHAN
GANTCHER, STEPHEN GRADY, TONE
GRANT, THOMAS HACKL, DAVID V.
HARKINS, SCOTT L. JAECKEL,
DENNIS A. KLEJNA, THOMAS H. LEE,
ERIC G. LIPOFF, SANTO C. MAGGIO,
PETER MCCARTHY, JOSEPH
MURPHY, FRANK MUTTERER,
RICHARD N. OUTRIDGE, RONALD L.
O'KELLEY, SCOTT A. SCHOEN,
WILLIAM M. SEXTON, GERALD
SHERER, PHILIP SILVERMAN and
ROBERT C. TROSTEN

        Defendants.

Index No.: _____ 08600020

**SUMMONS**

FILED

JAN 0 4 2008

NEW YORK
COUNTY CLERKS OFFICE

312420

## TO THE ABOVE NAMED DEFENDANTS:

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve

a copy of your answer, or if the Complaint is not served with this summons, to serve a notice of

appearance on plaintiff's attorneys, within twenty (20) days after the service of this summons,

exclusive of the day of service (or within thirty (30) days after the service is complete if this

summons is not personally delivered to you in the State of New York); and in case of your

failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the Complaint. Plaintiff designates New York County as the place of trial.

The basis for venue is that plaintiff Arch Insurance Company's principal place of business is located at One Liberty Plaza, 53rd Floor, New York, NY 10006, and the County of New York is therefore the proper venue for trial pursuant to CPLR §503(a).

Dated:  January 4, 2008                          Respectfully submitted,

                                                 VEDDER PRICE P.C.


                                                 By: _____
                                                     John H. Eickemeyer
                                                     Daniel C. Green

                                                 1633 Broadway
                                                 47th Floor
                                                 New York, New York 10019

                                                 (212) 407-7700

                                                 Of Counsel:

                                                 Daniel J. Standish
                                                 Jonathan M. Jacobs
                                                 Cara Tseng Duffield
                                                 WILEY REIN LLP
                                                 1776 K Street, NW
                                                 Washington, DC 20006
                                                 202-719-7000

                                                 *Attorneys for Plaintiff*
                                                 *Arch Insurance Company*

To:

John D. Agoglia
3 Sweet Hollow Ct.
St. James, NY 11780

Phillip R. Bennett
125 Colt Lane
Gladstone, NJ  07934

Leo R. Breitman
7767 Wind Key Drive
Boca Raton, FL  33434

Edwin L. Cox
c/o Brian O'Connor, Esq.
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099

Sukhmeet Dhillon
1 Upper Vintage
Laguna Niguel, CA 92677-9202

Thomas H. Dittmer
150 S. Wacker Drive, Suite 1200
Chicago, IL 60606-4201

Nathan Gantcher
86 Birchall Drive
Scarsdale, NY  10583

Stephen Grady
c/o Lawrence J. Kotler, Esq.
Duane, Morris & Heckscher LLP
30 South 17th Street
Philadelphia, PA 19103

Tone Grant
680 North Lake Shore Drive, Apt. 1620
Chicago, IL  60611

Thomas Hackl
c/o Avraham C. Moskowitz, Esq.
Moskowitz and Book, LLP
1372 Broadway
New York, NY 10018

David V. Harkins
Corn Point Road
Marblehead, MA  01945

Scott L. Jaeckel
151 Tremont Street, Apt. 25E
Boston, MA  02111-1123

3

Dennis A. Klejna
2301 E Street NW, Apt. A1010
Washington, DC 20037-2829

Thomas H. Lee
322 E. 57th Street
New York, NY 10022

Eric G. Lipoff
c/o Stephen M. Ray, Esq.
Robert A. Greenfield, Esq.
Stutman, Treister & Glatt PC
1901 Avenue of Stars, 12th Floor
Los Angeles, CA 90067

Santo C. Maggio
1825 8th Street South
Naples, FL 34102

Peter McCarthy
38 South Bridge Street
Poughkeepsie, NY 12601

Joseph Murphy
1038 Bloom Street
Hoboken, NJ 07030

Frank Mutterer
c/o Lawrence S. Lustberg, Esq.
Gibbons P.C.
One Gateway Center
Newark, NJ 07102

Ronald L. O'Kelley
6001 Trophy Drive, Apt. 1002
Naples, FL 34110

Richard N. Outridge
24 Pennbrook Dr.
Lincoln University, PA 19352

Scott A. Schoen
191 Kings Grant Road
Weston, MA 02493

4

William M. Sexton
c/o Stuart I. Friedman, Esq.
Ivan Kline, Esq.
Friedman & Wittenstein, P.C.
600 Lexington Avenue
New York, NY 10022

Gerald Sherer
333 Central Park West, Apt. 81
New York, NY  10025-7145

Philip Silverman
3 Edie Drive
Marlboro, NJ 07746

Robert C. Trosten
895 Scioto Drive
Franklin Lakes, NJ 07417

5

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

ARCH INSURANCE COMPANY,

      Plaintiff,

v.

JOHN D. AGOGLIA, PHILLIP R.
BENNETT, LEO R. BREITMAN, EDWIN
L. COX, SUKHMEET DHILLON,
THOMAS H. DITTMER, NATHAN
GANTCHER, STEPHEN GRADY, TONE
GRANT, THOMAS HACKL, DAVID V.
HARKINS, SCOTT L. JAECKEL,
DENNIS A. KLEJNA, THOMAS H. LEE,
ERIC G. LIPOFF, SANTO C. MAGGIO,
PETER MCCARTHY, JOSEPH
MURPHY, FRANK MUTTERER,
RICHARD N. OUTRIDGE, RONALD L.
O'KELLEY, SCOTT A. SCHOEN,
WILLIAM M. SEXTON, GERALD
SHERER, PHILIP SILVERMAN and
ROBERT C. TROSTEN

      Defendants.

Index No.: _____

08600029

**COMPLAINT FOR
DECLARATORY JUDGMENT**

**FILED**

JAN 0 4 2008

NEW YORK
COUNTY CLERK'S OFFICE

In support of its Complaint against defendants, plaintiff Arch Insurance Company

("Arch") alleges as follows:

## INTRODUCTION

1.  Arch issued an excess directors, officers and corporate liability insurance policy to

Refco, Inc. ("Refco") for the period from August 11, 2005 to August 11, 2006 (the "Arch

Policy"). Since August 11, 2005, numerous lawsuits and governmental and/or regulatory

investigations (the "Underlying Matters") involving certain individuals insured under the Arch

Policy have been instituted and various of those individuals have tendered the Underlying

Matters to Arch for coverage under the Arch Policy. Arch brings this action against the defendants named herein ("Defendants") to seek a declaration that the Arch Policy affords no coverage for the Defendants in connection with the Underlying Matters.

2. This is the second lawsuit that Arch has filed in this court for a declaration regarding the parties' rights and responsibilities under the Arch Policy. The first lawsuit (Index No. 600805/06) was dismissed without prejudice by Justice Freedman in an opinion dated February 20, 2007 based on two factors that no longer exist. First, the Arch Policy contains a limit of liability that is $10 million excess of $40 million in underlying limits, and Justice Freedman ruled that it was entirely speculative whether the Underlying Matters would ever generate losses that would implicate the Arch Policy. Since that ruling, the limits of the underlying policies have been depleted at a voracious pace. As of the filing of this Complaint, the underlying insurers have advanced approximately $25 million in attorneys' fees and costs, and the bevy of law firms representing the individual insureds is generating over $2 million per month in additional fees and costs. Thus, contrary to the position that the individual insureds advanced before this Court when Arch filed its first action, it is far from speculative whether, setting aside the dispositive coverage issues that Arch outlines in this complaint based on the unique terms of its Policy, the Arch limit will be implicated.

3. Justice Freedman also held that Arch could not proceed with the first action because the question whether any insured had knowledge of facts or circumstances that might give rise to a claim as of the Arch Policy inception date — a key issue for purposes of the exclusions that form the basis for Arch's denial of coverage — would overlap with issues that were not yet adjudicated in the Underlying Matters. That impediment no longer exists. On December 19, 2007, Santo C. Maggio ("Maggio"), a former executive vice president of Refco and an insured

2

under the Arch Policy, pleaded guilty to federal charges of conspiracy, securities fraud and wire fraud and admitted that he knew of and participated in the wrongdoing that is at the heart of the allegations in the Underlying Matters.  The guilty plea and related admissions of fact, which establish that Maggio knew of the wrongdoing at the time of the inception of the Arch Policy, trigger the applicability of the exclusions identified in this complaint as to all of the Defendants in this action with respect to the Underlying Matters without regard to the outcome of any unresolved proceeding involving any other Defendant.  Thus, the second ground for the dismissal of Arch's first action no longer exists.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction to resolve an actual controversy between Arch and the Defendants pursuant to the New York Declaratory Judgment Act, CPLR § 3001.

5.    Personal jurisdiction over Defendants is proper pursuant to CPLR § 301 and § 302. Defendants possess sufficient minimum contacts with the state of New York to render the exercise of jurisdiction by a New York court permissible under traditional notions of fair play and substantial justice.  Defendants were directors or officers of Refco, a corporation with its principal place of business in New York.[1]  As directors and/or officers of Refco, Defendants transacted business in the state of New York.  In addition, some or all of Defendants seek coverage under the Arch Policy for the Underlying Matters.  Accordingly, Defendants have an ongoing contractual relationship with Arch, a corporation with its principal place of business in New York.  Finally, most of the lawsuits comprising the Underlying Matters were filed in the

---

[1]  "Refco", as used herein, refers to Refco, Inc., the publicly-traded company formed in connection with an August 2005 initial public offering, Refco Group Ltd., LLC ("RGL"), the company through which Refco, Inc.'s business primarily was conducted prior to the IPO, and the subsidiaries of Refco, Inc. and Refco Group Ltd., LLC.

federal courts located in New York. These lawsuits allege that Defendants committed acts in the state of New York and/or acts outside the state of New York that could reasonably be expected to have consequences in the state of New York.

6.  Venue is proper in this County under CPLR § 503 because Arch has its principal place of business in this County.

## PARTIES

7.  Arch is an insurance company that is organized and exists pursuant to the laws of the state of Missouri. Arch has its principal place of business in New York County, New York.

8.  Defendant John D. Agoglia ("Agoglia") served as a senior vice president at Refco Securities, LLC, a subsidiary of Refco, Inc., at times relevant to this action. Upon information and belief, Agoglia is a citizen of New York.

9.  Defendant Phillip R. Bennett ("Bennett") served as the Chairman, President and Chief Executive Officer of Refco until October 2005, when he took a leave of absence at the request of the Refco board of directors. Upon information and belief, Bennett is a citizen of New Jersey.

10. Defendant Leo R. Breitman ("Breitman") served as a director of Refco at times relevant to this action. Upon information and belief, Breitman is a citizen of Florida.

11. Defendant Edwin L. Cox ("Cox") served as a director of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Cox is a citizen of Texas.

12. Defendant Sukhmeet Dhillon ("Dhillon") served as Executive Vice President of Refco Group Ltd., LLC and as Executive Vice President of the entity that became Refco LLC, during times relevant to this complaint. Upon information and belief, Dhillon is a citizen of California.

13. Thomas H. Dittmer ("Dittmer") served as Chairman and CEO of Refco during times relevant to this action. Upon information and belief, Dittmer is a citizen of Illinois.

14. Defendant Nathan Gantcher ("Gantcher") served as a director of Refco at times relevant to this action. Upon information and belief, Gantcher is a citizen of New York.

15. Defendant Stephen Grady ("Grady") was COO of Refco Global Futures LLC, a Refco subsidiary, during times relevant to this action. Upon information and belief, Grady is a citizen of New Jersey.

16. Defendant Tone Grant ("Grant") served as President of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Grant is a citizen of Illinois.

17. Defendant Thomas Hackl ("Hackl") served as Executive Vice President of RGL at times relevant to this action. Upon information and belief, Hackl is a citizen of Geneva, Switzerland.

18. Defendant David V. Harkins ("Harkins") served as a Director of Refco at times relevant to this action. Upon information and belief, Harkins is a citizen of Massachusetts.

19. Defendant Scott L. Jaeckel ("Jaeckel") served as a Director of Refco at times relevant to this action. Upon information and belief, Jaeckel is a citizen of Massachusetts.

20. Defendant Dennis A. Klejna ("Klejna") served as Executive Vice President and General Counsel of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Klejna is a citizen of Washington, D.C.

21. Defendant Thomas H. Lee ("Lee") served as a Director of Refco at times relevant to this action. Upon information and belief, Lee is a citizen of New York.

22. Defendant Eric G. Lipoff ("Lipoff ") served as Executive Vice President of a Refco subsidiary at times relevant to this action. Upon information and belief, Lipoff is a citizen of California.

23. Defendant Santo C. Maggio ("Maggio") served as an Executive Vice President of Refco and as President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd. at times relevant to this action. Upon information and belief, Maggio is a citizen of Florida.

24. Defendant Peter McCarthy ("McCarthy") served as Executive Vice-President of Refco Securities at times relevant to this action. Upon information and belief, McCarthy is a citizen of New Jersey.

25. Defendant Joseph Murphy ("Murphy") served as President of Refco from October 2005 to November 28, 2005, when he resigned. Murphy also served as Chief Executive Officer of Refco Global Futures and President of Refco, LLC at times relevant to this action. Upon information and belief, Murphy is a citizen of New Jersey.

26. Defendant Frank Mutterer ("Mutterer") served as Controller of Refco Group Ltd., LLC, during times relevant to this action. Upon information and belief, Mutterer is a citizen of New Jersey.

27. Defendant Richard N. Outridge ("Outridge") served as CFO of Refco Capital Management at times relevant to this action. Upon information and belief, Outridge is a citizen of Pennsylvania.

28. Defendant Ronald L. O'Kelley ("O'Kelley") served as a Director of Refco at times relevant to this action. Upon information and belief, O'Kelley is a citizen of Florida.

29. Defendant Scott A. Schoen ("Schoen") served as a Director of Refco at times relevant to this action.  Upon information and belief, Schoen is a citizen of Massachusetts.

30. Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer of Refco at times relevant to this action.  Upon information and belief, Sexton is a citizen of Iowa.

31. Defendant Gerald Sherer ("Sherer") served as Executive Vice President and Chief Financial Officer of Refco at times relevant to this action.  Upon information and belief, Sherer is a citizen of New York.

32. Defendant Philip Silverman ("Silverman") served as Secretary of Refco at times relevant to this action.  Upon information and belief, Silverman is a citizen of New Jersey.

33. Robert C. Trosten ("Trosten") served as Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC  at times relevant to this action.  Upon information and belief, Trosten is a citizen of New Jersey.

## FACTUAL ALLEGATIONS

### The Arch Policy

34. The Arch Policy is an excess directors, officers and corporate liability policy.  It has a policy period of August 11, 2005 to August 11, 2006 and a limit of liability of $10 million excess of $40 million in underlying insurance.  A copy of the Arch Policy is attached as Exhibit A.

35. Various other insurers issued underlying insurance policies to Refco.  U.S. Specialty Insurance Company issued a primary policy with limits of $10 million excess of applicable retentions (the "Primary Policy").  A copy of the Primary Policy is attached as Exhibit B. Lexington Insurance Company issued a first excess policy with limits of $7.5 million excess of $10 million (the "Lexington Policy").  A copy of the Lexington Policy is attached as Exhibit C. Axis Reinsurance Company issued a second excess policy with limits of $10 million excess of

$17.5 million (the "Axis Policy"). A copy of the Axis Policy is attached as Exhibit D. Allied

World Assurance Company issued a third excess policy with limits of $12.5 million excess of

$27.5 million (the "AWAC Policy"). A copy of the AWAC Policy is attached as Exhibit E.

Each of the underlying policies has a policy period of August 11, 2005 to August 11, 2006.

36. In general, the Arch Policy applies in conformance with the terms and conditions of

the Primary Policy and in conformance with the terms and conditions in the Arch Policy or any

other underlying insurance "further limiting or restricting coverage." Arch Policy, Section I.C.

The Arch Policy provides that "[i]n no event shall this Policy grant broader coverage than that

provided by the most restrictive policy included in the Underlying Insurance." *Id*. The Arch

Policy provides that coverage thereunder applies only after exhaustion of the **Underlying Limit**

solely as a result of actual payment under the **Underlying Insurance** in connection with

**Claim(s)**. *Id*., Section I.B.[2]

37. Subject to all of its terms and conditions, the Arch Policy affords five types of

specified coverage. First, the Arch Policy affords specified coverage to **Insured Persons** for

"**Loss** arising from **Claims** first made during the **Policy Period** . . . for **Wrongful Acts**, except

when and to the extent that the **Company** has paid such **Loss** to or on behalf of the **Insured**

**Persons** as indemnification or advancement." Primary Policy, Insuring Agreement (A).

**Insured Persons** is defined in relevant part as "any past, present or future director or officer of

the **Company** . . . ." Primary Policy, Definition F(1). The "**Company**" is Refco Inc. and its

subsidiaries. Primary Policy, Definitions (C), (H), (O), Declarations Item 1.

---

[2] Policy language appearing herein in bold typeface is defined in the policy being quoted, and
appears in bold typeface in that policy.

38. Second, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the Company for "**Loss** arising from . . . **Claims** first made during the **Policy Period** . . . against the **Insured Persons** for **Wrongful Acts**, if the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement." Primary Policy, Insuring Agreement (B)(1).

39. Third, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the Company for "**Loss** arising from **Securities Claims** first made during the **Policy Period** . . . against the **Company** for **Wrongful Acts**." Primary Policy, Insuring Agreement (B)(2).

40. Fourth, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the "**Controlling Shareholder**," defined as Bennett, for "**Loss** arising from a **Securities Claim** first made during the **Policy Period** . . . against such **Controlling Shareholder** for **Wrongful Acts**, provided, that one or more **Insured Persons** and/or the **Company** are and remain co-defendants in such **Securities Claim** along with such **Controlling Shareholder**." Primary Policy, Endorsement No. 15.

41. Fifth, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the Company for "all **Derivative Demand Investigation Costs** incurred by the **Company** as a result of a **Derivative Demand** first received by the **Company's** Board of Directors and reported in writing to the Insurer during the **Policy Period** . . . up to the amount of the **Derivative Demand Investigation Costs Sub-Limit**" of $250,000. Primary Policy, Endorsement No. 11.

42. The AWAC Policy contains the following provision: "It is hereby understood and agreed that the **Insurer** shall not be liable for **Loss** in connection with any claim or claims made

against the **Insureds** alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which any Insured had knowledge as of inception and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage hereunder; or (ii) which indicate the probability of any such claim." AWAC Policy, Endorsement No. 3 ("AWAC Prior Knowledge Exclusion").

43. The Arch Policy contains the following provision: "If any **Insured** as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a **Claim** under this Policy, the **Excess Insurer** shall not be liable to make any payment under this Policy as a result of a **Claim** arising out of, based upon or attributable to any such act, error, omission, fact, matter or circumstance." Arch Policy, Endorsement No. 4 (the "Arch Prior Knowledge or Information Exclusion").

44. The Arch Policy defines **Insured(s)** as "any person(s) or entity(ies) that are entitled to coverage under the **Followed Policy** at its inception." Arch Policy, § III.B. The "**Followed Policy**" is the Primary Policy. Arch Policy, § III.C.; Declarations, Item 4.

45. The Arch Policy and underlying insurance policies contain other terms, conditions and limitations that may ultimately be implicated in this action.

46. Defense Costs have been advanced to certain Defendants under the Primary Policy, the Lexington Policy and the Axis Policy.[3] As of the filing of this complaint, the advancement of defense costs has exhausted the $10 million limit of the Primary Policy and the $7.5 million limit of the Lexington Policy, and has eroded over $7 million of the Axis Policy. The law firms

---

[3] The coverage defenses that Arch advances in this action are unique to the Arch Policy; thus, the fact that U.S. Specialty and Lexington advanced fees and costs has no bearing on the coverage issues presented in this case. Axis was ordered by the Refco bankruptcy court to advance fees and costs despite its denial of coverage based on its unique policy provisions and contrary to the language in the operative policies. Axis has appealed that order to the United States District Court for the Southern District of New York.

representing the defendants in the Underlying Matters are currently generating attorneys' fees and costs in the vicinity of $2 million *per month*.  Thus, it is far from conjectural that the Arch Policy limits will be implicated unless this Court promptly adjudicates the coverage issues presented in this case.

**The Events at Refco**

47. The Arch Policy incepted on August 11, 2005.  On the same day, Refco conducted its initial public offering.

48. On October 10, 2005, Refco issued a press release.  The press release announced that the Company had been carrying an undisclosed receivable of $430 million from an entity controlled by Bennett.  Refco stated that "[b]ased on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible."  Moreover, Refco stated that although the receivable "was reflected on the Company's prior period financials, as well as on the Company's May 31, 2005 balance sheet," the receivable "was not shown as a related party transaction in any such financials.  For that reason, and after consultation by the Audit Committee with the Company's independent accountants, the Company determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

49. On October 11, 2005, Refco issued a second press release.  The press release announced that Bennett had repaid the $430 million receivable in full.  The press release also provided further information on the nature of the receivable:  "Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of

uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998. These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable from that entity, rather than a receivable from the originating accounts. The fact that the receivable was from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual reporting periods by reason of transfers to a third party customer account that we currently believe is unaffiliated with Mr. Bennett or anyone else at the Company."

50. On October 17, 2005, Refco and certain of its unregulated subsidiaries filed for Chapter 11 bankruptcy protection.

51. On December 19, 2007, Maggio, who is an Insured under the Arch Policy, pleaded guilty to a criminal information ("Information") containing counts of conspiracy (Count I), securities fraud (Counts II and III), and Wire Fraud (Count IV). A copy of the Information is attached hereto as Exhibit F.

52. The Information charged that, beginning in or about the late 1990's, Maggio, Bennett and their co-conspirators engaged in a scheme to mask the true financial performance of Refco:

> From at least as early as in or about the late 1990s, SANTO C. MAGGIO, the defendant, at the direction of Phillip R. Bennett and together with others known and unknown, schemed to hide the true financial health of Refco from its banks, counterparties, auditors, and investors. Starting at least as early as the late 1990s, Bennett, MAGGIO, and their coconspirators embarked on a strategy to mask the true performance of Refco's business in order to sell the company for Bennett and MAGGIO's own benefit and that of Refco's owners other than Bennett. To that end, over the ensuing years, Bennett, MAGGIO, and others known and unknown systematically (1) covered up both Refco's own losses and customer losses for which Refco became responsible; (2) moved Refco operating expenses off the company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping

Refco in business and then selling it for the maximum benefit to its owners and senior management.

Information, ¶ 8.

53. According to the Information, the scheme permitted Refco to engage in, *inter alia,* Refco's August 2005 initial public offering of stock, in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement. *Id.* at ¶ 9.

54. According to the Information, the scheme was hatched in 1997, when Refco directly and indirectly incurred a series of substantial trading losses that threatened the continued viability of its business. *Id.* at ¶ 10. In response to those losses, Bennett, Maggio and others moved losses and expenses out of Refco and into Refco Group Holdings, Inc. ("RGHI"), an entity that owned Refco and that was owned by, *inter alia*, Bennett and Grant, in an effort to mask Refco's financial condition. This strategy increased the debt owned by RGHI to Refco (the "RGHI Receivable"), which ultimately grew to over $1 billion. *Id.* Beginning as early as February 1998, Bennett, Maggio and others "directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Bennett or Refco." *Id.* at ¶ 21. Maggio, Bennett and others caused this cover-up to occur "at every fiscal year-end from at least the fiscal year-end on February 28, 1998 through the fiscal year-end on February 29, 2004. *Id.* Beginning in 2004, Maggio, Bennett and others began causing these cover-up transactions to occur at the ends of Refco's quarterly reporting periods. *Id.* at ¶ 23.

55. Based on the above, the Information charged Maggio with four counts: (Count I)
Conspiracy to commit securities fraud, wire fraud, to make false filings with the SEC, to make
material misstatements to auditors, bank fraud and money laundering; (Count II) Securities fraud
in connection with the sale of 9% Senior Subordinated Notes due 2012; (Count III) Securities
fraud in connection with the purchase and sale of Refco common stock; and (Count IV) Wire
fraud in connection with the interstate transmission of a Refco Form 10-K via wire
communication on July 19, 2005.

56. On December 19, 2007, Maggio pleaded guilty to the Information.  A copy of the
transcript of the hearing is attached hereto as Exhibit G.  During the hearing at which Maggio
pleaded guilty, the following exchange occurred between the Court and Maggio:

> THE COURT:  Did you commit the offenses for which you have
> been charged, Mr. Maggio?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Tell me what you did.
>
> . . .
>
> THE DEFENDANT:  Your Honor, from the late 1990s to October
> 2005 I was a senior executive at Revko [sic] Ink [sic].  During that
> period I participated with others to hide the true financial health of
> Revko [sic] from banks, counter-parties, auditors and investors.
> With my knowledge and active participation Revko's [sic]
> substantial losses were covered up as revenues padded [sic] and
> certain operating expenses were moved off its book.  Among the
> acts I personally engaged in [sic] the signing of loan agreements
> referencing paragraphs 61-D [loan agreement signed in furtherance
> of the conspiracy on or about February 20, 2004] and 61-P [loan
> agreement signed in furtherance of the conspiracy on or about
> February 23, 2005] of the indictment.
>     As a result of my conduct and that of my coconspirators
> false financial statements were issued to obtain debt financing
> from the public including 9 percent senior subordinated notes
> referenced in Count Two of the indictment.
>     To consummate the sale of 57 percent of Revko [sic] to a
> group headed by Thomas H. Lee in 2004 and to obtain

$800 million in bank financing the same year and to effect the
Revko [sic] initial public offering in 2005. [sic] Moreover, with
my knowledge false financial statements were filed with the SEC
including form 10K referencing Count Four. The mails and
interstate wires were used as part of the fraudulent scheme.
       I deeply regret my conduct and the harm that it has caused.

THE COURT: First of all, with respect to all of the activities that
you've indicate you participated in it knowingly?

THE DEFENDANT: Yes.

Transcript, Exhibit G, at 17-18.

57. At the conclusion of the hearing at which Maggio pleaded guilty, the Court found that

Maggio pleaded guilty knowingly and voluntarily:

Based on defendant's allocution and the recommendations by the
government I find that the defendant understands the nature, the
charges and consequences of his guilty plea. I also find that the
plea is voluntary and that there is a factual basis for the plea. I,
therefore, recommend that the plea be accepted . . . .

Transcript, Exhibit G, at 20.

58. As demonstrated by his guilty plea to counts that alleged his knowledge of, *inter alia,*

efforts to hide the RGHI Receivable from the investing public prior to 2005, Maggio, as of

August 11, 2005, had knowledge of or information concerning acts, errors, omissions, facts,

matters or circumstances that might give rise to a Claim under the AWAC Policy or the Arch

Policy.

**The Underlying Matters**

59. Beginning on October 12, 2005, various lawsuits were filed against the Defendants.

60. A criminal complaint was filed against Bennett (the "Bennett Criminal Complaint")

on October 12, 2005 in *United States v. Bennett*, No. 05-1720 (S.D.N.Y.).

61. The Bennett Criminal Complaint alleges that Bennett knowingly "hid from investors

in [Refco's] August 2005 initial public offering of stock . . . the existence of hundreds of millions

of dollars of related party transactions between Refco and a company controlled by Bennett, including causing Refco to file a false and fraudulent S-1 registration statement with the Securities and Exchange Commission." Bennett Criminal Complaint, ¶ 9. On or about November 10, 2005, the Grand Jury for the Southern District of New York indicted Bennett. The indictment ("Indictment") repeated and expanded upon the allegations in the Bennett Criminal Complaint. On or about October 24, 2006, a Superseding Indictment was filed that named both Bennett and Trosten, and a Second Superseding Indictment was filed against them on or about November 16, 2006. On January 16, 2007, a Third Superseding Indictment that added Grant as a defendant was filed. On December 19, 2007, the Information against Maggio was filed. Each of these filings alleged, *inter alia,* that the Defendant(s) named therein engaged in a scheme to hide the RGHI Receivable from the investing public. Collectively, the proceedings initiated by these filings will be referred to herein as the "Criminal Proceedings".

