John H. Eickemeyer (JE-8302)
Daniel C. Green (DG-0059)
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019

Daniel J. Standish (*pro hac vice*)
Marc E. Rindner (*pro hac vice*)
Cara Tseng Duffield (*pro hac vice*)
WILEY REIN LLP
1776 K Street NW
Washington, D.C. 20006

*Attorneys for Plaintiff Arch Insurance Company*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **ARCH INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 08-CIV-5252 (GEL)** |
| | ) | **ECF Case** |
| **JOHN D. AGOGLIA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

     Annexed hereto are true copies of filings originally made in the Supreme Court of the State of New York, County of New York, in the action *Arch Insurance Co. v. Agoglia, et al.*, Index No. 08/600029, which was removed to this Court on or around June 9, 2008.

     The record is supplemented by the undersigned counsel for the plaintiff Arch Insurance Company, pursuant to a letter from such counsel which was So Ordered by the Court on July 21, 2008 and entered into the docket on July 22, where it was assigned ECF No. 26.  The supplementary filings are as follows:

| Document Number | Document Title |
|---|---|
| | |
| 1. | Summons and Complaint (and Exhibits A-G thereto) |
| 2. | Amended Summons and First Amended Complaint for Declaratory Judgment (and Exhibits A-J thereto) |

| 3. | Affidavit of Service of Summons and Complaint and of Amended Summons and Complaint Upon Enumerated Defendants (and Exhibits 1-15 thereto) |
|---|---|
| 4. | Request for Judicial Intervention |
| 5. | Statement in Support of Request for Assignment to Commercial Division (and Exhibit A thereto) |
| 6. | Notice of Motion for the *Pro Hac Vice* Admission of Cara Tseng Duffield, Marc E. Rindner and Daniel J. Standish |
| 7. | Affirmation of Daniel C. Green in Support of the *Pro Hac Vice* Admission of Cara Tseng Duffield, Marc E. Rindner and Daniel J. Standish (and Exhibits 1-3 thereto) |
| 8. | Affidavit of Service of Enumerated Filings Upon Defendant Cox |
| 9. | So Ordered Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett with annexed Judgment Entered by Clerk |
| 10. | Notice of Discontinuance as to Defendant Cox |
| 11. | Stipulation of Partial Discontinuance with Prejudice as against Defendant Trosten |
| 12. | Notice of Motion and Affirmation of Richard Cashman (and Exhibits A-Z thereto) |
| 13. | Memorandum of Law in Support of the Insureds' Motion to Dismiss the First Amended Complaint for Declaratory Judgment |
| 14. | Corrected Notice of Motion |
| 15. | Corrected Memorandum of Law in Support of the Insureds' Motion to Dismiss the First Amended Complaint for Declaratory Judgment |
| 16. | Notice of Appearance of Zuckerman Spaeder LLP on Behalf of Defendant Grant |
| 17. | Notice of Motion for Admission *Pro Hac Vice* of Norman L. Eisen and Affirmation of Laura E. Neish in Support Thereof |
| 18. | Affirmation of John H. Eickemeyer in Support of Arch Insurance Company's Opposition to Certain Defendants' Motion to Dismiss the First Amended Complaint (and Exhibits A-M thereto) |

NEWYORK/#198626.1

| 19. | Plaintiff Arch Insurance Company's Opposition to Certain Defendants' Motion to Dismiss the First Amended Complaint |
|---|---|
| 20. | Notice of Entry of So Ordered Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett (annexed as Exhibit A thereto) |
| 21. | Corrected Affidavit of Service of Notice of Entry Upon Enumerated Defendants |
| 22. | Reply Affirmation of Richard Cashman (and Exhibits A-D thereto) |
| 23. | Reply Memorandum of Law in Support of the Insureds' Motion to Dismiss the First Amended Complaint for Declaratory Judgment |
| 24. | Affidavit of Service of Summons and Complaint and of Amended Summons and Complaint upon Defendants Dhillon and Lipoff |
| 25. | Notice of Motion for Voluntary Discontinuance as Against Defendants Thomas H. Dittmer and Stephen Grady; Affirmation of Daniel C. Green in Support of Motion for Voluntary Discontinuance as Against Defendants Thomas H. Dittmer and Stephen Grady |
| 26. | So Ordered Stipulation of Partial Discontinuance with Prejudice as against Defendant Maggio |
| 27. | Order Granting *Pro Hac Vice* Admission of Cara Tseng Duffield, Marc E. Rindner, and Daniel J. Standish |
| 28. | Order Granting *Pro Hac Vice* Admission of Norman Eisen |
| 29. | Notice of Filing of Notice of Removal (annexed as Exhibit A thereto) |

3

Date:  July 31, 2008

Respectfully submitted,


By:    s/  John H. Eickemeyer
        John H. Eickemeyer  (JE-8302)
        jeickemeyer@vedderprice.com
        Daniel C. Green  (DG-0059)
        dgreen@vedderprice.com
        VEDDER PRICE P.C.
        1633 Broadway, 47th Floor
        New York, NY 10019
        (212) 407-7700

        Daniel J. Standish (*pro hac vice*)
        dstandish@wileyrein.com
        Marc E. Rindner (*pro hac vice*)
        mrindner@wileyrein.com
        Cara Tseng Duffield (*pro hac vice*)
        cduffield@wileyrein.com
        WILEY REIN LLP
        1776 K Street, N.W.
        Washington, D.C. 20006
        (202) 719-7000

        *Counsel for Plaintiff Arch Insurance Company*

NEWYORK/#198626.1

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

|  |  |
|---|---|
| ARCH INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | )  Index No.: 08/600029 |
| | ) |
| v. | ) |
| | ) |
| JOHN D. AGOGLIA, PHILLIP R. | )  **AMENDED SUMMONS** |
| BENNETT, LEO R. BREITMAN, EDWIN | ) |
| L. COX, SUKHMEET DHILLON, | ) |
| THOMAS H. DITTMER, NATHAN | ) |
| GANTCHER, STEPHEN GRADY, TONE | ) |
| GRANT, THOMAS HACKL, DAVID V. | ) |
| HARKINS, SCOTT L. JAECKEL, | ) |
| DENNIS A. KLEJNA, THOMAS H. LEE, | ) |
| ERIC G. LIPOFF, SANTO C. MAGGIO, | ) |
| PETER MCCARTHY, JOSEPH | ) |
| MURPHY, FRANK MUTTERER, | ) |
| RICHARD N. OUTRIDGE, RONALD L. | ) |
| O'KELLEY, SCOTT A. SCHOEN, | ) |
| WILLIAM M. SEXTON, GERALD | ) |
| SHERER, PHILIP SILVERMAN and | ) |
| ROBERT C. TROSTEN | ) |
| | ) |
| Defendants. | ) |
| | ) |

**FILED**

FEB 2 2 2008

NEW YORK
COUNTY CLERK'S OFFICE

**TO THE ABOVE NAMED DEFENDANTS:**

   **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your answer, or if the Complaint is not served with this summons, to serve a notice of appearance on plaintiff's attorneys, within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you in the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint. Plaintiff designates New York County as the place of trial.

The basis for venue is that plaintiff Arch Insurance Company's principal place of business is located at One Liberty Plaza, 53rd Floor, New York, NY 10006, and the County of New York is therefore the proper venue for trial pursuant to CPLR §503(a).

Dated:  February 21, 2008                    Respectfully submitted,

                                             VEDDER PRICE P.C.

                                             By: _____
                                                  John H. Eickemeyer
                                                  Daniel C. Green

                                             1633 Broadway
                                             47th Floor
                                             New York, New York 10019

                                             (212) 407-7700

                                             Of Counsel:

                                             Daniel J. Standish
                                             Marc E. Rindner
                                             Cara Tseng Duffield
                                             WILEY REIN LLP
                                             1776 K Street, NW
                                             Washington, DC 20006
                                             202-719-7000

                                             *Attorneys for Plaintiff*
                                             *Arch Insurance Company*

To:

John D. Agoglia
3 Sweet Hollow Ct.
St. James, NY 11780

Phillip R. Bennett
125 Colt Lane
Gladstone, NJ  07934

Leo R. Breitman
7767 Wind Key Drive
Boca Raton, FL  33434

Edwin L. Cox
c/o Brian O'Connor, Esq.
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099

Sukhmeet Dhillon
1 Upper Vintage
Laguna Niguel, CA 92677-9202

Thomas H. Dittmer
150 S. Wacker Drive, Suite 1200
Chicago, IL 60606-4201

Nathan Gantcher
86 Birchall Drive
Scarsdale, NY  10583

Stephen Grady
c/o Lawrence J. Kotler, Esq.
Duane, Morris & Heckscher LLP
30 South 17th Street
Philadelphia, PA 19103

Tone Grant
680 North Lake Shore Drive, Apt. 1620
Chicago, IL  60611

Thomas Hackl
c/o Avraham C. Moskowitz, Esq.
Moskowitz and Book, LLP
1372 Broadway
New York, NY 10018

David V. Harkins
Corn Point Road
Marblehead, MA  01945

Scott L. Jaeckel
151 Tremont Street, Apt. 25E
Boston, MA  02111-1123

3

Dennis A. Klejna
2301 E Street NW, Apt. A1010
Washington, DC 20037-2829

Thomas H. Lee
322 E. 57th Street
New York, NY 10022

Eric G. Lipoff
c/o Stephen M. Ray, Esq.
Robert A. Greenfield, Esq.
Stutman, Treister & Glatt PC
1901 Avenue of Stars, 12th Floor
Los Angeles, CA 90067

Santo C. Maggio
1825 8th Street South
Naples, FL 34102

Peter McCarthy
38 South Bridge Street
Poughkeepsie, NY 12601

Joseph Murphy
1038 Bloom Street
Hoboken, NJ 07030

Frank Mutterer
c/o Lawrence S. Lustberg, Esq.
Gibbons P.C.
One Gateway Center
Newark, NJ 07102

Ronald L. O'Kelley
6001 Trophy Drive, Apt. 1002
Naples, FL 34110

Richard N. Outridge
24 Pennbrook Dr.
Lincoln University, PA 19352

Scott A. Schoen
191 Kings Grant Road
Weston, MA 02493

4

William M. Sexton
c/o Stuart I. Friedman, Esq.
Ivan Kline, Esq.
Friedman & Wittenstein, P.C.
600 Lexington Avenue
New York, NY 10022

Gerald Sherer
333 Central Park West, Apt. 81
New York, NY  10025-7145

Philip Silverman
3 Edie Drive
Marlboro, NJ 07746

Robert C. Trosten
895 Scioto Drive
Franklin Lakes, NJ 07417

NEWYORK/#191889.1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| ARCH INSURANCE COMPANY, )<br><br>Plaintiff, )<br><br>v. )<br><br>JOHN D. AGOGLIA, PHILLIP R. )<br>BENNETT, LEO R. BREITMAN, EDWIN )<br>L. COX, SUKHMEET DHILLON, )<br>THOMAS H. DITTMER, NATHAN )<br>GANTCHER, STEPHEN GRADY, TONE )<br>GRANT, THOMAS HACKL, DAVID V. )<br>HARKINS, SCOTT L. JAECKEL, )<br>DENNIS A. KLEJNA, THOMAS H. LEE, )<br>ERIC G. LIPOFF, SANTO C. MAGGIO, )<br>PETER MCCARTHY, JOSEPH )<br>MURPHY, FRANK MUTTERER, )<br>RICHARD N. OUTRIDGE, RONALD L. )<br>O'KELLEY, SCOTT A. SCHOEN, )<br>WILLIAM M. SEXTON, GERALD )<br>SHERER, PHILIP SILVERMAN and )<br>ROBERT C. TROSTEN, )<br><br>Defendants. )<br> ) | Index No.: 08-600029<br><br>**FIRST AMENDED COMPLAINT**<br>**FOR DECLARATORY JUDGMENT**<br><br>FILED<br><br>FEB 2 2 2008<br><br>NEW YORK<br>COUNTY CLERK'S OFFICE |

In support of its first amended complaint against defendants, plaintiff Arch Insurance

Company ("Arch") alleges as follows:

**INTRODUCTION**

1.  Arch issued an excess directors, officers and corporate liability insurance policy to

Refco, Inc. ("Refco") for the period from August 11, 2005 to August 11, 2006 (the "Arch

Policy"). Since August 11, 2005, numerous lawsuits and governmental and/or regulatory

investigations (the "Underlying Matters") involving certain individuals insured under the Arch

Policy have been instituted and various of those individuals have tendered the Underlying

Matters to Arch for coverage under the Arch Policy. Arch brings this action against the defendants named herein ("Defendants") to seek a declaration that the Arch Policy affords no coverage for the Defendants in connection with the Underlying Matters.

2. This is the second lawsuit that Arch has filed in this court for a declaration regarding the parties' rights and responsibilities under the Arch Policy. The first lawsuit (Index No. 600805/06) was dismissed without prejudice by Justice Freedman in an opinion dated February 20, 2007 based on two factors that no longer exist. First, the Arch Policy contains a limit of liability that is $10 million excess of $40 million in underlying limits, and Justice Freedman ruled that it was entirely speculative whether the Underlying Matters would ever generate losses that would implicate the Arch Policy. Since that ruling, the limits of the underlying policies have been depleted at a voracious pace. As of the filing of this first amended complaint, the underlying insurers have advanced approximately $27.5 million in attorneys' fees and costs, and the bevy of law firms representing the individual insureds is generating over $2 million per month in additional fees and costs. Thus, contrary to the position that the individual insureds advanced before this Court when Arch filed its first action, it is far from speculative whether, setting aside the dispositive coverage issues that Arch outlines in this complaint based on the unique terms of its Policy, the Arch limit will be implicated.

3. Justice Freedman also held that Arch could not proceed with the first action because the question whether any insured had knowledge of facts or circumstances that might give rise to a claim as of the Arch Policy inception date – key issue for purposes of the exclusions that form the basis for Arch's denial of coverage – would overlap with issues that were not yet adjudicated in the Underlying Matters. That impediment no longer exists. Beginning on December 19, 2007, three former executives of Refco – namely, its former Chairman, President and Chief

Executive Officer, Phillip R. Bennett, its former Chief Financial Officer, Robert C. Trosten, and its former Executive Vice President, Santo C. Maggio – pleaded guilty to a number of federal charges, including conspiracy, securities, wire and bank fraud, making false filings with the SEC, making false statements to Refco's auditors and money laundering. In connection with their guilty pleas, Bennett, Trosten and Maggio, all of whom are insureds under the Arch Policy, each admitted that he knew of and participated in the wrongdoing that is at the heart of the allegations in the Underlying Matters. These guilty pleas and related admissions of fact, which establish that Bennett, Trosten and Maggio knew of the wrongdoing at the time of the inception of the Arch Policy, trigger the applicability of the exclusions identified in this amended complaint as to all of the Defendants in this action with respect to the Underlying Matters without regard to the outcome of any unresolved proceeding involving any other Defendant. Thus, the second ground for the dismissal of Arch's first action no longer exists.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction to resolve an actual controversy between Arch and the Defendants pursuant to the New York Declaratory Judgment Act, CPLR § 3001.

5.    Personal jurisdiction over Defendants is proper pursuant to CPLR § 301 and § 302. Defendants possess sufficient minimum contacts with the state of New York to render the exercise of jurisdiction by a New York court permissible under traditional notions of fair play and substantial justice. Defendants were directors or officers of Refco, a corporation with its principal place of business in New York.[1] As directors and/or officers of Refco, Defendants

---

[1] "Refco", as used herein, refers to Refco, Inc., the publicly-traded company formed in connection with an August 2005 initial public offering, Refco Group Ltd., LLC ("RGL"), the company through which Refco, Inc.'s business primarily was conducted prior to the offering, and the subsidiaries of Refco, Inc. and Refco Group Ltd., LLC.

transacted business in the state of New York.  In addition, some or all of Defendants seek coverage under the Arch Policy for the Underlying Matters.  Accordingly, Defendants have an ongoing contractual relationship with Arch, a corporation with its principal place of business in New York.  Finally, most of the lawsuits comprising the Underlying Matters were filed in the federal courts located in New York.  These lawsuits allege that Defendants committed acts in the state of New York and/or acts outside the state of New York that could reasonably be expected to have consequences in the state of New York.

6.  Venue is proper in this County under CPLR § 503 because Arch has its principal place of business in this County.

## PARTIES

7.  Arch is an insurance company that is organized and exists pursuant to the laws of the state of Missouri.  Arch has its principal place of business in New York County, New York.

8.  Defendant John D. Agoglia ("Agoglia") served as a senior vice president at Refco Securities, LLC, a subsidiary of Refco, Inc., at times relevant to this action.  Upon information and belief, Agoglia is a citizen of New York.

9.  Defendant Phillip R. Bennett ("Bennett") served as the Chairman, President and Chief Executive Officer of Refco until October 2005, when he took a leave of absence at the request of the Refco board of directors.  Upon information and belief, Bennett is a citizen of New Jersey.

10. Defendant Leo R. Breitman ("Breitman") served as a director of Refco at times relevant to this action.  Upon information and belief, Breitman is a citizen of Florida.

11. Defendant Edwin L. Cox ("Cox") served as a director of Refco Group Ltd., LLC at times relevant to this action.  Upon information and belief, Cox is a citizen of Texas.

4

12. Defendant Sukhmeet Dhillon ("Dhillon") served as Executive Vice President of Refco Group Ltd., LLC and as Executive Vice President of the entity that became Refco LLC, during times relevant to this complaint. Upon information and belief, Dhillon is a citizen of California.

13. Thomas H. Dittmer ("Dittmer") served as Chairman and CEO of Refco during times relevant to this action. Upon information and belief, Dittmer is a citizen of Illinois.

14. Defendant Nathan Gantcher ("Gantcher") served as a director of Refco at times relevant to this action. Upon information and belief, Gantcher is a citizen of New York.

15. Defendant Stephen Grady ("Grady") was COO of Refco Global Futures LLC, a Refco subsidiary, during times relevant to this action. Upon information and belief, Grady is a citizen of New Jersey.

16. Defendant Tone Grant ("Grant") served as President of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Grant is a citizen of Illinois.

17. Defendant Thomas Hackl ("Hackl") served as Executive Vice President of RGL at times relevant to this action. Upon information and belief, Hackl is a citizen of Geneva, Switzerland.

18. Defendant David V. Harkins ("Harkins") served as a Director of Refco at times relevant to this action. Upon information and belief, Harkins is a citizen of Massachusetts.

19. Defendant Scott L. Jaeckel ("Jaeckel") served as a Director of Refco at times relevant to this action. Upon information and belief, Jaeckel is a citizen of Massachusetts.

20. Defendant Dennis A. Klejna ("Klejna") served as Executive Vice President and General Counsel of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Klejna is a citizen of Washington, D.C.

5

21. Defendant Thomas H. Lee ("Lee") served as a Director of Refco at times relevant to this action. Upon information and belief, Lee is a citizen of New York.

22. Defendant Eric G. Lipoff ("Lipoff ") served as Executive Vice President of a Refco subsidiary at times relevant to this action. Upon information and belief, Lipoff is a citizen of California.

23. Defendant Santo C. Maggio ("Maggio") served as an Executive Vice President of Refco and as President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd. at times relevant to this action. Upon information and belief, Maggio is a citizen of Florida.

24. Defendant Peter McCarthy ("McCarthy") served as Executive Vice-President of Refco Securities at times relevant to this action. Upon information and belief, McCarthy is a citizen of New Jersey.

25. Defendant Joseph Murphy ("Murphy") served as President of Refco from October 2005 to November 28, 2005, when he resigned. Murphy also served as Chief Executive Officer of Refco Global Futures and President of Refco, LLC at times relevant to this action. Upon information and belief, Murphy is a citizen of New Jersey.

26. Defendant Frank Mutterer ("Mutterer") served as Controller of Refco Group Ltd., LLC, during times relevant to this action. Upon information and belief, Mutterer is a citizen of New Jersey.

27. Defendant Richard N. Outridge ("Outridge") served as CFO of Refco Capital Management at times relevant to this action. Upon information and belief, Outridge is a citizen of Pennsylvania.

28. Defendant Ronald L. O'Kelley ("O'Kelley") served as a Director of Refco at times relevant to this action. Upon information and belief, O'Kelley is a citizen of Florida.

29. Defendant Scott A. Schoen ("Schoen") served as a Director of Refco at times relevant to this action. Upon information and belief, Schoen is a citizen of Massachusetts.

30. Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer of Refco at times relevant to this action. Upon information and belief, Sexton is a citizen of Iowa.

31. Defendant Gerald Sherer ("Sherer") served as Executive Vice President and Chief Financial Officer of Refco at times relevant to this action. Upon information and belief, Sherer is a citizen of New York.

32. Defendant Philip Silverman ("Silverman") served as Secretary of Refco at times relevant to this action. Upon information and belief, Silverman is a citizen of New Jersey.

33. Robert C. Trosten ("Trosten") served as Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Trosten is a citizen of New Jersey.

## FACTUAL ALLEGATIONS

### The Arch Policy

34. The Arch Policy is an excess directors, officers and corporate liability policy. It has a policy period of August 11, 2005 to August 11, 2006 and a limit of liability of $10 million excess of $40 million in underlying insurance. A copy of the Arch Policy is attached as Exhibit A.

35. Various other insurers issued underlying insurance policies to Refco. U.S. Specialty Insurance Company issued a primary policy with limits of $10 million excess of applicable retentions (the "Primary Policy"). A copy of the Primary Policy is attached as Exhibit B. Lexington Insurance Company issued a first excess policy with limits of $7.5 million excess of

7

$10 million (the "Lexington Policy"). A copy of the Lexington Policy is attached as Exhibit C. Axis Reinsurance Company issued a second excess policy with limits of $10 million excess of $17.5 million (the "Axis Policy"). A copy of the Axis Policy is attached as Exhibit D. Allied World Assurance Company issued a third excess policy with limits of $12.5 million excess of $27.5 million (the "AWAC Policy"). A copy of the AWAC Policy is attached as Exhibit E. Each of the underlying policies has a policy period of August 11, 2005 to August 11, 2006.

36. In general, the Arch Policy applies in conformance with the terms and conditions of the Primary Policy and in conformance with the terms and conditions in the Arch Policy or any other underlying insurance "further limiting or restricting coverage." Arch Policy, Section I.C. The Arch Policy provides that "[i]n no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the Underlying Insurance." *Id.* The Arch Policy provides that coverage thereunder applies only after exhaustion of the **Underlying Limit** solely as a result of actual payment under the **Underlying Insurance** in connection with **Claim(s).** *Id.*, Section I.B.[2]

37. Subject to all of its terms and conditions, the Arch Policy affords five types of specified coverage. First, the Arch Policy affords specified coverage to **Insured Persons** for "**Loss** arising from **Claims** first made during the **Policy Period** . . . for **Wrongful Acts**, except when and to the extent that the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement." Primary Policy, Insuring Agreement (A). **Insured Persons** is defined in relevant part as "any past, present or future director or officer of

---

[2] Policy language appearing herein in bold typeface is defined in the policy being quoted, and appears in bold typeface in that policy.

the **Company** . . . ." Primary Policy, Definition F(1). The "**Company**" is Refco Inc. and its

subsidiaries. Primary Policy, Definitions (C), (H), (O), Declarations Item 1.

38. Second, subject to all of its terms and conditions, the Arch Policy affords specified

coverage to the Company for "**Loss** arising from . . . **Claims** first made during the **Policy**

**Period** . . . against the **Insured Persons** for **Wrongful Acts**, if the **Company** has paid such **Loss**

to or on behalf of the **Insured Persons** as indemnification or advancement." Primary Policy,

Insuring Agreement (B)(1).

39. Third, subject to all of its terms and conditions, the Arch Policy affords specified

coverage to the Company for "**Loss** arising from **Securities Claims** first made during the **Policy**

**Period** . . . against the **Company** for **Wrongful Acts**." Primary Policy, Insuring Agreement

(B)(2).

40. Fourth, subject to all of its terms and conditions, the Arch Policy affords specified

coverage to the "**Controlling Shareholder**," defined as Bennett, for "**Loss** arising from a

**Securities Claim** first made during the **Policy Period** . . . against such **Controlling Shareholder**

for **Wrongful Acts**, provided, that one or more **Insured Persons** and/or the **Company** are and

remain co-defendants in such **Securities Claim** along with such **Controlling Shareholder**."

Primary Policy, Endorsement No. 15.

41. Fifth, subject to all of its terms and conditions, the Arch Policy affords specified

coverage to the Company for "all **Derivative Demand Investigation Costs** incurred by the

**Company** as a result of a **Derivative Demand** first received by the **Company's** Board of

Directors and reported in writing to the Insurer during the **Policy Period** . . . up to the amount of

the **Derivative Demand Investigation Costs Sub-Limit**" of $250,000. Primary Policy,

Endorsement No. 11.

42. The AWAC Policy contains the following provision: "It is hereby understood and agreed that the **Insurer** shall not be liable for **Loss** in connection with any claim or claims made against the **Insureds** alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which any Insured had knowledge as of inception and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage hereunder; or (ii) which indicate the probability of any such claim." AWAC Policy, Endorsement No. 3 ("AWAC Prior Knowledge Exclusion").

43. The Arch Policy contains the following provision: "If any **Insured** as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a **Claim** under this Policy, the **Excess Insurer** shall not be liable to make any payment under this Policy as a result of a **Claim** arising out of, based upon or attributable to any such act, error, omission, fact, matter or circumstance." Arch Policy, Endorsement No. 4 (the "Arch Prior Knowledge or Information Exclusion").

44. The Arch Policy defines **Insured(s)** as "any person(s) or entity(ies) that are entitled to coverage under the **Followed Policy** at its inception." Arch Policy, § III.B. The "**Followed Policy**" is the Primary Policy. Arch Policy, § III.C.; Declarations, Item 4.

45. The Arch Policy and underlying insurance policies contain other terms, conditions and limitations that may ultimately be implicated in this action.

46. Defense Costs have been advanced to certain Defendants under the Primary Policy, the Lexington Policy and the Axis Policy.[3] As of the filing of this first amended complaint, the

---

[3] The coverage defenses that Arch advances in this action are unique to the Arch Policy; thus, the fact that U.S. Specialty and Lexington advanced fees and costs has no bearing on the coverage issues presented in this case. Axis was ordered by the Refco bankruptcy court to advance fees and costs despite its denial of coverage based on its unique policy provisions and

advancement of defense costs has exhausted the $10 million limit of the Primary Policy, the

$7.5 million limit of the Lexington Policy, and the $10 million limit of the Axis Policy. The law

firms representing the defendants in the Underlying Matters are currently generating attorneys'

fees and costs in the vicinity of $2 million *per month*. Thus, it is far from conjectural that the

Arch Policy limits will be implicated unless this Court promptly adjudicates the coverage issues

presented in this case.

**The Events at Refco**

47. The Arch Policy incepted on August 11, 2005. On the same day, Refco conducted its

initial public offering.

48. On October 10, 2005, Refco issued a press release. The press release announced that

the Company had been carrying an undisclosed receivable of $430 million from an entity

controlled by Bennett. Refco stated that "[b]ased on the results of the review to date, the

Company believes that the receivable was the result of the assumption by an entity controlled by

Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company,

which may have been uncollectible." Moreover, Refco stated that although the receivable "was

reflected on the Company's prior period financials, as well as on the Company's May 31, 2005

balance sheet," the receivable "was not shown as a related party transaction in any such

financials. For that reason, and after consultation by the Audit Committee with the Company's

independent accountants, the Company determined, on October 9, 2005, that its financial

statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28,

---

contrary to the language in the operative policies. Axis has appealed that order to the United
States District Court for the Southern District of New York.

2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

49. On October 11, 2005, Refco issued a second press release. The press release announced that Bennett had repaid the $430 million receivable in full. The press release also provided further information on the nature of the receivable: "Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998. These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable from that entity, rather than a receivable from the originating accounts. The fact that the receivable was from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual reporting periods by reason of transfers to a third party customer account that we currently believe is unaffiliated with Mr. Bennett or anyone else at the Company."

50. On October 17, 2005, Refco and certain of its unregulated subsidiaries filed for Chapter 11 bankruptcy protection.

51. On January 16, 2007, a federal grand jury returned a third superseding indictment against Bennett, Trosten and Grant (the "S3 Indictment"). The S3 Indictment charged Bennett, Trosten and Grant with securities fraud, conspiracy to commit securities fraud, wire fraud, bank fraud and money laundering. The S3 Indictment also charged Bennett with making false filings with the SEC and making false statements to Refco's auditors. A copy of the S3 Indictment is attached hereto as Exhibit F.

52. On February 15, 2008, Bennett, who is an **Insured** under the Arch Policy, pleaded guilty to all charges against him in the S3 Indictment. Five days later, on February 20, 2008,

Trosten, who also is an **Insured** under the Arch Policy, similarly pleaded guilty to charges of conspiracy, securities, wire and bank fraud and money laundering.

53. The S3 Indictment charged that, beginning in the mid 1990's, Bennett, Trosten and their co-conspirators engaged in a scheme to mask the true financial performance of Refco. Specifically,

> [s]tarting at least as early as the mid 1990s, BENNETT and GRANT schemed to hide the true financial health of Refco from its banks, counterparties, auditors, and investors. Starting at least as early as the late 1990s, BENNETT and GRANT embarked on a strategy to mask the true performance of Refco's business in order to sell the company for their own benefit and that of Refco's other owners. To that end, over the ensuing years, BENNETT, TROSTEN, GRANT and others known and unknown systematically (1) covered up both Refco's own losses and customer losses for which Refco became responsible; (2) moved Refco operating expenses off the company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping Refco in business and then selling it for the maximum benefit to its owners and senior management.

S3 Indictment, ¶ 7.

54. According to the S3 Indictment, in furtherance of the scheme, Bennett, Trosten and their co-conspirators made and caused Refco and others on its behalf to make false and fraudulent statements to Refco's banks, counterparties, customers, auditors and investors, and to create false audited financial statements and false public filings with the SEC.

55. The S3 Indictment charged that the scheme permitted Refco to engage in, among other things, Refco's August 2005 initial public offering of stock, in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement.   S3 Indictment, ¶ 8.

56. According to the S3 Indictment, the scheme was hatched in 1997, when Refco directly and indirectly incurred a series of substantial trading losses that threatened the continued

viability of its business. S3 Indictment, ¶ 9. In response to those losses, Bennett, Trosten and

others moved losses and expenses out of Refco and into Refco Group Holdings, Inc. ("RGHI"),

an entity that owned Refco and that was owned by, among others, Bennett and Grant, in an effort

to mask Refco's financial condition. This strategy increased the debt owed by RGHI to Refco

(the "RGHI Receivable"), which ultimately grew to over $1 billion. *Id.*

57. The S3 Indictment charged that, beginning as early as February 1998, Bennett and

others directed a series of transactions every year designed to hide the "huge and growing"

RGHI Receivable from, among others, Refco's auditors, by temporarily paying down all or part

of the RGHI Receivable over Refco's fiscal year-end and replacing it with a receivable from one

or more other entities not related to Bennett or Refco. S3 Indictment at ¶ 21. Bennett and others

caused this cover-up to occur "at every fiscal year-end from at least the fiscal year-end on

February 28, 1998 through the fiscal year-end on February 29, 2004." *Id.* Beginning in 2004,

Bennett and others began causing these cover-up transactions to occur at the ends of Refco's

quarterly reporting periods. *Id.* at ¶ 46.

58. The S3 Indictment further charged that Bennett, Trosten and others participated in a

scheme to defraud participants in the 2004 leveraged buyout of Refco, which was led by private

equity fund Thomas H. Lee Partners, by misleading the fund and purchasers of the $600 million

in notes and $800 million in bank debt about the true financial health of Refco. S3 Indictment, ¶

34.

59. Based on these and other allegations, the S3 Indictment charged Bennett as follows:

| Count | Charge |
|-------|--------|
| 1 | Conspiracy to commit securities fraud, wire fraud, to make false filings with the SEC, to make material misstatements to auditors, bank fraud and money laundering |

| Count | Charge |
|-------|--------|
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 3 | Securities fraud in connection with the purchase and sale of Refco common stock |
| 4 | False filing with the SEC in connection with the filing of Refco's Form 10-K under the Exchange of 1934 on July 19, 2005 |
| 5, 6 | False filing with the SEC in connection with the filing of certain registration statements under the Securities Act of 1933 on April 6, 2005 and August 8, 2005 |
| 7 – 13 | Wire fraud in connection with certain electronic communications between June 22, 2004 and August 5, 2005, including the transmission of Refco's Form 10-K on July 19, 2005 and its registration statements on April 6, 2005 and August 8, 2005 |
| 14 | Material misstatements to auditors |
| 15 | Bank fraud in connection with the 2004 leverage buyout transaction |
| 16 – 20 | Money laundering in connection with proceeds of the 2004 leverage buyout transaction |

60. On February 15, 2008, Bennett pleaded guilty to all twenty counts against him in the

S3 Indictment. A copy of the transcript of the hearing ("2/15 Tr.") is attached hereto as Exhibit

G. During the hearing at which Bennett pleaded guilty, the following exchange occurred

between the Court and Bennett:

> THE COURT: Mr. Bennett, did you commit the crimes for which you've been charged?
>
> THE DEFENDANT: I did, your honor.
>
> THE COURT: Would you tell me in your own words what you did?

THE DEFENDANT: Your Honor, during the period that I served as CEO of Refco, I agreed with other Refco executives to enter into a series of transactions at the end of Refco's financial reporting periods to make it appear as if a receivable due to Refco from Refco Upholdings, Inc. [sic], a related party, was instead due from an independent third-party customer.

The IGHI [sic] receivable was composed of, amongst other things, historical customer losses, bad debts, and expenses that IGHI [sic] had incurred on behalf of Refco.

I, along with other Refco executives, have caused Refco to enter into these transactions in order to conceal the size and nature of the IGHI [sic] receivable. We concealed the receivable from, amongst others, Refco's auditors, Thomas H. Lee Partners, various lenders who, in 2004, participated in Refco's senior secured credit facility, and the issuance of 9 percent senior subordinated notes, and also investors in Refco's common stock.

Among the lenders to whom I knowingly caused the IGHI [sic] receivable to be misrepresented was HSBC Bank, referenced in Count Fifteen of the indictment. I and other Refco executives also used the interstate wires to accomplish these acts within this district, as referenced in Counts Seven through Thirteen. Furthermore, I caused funds obtained from the transaction with Thomas H. Lee Partners, referenced in paragraph 34 of the indictment, to be wired to various parties receiving proceeds from the transaction, as referenced in Counts Sixteen through Twenty, knowing that this money had been unlawfully obtained.

The IGHI [sic] receivable and related party transaction used to conceal it were material information that Refco investors and lenders would have wanted to have known prior to investing in or lending money to Refco. While I believed that I would be able to pay the IGHI [sic] receivable down over time, and did, in fact, ultimately pay [sic] off the receivable balance in its entirety, I knew that obtaining funds from Refco's investors and lenders based on misleading financial statements was also wrong.

I also caused Refco to file documents with the SEC, namely S1, S4, and 10-K that did not disclose the full extent of the IGHI [sic] receivable or the transactions used to conceal it; and, thus, were false and misleading with respect to material facts. I knew that failing to disclose these facts in public filings and in connection with Refco's sale and registration of Refco's notes and common stock was wrong , and I deeply regret having done so.

16

> Your Honor, I take full responsibility for my actions . . . .

2/15 Tr. at 16-20.

61. At the conclusion of the February 15, 2008 hearing, the Court found that Bennett

pleaded guilty knowingly and voluntarily:

> THE COURT: Mr. Bennett, I'm satisfied that you understand the
> nature of the charges against you and the consequences of your
> plea; and that your plea is made voluntarily and knowingly; and
> that there is a sufficient factual basis for it. Accordingly, I will
> accept your plea of guilty . . . .

2/15 Tr. at 20.

62. The S3 Indictment charged Trosten as follows:

| Count | Charge |
|-------|--------|
| 1 | Conspiracy to commit securities fraud, wire fraud, to make false filings with the SEC, to make material misstatements to auditors, bank fraud and money laundering |
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 7, 8 | Wire fraud in connection with certain electronic communications between June 22, 2004 and August 3, 2004 5, 2005, including e-mails to representatives of Thomas H. Lee Partners |
| 15 | Bank fraud in connection with the 2004 leverage buyout transaction |
| 17-18 | Money laundering in connection with proceeds of the 2004 leverage buyout transaction |

63. On February 20, 2008, Trosten pleaded guilty to Counts 1, 2, 7, 15 and 17 against

him in the S3 Indictment. A copy of the transcript of the hearing ("2/20 Tr.") is attached hereto

as Exhibit H. During the hearing at which Trosten pleaded guilty, the following exchange

occurred between the Court and Trosten:

17

THE COURT: Mr. Trosten, did you commit the offenses that you are pleading guilty to?

THE DEFENDANT: I did, your honor.

THE COURT: Would you tell me, please, what you did?

\*       \*       \*

THE DEFENDANT: Your Honor, while I was employed at Refco, I agreed with other Refco executives to hide the true nature of Refco's finances on Refco's financial statements. I knew that Refco's financial statements did not accurately reflect Refco's financial condition, because the financial statements did not disclose the full amount that Refco Group Holdings, Inc., a related party, owed to Refco. I understood that the RGHI receivable was underreported because Phillip Bennett, Refco's former chief executive officer, and other Refco executives, including me, were involved in a series of transaction at the end of Refco's financial reporting periods to make it appear as if a receivable was due from third-party customers rather than from a related party.

The RGHI receivable was composed of, amongst other things, historic customer losses, bad debts, and expenses that RGHI incurred on behalf of Refco.

In addition, I participated in a number of transactions that padded or inflated Refco's income. For example, I participated in transactions that shifted expenses off the books of Refco and onto the books of Refco Group Holdings, Inc.

I, along with other Refco executives, agreed to conceal the true size and nature of the RGHI receivable from, amongst others, Refco's auditors, Thomas H. Lee Partners; HSBC, which, in 2004, participated in Refco's senior secured credit facility, as referenced in . . . paragraph 41 and Count Fifteen of the indictment; and investors who purchased bonds that Refco issued in 2004, as referenced in Count Two of the indictment.

I left the company in August 2004, one year before the IPO of Refco. I and other executives used the interstate wires to accomplish these acts within this district, as referenced in Count Seven of the indictment.

Furthermore, I received funds obtained from the transaction with Thomas H. Lee Partners, referenced in paragraph 34 of the indictment, which I knew were proceeds from unlawful activity, as referenced in Count Seventeen.

> The RGHI receivable and transactions used to conceal it were
> material information that Refco investors and lenders would have
> wanted to know before investing in or lending money to Refco.
>
> I knew that obtaining funds from Refco investors and lenders
> based on misleading financial information was wrong . . . .
>
> Your Honor, I take full responsibility for my actions and my
> conduct . . . .

2/20 Tr. at 17-20.

64. At the conclusion of the February 20, 2008 hearing, the Court found that Trosten

pleaded guilty knowingly and voluntarily:

> THE COURT: Mr. Trosten, I am satisfied that you understand the
> nature of the charges against you and the consequences of your
> plea, and that your plea is made voluntarily and knowingly, and
> that there is a factual basis for your. I will, therefore, accept your
> plea of guilty.

2/20 Tr. at 20.

65. Meanwhile, on December 19, 2007, Maggio, who is an **Insured** under the Arch

Policy, pleaded guilty to a four-count criminal information (the "Maggio Information") charging

him with conspiracy, securities fraud and wire fraud. A copy of the Maggio Information is

attached hereto as Exhibit I.

66. The Maggio Information, which included nearly all of the same charges of

misconduct as the S3Indictment, charged that Maggio was one of Bennett's and Trosten's co-

conspirators and that he participated in the conduct underlying the conspiracy. In particular, the

Maggio Information charged that Maggio participated in the scheme to hide the RGHI

Receivable and to mask the true financial condition of Refco in the several years prior to the

August 11, 2005 initial public offering.

67. Based on these and other allegations, the Maggio Information charged Maggio as

follows:

19

| Count | Charge |
|-------|--------|
| 1 | Conspiracy to commit securities fraud, wire fraud, to make false filings with the SEC, to make material misstatements to auditors, bank fraud and money laundering |
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 3 | Securities fraud in connection with the purchase and sale of Refco common stock |
| 4 | Wire fraud in connection with the electronic transmission of Refco's Form 10-K on July 19, 2005 |

68. On December 19, 2007, Maggio pleaded guilty to every count in the Maggio

Information. A copy of the transcript of the hearing ("12/19 Tr.") is attached hereto as Exhibit J.

During the hearing at which Maggio pleaded guilty, the following exchange occurred between

the Court and Maggio:

> THE COURT: Did you commit the offenses for which you have been charged, Mr. Maggio?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Tell me what you did.
>
> \*      \*      \*
>
> THE DEFENDANT: Your Honor, from the late 1990s to October 2005 I was a senior executive at Revko [sic] Ink [sic]. During that period I participated with others to hide the true financial health of Revko [sic] from banks, counter-parties, auditors and investors. With my knowledge and active participation Revko's [sic] substantial losses were covered up as revenues padded [sic] and certain operating expenses were moved off its book. Among the acts I personally engaged in [sic] the signing of loan agreements referencing paragraphs 61-D [loan agreement signed in furtherance of the conspiracy on or about February 20, 2004] and 61-P [loan agreement signed in furtherance of the conspiracy on or about February 23, 2005] of the indictment.
>
> As a result of my conduct and that of my coconspirators false financial statements were issued to obtain debt financing

> from the public including 9 percent senior subordinated notes referenced in Count Two of the indictment.
>
> To consummate the sale of 57 percent of Revko [sic] to a group headed by Thomas H. Lee in 2004 and to obtain $800 million in bank financing the same year and to effect the Revko [sic] initial public offering in 2005. [sic] Moreover, with my knowledge false financial statements were filed with the SEC including form 10K referencing Count Four.  The mails and interstate wires were used as part of the fraudulent scheme.
>
> I deeply regret my conduct and the harm that it has caused.
>
> THE COURT:  First of all, with respect to all of the activities that you've indicate you participated in it knowingly?
>
> THE DEFENDANT:  Yes.

12/19 Tr. at 17-18.

69. At the conclusion of the December 19, 2007 hearing, the Court found that Maggio pleaded guilty knowingly and voluntarily:

> Based on defendant's allocution and the recommendations by the government I find that the defendant understands the nature, the charges and consequences of his guilty plea.  I also find that the plea is voluntary and that there is a factual basis for the plea.  I, therefore, recommend that the plea be accepted . . . .

12/19 Tr. at 20.

70. As demonstrated by each of their guilty pleas to counts that alleged their knowledge of, *inter alia,* efforts to hide the RGHI Receivable from the investing public prior to 2005, Bennett, Trosten and Maggio, as of August 11, 2005, had knowledge of or information concerning acts, errors, omissions, facts, matters or circumstances that might give rise to a Claim under the AWAC Policy or the Arch Policy.

**The Underlying Matters**

71. Beginning on October 12, 2005, various lawsuits were filed against the Defendants.

72. A criminal complaint was filed against Bennett (the "Bennett Criminal Complaint") on October 12, 2005 in *United States v. Bennett*, No. 05-1720 (S.D.N.Y.).

73. The Bennett Criminal Complaint alleged that Bennett knowingly "hid from investors in [Refco's] August 2005 initial public offering of stock . . . the existence of hundreds of millions of dollars of related party transactions between Refco and a company controlled by Bennett, including causing Refco to file a false and fraudulent S-1 registration statement with the Securities and Exchange Commission." Bennett Criminal Complaint, ¶ 9. A federal grand jury in New York subsequently returned a criminal "Indictment" against Bennett that was filed on or about November 10, 2005 in *United States v. Bennett, et al.*, No. 05-1192 (S.D.N.Y.). This indictment repeated and expanded upon the allegations in the Bennett Criminal Complaint. On or about October 24, 2006, the grand jury returned a "Superseding Indictment" that named both Bennett and Trosten, and a "Second Superseding Indictment" against them on or about November 16, 2006. On January 16, 2007, a "Third Superseding Indictment" – referred to above as the "Bennett Indictment" – that added Grant as a defendant was filed. On December 19, 2007, the Information against Maggio was filed. Each of these filings alleged, among other things, that the defendant(s) named therein engaged in a scheme to hide the RGHI receivable from the investing public. Collectively, the proceedings initiated by these filings will be referred to herein as the "Criminal Proceedings".

74. The Bennett Criminal Complaint was tendered to Arch for coverage under the Arch Policy on or about October 13, 2005, and the Indictment, the Superseding Indictment, the Second Superseding Indictment and/or the Third Superseding Indictment were tendered to Arch for coverage under the Arch Policy thereafter.

22

75. The suits *Mazur et al. v. Refco, Inc., et al.*, No. 05-8626 (S.D.N.Y.), *Frontpoint Fin.*

*Serv., Inc. v. Refco, Inc., et al.*, No. 05-8663 (S.D.N.Y.), *Lieber v. Refco, Inc., et al.*, No. 05-8667

(S.D.N.Y.), *Weiss v. Refco, Inc., et al.*, No. 05-8691 (S.D.N.Y.), *Glaubach v. Refco, Inc., et al.*,

No. 05-8692 (S.D.N.Y.), *Gross v. Refco, Inc., et al.*, No. 05-8697 (S.D.N.Y.), *Salamone v. Refco,*

*Inc. et al.*, No. 05-8716 (S.D.N.Y.), *RD Partners LLC v. Refco, Inc., et al.*, No. 05-8737

(S.D.N.Y.), *Wakefield v. Refco, Inc., et al.*, No. 05-8742 (S.D.N.Y.), *Gaugler v. Bennett, et al.*,

No. 05-8886 (S.D.N.Y.), *Baker v. Bennett, et al.*, No. 05-8923 (S.D.N.Y.), *Nathanson v. Bennett,*

*et al.*, No. 05-8926 (S.D.N.Y.), *Becker v. Refco, Inc., et al.*, No. 05-8929 (S.D.N.Y.), *Mettupatti*

*v. Bennett, et al.*, No. 05-9048 (S.D.N.Y.), *Weiss v. Bennett, et al.*, No. 05-9126 (S.D.N.Y.), *Weit*

*v. Bennett, et al.*, No. 05-9611 (S.D.N.Y.), *Esses v. Bennett, et al.*, No. 05-9654 (S.D.N.Y.), *City*

*of Pontiac General Employees Retirement System v. Bennett et al.*, No. 05-9941 (S.D.N.Y.),

*Gensheimer v. Bennett*, No. 05-10318 (S.D.N.Y) and *Teachers' Retirement System of the State of*

*Illinois et al. v. Lee, et al.*, No. 05-10403 (S.D.N.Y.) are purported class action securities fraud

lawsuits that have been consolidated for pre-trial purposes under Case No. 05-8626 (the

"Securities Litigation"). The First Amended Consolidated Class Action Complaint ("FAC") was

filed in the consolidated proceedings on May 5, 2006, and the Second Amended Consolidated

Class Action Complaint was filed on or about December 3, 2007.

76. The FAC and SAC allege that Refco's initial public offering registration statement

and prospectus were materially false and misleading. Specifically, they allege that the

registration statement and prospectus failed to disclose the existence of the RGHI Receivable.

The FAC further alleges that the Refco financial statements incorporated in Refco's registration

statement and prospectus were inaccurate because they failed to disclose the related-party

transactions between Refco and RGHI designed to hide the RGHI Receivable. Included among

the defendants named in the SAC are Bennett, Sherer, Sexton, Maggio, Murphy, Silverman, Klejna, Trosten, Grant, O'Kelley, Breitman, Gantcher, Lee, Harkins, Jaeckel, and Schoen.

77. Beginning on or about October 14, 2005, some of the lawsuits comprising the Securities Litigation were tendered to Arch for coverage under the Arch Policy. The FAC was tendered to Arch by letter dated April 28, 2006.

78. The suits *David Fine v. Bennett, et al.*, No. 05-8701 (S.D.N.Y), and *Mehta v. Bennett, et al.*, No. 05-8748 (S.D.N.Y.), which were shareholder derivative actions (the "Derivative Litigation"), have been dismissed. Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen, Sexton and Murphy, among others, were named as defendants in the Derivative Litigation.

79. The complaints in the Derivative Litigation alleged that Refco's initial public offering registration statement and prospectus were materially false and misleading. Specifically, the complaints alleged that the registration statement and prospectus failed to disclose the existence of the RGHI Receivable. The complaints further alleged that the Refco financial statements incorporated in its registration statement and prospectus were inaccurate because they failed to disclose the related-party transactions between Refco and RGHI that were designed to hide the RGHI Receivable.

80. The *Mehta* complaint was tendered to Arch for coverage under the Arch Policy on or about October 17, 2005.

81. The suit *Bawag P.S.K. Bank v. Refco Inc., et al.*, No. 05-60006 (S.D.N.Y. Bankr.), Adv. No. 05-03161, was filed on November 16, 2005 (the "Bawag Action"). The Bawag Action names Bennett (among others) as a defendant.

82. The complaint in the Bawag Action alleges that the plaintiff was fraudulently induced to loan approximately $420 million to Bennett on October 10, 2005. The complaint alleges that Bennett failed to disclose that he sought the loan to pay off the RGHI Receivable, a "related-party receivable resulting from the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to Refco [that] likely was impaired and not collectible." Bawag Action Complaint, § 17. The complaint alleges that Bennett "knew that if BAWAG had been aware of any of the key facts set forth in [Refco's] October 10, 2005 Press Release, BAWAG would not have made the Loan." *Id.*, § 30.

83. The Bawag Action was tendered to Arch for coverage under the Arch Policy on or about November 30, 2005.

84. The suit *Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*, No. 05-9608 (S.D.N.Y.), was filed on November 14, 2005 (the "THL Funds Action"). The THL Funds Action names Bennett, Grant and Maggio, among others, as defendants.

85. The complaint in the THL Funds Action alleges that in June 2004, the plaintiffs invested approximately $507 million in Refco. The complaint alleges that despite the plaintiffs' due diligence efforts, they were unaware that "Bennett intentionally and deliberately engaged in accounting fraud in order to mask a group of largely worthless receivables, bad debts and questionable obligations that, if accurately portrayed on the Company's financial statements, would have materially reduced Refco's value." THL Funds Action Complaint, § 4. Specifically, the complaint alleges that Bennett "nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of million dollars [sic] of customer losses and obligations that would never be repaid to the Company." *Id.*, § 30. The complaint alleges

25

that the Refco financial statements provided to the plaintiffs during their due diligence review in 2003 and 2004 were materially false and misleading.

86. The THL Funds Action was tendered to Arch for coverage under the Arch Policy on or about February 13, 2006.

87. The complaint in *Unovalores Ltd. v. Bennett,* No. L1564-05 (Sup. Ct. of New Jersey, Somerset County, Law Division) (the "Unovalores Action") was filed in New Jersey state court on or about November 1, 2005.

88. The plaintiff in the Unovalores Action, which identifies itself as a Refco Capital account holder, names only Mr. Bennett as a defendant. Plaintiff alleges that it entered into a Repurchase Transaction with Refco on August 31, 2005, in reliance upon representations in Refco's registration statement and other filings concerning Refco's financial health. Those representations were false, according to the complaint, because they concealed massive receivables owed by an entity controlled by Mr. Bennett and at least one-half billion dollars of related party transactions with Mr. Bennett.

89. The Unovalores Action was tendered to Arch for coverage under the Arch Policy on or about February 13, 2006.

90. The complaint in *American Financial International Group v. Refco, Inc., et al.*, No. 05-8988 (S.D.N.Y.) (the "American Financial Action"), was filed in the Southern District of New York on or about October 21, 2005, an amended complaint was filed on April 13, 2006, and a second amended complaint was filed on June 30, 2006.

91. The plaintiff in the American Financial Action identifies itself as a Delaware LLC that traded currencies through an account at Refco F/X Associates, LLC ("RefcoFX"). The suit is a purported class action brought on behalf of all persons who traded currencies through, or had

26

currency trading accounts with, RefcoFX from August 11, 2005 through the date the amended

complaint was filed and who have been damaged.  Included among the defendants named in the

second amended complaint are Bennett, Sherer, Sexton, Maggio, Trosten, Mutterer and

Silverman.  The second amended complaint generally alleges the same conduct that is the subject

of the Criminal Proceedings and the Securities Litigation.

92. The complaint in the American Financial Action was tendered to Arch for coverage

under the Arch Policy on or about October 25, 2005, and the amended complaint was tendered to

Arch in May 2006.

93. The complaint in *Global Management Worldwide Limited v. Philip R. Bennett, et al.*,

No. 06-0643 (S.D.N.Y.) (the "Global Management Litigation"), was filed in the Southern

District of New York on or about January 26, 2006, and a Consolidated Amended Class Action

Complaint was filed in September 2006.

94. The plaintiff in the Global Management Litigation identifies itself as a corporation

organized under the laws of Nassau, the Bahamas, that was a brokerage customer of Refco

Capital Markets, Ltd. ("RCM").  The suit is a purported class action brought on behalf of all

brokerage customers of RCM who, at any time from October 17, 2000 to October 17, 2005,

entrusted securities to RCM and/or Refco Securities, LLC, directly or indirectly, as custodian

and broker for safe-keeping, and continued to hold positions with RCM on October 17, 2005 or

thereafter.  Plaintiffs generally allege that, during the purported class period, Refco, either

directly or through its affiliates, incurred billions of dollars in losses, and tried to hide those

losses by surreptitiously selling securities held by RCM in custody for class members.  Plaintiffs

allege that the financial statements filed by Refco with the SEC during the purported class period

were false and misleading because they fraudulently omitted these losses, as well as the scheme

27

to hide the losses by selling securities stolen from plaintiffs and by building up and hiding the RGHI Receivable. Plaintiffs further allege that they relied upon these false and misleading financial statements and the purported financial integrity of Refco in entrusting securities to RCM.

95. The Global Management Litigation was tendered to Arch for coverage under the Arch Policy on or about March 14, 2006.

96. On or about October 9, 2007, two separate lawsuits were brought by seven investment entities that maintained accounts at RCM: (1) *VR Global Partners L.P., et al. v. Bennett, et al.*, Case No. 07-8686 (S.D.N.Y.) and (2) *Capital Management Select Fund Ltd., et al., v. Bennett, et al.*, Case No. 07-8688 (S.D.N.Y.). The complaints, which were tendered to Arch in October 2007, also allege that Refco insiders schemed to hide the RGHI Receivable, thereby inducing plaintiffs to maintain accounts at RCM, and converted securities owned by plaintiffs to hide losses incurred by Refco. The defendants in the *VR Global* and *Capital Management* litigations include Bennett, Sexton, Maggio, Murphy, Silverman, Trosten, Grant, Lee, Harkins, Jaeckel, Schoen and Outridge. By order dated November 20, 2007, the Global Management Litigation was consolidated for pre-trial purposes with the *VR Global* and *Capital Management* litigations. The consolidated proceedings will be referred to herein as the "RCM Brokerage Customer Securities Litigation."

97. The complaint in *Kirschner v. Thomas H. Lee Partners, L.P.*, No. 07-7074 (S.D.N.Y) (the "Trustee/THL Partners Litigation"), was filed in the Southern District of New York on or about August 8, 2007.

98. The plaintiff in the Trustee/THL Partners Litigation identifies himself as the trustee of the Refco Litigation Trust ("Trustee"). The individual defendants named in the complaint are

Lee, Harkins, Jaeckel, and Schoen.  The Trustee generally alleges that the individual defendants breached fiduciary duties owed to Refco by failing to inform themselves of Refco's true financial state – including efforts to hide the RGHI Receivable – before making business decisions on behalf of Refco.

99. The complaint in the Trustee/THL Partners Litigation was tendered to Arch for coverage under the Arch Policy by letter dated August 16, 2007.

100.     The complaint in *Kirschner v. Grant Thornton LLP, et al.*, No. 2007L008818 (Cook County, Ill.) (the "Grant Thornton Litigation"), was filed in Illinois state court on August 21, 2007, and was removed to federal court on or about September 19, 2007 as Case No. 07-cv-05306 (N.D. Ill.).

101.     The Grant Thornton Litigation was brought by the Trustee.  The individual defendants named in the complaint include Bennett, Maggio, Trosten, and Grant.  The Trustee generally alleges that these defendants engaged in a scheme to hide Refco's true financial condition, which included efforts to hide the RGHI Receivable.

102.     The complaint in the Grant Thornton Litigation was tendered to Arch for coverage under the Arch Policy by letter dated September 20, 2007.

103.     The complaint in *Kirschner v. Agoglia, et al.*, Adv. Pro. No. 07-3060 (Bankr. S.D.N.Y.) (the "Agoglia Litigation"), was filed on or about October 15, 2007.

104.     The Agoglia Litigation was brought by the Trustee.  The individual defendants named in the complaint are Agoglia, Bennett, Cox, Dittmer, Dhillon, Grady, Grant, Lipoff, Maggio, McCarthy, Murphy, Mutterer, Sexton, and Trosten.  The Trustee alleges that Bennett and others "orchestrated a massive financial fraud designed to inflate Refco's financial position artificially until such time as it could be sold", Compl. ¶ 59, a fraud that included the hiding of

the RGHI Receivable. The Trustee seeks to recover transfers made to defendants under avoidance provisions of the Bankruptcy Code and to recover the value of the transfers under a theory of unjust enrichment.

105.    The complaint in the Agoglia Litigation was tendered to Arch for coverage under the Arch Policy by letters dated November 8 and November 21, 2007.

106.    The complaint in *Kirschner v. Thomas Hackl, et al.*, No. 07-9238 (S.D.N.Y.) (the "Hackl Litigation"), was filed on or about October 15, 2007.

107.    The Hackl Litigation was brought by the Trustee. The only individual defendant named in the complaint is Hackl. The Trustee alleges that Bennett, Hackl and others engaged in a scheme to hide the true financial condition of Refco, including efforts to hide the RGHI Receivable, and seeks recovery from Hackl under counts alleging, *inter alia,* breach of fiduciary duty, civil conspiracy, aiding and abetting fraud, and unjust enrichment.

108.    The complaint in *Kirschner v. Bennett, et al.,* Case No. 602869 (New York County, New York) (the "Trustee/Bennett Litigation"), was filed in the Supreme Court of New York on or about August 27, 2007, and was removed to federal court on or about September 17, 2007 as Case No. 07- 08165 (S.D.N.Y.).

109.    The plaintiff in the Trustee/Bennett Litigation identifies himself as the trustee of the Refco Private Actions Trust and assignee of all claims related to Refco belonging to, among others, certain former Refco customers who maintained accounts at, and entrusted funds to, RCM. The individual defendants named in the complaint are Bennett, Maggio, Trosten and Grant. The complaint alleges, *inter alia,* that these defendants engaged in a scheme to hide Refco's true financial condition, including engaging in steps to hide the RGHI Receivable. This

conduct allegedly induced RCM customers to entrust assets with RCM, which allegedly were later converted for Refco's use.

110.    The Trustee/THL Partners Litigation, the Grant Thornton Litigation, the Trustee/Bennett Litigation, the Agoglia Litigation and the Hackl Litigation are collectively referred to herein as the "Trustee Litigation."

111.    Upon information and belief, various governmental and/or regulatory investigations of or proceedings involving one or more of the defendants (the "Regulatory Matters") are ongoing, and one or more of the defendants has sought or may seek coverage for such matters.

112.    The proceedings discussed above, including the Criminal Proceedings, the Securities Litigation, the Derivative Litigation, the Bawag Action, the THL Funds Action, the Unovalores Action, the American Financial Action, the RCM Brokerage Customer Securities Litigation, the Trustee Litigation, and the Regulatory Matters, collectively are referenced herein as the "Underlying Matters."

## COUNT I

### DECLARATORY JUDGMENT THAT THE AWAC PRIOR KNOWLEDGE EXCLUSION BARS COVERAGE FOR THE UNDERLYING MATTERS

113.    Arch incorporates by reference each of the allegations of paragraphs 1 through 112 above.

114.    As of August 11, 2005, Bennett, Trosten and Maggio possessed knowledge of facts and circumstances that a reasonable person would suppose might afford valid grounds for a claim or that would indicate the probability of any such claim.

31

115.    The Underlying Matters consist of Claims alleging, arising out of, based upon, in consequence of, or attributable to such facts and circumstances.

116.    Arch seeks a declaration that based upon the AWAC Prior Knowledge Exclusion, the Arch Policy does not provide coverage for any loss arising out of the Underlying Matters.

## COUNT II

## DECLARATORY JUDGMENT THAT THE
## ARCH PRIOR KNOWLEDGE OR INFORMATION EXCLUSION
## BARS COVERAGE FOR THE UNDERLYING MATTERS

117.    Arch incorporates by reference each of the allegations of paragraphs 1 through 116 above.

118.    As of August 11, 2005, Bennett, Trosten and Maggio possessed knowledge or information concerning acts, errors, omissions, facts, matters or circumstances that might give rise to a Claim under the Arch Policy.

119.    The Underlying Matters consist of Claims arising out of, based upon, or attributable to such acts, errors, omissions, facts, matters or circumstances.

120.    Arch seeks a declaration that, based upon the Arch Prior Knowledge or Information Exclusion, the Arch Policy does not provide coverage for any loss arising out of the Underlying Matters.

## OTHER COVERAGE DEFENSES

121.    Other Arch Policy terms and conditions may ultimately be implicated.  Nothing in this Complaint should be construed as a waiver by Arch of any other coverage defenses under the Arch Policy or underlying policies with respect to any claim or potential claim and Arch reserves the right to raise all other terms and conditions of the Arch Policy and underlying policies as defenses to coverage as appropriate.

WHEREFORE, Arch requests that the Court enter a declaration and judgment in its

favor:

A.    Declaring that, for the reasons set forth in Count I, the Arch Policy does not
      provide coverage to any Defendant for any Loss incurred in connection with the
      Underlying Matters;

B.    Declaring that, for the reasons set forth in Count II, the Arch Policy does not
      provide coverage to any Defendant for any Loss incurred in connection with the
      Underlying Matters;

C.    Awarding Arch such additional declaratory and other relief as shall be found to be
      appropriate under the circumstances; and

D.    Awarding Arch its fees and costs incurred in prosecuting this action.


Dated:  February 21, 2008                    Respectfully submitted,


                                             VEDDER PRICE P.C.


                                             By: _____
                                                 John H. Eickemeyer
                                                 Daniel C. Green
                                             1633 Broadway
                                             47th Floor
                                             New York, New York  10019
                                             (212) 407-7700


                                             Of Counsel:

                                             Daniel J. Standish
                                             Marc E. Rindner
                                             Cara Tseng Duffield
                                             WILEY REIN LLP
                                             1776 K Street, NW
                                             Washington, DC 20006
                                             (202) 719-7000


                                             *Attorneys for Plaintiff*
                                             *Arch Insurance Company*


33

# EXHIBIT A



# ☆Arch
## Insurance Group

## ARCH INSURANCE COMPANY
### (A Missouri Corporation)

Home Office Address:
3100 Broadway, Suite 511
Kansas City, MO 64111

Administrative Address:
One Liberty Plaza, 53rd Floor
New York, NY 10006
Tel: (800) 817-3252

## EXCESS INSURANCE POLICY

**UNLESS OTHERWISE PROVIDED IN THE UNDERLYING POLICY(IES), THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS AND EXPENSES.**

## DECLARATIONS

Terms appearing in **bold** in these Declarations are defined in the Policy.

---

Policy No.: DOX0009322-00

Item 1. **Named Entity:**     Refco, Inc.
**Principal Address:**     550 W. Jackson Blvd. Suite 1300
Chicago, IL 60661

---

Item 2. **Policy Period:**

From:   August 11, 2005       at 12:01 a.m. (local time at the address stated in Item 1.)

To:     August 11, 2006       at 12:01 a.m. (local time at the address stated in Item 1.)

---

Item 3. Limit of Liability (inclusive of defense costs and expenses):

a.       Each **Claim:**                                          $10,000,000

b.       Maximum aggregate Limit of Liability for

all **Claims** during the **Policy Period:**                $10,000,000

---

Item 4. **Followed Policy:**

Issuing Carrier:   U.S. Specialty Insurance Company

Form:              USSIC 991 (03/2004)

Policy Number:   24-MGU-05-A10821

Limit of Liability:  $10,000,000

Deductible or Self Insured Retention:   $0/$300,000/$500,000

---

**Item 5.  Underlying and Excess Insurer Policy(ies):**

| | Issuing Company | Policy No. | Limits of Liability | Attachment |
|---|---|---|---|---|
| **A.  Primary Policy:** | | | | |
| | U.S. Specialty Insurance Company | 24-MGU-05-A10821 | $10,000,000 | $0 |
| **B.  Underlying Excess Policy(ies)** | | | | |
| First Excess: | Lexington Insurance Company | 162-0924 | $7,500,000 | $10,000,000 |
| Second Excess: | Axis Reinsurance Company | TBD | $10,000,000 | $17,500,000 |
| Third Excess: | Allied World Assurance Company (U.S.), Inc. | AW0418197 | $12,500,000 | $27,500,000 |
| Fourth Excess: | | | | |
| Fifth Excess: | | | | |
| Sixth Excess: | | | | |
| Seventh Excess: | | | | |
| Eighth Excess: | | | | |
| **C.  Excess Insurer** | | | | |
| | Arch Insurance Co. | DOX0009322-00 | $10,000,000 | $40,000,000 |

---

**Item 6.  Premium:** $241,693

Premium Attributable to Terrorism Risk Insurance: $0
(Included In Policy Premium ☒)
(In Addition To Policy Premium ☐)

---

**Item 7.  Endorsements Applicable to Coverage at Inception of Policy:  (See attached Schedule of Forms and Endorsements.)**

---

**Item 8.  Notices to Excess Insurer:**

**Notice Of Claim(s) To Be Sent To:**
Executive Assurance Claims
Arch Insurance Company
One Liberty Plaza, 53rd Floor
New York, NY 10006
Fax: (646) 746-8111

**All Other Notices To Be Sent To:**
Executive Assurance Underwriting
Arch Insurance Company
One Liberty Plaza, 53rd Floor
New York, NY 10006
Fax: (212) 651-6499

---

THESE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION FOR THIS POLICY, THE APPLICATIONS FOR ALL **UNDERLYING INSURANCE**, ALL MATERIALS SUBMITTED THEREWITH AND THE POLICY FORM ATTACHED HERETO, CONSTITUTE THE EXCESS INSURANCE POLICY.

The **Excess Insurer** has caused this Policy to be signed and attested to by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the **Excess Insurer**.

_____     3/7/06
Authorized Representative                              Date

_____     _____
Secretary                                                      President

# EXCESS INSURANCE POLICY

In consideration of the payment of the premium set forth in Item 6. of the Declarations of this Policy, and in reliance upon all statements made in the Application for this Policy, in the applications for all **Underlying Insurance** and in any other materials submitted to the Insurer designated in the Declarations of this Policy (hereinafter "the **Excess Insurer**"), which are incorporated into and constitute part of this Policy, and subject to the Limit of Liability set forth in Item 3. of the Declarations of this Policy, the **Excess Insurer** agrees with the **Insureds** as follows:

## SECTION I

INSURING AGREEMENT.

A.  The **Excess Insurer** shall provide the **Insureds** coverage for **Claims** in excess of the **Underlying Insurance**.

B.  The insurance coverage afforded by this Policy shall apply only after exhaustion of the **Underlying Limit** solely as a result of actual payment, in legal currency, under the **Underlying Insurance** in connection with **Claim(s)** and after the **Insureds** shall have paid the full amount of any applicable deductible or self insured retentions.

C.  Except with respect to premium and Limit of Liability and as provided in this Policy, the insurance coverage afforded by this Policy shall apply in conformance with the terms and conditions of the **Followed Policy** and in conformance with any terms and conditions further limiting or restricting coverage in this Policy or in any other **Underlying Insurance**. In no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the **Underlying Insurance**.

## SECTION II

LIMIT OF LIABILITY.

A.  The amount stated in Item 3.b. of the Declarations of this Policy shall be the maximum amount payable by the **Excess Insurer** on account of all **Claims** during the **Policy Period**.

B.  All payments by the **Excess Insurer** in connection with a **Claim** shall be part of and not in addition to the Limit of Liability set forth in Item 3. of the Declarations of this Policy, and shall reduce such Limit of Liability.

## SECTION III

DEFINITIONS.

All terms defined in this Policy appear in **bold**.

A.  **Claim(s)** shall have the same meaning in this Policy as given to it in the **Followed Policy**.

B.  **Insured(s)** means any person(s) or entity(ies) that are entitled to coverage under the **Followed Policy** at its inception.

C.  **Followed Policy**, **Named Entity**, **Primary Policy**, **Policy Period** and **Underlying Excess Policies**, are as identified in the Declarations of this Policy.

D.  **Underlying Insurance** means the **Primary Policy** and any **Underlying Excess Policies** listed in Item 5. of the Declarations of this Policy.

E. **Underlying Limit** means an amount equal to the aggregate of all limits of liability for all **Underlying Insurance**, plus the deductible or self insured retention, if any, applicable under the **Primary Policy**.

### SECTION IV

MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE**.

A. As a condition to the coverage of this Policy, the **Insureds** shall maintain all **Underlying Insurance** in full force and effect with solvent insurers during the **Policy Period**, except for reduction or exhaustion of the **Underlying Limit** by payment in connection with **Claims**.

B. In the event of depletion of the **Underlying Limit** by payment in connection with **Claim(s)**, this Policy shall, subject to the Limit of Liability stated in Item 3. of the Declarations of this Policy, continue to apply as excess insurance over the amount of insurance remaining under such **Underlying Insurance**.

C. In the event of exhaustion of all of the **Underlying Limit** by payment in connection with **Claim(s)**, this Policy shall, subject to the Limit of Liability stated in Item 3. of the Declarations of this Policy, continue in force as primary insurance subject to the terms and conditions and the deductible or self insured retention under the **Primary Policy**, which deductible or self insured retention shall be applied to any subsequent **Claim** in the same manner as specified in the **Primary Policy**.

D. This Policy shall drop down only in the event of reduction or exhaustion of all of the **Underlying Limit** by payment in connection with **Claim(s)**, and shall not drop down for any other reason including, but not limited to: (i) any exhaustion of a sublimit of any **Underlying Insurance**; or (ii) uncollectibility, in whole or in part, of any **Underlying Insurance** whether due to financial impairment or insolvency, liquidation, or for any other reason; or (iii) failure of the **Insured** to maintain any **Underlying Insurance**. The risk of any gaps in coverage or uncollectibility for any reason is expressly retained by the **Insured**, and is not assumed or insured by the **Excess Insurer**.

E. As a condition precedent to coverage under this Policy, the **Insureds** shall give to the **Excess Insurer** written notice and the full particulars of: (i) cancellation of any **Underlying Insurance**; (ii) reduction and or exhaustion of the **Underlying Limit**; (iii) additional or return premium in connection with any **Underlying Insurance**; (iv) any changes to the **Underlying Insurance** by rewrite, endorsement or otherwise; and (v) the initiation of any receivership, liquidation, dissolution, rehabilitation or similar proceeding by any regulatory authority or any other person or entity against the issuing company of any **Underlying Insurance**. Such notice shall be sent to the **Excess Insurer** immediately upon receipt of such notice by the **Named Entity** or any **Insured**.

F. In the event of any changes to any **Underlying Insurance** during the Policy Period, this Policy shall become subject to any such changes upon the effective date of the changes in the **Underlying Insurance** only if and to the extent that consent of the **Excess Insurer** is expressly endorsed hereon and provided that the **Insureds** shall pay any additional premium reasonably required by the **Excess Insurer** for such changes.

G. This Policy shall terminate immediately upon the termination of any **Underlying Insurance**, whether by the **Insured** or by the issuer of the **Underlying Insurance**. Notice of cancellation or non-renewal of all or part of the **Underlying Insurance** duly given by any such Insurer shall serve as notice of the cancellation or non-renewal of this Policy by the **Excess Insurer**. Return premium, if any, shall be as provided in Section VIII.C. below.

## SECTION V

DUTIES IN THE EVENT OF A **CLAIM**.

A.  With respect to any **Claim(s)** that, alone or combined, might result in payment pursuant to the insurance coverage afforded under this Policy, the **Insured** shall not admit liability and shall not agree to settle any **Claim** without the **Excess Insurer's** consent.

B.  The **Insured** shall give notice under this Policy as provided in the **Followed Policy** and at the address shown in Item 8. of the Declarations of this Policy.  Notice to the issuer of the **Followed Policy**, the **Primary Policy**, or any other **Underlying Insurer** shall not constitute notice to the **Excess Insurer**.

C.  With respect to any **Claim(s)** that, alone or combined, might result in payment pursuant to the insurance coverage afforded under this Policy, no costs, charges or expenses for investigation or defense of any **Claim** shall be incurred, or settlements made, without the **Excess Insurer's** consent, such consent not to be unreasonably withheld.

D.  If legal proceedings are begun, the **Insured** shall forward to the **Excess Insurer** a copy of each pleading or document received by the **Insured** or the **Insured's** representatives, together with copies of reports or investigations made by the **Insured** or the **Insured's** representatives with respect to such proceedings.

E.  The **Excess Insurer** may, at its sole option, elect to effectively participate in the investigation, settlement or defense of any **Claim** against any **Insured** for matters covered by this Policy even if the **Underlying Limit** has not been exhausted.  The **Excess Insurer** may, at its own expense, elect to appeal any judgment which may involve the insurance provided by this Policy.

## SECTION VI

COOPERATION.  The **Insured** shall give the **Excess Insurer** such information and cooperation as the **Excess Insurer** may reasonably require.

## SECTION VII

SUBROGATION AND RECOVERIES.  In the event of any payment under this Policy, the **Excess Insurer** shall be subrogated to all of the **Insureds'** rights of recovery against any person or organization, and the **Insured** shall execute and deliver all instruments and papers and do whatever else may be necessary to secure such rights.

Any amount recovered after payment under this Policy shall be apportioned in the inverse order of payment to the extent of actual payment.  The expenses of all such recovery proceedings shall be apportioned in the same ratio as the recoveries.

## SECTION VIII

CANCELLATION.

A.  This Policy may be cancelled by the **Named Entity** at any time by written notice or by surrender of this Policy to the **Excess Insurer** at the address listed in Item 8. of the Declarations of this Policy, stating when thereafter the cancellation shall be effective.

B.  Except as provided in Section IV.G. above, this Policy may be cancelled by or on behalf of the **Excess Insurer** by mailing or delivering to the **Named Entity** at the address shown in Item 1. of the Declarations of this Policy written notice stating when such cancellation shall be effective.  Notice of cancellation will be provided at least ten (10) days before the effective date of cancellation if the **Excess Insurer** is cancelling this Policy for nonpayment of premium.  Notice of cancellation will be

provided at least sixty (60) days before the effective date of cancellation if this Policy is cancelled for any other reason.   The mailing of such notice shall be sufficient notice and the effective date of cancellation shall become the end of the **Policy Period**.   Delivery of such notice shall be equivalent to mailing.

C.   If this Policy is cancelled by the **Named Entity**, the **Excess Insurer** shall retain the customary short-rate portion of the premium.   If this Policy is cancelled by the **Excess Insurer**, the **Excess Insurer** shall send the applicable portion of the pro-rata premium refund to the **Named Entity** at the address shown in Item 1. of the Declarations of this Policy.   Premium adjustment may be made as soon as practicable after cancellation is effective and payment or tender of any unearned premium by the **Excess Insurer** shall not be a condition precedent to the effectiveness of cancellation.

### SECTION IX

ASSIGNMENT.   This Policy and any and all rights hereunder are not assignable without the prior written consent of the **Excess Insurer**.

### SECTION X

**NAMED ENTITY** AUTHORIZATION CLAUSE.   By acceptance of this Policy, the **Insureds** and the **Named Entity** agree that the **Named Entity** will act on behalf of all of the **Insureds** as well as the **Named Entity** with respect to the giving and receiving of all notices, the payment of premiums, and the receiving of any return premium that may become due.

### SECTION XI

CAPTIONS.   The headings or captions used in this Policy are for the purposes of reference only and shall not otherwise affect the meaning of this Policy.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**PENDING AND PRIOR LITIGATION EXCLUSION (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

1.  The **Excess Insurer** shall not be liable to make any payment in connection with a **Claim** arising out of, based upon or attributable to:

    a.  any litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured** occurring prior to, or pending as of, <u>August 11, 2005</u>;

    b.  any subsequent litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured** arising from or based on any matter alleged in such prior or pending litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured**; or

    c.  any **Wrongful Act** which gave rise to such prior or pending litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured**, or any other **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** described above, constitute **Interrelated Wrongful Acts**.

2.  "**Wrongful Act**" means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act.

3.  "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:   1

Policy Number:          DOX0009322-00

Named Insured:          Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0047 00 01 03                                                            Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**PRIOR NOTICE EXCLUSION (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

1.  The **Excess Insurer** shall not be liable to make any payment in connection with a **Claim** alleging, arising out of, based upon or attributable to:

    a.  any **Wrongful Act** or any matter, fact, circumstance, situation, transaction, or event which has been the subject of any notice given under any policy, the term of which incepted prior to the inception date of this Policy; or

    b.  any **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** described in a. above, constitute **Interrelated Wrongful Acts**.

2.  "**Wrongful Act**" means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act.

3.  "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  2

Policy Number:          DOX0009322-00

Named Insured:         Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0051 00 01 03                                                          Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**APPLICATION ENDORSEMENT (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

The term "Application" or "Renewal Application," as used in this Policy or any **Underlying Insurance** shall mean:

1.  Each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this Policy or any **Underlying Insurance** or the underwriting of any other directors and officers and/or corporation (or equivalent) liability policy issued by the **Excess Insurer** or an insurer of any **Underlying Insurance**, or any of their affiliates, of which this Policy or any **Underlying Insurance** is a renewal, replacement or which it succeeds in time;

2.  Any public documents filed by the **Insureds** with the Securities and Exchange Commission ("SEC") or any similar state, local, or foreign regulatory agency, including, but not limited to, the Annual Report(s), 10Ks, 10Qs, 8Ks and proxy statements of an entity that is an **Insured**; and

3.  Any other written public statement or certification required by law to be made by the chief executive officer, chief financial officer or other executive officer of an entity that is an **Insured** regarding the accuracy, completeness or adequacy of such **Insured's** financial statements, SEC filings, or internal controls.

All such applications, attachments, materials, filings and certifications, whether or not furnished to the **Excess Insurer**, are deemed attached to and incorporated into this Policy.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  3

Policy Number:          DOX0009322-00

Named Insured:         Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0004 00 04 03                                                                 Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ILLINOIS AMENDATORY ENDORSEMENT**

1.  **SECTION IV,** MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE.,** A. is amended by deleting the phrase "with solvent insurers".

2.  **SECTION IV,** MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE.,** E. is amended by the addition of the following:

    The **Insureds'** failure to provide the foregoing notice shall not invalidate this Policy, but in the event the **Insureds** fail to provide such notice the **Excess Insurer** shall be liable under this Policy only to the extent that the **Excess Insurer** would have been liable had the **Insureds** provided adequate notice under this provision.

3.  **SECTION IV,** MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE.,** G. is deleted in its entirety.

4.  **SECTION VIII,** CANCELLATION., B. is deleted and replaced by the following:

    B.  After this Policy has been in effect for sixty (60) days, this Policy may be cancelled by or on behalf of the **Excess Insurer** only for one of the following reasons:

        1)  nonpayment of premium;

        2)  this Policy was obtained through a material misrepresentation;

        3)  any **Insured** violated any of the terms and conditions of this  Policy;

        4)  the risk originally accepted has measurably increased;

        5)  certification to the Director of the Department of Insurance of the loss of reinsurance by the **Excess Insurer** which provided coverage to the **Excess Insurer** for all or a substantial part of the underlying risk insured; or

        6)  a determination by the Director of the Department of Insurance that the continuance of the Policy could place the **Excess Insurer** in violation of the insurance laws of Illinois.

        The **Excess Insurer** shall mail written notice of cancellation to the **Named Entity** and the **Named Entity's** agent or broker of any record at the last address known to the **Excess Insurer** and any mortgagee or lienholder, if known.  Notice of cancellation shall be provided at least ten (10) days before the effective date of cancellation if cancellation is for nonpayment of premium.  If cancellation is for any of the reasons listed in 2) through 6) above, and the Policy has been in effect for sixty (60) days or less, then notice of cancellation shall be provided at least thirty (30) days before the effective date of cancellation.  After the Policy has been in effect for sixty-one (61) days or more, notice of cancellation shall be provided at least sixty (60) days before the effective date of cancellation. The mailing of such notice shall be sufficient and the effective date of cancellation shall become the end of the **Policy Period**.  The **Excess Insurer** shall maintain proof of mailing on a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service.  The notice shall state the reason or reasons for cancellation.

# TERRORISM COVERAGE DISCLOSURE NOTICE

### TERRORISM COVERAGE PROVIDED UNDER THIS POLICY

The Terrorism Risk Insurance Act of 2002 established a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. The Act provides that, to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States.

In accordance with the Terrorism Risk Insurance Act of 2002, we are required to offer you coverage for losses resulting from an act of terrorism **that is certified under the federal program** as an act of terrorism committed by an individual(s) acting on behalf of a foreign person or foreign interest.  The policy's other provisions will still apply to such an act.  Your decision is needed on this question:  do you choose to pay the premium for terrorism coverage stated in this offer of coverage, or do you reject the offer of coverage and not pay the premium? You may accept or reject this offer.

If your policy provides commercial property coverage, in certain states, statutes or regulations may require coverage for fire following an act of terrorism.  In those states, if "terrorism" results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements that apply to those coverage forms, or to Legal Liability coverage forms or Leasehold Interest coverage forms.

**Your premium will include the additional premium for terrorism as stated in the section of this Notice titled DISCLOSURE OF PREMIUM.**

### DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. **The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.**

### DISCLOSURE OF PREMIUM
Your premium for terrorism coverage is: **Included in Policy Premium**
(This charge/amount is applied to obtain the final premium.)

**You may choose to reject the offer by signing the statement below and returning it to us.  Your policy will be changed to exclude the described coverage.  If you chose to accept this offer, this form does not have to be returned.**
### REJECTION STATEMENT

I hereby decline to purchase coverage for certified acts of terrorism.  I understand that an exclusion of certain terrorism losses will be made part of this policy.

_____
Policyholder/Legal Representative/Applicant's
Signature

Refco, Inc.
_____
Named Insured

_____
Print Name of Policyholder/Legal
Representative /Applicant

Arch Insurance Company
_____
Insurance Company

Date: _____

Policy Number: DOX0009322-00

00 MLT0027 00 01 05

# EXHIBIT B

# U.S. SPECIALTY INSURANCE COMPANY
## Houston, Texas

**NOTICE: THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION. THE INSURER HAS NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED.**

## DECLARATIONS

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

POLICY NUMBER: 24-MGU-05-A10821          RENEWAL OF: N/A

ITEM 1.    **NAMED CORPORATION:**    Refco Inc.
                                     550 W. Jackson Blvd., Suite 1300
                                     Chicago, IL 60661

ITEM 2.    **POLICY PERIOD:**    (a)  Inception Date:  8/11/2005
                                 (b)  Expiration Date: 8/11/2006
                                 at 12:01 a.m. at the Principal Address stated in Item 1.

ITEM 3.    **LIMIT OF LIABILITY** (inclusive of Defense Costs):
           $10,000,000 in the aggregate, for INSURING AGREEMENTS A and B combined

ITEM 4.    **RETENTIONS:**
           (a)  INSURING AGREEMENT A:       $0 or minimum required under applicable law, if any
           (b)  INSURING AGREEMENT B(1):    $300,000 for **Loss** arising from **Claims** alleging the same
                                            **Wrongful Act** or related **Wrongful Acts** (waivable under the
                                            circumstances described in CONDITION (A)(5))
           (c)  INSURING AGREEMENT B(2):    $500,000 for **Loss** arising from **Claims** alleging the same
                                            **Wrongful Act** or related **Wrongful Acts** (waivable under the
                                            circumstances described in CONDITION (A)(5))

ITEM 5.    **PREMIUM:**  $395,000.00

ITEM 6.    **NOTICES REQUIRED TO BE GIVEN TO THE INSURER MUST BE ADDRESSED TO:**

           HCC GLOBAL FINANCIAL PRODUCTS
           P.O. Box 4018
           Farmington, CT 06034
           Attention:  Claims Manager

ITEM 7.    **DISCOVERY PERIOD:**
           (a)  Premium:   150% of the Annual Premium.
           (b)  Duration:   365 days

ITEM 8.    **ENDORSEMENTS ATTACHED AT ISSUANCE:**
           1117C-IL  991-301  991-302  991-319  991-322  991-412  991-415  991-442  991-444 991-701
           991-804 991-830  991-861  991-876  991-1122  80016

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed on the Declarations Page by its President, a Secretary and a duly authorized representative of the Insurer.


Secretary                    President                    Authorized Representative

Date: September 23, 2005                                  USSIC-990 (04/2002)

# U. S. SPECIALTY INSURANCE COMPANY

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

#### This is a claims made policy. Please read it carefully.

In consideration of the payment of the premium, and in reliance upon the statements made in the **Application**, including attachments, all of which are made a part hereof and deemed attached hereto, and subject to the Declarations and the limitations, conditions, provisions, any endorsements to and all other terms of this Policy, the Insurer and the **Insureds** agree as follows:

## INSURING AGREEMENTS

(A)    The Insurer will pay to or on behalf of the **Insured Persons Loss** arising from **Claims** first made during the **Policy Period** or Discovery Period (if applicable), against the **Insured Persons** for **Wrongful Acts**, except when and to the extent that the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement.

(B)    The Insurer will pay to or on behalf of the **Company Loss** arising from:

   (1)    **Claims** first made during the **Policy Period** or the Discovery Period (if applicable) against the **Insured Persons** for **Wrongful Acts**, if the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement, and/or

   (2)    **Securities Claims** first made during the **Policy Period** or the Discovery Period (if applicable) against the **Company** for **Wrongful Acts**.

## DEFINITIONS

(A)    **Application** means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are deemed a part of the Policy.

(B)    **Claim** means:

   (1)    any written demand for monetary or non-monetary relief,

   (2)    any civil proceeding commenced by service of a complaint or similar pleading,

   (3)    any arbitration, mediation or other similar dispute resolution proceeding,

   (4)    any criminal proceeding commenced by return of an indictment,

   (5)    the receipt by an **Insured Person** of a target letter or similar document in connection with a criminal investigation of such **Insured Person**, or

   (6)    any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

   including any appeal from any such proceeding.

(C)    **Company** means the **Named Corporation** and any **Subsidiary** thereof.

(D)    **Defense Costs** means reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation,

U.S. SPECIALTY INSURANCE COMPANY

adjustment, defense or appeal of a **Claim** against an **Insured Person** (or, with respect to **Securities Claims**, against any **Insured**), but excluding salaries, wages, benefits or overhead expenses of directors, officers or employees of the **Company**.

(E)    **Insured** means the **Insured Persons** and the **Company**.

(F)    **Insured Person** means:

    (1)    any past, present or future director or officer of the **Company**, including any person in a position which is the functional equivalent of a director or officer with respect to any entity included within the definition of **Company** or **Outside Entity** located outside the United States, and

    (2)    with respect only to **Securities Claims**, any past, present or future employee of the **Company**.

(G)    **Loss** means **Defense Costs** and any damages, settlements, judgments or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that:

    (1)    an **Insured Person** is legally obligated to pay as a result of any **Claim**, or

    (2)    the **Company** is legally obligated to pay as a result of any **Securities Claim**;

provided, that **Loss** will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed. For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insureds** in that regard.

(H)    **Named Corporation** means the entity designated as such in Item 1 of the Declarations.

(I)    **No Liability** means all defendant **Insureds** obtain by reason of a motion to dismiss, motion for summary judgment or trial a final non-appealable judgment in their favor.

(J)    **Outside Capacity** means service by an **Insured Person** as a director, officer, trustee, regent or governor of, or in another equivalent executive position with respect to, an **Outside Entity**, during such time that such service is at the request of the **Company**.

(K)    **Outside Entity** means any not-for-profit corporation, association, organization or entity.

(L)    **Policy Period** means the period set forth in Item 2 of the Declarations, subject to prior termination or cancellation pursuant to CONDITION (E).

(M)    **Pollutants** means any seepage, pollution or contamination, including but not limited to any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and materials to be recycled, reconditioned or reclaimed.

(N)    **Securities Claim** means a **Claim** which:

    (1)    is brought by or on behalf of one or more securities holders of the **Company** in their capacity as such, or

U.S. SPECIALTY INSURANCE COMPANY

        (2)    arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the **Company**, whether such purchase, sale or offer involves a transaction with the **Company** or occurs in the open market.

(O)    **Subsidiary** means any entity:

        (1)    during any time on or before the inception of the **Policy Period** in which the **Named Corporation** owns or owned more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other **Subsidiaries**; or

        (2)    created or acquired during the **Policy Period** during any time in which, as a result of such creation or acquisition, the **Named Corporation** owns more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other **Subsidiaries**.

An entity ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50% of its issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other **Subsidiaries**. The coverage afforded under this Policy with respect to **Claims** against a **Subsidiary** or any **Insured Person** thereof will apply only in respect of **Wrongful Acts** committed or allegedly committed after the effective time that such entity becomes a **Subsidiary** and prior to the time that such entity ceases to be a **Subsidiary**.

(P)    **Wrongful Act** means any:

        (1)    actual or alleged act, error, misstatement, misleading statement, omission or breach of duty:

                (a)    by an **Insured Person** in his or her capacity as such, including in an **Outside Capacity**, or

                (b)    with respect only to **Securities Claims**, by the **Company**; or

        (2)    matter claimed against an **Insured Person** solely by reason of his or her service in such capacity or in an **Outside Capacity**.

## EXCLUSIONS

Unless otherwise specifically stated or provided for in CONDITION (D)(2) or elsewhere in this Policy, the Insurer will not be liable to make any payment of **Loss** in connection with a **Claim**:

(A)    arising out of based upon or attributable to the gaining by any **Insured** of any profit or advantage to which such **Insured** was not legally entitled; provided, that this EXCLUSION (A) will apply only if there has been a final adjudication adverse to such **Insured** establishing that the **Insured** gained such a profit or advantage;

(B)    arising out of, based upon or attributable to the commission by any **Insured** of any criminal or deliberately fraudulent or dishonest act; provided, that this EXCLUSION (B) will apply only if there has been a final adjudication adverse to such **Insured** establishing that the **Insured** so acted;

(C)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from any actual or alleged libel, slander, defamation or disparagement or

U.S. SPECIALTY INSURANCE COMPANY

violation of a person's right of privacy; provided, that this EXCLUSION (C) will not apply to **Securities Claims**;

(D)  for the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants** or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, that this EXCLUSION (D) will not apply to **Securities Claims**;

(E)  for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or any regulations promulgated thereunder or of any similar law or regulation; provided, that this EXCLUSION (E) will apply only to **Claims** involving employee pension or welfare benefit plans organized or sponsored by the **Company** for its own employees, and will not apply to **Securities Claims**;

(F)  brought by or on behalf of, or in the name or right of, the **Company**, whether directly or derivatively, or any **Insured Person**, unless such **Claim** is:

   (1)  brought and maintained independently of, and without the solicitation, assistance or active participation of, the **Company** or any **Insured Person**, or

   (2)  for an actual or alleged wrongful termination of employment, or

   (3)  brought or maintained by an **Insured Person** for contribution or indemnity and directly results from another **Claim** covered under this Policy, or

   (4)  brought and maintained by an employee of the **Company** solely to enforce his or her rights as a holder of securities issued by the **Company**;

   provided, that this EXCLUSION (F) will not apply to **Claims** brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the **Company**;

(G)  by or on behalf of, or in the name or right of, any **Outside Entity**, whether directly or derivatively, against an **Insured Person** for a **Wrongful Act** in his or her **Outside Capacity** with respect to such **Outside Entity**, unless such **Claim** is brought and maintained independently of, and without the solicitation, assistance or active participation of, the **Outside Entity**, the **Company** or any **Insured Person**;

(H)  arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related **Wrongful Acts** alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time; or

(I)  arising out of, based upon or attributable to any pending or prior litigation as of the inception date of this Policy, or alleging or derived from the same or essentially the same facts or circumstances as alleged in such pending or prior litigation.

For purposes of determining the application of the above EXCLUSIONS, no **Wrongful Act** of any **Insured Person** will be imputed to any other **Insured Person** who did not have actual knowledge of, or directly participate in the commission of, such **Wrongful Act** and, except for **Wrongful Acts** of the **Company's** chairman of the board, chief executive officer, president, chief financial officer or general counsel, no **Wrongful Act** of any **Insured Person** will be imputed to the **Company**.

DISCOVERY PERIOD

If the Insurer or the **Named Corporation** fails or refuses to renew this Policy or if the **Named Corporation** cancels this Policy, any **Insured** will have the right, upon payment of the Discovery Period Premium set

**U.S. SPECIALTY INSURANCE COMPANY** 

forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any **Wrongful Act** actually or allegedly taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period. This clause and the right contained within will not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

## EXTENSIONS

(A)     Subject to its terms and conditions, this Policy will afford coverage for **Claims** for **Wrongful Acts** of an **Insured Person** if such **Claims** are made against the estates, heirs, legal representatives or assigns of an **Insured Person** who is deceased or against the legal representatives or assigns of an **Insured Person** who is incompetent, insolvent or bankrupt, to the extent that such **Claims** would have been covered by this Policy in the absence of such death, incompetence, insolvency or bankruptcy.

(B)     Subject to its terms and conditions, this Policy will afford coverage for **Claims** for **Wrongful Acts** of an **Insured Person** if such **Claims** are made against the **Insured Person's** lawful spouse solely by reason of such spouse's legal status as a spouse of the **Insured Person** or such spouse's ownership interest in property which the claimant seeks as recovery for alleged **Wrongful Acts** of the **Insured Person**. For purposes of the Policy, amounts which such spouse becomes legally obligated to pay by reason of such **Claim** will be treated as **Loss** which the **Insured Person** is legally obligated to pay on account of the **Claim** made against the **Insured Person**. This coverage extension does not apply, however, to the extent the **Claim** alleges any wrongful act or omission by the **Insured Person's** spouse.

## CONDITIONS

(A)     <u>Limit of Liability and Retention</u>

(1)     The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period**, whether covered under one or more INSURING AGREEMENTS, will not exceed the Limit of Liability set forth in Item 3 of the Declarations.

(2)     **Defense Costs** will be part of and not in addition to the Limit of Liability, and payment of **Defense Costs** will reduce the Limit of Liability. **Defense Costs**, as incurred, will also be applied against the retention.

(3)     The retention stated in Item 4(b) of the Declarations will apply to **Loss**, including **Defense Costs**, which the **Company** is required or permitted to pay as indemnification or advancement to or on behalf of the **Insured Persons**, whether or not such **Loss** is actually paid, unless the **Company** is unable to pay such **Loss** as indemnification or advancement solely by reason of its financial insolvency. For purposes of this CONDITION (A)(3), the certificate of incorporation, charter, articles of association or other organizational documents of the **Named Corporation**, each **Subsidiary** and each **Outside Entity**, including the bylaws and resolutions thereof, will be deemed to have been adopted or amended to provide indemnification and advancement to the **Insured Persons** to the fullest extent permitted by law.

(4)     The Insurer will be liable only for the amount of **Loss** in connection with any **Claim**, which is in excess of the applicable retention stated in Item 4 of the Declarations. Such retention is to be borne by the **Insureds** and remain uninsured. A single retention will

U.S. SPECIALTY INSURANCE COMPANY

apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

(5)    Notwithstanding the foregoing, with respect to **Securities Claims** the retentions stated in Items 4(b) and 4(c) of the Declarations will apply only to **Defense Costs**; provided, that if a **Securities Claim** is finally resolved by a determination of **No Liability**, no retention will apply to such **Securities Claim** even as respects **Defense Costs** and the Insurer will thereupon reimburse **Defense Costs** within the retention which shall already have been paid by the **Insureds**.

(6)    One retention amount will apply to the covered portion of each and every single **Claim**. If a single **Claim** is covered under more than one INSURING AGREEMENT, the retentions stated in Item 4 of the Declarations will be applied separately to the portions of the **Claim** covered by each INSURING AGREEMENT, and the sum of the retentions so applied will constitute the retention for each single **Claim**, which in total will not exceed the largest of the applicable retentions.

(B)    Notice of **Claims** and Reporting Provisions

(1)    The **Insureds** must, as a condition precedent to the obligations of the Insurer under this Policy, give written notice, including full details, to the Insurer of any **Claim** as soon as practicable after it is made.

(2)    If written notice of a **Claim** has been given to the Insurer pursuant to CONDITION (B)(1) above, then any **Claim** subsequently made against the **Insureds** and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** of which such notice has been given, or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** of which such notice has been given, will be considered to have been made at the time such notice was given.

(3)    If, during the **Policy Period** or the Discovery Period (if applicable), the **Insureds** become aware of any circumstances which may reasonably be expected to give rise to a **Claim** against the **Insureds** and if, before the end of the **Policy Period** or the Discovery Period (if applicable), the **Insureds** give written notice to the Insurer of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, potential claimants and the consequences which have resulted or may result from such **Wrongful Act**, then any **Claim** subsequently made against the **Insureds** and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** described in such notice will be considered to have been made at the time such notice of circumstances was given.

(4)    All notices under this CONDITION (B) must refer to the Policy Number, must be in writing, must request coverage under this Policy, and must be given by certified mail or prepaid express courier to the address set forth in Item 6 of the Declarations.

(C)    Interrelationship of **Claims**

All **Claims** alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single **Claim** and will be considered to have been made at the time the earliest such **Claim** was made.

(D)    **Defense Costs, Settlements, Allocation of Loss, Priority of Payments**

U.S. SPECIALTY INSURANCE COMPANY

(1)    The Insurer will have no duty under this Policy to defend any **Claim**. The **Insureds** must defend any **Claim** made against them. The **Insureds** may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the Insurer's prior written consent. Only those settlements, stipulated judgments and **Defense Costs** to which the Insurer has consented will be recoverable as **Loss** under this Policy. The Insurer's consent may not be unreasonably withheld; provided, that the Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any **Claim**.

(2)    The Insurer will pay covered **Defense Costs** on an as-incurred basis. If it is finally determined that any **Defense Costs** paid by the Insurer are not covered under this Policy, the **Insureds** agree to repay such non-covered **Defense Costs** to the Insurer.

(3)    If **Loss** covered by this Policy and loss not covered by this Policy are both incurred in connection with a single **Claim**, either because the **Claim** includes both covered and uncovered matters, or because the **Claim** is made both against **Insured Persons** (or, with respect only to **Securities Claims**, against **Insureds**) and against others not included within the definition of **Insured Person** (or, with respect only to **Securities Claims**, the definition of **Insured**), the **Insureds** and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts, taking into account the relative legal and financial exposures of the parties to the **Claim** and the relative benefits to be obtained by the resolution of the **Claim**. The Insurer will be obligated to pay only those amounts or portions of **Loss** allocated to covered matters claimed against **Insured Persons** (or, with respect only to **Securities Claims**, against **Insureds**). If the **Insureds** and the Insurer are unable to agree upon an allocation, then until a final allocation is agreed upon or determined pursuant to the provisions of this Policy and applicable law, the Insurer will be obligated to make an interim payment of that amount or portion of **Loss**, including **Defense Costs**, which the parties agree is not in dispute.

(4)    If the Insurer is obligated to pay **Loss**, including **Defense Costs**, under more than one INSURING AGREEMENT, whether in connection with a single **Claim** or multiple **Claims**, the Insurer will first pay any **Loss** payable under INSURING AGREEMENT (A) and, if the Insurer concludes that the amount of all **Loss**, including **Defense Costs**, is likely to exceed the Insurer's Limit of Liability, the Insurer shall be entitled to withhold some or all of any **Loss** payable under INSURING AGREEMENT (B)(1) or (B)(2) to ensure that as much of the Limit of Liability as possible is available for the payment of **Loss** under INSURING AGREEMENT (A). If no **Loss** is payable under INSURING AGREEMENT (A), or if the Insurer's obligations under INSURING AGREEMENT (A) have been satisfied, then, subject to the Insurer's Limit of Liability as set forth in Item 3 of the Declarations, the Insurer will pay such **Loss** as it is required to pay under INSURING AGREEMENT (B)(1) or (B)(2) in such manner and, in the event of multiple **Claims**, apportioned among such **Claims** as the **Named Corporation** shall direct in writing.

(E)    <u>Cancellation or Nonrenewal</u>

(1)    The Insurer may cancel this Policy for non-payment of premium by sending not less than ten (10) days notice to the **Named Corporation** at its last known address. The Insurer may not otherwise cancel this Policy.

(2)    The **Named Corporation** may cancel this Policy by mailing the Insurer written notice stating when such cancellation will be effective; provided, that the **Named Corporation** may not cancel this Policy after the effective date of any acquisition of the **Named Corporation** as described in CONDITION (F) below. If the **Named Corporation** cancels this Policy, the Insurer will retain the customary short rate premium. Premium adjustment may be made either at the time cancellation is effective or as soon as

U.S. SPECIALTY INSURANCE COMPANY

practicable after cancellation becomes effective, but payment of unearned premium is not a condition of cancellation.

(3) If the Insurer elects not to renew this Policy, the Insurer must give the **Named Corporation** notice of non-renewal no less than sixty (60) days before the end of the **Policy Period**.

(4) If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period will be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

(F) <u>Changes in Control</u>

(1) If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to the **Named Corporation**:

(a) the **Named Corporation** merges into or consolidates with another entity such that the **Named Corporation** is not the surviving entity, or

(b) another entity, person or group of entities and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Named Corporation**, or

(c) a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the **Named Corporation**;

then coverage under this Policy will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such Change in Control, but coverage will cease with respect to **Claims** for **Wrongful Acts** committed or allegedly committed thereafter and the premium will be considered fully earned in consideration of the coverage extended.

(2) If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to a **Subsidiary**:

(a) the **Subsidiary** ceases to be a **Subsidiary**, or

(b) a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the **Subsidiary**;

then coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** thereof will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** thereof will cease with respect to **Claims** for **Wrongful Acts** committed or allegedly committed thereafter.

(G) <u>Other Insurance and Other Indemnification</u>

(1) Such insurance as is provided by this Policy will apply only as excess over and will not contribute with any other valid and collectible insurance.

U.S. SPECIALTY INSURANCE COMPANY 

     (2)    All coverage for **Loss** from **Claims** against **Insured Persons** for **Wrongful Acts** in their **Outside Capacities** will be specifically excess of, and will not contribute with,

          (a)    any other insurance available to such **Insured Persons** by reason of their service in **Outside Capacities**, and

          (b)    any indemnification available to such **Insured Persons** in connection with their service in **Outside Capacities** from any source other than the **Company**, including but not limited to **Outside Entities**.

(H)    <u>Cooperation and Subrogation</u>

     (1)    In the event of any notice under CONDITION (B) of a **Claim** or of circumstances which may reasonably be expected to give rise to a **Claim**, the **Insureds** will give the Insurer all information, assistance and cooperation that the Insurer may reasonably request with respect thereto.

     (2)    In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery, including without limitation the **Insured Persons'** rights to indemnification or advancement from the **Company**. The **Insureds** must execute all papers required and do everything necessary to secure such rights and to enable the Insurer to bring suit in their name.

(I)    <u>No Action against the Insurer</u>

    No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy and until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against an **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the Insurer. No person or organization will have any right under this Policy to join the Insurer as a party to any action against the **Insureds** to determine the Insurer's liability; nor may the Insurer be impleaded by the **Insureds** or their legal representatives in any such action.

(J)    <u>Notices and Authority</u>

    By acceptance of this Policy, the **Insureds** agree that the **Named Corporation** may act on behalf of all **Insureds** with respect to the giving and receiving of any notices, the payment of premiums and the receiving of any return premium, the cancellation or renewal of this Policy and the acceptance of any amendments thereto.

(K)    <u>Assignment</u>

    No assignment of interest under this Policy will bind the Insurer without the Insurer's written consent.

(L)    <u>Titles and Headings</u>

    The titles and headings to the various paragraphs and sections in this Policy, including endorsements attached, are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such paragraphs and sections to which they relate.

(M)    <u>Representations and Severability</u>

    The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations.

**U.S. SPECIALTY INSURANCE COMPANY**

No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** except for material facts or information known to the person or persons who signed the **Application**. If any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

(N)     <u>Changes</u>

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not effect a waiver or a change in any part of this Policy or stop the Insurer from asserting any right under the terms of this Policy. This Policy cannot be waived or changed, except by written endorsement issued to form a part of this Policy.

(O)     <u>Entire Agreement</u>

By acceptance of this Policy, the **Insureds** and the Insurer agree that this Policy (including the **Application** and any materials submitted therewith) and any written endorsements attached hereto constitute the entire agreement between the parties with respect to this insurance.

(P)     <u>Territory</u>

This Policy applies to **Wrongful Acts** actually or allegedly taking place or **Claims** made anywhere in the world.

(Q)     <u>Conformity to Statute</u>

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, including any endorsement to this Policy which is required by any state Department of Insurance (or equivalent authority) ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein will be construed to restrict the terms of any State Amendatory Endorsement. In addition, to the extent permissible by law, nothing in any State Amendatory Endorsement will be construed to restrict the terms of this Policy.

In witness whereof the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations Page by a duly authorized representative of the Insurer.

Secretary                                                    President

...S. SPECIALTY INSURANCE CO..._'ANY

ENDORSEMENT NUMBER: 1

ILLINOIS AMENDATORY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on 8/11/05, forms part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company:

In consideration of the premium charged:

DEFINITIONS (D) <u>Defense Costs</u> of the policy has been amended to read:

> **Defense Costs** means reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation, adjustment, defense or appeal of a **Claim** against an **Insured Person** (or, with respect to **Securities Claims**, against any **Insured**), but excluding salaries, wages, benefits or overhead expenses of directors, officers or employees of the **Company** or the Insurer.

DISCOVERY PERIOD of the policy has been amended to read:

> If the Insurer or the **Named Corporation** fails or refuses to renew this Policy or if the **Named Corporation** cancels this Policy, any **Insured** will have the right, upon payment of the Discovery Period Premium set forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any **Wrongful Act** actually or allegedly taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period.

CONDITIONS (G)(1) <u>Other Insurance and Other Indemnification</u> of the policy has been amended to read:

> (1)    Such insurance as is provided by this Policy will share proportionately with similar coverages provided under any other valid and collectible insurance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

ENDORSEMENT NUMBER: 2

**EMPLOYMENT PRACTICES LIABILITY EXTENSION – NONENTITY**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged it is hereby understood and agreed that:

(1)     DEFINITION (P) **Wrongful Act** is amended to include any **Employment Practices Wrongful Act** by an **Insured Person** in his or her capacity as such.

(2)     DEFINITION (F) **Insured Person**, subsection (2) is amended to read:

    (2)     with respect only to **Securities Claims** and **Claims** for **Employment Practices Wrongful Acts**, any past, present or future employee of the **Company**.

(3)     The following DEFINITIONS are added to the Policy:

**Discrimination** means:

    (1)     any failure or refusal to hire, failure or refusal to promote, demotion or discharge of, or wrongful failure to grant tenure to, any person, or

    (2)     any limitation, segregation or classification of any employee or applicant for employment in any way that would deprive or tend to deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee;

because of such person's race, color, age, sex, disability, pregnancy, sexual orientation or preference, national origin, religion, or other status that is protected pursuant to any applicable federal, state or local statute or ordinance.

**Employment Practices Wrongful Act** means any actual or alleged:

    (1)     **Discrimination,**
    (2)     **Retaliation,**
    (3)     **Sexual Harassment,**
    (4)     **Workplace Harassment,**
    (5)     **Workplace Tort,** or
    (6)     **Wrongful Termination.**

**Retaliation** means retaliatory treatment against an employee of the **Company** on account of such employee's exercise or attempted exercise of his or her rights under law.

**Sexual Harassment** means unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature that is made a condition of employment with the **Company**, is used as a basis for employment decisions by the

Company, creates a work environment with the **Company** that interferes with performance, or creates an intimidating, hostile or offensive working environment.

**Workplace Harassment** means conduct that creates a work environment with the **Company** that interferes with performance, or creates an intimidating, hostile or offensive working environment.

**Workplace Tort** means misrepresentation, defamation (including libel and slander), invasion of privacy, false imprisonment, negligent evaluation, negligent training or supervision, wrongful discipline or wrongful deprivation of career opportunity, if actually or allegedly related to the claimant's employment by the **Company**.

**Wrongful Termination** means actual or constructive termination of the employment of, or demotion of, or failure or refusal to promote, any employee, which is in violation of law, against public policy or in breach of an implied agreement to continue employment.

(4)    EXCLUSION (C) will not apply to Loss for mental anguish, emotional distress, libel, slander, defamation or disparagement or violation of a person's right of privacy caused by an **Employment Practices Wrongful Act.**

(5)    EXCLUSION (F), subsection (2) is amended to read as follows:

    (2)    for an actual or alleged **Employment Practices Wrongful Act;**

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement: .

             By:_____
                            Attorney-in-fact

ENDORSEMENT NUMBER:  3

**ADD SPECIFIC INDIVIDUALS AS "INSURED PERSONS"**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (F) **"Insured Person"** is amended to include the following individuals:

Insurance Manager and General Counsel

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete Only When This Endorsement Is Not Prepared With The Policy Or Is Not To Be Effective With The Policy.

Effective Date of this endorsement:

By:  _____
                    Attorney-in-Fact

ENDORSEMENT NUMBER: 4

## AMEND "LOSS" TO INCLUDE PRE-JUDGMENT
## AND POST-JUDGMENT INTEREST

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (G) **Loss** is amended to read as follows:

    (G)    **Loss** means **Defense Costs** and any damages, settlements, judgments, pre-judgment interest, post-judgment interest, or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that:

        (1)    an **Insured Person** is legally obligated to pay as a result of any **Claim**, or

        (2)    the **Company** is legally obligated to pay as a result of any **Securities Claim**;

provided, that **Loss** will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed. For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insureds** in that regard.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

            By: _____
                        Attorney-in-Fact

ENDORSEMENT NUMBER: 5

**EMPLOYED LAWYERS EXTENSION**
**(SEPARATE LIMIT AND RETENTION)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)    DEFINITION (F) **Insured Person** is amended to include any **Employed Lawyer**.

(2)    DEFINITION (P) **Wrongful Act** is amended to include any act, error, misstatement, misleading statement, omission or breach of duty by an **Employed Lawyer**, in his or her capacity as such, in the rendering or failure to render professional legal services for the **Company**; provided, that **Wrongful Act** shall not include any act, error, misstatement, misleading statement, omission or breach of duty by such **Employed Lawyer** in connection with any activities: (1) that are not related to such **Employed Lawyer's** employment with the **Company**; (2) that are not rendered on the behalf of the **Company** at the **Company's** written request; or (3) that are performed by the **Employed Lawyer** for others for a fee.

(3)    The following DEFINITION is added to the Policy:

**Employed Lawyer** means any past, present or future full-time, salaried employee of the **Company** who is admitted to practice law and who is employed at the time of any alleged **Wrongful Act** as a lawyer full-time for and salaried by the **Company**.

(4)    The EXCLUSIONS section of the Policy is amended by the addition of the following:

The **Insurer** will not be liable to make any payment of **Loss** in connection with any **Claim** made against an **Employed Lawyer**:

(a)    alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring at a time when such **Employed Lawyer** was not employed as a lawyer by the **Company**;

(b)    alleging, arising out of, based upon or attributable to any **Claim** made or any prior or pending litigation as of 8/11/05, or alleging or derived from the same facts or circumstances as alleged in such pending or prior litigation;

(c)    alleging, arising out of, based upon or attributable to any **Wrongful Act**, if as of 8/11/05, such **Employed Lawyer** knew or could have reasonably foreseen that such **Wrongful Act** could give rise to a **Claim**;

(d)    alleging, arising out of, based upon or attributable to any activities by such **Employed Lawyer** as an officer or director of any entity other than the **Company**.

(5)    For purposes of the applicability of the coverage provided by this endorsement, the **Company** will be conclusively deemed to have indemnified the **Employed Lawyer** to the extent that the **Company** is permitted or required to indemnify him or her pursuant to

law, common or statutory, or contract, or the charter or by-laws of the **Company** (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The **Company** hereby agrees to indemnify the **Employed Lawyer** to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)    The coverage provided by this endorsement shall apply only to **Claims** made against an **Employed Lawyer**, provided that, and only for so long as, one or more **Insured Persons** (other than such **Employed Lawyer**) are and remain co-defendants in the proceeding along with such **Employed Lawyer**.

(7)    The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)    Solely for purposes of the coverage provided under this endorsement:

(a)    The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period** will not exceed $100,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

(b)    A retention of $100,000 shall apply to **Loss** resulting from each **Claim**; provided, such retention shall not apply to **Loss** incurred by any **Employed Lawyer** if indemnification of such Loss by the **Company** is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                    Attorney-in-Fact

991-322                          Page 1 of 1
(Ed. 09/03)

ENDORSEMENT NUMBER:  6

**ERRORS AND OMISSIONS EXCLUSION
WITH MANAGEMENT CARVEBACK**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to
make any payment of **Loss** in connection with a **Claim** arising out of, based upon or
attributable to any actual or alleged rendering of or failure to render, whether by the
**Company** or by any **Insured Person**, any service for others for a fee; provided, that this
exclusion will not apply to a **Claim** against an **Insured Person** for a **Wrongful Act** in
connection with the management or supervision of the **Company** or any division or
group therein.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is
not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                    Attorney-in-Fact

ENDORSEMENT NUMBER: 7

## SPECIFIC LITIGATION EXCLUSION

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of **Loss** in connection with any **Claim** arising out of, based upon or attributable to the following litigation:

Edward McElwreath Case

or alleging or derived from the same or essentially the same facts or circumstances as alleged in such litigation.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                    Attorney-in-Fact

991-415                    Page 1 of 1
Ed. 09/05

ENDORSEMENT NUMBER: 8

**AMEND POLLUTION EXCLUSION ENDORSEMENT
(A-SIDE CARVEBACK)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (D) of this Policy is amended to read in its entirety as follows:

(D)    for the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants** or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, that this EXCLUSION (D) will not apply to **Securities Claims**; provided further, that this EXCLUSION (D) will not apply to **Claims** for **Loss** payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
Attorney-in-Fact

991-442
Ed (05/04)

Page 1 of 1

ENDORSEMENT NUMBER: 9

**AMEND EXCLUSION (C) ENDORSEMENT –
A-SIDE CARVEBACK**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (C) is amended to read in its entirety as follows:

(C)     for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from any actual or alleged libel, slander, defamation or disparagement or violation of a person's right of privacy; provided, that this EXCLUSION (C) will not apply to:

(1)     **Securities Claims, or**

(2)     **Claims for Loss** payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
        Attorney-in-Fact

ENDORSEMENT NUMBER: 10

## FULL SEVERABILITY

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, CONDITION (M) <u>Representations and Severability</u> is amended to read as follows:

(M)     <u>Representations and Severability</u>

The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**. If any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
           Attorney-in-Fact

991-701                          Page 1 of 1
Ed (09/03)

ENDORSEMENT NUMBER: 11

## DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)     INSURING AGREEMENTS is amended by the addition of the following:

The Insurer will pay to or on behalf of the **Company** all **Derivative Demand Investigation Costs** incurred by the **Company** as a result of a **Derivative Demand** first received by the **Company's** Board of Directors and reported in writing to the Insurer during the **Policy Period** or the Discovery Period, if purchased, up to the amount of the **Derivative Demand Investigation Costs Sub-Limit**.

(2)     DEFINITIONS is amended by the addition of the following:

**Derivative Demand** means a written demand by one or more shareholders of the **Company** made upon its Board of Directors to bring a civil proceeding in a court of law against an **Insured Person** for a **Wrongful Act**.

**Derivative Demand Investigation Costs** means reasonable fees, costs and expenses (including but not limited to attorneys' fees and experts' fees) incurred in connection with the investigation or evaluation of any **Derivative Demand**, but excluding wages, salaries, fees, benefits or overhead expenses of any **Insured Person**.

**Derivative Demand Investigation Costs Sub-Limit** means $250,000.

(3)     The Insurer's maximum aggregate liability for **Derivative Demand Investigation Costs** resulting from all **Derivative Demands** shall be the amount set forth in the definition of **Derivative Demand Investigation Costs Sub-Limit**, regardless of the number of **Derivative Demands** received during the **Policy Period** or the Discovery Period, if purchased. The **Derivative Demand Investigation Costs Sub-Limit** shall be part of and not in addition to the Limit of Liability set forth in Item 3 of the Declarations, and payment of such **Derivative Demand Investigation Costs** shall reduce such Limit of Liability.

(4)     There shall be no retention applicable to **Derivative Demand Investigation Costs**.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By:_____
                              Attorney-in-Fact

991-804                       Page 1 of 1
Ed (06/00)

ENDORSEMENT NUMBER: 12

**SEPARATE RETENTION FOR SECURITIES CLAIMS
UNDER INSURING AGREEMENT (B)(1)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, solely for purposes of **Loss** payable
under INSURING AGREEMENT (B)(1) arising from any **Securities Claim**, the retention stated
in Item 4(b) of the Declarations is amended to be $500,000.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be
effective with the Policy.

Effective date of this endorsement:

By:_____
                         Attorney-in-Fact

991-830                        Page 1 of 1
Ed. 07/05

ENDORSEMENT NUMBER: 13

**NON-RESCINDABLE:**
**INSURING AGREEMENT (A) ONLY**

To be attached to and made a part of Policy No. 24-MGU-05-A10821 , issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, notwithstanding anything in this Policy to the contrary, the Insurer shall not be entitled under any circumstances to rescind the coverage provided under Insuring Agreement (A) of this Policy.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                    Attorney-in-Fact

991-861                          Page 1 of 1
Ed (04/04)

ENDORSEMENT NUMBER: 14

**SPECIFIC EVENT(S) EXCLUSION**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of Loss in connection with a **Claim** arising out of, based upon or attributable to any event described hereunder.

Excluded Event(s):
Wells Notice/SEC Investigation

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                                    Attorney-in-Fact

991-876                    Page 1 of 1
Ed. (05/05)

ENDORSEMENT NUMBER: 15

## CONTROLLING SHAREHOLDER COVERAGE –
## SPECIFIC PERSON(S)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that:

(1)     The following INSURING AGREEMENT is added to the Policy:

The Insurer will pay to or on behalf of the **Controlling Shareholder Loss** arising from a **Securities Claim** first made during the **Policy Period** or the Discovery Period (if applicable) against such **Controlling Shareholder** for **Wrongful Acts**, provided, that one or more **Insured Persons** and/or the **Company** are and remain co-defendants in such **Securities Claim** along with such **Controlling Shareholder**.

(2)     The following DEFINITION is added to the Policy:

**Controlling Shareholder** means the following person(s):

Philip Bennett

(3)     DEFINITION (E) **Insured** is amended to read as follows:

(E)     **Insured** means:  (1) the **Insured Persons**; (2) the **Company**; or (3) the **Controlling Shareholder** but only with respect to **Securities Claims**.

(4)     DEFINITION (G) **Loss**, subsection (2), is amended to read as follows:

(2)     the **Company** or **Controlling Shareholder** is legally obligated to pay as a result of any **Securities Claim**;

(5)     DEFINITION (P) **Wrongful Act**, subsection (1)(b), is amended to read as follows:

(b)     with respect only to **Securities Claims**, by the **Company** or by the **Controlling Shareholder** in his or her capacity as such or any matter claimed against such **Controlling Shareholder** by reason of his or her status as such; or

(6)     EXCLUSION (F) is amended to read as follows:

(F)     brought by or on behalf of, or in the name or right of, the **Company**, whether directly or derivatively, or any **Insured Person** or **Controlling Shareholder**, unless such **Claim** is:

(1)     brought and maintained independently of, and without the solicitation, assistance or active participation of, the **Company** or any **Insured Person**, or

(2)    for an actual or alleged wrongful termination of employment, or

(3)    brought or maintained by an **Insured Person** or a **Controlling Shareholder** for contribution or indemnity and directly results from another **Claim** covered under this Policy, or

(4)    brought and maintained by an employee of the **Company** solely to enforce his or her rights as a holder of securities issued by the **Company**;

provided, that this EXCLUSION (F) will not apply to **Claims** brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the **Company**;

(7)    A retention of $300,000 will apply to **Loss** resulting from each **Claim** for which coverage is provided under this endorsement; provided, however, that such retention will apply only to **Defense Costs** and will not apply to any other **Loss**.

(8)    CONDITION (F) <u>Changes in Control</u>, subsection (2), is amended to read as follows:

(2)    If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to a **Subsidiary**:

(a)    the **Subsidiary** ceases to be a **Subsidiary**, or

(b)    a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the **Subsidiary**;

then coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** or **Controlling Shareholder** thereof will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** or **Controlling Shareholder** thereof will cease with respect to **Claims** for **Wrongful Acts** committed or allegedly committed thereafter.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____

**Attorney-in-Fact**

991-1122
Ed. 09/05

Page 2 of 2

ENDORSEMENT NUMBER:  16

**POLICYHOLDER DISCLOSURE – TERRORISM PREMIUM NOTICE**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

Your policy contains coverage for certain losses caused by terrorism.  We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act of 2002.  The Act also requires us to provide disclosure of Federal participation in payment of terrorism losses.  For a further description of an act of terrorism as provided under the Act, see below.

You should know that effective November 26, 2002 any losses caused by certified acts of terrorism would be partially reimbursed by the United States government, Department of Treasury, under a formula established by federal law.  Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.  The premium charged for this coverage is shown below; it does not include any charges for the portion of loss covered by the federal government under the Act.

The portion of your premium that is attributable to coverage for terrorist acts certified under the Act is $0.

The following excerpt from the Act is provided for your information:

According to Section 102(1) of the Terrorism Risk Insurance Act of 2002: "The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States —— (1) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or (III) infrastructure; (iii) to have resulted in damage within the United States, or premises of a United States mission; and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion." Section 102(1)(B) states: "No act shall be certified by the Secretary as an act of terrorism if (i) the act is committed as part of the course of war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000." Section 102(C) and (D) specify that the determination are final and not subject to judicial review and that the Secretary of the Treasury cannot delegate the determination to anyone.

ENDORSEMENT NUMBER: 17

### EMPLOYED LAWYERS EXTENSION
### (SEPARATE LIMIT AND RETENTION)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

This endorsement replaces and supersedes Endorsement Number 5 ("Employed
Lawyers Extension (Separate Limit and Retention") as of the effective date of this
endorsement.

In consideration of the premium charged:

(1)    DEFINITION (F) **Insured Person** is amended to include any **Employed Lawyer**.

(2)    DEFINITION (P) **Wrongful Act** is amended to include any act, error, misstatement,
misleading statement, omission or breach of duty by an **Employed Lawyer**, in his or her
capacity as such, in the rendering or failure to render professional legal services for the
**Company**; provided, that **Wrongful Act** shall not include any act, error, misstatement,
misleading statement, omission or breach of duty by such **Employed Lawyer** in
connection with any activities: (1) that are not related to such **Employed Lawyer's**
employment with the **Company**; (2) that are not rendered on the behalf of the **Company**
at the **Company's** written request; or (3) that are performed by the **Employed Lawyer**
for others for a fee.

(3)    The following DEFINITION is added to the Policy:

**Employed Lawyer** means any past, present or future full-time, salaried employee of the
**Company** who is admitted to practice law and who is employed at the time of any
alleged **Wrongful Act** as a lawyer full-time for and salaried by the **Company**.

(4)    The EXCLUSIONS section of the Policy is amended by the addition of the following:

The **Insurer** will not be liable to make any payment of **Loss** in connection with any
**Claim** made against an **Employed Lawyer**:

(a)    alleging, arising out of, based upon or attributable to any **Wrongful Act**
occurring at a time when such **Employed Lawyer** was not employed as a lawyer
by the **Company**;

(b)    alleging, arising out of, based upon or attributable to any **Claim** made or any
prior or pending litigation as of 8/11/05, or alleging or derived from the same
facts or circumstances as alleged in such pending or prior litigation;

(c)    alleging, arising out of, based upon or attributable to any **Wrongful Act**, if as of
8/11/05, such **Employed Lawyer** knew or could have reasonably foreseen that
such **Wrongful Act** could give rise to a **Claim**;

991-322                              Page 1 of 1
(Ed. 09/03)

(d)     alleging, arising out of, based upon or attributable to any activities by such **Employed Lawyer** as an officer or director of any entity other than the **Company**.

(5)     For purposes of the applicability of the coverage provided by this endorsement, the **Company** will be conclusively deemed to have indemnified the **Employed Lawyer** to the extent that the **Company** is permitted or required to indemnify him or her pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Company** (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The **Company** hereby agrees to indemnify the **Employed Lawyer** to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)     The coverage provided by this endorsement shall apply only to **Claims** made against an **Employed Lawyer**, provided that, and only for so long as, one or more **Insured Persons** (other than such **Employed Lawyer**) are and remain co-defendants in the proceeding along with such **Employed Lawyer**.

(7)     The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)     Solely for purposes of the coverage provided under this endorsement:

(a)     The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period** will not exceed $1,000,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

(b)     A retention of $100,000 shall apply to **Loss** resulting from each **Claim**; provided, such retention shall not apply to **Loss** incurred by any **Employed Lawyer** if indemnification of such **Loss** by the **Company** is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:     8/11/2005

By: _____
                    Attorney-in-Fact

# EXHIBIT C

# LEXINGTON INSURANCE COMPANY

**Administrative Offices: 100 Summer Street, Boston, Massachusetts 02110-2103**
(hereinafter called the Company)

**DIRECTORS AND OFFICERS LIABILITY AND CORPORATION REIMBURSEMENT**
**Declarations**
**FOLLOW FORM EXCESS LIABILITY POLICY**

**THIS IS A CLAIMS-MADE POLICY. PLEASE READ CAREFULLY.**

NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGEMENTS OR SETTLEMENTS SHALL BE RE-
DUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. FURTHER NOTE THAT AMOUNTS INCURRED
FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE DEDUCTIBLE OR RETENTION AMOUNT.

Policy Number:  1620924                                  Renewal of:  NEW

Named Insured:  REFCO LLC

Address:        550 W JACKSON BLVD
                SUITE 1300
                CHICAGO              IL 60661

State of Incorporation of the Company Named Above:  ILLINOIS

## SECTION I-EXCESS INSURANCE

| | | |
|---|---|---|
| (a) | Policy Period: | |
| | From:  08/11/05      To:  08/11/06 | |
| | (12:01 A.M. Standard Time at the Address of the Insured) | |
| (b) | Coverage:      Follow Form Excess Liability | |
| (c) | Limits of Liability:      $7,500,000 each policy year | |
| (d) | Premium:      Annual Minimum Premium | Minimum Earned Premium At Inception |
| | $251,813 | $88,135 |
| (e) | Retroactive Date:  06/04/04 | |
| (f) | Endorsements: SEE ATTACHED FORMS SCHEDULE | |

## SECTION II-UNDERLYING INSURANCE

(a)             Endorsements made part of this Policy:




(b)             Policy Jacket:
                Underlying Company:
                Coverage:
                Policy Number:
                Policy Limit:                        each policy year
                Policy Period:      from:            to:
                Retroactive Date:

Total Limits of all underlying insurance including the underlying policies in excess of which this policy applies,
whether  recoverable  or  not    $10,000,000      each  policy  year,  subject  to  retentions  of
                    per loss Corporation Reimbursement,                    per Director or Officer, sub-
ject to a maximum of                        per loss.

_____
**Authorized Representative OR**
**Countersignature (In states where applicable)**

LEX-DO-CM-FF(Ed.2/91)
LX2004

# LEXINGTON INSURANCE COMPANY

**Administrative Offices: 100 Summer Street, Boston, Massachusetts 02110-2103**
(hereinafter called the Company)

### Following Form - Excess Liability Policy

**I.    Insuring Agreements**

Lexington Insurance Company (hereinafter called the "Company") in consideration of the payment of premium and in reliance upon the statements in the Declarations made a part thereof, hereby agrees to indemnify the Insured named in the Declarations (hereinafter called the "Insured") in accordance with the applicable insuring agreements, terms, conditions and exclusions of the Underlying Policy (and renewals thereof on the same basis) specified in Section II(a) of the Declarations (hereinafter called the "Underlying Policy") to the extent not inconsistent with the exclusions, conditions and other terms of this policy or endorsement(s) attached hereto, which shall prevail in the event and to the extent of any such inconsistency, against "loss" which is excess of the total limit(s) of all Underlying Insurance specified in Section II(b) of the Declarations subject to the limit of liability stated in Section I(c) of the Declarations.

The provision of the Underlying Policy.

except as regards the premium, the obligation to investigate and defend (and for costs and expenses incident to the same), the amount and limits of liability, the renewal agreement, if any, additional coverage provided by a discovery period provision, and any other provision therein inconsistent with this policy.

are hereby incorporated as part of this policy.

Liability of the Company under this policy shall not attach unless and until the Insured or the Insured's Underlying Insurance has paid or has been held liable to pay the total applicable underlying limits.

**II.    EXCLUSIONS - This policy does not apply:**

A) 1) to bodily injury, personal injury or property damage which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

2) to any loss, costs or expense of any nature, arising out of any:

a) request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

b) claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way respond to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

B) Nuclear Energy Liability Exclusions:

1) Under any Liability Coverage, to injury, sickness disease, death or destruction:

a) with respect to which an Insured under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or

- 1 -



any law amendatory thereof, or (2) the Insured is, or had this policy not been issued would be, entitled to indemnify from the United States of America, or agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2) Under any Medical Payments Coverage, or under any Supplementary Payments provisions relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of a nuclear facility by any person or organization.

3) Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

   a) the nuclear material (1) is at any nuclear facility owned by or operated by or on behalf of an Insured, or (2) has been discharged or dispersed therefrom;

   b) The nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of any Insured; or

   c) The injury, sickness, disease, death or destruction arises out of the furnishing by an Insured of services, materials, parts of equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possession or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

As used in this exclusion:

"hazardous properties" include radioactive, toxic or explosive properties;
"nuclear materials" means source material, special nuclear material or by-product material;
"source material", "special nuclear material" and "by-product material" have the meaning given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;
"spent fuel" means any fuel element or fuel component, solid or liquid which has been used or exposed to radiation in a nuclear reactor;
"waste" means any waste material containing by-product material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, and (b) resulting from the operation by any person or organization of any nuclear facility included under the first two paragraphs of the definition of nuclear facility;

"nuclear facility" means:

   a) any nuclear reactor,

   b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

   c) any equipment or device used for the processing, fabrication or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

   d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

with respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

C) to any liability of the Insured due to war, invasion, acts of foreign enemies, hostilities, (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization

- 2 -



or requisition or destruction or damage to property by or under the order of any government or public or local authority.

D) 1) to any liability for property damage, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish mental injury at any time arising out of the manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust, or

2) to any obligation of the Insured to indemnify any party because of damages arising out of such property damage, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish or mental injury at any time as a result of the manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

3) to any obligation to defend any suit or claim against the Insured alleging bodily injury or property damage and seeking damages, if such suit or claim arises from bodily injury or property damage resulting from or contributed to, by any and all manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

## III.   LIMITS OF LIABILITY

Regardless of the number of Insureds under this policy, persons or organization who sustain injury or damage, or claims made or suits brought on account of injury or damage covered hereby, the Company's limit of liability for "loss" excess of the Underlying Insurance shall be limited to the amount stated in Section I (c) of the Declarations as applicable to "each occurrence" or "each claim"; provided, however, that the Company's liability shall be further limited to the amount stated in Section I (c) of the Declarations stated as "aggregate" with respect to "loss" excess of the Underlying Insurance which occurs during each annual period while this policy is in force.

## IV.   INSURED'S DUTIES

The Insured named in the Declarations hereby agrees to promptly furnish the Company with a copy of the Underlying Policy and all endorsements thereto which in any way effect this excess insurance. Written notice of any "loss" likely to give rise to a claim hereunder shall be given to the Company by or on behalf of the Insured named in the Declarations, containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstance of the "loss".

## V.   SETTLEMENT AND DEFENSE

Anything in the Underlying Insurance to the contrary notwithstanding, the Company shall not be obligated to assume charge of the settlement or defense of any claim or suit brought or proceeding instituted against the Insured, but the Company, at its option but not being requried to, shall have the right and be given the opportunity to associate with the Insured in the defense or control of any claim, suit or proceeding which appears reasonably likely to involve the Company, in which event the Insured and the Company shall cooperate in all things in the defense or control of such claim, suit or proceeding. In the event costs are incurred by the Company with respect to such claim, suit or proceeding, the Company shall pay it incurred costs and such expenses incurred by the Insured with the approval of the Company.

## VI.   MAINTENANCE OF UNDERLYING INSURANCE

The underlying insurance referred to in paragraph (b) of Section II of the Declarations page and renewal or replacement thereof on terms and conditions not more restrictive, shall be maintained by the Named Insured in full effect during the currency of this policy without such alteration of terms or conditions except for any reduction of the aggregate limit of limits contained therein solely by payment of claims. Failure of the Named Insured to comply with the foregoing shall not invalidate the policy, but in the event of such failure, the Company shall only be liable to the same extent as it would have been had the Named Insured so maintained such underlying insurance.

Further, the receivership, the insolvency and/or inability to pay by an underlying insurer for any reason shall not be deemed to render the funds which would have been otherwise available from an underlying insurer to be unavailable, unrecoverable, reduced or exhausted for the purposes of determining the Company's liability under this policy, it being understood that the liability of the Company under this policy shall in no way be increased or expanded as a result of such receivership, insolvency or inability to pay underlying insurer.

- 3 -




## VII.  AGGREGATE POLICY PERIOD

If the period of the Underlying Insurance is not concurrent with the policy period of this policy, it is agreed that for the purpose of determining the Company's liability for "loss" excess of the aggregate limits of the Underlying Insurance, only "loss" or "losses" which take place during the policy period of this policy shall be included.

## VIII.  SUBROGATION

In the event of any payment under this policy, the Company may participate with the Insured in the exercise of all the Insured's rights of recovery against any person or organization liable therefor.

## IX.  PREMIUM

It is agreed that should any alteration be made in the premium for the Underlying Policy during the period of this policy, or if there is an increase in the risk assumed by the Company, then the premium hereon may be adjusted accordingly.

If this policy is subject to audit adjustment, the premium will be based upon the rating base as set forth in the Declarations.  Upon notice to the Named Insured of the earned premium due, such premium in excess of the advance premium shall become due and payable.  If the total earned premium is less than the premium previously paid, the Company shall return to the Insured the unearned portion paid by the Insured, subject however to any minimum premium stated in the Declarations.

## X.  CANCELLATION

It is understood and agreed that the terms of Condition X, Cancellation, of this policy are deleted in their entirety and are replace by the following:

This policy may be cancelled by the Named Insured by surrender thereof to the Company or by mailing to the Company written notice stating when thereafter such cancellation shall be effective.  The policy may be cancelled by the Company by mailing to the Named Insured at the address shown in this policy written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective; provided, however, if such cancellation is for non-payment of premium, the Company is required to give only at least ten (10) days notice.  Proof of the mailing of the notice shall be sufficient proof of notice.  The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period.  Delivery of such written notice either by the Named Insured or by the Company shall be equivalent to mailing.  If the named Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure for the period this policy is in effect, applied to the premium developed in accordance with the Premium Condition of this policy, subject to the short rate amount of the Minimum Annual Premium stated in this policy but in no event shall the earned premium be less than the Minimum Earned Premium stated in this policy.  If the Company cancels, earned premium shall be computed pro rata of the premium developed in accordance with the Premium Condition of this policy subject to the pro rata amount of the Minimum Annual Premium stated in this policy; provided, however, if the Company cancels for non-payment of premium, the premium shall be computed on the same basis as if the Named Insured cancels.

Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.  The check of the Company mailed or delivered, shall be sufficient tender of any refund due the Named Insured.

If this policy insures more than one Named Insured, cancellation may be effected by the one first named for the account of all Insureds.  Notice of cancellation by the Company to such first Named Insured shall be notice to all Insureds.  Payment of any unearned premium to such first Named Insured shall be for the account of all Insureds.

## XI.  SERVICE OF SUIT

In the event of failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United states. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Counsel, Legal Department, Lexington Insurance Company, 100 Summer Street, Boston, MA 02110-2103,

- 4 -

or his or her representative, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this policy of insurance, and hereby designates the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## XII. DEFINITIONS

The word "Loss" shall be understood to mean the sums paid or payable in settlement of claims for which the Insured is liable after making deductions for all other recoveries, salvages or other insurance (other than recoveries under underlying insurance, whether recoverable or not) and shall exclude all expenses and costs.

The work "Costs" shall be understood to mean interest on judgements, investigations, adjustments and legal expenses (excluding all expenses for salaried employees of the Insured or any of the Underlying Insurer's permanent employees).

The term "Underlying Policy" shall be understood to mean the policy indicated in Section II(a) of the Declarations.

The term "Underlying Insurance" shall be understood to mean the total limits of all insurance including the Underlying Policy and/or any self-insured retentions excess of which this policy is written, whether recoverable or not recoverable.

The term "Insured" shall be understood to mean the Insured named in the Declarations, any Insured under the Underlying Policy, and any additional Insured added to the policy by endorsement attached hereto.

IN WITNESS WHEREOF,  the Company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned in the Declarations by one of its duly authorized representatives.


*Elizabeth M. Tuck*

**Secretary**


*L. H. Kelley*

**Chairman of the Board and CEO**


- 5 -

ENDORSEMENT # 1


This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:  1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY


### DISCOVERY CLAUSE-AMENDED


In consideration of the premium charged, it is understood and agreed that Section 10, Discovery Clause, is deleted in its entirety and replaced with the following:

If the Insurer or the Named Corporation shall cancel or refuse to renew this policy, the Named Corporation shall have the right, upon payment of an additional premium of 150%      of the one year premium, to a period of  365  days following the effective date of such cancellation or non-renewable (herein  referred to as the Discovery Period) in which to give written notice to the Insurer of claim(s) first made against the Insured(s) during said Discovery Period for any Wrongful Act  committed before the effective date of such cancellation or non-renewal and otherwise covered by this policy.

The rights contained in this clause shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within ten (10) days of the effective date of cancellation or non-renewal. The additional premium for the Discovery Period shall be <u>fully earned</u> at the inception of the Discovery Period. The Discovery Period is not cancelable. If the policy is cancelled due to nonpayment of premium, the Insured(s) and/or the Company shall not have the option to purchase the Discovery Period described above.

The offer by the Insurer of renewal terms, conditions, the Limit of Liability and/or premiums different from those of the expiring policy shall not constitute non-renewal.


All other terms and conditions of the policy remain unchanged.


_____
**Authorized Representative OR**
**Countersignature (in states where applicable)**

LX0940 (05/96)

ENDORSEMENT # 2

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:   1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

## MINIMUM EARNED PREMIUM ENDORSEMENT

In the event that this policy is terminated or cancelled prior to the  expiration of the policy period for any reason other than cancellation by the Insurer, it is agreed that the premium charged shall be $ 88,135 earned upon the inception of the policy or computed in accordance  with the customary short-rate table and procedure, whichever is greater.

All other terms and conditions of the policy remain unchanged.

_____

**Authorized Representative OR**
**Countersignature (in states where applicable)**

LX0958 (05/96)

POLICY NUMBER:  1620924     ENDORSEMENT # 3                          CU 21 23 02 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

I. The insurance does not apply:

A. Under any Liability Coverage, to "bodily injury" or "property damage":

(1) With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

(1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or (b) has been discharged or dispersed therefrom;

(2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

(3) The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

II. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

Includes copyrighted information of the Insurance Services

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

Includes copyrighted information of the Insurance Services
CU 21 23 02 02

ENDORSEMENT # 4

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:   1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

## TERRORISM PREMIUM CHARGE ENDORSEMENT

The "Terrorism" charge is $4,938        and is included in the Policy Premium shown on the Declarations Page of this policy.

DEFINITION - The following definition of terrorism shall apply:

"Terrorism" means the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

    (1) A government;
    (2) The civilian population of a country, state or community; or
    (3) To disrupt the economy of a country, state or community.

So long as the Terrorism Risk Insurance Act of 2002 (the "Act") is in effect, "Terrorism" includes a certified act of terrorism defined by Section 102. Definitions, of the Act and any revisions or amendments thereto.

All other terms and conditions of the policy are the same.

_____
**Authorized Representative OR**
**Countersignature (In states where applicable)**

LX9827 (01/05)

ENDORSEMENT # 5

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.: 1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

### PENDING AND PRIOR LITIGATION EXCLUSION FOR HIGHER LIMITS

In consideration of the premium charged, it is hereby understood and agreed that with respect to the Limit of Liability $7,500,000    excess of $10,000,000    , exclusion 4(h) is amended to indicate that the Insurer shall not be liable to make any payment for Loss in connection with any claim or claims made against the Directors or Officers alleging, arising out of, based upon or attributable to any pending or prior litigation as of JUNE 4, 2004    or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation.

All other terms and conditions of the policy remain unchanged.

_____
**Authorized Representative OR
Countersignature (in states where applicable)**

FSE073(Ed.2/91)

# EXHIBIT D



## SECUREXCESS DECLARATIONS

**SUBJECT TO THE PROVISIONS OF THE UNDERLYING INSURANCE, THIS POLICY MAY ONLY APPLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

| **COMPANY**: Axis Reinsurance Company | **POLICY NUMBER**: RNN 506300 |
|---|---|

**Item 1. Policyholder:**
Refco, Inc.
550 West Jackson Boulevard
Suite 1300
Chicago, IL 60661

**Item 2. Policy Period:**
a. Inception Date: August 11, 2005
b. Expiration Date: August 11, 2006

Both dates at 12:01 a.m. at the address listed in Item 1

Item 3. Limits of Liability (inclusive of defense costs):
    a.  Each **Claim**                                       $ 10,000,000
    b.  Maximum aggregate Limit of Liability for all **Claim(s)**
        During the **Policy Period** of all **Insurance Products**    $ 10,000,000

Item 4. **Underlying Insurance** and **Insurance Products**: See Endorsement No. 1

Item 5. Endorsements Attached at Inception: SE 1000, SE 1300, SE 0522, SE 1010, MU 1032, Manuscript #6

Item 6. Notices to Insurer:
| Notice of Claim(s) To Be Sent To: | All Other Notices To Be Sent To: |
|---|---|
| Axis Financial Insurance Solutions Claims | Axis Financial Insurance Solutions |
| Address: Connell Corporate Park | Address: Connell Corporate Park |
|         Three Connell Drive |         Three Connell Drive |
|         P.O. Box 357 |         P.O. Box 357 |
|         Berkeley Heights, NJ 07922-0357 |         Berkeley Heights, NJ 07922-0357 |

| Item 7. Pending and Prior Claim Date: 06/04/04 | Item. 8 Terrorism Coverage Premium: $10,000 |
|---|---|

The Insurer has caused this Policy to be signed and attested by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the Insurer.

_Seare Lukac_                              _9/1/05_
Authorized Representative                      Date

_Kevin D. McJean_                        _Michael E. Morrill_

Secretary                                          President

# SECUREXCESS POLICY

In consideration of the payment of the premium, and in reliance on all statements made in the application(s) for this Policy and the **Underlying Insurance** and all information provided to the **Insurer** and any or all of the **Underlying Insurers**, and subject to the provisions of this Policy, the **Insurer** and the **Policyholder**, on its own behalf and on behalf of all **Insureds**, agree as follows.

## I.    INSURING AGREEMENT

With respect to each **Insurance Product**, the **Insurer** shall provide the **Insureds** with insurance during the **Policy Period** excess of all applicable **Underlying Insurance**. Except as specifically set forth in the provisions of this Policy, the insurance afforded hereunder shall apply in conformance with the provisions of the applicable **Primary Policy** and, to the extent coverage is further limited or restricted thereby, to any other applicable **Underlying Insurance**. In no event shall this Policy grant broader coverage than would be provided by the most restrictive policy constituting part of the applicable **Underlying Insurance**.

The insurance afforded under this Policy shall apply only after all applicable **Underlying Insurance** with respect to an **Insurance Product** has been exhausted by actual payment under such **Underlying Insurance**, and shall only pay excess of any retention or deductible amounts provided in the **Primary Policy** and other exhausted **Underlying Insurance**.

## II.   DEFINITIONS

    **A.**  **Claim(s)** means the event(s) which take place during the **Policy Period** and which trigger(s) coverage under the insuring agreement(s) of the **Underlying Insurance**.

    **B.**  **Insurance Product** means each separate type of insurance identified as an **"Insurance Product"** in Endorsement No. 1 to this Policy.

    **C.**  **Insured(s)** means any person(s) or entity(ies) that may be entitled to coverage under the **Primary Policy** at its inception.

    **D.**  **Insurer** means the company identified as **"Insurer"** in the Declarations.

    **E.**  **Policy Period** means the period from the inception date to the expiration date of this Policy stated in Item 2. in the Declarations, or its earlier cancellation or termination date, if any.

    **F.**  **Policyholder** means the person(s) or entity(ies) identified in Item 1. in the Declarations.

    **G.**  **Primary Policy** means the specific policy identified as the **"Primary Policy"** under the applicable **Insurance Product** listed in Endorsement No. 1 to this Policy.

    **H.**  **Sublimit** means any **Underlying Limits** which:

        1.    applies only to a particular grant of coverage under such **Underlying Insurance**; and
        2.    reduces and is part of the otherwise applicable limits of liability of such **Underlying Insurance** set forth in Item 4 of the Declarations.

    **I.**  **Underlying Insurance** means each insurance policy which constitutes all or part of an **Insurance Product**, as scheduled in Endorsement No. 1 to this Policy.

    **J.**  **Underlying Insurers** means any or all of the companies who issued the policies of **Underlying Insurance**.

    **K.**  **Underlying Limits** means, with respect to each **Insurance Product**, an amount equal to the aggregate of all limits of liability for each **Insurance Product** stated in Endorsement No. 1 to this Policy, plus the

uninsured retention or deductible, if any, applicable to the **Primary Policy** under such **Insurance Product**.

## III.  CONDITIONS OF COVERAGE

A.  For purposes of determining when insurance under this Policy shall attach and the limitations under which such insurance shall apply:

    1.  All of the **Underlying Insurance** in effect as of the inception date of the **Policy Period** shall be maintained in full effect with solvent insurers throughout the **Policy Period** except for any reduction or exhaustion of the **Underlying Limits** as provided in Section IV. below; and

    2.  All **Insureds** shall comply fully with all of the provisions of this Policy.

B.  As a condition precedent to coverage under this Policy, the **Insured** shall give to the **Insurer** as soon as practicable, but in no event later than thirty (30) days thereafter, written notice and the full particulars of i) the exhaustion of the aggregate limit of liability of any **Underlying Insurance**, ii) any **Underlying Insurance** not being maintained in full effect during the **Policy Period**, or iii) an **Underlying Insurer** becoming subject to a receivership, liquidation, dissolution, rehabilitation or similar proceeding or being taken over by any regulatory authority.

C.  If during the **Policy Period** the provisions of the **Primary Policy** are changed in any manner, as a condition precedent to coverage under this Policy, the **Insured** shall give written notice to the **Insurer** of the full particulars of such change as soon as practicable but in no event later than thirty (30) days following the effective date of such change.  No amendment to any **Primary Policy** or **Underlying Insurance** during the **Policy Period** shall be effective in broadening or extending the coverage afforded by this Policy or extending or increasing the limits of liability afforded by this Policy unless the Insurer so agrees in writing.  The Insurer may, in its sole discretion, condition its agreement to follow any changes to the **Primary Policy** or the **Underlying Insurance** on the **Insured** paying any additional premium required by the **Insurer** for such change.

As soon as practicable, but in no event later than thirty (30) days thereafter, the **Policyholder** must give the **Insurer** written notice of any additional or return premiums charged or allowed in connection with any **Underlying Insurance**.

## IV.  REDUCTION OR EXHAUSTION OF UNDERLYING LIMITS

A.  If the **Underlying Limits** are partially reduced solely due to actual payment under the **Underlying Insurance**, this Policy shall continue to apply as excess insurance over the remaining **Underlying Limits**.

B.  If the **Underlying Limits** are wholly exhausted solely due to actual payment under the **Underlying Insurance**, this Policy shall continue to apply as primary insurance with respect to the applicable **Insurance Product(s)** and the retention or deductible, if any, applicable under the **Primary Policy(ies)** shall apply under this Policy.

C  If any **Underlying Limits** are subject to a **Sublimit** then coverage hereunder shall not apply to any **Claim** which is subject to such **Sublimit**, provided however, that the **Underlying Limit** shall be recognized hereunder as depleted to the extent of any payment of such **Claim** subject to such **Sublimit**.

## V.  LIMITS OF LIABILITY

A.  The amount stated in Item 3.a. in the Declarations shall be the maximum limit of the **Insurer's** liability for each **Claim** under the applicable **Primary Policy**, and shall be the maximum amount payable by the **Insurer** under this Policy for a single **Claim**, which amount shall be part of, and not in addition to, the amount stated in Item 3.b. in the Declarations.

B. The amount stated in Item 3.b. in the Declarations shall be the maximum aggregate amount payable by the **Insurer** under this Policy with respect to all **Claims** during the **Policy Period** for all **Insurance Products**.

C. This Policy does not provide coverage for any **Claim** not covered by the **Underlying Insurance**, and shall drop down only to the extent that payment is not made under the **Underlying Insurance** solely by reason of exhaustion of the **Underlying Insurance** through payments thereunder, and shall not drop down for any other reason. If any **Underlying Insurer** fails to make payments under such **Underlying Insurance** for any reason whatsoever, including without limitation the insolvency of such **Underlying Insurer**, then the **Insureds** shall be deemed to have retained any such amounts which are not so paid. If the **Underlying Insurance** is not so maintained, the **Insurer** shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Insurance** been so maintained.

D. Payment by the **Insurer** of any amount, including but not limited to defense costs, shall reduce the limits of liability available under this Policy.

## VI. SETTLEMENTS AND DEFENSE

A. No **Insured** under this Policy may, without the **Insurer's** prior written consent, which consent shall not be unreasonably withheld, admit liability for or settle any matter for which insurance may be sought under this Policy.

B. The **Insurer** may, at its sole discretion, elect to participate in the investigation, defense and/or settlement of any claim under this Policy, regardless of whether the applicable **Underlying Insurance** has been exhausted.

C. The **Insured**, and not the **Insurer**, has the duty to defend all **Claims** under this Policy.

## VII. SUBROGATION

A. In the event of payment under this Policy, the **Insurer** shall be subrogated to all rights of recovery of each and all **Insureds** against any person or organization, and the **Insureds** shall do whatever is necessary to secure those rights to the satisfaction of the **Insurer**, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of such **Insureds**.

B. Any amount recovered after payment under this Policy and any **Underlying Insurance** policies shall be apportioned among the Insurer and the **Underlying Insurers** net of the expense of such recovery in the reverse order of actual payment. The expenses attendant to such recovery shall be apportioned among those benefiting from the recovery in proportion to the amount of benefit to each party.

## VIII. AUTHORIZATION

Except as stated in paragraph IX.A. below, the **Policyholder** shall be the sole agent of all **Insureds** with respect to all matters, including but not limited to giving and receiving notices and other communications, effecting or accepting any endorsements to or notices of cancellation of this Policy, the payment of premium and the receipt of any return premiums.

## IX. NOTICE

A. With respect to any **Claim**, situation that could give rise to a **Claim**, or other matter as to which insurance may be sought under this Policy, the **Policyholder** or any **Insured** must give the **Insurer** written notice contemporaneously with and in the identical manner required by the applicable **Primary Policy**.

B. All notices under this Policy shall be sent to the **Insurer** at the address set forth in Item 6. in the Declarations.

## X.  MODIFICATION, CANCELLATION AND NONRENEWAL

**A.**  No modification of this Policy shall be effective unless made by endorsement signed by an authorized representative of the **Insurer**.

**B.**  The **Policyholder** may cancel this Policy at any time by written notice stating when thereafter such cancellation is to be effective.

**C.**  The **Insurer** may cancel this Policy only for nonpayment of premium, and only by delivering or mailing to the **Policyholder** written notice stating when, not less than ten (10) days thereafter, such cancellation shall become effective. The delivery or mailing of such notice shall be sufficient proof thereof and this Policy and the **Policy Period** shall terminate at the date and hour specified in the notice.

**D.**  The **Insurer** shall refund the unearned premium, computed at the customary short rate, if the Policy is cancelled by the **Policyholder**.

**E.**  The **Insurer** shall have no obligation to renew this Policy upon its expiration. If the **Insurer** decides not to renew this Policy, the **Insurer** shall provide written notice to the **Policyholder** by messenger, express delivery or first class mail at least sixty (60) days prior to the expiration of the Policy.

**F.**  Notwithstanding anything to the contrary set forth elsewhere in the Policy, in the event that any **Underlying Insurance** is rescinded by agreement or legal process for fraud or other material misrepresentation by the **Policyholder** or any of the **Insureds**, then this Policy shall be deemed to be automatically and immediately rescinded, but only with respect to any **Insurance Product** containing such rescinded **Underlying Insurance**.

## XI.  EXCLUSIONS

The **Insurer** shall not be liable for any amount in any **Claim** taking place during the **Policy Period** and arising under any **Insurance Product**, which is based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

**A.**  Any demand, suit or other proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the Pending or Prior Claim Date set forth in Item 7 of the Declarations or any wrongful act, fact, circumstance or situation underlying or alleged therein; or

**B.**  Any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

Endorsement No. 1

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

# SCHEDULE OF UNDERLYING INSURANCE AND INSURANCE PRODUCTS

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

The Schedule of **Underlying Insurance** and **Insurance Products** is as follows:

    **A.  Insurance Product:**     Directors and Officers Liability

    **1.   Primary Policy**

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| HCC | 24-MGU-05-A10821 | $10,000,000 | 08/11/05-08/11/06 |

    **2.   Other Underlying Policies**

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| Lexington | 1620924 | $7,500,000 | 08/11/05-08/11/06 |

All other provisions remain unchanged.

_Sean Lukos_
Authorized Representative

_9/1/05_
Date

SE 10 00 (Ed. 02 03)                          Page 1 of 1                          Printed in U.S.A.

Endorsement No. 2

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

# IMPORTANT NOTICE TO ALL ILLINOIS POLICYHOLDERS

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

In the event you need to contact someone about this Policy for any reason, please contact us at:

Axis Reinsurance Company
Connell Corporate Park
Three Connell Drive
P.O. Box 357
Berkeley Heights, NJ  07922-0357
Fax No.:  1 (908) 286-5600

If you have been unable to contact or obtain satisfaction from the Insurer, you may contact the Illinois Department of Insurance to obtain information or make a complaint at:

Illinois Department of Insurance
Consumer Division of Public
Services Section
Springfield, Illinois 62767

Endorsement No. 3

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

# ILLINOIS AMENDATORY ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

1. Section **X., MODIFICATION, CANCELLATION AND NONRENEWAL**, paragraph **C.** is amended by deleting the words "delivering or" in the first sentence and the words "delivery or" in the second sentence of that provision.

2. Section **X., MODIFICATION, CANCELLATION AND NONRENEWAL**, paragraph **F.** is deleted.  Provided, however, the **Insureds** and the **Insurer** hereby agree that the **Insurer** shall have the same rights under law to rescission that it had if Section X. F. had not been included in the Policy or deleted by this endorsement.

All other provisions remain unchanged.

_Jean Lukar_
Authorized Representative

_9/11/05_
Date

**SE 0522 (Ed. 0205)**                                                                 **Printed in U.S.A.**

Endorsement No. 4

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company


## PRIOR NOTICE EXCLUSION


## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

In consideration of the premium charged, it is agreed that the **Insurer** shall not be liable for any amount
from any **Claim** which is based upon, arising from, or attributable to or in consequence of any fact,
circumstance or situation which has been the subject of any written notice given under any other policy of
insurance.


All other provisions remain unchanged.

_____
Authorized Representative

_____
Date

SE1010 0203

Endorsement No. 5

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## MANUSCRIPT APPLICATION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## SECUREXCESS POLICY

In consideration of the premium charged, it is agreed by the **Insurer** and **Insureds** that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the **Insurer** as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above.  The **Insurer** has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to **Insurer** using its own Application form.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date            9/14/05

MU1032  2/2003

Endorsement No. 6

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

**Knowledge Exclusion**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

In consideration of the premium charged, it is agreed that this Policy does not respond to **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the **Policy Period,** any **Insured** had knowledge and had reason to suppose might give rise to a **Claim** that would fall within the scope of the insurance afforded by this Policy.

All other provisions remain unchanged.

_____
Authorized Representative

_____9/11/05_____
Date

# EXHIBIT E



# ALLIED WORLD ASSURANCE COMPANY (U.S.), INC.

Boston Branch:
100 Summer Street, Boston, MA 02110

**EXCESS DIRECTORS AND OFFICERS INSURANCE
AND COMPANY REIMBURSEMENT POLICY**

**NOTICE:** EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD (OR DURING THE DISCOVERY PERIOD IF APPLICABLE). PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND.

## DECLARATIONS

**POLICY NO.:** AW0418197

**ITEM 1.** NAMED CORPORATION: Refco Inc.

MAILING ADDRESS: 550 West Jackson Boulevard, Suite 1300
Chicago, IL 60661

**ITEM 2.** FOLLOWED POLICY:
INSURER: U.S. Specialty Insurance Company
POLICY NO: 24-MGU-05-A10821

**ITEM 3.** POLICY PERIOD: From: August 11, 2005    To: August 11, 2006
(12:01 A.M. standard time at the address stated in Item 1.)

**ITEM 4.** LIMIT OF LIABILITY: $12,500,000 Per Claim
$12,500,000 Annual Aggregate(including Defense Costs)

EXCESS OF TOTAL UNDERLYING LIMITS OF: $27,500,000 Per Claim
$27,500,000 Annual Aggregate

**ITEM 5.** PENDING OR PRIOR DATE: See Endorsement #002

Allied World Assurance Company (U.S.), Inc.
Excess US D&O (9/04) Declarations                    1 of 2



**DECLARATIONS** (continued)                                          **POLICY NO.:** AW0418197

**ITEM 6.**     SCHEDULE OF PRIMARY AND UNDERLYING EXCESS POLICIES:

**Primary Policy:**

| Insurer | Policy Number | Limits | Policy Period |
|---|---|---|---|
| U.S. Specialty Insurance Company | 24-MGU-05-A10821 | $10,000,000 | 08/11/2005 – 08/11/2006 |

**Excess Policies:**

| Insurer | Policy Number | Limits | Policy Period |
|---|---|---|---|
| Lexington Insurance Company | 162-0924 | $ 7,500,000 | 08/11/2005 – 08/11/2006 |
| AXIS Reinsurance Company | RNN 506300 | $10,000,000 | 08/11/2005 – 08/11/2006 |

**ITEM 7.**     PREMIUM: $339,445

**ITEM 8.**     A.      DISCOVERY PERIOD PREMIUM:      150%

               B.      DISCOVERY PERIOD:      1 Year

**ITEM 9.**     NOTICE OF CANCELLATION PERIOD:      Per Followed Policy

**ITEM 10.**     ADDRESS OF INSURER FOR ALL NOTICES UNDER THIS POLICY:

        ALLIED WORLD ASSURANCE COMPANY (U.S.), INC.
        ATTN: CLAIMS DEPARTMENT
        100 SUMMER STREET
        BOSTON, MA 02210

**ITEM 11.**     POLICY FORM:      EXCESS DIRECTORS AND OFFICERS INSURANCE AND
                                 COMPANY REIMBURSEMENT POLICY
                                 (Excess US D&O (09/04))

               ENDORSEMENT(S):      SERVICE OF SUIT CLAUSE
                                        PENDING AND PRIOR LITIGATION EXCLUSION
                                        PRIOR KNOWLEDGE EXCLUSION

        BROKER:
         Marsh USA. Inc.
         1166 Avenue of the Americas
         New York, NY 10036

*[signature]*

Authorized Representative



# Allied World Assurance Company (U.S.), Inc.
### (hereinafter referred to as the "Insurer")
#### Administrative Offices: 100 Summer Street, Boston, MA 02110

## EXCESS DIRECTORS AND OFFICERS INSURANCE
## AND COMPANY REIMBURSEMENT POLICY

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application and/or warranty forming a part hereof and its attachments and the material incorporated therein, Allied World Assurance Company, herein called the "**Insurer**", agrees as follows:

## I.    INSURING AGREEMENT

This policy shall provide the **Insured(s)** with Excess Directors and Officers Insurance and Company Reimbursement coverage for **Loss** or **Damages** resulting from any claim or claims first made against the **Insured(s)** and reported to the **Insurer** pursuant to the terms of this policy in accordance with the same warranties, terms, conditions, exclusions and limitations of the **Followed Policy** identified in Item 2 of the Declarations as they were in existence on the inception date of this policy subject to the premium, limits of liability, **Policy Period**, warranties, exclusions, limitations and other terms and conditions of this policy including any and all endorsements attached hereto; provided always that this policy shall, in no event and notwithstanding any other provision, provide coverage broader than that provided by any **Underlying Policy** unless such broader coverage is specifically agreed to by the **Insurer** herein or in a written endorsement attached hereto.

## II.    DEFINITIONS

(a)    The term "**Followed Policy**" shall mean the policy identified in Item 2 of the Declarations.

(b)    The term "**Interrelated Wrongful Act(s)**" shall mean any Wrongful Act(s) which:

    (i)    are the same, similar, related or repeated; or
    (ii)    arise from the same, related or common nexus of facts

without regard to whether the same or different claims, **Insured(s)**, claimants, causes of action or venues are involved.

(c)    The term "**Loss**" or "**Damages**" shall have the same meaning in this policy as is attributed to it in the **Followed Policy** except that the term "**Loss**" or "**Damages**" shall in no event include civil or criminal fines or penalties, or any amounts for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds**, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

**Loss** or **Damages** shall include punitive damages and the multiplied portion of multiplied damages to the same extent punitive damages and the multiplied portion of multiplied damages are part of **Loss** or **Damages** under the **Followed Policy**.

(d)    The term "**Insured(s)**" shall have the same meaning as in the **Followed Policy** or the same meaning as similar terms such as Assured or Insured Person.

(e)    The term "**Policy Period**" shall mean the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy.



(f)   The term **"Underlying Policies"** shall mean the Primary and Underlying Excess Policies set forth in Item 6 of the Declarations.

(g)   The term **"Underlying Insurer(s)"** shall mean the insurer(s) of the **Underlying Policies**.

(h)   The term **"Underlying Aggregate Limit"** shall mean an amount equal to the aggregate of all the limits of the **Underlying Policies** combined (excess of their retentions).

All other terms shall have the same meaning in this policy as is attributed to them in the applicable **Followed Policy**.

## III.   EXCLUSIONS

This policy shall not cover any **Loss** or **Damages** in connection with any claim:

1.   alleging, arising out of, based upon or attributable to the facts alleged, or to the same or **Interrelated Wrongful Act(s)** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy, whether excess or underlying, of which this policy is a renewal or replacement or which it may succeed in time;

2.   alleging, arising out of, based upon or attributable to, as of the Pending or Prior Date listed in Item 5 of the Declarations, any pending or prior: 1) litigation; or 2) administrative or regulatory proceeding or investigation of which the Named Corporation or an **Insured** had notice; or 3) alleging or derived from the same or essentially the same facts, or the same or **Interrelated Wrongful Act(s)**, as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation.

## IV.   LIMIT OF LIABILITY

The Limit of Liability stated in Item 4 of the Declarations is the aggregate limit of the **Insurer's** liability for all **Loss** or **Damages** arising out of all claims or occurrences reported to the **Insurer** in accordance with the terms and conditions of the **Followed Policy**; the Limit of Liability for the Discovery Period (if applicable) shall be part of, and not in addition to, the Limit of Liability for the **Policy Period**. Further, any claim which is made subsequent to the **Policy Period** or Discovery Period (if applicable) which pursuant to Clause V herein and the terms and conditions of the **Followed Policy** is considered made during the **Policy Period** or Discovery Period (if applicable) shall also be subject to the one aggregate Limit of Liability stated in Item 4 of the Declarations. The **Insurer's** maximum liability for any combination of losses during the same **Policy Period** or Discovery Period (if applicable) shall be the Limit of Liability stated in Item 4 of the Declarations.

*It is expressly agreed that liability for any covered **Loss** or **Damages** with respect to claims first made during the* **Policy Period** *or Discovery Period (if applicable) shall attach to the **Insurer** only after the **Underlying Insurers**, the Named Corporation as indemnitor of the **Insureds**, and/or the **Insureds** shall have paid or been held liable to pay the full amount of the **Underlying Aggregate Limit**, and the Named Corporation as indemnitor of the **Insureds** and/or the **Insured(s)** shall have paid or been held liable to pay the full amount of the applicable retention amount for such **Policy Period**. In the event and only in the event of the reduction or exhaustion of the **Underlying Aggregate Limit** by reason of the **Underlying Insurers**, the Named Corporation as indemnitor of the **Insureds**, and/or the **Insureds** paying or being held liable to pay **Loss** or **Damages** otherwise covered hereunder, this policy shall: (i) in the event of reduction, pay excess of the reduced **Underlying Aggregate Limit**, and (ii) in the event of exhaustion, continue in force as primary insurance; provided always that in the latter event this policy shall only pay excess of the retention amounts set forth in the **Followed Policy**, which retention amount shall be applied to any subsequent **Loss** or **Damages** in the same manner as specified in the **Followed Policy**; provided, however, that the retention amount set forth in the **Followed Policy** shall apply to each **Loss** for which the Named Corporation has*

Allied World Assurance Company (U.S.), Inc.
Excess D&O (9/04)



indemnified or is permitted or required to indemnify the **Insureds** pursuant to law, common or statutory, or contract, or the Charter or Bylaws of the Named Corporation duly effective under such law which determines and defines such rights of indemnity, provided further, however, that no retention amount shall apply if the retention amount of any **Underlying Policy** has been applied to such **Loss**.

This policy shall pay only in the event of reduction or exhaustion of the **Underlying Aggregate Limit** as described above and shall not drop down for any reason including, but not limited to, uncollectability (in whole or in part) of the **Underlying Aggregate Limit**, existence of a sub-limit of liability in any **Underlying Policy**, or any Excess Policy containing terms and conditions different from the **Followed Policy**, provided, however, that this policy will recognize erosion of any **Underlying Policy** due to the existence of a sub-limit. The risk of uncollectability of such underlying insurance (in whole or in part) whether because of financial impairment or insolvency of an **Underlying Insurer**, the application of any underlying sub-limit of liability or differing terms and conditions or for any other reason is expressly retained by the **Insureds** and the Named Corporation and is not in any way or under any circumstances insured or assumed by the **Insurer**.

It is agreed that if, at any point during the **Policy Period**, the **Followed Policy** has been issued but any **Underlying Policy** is still providing coverage under binder and a claim arises, the preceding paragraph applies and under no circumstances will the **Insurer** provide broader coverage than would have existed had the **Underlying Policy** been issued.

In the event any **Underlying Policy** contains terms and conditions more restrictive than the **Followed Policy**, then the **Insurer's** coverage shall under no circumstances be broader than the most restrictive terms and conditions contained in the **Followed Policy** or any **Underlying Policy**.

It is agreed that if any warranty signed by or on behalf of any **Insured**, whether or not contained in any **Underlying Insurer's** application or warranty statement, applies to the Limit of Liability covered by the **Insurer** or any **Underlying Insurer**, then any representations or warranties made in said application or warranty, whether or not it is assigned to the **Insurer**, will be deemed to be treated as though it was assigned to the **Insurer**.

## V.     UNDERLYING LIMITS

It is a condition of this policy that the **Underlying Policies** shall be maintained in full effect with solvent insurers during the **Policy Period** except for any reduction or exhaustion of the **Underlying Aggregate Limit** contained therein by reason of **Loss** or **Damages** paid thereunder (as provided for in Clause IV above). Failure to comply with the foregoing shall not invalidate this policy, but in the event of such failure, the **Insurer** shall be liable only to the extent that it would have been liable had the **Insureds** and the Named Corporation complied with such condition.

If during the **Policy Period** or any Discovery Period (if applicable) the terms, conditions, exclusions or limitations of any **Underlying Policy** are changed in any manner, the Named Corporation or the **Insured(s)** shall as a condition precedent to their rights under this policy give to the **Insurer** as soon as practicable written notice of the full particulars thereof. This policy shall become subject to any such changes upon the effective date of the changes in the Underlying Policy, but only upon the condition that the **Insurer** agrees to follow such changes by written endorsement attached hereto and the Named Corporation agrees to any additional premium and/or amendment of the provisions of this policy required by the **Insurer** relating to such changes. Further, such new coverage is conditioned upon the Named Corporation paying when due any additional premium required by the **Insurer** relating to such changes.

Allied World Assurance Company (U.S.), Inc.
Excess D&O (9/04)



## VI.    NOTICE OF CLAIM

The **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** at the address set forth in Item 10 of the Declarations and all **Underlying Insurers** of any claim made or circumstances that might give rise to a claim against the **Insured(s)**. Such written notice shall be provided to the **Insurer** in accordance with the terms and conditions of the **Followed Policy**.

If during the **Policy Period** or during the **Discovery Period** (if applicable) (i) written notice of a claim has been given to the **Insurer** and all **Underlying Insurers** as set forth in this clause, or (ii) to the extent permitted by the terms and conditions of the **Followed Policy**, written notice of circumstances that might reasonably be expected to give rise to a claim, has been given to the **Insurer** and all **Underlying Insurers**, then any claim which is subsequently made against the **Insured(s)** and reported to the **Insurer** and all **Underlying Insurers** alleging, arising out of, based upon or attributable to the facts alleged in the claim or circumstances of which such notice has been given, or alleging any wrongful act which is the same as or related to any wrongful act alleged in the claim or circumstances of which such notice has been given, shall be considered made at the time notice of such claim or circumstances has been given to the **Insurer** so long as the **Followed Policy** accepts as adequate the written notice of circumstances that might reasonably be expected to give rise to a claim.

The **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of the following events as soon as practicable but in no event later than thirty (30) days after the **Insured** becomes aware of the event:

    (i)    Any **Underlying Policy** being canceled or non-renewed or otherwise ceasing to be in effect or being uncollectible (in part or in whole); or

    (ii)    Any **Underlying Insurer** being subject to a receivership, liquidation, dissolution, rehabilitation or any similar proceeding or being taken over by any regulatory authority; or

    (iii)    The **Named Corporation** consolidating with or merging with or into, or transferring all or substantially all of its assets to, or acquiring or being acquired by any natural person or entity or group of natural persons and/or entities acting in concert.

## VII.    CLAIM PARTICIPATION

The **Insurer** shall have the right, in its sole discretion, but not the obligation to effectively associate with the **Named Corporation** and the **Insured(s)** in the defense and settlement of any claim that appears to the **Insurer** to be reasonably likely to involve the **Insurer**, including but not limited to effectively associating in the negotiation of a settlement. The **Insureds** shall defend and contest any such claim. The **Named Corporation** and the **Insured(s)** shall give the **Insurer** full cooperation and such information as it may reasonably require. The failure of the **Insurer** to exercise any right under this paragraph at any point in a claim shall not act as a waiver or limit the right of the **Insurer** in any manner to exercise such rights at any other point in a claim including the right to effectively associate in the negotiation of a settlement.

The **Insurer** does not under this policy assume any duty to defend. The **Insured(s)** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment or incur any Defense Costs without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the **Insurer** shall be recoverable as Loss under the terms of this policy. The **Insurer's** consent shall not be unreasonably withheld, provided that the **Insurer** shall be entitled to effectively associate in the defense and the negotiation of any settlement of any claim in order to reach a decision as to reasonableness.



## VIII.   DISCOVERY CLAUSE

The **Insured** shall be entitled to a Discovery Period (or Extended Reporting Period) pursuant to the terms and conditions of the **Followed Policy**. The Discovery Period (or the Extended Reporting Period) is not available unless the Named Corporation has elected the Discovery Period (or Extended Reporting Period) in all **Underlying Policies**. The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. The Discovery Period percentage for this policy is specified in Item 8 of the Declarations. The cost of discovery, as a percentage of the annual premium, shall in no event be less than the highest percentage of any **Underlying Policy**.

## IX.    CANCELLATION CLAUSE

This policy may be canceled by the Named Corporation only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or its authorized agent at the address set forth in Item 10 of the Declarations and within the time period and in the manner set forth in the **Followed Policy**.

This policy shall not be cancelled by or on behalf of the **Insurer** except by reason of non-payment of the premium set forth in Item 7 of the Declarations within the time period specified in the Binder Confirmation issued by the **Insurer** in connection with this policy. The **Insurer** may cancel the policy by delivering to the Named Corporation or by mailing to the Named Corporation, by registered, certified, or other first class mail, at the Named Corporation's address set forth in the Declarations, written notice stating when, not less than the period set forth in Item 9 of the Declarations, thereafter the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender.

If this policy shall be canceled by the Named Corporation, the **Insurer** shall retain the customary short rate proportion of the premium hereon.

If this policy shall be canceled by the **Insurer**, the **Insurer** shall retain the pro rata proportion of the premium hereon.

Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

## X.    ALTERNATIVE DISPUTE RESOLUTION PROCESS

Any and all disputes or differences which may arise under this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss** or the formation and validity of this policy, shall be subject to the alternative dispute resolution process ("ADR") set forth in this clause.

Either the **Insurer** or the **Insureds** may elect the type of ADR discussed below; provided, however, that the **Insureds** shall have the right to reject the **Insurer's** choice of ADR at any time prior to its commencement, in which case the Insureds' choice of ADR shall control.

Allied World Assurance Company (U.S.), Inc.
Excess D&O (9/04)

The Insurer and Insureds agree that there shall be two choices of ADR: (1) non-binding mediation administered by the American Arbitration Association, in which the Insurer and Insureds shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration submitted to the American Arbitration Association under or in accordance with its then-prevailing Commercial Arbitration Rules, in which the arbitration panel shall be composed of three disinterested individuals. In either mediation or arbitration, the mediator(s) or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute.

The mediator(s) or arbitrators shall also give due consideration to the general principles of the law of the state where the Named Corporation is incorporated in the construction or interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an even-handed fashion in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys' fees or other costs. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the ADR.

Either choice of ADR may be commenced in either New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations as the mailing address for the Named Corporation. The Named Corporation shall act on behalf of all Insureds in selection of the ADR in accordance with this clause.

## XI.    HEADINGS

The descriptions in the headings and any subheading of this policy (including any titles given to any endorsement attached hereto) are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

IN WITNESS WHEREOF, the Insurer  has caused this policy to be signed by its Vice President of Professional Lines.

_____
Vice President of Professional Lines

6 of 6

Allied World Assurance Company (U.S.), Inc.
Excess D&O (9/04)

Endorsement No.:            001
This endorsement, effective:    August 11, 2005
(at 12:00 A.M. prevailing time at the address of the Named Insured as shown in item 1 (a) of the Declarations)
forms a part of Policy No.:    AW0418197
Issued to:                Refco Inc.
By:                     Allied World Assurance Company (U.S.), Inc.

## SERVICE OF SUIT

In the event of failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon counsel, Legal Department, Allied World Assurance Company, 100 Summer Street, Boston, MA 02110 or his or her representative, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statue, or his or her successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this policy of insurance and hereby designates the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

Issue Date August 30, 2005                    _John J McElroy_
                                     **AUTHORIZED REPRESENTATIVE**

Endorsement No.:            002
This endorsement, effective:       August 11, 2005
(at 12:00 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)
forms a part of Policy No.:        AW0418197
Issued to:                 Refco Inc.
By:                       Allied World Assurance Company (U.S.), Inc.

## PENDING AND PRIOR LITIGATION EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable for **Loss** in connection with any claim or claims made against the **Insureds**:

(a)        alleging, arising out of, based upon or attributable to any pending or prior litigation as of:

- 06/04/2004 for the $2.5M xs $27.5MM
- Inception for $10MM xs $30MM

or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation;

All other terms and conditions remain unchanged.

_____
**Authorized Representative**

Date of Issuance: 3/16/2006

Endorsement No.:               **003**
This endorsement, effective:    August 11, 2005
(at 12:00 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)
forms a part of Policy No.:     AW0148197
Issued to:                     Refco Inc.
By:                            Allied World Assurance Company (U.S.), Inc.

## PRIOR KNOWLEDGE EXCLUSION

It is hereby understood and agreed that the **Insurer** shall not be liable for **Loss** in connection with any claim or claims made against the **Insureds**:

(a)   alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which any Insured had knowledge as of **inception** and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage hereunder, or (ii) which indicate the probability of any such claim.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

*(signature)*
**Authorized Representative**

Date of Issuance:  3/16/2006

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**REDACTED**

------------------------------------x
                                  :

UNITED STATES OF AMERICA       :

     -v-                  :

PHILLIP R. BENNETT,         :
ROBERT C. TROSTEN and      :
TONE N. GRANT,            :

              Defendants.   :

------------------------------------x

**INDICTMENT**

S3 05 Cr. 1192 (NRB)

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 1-16-07 |

## COUNT ONE

(Conspiracy To Commit Securities Fraud, Wire Fraud, To Make
False Filings With The SEC, To Make Material Misstatements To
Auditors, Bank Fraud and Money Laundering)

The Grand Jury charges:

### RELEVANT ENTITIES AND PERSONS

1.  At certain times relevant to this Indictment,
Refco, Inc. was a Delaware corporation with its principal place
of business in New York, New York.  From at least the mid-1990s,
the business of Refco, Inc. and its predecessor entities included
providing execution and clearing services for exchange-traded
derivatives and providing prime brokerage services in the fixed
income and foreign exchange markets.  Refco, Inc. held its
initial public offering of common stock on or about August 10,
2005.  Prior to on or about August 10, 2005, Refco, Inc.'s
predecessor entities were privately held.  Refco, Inc. and its
predecessor entities are referred to herein collectively as
"Refco."

2.    At all times relevant to this Indictment, PHILLIP R. BENNETT, the defendant, was the President and Chief Executive Officer of Refco.  At all times relevant to this Indictment, BENNETT had a substantial ownership interest in Refco, directly and indirectly.

3.    At certain times relevant to this Indictment, ROBERT C. TROSTEN, the defendant, held senior management positions at Refco.  Among other positions, TROSTEN was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004, when he left the company.

4.    At certain times relevant to this Indictment, TONE N. GRANT, the defendant, held a senior management position at Refco.  From at least in or about 1997 through in or about June 1998, GRANT was the President of Refco.  At certain times relevant to this Indictment, GRANT indirectly, held a significant ownership interest in Refco.

5.    At all times relevant to this Indictment, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft,("BAWAG"), was the fourth largest bank in Austria.  BAWAG was owned at various times by, among other entities, the Austrian Trade Unions Association, formally known as Österreichischer Gewerkschaftsbund (ÖGB).  At various times relevant to this Indictment, BAWAG indirectly held a substantial ownership interest in Refco.

2

6.    At all times relevant to this Indictment, Refco Group Holdings, Inc. ("RGHI") was a privately-held Delaware corporation that held a substantial ownership interest in Refco. At various times relevant to this Indictment, RGHI was owned in whole or in part by PHILLIP R. BENNETT and TONE N. GRANT.

### THE SCHEME TO DEFRAUD

7.    From at least as early as in or about the mid 1990s, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, together with others known and unknown, schemed to hide the true financial health of Refco from its banks, counterparties, auditors, and investors.  Starting at least as early as the mid 1990s, BENNETT and GRANT embarked on a strategy to mask the true performance of Refco's business in order to sell the company for their own benefit and that of Refco's other owners.  To that end, over the ensuing years, BENNETT, TROSTEN, GRANT and others known and unknown systematically (1) covered up both Refco's own losses and customer losses for which Refco became responsible; (2) moved Refco operating expenses off the company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping Refco in business and then selling it for the maximum benefit to its owners and senior management.

8.    In furtherance of this scheme, PHILLIP R. BENNETT,

3

ROBERT C. TROSTEN, TONE N. GRANT, and others known and unknown
made and caused Refco and others on its behalf to make false and
fraudulent statements to Refco's banks, counterparties,
customers, auditors, and investors, and to create false audited
financial statements and false public filings with the United
States Securities and Exchange Commission ("SEC").  The scheme
included obtaining, through fraud, the following:  lines of
credit for Refco; the private sale of notes prior to 2004; the
sale of 57% of Refco to a group headed by Thomas H. Lee Partners
in 2004; the sale of approximately $600 million of notes to the
public in 2004; approximately $800 million of bank financing
obtained in 2004; and the August 2005 initial public offering of
stock ("IPO") in Refco, Inc., in which the public purchased
approximately $583 million of Refco common stock based on a false
and fraudulent registration statement.

### Early Origins Of Refco's Financial Problems

9.    In or about the mid-1990s, Refco was wholly owned
by RGHI, which in turn was owned by PHILLIP R. BENNETT, TONE N.
GRANT and one other partner.  As of early 1997, RGHI owed Refco
at least approximately $106 million.  Starting later in 1997,
Refco directly and indirectly incurred a series of substantial
trading losses that threatened the continued viability of Refco's
business.  In response to these losses, at various times between
in or about May 1997 and in or about October 2005, BENNETT and

4

his coconspirators, including TONE N. GRANT and ROBERT C.
TROSTEN, moved losses and expenses out of Refco and into RGHI,
and artificially padded Refco's revenues at the expense of RGHI,
in an effort to hide Refco's true liabilities, manipulate its
reported earnings, and thereby seek to defraud a purchaser into
buying the firm at a price that would pay off the accumulated
debt and ensure a profit to Refco's owners.  This strategy
resulted in an enormous increase in the already large debt from
RGHI to Refco that eventually totaled more than $1 billion.  The
debt by RGHI to Refco, carried on Refco's books as a receivable
from RGHI, was over time comprised of, among other things, the
following principal components: (a) liabilities incurred by Refco
when brokerage customers to whom it had extended credit defaulted
on their obligations, which were later transferred to RGHI; (b)
Refco's proprietary trading losses; (c) various operating
expenses incurred by Refco and paid in the first instance by
Refco but later transferred to RGHI as an increase in RGHI's debt
to Refco; and (d) transactions designed to pad Refco's revenues
in which the benefits accrued to Refco and the associated costs
were incurred by RGHI.

        10.  As a commodities, securities, and futures
brokerage and clearing firm, Refco extended credit to customers,
allowing customers to make securities, commodities, and futures
trades in accounts held at Refco.  In the later 1990s, certain

Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of trading losses in their accounts at Refco.  When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts.  Refco sustained large losses of this type, among other times, in 1997, totaling at least approximately $225 million.  These customer losses included the following:

### Asian Debt Crisis Customers

11.  In or about May 1997, a group of Refco customers to whom Refco had extended credit for the purpose of investing in Asian markets sustained large losses in connection with the Asian debt crisis.  When those customers were unable to cover their losses, Refco paid the losses, using hundreds of millions of dollars of customer funds within the unregulated segments of its business.  By the end of May 1997, these losses totaled more than $310 million, and, at the end of December 1997, based on changed market conditions, they totaled approximately $185 million.

### Customer 1

12.  In or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1"), lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME").  When Customer 1 could not cover his margin requirements, Refco was forced to meet the margin call

from the CME, using the proceeds of an intra day loan from a
financial institution of at least approximately $90 million to
meet its margin requirements, and then using customer funds taken
from the unregulated segments of Refco's business to repay the
intra day loan.

13.   Recognizing that public acknowledgment of a loss
of more than $90 million would threaten Refco's continued
existence, PHILLIP R. BENNETT, TONE N. GRANT and others known and
unknown falsely represented to the public and other customers
that Refco had not sustained a significant loss as a result of
Customer 1's losses.  In addition, BENNETT, GRANT and ROBERT C.
TROSTEN significantly misrepresented the size of the loss to
Refco's auditors.

14.   PHILLIP R. BENNETT and TONE N. GRANT, having
misrepresented to third parties that Refco had not suffered a
significant loss as a result of Customer 1's trading activity,
caused at least $71 million of debt owed by Customer 1 from the
trading losses to be transferred to become a debt from RGHI to
Refco.

*Proprietary Trading Losses*

15.   In the late 1990s, Refco also incurred substantial
losses from proprietary trades, or trades carried out on its own
behalf.  For example, in or about 1998, Refco suffered a loss of
at least approximately $40 million on its investment in Russian

bonds after the Russian Government defaulted on its obligations.
PHILLIP R. BENNETT, so as to avoid having to acknowledge this
loss on Refco's books, caused Refco to inflate the value of the
bonds in Refco's books and records to hide the full magnitude of
the loss.   Eventually, BENNETT caused those losses to be
transferred to RGHI, so that they appeared as a debt from RGHI to
Refco.

### Refco Expenses Moved To RGHI

16.   Beginning at least as early as 1999, PHILLIP R.
BENNETT and others schemed to reduce Refco's expenses (therefore
falsely increasing Refco's apparent profitability) by moving
Refco expenses off of Refco's books and onto the books of RGHI.
For example:

a. From at least as early as February 1999, and
continuing until at least in or about February 2002, BENNETT and
others caused a total of approximately $46.3 million of computer
systems expenses incurred by Refco to be transferred to RGHI, in
the following years in the following amounts:

| Fiscal Year End | Amount Transferred to RGHI |
|-----------------|----------------------------|
| 2000 | $7,378,927.80 |
| 2001 | $8,797,189.98 |
| 2002 | $9,393,846.76 |
| 2003 | $7,002,153.65 |
| 2004 | $4,876,657.60 |
| 2005 | $5,028,053.21 |
| 2006 | $3,895,030.92 |

b. On or about August 9, 1999, BENNETT and others caused a total of approximately $1.5 million of expenses characterized as payroll expenses to be transferred from Refco to RGHI.

17. The result of these actions by PHILLIP R. BENNETT and his coconspirators was to create a large and growing debt owed by RGHI to Refco. By in or about February 1999, RGHI owed Refco at least approximately $252 million. In addition, as of in or about February 1999, at least approximately $156 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary. Thus, a total of at least approximately $409 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

## Refco's Losses Funded By Use Of Customer Funds

18.    Starting at least in or about 1997, PHILLIP R.
BENNETT and TONE N. GRANT caused Refco to use customer funds to
cover its losses.  As a result, Refco was perpetually short of
cash, and was often unable to cover settlement of its customers'
transactions.  Accordingly, BENNETT, GRANT and others caused
Refco to systematically fail to meet settlement on its customer
transactions, often on a daily basis, in amounts that exceeded,
at times, $100 million a day.  BENNETT, GRANT and others then
caused Refco to repeatedly misrepresent to the financial
institutions to whom Refco owed money to settle Refco's
customers' transactions that its failure to make settlement was
an error, when in fact Refco purposefully selected, on a rotating
basis, institutions with whom it would fail to make settlement,
and attempted to stagger its failures to make settlement with
each institution so as not to arouse suspicion from the
institutions that Refco was in fact unable to fulfill its daily
settlement obligations.

## BAWAG Invests In Refco

19.    By the end of 1998, Refco was in a precarious
financial condition, in light of the significant customer and
proprietary trading losses it had absorbed and the resulting
daily failure to make settlement on customer transactions.  In
order to address that problem, in or about late 1998, PHILLIP R.

10

BENNETT sought a capital contribution from a long-time Refco customer, BAWAG Bank of Austria. In a transaction that closed in 1999, BAWAG through an affiliate purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase an additional ten percent of Refco.

### Hiding The RGHI Receivable

20.    Throughout the period covered by this Indictment, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February. Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including PHILLIP R. BENNETT. Refco and RGHI were related parties.

21.    Beginning at least as early as February 1998, PHILLIP R. BENNETT directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to BENNETT or Refco. At certain times, BENNETT also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global

11

Finance, a consolidating entity within Refco Group, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end.  BENNETT and, later, ROBERT C. TROSTEN, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end on February 28, 1998 through the fiscal year-end on February 29, 2004.  BENNETT and TROSTEN directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22.  In 1998 and 1999, PHILLIP R. BENNETT, and with respect to 1999, TONE N. GRANT, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
| --- | --- |
| February 1998 | $175 million |
| February 1999 | $265 million |

23.  Beginning in 2000, PHILLIP R. BENNETT's year-end cover-up transactions were of two types:  transactions with Refco customers, and transactions with BAWAG.  In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to August

12

2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|------|---------------------------|-------------|-------------------------------|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |
| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

24.    These transactions typically followed standard
patterns.  For example, in or about February 2000, PHILLIP R.
BENNETT caused the following transactions to occur with several
customers and BAWAG, for the purpose of paying down a portion of
the RGHI receivable over the February 2000 year-end:

a.    Three different customers (collectively, the
"Three Customers") lent a total of approximately $310 million to
RGHI, which it then used to pay down its obligation to Refco.  At
the same time, Refco lent to the Three Customers $310 million.
As a result, it appeared on Refco's books and records that Refco
had $310 million in receivables from the Three Customers, and the
debt from RGHI appeared to be reduced by $310 million.  In or
about March 2000, the transactions were unwound, with Refco
lending $310 million back to RGHI (thus increasing the amount
owed by RGHI to Refco by $310 million), which RGHI then used to
pay back the Three Customers the full amount of the loan.  To

13

ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco. Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar to the agreements that follow:

(i).    On or about February 25, 2000, Refco Capital Markets, Ltd. a Bermuda corporation controlled by Refco, loaned Customer 2, one of the Three Customers, approximately $150 million. The loan was to be repaid on March 9, 2000.

(ii).    On or about the same day, February 25, 2000, Customer 2 loaned approximately $150 million to RGHI. The repayment date was on or about March 9, 2000. The loan agreement for this loan was executed by BENNETT on behalf of RGHI. The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

(iii).    On or about the same date, BENNETT signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.

b.    At or around the same time as the

14

transactions with the Three Customers, BAWAG loaned RGHI $300 million in cash.  RGHI then used the $300 million to pay off $300 million of its debt to Refco, and Refco then loaned to BAWAG $225 million, using the remaining $75 million to fund its operations. In or about March 2000, the transaction was unwound.  Refco lent $300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI.  RGHI then used the $300 million to pay off the loan from BAWAG.  No loan documents were prepared to document this or any of the subsequent BAWAG transactions.

        25.  In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, PHILLIP R. BENNETT, TONE N. GRANT and ROBERT C. TROSTEN, and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.  For example, on or about April 30, 2003 and April 27, 2004, BENNETT and TROSTEN each signed letters to Refco's auditors in which they represented that "[r]elated party transactions and related amounts receivable," including "loans" and "transfers" had all "been properly recorded or disclosed in the consolidated financial statements," when in fact neither BENNETT nor TROSTEN had disclosed the true amount of the related party transactions or indebtedness.

## Refco Sells Notes Based On False Financial Information

26.   At various times prior to August 2004, PHILLIP R.
BENNETT and ROBERT C. TROSTEN, in furtherance of the scheme to
defraud Refco's potential investors, caused Refco to raise
capital through the private placement of certain notes.  These
notes were sold to investors based, in part, on the audited
financial statements prepared by Refco's auditors, which in turn
were rendered false and misleading by the year-end cover-up
transactions outlined above and the siphoning of Refco expenses
out of Refco and into RGHI.  In particular, BENNETT and TROSTEN
caused Refco to raise the following capital through the sale of
the following notes to investors, based on false and fraudulent
financial statements:

| Date | Note Coupon And Due Date | Approximate Capital Raised |
|------|--------------------------|----------------------------|
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

## Refco Obtains Credit Counterparty Relationships
## Based On False Financial Information

27.   Because Refco was constantly in need of cash to
cover its transactions and meet settlement, Refco sought and

obtained credit from banks and other financial institutions,
including a revolving line of credit from a number of financial
institutions, including JP Morgan Chase, beginning in or about
1998, that eventually grew to more than $300 million.  For each
such transaction, including the annual renewal of the revolving
line of credit, Refco submitted to the proposed creditor the
fraudulent financial statements and made other false statements
which materially misstated the health of Refco.

### Refco Helps BAWAG Hide Its Own Balance Sheet Problems

        28.  Between 2000 and 2005, while BAWAG assisted
PHILLIP R. BENNETT in hiding the RGHI receivable in the manner
described above, BENNETT caused Refco to assist BAWAG in hiding
its own balance sheet problem.  In or about early 2000, BAWAG
entrusted approximately €350 million of BAWAG's funds to an
investment advisor, who by the end of 2000 reported to the bank
that he had lost substantially all of those funds.  In order to
disguise this loss on its balance sheet, BAWAG arranged through
BENNETT to hold in an account at Refco certain worthless bonds
and other investments that Refco, at BENNETT's direction,
maintained at a false value that, over time, reached at least
approximately €500 million.  These fake assets were purportedly
housed at Refco and maintained at an inflated value for BAWAG's
benefit until 2005.

**BAWAG Invests Further In Refco**

29.    In or about 2003 and 2004, BAWAG, through a series of off-shore corporate entities, made two contributions to Refco totaling approximately $467,480,000.  In return, BAWAG received the right to approximately 27.2% of the proceeds of the sale of Refco and, together with its existing interest in 20 percent of Refco, had rights to approximately 47 percent of the proceeds of a sale of the company.

**BENNETT's "Exit Strategy" Develops**

30.    In or about 2003, PHILLIP R. BENNETT caused Refco to hire the investment bank Credit Suisse First Boston ("CSFB") to assist in selling Refco.  BENNETT asked CSFB to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested.  After efforts to sell Refco to such a first line buyer failed, BENNETT directed CSFB to look for other purchasers for the company, with the understanding that it would be taken public.

31.    In connection with PHILLIP R. BENNETT's plan to sell Refco, BENNETT and ROBERT C. TROSTEN (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by BENNETT and others to disguise the ongoing operational problems at the company.

32.    For example, in or about March 2004, PHILLIP R.

18

BENNETT and others caused approximately $7.9 million in Refco consulting fee expenses to be transferred to RGHI. In addition, during the fiscal year that ended in February 2004, BENNETT and ROBERT C. TROSTEN caused approximately $4.8 million in Refco computer expenses to be shifted to RGHI.

33. In order to further make Refco appear more attractive to a potential purchaser or investor, from at least in or about April 2003, through and including in or about August 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN shifted at least approximately $34 million in proprietary trading losses that Refco suffered from Refco to RGHI, and thus making it appear that Refco was more profitable than it actually was, and increasing the debt owed by RGHI to Refco.

### The Fraudulent Leveraged Buyout Transaction

34. In or about 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction. As ultimately carried out on or about August 5, 2004, the leveraged buyout was structured as follows: Thomas H. Lee Partners, through an affiliate, purchased a 57% ownership interest in Refco, in return for approximately $507 million of new capital; simultaneously, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.

19

35.   As a precursor to this transaction, PHILLIP R. BENNETT purchased TONE N. GRANT's ownership interest in Refco for approximately $4 million, plus a 50% interest in profits made by BENNETT in a future sale of BENNETT's interest in Refco.  As a result of their agreement, GRANT was no longer responsible for RGHI's debt to Refco, which as of February 2004 totaled more than approximately $1 billion, and BENNETT controlled all of RGHI immediately prior to the sale to the Lee entities.

**Lies To Thomas H. Lee Partners**

36.   In connection with the leveraged buyout transaction, on or about July 9, 2004, PHILLIP R. BENNETT executed an officer's questionnaire in which he falsely certified, among other things, that (a) he had no direct or indirect interest in any transaction with Refco or its affiliates within the prior fiscal year of more than $60,000; and (b) had not, in the prior fiscal year, been indebted to Refco or its affiliates.  In fact, during the prior fiscal year, BENNETT owned a substantial interest in RGHI, which had engaged in transactions worth more than $1.5 billion during the year-end cover-up transactions with Refco, and which owed Refco more than $1 billion as of late February 2004.

37.   In connection with the leveraged buyout transaction, on or about July 2, 2004, ROBERT C. TROSTEN executed an officer's questionnaire in which he falsely certified, among

20

other things, that there was no "material fact concerning the
business and operations of [Refco] which is not disclosed in the
Offering Circular provided to you or which you believe may be
inaccurately stated therein," even though TROSTEN knew that the
related party and expense shifting transactions had not been
disclosed in the offering documents related to the transaction.

38.   In connection with the leveraged buyout
transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others
caused Refco's audited financial statements for the year ending
February 2004 to be provided to Thomas H. Lee Partners.  Those
audited financial statements were false and misleading in the
following respects, among others:

a.    The financial statements hid the size of the
related party receivable from RGHI, which at the end of February
2004 was, but for the cover-up loan transactions, at least
approximately $1 billion, whereas the financial statements
misleadingly reported that the "$105 million due from related
parties, included in loans receivable at February 28, 2003, was
received by February 29, 2004."

b.    The financial statements falsely reported
Refco's net income for the year as $187 million, when in fact
that number was inflated.

39.   In connection with the leveraged buyout
transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others

21

falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Note Purchasers

40.    In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others provided to the note underwriters and note purchasers the following false and misleading information:

a.    Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 37;

b.    BENNETT, TROSTEN and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

c.    BENNETT, TROSTEN and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Bank Syndicate

41.    In connection with the leveraged buyout

transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

       a.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 37;

       b.   BENNETT, TROSTEN and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

       c.   BENNETT, TROSTEN and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

       42.   The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion. Thereafter, PHILLIP R. BENNETT caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

23

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| BENNETT | $25 million |
| TROSTEN | $48 million |
| GRANT | $16 million |
| Other Former Equity Partners | $81.5 million |
| Other Refco Officers, Employees, and Affiliated Parties | $112 million |

43.  In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN falsely represented to Thomas H. Lee Partners that Refco had accumulated approximately $500 million cash in retained profits and that it would be distributing those retained profits through a dividend to its shareholders at the time of the leveraged buyout.  In fact, Refco had not retained $500 million in profits, but had funded an account at BAWAG with $110 million in customer funds and a $390 million loan from BAWAG.  At the end of the leveraged buyout transaction, BENNETT distributed the $110 million taken from Refco to BAWAG as payment for its participation in this aspect of the fraud, and then wrote off $390 million of the RGHI debt to Refco against the $390 million "dividend" "paid" to RGHI as owner of Refco.

44.  In or about August 2004, after completion of the leveraged buyout transaction, ROBERT C. TROSTEN left Refco.

24

PHILLIP R. BENNETT caused RGHI to pay TROSTEN approximately $48 million from the proceeds of the TH Lee transaction, in order to keep TROSTEN from revealing the ongoing fraud scheme.

### BENNETT Plans To Take Refco Public

45. After the leveraged buyout, PHILLIP R. BENNETT, who remained the Chief Executive Officer of Refco following the transaction, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

46. Between the August 2004 leveraged buyout and the August 2005 IPO, PHILLIP R. BENNETT continued his manipulation of Refco's finances: At each quarter and year-end period, BENNETT caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and BENNETT continued to cause Refco expenses to be assumed by RGHI and to artificially pad Refco's revenues by the means previously described. BENNETT caused the following quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

25

47.   Between August 2004 and August 2005, Refco padded its revenue by at least approximately $79 million, comprised of at least approximately $38 million in inflated interest income, at least approximately $13 million in fictitious transactions in U.S. Treasury securities, and at least approximately $28 million in fictitious foreign currency transactions.  In particular, BENNETT caused the following transactions, among others, to artificially inflate Refco's revenues:

a.   On or about November 17, 2004, BENNETT caused RGHI, in a total of approximately 50 transactions, to purportedly purchase a total of approximately $1.25 billion in US Treasury notes from Refco, and then reversed the transactions the same day, at a loss to RGHI and a profit to Refco of approximately $7.8 million.

b.   On or about February 11, 2005, BENNETT caused Refco to credit a $12 million "interest adjustment" from RGHI that increased Refco's revenue by $12 million, and RGHI's debt to Refco by the same amount.

c.   On or about February 17, 2005, BENNETT caused RGHI to engage in approximately 32 fictitious foreign currency exchange transactions in British Pounds, Euros, Japanese Yen and Swiss Francs with Refco.  RGHI lost approximately $5 million on the transactions, and Refco recognized $5 million in revenue as a

26

result of the transactions.  The $5 million loss was then added
to the RGHI receivable.

### Refco's Public Filings And Publicly Traded Securities

48.  In 2005, Refco registered certain of its
securities with the SEC and, with that registration, was required
to make certain additional public filings with the SEC.

49.  On or about April 6, 2005, Refco filed an S-4
registration statement with the SEC in connection with its offer
to exchange $600 million of the senior subordinated notes
originally issued in August 2004 for $600 million of senior
subordinated notes registered under the Securities Act of 1933.
PHILLIP R. BENNETT signed the registration statement on or about
April 6, 2005 in New York, New York.  Registration of these notes
permitted them to be traded publicly.  The S-4 contained several
material misstatements about Refco, including the audited
financial statements which failed to reflect the related party
transactions described above or the debt owed to Refco from RGHI.
The S-4 also cited inflated revenue and income numbers that
resulted from the revenue padding and expense shifting described
above, and falsely claimed that Refco did not engage in
proprietary trading.

50.  On or about July 19, 2005, as required by the
Securities and Exchange Act of 1934 (the "Exchange Act") and
applicable rules, Refco filed with the SEC its annual report for

the year ended February 28, 2005 on Form 10K.    PHILLIP R. BENNETT
signed the annual report on or about July 19, 2005 in New York,
New York.    BENNETT also signed two certifications regarding the
annual report.    In those certifications, BENNETT attested that he
had reviewed the annual report and (a) that it did "not contain
any untrue statement of a material fact or omit to state a
material fact necessary to make the statements made, in light of
the circumstances under which such statements were made, not
misleading with respect to the period covered by th[e] report";
and (b) that "the information contained in the Report fairly
present[ed], in all material respects, the financial condition
and results of operations of the Company."    As noted above, the
financial statements were fraudulent in that, among other things,
they failed to reflect the related party receivables, the padded
revenue, and the shifted expenses.

        51.    On or about August 8, 2005, Refco filed an S-1
registration statement with the SEC in connection with its
initial public offering of common stock.    PHILLIP R. BENNETT
signed that registration statement on or about August 8, 2005, in
New York, New York.

        52.    The S-4 registration statement, 10K annual report,
and S-1 registration statement signed by PHILLIP R. BENNETT each
required the disclosure of (a) certain transactions between Refco
and its management and (b) certain debts owed directly or

indirectly by any executive officer of Refco to Refco, during Refco's past fiscal year and, for the registration statements, during Refco's prior two fiscal years. These disclosures were required in order to apprize investors of, among other things, potential conflicts of interest by management.

53. The S-4 registration statement, 10K annual report, and S-1 registration statement signed by PHILLIP R. BENNETT each failed to disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above. In particular, these public filings failed to disclose: (a) the existence of hundreds of millions of dollars of indebtedness by RGHI to Refco during 2004 and 2005; (b) the transactions at quarter- and fiscal year-end during 2004 and 2005 by which RGHI temporarily paid down its debt to Refco, the guaranties by Refco of the third party lenders' loans to RGHI, and the subsequent re-assumption of the debt by RGHI, each of which was a related party transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

54. On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock. PHILLIP R. BENNETT, through RGHI, sold Refco stock in the IPO valued at more than $100 million, while retaining a substantial ownership interest in

Refco.  Following the initial public offering, Refco's common
stock was listed on the New York Stock Exchange under ticker
symbol "RFX."

### End Of Quarter Transactions In August 2005

55.  In or about late August 2005, after the completion
of Refco's IPO, PHILLIP R. BENNETT caused Refco to carry out $420
million in cover-up transactions with a Refco customer that
temporarily transformed all or part of the RGHI receivable into a
receivable from that customer.  After the August 31, 2005 end of
Refco's second quarter, the $420 million in cover-up transactions
were unwound.

### Public Disclosure Of The Related Party Debt

56.  In or about early October 2005, Refco discovered
an approximately $430 million receivable on its books from RGHI.
It demanded repayment of the debt by PHILLIP R. BENNETT, who
repaid Refco approximately $430 million on or about October 10,
2005, having received an emergency loan in that approximate
amount from BAWAG.

57.  On or about October 10, 2005, Refco issued a press
release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company

believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities. Independent counsel and forensic auditors have been retained to assist the Audit Committee in an investigation of these matters.

58.   Following Refco's announcement of its discovery of this related party receivable, the market price of Refco stock plummeted, resulting in a loss of well more than $1 billion in market capitalization.

59.   On or about October 17, 2005, Refco, Inc. and twenty-three of its subsidiaries or affiliates filed a petition in bankruptcy in the United States Bankruptcy Court for the Southern District of New York.   Refco's common stock was subsequently delisted by the New York Stock Exchange.

## THE CONSPIRACY

60.   From in or about the mid-1990s up to in or about October 2005, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely: (a) to commit fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and

31

Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78o(d) and 78ff; (c) to make and cause to be made false statements in a registration statement filed under the Securities Act of 1933, in violation of Title 15, United States Code, Section 77x; (d) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; (e) to make and cause to be made false statements and omissions to Refco's auditors, in violation of Title 15, United States Code, Sections 78m and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; (f) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code; and (g) to commit money laundering, in violation of Section 1957(a) of Title 18, United States Code, Section 1957.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

61.  It was a part and object of the conspiracy that PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT the defendants, and others known and unknown, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and facilities of national

securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of notes issued by Refco and the common stock of Refco, Inc., all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings – Exchange Act

62.    It was further a part and object of the conspiracy that PHILLIP R. BENNETT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, in reports and documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

33

## False Statements In SEC Filings — Securities Act

63. It was further a part and object of the conspiracy that PHILLIP R. BENNETT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omit to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

## Wire Fraud

64. It was further a part and object of the conspiracy that PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

## Material Misstatements To Auditors

65. It was further a part and object of the conspiracy

34

that PHILLIP R. BENNETT, the defendant, being an officer and
director of Refco, an issuer obligated to file reports pursuant
to section 15(d) of the Securities and Exchange Act of 1934 and
subsequently with a class of securities registered pursuant to
section 12 of the Securities Exchange Act of 1934, unlawfully,
willfully and knowingly, directly and indirectly, (a) made and
caused to be made materially false and misleading statements; and
(b) omitted to state, and caused others to omit to state,
material facts necessary in order to make statements made, in
light of the circumstances under which they were made, not
misleading to accountants in connection with (i) audits, reviews
and examinations of the financial statements of Refco required to
be filed under the Securities and Exchange Act of 1934; and (ii)
the preparation and filing of documents and reports required to
be filed with the SEC pursuant to rules and regulations
promulgated by the SEC.

## Bank Fraud

66.    It was further a part and object of the conspiracy
that PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT,
the defendants, unlawfully, willfully and knowingly, would and
did execute, and attempt to execute, a scheme and artifice to
defraud a financial institution, to wit, HSBC, and to obtain
moneys, funds, credits, assets, securities and other property
owned by, and under the custody and control of, a financial

35

institution, to wit, HSBC, whose deposits were insured by the
Federal Deposit Insurance Corporation, by means of false and
fraudulent pretenses, representations and promises, all in
violation of Title 18, United States Code, Section 1344.

### Money Laundering

67.    It was further a part and object of the conspiracy
that PHILLIP R. BENNETT, ROBERT C. TROSTEN and TONE N. GRANT, the
defendants, in an offense involving and affecting interstate and
foreign commerce, unlawfully, willfully and knowingly would and
did engage and attempt to engage in monetary transactions in
criminally derived property that was of a value greater than
$10,000 and that was derived from specified unlawful activity, to
wit, securities fraud, bank fraud, and wire fraud, in violation
of Title 18, United States Code, Section 1957(a).

### MEANS AND METHODS OF THE CONSPIRACY

68.    Among the means and methods by which PHILLIP R.
BENNETT, ROBERT C. TROSTEN, TONE N. GRANT, the defendants, and
their co-conspirators would and did carry out the conspiracy were
the following:

a.    PHILLIP R. BENNETT and TONE N. GRANT, the
defendants, misrepresented to the public the size of customer
losses for which Refco was responsible.

b.    PHILLIP R. BENNETT, ROBERT C. TROSTEN, and
TONE N. GRANT, the defendants, and their coconspirators

36

transferred losses incurred by Refco to BENNETT's company, RGHI.

c.    PHILLIP R. BENNETT and ROBERT C. TROSTEN, the
defendants, and their coconspirators concealed the size and
related party nature of the debt owed by RGHI to Refco by causing
Refco and others to carry out loan transactions over fiscal year-
end and fiscal quarter-end dates to move the RGHI receivable to
one or more Refco customers.

d.    PHILLIP R. BENNETT, the defendant, and his
coconspirators caused Refco to file false and fraudulent
statements with the SEC.

e.    PHILLIP R. BENNETT and ROBERT C. TROSTEN, the
defendants, and their coconspirators, made and caused to be made
material false statements and omissions to Refco's auditors.

f.    PHILLIP R. BENNETT, ROBERT C. TROSTEN, and
TONE N. GRANT, the defendants, and their coconspirators used
facilities of interstate commerce, including the use of
interstate telephone calls and interstate wire transfers, in
furtherance of the objects of the conspiracy.

g.    PHILLIP R. BENNETT, ROBERT C. TROSTEN, and
TONE N. GRANT, the defendants, and their coconspirators
misrepresented to customers, potential customers, lenders,
investors and others that Refco did not engage in proprietary
trading.

37

**Overt Acts**

69.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about late 1997, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.    On or about May 15, 1998, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.    On or about April 30, 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

d.    On or about February 20, 2004, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an

38

approximately $720 million loan from a Refco customer to RGHI.

e.    On or about April 27, 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

f.    On or about May 17, 2004, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, met at a hotel in lower Manhattan to discuss the more than $1 billion debt that they, as the owners of RGHI, owed to Refco.

g.    On or about August 5, 2004, PHILLIP R. BENNETT, the defendant, caused RGHI to transfer to ROBERT C. TROSTEN, the defendant, approximately $48 million.

h.    On or about August 5, 2004, PHILLIP R. BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT, the defendant, approximately $4 million.

i.    On or about August 8, 2004, PHILLIP R. BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT, the defendant, approximately $12 million.

j.    On or about February 23, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an approximately $345 million loan from a Refco customer to RGHI.

k.    On or about April 6, 2005, in New York, New

39

York, PHILLIP R. BENNETT, the defendant, signed Refco's S-4 registration statement.

l.    On or about May 25, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an approximately $450 million loan from a Refco customer to RGHI.

m.    On or about July 19, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed Refco's annual report on Form 10K.

n.    On or about August 8, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed Refco's S-1 registration statement.

(Title 18, United States Code, Section 371).

### COUNT TWO

(Securities Fraud)

The Grand Jury further charges:

70.    The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

71.    From in or about the mid-1990s up to in or about 2004, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce,

the mails, and the facilities of national securities exchanges,
did use and employ, in connection with the purchase and sale of
securities, manipulative and deceptive devices and contrivances,
in violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by: (a) employing devices, schemes, and artifices to
defraud; (b) making untrue statements of material facts and
omitting to state material facts necessary in order to make the
statements made, in light of the circumstances under which they
were made, not misleading; and (c) engaging in acts, practices,
and courses of business which operated and would operate as a
fraud and deceit upon a person, in connection with the purchase
and sale of 9% Senior Subordinated Notes due 2012, issued by
Refco Group Ltd., LLC and Refco Finance, Inc.

   (Title 15, United States Code, Sections 78j(b) and 78ff; Title
      17, Code of Federal Regulations, Section 240.10b-5; and
             Title 18, United States Code, Section 2).

### COUNT THREE

(Securities Fraud)

The Grand Jury further charges:

72.   The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

73.   From in or about the mid-1990s up to in or about
October 2005, in the Southern District of New York and elsewhere,
PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and

41

knowingly, directly and indirectly, by the use of means and
instrumentalities of interstate commerce, the mails, and the
facilities of national securities exchanges, did use and employ,
in connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances, in violation
of Title 17, Code of Federal Regulations, Section 240.10b-5, by:
(a) employing devices, schemes, and artifices to defraud; (b)
making untrue statements of material facts and omitting to state
material facts necessary in order to make the statements made, in
light of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices, and courses of
business which operated and would operate as a fraud and deceit
upon a person, in connection with the purchase and sale of the
common stock of Refco, Inc.

    (Title 15, United States Code, Sections 78j(b) and 78ff; Title
       17, Code of Federal Regulations, Section 240.10b-5; and
           Title 18, United States Code, Section 2).

## COUNT FOUR

(False Filing With The SEC - Exchange Act)

The Grand Jury further charges:

    74.  The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

    75.  On or about July 19, 2005, in the Southern
District of New York and elsewhere, PHILLIP R. BENNETT, the
defendant, unlawfully, willfully, and knowingly made and caused

42

to be made statements in a report and document required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, BENNETT and others caused Refco to submit, and aided and abetted the submission of, in New York, New York, to the SEC in Washington, D.C., Refco's Form 10-K.

> (Title 15, United States Code, Sections 78o(d) and 78ff;
> Title 17, Code of Federal Regulations, Section 240.15d-2;
> and Title 18, United States Code, Section 2.)

### COUNTS FIVE AND SIX

(False Filing With The SEC - Securities Act)

The Grand Jury further charges:

76. The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

77. On or about the dates specified below, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and knowingly made and caused to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omitted to state material facts required to be stated therein and necessary to make the statements therein not misleading, to wit, BENNETT and others caused Refco to submit, and aided and abetted the submission of, in New York, New York,

43

to the SEC in Washington, D.C., the following Forms:

| Count | Approximate Date | Form |
|-------|------------------|------|
| FIVE | April 6, 2005 | S-4 |
| SIX | August 8, 2005 | S-1 |

(Title 15, United States Code, Section 77x;
and Title 18, United States Code, Section 2.)

### COUNTS SEVEN THROUGH THIRTEEN

(Wire Fraud)

The Grand Jury further charges:

78.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

79.  On or about the dates set forth below, in the Southern District of New York, the defendants set forth below unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice:

44

| Count | Defendant | Approximate Date | Wire Communication |
|-------|-----------|------------------|--------------------|
| SEVEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | June 22, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| EIGHT | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 3, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| NINE | PHILLIP R. BENNETT | April 6, 2005 | Electronic transmission of Refco Form S-4 from New York, New York to Virginia |
| TEN | PHILLIP R. BENNETT | July 19, 2005 | Electronic transmission of Refco Form 10-K from New York, New York to Virginia |
| ELEVEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago, Illinois |
| TWELVE | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |
| THIRTEEN | PHILLIP R. BENNETT | August 8, 2005 | Electronic transmission of Refco Form S-1 from New York, New York to Virginia |

(Title 18, United States Code, Sections 1343 and 2).

## COUNT FOURTEEN

(Material Misstatements To Auditors)

The Grand Jury further charges:

80.    The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

81.    From in or about April 2005 to in or about October

45

2005, in the Southern District of New York, PHILLIP R. BENNETT, the defendant, being an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Securities and Exchange Act of 1934 and subsequently with a class of securities registered pursuant to section 12 of the Securities Exchange Act of 1934, unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be filed under the Securities and Exchange Act of 1934; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC.

(Title 15, United States Code, Sections 78m and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Section 2).

## COUNT FIFTEEN

(Bank Fraud)

The Grand Jury further charges:

82.    The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if

46

fully set forth herein.

83.  On or about August 5, 2004, in the Southern District of New York, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2).

## COUNTS SIXTEEN THROUGH TWENTY

### (Money Laundering)

The Grand Jury further charges:

84.  The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

85.  On or about the dates set forth below, in the Southern District of New York, the defendants set forth below, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than

47

$10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a):

| Count | Defendant | Approximate Date | Transaction |
|-------|-----------|------------------|-------------|
| SIXTEEN | PHILLIP R. BENNETT | August 5, 2004 | $25,322,810 transfer from RGHI's JP Morgan Chase account in New York, NY to BENNETT's JP Morgan Chase account in New York, NY |
| SEVENTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $46,069,300 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| EIGHTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $1,950,000 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| NINETEEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago Illinois |
| TWENTY | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |

(Title 18, United States Code, Sections 1957(a) and 2).

48

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE THROUGH FOURTEEN

    86.    As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.15d-2, as alleged in Counts One, Two, Three, Four, Five, Six and Fourteen; wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One, Seven, Eight, Nine, Ten, Eleven, Twelve and Thirteen of this Indictment, PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN, the defendant (as to the acts alleged in Counts One, Two, Seven, and Eight), and TONE GRANT, the defendant (as to acts alleged in Counts One, Two, and Eleven) shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to the following:

    a.    At least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses, for which the defendants are jointly and severally liable, including but not limited to:

    1.    The contents of Account No. ████6752,

in the name of Refco Group Holdings, Inc., held at JP Morgan
Chase Bank, New York (approximately $63,393.20);

        2.    The contents of Account No. ███2791
in the name of Phillip R. Bennett And/or Valerie Bennett, held at
JP Morgan Chase Bank, New York (approximately $905,314.91);

        3.    The contents of Account No. ███5-00-
7, in the name of Phillip Bennett Grantor Retained Annuity Trust
("GRAT"), held at JP Morgan Chase Bank, New York (approximately
$13,880,143.28);

        4.    All funds from the Liquidation of the
Limited Capital Account for Sphinx Managed Futures Index Fund,
LP, in the name of Philip Bennett, held at the BISYS Group, Inc.
(approximately $974,533.91);

        5.    The contents of Account No. ███0832, in
the name of Phillip Bennett, held at Citibank, N.A., New York,
New York (approximately $13,810,347.00);

        6.    The contents of Account No.
███████0258, in the name of Valerie Bennett, held at Wachovia
Bank, Charlotte, North Carolina (approximately $440,014.55);

        7.    The contents of Account No. ███7710,
in the name of Valerie Bennett, held at Merrill Lynch, New York
(approximately $1,828,492.00);

        8.    The contents of Account. No. ███
███10-19, in the name of Zahava R. Trosten, held at JP Morgan

Chase Bank, New York (approximately $30,024,148.66);

       9.  The contents of Account No. ████████09-19, in the name of Trosten Family Investments LLC, held at JP Morgan Chase Bank, New York (approximately $4,040,000.00); and

      10.  The contents of Account No. ████████70-01, in the name of Zahava R. Trosten, held at JP Morgan Chase Bank, New York (approximately $2,248,318.53);

      11. Any and all funds in Account No. ████3235, held at Citibank, New York, or any account to which said contents have been transferred, up to and including $4,000,000.00;

      12. Any and all right, title and interest in the real property and appurtenances known as █████████████, Sarasota, Florida 34236; and

      13.  A sum of at least $1,900,000.00 from Account Nos. ███████4805 and ███████0709, in the name of Phillip R. Bennett, held at Commerce Bank, Mount Laurel, New Jersey.

### FORFEITURE ALLEGATION WITH RESPECT TO COUNTS ONE AND FIFTEEN THROUGH TWENTY

      87.  As a result of committing one or more of the foregoing bank fraud offenses, in violation of Title 18 United States Code, Section 1344, as alleged in Counts One and Fifteen of this Indictment, and the money laundering offenses, in violation of Title 18, United States Code, Section 1957(a), as alleged in Counts Sixteen through Twenty of this Indictment,

51

PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN, the

defendant (as to the acts alleged in Counts One, Fifteen,

Seventeen, and Eighteen), and TONE GRANT, the defendant (as to

acts alleged in Counts One, Fifteen, and Nineteen) shall forfeit

to the United States pursuant to Title 18, United States Code,

Section 982, any property constituting or derived from the

proceeds obtained directly or indirectly as a result of the bank

fraud offenses and all property, real and personal, involved in

the money laundering offenses and all property traceable to such

property, including but not limited to the following:

     a.  At least $800 million in United States currency,

representing the amount of proceeds obtained as a result of the

charged bank fraud offenses, for which the defendants are jointly

and severally liable, including but not limited to the property

described in subparagraphs 1-13 in the forfeiture allegation

above; and

     b.  At least $2.4 billion in United States currency, in

that such sum in aggregate is property which was involved in the

charged money laundering offenses or is traceable to such

property, for which the defendants are jointly and severally

liable, including but not limited to the property described in

subparagraphs 1-13 of the forfeiture allegation above.

### SUBSTITUTE ASSETS PROVISION

     88.  If any of the above-described forfeitable

property, as a result of any act or omission of the defendants:

(i)  cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above including but not limited to the following:

1.  Any and all right, title and interest in the real property and appurtenances known as ███████████, Gladstone, New Jersey 07934;

2.  Any and all right, title and interest in the shares of the capital stock of 1001 Tenants Corporation and the proprietary lease for the penthouse apartment located at ████ ███████████, New York, New York 10028; and

3.  Any and all right, title and interest in the

53

real property and appurtenances known as 

 Longboat Key, Florida 34228.

(Title 18, United States Code, Sections 371, 981, 982, 1343, 1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d), 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.15d-2; Title 21, United States, Section 853(p); and Title 28, United States Code, Section 2461.)


FOREPERSON

MICHAEL J. GARCIA
United States Attorney

54

Form No. USA-33s-274 (Ed. 9-25-58)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

## UNITED STATES OF AMERICA

- v -

## PHILLIP R. BENNETT,
## ROBERT C. TROSTEN,
## TONE N. GRANT

**Defendants.**

## INDICTMENT

S3 05 Cr. 1192 (NRB)

(18 USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR,
§240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18
USC 1343, 2; 15 U.S.C. §78m and 78ff;  17 CFR §240.13b2-
2); 18 USC 1344,2: 18 USC 1957(a).

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

Foreperson.

# EXHIBIT G

82FVBENP.txt

                                                                    1
    82FVBENP                    Plea
 1  UNITED STATES DISTRICT COURT
 1  SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 2
 3
 3  UNITED STATES OF AMERICA,
 4
 4            v.                          05 CR 001192 (NRB)
 5
 5  PHILLIP BENNETT,
 5
 6                  Defendant.
 6
 7  ------------------------------x
 7
 8                                       New York, N.Y.
 8                                       February 15, 2008
 9                                       5:40 p.m.
 9
10
10  Before:
11
11              HON. NAOMI REICE BUCHWALD,
12
12                                       District Judge
13
13
14                       APPEARANCES
14
15  MICHAEL J. GARCIA
15       United States Attorney for the
16       Southern District of New York
16  NEIL M. BAROFSKY
17  CHRISTOPHER L. GARCIA
17       Assistant United States Attorneys
18
18  KRAMER LEVIN NAFTALIS & FRANKEL
19       Attorneys for Defendant
19  GARY P. NAFTALIS
20  DAVID S. FRANKEL
20  ADAM C. FORD
21  DARREN A. LAVERNE
21
22  ALSO PRESENT:  WILLIAM JOHNSON, Postal Inspector
22                 KRIS MOON, Postal Inspector
23                 ANNE RAILTON, Law Student
23
24
25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                                    2
    82FVBENP                    Plea
 1            (In open court)
 2            (Case called)
 3            THE DEPUTY CLERK:  The case is United States against
 4  Phillip Bennett; docket number 05 CR 1192.  Is the government
 5  ready to proceed?
 6            MR. BAROFSKY:  Yes.  Neil Barofsky for the government.
 7  With me at counsel table, with your Honor's permission, is
 8  Christopher Garcia of our office, our postal inspectors on the
 9  case, William Johnson and Kris Moon, as well as our legal
                          Page 1

82FVBENP.txt
```
10   intern, Annie Railton, who's been assisting the trial of this
11   matter.  Good evening, your Honor.
12           MR. GARCIA:  Good evening, your Honor.
13           THE DEPUTY CLERK:  Is the defense ready to proceed?
14           MR. NAFTALIS:  Yes, we are.  Gary Naftalis for
15   Mr. Bennett, along with David Frankel.
16           THE COURT:  Mr. Naftalis?
17           MR. NAFTALIS:  Your Honor, we have an application on
18   behalf of Mr. Bennett to withdraw his plea of not guilty to the
19   charges in the indictment and to offer to plead guilty to the
20   charges in the indictment.
21           THE COURT:  All right.  Mr. Bennett, would you stand
22   please.  Would you raise your right hand.
23           (Defendant sworn)
24           THE COURT:  And would you state your full name for me
25   please.
```

82FVBENP                    Plea
```
1            THE DEFENDANT:  Phillip Roger Bennett.
2            THE COURT:  And Mr. Bennett, how old are you?
3            THE DEFENDANT:  59, your Honor.
4            THE COURT:  Why don't you sit down.  Mr. Bennett, what
5    was the highest grade in school that you completed?
6            THE DEFENDANT:  University.  Grade, twelfth grade, I
7    think it is, your Honor.
8            THE COURT:  You have the equivalent of a college
9    degree.
10           THE DEFENDANT:  Yes, master of arts.
11           THE COURT:  And are you now or have you currently been
12   under the care of a doctor or psychiatrist?
13           THE DEFENDANT:  No, your Honor.
14           THE COURT:  And have you ever been hospitalized or
15   treated for alcoholism or narcotics addiction?
16           THE DEFENDANT:  No, your Honor.
17           THE COURT:  Are you under the influence of any drug or
18   alcohol today?
19           THE DEFENDANT:  I'm not, no, your Honor.
20           THE COURT:  And how are you feeling physically today?
21           THE DEFENDANT:  Fine, your Honor.  Thank you.
22           THE COURT:  Mr. Bennett, have you had the opportunity
23   to review the charges against you and your plea with
24   Mr. Naftalis and Mr. Frankel and perhaps some other lawyers, as
25   well?
```

82FVBENP                    Plea
```
1            THE DEFENDANT:  I have, your Honor, yes.
2            THE COURT:  And have you been satisfied with the
3    advice and counsel that Messrs. Naftalis and Frankel have given
4    to you?
5            THE DEFENDANT:  I have, yes.
6            THE COURT:  Are you ready to change your plea at this
7    time?
8            THE DEFENDANT:  I am, your Honor.
9            THE COURT:  And what is your plea at this time, guilty
10   or not guilty?
11           THE DEFENDANT:  It's guilty, your Honor.
12           THE COURT:  Mr. Bennett, in order to determine whether
13   your plea is voluntary and made with a full understanding of
14   the charges against you and the consequences of your plea, I
```
                              Page 2

82FVBENP.txt

15  will make certain statements to you and I will ask you certain
16  questions.  I want you to understand that I need not accept
17  your plea unless I am satisfied that you are, in fact, guilty,
18  and that you fully understand your rights.  I'm tempted to ask
19  the government to pick a few favorite charges instead of all of
20  these, but, okay.
21          Mr. Bennett, you've been charged in the 20-count
22  indictment.
23          The first count charges you with a conspiracy to
24  commit securities fraud, wire fraud, bank fraud, and money
25  laundering, and to make false filings to the SEC.  This crime
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    5
82FVBENP              Plea
1   carries a maximum sentence under the law of five years
2   imprisonment, a maximum fine of the greatest of $250,000 or
3   twice the gross pecuniary gain derived from the offense or
4   twice the gross pecuniary loss to persons other than yourself
5   as a result of the offense, and a $100 special assessment, and
6   a maximum term of supervised release of three years.
7           Do you understand that those are the charges in Count
8   One of the indictment and the maximum statutory penalties
9   applicable to those charges?
10          THE DEFENDANT:  I do, your Honor, yes.
11          THE COURT:  Counts Two and Three of the indictment
12  charge you with securities fraud.  Each of these counts carries
13  a maximum sentence of 20 years in prison, a maximum fine of
14  $5,000,000 or twice the gross pecuniary gain derived from the
15  offense or twice the gross pecuniary loss to a person other
16  than yourself as a result of the offense, a $100 special
17  assessment, and a maximum term of supervised release of three
18  years.
19          Do you understand that those are the charges in Counts
20  Two and Three and the maximum penalties under law for those
21  charges of securities fraud?
22          THE DEFENDANT:  I do, your Honor.
23          THE COURT:  Count Four charges you with making a false
24  filing with the Securities and Exchange Commission.  And this
25  crime carries a maximum statutory penalty of 20 years in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    6
82FVBENP              Plea
1   prison, a maximum fine of the greatest of $5,000,000 or twice
2   the gross monetary gain derived from the offense or twice the
3   gross monetary loss to a person other than yourself as a result
4   of the offense, a $100 special assessment, and a maximum term
5   of supervised release of three years.
6           Do you understand that those are the charges in Count
7   Four and the maximum penalties applicable to those charges?
8           THE DEFENDANT:  I do, your Honor.
9           THE COURT:  Counts Five and Six of the indictment
10  charge you with making a false filing with the Securities and
11  Exchange Commission -- excuse me, with the Securities and
12  Exchange Commission.  Each of these counts carries a maximum
13  sentence under the law of five years imprisonment, a maximum
14  fine of the greatest of $250,000 or twice the gross pecuniary
15  gain derived from the offense or twice the gross pecuniary loss
16  to a person other than yourself as a result of the offense, and
17  a $100 special assessment, and a maximum supervised release
18  term of three years.  Do you understand that those are the
19  charges in Counts Five and Six of the indictment and the
                            Page 3

82FVBENP.txt
20  maximum penalties provided for by law for those crimes?
21          THE DEFENDANT:  Yes, I do, your Honor.
22          THE COURT:  And Counts Seven through Thirteen of the
23  indictment charge you with wire fraud.  Each of these counts
24  carries a maximum possible sentence of 20 years in prison, a
25  maximum fine of the greatest of $250,000 or twice the gross
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              7
      82FVBENP              Plea
1   pecuniary gain derived from the offense or twice the gross
2   pecuniary loss to a person other than yourself as a result of
3   the offense, a $100 special assessment, and a maximum term of
4   supervised release of three years.
5           Do you understand that those are the charges in Counts
6   Seven through Thirteen, and the maximum penalties under the
7   statute for those charges?
8           THE DEFENDANT:  Yes, I do, your Honor.
9           THE COURT:  All right.  Count Fourteen charges you
10  with making material misstatements to auditors.  And this crime
11  carries a maximum sentence of 20 years imprisonment, a maximum
12  fine of $5,000,000 or twice the gross pecuniary gain derived
13  from the offense or twice the gross pecuniary loss to a person
14  other than yourself as a result of the offense, a $100 special
15  assessment, and a maximum term of supervised release of three
16  years.
17          Do you understand that that is the crime charged in
18  Count Fourteen of the indictment, and the maximum penalty
19  provided for by statute for Count Fourteen?
20          THE DEFENDANT:  Yes, I do, your Honor.
21          THE COURT:  Count Fifteen of the indictment charges
22  you with bank fraud.  And this crime carries a maximum sentence
23  of 30 years in prison, a maximum fine of the greatest of
24  $1,000,000 or twice the gross pecuniary gain derived from the
25  offense or twice the gross pecuniary loss to a person other
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              8
      82FVBENP              Plea
1   than yourself as a result of the offense, a $100 special
2   assessment, and a maximum term of supervised release of five
3   years.
4           Do you understand that that is the charge in Count
5   Fifteen, and that those are the maximum penalties provided for
6   by law?
7           THE DEFENDANT:  Yes, your Honor.  Forgive me, yes,
8   your Honor.
9           THE COURT:  Counts Sixteen through Twenty charge you
10  with money laundering.  Each of these counts carries a maximum
11  possible sentence of ten years imprisonment, a maximum fine of
12  the greatest of $250,000, twice the gross pecuniary gain
13  derived from the offense or twice the gross pecuniary loss to a
14  person other than yourself as a result of the offense, and a
15  $100 mandatory special assessment, and a maximum supervised
16  release term of five years.
17          Do you understand that those are the crimes charged in
18  Counts Sixteen through Twenty, and the maximum possible penalty
19  provided by law?
20          THE DEFENDANT:  Yes, your Honor.
21          THE COURT:  Do you also understand that the Court must
22  impose an order of restitution by law?
23          THE DEFENDANT:  Yes, your Honor.
24          THE COURT:  And do you understand that you are also
                         Page 4

82FVBENP.txt
25      subject to mandatory asset forfeiture?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    9
        82FVBENP                Plea
1               THE DEFENDANT: Yes, your Honor.
2               THE COURT:  And do you understand that you have the
3       right to plead not guilty and the right to a trial on the
4       charges against you and, in fact, the right to a jury trial?
5               THE DEFENDANT: Yes, your Honor.
6               THE COURT:  At this time, I'd ask the government to
7       recite the elements of the crimes charged.
8               MR. BAROFSKY:  Yes, your Honor.  For Count One,
9       conspiracy, the government would have to prove the following
10      elements:
11              First, that an agreement or understanding existed to
12      commit the objects charged in the indictment.  Second, the
13      defendant knowingly became a member of that agreement or
14      understanding.  And third, that one of the conspirators
15      knowingly committed at least one overt act in furtherance of
16      the conspiracy during the life of the conspiracy.
17              With respect to Counts Two and Three, securities
18      fraud, the government would have to prove, first, that Bennett,
19      in connection with the purchase or sale of securities, and for
20      Count Two, that would be the notes described in the indictment,
21      and in Count Three, the common stock of Refco described in the
22      indictment, he did one or more of the following:  He either
23      employed a device, scheme, or artifice to defraud or made an
24      untrue statement of a material fact or omitted to state a
25      material fact which made what was said under the circumstances
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    10
        82FVBENP                Plea
1       misleading or engage in an act, practice, or course of business
2       that operated or would operate as a fraud or deceit on a
3       purchaser or seller.  Second, that Bennett acted knowingly,
4       willfully, and with intent to defraud.  And, third, that he
5       used or caused to be used any means or instruments of
6       transportation or communication in interstate commerce, but he
7       used the mails in furtherance of the fraudulent conduct.
8               With respect to Count Four, which charges false filing
9       under the Exchange Act, the first element the government would
10      have to prove is that Refco was required by the Securities
11      Exchange Act of 1934 to file the 10-K that's described in Count
12      Four.  And, second, the defendant knowingly and willfully made
13      or caused to be made a materially false or misleading statement
14      in that document or omitted to state any material fact required
15      to be stated therein or necessary to make the statements
16      therein not misleading.
17              With respect to Counts Five and Six, false filings
18      under the Securities Act, the government would have to prove,
19      again, first, that Refco was required under the Securities Act
20      of 1933 to file the S4, which is described in Count Five, and
21      the S1 registration statement described in Count Six.  And,
22      second, that Bennett knowingly and willfully made or caused to
23      be made a materially false or misleading statement in those
24      documents or omitted to state any material fact required to be
25      state therein or necessary to make the statements therein not
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    11
        82FVBENP                Plea
                                Page 5

82FVBENP.txt
1  misleading.
2          With respect to Counts Seven through Thirteen of wire
3  fraud, the government would have to prove, first, that a scheme
4  to defraud must have existed; that Bennett must have
5  participated in the scheme with intent to defraud; that
6  misrepresentations or omissions must have related to material
7  facts were made in furtherance of the fraud; that the scheme
8  was executed to obtain money or property; and that in the
9  execution of the scheme, Bennett used or caused to be used the
10  interstate wires listed in the indictment.  And here for Count
11  Seven is the June 22nd of 2004 email from Robert Trosten; in
12  Count Eight, the August 3, '04 email from Robert Trosten; in
13  Count Nine, the April 6, '05 transmission of the S4 from New
14  York to Virginia; in Count Ten, the July 19th, 2005
15  transmission of 10-K from New York to Virginia; in Count
16  Eleven, the August 5th, 2004 transmission of $4,000,000 from
17  New York to Illinois; in Count Twelve, the August 5th, 2004
18  transmission of $40,000,000 from New York to Illinois; and in
19  Count Thirteen, the August 8th, 2005 transmission of the S1
20  registration statement from New York to Virginia.
21          For Count Fourteen, material misstatements to
22  auditors, the government would have to prove, first, that Refco
23  was a public company that was required to submit financial
24  statements to the SEC; second, that Bennett was a
25  director/officer of Refco; third, Bennett knowingly and
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              12
82FVBENP                      Plea
1  willfully made, caused to be made, a materially false or
2  misleading statement or omitted to state a material fact
3  necessary order to make the statements made in light of the
4  circumstances under which such statements were made not
5  misleading to an accountant, and that the statement was made in
6  connection with the audit or examination of the financial
7  statements of Refco required to be made pursuant to the Act.
8          Count Fifteen charges the defendant with bank fraud.
9  And specifically, that on August 5th, 2004, defrauded HSBC.
10  And the government would have to prove, first, there was a
11  scheme to defraud a bank by means of materially false or
12  fraudulent pretenses, representations, or promises; second,
13  that Bennett executed or attempted to execute the scheme with
14  intent to defraud the bank, here, again, HSBC; and third, at
15  the time of the execution of the scheme, HSBC had its deposits
16  insured by the FDIC.  And I'll represent to the Court that at
17  the relevant time periods, HSBC's deposits were insured by the
18  FDIC.
19          And finally, Counts Sixteen through Twenty charge the
20  defendant with money laundering.  And the government would have
21  to prove, first, that Bennett engaged or attempted to engage in
22  monetary transactions involving criminally derived property of
23  a value greater than $10,000; second, that the property
24  involved in the monetary transaction was, in fact, derived and
25  specified unlawful activity; third, that Bennett acted
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              13
82FVBENP                      Plea
1  knowingly.  And for these purposes, wire fraud, bank fraud, and
2  securities fraud are all specified unlawful activities and
3  would have to prove each of the transactions listed in the
4  indictment in Counts Sixteen through Twenty, basically the wire
5  transactions which are described therein.
                         Page 6

82FVBENP.txt

```
 6              THE COURT:  Mr. Bennett, do you understand that if you
 7    pled not guilty and went to trial, that the burden would be on
 8    the government to prove each and every element of every crime
 9    charged beyond a reasonable doubt in order to convict you of
10    that crime?
11              THE DEFENDANT:  I do, your Honor.
12              THE COURT:  Do you understand that at a trial you
13    would have the right to be represented by an attorney at all
14    stages of the proceeding and, if necessary, an attorney would
15    be appointed for you?
16              THE DEFENDANT:  Yes, I do.
17              THE COURT:  And do you understand that at a trial you
18    would have the right to confront and cross-examine witnesses
19    and the right not to be compelled to incriminate yourself?
20              THE DEFENDANT:  I do, your Honor.
21              THE COURT:  And do you understand that at a trial you
22    would be presumed innocent until such time, if ever, the
23    government established your guilt by competent evidence to the
24    satisfaction of the trier of fact beyond a reasonable doubt?
25              THE DEFENDANT:  Yes, your Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

14

```
      82FVBENP              Plea
 1              THE COURT:  And do you understand that at a trial you
 2    would have the right to testify and would also be entitled to
 3    compulsory process; in other words, the right to call other
 4    witnesses on your behalf?
 5              THE DEFENDANT:  Yes, your Honor.
 6              THE COURT:  And do you understand that if your plea is
 7    accepted, that there will be no further trial of any kind, so
 8    that by pleading guilty, you are waiving your right to a trial?
 9              THE DEFENDANT:  I do understand that, your Honor, yes.
10              THE COURT:  And do you understand that if you are
11    sentenced to a period of supervised release, and if you violate
12    the terms of your supervised release, that an additional period
13    of jail time may be imposed without credit for the time that
14    you've previously spent on supervised release?
15              THE DEFENDANT:  Yes, your Honor.
16              THE COURT:  Do you understand that in connection with
17    your plea of guilty, that the Court may ask you certain
18    questions about the offense to which you have pled; and if you
19    answer those questions under oath and on the record and in the
20    presence of your counsel, that your answers are false may later
21    be used against you in a prosecution against you for perjury or
22    false statement?
23              THE DEFENDANT:  Yes, your Honor.
24              THE COURT:  And I recall, Mr. Bennett, you're a
25    citizen of Great Britain.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

15

```
      82FVBENP              Plea
 1              THE DEFENDANT:  I am, your Honor, yes.
 2              THE COURT:  Do you understand that following any
 3    sentence that you receive, that you will likely be deported?
 4              THE DEFENDANT:  That is my understanding, your Honor,
 5    yes.
 6              THE COURT:  And do you understand that in determining
 7    your sentence, that the Court is obligated to calculate the
 8    applicable sentencing guidelines range, and to consider that
 9    range and any possible departures under the guidelines and
10    other sentencing factors under the statute which entitles the
                            Page 7
```

82FVBENP.txt
```
11    Court to consider the nature and circumstances of the offense
12    and the history and characteristics of the defendant?
13              THE DEFENDANT:  Yes, your Honor.
14              THE COURT:  And have you reviewed with your counsel
15    the government's letter to them of yesterday which explains the
16    government's position as to the sentence that you face if the
17    sentencing guidelines are applied to your case?
18              THE DEFENDANT:  I have reviewed it, your Honor,
19    correct.
20              THE COURT:  Actually, that was said very badly.  Let
21    me just try it again so that there's no confusion.
22              Have you reviewed that letter with your lawyers which
23    sets forth the government's calculation of the sentence that
24    you face under the sentencing guidelines?
25              THE DEFENDANT:  I have reviewed it.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                  16
```
      82FVBENP           Plea
 1              THE COURT:  And do you understand that the government
 2    calculates that under the guidelines, that you face a sentence
 3    of life imprisonment; and that it has calculated that the
 4    maximum possible statutory sentence is 315 years; and that the
 5    fine range is from 25,000 to $5,000,000?
 6              THE DEFENDANT:  I understand that, your Honor,
 7    correct.
 8              THE COURT:  And do you understand that that
 9    calculation by the guidelines -- that by the government is just
10    based on the information they currently have?
11              THE DEFENDANT:  Yes, your Honor.
12              THE COURT:  And do you further understand that the
13    government's letter doesn't bind either the Court or the
14    probation department, and that ultimately the sentence that you
15    receive will be determined by the Court?
16              THE DEFENDANT:  Yes, your Honor.
17              THE COURT:  Mr. Bennett, have any threats or promises
18    been made to you to make you plead guilty?
19              THE DEFENDANT:  No, your Honor.
20              THE COURT:  Have any understandings or promises been
21    made to you concerning the sentence that you will receive?
22              THE DEFENDANT:  None.
23              THE COURT:  Is your plea voluntary?
24              THE DEFENDANT:  It is, your Honor.
25              THE COURT:  Mr. Bennett, did you commit the crimes
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                  17
```
      82FVBENP              Plea
 1    that you've been charged with in the indictment?
 2              THE DEFENDANT:  I did, your Honor.
 3              THE COURT:  Would you tell me in your own words what
 4    you did?
 5              THE DEFENDANT:  Your Honor, during the period that I
 6    served as CEO of Refco, I agreed with other Refco executives to
 7    enter into a series of transactions at the end of Refco's
 8    financial reporting periods to make it appear as if a
 9    receivable due to Refco from Refco Upholdings, Inc., a related
10    party, was instead due from an independent third-party
11    customer.
12              The IGHI receivable was composed of, amongst other
13    things, historical customer losses, bad debts, and expenses
14    that IGHI had incurred on behalf of Refco.
15              I, along with other Refco executives, have caused
                            Page 8
```

82FVBENP.txt
```
16   Refco to enter into these transactions in order to conceal the
17   size and nature of the IGHI receivable.  We concealed the
18   receivable from, amongst others, Refco's auditors, Thomas H.
19   Lee Partners, various lenders who, in 2004, participated in
20   Refco's senior secured credit facility, and the issuance of 9
21   percent senior subordinated notes, and also investors in
22   Refco's common stock.
23              Among the lenders to whom I knowingly caused the IGHI
24   receivable to be misrepresented was HSBC Bank, referenced in
25   Count Fifteen of the indictment.  I and other Refco executives
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                18
82FVBENP                    Plea
```
1    also used the interstate wires to accomplish these acts within
2    this district, as referenced in Counts Seven through Thirteen.
3    Furthermore, I caused funds obtained from the transaction with
4    Thomas H. Lee Partners, referenced in paragraph 34 of the
5    indictment, to be wired to various parties receiving proceeds
6    from the transaction, as referenced in Counts Sixteen through
7    Twenty, knowing that this money had been unlawfully obtained.
8              The IGHI receivable and related party transaction used
9    to conceal it were material information that Refco investors
10   and lenders would have wanted to have known prior to investing
11   in or lending money to Refco.  While I believed that I would be
12   able to pay the IGHI receivable down over time, and did, in
13   fact, ultimately pay off the receivable balance in its
14   entirety, I knew that failing to disclose the receivable was
15   wrong; I knew that obtaining funds from Refco's investors and
16   lenders based on misleading financial statements was also
17   wrong.
18             I also caused Refco to file documents with the SEC,
19   namely S1, S4, and 10-K that did not disclose the full extent
20   of the IGHI receivable or the transactions used to conceal it;
21   and, thus, were false and misleading with respect to material
22   facts.  I knew that failing to disclose these facts in public
23   filings and in connection with Refco's sale and registration of
24   Refco's notes and common stock was wrong, and I deeply regret
25   having done so.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                19
82FVBENP                    Plea
```
1              Your Honor, I take full responsibility for my actions.
2    I wish to publicly apologize to my family and to all of those
3    who have been harmed by my conduct.  Thank you, your Honor.
4              THE COURT:  Mr. Barofsky, is there anything else you
5    would want me to ask the defendant?
6              MR. BAROFSKY:  Your Honor, can we just have a moment
7    to review?  There's a lot of elements.  Thank you, your Honor.
8              THE COURT:  Certainly.
9              (Pause)
10             MR. BAROFSKY:  Your Honor, just a couple of areas for
11   clarification.  First, if you can please ask the defendant to
12   confirm that he was a director or officer of Refco during this
13   relevant time period.  Should I go one-by-one?
14             THE COURT:  Mr. Bennett, can you confirm that?
15             THE DEFENDANT:  I was, your Honor.
16             MR. BAROFSKY:  Second, your Honor, that the
17   misstatements made about Refco's auditor was in connection with
18   the auditor's preparation of a financial statement, and that
19   occurred after April of 2005.
20             THE COURT:  Can you confirm that?
```
                              Page 9

82FVBENP.txt
```
21          THE DEFENDANT:  That's correct, your Honor.
22          MR. BAROFSKY:  Your Honor, and if you can ask the
23  defendant to confirm he made reference to various wire
24  transfers and wire communications, as well as certain filings
25  in the indictment, if you could please confirm with the
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```
                                                              20
```
    82FVBENP          Plea
1   defendant that those acts occurred on or about the dates set
2   forth in the indictment.
3           THE DEFENDANT:  They did, your Honor.
4           MR. BAROFSKY:  And finally, your Honor, as I noted
5   earlier, I will represent to the Court that HSBC was --
6   deposits were insured by the FDIC during the relevant time
7   period; and also that Refco was an entity that was required to
8   file the various reports and documents and registration
9   statements under the Exchange Acts of 1933 and 1934, as well as
10  to file financial statements with respect to the 10-K and the
11  misstatement to auditors account.  Thank you, your Honor.
12          THE COURT:  Mr. Bennett, do you still wish to plead
13  guilty?
14          THE DEFENDANT:  I do, your Honor, yes.
15          THE COURT:  Mr. Naftalis, do you know of any reason
16  that Mr. Bennett ought not plead guilty?
17          MR. NAFTALIS:  No, your Honor.
18          THE COURT:  Mr. Bennett, I'm satisfied that you
19  understand the nature of the charge against you and the
20  consequences of your plea; and that your plea is made
21  voluntarily and knowingly; and that there is a factual basis
22  for it.  Accordingly, I will accept your plea of guilty and
23  direct that a presentence report be prepared.
24          THE DEFENDANT:  Thank you, your Honor.
25          THE COURT:  As for a sentencing date, can I just
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```
                                                              21
```
    82FVBENP          Plea
1   basically count out the requisite number of days or does the
2   government have a view that it should be maybe a little bit
3   more off into the future in light of the trial that's still
4   upcoming?
5           MR. BAROFSKY:  Your Honor, we think we can be prepared
6   in three months.
7           THE COURT:  All right.  Why don't we set sentencing
8   for May 20th at 4 o'clock.  And since I would anticipate some
9   significant presentence submissions, I think we should set a
10  schedule for that.  Why don't we say that the government's
11  submission is due -- the defense submission is due on May 6th,
12  and the government's on May 13th.
13          MR. BAROFSKY:  That's fine, your Honor.
14          MR. NAFTALIS:  Your Honor, if there are things in the
15  government submission that we want to respond to, that's sort
16  of --
17          THE COURT:  Doesn't give you quite enough time.
18          MR. NAFTALIS:  We don't have -- you're having us
19  first, so we don't really sort of provide -- they could go
20  first, we could go second; we wouldn't object to that.
21          MR. BAROFSKY:  We could do simultaneous submissions,
22  as well, your Honor, on the 6th and then we could each respond.
23          THE COURT:  Sounds like fun.
24          MR. BAROFSKY:  Okay.
25          MR. NAFTALIS:  It's a living.
                       Page 10
```

82FVBENP.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

82FVBENP                    Plea
1    THE COURT: Let's not go there.  Okay?  Are we done?
2    MR. BAROFSKY:  No, your Honor.  There is the issue of
3  bail.  And at this time, your Honor, the government does
4  request that defendant be remanded.  And if your Honor will let
5  me, I would like to speak briefly on the topic.
6    THE COURT:  Okay.
7    MR. BAROFSKY:  Obviously the standard has changed
8  under the Bail Act under 3143.  Before when we appeared before
9  your Honor several years ago, the burden was ours to prove the
10  defendant was a risk of flight.  Now, of course, it is the
11  defendant's burden to prove by clear and convincing evidence
12  that he is not likely to flee.  And respectfully, we submit
13  that there have been some extremely significant changed
14  circumstances, that we respectfully submit the defendant cannot
15  meet the burden in this case.
16    First of all, under the current bond, which, as your
17  Honor may recall, is a $50,000,000 bond, secured by $5,000,000
18  in cash and two properties, that security is now essentially
19  worthless; it's essentially an unsecured bond, because all of
20  those properties and that money are subject to asset
21  forfeiture.  The $5,000,000 we have traced as direct proceeds
22  from the IPO, which the defendant has just admitted was money
23  that was fraudulently obtained, and we already have lis pendens
24  on both of the properties, because basically under substitute
25  assets, we'd be able to take those, as well.  Those are all
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

82FVBENP                    Plea
1  subject to asset forfeiture and, therefore, don't provide any
2  security for the existing bond.
3    Secondly, the defendant is facing a $2.4 billion asset
4  forfeiture.  We don't think he has $2.4 billion, but we do
5  believe that will essentially -- through proceeds and
6  substitute assets, once this conviction is final -- will
7  basically deprive the defendant of all of his assets.  We have
8  restrained a number of his assets pretrial, but we have not
9  been able to restrain assets that we haven't been able to prove
10  are directly traceable.  And we don't know the exact amount of
11  those items, but we believe that they are in the $20,000,000
12  range, which would certainly facilitate the ability of the
13  defendant to flee.
14    Third, and I guess the most obvious point, is the
15  defendant now faces an advisory guideline range of 315 years of
16  imprisonment.  And that obviously changes the calculus a lot
17  from when we last appeared before your Honor.  We're not
18  suggesting that your Honor is going to --
19    THE COURT:  He always faced that, right?
20    MR. BAROFSKY:  Yes, your Honor; but before,
21  pretrial -- I'm sorry, pre-guilty plea, there was no certainty
22  that he was necessarily going to be convicted in this case.
23  Now, jail is an inevitability.  And I don't mean to presume
24  what the ultimate sentence will be in this case, because
25  there's obviously no way to predict what the precise sentence
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

82FVBENP                    Plea
1  will be, but the best guess, I think, from anyone's
Page 11

82FVBENP.txt

```
 2   perspective, is that it will be a substantial prison sentence.
 3   And for this defendant -- he is now with certainty facing such
 4   a sentence that has -- under the guidelines is the equivalent
 5   of a life sentence.
 6          Defendant is 59 years old.  A sentence of -- a
 7   significant sentence in this case may very well prove to be the
 8   equivalent of a life sentence.  The defendant is facing certain
 9   deportation after he serves that sentence.
10          THE COURT:  Not to a bad place though.
11          MR. BAROFSKY:  Not to a bad place, your Honor.  But it
12   does give the defendant a tremendous incentive to self-deport.
13   In other words, to flee the jurisdiction really with -- unlike
14   most cases, with very little downside.  The worse that happens
15   if he flees and gets caught is he's brought back to the United
16   States and does a jail sentence that probably will be the rest
17   of his life.  If he stays, he's facing pretty much the prospect
18   of the same result, a sentence that may, in fact, result in him
19   being in jail for the rest of his life, given his age.
20          And, your Honor, we respectfully submit that given the
21   shifting of the burden in these really remarkable circumstances
22   of a defendant who's not a U.S. citizen, who's facing the
23   equivalent of a life sentence, and who's now basically would be
24   free on an unsecured bond, that the circumstances dictate the
25   defendant should start serving his sentence, in effect,
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

                                                                    25

         82FVBENP                    Plea

```
 1   immediately.  And the defendant should be remanded on the
 2   grounds that he cannot meet his burden of demonstrating by
 3   clear and convincing evidence that he is not a risk of flight.
 4          THE COURT:  Mr. Naftalis.
 5          MR. NAFTALIS:  Most respectfully, I find this
 6   application most surprising and a baseless one.  And I say it
 7   with -- most advisedly.
 8          You have a situation here where our client, for almost
 9   two and-a-half years, has met every single condition of the
10   bond that was set here.  Your Honor got a report today from the
11   office of pretrial services, which we were given a copy of when
12   we entered the room, in which the office of pretrial services
13   has pointed out that he has complied with the terms of his bail
14   all the way through.
15          And I can sort of punctuate that a little bit because,
16   in fact, if you check with Officer Forelli, who he deals with
17   in pretrial services, you could hear anecdotal information such
18   as Mr. Bennett was the one who has set up the monitoring system
19   in the house in New Jersey because, whatever, I guess they're
20   technophobes, like I, the marshals service, he actually set up
21   the monitoring service which passed their muster in the
22   electronic stuff.  Once, when his bracelet broke down, he
23   immediately reported it to Officer Forelli that it was
24   malfunctioning and he went in.  He's been meticulous in
25   reporting to these people.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

                                                                    26

         82FVBENP                    Plea

```
 1          And secondly, something that the government
 2   consciously avoided bringing to your attention, his bond is
 3   signed by the three immediate members of his family.  The three
 4   of them who are American citizens:  His wife, his daughter, and
 5   his son.  They have signed a $50,000,000 bond on his behalf,
 6   and these are people with roots in the community.  The daughter
```
                             Page 12

82FVBENP.txt
```
 7  is a lawyer, works at a law firm; the son is an investment
 8  banker with a leading firm.  The notion that he would run away
 9  and do that to his family, I mean, is incomprehensible.  And
10  all we have is rhetoric from the government there.
11          You also have the strict monitoring conditions in
12  which he's under and which he's faithfully complied with for
13  the last two and-a-half years.  Of course, he has no passport;
14  his wife has given up her passport; he has no effective way of
15  leaving the country.
16          And with respect to other situations, in other
17  situations in high-profile cases where people were facing
18  enormous sentences, no such applications were ever granted.
19  For example, the Computer Associates case, where the CEO of
20  Computer Associates, Mr. Kumar, who, under the guidelines which
21  were then in effect, more applicable now, after the Gall case,
22  the guidelines are just, you know, one ingredient in the soup
23  for your Honor to consider under 3533.  He faced life
24  imprisonment under his guidelines.  After pleading guilty, he
25  continued to be free on bond, even though there were admissions
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```
                                                                    27
```
    82FVBENP                 Plea
 1  of obstruction of justice in that case.
 2          After Kumar was sentenced or he got a 12-year
 3  sentence, he continued to be allowed to be -- remained free on
 4  bond to work out various issues of restitution and the like.
 5          In the case in front of Judge Sand, the Adelphia case,
 6  which is one of the cases, the Rigases, who got 15 and 20-year
 7  sentences, one of them was an eighty -- somewhere in his
 8  eighties, they were allowed to remain free on bond pending
 9  appeal, even though they had the same sort of issues.  Even
10  Mr. Ebbers, who received the largest sentence in history I've
11  ever heard of, a real outlier sentence, 25 years, he was
12  allowed to remain free on bond pending appeal and the like.
13          And apart from the fact that there is not the
14  slightest bit of evidence for this most unfair application,
15  it's also prejudicial.  As your Honor knows, we have to put in
16  sentencing submissions.  And under 3533, your Honor has a lot
17  of things which you can properly consider in determining in
18  your best judgment what's a fair and just sentence under the
19  case here.  And obviously it's very prejudicial to us in being
20  able to work with our client, who for the last two and-a-half
21  years has been coming to our office every day on a daily basis
22  to work on the case with us.  So I don't see any good-faith
23  basis for any change in bond here whatsoever.
24          THE COURT:  Mr. Barofsky.
25          MR. BAROFSKY:  Your Honor, if there's any specific
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```
                                                                    28
```
    82FVBENP                 Plea
 1  points you'd like me to respond to.  The ones that jump out to
 2  me is, I mean the notion that a defendant can't chronically
 3  prepare for sentencing when he's incarcerated, obviously your
 4  Honor knows countless defendants who are able to prepare for
 5  sentencing when they are incarcerated; and having spent so much
 6  time with Mr. Naftalis, I think they are pretty much -- I'm
 7  sure they have contemplated this before, this is not the first
 8  time.
 9          As opposed to those other cases, defendants who are
10  released pending appeal after they've been convicted at trial
11  is a different situation.  There's obviously provisions within
                                Page 13
```

82FVBENP.txt

12    3143 when there are issues on appeal that the judge finds are
13    significant issues that need to be considered and possibly
14    could result in the reversal of a conviction.  That's a
15    different -- those are different facts, and that's a different
16    standard.  Here, we have a guilty plea.  I don't think that
17    Mr. Bennett is going to be challenging his conviction in this
18    case.  He just gave a very detailed guilty plea.
19          With respect to his assurances to his family, I don't
20    mean to minimize the bond between Mr. Bennett and his family,
21    but on the flip side, we're looking at a man who just admitted
22    to telling a series of lies to a large number of victims that
23    resulted in the defrauding of $2.4 billion.  1.7 or 8 billion,
24    which we will show for restitution at the time of sentencing,
25    has not been collected.  People are out all of this money.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              29
      82FVBENP                      Plea
1           So this man maybe may have some allegiance to his
2     family, but I think you have to look at the flip side as to how
3     strong that may be by a man if he is willing to tell whatever
4     lie is necessary to -- you know, on proportions that are
5     mind-boggling, in the billions of dollars.
6           So we would respectfully submit that -- and we don't
7     contest the fact, by the way, to be clear, that Mr. Bennett has
8     complied with the conditions.  And that is certainly a relevant
9     factor that Mr. Naftalis points out and we don't contest it.
10    We just don't think that that's enough to meet his burden,
11    given his changed circumstances.  And that to allow a defendant
12    like this, who's also not a U.S. citizen, unlike those
13    individuals, out on what is essentially an unsecured bond, it
14    simply isn't the right course of action here.
15          MR. NAFTALIS:  Just one small point, which they
16    reminded me to mention.  Although Mr. Bennett never changed his
17    citizenship, like his wife, or became an American citizen like
18    his children, he's lived in the United States for more than 30
19    years; so it's not like he has any roots anyplace else.  So
20    it's a little unfair for this eleventh-hour application which
21    we heard about today to suggest as if he had someplace to go
22    to.
23          And the government ignored the situation in the Kumar
24    case.  He said that all these other cases where people were on
25    appeal.  In the Kumar case it was a plea of guilty with someone
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              30
      82FVBENP                      Plea
1     facing, if one took the government's view of the thing, a life
2     sentence.  And he was allowed out, and he showed up.  Even
3     after he got his sentence of 12 years he remained out on bond
4     to work out the restitution things.
5           And we don't necessarily agree at all with the amount
6     of the forfeiture issues here.  I mean there's a forfeiture
7     issue in the case, but the numbers he tosses around are not
8     numbers that we have stipulated to or agreed to by any stretch
9     of the imagination, and he throws them around.
10          That's the only point I wanted to make.
11          THE COURT:  All right.  I'm not going to remand
12    Mr. Bennett, although I do think I can modify his bail
13    conditions to create greater security.  And I'm not going to do
14    so for a number of reasons, the most important of which is that
15    this indictment was filed in 2005.
16          If Mr. Bennett had wanted to flee, he should have fled
                              Page 14

82FVBENP.txt

17  before he paid his lawyers all the money, and kept it, and gone
18  to an appealing location. In fact, having pled guilty, to
19  leave now, extraditing him will be much easier. So there's a
20  balance there.
21      In addition, I note that just by statute, to release
22  someone on appeal requires the same finding as the finding now.
23  The judicial officer has to be persuaded by clear and
24  convincing evidence that the person is not likely to flee.
25  That's half of the standard. The appellate issue is the other
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              31
        82FVBENP            Plea
1   half, so it's the same standard.
2       And I also think that -- and I want to make it
3   clear -- that I don't make any prejudgments about the substance
4   of the case, but this is a case in which there has been a lot
5   of information, publicly, at least, from the bankruptcy
6   proceeding, and so this is a situation in which Mr. Bennett has
7   had the opportunity to see an examiner put the evidence
8   together. This is not a situation where as the case approaches
9   trial, the government finally turns over information. I think
10  Mr. Bennett has had a pretty good idea of the nature of the
11  case and the evidence for at least some time, which makes the
12  fact that he stays more significant.
13      The pretrial officer tells me that it would be easier
14  and more effective to monitor Mr. Bennett if he stayed in one
15  home or the other. And, I guess -- and tells me that basically
16  the minute he leaves home they know about it. So given that it
17  would take some time to -- since make an escape without a
18  passport, I think that if we modified the bail conditions to
19  limit his location, pretrial tells me that that makes it a more
20  secure situation. In addition, if the government has any
21  particular practical economic conditions that you can think of,
22  I'm always willing to listen to those.
23      MR. BAROFSKY: Your Honor, the posting of additional
24  assets by the defendant, they are largely forfeitable assets,
25  but to the extent that there are assets that have not been --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              32
        82FVBENP            Plea
1   as I said, we estimate that it's in the range of approximately
2   $20,000,000. If we could at least secure those assets, these
3   are assets that we've not yet secured by having him posted for
4   the bond.
5       In addition, because, frankly, we're going to get
6   those assets anyhow at the conclusion of this case, perhaps the
7   posting the requiring of assets from the children. He
8   mentioned that the children are successful, one's an investment
9   banker. And if they have property, that may increase the
10  incentive for Mr. Bennett to stay.
11      THE COURT: I think it's enough that he's -- the bond
12  mortgages their future if he flees. We're not taking his kids'
13  money.
14      MR. BAROFSKY: We aren't. I wouldn't suggest that we
15  would take it other than if he fled. We would only be posting
16  whatever interest. Because really right now the problem, your
17  Honor, and I hear what your Honor is saying, is that he has an
18  unsecured bond, and that just causes us a great deal of
19  concern. I don't know what the circumstances are in Kumar or
20  Ebbers, but this is a situation if there is a third party
21  posting collateral --
                          Page 15

82FVBENP.txt

22          THE COURT:  For all those people, the bottom line is
23     that for any defendant who was older and who was facing
24     sentencing, in, lets call it, the post-Enron era, the situation
25     was the same as for Mr. Bennett.  The possibility that their
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    33

     82FVBENP            Plea
1      sentence would be -- that their residence in the Bureau of
2      Prisons was the last residence they are going to have.
3          So I don't think this is really dramatically
4      different.  And I don't think the fact that he's a British
5      citizen changes the situation, that he has to -- I think he
6      gets the credit for having complied with all of his bail
7      conditions and having had two and-a-half years to reflect.
8          MR. BAROFSKY:  Your Honor, to be clear, I wasn't
9      rearguing the bail application.  I was merely trying to respond
10     to your Honor's question whether there were additional economic
11     circumstances.
12          THE COURT:  I'm not asking his children, okay?
13          MR. BAROFSKY:  Well, your Honor, then I would ask that
14     in the alternative, if the defendant could post additional
15     property or money that has not been seized or frozen by the
16     government to secure this bond to at least increase so that
17     there's some notional security of the bond.  And I would ask
18     for a number of $10,000,000 in cash or property.
19          MR. NAFTALIS:  Your Honor, I just think there is no
20     basis whatsoever for the application.  His children, the most
21     important things in the world, are on the hook for $50,000,000
22     if he were to leave.  As they've indicated, they don't have any
23     evidence of anything that he's ever done anything which would
24     indicate he would leave.  As your Honor said, quite correctly,
25     we've known about the evidence in this case; your Honor
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    34

     82FVBENP            Plea
1      remembers the litigation with respect to the bankruptcy trusts,
2      these report the motion practice there.  There's no secret
3      about that.  He's showed up all the time; he's complied with
4      all the conditions.  And there's not a reason in the world and
5      there's not a basis in the world for any change here
6      whatsoever.
7          MR. BAROFSKY:  Your Honor, respectfully, I don't see
8      any harm in having him post additional property that could only
9      be used at this time for the purposes to facilitate flight.  He
10     can't transfer these properties without violating the money
11     laundering laws at this point, and I don't see -- I don't even
12     understand how upping the collateral so as to prevent him from
13     fleeing prejudices him in any way.  And we're not asking even
14     for all of the money that we believe is out there, we're asking
15     for $10,000,000 to provide some additional security on what is
16     now an essentially an uncollateralized bond.  It doesn't really
17     move the ball tremendously for us, but it helps.  And at least
18     it would limit his ability to flee, should he make that
19     decision, that it makes more sense to self-deport, since he's
20     going to be going back to England anyhow before he has to face
21     the sentence.  I don't think the government's request is
22     shocking or surprising or terribly dramatic, but we do think it
23     would help, given the situation.
24          MR. NAFTALIS:  They have not shown anything for this
25     eleventh-hour request.  It's totally and absolutely baseless.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            Page 16

82FVBENP.txt
(212) 805-0300
82FVBENP                    Plea
1   And I don't think -- I don't know what property may or may not
2   exist, but I don't think that there's any justification.  And
3   they just can't come into court without any basis whatsoever
4   and allege things where all the evidence shows that this
5   application is frivolous.
6            MR. BAROFSKY:  Your Honor, I've listened to this for a
7   fair amount of time now.  And to characterize our application
8   as frivolous and baseless and eleventh-hour I think is unfair.
9            THE COURT:  At least the eleventh hour.
10           MR. BAROFSKY:  I don't know when we were supposed to
11  have made this application.  I don't know if Mr. Naftalis would
12  have had us make it when he notified us about the intent to
13  change his plea yesterday afternoon, I don't think so.  I think
14  the only time we can make a plea based on the changed
15  circumstance of the defendant entering a guilty plea is after
16  he enters the guilty plea.
17           As far as it being baseless, the notion that a
18  defendant who's facing 315 years of prison time --
19           THE COURT:  He wishes.
20           MR. BAROFSKY:  -- is -- that it's baseless to seek his
21  remand when he is an English citizen subject to deportation --
22           THE COURT:  Excuse me.  We're not -- we're sending him
23  to one of the most civilized countries in the world.  It's not
24  punishment to live in England, all right?
25           MR. BAROFSKY:  Exactly, your Honor, which is why we
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

82FVBENP                    Plea
1   would ask for additional collateral.
2            THE COURT:  And there is an extradition treaty between
3   the United States and Great Britain, so...
4            MR. BAROFSKY:  Your Honor, I just don't understand the
5   harm --
6            THE COURT:  Because I'm not sure that the purpose of
7   bail is to help you collect, you know, whatever you claim is
8   your eventual restitution.
9            MR. BAROFSKY:  Your Honor, if I wasn't clear on this
10  argument, I apologize.  The reason why we're asking for this is
11  to assure the defendant's appearance.  If that money is posted
12  as a bond, it's not so that we can eventually seize it.  If
13  it's posted as a bond, it's not available for him to use to
14  facilitate flight.  It's also to secure the bond.  This
15  original bond was issued because it was secured by money and
16  property.  Right now it's essentially not secured by money and
17  property.
18           THE COURT:  But that argument applies to any
19  additional money that he would put up.  You would say it was
20  just as forfeitable to you.  So it then becomes unsecured, the
21  same way.
22           MR. BAROFSKY:  But it's unrestrained property, Judge,
23  that's the difference.  This property is actually restrained on
24  top of the fact that it's -- because it's their direct
25  proceeds.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

82FVBENP                    Plea
1            What I'm suggesting, these are other properties that
2   have not been restrained, because we're not able to restrain
                              Page 17

82FVBENP.txt
```
3    certain properties that are not proceeds.  So this is money
4    that is available to the defendant for use if he wants to
5    facilitate flight.
6          The purpose of a bond, obviously security of a bond,
7    and why your Honor endorsed the order of a secured bond, was
8    because more security means less likelihood of flight.  And all
9    we're suggesting is taking this property that is now available
10   to the defendant and posting it as security for the bond.  And
11   obviously if we are unable to prove, as Mr. Naftalis suggests,
12   that this is property that's subject to asset forfeiture or
13   restitution, he'll get it back when -- at the time of his
14   sentencing or the time that he reports.
15         So we're not taking anything; we're not putting our
16   hands on stuff that we're not entitled to; we're just asking
17   that this bond be really secured, because right now we're
18   basically -- it's the exact same situation we had in October of
19   2005, when he's going out on the same conditions, it's
20   essentially an unsecured bond.  And I don't think that your
21   Honor would have ordered an unsecured bond back then, and we're
22   just asking for some additional security:  Money that is
23   available for the defendant or property, and that we have that
24   to secure the bond in case the defendant flees, and to
25   encourage him not to flee.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
```
                                                              38
82FVBENP                    Plea
```
1          MR. NAFTALIS:  Apart from the fact that the government
2    has proffered not a single fact that anything has changed, I
3    don't agree with the notion that this bond is unsecured.  One
4    of the homes which is securing the bond -- there's $5,000,000
5    cash, there's two residences, is in a trust.  So without going
6    through all the legalities, I don't think it's so quickly
7    forfeitable, as they say.
8          And the notion of ignoring -- and that will be worked
9    out; we're not here to litigate that issue, but I just -- and
10   the notion that they can continue to ignore the fact that his
11   wife and children have signed a $50,000,000 bond that they will
12   be on the hook for and their lives will be ruined, the notion
13   there's not the slightest reason to suppose that he would do
14   this to his children, he never has, and I have nothing else to
15   say.
16         THE COURT:  I think $50,000,000 is a lot of money.
17   And it does directly affect wife, children, inheritances.  So
18   what about the issue of where he's going to live?
19         MR. NAFTALIS:  If your Honor wants -- feels it would
20   be better, pretrial services --
21         THE COURT:  That's what pretrial tells me.
22         MR. NAFTALIS:  I think he would -- there's a residence
23   in New York and a residence in New Jersey.  I think he would
24   prefer to be in New Jersey where his wife is, and then subject
25   to the fact he could just come to our offices and work with us,
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
```
                                                              39
82FVBENP                    Plea
```
1    which I think he's allowed to do, I think that would be his
2    preference in terms of the quality of the life until the
3    sentence, if that's --
4          THE COURT:  I get the high sign from pretrial; so
5    he'll stay in New Jersey.
6          MR. NAFTALIS:  Okay.
7          THE COURT:  Other than when he goes to you and also
```
                         Page 18

82FVBENP.txt

```
 8    when you have to get him to pretrial for -- to probation for
 9    his interview.
10            MR. NAFTALIS:  Yes.
11            THE COURT:  Which we do need to do within the two
12    weeks so that the sentencing schedule can proceed.  And the
13    same is true for the government's description of the crimes.
14            Okay?  I think we're done then.
15            MR. NAFTALIS:  Thank you, your Honor.
16            MR. BAROFSKY:  Thank you, your Honor.
17            MR. GARCIA:  Thank you, your Honor.
18            THE DEFENDANT:  Thank you, your Honor.
19                         *    *    *
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Page 19

# EXHIBIT H

82KATROP.txt

1

82KATROPps
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  -----------------------------x
2
3  UNITED STATES OF AMERICA,
3
4              v.                        05 CR 1192 (NRB)
4
5  ROBERT TROSTEN,
5
6              Defendant.
6
7  -----------------------------x
7
8                                   New York, N.Y.
8                                   February 20, 2008
9                                   5:30 p.m.
9
10
10 Before:
11
11               HON. NAOMI REICE BUCHWALD
12
12                                   District Judge
13
13
14                        APPEARANCES
14
15 MICHAEL J. GARCIA
15      Acting United States Attorney for the
16      Southern District of New York
16 BY:  CHRISTOPHER GARCIA
17      NEIL BAROFSKY
17      Assistant United States Attorneys
18
18 MORVILLO, ABRAMOWITZ, GRAND, IASON,
19 ANELLO & BOHRER, P.C.
19      Attorneys for Defendant
20 BY:  ROBERT G. MORVILLO
20      CHRISTOPHER J. MORVILLO
21      RACHEL M. KORENBLAT
21
22
22 Also Present:  Robert W. Manchak, Criminal Investigator
23               Rua M. Kelly, Assistant United States Attorney
23               Mary Beth Allen, Paralegal
24               United States Attorney's Office
25

              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                        2
   82KATROPps
1          (In open court)
2          THE CLERK:  The case is United States v. Robert
3  Trosten, Docket No. 05 Crim. 1192.  Is the government ready to
4  proceed?
5          MR. GARCIA:  Yes.  Good afternoon, your Honor.
6  Christopher Garcia on behalf of the government.  With me at
7  counsel table is Assistant United States Attorney Neil
8  Barofsky.  And with the Court's permission, also at counsel
9  table:  Robert Manchak, criminal investigator with our office;
                        Page 1

82KATROP.txt
```
10    Mary Beth Allen, paralegal with our office; and also Rua Kelly,
11    also an Assistant United States Attorney with our office.
12              THE CLERK:  And is the defense attorney ready to
13    proceed?
14              MR. R. MORVILLO:  We are, your Honor.  Mr. Trosten is
15    here.  For the record, my name is Robert Morvillo.  I represent
16    Mr. Trosten.  And seated to my left is Christopher Morvillo, my
17    co-counsel.
18              THE DEFENDANT:  Good afternoon.
19              THE COURT:  Good afternoon, Mr. Morvillo.
20              MR. R. MORVILLO:  I think it's my application, your
21    Honor.  We would apply to the Court for permission to withdraw
22    our previously entered plea of not guilty as to Counts One,
23    Two, Seven, Fifteen, and Seventeen of the indictment and enter
24    a plea of guilty.
25              THE COURT:  Mr. Trosten, if you will remain standing
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                3
82KATROPps
```
1    for a moment, would you raise your right hand, please.
2              Do you solemnly swear that the answers to the
3    questions I am about to ask you will be the truth, the whole
4    truth, and nothing but the truth, so help you God?
5              THE DEFENDANT:  I do, your Honor.
6              THE COURT:  Would you state your full name for me,
7    please.
8              THE DEFENDANT:  Robert Charles Trosten, Sr.
9              THE COURT:  And, Mr. Trosten, how old are you?
10              THE DEFENDANT:  38.
11              THE COURT:  Why don't you sit down.
12              THE DEFENDANT:  Thank you.
13              THE COURT:  Mr. Trosten, what was the last grade or
14    level of school that you completed?
15              THE DEFENDANT:  I finished undergraduate college with
16    a B.S. in accounting.
17              THE COURT:  At this time are you under the care of a
18    doctor or psychiatrist?
19              THE DEFENDANT:  Yes, I am.
20              THE COURT:  Which?
21              THE DEFENDANT:  A doctor -- a psychiatrist.
22              THE COURT:  And what condition is he treating you for?
23              THE DEFENDANT:  Dr. Neiman is treating me for sleep
24    and anxiety on occasion.
25              THE COURT:  And are you taking any medicine as a
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                4
82KATROPps
```
1    result of or in connection with that treatment?
2              THE DEFENDANT:  I take sleep medicine as needed and
3    anxiety medicine as needed.
4              THE COURT:  At the moment, are you under the influence
5    of any drug or alcohol?
6              THE DEFENDANT:  No, I'm not.
7              THE COURT:  Have you in fact ever been hospitalized or
8    treated for either alcoholism or narcotics addiction?
9              THE DEFENDANT:  No, I have not.
10              THE COURT:  And how are you feeling physically today?
11              THE DEFENDANT:  I feel great.
12              THE COURT:  Have you had sufficient time to discuss
13    the charges against you and your proposed plea with your
14    counsel, the Messrs. Morvillo?
```
                              Page 2

82KATROP.txt

```
15              THE DEFENDANT:  I have, yes.
16              THE COURT:  And have you been satisfied with the
17     advice and counsel that they have given to you?
18              THE DEFENDANT:  I am.
19              THE COURT:  And at this time, are you ready to change
20     your plea?
21              THE DEFENDANT:  I am indeed.
22              THE COURT:  And what is your plea at the moment?
23     Guilty or not guilty?
24              THE DEFENDANT:  Guilty.
25              THE COURT:  All right.  Mr. Trosten, in order to
                SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
5

82KATROPps
```
1      determine whether your plea is voluntary and made with a full
2      understanding of the charges against you and the consequences
3      of your plea, I will make certain statements to you and I will
4      ask you certain questions.  I want you to understand that I
5      need not accept your plea unless I am satisfied that you are in
6      fact guilty and that you fully understand your rights.
7              Now, Count One of the indictment charges you with a
8      conspiracy to commit securities fraud, wire fraud, bank fraud,
9      and money laundering, and to make false filings with the SEC
10     and material misstatements to auditors.  This crime carries a
11     maximum statutory penalty of five years in prison, a maximum
12     fine of the greatest of $250,000 or twice the gross pecuniary
13     gain derived from the offense or twice the gross pecuniary loss
14     to a person other than yourself as a result of the offense, a
15     $100 special assessment, and a mandatory term of supervised
16     release of three years.  Do you understand that those are the
17     charges in Count One and the maximum statutory penalties
18     provided for that charge?
19              THE DEFENDANT:  I do.
20              THE COURT:  Count Two charges you with securities
21     fraud.  And this crime carries a maximum possible sentence of
22     20 years in prison, a maximum fine of the greatest of $5
23     million or twice the gross pecuniary loss derived from the
24     offense, or twice the gross pecuniary loss -- I'm sorry.  I
25     think I said twice pecuniary loss.  It's twice the gross
                SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
6

82KATROPps
```
1      pecuniary gain derived from the offense or twice the gross
2      pecuniary loss to a person other than yourself as a result of
3      the offense, a $100 special assessment, and a maximum term of
4      supervised release of three years.  Do you understand that
5      those are the charges in Count Two and the maximum possible
6      penalties provided by law?
7              THE DEFENDANT:  I do.
8              THE COURT:  Count Seven charges you with wire fraud,
9      and this crime carries a maximum possible sentence of 20 years
10     in prison, a maximum fine of the greatest of $250,000 or twice
11     the gross pecuniary gain derived from the offense or twice the
12     gross pecuniary loss to a person other than yourself as a
13     result of the offense, a $100 special assessment, and a maximum
14     term of supervised release of three years.  Do you understand
15     that those are the charges in Count Seven and the maximum
16     statutory penalty provided for the crime of wire fraud?
17              THE DEFENDANT:  I do, your Honor.
18              THE COURT:  Count Fifteen charges you with bank fraud.
19     And this crime carries a maximum possible sentence of 30 years
```
Page 3

82KATROP.txt

20  in prison, a maximum fine of the greatest of $250,000 or twice
21  the gross pecuniary gain derived from the offense or twice the
22  gross pecuniary loss to a person other than yourself as a
23  result of the offense, a $100 special assessment, and a
24  mandatory -- or a maximum term of supervised release of five
25  years.  Do you understand that those are the charges in Count
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              7
    82KATROPps
1   Fifteen and the maximum statutory penalty provided therefor?
2            THE DEFENDANT:  I do, your Honor.
3            THE COURT:  Count Seventeen charges you with money
4   laundering, and this crime carries a maximum sentence of ten
5   years in prison, a maximum fine of the greatest of $250,000 or
6   twice the gross pecuniary gain derived from the offense or
7   twice the gross pecuniary loss to a person other than yourself
8   as a result of the offense, a $100 mandatory special
9   assessment, and a maximum supervised release term of three
10  years.  Do you understand that that is the charge in Count
11  Seventeen and the maximum penalty provided for it by statute?
12           THE DEFENDANT:  I do, your Honor.
13           THE COURT:  And do you understand that, in addition to
14  the punishments which I just described, that the Court must
15  order restitution with respect to the charges in the
16  indictment?
17           THE DEFENDANT:  I'm sorry, your Honor?
18           THE COURT:  I said, do you understand that in addition
19  to the punishments that I've just described, that the Court
20  must order restitution --
21           THE DEFENDANT:  I do.
22           THE COURT:  -- with respect to the charges to which
23  you are pleading?
24           THE DEFENDANT:  I do.
25           THE COURT:  Do you understand that as part of your
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              8
    82KATROPps
1   plea agreement, that you have admitted the forfeiture
2   allegations in the indictment and that you agree to forfeit to
3   the United States the sum of $2,400,000,000, as well as all the
4   specific property listed in schedule A to your plea agreement?
5            THE DEFENDANT:  I do, your Honor.
6            THE COURT:  And that as part of this plea agreement,
7   that you have agreed to not file any claims for any of the
8   forfeited property, and also to take such steps as necessary to
9   clear title to the specific property?
10           THE DEFENDANT:  I do, your Honor.
11           THE COURT:  And do you understand that you have the
12  right to plead not guilty and the right to a trial on the
13  charges against you and in fact the right to a jury trial?
14           THE DEFENDANT:  I do.
15           THE COURT:  At this time, Mr. Garcia, I would ask you,
16  please, to recite the elements of the crimes to which
17  Mr. Trosten is pleading.
18           MR. GARCIA:  Yes, your Honor.  With respect to Count
19  One, there are three elements: first, that there existed an
20  agreement or understanding to commit the objects charged;
21  second, that Mr. Trosten knowingly became a member of that
22  agreement or understanding; and, third, that one of the
23  co-conspirators knowingly committed at least one overt act in
24  furtherance of the conspiracy during the life of the
                         Page 4

82KATROP.txt

25      conspiracy.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

82KATROPps
1          With respect to Count Two, the securities fraud count,
2     the first element is that Mr. Trosten, in connection with the
3     purchase or sale of securities, here the notes described in
4     Count Two, did one or more of the following: employed a device,
5     scheme, or artifice to defraud; or made an untrue statement of
6     material fact; or omitted to state a material fact which made
7     what was said, under the circumstances, misleading; or engaged
8     in an act, practice, or course of business that operated or
9     would operate as a fraud or deceit upon a purchaser or seller.
10    Second, that Mr. Trosten acted knowingly, willfully, and with
11    intent to defraud.  And, third, that Mr. Trosten used or caused
12    to be used any means or instruments of transportation or
13    communication in interstate commerce, or the use of the mails,
14    in furtherance of the fraudulent conduct.
15         With respect to Count Seven, the wire fraud count,
16    there are five elements: first, that a scheme to defraud
17    existed; second, that Mr. Trosten must have participated in the
18    scheme with intent to defraud; third, that misrepresentations
19    or omissions must have related to material facts; fourth, that
20    the scheme was executed to obtain money or property; and
21    finally, that in executing the scheme, Mr. Trosten used or
22    caused to be used interstate wires, or the use of such wires
23    were reasonably foreseeable to him, as listed in the
24    indictment.  And here, your Honor, with respect to Count Seven,
25    it is alleged that on June 22, 2004, Mr. Trosten sent an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

82KATROPps
1     e-mail.
2          With respect to Count Fifteen, the bank fraud charge,
3     your Honor, there are three elements: first, that there was a
4     scheme to defraud a bank by means of materially false or
5     fraudulent pretenses, representations, or promises; second,
6     that Mr. Trosten executed or attempted to execute the scheme
7     with intent to defraud the bank; and, third, that at the time
8     of the execution of the scheme, the bank had its deposits
9     insured by the Federal Deposit Insurance Corporation.
10         At this time, your Honor, the government would proffer
11    and represent that HSBC, which is identified in the indictment,
12    has its deposits, and had its deposits at the relevant period,
13    insured by the Federal Deposit Insurance Corporation.
14         Finally, your Honor, with respect to Count Seventeen,
15    the money laundering count, there are three elements: first,
16    that Mr. Trosten engaged or attempted to engage in monetary
17    transactions involving criminally derived property of a value
18    greater than $10,000; second, that the property involved in the
19    monetary transaction, or attempted transaction, was in fact
20    derived from specified unlawful activity; finally, that
21    Mr. Trosten acted knowingly.  And with respect to this count,
22    the specified unlawful activities are the wire fraud, bank
23    fraud, and securities fraud otherwise charged.
24         THE COURT:  Mr. Trosten, do you understand that if you
25    pled not guilty and went to trial, that the burden would be on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

82KATROPps

Page 5

82KATROP.txt
1   the government to prove each and every element of the crimes
2   charged beyond a reasonable doubt in order to convict you?
3            THE DEFENDANT:  Yes, your Honor.
4            THE COURT:  Do you understand that at a trial, you
5   would have the right to be represented by an attorney at all
6   stages of the proceeding and if necessary an attorney would be
7   appointed for you?
8            THE DEFENDANT:  I do, your Honor.
9            THE COURT:  Do you understand that at a trial you
10  would have the right to confront and cross-examine witnesses
11  against you and the right not to be compelled to incriminate
12  yourself?
13           THE DEFENDANT:  Yes, your Honor.
14           THE COURT:  And do you understand that at a trial you
15  would be presumed innocent until such time, if ever, the
16  government established your guilt by competent evidence to the
17  satisfaction of the trier of fact beyond a reasonable doubt?
18           THE DEFENDANT:  I do, your Honor.
19           THE COURT:  And do you understand that at a trial, you
20  would have the right to testify and would also be entitled to
21  compulsory process, in other words, the right to call other
22  witnesses on your behalf?
23           THE DEFENDANT:  I do, your Honor.
24           THE COURT:  And do you understand that if your plea is
25  accepted, that there will be no further trial of any kind, so
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                              12
82KATROPps
1   that by pleading guilty, you are waiving your right to a trial?
2            THE DEFENDANT:  I do.
3            THE COURT:  Do you understand that if you are
4   sentenced to a period of supervised release and if you violate
5   the terms of your supervised release, that an additional period
6   of jail time may be imposed without credit for the time that
7   you had previously spent on supervised release?
8            THE DEFENDANT:  I do.
9            THE COURT:  And do you understand that in connection
10  with your plea of guilty, that the Court may ask you certain
11  questions about the offense to which you have pled, and if you
12  answer those questions under oath and on the record and in the
13  presence of your lawyer, that your answers if false may later
14  be used against you in a prosecution for perjury or false
15  statement?
16           THE DEFENDANT:  I do, your Honor.
17           THE COURT:  And do you understand that, in determining
18  your sentence, that the Court is obligated to calculate the
19  applicable sentencing guidelines range and to consider that
20  range and possible departures under the guidelines, as well as
21  other factors concerning the nature and circumstance of the
22  offense and the history and characteristics of the defendant?
23           THE DEFENDANT:  I do, your Honor.
24           THE COURT:  Mr. Trosten, did you sign a plea agreement
25  earlier today?
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                              13
82KATROPps
1            THE DEFENDANT:  I did, your Honor.
2            THE COURT:  And before you signed it, did you discuss
3   it with your lawyers?
4            THE DEFENDANT:  I did.
5            THE COURT:  And before you signed it, did you read it?
                         Page 6

82KATROP.txt

```
 6              THE DEFENDANT:  I did, your Honor.
 7              THE COURT:  Let's just put the plea agreement to one
 8    side for a moment.  Apart from the plea agreement, have any
 9    threats or promises been made to you to make you plead guilty?
10              THE DEFENDANT:  No, your Honor.
11              THE COURT:  Again, apart from the plea agreement, have
12    any understandings or promises been made to you concerning the
13    sentence that you will receive?
14              THE DEFENDANT:  No, your Honor.
15              THE COURT:  Is your plea voluntary?
16              THE DEFENDANT:  Yes, it is.
17              THE COURT:  I would like to review a few portions of
18    the plea agreement with you.  Do you understand that pursuant
19    to this plea agreement, that you have undertaken to truthfully
20    and completely disclose all information about yourself and
21    others as required of you by the U.S. Attorney's Office; and
22    that you have agreed to fully cooperate with the U.S.
23    Attorney's Office, the United States Postal Inspection Service,
24    the Securities and Exchange Commission, and any other law
25    enforcement agency designated by the Office; that you have
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

                                                              14

82KATROPps

```
 1    agreed to attend all meetings as your presence is requested,
 2    and to provide to the U.S. Attorney's Office any document or
 3    other tangible evidence relating to any inquiry from the U.S.
 4    Attorney's Office or other law enforcement agencies; that you
 5    have agreed to truthfully testify before the grand jury and at
 6    any other trial or court proceeding; that you have agreed to
 7    fully disclose to the U.S. Attorney's Office any crimes that
 8    you have committed and any civil or criminal proceedings in
 9    which you have been or are a subject target or a witness; and
10    that you have further agreed to commit no further crimes
11    whatsoever?
12              THE DEFENDANT:  Yes, your Honor.
13              THE COURT:  And do you understand that the U.S.
14    Attorney's Office has no authority to agree not to prosecute
15    you for any possible criminal tax violations?
16              THE DEFENDANT:  I do, your Honor.
17              THE COURT:  And do you understand that if you fully
18    comply with this agreement, that you will not be further
19    prosecuted by the U.S. Attorney's Office for any crime related
20    to your participation in the crimes described in the
21    indictment, Counts One, Two, Seven, Fifteen, and Seventeen,
22    except for a possible criminal tax violation?
23              THE DEFENDANT:  Yes, your Honor.
24              THE COURT:  And are you aware that this agreement
25    doesn't bind any other federal, state, or local prosecuting
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

                                                              15

82KATROPps

```
 1    office?
 2              THE DEFENDANT:  Yes, your Honor.
 3              THE COURT:  And do you understand further that the
 4    sentence that you will receive is within the sole discretion of
 5    the Court?
 6              THE DEFENDANT:  Yes, your Honor, I do.
 7              THE COURT:  And do you understand that if the United
 8    States Attorney's Office determines that you have provided
 9    substantial assistance in an investigation or prosecution and
10    fully complied with the understandings specified in this plea
```
                              Page 7

82KATROP.txt
```
11   agreement, that the U.S. Attorney's Office will file a motion
12   pursuant to Section 5K1.1 of the guidelines, requesting that
13   you be sentenced in accordance with the factors set forth in
14   that section?
15             THE DEFENDANT:  I do, your Honor.
16             THE COURT:  And do you understand that even if the
17   U.S. Attorney makes such a motion, that the issue of sentencing
18   remains within the discretion of the Court?
19             THE DEFENDANT:  I do.
20             THE COURT:  And do you understand that if the U.S.
21   Attorney's Office determines that you have not provided
22   substantial assistance, that they are released of any
23   obligation to file a 5K1.1 letter?
24             THE DEFENDANT:  I do, your Honor.
25             THE COURT:  And do you understand that, should you
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                16
82KATROPps
```
 1   commit any further crimes or should it be determined that you
 2   have given false, incomplete, or misleading testimony or
 3   information, that you are thereafter subject to prosecution for
 4   additional federal crimes?
 5             THE DEFENDANT:  I do, your Honor.
 6             THE COURT:  Do you understand that if it is determined
 7   that you have committed further crimes or given false or
 8   misleading testimony or otherwise violated this agreement, that
 9   all statements made by you to the United States Attorney's
10   Office can be used against you in a subsequent prosecution?
11             THE DEFENDANT:  Yes, your Honor.
12             THE COURT:  And are you entering this plea because you
13   are in fact guilty?
14             THE DEFENDANT:  I am, your Honor.
15             THE COURT:  And do you understand that as part of this
16   plea agreement, that you are waiving any right you might have
17   to have the government preserve any physical evidence for
18   future DNA testing or any right you might have for DNA testing
19   at the present time?
20             THE DEFENDANT:  Yes, your Honor.
21             THE COURT:  And do you understand that this agreement
22   takes the place of any prior understanding that you may have
23   reached with the United States Attorney's Office and that there
24   are no conditions beyond those set forth in this written
25   agreement and that there cannot be any additional
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                17
82KATROPps
```
 1   understandings that are not entered into in writing and signed?
 2             THE DEFENDANT:  Yes, your Honor.
 3             THE COURT:  Mr. Trosten, did you commit the offenses
 4   that you are pleading guilty to?
 5             THE DEFENDANT:  I did, your Honor.
 6             THE COURT:  Would you tell me, please, what you did.
 7             THE DEFENDANT:  Your Honor, first, I just would like
 8   to state for the record that, when I said I felt great, it was
 9   relating to medicines that I had taken, as opposed to feeling
10   ill because of those medicines, not because of my conduct,
11   which I deeply regret, your Honor.
12             THE COURT:  I would just like -- are you under the
13   influence of any medicine today?
14             THE DEFENDANT:  I am not, no.  No.
15             THE COURT:  OK.  And you have not had any trouble
                        Page 8
```

82KATROP.txt
16  following any of the questions I have asked you?
17          THE DEFENDANT:  No, I have not.  No, I have not.
18          Your Honor, while I was employed at Refco, I agreed
19  with other Refco executives to hide the true nature of Refco's
20  finances on Refco's financial statements.  I knew that Refco's
21  financial statements did not accurately reflect Refco's
22  financial condition, because the financial statements did not
23  disclose the full amount that Refco Group Holdings, Inc., a
24  related party, owed to Refco.  I understood that the RGHI
25  receivable was underreported because Philip Bennett, Refco's
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                18
    82KATROPps
1   former chief executive officer, and other Refco executives,
2   including me, were involved in a series of transactions at the
3   end of Refco's financial reporting periods to make it appear as
4   if a receivable was due from third-party customers rather than
5   from a related party.
6           The RGHI receivable was composed of, amongst other
7   things, historic customer losses, bad debts, and expenses that
8   RGHI incurred on behalf of Refco.
9           In addition, I participated in a number of
10  transactions that padded or inflated Refco's income.  For
11  example, I participated in transactions that shifted expenses
12  off the books of Refco and onto the books of Refco Group
13  Holdings, Inc.
14          I, along with other Refco executives, agreed to
15  conceal the true size and nature of the RGHI receivable from,
16  amongst others, Refco's auditors, Thomas H. Lee Partners; HSBC,
17  which, in 2004, participated in Refco's senior secured credit
18  facility, as referenced in paragraph 14 -- I'm sorry --
19  paragraph 41 and Count Fifteen of the indictment; and investors
20  who purchased bonds that Refco issued in 2004, as referenced in
21  Count Two of the indictment.
22          I left the company in August of 2004, one year before
23  the IPO of Refco.  I and other Refco executives used the
24  interstate wires to accomplish these acts within this district,
25  as referenced in Count Seven of the indictment.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                19
    82KATROPps
1           Furthermore, I received funds obtained from the
2   transaction with Thomas H. Lee Partners, referenced in
3   paragraph 34 of the indictment, which I knew were proceeds from
4   unlawful activity, as referenced in Count Seventeen.
5           The RGHI receivable and the transactions used to
6   conceal it were material information that Refco investors and
7   lenders would have wanted to know before investing in or
8   lending money to Refco.
9           I knew that obtaining funds from Refco investors and
10  lenders based on misleading financial information was wrong.
11          Excuse me.
12          Your Honor, I take full responsibility for my actions
13  and my conduct.
14          I wish to apologize to my family and those that I
15  harmed by my conduct, which I deeply and sincerely regret, your
16  Honor.
17          Thank you.
18          THE COURT:  Mr. Garcia, is there anything else that
19  you wish me to ask Mr. Trosten?
20          MR. GARCIA:  No, your Honor.
                              Page 9

```
                           82KATROP.txt
21              THE COURT:  Mr. Trosten, do you still wish to plead
22  guilty?
23              THE DEFENDANT:  I do, your Honor.
24              THE COURT:  Mr. Morvillo, do you know of any reason
25  that Mr. Trosten ought not to plead guilty?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                              20
    82KATROPps
1               MR. R. MORVILLO:  I do not, your Honor.
2               THE COURT:  All right.  Mr. Trosten, I am satisfied
3   that you understand the nature of the charge against you and
4   the consequences of your plea, and that your plea is made
5   voluntarily and knowingly, and that there is a factual basis
6   for your plea.  I will therefore accept your plea of guilty.
7               Mr. Garcia, do you want to give me a control date?
8               MR. GARCIA:  Your Honor, respectfully, the government
9   would request about a year for a control date.
10              THE COURT:  Let's just see if -- OK.  Well, February
11  20, 2009 is a Friday.  So you can write to me then.
12              All right.  Is there anything else at this time?
13              MR. GARCIA:  Nothing more, your Honor, from the
14  government.
15              THE COURT:  Mr. Morvillo?
16              MR. R. MORVILLO:  Nothing, your Honor.  Thank you for
17  accommodating my schedule by sitting as late as you are.
18              THE COURT:  We're always here at this time.
19              MR. GARCIA:  Thank you, Judge.
20                              oOo
21
22
23
24
25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

Page 10

**EXHIBIT I**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
                                     :
UNITED STATES OF AMERICA             :
                                     :    <u>INFORMATION</u>
        -v-                          :
                                     :    07 Cr.
SANTO C. MAGGIO,                     :
                                     :
              Defendant.             :
                                     :
-------------------------------------x


<u>COUNT ONE</u>

**(Conspiracy To Commit Securities Fraud, Wire Fraud, To Make
False Filings With The SEC, To Make Material Misstatements To
Auditors, Bank Fraud and Money Laundering)**

The United States Attorney charges:

<u>RELEVANT ENTITIES AND PERSONS</u>

1.  At certain times relevant to this Information,
Refco, Inc. was a Delaware corporation with its principal place
of business in New York, New York.  From at least the mid-1990s,
the business of Refco, Inc. and its predecessor entities included
providing execution and clearing services for exchange-traded
derivatives and providing prime brokerage services in the fixed
income and foreign exchange markets.  Refco, Inc. held its
initial public offering of common stock on or about August 10,
2005.  Prior to on or about August 10, 2005, Refco, Inc.'s
predecessor entities were privately held.  Refco, Inc. and its
predecessor entities are referred to herein collectively as
"Refco."

2.  At all times relevant to this Information, Phillip

R. Bennett, a coconspirator not named as a defendant herein, was
the President and Chief Executive Officer of Refco.  At all times
relevant to this Information, Bennett had a substantial ownership
interest in Refco, directly and indirectly.

       3.   At certain times relevant to this Information,
Robert C. Trosten, a coconspirator not named as a defendant
herein, held senior management positions at Refco.  Among other
positions, Trosten was Chief Financial Officer of Refco, a
position he held from in or about May 2001 until in or about
August 2004, when he left the company.

       4.   At certain times relevant to this Information,
Tone N. Grant, a coconspirator not named as a defendant herein,
held a senior management position at Refco.  From at least in or
about 1997 through in or about June 1998, Grant was the President
of Refco.  At certain times relevant to this Information, Grant
indirectly held a significant ownership interest in Refco.

       5.   At certain times relevant to this Information,
SANTO C. MAGGIO, the defendant, held senior management positions
at Refco.  Among other positions, MAGGIO was an Executive Vice
President of Refco, and the President and Chief Executive Officer
of Refco Securities LLC, a wholly owned subsidiary of Refco.

       6.   At all times relevant to this Information, Bank
Für Arbeit Und Wirtschaft Und Österreichische Postparkasse
Aktiengesellschaft,("BAWAG"), was the fourth largest bank in

Austria.  BAWAG was owned at various times by, among other
entities, the Austrian Trade Unions Association, formally known
as Österreichischer Gewerkschaftsbund (ÖGB).  At various times
relevant to this Information, BAWAG indirectly held a substantial
ownership interest in Refco.

      7.   At all times relevant to this Information, Refco
Group Holdings, Inc. ("RGHI") was a privately-held Delaware
corporation that held a substantial ownership interest in Refco.
At various times relevant to this Information, RGHI was owned in
whole or in part by Phillip R. Bennett and Tone N. Grant.

<u>**THE SCHEME TO DEFRAUD**</u>

      8.   From at least as early as in or about the late
1990s, SANTO C. MAGGIO, the defendant, at the direction of
Phillip R. Bennett and together with others known and unknown,
schemed to hide the true financial health of Refco from its
banks, counterparties, auditors, and investors.  Starting at
least as early as the late 1990s, Bennett, MAGGIO, and their
coconspirators embarked on a strategy to mask the true
performance of Refco's business in order to sell the company for
Bennett and MAGGIO's own benefit and that of Refco's owners other
than Bennett.  To that end, over the ensuing years, Bennett,
MAGGIO, and others known and unknown systematically (1) covered
up both Refco's own losses and customer losses for which Refco
became responsible; (2) moved Refco operating expenses off the

to pad Refco's revenues in which the benefits accrued to Refco
and the associated costs were incurred by RGHI.

### Historical Losses

11.   As a commodities, securities, and futures
brokerage and clearing firm, Refco extended credit to customers,
allowing customers to make securities, commodities, and futures
trades in accounts held at Refco.   In the later 1990s, certain
Refco customers to whom Refco had extended credit sustained
hundreds of millions of dollars of trading losses in their
accounts at Refco.   When the customers were unable to make
payments on the credit Refco had extended, Refco liquidated
certain of the positions and assumed the resulting losses in the
customers' accounts.   Refco sustained large losses of this type,
among other times, in 1997, totaling at least approximately $225
million.   These customer losses included the following:

### Asian Debt Crisis Customers

12.   In or about May 1997, a group of Refco customers
to whom Refco had extended credit for the purpose of investing in
Asian markets sustained large losses in connection with the Asian
debt crisis.   When those customers were unable to cover their
losses, Refco paid the losses, using hundreds of millions of
dollars of customer funds within the unregulated segments of its
business.   By the end of May 1997, these losses totaled more than
$310 million, and, at the end of December 1997, based on changed

6

market conditions, they totaled approximately $185 million.

## Customer 1

13.   In or about October 1997, a Refco customer to whom
Refco had extended credit ("Customer 1"), lost more than $90
million in a series of transactions carried out on the Chicago
Mercantile Exchange ("CME").  When Customer 1 could not cover his
margin requirements, Refco was forced to meet the margin call
from the CME, using the proceeds of a short-term loan from a
financial institution of at least approximately $90 million to
meet its margin requirements, and then using customer funds taken
from the unregulated segments of Refco's business to repay the
loan.

14.   Recognizing that public acknowledgment of a loss
of more than $90 million would threaten Refco's continued
existence, Phillip R. Bennett, Tone N. Grant, SANTO C. MAGGIO,
and others known and unknown falsely represented to the public
and other customers that Refco had not sustained a significant
loss as a result of Customer 1's losses.  In addition, Bennett
and others significantly misrepresented the size of the loss to
Refco's auditors.

15.   Philip R. Bennett, SANTO C. MAGGIO, and others,
having misrepresented to third parties that Refco had not
suffered a significant loss as a result of Customer 1's trading
activity, caused at least $71 million of debt owed by Customer 1

7

from the trading losses to be transferred to become a debt from RGHI to Refco.

### Refco Expenses Moved To RGHI

16.  Beginning at least as early as 1999, Phillip R. Bennett and others schemed to reduce Refco's expenses (therefore falsely increasing Refco's apparent profitability) by moving Refco expenses off of Refco's books and onto the books of RGHI.

17.  The result of these actions by Phillip R. Bennett, SANTO C. MAGGIO, and their coconspirators was to contribute to the large and growing debt owed by RGHI to Refco.  By in or about February 1999, RGHI owed Refco at least approximately $252 million.  In addition, as of in or about February 1999, at least approximately $156 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary.  Thus, a total of at least approximately $409 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

### Refco's Losses Funded By Use Of Customer Funds

18.  Starting at least in or about 1997, Phillip R. Bennett, SANTO C. MAGGIO, and their coconspirators caused Refco to use customer funds to cover its losses.  As a result, Refco was perpetually short of cash, and was often unable to cover settlement of its customers' transactions.  Accordingly, Bennett,

8

MAGGIO, and others caused Refco systematically to fail to meet settlement on its customer transactions, often on a daily basis, in amounts that exceeded, at times, approximately $100 million a day. Bennett, MAGGIO, and others then caused Refco to repeatedly misrepresent to the financial institutions to whom Refco owed money to settle Refco's customers' transactions that its failure to make settlement was an error, when in fact Refco purposefully selected, on a rotating basis, institutions with whom it would fail to make settlement, and attempted to stagger its failures to make settlement with each institution so as not to arouse suspicion from the institutions that Refco was in fact unable to fulfill its daily settlement obligations.

### BAWAG Invests In Refco

19. By the end of 1998, Refco was in a precarious financial condition, in light of the significant customer and proprietary trading losses it had absorbed and the resulting daily failure to make settlement on customer transactions. In order to address that problem, in or about late 1998, Bennett sought a capital contribution from BAWAG. In a transaction that closed in 1999, BAWAG, through an affiliate, purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase an additional ten percent of Refco.

9

## Hiding The RGHI Receivable

20.  Throughout the period covered by this Information, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February.  Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including Phillip R. Bennett.  Refco and RGHI were related parties.

21.  Beginning at least as early as February 1998, Phillip R. Bennett and SANTO C. MAGGIO, among others, directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Bennett or Refco.  At certain times, Bennett also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global Finance, a consolidating entity within Refco, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end.  Bennett and, later, MAGGIO and others, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end

10

on February 28, 1998 through the fiscal year-end on February 29, 2004. Bennett, MAGGIO and others directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22. In 1998 and 1999, Phillip R. Bennett, SANTO C. MAGGIO and others, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
|------|----------------------------|
| February 1998 | $175 million |
| February 1999 | $265 million |

23. Beginning in 2000, Phillip R. Bennett and SANTO C. MAGGIO's year-end, and starting in 2004, quarter-end cover-up transactions were of two types: transactions with Refco customers, and transactions with BAWAG. In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to May 2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |

| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

24.   These transactions typically followed standard patterns.  For example, in or about February 2000, SANTO C. MAGGIO, Phillip R. Bennett and others caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a.   Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco.  At the same time, Refco lent to the Three Customers $310 million. As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million.  In or about March 2000, the transactions were reversed, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan.  To ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco.  Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar

12

to the agreements that follow:

(i).      On or about February 25, 2000,
Refco Capital Markets, Ltd. a Bermuda corporation controlled by
Refco, loaned Customer 2, one of the Three Customers,
approximately $150 million.  The loan was to be repaid on March
9, 2000.

(ii).      On or about the same day, February
25, 2000, Customer 2 loaned approximately $150 million to RGHI.
The repayment date was on or about March 9, 2000.  The loan
agreement for this loan was executed by Bennett on behalf of
RGHI.  The interest rate on this loan was 15 basis points higher
than the interest rate on the loan from Refco Capital Markets to
Customer 2, thereby assuring Customer 2 a profit.

(iii).      On or about the same date, Bennett
signed a letter of guaranty to Customer 2 on behalf of Refco
Group, Ltd., assuring Customer 2 that, should RGHI default on its
approximately $150 million obligation to Customer 2, Refco Group,
Ltd. would make Customer 2 whole.

b.    At or around the same time as the
transactions with the Three Customers, BAWAG loaned RGHI $300
million in cash.  RGHI then used the $300 million to pay off $300
million of its debt to Refco, and Refco then loaned to BAWAG $225
million, using the remaining $75 million to fund its operations.
In or about March 2000, the transaction was reversed.  Refco lent

13

$300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI. RGHI then used the $300 million to pay off the loan from BAWAG.

25. In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, Phillip R. Bennett, SANTO C. MAGGIO and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.

### Refco Sells Notes Based On False Financial Information

26. At various times prior to August 2004, Phillip R. Bennett, SANTO C. MAGGIO, and others, in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital through the private placement of certain notes. These notes were sold to investors based, in part, on the audited financial statements prepared by Refco's auditors, which in turn were rendered false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI. In particular, Bennett, MAGGIO and others caused Refco to raise the following capital through the sale of the following notes to investors, based on false and fraudulent financial statements:

14

| Date | Note Coupon And Due Date | Approximate Capital Raised |
|---|---|---|
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

### Refco Obtains Credit Counterparty Relationships Based On False Financial Information

27. Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and obtained credit from banks and other financial institutions, including a revolving line of credit from a number of financial institutions, including JP Morgan Chase, beginning in or about 1998, that eventually grew to more than $300 million. For each such transaction, including the annual renewal of the revolving line of credit, Refco submitted to the proposed creditor the fraudulent financial statements and made other false statements which materially misstated the health of Refco.

### Refco Helps BAWAG Hide Its Own Balance Sheet Problems

28. Between 2000 and 2005, while BAWAG assisted Phillip R. Bennett in hiding the RGHI receivable in the manner described above, Bennett and SANTO C. MAGGIO caused Refco to assist BAWAG in hiding its own balance sheet problems. In or

15

about early 2000, BAWAG entrusted approximately €350 million of BAWAG's funds to an investment advisor, who by the end of 2000 reported to the bank that he had lost substantially all of those funds.  In order to disguise this loss on its balance sheet, BAWAG arranged through Bennett and MAGGIO to hold in an account at Refco certain worthless bonds and other investments that Refco, at Bennett and MAGGIO's direction, maintained at a false value that, over time, reached at least approximately €500 million.  These fake assets were purportedly housed at Refco and maintained at an inflated value for BAWAG's benefit until 2005.

### Bennett's "Exit Strategy" Develops

29.  In or about 2003, Phillip R. Bennett caused Refco to hire an investment bank (the "Investment Bank"), to assist in selling Refco.  Bennett asked the Investment Bank to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested.  After efforts to sell Refco to such a first line buyer failed, Bennett directed the Investment Bank to look for other purchasers for the company, with the understanding that it would be taken public.

30.  In connection with Phillip R. Bennett's plan to sell Refco, Bennett, SANTO C. MAGGIO, and others (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by Bennett and others to disguise the ongoing operational

16

problems at the company.

### The Fraudulent Leveraged Buyout Transaction

31.    In or about 2003, Phillip R. Bennett, SANTO C.
MAGGIO, and others began negotiations with Thomas H. Lee
Partners, a private equity fund, regarding that entity's possible
purchase of a controlling stake in Refco as part of a leveraged
buyout transaction.  As ultimately carried out on or about August
5, 2004, the leveraged buyout was structured as follows:  Thomas
H. Lee Partners, through an affiliate, purchased a 57 percent
ownership interest in Refco, in return for approximately $507
million of new capital; simultaneously, Refco sold $600 million
in notes and obtained $800 million in financing from a syndicate
of banks.

#### *Lies To Thomas H. Lee Partners*

32.  In connection with the leveraged buyout
transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others
caused Refco's audited financial statements for the year ending
February 2004 to be provided to Thomas H. Lee Partners.  Those
audited financial statements were false and misleading in the
following respects, among others:

a.    The financial statements hid the size of the
related party receivable from RGHI, which at the end of February
2004 was, but for the cover-up loan transactions, at least
approximately $1 billion, whereas the financial statements

17

misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

      b.   The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

      33.   In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Note Purchasers

      34.   In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the note underwriters and note purchasers the following false and misleading information:

      a.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

      b.   Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in

18

fact, caused the Asian Debt Crisis Customer Losses; and

      c.   Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### *Lies To The Bank Syndicate*

      35.  In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

      a.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

      b.   Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

      c.   Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to

RGHI for the purpose of hiding them.

36.    The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion.    Thereafter, Phillip R. Bennett caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| Bennett | $25 million |
| Trosten | $48 million |
| Grant | $16 million |
| Other Former Equity Partners | $81.5 million |
| MAGGIO | $5.75 million |
| Other Refco Officers, Employees, and Affiliated Parties | $106.25 million |

**Bennett Plans To Take Refco Public**

37.    After the leveraged buyout, Phillip R. Bennett, who remained the Chief Executive Officer of Refco following the transaction, SANTO C. MAGGIO, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

38.    Between the August 2004 leveraged buyout and the August 2005 IPO, Phillip R. Bennett, SANTO C. MAGGIO, and others

20

continued their manipulation of Refco's finances:  At each quarter and year-end period, Bennett and MAGGIO caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and Bennett and MAGGIO continued to cause Refco expenses to be assumed by RGHI and to artificially pad Refco's revenues by the means previously described.  Bennett and MAGGIO caused the following quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|---|---|---|---|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

39.  Between August 2004 and August 2005, Refco padded its revenue by at least approximately $79 million, comprised of at least approximately $38 million in inflated interest income, at least approximately $13 million in fictitious transactions in U.S. Treasury securities, and at least approximately $28 million in fictitious foreign currency transactions.  In particular, Bennett and MAGGIO caused the following transactions, among others, to artificially inflate Refco's revenues:

a.  On or about February 11, 2005, Bennett and

21

MAGGIO caused Refco to credit a $12 million "interest adjustment" from RGHI that increased Refco's revenue by $12 million, and RGHI's debt to Refco by the same amount.

　　　　b.　　On or about February 17, 2005, Bennett and MAGGIO caused RGHI to engage in approximately 32 fictitious foreign currency exchange transactions in British Pounds, Euros, Japanese Yen and Swiss Francs with Refco.　RGHI lost approximately $5 million on the transactions, and Refco recognized $5 million in revenue as a result of the transactions. The $5 million loss was then added to the RGHI receivable.

### Refco's Public Filings And Publicly Traded Securities

　　　　40.　　In 2005, Refco registered certain of its securities with the SEC and, with that registration, was required to make certain additional public filings with the SEC.

　　　　41.　　On or about April 6, 2005, Refco filed an S-4 registration statement with the SEC in connection with its offer to exchange $600 million of the senior subordinated notes originally issued in August 2004 for $600 million of senior subordinated notes registered under the Securities Act of 1933. Phillip R. Bennett signed the registration statement on or about April 6, 2005 in New York, New York.　Registration of these notes permitted them to be traded publicly.　The S-4 contained several material misstatements about Refco, including the audited financial statements which failed to reflect the related party

22

transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above, and falsely claimed that Refco did not engage in proprietary trading.

42.   On or about July 19, 2005, as required by the Securities and Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for the year ended February 28, 2005 on Form 10K.  Phillip R. Bennett signed the annual report on or about July 19, 2005, in New York, New York.  Bennett also signed two certifications regarding the annual report.  In those certifications, Bennett attested that he had reviewed the annual report and (a) that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report"; and (b) that "the information contained in the Report fairly present[ed], in all material respects, the financial condition and results of operations of the Company."  As noted above, the financial statements were fraudulent in that, among other things, they failed to reflect the related party receivables, the padded revenue, and the shifted expenses.

43.   On or about August 8, 2005, Refco filed an S-1

registration statement with the SEC in connection with its initial public offering of common stock. Phillip R. Bennett signed that registration statement on or about August 8, 2005, in New York, New York.

44. The S-4 registration statement, 10K annual report, and S-1 registration statement signed by Phillip R. Bennett each required the disclosure of (a) certain transactions between Refco and its management and (b) certain debts owed directly or indirectly by any executive officer of Refco to Refco, during Refco's past fiscal year and, for the registration statements, during Refco's prior two fiscal years. These disclosures were required in order to apprize investors of, among other things, potential conflicts of interest by management.

45. The S-4 registration statement, 10K annual report, and S-1 registration statement signed by Phillip R. Bennett each failed to disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above. In particular, these public filings failed to disclose: (a) the existence of hundreds of millions of dollars of indebtedness by RGHI to Refco during 2004 and 2005; (b) the transactions at quarter- and fiscal year-end during 2004 and 2005 by which RGHI temporarily paid down its debt to Refco, the guaranties by Refco of the third party lenders' loans to RGHI, and the subsequent re-assumption of the debt by RGHI, each of which was a related party

24

transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

46.  On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock.  Phillip R. Bennett, through RGHI, sold Refco stock in the IPO valued at more than $100 million, while retaining a substantial ownership interest in Refco.  Following the initial public offering, Refco's common stock was listed on the New York Stock Exchange under the ticker symbol "RFX."

### End Of Quarter Transactions In August 2005

47.  In or about late August 2005, after the completion of Refco's IPO, Phillip R. Bennett and SANTO C. MAGGIO caused Refco to carry out $420 million in cover-up transactions with a Refco customer that temporarily transformed all or part of the RGHI receivable into a receivable from that customer.  After the August 31, 2005 end of Refco's second quarter, the $420 million in cover-up transactions were reversed.

### Public Disclosure Of The Related Party Debt

48.  In or about early October 2005, Refco discovered an approximately $430 million receivable on its books from RGHI. It demanded repayment of the debt by Phillip R. Bennett, who repaid Refco approximately $430 million on or about October 10,

2005, having received an emergency loan in that approximate amount from BAWAG.

49.   On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities. Independent counsel and forensic auditors have been retained to assist the Audit Committee in an investigation of these matters.

50.   Following Refco's announcement, the market price of Refco stock plummeted, resulting in a loss of well more than $1 billion in market capitalization.

51.   On or about October 17, 2005, Refco, Inc. and twenty-three of its subsidiaries or affiliates filed a petition in bankruptcy in the United States Bankruptcy Court for the Southern District of New York.  Refco's common stock was subsequently delisted by the New York Stock Exchange.

## THE CONSPIRACY

52.   From in or about the mid-1990s up to in or about October 2005, in the Southern District of New York and elsewhere,

26

SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely:  (a) to commit fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"), and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78o(d) and 78ff; (c) to make and cause to be made false statements in a registration statement filed under the Securities Act, in violation of Title 15, United States Code, Section 77x; (d) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; (e) to make and cause to be made false statements and omissions to Refco's auditors, in violation of Title 15, United States Code, Sections 78m and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2; (f) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code; and (g) to commit money laundering, in violation of Section 1957(a) of Title 18, United States Code.

27

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

53.  It was a part and object of the conspiracy that
SANTO C. MAGGIO, the defendant, and others known and unknown,
unlawfully, willfully, and knowingly, by the use of the means and
instrumentalities of interstate commerce, the mails, and
facilities of national securities exchanges, directly and
indirectly, would and did use and employ, in connection with the
purchase and sale of securities, manipulative and deceptive
devices and contrivances, in violation of Title 17, Code of
Federal Regulations, Section 240.10b-5, by: (a) employing
devices, schemes, and artifices to defraud; (b) making untrue
statements of material facts and omitting to state material facts
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon a person,
in connection with the purchase and sale of notes issued by Refco
and the common stock of Refco, Inc., all in violation of Title
15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings - Exchange Act

54.  It was further a part and object of the conspiracy
that SANTO C. MAGGIO, the defendant, and others known and
unknown, unlawfully, willfully, and knowingly, in reports and

28

documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

### False Statements In SEC Filings - Securities Act

55.  It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omissions to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

### Wire Fraud

56.  It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals,

29

pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

## Material Misstatements To Auditors

57.   It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and Phillip R. Bennett, an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Exchange Act of 1934 and with a class of securities registered pursuant to section 12 of the Exchange Act, unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be filed under the Exchange Act; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC, in violation of Title 15, United States Code, Section 78m, and Title 17, Code of Federal Regulations, Section 240.13b2-2(a).

## Bank Fraud

58.   It was further a part and object of the conspiracy

30

that SANTO C. MAGGIO, the defendant, and others known and

unknown, unlawfully, willfully and knowingly, would and did

execute, and attempt to execute, a scheme and artifice to defraud

a financial institution, to wit, HSBC, and to obtain moneys,

funds, credits, assets, securities and other property owned by,

and under the custody and control of, a financial institution

whose deposits were insured by the Federal Deposit Insurance

Corporation, by means of false and fraudulent pretenses,

representations and promises, all in violation of Title 18,

United States Code, Section 1344.

## Money Laundering

59.   It was further a part and object of the conspiracy

that SANTO C. MAGGIO, the defendant, and others known and

unknown, in an offense involving and affecting interstate and

foreign commerce, unlawfully, willfully and knowingly would and

did engage and attempt to engage in monetary transactions in

criminally derived property that was of a value greater than

$10,000 and that was derived from specified unlawful activity, to

wit, securities fraud, bank fraud, and wire fraud, in violation

of Title 18, United States Code, Section 1957(a).

## MEANS AND METHODS OF THE CONSPIRACY

60.   Among the means and methods by which SANTO C.

MAGGIO, the defendant, and others known and unknown, and their

co-conspirators would and did carry out the conspiracy were the

31

following:

        a.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators misrepresented to the public the size of customer losses for which Refco was responsible.

        b.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators transferred losses incurred by Refco to Bennett's company, RGHI.

        c.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

        d.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators caused Refco to file false and fraudulent statements with the SEC.

        e.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators made and caused to be made material false statements and omissions to Refco's auditors.

        f.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

g.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators misrepresented to customers, potential customers, lenders, investors and others that Refco did not engage in proprietary trading.

**Overt Acts**

61.  In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about late 1997, Phillip R. Bennett and Tone N. Grant misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.    On or about May 15, 1998, Phillip R. Bennett and Tone N. Grant signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.    On or about April 30, 2003, Phillip R. Bennett and Robert C. Trosten signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

33

d.    On or about February 20, 2004, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $720 million loan from Refco Capital Markets, Ltd., to a customer.

e.    On or about April 27, 2004, Phillip R. Bennett and Robert C. Trosten signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party receivables had been fully disclosed to the auditors.

f.    On or about May 17, 2004, Phillip R. Bennett and Tone N. Grant met at a hotel in lower Manhattan to discuss the more than $1 billion debt that they, as the owners of RGHI, owed to Refco.

g.    On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Robert C. Trosten approximately $48 million.

h.    On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Tone N. Grant approximately $4 million.

i.    On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the defendant, approximately $5.75 million.

j.    On or about August 8, 2004, Phillip R. Bennett caused RGHI to transfer to TONE N. GRANT approximately

34

$12 million.

k.    On or about February 23, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $345 million loan from a Refco customer to RGHI.

l.    On or about April 6, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-4 registration statement.

m.    On or about May 25, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $450 million loan from a Refco customer to RGHI.

n.    On or about July 19, 2005, in New York, New York, Phillip R. Bennett signed Refco's annual report on Form 10K.

o.    On or about August 8, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-1 registration statement.

p.    On or about August 26, 2005, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $420 million loan from Refco Capital Markets, Ltd., to a customer.

q.    On or about September 6, 2005, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the

35

defendant, approximately $7,668,600.

(Title 18, United States Code, Section 371).

## COUNT TWO

### (Securities Fraud)

The United States Attorney further charges:

62.  The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

63.  From in or about the late 1990s up to in or about 2004, in the Southern District of New York and elsewhere, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons and entities, in connection with the purchase and

36

sale of 9% Senior Subordinated Notes due 2012, issued by Refco

Group Ltd., LLC and Refco Finance, Inc.

    (Title 15, United States Code, Sections 78j(b) and 78ff; Title
      17, Code of Federal Regulations, Section 240.10b-5; and
          Title 18, United States Code, Section 2.)

## COUNT THREE

### (Securities Fraud)

        The United States Attorney further charges:

        64.  The allegations contained in paragraphs 1 through

51, 60 and 61 of this Information are repeated and realleged as

if fully set forth herein.

        65.  From in or about the late 1990s up to in or about

October 2005, in the Southern District of New York and elsewhere,

SANTO C. MAGGIO, the defendant, unlawfully, willfully, and

knowingly, directly and indirectly, by the use of means and

instrumentalities of interstate commerce, the mails, and the

facilities of national securities exchanges, did use and employ,

in connection with the purchase and sale of securities,

manipulative and deceptive devices and contrivances, in violation

of Title 17, Code of Federal Regulations, Section 240.10b-5, by:

(a) employing devices, schemes, and artifices to defraud; (b)

making untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not

misleading; and (c) engaging in acts, practices, and courses of

business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of the common stock of Refco, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

## COUNT FOUR

### (Wire Fraud)

The United States Attorney further charges:

66. The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

67. On or about July 19, 2005, in the Southern District of New York, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice, the electronic transmission of Refco Form 10-K from New York, New York to Virginia.

(Title 18, United States Code, Sections 1343 and 2).

38

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE THROUGH FOUR

68. As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5, as alleged in Counts One, Two and Three; and wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One and Four of this Information, SANTO C. MAGGIO shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to the following: At least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses, for which the defendant is jointly and severally liable.

## SUBSTITUTE ASSETS PROVISION

69. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(i)   cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

39

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 371, 981, 982, 1343; Title 15, United States Code, Sections 78j(b), 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; Title 21, United States, Section 853(p); and Title 28, United States Code, Section 2461.)

MICHAEL J. GARCIA
United States Attorney

40

Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

- v -

**SANTO C. MAGGIO,**

**Defendant.**

## INFORMATION

07 Cr.

(18  USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR,
§240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18
USC 1343, 2; 15 U.S.C. §78m and 78ff;  17 CFR §240.13b2-
2); 18 USC 1344,2: 18 USC 1957(a).

MICHAEL J. GARCIA
United States Attorney.

# EXHIBIT J

7CJAAMAGP.txt

1

7CJAAMAGP          Plea
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  UNITED STATES OF AMERICA,
3
4       v.                    07 SD 312 (RLE)
4
5  SANTO C. MAGGIO,
5
6          Defendant.
6
7  ------------------------------x
7
8                              New York, N.Y.
8                              December 19, 2007
9                              11:30 a.m.
9
10
10 Before:
11
11          HON. RONALD L. ELLIS,
12
12                      Magistrate Judge
13
13
14              APPEARANCES
14
15 JAMES B. COMEY
15    United States Attorney for the
16    Southern District of New York
16 NEIL BAROFSKY
17 CHRISTOPHER GARCIA
17    Assistant United States Attorney
18
18 PAUL SHECHTMAN
19    Attorney for Defendant Maggio
19
20 SCOTT E. HERSHMAN
20    Attorney for Defendant Maggio
21

Page 1

7CJAAMAGP.txt
22
23
24
25
           SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300
☐                                              2
     7CJAAMAGP              Plea
1          (Case called)
2          MR. BAROFSKY:  Neil Barofsky and Christopher Garcia
3    for the government.
4          Good morning, your Honor.
5          MR. SCHECTMAN:  Paul Shechtman, for Mr. Maggio, with
6    Scott Hershman, for Mr. Maggio.
7          THE COURT:  Okay.  I understand that he is going to be
8    pleading to an information.
9          MR. SCHECTMAN:  Correct, your Honor.
10         THE COURT:  Has he waived indictment yet?
11         MR. SCHECTMAN:  You have the paperwork.  We're ready
12   to waive.
13         THE COURT:  We will do those separately.  Treat the
14   waiver as it should be and then I'll consider the taking of the
15   plea.
16         MR. SCHECTMAN:  Sounds right.
17         COURTROOM DEPUTY:  You are Santo Maggio?
18         THE DEFENDANT:  Yes.
19         COURTROOM DEPUTY:  Have you signed this waiver of
20   indictment.
21         THE DEFENDANT:  Yes.
22         COURTROOM DEPUTY:  Before you signed it did you
23   discussion it with your attorney?
24         THE DEFENDANT:  Yes.
25         COURTROOM DEPUTY:  Did he explain it to you?
           SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300
☐                                              3
     7CJAAMAGP              Plea
1          THE DEFENDANT:  Yes.
2          THE COURT:  Do you understand what you are doing?
3          THE DEFENDANT:  Yes.
4          COURTROOM DEPUTY:  Do you understand that you are
5    under no obligation to waive indictment?
6          THE DEFENDANT:  Yes.
                            Page 2

7CJAAMAGP.txt

 7     COURTROOM DEPUTY:  Do you understand that if you do
 8  not waive indictment, if the government wants to prosecute you
 9  they will have to present this case to a grand jury which may
10  or may not indict you?
11     THE DEFENDANT:  Yes.
12     THE COURT:  Do you realize by that by signing this
13  waiver of indictment you have given up your right to have this
14  case presented to a grand jury?
15     THE DEFENDANT:  Yes, I do.
16     COURTROOM DEPUTY:  Have you seen a copy of the
17  information?
18     THE DEFENDANT:  Yes, I did.
19     THE COURT:  Would you like for me to read it to you?
20     THE DEFENDANT:  No.
21     COURTROOM DEPUTY:  How do you plead?
22     THE DEFENDANT:  Guilty.
23     COURTROOM DEPUTY:  The case has already been assigned
24  to Judge Stein.
25     MR. SCHECTMAN:  Correct.
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

☐                                              4
      7CJAAMAGP            Plea
 1     MR. BAROVSKY:  Your Honor, we consent to the defendant
 2  being released on his own recognizance.
 3     MR. SCHECTMAN:  We don't object to that.
 4     THE COURT:  Technically to the information you are
 5  supposed to plead "not guilty".
 6     MR. SCHECTMAN:  I think that is right and it is my
 7  apologies.
 8     THE DEFENDANT:  I plead not guilty now and then later
 9  of guilty.
10     MR. SCHECTMAN:  Not guilty at this time, your Honor,
11  but we will be entering a guilty plea.
12     THE COURT:  Objection.  All right.  Now, the actual
13  plea has been referred by Judge Stein; is that it?
14     MR. BAROFSKY:  Yes, your Honor.
15     THE COURT:  And how many counts in the information?
16     MR. BAROFSKY:  Your Honor, there are four counts.
17     THE COURT:  What is he pleading to?
18     MR. BAROFSKY:  All four counts, Judge.
19     THE COURT:  Okay.  Mr. Maggio, this matter has been
20  referred to me before Judge Stein for the purpose of taking
                        Page 3

7CJAAMAGP.txt

21    your plea.  Did you consent to proceed before a United States
22    magistrate judge on your felony plea allocution?
23         THE DEFENDANT:  Yes.
24         THE COURT:  Before you signed it did you discuss it
25    with your attorneys?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

7CJAAMAGP          Plea

1          THE DEFENDANT:  Yes, your Honor.
2          THE COURT:  Did they explain it to you?
3          THE DEFENDANT:  Yes.
4          THE COURT:  Do you understand that you have an
5     absolute right to have this proceeding before a United States
6     district judge?
7          THE DEFENDANT:  Yes, I do.
8          THE COURT:  You are voluntarily proceeding before a
9     United States magistrate judge?
10         THE DEFENDANT:  Yes.
11         THE COURT:  Mr. Maggio, you are charged in a four
12    count information.  Count One of the information charges you,
13    well, conspiracy to commit securities fraud, wire fraud, bank
14    fraud and money laundering and to make false filings with the
15    SEC and material misstatements to auditors in violation of
16    Title 18 U.S.C. Sections 371.  This crime carries a maximum
17    sentence of five years imprisonment, a maximum fine which is
18    the greatest of either $250,5000 or twice the gross pecuniary
19    gain derived from the offense or twice the gross pecuniary loss
20    to persons other than yourself as a result of the offense.
21    There is a $100 special assessment and a term of supervised
22    release of three years.
23         Counts Two and Three of the information charge you
24    with securities fraud in violation of Title 15 U.S.C. Section
25    78 (J) (B) and 78 (F) (F) and Title 17 Code of Federal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

7CJAAMAGP          Plea

1     Regulations Section 240, 10 (B) (5) and each of those counts
2     carries a maximum sentence of 20 years imprisonment, a maximum
3     fine which is the greatest of either five million dollars or
4     twice the gross pecuniary gain derived from the offense and
5     twice the gross pecuniary loss of persons other than yourself

Page 4

7CJAAMAGP.txt

6  as a result of the offense.  Each also has a $100 special
7  assessment and a term of supervised release of three years.
8        Count four of the information charges you with wire
9  fraud in violation of Title 18 U.S.C. Section 1343 and carries
10  a maximum sentence of 0 years imprisonment, a maximum fine
11  which is the greatest of either $250,000 or twice the gross
12  pecuniary gain derived from the offense, or twice the gross
13  pecuniary loss to person others than yourself as a result of
14  the offense.  It carries a $100 special assessment and a term
15  of supervised release of three years.
16        A total maximum sentence of incarceration on the
17  information is 65 years imprisonment.  In addition to the
18  foregoing the Court must order restitution with respect to the
19  information and in accordance with U.S.C.
20        In addition, if you are sentenced to any period of
21  supervised release and violate the conditions of your
22  supervised release you may be sentenced to all or part of the
23  supervised release as authorized by statute without any credit
24  for time already served on supervised release.
25        Do you understand that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐                                        7

7CJAAMAGP              Plea
1        THE DEFENDANT:  Yes.
2        THE COURT:  So you understand these penalties as I've
3  read them to you?
4        THE DEFENDANT:  Yes, I do.
5        THE COURT:  Have you seen a copy of the information in
6  which the government makes these charges against you?
7        THE DEFENDANT:  Yes, I do.
8        THE COURT:  Have you discussed it with your attorneys?
9        THE DEFENDANT:  Yes, your Honor.
10        THE COURT:  Are you prepared to enter a plea today?
11        THE DEFENDANT:  Yes, I am.
12        THE COURT:  Santo Maggio, how do you plead?
13        THE DEFENDANT:  Guilty.
14        THE COURT:  Mr. Maggio, before I can recommend that
15  your plea be accepted I must determine that you understand the
16  plea and its consequences, that the plea is voluntary and that
17  there's a factual basis for the plea.  For that purpose I must
18  ask you a number of questions and your answers must be under
19  oath.  Do you understand that the answers you give under oath

Page 5

7CJAAMAGP.txt
20   may subject you to prosecution for perjury if you do not tell
21   the truth?
22        THE DEFENDANT:  Yes, I do.
23        THE COURT:  Raise your right hand.
24        (Defendant Santo C. Maggio sworn)
25        THE COURT:  Thank you.  Please state your full name
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                8
      7CJAAMAGP          Plea
 1   for record.
 2        THE DEFENDANT:  Santo C. Maggio.
 3        THE COURT:  How far did you go in school?
 4        THE DEFENDANT:  I finished high school.
 5        THE COURT:  Are you currently being treated by a
 6   doctor or psychiatrist for any reason?
 7        THE DEFENDANT:  No.
 8        THE COURT:  Are you currently on any medications which
 9   might effect you in being alert for this proceeding?
10        THE DEFENDANT:  No.
11        THE COURT:  Are you any difficulty seeing, hearing or
12   understanding anything that I am saying?
13        THE DEFENDANT:  No.
14        THE COURT:  Have you had enough time to discuss with
15   your attorneys how you wish to plead?
16        THE DEFENDANT:  Yes.
17        THE COURT:  Are you satisfied with your attorneys?
18        THE DEFENDANT:  Yes.
19        THE COURT:  Do you understand what the government says
20   that you did?
21        THE DEFENDANT:  Yes.
22        THE COURT:  Do you understand that have you a right to
23   plead not guilty?
24        THE DEFENDANT:  Yes.
25        THE COURT:  Do you understand that you have a right to
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                9
      7CJAAMAGP          Plea
 1   trial by jury on these charges?
 2        THE DEFENDANT:  Yes.
 3        THE COURT:  Do you understand that if you are to plead
 4   not guilty and go to trial you would be presumed innocent until
                           Page 6

7CJAAMAGP.txt

5  the government proved your guilt beyond a reasonable doubt?
6      THE DEFENDANT:  Yes, I do.
7      THE COURT:  Do you understand that if you were to go
8  to trial you would have a number of important constitutional
9  rights including the right to be represented by counsel and to
10  have counsel appointed for you if you cannot afford an
11  attorney?
12      THE DEFENDANT:  Yes.
13      THE COURT:  Do you understand that at trial you cannot
14  be forced to testify against yourself?
15      THE DEFENDANT:  Yes.
16      THE COURT:  Do you understand at a trial you would
17  have the right to confront and cross-examine witnesses called
18  by the government?
19      THE DEFENDANT:  Yes.
20      THE COURT:  Do you understand that at a trial you
21  would have the right to testify yourself and to call witnesses
22  on your behalf and to compel their attendance by subpoena if
23  necessary?
24      THE DEFENDANT:  Yes.
25      THE COURT:  Do you understand that if your guilty plea
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

☐                                        10

7CJAAMAGP          Plea
1  is accepted there will be no trial of any kind and the only
2  remaining steps in your case will be a presentence report and
3  sentencing by Judge Stein?
4      THE DEFENDANT:  Yes.
5      THE COURT:  Have you discussed with your attorney the
6  role that the sentencing guidelines play in sentencing?
7      THE DEFENDANT:  Yes.
8      THE COURT:  Do you understand that the district judge
9  will retain discretion regardless of what calculations there
10  are under the guidelines?
11      THE DEFENDANT:  Yes.
12      THE COURT:  Do you understand that the calculation
13  under the guidelines will take into account a number of factors
14  including the actual conduct in which you engaged, any victims
15  of the offense, the role that you played in the offense,
16  whether or not you have accepted responsibility for your acts,
17  whether you have any criminal history or whether you have
18  engaged in any obstruction of justice; do you understand that?
            Page 7

7CJAAMAGP.txt

19          THE DEFENDANT:  Yes.
20          THE COURT:  Between now and the date of sentencing the
21    probation department will conduct an investigation and will
22    prepare a presentence report.  Your attorney, the government
23    and Judge Stein will receive copies.  Both your attorney and
24    the government will have the opportunity to object if they
25    believe anything in the report is inaccurate; do you understand
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

☐                                              11
      7CJAAMAGP          Plea
1     that?
2           THE DEFENDANT:  Yes.
3           THE COURT:  Do you understand that until the
4     presentence report is prepared neither your attorney nor the
5     government, nor Judge Stein will be able to determine precisely
6     what range of penalties will be calculated under the
7     guidelines.
8           THE DEFENDANT:  Yes.
9           THE COURT:  Do you understand than regardless of
10    calculation and the guidelines your sentence cannot exceed the
11    maximums that I advised you of earlier?
12          THE DEFENDANT:  Yes.
13          THE COURT:  Do you understand that under certain
14    circumstances both you and the government may have the right to
15    appeal the sentence imposed.
16          THE DEFENDANT:  Yes.
17          THE COURT:  Do you understand that if the sentence is
18    more severe than you expected you will be bound by your guilty
19    plea and will not be permitted to withdraw it?
20          THE DEFENDANT:  Yes.
21          THE COURT:  You understand that parole has been
22    abolished and that if you are sentenced to any term of
23    imprisonment you will be required to serve the entire term?
24          THE DEFENDANT:  Yes.
25          THE COURT:  Mr. Maggio, are you a citizen of the
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

☐                                              12
      7CJAAMAGP          Plea
1     United States?
2           THE DEFENDANT:  Yes, I am.
3           THE COURT:  Mr. Maggio, I have been handed up a plea
                         Page 8

7CJAAMAGP.txt

4    agreement from your case.  Have you had an opportunity to
5    review and go over this agreement with your attorneys?
6         THE DEFENDANT:  Yes.
7         THE COURT:  Do you understand that one of the
8    provisions in the plea agreement is that you admit the
9    forfeiture allegation in the information and that you agree to
10   forfeit to the United States a sum of money equal to two
11   billion, four hundred million dollars?
12        THE DEFENDANT:  Yes.
13        THE COURT:  That is what it says, right?
14        MR. BAROFSKY:  Yes, your Honor, that number is
15   correct.
16        Your Honor, the plea cooperation agreement also
17   provides, however, that in satisfaction of that amount there
18   are certain schedules attached to the plea agreement which the
19   government will accept in satisfaction of that judgment.
20        MR. SCHECTMAN:  We don't have quite that much, your
21   Honor.
22        THE COURT:  Okay.  I thought had I too many zeros
23   myself at first.
24        MR. SCHECTMAN:  No, you read it right.
25        THE COURT:  That represents the amount of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

☐                                    13
     7CJAAMAGP              Plea
1    proceedings obtained as a result of the offense; do you
2    understand that?
3         THE DEFENDANT:  Yes.
4         THE COURT:  You also understand that any forfeiture
5    would not be treated as satisfaction of any fine, restitution,
6    cause of imprisonment or any other penalty the Court may
7    impose?
8         THE DEFENDANT:  Yes.
9         THE COURT:  And as indicated in the agreement, there
10   is a scheduled pay of assets.  You have seen the schedule and
11   you have gone over it with your attorneys?
12        THE DEFENDANT:  Yes.
13        THE COURT:  To make sure that it's accurate?
14        THE DEFENDANT:  Yes.
15        MR. SCHECTMAN:  Judge, I might point out for the
16   record there is a Schedule B as well, which are assets that are
17   in Mrs.~Maggio's name that are being forfeited as part of the
                              Page 9

7CJAAMAGP.txt

18    plea and there is a separate agreement that need not concern
19    your Honor in this matter involving Mrs.~Maggio.
20         THE COURT:  Is that correct, Mr. Maggio, there is also
21    a Schedule B?
22         THE DEFENDANT:  Yes.
23         THE COURT:  That's Mrs.~Maggio's assets?
24         THE DEFENDANT:  Yes.
25         THE COURT:  That is also covered by the agreement that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

☐                                                              14
     7CJAAMAGP              Plea
1    you made with the government?
2         THE DEFENDANT:  Yes.
3         THE COURT:  You are also understand the agreement
4    provides that you cooperate fully with the United States
5    attorney's office?
6         THE DEFENDANT:  Yes.
7         THE COURT:  And that in exchange for that cooperation,
8    assuming that the office determines that you have made full and
9    accurate disclosures to them, the government has agreed that it
10   will submit a motion pursuant to Section 5K1.1 of the
11   sentencing guidelines in your favor?
12        THE DEFENDANT:  Yes.
13        THE COURT:  Do you understand that if for any reason
14   the government determines that it will not file such a motion
15   you will not be allowed to withdraw your plea?
16        THE DEFENDANT:  Yes.
17        THE COURT:  You understand that even if the government
18   files such a motion sentencing will still be at the sole
19   discretion of the Court?
20        THE DEFENDANT:  Yes, I did.
21        THE COURT:  Is there anything else in the agreement
22   that I might want to highlight?
23        MR. BAROFSKY:  No, your Honor.
24        THE COURT:  All right.  Other than the representations
25   in this agreement, have any promises been made to you by anyone
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

☐                                                              15
     7CJAAMAGP              Plea
1    to influence you to plead guilty?
2         THE DEFENDANT:  No.
                         Page 10

7CJAAMAGP.txt

3        THE COURT: This constitutes the sole agreement that
4    you have?
5        THE DEFENDANT: Yes.
6        THE COURT: Has anyone promised you a specific
7    sentence if you plead guilty?
8        THE DEFENDANT: No.
9        THE COURT: Has anyone made any threats to you to
10   influence you to plead guilty?
11       THE DEFENDANT: No.
12       THE COURT: Are you making this plea voluntarily of
13   your own freewill and choice?
14       THE DEFENDANT: Yes, I am.
15       THE COURT: The elements of the offense is?
16       MR. BAROFSKY: Your Honor, for Counts One defendant's
17   is charged with conspiracy. The government would be required
18   to prove each of the elements beyond a reasonable doubt.
19   First, that there is an assistance of a an agreement or
20   understanding to commit one of the objects charged in the
21   information.
22       Second, the defendant knowingly became a member of
23   that agreement or understanding.
24       And third, that one of the conspirators or
25   coconspirators or Mr. Maggio knowingly committed at least one
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

□                                          16
     7CJAAMAGP          Plea
1    overt act in furtherance of the conspiracy during its life.
2        With respect to the securities frauds counts in two
3    and three, first, the defendant in connection with the purchase
4    or sale of securities, here the notes that are described in
5    Count Two and the common stock of Revko that's referenced in
6    Count Three did one or more of the following: Employed a
7    devise, scheme or artifice to defraud or made an untrue
8    statement of a material fact or admitted to state a material
9    fact which made what was said under the circumstances
10   misleading or engaged in an act, practice or course of business
11   that operated or would operate as a fraud or deceit upon a
12   purchase of a seller for securities.
13       Second the defendant acted knowingly, willfully with
14   the intent to defraud.
15       And third, the defendant used or caused to be used any
16   means or instruments of transportation or communication in
                       Page 11

7CJAAMAGP.txt

17  interstate commerce or use of the mails in furtherance of that
18  fraudulent conduct.
19        and with respect to the Count Four wire fraud, first,
20  that there was a scheme or artifice to defraud that existence
21  the defendant must have participated in the scheme with the
22  intent to defraud misrepresentations or omissions must have
23  related to a material fact, that the scheme was executed to
24  obtain money or property.
25        And finally, that in execution of the scheme the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

☐                                    17
     7CJAAMAGP            Plea
1   defendant used or caused to be used interstate wires or that
2   such use was reasonably foreseeable to him.
3         THE COURT:  Mr. Maggio, did you hear that recitation?
4         THE DEFENDANT:  Yes.
5         THE COURT:  Did you understand that if the government
6   were to proceed to trial against you it would have the burden
7   of proving each element for each offense, that is, each count
8   beyond a reasonable doubt.
9         THE DEFENDANT:  Yes.
10        THE COURT:  Did you commit the offenses for which you
11  have been charged, Mr. Maggio?
12        THE DEFENDANT:  Yes.
13        THE COURT:  Tell me what you did.
14        MR. SCHECTMAN:  Judge, if it's acceptable to you
15  Mr. Maggio has written out a statement that I think speaks to
16  all four crimes.
17        THE COURT:  Considering the complexities here I'll
18  allow him to read and then if it's not he could fill in the
19  gaps.
20        THE DEFENDANT:  Your Honor, from the late 1990s to
21  October 2005 I was a senior executive at Revko Ink.  During
22  that period I participated with others to hide the true
23  financial health of Revko from banks, counter-parties, auditors
24  and investors.  With my knowledge and active participation
25  Revko's substantial losses were covered up as revenues padded
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

☐                                    18
     7CJAAMAGP            Plea
1   and certain operating expenses were moved off its book.  Among
                         Page 12

7CJAAMAGP.txt

2   the acts I personally engaged in the signing of loan agreements
3   referencing paragraphs 61-D and 61-P of the indictment.
4          As a result of my conduct and that of my
5   coconspirators false financial statements were issued to obtain
6   debt financing from the public including 9 percent senior
7   subordinated notes referenced in Count Two of the indictment.
8          To consummate the sale of 57 percent of Revko to a
9   group headed by Thomas H. Lee in 2004 and to obtain $800
10  million in bank financing the same year and to effect the Revko
11  initial public offering in 2005.  Moreover, with my knowledge
12  false financial statements were filed with the SEC including
13  form 10K referencing Count Four.  The mails and interstate
14  wires were used as part of the fraudulent scheme.
15         I deeply regret my conduct and the harm that it has
16  caused.
17         THE COURT:  First of all, with respect to all of the
18  activities that you've indicate you participated in it
19  knowingly?
20         THE DEFENDANT:  Yes.
21         THE COURT:  Okay.  Where did this take place.
22         THE DEFENDANT:  In New York, New York.  Manhattan, New
23  York.
24         THE COURT:  You said coconspirators, so other people
25  had agreed with you to effectuate this scheme?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

7CJAAMAGP              Plea
1          THE DEFENDANT:  Yes.
2          THE COURT:  And the intent of this scheme was to
3   defraud?
4          THE DEFENDANT:  Yes.
5          THE COURT:  Now, I know you mentioned the notes and I
6   think you mentioned the 2005 initial offering that was
7   addressed to Count Three of the information, that is, whether
8   or not you had a scheme to defraud people based on the value of
9   the stock?
10         THE DEFENDANT:  Correct, your Honor.
11         THE COURT:  Mr. Maggio?
12         THE DEFENDANT:  Yes.
13         THE COURT:  That did involve false statements?
14         THE DEFENDANT:  Yes.
15         THE COURT:  False filings that you've indicated?

Page 13

7CJAAMAGP.txt

16          THE DEFENDANT:  Yes.
17          THE COURT:  Now, you said you used the mails which
18  interstate -- I mean, you used the mails, a phone?  How did you
19  use --
20          THE DEFENDANT:  Yes, used regular mail.  We used
21  Express Mail.  We used e-mail all to effect the scheme.
22          THE COURT:  You submitted false statements in the
23  mail?
24          THE DEFENDANT:  False statements, loan agreements as
25  referenced here, yes.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

☐                                                    20

7CJAAMAGP          Plea
1          THE COURT:  Okay.  Any --
2          MR. BAROFSKY:  Your Honor, I'll just represent to the
3  Court that with respect to Count Four, the wire transmission
4  did in fact originate in the Southern District of New York in
5  Manhattan and was wired outside of the Southern District to
6  Virginia.
7          THE COURT:  Anything else?
8          MR. SCHECTMAN:  Nothing, your Honor.
9          MR. BAROFSKY:  No, your Honor.
10          THE COURT:  I am depending on you here.  Does any
11  either counsel know of any reason why I should not recommend
12  that this plea not be accepted?
13          MR. BAROFSKY:  No, your Honor.
14          MR. SCHECTMAN:  No, your Honor.
15          THE COURT:  Based on defendant's allocution and the
16  recommendations by the government I find that the defendant
17  understands the nature, the charges and consequences of his
18  guilty plea.  I also find that the plea is voluntary and that
19  there is a factual basis for the plea.  I, therefore, recommend
20  that the plea be accepted and direct that a presentence report
21  be reaped.
22          Sentencing will take place before Judge Stein on.
23          MR. BAROFSKY:  May 9, at 2 p.m.
24          THE COURT:  Is there anything else that needs to be
25  addressed today.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

☐                                                    21

7CJAAMAGP          Plea

                        Page 14

7CJAAMAGP.txt

1    MR. BAROVSKY:  Not from the government, your Honor.
2    MR. SCHECTMAN:  Not from the offense.
3    THE COURT:  We are adjourned.
4              o 0 o
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

☐

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

ARCH INSURANCE COMPANY,                    )
                                           )
                    Plaintiff,             )        Index No.: 08/600029
                                           )
v.                                         )
                                           )
JOHN D. AGOGLIA, PHILLIP R.                )        **AFFIDAVIT OF SERVICE**
BENNETT, LEO R. BREITMAN, EDWIN            )
L. COX, SUKHMEET DHILLON,                  )
THOMAS H. DITTMER, NATHAN                  )
GANTCHER, STEPHEN GRADY, TONE              )
GRANT, THOMAS HACKL, DAVID V.              )
HARKINS, SCOTT L. JAECKEL,                 )
DENNIS A. KLEJNA, THOMAS H. LEE,           )
ERIC G. LIPOFF, SANTO C. MAGGIO,           )
PETER MCCARTHY, JOSEPH                     )
MURPHY, FRANK MUTTERER,                    )
RICHARD N. OUTRIDGE, RONALD L.             )
O'KELLEY, SCOTT A. SCHOEN,                 )
WILLIAM M. SEXTON, GERALD                  )
SHERER, PHILIP SILVERMAN and               )
ROBERT C. TROSTEN                          )
                                           )
                    Defendants.            )
                                           )

---

DISTRICT OF COLUMBIA      :
                          :   SS.:
                          :

**MARC E. RINDNER,** being duly sworn, deposes and says:

1.    I am a partner at Wiley Rein, LLP, resident in its Washington, D.C. office, and

am counsel to plaintiff Arch Insurance Company in the above-captioned litigation.

1

2.     I caused a copy of the Summons and Complaint and Amended Summons and

Amended Complaint of plaintiff Arch Insurance Company to be delivered to the following

defendants, by and through their counsel, as follows:

| Date and Delivery Method | Defendant | Counsel |
|---|---|---|
| February 25, 2008<br>Overnight Delivery | William M. Sexton<br>Gerald Sherer | Ivan Kline<br>Friedman & Wittenstein, P.C.<br>600 Lexington Avenue<br>New York, NY 10022<br>(212) 750-8700 |
| February 25, 2008<br>Overnight Delivery | Thomas H. Dittmer | Thomas C. Wolford<br>Neal Gerber & Eisenberg, LLP<br>2 North LaSalle Street<br>Chicago, IL 60602<br>(312) 269-5675 |
| February 25, 2008<br>Overnight Delivery | John D. Agoglia<br>Peter J. McCarthy | William Flemming<br>Gage Spencer & Fleming, LLP<br>410 Park Avenue<br>New York, NY 10022<br>(212) 768-4900 |
| February 25, 2008<br>Overnight Delivery | Santo Maggio | Scott E. Hershman<br>Hunton & Williams<br>200 Park Avenue, 43rd Floor<br>New York, NY 10166<br>(212) 309-1053 |
| February 25, 2008<br>Overnight Delivery | Tone Grant | William A. Schreiner, Jr., Esq.<br>Zuckerman Spaeder LLP<br>1800 M Street, NW, Suite 1000<br>Washington, D.C. 20036<br>(202) 778-1858 |
| February 25, 2008<br>Overnight Delivery | Phillip R. Bennett | Jeffrey To. Golenbock<br>Golenbock Eisman Assor Bell & Pesko LLP<br>437 Madison Avenue<br>New York, NY 10022<br>(212) 907-7373 |

| February 25, 2008 Overnight Delivery | Robert C. Trosten | Barbara Moses Morvillo, Abramowitz, Grand, Iason & Silberberg, PC 565 Fifth Avenue New York, NY 10017 (212) 880-9540 |
|---|---|---|
| February 28, 2008 Overnight Delivery<br><br>February 29, 2008 Overnight Delivery | Joseph Murphy | John R. Jerome Saul Ewing, LLP 245 Park Avenue 24th Floor New York, NY 10167<br><br>Timothy E. Hoeffner Saul Ewing 1500 Market Street Philadelphia, PA 19102 |
| February 28, 2008 Overnight Delivery | Frank Mutterer | Janet Costello Gibbons, P.C. One Gateway Center Newark, NJ 07102 973-596-4825 |
| February 28, 2008 Overnight Delivery | Leo R. Breitman Nathan Gantcher David V. Harkins Scott L. Jaekel Thomas H. Lee Ronald L. O'Kelley Scott A. Schoen | Paul A. Ferrillo Weil Gotshal & Manges LLP 767 Fifth Avenue New York, NY 10153 (212) 310-8372 |
| February 28, 2008 Overnight Delivery | Stephen Grady | Lawrence J. Kotler Duane Morris & Heckscher, LLP 30 South 17th Street Philadelphia, PA 19103 (215) 979-1514 |
| February 28, 2008 Overnight Delivery | Dennis Klejna | Helen Kim Katten Muchin Rosenman, LLP 2029 Century Park East, Suite 2600 Los Angeles, CA 90067 (310) 788-4525 |

| | | |
|---|---|---|
| February 28, 2008<br>Overnight Delivery | Philip Silverman | Richard Cashman<br>Heller Ehrman, LLP<br>Times Square Tower<br>7 Times Square<br>New York, NY 10036<br>(212) 847-8796 |

      3.     I received confirmation that the following defendants, by and through their

counsel, did waive formal service of process under C.P.L.R. 308 and accept service of the

aforementioned filings, as follows:

| Date of Acknowledgement | Defendant | Counsel |
|---|---|---|
| February 28, 2008 | William M. Sexton<br>Gerald Sherer | Ivan Kline<br>Friedman & Wittenstein, P.C.<br>600 Lexington Avenue<br>New York, NY 10022<br>(212) 750-8700 |
| March 7, 2008 | Thomas H. Dittmer | Thomas C. Wolford<br>Neal Gerber & Eisenberg,<br>LLP<br>2 North LaSalle Street<br>Chicago, IL 60602<br>(312) 269-5675 |
| February 29, 2008 | John D. Agoglia<br>Peter J. McCarthy | William Flemming<br>Gage Spencer & Fleming,<br>LLP<br>410 Park Avenue<br>New York, NY 10022<br>(212) 768-4900 |
| March 10, 2008 | Santo Maggio | Scott E. Hershman<br>Hunton & Williams<br>200 Park Avenue, 43rd Floor<br>New York, NY 10166<br>(212) 309-1053 |
| March 6, 2008 | Tone Grant | William A. Schreiner, Jr., Esq.<br>Zuckerman Spaeder LLP<br>1800 M Street, NW, Suite<br>1000<br>Washington, D.C. 20036<br>(202) 778-1858 |

| Undated | Phillip R. Bennett | Jeffrey To. Golenbock<br>Golenbock Eisman Assor Bell<br>& Pesko LLP<br>437 Madison Avenue<br>New York, NY  10022<br>(212) 907-7373 |
|---|---|---|
| March 4, 2008 | Robert C. Trosten | Barbara Moses<br>Morvillo, Abramowitz, Grand,<br>Iason  & Silberberg, PC<br>565 Fifth Avenue<br>New York, NY  10017<br>(212) 880-9540 |
| March 7, 2008 | Joseph Murphy | Timothy E. Hoeffner<br>Saul Ewing<br>1500 Market Street<br>Philadelphia, PA 19102 |
| March 14, 2008 | Frank Mutterer | Janet Costello<br>Gibbons, P.C.<br>One Gateway Center<br>Newark, NJ  07102<br>973-596-4825 |
| March 18, 2008 | Leo R. Breitman<br>Nathan Gantcher<br>David V. Harkins<br>Scott L. Jaekel<br>Thomas H. Lee<br>Ronald L. O'Kelley<br>Scott A. Schoen | Michael Walsh<br>Weil Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY  10153<br>(212) 310-8372 |
| March 3, 2008 | Stephen Grady | Lawrence J. Kotler<br>Duane Morris & Heckscher,<br>LLP<br>30 South 17th Street<br>Philadelphia, PA  19103<br>(215) 979-1514 |

| February 29, 2008 | Dennis Klejna | Helen Kim<br>Katten Muchin Rosenman, LLP<br>2029 Century Park East, Suite 2600<br>Los Angeles, CA  90067<br>(310) 788-4525 |
| March 3, 2008 | Philip Silverman | Richard Cashman<br>Heller Ehrman, LLP<br>Times Square Tower<br>7 Times Square<br>New York, NY  10036<br>(212) 847-8796 |

True and correct copies of the above-referenced acknowledgement letters are annexed as Exhibits 1 through 13.

4.    On February 25, 2008, I caused a copy of the Summons and Complaint and Amended Summons and Amended Complaint of plaintiff Arch Insurance Company to be delivered via overnight delivery to Richard N. Outridge at 24 Pennbrook Drive, Lincoln University, Pennsylvania, 19352. A true and correct copy of the letter is attached as Exhibit 14. I received confirmation by a countersigned letter that Mr. Outridge did waive formal service of process under C.P.L.R. 308 and accept service of the aforementioned filings. A true and correct copy of the countersigned acknowledgement letter is attached as Exhibit 15.

5.    Further affiant sayeth not.

_____
Marc E. Rindner

Sworn to and subscribed before me
on this the 25 day of _March_____, 2008.

_____
Notary Public

My Commission expires 6-14-10

6

# Exhibit 1



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

February 28, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA E-MAIL AND U.S. MAIL**

Ivan Kline, Esq.
Friedman & Wittenstein, P.C.
600 Lexington Avenue
New York, NY 10022

Re:    *Arch Insurance Company v. Agoglia, et al.*
       Index No. 08/600029

Dear Ivan:

I write to confirm that your clients, William M. Sexton and Gerald Sherer, have agreed to waive formal service of process under CPLR 308, and have authorized you to accept service on their behalf of the Summons, Complaint, Amended Summons and First Amended Complaint in the referenced action, which were sent to you by overnight delivery earlier this week. In addition, Arch has agreed to allow your clients until April 28, 2008 to respond to the First Amended Complaint, in return for their agreement not to take any action before April 28, 2008 to seek payment of defense costs by Arch, whether by way of injunction or otherwise.

Please confirm your clients' agreement to these terms and acknowledge receipt of the summonses and pleadings by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Marc E. Rindner

ACKNOWLEDGED & RECEIVED

By: _____ 2/28/08
                                  **Date**

cc:    Daniel C. Green, Esq. (via e-mail)

# Exhibit 2



**Wiley Rein LLP**

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX   202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX   703.905.2820

www.wileyrein.com

February 28, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA E-MAIL AND U.S. MAIL**

Thomas C. Wolford
Neal Gerber & Eisenberg, LLP
2 North LaSalle Street
Chicago, IL  60602

Re:    *Arch Insurance Company v. Agoglia, et al.*
       Index No. 08/600029

Dear Tom:

I write to confirm that your client, Thomas H. Dittmer, has agreed to waive formal
service of process under CPLR 308, and has authorized you to accept service on his
behalf of the Summons, Complaint, Amended Summons and First Amended
Complaint in the referenced action, which were sent to you by overnight delivery
earlier this week.  In addition, Arch has agreed to allow your client until April 28,
2008 to respond to the First Amended Complaint, in return for his agreement not to
take any action before April 28, 2008 to seek payment of defense costs by Arch,
whether by way of injunction or otherwise.

Please confirm your client's agreement to these terms and acknowledge receipt of
the summonses and pleadings by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not
hesitate to contact me.

Sincerely,

Marc E. Rindner

**ACKNOWLEDGED & RECEIVED**

By: _Thomas C. Wolford_  3/7/08
                          **Date**

cc:    Daniel C. Green, Esq. (via e-mail)

# Exhibit 3

MAR 0 5 REC'D



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX   202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX   703.905.2820

www.wileyrein.com

February 28, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA E-MAIL AND U.S. MAIL**

William Flemming, Esq.
Gage Spencer & Flemming, LLP
410 Park Avenue
New York, NY  10022

Re:    *Arch Insurance Company v. Agoglia, et al.*
       Index No. 08/600029

Dear Will:

I write to confirm that your clients, John D. Agoglia and Peter J. McCarthy, have agreed to waive formal service of process under CPLR 308, and have authorized you to accept service on their behalf of the Summons, Complaint, Amended Summons and First Amended Complaint in the referenced action, which were sent to you by overnight delivery earlier this week.  In addition, Arch has agreed to allow your clients until April 28, 2008 to respond to the First Amended Complaint, in return for their agreement not to take any action before April 28, 2008 to seek payment of defense costs by Arch, whether by way of injunction or otherwise.

Please confirm your clients' agreement to these terms and acknowledge receipt of the summonses and pleadings by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Marc E. Rindner

ACKNOWLEDGED & RECEIVED

By: _____   2/29/08
                                   **Date**

cc:    Daniel C. Green, Esq. (via e-mail)

# Exhibit 4



1776 K STREET NW
WASHINGTON, DC 20006
PHONE   202.719.7000
FAX   202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE   703.905.2800
FAX   703.905.2820

www.wileyrein.com

February 28, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA E-MAIL AND U.S. MAIL**

Scott E. Hershman, Esq.
Hunton & Williams, LLP
200 Park Avenue, 43rd Floor
New York, NY  10166

Re:   *Arch Insurance Company v. Agoglia, et al.*
      Index No. 08/600029

Dear Scott:

I write to confirm that your client, Santo C. Maggio, has agreed to waive formal
service of process under CPLR 308, and has authorized you to accept service on his
behalf of the Summons, Complaint, Amended Summons and First Amended
Complaint in the referenced action, which were sent to you by overnight delivery
earlier this week.  In addition, Arch has agreed to allow your client until April 28,
2008 to respond to the First Amended Complaint, in return for his agreement not to
take any action before April 28, 2008 to seek payment of defense costs by Arch,
whether by way of injunction or otherwise.

Please confirm your client's agreement to these terms and acknowledge receipt of
the summonses and pleadings by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not
hesitate to contact me.

Sincerely,

Marc E. Rindner

ACKNOWLEDGED & RECEIVED

By: _____  3/11/08
                              **Date**

cc:      Daniel C. Green, Esq. (via e-mail)

# Exhibit 5



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

February 28, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA E-MAIL AND U.S. MAIL**

William A. Schreiner, Jr., Esq.
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, D.C.  20036

Re:    *Arch Insurance Company v. Agoglia, et al.*
        Index No. 08/600029

Dear Bill:

I write to confirm that your client, Tone Grant, has agreed to waive formal service of process under CPLR 308, and has authorized you to accept service on his behalf of the Summons, Complaint, Amended Summons and First Amended Complaint in the referenced action, which were sent to you by overnight delivery earlier this week.  In addition, Arch has agreed to allow your client until April 28, 2008 to respond to the First Amended Complaint, in return for his agreement not to take any action before April 28, 2008 to seek payment of defense costs by Arch, whether by way of injunction or otherwise.

Please confirm your client's agreement to these terms and acknowledge receipt of the summonses and pleadings by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Marc E. Rindner

**ACKNOWLEDGED & RECEIVED**

By: _____  3/6/08
                                    **Date**

cc:    Daniel C. Green, Esq. (via e-mail)

# Exhibit 6



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX    202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX    703.905.2820

www.wileyrein.com

February 25, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA OVERNIGHT DELIVERY**

Jeffrey T. Golenbock, Esq.
Golenbock Eiseman Assor Bell
    & Peskoe, LLP
437 Madison Avenue
New York, NY  10002

Re:    *Arch Insurance Company v. Agoglia, et al.*
        Index No. 08/600029

Dear Jeff:

Based on our communications last week, I understand that your client, Phillip R. Bennett, waives service of process under CPLR 308, and authorizes you to accept service of the enclosed Complaint, Summons, First Amended Complaint and Amended Summons on his behalf.   Mr. Bennett's cooperation in this regard is greatly appreciated.  Arch recognizes that he reserves all other rights and defenses.

Please confirm Mr. Bennett's waiver of formal service and your receipt of the enclosed documents by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Marc E. Rindner

**ACKNOWLEDGED & RECEIVED**

By: _____

                                    **Date**

Enclosures

cc:    Daniel C. Green, Esq. (via e-mail and w/o enclosures)

# Exhibit 7



**1776 K STREET NW**
**WASHINGTON, DC 20006**
**PHONE** 202.719.7000
**FAX** 202.719.7049

**7925 JONES BRANCH DRIVE**
**McLEAN, VA 22102**
**PHONE** 703.905.2800
**FAX** 703.905.2820

**www.wileyrein.com**

February 28, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA E-MAIL AND U.S. MAIL**

Barbara Moses, Esq.
Morvillo, Abramowitz, Grand,
  Iason & Silberberg, P.C.
565 Fifth Avenue
New York, NY 10017

Re:   *Arch Insurance Company v. Agoglia, et al.*
       Index No. 08/600029

Dear Barbara:

I write to confirm that your client, Robert C. Trosten, has agreed to waive formal service of process under CPLR 308, and has authorized you to accept service on his behalf of the Summons, Complaint, Amended Summons and First Amended Complaint in the referenced action, which were sent to you by overnight delivery earlier this week. In addition, Arch has agreed to allow your client until April 28, 2008 to respond to the First Amended Complaint, in return for his agreement not to take any action before April 28, 2008 to seek payment of defense costs by Arch, whether by way of injunction or otherwise.

Please confirm your client's agreement to these terms and acknowledge receipt of the summonses and pleadings by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Marc E. Rindner

**ACKNOWLEDGED & RECEIVED**

By: _____

Date 3/4/08

cc:    Daniel C. Green, Esq. (via e-mail)

# Exhibit 8



**Wiley Rein LLP**

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

February 29, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA OVERNIGHT DELIVERY**

Timothy E. Hoeffner
Saul Ewing LLP
1500 Market Street, 38th Flr.
Philadelphia, PA 19102

Re:     *Arch Insurance Company v. Agoglia, et al.*
        Index No. 08/600029

Dear Mr. Hoeffner:

I write to request that your client, ~~Edwin Cox~~ Joseph Murphy, waive formal service of process
under CPLR 308, and authorize you to accept service on his behalf of the Summons,
Complaint, Amended Summons and First Amended Complaint in the referenced
action, which are enclosed.  In exchange, Arch will agree to allow your client until
April 28, 2008 to respond to the First Amended Complaint, provided that he further
agrees not to take any action before April 28, 2008 to seek payment of defense costs
by Arch, whether by way of injunction or otherwise.

If acceptable, please confirm your clients' agreement to these terms and
acknowledge receipt of the summonses and pleadings by returning to me a
countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not
hesitate to contact me.

Sincerely,

Marc E. Rindner

**ACKNOWLEDGED & RECEIVED**

By: _Timothy E. Hill_  3/7/08
                          **Date**

Enclosures

cc:     Daniel C. Green, Esq. (via e-mail and w/o encls.)

# Exhibit 9



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX   202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX   703.905.2820

www.wileyrein.com

February 28, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA E-MAIL AND U.S. MAIL**

Janet Costello, Esq.
Gibbons P.C.
One Gateway Center
Newark, NJ  07102

Re:    *Arch Insurance Company v. Agoglia, et al.*
       Index No. 08/600029

Dear Janet:

I write to confirm that your client, Frank Mutterer, has agreed to waive formal service of process under CPLR 308, and has authorized you to accept service on his behalf of the Summons, Complaint, Amended Summons and First Amended Complaint in the referenced action, which were sent to you by overnight delivery earlier this week.  In addition, Arch has agreed to allow your client until April 28, 2008 to respond to the First Amended Complaint, in return for his agreement not to take any action before April 28, 2008 to seek payment of defense costs by Arch, whether by way of injunction or otherwise.

Please confirm your client's agreement to these terms and acknowledge receipt of the summonses and pleadings by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Marc E. Rindner

ACKNOWLEDGED & RECEIVED

By: _____  3/14/08
                              Date

cc:    Daniel C. Green, Esq. (via e-mail)

# Exhibit 10



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

February 28, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA OVERNIGHT DELIVERY**

Paul A. Ferrillo
Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153

Re:  *Arch Insurance Company v. Agoglia, et al.*
Index No. 08/600029

Dear Paul:

I write to confirm that your clients – Leo Breitman, Nathan Gantcher, David
Harkins, Scott Jaekel, Thomas Lee, Ronald O'Kelley and Scott Schoen – have
agreed to waive formal service of process under CPLR 308, and have authorized
you to accept service on their behalf of the Summons, Complaint, Amended
Summons and First Amended Complaint in the referenced action, which are
enclosed.  In addition, Arch has agreed to allow your clients until April 28, 2008 to
respond to the First Amended Complaint, in return for their agreement not to take
any action before April 28, 2008 to seek payment of defense costs by Arch, whether
by way of injunction or otherwise.

Please confirm your clients' agreement to these terms and acknowledge receipt of
the summonses and pleadings by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not
hesitate to contact me.

Sincerely,

Marc E. Rindner

ACKNOWLEDGED & RECEIVED

By: _____

Date
3.18.08

Enclosures

cc:  Daniel C. Green, Esq. (via e-mail and w/o encls.)

# Exhibit 11



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX   202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX   703.905.2820

www.wileyrein.com

February 28, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA OVERNIGHT DELIVERY**

Lawrence J. Kotler, Esq.
Duane Morris & Heckscher, LLP
30 South 17th Street
Philadelphia, PA  19103

Re:    *Arch Insurance Company v. Agoglia, et al.*
       Index No. 08/600029

Dear Larry:

I write to confirm that your client, Stephen Grady, has agreed to waive formal service of process under CPLR 308, and has authorized you to accept service on his behalf of the Summons, Complaint, Amended Summons and First Amended Complaint in the referenced action, which are enclosed.  In addition, Arch has agreed to allow your client until April 28, 2008 to respond to the First Amended Complaint, in return for his agreement not to take any action before April 28, 2008 to seek payment of defense costs by Arch, whether by way of injunction or otherwise.

Please confirm your clients' agreement to these terms and acknowledge receipt of the summonses and pleadings by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Marc E. Rindner

**ACKNOWLEDGED & RECEIVED**

By _____  -3/3/08
                                **Date**

Enclosures

cc:    Daniel C. Green, Esq. (via e-mail and w/o encls.)

# Exhibit 12



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

February 28, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA OVERNIGHT DELIVERY**

Helen Kim, Esq.
Katten Muchin Rosenman, LLP
2029 Century Park East, Suite 2600
Los Angeles, CA  90067

Re:  *Arch Insurance Company v. Agoglia, et al.*
       Index No. 08/600029

Dear Helen:

I write to confirm that your client, Dennis Klejna, has agreed to waive formal service of process under CPLR 308, and has authorized you to accept service on his behalf of the Summons, Complaint, Amended Summons and First Amended Complaint in the referenced action, which are enclosed.  In addition, Arch has agreed to allow your client until April 28, 2008 to respond to the First Amended Complaint, in return for his agreement not to take any action before April 28, 2008 to seek payment of defense costs by Arch, whether by way of injunction or otherwise.

Please confirm your clients' agreement to these terms and acknowledge receipt of the summonses and pleadings by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Marc E. Rindner

ACKNOWLEDGED & RECEIVED

By: _____
                                              **Date**

Enclosures

cc:    Daniel C. Green, Esq. (via e-mail and w/o encls.)

# Exhibit 13



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX   202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX   703.905.2820

www.wileyrein.com

February 28, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA OVERNIGHT DELIVERY**

Richard Cashman, Esq.
Heller Ehrman, LLP
Times Square Tower
7 Times Square
New York, NY  10036

Re:     *Arch Insurance Company v. Agoglia, et al.*
        Index No. 08/600029

Dear Richard:

I write to confirm that your client, Philip Silverman, has agreed to waive formal service of process under CPLR 308, and has authorized you to accept service on his behalf of the Summons, Complaint, Amended Summons and First Amended Complaint in the referenced action, which are enclosed.  In addition, Arch has agreed to allow your client until April 28, 2008 to respond to the First Amended Complaint, in return for his agreement not to take any action before April 28, 2008 to seek payment of defense costs by Arch, whether by way of injunction or otherwise.

Please confirm your clients' agreement to these terms and acknowledge receipt of the summonses and pleadings by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Marc E. Rindner

**ACKNOWLEDGED & RECEIVED**

By: _Richard Cashman_   3/3/08
                                    **Date**

Enclosures

cc:    Daniel C. Green, Esq. (via e-mail and w/o encls.)

# Exhibit 14



**Wiley Rein LLP**

1776 K STREET NW
WASHINGTON, DC 20006
PHONE 202.719.7000
FAX 202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE 703.905.2800
FAX 703.905.2820

www.wileyrein.com

February 25, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA OVERNIGHT DELIVERY**

Richard N. Outridge
24 Pennbrook Dr.
Lincoln University, PA 19352

Re:    *Arch Insurance Company v. Agoglia, et al.*
       Index No. 08/600029

Dear Mr. Outridge:

Based on my communications last week with your counsel, Claire Gutekunst, I understand that you have agreed to waive formal service process under CPLR 308 and to accept service of the enclosed Complaint, Summons, First Amended Complaint and Amended Summons by overnight delivery. Your cooperation in this regard is greatly appreciated. Arch recognizes that you reserve all other rights and defenses.

Please confirm your waiver of formal service and receipt of the enclosed documents by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Marc E. Rindner

**ACKNOWLEDGED & RECEIVED**

By: _____
                              **Date**

Enclosures

cc:    Claire P. Gutekunst, Esq. (via overnight delivery w/enclosures)
       Daniel C. Green, Esq. (via e-mail and w/o enclosures)

# Exhibit 15



**Wiley Rein**
LLP

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

February 28, 2008

Marc E. Rindner
202.719.7486
mrindner@wileyrein.com

**VIA OVERNIGHT DELIVERY**

Richard N. Outridge
24 Pennbrook Dr.
Lincoln University, PA  19352

Re:    *Arch Insurance Company v. Agoglia, et al.*
       Index No. 08/600029

Dear Mr. Outridge:

Based on my communications with Claire Gutenkust, I write to confirm that you
have agreed to waive formal service of process under CPLR 308, and have agreed
to accept service by overnight delivery of the Summons, Complaint, Amended
Summons and First Amended Complaint in the referenced action, which were sent
to you and Ms. Gutenkust earlier this week.  In addition, Arch has agreed to allow
you until April 28, 2008 to respond to the First Amended Complaint, in return for
your agreement not to take any action before April 28, 2008 to seek payment of
defense costs by Arch, whether by way of injunction or otherwise.

Please confirm your agreement to these terms and acknowledge receipt of the
summonses and pleadings by returning to me a countersigned copy of this letter.

If you have any questions, or would like to discuss this matter further, please do not
hesitate to contact me.

Sincerely,

Marc E. Rindner

**ACKNOWLEDGED & RECEIVED**

By: _____

Date

cc:    Daniel C. Green, Esq. (via e-mail)
       Claire Gutenkust, Esq. (via e-mail)

UCS-840(REV 1/2000)

## REQUEST FOR JUDICIAL INTERVENTION

| SUPREME | NEW YORK | 08/600029 | 1/4/08 |
|---|---|---|---|
| COURT | COUNTY | INDEX NO. | DATE PURCHASED |

For Clerk Only

MAR 2 9 2008

IAS entry date

Judge Assigned

RJI Date

PLAINTIFF(S):
ARCH INSURANCE COMPANY

003802

DEFENDANT(S):
JOHN D. AGOGLIA, PHILLIP R. BENNETT, LEO R. BREITMAN
EDWIN L. COX, SUKHMEET DHILLON, THOMAS H. DITTMER
NATHAN GANTCHER, STEPHEN GRADY, TONE GRANT, THOMAS HACKL
DAVID V. HARKINS, SCOTT L. JAECKEL, DENNIS A. KLEJNA,
THOMAS H. LEE, ERIC G. LIPOFF, SANTO C. MAGGIO, PETER McCARTHY
JOSEPH MURPHY, FRANK MUTTERER, RICHARD N. OUTRIDGE
RONALD L. O'KELLEY, SCOTT A. SCHOEN, WILLIAM M. SEXTON
GERALD SHERER, PHILIP SILVERMAN AND ROBERT C. TROSTEN

Date issue joined: ___NA___    Bill of particulars served (Y/N): [ ]Yes    [x]No

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**NATURE OF JUDICIAL INTERVENTION** (check **ONE** box only **AND** enter information)

[ ] Request for preliminary conference

[ ] Note of issue and/or certificate of readiness

[X] Notice of motion (return date: 4/8/08 )
    Relief sought __Admission Pro Hac Vice__

[ ] Order to show cause
    (clerk enter return date:_____
    Relief sought _____

[ ] Other ex parte application (specify:

[ ] Notice of petition (return date:_____
    Relief sought _____

[ ] Notice of medical or dental malpractice
    action (specify:_____)

[ ] Statement of net worth

[ ] Writ of habeas corpus

[ ] Other (specify: _____)

_____

**NATURE OF ACTION OR PROCEEDING** (Check **ONE** box only)

**MATRIMONIAL**
[ ] Contested                    -CM
[ ] Uncontested                  -UM

**COMMERCIAL**
[ ] Contract                     -CONT
[ ] Corporate                    -CORP
[X] Insurance (where insurer is a
    party, except arbitration)   -INS
[ ] UCC (including sales, negotiable
    instruments)                 -UCC
[ ] *Other Commercial            -OC

**REAL PROPERTY**
[ ] Tax Certiorari               -TAX
[ ] Foreclosure                  -FOR
[ ] Condemnation                 -COND
[ ] Landlord/Tenant              -LT
[ ] *Other Real Property         -ORP

**OTHER MATTERS**
[ ] *_____                 -OTH

**Malpractice**
[ ] Medical/Podiatric            -MM
[ ] Dental                       -DM
[ ] *Other Professional          -OPM

[ ] Motor Vehicle                -MV
[ ] *Products Liability          -PL

[ ] Environmental                -EN
[ ] Asbestos                     -ASB
[ ] Breast Implant               -BI
[ ] *Other Negligence            -OTN

[ ] *Other Tort (including
    intentional)                 -OT

**SPECIAL PROCEEDINGS**
[ ] Art. 75 (Arbitration)        -ART75
[ ] Art. 77 (Trusts)             -ART77
[ ] Art. 78                      -ART78
[ ] Election Law                 -ELEC
[ ] Guardianship (MHL Art. 81)   -GUARD81
[ ] *Other Mental Hygiene        -MHYG
[ ] *Other Special Proceeding    -OSP

**TORTS**

**Check "YES" or "NO" for each of the following questions:**

Is this action/proceeding against a

| YES | NO | | YES | NO | |
|---|---|---|---|---|---|
| [ ] | [X] | Municipality: (Specify_____) | [ ] | [x] | Public Authority: (Specify_____) |

YES   NO
[x]   [ ]  Does this action/proceeding seek equitable relief?
[ ]   [x]  Does this action/proceeding seek recovery for personal injury?
[ ]   [X]  Does this action/proceeding seek recovery for property damage?

**Pre-Note Time Frames:**
**(This applies to all cases except contested matrimonials and tax certiorari cases)**

Estimated time period for case to be ready for trial (from filing of RJI to filing of Note of Issue):

☐ Expedited: 0-8 months      ☒ Standard: 9-12 months      ☐ Complex: 13-15 months

**Contested Matrimonial Cases Only:** (Check and give date)

Has summons been served?      ☐ No      ☐ Yes, Date_____

Was a Notice of No Necessity filed?   ☐ No    ☐ Yes, Date_____

**ATTORNEY(S) FOR PLAINTIFF(S):**

| Self Rep.* | Name | Address | Phone # |
|---|---|---|---|
| ☐ | See Rider | | |
| ☐ | | | |

**ATTORNEY(S) FOR DEFENDANT(S):**

| Self Rep.* | Name | Address | Phone # |
|---|---|---|---|
| ☐ | See Rider | | |
| ☐ | | | |

*Self Represented: parties representing themselves, without an attorney, should check the "Self Rep." box and enter their name, address, and phone # in the space provided above for attorneys.

**INSURANCE CARRIERS:**

None

**RELATED CASES: (IF NONE, write "NONE" below)**

| Title | Index # | Court | Nature of Relationship |
|---|---|---|---|
| Arch Insurance Co. v. Bennett, et al. | 06/600805 | Supreme New York | earlier action seeking declaring judgment |

I AFFIRM UNDER PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.

Dated: March 12 , 2008

_____
(SIGNATURE)

John H. Eickemeyer for Vedder Price P.C.
(PRINT OR TYPE NAME)

Plaintiff Arch Insurance Company
ATTORNEY FOR

**ATTACH RIDER SHEET IF NECESSARY TO PROVIDE REQUIRED INFORMATION**

\forms\rji2000.wpd

John H. Eickemeyer
Daniel C. Green
Vedder Price, P.C.
1633 Broadway, Floor 47
New York, NY 10019
212-407-7700

*Attorneys for Plaintiff Arch Insurance Company*

William Flemming
Gage Spencer & Fleming, LLP
410 Park Avenue
New York, NY 10022
(212) 768-4900

*Attorneys for Defendants John D. Agoglia and Peter J. McCarthy*

Jeffrey T. Golenbock
Golenbock Eisman Assor Bell & Pesko LLP
437 Madison Avenue
New York, NY 10022
(212) 907-7373

*Attorneys for Defendant Phillip R. Bennett*

Paul A. Ferrillo
Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8372

*Attorneys for Defendants Leo R. Breitman, Nathan Gantcher, David V. Harkins,
Scott L. Jaekel, Thomas H.Lee, Ronald L. O'Kelley, and Scott A. Schoen*

Brian O'Connor
Willkie Farr & Gallagher, LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8251

*Attorneys for Defendant Edwin Cox*

Neil A. Goteiner
Farella, Braun & Martel
235 Montgomery Street, 30th Floor
San Francisco, CA 94104
(415) 954-4485

*Attorneys for Defendants Sukhmeet Dillon and Eric Lipoff*

---

Thomas C. Wolford
Neal Gerber & Eisenberg, LLP
2 North LaSalle Street
Chicago, IL 60602
(312) 269-5675

*Attorneys for Defendant Thomas H. Dittmer*

---

Lawrence J. Kotler
Duane Morris & Heckscher, LLP
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1514

*Attorneys for Defendant Stephen Grady*

---

William A. Schreiner, Jr., Esq.
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, D.C. 20036
(202) 778-1858

*Attorneys for Defendant Tone Grant*

---

Helen Kim
Katten Muchin Rosenman, LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
(310) 788-4525

*Attorneys for Defendant Dennis Klejna*

Scott E. Hershman
Hunton & Williams
200 Park Avenue, 43rd Floor
New York, NY  10166
(212) 309-1053

*Attorneys for Defendant Santo C. Maggio*

John R. Jerome
Saul Ewing, LLP
245 Park Avenue
24th Floor
New York, NY  10167

*Attorneys for Defendant Joseph Murphy*

Janet Costello
Gibbons, P.C.
One Gateway Center
Newark, NJ  07102
973-596-4825

*Attorneys for Defendant Frank Mutterer*

Claire P. Gutekunst
Proskauer Rose, LLP
1585 Broadway
New York, NY  10036
(212) 969-3421

*Attorneys for Defendant Richard N. Outridge*

Ivan Kline
Friedman & Wittenstein, P.C.
600 Lexington Avenue
New York, NY  10022
(212) 750-8700

*Attorneys for Defendants William M. Sexton and Gerald Sherer*

Richard Cashman
Heller Ehrman, LLP
Times Square Tower
7 Times Square
New York, NY  10036
(212) 847-8796

*Attorneys for Defendant Philip Silverman*

Barbara Moses
Morvillo, Abramowitz, Grand, Iason  & Silberberg, PC
565 Fifth Avenue
New York, NY  10017
(212) 880-9540

*Attorneys for Defendant Robert C. Trosten*

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                         ) ss.:
COUNTY OF NEW YORK  )

FRANCINE TORMEY, being sworn, says:

I am not a party to the action, am over 18 years of age and reside in Queens, New York.

On March 14, 2008, I caused a true copy of the within **REQUEST FOR JUDICIAL INTERVENTION** to be served by U.S. mail upon the following:

William Flemming
Gage Spencer & Fleming, LLP
410 Park Avenue
New York, NY 10022
(212) 768-4900

*Attorneys for Defendants John D. Agoglia and Peter J. McCarthy*

Jeffrey T. Golenbock
Golenbock Eisman Assor Bell & Pesko LLP
437 Madison Avenue
New York, NY 10022
(212) 907-7373

*Attorneys for Defendant Phillip R. Bennett*

Paul A. Ferrillo
Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8372

*Attorneys for Defendants Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaekel, Thomas H.Lee, Ronald L. O'Kelley, and Scott A. Schoen*

Brian O'Connor
Willkie Farr & Gallagher, LLP
787 Seventh Avenue
New York, NY  10019
(212) 728-8251

*Attorneys for Defendant Edwin Cox*

Neil A. Goteiner
Farella, Braun & Martel
235 Montgomery Street, 30th Floor
San Francisco, CA 94104
(415) 954-4485

*Attorneys for Defendants Sukhmeet Dillon and Eric Lipoff*

Thomas C. Wolford
Neal Gerber & Eisenberg, LLP
2 North LaSalle Street
Chicago, IL  60602
(312) 269-5675

*Attorneys for Defendant Thomas H. Dittmer*

Lawrence J. Kotler
Duane Morris & Heckscher, LLP
30 South 17th Street
Philadelphia, PA  19103
(215) 979-1514

*Attorneys for Defendant Stephen Grady*

William A. Schreiner, Jr., Esq.
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, D.C.  20036
(202) 778-1858

*Attorneys for Defendant Tone Grant*

Helen Kim
Katten Muchin Rosenman, LLP
2029 Century Park East, Suite 2600
Los Angeles, CA  90067
(310) 788-4525

*Attorneys for Defendant Dennis Klejna*

Scott E. Hershman
Hunton & Williams
200 Park Avenue, 43rd Floor
New York, NY  10166
(212) 309-1053

*Attorneys for Defendant Santo C. Maggio*

John R. Jerome
Saul Ewing, LLP
245 Park Avenue
24th Floor
New York, NY  10167

*Attorneys for Defendant Joseph Murphy*

Janet Costello
Gibbons, P.C.
One Gateway Center
Newark, NJ  07102
973-596-4825

*Attorneys for Defendant Frank Mutterer*

Claire P. Gutekunst
Proskauer Rose, LLP
1585 Broadway
New York, NY  10036
(212) 969-3421

*Attorneys for Defendant Richard N. Outridge*

Ivan Kline
Friedman & Wittenstein, P.C.
600 Lexington Avenue
New York, NY  10022
(212) 750-8700

*Attorneys for Defendants William M. Sexton and Gerald Sherer*

Richard Cashman
Heller Ehrman, LLP
Times Square Tower
7 Times Square
New York, NY  10036
(212) 847-8796

*Attorneys for Defendant Philip Silverman*

Barbara Moses
Morvillo, Abramowitz, Grand, Iason  & Silberberg, PC
565 Fifth Avenue
New York, NY  10017
(212) 880-9540

*Attorneys for Defendant Robert C. Trosten*

FRANCINE TORMEY

Sworn to before me this
14th day of March, 2008

Notary Public

NANCY J. NEUBAUER
Notary Public, State of New York
No. 01NE5041602
Qualified in New York County
Commission Expires April 10, 2011