62. The Bennett Criminal Complaint was tendered to Arch for coverage under the Arch Policy on or about October 13, 2005, and the Indictment, the Superseding Indictment, the Second Superseding Indictment and/or the Third Superseding Indictment were tendered to Arch for coverage under the Arch Policy thereafter.

63. The suits *Mazur et al. v. Refco, Inc. et al.,* No. 05-8626 (S.D.N.Y.), *Frontpoint Fin. Serv., Inc. v. Refco, Inc. et al.,* No. 05-8663 (S.D.N.Y.), *Lieber v. Refco, Inc. et al.,* No. 05-8667 (S.D.N.Y.), *Weiss v. Refco, Inc. et al.,* No. 05-8691 (S.D.N.Y.), *Glaubach v. Refco, Inc. et al.,* No. 05-8692 (S.D.N.Y.), *Gross v. Refco, Inc. et al.,* No. 05-8697 (S.D.N.Y.), *Salamone v. Refco, Inc. et al.,* No. 05-8716 (S.D.N.Y.), *RD Partners LLC v. Refco, Inc. et al.,* No. 05-8737 (S.D.N.Y.), *Wakefield v. Refco, Inc. et al.,* No. 05-8742 (S.D.N.Y.), *Gaugler v. Bennett et al.,* No. 05-8886 (S.D.N.Y.), *Baker v. Bennett et al.,* No. 05-8923 (S.D.N.Y.), *Nathanson v. Bennett*

*et al.*, No. 05-8926 (S.D.N.Y.), *Becker v. Refco, Inc. et al.*, No. 05-8929 (S.D.N.Y.), *Mettupatti v. Bennett et al.*, No. 05-9048 (S.D.N.Y.), *Weiss v. Bennett et al.*, No. 05-9126 (S.D.N.Y.), *Weit v. Bennett et al.*, No. 05-9611 (S.D.N.Y.), *Esses v. Bennett et al.*, No. 05-9654 (S.D.N.Y.), *City of Pontiac General Employees Retirement System v. Bennett et al.*, No. 05-9941 (S.D.N.Y.), *Gensheimer v. Bennett*, No. 05-10318 (S.D.N.Y) and *Teachers' Retirement System of the State of Illinois et al. v. Lee, et al.*, No. 05-10403 (S.D.N.Y.) are purported class action securities fraud lawsuits that have been consolidated for pre-trial purposes under Case No. 05-8626 (the "Securities Litigation"). The First Amended Consolidated Class Action Complaint ("FAC") was filed in the consolidated proceedings on May 5, 2006, and the Second Amended Consolidated Class Action Complaint was filed on or about December 3, 2007.

64. The FAC and SAC allege that Refco's initial public offering registration statement and prospectus were materially false and misleading. Specifically, they allege that the registration statement and prospectus failed to disclose the existence of the RGHI Receivable. The FAC further alleges that the Refco financial statements incorporated in Refco's registration statement and prospectus were inaccurate because they failed to disclose the related-party transactions between Refco and RGHI designed to hide the RGHI Receivable. Included among the Defendants named in the SAC are Bennett, Sherer, Sexton, Maggio, Murphy, Silverman, Klejna, Trosten, Grant, O'Kelley, Breitman, Gantcher, Lee, Harkins, Jaeckel, and Schoen.

65. Beginning on or about October 14, 2005, some of the lawsuits comprising the Securities Litigation were tendered to Arch for coverage under the Arch Policy. The FAC was tendered to Arch by letter dated April 28, 2006.

66. The suits *David Fine v. Bennett, et al.*, No. 05-8701 (S.D.N.Y), and *Mehta v. Bennett et al.*, No. 05-8748 (S.D.N.Y.), which were shareholder derivative actions (the "Derivative

Litigation"), have been dismissed. Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen, Sexton and Murphy, among others, were named as defendants in the Derivative Litigation.

67. The complaints in the Derivative Litigation alleged that Refco's initial public offering registration statement and prospectus were materially false and misleading. Specifically, the complaints alleged that the registration statement and prospectus failed to disclose the existence of the RGHI Receivable. The complaints further alleged that the Refco financial statements incorporated in its registration statement and prospectus were inaccurate because they failed to disclose the related-party transactions between Refco and RGHI that were designed to hide the RGHI Receivable.

68. The *Mehta* complaint was tendered to Arch for coverage under the Arch Policy on or about October 17, 2005.

69. The suit *Bawag P.S.K. Bank v. Refco Inc. et al.*, No. 05-60006 (S.D.N.Y. Bankr.), Adv. No. 05-03161, was filed on November 16, 2005 (the "Bawag Action"). The Bawag Action names Bennett (among others) as a defendant.

70. The complaint in the Bawag Action alleges that the plaintiff was fraudulently induced to loan approximately $420 million to Bennett on October 10, 2005. The complaint alleges that Bennett failed to disclose that he sought the loan to pay off the RGHI Receivable, a "related-party receivable resulting from the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to Refco [that] likely was impaired and not collectible." Bawag Action Complaint, § 17. The complaint alleges that Bennett "knew that if BAWAG had been aware of any of the key facts set forth in [Refco's] October 10, 2005 Press Release, BAWAG would not have made the Loan." *Id.*, § 30.

71. The Bawag Action was tendered to Arch for coverage under the Arch Policy on or about November 30, 2005.

72. The suit *Thomas H. Lee Equity Fund V, L.P. et al. v. Bennett et al.*, No. 05-9608 (S.D.N.Y.), was filed on November 14, 2005 (the "THL Funds Action"). The THL Funds Action names Bennett, Grant and Maggio, among others, as defendants.

73. The complaint in the THL Funds Action alleges that in June 2004, the plaintiffs invested approximately $507 million in Refco. The complaint alleges that despite the plaintiffs' due diligence efforts, they were unaware that "Bennett intentionally and deliberately engaged in accounting fraud in order to mask a group of largely worthless receivables, bad debts and questionable obligations that, if accurately portrayed on the Company's financial statements, would have materially reduced Refco's value." THL Funds Action Complaint, § 4. Specifically, the complaint alleges that Bennett "nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of million dollars [sic] of customer losses and obligations that would never be repaid to the Company." *Id.*, § 30. The complaint alleges that the Refco financial statements provided to the plaintiffs during their due diligence review in 2003 and 2004 were materially false and misleading.

74. The THL Funds Action was tendered to Arch for coverage under the Arch Policy on or about February 13, 2006.

75. The complaint in *Unovalores Ltd. v. Bennett,* No. L1564-05 (Sup. Ct. of New Jersey, Somerset County, Law Division) (the "Unovalores Action") was filed in New Jersey state court on or about November 1, 2005.

76. The plaintiff in the Unovalores Action, which identifies itself as a Refco Capital account holder, names only Mr. Bennett as a defendant. Plaintiff alleges that it entered into a Repurchase Transaction with Refco on August 31, 2005, in reliance upon representations in Refco's registration statement and other filings concerning Refco's financial health. Those representations were false, according to the complaint, because they concealed massive receivables owed by an entity controlled by Mr. Bennett and at least one-half billion dollars of related party transactions with Mr. Bennett.

77. The Unovalores Action was tendered to Arch for coverage under the Arch Policy on or about February 13, 2006.

78. The complaint in *American Financial International Group v. Refco, Inc. et al.*, No. 05-8988 (S.D.N.Y.) (the "American Financial Action"), was filed in the Southern District of New York on or about October 21, 2005, an amended complaint was filed on April 13, 2006, and a second amended complaint was filed on June 30, 2006.

79. The plaintiff in the American Financial Action identifies itself as a Delaware LLC that traded currencies through an account at Refco F/X Associates, LLC ("RefcoFX"). The suit is a purported class action brought on behalf of all persons who traded currencies through, or had currency trading accounts with, RefcoFX from August 11, 2005 through the date the amended complaint was filed and who have been damaged. Included among the defendants named in the second amended complaint are Bennett, Sherer, Sexton, Maggio, Trosten, Mutterer and Silverman. The second amended complaint generally alleges the same conduct that is the subject of the Criminal Proceedings and the Securities Litigation.

80. The complaint in the American Financial Action was tendered to Arch for coverage under the Arch Policy on or about October 25, 2005, and the amended complaint was tendered to Arch in May 2006.

81. The complaint in *Global Management Worldwide Limited v. Philip R. Bennett, et al.*, No. 06-0643 (S.D.N.Y.) (the "Global Management Litigation"), was filed in the Southern District of New York on or about January 26, 2006, and a Consolidated Amended Class Action Complaint was filed in September 2006.

82. The plaintiff in the Global Management Litigation identifies itself as a corporation organized under the laws of Nassau, the Bahamas, that was a brokerage customer of Refco Capital Markets, Ltd. ("RCM"). The suit is a purported class action brought on behalf of all brokerage customers of RCM who, at any time from October 17, 2000 to October 17, 2005, entrusted securities to RCM and/or Refco Securities, LLC, directly or indirectly, as custodian and broker for safe-keeping, and continued to hold positions with RCM on October 17, 2005 or thereafter. Plaintiffs generally allege that, during the purported class period, Refco, either directly or through its affiliates, incurred billions of dollars in losses, and tried to hide those losses by surreptitiously selling securities held by RCM in custody for class members. Plaintiffs allege that the financial statements filed by Refco with the SEC during the purported class period were false and misleading because they fraudulently omitted these losses, as well as the scheme to hide the losses by selling securities stolen from plaintiffs and by building up and hiding the RGHI Receivable. Plaintiffs further allege that they relied upon these false and misleading financial statements and the purported financial integrity of Refco in entrusting securities to RCM.

83. The Global Management Litigation was tendered to Arch for coverage under the Arch Policy on or about March 14, 2006.

84. On or about October 9, 2007, two separate lawsuits were brought by seven investment entities that maintained accounts at RCM: (1) *VR Global Partners L.P., et al. v. Bennett, et al.,* Case No. 07-8686 (S.D.N.Y.) and (2) *Capital Management Select Fund Ltd., et al., v. Bennett, et al.,* Case No. 07-8688 (S.D.N.Y.). The complaints, which were tendered to Arch in October 2007, also allege that Refco insiders schemed to hide the RGHI Receivable, thereby inducing plaintiffs to maintain accounts at RCM, and converted securities owned by plaintiffs to hide losses incurred by Refco. The defendants in the *VR Global* and *Capital Management* litigations include Bennett, Sexton, Maggio, Murphy, Silverman, Trosten, Grant, Lee, Harkins, Jaeckel, Schoen and Outridge. By order dated November 20, 2007, the Global Management Litigation was consolidated for pre-trial purposes with the *VR Global* and *Capital Management* litigations. The consolidated proceedings will be referred to herein as the "RCM Brokerage Customer Securities Litigation".

85. The complaint in *Kirschner v. Thomas H. Lee Partners, L.P.,* No. 07-Civ-7074 (S.D.N.Y) (the "Trustee/THL Partners Litigation"), was filed in the Southern District of New York on or about August 8, 2007.

86. The plaintiff in the Trustee/THL Partners Litigation identifies himself as the trustee of the Refco Litigation Trust ("Trustee"). The individual defendants named in the complaint are Lee, Harkins, Jaeckel, and Schoen. The Trustee generally alleges that the individual defendants breached fiduciary duties owed to Refco by failing to inform themselves of Refco's true financial state — including efforts to hide the RGHI Receivable — before making business decisions on behalf of Refco.

87. The complaint in the Trustee/THL Partners Litigation was tendered to Arch for coverage under the Arch Policy by letter dated August 16, 2007.

88. The complaint in *Kirschner v. Grant Thornton LLP, et al.,* No. 2007L008818 (Cook County, Ill.) (the "Grant Thornton Litigation"), was filed in Illinois state court on August 21, 2007, and was removed to federal court on or about September 19, 2007 as Case No. 07-cv-05306 (N.D. Ill.).

89. The Grant Thornton Litigation was brought by the Trustee. The individual defendants named in the complaint include Bennett, Maggio, Trosten, and Grant. The Trustee generally alleges that these defendants engaged in a scheme to hide Refco's true financial condition, which included efforts to hide the RGHI Receivable.

90. The complaint in the Grant Thornton Litigation was tendered to Arch for coverage under the Arch Policy by letter dated September 20, 2007.

91. The complaint in *Kirschner v. Agoglia, et al.,* Adv. Pro. No. 07-3060 (Bankr. S.D.N.Y.) (the "Agoglia Litigation"), was filed on or about October 15, 2007.

92. The Agoglia Litigation was brought by the Trustee. The individual defendants named in the complaint are Agoglia, Bennett, Cox, Dittmer, Dhillon, Grady, Grant, Lipoff, Maggio, McCarthy, Murphy, Mutterer, Sexton, and Trosten. The Trustee alleges that Bennett and others "orchestrated a massive financial fraud designed to inflate Refco's financial position artificially until such time as it could be sold", Compl. ¶ 59, a fraud that included the hiding of the RGHI Receivable. The Trustee seeks to recover transfers made to defendants under avoidance provisions of the Bankruptcy Code and to recover the value of the transfers under a theory of unjust enrichment.

93. The complaint in the Agoglia Litigation was tendered to Arch for coverage under the Arch Policy by letters dated November 8 and November 21, 2007.

94. The complaint in *Kirschner v. Thomas Hackl, et al.*, No. 07-9238 (S.D.N.Y.) (the "Hackl Litigation"), was filed on or about October 15, 2007.

95. The Hackl Litigation was brought by the Trustee. The only individual defendant named in the complaint is Hackl. The Trustee alleges that Bennett, Hackl and others engaged in a scheme to hide the true financial condition of Refco, including efforts to hide the RGHI Receivable, and seeks recovery from Hackl under counts alleging, *inter alia,* breach of fiduciary duty, civil conspiracy, aiding and abetting fraud, and unjust enrichment.

96. The complaint in *Kirschner v. Bennett, et al.,* Case No. 602869 (New York County, New York) (the "Trustee/Bennett Litigation"), was filed in the Supreme Court of New York on or about August 27, 2007, and was removed to federal court on or about September 17, 2007 as Case No. 07-cv-08165-GEL (S.D.N.Y.).

97. The plaintiff in the Trustee/Bennett Litigation identifies himself as the trustee of the Refco Private Actions Trust and assignee of all claims related to Refco belonging to, among others, certain former Refco customers who maintained accounts at, and entrusted funds to, RCM. The individual defendants named in the complaint are Bennett, Maggio, Trosten and Grant. The complaint alleges, *inter alia,* that these defendants engaged in a scheme to hide Refco's true financial condition, including engaging in steps to hide the RGHI Receivable. This conduct allegedly induced RCM customers to entrust assets with RCM, which allegedly were later converted for Refco's use.

98. The Trustee/THL Partners Litigation, the Grant Thornton Litigation, the Trustee/Bennett Litigation, the Agoglia Litigation and the Hackl Litigation are collectively referred to herein as the "Trustee Litigation".

99. Upon information and belief, various governmental and/or regulatory investigations of or proceedings involving one or more of the defendants (the "Regulatory Matters") are ongoing, and one or more of the defendants has sought or may seek coverage for such matters.

100.    The proceedings discussed above, including the Criminal Proceedings, the Securities Litigation, the Derivative Litigation, the Bawag Action, the THL Funds Action, the Unovalores Action, the American Financial Action, the RCM Brokerage Customer Securities Litigation, the Trustee Litigation, and the Regulatory Matters, collectively are referenced herein as the "Underlying Matters."

## COUNT I

## DECLARATORY JUDGMENT THAT THE AWAC PRIOR KNOWLEDGE EXCLUSION BARS COVERAGE FOR THE UNDERLYING MATTERS

101.    Arch incorporates by reference each of the allegations of paragraphs 1 through 100 above.

102.    As of August 11, 2005, Maggio possessed knowledge of facts and circumstances that a reasonable person would suppose might afford valid grounds for a claim or that would indicate the probability of any such claim.

103.    The Underlying Matters consist of Claims alleging, arising out of, based upon, in consequence of, or attributable to such facts and circumstances.

104.    Arch seeks a declaration that based upon the AWAC Prior Knowledge Exclusion, the Arch Policy does not provide coverage for any loss arising out of the Underlying Matters.

## COUNT II

## DECLARATORY JUDGMENT THAT THE
## ARCH PRIOR KNOWLEDGE OR INFORMATION EXCLUSION
## BARS COVERAGE FOR THE UNDERLYING MATTERS

105.    Arch incorporates by reference each of the allegations of paragraphs 1 through 104 above.

106.    As of August 11, 2005, Maggio possessed knowledge or information concerning acts, errors, omissions, facts, matters or circumstances that might give rise to a Claim under the Arch Policy.

107.    The Underlying Matters consist of Claims arising out of, based upon, or attributable to such acts, errors, omissions, facts, matters or circumstances.

108.    Arch seeks a declaration that, based upon the Arch Prior Knowledge or Information Exclusion, the Arch Policy does not provide coverage for any loss arising out of the Underlying Matters.

## OTHER COVERAGE DEFENSES

109.    Other Arch Policy terms and conditions may ultimately be implicated.  Nothing in this Complaint should be construed as a waiver by Arch of any other coverage defenses under the Arch Policy or underlying policies with respect to any claim or potential claim and Arch reserves the right to raise all other terms and conditions of the Arch Policy and underlying policies as defenses to coverage as appropriate.

WHEREFORE, Arch requests that the Court enter a declaration and judgment in its favor:

        A.    Declaring that, for the reasons set forth in Count I, the Arch Policy does not provide coverage to any Defendant for any Loss incurred in connection with the Underlying Matters;

B.     Declaring that, for the reasons set forth in Count II, the Arch Policy does not
       provide coverage to any Defendant for any Loss incurred in connection with the
       Underlying Matters;

C.     Awarding Arch such additional declaratory and other relief as shall be found to be
       appropriate under the circumstances; and

D.     Awarding Arch its fees and costs incurred in prosecuting this action.


Dated:  January 4, 2008                    Respectfully submitted,


                                           VEDDER PRICE P.C.


                                           By: _____
                                               John H. Eickemeyer
                                               Daniel C. Green

                                           1633 Broadway
                                           47th Floor
                                           New York, New York 10019

                                           (212) 407-7700


                                           Of Counsel:

                                           Daniel J. Standish
                                           Jonathan M. Jacobs
                                           Cara Tseng Duffield
                                           WILEY REIN LLP
                                           1776 K Street, NW
                                           Washington, DC 20006
                                           202-719-7000


                                           *Attorneys for Plaintiff*
                                           *Arch Insurance Company*

Exhibit A



## Arch
### Insurance Group

## ARCH INSURANCE COMPANY
### (A Missouri Corporation)

Home Office Address:
3100 Broadway, Suite 511
Kansas City, MO 64111

Administrative Address:
One Liberty Plaza, 53rd Floor
New York, NY 10006
Tel: (800) 817-3252

## EXCESS INSURANCE POLICY

**UNLESS OTHERWISE PROVIDED IN THE UNDERLYING POLICY(IES), THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS AND EXPENSES.**

### DECLARATIONS

Terms appearing in **bold** in these Declarations are defined in the Policy.

| | |
|---|---|
| **Policy No.: DOX0009322-00** | |
| Item 1. **Named Entity:** Refco, Inc. **Principal Address:** 550 W. Jackson Blvd. Suite 1300 Chicago, IL 60661 | |
| Item 2. **Policy Period:** | |
| From: August 11, 2005 at 12:01 a.m. (local time at the address stated in Item 1.) | |
| To: August 11, 2006 at 12:01 a.m. (local time at the address stated in Item 1.) | |
| Item 3. Limit of Liability (inclusive of defense costs and expenses): | |
| a. Each **Claim**: | $10,000,000 |
| b. Maximum aggregate Limit of Liability for all **Claims** during the **Policy Period**: | $10,000,000 |
| Item 4. **Followed Policy:** | |
| Issuing Carrier: U.S. Specialty Insurance Company | |
| Form: USSIC 991 (03/2004) | |
| Policy Number: 24-MGU-05-A10821 | |
| Limit of Liability: $10,000,000 | |
| Deductible or Self Insured Retention: $0/$300,000/$500,000 | |

**Item 5.  Underlying and Excess Insurer Policy(ies):**

| | Issuing Company | Policy No. | Limits of Liability | Attachment |
|---|---|---|---|---|
| **A.  Primary Policy:** | | | | |
| | U.S. Specialty Insurance Company | 24-MGU-05-A10821 | $10,000,000 | $0 |
| **B.  Underlying Excess Policy(ies)** | | | | |
| First Excess: | Lexington Insurance Company | 162-0924 | $7,500,000 | $10,000,000 |
| Second Excess: | Axis Reinsurance Company | TBD | $10,000,000 | $17,500,000 |
| Third Excess: | Allied World Assurance Company (U.S.), Inc. | AW0418197 | $12,500,000 | $27,500,000 |
| Fourth Excess: | | | | |
| Fifth Excess: | | | | |
| Sixth Excess: | | | | |
| Seventh Excess: | | | | |
| Eighth Excess: | | | | |
| **C.  Excess Insurer** | | | | |
| | Arch Insurance Co. | DOX0009322-00 | $10,000,000 | $40,000,000 |

| Item 6.  Premium: | $241,693 |
|---|---|
| Premium Attributable to Terrorism Risk Insurance: | $0 |
| (Included In Policy Premium  ☒) | |
| (In Addition To Policy Premium  ☐) | |

**Item 7.** Endorsements Applicable to Coverage at Inception of Policy:  (See attached Schedule of Forms and Endorsements.)

**Item 8.**  Notices to **Excess Insurer:**

Notice Of **Claim(s)** To Be Sent To:
Executive Assurance Claims
Arch Insurance Company
One Liberty Plaza, 53rd Floor
New York, NY 10006
Fax: (646) 746-8111

All Other Notices To Be Sent To:
Executive Assurance Underwriting
Arch Insurance Company
One Liberty Plaza, 53rd Floor
New York, NY 10006
Fax: (212) 651-6499

THESE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION FOR THIS POLICY, THE APPLICATIONS FOR ALL **UNDERLYING INSURANCE**, ALL MATERIALS SUBMITTED THEREWITH AND THE POLICY FORM ATTACHED HERETO, CONSTITUTE THE EXCESS INSURANCE POLICY.

The **Excess Insurer** has caused this Policy to be signed and attested to by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the **Excess Insurer**.

_____
Authorized Representative

3/7/05
Date

_____
Secretary

_____
President

# EXCESS INSURANCE POLICY

In consideration of the payment of the premium set forth in Item 6. of the Declarations of this Policy, and in reliance upon all statements made in the Application for this Policy, in the applications for all **Underlying Insurance** and in any other materials submitted to the Insurer designated in the Declarations of this Policy (hereinafter "the **Excess Insurer**"), which are incorporated into and constitute part of this Policy, and subject to the Limit of Liability set forth in Item 3. of the Declarations of this Policy, the **Excess Insurer** agrees with the **Insureds** as follows:

## SECTION I

INSURING AGREEMENT.

A. The **Excess Insurer** shall provide the **Insureds** coverage for **Claims** in excess of the **Underlying Insurance**.

B. The insurance coverage afforded by this Policy shall apply only after exhaustion of the **Underlying Limit** solely as a result of actual payment, in legal currency, under the **Underlying Insurance** in connection with **Claim(s)** and after the **Insureds** shall have paid the full amount of any applicable deductible or self insured retentions.

C. Except with respect to premium and Limit of Liability and as provided in this Policy, the insurance coverage afforded by this Policy shall apply in conformance with the terms and conditions of the **Followed Policy** and in conformance with any terms and conditions further limiting or restricting coverage in this Policy or in any other **Underlying Insurance**. In no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the **Underlying Insurance**.

## SECTION II

LIMIT OF LIABILITY.

A. The amount stated in Item 3.b. of the Declarations of this Policy shall be the maximum amount payable by the **Excess Insurer** on account of all **Claims** during the **Policy Period**.

B. All payments by the **Excess Insurer** in connection with a **Claim** shall be part of and not in addition to the Limit of Liability set forth in Item 3. of the Declarations of this Policy, and shall reduce such Limit of Liability.

## SECTION III

DEFINITIONS.

All terms defined in this Policy appear in **bold**.

A. **Claim(s)** shall have the same meaning in this Policy as given to it in the **Followed Policy**.

B. **Insured(s)** means any person(s) or entity(ies) that are entitled to coverage under the **Followed Policy** at its inception.

C. **Followed Policy**, **Named Entity**, **Primary Policy**, **Policy Period** and **Underlying Excess Policies**, are as identified in the Declarations of this Policy.

D. **Underlying Insurance** means the **Primary Policy** and any **Underlying Excess Policies** listed in Item 5. of the Declarations of this Policy.

E. **Underlying Limit** means an amount equal to the aggregate of all limits of liability for all **Underlying Insurance**, plus the deductible or self insured retention, if any, applicable under the **Primary Policy**.

SECTION IV

MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE**.

A. As a condition to the coverage of this Policy, the **Insureds** shall maintain all **Underlying Insurance** in full force and effect with solvent insurers during the **Policy Period**, except for reduction or exhaustion of the **Underlying Limit** by payment in connection with **Claims**.

B. In the event of depletion of the **Underlying Limit** by payment in connection with **Claim(s)**, this Policy shall, subject to the Limit of Liability stated in Item 3. of the Declarations of this Policy, continue to apply as excess insurance over the amount of insurance remaining under such **Underlying Insurance**.

C. In the event of exhaustion of all of the **Underlying Limit** by payment in connection with **Claim(s)**, this Policy shall, subject to the Limit of Liability stated in Item 3. of the Declarations of this Policy, continue in force as primary insurance subject to the terms and conditions and the deductible or self insured retention under the **Primary Policy**, which deductible or self insured retention shall be applied to any subsequent **Claim** in the same manner as specified in the **Primary Policy**.

D. This Policy shall drop down only in the event of reduction or exhaustion of all of the **Underlying Limit** by payment in connection with **Claim(s)**, and shall not drop down for any other reason including, but not limited to: (i) any exhaustion of a sublimit of any **Underlying Insurance**; or (ii) uncollectibility, in whole or in part, of any **Underlying Insurance** whether due to financial impairment or insolvency, liquidation, or for any other reason; or (iii) failure of the **Insured** to maintain any **Underlying Insurance**. The risk of any gaps in coverage or uncollectibility for any reason is expressly retained by the **Insured**, and is not assumed or insured by the **Excess Insurer**.

E. As a condition precedent to coverage under this Policy, the **Insureds** shall give to the **Excess Insurer** written notice and the full particulars of: (i) cancellation of any **Underlying Insurance**; (ii) reduction and or exhaustion of the **Underlying Limit**; (iii) additional or return premium in connection with any **Underlying Insurance**; (iv) any changes to the **Underlying Insurance** by rewrite, endorsement or otherwise; and (v) the initiation of any receivership, liquidation, dissolution, rehabilitation or similar proceeding by any regulatory authority or any other person or entity against the issuing company of any **Underlying Insurance**. Such notice shall be sent to the **Excess Insurer** immediately upon receipt of such notice by the **Named Entity** or any **Insured**.

F. In the event of any changes to any **Underlying Insurance** during the Policy Period, this Policy shall become subject to any such changes upon the effective date of the changes in the **Underlying Insurance** only if and to the extent that consent of the **Excess Insurer** is expressly endorsed hereon and provided that the **Insureds** shall pay any additional premium reasonably required by the **Excess Insurer** for such changes.

G. This Policy shall terminate immediately upon the termination of any **Underlying Insurance**, whether by the **Insured** or by the issuer of the **Underlying Insurance**. Notice of cancellation or non-renewal of all or part of the **Underlying Insurance** duly given by any such Insurer shall serve as notice of the cancellation or non-renewal of this Policy by the **Excess Insurer**. Return premium, if any, shall be as provided in Section VIII.C. below.

## SECTION V

DUTIES IN THE EVENT OF A **CLAIM**.

A. With respect to any **Claim(s)** that, alone or combined, might result in payment pursuant to the insurance coverage afforded under this Policy, the **Insured** shall not admit liability and shall not agree to settle any **Claim** without the **Excess Insurer's** consent.

B. The **Insured** shall give notice under this Policy as provided in the **Followed Policy** and at the address shown in Item 8. of the Declarations of this Policy. Notice to the issuer of the **Followed Policy**, the **Primary Policy**, or any other **Underlying Insurer** shall not constitute notice to the **Excess Insurer**.

C. With respect to any **Claim(s)** that, alone or combined, might result in payment pursuant to the insurance coverage afforded under this Policy, no costs, charges or expenses for investigation or defense of any **Claim** shall be incurred, or settlements made, without the **Excess Insurer's** consent, such consent not to be unreasonably withheld.

D. If legal proceedings are begun, the **Insured** shall forward to the **Excess Insurer** a copy of each pleading or document received by the **Insured** or the **Insured's** representatives, together with copies of reports or investigations made by the **Insured** or the **Insured's** representatives with respect to such proceedings.

E. The **Excess Insurer** may, at its sole option, elect to effectively participate in the investigation, settlement or defense of any **Claim** against any **Insured** for matters covered by this Policy even if the **Underlying Limit** has not been exhausted. The **Excess Insurer** may, at its own expense, elect to appeal any judgment which may involve the insurance provided by this Policy.

## SECTION VI

COOPERATION. The **Insured** shall give the **Excess Insurer** such information and cooperation as the **Excess Insurer** may reasonably require.

## SECTION VII

SUBROGATION AND RECOVERIES. In the event of any payment under this Policy, the **Excess Insurer** shall be subrogated to all of the **Insureds'** rights of recovery against any person or organization, and the **Insured** shall execute and deliver all instruments and papers and do whatever else may be necessary to secure such rights.

Any amount recovered after payment under this Policy shall be apportioned in the inverse order of payment to the extent of actual payment. The expenses of all such recovery proceedings shall be apportioned in the same ratio as the recoveries.

## SECTION VIII

CANCELLATION.

A. This Policy may be cancelled by the **Named Entity** at any time by written notice or by surrender of this Policy to the **Excess Insurer** at the address listed in Item 8. of the Declarations of this Policy, stating when thereafter the cancellation shall be effective.

B. Except as provided in Section IV.G. above, this Policy may be cancelled by or on behalf of the **Excess Insurer** by mailing or delivering to the **Named Entity** at the address shown in Item 1. of the Declarations of this Policy written notice stating when such cancellation shall be effective. Notice of cancellation will be provided at least ten (10) days before the effective date of cancellation if the **Excess Insurer** is cancelling this Policy for nonpayment of premium. Notice of cancellation will be

00 DOX0112 00 04 03

provided at least sixty (60) days before the effective date of cancellation if this Policy is cancelled for any other reason. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall become the end of the **Policy Period**. Delivery of such notice shall be equivalent to mailing.

C.  If this Policy is cancelled by the **Named Entity**, the **Excess Insurer** shall retain the customary short-rate portion of the premium. If this Policy is cancelled by the **Excess Insurer**, the **Excess Insurer** shall send the applicable portion of the pro-rata premium refund to the **Named Entity** at the address shown in Item 1. of the Declarations of this Policy. Premium adjustment may be made as soon as practicable after cancellation is effective and payment or tender of any unearned premium by the **Excess Insurer** shall not be a condition precedent to the effectiveness of cancellation.

## SECTION IX

ASSIGNMENT. This Policy and any and all rights hereunder are not assignable without the prior written consent of the **Excess Insurer**.

## SECTION X

**NAMED ENTITY** AUTHORIZATION CLAUSE. By acceptance of this Policy, the **Insureds** and the **Named Entity** agree that the **Named Entity** will act on behalf of all of the **Insureds** as well as the **Named Entity** with respect to the giving and receiving of all notices, the payment of premiums, and the receiving of any return premium that may become due.

## SECTION XI

CAPTIONS. The headings or captions used in this Policy are for the purposes of reference only and shall not otherwise affect the meaning of this Policy.

## SCHEDULE OF FORMS AND ENDORSEMENTS

| INSURED: Refco, Inc. | TERM: 8/11/2005 to 8/11/2006 |
| --- | --- |
| POLICY NUMBER: DOX0009322-00 | |

| ENDT. NO. | FORM NO. | TITLE |
| --- | --- | --- |
|  | 00 DOX0112 00 04 03 | EXCESS INSURANCE POLICY |
| 1 | 00 DOX0047 00 01 03 | PENDING AND PRIOR LITIGATION EXCLUSION (EXCESS) |
| 2 | 00 DOX0051 00 01 03 | PRIOR NOTICE EXCLUSION (EXCESS) |
| 3 | 00 DOX0004 00 04 03 | APPLICATION ENDORSEMENT (EXCESS) |
| 4 | 00 DOX0050 00 01 03 | PRIOR KNOWLEDGE OR INFORMATION EXCLUSION (EXCESS) |
| 5 | 00 DOX0129 14 08 03 | ILLINOIS AMENDATORY ENDORSEMENT |
|  | 00 MLT0027 00 01 05 | TERRORISM COVERAGE DISCLOSURE NOTICE |

00 ML0012 00 09 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**PENDING AND PRIOR LITIGATION EXCLUSION (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

1.  The **Excess Insurer** shall not be liable to make any payment in connection with a **Claim** arising out of, based upon or attributable to:

    a.  any litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured** occurring prior to, or pending as of, August 11, 2005;

    b.  any subsequent litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured** arising from or based on any matter alleged in such prior or pending litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured**; or

    c.  any **Wrongful Act** which gave rise to such prior or pending litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured**, or any other **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** described above, constitute **Interrelated Wrongful Acts**.

2.  "**Wrongful Act**" means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act.

3.  "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:   1

Policy Number:          DOX0009322-00

Named Insured:         Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0047 00 01 03                                                                         Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**PRIOR NOTICE EXCLUSION (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

1.  The **Excess Insurer** shall not be liable to make any payment in connection with a **Claim** alleging, arising out of, based upon or attributable to:

    a.  any **Wrongful Act** or any matter, fact, circumstance, situation, transaction, or event which has been the subject of any notice given under any policy, the term of which incepted prior to the inception date of this Policy; or

    b.  any **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** described in a. above, constitute **Interrelated Wrongful Acts**.

2.  "**Wrongful Act**" means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act.

3.  "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  2

Policy Number:          DOX0009322-00

Named Insured:          Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0051 00 01 03                                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**APPLICATION ENDORSEMENT (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

The term "Application" or "Renewal Application," as used in this Policy or any **Underlying Insurance** shall mean:

1.  Each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this Policy or any **Underlying Insurance** or the underwriting of any other directors and officers and/or corporation (or equivalent) liability policy issued by the **Excess Insurer** or an insurer of any **Underlying Insurance**, or any of their affiliates, of which this Policy or any **Underlying Insurance** is a renewal, replacement or which it succeeds in time;

2.  Any public documents filed by the **Insureds** with the Securities and Exchange Commission ("SEC") or any similar state, local, or foreign regulatory agency, including, but not limited to, the Annual Report(s), 10Ks, 10Qs, 8Ks and proxy statements of an entity that is an **Insured**; and

3.  Any other written public statement or certification required by law to be made by the chief executive officer, chief financial officer or other executive officer of an entity that is an **Insured** regarding the accuracy, completeness or adequacy of such **Insured's** financial statements, SEC filings, or internal controls.

All such applications, attachments, materials, filings and certifications, whether or not furnished to the **Excess Insurer**, are deemed attached to and incorporated into this Policy.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  3

Policy Number:          DOX0009322-00

Named Insured:          Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0004 00 04 03                                                                                      Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**PRIOR KNOWLEDGE OR INFORMATION EXCLUSION (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

If any **Insured** as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a **Claim** under this Policy, the **Excess Insurer** shall not be liable to make any payment under this Policy as a result of a **Claim** arising out of, based upon or attributable to any such act, error, omission, fact, matter or circumstance.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  4

Policy Number:          DOX0009322-00

Named Insured:          Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0050 00 01 03

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ILLINOIS AMENDATORY ENDORSEMENT**

1.  **SECTION IV,** MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE.,** A. is amended by deleting the phrase "with solvent insurers".

2.  **SECTION IV,** MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE.,** E. is amended by the addition of the following:

    The **Insureds'** failure to provide the foregoing notice shall not invalidate this Policy, but in the event the **Insureds** fail to provide such notice the **Excess Insurer** shall be liable under this Policy only to the extent that the **Excess Insurer** would have been liable had the **Insureds** provided adequate notice under this provision.

3.  **SECTION IV,** MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE.,** G. is deleted in its entirety.

4.  **SECTION VIII,** CANCELLATION., B. is deleted and replaced by the following:

    B.  After this Policy has been in effect for sixty (60) days, this Policy may be cancelled by or on behalf of the **Excess Insurer** only for one of the following reasons:

        1)  nonpayment of premium;

        2)  this Policy was obtained through a material misrepresentation;

        3)  any **Insured** violated any of the terms and conditions of this  Policy;

        4)  the risk originally accepted has measurably increased;

        5)  certification to the Director of the Department of Insurance of the loss of reinsurance by the **Excess Insurer** which provided coverage to the **Excess Insurer** for all or a substantial part of the underlying risk insured; or

        6)  a determination by the Director of the Department of Insurance that the continuance of the Policy could place the **Excess Insurer** in violation of the insurance laws of Illinois.

    The **Excess Insurer** shall mail written notice of cancellation to the **Named Entity** and the **Named Entity's** agent or broker of any record at the last address known to the **Excess Insurer** and any mortgagee or lienholder, if known.  Notice of cancellation shall be provided at least ten (10) days before the effective date of cancellation if cancellation is for nonpayment of premium.  If cancellation is for any of the reasons listed in 2) through 6) above, and the Policy has been in effect for sixty (60) days or less, then notice of cancellation shall be provided at least thirty (30) days before the effective date of cancellation.  After the Policy has been in effect for sixty-one (61) days or more, notice of cancellation shall be provided at least sixty (60) days before the effective date of cancellation. The mailing of such notice shall be sufficient and the effective date of cancellation shall become the end of the **Policy Period**.  The **Excess Insurer** shall maintain proof of mailing on a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service.  The notice shall state the reason or reasons for cancellation.

5.  **SECTION VIII** is amended by the addition of the following:

NONRENEWAL.    Should the **Excess Insurer** decide to nonrenew this Policy, then the **Excess Insurer** shall mail written notice of nonrenewal to the **Named Entity** at the principal address shown in Item 1. of the Declarations of this Policy, the agent or broker of record and any mortgagee or lienholder, if known.  The **Excess Insurer** shall mail or deliver such notice at least sixty (60) days before the end of the **Policy Period**.  The notice shall state the reason or reasons for nonrenewal.  The mailing of such notice shall be sufficient and the **Excess Insurer** shall maintain proof of mailing on a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial delivery service.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  5

Policy Number:          DOX0009322-00

Named Insured:         Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0129 14 08 03                                              Page 2 of 2

# TERRORISM COVERAGE DISCLOSURE NOTICE

## TERRORISM COVERAGE PROVIDED UNDER THIS POLICY

The Terrorism Risk Insurance Act of 2002 established a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. The Act provides that, to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States.

In accordance with the Terrorism Risk Insurance Act of 2002, we are required to offer you coverage for losses resulting from an act of terrorism **that is certified under the federal program** as an act of terrorism committed by an individual(s) acting on behalf of a foreign person or foreign interest.  The policy's other provisions will still apply to such an act.  Your decision is needed on this question:  do you choose to pay the premium for terrorism coverage stated in this offer of coverage, or do you reject the offer of coverage and not pay the premium? You may accept or reject this offer.

If your policy provides commercial property coverage, in certain states, statutes or regulations may require coverage for fire following an act of terrorism.  In those states, if "terrorism" results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements that apply to those coverage forms, or to Legal Liability coverage forms or Leasehold Interest coverage forms.

**Your premium <u>will</u> include the additional premium for terrorism as stated in the section of this Notice titled DISCLOSURE OF PREMIUM.**

## DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. **The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.**

## DISCLOSURE OF PREMIUM
Your premium for terrorism coverage is: <u>Included in Policy Premium</u>
(This charge/amount is applied to obtain the final premium.)

**You may choose to reject the offer by signing the statement below and returning it to us.  Your policy will be changed to exclude the described coverage.  If you chose to accept this offer, this form does not have to be returned.**
## REJECTION STATEMENT

> I hereby decline to purchase coverage for certified acts of terrorism.  I understand that an exclusion of certain terrorism losses will be made part of this policy.

| | |
|---|---|
| _____ | Refco, Inc. |
| Policyholder/Legal Representative/Applicant's Signature | Named Insured |
| _____ | _____ |
| | Arch Insurance Company |
| Print Name of Policyholder/Legal Representative /Applicant | Insurance Company |
| Date: _____ | Policy Number: DOX0009322-00 |

Exhibit B

# U.S. SPECIALTY INSURANCE COMPANY
## Houston, Texas

NOTICE: THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION. THE INSURER HAS NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED.

## DECLARATIONS

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

POLICY NUMBER: 24-MGU-05-A10821          RENEWAL OF: N/A

ITEM 1.    **NAMED CORPORATION:**    Refco Inc.
550 W. Jackson Blvd., Suite 1300
Chicago, IL 60661

ITEM 2.    **POLICY PERIOD:**    (a)  Inception Date:  8/11/2005
(b)  Expiration Date: 8/11/2006
at 12:01 a.m. at the Principal Address stated in Item 1.

ITEM 3.    **LIMIT OF LIABILITY** (inclusive of Defense Costs):
$10,000,000 in the aggregate, for INSURING AGREEMENTS A and B combined

ITEM 4.    **RETENTIONS:**
(a)  INSURING AGREEMENT A:      $0 or minimum required under applicable law, if any
(b)  INSURING AGREEMENT B(1):   $300,000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under the circumstances described in CONDITION (A)(5))

(c)  INSURING AGREEMENT B(2):   $500,000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under the circumstances described in CONDITION (A)(5))

ITEM 5.    **PREMIUM:** $395,000.00

ITEM 6.    **NOTICES REQUIRED TO BE GIVEN TO THE INSURER MUST BE ADDRESSED TO:**

HCC GLOBAL FINANCIAL PRODUCTS
P.O. Box 4018
Farmington, CT 06034
Attention:  Claims Manager

ITEM 7.    **DISCOVERY PERIOD:**
(a)  Premium:   150% of the Annual Premium.
(b)  Duration:  365 days

ITEM 8.    **ENDORSEMENTS ATTACHED AT ISSUANCE:**
1117C-IL  991-301  991-302  991-319  991-322  991-412  991-415  991-442  991-444 991-701  991-804 991-830  991-861  991-876  991-1122  80016

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed on the Declarations Page by its President, a Secretary and a duly authorized representative of the Insurer.

Secretary                    President              Authorized Representative

Date: September 23, 2005                                USSIC-990 (04/2002)



# U. S. SPECIALTY INSURANCE COMPANY

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

**This is a claims made policy. Please read it carefully.**

In consideration of the payment of the premium, and in reliance upon the statements made in the **Application**, including attachments, all of which are made a part hereof and deemed attached hereto, and subject to the Declarations and the limitations, conditions, provisions, any endorsements to and all other terms of this Policy, the Insurer and the **Insureds** agree as follows:

INSURING AGREEMENTS

(A)     The Insurer will pay to or on behalf of the **Insured Persons Loss** arising from **Claims** first made during the **Policy Period** or Discovery Period (if applicable), against the **Insured Persons** for **Wrongful Acts**, except when and to the extent that the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement.

(B)     The Insurer will pay to or on behalf of the **Company Loss** arising from:

   (1)     **Claims** first made during the **Policy Period** or the Discovery Period (if applicable) against the **Insured Persons** for **Wrongful Acts**, if the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement, and/or

   (2)     **Securities Claims** first made during the **Policy Period** or the Discovery Period (if applicable) against the **Company** for **Wrongful Acts**.

DEFINITIONS

(A)     **Application** means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are deemed a part of the Policy.

(B)     **Claim** means:

   (1)     any written demand for monetary or non-monetary relief,

   (2)     any civil proceeding commenced by service of a complaint or similar pleading,

   (3)     any arbitration, mediation or other similar dispute resolution proceeding,

   (4)     any criminal proceeding commenced by return of an indictment,

   (5)     the receipt by an **Insured Person** of a target letter or similar document in connection with a criminal investigation of such **Insured Person**, or

   (6)     any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

   including any appeal from any such proceeding.

(C)     **Company** means the Named Corporation and any **Subsidiary** thereof.

(D)     **Defense Costs** means reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation,

U.S. SPECIALTY INSURANCE COMPANY

adjustment, defense or appeal of a **Claim** against an **Insured Person** (or, with respect to **Securities Claims**, against any **Insured**), but excluding salaries, wages, benefits or overhead expenses of directors, officers or employees of the **Company**.

(E)     **Insured** means the **Insured Persons** and the **Company**.

(F)     **Insured Person** means:

    (1)     any past, present or future director or officer of the **Company**, including any person in a position which is the functional equivalent of a director or officer with respect to any entity included within the definition of **Company** or **Outside Entity** located outside the United States, and

    (2)     with respect only to **Securities Claims**, any past, present or future employee of the **Company**.

(G)     **Loss** means **Defense Costs** and any damages, settlements, judgments or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that:

    (1)     an **Insured Person** is legally obligated to pay as a result of any **Claim**, or

    (2)     the **Company** is legally obligated to pay as a result of any **Securities Claim**;

provided, that **Loss** will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed.  For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insureds** in that regard.

(H)     **Named Corporation** means the entity designated as such in Item 1 of the Declarations.

(I)     **No Liability** means all defendant **Insureds** obtain by reason of a motion to dismiss, motion for summary judgment or trial a final non-appealable judgment in their favor.

(J)     **Outside Capacity** means service by an **Insured Person** as a director, officer, trustee, regent or governor of, or in another equivalent executive position with respect to, an **Outside Entity**, during such time that such service is at the request of the **Company**.

(K)     **Outside Entity** means any not-for-profit corporation, association, organization or entity.

(L)     **Policy Period** means the period set forth in Item 2 of the Declarations, subject to prior termination or cancellation pursuant to CONDITION (E).

(M)     **Pollutants** means any seepage, pollution or contamination, including but not limited to any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and materials to be recycled, reconditioned or reclaimed.

(N)     **Securities Claim** means a **Claim** which:

    (1)     is brought by or on behalf of one or more securities holders of the **Company** in their capacity as such, or



U.S. SPECIALTY INSURANCE COMPANY

   (2)   arises from the purchase or sale of, or offer to purchase or sell, any securities issued by
         the **Company**, whether such purchase, sale or offer involves a transaction with the
         **Company** or occurs in the open market.

(O)   **Subsidiary** means any entity:

   (1)   during any time on or before the inception of the **Policy Period** in which the **Named
         Corporation** owns or owned more than 50% of the issued and outstanding securities
         representing the right to vote for the election of such entity's directors (or the legal
         equivalent thereof), either directly or indirectly through one or more other **Subsidiaries**;
         or

   (2)   created or acquired during the **Policy Period** during any time in which, as a result of such
         creation or acquisition, the **Named Corporation** owns more than 50% of the issued and
         outstanding securities representing the right to vote for the election of such entity's
         directors (or the legal equivalent thereof), either directly or indirectly through one or more
         other **Subsidiaries.**

An entity ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50%
of its issued and outstanding securities representing the right to vote for the election of such
entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more
other **Subsidiaries**. The coverage afforded under this Policy with respect to **Claims** against a
**Subsidiary** or any **Insured Person** thereof will apply only in respect of **Wrongful Acts**
committed or allegedly committed after the effective time that such entity becomes a **Subsidiary**
and prior to the time that such entity ceases to be a **Subsidiary**.

(P)   **Wrongful Act** means any:

   (1)   actual or alleged act, error, misstatement, misleading statement, omission or breach of
         duty:

         (a)   by an **Insured Person** in his or her capacity as such, including in an **Outside
               Capacity**, or

         (b)   with respect only to **Securities Claims**, by the **Company**; or

   (2)   matter claimed against an **Insured Person** solely by reason of his or her service in such
         capacity or in an **Outside Capacity**.

EXCLUSIONS

Unless otherwise specifically stated or provided for in CONDITION (D)(2) or elsewhere in this Policy, the
Insurer will not be liable to make any payment of **Loss** in connection with a **Claim**:

(A)   arising out of based upon or attributable to the gaining by any **Insured** of any profit or advantage
      to which such **Insured** was not legally entitled; provided, that this EXCLUSION (A) will apply
      only if there has been a final adjudication adverse to such **Insured** establishing that the **Insured**
      gained such a profit or advantage;

(B)   arising out of, based upon or attributable to the commission by any **Insured** of any criminal or
      deliberately fraudulent or dishonest act; provided, that this EXCLUSION (B) will apply only if
      there has been a final adjudication adverse to such **Insured** establishing that the **Insured** so acted;

(C)   for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or
      death of any person or damage to or destruction of any tangible property, including the loss of use
      thereof, or for injury from any actual or alleged libel, slander, defamation or disparagement or

U.S. SPECIALTY INSURANCE COMPANY 

violation of a person's right of privacy; provided, that this EXCLUSION (C) will not apply to **Securities Claims**;

(D)    for the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants** or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, that this EXCLUSION (D) will not apply to **Securities Claims**;

(E)    for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or any regulations promulgated thereunder or of any similar law or regulation; provided, that this EXCLUSION (E) will apply only to **Claims** involving employee pension or welfare benefit plans organized or sponsored by the **Company** for its own employees, and will not apply to **Securities Claims**;

(F)    brought by or on behalf of, or in the name or right of, the **Company**, whether directly or derivatively, or any **Insured Person**, unless such **Claim** is:

      (1)    brought and maintained independently of, and without the solicitation, assistance or active participation of, the **Company** or any **Insured Person**, or

      (2)    for an actual or alleged wrongful termination of employment, or

      (3)    brought or maintained by an **Insured Person** for contribution or indemnity and directly results from another **Claim** covered under this Policy, or

      (4)    brought and maintained by an employee of the **Company** solely to enforce his or her rights as a holder of securities issued by the **Company**;

    provided, that this EXCLUSION (F) will not apply to **Claims** brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the **Company**;

(G)    by or on behalf of, or in the name or right of, any **Outside Entity**, whether directly or derivatively, against an **Insured Person** for a **Wrongful Act** in his or her **Outside Capacity** with respect to such **Outside Entity**, unless such **Claim** is brought and maintained independently of, and without the solicitation, assistance or active participation of, the **Outside Entity**, the **Company** or any **Insured Person**;

(H)    arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related **Wrongful Acts** alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time; or

(I)    arising out of, based upon or attributable to any pending or prior litigation as of the inception date of this Policy, or alleging or derived from the same or essentially the same facts or circumstances as alleged in such pending or prior litigation.

For purposes of determining the application of the above EXCLUSIONS, no **Wrongful Act** of any **Insured Person** will be imputed to any other **Insured Person** who did not have actual knowledge of, or directly participate in the commission of, such **Wrongful Acts** and, except for **Wrongful Acts** of the **Company's** chairman of the board, chief executive officer, president, chief financial officer or general counsel, no **Wrongful Act** of any **Insured Person** will be imputed to the **Company**.

DISCOVERY PERIOD

If the Insurer or the **Named Corporation** fails or refuses to renew this Policy or if the **Named Corporation** cancels this Policy, any **Insured** will have the right, upon payment of the Discovery Period Premium set

**U.S. SPECIALTY INSURANCE COMPANY**

forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any **Wrongful Act** actually or allegedly taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period. This clause and the right contained within will not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

EXTENSIONS

(A)     Subject to its terms and conditions, this Policy will afford coverage for **Claims** for **Wrongful Acts** of an **Insured Person** if such **Claims** are made against the estates, heirs, legal representatives or assigns of an **Insured Person** who is deceased or against the legal representatives or assigns of an **Insured Person** who is incompetent, insolvent or bankrupt, to the extent that such **Claims** would have been covered by this Policy in the absence of such death, incompetence, insolvency or bankruptcy.

(B)     Subject to its terms and conditions, this Policy will afford coverage for **Claims** for **Wrongful Acts** of an **Insured Person** if such **Claims** are made against the **Insured Person**'s lawful spouse solely by reason of such spouse's legal status as a spouse of the **Insured Person** or such spouse's ownership interest in property which the claimant seeks as recovery for alleged **Wrongful Acts** of the **Insured Person**. For purposes of the Policy, amounts which such spouse becomes legally obligated to pay by reason of such **Claim** will be treated as **Loss** which the **Insured Person** is legally obligated to pay on account of the **Claim** made against the **Insured Person**. This coverage extension does not apply, however, to the extent the **Claim** alleges any wrongful act or omission by the **Insured Person's** spouse.

CONDITIONS

(A)     <u>Limit of Liability and Retention</u>

(1)     The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period**, whether covered under one or more INSURING AGREEMENTS, will not exceed the Limit of Liability set forth in Item 3 of the Declarations.

(2)     **Defense Costs** will be part of and not in addition to the Limit of Liability, and payment of **Defense Costs** will reduce the Limit of Liability. **Defense Costs**, as incurred, will also be applied against the retention.

(3)     The retention stated in Item 4(b) of the Declarations will apply to **Loss**, including **Defense Costs**, which the **Company** is required or permitted to pay as indemnification or advancement to or on behalf of the **Insured Persons**, whether or not such **Loss** is actually paid, unless the **Company** is unable to pay such **Loss** as indemnification or advancement solely by reason of its financial insolvency. For purposes of this CONDITION (A)(3), the certificate of incorporation, charter, articles of association or other organizational documents of the **Named Corporation**, each **Subsidiary** and each **Outside Entity**, including the bylaws and resolutions thereof, will be deemed to have been adopted or amended to provide indemnification and advancement to the **Insured Persons** to the fullest extent permitted by law.

(4)     The Insurer will be liable only for the amount of **Loss** in connection with any **Claim**, which is in excess of the applicable retention stated in Item 4 of the Declarations. Such retention is to be borne by the **Insureds** and remain uninsured. A single retention will

U.S. SPECIALTY INSURANCE COMPANY

apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

(5)  Notwithstanding the foregoing, with respect to **Securities Claims** the retentions stated in Items 4(b) and 4(c) of the Declarations will apply only to **Defense Costs**; provided, that if a **Securities Claim** is finally resolved by a determination of **No Liability**, no retention will apply to such **Securities Claim** even as respects **Defense Costs** and the Insurer will thereupon reimburse **Defense Costs** within the retention which shall already have been paid by the **Insureds**.

(6)  One retention amount will apply to the covered portion of each and every single **Claim**. If a single **Claim** is covered under more than one INSURING AGREEMENT, the retentions stated in Item 4 of the Declarations will be applied separately to the portions of the **Claim** covered by each INSURING AGREEMENT, and the sum of the retentions so applied will constitute the retention for each single **Claim**, which in total will not exceed the largest of the applicable retentions.

(B)  <u>Notice of Claims and Reporting Provisions</u>

(1)  The **Insureds** must, as a condition precedent to the obligations of the Insurer under this Policy, give written notice, including full details, to the Insurer of any **Claim** as soon as practicable after it is made.

(2)  If written notice of a **Claim** has been given to the Insurer pursuant to CONDITION (B)(1) above, then any **Claim** subsequently made against the **Insureds** and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** of which such notice has been given, or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** of which such notice has been given, will be considered to have been made at the time such notice was given.

(3)  If, during the **Policy Period** or the Discovery Period (if applicable), the **Insureds** become aware of any circumstances which may reasonably be expected to give rise to a **Claim** against the **Insureds** and if, before the end of the **Policy Period** or the Discovery Period (if applicable), the **Insureds** give written notice to the Insurer of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, potential claimants and the consequences which have resulted or may result from such **Wrongful Act**, then any **Claim** subsequently made against the **Insureds** and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** described in such notice will be considered to have been made at the time such notice of circumstances was given.

(4)  All notices under this CONDITION (B) must refer to the Policy Number, must be in writing, must request coverage under this Policy, and must be given by certified mail or prepaid express courier to the address set forth in Item 6 of the Declarations.

(C)  <u>Interrelationship of Claims</u>

All **Claims** alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single **Claim** and will be considered to have been made at the time the earliest such **Claim** was made.

(D)  <u>Defense Costs, Settlements, Allocation of Loss, Priority of Payments</u>

U.S. SPECIALTY INSURANCE COMPANY 

(1)     The Insurer will have no duty under this Policy to defend any **Claim**. The **Insureds** must defend any **Claim** made against them. The **Insureds** may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the Insurer's prior written consent. Only those settlements, stipulated judgments and **Defense Costs** to which the Insurer has consented will be recoverable as **Loss** under this Policy. The Insurer's consent may not be unreasonably withheld; provided, that the Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any **Claim**.

(2)     The Insurer will pay covered **Defense Costs** on an as-incurred basis. If it is finally determined that any **Defense Costs** paid by the Insurer are not covered under this Policy, the **Insureds** agree to repay such non-covered **Defense Costs** to the Insurer.

(3)     If **Loss** covered by this Policy and loss not covered by this Policy are both incurred in connection with a single **Claim**, either because the **Claim** includes both covered and uncovered matters, or because the **Claim** is made both against **Insured Persons** (or, with respect only to **Securities Claims**, against **Insureds**) and against others not included within the definition of **Insured Person** (or, with respect only to **Securities Claims**, the definition of **Insured**), the **Insureds** and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts, taking into account the relative legal and financial exposures of the parties to the **Claim** and the relative benefits to be obtained by the resolution of the **Claim**. The Insurer will be obligated to pay only those amounts or portions of **Loss** allocated to covered matters claimed against **Insured Persons** (or, with respect only to **Securities Claims**, against **Insureds**). If the **Insureds** and the Insurer are unable to agree upon an allocation, then until a final allocation is agreed upon or determined pursuant to the provisions of this Policy and applicable law, the Insurer will be obligated to make an interim payment of that amount or portion of **Loss**, including **Defense Costs**, which the parties agree is not in dispute.

(4)     If the Insurer is obligated to pay **Loss**, including **Defense Costs**, under more than one INSURING AGREEMENT, whether in connection with a single **Claim** or multiple **Claims**, the Insurer will first pay any **Loss** payable under INSURING AGREEMENT (A) and, if the Insurer concludes that the amount of all **Loss**, including **Defense Costs**, is likely to exceed the Insurer's Limit of Liability, the Insurer shall be entitled to withhold some or all of any **Loss** payable under INSURING AGREEMENT (B)(1) or (B)(2) to ensure that as much of the Limit of Liability as possible is available for the payment of **Loss** under INSURING AGREEMENT (A). If no **Loss** is payable under INSURING AGREEMENT (A), or if the Insurer's obligations under INSURING AGREEMENT (A) have been satisfied, then, subject to the Insurer's Limit of Liability as set forth in Item 3 of the Declarations, the Insurer will pay such **Loss** as it is required to pay under INSURING AGREEMENT (B)(1) or (B)(2) in such manner and, in the event of multiple **Claims**, apportioned among such **Claims** as the **Named Corporation** shall direct in writing.

(E)     Cancellation or Nonrenewal

(1)     The Insurer may cancel this Policy for non-payment of premium by sending not less than ten (10) days notice to the **Named Corporation** at its last known address. The Insurer may not otherwise cancel this Policy.

(2)     The **Named Corporation** may cancel this Policy by mailing the Insurer written notice stating when such cancellation will be effective; provided, that the **Named Corporation** may not cancel this Policy after the effective date of any acquisition of the **Named Corporation** as described in CONDITION (F) below. If the **Named Corporation** cancels this Policy, the Insurer will retain the customary short rate premium. Premium adjustment may be made either at the time cancellation is effective or as soon as

U.S. SPECIALTY INSURANCE COMPANY

practicable after cancellation becomes effective, but payment of unearned premium is not a condition of cancellation.

(3)    If the Insurer elects not to renew this Policy, the Insurer must give the **Named Corporation** notice of non-renewal no less than sixty (60) days before the end of the **Policy Period**.

(4)    If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period will be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

(F)    <u>Changes in Control</u>

(1)    If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to the **Named Corporation**:

(a)    the **Named Corporation** merges into or consolidates with another entity such that the **Named Corporation** is not the surviving entity, or

(b)    another entity, person or group of entities and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Named Corporation**, or

(c)    a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the **Named Corporation**;

then coverage under this Policy will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such Change in Control, but coverage will cease with respect to **Claims** for **Wrongful Acts** committed or allegedly committed thereafter and the premium will be considered fully earned in consideration of the coverage extended.

(2)    If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to a **Subsidiary**:

(a)    the **Subsidiary** ceases to be a **Subsidiary**, or

(b)    a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the **Subsidiary**;

then coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** thereof will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** thereof will cease with respect to **Claims** for **Wrongful Acts** committed or allegedly committed thereafter.

(G)    <u>Other Insurance and Other Indemnification</u>

(1)    Such insurance as is provided by this Policy will apply only as excess over and will not contribute with any other valid and collectible insurance.



U.S. SPECIALTY INSURANCE COMPANY

    (2)    All coverage for **Loss** from **Claims** against **Insured Persons** for **Wrongful Acts** in their **Outside Capacities** will be specifically excess of, and will not contribute with,

        (a)    any other insurance available to such **Insured Persons** by reason of their service in **Outside Capacities**, and

        (b)    any indemnification available to such **Insured Persons** in connection with their service in **Outside Capacities** from any source other than the **Company**, including but not limited to **Outside Entities**.

(H)    <u>Cooperation and Subrogation</u>

    (1)    In the event of any notice under CONDITION (B) of a **Claim** or of circumstances which may reasonably be expected to give rise to a **Claim**, the **Insureds** will give the Insurer all information, assistance and cooperation that the Insurer may reasonably request with respect thereto.

    (2)    In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery, including without limitation the **Insured Persons'** rights to indemnification or advancement from the **Company**. The **Insureds** must execute all papers required and do everything necessary to secure such rights and to enable the Insurer to bring suit in their name.

(I)    <u>No Action against the Insurer</u>

    No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy and until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against an **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the Insurer. No person or organization will have any right under this Policy to join the Insurer as a party to any action against the **Insureds** to determine the Insurer's liability; nor may the Insurer be impleaded by the **Insureds** or their legal representatives in any such action.

(J)    <u>Notices and Authority</u>

    By acceptance of this Policy, the **Insureds** agree that the **Named Corporation** may act on behalf of all **Insureds** with respect to the giving and receiving of any notices, the payment of premiums and the receiving of any return premium, the cancellation or renewal of this Policy and the acceptance of any amendments thereto.

(K)    <u>Assignment</u>

    No assignment of interest under this Policy will bind the Insurer without the Insurer's written consent.

(L)    <u>Titles and Headings</u>

    The titles and headings to the various paragraphs and sections in this Policy, including endorsements attached, are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such paragraphs and sections to which they relate.

(M)    <u>Representations and Severability</u>

    The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations.

**U.S. SPECIALTY INSURANCE COMPANY**

No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** except for material facts or information known to the person or persons who signed the **Application**. If any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

(N)    <u>Changes</u>

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not effect a waiver or a change in any part of this Policy or stop the Insurer from asserting any right under the terms of this Policy. This Policy cannot be waived or changed, except by written endorsement issued to form a part of this Policy.

(O)    <u>Entire Agreement</u>

By acceptance of this Policy, the **Insureds** and the Insurer agree that this Policy (including the **Application** and any materials submitted therewith) and any written endorsements attached hereto constitute the entire agreement between the parties with respect to this insurance.

(P)    <u>Territory</u>

This Policy applies to **Wrongful Acts** actually or allegedly taking place or **Claims** made anywhere in the world.

(Q)    <u>Conformity to Statute</u>

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, including any endorsement to this Policy which is required by any state Department of Insurance (or equivalent authority) ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein will be construed to restrict the terms of any State Amendatory Endorsement. In addition, to the extent permissible by law, nothing in any State Amendatory Endorsement will be construed to restrict the terms of this Policy.

In witness whereof the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations Page by a duly authorized representative of the Insurer.

Secretary                                    President

.S. SPECIALTY INSURANCE COI._ANY

ENDORSEMENT NUMBER:  1

ILLINOIS AMENDATORY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on 8/11/05, forms part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company:

In consideration of the premium charged:

DEFINITIONS (D) <u>Defense Costs</u> of the policy has been amended to read:

**Defense Costs** means reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation, adjustment, defense or appeal of a **Claim** against an **Insured Person** (or, with respect to **Securities Claims**, against any **Insured**), but excluding salaries, wages, benefits or overhead expenses of directors, officers or employees of the **Company** or the Insurer.

DISCOVERY PERIOD of the policy has been amended to read:

If the Insurer or the **Named Corporation** fails or refuses to renew this Policy or if the **Named Corporation** cancels this Policy, any **Insured** will have the right, upon payment of the Discovery Period Premium set forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any **Wrongful Act** actually or allegedly taking place before the date of such cancellation or non-renewal.  A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy.  Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period.

CONDITIONS (G)(1) <u>Other Insurance and Other Indemnification</u> of the policy has been amended to read:

(1)    Such insurance as is provided by this Policy will share proportionately with similar coverages provided under any other valid and collectible insurance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

ENDORSEMENT NUMBER: 2

**EMPLOYMENT PRACTICES LIABILITY EXTENSION – NONENTITY**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged it is hereby understood and agreed that:

(1)    DEFINITION (P) **Wrongful Act** is amended to include any **Employment Practices Wrongful Act** by an **Insured Person** in his or her capacity as such.

(2)    DEFINITION (F) **Insured Person**, subsection (2) is amended to read:

    (2)    with respect only to **Securities Claims** and **Claims** for **Employment Practices Wrongful Acts**, any past, present or future employee of the **Company**.

(3)    The following DEFINITIONS are added to the Policy:

**Discrimination** means:

    (1)    any failure or refusal to hire, failure or refusal to promote, demotion or discharge of, or wrongful failure to grant tenure to, any person, or

    (2)    any limitation, segregation or classification of any employee or applicant for employment in any way that would deprive or tend to deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee;

because of such person's race, color, age, sex, disability, pregnancy, sexual orientation or preference, national origin, religion, or other status that is protected pursuant to any applicable federal, state or local statute or ordinance.

**Employment Practices Wrongful Act** means any actual or alleged:

    (1)    **Discrimination,**
    (2)    **Retaliation,**
    (3)    **Sexual Harassment,**
    (4)    **Workplace Harassment,**
    (5)    **Workplace Tort,** or
    (6)    **Wrongful Termination.**

**Retaliation** means retaliatory treatment against an employee of the **Company** on account of such employee's exercise or attempted exercise of his or her rights under law.

**Sexual Harassment** means unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature that is made a condition of employment with the **Company**, is used as a basis for employment decisions by the

991-301                           Page 1 of 2
Ed (01/03)

**Company**, creates a work environment with the **Company** that interferes with performance, or creates an intimidating, hostile or offensive working environment.

**Workplace Harassment** means conduct that creates a work environment with the **Company** that interferes with performance, or creates an intimidating, hostile or offensive working environment.

**Workplace Tort** means misrepresentation, defamation (including libel and slander), invasion of privacy, false imprisonment, negligent evaluation, negligent training or supervision, wrongful discipline or wrongful deprivation of career opportunity, if actually or allegedly related to the claimant's employment by the **Company**.

**Wrongful Termination** means actual or constructive termination of the employment of, or demotion of, or failure or refusal to promote, any employee, which is in violation of law, against public policy or in breach of an implied agreement to continue employment.

(4)   EXCLUSION (C) will not apply to Loss for mental anguish, emotional distress, libel, slander, defamation or disparagement or violation of a person's right of privacy caused by an **Employment Practices Wrongful Act**.

(5)   EXCLUSION (F), subsection (2) is amended to read as follows:

(2)   for an actual or alleged **Employment Practices Wrongful Act**;

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement: .

By:_____
                    Attorney-in-fact

ENDORSEMENT NUMBER: 3

## ADD SPECIFIC INDIVIDUALS AS "INSURED PERSONS"

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (F) **"Insured Person"** is amended to include the following individuals:

Insurance Manager and General Counsel

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete Only When This Endorsement Is Not Prepared With The Policy Or Is Not To Be Effective With The Policy.

Effective Date of this endorsement:

By: _____
        Attorney-in-Fact

991-302                                    Page 1 of 1
Ed (05/00)

ENDORSEMENT NUMBER: 4

## AMEND "LOSS" TO INCLUDE PRE-JUDGMENT AND POST-JUDGMENT INTEREST

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (G) **Loss** is amended to read as follows:

(G)   **Loss** means **Defense Costs** and any damages, settlements, judgments, pre-judgment interest, post-judgment interest, or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that:

(1)   an **Insured Person** is legally obligated to pay as a result of any **Claim**, or

(2)   the **Company** is legally obligated to pay as a result of any **Securities Claim**;

provided, that **Loss** will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed. For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insureds** in that regard.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
        Attorney-in-Fact

991-319                         Page 1 of 1
Ed (06/03)

ENDORSEMENT NUMBER: 5

**EMPLOYED LAWYERS EXTENSION**
**(SEPARATE LIMIT AND RETENTION)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)     DEFINITION (F) **Insured Person** is amended to include any **Employed Lawyer**.

(2)     DEFINITION (P) **Wrongful Act** is amended to include any act, error, misstatement,
misleading statement, omission or breach of duty by an **Employed Lawyer**, in his or her
capacity as such, in the rendering or failure to render professional legal services for the
**Company**; provided, that **Wrongful Act** shall not include any act, error, misstatement,
misleading statement, omission or breach of duty by such **Employed Lawyer** in
connection with any activities: (1) that are not related to such **Employed Lawyer's**
employment with the **Company**; (2) that are not rendered on the behalf of the **Company**
at the **Company's** written request; or (3) that are performed by the **Employed Lawyer**
for others for a fee.

(3)     The following DEFINITION is added to the Policy:

**Employed Lawyer** means any past, present or future full-time, salaried employee of the
**Company** who is admitted to practice law and who is employed at the time of any
alleged **Wrongful Act** as a lawyer full-time for and salaried by the **Company**.

(4)     The EXCLUSIONS section of the Policy is amended by the addition of the following:

The **Insurer** will not be liable to make any payment of **Loss** in connection with any
**Claim** made against an **Employed Lawyer**:

(a)     alleging, arising out of, based upon or attributable to any **Wrongful Act**
occurring at a time when such **Employed Lawyer** was not employed as a lawyer
by the **Company**;

(b)     alleging, arising out of, based upon or attributable to any **Claim** made or any
prior or pending litigation as of 8/11/05, or alleging or derived from the same
facts or circumstances as alleged in such pending or prior litigation;

(c)     alleging, arising out of, based upon or attributable to any **Wrongful Act**, if as of
8/11/05, such **Employed Lawyer** knew or could have reasonably foreseen that
such **Wrongful Act** could give rise to a **Claim**;

(d)     alleging, arising out of, based upon or attributable to any activities by such
**Employed Lawyer** as an officer or director of any entity other than the
**Company**.

(5)     For purposes of the applicability of the coverage provided by this endorsement, the
**Company** will be conclusively deemed to have indemnified the **Employed Lawyer** to
the extent that the **Company** is permitted or required to indemnify him or her pursuant to

991-322                                  Page 1 of 1
(Ed. 09/03)

law, common or statutory, or contract, or the charter or by-laws of the **Company** (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The **Company** hereby agrees to indemnify the **Employed Lawyer** to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)   The coverage provided by this endorsement shall apply only to **Claims** made against an **Employed Lawyer**, provided that, and only for so long as, one or more **Insured Persons** (other than such **Employed Lawyer**) are and remain co-defendants in the proceeding along with such **Employed Lawyer**.

(7)   The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)   Solely for purposes of the coverage provided under this endorsement:

    (a)   The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period** will not exceed $100,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

    (b)   A retention of $100,000 shall apply to **Loss** resulting from each **Claim**; provided, such retention shall not apply to **Loss** incurred by any **Employed Lawyer** if indemnification of such **Loss** by the **Company** is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By:   _____
                    Attorney-in-Fact

ENDORSEMENT NUMBER: 6

**ERRORS AND OMISSIONS EXCLUSION
WITH MANAGEMENT CARVEBACK**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to
make any payment of **Loss** in connection with a **Claim** arising out of, based upon or
attributable to any actual or alleged rendering of or failure to render, whether by the
**Company** or by any **Insured Person**, any service for others for a fee; provided, that this
exclusion will not apply to a **Claim** against an **Insured Person** for a **Wrongful Act** in
connection with the management or supervision of the **Company** or any division or
group therein.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is
not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                    Attorney-in-Fact

991-412                          Page 1 of 1
Ed (09/00)

ENDORSEMENT NUMBER: 7

**SPECIFIC LITIGATION EXCLUSION**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of **Loss** in connection with any **Claim** arising out of, based upon or attributable to the following litigation:

Edward McElwreath Case

or alleging or derived from the same or essentially the same facts or circumstances as alleged in such litigation.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

ENDORSEMENT NUMBER: 8

**AMEND POLLUTION EXCLUSION ENDORSEMENT**
**(A-SIDE CARVEBACK)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (D) of this Policy is amended to read in its entirety as follows:

(D)     for the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants** or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, that this EXCLUSION (D) will not apply to **Securities Claims**; provided further, that this EXCLUSION (D) will not apply to **Claims** for **Loss** payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                    Attorney-in-Fact

991-442                        **Page 1 of 1**
Ed (05/04)

ENDORSEMENT NUMBER: 9

**AMEND EXCLUSION (C) ENDORSEMENT –**
**A-SIDE CARVEBACK**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (C) is amended to read in its entirety as follows:

(C)     for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from any actual or alleged libel, slander, defamation or disparagement or violation of a person's right of privacy; provided, that this EXCLUSION (C) will not apply to:

(1)     **Securities Claims, or**

(2)     **Claims** for **Loss** payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
        Attorney-in-Fact

ENDORSEMENT NUMBER: 10

**FULL SEVERABILITY**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, CONDITION (M) <u>Representations and Severability</u> is amended to read as follows:

(M)    <u>Representations and Severability</u>

The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy.  This Policy is issued in reliance upon the truth of such representations.  No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**.  If any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By:  _____
                Attorney-in-Fact

ENDORSEMENT NUMBER: 11

### DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)    **INSURING AGREEMENTS** is amended by the addition of the following:

The Insurer will pay to or on behalf of the **Company** all **Derivative Demand Investigation Costs** incurred by the **Company** as a result of a **Derivative Demand** first received by the **Company's** Board of Directors and reported in writing to the Insurer during the **Policy Period** or the Discovery Period, if purchased, up to the amount of the **Derivative Demand Investigation Costs Sub-Limit.**

(2)    **DEFINITIONS** is amended by the addition of the following:

**Derivative Demand** means a written demand by one or more shareholders of the **Company** made upon its Board of Directors to bring a civil proceeding in a court of law against an **Insured Person** for a **Wrongful Act.**

**Derivative Demand Investigation Costs** means reasonable fees, costs and expenses (including but not limited to attorneys' fees and experts' fees) incurred in connection with the investigation or evaluation of any **Derivative Demand**, but excluding wages, salaries, fees, benefits or overhead expenses of any **Insured Person.**

**Derivative Demand Investigation Costs Sub-Limit** means $250,000.

(3)    The Insurer's maximum aggregate liability for **Derivative Demand Investigation Costs** resulting from all **Derivative Demands** shall be the amount set forth in the definition of **Derivative Demand Investigation Costs Sub-Limit**, regardless of the number of **Derivative Demands** received during the **Policy Period** or the Discovery Period, if purchased. The **Derivative Demand Investigation Costs Sub-Limit** shall be part of and not in addition to the Limit of Liability set forth in Item 3 of the Declarations, and payment of such **Derivative Demand Investigation Costs** shall reduce such Limit of Liability.

(4)    There shall be no retention applicable to **Derivative Demand Investigation Costs.**

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By:_____
                    Attorney-in-Fact

991-804                    Page 1 of 1
Ed (06/00)

ENDORSEMENT NUMBER:  12

**SEPARATE RETENTION FOR SECURITIES CLAIMS
UNDER INSURING AGREEMENT (B)(1)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, solely for purposes of **Loss** payable
under INSURING AGREEMENT (B)(1) arising from any **Securities Claim**, the retention stated
in Item 4(b) of the Declarations is amended to be $500,000.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be
effective with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

ENDORSEMENT NUMBER: 13

**NON-RESCINDABLE:**
**INSURING AGREEMENT (A) ONLY**

To be attached to and made a part of Policy No. 24-MGU-05-A10821 , issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, notwithstanding anything in this Policy to the contrary, the Insurer shall not be entitled under any circumstances to rescind the coverage provided under Insuring Agreement (A) of this Policy.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                    Attorney-in-Fact

991-861
Ed (04/04)                    Page 1 of 1

ENDORSEMENT NUMBER:  14

**SPECIFIC EVENT(S) EXCLUSION**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of Loss in connection with a **Claim** arising out of, based upon or attributable to any event described hereunder.

<u>Excluded Event(s)</u>:
Wells Notice/SEC Investigation

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____

        Attorney-in-Fact

991-876                    Page 1 of 1
Ed. (05/05)

ENDORSEMENT NUMBER: 15

## CONTROLLING SHAREHOLDER COVERAGE --
## SPECIFIC PERSON(S)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that:

(1)     The following INSURING AGREEMENT is added to the Policy:

The Insurer will pay to or on behalf of the **Controlling Shareholder Loss** arising from a **Securities Claim** first made during the **Policy Period** or the Discovery Period (if applicable) against such **Controlling Shareholder** for **Wrongful Acts**, provided, that one or more **Insured Persons** and/or the **Company** are and remain co-defendants in such **Securities Claim** along with such **Controlling Shareholder**.

(2)     The following DEFINITION is added to the Policy:

**Controlling Shareholder** means the following person(s):

Philip Bennett

(3)     DEFINITION (E) **Insured** is amended to read as follows:

(E)     **Insured** means:  (1) the **Insured Persons**; (2) the **Company**; or (3) the **Controlling Shareholder** but only with respect to **Securities Claims**.

(4)     DEFINITION (G) **Loss**, subsection (2), is amended to read as follows:

(2)     the **Company** or **Controlling Shareholder** is legally obligated to pay as a result of any **Securities Claim**;

(5)     DEFINITION (P) **Wrongful Act**, subsection (1)(b), is amended to read as follows:

(b)     with respect only to **Securities Claims**, by the **Company** or by the **Controlling Shareholder** in his or her capacity as such or any matter claimed against such **Controlling Shareholder** by reason of his or her status as such; or

(6)     EXCLUSION (F) is amended to read as follows:

(F)     brought by or on behalf of, or in the name or right of, the **Company**, whether directly or derivatively, or any **Insured Person** or **Controlling Shareholder**, unless such **Claim** is:

(1)     brought and maintained independently of, and without the solicitation, assistance or active participation of, the **Company** or any **Insured Person**, or

(2)     for an actual or alleged wrongful termination of employment, or

(3)     brought or maintained by an **Insured Person** or a **Controlling Shareholder** for contribution or indemnity and directly results from another **Claim** covered under this Policy, or

(4)     brought and maintained by an employee of the **Company** solely to enforce his or her rights as a holder of securities issued by the **Company**;

provided, that this EXCLUSION (F) will not apply to **Claims** brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the **Company**;

(7)    A retention of $300,000 will apply to **Loss** resulting from each **Claim** for which coverage is provided under this endorsement; provided, however, that such retention will apply only to **Defense Costs** and will not apply to any other **Loss**.

(8)    CONDITION (F) <u>Changes in Control</u>, subsection (2), is amended to read as follows:

(2)     If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to a **Subsidiary**:

(a)     the **Subsidiary** ceases to be a **Subsidiary**, or

(b)     a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the **Subsidiary**;

then coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** or **Controlling Shareholder** thereof will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** or **Controlling Shareholder** thereof will cease with respect to **Claims** for **Wrongful Acts** committed or allegedly committed thereafter.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____

              **Attorney-in-Fact**

ENDORSEMENT NUMBER: 16

## POLICYHOLDER DISCLOSURE – TERRORISM PREMIUM NOTICE

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

Your policy contains coverage for certain losses caused by terrorism. We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act of 2002. The Act also requires us to provide disclosure of Federal participation in payment of terrorism losses. For a further description of an act of terrorism as provided under the Act, see below.

You should know that effective November 26, 2002 any losses caused by certified acts of terrorism would be partially reimbursed by the United States government, Department of Treasury, under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is shown below; it does not include any charges for the portion of loss covered by the federal government under the Act.

The portion of your premium that is attributable to coverage for terrorist acts certified under the Act is $0.

The following excerpt from the Act is provided for your information:

According to Section 102(1) of the Terrorism Risk Insurance Act of 2002: "The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States —— (1) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or (III) infrastructure; (iii) to have resulted in damage within the United States, or premises of a United States mission; and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion." Section 102(1)(B) states: "No act shall be certified by the Secretary as an act of terrorism if (i) the act is committed as part of the course of war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000." Section 102(C) and (D) specify that the determination are final and not subject to judicial review and that the Secretary of the Treasury cannot delegate the determination to anyone.

ENDORSEMENT NUMBER: 17

**EMPLOYED LAWYERS EXTENSION
(SEPARATE LIMIT AND RETENTION)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

This endorsement replaces and supersedes Endorsement Number 5 ("Employed Lawyers Extension (Separate Limit and Retention") as of the effective date of this endorsement.

In consideration of the premium charged:

(1)     DEFINITION (F) **Insured Person** is amended to include any **Employed Lawyer**.

(2)     DEFINITION (P) **Wrongful Act** is amended to include any act, error, misstatement, misleading statement, omission or breach of duty by an **Employed Lawyer**, in his or her capacity as such, in the rendering or failure to render professional legal services for the **Company**; provided, that **Wrongful Act** shall not include any act, error, misstatement, misleading statement, omission or breach of duty by such **Employed Lawyer** in connection with any activities: (1) that are not related to such **Employed Lawyer's** employment with the **Company**; (2) that are not rendered on the behalf of the **Company** at the **Company's** written request; or (3) that are performed by the **Employed Lawyer** for others for a fee.

(3)     The following DEFINITION is added to the Policy:

**Employed Lawyer** means any past, present or future full-time, salaried employee of the **Company** who is admitted to practice law and who is employed at the time of any alleged **Wrongful Act** as a lawyer full-time for and salaried by the **Company**.

(4)     The EXCLUSIONS section of the Policy is amended by the addition of the following:

The **Insurer** will not be liable to make any payment of **Loss** in connection with any **Claim** made against an **Employed Lawyer**:

(a)     alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring at a time when such **Employed Lawyer** was not employed as a lawyer by the **Company**;

(b)     alleging, arising out of, based upon or attributable to any **Claim** made or any prior or pending litigation as of 8/11/05, or alleging or derived from the same facts or circumstances as alleged in such pending or prior litigation;

(c)     alleging, arising out of, based upon or attributable to any **Wrongful Act**, if as of 8/11/05, such **Employed Lawyer** knew or could have reasonably foreseen that such **Wrongful Act** could give rise to a **Claim**;

(d)    alleging, arising out of, based upon or attributable to any activities by such **Employed Lawyer** as an officer or director of any entity other than the **Company**.

(5)    For purposes of the applicability of the coverage provided by this endorsement, the **Company** will be conclusively deemed to have indemnified the **Employed Lawyer** to the extent that the **Company** is permitted or required to indemnify him or her pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Company** (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The **Company** hereby agrees to indemnify the **Employed Lawyer** to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)    The coverage provided by this endorsement shall apply only to **Claims** made against an **Employed Lawyer**, provided that, and only for so long as, one or more **Insured Persons** (other than such **Employed Lawyer**) are and remain co-defendants in the proceeding along with such **Employed Lawyer**.

(7)    The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)    Solely for purposes of the coverage provided under this endorsement:

(a)    The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period** will not exceed $1,000,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

(b)    A retention of $100,000 shall apply to **Loss** resulting from each **Claim**; provided, such retention shall not apply to **Loss** incurred by any **Employed Lawyer** if indemnification of such **Loss** by the **Company** is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:    8/11/2005

By: _____
                Attorney-in-Fact

991-322                                    Page 1 of 1
(Ed. 09/03)

Exhibit C

# LEXINGTON INSURANCE COMPANY

**Administrative Offices: 100 Summer Street, Boston, Massachusetts 02110-2103**
(hereinafter called the Company)

**DIRECTORS AND OFFICERS LIABILITY AND CORPORATION REIMBURSEMENT**
**Declarations**
**FOLLOW FORM EXCESS LIABILITY POLICY**

### THIS IS A CLAIMS-MADE POLICY. PLEASE READ CAREFULLY.

NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGEMENTS OR SETTLEMENTS SHALL BE RE-
DUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. FURTHER NOTE THAT AMOUNTS INCURRED
FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE DEDUCTIBLE OR RETENTION AMOUNT.

Policy Number: 1620924                                         Renewal of:  NEW

Named Insured:  REFCO LLC

Address:        550 W JACKSON BLVD
                SUITE 1300
                CHICAGO            IL 60661

State of Incorporation of the Company Named Above:  ILLINOIS

## SECTION I-EXCESS INSURANCE

(a)     Policy Period:
        From:  08/11/05     To:  08/11/06
        (12:01 A.M. Standard Time at the Address of the Insured)
(b)     Coverage:     Follow Form Excess Liability
(c)     Limits of Liability:     $7,500,000 each policy year
(d)     Premium:     Annual Minimum Premium          Minimum Earned Premium
                                                      At Inception
                     $251,813                         $88,135
(e)     Retroactive Date:  06/04/04
(f)     Endorsements: SEE ATTACHED FORMS SCHEDULE

## SECTION II-UNDERLYING INSURANCE

(a)            Endorsements made part of this Policy:




               Policy Jacket:
(b)            Underlying Company:
               Coverage:
               Policy Number:
               Policy Limit:                    each policy year
               Policy Period:      from:              to:
               Retroactive Date:

Total Limits of all underlying insurance including the underlying policies in excess of which this policy applies,
whether  recoverable  or  not     $10,000,000     each  policy  year,  subject  to  retentions  of
               per loss Corporation Reimbursement,                    per Director or Officer, sub-
ject to a maximum of                    per loss.


                                        _____
                                        **Authorized Representative OR**
                                        **Countersignature (In states where applicable)**

LEX-DO-CM-FF(Ed.2/91)
LX2004

# LEXINGTON INSURANCE COMPANY

**Administrative Offices: 100 Summer Street, Boston, Massachusetts 02110-2103**
(hereinafter called the Company)

### Following Form - Excess Liability Policy

## I.    Insuring Agreements

Lexington Insurance Company (hereinafter called the "Company") in consideration of the payment of premium and in reliance upon the statements in the Declarations made a part thereof, hereby agrees to indemnify the Insured named in the Declarations (hereinafter called the "Insured") in accordance with the applicable insuring agreements, terms, conditions and exclusions of the Underlying Policy (and renewals thereof on the same basis) specified in Section II(a) of the Declarations (hereinafter called the "Underlying Policy") to the extent not inconsistent with the exclusions, conditions and other terms of this policy or endorsement(s) attached hereto, which shall prevail in the event and to the extent of any such inconsistency, against "loss" which is excess of the total limit(s) of all Underlying Insurance specified in Section II(b) of the Declarations subject to the limit of liability stated in Section I(c) of the Declarations.

The provision of the Underlying Policy.

> except as regards the premium, the obligation to investigate and defend (and for costs and expenses incident to the same), the amount and limits of liability, the renewal agreement, if any, additional coverage provided by a discovery period provision, and any other provision therein inconsistent with this policy.

are hereby incorporated as part of this policy.

Liability of the Company under this policy shall not attach unless and until the Insured or the Insured's Underlying Insurance has paid or has been held liable to pay the total applicable underlying limits.

## II.    EXCLUSIONS - This policy does not apply:

A) 1)  to bodily injury, personal injury or property damage which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

2)  to any loss, costs or expense of any nature, arising out of any:

a)  request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

b)  claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way respond to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

B) Nuclear Energy Liability Exclusions:

1)  Under any Liability Coverage, to injury, sickness disease, death or destruction:

a)  with respect to which an Insured under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

b)  resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or

- 1 -

LEX-DO-CM-FFT(Ed.2/91)



any law amendatory thereof, or (2) the Insured is, or had this policy not been issued would be, entitled to indemnify from the United States of America, or agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2) Under any Medical Payments Coverage, or under any Supplementary Payments provisions relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of a nuclear facility by any person or organization.

3) Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

   a) the nuclear material (1) is at any nuclear facility owned by or operated by or on behalf of an Insured, or (2) has been discharged or dispersed therefrom;

   b) The nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of any Insured; or

   c) The injury, sickness, disease, death or destruction arises out of the furnishing by an Insured of services, materials, parts of equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possession or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

As used in this exclusion:

"hazardous properties" include radioactive, toxic or explosive properties;
"nuclear materials" means source material, special nuclear material or by-product material;
"source material", "special nuclear material" and "by-product material" have the meaning given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;
"spent fuel" means any fuel element or fuel component, solid or liquid which has been used or exposed to radiation in a nuclear reactor;
"waste" means any waste material containing by-product material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, and (b) resulting from the operation by any person or organization of any nuclear facility included under the first two paragraphs of the definition of nuclear facility;

"nuclear facility" means:

a) any nuclear reactor,

b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

c) any equipment or device used for the processing, fabrication or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material:

with respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

C) to any liability of the Insured due to war, invasion, acts of foreign enemies, hostilities, (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization

- 2 -



or requisition or destruction or damage to property by or under the order of any government or public or local authority.

D) 1) to any liability for property damage, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish mental injury at any time arising out of the manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust, or

2) to any obligation of the Insured to indemnify any party because of damages arising out of such property damage, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish or mental injury at any time as a result of the manufacture of, mining of, use of, sales of, installation of, re-moval of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

3) to any obligation to defend any suit or claim against the Insured alleging bodily injury or property damage and seeking damages, if such suit or claim arises from bodily injury or property damage resulting from or contributed to, by any and all manufacture of, mining of, use of, sales of, installation of, removal of, dis-tribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

## III.  LIMITS OF LIABILITY

Regardless of the number of Insureds under this policy, persons or organization who sustain injury or damage, or claims made or suits brought on account of injury or damage covered hereby, the Company's limit of liability for "loss" excess of the Underlying Insurance shall be limited to the amount stated in Section I (c) of the Decla-rations as applicable to "each occurrence" or "each claim"; provided, however, that the Company's liability shall be further limited to the amount stated in Section I (c) of the Declarations stated as "aggregate" with respect to "loss" excess of the Underlying Insurance which occurs during each annual period while this policy is in force.

## IV.  INSURED'S DUTIES

The Insured named in the Declarations hereby agrees to promptly furnish the Company with a copy of the Underlying Policy and all endorsements thereto which in any way effect this excess insurance. Written notice of any "loss" likely to give rise to a claim hereunder shall be given to the Company by or on behalf of the Insured named in the Declarations, containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstance of the "loss".

## V.  SETTLEMENT AND DEFENSE

Anything in the Underlying Insurance to the contrary notwithstanding, the Company shall not be obligated to as-sume charge of the settlement or defense of any claim or suit brought or proceeding instituted against the In-sured, but the Company, at its option but not being requried to, shall have the right and be given the opportunity to associate with the Insured in the defense or control of any claim, suit or proceeding which appears reasonably likely to involve the Company, in which event the Insured and the Company shall cooperate in all things in the defense or control of such claim, suit or proceeding.  In the event costs are incurred by the Company with respect to such claim, suit or proceeding, the Company shall pay it incurred costs and such expenses incurred by the Insured with the approval of the Company.

## VI.  MAINTENANCE OF UNDERLYING INSURANCE

The underlying insurance referred to in paragraph (b) of Section II of the Declarations page and renewal or re-placement thereof on terms and conditions not more restrictive, shall be maintained by the Named Insured in full effect during the currency of this policy without such alteration of terms or conditions except for any reduction of the aggregate limit of limits contained therein solely by payment of claims. Failure of the Named Insured to comply with the foregoing shall not invalidate the policy, but in the event of such failure, the Company shall only be liable to the same extent as it would have been had the Named Insured so maintained such underlying in-surance.

Further, the receivership, the insolvency and/or inability to pay by an underlying insurer for any reason shall not be deemed to render the funds which would have been otherwise available from an underlying insurer to be un-available, unrecoverable, reduced or exhausted for the purposes of determining the Company's liability under this policy, it being understood that the liability of the Company under this policy shall in no way be increased or ex-panded as a result of such receivership, insolvency or inability to pay underlying insurer.

- 3 -



## VII. AGGREGATE POLICY PERIOD

If the period of the Underlying Insurance is not concurrent with the policy period of this policy, it is agreed that for the purpose of determining the Company's liability for "loss" excess of the aggregate limits of the Underlying Insurance, only "loss" or "losses" which take place during the policy period of this policy shall be included.

## VIII. SUBROGATION

In the event of any payment under this policy, the Company may participate with the Insured in the exercise of all the Insured's rights of recovery against any person or organization liable therefor.

## IX. PREMIUM

It is agreed that should any alteration be made in the premium for the Underlying Policy during the period of this policy, or if there is an increase in the risk assumed by the Company, then the premium hereon may be adjusted accordingly.

If this policy is subject to audit adjustment, the premium will be based upon the rating base as set forth in the Declarations. Upon notice to the Named Insured of the earned premium due, such premium in excess of the advance premium shall become due and payable. If the total earned premium is less than the premium previously paid, the Company shall return to the Insured the unearned portion paid by the Insured, subject however to any minimum premium stated in the Declarations.

## X. CANCELLATION

It is understood and agreed that the terms of Condition X, Cancellation, of this policy are deleted in their entirety and are replace by the following:

This policy may be cancelled by the Named Insured by surrender thereof to the Company or by mailing to the Company written notice stating when thereafter such cancellation shall be effective. The policy may be cancelled by the Company by mailing to the Named Insured at the address shown in this policy written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective; provided, however, if such cancellation is for non-payment of premium, the Company is required to give only at least ten (10) days notice. Proof of the mailing of the notice shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Named Insured or by the Company shall be equivalent to mailing. If the named Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure for the period this policy is in effect, applied to the premium developed in accordance with the Premium Condition of this policy, subject to the short rate amount of the Minimum Annual Premium stated in this policy but in no event shall the earned premium be less than the Minimum Earned Premium stated in this policy. If the Company cancels, earned premium shall be computed pro rata of the premium developed in accordance with the Premium Condition of this policy subject to the pro rata amount of the Minimum Annual Premium stated in this policy; provided, however, if the Company cancels for non-payment of premium, the premium shall be computed on the same basis as if the Named Insured cancels.

Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter. The check of the Company mailed or delivered, shall be sufficient tender of any refund due the Named Insured.

If this policy insures more than one Named Insured, cancellation may be effected by the one first named for the account of all Insureds. Notice of cancellation by the Company to such first Named Insured shall be notice to all Insureds. Payment of any unearned premium to such first Named Insured shall be for the account of all Insureds.

## XI. SERVICE OF SUIT

In the event of failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United states. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Counsel, Legal Department, Lexington Insurance Company, 100 Summer Street, Boston, MA 02110-2103,

LEX-DO-CM-FFT(Ed.2/91)
LX2057

or his or her representative, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his successoror successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this policy of insurance, and hereby designates the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## XII. DEFINITIONS

The word "Loss" shall be understood to mean the sums paid or payable in settlement of claims for which the Insured is liable after making deductions for all other recoveries, salvages or other insurance (other than recoveries under underlying insurance, whether recoverable or not) and shall exclude all expenses and costs.

The work "Costs" shall be understood to mean interest on judgements, investigations, adjustments and legal expenses (excluding all expenses for salaried employees of the Insured or any of the Underlying Insurer's permanent employees).

The term "Underlying Policy" shall be understood to mean the policy indicated in Section II(a) of the Declarations.

The term "Underlying Insurance" shall be understood to mean the total limits of all insurance including the Underlying Policy and/or any self-insured retentions excess of which this policy is written, whether recoverable or not recoverable.

The term "Insured" shall be understood to mean the Insured named in the Declarations. any Insured under the Underlying Policy, and any additional Insured added to the policy by endorsement attached hereto.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned in the Declarations by one of its duly authorized representatives.

*Elizabeth M. Tuck*
**Secretary**

*L. H. Mulley*
**Chairman of the Board and CEO**

- 5 -

LEX-DO-CM-FFT(Ed.2/91)

ENDORSEMENT # 1

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:  1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

### DISCOVERY CLAUSE-AMENDED

In consideration of the premium charged, it is understood and agreed that Section 10, Discovery Clause, is deleted in its entirety and replaced with the following:

If the Insurer or the Named Corporation shall cancel or refuse to renew this policy, the Named Corporation shall have the right, upon payment of an additional premium of 150%    of the one year premium, to a period of  365  days following the effective date of such cancellation or non-renewable (herein  referred to as the Discovery Period) in which to give written notice to the Insurer of claim(s) first made against the Insured(s) during said Discovery Period for any Wrongful Act  committed before the effective date of such cancellation or non-renewal and otherwise covered by this policy.

The rights contained in this clause shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within ten (10) days of the effective date of cancellation or non-renewal. The additional premium for the Discovery Period shall be _fully earned_ at the inception of the Discovery Period. The Discovery Period is not cancelable. If the policy is cancelled due to nonpayment of premium, the Insured(s) and/or the Company shall not have the option to purchase the Discovery Period described above.

The offer by the Insurer of renewal terms, conditions, the Limit of Liability and/or premiums different from those of the expiring policy shall not constitute non-renewal.

All other terms and conditions of the policy remain unchanged.

_____
**Authorized Representative OR**
**Countersignature (in states where applicable)**

LX0940 (05/96)

ENDORSEMENT # 2

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.: 1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

### MINIMUM EARNED PREMIUM ENDORSEMENT

In the event that this policy is terminated or cancelled prior to the expiration of the policy period for any reason other than cancellation by the Insurer, it is agreed that the premium charged shall be $ 88,135 earned upon the inception of the policy or computed in accordance with the customary short-rate table and procedure, whichever is greater.

All other terms and conditions of the policy remain unchanged.

_____
**Authorized Representative OR
Countersignature (In states where applicable)**

LX0958 (05/96)

POLICY NUMBER:   1620924    ENDORSEMENT # 3                    CU 21 23 02 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## NUCLEAR ENERGY LIABILITY EXCLUSION
## ENDORSEMENT
### (Broad Form)

I. The insurance does not apply:

A. Under any Liability Coverage, to "bodily injury" or "property damage":

(1) With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

(1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or (b) has been discharged or dispersed therefrom;

(2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

(3) The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

II. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radio active contamination of property.

Includes copyrighted information of the Insurance Services

CU 21 23 02 02

ENDORSEMENT # 4

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:  1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

## TERRORISM PREMIUM CHARGE ENDORSEMENT

The "Terrorism" charge is $4,938        and is included in the Policy Premium shown on the Declarations Page of this policy.

DEFINITION - The following definition of terrorism shall apply:

"Terrorism" means the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

    (1) A government;
    (2) The civilian population of a country, state or community; or
    (3) To disrupt the economy of a country, state or community.

So long as the Terrorism Risk Insurance Act of 2002 (the "Act") is in effect, "Terrorism" includes a certified act of terrorism defined by Section 102. Definitions, of the Act and any revisions or amendments thereto.

All other terms and conditions of the policy are the same.

 

**Authorized Representative OR**
**Countersignature (in states where applicable)**

ENDORSEMENT # 5

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.: 1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

PENDING AND PRIOR LITIGATION EXCLUSION FOR HIGHER LIMITS

In consideration of the premium charged, it is hereby understood and agreed that with respect to the Limit of Liability $7,500,000     excess of $10,000,000    , exclusion 4(h) is amended to indicate that the Insurer shall not be liable to make any payment for Loss in connection with any claim or claims made against the Directors or Officers alleging, arising out of, based upon or attributable to any pending or prior litigation as of JUNE 4, 2004          or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation.

All other terms and conditions of the policy remain unchanged.

_____
**Authorized Representative OR**
**Countersignature (in states where applicable)**

FSE073(Ed.2/91)

Exhibit D



## SECUREXCESS DECLARATIONS

**SUBJECT TO THE PROVISIONS OF THE UNDERLYING INSURANCE, THIS POLICY MAY ONLY APPLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

| **COMPANY**: Axis Reinsurance Company | **POLICY NUMBER**: RNN 506300 |
|---|---|

| Item 1. **Policyholder**: <br> Refco, Inc. <br> 550 West Jackson Boulevard <br> Suite 1300 <br> Chicago, IL 60661 | Item 2. **Policy Period**: <br> a. Inception Date: August 11, 2005 <br> b. Expiration Date: August 11, 2006 <br><br> Both dates at 12:01 a.m. at the address listed in Item 1 |
|---|---|

Item 3. Limits of Liability (inclusive of defense costs):
  a. Each **Claim** $ 10,000,000
  b. Maximum aggregate Limit of Liability for all **Claim**(s)
     During the **Policy Period** of all **Insurance Products** $ 10,000,000

Item 4. **Underlying Insurance** and **Insurance Products**:   See Endorsement No. 1

Item 5. Endorsements Attached at Inception: SE 1000, SE 1300, SE 0522, SE 1010, MU 1032, Manuscript #6

Item 6. Notices to **Insurer**:

| Notice of **Claim(s)** To Be Sent To: <br> Axis Financial Insurance Solutions Claims <br> Address:  Connell Corporate Park <br>         Three Connell Drive <br>         P.O. Box 357 <br>         Berkeley Heights, NJ 07922-0357 | All Other Notices To Be Sent To: <br> Axis Financial Insurance Solutions <br> Address:  Connell Corporate Park <br>         Three Connell Drive <br>         P.O. Box 357 <br>         Berkeley Heights, NJ 07922-0357 |
|---|---|

| Item 7. Pending and Prior Claim Date: 06/04/04 | Item 8 Terrorism Coverage Premium: <br> $10,000 |
|---|---|

The Insurer has caused this Policy to be signed and attested by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the Insurer.

_Sean Lukac_
Authorized Representative

_9/1/05_
Date

_Kevin J. McLean_

Secretary

_Michael E. Morrill_

President

SE 0100 (Ed. 02 03)          Page 1 of 1          **Printed in U.S.A.**

# SECUREXCESS POLICY

In consideration of the payment of the premium, and in reliance on all statements made in the application(s) for this Policy and the **Underlying Insurance** and all information provided to the **Insurer** and any or all of the **Underlying Insurers**, and subject to the provisions of this Policy, the **Insurer** and the **Policyholder**, on its own behalf and on behalf of all **Insureds**, agree as follows.

## I.    INSURING AGREEMENT

With respect to each **Insurance Product**, the **Insurer** shall provide the **Insureds** with insurance during the **Policy Period** excess of all applicable **Underlying Insurance**. Except as specifically set forth in the provisions of this Policy, the insurance afforded hereunder shall apply in conformance with the provisions of the applicable **Primary Policy** and, to the extent coverage is further limited or restricted thereby, to any other applicable **Underlying Insurance**. In no event shall this Policy grant broader coverage than would be provided by the most restrictive policy constituting part of the applicable **Underlying Insurance**.

The insurance afforded under this Policy shall apply only after all applicable **Underlying Insurance** with respect to an **Insurance Product** has been exhausted by actual payment under such **Underlying Insurance**, and shall only pay excess of any retention or deductible amounts provided in the **Primary Policy** and other exhausted **Underlying Insurance**.

## II.    DEFINITIONS

A.  **Claim(s)** means the event(s) which take place during the **Policy Period** and which trigger(s) coverage under the insuring agreement(s) of the **Underlying Insurance**.

B.  **Insurance Product** means each separate type of insurance identified as an **"Insurance Product"** in Endorsement No. 1 to this Policy.

C.  **Insured(s)** means any person(s) or entity(ies) that may be entitled to coverage under the **Primary Policy** at its inception.

D.  **Insurer** means the company identified as **"Insurer"** in the Declarations.

E.  **Policy Period** means the period from the inception date to the expiration date of this Policy stated in Item 2. in the Declarations, or its earlier cancellation or termination date, if any.

F.  **Policyholder** means the person(s) or entity(ies) identified in Item 1. in the Declarations.

G.  **Primary Policy** means the specific policy identified as the **"Primary Policy"** under the applicable **Insurance Product** listed in Endorsement No. 1 to this Policy.

H.  **Sublimit** means any **Underlying Limits** which:

1.    applies only to a particular grant of coverage under such **Underlying Insurance**; and
2.    reduces and is part of the otherwise applicable limits of liability of such **Underlying Insurance** set forth in Item 4 of the Declarations.

I.  **Underlying Insurance** means each insurance policy which constitutes all or part of an **Insurance Product**, as scheduled in Endorsement No. 1 to this Policy.

J.  **Underlying Insurers** means any or all of the companies who issued the policies of **Underlying Insurance**.

K.  **Underlying Limits** means, with respect to each **Insurance Product**, an amount equal to the aggregate of all limits of liability for each **Insurance Product** stated in Endorsement No. 1 to this Policy, plus the

uninsured retention or deductible, if any, applicable to the **Primary Policy** under such **Insurance Product**.

## III.  CONDITIONS OF COVERAGE

A.   For purposes of determining when insurance under this Policy shall attach and the limitations under which such insurance shall apply:

1.   All of the **Underlying Insurance** in effect as of the inception date of the **Policy Period** shall be maintained in full effect with solvent insurers throughout the **Policy Period** except for any reduction or exhaustion of the **Underlying Limits** as provided in Section IV. below; and

2.   All **Insureds** shall comply fully with all of the provisions of this Policy.

B.   As a condition precedent to coverage under this Policy, the **Insured** shall give to the **Insurer** as soon as practicable, but in no event later than thirty (30) days thereafter, written notice and the full particulars of i) the exhaustion of the aggregate limit of liability of any **Underlying Insurance**, ii) any **Underlying Insurance** not being maintained in full effect during the **Policy Period**, or iii) an **Underlying Insurer** becoming subject to a receivership, liquidation, dissolution, rehabilitation or similar proceeding or being taken over by any regulatory authority.

C.   If during the **Policy Period** the provisions of the **Primary Policy** are changed in any manner, as a condition precedent to coverage under this Policy, the **Insured** shall give written notice to the **Insurer** of the full particulars of such change as soon as practicable but in no event later than thirty (30) days following the effective date of such change.  No amendment to any **Primary Policy** or **Underlying Insurance** during the **Policy Period** shall be effective in broadening or extending the coverage afforded by this Policy or extending or increasing the limits of liability afforded by this Policy unless the Insurer so agrees in writing.  The Insurer may, in its sole discretion, condition its agreement to follow any changes to the **Primary Policy** or the **Underlying Insurance** on the **Insured** paying any additional premium required by the **Insurer** for such change.

As soon as practicable, but in no event later than thirty (30) days thereafter, the **Policyholder** must give the **Insurer** written notice of any additional or return premiums charged or allowed in connection with any **Underlying Insurance**.

## IV.  REDUCTION OR EXHAUSTION OF UNDERLYING LIMITS

A.   If the **Underlying Limits** are partially reduced solely due to actual payment under the **Underlying Insurance**, this Policy shall continue to apply as excess insurance over the remaining **Underlying Limits**.

B.   If the **Underlying Limits** are wholly exhausted solely due to actual payment under the **Underlying Insurance**, this Policy shall continue to apply as primary insurance with respect to the applicable **Insurance Product(s)** and the retention or deductible, if any, applicable under the **Primary Policy(ies)** shall apply under this Policy.

C    If any **Underlying Limits** are subject to a **Sublimit** then coverage hereunder shall not apply to any **Claim** which is subject to such **Sublimit**, provided however, that the **Underlying Limit** shall be recognized hereunder as depleted to the extent of any payment of such **Claim** subject to such **Sublimit**.

## V.  LIMITS OF LIABILITY

A.   The amount stated in Item 3.a. in the Declarations shall be the maximum limit of the **Insurer's** liability for each **Claim** under the applicable **Primary Policy**, and shall be the maximum amount payable by the **Insurer** under this Policy for a single **Claim**, which amount shall be part of, and not in addition to, the amount stated in Item 3.b. in the Declarations.

**B.** The amount stated in Item 3.b. in the Declarations shall be the maximum aggregate amount payable by the **Insurer** under this Policy with respect to all **Claims** during the **Policy Period** for all **Insurance Products**.

**C.** This Policy does not provide coverage for any **Claim** not covered by the **Underlying Insurance**, and shall drop down only to the extent that payment is not made under the **Underlying Insurance** solely by reason of exhaustion of the **Underlying Insurance** through payments thereunder, and shall not drop down for any other reason. If any **Underlying Insurer** fails to make payments under such **Underlying Insurance** for any reason whatsoever, including without limitation the insolvency of such **Underlying Insurer**, then the **Insureds** shall be deemed to have retained any such amounts which are not so paid. If the **Underlying Insurance** is not so maintained, the **Insurer** shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Insurance** been so maintained.

**D.** Payment by the **Insurer** of any amount, including but not limited to defense costs, shall reduce the limits of liability available under this Policy.

## VI.  SETTLEMENTS AND DEFENSE

**A.** No **Insured** under this Policy may, without the **Insurer's** prior written consent, which consent shall not be unreasonably withheld, admit liability for or settle any matter for which insurance may be sought under this Policy.

**B.** The **Insurer** may, at its sole discretion, elect to participate in the investigation, defense and/or settlement of any claim under this Policy, regardless of whether the applicable **Underlying Insurance** has been exhausted.

**C.** The **Insured**, and not the **Insurer**, has the duty to defend all **Claims** under this Policy.

## VII.  SUBROGATION

**A.** In the event of payment under this Policy, the **Insurer** shall be subrogated to all rights of recovery of each and all **Insureds** against any person or organization, and the **Insureds** shall do whatever is necessary to secure those rights to the satisfaction of the **Insurer**, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of such **Insureds**.

**B.** Any amount recovered after payment under this Policy and any **Underlying Insurance** policies shall be apportioned among the Insurer and the **Underlying Insurers** net of the expense of such recovery in the reverse order of actual payment. The expenses attendant to such recovery shall be apportioned among those benefiting from the recovery in proportion to the amount of benefit to each party.

## VIII. AUTHORIZATION

Except as stated in paragraph IX.A. below, the **Policyholder** shall be the sole agent of all **Insureds** with respect to all matters, including but not limited to giving and receiving notices and other communications, effecting or accepting any endorsements to or notices of cancellation of this Policy, the payment of premium and the receipt of any return premiums.

## IX.  NOTICE

**A.** With respect to any **Claim**, situation that could give rise to a **Claim**, or other matter as to which insurance may be sought under this Policy, the **Policyholder** or any **Insured** must give the **Insurer** written notice contemporaneously with and in the identical manner required by the applicable **Primary Policy**.

**B.** All notices under this Policy shall be sent to the **Insurer** at the address set forth in Item 6. in the Declarations.

## X.   MODIFICATION, CANCELLATION AND NONRENEWAL

**A.**   No modification of this Policy shall be effective unless made by endorsement signed by an authorized representative of the **Insurer**.

**B.**   The **Policyholder** may cancel this Policy at any time by written notice stating when thereafter such cancellation is to be effective.

**C.**   The **Insurer** may cancel this Policy only for nonpayment of premium, and only by delivering or mailing to the **Policyholder** written notice stating when, not less than ten (10) days thereafter, such cancellation shall become effective. The delivery or mailing of such notice shall be sufficient proof thereof and this Policy and the **Policy Period** shall terminate at the date and hour specified in the notice.

**D.**   The **Insurer** shall refund the unearned premium, computed at the customary short rate, if the Policy is cancelled by the **Policyholder**.

**E.**   The **Insurer** shall have no obligation to renew this Policy upon its expiration. If the **Insurer** decides not to renew this Policy, the **Insurer** shall provide written notice to the **Policyholder** by messenger, express delivery or first class mail at least sixty (60) days prior to the expiration of the Policy.

**F.**   Notwithstanding anything to the contrary set forth elsewhere in the Policy, in the event that any **Underlying Insurance** is rescinded by agreement or legal process for fraud or other material misrepresentation by the **Policyholder** or any of the **Insureds**, then this Policy shall be deemed to be automatically and immediately rescinded, but only with respect to any **Insurance Product** containing such rescinded **Underlying Insurance**.

## XI.  EXCLUSIONS

The **Insurer** shall not be liable for any amount in any **Claim**  taking place during the **Policy Period** and arising under any **Insurance Product**, which is based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

**A.** Any demand, suit or other proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the Pending or Prior Claim Date set forth in Item 7 of the Declarations or any wrongful act, fact, circumstance or situation underlying or alleged therein; or

**B.** Any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

Endorsement No. 1

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

# SCHEDULE OF UNDERLYING INSURANCE AND INSURANCE PRODUCTS

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

The Schedule of **Underlying Insurance** and **Insurance Products** is as follows:

A.  Insurance Product:    Directors and Officers Liability

1.  **Primary Policy**

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| HCC | 24-MGU-05-A10821 | $10,000,000 | 08/11/05-08/11/06 |

2.  Other Underlying Policies

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| Lexington | 1620924 | $7,500,000 | 08/11/05-08/11/06 |

All other provisions remain unchanged.

_Sean Lukac_
Authorized Representative

_9/11/05_
Date

SE 10 00 (Ed. 02 03)                    Page 1 of 1                    Printed in U.S.A.

Endorsement No. 2

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

# IMPORTANT NOTICE TO ALL ILLINOIS POLICYHOLDERS

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

In the event you need to contact someone about this Policy for any reason, please contact us at:

Axis Reinsurance Company
Connell Corporate Park
Three Connell Drive
P.O. Box 357
Berkeley Heights, NJ  07922-0357
Fax No.:  1 (908) 286-5600

If you have been unable to contact or obtain satisfaction from the Insurer, you may contact the Illinois Department of Insurance to obtain information or make a complaint at:

Illinois Department of Insurance
Consumer Division of Public
Services Section
Springfield, Illinois 62767

Endorsement No. 3

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## ILLINOIS AMENDATORY ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

1.  Section **X., MODIFICATION, CANCELLATION AND NONRENEWAL,** paragraph **C.** is amended by deleting the words "delivering or" in the first sentence and the words "delivery or" in the second sentence of that provision.

2.  Section **X., MODIFICATION, CANCELLATION AND NONRENEWAL,** paragraph **F.** is deleted.  Provided, however, the **Insureds** and the **Insurer** hereby agree that the **Insurer** shall have the same rights under law to rescission that it had if Section X. F. had not been included in the Policy or deleted by this endorsement.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date    9/11/05

**SE 0522 (Ed. 0205)**                                                          **Printed in U.S.A.**

Endorsement No. <u>4</u>

Effective date of this endorsement:  12:01 a.m. on: <u>August 11, 2005</u>
To be attached to and form part of Policy Number: <u>RNN 506300</u>
Issued to: <u>Refco, Inc.</u>
By: <u>Axis Reinsurance Company</u>

## PRIOR NOTICE EXCLUSION

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

In consideration of the premium charged, it is agreed that the **Insurer** shall not be liable for any amount from any **Claim** which is based upon, arising from, or attributable to or in consequence of any fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date

SE1010 0203

Endorsement No. 5

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## MANUSCRIPT APPLICATION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## SECUREXCESS POLICY

In consideration of the premium charged, it is agreed by the **Insurer** and **Insureds** that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the **Insurer** as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above.  The **Insurer** has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to **Insurer** using its own Application form.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date

MU1032  2/2003

Endorsement No. 6

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

**Knowledge Exclusion**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

## SECUREXCESS POLICY

In consideration of the premium charged, it is agreed that this Policy does not respond to **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the **Policy Period**, any **Insured** had knowledge and had reason to suppose might give rise to a **Claim** that would fall within the scope of the insurance afforded by this Policy.

All other provisions remain unchanged.

_____
Authorized Representative

_____9/11/05_____
Date

Exhibit E



## ALLIED WORLD ASSURANCE COMPANY (U.S.), INC.

Boston Branch:
100 Summer Street, Boston, MA 02110

### EXCESS DIRECTORS AND OFFICERS INSURANCE
### AND COMPANY REIMBURSEMENT POLICY

**NOTICE:**   EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD (OR DURING THE DISCOVERY PERIOD IF APPLICABLE).  PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND.

**DECLARATIONS**                                    **POLICY NO.:**   AW0418197

**ITEM 1.**   NAMED CORPORATION:   Refco Inc.

   MAILING ADDRESS:   550 West Jackson Boulevard, Suite 1300
   Chicago, IL 60661

**ITEM 2.**   FOLLOWED POLICY:
   INSURER:   U.S. Specialty Insurance Company
   POLICY NO:   24-MGU-05-A10821

**ITEM 3.**   POLICY PERIOD:   From:   August 11, 2005     To:   August 11, 2006
   (12:01 A.M. standard time at the address stated in Item 1.)

**ITEM 4.**   LIMIT OF LIABILITY:   $12,500,000 Per Claim
   $12,500,000 Annual Aggregate(including Defense Costs)

   EXCESS OF TOTAL UNDERLYING LIMITS OF: $27,500,000 Per Claim
   $27,500,000  Annual Aggregate

**ITEM 5.**   PENDING OR PRIOR DATE: See Endorsement #002



**DECLARATIONS** (continued)                                        **POLICY NO.:** AW0418197

ITEM 6.    SCHEDULE OF PRIMARY AND UNDERLYING EXCESS POLICIES:

**Primary Policy:**

| Insurer | Policy Number | Limits | Policy Period |
|---|---|---|---|
| U.S. Specialty Insurance Company | 24-MGU-05-A10821 | $10,000,000 | 08/11/2005 – 08/11/2006 |

**Excess Policies:**

| Insurer | Policy Number | Limits | Policy Period |
|---|---|---|---|
| Lexington Insurance Company | 162-0924 | $ 7,500,000 | 08/11/2005 – 08/11/2006 |
| AXIS Reinsurance Company | RNN 506300 | $10,000,000 | 08/11/2005 – 08/11/2006 |

ITEM 7.    PREMIUM: $339,445

ITEM 8.    A.    DISCOVERY PERIOD PREMIUM:        150%

           B.    DISCOVERY PERIOD:        1 Year

ITEM 9.    NOTICE OF CANCELLATION PERIOD:        Per Followed Policy

ITEM 10.    ADDRESS OF INSURER FOR ALL NOTICES UNDER THIS POLICY:

    ALLIED WORLD ASSURANCE COMPANY (U.S.), INC.
    ATTN: CLAIMS DEPARTMENT
    100 SUMMER STREET
    BOSTON, MA  02210

ITEM 11.    POLICY FORM:        EXCESS DIRECTORS AND OFFICERS INSURANCE AND
                         COMPANY REIMBURSEMENT POLICY
                         (Excess US D&O (09/04))

           ENDORSEMENT(S):        SERVICE OF SUIT CLAUSE
                         PENDING AND PRIOR LITIGATION EXCLUSION
                         PRIOR KNOWLEDGE EXCLUSION

      BROKER:
       Marsh USA, Inc.
       1166 Avenue of the Americas
       New York, NY 10036

*gm g m lug*

Authorized Representative



**Allied World Assurance Company (U.S.), Inc.**
(hereinafter referred to as the "Insurer")
Administrative Offices: 100 Summer Street, Boston, MA 02110

### EXCESS DIRECTORS AND OFFICERS INSURANCE
### AND COMPANY REIMBURSEMENT POLICY

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application and/or warranty forming a part hereof and its attachments and the material incorporated therein, Allied World Assurance Company, herein called the "**Insurer**", agrees as follows:

### I.    INSURING AGREEMENT

This policy shall provide the **Insured(s)** with Excess Directors and Officers Insurance and Company Reimbursement coverage for **Loss** or **Damages** resulting from any claim or claims first made against the **Insured(s)** and reported to the **Insurer** pursuant to the terms of this policy in accordance with the same warranties, terms, conditions, exclusions and limitations of the **Followed Policy** identified in Item 2 of the Declarations as they were in existence on the inception date of this policy subject to the premium, limits of liability, **Policy Period**, warranties, exclusions, limitations and other terms and conditions of this policy including any and all endorsements attached hereto; provided always that this policy shall, in no event and notwithstanding any other provision, provide coverage broader than that provided by any **Underlying Policy** unless such broader coverage is specifically agreed to by the **Insurer** herein or in a written endorsement attached hereto.

### II.    DEFINITIONS

(a)    The term "**Followed Policy**" shall mean the policy identified in Item 2 of the Declarations.

(b)    The term "**Interrelated Wrongful Act(s)**" shall mean any Wrongful Act(s) which:

      (i)    are the same, similar, related or repeated; or
      (ii)   arise from the same, related or common nexus of facts

    without regard to whether the same or different claims, **Insured(s)**, claimants, causes of action or venues are involved.

(c)    The term "**Loss**" or "**Damages**" shall have the same meaning in this policy as is attributed to it in the **Followed Policy** except that the term "**Loss**" or "**Damages**" shall in no event include civil or criminal fines or penalties, or any amounts for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds**, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

    **Loss** or **Damages** shall include punitive damages and the multiplied portion of multiplied damages to the same extent punitive damages and the multiplied portion of multiplied damages are part of **Loss** or **Damages** under the **Followed Policy**.

(d)    The term "**Insured(s)**" shall have the same meaning as in the **Followed Policy** or the same meaning as similar terms such as Assured or Insured Person.

(e)    The term "**Policy Period**" shall mean the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy.

1 of 6



(f)     The term **"Underlying Policies"** shall mean the Primary and Underlying Excess Policies set forth in Item 6 of the Declarations.

(g)     The term **"Underlying Insurer(s)"** shall mean the insurer(s) of the **Underlying Policies.**

(h)     The term **"Underlying Aggregate Limit"** shall mean an amount equal to the aggregate of all the limits of the **Underlying Policies** combined (excess of their retentions).

All other terms shall have the same meaning in this policy as is attributed to them in the applicable **Followed Policy.**

## III.    EXCLUSIONS

This policy shall not cover any **Loss** or **Damages** in connection with any claim:

1.      alleging, arising out of, based upon or attributable to the facts alleged, or to the same or **Interrelated Wrongful Act(s)** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy, whether excess or underlying, of which this policy is a renewal or replacement or which it may succeed in time;

2.      alleging, arising out of, based upon or attributable to, as of the Pending or Prior Date listed in Item 5 of the Declarations, any pending or prior: 1) litigation; or 2) administrative or regulatory proceeding or investigation of which the Named Corporation or an **Insured** had notice; or 3) alleging or derived from the same or essentially the same facts, or the same or **Interrelated Wrongful Act(s)**, as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation.

## IV.    LIMIT OF LIABILITY

The Limit of Liability stated in Item 4 of the Declarations is the aggregate limit of the **Insurer's** liability for all **Loss** or **Damages** arising out of all claims or occurrences reported to the **Insurer** in accordance with the terms and conditions of the **Followed Policy;** the Limit of Liability for the Discovery Period (if applicable) shall be part of, and not in addition to, the Limit of Liability for the **Policy Period.** Further, any claim which is made subsequent to the **Policy Period** or Discovery Period (if applicable) which pursuant to Clause V herein and the terms and conditions of the **Followed Policy** is considered made during the **Policy Period** or Discovery Period (if applicable) shall also be subject to the one aggregate Limit of Liability stated in Item 4 of the Declarations. The **Insurer's** maximum liability for any combination of losses during the same **Policy Period** or Discovery Period (if applicable) shall be the Limit of Liability stated in Item 4 of the Declarations.

*It is expressly agreed that liability for any covered **Loss** or **Damages** with respect to claims first made during the **Policy Period** or Discovery Period (if applicable) shall attach to the **Insurer** only after the **Underlying Insurers,** the Named Corporation as indemnitor of the **Insureds,** and/or the **Insureds** shall have paid or been held liable to pay the full amount of the **Underlying Aggregate Limit,** and the Named Corporation as indemnitor of the **Insureds** and/or the **Insured(s)** shall have paid or been held liable to pay the full amount of the applicable retention amount for such **Policy Period.** In the event and only in the event of the reduction or exhaustion of the **Underlying Aggregate Limit** by reason of the **Underlying Insurers,** the Named Corporation as indemnitor of the **Insureds,** and/or the **Insureds** paying or being held liable to pay **Loss** or **Damages** otherwise covered hereunder, this policy shall: (i) in the event of reduction, pay excess of the reduced Underlying Aggregate Limit, and (ii) in the event of exhaustion, continue in force as primary insurance; provided always that in the latter event this policy shall only pay excess of the retention amounts set forth in the **Followed Policy,** which retention amount shall be applied to any subsequent **Loss** or **Damages** in the same manner as specified in the **Followed Policy;** provided, however, that the retention amount set forth in the **Followed Policy** shall apply to each **Loss** for which the Named Corporation has*

Allied World Assurance Company (U.S.), Inc.
Excess D&O (9/04)



indemnified or is permitted or required to indemnify the **Insureds** pursuant to law, common or statutory, or contract, or the Charter or Bylaws of the Named Corporation duly effective under such law which determines and defines such rights of indemnity, provided further, however, that no retention amount shall apply if the retention amount of any **Underlying Policy** has been applied to such **Loss**.

This policy shall pay only in the event of reduction or exhaustion of the **Underlying Aggregate Limit** as described above and shall not drop down for any reason including, but not limited to, uncollectability (in whole or in part) of the **Underlying Aggregate Limit**, existence of a sub-limit of liability in any **Underlying Policy**, or any **Excess Policy** containing terms and conditions different from the **Followed Policy**, provided, however, that this policy will recognize erosion of any **Underlying Policy** due to the existence of a sub-limit. The risk of uncollectability of such underlying insurance (in whole or in part) whether because of financial impairment or insolvency of an **Underlying Insurer**, the application of any underlying sub-limit of liability or differing terms and conditions or for any other reason is expressly retained by the **Insureds** and the **Named Corporation** and is not in any way or under any circumstances insured or assumed by the **Insurer**.

It is agreed that if, at any point during the **Policy Period**, the **Followed Policy** has been issued but any **Underlying Policy** is still providing coverage under binder and a claim arises, the preceding paragraph applies and under no circumstances will the **Insurer** provide broader coverage than would have existed had the **Underlying Policy** been issued.

In the event any **Underlying Policy** contains terms and conditions more restrictive than the **Followed Policy**, then the **Insurer's** coverage shall under no circumstances be broader than the most restrictive terms and conditions contained in the **Followed Policy** or any **Underlying Policy**.

It is agreed that if any warranty signed by or on behalf of any **Insured**, whether or not contained in any **Underlying Insurer's** application or warranty statement, applies to the Limit of Liability covered by the **Insurer** or any **Underlying Insurer**, then any representations or warranties made in said application or warranty, whether or not it is assigned to the **Insurer**, will be deemed to be treated as though it was assigned to the **Insurer**.

## V.    UNDERLYING LIMITS

It is a condition of this policy that the **Underlying Policies** shall be maintained in full effect with solvent insurers during the **Policy Period** except for any reduction or exhaustion of the **Underlying Aggregate Limit** contained therein by reason of **Loss** or **Damages** paid thereunder (as provided for in Clause IV above). Failure to comply with the foregoing shall not invalidate this policy, but in the event of such failure, the **Insurer** shall be liable only to the extent that it would have been liable had the **Insureds** and the **Named Corporation** complied with such condition.

If during the **Policy Period** or any **Discovery Period** (if applicable) the terms, conditions, exclusions or limitations of any **Underlying Policy** are changed in any manner, the **Named Corporation** or the **Insured(s)** shall as a condition precedent to their rights under this policy give to the **Insurer** as soon as practicable written notice of the full particulars thereof. This policy shall become subject to any such changes upon the effective date of the changes in the **Underlying Policy**, but only upon the condition that the **Insurer** agrees to follow such changes by written endorsement attached hereto and the **Named Corporation** agrees to any additional premium and/or amendment of the provisions of this policy required by the **Insurer** relating to such changes. Further, such new coverage is conditioned upon the **Named Corporation** paying when due any additional premium required by the **Insurer** relating to such changes.

Allied World Assurance Company (U.S.), Inc.
Excess D&O (9/04)



## VI.    NOTICE OF CLAIM

The Insured(s) shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer at the address set forth in Item 10 of the Declarations and all Underlying Insurers of any claim made or circumstances that might give rise to a claim against the Insured(s). Such written notice shall be provided to the Insurer in accordance with the terms and conditions of the Followed Policy.

If during the Policy Period or during the Discovery Period (if applicable) (i) written notice of a claim has been given to the Insurer and all Underlying Insurers as set forth in this clause, or (ii) to the extent permitted by the terms and conditions of the Followed Policy, written notice of circumstances that might reasonably be expected to give rise to a claim, has been given to the Insurer and all Underlying Insurers, then any claim which is subsequently made against the Insured(s) and reported to the Insurer and all Underlying Insurers alleging, arising out of, based upon or attributable to the facts alleged in the claim or circumstances of which such notice has been given, or alleging any wrongful act which is the same as or related to any wrongful act alleged in the claim or circumstances of which such notice has been given, shall be considered made at the time notice of such claim or circumstances has been given to the Insurer so long as the Followed Policy accepts as adequate the written notice of circumstances that might reasonably be expected to give rise to a claim.

The Insured(s) shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of the following events as soon as practicable but in no event later than thirty (30) days after the Insured becomes aware of the event:

     (i)     Any Underlying Policy being canceled or non-renewed or otherwise ceasing to be in effect or being uncollectible (in part or in whole); or

     (ii)     Any Underlying Insurer being subject to a receivership, liquidation, dissolution, rehabilitation or any similar proceeding or being taken over by any regulatory authority; or

     (iii)     The Named Corporation consolidating with or merging with or into, or transferring all or substantially all of its assets to, or acquiring or being acquired by any natural person or entity or group of natural persons and/or entities acting in concert.

## VII.    CLAIM PARTICIPATION

The Insurer shall have the right, in its sole discretion, but not the obligation to effectively associate with the Named Corporation and the Insured(s) in the defense and settlement of any claim that appears to the Insurer to be reasonably likely to involve the Insurer, including but not limited to effectively associating in the negotiation of a settlement. The Insureds shall defend and contest any such claim. The Named Corporation and the Insured(s) shall give the Insurer full cooperation and such information as it may reasonably require. The failure of the Insurer to exercise any right under this paragraph at any point in a claim shall not act as a waiver or limit the right of the Insurer in any manner to exercise such rights at any other point in a claim including the right to effectively associate in the negotiation of a settlement.

The Insurer does not under this policy assume any duty to defend. The Insured(s) shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any claim in order to reach a decision as to reasonableness.

Allied World Assurance Company (U.S.), Inc.
Excess D&O (9/04)



## VIII.    DISCOVERY CLAUSE

The **Insured** shall be entitled to a Discovery Period (or Extended Reporting Period) pursuant to the terms and conditions of the **Followed Policy**. The Discovery Period (or the Extended Reporting Period) is not available unless the Named Corporation has elected the Discovery Period (or Extended Reporting Period) in all **Underlying Policies**. The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. The Discovery Period percentage for this policy is specified in Item 8 of the Declarations. The cost of discovery, as a percentage of the annual premium, shall in no event be less than the highest percentage of any **Underlying Policy**.

## IX.    CANCELLATION CLAUSE

This policy may be canceled by the Named Corporation only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or its authorized agent at the address set forth in Item 10 of the Declarations and within the time period and in the manner set forth in the **Followed Policy**.

This policy shall not be cancelled by or on behalf of the **Insurer** except by reason of non-payment of the premium set forth in Item 7 of the Declarations within the time period specified in the Binder Confirmation issued by the **Insurer** in connection with this policy. The **Insurer** may cancel the policy by delivering to the Named Corporation or by mailing to the Named Corporation, by registered, certified, or other first class mail, at the Named Corporation's address set forth in the Declarations, written notice stating when, not less than the period set forth in Item 9 of the Declarations, thereafter the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender.

If this policy shall be canceled by the Named Corporation, the **Insurer** shall retain the customary short rate proportion of the premium hereon.

If this policy shall be canceled by the **Insurer**, the **Insurer** shall retain the pro rata proportion of the premium hereon.

Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

## X.    ALTERNATIVE DISPUTE RESOLUTION PROCESS

Any and all disputes or differences which may arise under this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss** or the formation and validity of this policy, shall be subject to the alternative dispute resolution process ("ADR") set forth in this clause.

Either the **Insurer** or the **Insureds** may elect the type of ADR discussed below; provided, however, that the **Insureds** shall have the right to reject the **Insurer's** choice of ADR at any time prior to its commencement, in which case the **Insureds'** choice of ADR shall control.

Allied World Assurance Company (U.S.), Inc.
Excess D&O (9/04)



The **Insurer** and **Insureds** agree that there shall be two choices of ADR: (1) non-binding mediation administered by the American Arbitration Association, in which the **Insurer** and **Insureds** shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration submitted to the American Arbitration Association under or in accordance with its then-prevailing Commercial Arbitration Rules, in which the arbitration panel shall be composed of three disinterested individuals. In either mediation or arbitration, the mediator(s) or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute.

The mediator(s) or arbitrators shall also give due consideration to the general principles of the law of the state where the Named Corporation is incorporated in the construction or interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an even-handed fashion in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys' fees or other costs. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the ADR.

Either choice of ADR may be commenced in either New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations as the mailing address for the Named Corporation. The Named Corporation shall act on behalf of all Insureds in selection of the ADR in accordance with this clause.

## XI.    HEADINGS

The descriptions in the headings and any subheading of this policy (including any titles given to any endorsement attached hereto) are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

IN WITNESS WHEREOF, the **Insurer** has caused this policy to be signed by its Vice President of Professional Lines.

_____
Vice President of Professional Lines

Allied World Assurance Company (U.S.), Inc.
Excess D&O (9/04)

Endorsement No.:              001
This endorsement, effective:    August 11, 2005
(at 12:00 A.M. prevailing time at the address of the Named Insured as shown in item 1 (a) of the Declarations)
forms a part of Policy No.:     AW0418197
Issued to:                   Refco Inc.
By:                        Allied World Assurance Company (U.S.), Inc.

## SERVICE OF SUIT

In the event of failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon counsel, Legal Department, Allied World Assurance Company, 100 Summer Street, Boston, MA 02110 or his or her representative, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statue, or his or her successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this policy of insurance and hereby designates the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

Issue Date August 30, 2005

_____
AUTHORIZED REPRESENTATIVE

AWAC (US) (07/03)-A412

Endorsement No.:                        002
This endorsement, effective:            August 11, 2005
(at 12:00 A.M. prevailing time at the address of the **Named Insured** as shown in item 1 of the Declarations)
forms a part of Policy No.:             AW0418197
Issued to:                              Refco Inc.
By:                                     Allied World Assurance Company (U.S.), Inc.


## PENDING AND PRIOR LITIGATION EXCLUSION


In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable for **Loss** in connection with any claim or claims made against the **Insureds**:


(a)    alleging, arising out of, based upon or attributable to any pending or prior litigation as of:

- 06/04/2004 for the $2.5M xs $27.5MM
- Inception for $10MM xs $30MM

or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation;


All other terms and conditions remain unchanged.

*[signature]*

**Authorized Representative**

Date of Issuance:  3/16/2006

Endorsement No.:          **003**
This endorsement, effective:    August 11, 2005
(at 12:00 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)
forms a part of Policy No.:    AW0148197
Issued to:                Refco Inc.
By:                       Allied World Assurance Company (U.S.), Inc.

## PRIOR KNOWLEDGE EXCLUSION

It is hereby understood and agreed that the **Insurer** shall not be liable for **Loss** in connection with any claim or claims made against the **Insureds**:

(a)    alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which any Insured had knowledge as of **inception** and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage hereunder, or (ii) which indicate the probability of any such claim.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Authorized Representative

Date of Issuance:  3/16/2006

Exhibit F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
UNITED STATES OF AMERICA            :
                                    :        INFORMATION
        -v-                         :
                                    :        07 Cr.
SANTO C. MAGGIO,                    :
                                    :
            Defendant.              :
                                    :
------------------------------------x

## COUNT ONE

**(Conspiracy To Commit Securities Fraud, Wire Fraud, To Make
False Filings With The SEC, To Make Material Misstatements To
Auditors, Bank Fraud and Money Laundering)**

The United States Attorney charges:

### RELEVANT ENTITIES AND PERSONS

1. At certain times relevant to this Information,
Refco, Inc. was a Delaware corporation with its principal place
of business in New York, New York. From at least the mid-1990s,
the business of Refco, Inc. and its predecessor entities included
providing execution and clearing services for exchange-traded
derivatives and providing prime brokerage services in the fixed
income and foreign exchange markets. Refco, Inc. held its
initial public offering of common stock on or about August 10,
2005. Prior to on or about August 10, 2005, Refco, Inc.'s
predecessor entities were privately held. Refco, Inc. and its
predecessor entities are referred to herein collectively as
"Refco."

2. At all times relevant to this Information, Phillip

R. Bennett, a coconspirator not named as a defendant herein, was the President and Chief Executive Officer of Refco. At all times relevant to this Information, Bennett had a substantial ownership interest in Refco, directly and indirectly.

3.    At certain times relevant to this Information, Robert C. Trosten, a coconspirator not named as a defendant herein, held senior management positions at Refco. Among other positions, Trosten was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004, when he left the company.

4.    At certain times relevant to this Information, Tone N. Grant, a coconspirator not named as a defendant herein, held a senior management position at Refco. From at least in or about 1997 through in or about June 1998, Grant was the President of Refco. At certain times relevant to this Information, Grant indirectly held a significant ownership interest in Refco.

5.    At certain times relevant to this Information, SANTO C. MAGGIO, the defendant, held senior management positions at Refco. Among other positions, MAGGIO was an Executive Vice President of Refco, and the President and Chief Executive Officer of Refco Securities LLC, a wholly owned subsidiary of Refco.

6.    At all times relevant to this Information, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft, ("BAWAG"), was the fourth largest bank in

2

Austria.  BAWAG was owned at various times by, among other
entities, the Austrian Trade Unions Association, formally known
as Österreichischer Gewerkschaftsbund (ÖGB).  At various times
relevant to this Information, BAWAG indirectly held a substantial
ownership interest in Refco.

        7.    At all times relevant to this Information, Refco
Group Holdings, Inc. ("RGHI") was a privately-held Delaware
corporation that held a substantial ownership interest in Refco.
At various times relevant to this Information, RGHI was owned in
whole or in part by Phillip R. Bennett and Tone N. Grant.

### THE SCHEME TO DEFRAUD

        8.    From at least as early as in or about the late
1990s, SANTO C. MAGGIO, the defendant, at the direction of
Phillip R. Bennett and together with others known and unknown,
schemed to hide the true financial health of Refco from its
banks, counterparties, auditors, and investors.  Starting at
least as early as the late 1990s, Bennett, MAGGIO, and their
coconspirators embarked on a strategy to mask the true
performance of Refco's business in order to sell the company for
Bennett and MAGGIO's own benefit and that of Refco's owners other
than Bennett.  To that end, over the ensuing years, Bennett,
MAGGIO, and others known and unknown systematically (1) covered
up both Refco's own losses and customer losses for which Refco
became responsible; (2) moved Refco operating expenses off the

3

company's books; and (3) padded Refco's revenues, all in an
effort to mislead Refco's banks, counterparties, auditors and
investors, with the goals of keeping Refco in business and then
selling it for the maximum benefit to its owners and senior
management.

9.    In furtherance of this scheme, Phillip R. Bennett,
SANTO C. MAGGIO, and others known and unknown made and caused
Refco and others on its behalf to make false and fraudulent
statements to Refco's banks, counterparties, customers, auditors,
and investors, and to create false audited financial statements
and false public filings with the United States Securities and
Exchange Commission ("SEC").  The scheme included obtaining,
through fraud, the following:  lines of credit for Refco; the
private sale of notes prior to 2004; the sale of 57 per cent of
Refco to a group headed by Thomas H. Lee Partners in 2004; the
sale of approximately $600 million of notes to the public in
2004; approximately $800 million of bank financing obtained in
2004; and the August 2005 initial public offering of stock
("IPO") in Refco, Inc., in which the public purchased
approximately $583 million of Refco common stock based on a false
and fraudulent registration statement.

### Early Origins Of Refco's Financial Problems

10.    In or about the mid-1990s, Refco was wholly owned
by RGHI, which in turn was owned by Phillip R. Bennett, Tone N.

4

Grant and one other partner.  As of early 1997, RGHI owed Refco

at least approximately $106 million.  Starting later in 1997,

Refco directly and indirectly incurred a series of substantial

trading losses that threatened the continued viability of Refco's

business.  In response to these losses, at various times between

in or about May 1997 and in or about October 2005, Bennett, and

later, SANTO C. MAGGIO and their coconspirators, moved losses and

expenses out of Refco and into RGHI, and artificially padded

Refco's revenues at the expense of RGHI, in an effort to hide

Refco's true liabilities, manipulate its reported earnings, and

thereby seek to defraud a purchaser into buying the firm at a

price that would pay off the accumulated debt and ensure a profit

to Refco's owners.  This strategy resulted in an enormous

increase in the already large debt from RGHI to Refco that

eventually totaled more than $1 billion (the "RGHI receivable").

The debt by RGHI to Refco, carried on Refco's books as a

receivable from RGHI, was over time comprised of, among other

things, the following principal components: (a) liabilities

incurred by Refco when brokerage customers to whom it had

extended credit defaulted on their obligations, which were later

transferred to RGHI; (b) Refco's proprietary trading losses; (c)

various operating expenses incurred by Refco and paid in the

first instance by Refco but later transferred to RGHI as an

increase in RGHI's debt to Refco; and (d) transactions designed

5

to pad Refco's revenues in which the benefits accrued to Refco
and the associated costs were incurred by RGHI.

### Historical Losses

11.  As a commodities, securities, and futures
brokerage and clearing firm, Refco extended credit to customers,
allowing customers to make securities, commodities, and futures
trades in accounts held at Refco.  In the later 1990s, certain
Refco customers to whom Refco had extended credit sustained
hundreds of millions of dollars of trading losses in their
accounts at Refco.  When the customers were unable to make
payments on the credit Refco had extended, Refco liquidated
certain of the positions and assumed the resulting losses in the
customers' accounts.  Refco sustained large losses of this type,
among other times, in 1997, totaling at least approximately $225
million.  These customer losses included the following:

### Asian Debt Crisis Customers

12.  In or about May 1997, a group of Refco customers
to whom Refco had extended credit for the purpose of investing in
Asian markets sustained large losses in connection with the Asian
debt crisis.  When those customers were unable to cover their
losses, Refco paid the losses, using hundreds of millions of
dollars of customer funds within the unregulated segments of its
business.  By the end of May 1997, these losses totaled more than
$310 million, and, at the end of December 1997, based on changed

6

market conditions, they totaled approximately $185 million.

### Customer 1

13.    In or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1"), lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME").  When Customer 1 could not cover his margin requirements, Refco was forced to meet the margin call from the CME, using the proceeds of a short-term loan from a financial institution of at least approximately $90 million to meet its margin requirements, and then using customer funds taken from the unregulated segments of Refco's business to repay the loan.

14.    Recognizing that public acknowledgment of a loss of more than $90 million would threaten Refco's continued existence, Phillip R. Bennett, Tone N. Grant, SANTO C. MAGGIO, and others known and unknown falsely represented to the public and other customers that Refco had not sustained a significant loss as a result of Customer 1's losses.  In addition, Bennett and others significantly misrepresented the size of the loss to Refco's auditors.

15.    Philip R. Bennett, SANTO C. MAGGIO, and others, having misrepresented to third parties that Refco had not suffered a significant loss as a result of Customer 1's trading activity, caused at least $71 million of debt owed by Customer 1

7

from the trading losses to be transferred to become a debt from
RGHI to Refco.

### Refco Expenses Moved To RGHI

16.  Beginning at least as early as 1999, Phillip R.
Bennett and others schemed to reduce Refco's expenses (therefore
falsely increasing Refco's apparent profitability) by moving
Refco expenses off of Refco's books and onto the books of RGHI.

17.  The result of these actions by Phillip R. Bennett,
SANTO C. MAGGIO, and their coconspirators was to contribute to
the large and growing debt owed by RGHI to Refco.  By in or about
February 1999, RGHI owed Refco at least approximately $252
million.  In addition, as of in or about February 1999, at least
approximately $156 million of customer losses for which Refco was
responsible were held in accounts within Refco Global Finance, a
consolidating Refco subsidiary.  Thus, a total of at least
approximately $409 million in customer losses, Refco losses, and
other expenses, principally from the sources outlined above, had
accumulated by February 1999.

### Refco's Losses Funded By Use Of Customer Funds

18.  Starting at least in or about 1997, Phillip R.
Bennett, SANTO C. MAGGIO, and their coconspirators caused Refco
to use customer funds to cover its losses.  As a result, Refco
was perpetually short of cash, and was often unable to cover
settlement of its customers' transactions.  Accordingly, Bennett,

8

MAGGIO, and others caused Refco systematically to fail to meet settlement on its customer transactions, often on a daily basis, in amounts that exceeded, at times, approximately $100 million a day.  Bennett, MAGGIO, and others then caused Refco to repeatedly misrepresent to the financial institutions to whom Refco owed money to settle Refco's customers' transactions that its failure to make settlement was an error, when in fact Refco purposefully selected, on a rotating basis, institutions with whom it would fail to make settlement, and attempted to stagger its failures to make settlement with each institution so as not to arouse suspicion from the institutions that Refco was in fact unable to fulfill its daily settlement obligations.

## BAWAG Invests In Refco

19.  By the end of 1998, Refco was in a precarious financial condition, in light of the significant customer and proprietary trading losses it had absorbed and the resulting daily failure to make settlement on customer transactions.  In order to address that problem, in or about late 1998, Bennett sought a capital contribution from BAWAG.  In a transaction that closed in 1999, BAWAG, through an affiliate, purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase an additional ten percent of Refco.

## Hiding The RGHI Receivable

20.  Throughout the period covered by this Information, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February.  Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including Phillip R. Bennett.  Refco and RGHI were related parties.

21.  Beginning at least as early as February 1998, Phillip R. Bennett and SANTO C. MAGGIO, among others, directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Bennett or Refco.  At certain times, Bennett also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global Finance, a consolidating entity within Refco, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end.  Bennett and, later, MAGGIO and others, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end

10

on February 28, 1998 through the fiscal year-end on February 29, 2004. Bennett, MAGGIO and others directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22. In 1998 and 1999, Phillip R. Bennett, SANTO C. MAGGIO and others, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
|------|----------------------------|
| February 1998 | $175 million |
| February 1999 | $265 million |

23. Beginning in 2000, Phillip R. Bennett and SANTO C. MAGGIO's year-end, and starting in 2004, quarter-end cover-up transactions were of two types: transactions with Refco customers, and transactions with BAWAG. In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to May 2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |

11

| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

24.    These transactions typically followed standard
patterns.  For example, in or about February 2000, SANTO C.
MAGGIO, Phillip R. Bennett and others caused the following
transactions to occur with several customers and BAWAG, for the
purpose of paying down a portion of the RGHI receivable over the
February 2000 year-end:

a.    Three different customers (collectively, the
"Three Customers") lent a total of approximately $310 million to
RGHI, which it then used to pay down its obligation to Refco.  At
the same time, Refco lent to the Three Customers $310 million.
As a result, it appeared on Refco's books and records that Refco
had $310 million in receivables from the Three Customers, and the
debt from RGHI appeared to be reduced by $310 million.  In or
about March 2000, the transactions were reversed, with Refco
lending $310 million back to RGHI (thus increasing the amount
owed by RGHI to Refco by $310 million), which RGHI then used to
pay back the Three Customers the full amount of the loan.  To
ensure a profit for the Three Customers, the interest rate that
RGHI paid to the Three Customers was higher than the interest
rate that the Three Customers paid to Refco.  Each of the
transactions with the customers were memorialized in loan
agreements between Refco, RGHI and the Three Customers, similar

to the agreements that follow:

(i).    On or about February 25, 2000,
Refco Capital Markets, Ltd. a Bermuda corporation controlled by
Refco, loaned Customer 2, one of the Three Customers,
approximately $150 million.  The loan was to be repaid on March
9, 2000.

(ii).    On or about the same day, February
25, 2000, Customer 2 loaned approximately $150 million to RGHI.
The repayment date was on or about March 9, 2000.  The loan
agreement for this loan was executed by Bennett on behalf of
RGHI.  The interest rate on this loan was 15 basis points higher
than the interest rate on the loan from Refco Capital Markets to
Customer 2, thereby assuring Customer 2 a profit.

(iii).    On or about the same date, Bennett
signed a letter of guaranty to Customer 2 on behalf of Refco
Group, Ltd., assuring Customer 2 that, should RGHI default on its
approximately $150 million obligation to Customer 2, Refco Group,
Ltd. would make Customer 2 whole.

b.    At or around the same time as the
transactions with the Three Customers, BAWAG loaned RGHI $300
million in cash.  RGHI then used the $300 million to pay off $300
million of its debt to Refco, and Refco then loaned to BAWAG $225
million, using the remaining $75 million to fund its operations.
In or about March 2000, the transaction was reversed.  Refco lent

13

$300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI.  RGHI then used the $300 million to pay off the loan from BAWAG.

25.  In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, Phillip R. Bennett, SANTO C. MAGGIO and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.

### Refco Sells Notes Based On False Financial Information

26.  At various times prior to August 2004, Phillip R. Bennett, SANTO C. MAGGIO, and others, in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital through the private placement of certain notes. These notes were sold to investors based, in part, on the audited financial statements prepared by Refco's auditors, which in turn were rendered false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI.  In particular, Bennett, MAGGIO and others caused Refco to raise the following capital through the sale of the following notes to investors, based on false and fraudulent financial statements:

14

| Date | Note Coupon And Due Date | Approximate Capital Raised |
|---|---|---|
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

### Refco Obtains Credit Counterparty Relationships Based On False Financial Information

27.  Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and obtained credit from banks and other financial institutions, including a revolving line of credit from a number of financial institutions, including JP Morgan Chase, beginning in or about 1998, that eventually grew to more than $300 million.  For each such transaction, including the annual renewal of the revolving line of credit, Refco submitted to the proposed creditor the fraudulent financial statements and made other false statements which materially misstated the health of Refco.

### Refco Helps BAWAG Hide Its Own Balance Sheet Problems

28.  Between 2000 and 2005, while BAWAG assisted Phillip R. Bennett in hiding the RGHI receivable in the manner described above, Bennett and SANTO C. MAGGIO caused Refco to assist BAWAG in hiding its own balance sheet problems.  In or

about early 2000, BAWAG entrusted approximately €350 million of BAWAG's funds to an investment advisor, who by the end of 2000 reported to the bank that he had lost substantially all of those funds. In order to disguise this loss on its balance sheet, BAWAG arranged through Bennett and MAGGIO to hold in an account at Refco certain worthless bonds and other investments that Refco, at Bennett and MAGGIO's direction, maintained at a false value that, over time, reached at least approximately €500 million. These fake assets were purportedly housed at Refco and maintained at an inflated value for BAWAG's benefit until 2005.

### Bennett's "Exit Strategy" Develops

29. In or about 2003, Phillip R. Bennett caused Refco to hire an investment bank (the "Investment Bank"), to assist in selling Refco. Bennett asked the Investment Bank to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested. After efforts to sell Refco to such a first line buyer failed, Bennett directed the Investment Bank to look for other purchasers for the company, with the understanding that it would be taken public.

30. In connection with Phillip R. Bennett's plan to sell Refco, Bennett, SANTO C. MAGGIO, and others (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by Bennett and others to disguise the ongoing operational

16

problems at the company.

### The Fraudulent Leveraged Buyout Transaction

31.    In or about 2003, Phillip R. Bennett, SANTO C.
MAGGIO, and others began negotiations with Thomas H. Lee
Partners, a private equity fund, regarding that entity's possible
purchase of a controlling stake in Refco as part of a leveraged
buyout transaction.  As ultimately carried out on or about August
5, 2004, the leveraged buyout was structured as follows:  Thomas
H. Lee Partners, through an affiliate, purchased a 57 percent
ownership interest in Refco, in return for approximately $507
million of new capital; simultaneously, Refco sold $600 million
in notes and obtained $800 million in financing from a syndicate
of banks.

### *Lies To Thomas H. Lee Partners*

32.    In connection with the leveraged buyout
transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others
caused Refco's audited financial statements for the year ending
February 2004 to be provided to Thomas H. Lee Partners.  Those
audited financial statements were false and misleading in the
following respects, among others:

a.    The financial statements hid the size of the
related party receivable from RGHI, which at the end of February
2004 was, but for the cover-up loan transactions, at least
approximately $1 billion, whereas the financial statements

17

misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

b.   The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

33.   In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Note Purchasers

34.   In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the note underwriters and note purchasers the following false and misleading information:

a.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

b.   Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in

18

fact, caused the Asian Debt Crisis Customer Losses; and

c.    Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### *Lies To The Bank Syndicate*

35.    In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

a.    Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

b.    Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

c.    Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to

19

RGHI for the purpose of hiding them.

36.  The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion.  Thereafter, Phillip R. Bennett caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| Bennett | $25 million |
| Trosten | $48 million |
| Grant | $16 million |
| Other Former Equity Partners | $81.5 million |
| MAGGIO | $5.75 million |
| Other Refco Officers, Employees, and Affiliated Parties | $106.25 million |

**Bennett Plans To Take Refco Public**

37.  After the leveraged buyout, Phillip R. Bennett, who remained the Chief Executive Officer of Refco following the transaction, SANTO C. MAGGIO, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

38.  Between the August 2004 leveraged buyout and the August 2005 IPO, Phillip R. Bennett, SANTO C. MAGGIO, and others

continued their manipulation of Refco's finances: At each quarter and year-end period, Bennett and MAGGIO caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and Bennett and MAGGIO continued to cause Refco expenses to be assumed by RGHI and to artificially pad Refco's revenues by the means previously described. Bennett and MAGGIO caused the following quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

39. Between August 2004 and August 2005, Refco padded its revenue by at least approximately $79 million, comprised of at least approximately $38 million in inflated interest income, at least approximately $13 million in fictitious transactions in U.S. Treasury securities, and at least approximately $28 million in fictitious foreign currency transactions. In particular, Bennett and MAGGIO caused the following transactions, among others, to artificially inflate Refco's revenues:

       a.  On or about February 11, 2005, Bennett and

21

MAGGIO caused Refco to credit a $12 million "interest adjustment"
from RGHI that increased Refco's revenue by $12 million, and
RGHI's debt to Refco by the same amount.

        b.   On or about February 17, 2005, Bennett and
MAGGIO caused RGHI to engage in approximately 32 fictitious
foreign currency exchange transactions in British Pounds, Euros,
Japanese Yen and Swiss Francs with Refco.  RGHI lost
approximately $5 million on the transactions, and Refco
recognized $5 million in revenue as a result of the transactions.
The $5 million loss was then added to the RGHI receivable.

### Refco's Public Filings And Publicly Traded Securities

        40.   In 2005, Refco registered certain of its
securities with the SEC and, with that registration, was required
to make certain additional public filings with the SEC.

        41.   On or about April 6, 2005, Refco filed an S-4
registration statement with the SEC in connection with its offer
to exchange $600 million of the senior subordinated notes
originally issued in August 2004 for $600 million of senior
subordinated notes registered under the Securities Act of 1933.
Phillip R. Bennett signed the registration statement on or about
April 6, 2005 in New York, New York.  Registration of these notes
permitted them to be traded publicly.  The S-4 contained several
material misstatements about Refco, including the audited
financial statements which failed to reflect the related party

transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above, and falsely claimed that Refco did not engage in proprietary trading.

42. On or about July 19, 2005, as required by the Securities and Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for the year ended February 28, 2005 on Form 10K. Phillip R. Bennett signed the annual report on or about July 19, 2005, in New York, New York. Bennett also signed two certifications regarding the annual report. In those certifications, Bennett attested that he had reviewed the annual report and (a) that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report"; and (b) that "the information contained in the Report fairly present[ed], in all material respects, the financial condition and results of operations of the Company." As noted above, the financial statements were fraudulent in that, among other things, they failed to reflect the related party receivables, the padded revenue, and the shifted expenses.

43. On or about August 8, 2005, Refco filed an S-1

registration statement with the SEC in connection with its
initial public offering of common stock.  Phillip R. Bennett
signed that registration statement on or about August 8, 2005, in
New York, New York.

44.  The S-4 registration statement, 10K annual report,
and S-1 registration statement signed by Phillip R. Bennett each
required the disclosure of (a) certain transactions between Refco
and its management and (b) certain debts owed directly or
indirectly by any executive officer of Refco to Refco, during
Refco's past fiscal year and, for the registration statements,
during Refco's prior two fiscal years.  These disclosures were
required in order to apprize investors of, among other things,
potential conflicts of interest by management.

45.  The S-4 registration statement, 10K annual report,
and S-1 registration statement signed by Phillip R. Bennett each
failed to disclose the related party transactions and the related
party indebtedness between Refco and RGHI outlined above.  In
particular, these public filings failed to disclose: (a) the
existence of hundreds of millions of dollars of indebtedness by
RGHI to Refco during 2004 and 2005; (b) the transactions at
quarter- and fiscal year-end during 2004 and 2005 by which RGHI
temporarily paid down its debt to Refco, the guaranties by Refco
of the third party lenders' loans to RGHI, and the subsequent re-
assumption of the debt by RGHI, each of which was a related party

24

transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

46.  On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock.  Phillip R. Bennett, through RGHI, sold Refco stock in the IPO valued at more than $100 million, while retaining a substantial ownership interest in Refco.  Following the initial public offering, Refco's common stock was listed on the New York Stock Exchange under the ticker symbol "RFX."

### End Of Quarter Transactions In August 2005

47.  In or about late August 2005, after the completion of Refco's IPO, Phillip R. Bennett and SANTO C. MAGGIO caused Refco to carry out $420 million in cover-up transactions with a Refco customer that temporarily transformed all or part of the RGHI receivable into a receivable from that customer.  After the August 31, 2005 end of Refco's second quarter, the $420 million in cover-up transactions were reversed.

### Public Disclosure Of The Related Party Debt

48.  In or about early October 2005, Refco discovered an approximately $430 million receivable on its books from RGHI. It demanded repayment of the debt by Phillip R. Bennett, who repaid Refco approximately $430 million on or about October 10,

25

2005, having received an emergency loan in that approximate
amount from BAWAG.

      49.  On or about October 10, 2005, Refco issued a press
release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company
> believes that the receivable was the result of the
> assumption by an entity controlled by Mr. Bennett
> of certain historical obligations owed by
> unrelated third parties to the Company, which may
> have been uncollectible. The Company believes that
> all customer funds on deposit are unaffected by
> these activities. Independent counsel and forensic
> auditors have been retained to assist the Audit
> Committee in an investigation of these matters.

      50.  Following Refco's announcement, the market price
of Refco stock plummeted, resulting in a loss of well more than
$1 billion in market capitalization.

      51.  On or about October 17, 2005, Refco, Inc. and
twenty-three of its subsidiaries or affiliates filed a petition
in bankruptcy in the United States Bankruptcy Court for the
Southern District of New York.  Refco's common stock was
subsequently delisted by the New York Stock Exchange.

**THE CONSPIRACY**

      52.  From in or about the mid-1990s up to in or about
October 2005, in the Southern District of New York and elsewhere,

26

SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely:  (a) to commit fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"), and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78o(d) and 78ff; (c) to make and cause to be made false statements in a registration statement filed under the Securities Act, in violation of Title 15, United States Code, Section 77x; (d) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; (e) to make and cause to be made false statements and omissions to Refco's auditors, in violation of Title 15, United States Code, Sections 78m and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2; (f) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code; and (g) to commit money laundering, in violation of Section 1957(a) of Title 18, United States Code.

27

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

53.  It was a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of notes issued by Refco and the common stock of Refco, Inc., all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings - Exchange Act

54.  It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, in reports and

28

documents required to be filed with the SEC under the Exchange
Act, and the rules and regulations promulgated thereunder, would
and did make and cause to be made statements which were false and
misleading with respect to material facts, in violation of Title
15, United States Code, Sections 78o(d) and 78ff.

### False Statements In SEC Filings - Securities Act

55.   It was further a part and object of the conspiracy
that SANTO C. MAGGIO, the defendant, and others known and
unknown, unlawfully, willfully, and knowingly would and did make
and cause to be made, in a registration statement filed with the
SEC under the Securities Act of 1933, untrue statements of
material facts and omissions to state material facts required to
be stated therein and necessary to make the statements therein
not misleading, in violation of Title 15, United States Code,
Section 77x.

### Wire Fraud

56.   It was further a part and object of the conspiracy
that SANTO C. MAGGIO, the defendant, and others known and
unknown, unlawfully, willfully, and knowingly, having devised and
intending to devise a scheme and artifice to defraud and for
obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, would and did transmit
and cause to be transmitted by means of wire communication in
interstate and foreign commerce, writings, signs, signals,

29

pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

### Material Misstatements To Auditors

57.  It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and Phillip R. Bennett, an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Exchange Act of 1934 and with a class of securities registered pursuant to section 12 of the Exchange Act, unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be filed under the Exchange Act; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC, in violation of Title 15, United States Code, Section 78m, and Title 17, Code of Federal Regulations, Section 240.13b2-2(a).

### Bank Fraud

58.  It was further a part and object of the conspiracy

30

that SANTO C. MAGGIO, the defendant, and others known and

unknown, unlawfully, willfully and knowingly, would and did

execute, and attempt to execute, a scheme and artifice to defraud

a financial institution, to wit, HSBC, and to obtain moneys,

funds, credits, assets, securities and other property owned by,

and under the custody and control of, a financial institution

whose deposits were insured by the Federal Deposit Insurance

Corporation, by means of false and fraudulent pretenses,

representations and promises, all in violation of Title 18,

United States Code, Section 1344.

### Money Laundering

59.   It was further a part and object of the conspiracy

that SANTO C. MAGGIO, the defendant, and others known and

unknown, in an offense involving and affecting interstate and

foreign commerce, unlawfully, willfully and knowingly would and

did engage and attempt to engage in monetary transactions in

criminally derived property that was of a value greater than

$10,000 and that was derived from specified unlawful activity, to

wit, securities fraud, bank fraud, and wire fraud, in violation

of Title 18, United States Code, Section 1957(a).

### MEANS AND METHODS OF THE CONSPIRACY

60.   Among the means and methods by which SANTO C.

MAGGIO, the defendant, and others known and unknown, and their

co-conspirators would and did carry out the conspiracy were the

31

following:

        a.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators misrepresented to the public the size of customer losses for which Refco was responsible.

        b.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators transferred losses incurred by Refco to Bennett's company, RGHI.

        c.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

        d.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators caused Refco to file false and fraudulent statements with the SEC.

        e.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators made and caused to be made material false statements and omissions to Refco's auditors.

        f.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

32

g.    SANTO C. MAGGIO, the defendant, and Phillip
R. Bennett and their coconspirators misrepresented to customers,
potential customers, lenders, investors and others that Refco did
not engage in proprietary trading.

**Overt Acts**

61.    In furtherance of the conspiracy and to effect the
illegal objects thereof, the following acts, among others, were
committed in the Southern District of New York and elsewhere:

a.    In or about late 1997, Phillip R. Bennett and
Tone N. Grant misrepresented to the public that Refco had not
taken a significant loss in connection with the trading of
Customer 1.

b.    On or about May 15, 1998, Phillip R. Bennett
and Tone N. Grant signed a letter to Refco's auditors
misrepresenting, among other things, that "the accounting records
underlying the financial statements accurately and fairly
reflect, in reasonable detail, the transactions of the company"
and that Refco had properly "recorded or disclosed" all "related
party transactions and related amounts receivable or payable."

c.    On or about April 30, 2003, Phillip R.
Bennett and Robert C. Trosten signed a letter to Refco's auditors
representing, among other things, that all related party
transactions and related party amounts receivable had been fully
disclosed to the auditors.

33

d.    On or about February 20, 2004, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $720 million loan from Refco Capital Markets, Ltd., to a customer.

e.    On or about April 27, 2004, Phillip R. Bennett and Robert C. Trosten signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party receivables had been fully disclosed to the auditors.

f.    On or about May 17, 2004, Phillip R. Bennett and Tone N. Grant met at a hotel in lower Manhattan to discuss the more than $1 billion debt that they, as the owners of RGHI, owed to Refco.

g.    On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Robert C. Trosten approximately $48 million.

h.    On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Tone N. Grant approximately $4 million.

i.    On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the defendant, approximately $5.75 million.

j.    On or about August 8, 2004, Phillip R. Bennett caused RGHI to transfer to TONE N. GRANT approximately

34

$12 million.

k.    On or about February 23, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $345 million loan from a Refco customer to RGHI.

l.    On or about April 6, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-4 registration statement.

m.    On or about May 25, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $450 million loan from a Refco customer to RGHI.

n.    On or about July 19, 2005, in New York, New York, Phillip R. Bennett signed Refco's annual report on Form 10K.

o.    On or about August 8, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-1 registration statement.

p.    On or about August 26, 2005, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $420 million loan from Refco Capital Markets, Ltd., to a customer.

q.    On or about September 6, 2005, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the

35

defendant, approximately $7,668,600.

(Title 18, United States Code, Section 371).

### COUNT TWO

### (Securities Fraud)

The United States Attorney further charges:

62.  The allegations contained in paragraphs 1 through
51, 60 and 61 of this Information are repeated and realleged as
if fully set forth herein.

63.  From in or about the late 1990s up to in or about
2004, in the Southern District of New York and elsewhere, SANTO
C. MAGGIO, the defendant, unlawfully, willfully, and knowingly,
directly and indirectly, by the use of means and
instrumentalities of interstate commerce, the mails, and the
facilities of national securities exchanges, did use and employ,
in connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances, in violation
of Title 17, Code of Federal Regulations, Section 240.10b-5, by:
(a) employing devices, schemes, and artifices to defraud; (b)
making untrue statements of material facts and omitting to state
material facts necessary in order to make the statements made, in
light of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices, and courses of
business which operated and would operate as a fraud and deceit
upon persons and entities, in connection with the purchase and

36

sale of 9% Senior Subordinated Notes due 2012, issued by Refco

Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

**COUNT THREE**

**(Securities Fraud)**

The United States Attorney further charges:

64.  The allegations contained in paragraphs 1 through

51, 60 and 61 of this Information are repeated and realleged as

if fully set forth herein.

65.  From in or about the late 1990s up to in or about

October 2005, in the Southern District of New York and elsewhere,

SANTO C. MAGGIO, the defendant, unlawfully, willfully, and

knowingly, directly and indirectly, by the use of means and

instrumentalities of interstate commerce, the mails, and the

facilities of national securities exchanges, did use and employ,

in connection with the purchase and sale of securities,

manipulative and deceptive devices and contrivances, in violation

of Title 17, Code of Federal Regulations, Section 240.10b-5, by:

(a) employing devices, schemes, and artifices to defraud; (b)

making untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not

misleading; and (c) engaging in acts, practices, and courses of

37

business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of the common stock of Refco, Inc.

> (Title 15, United States Code, Sections 78j(b) and 78ff; Title
> 17, Code of Federal Regulations, Section 240.10b-5; and
> Title 18, United States Code, Section 2).

### COUNT FOUR

### (Wire Fraud)

The United States Attorney further charges:

66.  The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

67.  On or about July 19, 2005, in the Southern District of New York, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice, the electronic transmission of Refco Form 10-K from New York, New York to Virginia.

> (Title 18, United States Code, Sections 1343 and 2).

38

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE THROUGH FOUR

68.    As a result of committing one or more of the
foregoing securities fraud offenses, in violation of Title 15,
United States Code, Sections 78j(b) and 78ff; and Title 17, Code
of Federal Regulations, Sections 240.10b-5, as alleged in Counts
One, Two and Three; and wire fraud offenses, in violation of
Title 18, United States Code, Section 1343, as alleged in Counts
One and Four of this Information, SANTO C. MAGGIO shall forfeit
to the United States pursuant to Title 18, United States Code,
Section 981(a)(1)(C) and Title 28, United States Code, Section
2461, all property, real and personal, that constitutes or is
derived from proceeds traceable to the commission of the
securities and wire fraud offenses, including but not limited to
the following: At least $2.4 billion in United States currency,
representing the amount of proceeds obtained as a result of the
charged wire and securities fraud offenses, for which the
defendant is jointly and severally liable.

## SUBSTITUTE ASSETS PROVISION

69.    If any of the above-described forfeitable
property, as a result of any act or omission of the defendant:

(i)    cannot be located upon the exercise of due
diligence;

(ii)   has been transferred or sold to, or
deposited with, a third party;

39

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 371, 981, 982, 1343; Title 15, United States Code, Sections 78j(b), 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; Title 21, United States, Section 853(p); and Title 28, United States Code, Section 2461.)

*Michael J. Garcia*

MICHAEL J. GARCIA
United States Attorney

40

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### SANTO C. MAGGIO,

**Defendant.**

### INFORMATION

07 Cr.

(18 USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR,
§240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18
USC 1343, 2; 15 U.S.C. §78m and 78ff;  17 CFR §240.13b2-
2); 18 USC 1344,2: 18 USC 1957(a).

MICHAEL J. GARCIA
United States Attorney.

Exhibit G

7CJAAMAGP.txt

1

7CJAAMAGP          Plea

1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    UNITED STATES OF AMERICA,
3
4         v.                    07 SD 312 (RLE)
4
5    SANTO C. MAGGIO,
5
6         Defendant.
6
7    ------------------------------x
7
8                              New York, N.Y.
8                              December 19, 2007
9                              11:30 a.m.
9
10
10   Before:
11
11             HON. RONALD L. ELLIS,
12
12                         Magistrate Judge
13
13                      APPEARANCES
14
14
15   JAMES B. COMEY
15      United States Attorney for the
16      Southern District of New York
16   NEIL BAROFSKY
17   CHRISTOPHER GARCIA
17      Assistant United States Attorney
18
18   PAUL SHECHTMAN
19      Attorney for Defendant Maggio
19
20   SCOTT E. HERSHMAN
20      Attorney for Defendant Maggio
21

Page 1

7CJAAMAGP.txt

22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐                                                                                    2

7CJAAMAGP              Plea

1        (Case called)
2        MR. BAROFSKY:  Neil Barofsky and Christopher Garcia
3    for the government.
4        Good morning, your Honor.
5        MR. SCHECTMAN:  Paul Shechtman, for Mr. Maggio, with
6    Scott Hershman, for Mr. Maggio.
7        THE COURT:  Okay.  I understand that he is going to be
8    pleading to an information.
9        MR. SCHECTMAN:  Correct, your Honor.
10       THE COURT:  Has he waived indictment yet?
11       MR. SCHECTMAN:  You have the paperwork.  We're ready
12   to waive.
13       THE COURT:  We will do those separately.  Treat the
14   waiver as it should be and then I'll consider the taking of the
15   plea.
16       MR. SCHECTMAN:  Sounds right.
17       COURTROOM DEPUTY:  You are Santo Maggio?
18       THE DEFENDANT:  Yes.
19       COURTROOM DEPUTY:  Have you signed this waiver of
20   indictment.
21       THE DEFENDANT:  Yes.
22       COURTROOM DEPUTY:  Before you signed it did you
23   discussion it with your attorney?
24       THE DEFENDANT:  Yes.
25       COURTROOM DEPUTY:  Did he explain it to you?
         SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

☐                                                                                    3

7CJAAMAGP              Plea

1        THE DEFENDANT:  Yes.
2        THE COURT:  Do you understand what you are doing?
3        THE DEFENDANT:  Yes.
4        COURTROOM DEPUTY:  Do you understand that you are
5    under no obligation to waive indictment?
6        THE DEFENDANT:  Yes.
                    Page 2

7CJAAMAGP.txt

7     COURTROOM DEPUTY:  Do you understand that if you do
8   not waive indictment, if the government wants to prosecute you
9   they will have to present this case to a grand jury which may
10  or may not indict you?
11    THE DEFENDANT:  Yes.
12    THE COURT:  Do you realize by that by signing this
13  waiver of indictment you have given up your right to have this
14  case presented to a grand jury?
15    THE DEFENDANT:  Yes, I do.
16    COURTROOM DEPUTY:  Have you seen a copy of the
17  information?
18    THE DEFENDANT:  Yes, I did.
19    THE COURT:  Would you like for me to read it to you?
20    THE DEFENDANT:  No.
21    COURTROOM DEPUTY:  How do you plead?
22    THE DEFENDANT:  Guilty.
23    COURTROOM DEPUTY:  The case has already been assigned
24  to Judge Stein.
25    MR. SCHECTMAN:  Correct.
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

☐                                          4
     7CJAAMAGP              Plea
1     MR. BAROVSKY:  Your Honor, we consent to the defendant
2   being released on his own recognizance.
3     MR. SCHECTMAN:  We don't object to that.
4     THE COURT:  Technically to the information you are
5   supposed to plead "not guilty".
6     MR. SCHECTMAN:  I think that is right and it is my
7   apologies.
8     THE DEFENDANT:  I plead not guilty now and then later
9   of guilty.
10    MR. SCHECTMAN:  Not guilty at this time, your Honor,
11  but we will be entering a guilty plea.
12    THE COURT:  Objection.  All right.  Now, the actual
13  plea has been referred by Judge Stein; is that it?
14    MR. BAROFSKY:  Yes, your Honor.
15    THE COURT:  And how many counts in the information?
16    MR. BAROFSKY:  Your Honor, there are four counts.
17    THE COURT:  What is he pleading to?
18    MR. BAROFSKY:  All four counts, Judge.
19    THE COURT:  Okay.  Mr. Maggio, this matter has been
20  referred to me before Judge Stein for the purpose of taking
                      Page 3

7CJAAMAGP.txt

21   your plea. Did you consent to proceed before a United States
22   magistrate judge on your felony plea allocution?
23        THE DEFENDANT: Yes.
24        THE COURT: Before you signed it did you discuss it
25   with your attorneys?
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                    5

7CJAAMAGP          Plea
1         THE DEFENDANT: Yes, your Honor.
2         THE COURT: Did they explain it to you?
3         THE DEFENDANT: Yes.
4         THE COURT: Do you understand that you have an
5    absolute right to have this proceeding before a United States
6    district judge?
7         THE DEFENDANT: Yes, I do.
8         THE COURT: You are voluntarily proceeding before a
9    United States magistrate judge?
10        THE DEFENDANT: Yes.
11        THE COURT: Mr. Maggio, you are charged in a four
12   count information. Count One of the information charges you,
13   well, conspiracy to commit securities fraud, wire fraud, bank
14   fraud and money laundering and to make false filings with the
15   SEC and material misstatements to auditors in violation of
16   Title 18 U.S.C. Sections 371. This crime carries a maximum
17   sentence of five years imprisonment, a maximum fine which is
18   the greatest of either $250,5000 or twice the gross pecuniary
19   gain derived from the offense or twice the gross pecuniary loss
20   to persons other than yourself as a result of the offense.
21   There is a $100 special assessment and a term of supervised
22   release of three years.
23        Counts Two and Three of the information charge you
24   with securities fraud in violation of Title 15 U.S.C. Section
25   78 (J) (B) and 78 (F) (F) and Title 17 Code of Federal
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                    6

7CJAAMAGP          Plea
1    Regulations Section 240, 10 (B) (5) and each of those counts
2    carries a maximum sentence of 20 years imprisonment, a maximum
3    fine which is the greatest of either five million dollars or
4    twice the gross pecuniary gain derived from the offense and
5    twice the gross pecuniary loss of persons other than yourself
                              Page 4

7CJAAMAGP.txt

6  as a result of the offense.  Each also has a $100 special
7  assessment and a term of supervised release of three years.
8         Count four of the information charges you with wire
9  fraud in violation of Title 18 U.S.C. Section 1343 and carries
10  a maximum sentence of 0 years imprisonment, a maximum fine
11  which is the greatest of either $250,000 or twice the gross
12  pecuniary gain derived from the offense, or twice the gross
13  pecuniary loss to person others than yourself as a result of
14  the offense.  It carries a $100 special assessment and a term
15  of supervised release of three years.
16         A total maximum sentence of incarceration on the
17  information is 65 years imprisonment.  In addition to the
18  foregoing the Court must order restitution with respect to the
19  information and in accordance with U.S.C.
20         In addition, if you are sentenced to any period of
21  supervised release and violate the conditions of your
22  supervised release you may be sentenced to all or part of the
23  supervised release as authorized by statute without any credit
24  for time already served on supervised release.
25         Do you understand that?
             SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

☐                                    7
7CJAAMAGP           Plea
1         THE DEFENDANT:  Yes.
2         THE COURT:  So you understand these penalties as I've
3  read them to you?
4         THE DEFENDANT:  Yes, I do.
5         THE COURT:  Have you seen a copy of the information in
6  which the government makes these charges against you?
7         THE DEFENDANT:  Yes, I do.
8         THE COURT:  Have you discussed it with your attorneys?
9         THE DEFENDANT:  Yes, your Honor.
10        THE COURT:  Are you prepared to enter a plea today?
11        THE DEFENDANT:  Yes, I am.
12        THE COURT:  Santo Maggio, how do you plead?
13        THE DEFENDANT:  Guilty.
14        THE COURT:  Mr. Maggio, before I can recommend that
15  your plea be accepted I must determine that you understand the
16  plea and its consequences, that the plea is voluntary and that
17  there's a factual basis for the plea.  For that purpose I must
18  ask you a number of questions and your answers must be under
19  oath.  Do you understand that the answers you give under oath
                          Page 5

7CJAAMAGP.txt

20    may subject you to prosecution for perjury if you do not tell
21    the truth?
22          THE DEFENDANT:  Yes, I do.
23          THE COURT:  Raise your right hand.
24          (Defendant Santo C. Maggio sworn)
25          THE COURT:  Thank you.  Please state your full name
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

☐                                                   8
      7CJAAMAGP            Plea
1     for record.
2           THE DEFENDANT:  Santo C. Maggio.
3           THE COURT:  How far did you go in school?
4           THE DEFENDANT:  I finished high school.
5           THE COURT:  Are you currently being treated by a
6     doctor or psychiatrist for any reason?
7           THE DEFENDANT:  No.
8           THE COURT:  Are you currently on any medications which
9     might effect you in being alert for this proceeding?
10          THE DEFENDANT:  No.
11          THE COURT:  Are you any difficulty seeing, hearing or
12    understanding anything that I am saying?
13          THE DEFENDANT:  No.
14          THE COURT:  Have you had enough time to discuss with
15    your attorneys how you wish to plead?
16          THE DEFENDANT:  Yes.
17          THE COURT:  Are you satisfied with your attorneys?
18          THE DEFENDANT:  Yes.
19          THE COURT:  Do you understand what the government says
20    that you did?
21          THE DEFENDANT:  Yes.
22          THE COURT:  Do you understand that have you a right to
23    plead not guilty?
24          THE DEFENDANT:  Yes.
25          THE COURT:  Do you understand that you have a right to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

☐                                                   9
      7CJAAMAGP            Plea
1     trial by jury on these charges?
2           THE DEFENDANT:  Yes.
3           THE COURT:  Do you understand that if you are to plead
4     not guilty and go to trial you would be presumed innocent until
                            Page 6

7CJAAMAGP.txt

5  the government proved your guilt beyond a reasonable doubt?
6      THE DEFENDANT: Yes, I do.
7      THE COURT: Do you understand that if you were to go
8  to trial you would have a number of important constitutional
9  rights including the right to be represented by counsel and to
10  have counsel appointed for you if you cannot afford an
11  attorney?
12      THE DEFENDANT: Yes.
13      THE COURT: Do you understand that at trial you cannot
14  be forced to testify against yourself?
15      THE DEFENDANT: Yes.
16      THE COURT: Do you understand at a trial you would
17  have the right to confront and cross-examine witnesses called
18  by the government?
19      THE DEFENDANT: Yes.
20      THE COURT: Do you understand that at a trial you
21  would have the right to testify yourself and to call witnesses
22  on your behalf and to compel their attendance by subpoena if
23  necessary?
24      THE DEFENDANT: Yes.
25      THE COURT: Do you understand that if your guilty plea
            SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

☐                                10

7CJAAMAGP            Plea
1  is accepted there will be no trial of any kind and the only
2  remaining steps in your case will be a presentence report and
3  sentencing by Judge Stein?
4      THE DEFENDANT: Yes.
5      THE COURT: Have you discussed with your attorney the
6  role that the sentencing guidelines play in sentencing?
7      THE DEFENDANT: Yes.
8      THE COURT: Do you understand that the district judge
9  will retain discretion regardless of what calculations there
10  are under the guidelines?
11      THE DEFENDANT: Yes.
12      THE COURT: Do you understand that the calculation
13  under the guidelines will take into account a number of factors
14  including the actual conduct in which you engaged, any victims
15  of the offense, the role that you played in the offense,
16  whether or not you have accepted responsibility for your acts,
17  whether you have any criminal history or whether you have
18  engaged in any obstruction of justice; do you understand that?
                    Page 7

7CJAAMAGP.txt

19          THE DEFENDANT: Yes.
20          THE COURT: Between now and the date of sentencing the
21   probation department will conduct an investigation and will
22   prepare a presentence report. Your attorney, the government
23   and Judge Stein will receive copies. Both your attorney and
24   the government will have the opportunity to object if they
25   believe anything in the report is inaccurate; do you understand
             SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                      11
7CJAAMAGP           Plea
1    that?
2           THE DEFENDANT: Yes.
3           THE COURT: Do you understand that until the
4    presentence report is prepared neither your attorney nor the
5    government, nor Judge Stein will be able to determine precisely
6    what range of penalties will be calculated under the
7    guidelines.
8           THE DEFENDANT: Yes.
9           THE COURT: Do you understand than regardless of
10   calculation and the guidelines your sentence cannot exceed the
11   maximums that I advised you of earlier?
12          THE DEFENDANT: Yes.
13          THE COURT: Do you understand that under certain
14   circumstances both you and the government may have the right to
15   appeal the sentence imposed.
16          THE DEFENDANT: Yes.
17          THE COURT: Do you understand that if the sentence is
18   more severe than you expected you will be bound by your guilty
19   plea and will not be permitted to withdraw it?
20          THE DEFENDANT: Yes.
21          THE COURT: You understand that parole has been
22   abolished and that if you are sentenced to any term of
23   imprisonment you will be required to serve the entire term?
24          THE DEFENDANT: Yes.
25          THE COURT: Mr. Maggio, are you a citizen of the
             SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                      12
7CJAAMAGP           Plea
1    United States?
2           THE DEFENDANT: Yes, I am.
3           THE COURT: Mr. Maggio, I have been handed up a plea
                         Page 8

7CJAAMAGP.txt
4  agreement from your case.  Have you had an opportunity to
5  review and go over this agreement with your attorneys?
6      THE DEFENDANT:  Yes.
7      THE COURT:  Do you understand that one of the
8  provisions in the plea agreement is that you admit the
9  forfeiture allegation in the information and that you agree to
10  forfeit to the United States a sum of money equal to two
11  billion, four hundred million dollars?
12      THE DEFENDANT:  Yes.
13      THE COURT:  That is what it says, right?
14      MR. BAROFSKY:  Yes, your Honor, that number is
15  correct.
16      Your Honor, the plea cooperation agreement also
17  provides, however, that in satisfaction of that amount there
18  are certain schedules attached to the plea agreement which the
19  government will accept in satisfaction of that judgment.
20      MR. SCHECTMAN:  We don't have quite that much, your
21  Honor.
22      THE COURT:  Okay.  I thought had I too many zeros
23  myself at first.
24      MR. SCHECTMAN:  No, you read it right.
25      THE COURT:  That represents the amount of the
                SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
☐                          13
7CJAAMAGP          Plea
1  proceedings obtained as a result of the offense; do you
2  understand that?
3      THE DEFENDANT:  Yes.
4      THE COURT:  You also understand that any forfeiture
5  would not be treated as satisfaction of any fine, restitution,
6  cause of imprisonment or any other penalty the Court may
7  impose?
8      THE DEFENDANT:  Yes.
9      THE COURT:  And as indicated in the agreement, there
10  is a scheduled pay of assets.  You have seen the schedule and
11  you have gone over it with your attorneys?
12      THE DEFENDANT:  Yes.
13      THE COURT:  To make sure that it's accurate?
14      THE DEFENDANT:  Yes.
15      MR. SCHECTMAN:  Judge, I might point out for the
16  record there is a Schedule B as well, which are assets that are
17  in Mrs.~Maggio's name that are being forfeited as part of the
                          Page 9

7CJAAMAGP.txt

18   plea and there is a separate agreement that need not concern
19   your Honor in this matter involving Mrs.~Maggio.
20        THE COURT:  Is that correct, Mr. Maggio, there is also
21   a Schedule B?
22        THE DEFENDANT:  Yes.
23        THE COURT:  That's Mrs.~Maggio's assets?
24        THE DEFENDANT:  Yes.
25        THE COURT:  That is also covered by the agreement that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                      14
        7CJAAMAGP              Plea
1    you made with the government?
2         THE DEFENDANT:  Yes.
3         THE COURT:  You are also understand the agreement
4    provides that you cooperate fully with the United States
5    attorney's office?
6         THE DEFENDANT:  Yes.
7         THE COURT:  And that in exchange for that cooperation,
8    assuming that the office determines that you have made full and
9    accurate disclosures to them, the government has agreed that it
10   will submit a motion pursuant to Section 5K1.1 of the
11   sentencing guidelines in your favor?
12        THE DEFENDANT:  Yes.
13        THE COURT:  Do you understand that if for any reason
14   the government determines that it will not file such a motion
15   you will not be allowed to withdraw your plea?
16        THE DEFENDANT:  Yes.
17        THE COURT:  You understand that even if the government
18   files such a motion sentencing will still be at the sole
19   discretion of the Court?
20        THE DEFENDANT:  Yes, I did.
21        THE COURT:  Is there anything else in the agreement
22   that I might want to highlight?
23        MR. BAROFSKY:  No, your Honor.
24        THE COURT:  All right.  Other than the representations
25   in this agreement, have any promises been made to you by anyone
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                      15
        7CJAAMAGP              Plea
1    to influence you to plead guilty?
2         THE DEFENDANT:  No.
                          Page 10

7CJAAMAGP.txt

3       THE COURT:  This constitutes the sole agreement that
4  you have?
5       THE DEFENDANT:  Yes.
6       THE COURT:  Has anyone promised you a specific
7  sentence if you plead guilty?
8       THE DEFENDANT:  No.
9       THE COURT:  Has anyone made any threats to you to
10  influence you to plead guilty?
11       THE DEFENDANT:  No.
12       THE COURT:  Are you making this plea voluntarily of
13  your own freewill and choice?
14       THE DEFENDANT:  Yes, I am.
15       THE COURT:  The elements of the offense is?
16       MR. BAROFSKY:  Your Honor, for Counts One defendant's
17  is charged with conspiracy.  The government would be required
18  to prove each of the elements beyond a reasonable doubt.
19  First, that there is an assistance of a an agreement or
20  understanding to commit one of the objects charged in the
21  information.
22       Second, the defendant knowingly became a member of
23  that agreement or understanding.
24       And third, that one of the conspirators or
25  coconspirators or Mr. Maggio knowingly committed at least one
           SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                        16
7CJAAMAGP              Plea
1  overt act in furtherance of the conspiracy during its life.
2       With respect to the securities frauds counts in two
3  and three, first, the defendant in connection with the purchase
4  or sale of securities, here the notes that are described in
5  Count Two and the common stock of Revko that's referenced in
6  Count Three did one or more of the following:  Employed a
7  devise, scheme or artifice to defraud or made an untrue
8  statement of a material fact or admitted to state a material
9  fact which made what was said under the circumstances
10  misleading or engaged in an act, practice or course of business
11  that operated or would operate as a fraud or deceit upon a
12  purchase of a seller for securities.
13       Second the defendant acted knowingly, willfully with
14  the intent to defraud.
15       And third, the defendant used or caused to be used any
16  means or instruments of transportation or communication in
                  Page 11

7CJAAMAGP.txt

17   interstate commerce or use of the mails in furtherance of that
18   fraudulent conduct.
19       and with respect to the Count Four wire fraud, first,
20   that there was a scheme or artifice to defraud that existence
21   the defendant must have participated in the scheme with the
22   intent to defraud misrepresentations or omissions must have
23   related to a material fact, that the scheme was executed to
24   obtain money or property.
25       And finally, that in execution of the scheme the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

7CJAAMAGP       Plea

1   defendant used or caused to be used interstate wires or that
2   such use was reasonably foreseeable to him.
3       THE COURT:  Mr. Maggio, did you hear that recitation?
4       THE DEFENDANT:  Yes.
5       THE COURT:  Did you understand that if the government
6   were to proceed to trial against you it would have the burden
7   of proving each element for each offense, that is, each count
8   beyond a reasonable doubt.
9       THE DEFENDANT:  Yes.
10       THE COURT:  Did you commit the offenses for which you
11   have been charged, Mr. Maggio?
12       THE DEFENDANT:  Yes.
13       THE COURT:  Tell me what you did.
14       MR. SCHECTMAN:  Judge, if it's acceptable to you
15   Mr. Maggio has written out a statement that I think speaks to
16   all four crimes.
17       THE COURT:  Considering the complexities here I'll
18   allow him to read and then if it's not he could fill in the
19   gaps.
20       THE DEFENDANT:  Your Honor, from the late 1990s to
21   October 2005 I was a senior executive at Revko Ink.  During
22   that period I participated with others to hide the true
23   financial health of Revko from banks, counter-parties, auditors
24   and investors.  With my knowledge and active participation
25   Revko's substantial losses were covered up as revenues padded

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

7CJAAMAGP       Plea

1   and certain operating expenses were moved off its book.  Among

Page 12

7CJAAMAGP.txt

2  the acts I personally engaged in the signing of loan agreements
3  referencing paragraphs 61-D and 61-P of the indictment.
4       As a result of my conduct and that of my
5  coconspirators false financial statements were issued to obtain
6  debt financing from the public including 9 percent senior
7  subordinated notes referenced in Count Two of the indictment.
8       To consummate the sale of 57 percent of Revko to a
9  group headed by Thomas H. Lee in 2004 and to obtain $800
10  million in bank financing the same year and to effect the Revko
11  initial public offering in 2005.  Moreover, with my knowledge
12  false financial statements were filed with the SEC including
13  form 10K referencing Count Four.  The mails and interstate
14  wires were used as part of the fraudulent scheme.
15       I deeply regret my conduct and the harm that it has
16  caused.
17       THE COURT:  First of all, with respect to all of the
18  activities that you've indicate you participated in it
19  knowingly?
20       THE DEFENDANT:  Yes.
21       THE COURT:  Okay.  Where did this take place.
22       THE DEFENDANT:  In New York, New York.  Manhattan, New
23  York.
24       THE COURT:  You said coconspirators, so other people
25  had agreed with you to effectuate this scheme?
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

☐                        19
      7CJAAMAGP            Plea
1       THE DEFENDANT:  Yes.
2       THE COURT:  And the intent of this scheme was to
3  defraud?
4       THE DEFENDANT:  Yes.
5       THE COURT:  Now, I know you mentioned the notes and I
6  think you mentioned the 2005 initial offering that was
7  addressed to Count Three of the information, that is, whether
8  or not you had a scheme to defraud people based on the value of
9  the stock?
10       THE DEFENDANT:  Correct, your Honor.
11       THE COURT:  Mr. Maggio?
12       THE DEFENDANT:  Yes.
13       THE COURT:  That did involve false statements?
14       THE DEFENDANT:  Yes.
15       THE COURT:  False filings that you've indicated?
                   Page 13

7CJAAMAGP.txt

16      THE DEFENDANT:  Yes.

17      THE COURT:  Now, you said you used the mails which

18  interstate -- I mean, you used the mails, a phone?  How did you

19  use --

20      THE DEFENDANT:  Yes, used regular mail.  We used

21  Express Mail.  We used e-mail all to effect the scheme.

22      THE COURT:  You submitted false statements in the

23  mail?

24      THE DEFENDANT:  False statements, loan agreements as

25  referenced here, yes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

20

7CJAAMAGP          Plea

1      THE COURT:  Okay.  Any --

2      MR. BAROFSKY:  Your Honor, I'll just represent to the

3  Court that with respect to Count Four, the wire transmission

4  did in fact originate in the Southern District of New York in

5  Manhattan and was wired outside of the Southern District to

6  Virginia.

7      THE COURT:  Anything else?

8      MR. SCHECTMAN:  Nothing, your Honor.

9      MR. BAROFSKY:  No, your Honor.

10      THE COURT:  I am depending on you here.  Does any

11  either counsel know of any reason why I should not recommend

12  that this plea not be accepted?

13      MR. BAROFSKY:  No, your Honor.

14      MR. SCHECTMAN:  No, your Honor.

15      THE COURT:  Based on defendant's allocution and the

16  recommendations by the government I find that the defendant

17  understands the nature, the charges and consequences of his

18  guilty plea.  I also find that the plea is voluntary and that

19  there is a factual basis for the plea.  I, therefore, recommend

20  that the plea be accepted and direct that a presentence report

21  be reaped.

22      Sentencing will take place before Judge Stein on.

23      MR. BAROFSKY:  May 9, at 2 p.m.

24      THE COURT:  Is there anything else that needs to be

25  addressed today.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

21

7CJAAMAGP          Plea

Page 14

7CJAAMAGP.txt

1      MR. BAROVSKY:  Not from the government, your Honor.
2      MR. SCHECTMAN:  Not from the offense.
3      THE COURT:  We are adjourned.
4              o 0 o
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