John H. Eickemeyer (JE-8302)
Daniel C. Green (DG-0059)
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019

Daniel J. Standish (*pro hac vice*)
Marc E. Rindner (*pro hac vice*)
Cara Tseng Duffield (*pro hac vice*)
WILEY REIN LLP
1776 K Street NW
Washington, D.C. 20006

*Attorneys for Plaintiff Arch Insurance Company*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ARCH INSURANCE COMPANY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 08-CIV-5252 (GEL)** |
| ) | **ECF Case** |
| **JOHN D. AGOGLIA, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

Annexed hereto are true copies of filings originally made in the Supreme Court of the State of New York, County of New York, in the action *Arch Insurance Co. v. Agoglia, et al.*, Index No. 08/600029, which was removed to this Court on or around June 9, 2008.

The record is supplemented by the undersigned counsel for the plaintiff Arch Insurance Company, pursuant to a letter from such counsel which was So Ordered by the Court on July 21, 2008 and entered into the docket on July 22, where it was assigned ECF No. 26. The supplementary filings are as follows:

| Document Number | Document Title |
|---|---|
| | |
| 1. | Summons and Complaint (and Exhibits A-G thereto) |
| 2. | Amended Summons and First Amended Complaint for Declaratory Judgment (and Exhibits A-J thereto) |

1

| 3. | Affidavit of Service of Summons and Complaint and of Amended Summons and Complaint Upon Enumerated Defendants (and Exhibits 1-15 thereto) |
|---|---|
| 4. | Request for Judicial Intervention |
| 5. | Statement in Support of Request for Assignment to Commercial Division (and Exhibit A thereto) |
| 6. | Notice of Motion for the *Pro Hac Vice* Admission of Cara Tseng Duffield, Marc E. Rindner and Daniel J. Standish |
| 7. | Affirmation of Daniel C. Green in Support of the *Pro Hac Vice* Admission of Cara Tseng Duffield, Marc E. Rindner and Daniel J. Standish (and Exhibits 1-3 thereto) |
| 8. | Affidavit of Service of Enumerated Filings Upon Defendant Cox |
| 9. | So Ordered Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett with annexed Judgment Entered by Clerk |
| 10. | Notice of Discontinuance as to Defendant Cox |
| 11. | Stipulation of Partial Discontinuance with Prejudice as against Defendant Trosten |
| 12. | Notice of Motion and Affirmation of Richard Cashman (and Exhibits A-Z thereto) |
| 13. | Memorandum of Law in Support of the Insureds' Motion to Dismiss the First Amended Complaint for Declaratory Judgment |
| 14. | Corrected Notice of Motion |
| 15. | Corrected Memorandum of Law in Support of the Insureds' Motion to Dismiss the First Amended Complaint for Declaratory Judgment |
| 16. | Notice of Appearance of Zuckerman Spaeder LLP on Behalf of Defendant Grant |
| 17. | Notice of Motion for Admission *Pro Hac Vice* of Norman L. Eisen and Affirmation of Laura E. Neish in Support Thereof |
| 18. | Affirmation of John H. Eickemeyer in Support of Arch Insurance Company's Opposition to Certain Defendants' Motion to Dismiss the First Amended Complaint (and Exhibits A-M thereto) |

NEWYORK/#198626.1

| 19. | Plaintiff Arch Insurance Company's Opposition to Certain Defendants' Motion to Dismiss the First Amended Complaint |
|-----|---|
| 20. | Notice of Entry of So Ordered Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett (annexed as Exhibit A thereto) |
| 21. | Corrected Affidavit of Service of Notice of Entry Upon Enumerated Defendants |
| 22. | Reply Affirmation of Richard Cashman (and Exhibits A-D thereto) |
| 23. | Reply Memorandum of Law in Support of the Insureds' Motion to Dismiss the First Amended Complaint for Declaratory Judgment |
| 24. | Affidavit of Service of Summons and Complaint and of Amended Summons and Complaint upon Defendants Dhillon and Lipoff |
| 25. | Notice of Motion for Voluntary Discontinuance as Against Defendants Thomas H. Dittmer and Stephen Grady; Affirmation of Daniel C. Green in Support of Motion for Voluntary Discontinuance as Against Defendants Thomas H. Dittmer and Stephen Grady |
| 26. | So Ordered Stipulation of Partial Discontinuance with Prejudice as against Defendant Maggio |
| 27. | Order Granting *Pro Hac Vice* Admission of Cara Tseng Duffield, Marc E. Rindner, and Daniel J. Standish |
| 28. | Order Granting *Pro Hac Vice* Admission of Norman Eisen |
| 29. | Notice of Filing of Notice of Removal (annexed as Exhibit A thereto) |

NEWYORK/#198626.1

Date:  July 31, 2008

Respectfully submitted,


By:     s/  John H. Eickemeyer   
     John H. Eickemeyer  (JE-8302)
     jeickemeyer@vedderprice.com
     Daniel C. Green  (DG-0059)
     dgreen@vedderprice.com
     VEDDER PRICE P.C.
     1633 Broadway, 47th Floor
     New York, NY 10019
     (212) 407-7700

     Daniel J. Standish (*pro hac vice*)
     dstandish@wileyrein.com
     Marc E. Rindner (*pro hac vice*)
     mrindner@wileyrein.com
     Cara Tseng Duffield (*pro hac vice*)
     cduffield@wileyrein.com
     WILEY REIN LLP
     1776 K Street, N.W.
     Washington, D.C. 20006
     (202) 719-7000

     *Counsel for Plaintiff Arch Insurance Company*

NEWYORK/#198626.1

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

4-28-08

```
------------------------------------------------------- x
ARCH INSURANCE COMPANY,                            :
                                                   :
                        Plaintiff,                 :
                                                   :
        v.                                         :
                                                   :
JOHN D. AGOGLIA, PHILLIP R. BENNETT,               :
LEO R. BREITMAN, EDWIN L. COX,                     :
SUKHMEET DHILLON, THOMAS H.                        :
DITTMER, NATHAN GANTCHER,                          :
STEPHEN GRADY, TONE GRANT,                         :
THOMAS HACKL, DAVID V. HARKINS,                    :
SCOTT L. JAECKEL, DENNIS A. KLEJNA,                :
THOMAS H. LEE, ERIC G. LIPOFF, SANTO               :
C. MAGGIO, PETER MCCARTHY, JOSEPH                  :
MURPHY, FRANK MUTTERER, RICHARD                    :
N. OUTRIDGE, RONALD L. O'KELLEY,                   :
SCOTT A. SCHOEN, WILLIAM M. SEXTON,                :
GERALD SHERER, PHILIP SILVERMAN and                :
ROBERT C. TROSTEN,                                 :
                                                   :
                        Defendants.                :
------------------------------------------------------- x
```

Index No.:  08/600029

IAS Part 39 (Freedman, J.)

**<u>NOTICE OF MOTION</u>**

Oral Argument Requested

**PLEASE TAKE NOTICE** that upon the affirmation of Richard Cashman, Esq., the

exhibits attached thereto, and the memorandum of law submitted herewith, Defendants John

Agoglia, Leo R. Breitman, Nathan Gantcher, Tone Grant, David Harkins, Scott L. Jaeckel,

Dennis A. Klejna, Thomas H. Lee, Peter McCarthy, Joseph Murphy, Frank Mutterer, Richard N.

Outridge, Ronald L. O'Kelley, Scott A. Schoen, William M. Sexton, Gerald Sherer, and Philip

Silverman will move this Court on May 15, 2008, at 9:30 a.m., in the Supreme Court of the State

of New York, New York County, Motion Support Office Courtroom (Room 130), for an order

pursuant to CPLR 3211(a)(4) dismissing this action, or, in the alternative, for an order pursuant

to CPLR 3211(a)(4) and CPLR 2201 staying this action, and granting such other and further relief as the Court deems appropriate.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to CPLR 2241(b), answering papers, if any, must be served upon counsel to the defendants no later than seven days prior to the return date set forth herein. Any reply papers must be served upon counsel to plaintiff no later than one day prior to the return date set forth herein.

Dated: April 28, 2008
   New York, New York

HELLER EHRMAN LLP

*Richard Cashman*
Richard Cashman
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone:    (212) 832-8300
Facsimile:    (212) 763-7600

*Attorneys for Defendant Philip Silverman*

FRIEDMAN & WITTENSTEIN
A Professional Corporation

*Ivan Kline /NB*
Ivan Kline
600 Lexington Avenue
New York, NY 10022-6003
Telephone:    (212) 750-8700
Facsimile:    (212) 223-8391

*Attorneys for Defendants William M. Sexton
and Gerald M. Sherer*

KATTEN MUCHIN ROSENMAN LLP

*Helen Kim /NB*
Helen B. Kim
575 Madison Avenue
New York, NY 10022-2504
Telephone:    (212) 940-8800
Facsimile:    (212) 940-8776

*Attorneys for Defendant Dennis A. Klejna*

ZUCKERMAN SPAEDER LLP

*Norman Eisen /NB*
Norman L. Eisen
1540 Broadway, Suite 1604-4021
New York, NY 10036
Telephone:    (212) 704-9600
Facsimile:    (212) 740-4256

*Attorneys for Defendant Tone N. Grant*

SAUL EWING LLP

_(signature)_ /MB
John J. Jerome
245 Park Avenue, 24th Floor
New York, NY 10167
Telephone:    (212) 672-1996
Facsimile:    (212) 672-1920

*Attorneys for Defendant Joseph Murphy*

WEIL, GOTSHAL & MANGES LLP

_(signature)_ /MB
Greg A. Danilow
Michael F. Walsh
767 Fifth Avenue
New York, NY 10153-0119
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007

*Attorneys for Defendants Leo R. Breitman,*
*Nathan Gantcher, David V. Harkins, Scott L.*
*Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and*
*Scott A. Schoen*

PROSKAUER ROSE LLP

_(signature)_ /MB
Claire P. Gutekunst
1585 Broadway
New York, NY 10036-8299
Telephone:    (212) 969-3421
Facsimile:    (212) 969-2900

*Attorneys for Defendant Richard N.*
*Outridge*

GAGE SPENCER & FLEMMING, LLP

_(signature)_ /MB
William Flemming
410 Park Avenue – 9th Floor
New York, NY 10022-4407
Telephone:    (212) 768-4900
Facsimile:    (212) 768-3629

*Attorneys for Defendants John D. Agoglia and*
*Peter McCarthy*

GIBBONS P.C.

_(signature)_ /MB
Lawrence S. Lustberg
One Pennsylvania Plaza, 37th Floor
New York, NY 10119-3701
Telephone:    (212) 649-4700
Facsimile:    (212) 333-5980

*Attorneys for Defendant Frank Mutterer*

TO:    CLERK OF THE COURT

John A. Eickemeyer
VEDDER, PRICE, KAUFMAN &
KAMMHOLZ, P.C.
1633 Broadway
New York, New York  10019-6705
Telephone:     (212) 407-7700
Facsimile:     (212) 407-7799

Daniel J. Standish
Cara Tseng Duffield
WILEY REIN & FIELDING LLP
1776 K Street, NW
Washington, DC  20006-2304

*Attorneys for Plaintiff Arch
Insurance Company*

Jeffrey T. Golenbock
GOLENBOCK EISEMAN ASSOR
  BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022-7001
Telephone:     (212) 907-7378
Facsimile:     (212) 754-0330

*Attorneys for Defendant Philip R. Bennett*

Scott E. Hershman
HUNTON & WILLIAMS
200 Park Avenue
New York, New York 10166-0005
Telephone:     (212) 309-1054
Facsimile:     (212) 309-1100

*Attorneys for Defendant Santo C.
Maggio*

Barbara Moses
MORVILLO, ABRAMOWITZ,
  GRAND, IASON, ANELLO &
  BOHRER, P.C.
565 Fifth Avenue
New York, New York 10017-2413
Telephone:     (212) 856-9600
Facsimile:     (212) 856-9494

*Attorneys for Defendant Robert Trosten*

4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

```
-------------------------------------------- x
ARCH INSURANCE COMPANY,                      :
                                             :
                 Plaintiff,                  :        Index No.:  08/600029
                                             :
          v.                                 :        IAS Part 39 (Freedman, J.)
                                             :
JOHN D. AGOGLIA, PHILLIP R. BENNETT,         :
LEO R. BREITMAN, EDWIN L. COX,               :
SUKHMEET DHILLON, THOMAS H.                  :
DITTMER, NATHAN GANTCHER,                    :
STEPHEN GRADY, TONE GRANT,                   :
THOMAS HACKL, DAVID V. HARKINS,              :
SCOTT L. JAECKEL, DENNIS A. KLEJNA,          :
THOMAS H. LEE, ERIC G. LIPOFF, SANTO         :
C. MAGGIO, PETER MCCARTHY, JOSEPH            :
MURPHY, FRANK MUTTERER, RICHARD              :
N. OUTRIDGE, RONALD L. O'KELLEY,             :
SCOTT A. SCHOEN, WILLIAM M. SEXTON,          :
GERALD SHERER, PHILIP SILVERMAN and          :
ROBERT C. TROSTEN,                           :
                                             :
                 Defendants.                 :
-------------------------------------------- x
```

## AFFIRMATION OF RICHARD CASHMAN

RICHARD CASHMAN, an attorney duly admitted to practice in the

courts of the State of New York, affirms under penalties of perjury the following:

1.      I am a member of the bar of the State of New York, and am

Special Counsel to Heller Ehrman, LLP ("Heller Ehrman"). Heller Ehrman represents

Defendant Philip Silverman.

2.    I respectfully submit this affirmation in support of the Defendants'

John Agoglia, Leo R. Breitman, Nathan Gantcher, Tone Grant, David Harkins, Scott L.

Jaeckel,  Dennis A. Klejna, Thomas H. Lee, Peter McCarthy, Joseph Murphy, Frank

Mutterer, Richard N. Outridge, Ronald L. O'Kelley, Scott A. Schoen, William M.

Sexton, Gerald Sherer, and Philip Silverman (collectively, the "Moving Insureds")

Memorandum of Law In Support of the Insureds' Motion to Dismiss the First Amended

Complaint of Arch Insurance Company for Declaratory Judgment (the "Motion").

3.    The following is a list of the exhibits cited in the Motion.  A true

and correct copy of each document is attached hereto.

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Amended Summons and First Amended Complaint For Declaratory Judgment, dated February 22, 2008, filed in *Arch Insurance Company v. Agoglia, et al.*, Index No. 08/600029 (N.Y. Sup. Ct.). |
| B | Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821 issued to Refco Inc. by U.S. Specialty Insurance Company for the period August 11, 2005 to August 11, 2006. |
| C | Letter dated April 25, 2007 from Leslie S. Ahari at Ross, Dixon & Bell, LLP, counsel for U.S. Specialty Insurance Company, to Luc A. Despins and Dennis C. O'Donnell at Milbank, Tweed, Hadley & McCloy, LLP. |
| D | Directors and Officers Liability and Corporation Reimbursement Follow Form Excess Liability Policy No. 1620924 issued to Refco LLC by Lexington Insurance Company for the period August 11, 2005 to August 11, 2006. |
| E | Letter dated August 8, 2007 from James E. Tolan at D'Amato & Lynch, counsel for Lexington Insurance Company, to Luc A. Despins and Dennis C. O'Donnell at Milbank, Tweed, Hadley & McCloy, LLP. |

| F | SecurExcess Policy No. RNN 506300 issued to Refco Inc. by Axis Reinsurance Company for the period August 11, 2005 to August 11, 2006. |
|---|---|
| G | Excess Directors and Officers Insurance and Company Reimbursement Policy No. AW0418197 issued to Refco Inc. by Allied World Assurance (U.S.), Inc. for the period August 11, 2005 to August 11, 2006. |
| H | Excess Insurance Policy No. DOX009322-00 issued to Refco Inc. by Arch Reinsurance Company for the period August 11, 2005 to August 11, 2006. |
| I | Classic A-Side Management Liability Insurance Policy, No. ELU089673-05 issued to Refco Inc. by XL Specialty Insurance Company for the period August 11, 2005 to August 11, 2006. |
| J | Letter dated March 6, 2006 from Kaufman Borgeest & Ryan LLP, counsel to Axis Reinsurance Company, to Pam Sylwestrzak, Senior Vice President, Marsh USA, Inc. |
| K | Letter dated March 28, 2006 from John D. Hughes of Edwards Angell Palmer & Dodge LLP, counsel to Allied World Assurance (U.S.), Inc., to Ms. Andrea Lieberman of Marsh USA. |
| L | Letter dated March 9, 2006 from Wiley Rein & Fielding LLP, counsel to Arch Insurance Company, to Ms. Andrea Lieberman of Marsh USA. |
| M | Letter dated January 24, 2006 from Boundas, Skarzynski, Walsh & Black, LLC, counsel to XL Specialty Insurance Company, to Ms. Andrea Lieberman of Marsh USA. |
| N | Complaint dated May 24, 2007 filed in *Axis Reinsurance Company v. Bennett et al.*, Adv. Proc. No. 07-0712 (RDD) (Bankr. S.D.N.Y.) (Without Exhibits). |

| | |
|---|---|
| O | Bankruptcy Court Order, dated October 19, 2007, and modified on October 22, 2007, Granting Motions for Summary Judgment against Axis on the Issue of Advancement of Defense Costs and Fees, *Axis Reinsurance Co. v. Bennett, et al.*, Adv. Proc. No. 07-01712 (RDD) (Bankr. S.D.N.Y.). |
| P | Motion to Intervene on behalf of Arch Insurance Company, *Axis Reinsurance Co. v. Bennett et al.*, No. 07-01712 (RDD) (Bankr. S.D.N.Y.). |
| Q | Bankruptcy Court Order dated September 6, 2007 Denying Motion of Arch Insurance Company to Intervene, *Axis Reinsurance Co. v. Bennett et al.*, No. 07-01712 (RDD) (Bankr. S.D.N.Y.). |
| R | Complaint dated September 10, 2007 filed in *Axis Reinsurance Co. v. Bennett et al.*, No. 07-cv-7924 (GEL) (Without Exhibits). |
| S | Order of the United States District Court for the Southern District of New York, dated November 13, 2007, *Axis Reinsurance Co. v. Bennett et al.*, No. 07-cv-7924 (GEL) (S.D.N.Y.). |
| T | Letter dated March 6, 2008 from Kaufman Borgeest & Ryan LLP, counsel for Axis Reinsurance Company, to Luc A. Despins and Dennis C. O'Donnell at Milbank, Tweed, Hadley & McCloy, LLP. |
| U | Amended Complaint for Declaratory Judgment dated June 22, 2006 filed in *Arch Ins. Co. v. Bennett, et al.*, No. 600805/06 (N.Y. Sup. Ct.) (Without Exhibits). |
| V | Order dated February 20, 2007 in *Arch Ins. Co. v. Bennett, et al.*, No. 600805/06 (N.Y. Sup. Ct.). |
| W | Complaint dated March 12, 2008 filed in *Murphy, et al. v. Allied World Assurance Company (U.S.), Inc.*, Adv. Proc. No. 08-0133 (RDD) (Without Exhibits). |

| X | Order dated April 21, 2008 Granting Preliminary Injunction Motion to Require Allied World Assurance Company (U.S.), Inc. To Pay Officer and Director Defense Costs In Underlying Litigation and For Relief From the Plan Injunction or Automatic Stay, to the Extent Applicable, For the Advancement of Such Defense Costs and to Permit Movants to Prosecute Claims Against Allied World Assurance Company (U.S.), Inc. in *Murphy, et al. v. Allied World Assurance Company (U.S.), Inc.*, Adv. Proc. No. 08-0133 (RDD). |
|---|---|
| Y | First Amended Complaint dated April 24, 2008 in *Murphy, et al. v. Allied World Assurance Company (U.S.), Inc.*, Adv. Proc. No. 08-0133 (RDD). |
| Z | Complaint dated April 22, 2008 in XL Specialty Insurance Company v. Agoglia, et al., No. 08 Civ. 3821 (S.D.N.Y.) (Without Exhibits). |

Dated: April 28, 2008
     New York, New York

Richard Cashman
Richard Cashman

Exhibit A

# SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

|  |  |
|---|---|
| ARCH INSURANCE COMPANY, ) | |
| ) | |
| Plaintiff, ) | Index No.: 08/600029 |
| ) | |
| v. ) | |
| ) | |
| JOHN D. AGOGLIA, PHILLIP R. ) | **AMENDED SUMMONS** |
| BENNETT, LEO R. BREITMAN, EDWIN ) | |
| L. COX, SUKHMEET DHILLON, ) | |
| THOMAS H. DITTMER, NATHAN ) | |
| GANTCHER, STEPHEN GRADY, TONE ) | |
| GRANT, THOMAS HACKL, DAVID V. ) | |
| HARKINS, SCOTT L. JAECKEL, ) | |
| DENNIS A. KLEJNA, THOMAS H. LEE, ) | |
| ERIC G. LIPOFF, SANTO C. MAGGIO, ) | |
| PETER MCCARTHY, JOSEPH ) | |
| MURPHY, FRANK MUTTERER, ) | |
| RICHARD N. OUTRIDGE, RONALD L. ) | |
| O'KELLEY, SCOTT A. SCHOEN, ) | |
| WILLIAM M. SEXTON, GERALD ) | |
| SHERER, PHILIP SILVERMAN and ) | |
| ROBERT C. TROSTEN ) | |
| ) | |
| Defendants. ) | |
| ) | |

**FILED**

FEB 2 2 2008

NEW YORK
COUNTY CLERK'S OFFICE

## TO THE ABOVE NAMED DEFENDANTS:

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve

a copy of your answer, or if the Complaint is not served with this summons, to serve a notice of

appearance on plaintiff's attorneys, within twenty (20) days after the service of this summons,

exclusive of the day of service (or within thirty (30) days after the service is complete if this

summons is not personally delivered to you in the State of New York); and in case of your

failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the Complaint.  Plaintiff designates New York County as the place of trial.

The basis for venue is that plaintiff Arch Insurance Company's principal place of business is located at One Liberty Plaza, 53rd Floor, New York, NY 10006, and the County of New York is therefore the proper venue for trial pursuant to CPLR §503(a).

Dated: February 21, 2008

Respectfully submitted,

VEDDER PRICE P.C.

By: _____
John H. Eickemeyer
Daniel C. Green

1633 Broadway
47th Floor
New York, New York 10019

(212) 407-7700

Of Counsel:

Daniel J. Standish
Marc E. Rindner
Cara Tseng Duffield
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
202-719-7000

*Attorneys for Plaintiff*
*Arch Insurance Company*

To:

John D. Agoglia
3 Sweet Hollow Ct.
St. James, NY 11780

Phillip R. Bennett
125 Colt Lane
Gladstone, NJ 07934

2

NEWYORK/#191889.1

Leo R. Breitman
7767 Wind Key Drive
Boca Raton, FL 33434

Edwin L. Cox
c/o Brian O'Connor, Esq.
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099

Sukhmeet Dhillon
1 Upper Vintage
Laguna Niguel, CA 92677-9202

Thomas H. Dittmer
150 S. Wacker Drive, Suite 1200
Chicago, IL 60606-4201

Nathan Gantcher
86 Birchall Drive
Scarsdale, NY 10583

Stephen Grady
c/o Lawrence J. Kotler, Esq.
Duane, Morris & Heckscher LLP
30 South 17th Street
Philadelphia, PA 19103

Tone Grant
680 North Lake Shore Drive, Apt. 1620
Chicago, IL 60611

Thomas Hackl
c/o Avraham C. Moskowitz, Esq.
Moskowitz and Book, LLP
1372 Broadway
New York, NY 10018

David V. Harkins
Corn Point Road
Marblehead, MA 01945

Scott L. Jaeckel
151 Tremont Street, Apt. 25E
Boston, MA 02111-1123

3

Supreme Court Records OnLine Library - page 3 of 39

Dennis A. Klejna
2301 E Street NW, Apt. A1010
Washington, DC 20037-2829

Thomas H. Lee
322 E. 57th Street
New York, NY 10022

Eric G. Lipoff
c/o Stephen M. Ray, Esq.
Robert A. Greenfield, Esq.
Stutman, Treister & Glatt PC
1901 Avenue of Stars, 12th Floor
Los Angeles, CA 90067

Santo C. Maggio
1825 8th Street South
Naples, FL 34102

Peter McCarthy
38 South Bridge Street
Poughkeepsie, NY 12601

Joseph Murphy
1038 Bloom Street
Hoboken, NJ 07030

Frank Mutterer
c/o Lawrence S. Lustberg, Esq.
Gibbons P.C.
One Gateway Center
Newark, NJ 07102

Ronald L. O'Kelley
6001 Trophy Drive, Apt. 1002
Naples, FL 34110

Richard N. Outridge
24 Pennbrook Dr.
Lincoln University, PA 19352

Scott A. Schoen
191 Kings Grant Road
Weston, MA 02493

4

Supreme Court Records OnLine Library - page 4 of 39

William M. Sexton
c/o Stuart I. Friedman, Esq.
Ivan Kline, Esq.
Friedman & Wittenstein, P.C.
600 Lexington Avenue
New York, NY 10022

Gerald Sherer
333 Central Park West, Apt. 81
New York, NY  10025-7145

Philip Silverman
3 Edie Drive
Marlboro, NJ 07746

Robert C. Trosten
895 Scioto Drive
Franklin Lakes, NJ 07417

5

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|   |   |   |
|---|---|---|
| ARCH INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Index No.: 08-600029 |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN D. AGOGLIA, PHILLIP R. | ) | **FIRST AMENDED COMPLAINT** |
| BENNETT, LEO R. BREITMAN, EDWIN | ) | **FOR DECLARATORY JUDGMENT** |
| L. COX, SUKHMEET DHILLON, | ) | |
| THOMAS H. DITTMER, NATHAN | ) | |
| GANTCHER, STEPHEN GRADY, TONE | ) | |
| GRANT, THOMAS HACKL, DAVID V. | ) | |
| HARKINS, SCOTT L. JAECKEL, | ) | |
| DENNIS A. KLEJNA, THOMAS H. LEE, | ) | |
| ERIC G. LIPOFF, SANTO C. MAGGIO, | ) | |
| PETER MCCARTHY, JOSEPH | ) | |
| MURPHY, FRANK MUTTERER, | ) | |
| RICHARD N. OUTRIDGE, RONALD L. | ) | |
| O'KELLEY, SCOTT A. SCHOEN, | ) | |
| WILLIAM M. SEXTON, GERALD | ) | |
| SHERER, PHILIP SILVERMAN and | ) | |
| ROBERT C. TROSTEN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

FILED

FEB 2 2 2008

NEW YORK
COUNTY CLERK'S OFFICE

In support of its first amended complaint against defendants, plaintiff Arch Insurance

Company ("Arch") alleges as follows:

**INTRODUCTION**

1.  Arch issued an excess directors, officers and corporate liability insurance policy to

Refco, Inc. ("Refco") for the period from August 11, 2005 to August 11, 2006 (the "Arch

Policy"). Since August 11, 2005, numerous lawsuits and governmental and/or regulatory

investigations (the "Underlying Matters") involving certain individuals insured under the Arch

Policy have been instituted and various of those individuals have tendered the Underlying

Matters to Arch for coverage under the Arch Policy. Arch brings this action against the defendants named herein ("Defendants") to seek a declaration that the Arch Policy affords no coverage for the Defendants in connection with the Underlying Matters.

2.  This is the second lawsuit that Arch has filed in this court for a declaration regarding the parties' rights and responsibilities under the Arch Policy. The first lawsuit (Index No. 600805/06) was dismissed without prejudice by Justice Freedman in an opinion dated February 20, 2007 based on two factors that no longer exist. First, the Arch Policy contains a limit of liability that is $10 million excess of $40 million in underlying limits, and Justice Freedman ruled that it was entirely speculative whether the Underlying Matters would ever generate losses that would implicate the Arch Policy. Since that ruling, the limits of the underlying policies have been depleted at a voracious pace. As of the filing of this first amended complaint, the underlying insurers have advanced approximately $27.5 million in attorneys' fees and costs, and the bevy of law firms representing the individual insureds is generating over $2 million per month in additional fees and costs. Thus, contrary to the position that the individual insureds advanced before this Court when Arch filed its first action, it is far from speculative whether, setting aside the dispositive coverage issues that Arch outlines in this complaint based on the unique terms of its Policy, the Arch limit will be implicated.

3.  Justice Freedman also held that Arch could not proceed with the first action because the question whether any insured had knowledge of facts or circumstances that might give rise to a claim as of the Arch Policy inception date – key issue for purposes of the exclusions that form the basis for Arch's denial of coverage – would overlap with issues that were not yet adjudicated in the Underlying Matters. That impediment no longer exists. Beginning on December 19, 2007, three former executives of Refco – namely, its former Chairman, President and Chief

2

Executive Officer, Phillip R. Bennett, its former Chief Financial Officer, Robert C. Trosten, and

its former Executive Vice President, Santo C. Maggio – pleaded guilty to a number of federal

charges, including conspiracy, securities, wire and bank fraud, making false filings with the SEC,

making false statements to Refco's auditors and money laundering.  In connection with their

guilty pleas, Bennett, Trosten and Maggio, all of whom are insureds under the Arch Policy, each

admitted that he knew of and participated in the wrongdoing that is at the heart of the allegations

in the Underlying Matters.  These guilty pleas and related admissions of fact, which establish

that Bennett, Trosten and Maggio knew of the wrongdoing at the time of the inception of the

Arch Policy, trigger the applicability of the exclusions identified in this amended complaint as to

all of the Defendants in this action with respect to the Underlying Matters without regard to the

outcome of any unresolved proceeding involving any other Defendant.  Thus, the second ground

for the dismissal of Arch's first action no longer exists.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction to resolve an actual controversy between Arch and the

Defendants pursuant to the New York Declaratory Judgment Act, CPLR § 3001.

5.    Personal jurisdiction over Defendants is proper pursuant to CPLR § 301 and § 302.

Defendants possess sufficient minimum contacts with the state of New York to render the

exercise of jurisdiction by a New York court permissible under traditional notions of fair play

and substantial justice.  Defendants were directors or officers of Refco, a corporation with its

principal place of business in New York.[1]  As directors and/or officers of Refco, Defendants

---

[1] "Refco", as used herein, refers to Refco, Inc., the publicly-traded company formed in
connection with an August 2005 initial public offering, Refco Group Ltd., LLC ("RGL"), the
company through which Refco, Inc.'s business primarily was conducted prior to the offering, and
the subsidiaries of Refco, Inc. and Refco Group Ltd., LLC.

3

Supreme Court Records OnLine Library - page 8 of 39

transacted business in the state of New York. In addition, some or all of Defendants seek

coverage under the Arch Policy for the Underlying Matters. Accordingly, Defendants have an

ongoing contractual relationship with Arch, a corporation with its principal place of business in

New York. Finally, most of the lawsuits comprising the Underlying Matters were filed in the

federal courts located in New York. These lawsuits allege that Defendants committed acts in the

state of New York and/or acts outside the state of New York that could reasonably be expected

to have consequences in the state of New York.

6.    Venue is proper in this County under CPLR § 503 because Arch has its principal

place of business in this County.

## PARTIES

7.    Arch is an insurance company that is organized and exists pursuant to the laws of the

state of Missouri. Arch has its principal place of business in New York County, New York.

8.    Defendant John D. Agoglia ("Agoglia") served as a senior vice president at Refco

Securities, LLC, a subsidiary of Refco, Inc., at times relevant to this action. Upon information

and belief, Agoglia is a citizen of New York.

9.    Defendant Phillip R. Bennett ("Bennett") served as the Chairman, President and

Chief Executive Officer of Refco until October 2005, when he took a leave of absence at the

request of the Refco board of directors. Upon information and belief, Bennett is a citizen of New

Jersey.

10. Defendant Leo R. Breitman ("Breitman") served as a director of Refco at times

relevant to this action. Upon information and belief, Breitman is a citizen of Florida.

11. Defendant Edwin L. Cox ("Cox") served as a director of Refco Group Ltd., LLC at

times relevant to this action. Upon information and belief, Cox is a citizen of Texas.

4

12. Defendant Sukhmeet Dhillon ("Dhillon") served as Executive Vice President of Refco Group Ltd., LLC and as Executive Vice President of the entity that became Refco LLC, during times relevant to this complaint. Upon information and belief, Dhillon is a citizen of California.

13. Thomas H. Dittmer ("Dittmer") served as Chairman and CEO of Refco during times relevant to this action. Upon information and belief, Dittmer is a citizen of Illinois.

14. Defendant Nathan Gantcher ("Gantcher") served as a director of Refco at times relevant to this action. Upon information and belief, Gantcher is a citizen of New York.

15. Defendant Stephen Grady ("Grady") was COO of Refco Global Futures LLC, a Refco subsidiary, during times relevant to this action. Upon information and belief, Grady is a citizen of New Jersey.

16. Defendant Tone Grant ("Grant") served as President of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Grant is a citizen of Illinois.

17. Defendant Thomas Hackl ("Hackl") served as Executive Vice President of RGL at times relevant to this action. Upon information and belief, Hackl is a citizen of Geneva, Switzerland.

18. Defendant David V. Harkins ("Harkins") served as a Director of Refco at times relevant to this action. Upon information and belief, Harkins is a citizen of Massachusetts.

19. Defendant Scott L. Jaeckel ("Jaeckel") served as a Director of Refco at times relevant to this action. Upon information and belief, Jaeckel is a citizen of Massachusetts.

20. Defendant Dennis A. Klejna ("Klejna") served as Executive Vice President and General Counsel of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Klejna is a citizen of Washington, D.C.

5

21. Defendant Thomas H. Lee ("Lee") served as a Director of Refco at times relevant to this action.  Upon information and belief, Lee is a citizen of New York.

22. Defendant Eric G. Lipoff ("Lipoff ") served as Executive Vice President of a Refco subsidiary at times relevant to this action.  Upon information and belief, Lipoff is a citizen of California.

23. Defendant Santo C. Maggio ("Maggio") served as an Executive Vice President of Refco and as President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd. at times relevant to this action.  Upon information and belief, Maggio is a citizen of Florida.

24. Defendant Peter McCarthy ("McCarthy") served as Executive Vice-President of Refco Securities at times relevant to this action.  Upon information and belief, McCarthy is a citizen of New Jersey.

25. Defendant Joseph Murphy ("Murphy") served as President of Refco from October 2005 to November 28, 2005, when he resigned.  Murphy also served as Chief Executive Officer of Refco Global Futures and President of Refco, LLC at times relevant to this action.  Upon information and belief, Murphy is a citizen of New Jersey.

26. Defendant Frank Mutterer ("Mutterer") served as Controller of Refco Group Ltd., LLC, during times relevant to this action.  Upon information and belief, Mutterer is a citizen of New Jersey.

27. Defendant Richard N. Outridge ("Outridge") served as CFO of Refco Capital Management at times relevant to this action.  Upon information and belief, Outridge is a citizen of Pennsylvania.

6

28. Defendant Ronald L. O'Kelley ("O'Kelley") served as a Director of Refco at times relevant to this action. Upon information and belief, O'Kelley is a citizen of Florida.

29. Defendant Scott A. Schoen ("Schoen") served as a Director of Refco at times relevant to this action. Upon information and belief, Schoen is a citizen of Massachusetts.

30. Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer of Refco at times relevant to this action. Upon information and belief, Sexton is a citizen of Iowa.

31. Defendant Gerald Sherer ("Sherer") served as Executive Vice President and Chief Financial Officer of Refco at times relevant to this action. Upon information and belief, Sherer is a citizen of New York.

32. Defendant Philip Silverman ("Silverman") served as Secretary of Refco at times relevant to this action. Upon information and belief, Silverman is a citizen of New Jersey.

33. Robert C. Trosten ("Trosten") served as Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Trosten is a citizen of New Jersey.

## FACTUAL ALLEGATIONS

### The Arch Policy

34. The Arch Policy is an excess directors, officers and corporate liability policy. It has a policy period of August 11, 2005 to August 11, 2006 and a limit of liability of $10 million excess of $40 million in underlying insurance. A copy of the Arch Policy is attached as Exhibit A.

35. Various other insurers issued underlying insurance policies to Refco. U.S. Specialty Insurance Company issued a primary policy with limits of $10 million excess of applicable retentions (the "Primary Policy"). A copy of the Primary Policy is attached as Exhibit B. Lexington Insurance Company issued a first excess policy with limits of $7.5 million excess of

7

$10 million (the "Lexington Policy"). A copy of the Lexington Policy is attached as Exhibit C.

Axis Reinsurance Company issued a second excess policy with limits of $10 million excess of

$17.5 million (the "Axis Policy"). A copy of the Axis Policy is attached as Exhibit D. Allied

World Assurance Company issued a third excess policy with limits of $12.5 million excess of

$27.5 million (the "AWAC Policy"). A copy of the AWAC Policy is attached as Exhibit E.

Each of the underlying policies has a policy period of August 11, 2005 to August 11, 2006.

36. In general, the Arch Policy applies in conformance with the terms and conditions of

the Primary Policy and in conformance with the terms and conditions in the Arch Policy or any

other underlying insurance "further limiting or restricting coverage." Arch Policy, Section I.C.

The Arch Policy provides that "[i]n no event shall this Policy grant broader coverage than that

provided by the most restrictive policy included in the Underlying Insurance." *Id.* The Arch

Policy provides that coverage thereunder applies only after exhaustion of the **Underlying Limit**

solely as a result of actual payment under the **Underlying Insurance** in connection with

**Claim(s).** *Id.*, Section I.B.[2]

37. Subject to all of its terms and conditions, the Arch Policy affords five types of

specified coverage. First, the Arch Policy affords specified coverage to **Insured Persons** for

"**Loss** arising from **Claims** first made during the **Policy Period** . . . for **Wrongful Acts**, except

when and to the extent that the **Company** has paid such **Loss** to or on behalf of the **Insured**

**Persons** as indemnification or advancement." Primary Policy, Insuring Agreement (A).

**Insured Persons** is defined in relevant part as "any past, present or future director or officer of

---

[2] Policy language appearing herein in bold typeface is defined in the policy being quoted, and
appears in bold typeface in that policy.

8

the **Company** . . . ." Primary Policy, Definition F(1). The "**Company**" is Refco Inc. and its

subsidiaries. Primary Policy, Definitions (C), (H), (O), Declarations Item 1.

38. Second, subject to all of its terms and conditions, the Arch Policy affords specified

coverage to the Company for "**Loss** arising from . . . **Claims** first made during the **Policy**

**Period** . . . against the **Insured Persons** for **Wrongful Acts**, if the **Company** has paid such **Loss**

to or on behalf of the **Insured Persons** as indemnification or advancement." Primary Policy,

Insuring Agreement (B)(1).

39. Third, subject to all of its terms and conditions, the Arch Policy affords specified

coverage to the Company for "**Loss** arising from **Securities Claims** first made during the **Policy**

**Period** . . . against the **Company** for **Wrongful Acts**." Primary Policy, Insuring Agreement

(B)(2).

40. Fourth, subject to all of its terms and conditions, the Arch Policy affords specified

coverage to the "**Controlling Shareholder**," defined as Bennett, for "**Loss** arising from a

**Securities Claim** first made during the **Policy Period** . . . against such **Controlling Shareholder**

for **Wrongful Acts**, provided, that one or more **Insured Persons** and/or the **Company** are and

remain co-defendants in such **Securities Claim** along with such **Controlling Shareholder**."

Primary Policy, Endorsement No. 15.

41. Fifth, subject to all of its terms and conditions, the Arch Policy affords specified

coverage to the Company for "all **Derivative Demand Investigation Costs** incurred by the

**Company** as a result of a **Derivative Demand** first received by the **Company's** Board of

Directors and reported in writing to the Insurer during the **Policy Period** . . . up to the amount of

the **Derivative Demand Investigation Costs Sub-Limit**" of $250,000. Primary Policy,

Endorsement No. 11.

9

42. The AWAC Policy contains the following provision: "It is hereby understood and agreed that the **Insurer** shall not be liable for **Loss** in connection with any claim or claims made against the **Insureds** alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which any Insured had knowledge as of inception and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage hereunder; or (ii) which indicate the probability of any such claim." AWAC Policy, Endorsement No. 3 ("AWAC Prior Knowledge Exclusion").

43. The Arch Policy contains the following provision: "If any **Insured** as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a **Claim** under this Policy, the **Excess Insurer** shall not be liable to make any payment under this Policy as a result of a **Claim** arising out of, based upon or attributable to any such act, error, omission, fact, matter or circumstance." Arch Policy, Endorsement No. 4 (the "Arch Prior Knowledge or Information Exclusion").

44. The Arch Policy defines **Insured(s)** as "any person(s) or entity(ies) that are entitled to coverage under the **Followed Policy** at its inception." Arch Policy, § III.B. The "**Followed Policy**" is the Primary Policy. Arch Policy, § III.C.; Declarations, Item 4.

45. The Arch Policy and underlying insurance policies contain other terms, conditions and limitations that may ultimately be implicated in this action.

46. Defense Costs have been advanced to certain Defendants under the Primary Policy, the Lexington Policy and the Axis Policy.[3] As of the filing of this first amended complaint, the

---

[3] The coverage defenses that Arch advances in this action are unique to the Arch Policy; thus, the fact that U.S. Specialty and Lexington advanced fees and costs has no bearing on the coverage issues presented in this case. Axis was ordered by the Refco bankruptcy court to advance fees and costs despite its denial of coverage based on its unique policy provisions and

10

advancement of defense costs has exhausted the $10 million limit of the Primary Policy, the

$7.5 million limit of the Lexington Policy, and the $10 million limit of the Axis Policy. The law

firms representing the defendants in the Underlying Matters are currently generating attorneys'

fees and costs in the vicinity of $2 million *per month*. Thus, it is far from conjectural that the

Arch Policy limits will be implicated unless this Court promptly adjudicates the coverage issues

presented in this case.

**The Events at Refco**

47. The Arch Policy incepted on August 11, 2005. On the same day, Refco conducted its

initial public offering.

48. On October 10, 2005, Refco issued a press release. The press release announced that

the Company had been carrying an undisclosed receivable of $430 million from an entity

controlled by Bennett. Refco stated that "[b]ased on the results of the review to date, the

Company believes that the receivable was the result of the assumption by an entity controlled by

Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company,

which may have been uncollectible." Moreover, Refco stated that although the receivable "was

reflected on the Company's prior period financials, as well as on the Company's May 31, 2005

balance sheet," the receivable "was not shown as a related party transaction in any such

financials. For that reason, and after consultation by the Audit Committee with the Company's

independent accountants, the Company determined, on October 9, 2005, that its financial

statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28,

---

contrary to the language in the operative policies. Axis has appealed that order to the United
States District Court for the Southern District of New York.

11

2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

49. On October 11, 2005, Refco issued a second press release. The press release announced that Bennett had repaid the $430 million receivable in full. The press release also provided further information on the nature of the receivable: "Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998. These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable from that entity, rather than a receivable from the originating accounts. The fact that the receivable was from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual reporting periods by reason of transfers to a third party customer account that we currently believe is unaffiliated with Mr. Bennett or anyone else at the Company."

50. On October 17, 2005, Refco and certain of its unregulated subsidiaries filed for Chapter 11 bankruptcy protection.

51. On January 16, 2007, a federal grand jury returned a third superseding indictment against Bennett, Trosten and Grant (the "S3 Indictment"). The S3 Indictment charged Bennett, Trosten and Grant with securities fraud, conspiracy to commit securities fraud, wire fraud, bank fraud and money laundering. The S3 Indictment also charged Bennett with making false filings with the SEC and making false statements to Refco's auditors. A copy of the S3 Indictment is attached hereto as Exhibit F.

52. On February 15, 2008, Bennett, who is an **Insured** under the Arch Policy, pleaded guilty to all charges against him in the S3 Indictment. Five days later, on February 20, 2008,

12

Trosten, who also is an **Insured** under the Arch Policy, similarly pleaded guilty to charges of

conspiracy, securities, wire and bank fraud and money laundering.

53. The S3 Indictment charged that, beginning in the mid 1990's, Bennett, Trosten and

their co-conspirators engaged in a scheme to mask the true financial performance of Refco.

Specifically,

> [s]tarting at least as early as the mid 1990s, BENNETT and
> GRANT schemed to hide the true financial health of Refco from
> its banks, counterparties, auditors, and investors. Starting at least
> as early as the late 1990s, BENNETT and GRANT embarked on a
> strategy to mask the true performance of Refco's business in order
> to sell the company for their own benefit and that of Refco's other
> owners. To that end, over the ensuing years, BENNETT,
> TROSTEN, GRANT and others known and unknown
> systematically (1) covered up both Refco's own losses and
> customer losses for which Refco became responsible; (2) moved
> Refco operating expenses off the company's books; and (3) padded
> Refco's revenues, all in an effort to mislead Refco's banks,
> counterparties, auditors and investors, with the goals of keeping
> Refco in business and then selling it for the maximum benefit to its
> owners and senior management.

S3 Indictment, ¶ 7.

54. According to the S3 Indictment, in furtherance of the scheme, Bennett, Trosten and

their co-conspirators made and caused Refco and others on its behalf to make false and

fraudulent statements to Refco's banks, counterparties, customers, auditors and investors, and to

create false audited financial statements and false public filings with the SEC.

55. The S3 Indictment charged that the scheme permitted Refco to engage in, among

other things, Refco's August 2005 initial public offering of stock, in which the public purchased

approximately $583 million of Refco common stock based on a false and fraudulent registration

statement. S3 Indictment, ¶ 8.

56. According to the S3 Indictment, the scheme was hatched in 1997, when Refco

directly and indirectly incurred a series of substantial trading losses that threatened the continued

13

viability of its business. S3 Indictment, ¶ 9. In response to those losses, Bennett, Trosten and

others moved losses and expenses out of Refco and into Refco Group Holdings, Inc. ("RGHI"),

an entity that owned Refco and that was owned by, among others, Bennett and Grant, in an effort

to mask Refco's financial condition. This strategy increased the debt owed by RGHI to Refco

(the "RGHI Receivable"), which ultimately grew to over $1 billion. *Id.*

57. The S3 Indictment charged that, beginning as early as February 1998, Bennett and

others directed a series of transactions every year designed to hide the "huge and growing"

RGHI Receivable from, among others, Refco's auditors, by temporarily paying down all or part

of the RGHI Receivable over Refco's fiscal year-end and replacing it with a receivable from one

or more other entities not related to Bennett or Refco. S3 Indictment at ¶ 21. Bennett and others

caused this cover-up to occur "at every fiscal year-end from at least the fiscal year-end on

February 28, 1998 through the fiscal year-end on February 29, 2004." *Id.* Beginning in 2004,

Bennett and others began causing these cover-up transactions to occur at the ends of Refco's

quarterly reporting periods. *Id.* at ¶ 46.

58. The S3 Indictment further charged that Bennett, Trosten and others participated in a

scheme to defraud participants in the 2004 leveraged buyout of Refco, which was led by private

equity fund Thomas H. Lee Partners, by misleading the fund and purchasers of the $600 million

in notes and $800 million in bank debt about the true financial health of Refco. S3 Indictment, ¶

34.

59. Based on these and other allegations, the S3 Indictment charged Bennett as follows:

| Count | Charge |
|-------|--------|
| 1 | Conspiracy to commit securities fraud, wire fraud, to make false filings with the SEC, to make material misstatements to auditors, bank fraud and money laundering |

14

| Count | Charge |
|-------|--------|
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 3 | Securities fraud in connection with the purchase and sale of Refco common stock |
| 4 | False filing with the SEC in connection with the filing of Refco's Form 10-K under the Exchange of 1934 on July 19, 2005 |
| 5, 6 | False filing with the SEC in connection with the filing of certain registration statements under the Securities Act of 1933 on April 6, 2005 and August 8, 2005 |
| 7 – 13 | Wire fraud in connection with certain electronic communications between June 22, 2004 and August 5, 2005, including the transmission of Refco's Form 10-K on July 19, 2005 and its registration statements on April 6, 2005 and August 8, 2005 |
| 14 | Material misstatements to auditors |
| 15 | Bank fraud in connection with the 2004 leverage buyout transaction |
| 16 – 20 | Money laundering in connection with proceeds of the 2004 leverage buyout transaction |

60. On February 15, 2008, Bennett pleaded guilty to all twenty counts against him in the S3 Indictment. A copy of the transcript of the hearing ("2/15 Tr.") is attached hereto as Exhibit G. During the hearing at which Bennett pleaded guilty, the following exchange occurred between the Court and Bennett:

> THE COURT: Mr. Bennett, did you commit the crimes for which you've been charged?
>
> THE DEFENDANT: I did, your honor.
>
> THE COURT: Would you tell me in your own words what you did?

15

THE DEFENDANT: Your Honor, during the period that I served as CEO of Refco, I agreed with other Refco executives to enter into a series of transactions at the end of Refco's financial reporting periods to make it appear as if a receivable due to Refco from Refco Upholdings, Inc. [sic], a related party, was instead due from an independent third-party customer.

The IGHI [sic] receivable was composed of, amongst other things, historical customer losses, bad debts, and expenses that IGHI [sic] had incurred on behalf of Refco.

I, along with other Refco executives, have caused Refco to enter into these transactions in order to conceal the size and nature of the IGHI [sic] receivable. We concealed the receivable from, amongst others, Refco's auditors, Thomas H. Lee Partners, various lenders who, in 2004, participated in Refco's senior secured credit facility, and the issuance of 9 percent senior subordinated notes, and also investors in Refco's common stock.

Among the lenders to whom I knowingly caused the IGHI [sic] receivable to be misrepresented was HSBC Bank, referenced in Count Fifteen of the indictment. I and other Refco executives also used the interstate wires to accomplish these acts within this district, as referenced in Counts Seven through Thirteen. Furthermore, I caused funds obtained from the transaction with Thomas H. Lee Partners, referenced in paragraph 34 of the indictment, to be wired to various parties receiving proceeds from the transaction, as referenced in Counts Sixteen through Twenty, knowing that this money had been unlawfully obtained.

The IGHI [sic] receivable and related party transaction used to conceal it were material information that Refco investors and lenders would have wanted to have known prior to investing in or lending money to Refco. While I believed that I would be able to pay the IGHI [sic] receivable down over time, and did, in fact, ultimately pay [sic] off the receivable balance in its entirety, I knew that obtaining funds from Refco's investors and lenders based on misleading financial statements was also wrong.

I also caused Refco to file documents with the SEC, namely S1, S4, and 10-K that did not disclose the full extent of the IGHI [sic] receivable or the transactions used to conceal it; and, thus, were false and misleading with respect to material facts. I knew that failing to disclose these facts in public filings and in connection with Refco's sale and registration of Refco's notes and common stock was wrong, and I deeply regret having done so.

16

Your Honor, I take full responsibility for my actions . . . .

2/15 Tr. at 16-20.

61. At the conclusion of the February 15, 2008 hearing, the Court found that Bennett

pleaded guilty knowingly and voluntarily:

> THE COURT: Mr. Bennett, I'm satisfied that you understand the
> nature of the charges against you and the consequences of your
> plea; and that your plea is made voluntarily and knowingly; and
> that there is a sufficient factual basis for it. Accordingly, I will
> accept your plea of guilty . . . .

2/15 Tr. at 20.

62. The S3 Indictment charged Trosten as follows:

| Count | Charge |
|-------|--------|
| 1 | Conspiracy to commit securities fraud, wire fraud, to make false filings with the SEC, to make material misstatements to auditors, bank fraud and money laundering |
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 7, 8 | Wire fraud in connection with certain electronic communications between June 22, 2004 and August 3, 2004 5, 2005, including e-mails to representatives of Thomas H. Lee Partners |
| 15 | Bank fraud in connection with the 2004 leverage buyout transaction |
| 17-18 | Money laundering in connection with proceeds of the 2004 leverage buyout transaction |

63. On February 20, 2008, Trosten pleaded guilty to Counts 1, 2, 7, 15 and 17 against

him in the S3 Indictment. A copy of the transcript of the hearing ("2/20 Tr.") is attached hereto

as Exhibit H. During the hearing at which Trosten pleaded guilty, the following exchange

occurred between the Court and Trosten:

17

THE COURT: Mr. Trosten, did you commit the offenses that you are pleading guilty to?

THE DEFENDANT: I did, your honor.

THE COURT: Would you tell me, please, what you did?

\*     \*     \*

THE DEFENDANT: Your Honor, while I was employed at Refco, I agreed with other Refco executives to hide the true nature of Refco's finances on Refco's financial statements. I knew that Refco's financial statements did not accurately reflect Refco's financial condition, because the financial statements did not disclose the full amount that Refco Group Holdings, Inc., a related party, owed to Refco. I understood that the RGHI receivable was underreported because Phillip Bennett, Refco's former chief executive officer, and other Refco executives, including me, were involved in a series of transaction at the end of Refco's financial reporting periods to make it appear as if a receivable was due from third-party customers rather than from a related party.

The RGHI receivable was composed of, amongst other things, historic customer losses, bad debts, and expenses that RGHI incurred on behalf of Refco.

In addition, I participated in a number of transactions that padded or inflated Refco's income. For example, I participated in transactions that shifted expenses off the books of Refco and onto the books of Refco Group Holdings, Inc.

I, along with other Refco executives, agreed to conceal the true size and nature of the RGHI receivable from, amongst others, Refco's auditors, Thomas H. Lee Partners; HSBC, which, in 2004, participated in Refco's senior secured credit facility, as referenced in . . . paragraph 41 and Count Fifteen of the indictment; and investors who purchased bonds that Refco issued in 2004, as referenced in Count Two of the indictment.

I left the company in August 2004, one year before the IPO of Refco. I and other executives used the interstate wires to accomplish these acts within this district, as referenced in Count Seven of the indictment.

Furthermore, I received funds obtained from the transaction with Thomas H. Lee Partners, referenced in paragraph 34 of the indictment, which I knew were proceeds from unlawful activity, as referenced in Count Seventeen.

18

> The RGHI receivable and transactions used to conceal it were
> material information that Refco investors and lenders would have
> wanted to know before investing in or lending money to Refco.
>
> I knew that obtaining funds from Refco investors and lenders
> based on misleading financial information was wrong . . . .
>
> Your Honor, I take full responsibility for my actions and my
> conduct . . . .

2/20 Tr. at 17-20.

64. At the conclusion of the February 20, 2008 hearing, the Court found that Trosten

pleaded guilty knowingly and voluntarily:

> THE COURT: Mr. Trosten, I am satisfied that you understand the
> nature of the charges against you and the consequences of your
> plea, and that your plea is made voluntarily and knowingly, and
> that there is a factual basis for your. I will, therefore, accept your
> plea of guilty.

2/20 Tr. at 20.

65. Meanwhile, on December 19, 2007, Maggio, who is an **Insured** under the Arch

Policy, pleaded guilty to a four-count criminal information (the "Maggio Information") charging

him with conspiracy, securities fraud and wire fraud. A copy of the Maggio Information is

attached hereto as Exhibit I.

66. The Maggio Information, which included nearly all of the same charges of

misconduct as the S3 Indictment, charged that Maggio was one of Bennett's and Trosten's co-

conspirators and that he participated in the conduct underlying the conspiracy. In particular, the

Maggio Information charged that Maggio participated in the scheme to hide the RGHI

Receivable and to mask the true financial condition of Refco in the several years prior to the

August 11, 2005 initial public offering.

67. Based on these and other allegations, the Maggio Information charged Maggio as

follows:

19

| Count | Charge |
|-------|--------|
| 1 | Conspiracy to commit securities fraud, wire fraud, to make false filings with the SEC, to make material misstatements to auditors, bank fraud and money laundering |
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 3 | Securities fraud in connection with the purchase and sale of Refco common stock |
| 4 | Wire fraud in connection with the electronic transmission of Refco's Form 10-K on July 19, 2005 |

68. On December 19, 2007, Maggio pleaded guilty to every count in the Maggio

Information. A copy of the transcript of the hearing ("12/19 Tr.") is attached hereto as Exhibit J.

During the hearing at which Maggio pleaded guilty, the following exchange occurred between

the Court and Maggio:

> THE COURT: Did you commit the offenses for which you have been charged, Mr. Maggio?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Tell me what you did.
>
> *    *    *
>
> THE DEFENDANT: Your Honor, from the late 1990s to October 2005 I was a senior executive at Revko [sic] Ink [sic]. During that period I participated with others to hide the true financial health of Revko [sic] from banks, counter-parties, auditors and investors. With my knowledge and active participation Revko's [sic] substantial losses were covered up as revenues padded [sic] and certain operating expenses were moved off its book. Among the acts I personally engaged in [sic] the signing of loan agreements referencing paragraphs 61-D [loan agreement signed in furtherance of the conspiracy on or about February 20, 2004] and 61-P [loan agreement signed in furtherance of the conspiracy on or about February 23, 2005] of the indictment.
>
> As a result of my conduct and that of my coconspirators false financial statements were issued to obtain debt financing

20

from the public including 9 percent senior subordinated notes referenced in Count Two of the indictment.

> To consummate the sale of 57 percent of Revko [sic] to a group headed by Thomas H. Lee in 2004 and to obtain $800 million in bank financing the same year and to effect the Revko [sic] initial public offering in 2005. [sic] Moreover, with my knowledge false financial statements were filed with the SEC including form 10K referencing Count Four. The mails and interstate wires were used as part of the fraudulent scheme.

> I deeply regret my conduct and the harm that it has caused.

> THE COURT: First of all, with respect to all of the activities that you've indicate you participated in it knowingly?

> THE DEFENDANT: Yes.

12/19 Tr. at 17-18.

69. At the conclusion of the December 19, 2007 hearing, the Court found that Maggio pleaded guilty knowingly and voluntarily:

> Based on defendant's allocution and the recommendations by the government I find that the defendant understands the nature, the charges and consequences of his guilty plea. I also find that the plea is voluntary and that there is a factual basis for the plea. I, therefore, recommend that the plea be accepted . . . .

12/19 Tr. at 20.

70. As demonstrated by each of their guilty pleas to counts that alleged their knowledge of, *inter alia,* efforts to hide the RGHI Receivable from the investing public prior to 2005, Bennett, Trosten and Maggio, as of August 11, 2005, had knowledge of or information concerning acts, errors, omissions, facts, matters or circumstances that might give rise to a Claim under the AWAC Policy or the Arch Policy.

## The Underlying Matters

71. Beginning on October 12, 2005, various lawsuits were filed against the Defendants.

21

72. A criminal complaint was filed against Bennett (the "Bennett Criminal Complaint") on October 12, 2005 in *United States v. Bennett*, No. 05-1720 (S.D.N.Y.).

73. The Bennett Criminal Complaint alleged that Bennett knowingly "hid from investors in [Refco's] August 2005 initial public offering of stock . . . the existence of hundreds of millions of dollars of related party transactions between Refco and a company controlled by Bennett, including causing Refco to file a false and fraudulent S-1 registration statement with the Securities and Exchange Commission." Bennett Criminal Complaint, ¶ 9. A federal grand jury in New York subsequently returned a criminal "Indictment" against Bennett that was filed on or about November 10, 2005 in *United States v. Bennett, et al.*, No. 05-1192 (S.D.N.Y.). This indictment repeated and expanded upon the allegations in the Bennett Criminal Complaint. On or about October 24, 2006, the grand jury returned a "Superseding Indictment" that named both Bennett and Trosten, and a "Second Superseding Indictment" against them on or about November 16, 2006. On January 16, 2007, a "Third Superseding Indictment" – referred to above as the "Bennett Indictment" – that added Grant as a defendant was filed. On December 19, 2007, the Information against Maggio was filed. Each of these filings alleged, among other things, that the defendant(s) named therein engaged in a scheme to hide the RGHI receivable from the investing public. Collectively, the proceedings initiated by these filings will be referred to herein as the "Criminal Proceedings".

74. The Bennett Criminal Complaint was tendered to Arch for coverage under the Arch Policy on or about October 13, 2005, and the Indictment, the Superseding Indictment, the Second Superseding Indictment and/or the Third Superseding Indictment were tendered to Arch for coverage under the Arch Policy thereafter.

22

75. The suits *Mazur et al. v. Refco, Inc., et al.*, No. 05-8626 (S.D.N.Y.), *Frontpoint Fin. Serv., Inc. v. Refco, Inc., et al.*, No. 05-8663 (S.D.N.Y.), *Lieber v. Refco, Inc., et al.*, No. 05-8667 (S.D.N.Y.), *Weiss v. Refco, Inc., et al.*, No. 05-8691 (S.D.N.Y.), *Glaubach v. Refco, Inc., et al.*, No. 05-8692 (S.D.N.Y.), *Gross v. Refco, Inc., et al.*, No. 05-8697 (S.D.N.Y.), *Salamone v. Refco, Inc. et al.*, No. 05-8716 (S.D.N.Y.), *RD Partners LLC v. Refco, Inc., et al.*, No. 05-8737 (S.D.N.Y.), *Wakefield v. Refco, Inc., et al.*, No. 05-8742 (S.D.N.Y.), *Gaugler v. Bennett, et al.*, No. 05-8886 (S.D.N.Y.), *Baker v. Bennett, et al.*, No. 05-8923 (S.D.N.Y.), *Nathanson v. Bennett, et al.*, No. 05-8926 (S.D.N.Y.), *Becker v. Refco, Inc., et al.*, No. 05-8929 (S.D.N.Y.), *Mettupatti v. Bennett, et al.*, No. 05-9048 (S.D.N.Y.), *Weiss v. Bennett, et al.*, No. 05-9126 (S.D.N.Y.), *Weit v. Bennett, et al.*, No. 05-9611 (S.D.N.Y.), *Esses v. Bennett, et al.*, No. 05-9654 (S.D.N.Y.), *City of Pontiac General Employees Retirement System v. Bennett et al.*, No. 05-9941 (S.D.N.Y.), *Gensheimer v. Bennett*, No. 05-10318 (S.D.N.Y) and *Teachers' Retirement System of the State of Illinois et al. v. Lee, et al.*, No. 05-10403 (S.D.N.Y.) are purported class action securities fraud lawsuits that have been consolidated for pre-trial purposes under Case No. 05-8626 (the "Securities Litigation"). The First Amended Consolidated Class Action Complaint ("FAC") was filed in the consolidated proceedings on May 5, 2006, and the Second Amended Consolidated Class Action Complaint was filed on or about December 3, 2007.

76. The FAC and SAC allege that Refco's initial public offering registration statement and prospectus were materially false and misleading. Specifically, they allege that the registration statement and prospectus failed to disclose the existence of the RGHI Receivable. The FAC further alleges that the Refco financial statements incorporated in Refco's registration statement and prospectus were inaccurate because they failed to disclose the related-party transactions between Refco and RGHI designed to hide the RGHI Receivable. Included among

23

the defendants named in the SAC are Bennett, Sherer, Sexton, Maggio, Murphy, Silverman, Klejna, Trosten, Grant, O'Kelley, Breitman, Gantcher, Lee, Harkins, Jaeckel, and Schoen.

77. Beginning on or about October 14, 2005, some of the lawsuits comprising the Securities Litigation were tendered to Arch for coverage under the Arch Policy. The FAC was tendered to Arch by letter dated April 28, 2006.

78. The suits *David Fine v. Bennett, et al.*, No. 05-8701 (S.D.N.Y), and *Mehta v. Bennett, et al.*, No. 05-8748 (S.D.N.Y.), which were shareholder derivative actions (the "Derivative Litigation"), have been dismissed. Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen, Sexton and Murphy, among others, were named as defendants in the Derivative Litigation.

79. The complaints in the Derivative Litigation alleged that Refco's initial public offering registration statement and prospectus were materially false and misleading. Specifically, the complaints alleged that the registration statement and prospectus failed to disclose the existence of the RGHI Receivable. The complaints further alleged that the Refco financial statements incorporated in its registration statement and prospectus were inaccurate because they failed to disclose the related-party transactions between Refco and RGHI that were designed to hide the RGHI Receivable.

80. The *Mehta* complaint was tendered to Arch for coverage under the Arch Policy on or about October 17, 2005.

81. The suit *Bawag P.S.K. Bank v. Refco Inc., et al.*, No. 05-60006 (S.D.N.Y. Bankr.), Adv. No. 05-03161, was filed on November 16, 2005 (the "Bawag Action"). The Bawag Action names Bennett (among others) as a defendant.

24

82. The complaint in the Bawag Action alleges that the plaintiff was fraudulently induced to loan approximately $420 million to Bennett on October 10, 2005. The complaint alleges that Bennett failed to disclose that he sought the loan to pay off the RGHI Receivable, a "related-party receivable resulting from the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to Refco [that] likely was impaired and not collectible." Bawag Action Complaint, § 17. The complaint alleges that Bennett "knew that if BAWAG had been aware of any of the key facts set forth in [Refco's] October 10, 2005 Press Release, BAWAG would not have made the Loan." *Id.*, § 30.

83. The Bawag Action was tendered to Arch for coverage under the Arch Policy on or about November 30, 2005.

84. The suit *Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*, No. 05-9608 (S.D.N.Y.), was filed on November 14, 2005 (the "THL Funds Action"). The THL Funds Action names Bennett, Grant and Maggio, among others, as defendants.

85. The complaint in the THL Funds Action alleges that in June 2004, the plaintiffs invested approximately $507 million in Refco. The complaint alleges that despite the plaintiffs' due diligence efforts, they were unaware that "Bennett intentionally and deliberately engaged in accounting fraud in order to mask a group of largely worthless receivables, bad debts and questionable obligations that, if accurately portrayed on the Company's financial statements, would have materially reduced Refco's value." THL Funds Action Complaint, § 4. Specifically, the complaint alleges that Bennett "nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of million dollars [sic] of customer losses and obligations that would never be repaid to the Company." *Id.*, § 30. The complaint alleges

25

that the Refco financial statements provided to the plaintiffs during their due diligence review in 2003 and 2004 were materially false and misleading.

86. The THL Funds Action was tendered to Arch for coverage under the Arch Policy on or about February 13, 2006.

87. The complaint in *Unovalores Ltd. v. Bennett,* No. L1564-05 (Sup. Ct. of New Jersey, Somerset County, Law Division) (the "Unovalores Action") was filed in New Jersey state court on or about November 1, 2005.

88. The plaintiff in the Unovalores Action, which identifies itself as a Refco Capital account holder, names only Mr. Bennett as a defendant. Plaintiff alleges that it entered into a Repurchase Transaction with Refco on August 31, 2005, in reliance upon representations in Refco's registration statement and other filings concerning Refco's financial health. Those representations were false, according to the complaint, because they concealed massive receivables owed by an entity controlled by Mr. Bennett and at least one-half billion dollars of related party transactions with Mr. Bennett.

89. The Unovalores Action was tendered to Arch for coverage under the Arch Policy on or about February 13, 2006.

90. The complaint in *American Financial International Group v. Refco, Inc., et al.,* No. 05-8988 (S.D.N.Y.) (the "American Financial Action"), was filed in the Southern District of New York on or about October 21, 2005, an amended complaint was filed on April 13, 2006, and a second amended complaint was filed on June 30, 2006.

91. The plaintiff in the American Financial Action identifies itself as a Delaware LLC that traded currencies through an account at Refco F/X Associates, LLC ("RefcoFX"). The suit is a purported class action brought on behalf of all persons who traded currencies through, or had

26

currency trading accounts with, RefcoFX from August 11, 2005 through the date the amended

complaint was filed and who have been damaged. Included among the defendants named in the

second amended complaint are Bennett, Sherer, Sexton, Maggio, Trosten, Mutterer and

Silverman. The second amended complaint generally alleges the same conduct that is the subject

of the Criminal Proceedings and the Securities Litigation.

92. The complaint in the American Financial Action was tendered to Arch for coverage

under the Arch Policy on or about October 25, 2005, and the amended complaint was tendered to

Arch in May 2006.

93. The complaint in *Global Management Worldwide Limited v. Philip R. Bennett, et al.*,

No. 06-0643 (S.D.N.Y.) (the "Global Management Litigation"), was filed in the Southern

District of New York on or about January 26, 2006, and a Consolidated Amended Class Action

Complaint was filed in September 2006.

94. The plaintiff in the Global Management Litigation identifies itself as a corporation

organized under the laws of Nassau, the Bahamas, that was a brokerage customer of Refco

Capital Markets, Ltd. ("RCM"). The suit is a purported class action brought on behalf of all

brokerage customers of RCM who, at any time from October 17, 2000 to October 17, 2005,

entrusted securities to RCM and/or Refco Securities, LLC, directly or indirectly, as custodian

and broker for safe-keeping, and continued to hold positions with RCM on October 17, 2005 or

thereafter. Plaintiffs generally allege that, during the purported class period, Refco, either

directly or through its affiliates, incurred billions of dollars in losses, and tried to hide those

losses by surreptitiously selling securities held by RCM in custody for class members. Plaintiffs

allege that the financial statements filed by Refco with the SEC during the purported class period

were false and misleading because they fraudulently omitted these losses, as well as the scheme

27

to hide the losses by selling securities stolen from plaintiffs and by building up and hiding the RGHI Receivable. Plaintiffs further allege that they relied upon these false and misleading financial statements and the purported financial integrity of Refco in entrusting securities to RCM.

95. The Global Management Litigation was tendered to Arch for coverage under the Arch Policy on or about March 14, 2006.

96. On or about October 9, 2007, two separate lawsuits were brought by seven investment entities that maintained accounts at RCM: (1) *VR Global Partners L.P., et al. v. Bennett, et al.,* Case No. 07-8686 (S.D.N.Y.) and (2) *Capital Management Select Fund Ltd., et al., v. Bennett, et al.,* Case No. 07-8688 (S.D.N.Y.). The complaints, which were tendered to Arch in October 2007, also allege that Refco insiders schemed to hide the RGHI Receivable, thereby inducing plaintiffs to maintain accounts at RCM, and converted securities owned by plaintiffs to hide losses incurred by Refco. The defendants in the *VR Global* and *Capital Management* litigations include Bennett, Sexton, Maggio, Murphy, Silverman, Trosten, Grant, Lee, Harkins, Jaeckel, Schoen and Outridge. By order dated November 20, 2007, the Global Management Litigation was consolidated for pre-trial purposes with the *VR Global* and *Capital Management* litigations. The consolidated proceedings will be referred to herein as the "RCM Brokerage Customer Securities Litigation."

97. The complaint in *Kirschner v. Thomas H. Lee Partners, L.P.,* No. 07-7074 (S.D.N.Y) (the "Trustee/THL Partners Litigation"), was filed in the Southern District of New York on or about August 8, 2007.

98. The plaintiff in the Trustee/THL Partners Litigation identifies himself as the trustee of the Refco Litigation Trust ("Trustee"). The individual defendants named in the complaint are

28

Lee, Harkins, Jaeckel, and Schoen. The Trustee generally alleges that the individual defendants breached fiduciary duties owed to Refco by failing to inform themselves of Refco's true financial state – including efforts to hide the RGHI Receivable – before making business decisions on behalf of Refco.

99. The complaint in the Trustee/THL Partners Litigation was tendered to Arch for coverage under the Arch Policy by letter dated August 16, 2007.

100.    The complaint in *Kirschner v. Grant Thornton LLP, et al.*, No. 2007L008818 (Cook County, Ill.) (the "Grant Thornton Litigation"), was filed in Illinois state court on August 21, 2007, and was removed to federal court on or about September 19, 2007 as Case No. 07-cv-05306 (N.D. Ill.).

101.    The Grant Thornton Litigation was brought by the Trustee. The individual defendants named in the complaint include Bennett, Maggio, Trosten, and Grant. The Trustee generally alleges that these defendants engaged in a scheme to hide Refco's true financial condition, which included efforts to hide the RGHI Receivable.

102.    The complaint in the Grant Thornton Litigation was tendered to Arch for coverage under the Arch Policy by letter dated September 20, 2007.

103.    The complaint in *Kirschner v. Agoglia, et al.*, Adv. Pro. No. 07-3060 (Bankr. S.D.N.Y.) (the "Agoglia Litigation"), was filed on or about October 15, 2007.

104.    The Agoglia Litigation was brought by the Trustee. The individual defendants named in the complaint are Agoglia, Bennett, Cox, Dittmer, Dhillon, Grady, Grant, Lipoff, Maggio, McCarthy, Murphy, Mutterer, Sexton, and Trosten. The Trustee alleges that Bennett and others "orchestrated a massive financial fraud designed to inflate Refco's financial position artificially until such time as it could be sold", Compl. ¶ 59, a fraud that included the hiding of

29

the RGHI Receivable. The Trustee seeks to recover transfers made to defendants under avoidance provisions of the Bankruptcy Code and to recover the value of the transfers under a theory of unjust enrichment.

105. The complaint in the Agoglia Litigation was tendered to Arch for coverage under the Arch Policy by letters dated November 8 and November 21, 2007.

106. The complaint in *Kirschner v. Thomas Hackl, et al.*, No. 07-9238 (S.D.N.Y.) (the "Hackl Litigation"), was filed on or about October 15, 2007.

107. The Hackl Litigation was brought by the Trustee. The only individual defendant named in the complaint is Hackl. The Trustee alleges that Bennett, Hackl and others engaged in a scheme to hide the true financial condition of Refco, including efforts to hide the RGHI Receivable, and seeks recovery from Hackl under counts alleging, *inter alia*, breach of fiduciary duty, civil conspiracy, aiding and abetting fraud, and unjust enrichment.

108. The complaint in *Kirschner v. Bennett, et al.*, Case No. 602869 (New York County, New York) (the "Trustee/Bennett Litigation"), was filed in the Supreme Court of New York on or about August 27, 2007, and was removed to federal court on or about September 17, 2007 as Case No. 07- 08165 (S.D.N.Y.).

109. The plaintiff in the Trustee/Bennett Litigation identifies himself as the trustee of the Refco Private Actions Trust and assignee of all claims related to Refco belonging to, among others, certain former Refco customers who maintained accounts at, and entrusted funds to, RCM. The individual defendants named in the complaint are Bennett, Maggio, Trosten and Grant. The complaint alleges, *inter alia*, that these defendants engaged in a scheme to hide Refco's true financial condition, including engaging in steps to hide the RGHI Receivable. This

30

conduct allegedly induced RCM customers to entrust assets with RCM, which allegedly were later converted for Refco's use.

110.    The Trustee/THL Partners Litigation, the Grant Thornton Litigation, the Trustee/Bennett Litigation, the Agoglia Litigation and the Hackl Litigation are collectively referred to herein as the "Trustee Litigation."

111.    Upon information and belief, various governmental and/or regulatory investigations of or proceedings involving one or more of the defendants (the "Regulatory Matters") are ongoing, and one or more of the defendants has sought or may seek coverage for such matters.

112.    The proceedings discussed above, including the Criminal Proceedings, the Securities Litigation, the Derivative Litigation, the Bawag Action, the THL Funds Action, the Unovalores Action, the American Financial Action, the RCM Brokerage Customer Securities Litigation, the Trustee Litigation, and the Regulatory Matters, collectively are referenced herein as the "Underlying Matters."

## COUNT I

## DECLARATORY JUDGMENT THAT THE AWAC PRIOR KNOWLEDGE EXCLUSION BARS COVERAGE FOR THE UNDERLYING MATTERS

113.    Arch incorporates by reference each of the allegations of paragraphs 1 through 112 above.

114.    As of August 11, 2005, Bennett, Trosten and Maggio possessed knowledge of facts and circumstances that a reasonable person would suppose might afford valid grounds for a claim or that would indicate the probability of any such claim.

31

115.    The Underlying Matters consist of Claims alleging, arising out of, based upon, in consequence of, or attributable to such facts and circumstances.

116.    Arch seeks a declaration that based upon the AWAC Prior Knowledge Exclusion, the Arch Policy does not provide coverage for any loss arising out of the Underlying Matters.

## COUNT II

### DECLARATORY JUDGMENT THAT THE ARCH PRIOR KNOWLEDGE OR INFORMATION EXCLUSION BARS COVERAGE FOR THE UNDERLYING MATTERS

117.    Arch incorporates by reference each of the allegations of paragraphs 1 through 116 above.

118.    As of August 11, 2005, Bennett, Trosten and Maggio possessed knowledge or information concerning acts, errors, omissions, facts, matters or circumstances that might give rise to a Claim under the Arch Policy.

119.    The Underlying Matters consist of Claims arising out of, based upon, or attributable to such acts, errors, omissions, facts, matters or circumstances.

120.    Arch seeks a declaration that, based upon the Arch Prior Knowledge or Information Exclusion, the Arch Policy does not provide coverage for any loss arising out of the Underlying Matters.

## OTHER COVERAGE DEFENSES

121.    Other Arch Policy terms and conditions may ultimately be implicated.  Nothing in this Complaint should be construed as a waiver by Arch of any other coverage defenses under the Arch Policy or underlying policies with respect to any claim or potential claim and Arch reserves the right to raise all other terms and conditions of the Arch Policy and underlying policies as defenses to coverage as appropriate.

32

WHEREFORE, Arch requests that the Court enter a declaration and judgment in its favor:

A.     Declaring that, for the reasons set forth in Count I, the Arch Policy does not provide coverage to any Defendant for any Loss incurred in connection with the Underlying Matters;

B.     Declaring that, for the reasons set forth in Count II, the Arch Policy does not provide coverage to any Defendant for any Loss incurred in connection with the Underlying Matters;

C.     Awarding Arch such additional declaratory and other relief as shall be found to be appropriate under the circumstances; and

D.     Awarding Arch its fees and costs incurred in prosecuting this action.

Dated: February 21, 2008                    Respectfully submitted,

                                            VEDDER PRICE P.C.

                                            By: _____
                                                John H. Eickemeyer
                                                Daniel C. Green

                                            1633 Broadway
                                            47th Floor
                                            New York, New York 10019
                                            (212) 407-7700

                                            Of Counsel:

                                            Daniel J. Standish
                                            Marc E. Rindner
                                            Cara Tseng Duffield
                                            WILEY REIN LLP
                                            1776 K Street, NW
                                            Washington, DC 20006
                                            (202) 719-7000

                                            *Attorneys for Plaintiff*
                                            *Arch Insurance Company*

33

ARCH INSURANCE COMPANY,       )
                                  )
             Plaintiff,     )       Index No.:  08600029
                                  )
       v.                )
                                  )
JOHN D. AGOGLIA, PHILLIP R.     )
BENNETT, LEO R. BREITMAN, EDWIN  )
L. COX, SUKHMEET DHILLON,     )
THOMAS H. DITTMER, NATHAN    )
GANTCHER, STEPHEN GRADY, TONE  )
GRANT, THOMAS HACKL, DAVID V.   )
HARKINS, SCOTT L. JAECKEL,     )
DENNIS A. KLEJNA, THOMAS H. LEE,  )
ERIC G. LIPOFF, SANTO C. MAGGIO,  )
PETER MCCARTHY, JOSEPH      )
MURPHY, FRANK MUTTERER,     )
RICHARD N. OUTRIDGE, RONALD L.  )
O'KELLEY, SCOTT A. SCHOEN,    )
WILLIAM M. SEXTON, GERALD    )
SHERER, PHILIP SILVERMAN and   )
ROBERT C. TROSTEN,       )
                                  )
            Defendants.   )

## AMENDED SUMMONS AND COMPLAINT FOR DECLARATORY JUDGMENT

VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.

*Attorney(s) for*  Plaintiff Arch Insurance Company
1633 Broadway
NEW YORK, NY 10019
(212) 407-7700

**FILED**

FEB 2 2 2008

NEW YORK
COUNTY CLERK'S OFFICE

To

Service of a copy of the within is hereby admitted.

Dated:...................................

Attorney(s) for

Exhibit B

# U.S. SPECIALTY INSURANCE COMPANY
## Houston, Texas

**NOTICE: THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION. THE INSURER HAS NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED.**

## DECLARATIONS

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

POLICY NUMBER: 24-MGU-05-A10821    RENEWAL OF: N/A

ITEM 1.    NAMED CORPORATION:    Refco Inc.
550 W. Jackson Blvd., Suite 1300
Chicago, IL 60661

ITEM 2.    POLICY PERIOD:    (a) Inception Date: 8/11/2005
(b) Expiration Date: 8/11/2006
at 12:01 a.m. at the Principal Address stated in Item 1.

ITEM 3.    LIMIT OF LIABILITY (inclusive of Defense Costs):
$10,000,000 in the aggregate, for INSURING AGREEMENTS A and B combined

ITEM 4.    RETENTIONS:
(a) INSURING AGREEMENT A:    $0 or minimum required under applicable law, if any
(b) INSURING AGREEMENT B(1):    $300,000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under the circumstances described in CONDITION (A)(5))
(c) INSURING AGREEMENT B(2):    $500,000 for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts (waivable under the circumstances described in CONDITION (A)(5))

ITEM 5.    PREMIUM:    $395,000.00

ITEM 6.    NOTICES REQUIRED TO BE GIVEN TO THE INSURER MUST BE ADDRESSED TO:

HCC GLOBAL FINANCIAL PRODUCTS
P.O. Box 4018
Farmington, CT 06034
Attention: Claims Manager

ITEM 7.    DISCOVERY PERIOD:
(a) Premium: 150% of the Annual Premium.
(b) Duration: 365 days

ITEM 8.    ENDORSEMENTS ATTACHED AT ISSUANCE:
1117C-IL 991-301 991-302 991-319 991-322 991-412 991-415 991-442 991-444 991-701
991-804 991-830 991-861 991-876 991-3122 80016

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed on the Declarations Page by its President, a Secretary and a duly authorized representative of the Insurer.

Secretary                    President                    Authorized Representative

Date: September 23, 2005                                    USSIC-990 (04/2002)

# U. S. SPECIALTY INSURANCE COMPANY

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

#### This is a claims made policy. Please read it carefully.

In consideration of the payment of the premium, and in reliance upon the statements made in the Application, including attachments, all of which are made a part hereof and deemed attached hereto, and subject to the Declarations and the limitations, conditions, provisions, any endorsements to and all other terms of this Policy, the Insurer and the Insureds agree as follows:

## INSURING AGREEMENTS

(A)     The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made during the Policy Period or Discovery Period (if applicable), against the Insured Persons for Wrongful Acts, except when and to the extent that the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement.

(B)     The Insurer will pay to or on behalf of the Company Loss arising from:

   (1)     Claims first made during the Policy Period or the Discovery Period (if applicable) against the Insured Persons for Wrongful Acts, if the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement, and/or

   (2)     Securities Claims first made during the Policy Period or the Discovery Period (if applicable) against the Company for Wrongful Acts.

## DEFINITIONS

(A)     Application means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are deemed a part of the Policy.

(B)     Claim means:

   (1)     any written demand for monetary or non-monetary relief;

   (2)     any civil proceeding commenced by service of a complaint or similar pleading;

   (3)     any arbitration, mediation or other similar dispute resolution proceeding;

   (4)     any criminal proceeding commenced by return of an indictment;

   (5)     the receipt by an Insured Person of a target letter or similar document in connection with a criminal investigation of such Insured Person, or

   (6)     any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

   including any appeal from any such proceeding.

(C)     Company means the Named Corporation and any Subsidiary thereof.

(D)     Defense Costs means reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation,

U.S. SPECIALTY INSURANCE COMPANY 

adjustment, defense or appeal of a Claim against an Insured Person (or, with respect to Securities Claims, against any Insured), but excluding salaries, wages, benefits or overhead expenses of directors, officers or employees of the Company.

(E)    **Insured** means the Insured Persons and the Company.

(F)    **Insured Person** means:

    (1)    any past, present or future director or officer of the Company, including any person in a position which is the functional equivalent of a director or officer with respect to any entity included within the definition of Company or Outside Entity located outside the United States, and

    (2)    with respect only to Securities Claims, any past, present or future employee of the Company.

(G)    **Loss** means Defense Costs and any damages, settlements, judgments or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that:

    (1)    an Insured Person is legally obligated to pay as a result of any Claim, or

    (2)    the Company is legally obligated to pay as a result of any Securities Claim;

provided, that Loss will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed. For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any Claim shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such Claim and is most favorable to the Insureds in that regard.

(H)    **Named Corporation** means the entity designated as such in Item 1 of the Declarations.

(I)    **No Liability** means all defendant Insureds obtain by reason of a motion to dismiss, motion for summary judgment or trial a final non-appealable judgment in their favor.

(J)    **Outside Capacity** means service by an Insured Person as a director, officer, trustee, regent or governor of, or in another equivalent executive position with respect to, an Outside Entity, during such time that such service is at the request of the Company.

(K)    **Outside Entity** means any not-for-profit corporation, association, organization or entity.

(L)    **Policy Period** means the period set forth in Item 2 of the Declarations, subject to prior termination or cancellation pursuant to CONDITION (E).

(M)    **Pollutants** means any seepage, pollution or contamination, including but not limited to any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and materials to be recycled, reconditioned or reclaimed.

(N)    **Securities Claim** means a Claim which:

    (1)    is brought by or on behalf of one or more securities holders of the Company in their capacity as such, or

U.S. SPECIALTY INSURANCE COMPANY 

    (2)    arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market.

(O)    **Subsidiary** means any entity:

    (1)    during any time on or before the inception of the Policy Period in which the Named Corporation owns or owned more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries; or

    (2)    created or acquired during the Policy Period during any time in which, as a result of such creation or acquisition, the Named Corporation owns more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries.

    An entity ceases to be a Subsidiary when the Named Corporation ceases to own more than 50% of its issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries. The coverage afforded under this Policy with respect to Claims against a Subsidiary or any Insured Person thereof will apply only in respect of Wrongful Acts committed or allegedly committed after the effective time that such entity becomes a Subsidiary and prior to the time that such entity ceases to be a Subsidiary.

(P)    **Wrongful Act** means any:

    (1)    actual or alleged act, error, misstatement, misleading statement, omission or breach of duty:

        (a)    by an Insured Person in his or her capacity as such, including in an Outside Capacity, or

        (b)    with respect only to Securities Claims, by the Company; or

    (2)    matter claimed against an Insured Person solely by reason of his or her service in such capacity or in an Outside Capacity.

## EXCLUSIONS

Unless otherwise specifically stated or provided for in CONDITION (D)(2) or elsewhere in this Policy, the Insurer will not be liable to make any payment of Loss in connection with a Claim:

(A)    arising out of based upon or attributable to the gaining by any Insured of any profit or advantage to which such Insured was not legally entitled; provided, that this EXCLUSION (A) will apply only if there has been a final adjudication adverse to such Insured establishing that the Insured gained such a profit or advantage;

(B)    arising out of, based upon or attributable to the commission by any Insured of any criminal or deliberately fraudulent or dishonest act; provided, that this EXCLUSION (B) will apply only if there has been a final adjudication adverse to such Insured establishing that the Insured so acted;

(C)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from any actual or alleged libel, slander, defamation or disparagement or

U.S. SPECIALTY INSURANCE COMPANY 

violation of a person's right of privacy; provided, that this EXCLUSION (C) will not apply to Securities Claims;

(D)    for the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants; provided, that this EXCLUSION (D) will not apply to Securities Claims;

(E)    for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or any regulations promulgated thereunder or of any similar law or regulation; provided, that this EXCLUSION (E) will apply only to Claims involving employee pension or welfare benefit plans organized or sponsored by the Company for its own employees, and will not apply to Securities Claims;

(F)    brought by or on behalf of, or in the name or right of, the Company, whether directly or derivatively, or any Insured Person, unless such Claim is:

    (1)    brought and maintained independently of, and without the solicitation, assistance or active participation of, the Company or any Insured Person, or

    (2)    for an actual or alleged wrongful termination of employment, or

    (3)    brought or maintained by an Insured Person for contribution or indemnity and directly results from another Claim covered under this Policy, or

    (4)    brought and maintained by an employee of the Company solely to enforce his or her rights as a holder of securities issued by the Company;

provided, that this EXCLUSION (F) will not apply to Claims brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the Company;

(G)    by or on behalf of, or in the name or right of, any Outside Entity, whether directly or derivatively, against an Insured Person for a Wrongful Act in his or her Outside Capacity with respect to such Outside Entity, unless such Claim is brought and maintained independently of, and without the solicitation, assistance or active participation of, the Outside Entity, the Company or any Insured Person;

(H)    arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time; or

(I)    arising out of, based upon or attributable to any pending or prior litigation as of the inception date of this Policy, or alleging or derived from the same or essentially the same facts or circumstances as alleged in such pending or prior litigation.

For purposes of determining the application of the above EXCLUSIONS, no Wrongful Act of any Insured Person will be imputed to any other Insured Person who did not have actual knowledge of, or directly participate in the commission of, such Wrongful Act and, except for Wrongful Acts of the Company's chairman of the board, chief executive officer, president, chief financial officer or general counsel, no Wrongful Act of any Insured Person will be imputed to the Company.

DISCOVERY PERIOD

If the Insurer or the Named Corporation fails or refuses to renew this Policy or if the Named Corporation cancels this Policy, any Insured will have the right, upon payment of the Discovery Period Premium set

U.S. SPECIALTY INSURANCE COMPANY 

forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any Wrongful Act actually or allegedly taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period. This clause and the right contained within will not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

EXTENSIONS

(A)  Subject to its terms and conditions, this Policy will afford coverage for Claims for Wrongful Acts of an Insured Person if such Claims are made against the estates, heirs, legal representatives or assigns of an Insured Person who is deceased or against the legal representatives or assigns of an Insured Person who is incompetent, insolvent or bankrupt, to the extent that such Claims would have been covered by this Policy in the absence of such death, incompetence, insolvency or bankruptcy.

(B)  Subject to its terms and conditions, this Policy will afford coverage for Claims for Wrongful Acts of an Insured Person if such Claims are made against the Insured Person's lawful spouse solely by reason of such spouse's legal status as a spouse of the Insured Person or such spouse's ownership interest in property which the claimant seeks as recovery for alleged Wrongful Acts of the Insured Person. For purposes of the Policy, amounts which such spouse becomes legally obligated to pay by reason of such Claim will be treated as Loss which the Insured Person is legally obligated to pay on account of the Claim made against the Insured Person. This coverage extension does not apply, however, to the extent the Claim alleges any wrongful act or omission by the Insured Person's spouse.

CONDITIONS

(A)  Limit of Liability and Retention

(1)  The Insurer's maximum aggregate liability for all Loss on account of all Claims first made during the same Policy Period, whether covered under one or more INSURING AGREEMENTS, will not exceed the Limit of Liability set forth in Item 3 of the Declarations.

(2)  Defense Costs will be part of and not in addition to the Limit of Liability, and payment of Defense Costs will reduce the Limit of Liability. Defense Costs, as incurred, will also be applied against the retention.

(3)  The retention stated in Item 4(b) of the Declarations will apply to Loss, including Defense Costs, which the Company is required or permitted to pay as indemnification or advancement to or on behalf of the Insured Persons, whether or not such Loss is actually paid, unless the Company is unable to pay such Loss as indemnification or advancement solely by reason of its financial insolvency. For purposes of this CONDITION (A)(3), the certificate of incorporation, charter, articles of association or other organizational documents of the Named Corporation, each Subsidiary and each Outside Entity, including the bylaws and resolutions thereof, will be deemed to have been adopted or amended to provide indemnification and advancement to the Insured Persons to the fullest extent permitted by law.

(4)  The Insurer will be liable only for the amount of Loss in connection with any Claim, which is in excess of the applicable retention stated in Item 4 of the Declarations. Such retention is to be borne by the Insureds and remain uninsured. A single retention will

U.S. SPECIALTY INSURANCE COMPANY 

apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

(5)  Notwithstanding the foregoing, with respect to Securities Claims the retentions stated in Items 4(b) and 4(c) of the Declarations will apply only to Defense Costs; provided, that if a Securities Claim is finally resolved by a determination of No Liability, no retention will apply to such Securities Claim even as respects Defense Costs and the Insurer will thereupon reimburse Defense Costs within the retention which shall already have been paid by the Insureds.

(6)  One retention amount will apply to the covered portion of each and every single Claim. If a single Claim is covered under more than one INSURING AGREEMENT, the retentions stated in Item 4 of the Declarations will be applied separately to the portions of the Claim covered by each INSURING AGREEMENT, and the sum of the retentions so applied will constitute the retention for each single Claim, which in total will not exceed the largest of the applicable retentions.

(B)  Notice of Claims and Reporting Provisions

(1)  The Insureds must, as a condition precedent to the obligations of the Insurer under this Policy, give written notice, including full details, to the Insurer of any Claim as soon as practicable after it is made.

(2)  If written notice of a Claim has been given to the Insurer pursuant to CONDITION (B)(1) above, then any Claim subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim of which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, will be considered to have been made at the time such notice was given.

(3)  If, during the Policy Period or the Discovery Period (if applicable), the Insureds become aware of any circumstances which may reasonably be expected to give rise to a Claim against the Insureds and if, before the end of the Policy Period or the Discovery Period (if applicable), the Insureds give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, potential claimants and the consequences which have resulted or may result from such Wrongful Act, then any Claim subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act described in such notice will be considered to have been made at the time such notice of circumstances was given.

(4)  All notices under this CONDITION (B) must refer to the Policy Number, must be in writing, must request coverage under this Policy, and must be given by certified mail or prepaid express courier to the address set forth in Item 6 of the Declarations.

(C)  Interrelationship of Claims

All Claims alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single Claim and will be considered to have been made at the time the earliest such Claim was made.

(D)  Defense Costs, Settlements, Allocation of Loss, Priority of Payments

U.S. SPECIALTY INSURANCE COMPANY 

(1) The Insurer will have no duty under this Policy to defend any Claim. The Insureds must defend any Claim made against them. The Insureds may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the Insurer's prior written consent. Only those settlements, stipulated judgments and Defense Costs to which the Insurer has consented will be recoverable as Loss under this Policy. The Insurer's consent may not be unreasonably withheld; provided, that the Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

(2) The Insurer will pay covered Defense Costs on an as-incurred basis. If it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer.

(3) If Loss covered by this Policy and loss not covered by this Policy are both incurred in connection with a single Claim, either because the Claim includes both covered and uncovered matters, or because the Claim is made both against Insured Persons (or, with respect only to Securities Claims, against Insureds) and against others not included within the definition of Insured Person (or, with respect only to Securities Claims, the definition of Insured), the Insureds and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts, taking into account the relative legal and financial exposures of the parties to the Claim and the relative benefits to be obtained by the resolution of the Claim. The Insurer will be obligated to pay only those amounts or portions of Loss allocated to covered matters claimed against Insured Persons (or, with respect only to Securities Claims, against Insureds). If the Insureds and the Insurer are unable to agree upon an allocation, then until a final allocation is agreed upon or determined pursuant to the provisions of this Policy and applicable law, the Insurer will be obligated to make an interim payment of that amount or portion of Loss, including Defense Costs, which the parties agree is not in dispute.

(4) If the Insurer is obligated to pay Loss, including Defense Costs, under more than one INSURING AGREEMENT, whether in connection with a single Claim or multiple Claims, the Insurer will first pay any Loss payable under INSURING AGREEMENT (A) and, if the Insurer concludes that the amount of all Loss, including Defense Costs, is likely to exceed the Insurer's Limit of Liability, the Insurer shall be entitled to withhold some or all of any Loss payable under INSURING AGREEMENT (B)(1) or (B)(2) to ensure that as much of the Limit of Liability as possible is available for the payment of Loss under INSURING AGREEMENT (A). If no Loss is payable under INSURING AGREEMENT (A), or if the Insurer's obligations under INSURING AGREEMENT (A) have been satisfied, then, subject to the Insurer's Limit of Liability as set forth in Item 3 of the Declarations, the Insurer will pay such Loss as it is required to pay under INSURING AGREEMENT (B)(1) or (B)(2) in such manner and, in the event of multiple Claims, apportioned among such Claims as the Named Corporation shall direct in writing.

(E) Cancellation or Nonrenewal

(1) The Insurer may cancel this Policy for non-payment of premium by sending not less than ten (10) days notice to the Named Corporation at its last known address. The Insurer may not otherwise cancel this Policy.

(2) The Named Corporation may cancel this Policy by mailing the Insurer written notice stating when such cancellation will be effective; provided, that the Named Corporation may not cancel this Policy after the effective date of any acquisition of the Named Corporation as described in CONDITION (F) below. If the Named Corporation cancels this Policy, the Insurer will retain the customary short rate premium. Premium adjustment may be made either at the time cancellation is effective or as soon as

U.S. SPECIALTY INSURANCE COMPANY 

practicable after cancellation becomes effective, but payment of unearned premium is not a condition of cancellation.

(3)    If the Insurer elects not to renew this Policy, the Insurer must give the Named Corporation notice of non-renewal no less than sixty (60) days before the end of the Policy Period.

(4)    If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period will be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

(F)    Changes in Control

(1)    If, during the Policy Period, any of the following transactions or events (each a "Change in Control") occurs with respect to the Named Corporation:

(a)    the Named Corporation merges into or consolidates with another entity such that the Named Corporation is not the surviving entity, or

(b)    another entity, person or group of entities and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the Named Corporation, or

(c)    a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the Named Corporation;

then coverage under this Policy will continue in full force and effect until the end of the Policy Period with respect to Claims for Wrongful Acts committed or allegedly committed before the effective date of such Change in Control, but coverage will cease with respect to Claims for Wrongful Acts committed or allegedly committed thereafter and the premium will be considered fully earned in consideration of the coverage extended.

(2)    If, during the Policy Period, any of the following transactions or events (each a "Change in Control") occurs with respect to a Subsidiary:

(a)    the Subsidiary ceases to be a Subsidiary, or

(b)    a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the Subsidiary;

then coverage under this Policy with respect to Claims against such Subsidiary or any Insured Person thereof will continue in full force and effect until the end of the Policy Period with respect to Claims for Wrongful Acts committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to Claims against such Subsidiary or any Insured Person thereof will cease with respect to Claims for Wrongful Acts committed or allegedly committed thereafter.

(G)    Other Insurance and Other Indemnification

(1)    Such insurance as is provided by this Policy will apply only as excess over and will not contribute with any other valid and collectible insurance.

U.S. SPECIALTY INSURANCE COMPANY 

    (2)    All coverage for Loss from Claims against Insured Persons for Wrongful Acts in their Outside Capacities will be specifically excess of, and will not contribute with,

        (a)    any other insurance available to such Insured Persons by reason of their service in Outside Capacities, and

        (b)    any indemnification available to such Insured Persons in connection with their service in Outside Capacities from any source other than the Company, including but not limited to Outside Entities.

**(H)**    <u>Cooperation and Subrogation</u>

    (1)    In the event of any notice under CONDITION (B) of a Claim or of circumstances which may reasonably be expected to give rise to a Claim, the Insureds will give the Insurer all information, assistance and cooperation that the Insurer may reasonably request with respect thereto.

    (2)    In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment to all of the Insureds' rights of recovery, including without limitation the Insured Persons' rights to indemnification or advancement from the Company. The Insureds must execute all papers required and do everything necessary to secure such rights and to enable the Insurer to bring suit in their name.

**(I)**    <u>No Action against the Insurer</u>

No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy and until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against an Insured after actual trial or by written agreement of the Insured, the claimant and the Insurer. No person or organization will have any right under this Policy to join the Insurer as a party to any action against the Insureds to determine the Insurer's liability; nor may the Insurer be impleaded by the Insureds or their legal representatives in any such action.

**(J)**    <u>Notices and Authority</u>

By acceptance of this Policy, the Insureds agree that the Named Corporation may act on behalf of all Insureds with respect to the giving and receiving of any notices, the payment of premiums and the receiving of any return premium, the cancellation or renewal of this Policy and the acceptance of any amendments thereto.

**(K)**    <u>Assignment</u>

No assignment of interest under this Policy will bind the Insurer without the Insurer's written consent.

**(L)**    <u>Titles and Headings</u>

The titles and headings to the various paragraphs and sections in this Policy, including endorsements attached, are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such paragraphs and sections to which they relate.

**(M)**    <u>Representations and Severability</u>

The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations.

U.S. SPECIALTY INSURANCE COMPANY

No knowledge or information possessed by any Insured will be imputed to any other Insured except for material facts or information known to the person or persons who signed the Application. If any of the particulars or statements in the Application is untrue, this Policy will be void with respect to any Insured who knew of such untruth or to whom such knowledge is imputed.

**(N)**    Changes

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not effect a waiver or a change in any part of this Policy or stop the Insurer from asserting any right under the terms of this Policy. This Policy cannot be waived or changed, except by written endorsement issued to form a part of this Policy.

**(O)**    Entire Agreement

By acceptance of this Policy, the Insureds and the Insurer agree that this Policy (including the Application and any materials submitted therewith) and any written endorsements attached hereto constitute the entire agreement between the parties with respect to this insurance.

**(P)**    Territory

This Policy applies to Wrongful Acts actually or allegedly taking place or Claims made anywhere in the world.

**(Q)**    Conformity to Statute

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, including any endorsement to this Policy which is required by any state Department of Insurance (or equivalent authority) ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein will be construed to restrict the terms of any State Amendatory Endorsement. In addition, to the extent permissible by law, nothing in any State Amendatory Endorsement will be construed to restrict the terms of this Policy.

In witness whereof the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations Page by a duly authorized representative of the Insurer.

Secretary                                    President

.S. SPECIALTY INSURANCE COMPANY

ENDORSEMENT NUMBER: 1

## ILLINOIS AMENDATORY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on 8/11/05, forms part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company:

In consideration of the premium charged:

DEFINITIONS (D) <u>Defense Costs</u> of the policy has been amended to read:

Defense Costs means reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation, adjustment, defense or appeal of a Claim against an Insured Person (or, with respect to Securities Claims, against any Insured), but excluding salaries, wages, benefits or overhead expenses of directors, officers or employees of the Company or the Insurer.

DISCOVERY PERIOD of the policy has been amended to read:

If the Insurer or the Named Corporation fails or refuses to renew this Policy or if the Named Corporation cancels this Policy, any Insured will have the right, upon payment of the Discovery Period Premium set forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any Wrongful Act actually or allegedly taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period.

CONDITIONS (G)(1) <u>Other Insurance and Other Indemnification</u> of the policy has been amended to read:

(1)    Such insurance as is provided by this Policy will share proportionately with similar coverages provided under any other valid and collectible insurance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

USSIC 1137C-IL (06/04)                    Page 1 of 1

ENDORSEMENT NUMBER:  2

EMPLOYMENT PRACTICES LIABILITY EXTENSION – NONENTITY

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged it is hereby understood and agreed that:

(1)    DEFINITION (P) Wrongful Act is amended to include any Employment Practices
Wrongful Act by an Insured Person in his or her capacity as such.

(2)    DEFINITION (F) Insured Person, subsection (2) is amended to read:

(2)    with respect only to Securities Claims and Claims for Employment
Practices Wrongful Acts, any past, present or future employee of the
Company.

(3)    The following DEFINITIONS are added to the Policy:

Discrimination means:

(1)    any failure or refusal to hire, failure or refusal to promote, demotion or discharge
of, or wrongful failure to grant tenure to, any person, or

(2)    any limitation, segregation or classification of any employee or applicant for
employment in any way that would deprive or tend to deprive any person of
employment opportunities or otherwise adversely affect his or her status as an
employee;

because of such person's race, color, age, sex, disability, pregnancy, sexual orientation or
preference, national origin, religion, or other status that is protected pursuant to any
applicable federal, state or local statute or ordinance.

Employment Practices Wrongful Act means any actual or alleged:

(1)    Discrimination,
(2)    Retaliation,
(3)    Sexual Harassment,
(4)    Workplace Harassment,
(5)    Workplace Tort, or
(6)    Wrongful Termination.

Retaliation means retaliatory treatment against an employee of the Company on account
of such employee's exercise or attempted exercise of his or her rights under law.

Sexual Harassment means unwelcome sexual advances, requests for sexual favors, or
other verbal, visual or physical conduct of a sexual nature that is made a condition of
employment with the Company, is used as a basis for employment decisions by the

991-301                              Page 1 of 2
Ed (01/03)

Company, creates a work environment with the Company that interferes with performance, or creates an intimidating, hostile or offensive working environment.

**Workplace Harassment** means conduct that creates a work environment with the Company that interferes with performance, or creates an intimidating, hostile or offensive working environment.

**Workplace Tort** means misrepresentation, defamation (including libel and slander), invasion of privacy, false imprisonment, negligent evaluation, negligent training or supervision, wrongful discipline or wrongful deprivation of career opportunity, if actually or allegedly related to the claimant's employment by the Company.

**Wrongful Termination** means actual or constructive termination of the employment of, or demotion of, or failure or refusal to promote, any employee, which is in violation of law, against public policy or in breach of an implied agreement to continue employment.

(4)     EXCLUSION (C) will not apply to Loss for mental anguish, emotional distress, libel, slander, defamation or disparagement or violation of a person's right of privacy caused by an Employment Practices Wrongful Act.

(5)     EXCLUSION (F), subsection (2) is amended to read as follows:

(2)     for an actual or alleged Employment Practices Wrongful Act;

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement: .

By: _____

Attorney-in-fact

991-301
Ed (01/03)

Page 2 of 2

ENDORSEMENT NUMBER: 3

### ADD SPECIFIC INDIVIDUALS AS "INSURED PERSONS"

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (F) "Insured Person" is amended to include the following individuals:

Insurance Manager and General Counsel

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete Only When This Endorsement Is Not Prepared With The Policy Or Is Not To Be Effective With The Policy.

Effective Date of this endorsement:

By: _____
                    Attorney-in-Fact

ENDORSEMENT NUMBER: 4

AMEND "LOSS" TO INCLUDE PRE-JUDGMENT
AND POST-JUDGMENT INTEREST

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (G) Loss is amended to read as
follows:

(G)    Loss means Defense Costs and any damages, settlements, judgments, pre-
judgment interest, post-judgment interest, or other amounts (including
punitive or exemplary damages and the multiplied portion of any
multiplied damage award, if and where insurable by law) that:

(1)    an Insured Person is legally obligated to pay as a result of
any Claim, or

(2)    the Company is legally obligated to pay as a result of any
Securities Claim;

provided, that Loss will not include wages, fines, taxes or penalties or
matters which are uninsurable under the law pursuant to which this Policy
is construed. For purposes of determining whether punitive or exemplary
damages or the multiplied portion of any multiplied damage award arising
from any Claim shall be insurable by law, the Insurer agrees to abide by
the law of whichever jurisdiction is applicable to such Claim and is most
favorable to the Insureds in that regard.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is
not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                    Attorney-in-Fact

991-319                          Page 1 of 1
Ed (06/03)

ENDORSEMENT NUMBER: 5

**EMPLOYED LAWYERS EXTENSION**
**(SEPARATE LIMIT AND RETENTION)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)     DEFINITION (F) Insured Person is amended to include any Employed Lawyer.

(2)     DEFINITION (P) Wrongful Act is amended to include any act, error, misstatement, misleading statement, omission or breach of duty by an Employed Lawyer, in his or her capacity as such, in the rendering or failure to render professional legal services for the Company; provided, that Wrongful Act shall not include any act, error, misstatement, misleading statement, omission or breach of duty by such Employed Lawyer in connection with any activities: (1) that are not related to such Employed Lawyer's employment with the Company; (2) that are not rendered on the behalf of the Company at the Company's written request; or (3) that are performed by the Employed Lawyer for others for a fee.

(3)     The following DEFINITION is added to the Policy:

Employed Lawyer means any past, present or future full-time, salaried employee of the Company who is admitted to practice law and who is employed at the time of any alleged Wrongful Act as a lawyer full-time for and salaried by the Company.

(4)     The EXCLUSIONS section of the Policy is amended by the addition of the following:

The Insurer will not be liable to make any payment of Loss in connection with any Claim made against an Employed Lawyer:

(a)     alleging, arising out of, based upon or attributable to any Wrongful Act occurring at a time when such Employed Lawyer was not employed as a lawyer by the Company;

(b)     alleging, arising out of, based upon or attributable to any Claim made or any prior or pending litigation as of 8/11/05, or alleging or derived from the same facts or circumstances as alleged in such pending or prior litigation;

(c)     alleging, arising out of, based upon or attributable to any Wrongful Act, if as of 8/11/05, such Employed Lawyer knew or could have reasonably foreseen that such Wrongful Act could give rise to a Claim;

(d)     alleging, arising out of, based upon or attributable to any activities by such Employed Lawyer as an officer or director of any entity other than the Company.

(5)     For purposes of the applicability of the coverage provided by this endorsement, the Company will be conclusively deemed to have indemnified the Employed Lawyer to the extent that the Company is permitted or required to indemnify him or her pursuant to

991-322                                   Page 1 of 1
(Ed. 09/03)

law, common or statutory, or contract, or the charter or by-laws of the **Company** (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The **Company** hereby agrees to indemnify the **Employed Lawyer** to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)    The coverage provided by this endorsement shall apply only to **Claims** made against an **Employed Lawyer**, provided that, and only for so long as, one or more **Insured Persons** (other than such **Employed Lawyer**) are and remain co-defendants in the proceeding along with such **Employed Lawyer**.

(7)    The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)    Solely for purposes of the coverage provided under this endorsement:

(a)    The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period** will not exceed $100,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

(b)    A retention of $100,000 shall apply to **Loss** resulting from each **Claim**; provided, such retention shall not apply to **Loss** incurred by any **Employed Lawyer** if indemnification of such **Loss** by the **Company** is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By:    _____
       Attorney-in-Fact

ENDORSEMENT NUMBER: 6

**ERRORS AND OMISSIONS EXCLUSION**
**WITH MANAGEMENT CARVEBACK**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to
make any payment of Loss in connection with a Claim arising out of, based upon or
attributable to any actual or alleged rendering of or failure to render, whether by the
**Company** or by any **Insured Person**, any service for others for a fee; provided, that this
exclusion will not apply to a Claim against an **Insured Person** for a **Wrongful Act** in
connection with the management or supervision of the **Company** or any division or
group therein.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is
not to be effective with the policy.

Effective Date of this endorsement:

By: _____
       Attorney-in-Fact

991-412                                   Page 1 of 1
Ed (09/00)

ENDORSEMENT NUMBER: 7

SPECIFIC LITIGATION EXCLUSION

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of Loss in connection with any Claim arising out of, based upon or attributable to the following litigation:

Edward McElwreath Case

or alleging or derived from the same or essentially the same facts or circumstances as alleged in such litigation.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                              Attorney-in-Fact

991-415
Ed. 09/05

Page 1 of 1

**ENDORSEMENT NUMBER: 8**

**AMEND POLLUTION EXCLUSION ENDORSEMENT**
**(A-SIDE CARVEBACK)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (D) of this Policy is amended to read in its entirety as follows:

(D)      for the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants; provided, that this EXCLUSION (D) will not apply to Securities Claims; provided further, that this EXCLUSION (D) will not apply to Claims for Loss payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
               Attorney-in-Fact

991-442
Ed (05/04)                    Page 1 of 1

ENDORSEMENT NUMBER: 9

AMEND EXCLUSION (C) ENDORSEMENT –
A-SIDE CARVEBACK

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (C) is amended to read in
its entirety as follows:

(C)    for any actual or alleged bodily injury, sickness, mental anguish, emotional
distress, disease or death of any person or damage to or destruction of any
tangible property, including the loss of use thereof, or for injury from any
actual or alleged libel, slander, defamation or disparagement or violation of a
person's right of privacy; provided, that this EXCLUSION (C) will not apply
to:

(1)    Securities Claims, or

(2)    Claims for Loss payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be
effective with the Policy.

Effective date of this endorsement:

By: _____
                        Attorney-in-Fact

ENDORSEMENT NUMBER: 10

FULL SEVERABILITY

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, CONDITION (M) Representations and Severability is amended to read as follows:

(M)     Representations and Severability

The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any Insured will be imputed to any other Insured. If any of the particulars or statements in the Application is untrue, this Policy will be void with respect to any Insured who knew of such untruth.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____

    Attorney-in-Fact

991-701                     Page 1 of 1
Ed (09/03)

ENDORSEMENT NUMBER: 11

DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)     INSURING AGREEMENTS is amended by the addition of the following:

The Insurer will pay to or on behalf of the Company all Derivative Demand Investigation Costs incurred by the Company as a result of a Derivative Demand first received by the Company's Board of Directors and reported in writing to the Insurer during the Policy Period or the Discovery Period, if purchased, up to the amount of the Derivative Demand Investigation Costs Sub-Limit.

(2)     DEFINITIONS is amended by the addition of the following:

Derivative Demand means a written demand by one or more shareholders of the Company made upon its Board of Directors to bring a civil proceeding in a court of law against an Insured Person for a Wrongful Act.

Derivative Demand Investigation Costs means reasonable fees, costs and expenses (including but not limited to attorneys' fees and experts' fees) incurred in connection with the investigation or evaluation of any Derivative Demand, but excluding wages, salaries, fees, benefits or overhead expenses of any Insured Person.

Derivative Demand Investigation Costs Sub-Limit means $250,000.

(3)     The Insurer's maximum aggregate liability for Derivative Demand Investigation Costs resulting from all Derivative Demands shall be the amount set forth in the definition of Derivative Demand Investigation Costs Sub-Limit, regardless of the number of Derivative Demands received during the Policy Period or the Discovery Period, if purchased. The Derivative Demand Investigation Costs Sub-Limit shall be part of and not in addition to the Limit of Liability set forth in Item 3 of the Declarations, and payment of such Derivative Demand Investigation Costs shall reduce such Limit of Liability.

(4)     There shall be no retention applicable to Derivative Demand Investigation Costs.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                        Attorney-in-Fact

991-804                          Page 1 of 1
Ed (06/00)

ENDORSEMENT NUMBER: 12

SEPARATE RETENTION FOR SECURITIES CLAIMS
UNDER INSURING AGREEMENT (B)(1)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, solely for purposes of Loss payable
under INSURING AGREEMENT (B)(1) arising from any Securities Claim, the retention stated
in Item 4(b) of the Declarations is amended to be $500,000.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be
effective with the Policy.

Effective date of this endorsement:

By: _____
         Attorney-in-Fact

991-830                          Page 1 of 1
Ed. 07/05

ENDORSEMENT NUMBER: 13

**NON-RESCINDABLE:**
**INSURING AGREEMENT (A) ONLY**

To be attached to and made a part of Policy No. 24-MGU-05-A10821 , issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, notwithstanding anything in this Policy to the contrary, the Insurer shall not be entitled under any circumstances to rescind the coverage provided under Insuring Agreement (A) of this Policy.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
          Attorney-in-Fact

991-861                    Page 1 of 1
Ed (04/04)

ENDORSEMENT NUMBER: 14

SPECIFIC EVENT(S) EXCLUSION

　　　　To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of Loss in connection with a Claim arising out of, based upon or attributable to any event described hereunder.

　　　Excluded Event(s):
　　　Wells Notice/SEC Investigation

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

　　Effective date of this endorsement:

　　　　　　　　　　　By: _____
　　　　　　　　　　　　　　Attorney-in-Fact

991-876                          Page 1 of 1
Ed. (05/05)

ENDORSEMENT NUMBER: 15

CONTROLLING SHAREHOLDER COVERAGE –
SPECIFIC PERSON(S)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that:

(1)     The following INSURING AGREEMENT is added to the Policy:

The Insurer will pay to or on behalf of the Controlling Shareholder Loss arising from a
Securities Claim first made during the Policy Period or the Discovery Period (if
applicable) against such Controlling Shareholder for Wrongful Acts, provided, that
one or more Insured Persons and/or the Company are and remain co-defendants in such
Securities Claim along with such Controlling Shareholder.

(2)     The following DEFINITION is added to the Policy:

Controlling Shareholder means the following person(s):

Philip Bennett

(3)     DEFINITION (E) Insured is amended to read as follows:

(E)     Insured means:  (1) the Insured Persons; (2) the Company; or (3) the
Controlling Shareholder but only with respect to Securities Claims.

(4)     DEFINITION (G) Loss, subsection (2), is amended to read as follows:

(2)     the Company or Controlling Shareholder is legally obligated to pay as a
result of any Securities Claim;

(5)     DEFINITION (P) Wrongful Act, subsection (1)(b), is amended to read as follows:

(b)     with respect only to Securities Claims, by the Company or by the
Controlling Shareholder in his or her capacity as such or any matter
claimed against such Controlling Shareholder by reason of his or her status
as such; or

(6)     EXCLUSION (F) is amended to read as follows:

(F)     brought by or on behalf of, or in the name or right of, the Company, whether
directly or derivatively, or any Insured Person or Controlling Shareholder,
unless such Claim is:

(1)     brought and maintained independently of, and without the
solicitation, assistance or active participation of, the Company or
any Insured Person, or

991-1122
Ed. 09/05

(2)    for an actual or alleged wrongful termination of employment, or

(3)    brought or maintained by an Insured Person or a Controlling Shareholder for contribution or indemnity and directly results from another Claim covered under this Policy, or

(4)    brought and maintained by an employee of the Company solely to enforce his or her rights as a holder of securities issued by the Company;

provided, that this EXCLUSION (F) will not apply to Claims brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the Company;

(7)    A retention of $300,000 will apply to Loss resulting from each Claim for which coverage is provided under this endorsement; provided, however, that such retention will apply only to Defense Costs and will not apply to any other Loss.

(8)    CONDITION (F) Changes in Control, subsection (2), is amended to read as follows:

(2)    If, during the Policy Period, any of the following transactions or events (each a "Change in Control") occurs with respect to a Subsidiary:

(a)    the Subsidiary ceases to be a Subsidiary, or

(b)    a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the Subsidiary;

then coverage under this Policy with respect to Claims against such Subsidiary or any Insured Person or Controlling Shareholder thereof will continue in full force and effect until the end of the Policy Period with respect to Claims for Wrongful Acts committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to Claims against such Subsidiary or any Insured Person or Controlling Shareholder thereof will cease with respect to Claims for Wrongful Acts committed or allegedly committed thereafter.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
        Attorney-in-Fact

991-1122                         Page 2 of 2
Ed. 09/05

ENDORSEMENT NUMBER: 16

## POLICYHOLDER DISCLOSURE – TERRORISM PREMIUM NOTICE

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

Your policy contains coverage for certain losses caused by terrorism.  We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act of 2002.  The Act also requires us to provide disclosure of Federal participation in payment of terrorism losses.  For a further description of an act of terrorism as provided under the Act, see below.

You should know that effective November 26, 2002 any losses caused by certified acts of terrorism would be partially reimbursed by the United States government, Department of Treasury, under a formula established by federal law.  Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.  The premium charged for this coverage is shown below; it does not include any charges for the portion of loss covered by the federal government under the Act.

The portion of your premium that is attributable to coverage for terrorist acts certified under the Act is $0.

The following excerpt from the Act is provided for your information:

According to Section 102(1) of the Terrorism Risk Insurance Act of 2002: "The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States —— (1) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or (III) infrastructure; (iii) to have resulted in damage within the United States, or premises of a United States mission; and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion." Section 102(1)(B) states: "No act shall be certified by the Secretary as an act of terrorism if (i) the act is committed as part of the course of war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000." Section 102(C) and (D) specify that the determination are final and not subject to judicial review and that the Secretary of the Treasury cannot delegate the determination to anyone.

ENDORSEMENT NUMBER: 17

**EMPLOYED LAWYERS EXTENSION**
**(SEPARATE LIMIT AND RETENTION)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

This endorsement replaces and supersedes Endorsement Number 5 ("Employed Lawyers Extension (Separate Limit and Retention)" as of the effective date of this endorsement.

In consideration of the premium charged:

(1)     DEFINITION (F) Insured Person is amended to include any Employed Lawyer.

(2)     DEFINITION (P) Wrongful Act is amended to include any act, error, misstatement, misleading statement, omission or breach of duty by an Employed Lawyer, in his or her capacity as such, in the rendering or failure to render professional legal services for the Company; provided, that Wrongful Act shall not include any act, error, misstatement, misleading statement, omission or breach of duty by such Employed Lawyer in connection with any activities: (1) that are not related to such Employed Lawyer's employment with the Company; (2) that are not rendered on the behalf of the Company at the Company's written request; or (3) that are performed by the Employed Lawyer for others for a fee.

(3)     The following DEFINITION is added to the Policy:

Employed Lawyer means any past, present or future full-time, salaried employee of the Company who is admitted to practice law and who is employed at the time of any alleged Wrongful Act as a lawyer full-time for and salaried by the Company.

(4)     The EXCLUSIONS section of the Policy is amended by the addition of the following:

The Insurer will not be liable to make any payment of Loss in connection with any Claim made against an Employed Lawyer:

(a)     alleging, arising out of, based upon or attributable to any Wrongful Act occurring at a time when such Employed Lawyer was not employed as a lawyer by the Company;

(b)     alleging, arising out of, based upon or attributable to any Claim made or any prior or pending litigation as of 8/11/05, or alleging or derived from the same facts or circumstances as alleged in such pending or prior litigation;

(c)     alleging, arising out of, based upon or attributable to any Wrongful Act, if as of 8/11/05, such Employed Lawyer knew or could have reasonably foreseen that such Wrongful Act could give rise to a Claim;

991-322                         Page 1 of 1
(Ed. 09/03)

(d)    alleging, arising out of, based upon or attributable to any activities by such Employed Lawyer as an officer or director of any entity other than the Company.

(5)    For purposes of the applicability of the coverage provided by this endorsement, the Company will be conclusively deemed to have indemnified the Employed Lawyer to the extent that the Company is permitted or required to indemnify him or her pursuant to law, common or statutory, or contract, or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The Company hereby agrees to indemnify the Employed Lawyer to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)    The coverage provided by this endorsement shall apply only to Claims made against an Employed Lawyer, provided that, and only for so long as, one or more Insured Persons (other than such Employed Lawyer) are and remain co-defendants in the proceeding along with such Employed Lawyer.

(7)    The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)    Solely for purposes of the coverage provided under this endorsement:

(a)    The Insurer's maximum aggregate liability for all Loss on account of all Claims first made during the same Policy Period will not exceed $1,000,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

(b)    A retention of $100,000 shall apply to Loss resulting from each Claim; provided, such retention shall not apply to Loss incurred by any Employed Lawyer if indemnification of such Loss by the Company is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:    8/11/2005

By _____
Attorney-in-Fact

991-322                          Page 1 of 1
(Ed. 09/03)

Exhibit C

# ROSS, DIXON & BELL, LLP

2001 K Street, N.W. • Washington, D.C. 20006-1040 • *p* (202) 662-2000 *f* (202) 662-2190

**LESLIE S. AHARI**
DIRECT DIAL:  (202) 662-2036
EMAIL:  LAHARI@RDBLAW.COM

April 25, 2007

**BY EMAIL AND FACSIMILE**

Luc A. Despins, Esq.
Dennis C. O'Donnell, Esq.
Milbank, Tweed, Hadley & McCloy, LLP
1 Chase Manhattan Plaza
New York, New York 10005

    Re:    **Refco/U.S. Specialty Insurance Company**

Dear Counsel:

    Pursuant to Judge Drain's March 27, 2006 Order in *In re Refco, Inc.*, Case No. 05-60006 (Bankr. S.D.N.Y.), U.S. Specialty hereby notifies you that it is in the process of making payments totaling $1,462,844.76 to counsel for various Insured Persons under the Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821 issued to Refco, Inc. We expect to send the checks to defense counsel on April 27, 2007. The payments made by U.S. Specialty under the Policy as of that date will then total $10 million, and U.S. Specialty's Policy limit of liability will be fully exhausted.

    Sincerely,

    ROSS, DIXON & BELL, LLP

    By                                 
        Leslie S. Ahari

cc:    Paul A. Ferrillo, Esq. (by email)
        Debora K. Grobman, Esq. (by email)
        Jeffrey T. Golenbock, Esq. (by email)
        Joseph L. Chairez, Esq. (by email)
        Matthew J. Sava, Esq. (by email)
        Blake Hannafan, Esq. (by email)
        Scott Hershman, Esq. (by email)
        Holly Kulka, Esq. (by email)
        John Dellicarpini, Esq. (by email)
        Ivan Kline, Esq. (by email)
        Chris Morvillo, Esq. (by email)
        J. Gregory Milmoe, Esq. (by email)
        Andrea Lieberman, Esq. (by email)
        R. Damian Brew, Esq. (by email)
        Norman Eisen, Esq. (by email)

336038 v 8

**WASHINGTON • ORANGE COUNTY • SAN DIEGO • CHICAGO**

Exhibit D

# LEXINGTON INSURANCE COMPANY

Administrative Offices: 100 Summer Street, Boston, Massachusetts 02110-2103
(hereinafter called the Company)

### DIRECTORS AND OFFICERS INSURANCE AND COMPANY REIMBURSEMENT POLICY
#### Declarations
#### EXCESS LIABILITY POLICY - FOLLOW FORM

### THIS IS A CLAIMS-MADE POLICY. PLEASE READ CAREFULLY.

**NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. FURTHER NOTE THAT AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE DEDUCTIBLE OR RETENTION AMOUNT.**

Policy Number: 1620924                                    Renewal of: NEW

NAMED CORPORATION:        REFCO LLC:
MAILING ADDRESS:          55 W JACKSON BLVD
                          SUITE 1300
                          CHICAGO    IL  60661

STATE OF INCORPORATION OF NAMED CORPORATION: ILLINOIS

## SECTION I-EXCESS INSURANCE

(a)        POLICY PERIOD:
           FROM:     08/11/05       TO:     08/11/06
           (12:01 A. M. Standard Time at the address stated in Item 1)

(b)        Coverage:     Follow Form - Excess Directors and Officers Liability
(c)        Limits of Liability:     $7,500,000 Excess of $10,000,000
(d)        Premium:     Annual Minimum Premium          Minimum Earned Premium At Inception
                        $251,815                         $88,135
(e)        Retroactive Date:
(f)        Endorsements:     SEE ATTACHED FORMS SCHEDULE

## SECTION II-UNDERLYING INSURANCE

(a)        Endorsements made part of this Policy:
(b)        Coverage:          Directors & officers Liability Insurance Policy
           Underlying Company:     HCC Global Financial
           Policy Number:          24-MGU-05-A10821
           Policy Limit:           $10,000,000
           Policy Period:          from: 08/11/05    to:     08/11/06
           Retroactive Date:

Total Limits of all underlying Insurance including the underlying policies in excess of which this policy applies, whether recoverable or not  $10,000,000  each policy year, subject to retentions of        per loss Corporation Reimbursement,    per Director or Officer, subject to a maximum of  per loss.

_Steven C. Stok Jr._

Authorized Representative
Countersignature (In states where applicable)

LEX-DO-CMFF(Ed.2/91)

LX2604

10/25/2005  01:47    617-330-8332    AIG    PAGE  02

## FORMS SCHEDULE

Named Insured:  REFCO LLC

Policy No:  1620924

Effective Date:  08/11/2005

| Form Number | Edition Date | Endorsement Number | Title |
|---|---|---|---|
| LEXDOCMFF | 05/04 | 00 | CLAIMS MADE DO EXCESS FF DEC |
| LEXDOCMFFT | 02/91 | | CLAIMS MADE DO EXCESS FF TXT |
| LX0940 | 05/96 | 1 | DISCOVERY CLAUSE-AMENDED |
| LX0958 | 05/96 | 2 | MINIMUM EARNED PREMIUM END |
| LX7100 | 02/02 | 3 | NUCLEAR ENERGY EXCL CU 21 23 |
| LX9827 | 01/05 | 4 | TERRORISM PREMIUM CHARGE END |
| FSE073 | 02/91 | 5 | PRIOR/PENDING LIT. HIGHER LIM. |

DOC018(Ed.12/87)
LX0295

.10/25/2005  01:47    617-330-8332              AIG                          PAGE  03

# LEXINGTON INSURANCE COMPANY

Administrative Offices: 100 Summer Street, Boston, Massachusetts 02110-2103
(hereinafter called the Company)

### Following Form - Excess Liability Policy

I.  **Insuring Agreements**

Lexington Insurance Company (hereinafter called the "Company") in consideration of the payment of premium and in reliance upon the statements in the Declarations made a part thereof, hereby agrees to indemnify the Insured named in the Declarations (hereinafter called the "Insured") in accordance with the applicable insuring agreements, terms, conditions and exclusions of the Underlying Policy (and renewals thereof on the same basis) specified in Section II(a) of the Declarations (hereinafter called the "Underlying Policy") to the extent not inconsistent with the exclusions, conditions and other terms of this policy or endorsement(s) attached hereto, which shall prevail in the event and to the extent of any such inconsistency, against "loss" which is excess of the total limit(s) of all Underlying Insurance specified in Section II(b) of the Declarations subject to the limit of liability stated in Section I(c) of the Declarations.

The provision of the Underlying Policy.

except as regards the premium, the obligation to investigate and defend (and for costs and expenses incident to the same), the amount and limits of liability, the renewal agreement, if any, additional coverage provided by a discovery period provision, and any other provision therein inconsistent with this policy.

are hereby incorporated as part of this policy.

Liability of the Company under this policy shall not attach unless and until the Insured or the Insured's Underlying Insurance has paid or has been held liable to pay the total applicable underlying limits.

II.  **EXCLUSIONS – This policy does not apply:**

A) 1)  to bodily injury, personal injury or property damage which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

2)  to any loss, costs or expense of any nature, arising out of any:

a)  request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

b)  claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way respond to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste.  Waste includes material to be recycled, reconditioned or reclaimed.

B) Nuclear Energy Liability Exclusions:

1)  Under any Liability Coverage, to injury, sickness disease, death or destruction:

a)  with respect to which an Insured under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

b)  resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or

LEX-DO-CM-FFT(Ed.2/91)
LX2857

any law amendatory th. .of, or (2) the insured is, or had this polic, .ot been issued would be, entitled to indemnify from the United States of America, or agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2) Under any Medical Payments Coverage, or under any Supplementary Payments provisions relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of a nuclear facility by any person or organization.

3) Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

   a) the nuclear material (1) is at any nuclear facility owned by or operated by or on behalf of an insured, or (2) has been discharged or dispersed therefrom;

   b) The nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of any insured; or

   c) The injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts of equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possession or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

As used in this exclusion:

"hazardous properties" include radioactive, toxic or explosive properties;
"nuclear materials" means source material, special nuclear material or by-product material;
"source material", "special nuclear material" and "by-product material" have the meaning given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;
"spent fuel" means any fuel element or fuel component, solid or liquid which has been used or exposed to radiation in a nuclear reactor;
"waste" means any waste material containing by-product material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, and (b) resulting from the operation by any person or organization of any nuclear facility included under the first two paragraphs of the definition of nuclear facility;

"nuclear facility" means:

   a) any nuclear reactor,

   b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

   c) any equipment or device used for the processing, fabrication or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

   d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

with respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

C) to any liability of the insured due to war, invasion, acts of foreign enemies, hostilities, (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, or confiscation or nationalization

- 2 -

or requisition or destruction or damage to property by or under the order any government or public or local authority.

D) 1) to any liability for property damage, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish mental injury at any time arising out of the manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust, or

2) to any obligation of the Insured to indemnify any party because of damages arising out of such property damage, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish or mental injury at any time as a result of the manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

3) to any obligation to defend any suit or claim against the Insured alleging bodily injury or property damage and seeking damages, if such suit or claim arises from bodily injury or property damage resulting from or contributed to, by any and all manufacture of, mining of, use of, sales of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

**III.   LIMITS OF LIABILITY**

Regardless of the number of Insureds under this policy, persons or organization who sustain injury or damage, or claims made or suits brought on account of injury or damage covered hereby, the Company's limit of liability for "loss" excess of the Underlying Insurance shall be limited to the amount stated in Section I (c) of the Declarations as applicable to "each occurrence" or "each claim"; provided, however, that the Company's liability shall be further limited to the amount stated in Section I (c) of the Declarations stated as "aggregate" with respect to "loss" excess of the Underlying Insurance which occurs during each annual period while this policy is in force.

**IV.   INSURED'S DUTIES**

The Insured named in the Declarations hereby agrees to promptly furnish the Company with a copy of the Underlying Policy and all endorsements thereto which in any way effect this excess insurance. Written notice of any "loss" likely to give rise to a claim hereunder shall be given to the Company by or on behalf of the Insured named in the Declarations, containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstance of the "loss"

**V.   SETTLEMENT AND DEFENSE**

Anything in the Underlying Insurance to the contrary notwithstanding, the Company shall not be obligated to assume charge of the settlement or defense of any claim or suit brought or proceeding instituted against the Insured, but the Company, at its option but not being required to, shall have the right and be given the opportunity to associate with the Insured in the defense or control of any claim, suit or proceeding which appears reasonably likely to involve the Company, in which event the Insured and the Company shall cooperate in all things in the defense or control of such claim, suit or proceeding. In the event costs are incurred by the Company with respect to such claim, suit or proceeding, the Company shall pay it incurred costs and such expenses incurred by the Insured with the approval of the Company.

**VI.   MAINTENANCE OF UNDERLYING INSURANCE**

The underlying insurance referred to in paragraph (b) of Section II of the Declarations page and renewal or replacement thereof on terms and conditions not more restrictive, shall be maintained by the Named Insured in full effect during the currency of this policy without such alteration of terms or conditions except for any reduction of the aggregate limit of limits contained therein solely by payment of claims. Failure of the Named Insured to comply with the foregoing shall not invalidate the policy, but in the event of such failure, the Company shall only be liable to the same extent as it would have been had the Named Insured so maintained such underlying insurance.

Further, the receivership, the insolvency and/or inability to pay by an underlying insurer for any reason shall not be deemed to render the funds which would have been otherwise available from an underlying insurer to be unavailable, unrecoverable, reduced or exhausted for the purposes of determining the Company's liability under this policy, it being understood that the liability of the Company under this policy shall in no way be increased or expanded as a result of such receivership, insolvency or inability to pay underlying insurer.

- 3 -

**VII.  AGGREGATE POLICY PERIOD**

If the period of the Underlying Insurance is not concurrent with the policy period of this policy, it is agreed that for the purpose of determining the Company's liability for "loss" excess of the aggregate limits of the Underlying Insurance, only "loss" or "losses" which take place during the policy period of this policy shall be included.

**VIII.  SUBROGATION**

In the event of any payment under this policy, the Company may participate with the Insured in the exercise of all the Insured's rights of recovery against any person or organization liable therefor.

**IX.  PREMIUM**

It is agreed that should any alteration be made in the premium for the Underlying Policy during the period of this policy, or if there is an increase in the risk assumed by the Company, then the premium hereon may be adjusted accordingly.

If this policy is subject to audit adjustment, the premium will be based upon the rating base as set forth in the Declarations.  Upon notice to the Named Insured of the earned premium due, such premium in excess of the advance premium shall become due and payable.  If the total earned premium is less than the premium previously paid, the Company shall return to the Insured the unearned portion paid by the Insured, subject however to any minimum premium stated in the Declarations.

**X.  CANCELLATION**

It is understood and agreed that the terms of Condition X, Cancellation, of this policy are deleted in their entirety and are replace by the following:

This policy may be cancelled by the Named Insured by surrender thereof to the Company or by mailing to the Company written notice stating when thereafter such cancellation shall be effective.  The policy may be cancelled by the Company by mailing to the Named Insured at the address shown in this policy written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective; provided, however, if such cancellation is for non-payment of premium, the Company is required to give only at least ten (10) days notice.  Proof of the mailing of the notice shall be sufficient proof of notice.  The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period.  Delivery of such written notice either by the Named Insured or by the Company shall be equivalent to mailing.  If the named Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure for the period this policy is in effect, applied to the premium developed in accordance with the Premium Condition of this policy, subject to the short rate amount of the Minimum Annual Premium stated in this policy but in no event shall the earned premium be less than the Minimum Earned Premium stated in this policy.  If the Company cancels, earned premium shall be computed pro rata of the premium developed in accordance with the Premium Condition of this policy subject to the pro rata amount of the Minimum Annual Premium stated in this policy; provided, however.  If the Company cancels for non-payment of premium, the premium shall be computed on the same basis as if the Named Insured cancels.

Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.  The check of the Company mailed or delivered, shall be sufficient tender of any refund due the Named Insured.

If this policy insures more than one Named Insured, cancellation may be effected by the one first named for the account of all Insureds.  Notice of cancellation by the Company to such first Named Insured shall be notice to all Insureds.  Payment of any unearned premium to such first Named Insured shall be for the account of all Insureds.

**XI.  SERVICE OF SUIT**

In the event of failure of the Company to pay any amount claimed to be due hereunder, the Company,  at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the  United states. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Counsel, Legal Department, Lexington Insurance Company, 100 Summer Street, Boston, MA . 02110-2103,

- 4 -

LEX-DO-CM-FFT(Ed.2/91)
LX2057

or his or her representative, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this policy of insurance, and hereby designates the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## XII.  DEFINITIONS

The word "Loss" shall be understood to mean the sums paid or payable in settlement of claims for which the Insured is liable after making deductions for all other recoveries, salvages or other insurance (other than recoveries under underlying insurance, whether recoverable or not) and shall exclude all expenses and costs.

The work "Costs" shall be understood to mean interest on judgements, investigations, adjustments and legal expenses (excluding all expenses for salaried employees of the Insured or any of the Underlying Insurer's permanent employees).

The term "Underlying Policy" shall be understood to mean the policy indicated in Section II(a) of the Declarations.

The term "Underlying Insurance" shall be understood to mean the total limits of all insurance including the Underlying Policy and/or any self-insured retentions excess of which this policy is written, whether recoverable or not recoverable.

The term "Insured" shall be understood to mean the Insured named in the Declarations, any Insured under the Underlying Policy, and any additional Insured added to the policy by endorsement attached hereto.

IN WITNESS WHEREOF,  the Company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned in the Declarations by one of its duly authorized representatives.

*Elizabeth M. Tuck*                              *L. H. Kelley*

**Secretary**                                **Chairman of the Board and CEO**

LEX-DO-CM-FFT(Ed.2/91)
CX2057

## ENDORSEMENT # 1

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:  1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

### DISCOVERY CLAUSE-AMENDED

In consideration of the premium charged, it is understood and agreed that Section 10, Discovery Clause, is deleted in its entirety and replaced with the following:

If the Insurer or the Named Corporation shall cancel or refuse to renew this policy, the Named Corporation shall have the right, upon payment of an additional premium of 150%     of the one year premium, to a period of  365  days following the effective date of such cancellation or non-renewable (herein  referred to as the Discovery Period) in which to give written notice to the Insurer of claim('s) first made against the Insured(s) during said Discovery Period for any Wrongful Act  committed before the effective date of such cancellation or non-renewal and otherwise covered by this policy.

The rights contained in this clause shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within ten (10) days of the effective date of cancellation or non-renewal. The additional premium for the Discovery Period shall be <u>fully earned</u> at the inception of the Discovery Period. The Discovery Period is not cancelable. If the policy is cancelled due to nonpayment of premium, the Insured(s) and/or the Company shall not have the option to purchase the Discovery Period described above.

The offer by the Insurer of renewal terms, conditions, the Limit of Liability and/or premiums different from those of the expiring policy shall not constitute non-renewal.

All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative OR
Countersignature (in states where applicable)

LX0940 (05/96)

ENDORSEMENT # 2

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:  1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

MINIMUM EARNED PREMIUM ENDORSEMENT

In the event that this policy is terminated or cancelled prior to the  expiration of the policy period for any reason other than cancellation by the insurer, it is agreed that the premium charged shall be $ 88,135 earned upon the inception of the policy or computed in accordance  with the customary short-rate table and procedure, whichever is greater.

All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative OR
Countersignature (in states where applicable)

LX0958 (05/96)

POLICY NUMBER:  1620924    ENDORSEMENT # 3    CU 21 23 02 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
(Broad Form)

**I.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

(1) With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

(1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or (b) has been discharged or dispersed therefrom;

(2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

(3) The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereof

**II.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

Includes copyrighted information of the Insurance Services Offices, Inc., with its permission.  All rights reserved.

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

Includes copyrighted information of the Insurance Services Offices, Inc., with its permission.  All rights reserved.

CU 21 23 02 02    □

ENDORSEMENT # 4

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:  1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

### TERRORISM PREMIUM CHARGE ENDORSEMENT

The "Terrorism" charge is $4,938         and is included in the Policy Premium shown on the Declarations Page of this policy.

DEFINITION - The following definition of terrorism shall apply:

"Terrorism" means the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

    (1) A government;
    (2) The civilian population of a country, state or community; or
    (3) To disrupt the economy of a country, state or community.

So long as the Terrorism Risk Insurance Act of 2002 (the "Act") is in effect, "Terrorism" includes a certified act of terrorism defined by Section 102 Definitions, of the Act and any revisions or amendments thereto.

All other terms and conditions of the policy are the same.

_____
Authorized Representative OR
Countersignature (in states where applicable)

LX9827 (01/05)

## ENDORSEMENT # 5

This endorsement, effective 12:01 AM 08/11/2005

Forms a part of policy no.:  1620924

Issued to: REFCO LLC

By: LEXINGTON INSURANCE COMPANY

### PENDING AND PRIOR LITIGATION EXCLUSION FOR HIGHER LIMITS

In consideration of the premium charged, it is hereby understood and agreed that with respect to the Limit of Liability $7,500,000    excess of $10,000,000    , exclusion 4(h) is amended to indicate that the Insurer shall not be liable to make any payment for Loss in connection with any claim or claims made against the Directors or Officers alleging, arising out of, based upon or attributable to any pending or prior litigation as of JUNE 4, 2004       or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation.

All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative OR
Countersignature (in states where applicable)

FSE073(Ed.2/91)
LX2029

Exhibit E

# D'AMATO & LYNCH

### LAWYERS

### 70 PINE STREET

### NEW YORK, N.Y. 10270-0110

TELEPHONE 212-269-0927
WWW.DAMATO-LYNCH.COM
CABLE ADDRESS
DAMCOSH
TELEX 960085 DCOS UI NYK
TELECOPIER 212-269-3559

### LONDON OFFICE

### LLOYD'S

### ONE LIME STREET

### LONDON EC3M 7HA, ENGLAND

TELEPHONE 0207 816 5977
TELECOPIER 0207 816 7257

GEORGE S. D'AMATO
LUKE D. LYNCH (1999)
KENNETH A. SAGAT
LUKE D. LYNCH, JR.
ROBERT E. KUSHNER
RICHARD F. RUSSELL
RONALD H. ALENSTEIN
HARRY J. ARNOLD, JR.
ROBERT W. LANG
NEAL M. GLAZER
ANDREW R. SIMMONDS
JOHN P. HIGGINS
THOMAS F. BREEN
ALFRED A. D'AGOSTINO, JR.
WILLIAM P. LARSEN, III
ROBERT D. LANG
DAVID A. BOYAR
MARY JO BARRY
BARBARA R. SEYMOUR
HARVEY BARRISON

WILLIAM C. BURTON
CHARLES BRANHAM
BILL V. KAKOULLIS
THOMAS W. HANLON
JOHN H. FITZSIMONS
MICHAEL L. MANIRE
KEVIN J. WINDELS
SAMUEL F. PANICCIA
ROBERT S. FRASER
WALTER PALMER
STEPHEN F. WILLIG
DEBORAH M. COLLINS
NEIL R. MORRISON
PETER A. STROLI
FRANCES BUCKLEY
DAVID J. KUFFLER
JAN H. DUFFALO

LLOYD J. HERMAN
LAURIE P. BEATUS
LIZA A. CHAFIIAN

JAMES E. TOLAN, II
CATHERINE L. CASAVANT
ROY CAPLINGER
ANNEMARIE J. MAZZONE
EDWARD M. ROTH
MARIA T. EHRLICH
RICHARD F. FERRIGNO
DEEANNA M. GALLA
JUDY Y. CHUNG
R. DAVID ADES
JONATHAN L. KRANZ
ARTURO M. BOUTIN

WENDY L. KALNICK
JOHN C. MUCCIFORI
MAXINE K. NAKAMURA
LAURA S. WEINER
DAVID BERGENFELD
JASON B. GRANT
GAVIN J. CURLEY
ASSAF RONEN
ALEXANDER K. RAZI
SOTHEARY JOHNNAR
MELEENA M. BOWERS
MEGAN MARCHICK

COUNSEL

ROBERT M. MAKLA
ALBERT B. LEWIS
PETER J. THUMSER

VICTOR F. MUSTELIER
ROBERT GILROY
RICHARD G. McGAHREN

August 8, 2007

**BY EMAIL AND FACSIMILE**
Luc A. Despins, Esq.
Dennis C. O'Donnell, Esq.
Milbank, Tweed, Hadley & McCloy, LLP
1 Chase Manhattan Plaza
New York, NY 10005

Re:  Directors and Officers Insurance and Company Reimbursement Policy
Excess Liability Policy-Follow Form
<u>Lex Policy No.</u>       :        162-0924
<u>Our File No.</u>         :        108-73096

Dear Counsel:

Pursuant to Judge Drain's Order dated May 4, 2007 in *In re Refco, Inc., et al.*, Case No. 05-60006 (RDD) (Bankr. S.D.N.Y.), Lexington Insurance Company ("Lexington") hereby notifies you that it is in the process of making payments totaling $3,200,325.84 to counsel for the various Insured Persons under the Directors and Officers Insurance and Company Reimbursement Excess Liability Policy No. 162-0924 (the "Policy") issued to Refco, LLC with a Limit of Liability of $7.5 million.  Lexington will be sending checks to defense counsel beginning on August 9, 2007.

Luc A. Despins, Esq.
Dennis C. O'Donnell, Esq.
Milbank, Tweed, Hadley & McCloy, LLP
August 8, 2007
Page - 2 -

These are the final payments that will be made under the Lexington Policy and will result in full erosion of the Lexington Excess policy. There are no further funds remaining on the Lexington Policy when combined with the initial payments made in June, 2007 totaling $4,299,674.16. The Lexington Excess Policy is now fully eroded.

Very truly yours,

James E. Tolan

JET/sdv
cc:    David Frankel, Esq. (by email)
       Jeffrey T. Golenbock, Esq. (by email)
       Helen Kim, Esq. (by email)
       Blake T. Hannafan, Esq. (by email)
       Norman Eisen, Esq (by email)
       Matthew J. Sava, Esq. (by email)
       Rachel Kornblatt, Esq. (by email)
       Holly Kulka, Esq. (by email)
       Ivan Kline, Esq. (by email)
       Paul A. Ferrillo, Esq. (by email)
       J. Gregory Milmoe, Esq. (by email)
       Andrea Lieberman, Esq. (by email)
       Scott Hershman, Esq. (by email)

Exhibit F



### SECUREXCESS DECLARATIONS

**SUBJECT TO THE PROVISIONS OF THE UNDERLYING INSURANCE, THIS POLICY MAY ONLY APPLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

| COMPANY: Axis Reinsurance Company | POLICY NUMBER: RNN 506300 |
|---|---|

| Item 1. Policyholder: <br> Refco, Inc. <br> 550 West Jackson Boulevard <br> Suite 1300 <br> Chicago, IL 60661 | Item 2. Policy Period: <br> a. Inception Date: August 11, 2005 <br> b. Expiration Date: August 11, 2006 <br><br> Both dates at 12:01 a.m. at the address listed in Item 1 |
|---|---|

**Item 3.** Limits of Liability (inclusive of defense costs):
  a. Each Claim                                                                     $ 10,000,000
  b. Maximum aggregate Limit of Liability for all Claim(s)
     During the Policy Period of all Insurance Products   $ 10,000,000

**Item 4.** Underlying Insurance and Insurance Products:  See Endorsement No. 1

**Item 5.** Endorsements Attached at Inception: SE 1000, SE 1300, SE 0522, SE 1010, MU 1032, Manuscript #6

**Item 6.** Notices to Insurer:

| Notice of Claim(s) To Be Sent To: <br> Axis Financial Insurance Solutions Claims <br> Address: Connell Corporate Park <br> Three Connell Drive <br> P.O. Box 357 <br> Berkeley Heights, NJ 07922-0357 | All Other Notices To Be Sent To: <br> Axis Financial Insurance Solutions <br> Address: Connell Corporate Park <br> Three Connell Drive <br> P.O. Box 357 <br> Berkeley Heights, NJ 07922-0357 |
|---|---|

| Item 7. Pending and Prior Claim Date: 06/04/04 | Item 8 Terrorism Coverage Premium: <br> $10,000 |
|---|---|

The Insurer has caused this Policy to be signed and attested by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the Insurer.

_Dean Lukre_
Authorized Representative                                   Date  9/1/05

_Kevin D. McJean_                                    _Michael E. Morrell_

Secretary                                                                                 President

SE 0100 (Ed. 02 03)                    Page 1 of 1                    Printed in U.S.A.

## SECUREXCESS POLICY

In consideration of the payment of the premium, and in reliance on all statements made in the application(s) for this Policy and the **Underlying Insurance** and all information provided to the Insurer and any or all of the **Underlying Insurers**, and subject to the provisions of this Policy, the Insurer and the Policyholder, on its own behalf and on behalf of all Insureds, agree as follows.

**I.    INSURING AGREEMENT**

With respect to each **Insurance Product**, the Insurer shall provide the Insureds with insurance during the **Policy Period** excess of all applicable **Underlying Insurance**. Except as specifically set forth in the provisions of this Policy, the insurance afforded hereunder shall apply in conformance with the provisions of the applicable **Primary Policy** and, to the extent coverage is further limited or restricted thereby, to any other applicable **Underlying Insurance**.  In no event shall this Policy grant broader coverage than would be provided by the most restrictive policy constituting part of the applicable **Underlying Insurance**.

The insurance afforded under this Policy shall apply only after all applicable **Underlying Insurance** with respect to an **Insurance Product** has been exhausted by actual payment under such **Underlying Insurance**, and shall only pay excess of any retention or deductible amounts provided in the **Primary Policy** and other exhausted **Underlying Insurance**.

**II.   DEFINITIONS**

**A.   Claim(s)** means the event(s) which take place during the **Policy Period** and which trigger(s) coverage under the insuring agreement(s) of the **Underlying Insurance**.

**B.**  **Insurance Product** means each separate type of insurance identified as an "Insurance Product" in Endorsement No. 1 to this Policy.

**C.**  **Insured(s)** means any person(s) or entity(ies) that may be entitled to coverage under the **Primary Policy** at its inception.

**D.**  **Insurer** means the company identified as "Insurer" in the Declarations.

**E.**  **Policy Period** means the period from the inception date to the expiration date of this Policy stated in Item 2. in the Declarations, or its earlier cancellation or termination date, if any.

**F.**  **Policyholder** means the person(s) or entity(ies) identified in Item 1. in the Declarations.

**G.**  **Primary Policy** means the specific policy identified as the "Primary Policy" under the applicable **Insurance Product** listed in Endorsement No. 1 to this Policy.

**H.**  **Sublimit** means any **Underlying Limits** which:

1.   applies only to a particular grant of coverage under such **Underlying Insurance**; and
2.   reduces and is part of the otherwise applicable limits of liability of such **Underlying Insurance** set forth in Item 4 of the Declarations.

**I.**   **Underlying Insurance** means each insurance policy which constitutes all or part of an **Insurance Product**, as scheduled in Endorsement No. 1 to this Policy.

**J.**   **Underlying Insurers** means any or all of the companies who issued the policies of **Underlying Insurance**.

**K.**   **Underlying Limits** means, with respect to each **Insurance Product**, an amount equal to the aggregate of all limits of liability for each **Insurance Product** stated in Endorsement No. 1 to this Policy, plus the

uninsured retention or deductible, if any, applicable to the Primary Policy under such Insurance Product.

### III.  CONDITIONS OF COVERAGE

**A.**  For purposes of determining when insurance under this Policy shall attach and the limitations under which such insurance shall apply:

1.  All of the **Underlying Insurance** in effect as of the inception date of the **Policy Period** shall be maintained in full effect with solvent insurers throughout the **Policy Period** except for any reduction or exhaustion of the **Underlying Limits** as provided in Section IV. below; and

2.  All **Insureds** shall comply fully with all of the provisions of this Policy.

**B.**  As a condition precedent to coverage under this Policy, the **Insured** shall give to the **Insurer** as soon as practicable, but in no event later than thirty (30) days thereafter, written notice and the full particulars of i) the exhaustion of the aggregate limit of liability of any **Underlying Insurance**, ii) any **Underlying Insurance** not being maintained in full effect during the **Policy Period**, or iii) an **Underlying Insurer** becoming subject to a receivership, liquidation, dissolution, rehabilitation or similar proceeding or being taken over by any regulatory authority.

**C.**  If during the **Policy Period** the provisions of the **Primary Policy** are changed in any manner, as a condition precedent to coverage under this Policy, the **Insured** shall give written notice to the **Insurer** of the full particulars of such change as soon as practicable but in no event later than thirty (30) days following the effective date of such change.  No amendment to any **Primary Policy** or **Underlying Insurance** during the **Policy Period** shall be effective in broadening or extending the coverage afforded by this Policy or extending or increasing the limits of liability afforded by this Policy unless the **Insurer** so agrees in writing.  The **Insurer** may, in its sole discretion, condition its agreement to follow any changes to the **Primary Policy** or the **Underlying Insurance** on the **Insured** paying any additional premium required by the **Insurer** for such change.

As soon as practicable, but in no event later than thirty (30) days thereafter, the **Policyholder** must give the **Insurer** written notice of any additional or return premiums charged or allowed in connection with any **Underlying Insurance**.

### IV.  REDUCTION OR EXHAUSTION OF UNDERLYING LIMITS

**A.**  If the **Underlying Limits** are partially reduced solely due to actual payment under the **Underlying Insurance**, this Policy shall continue to apply as excess insurance over the remaining **Underlying Limits**.

**B.**  If the **Underlying Limits** are wholly exhausted solely due to actual payment under the **Underlying Insurance**, this Policy shall continue to apply as primary insurance with respect to the applicable **Insurance Product(s)** and the retention or deductible, if any, applicable under the **Primary Policy(ies)** shall apply under this Policy.

**C**  If any **Underlying Limits** are subject to a **Sublimit** then coverage hereunder shall not apply to any **Claim** which is subject to such **Sublimit**, provided however, that the **Underlying Limit** shall be recognized hereunder as depleted to the extent of any payment of such **Claim** subject to such **Sublimit**.

### V.  LIMITS OF LIABILITY

**A.**  The amount stated in Item 3.a. in the Declarations shall be the maximum limit of the **Insurer's** liability for each **Claim** under the applicable **Primary Policy**, and shall be the maximum amount payable by the **Insurer** under this Policy for a single **Claim**, which amount shall be part of, and not in addition to, the amount stated in Item 3.b. in the Declarations.

    **B.**   The amount stated in Item 3.b. in the Declarations shall be the maximum aggregate amount payable by the Insurer under this Policy with respect to all Claims during the **Policy Period** for all **Insurance Products.**

    **C.**   This Policy does not provide coverage for any **Claim** not covered by the **Underlying Insurance**, and shall drop down only to the extent that payment is not made under the **Underlying Insurance** solely by reason of exhaustion of the **Underlying Insurance** through payments thereunder, and shall not drop down for any other reason. If any **Underlying Insurer** fails to make payments under such **Underlying Insurance** for any reason whatsoever, including without limitation the insolvency of such **Underlying Insurer**, then the **Insureds** shall be deemed to have retained any such amounts which are not so paid. If the **Underlying Insurance** is not so maintained, the **Insurer** shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Insurance** been so maintained.

    **D.**   Payment by the **Insurer** of any amount, including but not limited to defense costs, shall reduce the limits of liability available under this Policy.

## VI.  SETTLEMENTS AND DEFENSE

    **A.**   No **Insured** under this Policy may, without the **Insurer's** prior written consent, which consent shall not be unreasonably withheld, admit liability for or settle any matter for which insurance may be sought under this Policy.

    **B.**   The **Insurer** may, at its sole discretion, elect to participate in the investigation, defense and/or settlement of any claim under this Policy, regardless of whether the applicable **Underlying Insurance** has been exhausted.

    **C.**   The **Insured**, and not the **Insurer**, has the duty to defend all **Claims** under this Policy.

## VII. SUBROGATION

    **A.**   In the event of payment under this Policy, the **Insurer** shall be subrogated to all rights of recovery of each and all **Insureds** against any person or organization, and the **Insureds** shall do whatever is necessary to secure those rights to the satisfaction of the **Insurer**, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of such **Insureds**.

    **B.**   Any amount recovered after payment under this Policy and any **Underlying Insurance** policies shall be apportioned among the **Insurer** and the **Underlying Insurers** net of the expense of such recovery in the reverse order of actual payment. The expenses attendant to such recovery shall be apportioned among those benefiting from the recovery in proportion to the amount of benefit to each party.

## VIII. AUTHORIZATION

Except as stated in paragraph IX.A. below, the **Policyholder** shall be the sole agent of all **Insureds** with respect to all matters, including but not limited to giving and receiving notices and other communications, effecting or accepting any endorsements to or notices of cancellation of this Policy, the payment of premium and the receipt of any return premiums.

## IX.  NOTICE

    **A.**   With respect to any **Claim**, situation that could give rise to a **Claim**, or other matter as to which insurance may be sought under this Policy, the **Policyholder** or any **Insured** must give the **Insurer** written notice contemporaneously with and in the identical manner required by the applicable **Primary Policy**.

    **B.**   All notices under this Policy shall be sent to the **Insurer** at the address set forth in Item 6. in the Declarations.

**X.** **MODIFICATION, CANCELLATION AND NONRENEWAL**

**A.** No modification of this Policy shall be effective unless made by endorsement signed by an authorized representative of the **Insurer**.

**B.** The **Policyholder** may cancel this Policy at any time by written notice stating when thereafter such cancellation is to be effective.

**C.** The **Insurer** may cancel this Policy only for nonpayment of premium, and only by delivering or mailing to the **Policyholder** written notice stating when, not less than ten (10) days thereafter, such cancellation shall become effective. The delivery or mailing of such notice shall be sufficient proof thereof and this Policy and the **Policy Period** shall terminate at the date and hour specified in the notice.

**D.** The **Insurer** shall refund the unearned premium, computed at the customary short rate, if the Policy is cancelled by the **Policyholder**.

**E.** The **Insurer** shall have no obligation to renew this Policy upon its expiration. If the **Insurer** decides not to renew this Policy, the **Insurer** shall provide written notice to the **Policyholder** by messenger, express delivery or first class mail at least sixty (60) days prior to the expiration of the Policy.

**F.** Notwithstanding anything to the contrary set forth elsewhere in the Policy, in the event that any **Underlying Insurance** is rescinded by agreement or legal process for fraud or other material misrepresentation by the **Policyholder** or any of the **Insureds**, then this Policy shall be deemed to be automatically and immediately rescinded, but only with respect to any **Insurance Product** containing such rescinded **Underlying Insurance**.

**XI.** **EXCLUSIONS**

The **Insurer** shall not be liable for any amount in any **Claim** taking place during the **Policy Period** and arising under any **Insurance Product**, which is based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

**A.** Any demand, suit or other proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the Pending or Prior Claim Date set forth in Item 7 of the Declarations or any wrongful act, fact, circumstance or situation underlying or alleged therein; or

**B.** Any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

Endorsement No. 1

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## SCHEDULE OF UNDERLYING INSURANCE AND INSURANCE PRODUCTS

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

The Schedule of Underlying Insurance and Insurance Products is as follows:

A. **Insurance Product:**    **Directors and Officers Liability**

1. **Primary Policy**

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| HCC | 24-MGU-05-A10821 | $10,000,000 | 08/11/05-08/11/06 |

2. **Other Underlying Policies**

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| Lexington | 1620924 | $7,500,000 | 08/11/05-08/11/06 |

All other provisions remain unchanged.

_Sean Lukas_
Authorized Representative

_9/1/05_
Date

Endorsement No. 2

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## IMPORTANT NOTICE TO ALL ILLINOIS POLICYHOLDERS

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

In the event you need to contact someone about this Policy for any reason, please contact us at:

Axis Reinsurance Company
Connell Corporate Park
Three Connell Drive
P.O. Box 357
Berkeley Heights, NJ 07922-0357
Fax No.: 1 (908) 286-5600

If you have been unable to contact or obtain satisfaction from the Insurer, you may contact the Illinois Department of Insurance to obtain information or make a complaint at:

Illinois Department of Insurance
Consumer Division of Public
Services Section
Springfield, Illinois 62767

SE13 00 (Ed. 02 03)                    Page 1 of 1                    Printed in U.S.A.

Endorsement No. 3

Effective date of this endorsement:  12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## ILLINOIS AMENDATORY ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY.. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

1.  Section X., **MODIFICATION, CANCELLATION AND NONRENEWAL**, paragraph C. is amended by deleting the words "delivering or" in the first sentence and the words "delivery or" in the second sentence of that provision.

2.  Section X., **MODIFICATION, CANCELLATION AND NONRENEWAL**, paragraph F. is deleted.  Provided, however, the **Insureds** and the **Insurer** hereby agree that the **Insurer** shall have the same rights under law to rescission that it had if Section X. F. had not been included in the Policy or deleted by this endorsement.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date    9/1/05

SE 0522 (Ed. 0205)                                    **Printed in U.S.A.**

Endorsement No. 4

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## PRIOR NOTICE EXCLUSION

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

In consideration of the premium charged, it is agreed that the Insurer shall not be liable for any amount from any Claim which is based upon, arising from, or attributable to or in consequence of any fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date

SE1010 0203

Endorsement No. 5

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## MANUSCRIPT APPLICATION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

SECUREXCESS POLICY

In consideration of the premium charged, it is agreed by the Insurer and Insureds that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above.  The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date    9/1/05

MU1032  2/2003

Endorsement No. 6

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

**Knowledge Exclusion**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

## SECUREXCESS POLICY

In consideration of the premium charged, it is agreed that this Policy does not respond to **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the **Policy Period**, any **Insured** had knowledge and had reason to suppose might give rise to a **Claim** that would fall within the scope of the insurance afforded by this Policy.

All other provisions remain unchanged.

_____
Authorized Representative

_____ 9/1/05 _____
Date

Page 1 of 1

Exhibit G



## ALLIED WORLD ASSURANCE COMPANY (U.S.), INC.

Boston Branch:
100 Summer Street, Boston, MA 02110

### EXCESS DIRECTORS AND OFFICERS INSURANCE
### AND COMPANY REIMBURSEMENT POLICY

**NOTICE:**   EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD (OR DURING THE DISCOVERY PERIOD IF APPLICABLE). PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND.

**DECLARATIONS**                                    **POLICY NO.:**   AW0418197

**ITEM 1.**     NAMED CORPORATION:     Refco Inc.

MAILING ADDRESS:     550 West Jackson Boulevard, Suite 1300
Chicago, IL 60661

**ITEM 2.**     FOLLOWED POLICY:
INSURER:     U.S. Specialty Insurance Company
POLICY NO:   24-MGU-05-A10821

**ITEM 3.**     POLICY PERIOD:     From:   August 11, 2005     To:   August 11, 2006
(12:01 A.M. standard time at the address stated in Item 1.)

**ITEM 4.**     LIMIT OF LIABILITY:     $12,500,000 Per Claim
$12,500,000 Annual Aggregate(including Defense Costs)

EXCESS OF TOTAL UNDERLYING LIMITS OF: $27,500,000 Per Claim
$27,500,000   Annual Aggregate

**ITEM 5.**     PENDING OR PRIOR DATE: See Endorsement #002

Allied World Assurance Company (U.S.), Inc.                    1 of 2
Excess US D&O (9/04) Declarations



**DECLARATIONS** (continued)                                              **POLICY NO.:** AW0418197

**ITEM 6.**     SCHEDULE OF PRIMARY AND UNDERLYING EXCESS POLICIES:

**Primary Policy:**

| **Insurer** | **Policy Number** | **Limits** | **Policy Period** |
|---|---|---|---|
| U.S. Specialty Insurance Company | 24-MGU-05-A10821 | $10,000,000 | 08/11/2005 – 08/11/2006 |

**Excess Policies:**

| **Insurer** | **Policy Number** | **Limits** | **Policy Period** |
|---|---|---|---|
| Lexington Insurance Company | 162-0924 | $ 7,500,000 | 08/11/2005 – 08/11/2006 |
| AXIS Reinsurance Company | RNN 506300 | $10,000,000 | 08/11/2005 – 08/11/2006 |

**ITEM 7.**     PREMIUM: $339,445

**ITEM 8.**     A.     DISCOVERY PERIOD PREMIUM:        150%

              B.     DISCOVERY PERIOD:        1 Year

**ITEM 9.**     NOTICE OF CANCELLATION PERIOD:        Per Followed Policy

**ITEM 10.**     ADDRESS OF INSURER FOR ALL NOTICES UNDER THIS POLICY:

        ALLIED WORLD ASSURANCE COMPANY (U.S.), INC.
        ATTN: CLAIMS DEPARTMENT
        100 SUMMER STREET
        BOSTON, MA 02210

**ITEM 11.**     POLICY FORM:        EXCESS DIRECTORS AND OFFICERS INSURANCE AND
                                  COMPANY REIMBURSEMENT POLICY
                                  (Excess US D&O (09/04))

                ENDORSEMENT(S):        SERVICE OF SUIT CLAUSE
                                    PENDING AND PRIOR LITIGATION EXCLUSION
                                    PRIOR KNOWLEDGE EXCLUSION

        BROKER:
        Marsh USA. Inc.
        1166 Avenue of the Americas
        New York, NY 10036

*Jm J M Clug*

Authorized Representative



**Allied World Assurance Company (U.S.), Inc.**
(hereinafter referred to as the "Insurer")
Administrative Offices: 100 Summer Street, Boston, MA 02110

## EXCESS DIRECTORS AND OFFICERS INSURANCE AND COMPANY REIMBURSEMENT POLICY

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application and/or warranty forming a part hereof and its attachments and the material incorporated therein, Allied World Assurance Company, herein called the "**Insurer**", agrees as follows:

### I.    INSURING AGREEMENT

This policy shall provide the **Insured(s)** with Excess Directors and Officers Insurance and Company Reimbursement coverage for **Loss** or **Damages** resulting from any claim or claims first made against the **Insured(s)** and reported to the **Insurer** pursuant to the terms of this policy in accordance with the same warranties, terms, conditions, exclusions and limitations of the **Followed Policy** identified in Item 2 of the Declarations as they were in existence on the inception date of this policy subject to the premium, limits of liability, **Policy Period**, warranties, exclusions, limitations and other terms and conditions of this policy including any and all endorsements attached hereto; provided always that this policy shall, in no event and notwithstanding any other provision, provide coverage broader than that provided by any **Underlying Policy** unless such broader coverage is specifically agreed to by the **Insurer** herein or in a written endorsement attached hereto.

### II.    DEFINITIONS

(a)     The term "**Followed Policy**" shall mean the policy identified in Item 2 of the Declarations.

(b)     The term "**Interrelated Wrongful Act(s)**" shall mean any Wrongful Act(s) which:

    (i)     are the same, similar, related or repeated; or
    (ii)    arise from the same, related or common nexus of facts

without regard to whether the same or different claims, **Insured(s)**, claimants, causes of action or venues are involved.

(c)     The term "**Loss**" or "**Damages**" shall have the same meaning in this policy as is attributed to it in the **Followed Policy** except that the term "**Loss**" or "**Damages**" shall in no event include civil or criminal fines or penalties, or any amounts for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds**, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

**Loss** or **Damages** shall include punitive damages and the multiplied portion of multiplied damages to the same extent punitive damages and the multiplied portion of multiplied damages are part of **Loss** or **Damages** under the **Followed Policy**.

(d)     The term "**Insured(s)**" shall have the same meaning as in the **Followed Policy** or the same meaning as similar terms such as Assured or Insured Person.

(e)     The term "**Policy Period**" shall mean the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy.

1 of 6



(f)     The term "**Underlying Policies**" shall mean the Primary and Underlying Excess Policies set forth in Item 6 of the Declarations.

(g)     The term "**Underlying Insurer(s)**" shall mean the insurer(s) of the Underlying Policies.

(h)     The term "**Underlying Aggregate Limit**" shall mean an amount equal to the aggregate of all the limits of the **Underlying Policies** combined (excess of their retentions).

All other terms shall have the same meaning in this policy as is attributed to them in the applicable Followed Policy.

## III.     EXCLUSIONS

This policy shall not cover any **Loss** or **Damages** in connection with any claim:

1.      alleging, arising out of, based upon or attributable to the facts alleged, or to the same or **Interrelated Wrongful Act(s)** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy, whether excess or underlying, of which this policy is a renewal or replacement or which it may succeed in time;

2.      alleging, arising out of, based upon or attributable to, as of the Pending or Prior Date listed in Item 5 of the Declarations, any pending or prior: 1) litigation; or 2) administrative or regulatory proceeding or investigation of which the **Named Corporation** or an **Insured** had notice; or 3) alleging or derived from the same or essentially the same facts, or the same or **Interrelated Wrongful Act(s)**, as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation.

## IV.     LIMIT OF LIABILITY

The Limit of Liability stated in Item 4 of the Declarations is the aggregate limit of the **Insurer's** liability for all **Loss** or **Damages** arising out of all claims or occurrences reported to the **Insurer** in accordance with the terms and conditions of the **Followed Policy**; the Limit of Liability for the Discovery Period (if applicable) shall be part of, and not in addition to, the Limit of Liability for the **Policy Period**. Further, any claim which is made subsequent to the **Policy Period** or Discovery Period (if applicable) which pursuant to Clause V herein and the terms and conditions of the **Followed Policy** is considered made during the **Policy Period** or Discovery Period (if applicable) shall also be subject to the one aggregate Limit of Liability stated in Item 4 of the Declarations. The **Insurer's** maximum liability for any combination of losses during the same **Policy Period** or Discovery Period (if applicable) shall be the Limit of Liability stated in Item 4 of the Declarations.

It is expressly agreed that liability for any covered **Loss** or **Damages** with respect to claims first made during the **Policy Period** or Discovery Period (if applicable) shall attach to the **Insurer** only after the **Underlying Insurers**, the **Named Corporation** as indemnitor of the **Insureds**, and/or the **Insureds** shall have paid or been held liable to pay the full amount of the **Underlying Aggregate Limit**, and the **Named Corporation** as indemnitor of the **Insureds** and/or the **Insured(s)** shall have paid or been held liable to pay the full amount of the applicable retention amount for such **Policy Period**. In the event and only in the event of the reduction or exhaustion of the **Underlying Aggregate Limit** by reason of the **Underlying Insurers**, the **Named Corporation** as indemnitor of the **Insureds**, and/or the **Insureds** paying or being held liable to pay **Loss** or **Damages** otherwise covered hereunder, this policy shall: (i) in the event of reduction, pay excess of the reduced **Underlying Aggregate Limit**, and (ii) in the event of exhaustion, continue in force as primary insurance; provided always that in the latter event this policy shall only pay excess of the retention amounts set forth in the **Followed Policy**, which retention amount shall be applied to any subsequent **Loss** or **Damages** in the same manner as specified in the **Followed Policy**; provided, however, that the retention amount set forth in the **Followed Policy** shall apply to each **Loss** for which the **Named Corporation** has

Allied World Assurance Company (U.S.), Inc.
Excess D&O (9/04)



indemnified or is permitted or required to indemnify the **Insureds** pursuant to law, common or statutory, or contract, or the Charter or Bylaws of the Named Corporation duly effective under such law which determines and defines such rights of indemnity, provided further, however, that no retention amount shall apply if the retention amount of any **Underlying Policy** has been applied to such **Loss**.

This policy shall pay only in the event of reduction or exhaustion of the **Underlying Aggregate Limit** as described above and shall not drop down for any reason including, but not limited to, uncollectability (in whole or in part) of the **Underlying Aggregate Limit**, existence of a sub-limit of liability in any **Underlying Policy**, or any **Excess Policy** containing terms and conditions different from the **Followed Policy**, provided, however, that this policy will recognize erosion of any **Underlying Policy** due to the existence of a sub-limit. The risk of uncollectability of such underlying insurance (in whole or in part) whether because of financial impairment or insolvency of an **Underlying Insurer**, the application of any underlying sub-limit of liability or differing terms and conditions or for any other reason is expressly retained by the **Insureds** and the **Named Corporation** and is not in any way or under any circumstances insured or assumed by the Insurer.

It is agreed that if, at any point during the **Policy Period**, the **Followed Policy** has been issued but any **Underlying Policy** is still providing coverage under binder and a claim arises, the preceding paragraph applies and under no circumstances will the **Insurer** provide broader coverage than would have existed had the **Underlying Policy** been issued.

In the event any **Underlying Policy** contains terms and conditions more restrictive than the **Followed Policy**, then the **Insurer's** coverage shall under no circumstances be broader than the most restrictive terms and conditions contained in the **Followed Policy** or any **Underlying Policy**.

It is agreed that if any warranty signed by or on behalf of any **Insured**, whether or not contained in any **Underlying Insurer's** application or warranty statement, applies to the **Limit of Liability** covered by the **Insurer** or any **Underlying Insurer**, then any representations or warranties made in said application or warranty, whether or not it is assigned to the **Insurer**, will be deemed to be treated as though it was assigned to the **Insurer**.

## V.    UNDERLYING LIMITS

It is a condition of this policy that the **Underlying Policies** shall be maintained in full effect with solvent insurers during the **Policy Period** except for any reduction or exhaustion of the **Underlying Aggregate Limit** contained therein by reason of **Loss** or **Damages** paid thereunder (as provided for in Clause IV above). Failure to comply with the foregoing shall not invalidate this policy, but in the event of such failure, the **Insurer** shall be liable only to the extent that it would have been liable had the **Insureds** and the **Named Corporation** complied with such condition.

If during the **Policy Period** or any **Discovery Period** (if applicable) the terms, conditions, exclusions or limitations of any **Underlying Policy** are changed in any manner, the **Named Corporation** or the **Insured(s)** shall as a condition precedent to their rights under this policy give to the **Insurer** as soon as practicable written notice of the full particulars thereof. This policy shall become subject to any such changes upon the effective date of the changes in the **Underlying Policy**, but only upon the condition that the **Insurer** agrees to follow such changes by written endorsement attached hereto and the **Named Corporation** agrees to any additional premium and/or amendment of the provisions of this policy required by the **Insurer** relating to such changes. Further, such new coverage is conditioned upon the **Named Corporation** paying when due any additional premium required by the **Insurer** relating to such changes.

Allied World Assurance Company (U.S.), Inc.
Excess D&O (9/04)



## VI.    NOTICE OF CLAIM

The Insured(s) shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer at the address set forth in Item 10 of the Declarations and all Underlying Insurers of any claim made or circumstances that might give rise to a claim against the Insured(s).  Such written notice shall be provided to the Insurer in accordance with the terms and conditions of the Followed Policy.

If during the Policy Period or during the Discovery Period (if applicable) (i) written notice of a claim has been given to the Insurer and all Underlying Insurers as set forth in this clause, or (ii) to the extent permitted by the terms and conditions of the Followed Policy, written notice of circumstances that might reasonably be expected to give rise to a claim, has been given to the Insurer and all Underlying Insurers, then any claim which is subsequently made against the Insured(s) and reported to the Insurer and all Underlying Insurers alleging, arising out of, based upon or attributable to the facts alleged in the claim or circumstances of which such notice has been given, or alleging any wrongful act which is the same as or related to any wrongful act alleged in the claim or circumstances of which such notice has been given, shall be considered made at the time notice of such claim or circumstances has been given to the Insurer so long as the Followed Policy accepts as adequate the written notice of circumstances that might reasonably be expected to give rise to a claim.

The Insured(s) shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of the following events as soon as practicable but in no event later than thirty (30) days after the Insured becomes aware of the event:

    (i)      Any Underlying Policy being canceled or non-renewed or otherwise ceasing to be in effect or being uncollectible (in part or in whole); or

    (ii)      Any Underlying Insurer being subject to a receivership, liquidation, dissolution, rehabilitation or any similar proceeding or being taken over by any regulatory authority; or

    (iii)      The Named Corporation consolidating with or merging with or into, or transferring all or substantially all of its assets to, or acquiring or being acquired by any natural person or entity or group of natural persons and/or entities acting in concert.

## VII.    CLAIM PARTICIPATION

The Insurer shall have the right, in its sole discretion, but not the obligation to effectively associate with the Named Corporation and the Insured(s) in the defense and settlement of any claim that appears to the Insurer to be reasonably likely to involve the Insurer, including but not limited to effectively associating in the negotiation of a settlement.  The Insureds shall defend and contest any such claim.  The Named Corporation and the Insured(s) shall give the Insurer full cooperation and such information as it may reasonably require.  The failure of the Insurer to exercise any right under this paragraph at any point in a claim shall not act as a waiver or limit the right of the Insurer in any manner to exercise such rights at any other point in a claim including the right to effectively associate in the negotiation of a settlement.

The Insurer does not under this policy assume any duty to defend.  The Insured(s) shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment or incur any Defense Costs without the prior written consent of the Insurer.  Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy.  The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any claim in order to reach a decision as to reasonableness.

Allied World Assurance Company (U.S.), Inc.
Excess D&O (9/04)



### VIII.    DISCOVERY CLAUSE

The Insured shall be entitled to a Discovery Period (or Extended Reporting Period) pursuant to the terms and conditions of the Followed Policy. The Discovery Period (or the Extended Reporting Period) is not available unless the Named Corporation has elected the Discovery Period (or Extended Reporting Period) in all **Underlying Policies**. The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. The Discovery Period percentage for this policy is specified in Item 8 of the Declarations.   The cost of discovery, as a percentage of the annual premium, shall in no event be less than the highest percentage of any **Underlying Policy**.

### IX.    CANCELLATION CLAUSE

This policy may be canceled by the Named Corporation  only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or its authorized agent at the address set forth in Item 10 of the Declarations and within the time period and in the manner set forth in the **Followed Policy**.

This policy shall not be cancelled by or on behalf of the **Insurer** except by reason of non-payment of the premium set forth in Item 7 of the Declarations within the time period specified in the Binder Confirmation issued by the **Insurer** in connection with this policy. The **Insurer** may cancel the policy by delivering to the Named Corporation or by mailing to the Named Corporation, by registered, certified, or other first class mail, at the Named Corporation's address set forth in the Declarations, written notice stating when, not less than the period set forth in Item 9 of the Declarations, thereafter the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender.

If this policy shall be canceled by the Named Corporation, the **Insurer** shall retain the customary short rate proportion of the premium hereon.

If this policy shall be canceled by the **Insurer**, the **Insurer** shall retain the pro rata proportion of the premium hereon.

Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

### X.    ALTERNATIVE DISPUTE RESOLUTION PROCESS

Any and all disputes or differences which may arise under this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss** or the formation and validity of this policy, shall be subject to the alternative dispute resolution process ("ADR") set forth in this clause.

Either the **Insurer** or  the **Insureds** may elect the type of ADR discussed below; provided, however, that the **Insureds** shall have the right to reject the **Insurer's** choice of ADR at any time prior to its commencement, in which case the **Insureds'** choice of ADR shall control.

Allied World Assurance Company (U.S.), Inc.
Excess D&O (9/04)



The Insurer and Insureds agree that there shall be two choices of ADR: (1) non-binding mediation administered by the American Arbitration Association, in which the Insurer and Insureds shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration submitted to the American Arbitration Association under or in accordance with its then-prevailing Commercial Arbitration Rules, in which the arbitration panel shall be composed of three disinterested individuals. In either mediation or arbitration, the mediator(s) or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute.

The mediator(s) or arbitrators shall also give due consideration to the general principles of the law of the state where the Named Corporation is incorporated in the construction or interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an even-handed fashion in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys' fees or other costs. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the ADR.

Either choice of ADR may be commenced in either New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations as the mailing address for the Named Corporation. The Named Corporation shall act on behalf of all Insureds in selection of the ADR in accordance with this clause.

## XI.    HEADINGS

The descriptions in the headings and any subheading of this policy (including any titles given to any endorsement attached hereto) are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

IN WITNESS WHEREOF, the Insurer has caused this policy to be signed by its Vice President of Professional Lines.

_____
Vice President of Professional Lines

6 of 6

Endorsement No.:                001
This endorsement, effective:    August 11, 2005
(at 12:00 A.M. prevailing time at the address of the Named Insured as shown in item 1 (a) of the Declarations)
forms a part of Policy No.:     AW0418197
Issued to:                      Refco Inc.
By:                             Allied World Assurance Company (U.S.), Inc.

## SERVICE OF SUIT

In the event of failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon counsel, Legal Department, Allied World Assurance Company, 100 Summer Street, Boston, MA  02110 or his or her representative, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statue, or his or her successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this policy of insurance and hereby designates the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.


Issue Date August 30, 2005

**AUTHORIZED REPRESENTATIVE**


AWAC (US) (07/03)-A412

Endorsement No.:                    002
This endorsement, effective:        August 11, 2005
(at 12:00 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)
forms a part of Policy No.:         AW0418197
Issued to:                          Refco Inc.
By:                                 Allied World Assurance Company (U.S.), Inc.


## PENDING AND PRIOR LITIGATION EXCLUSION


In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable for Loss in connection with any claim or claims made against the Insureds:


    (a)   'alleging, arising out of, based upon or attributable to any pending or prior litigation as of:

- 06/04/2004 for the $2.5M xs $27.5MM
- Inception for $10MM xs $30MM

or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation;


All other terms and conditions remain unchanged.


_____
**Authorized Representative**


Date of Issuance:   3/16/2006

Endorsement No.:                **003**
This endorsement, effective:    August 11, 2005
(at 12:00 A.M. prevailing time at the address of the Named Insured as shown in item 1 of the Declarations)
forms a part of Policy No.:     AW0148197
Issued to:                      Refco Inc.
By:                             Allied World Assurance Company (U.S.), Inc.


## PRIOR KNOWLEDGE EXCLUSION

It is hereby understood and agreed that the **Insurer** shall not be liable for **Loss** in connection with any claim or claims made against the **Insureds**:

(a)     alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which any Insured had knowledge as of **inception** and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage hereunder, or (ii) which indicate the probability of any such claim.


ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.


_(signature)_
**Authorized Representative**


Date of Issuance:  3/16/2006

Exhibit H



## Arch
### Insurance Group

**ARCH INSURANCE COMPANY**

(A Missouri Corporation)

Home Office Address:
3100 Broadway, Suite 511
Kansas City, MO 64111

Administrative Address:
One Liberty Plaza, 53rd Floor
New York, NY 10006
Tel: (800) 817-3252

### EXCESS INSURANCE POLICY

**UNLESS OTHERWISE PROVIDED IN THE UNDERLYING POLICY(IES), THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS AND EXPENSES.**

### DECLARATIONS

Terms appearing in **bold** in these Declarations are defined in the Policy.

---

Policy No.: DOX0009322-00

Item 1. **Named Entity:** Refco, Inc.
**Principal Address:** 550 W. Jackson Blvd. Suite 1300
Chicago, IL 60661

---

Item 2. **Policy Period:**

From: August 11, 2005    at 12:01 a.m. (local time at the address stated in Item 1.)

To: August 11, 2006    at 12:01 a.m. (local time at the address stated in Item 1.)

---

Item 3. Limit of Liability (inclusive of defense costs and expenses):

   a.    Each **Claim**:      $10,000,000

   b.    Maximum aggregate Limit of Liability for

       all **Claims** during the **Policy Period**:      $10,000,000

---

Item 4. **Followed Policy:**

Issuing Carrier:   U.S. Specialty Insurance Company

Form:   USSIC 991 (03/2004)

Policy Number:   24-MGU-05-A10821

Limit of Liability:   $10,000,000

Deductible or Self Insured Retention:   $0/$300,000/$500,000

---

**Item 5.  Underlying and Excess Insurer Policy(ies):**

| | Issuing Company | Policy No. | Limits of Liability | Attachment |
|---|---|---|---|---|
| **A.  Primary Policy:** | | | | |
| | U.S. Specialty Insurance Company | 24-MGU-05-A10821 | $10,000,000 | $0 |
| **B.  Underlying Excess Policy(ies)** | | | | |
| First Excess: | Lexington Insurance Company | 162-0924 | $7,500,000 | $10,000,000 |
| Second Excess: | Axis Reinsurance Company | TBD | $10,000,000 | $17,500,000 |
| Third Excess: | Allied World Assurance Company (U.S.), Inc. | AW0418197 | $12,500,000 | $27,500,000 |
| Fourth Excess: | | | | |
| Fifth Excess: | | | | |
| Sixth Excess: | | | | |
| Seventh Excess: | | | | |
| Eighth Excess: | | | | |
| **C.  Excess Insurer** | | | | |
| | Arch Insurance Co. | DOX0009322-00 | $10,000,000 | $40,000,000 |

**Item 6.  Premium:**                                                                                 $241,693

Premium Attributable to Terrorism Risk Insurance:                          $0
(Included In Policy Premium  ☒)
(In Addition To Policy Premium  ☐)

**Item 7.**  Endorsements Applicable to Coverage at Inception of Policy:  (See attached Schedule of Forms and Endorsements.)

**Item 8.**  Notices to **Excess Insurer:**

Notice Of **Claim(s)** To Be Sent To:
Executive Assurance Claims
Arch Insurance Company
One Liberty Plaza, 53rd Floor
New York, NY 10006
Fax: (646) 746-8111

All Other Notices To Be Sent To:
Executive Assurance Underwriting
Arch Insurance Company
One Liberty Plaza, 53rd Floor
New York, NY 10006
Fax: (212) 651-6499

THESE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION FOR THIS POLICY, THE APPLICATIONS FOR ALL **UNDERLYING INSURANCE**, ALL MATERIALS SUBMITTED THEREWITH AND THE POLICY FORM ATTACHED HERETO, CONSTITUTE THE EXCESS INSURANCE POLICY.

The **Excess Insurer** has caused this Policy to be signed and attested to by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the **Excess Insurer**.

_____                    _____
Authorized Representative                                                  Date  3/7/06

Secretary                                                   President

# EXCESS INSURANCE POLICY

In consideration of the payment of the premium set forth in Item 6. of the Declarations of this Policy, and in reliance upon all statements made in the Application for this Policy, in the applications for all **Underlying Insurance** and in any other materials submitted to the Insurer designated in the Declarations of this Policy (hereinafter "the **Excess Insurer**"), which are incorporated into and constitute part of this Policy, and subject to the Limit of Liability set forth in Item 3. of the Declarations of this Policy, the **Excess Insurer** agrees with the **Insureds** as follows:

## SECTION I

INSURING AGREEMENT.

A. The **Excess Insurer** shall provide the **Insureds** coverage for **Claims** in excess of the **Underlying Insurance**.

B. The insurance coverage afforded by this Policy shall apply only after exhaustion of the **Underlying Limit** solely as a result of actual payment, in legal currency, under the **Underlying Insurance** in connection with **Claim(s)** and after the **Insureds** shall have paid the full amount of any applicable deductible or self insured retentions.

C. Except with respect to premium and Limit of Liability and as provided in this Policy, the insurance coverage afforded by this Policy shall apply in conformance with the terms and conditions of the **Followed Policy** and in conformance with any terms and conditions further limiting or restricting coverage in this Policy or in any other **Underlying Insurance**. In no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the **Underlying Insurance**.

## SECTION II

LIMIT OF LIABILITY.

A. The amount stated in Item 3.b. of the Declarations of this Policy shall be the maximum amount payable by the **Excess Insurer** on account of all **Claims** during the **Policy Period**.

B. All payments by the **Excess Insurer** in connection with a **Claim** shall be part of and not in addition to the Limit of Liability set forth in Item 3. of the Declarations of this Policy, and shall reduce such Limit of Liability.

## SECTION III

DEFINITIONS.

All terms defined in this Policy appear in **bold**.

A. **Claim(s)** shall have the same meaning in this Policy as given to it in the **Followed Policy**.

B. **Insured(s)** means any person(s) or entity(ies) that are entitled to coverage under the **Followed Policy** at its inception.

C. **Followed Policy**, **Named Entity**, **Primary Policy**, **Policy Period** and **Underlying Excess Policies**, are as identified in the Declarations of this Policy.

D. **Underlying Insurance** means the **Primary Policy** and any **Underlying Excess Policies** listed in Item 5. of the Declarations of this Policy.

E.  **Underlying Limit** means an amount equal to the aggregate of all limits of liability for all **Underlying Insurance**, plus the deductible or self insured retention, if any, applicable under the **Primary Policy**.

## SECTION IV

MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE**.

A.  As a condition to the coverage of this Policy, the **Insureds** shall maintain all **Underlying Insurance** in full force and effect with solvent insurers during the **Policy Period**, except for reduction or exhaustion of the **Underlying Limit** by payment in connection with **Claims**.

B.  In the event of depletion of the **Underlying Limit** by payment in connection with **Claim(s)**, this Policy shall, subject to the Limit of Liability stated in Item 3. of the Declarations of this Policy, continue to apply as excess insurance over the amount of insurance remaining under such **Underlying Insurance**.

C.  In the event of exhaustion of all of the **Underlying Limit** by payment in connection with **Claim(s)**, this Policy shall, subject to the Limit of Liability stated in Item 3. of the Declarations of this Policy, continue in force as primary insurance subject to the terms and conditions and the deductible or self insured retention under the **Primary Policy**, which deductible or self insured retention shall be applied to any subsequent **Claim** in the same manner as specified in the **Primary Policy**.

D.  This Policy shall drop down only in the event of reduction or exhaustion of all of the **Underlying Limit** by payment in connection with **Claim(s)**, and shall not drop down for any other reason including, but not limited to:  (i) any exhaustion of a sublimit of any **Underlying Insurance**; or (ii) uncollectibility, in whole or in part, of any **Underlying Insurance** whether due to financial impairment or insolvency, liquidation, or for any other reason; or (iii) failure of the **Insured** to maintain any **Underlying Insurance**.  The risk of any gaps in coverage or uncollectibility for any reason is expressly retained by the **Insured**, and is not assumed or insured by the **Excess Insurer**.

E.  As a condition precedent to coverage under this Policy, the **Insureds** shall give to the **Excess Insurer** written notice and the full particulars of:  (i) cancellation of any **Underlying Insurance**; (ii) reduction and or exhaustion of the **Underlying Limit**; (iii) additional or return premium in connection with any **Underlying Insurance**; (iv) any changes to the **Underlying Insurance** by rewrite, endorsement or otherwise; and (v) the initiation of any receivership, liquidation, dissolution, rehabilitation or similar proceeding by any regulatory authority or any other person or entity against the issuing company of any **Underlying Insurance**.  Such notice shall be sent to the **Excess Insurer** immediately upon receipt of such notice by the **Named Entity** or any **Insured**.

F.  In the event of any changes to any **Underlying Insurance** during the Policy Period, this Policy shall become subject to any such changes upon the effective date of the changes in the **Underlying Insurance** only if and to the extent that consent of the **Excess Insurer** is expressly endorsed hereon and provided that the **Insureds** shall pay any additional premium reasonably required by the **Excess Insurer** for such changes.

G.  This Policy shall terminate immediately upon the termination of any **Underlying Insurance**, whether by the **Insured** or by the issuer of the **Underlying Insurance**.  Notice of cancellation or non-renewal of all or part of the **Underlying Insurance** duly given by any such Insurer shall serve as notice of the cancellation or non-renewal of this Policy by the **Excess Insurer**.  Return premium, if any, shall be as provided in Section VIII.C. below.

## SECTION V

DUTIES IN THE EVENT OF A **CLAIM**.

A. With respect to any **Claim(s)** that, alone or combined, might result in payment pursuant to the insurance coverage afforded under this Policy, the **Insured** shall not admit liability and shall not agree to settle any **Claim** without the **Excess Insurer**'s consent.

B. The **Insured** shall give notice under this Policy as provided in the **Followed Policy** and at the address shown in Item 8. of the Declarations of this Policy. Notice to the issuer of the **Followed Policy**, the **Primary Policy**, or any other **Underlying Insurer** shall not constitute notice to the **Excess Insurer**.

C. With respect to any **Claim(s)** that, alone or combined, might result in payment pursuant to the insurance coverage afforded under this Policy, no costs, charges or expenses for investigation or defense of any **Claim** shall be incurred, or settlements made, without the **Excess Insurer**'s consent, such consent not to be unreasonably withheld.

D. If legal proceedings are begun, the **Insured** shall forward to the **Excess Insurer** a copy of each pleading or document received by the **Insured** or the **Insured's** representatives, together with copies of reports or investigations made by the **Insured** or the **Insured's** representatives with respect to such proceedings.

E. The **Excess Insurer** may, at its sole option, elect to effectively participate in the investigation, settlement or defense of any **Claim** against any **Insured** for matters covered by this Policy even if the **Underlying Limit** has not been exhausted. The **Excess Insurer** may, at its own expense, elect to appeal any judgment which may involve the insurance provided by this Policy.

## SECTION VI

COOPERATION. The **Insured** shall give the **Excess Insurer** such information and cooperation as the **Excess Insurer** may reasonably require.

## SECTION VII

SUBROGATION AND RECOVERIES. In the event of any payment under this Policy, the **Excess Insurer** shall be subrogated to all of the **Insureds**' rights of recovery against any person or organization, and the **Insured** shall execute and deliver all instruments and papers and do whatever else may be necessary to secure such rights.

Any amount recovered after payment under this Policy shall be apportioned in the inverse order of payment to the extent of actual payment. The expenses of all such recovery proceedings shall be apportioned in the same ratio as the recoveries.

## SECTION VIII

CANCELLATION.

A. This Policy may be cancelled by the **Named Entity** at any time by written notice or by surrender of this Policy to the **Excess Insurer** at the address listed in Item 8. of the Declarations of this Policy, stating when thereafter the cancellation shall be effective.

B. Except as provided in Section IV.G. above, this Policy may be cancelled by or on behalf of the **Excess Insurer** by mailing or delivering to the **Named Entity** at the address shown in Item 1. of the Declarations of this Policy written notice stating when such cancellation shall be effective. Notice of cancellation will be provided at least ten (10) days before the effective date of cancellation if the **Excess Insurer** is cancelling this Policy for nonpayment of premium. Notice of cancellation will be

provided at least sixty (60) days before the effective date of cancellation if this Policy is cancelled for any other reason. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall become the end of the **Policy Period**. Delivery of such notice shall be equivalent to mailing.

C. If this Policy is cancelled by the **Named Entity**, the **Excess Insurer** shall retain the customary short-rate portion of the premium. If this Policy is cancelled by the **Excess Insurer**, the **Excess Insurer** shall send the applicable portion of the pro-rata premium refund to the **Named Entity** at the address shown in Item 1. of the Declarations of this Policy. Premium adjustment may be made as soon as practicable after cancellation is effective and payment or tender of any unearned premium by the **Excess Insurer** shall not be a condition precedent to the effectiveness of cancellation.

## SECTION IX

ASSIGNMENT. This Policy and any and all rights hereunder are not assignable without the prior written consent of the **Excess Insurer**.

## SECTION X

**NAMED ENTITY** AUTHORIZATION CLAUSE. By acceptance of this Policy, the **Insureds** and the **Named Entity** agree that the **Named Entity** will act on behalf of all of the **Insureds** as well as the **Named Entity** with respect to the giving and receiving of all notices, the payment of premiums, and the receiving of any return premium that may become due.

## SECTION XI

CAPTIONS. The headings or captions used in this Policy are for the purposes of reference only and shall not otherwise affect the meaning of this Policy.

## SCHEDULE OF FORMS AND ENDORSEMENTS

| INSURED: Refco, Inc. | TERM: 8/11/2005 to 8/11/2006 |
|---|---|
| POLICY NUMBER: DOX0009322-00 | |

| ENDT. NO. | FORM NO. | TITLE |
|---|---|---|
| | 00 DOX0112 00 04 03 | EXCESS INSURANCE POLICY |
| 1 | 00 DOX0047 00 01 03 | PENDING AND PRIOR LITIGATION EXCLUSION (EXCESS) |
| 2 | 00 DOX0051 00 01 03 | PRIOR NOTICE EXCLUSION (EXCESS) |
| 3 | 00 DOX0004 00 04 03 | APPLICATION ENDORSEMENT (EXCESS) |
| 4 | 00 DOX0050 00 01 03 | PRIOR KNOWLEDGE OR INFORMATION EXCLUSION (EXCESS) |
| 5 | 00 DOX0129 14 08 03 | ILLINOIS AMENDATORY ENDORSEMENT |
| | 00 MLT0027 00 01 05 | TERRORISM COVERAGE DISCLOSURE NOTICE |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PENDING AND PRIOR LITIGATION EXCLUSION (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

1.  The **Excess Insurer** shall not be liable to make any payment in connection with a **Claim** arising out of, based upon or attributable to:

    a.  any litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured** occurring prior to, or pending as of, August 11, 2005;

    b.  any subsequent litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured** arising from or based on any matter alleged in such prior or pending litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured**; or

    c.  any **Wrongful Act** which gave rise to such prior or pending litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured**, or any other **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** described above, constitute **Interrelated Wrongful Acts**.

2.  **"Wrongful Act"** means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act.

3.  **"Interrelated Wrongful Acts"** means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  1

Policy Number:        DOX0009322-00

Named Insured:        Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PRIOR NOTICE EXCLUSION (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

1.  The **Excess Insurer** shall not be liable to make any payment in connection with a **Claim** alleging, arising out of, based upon or attributable to:

    a.  any **Wrongful Act** or any matter, fact, circumstance, situation, transaction, or event which has been the subject of any notice given under any policy, the term of which incepted prior to the inception date of this Policy; or

    b.  any **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** described in a. above, constitute **Interrelated Wrongful Acts**.

2.  "**Wrongful Act**" means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act.

3.  "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as' a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  2

Policy Number:          DOX0009322-00

Named Insured:        Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0051 00 01 03                                                        Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**APPLICATION ENDORSEMENT (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

The term "Application" or "Renewal Application," as used in this Policy or any **Underlying Insurance** shall mean:

1. Each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this Policy or any **Underlying Insurance** or the underwriting of any other directors and officers and/or corporation (or equivalent) liability policy issued by the **Excess Insurer** or an insurer of any **Underlying Insurance**, or any of their affiliates, of which this Policy or any **Underlying Insurance** is a renewal, replacement or which it succeeds in time;

2. Any public documents filed by the **Insureds** with the Securities and Exchange Commission ("SEC") or any similar state, local, or foreign regulatory agency, including, but not limited to, the Annual Report(s), 10Ks, 10Qs, 8Ks and proxy statements of an entity that is an **Insured**; and

3. Any other written public statement or certification required by law to be made by the chief executive officer, chief financial officer or other executive officer of an entity that is an **Insured** regarding the accuracy, completeness or adequacy of such **Insured's** financial statements, SEC filings, or internal controls.

All such applications, attachments, materials, filings and certifications, whether or not furnished to the **Excess Insurer**, are deemed attached to and incorporated into this Policy.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  3

Policy Number:          DOX0009322-00

Named Insured:          Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0004 00 04 03                                                                  Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**PRIOR KNOWLEDGE OR INFORMATION EXCLUSION (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

If any **Insured** as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a **Claim** under this Policy, the **Excess Insurer** shall not be liable to make any payment under this Policy as a result of a **Claim** arising out of, based upon or attributable to any such act, error, omission, fact, matter or circumstance.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  4

Policy Number:          DOX0009322-00

Named Insured:          Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0050 00 01 03

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ILLINOIS AMENDATORY ENDORSEMENT**

1. **SECTION IV,** MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE.,** A. is amended by deleting the phrase "with solvent insurers".

2. **SECTION IV,** MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE.,** E. is amended by the addition of the following:

    The **Insureds'** failure to provide the foregoing notice shall not invalidate this Policy, but in the event the **Insureds** fail to provide such notice the **Excess Insurer** shall be liable under this Policy only to the extent that the **Excess Insurer** would have been liable had the **Insureds** provided adequate notice under this provision.

3. **SECTION IV,** MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE.,** G. is deleted in its entirety.

4. **SECTION VIII,** CANCELLATION., B. is deleted and replaced by the following:

    B. After this Policy has been in effect for sixty (60) days, this Policy may be cancelled by or on behalf of the **Excess Insurer** only for one of the following reasons:

    1) nonpayment of premium;

    2) this Policy was obtained through a material misrepresentation;

    3) any **Insured** violated any of the terms and conditions of this Policy;

    4) the risk originally accepted has measurably increased;

    5) certification to the Director of the Department of Insurance of the loss of reinsurance by the **Excess Insurer** which provided coverage to the **Excess Insurer** for all or a substantial part of the underlying risk insured; or

    6) a determination by the Director of the Department of Insurance that the continuance of the Policy could place the **Excess Insurer** in violation of the insurance laws of Illinois.

    The **Excess Insurer** shall mail written notice of cancellation to the **Named Entity** and the **Named Entity's** agent or broker of any record at the last address known to the **Excess Insurer** and any mortgagee or lienholder, if known. Notice of cancellation shall be provided at least ten (10) days before the effective date of cancellation if cancellation is for nonpayment of premium. If cancellation is for any of the reasons listed in 2) through 6) above, and the Policy has been in effect for sixty (60) days or less, then notice of cancellation shall be provided at least thirty (30) days before the effective date of cancellation. After the Policy has been in effect for sixty-one (61) days or more, notice of cancellation shall be provided at least sixty (60) days before the effective date of cancellation. The mailing of such notice shall be sufficient and the effective date of cancellation shall become the end of the **Policy Period**. The **Excess Insurer** shall maintain proof of mailing on a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service. The notice shall state the reason or reasons for cancellation.

5.  **SECTION VIII** is amended by the addition of the following:

NONRENEWAL.    Should the **Excess Insurer** decide to nonrenew this Policy, then the **Excess Insurer** shall mail written notice of nonrenewal to the **Named Entity** at the principal address shown in Item 1. of the Declarations of this Policy, the agent or broker of record and any mortgagee or lienholder, if known.  The **Excess Insurer** shall mail or deliver such notice at least sixty (60) days before the end of the **Policy Period**.  The notice shall state the reason or reasons for nonrenewal.  The mailing of such notice shall be sufficient and the **Excess Insurer** shall maintain proof of mailing on a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial delivery service.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  5

Policy Number:          DOX0009322-00

Named Insured:         Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0129 14 08 03                                                                                                    Page 2 of 2

# TERRORISM COVERAGE DISCLOSURE NOTICE

### TERRORISM COVERAGE PROVIDED UNDER THIS POLICY

The Terrorism Risk Insurance Act of 2002 established a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. The Act provides that, to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States.

In accordance with the Terrorism Risk Insurance Act of 2002, we are required to offer you coverage for losses resulting from an act of terrorism **that is certified under the federal program** as an act of terrorism committed by an individual(s) acting on behalf of a foreign person or foreign interest. The policy's other provisions will still apply to such an act. Your decision is needed on this question: do you choose to pay the premium for terrorism coverage stated in this offer of coverage, or do you reject the offer of coverage and not pay the premium? You may accept or reject this offer.

If your policy provides commercial property coverage, in certain states, statutes or regulations may require coverage for fire following an act of terrorism. In those states, if "terrorism" results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements that apply to those coverage forms, or to Legal Liability coverage forms or Leasehold Interest coverage forms.

**Your premium <u>will</u> include the additional premium for terrorism as stated in the section of this Notice titled DISCLOSURE OF PREMIUM.**

### DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. **The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.**

### DISCLOSURE OF PREMIUM
Your premium for terrorism coverage is: **Included in Policy Premium**
(This charge/amount is applied to obtain the final premium.)

**You may choose to reject the offer by signing the statement below and returning it to us. Your policy will be changed to exclude the described coverage.** If you chose to accept this offer, this form does not have to be returned.
### REJECTION STATEMENT

| I hereby decline to purchase coverage for certified acts of terrorism. I understand that an exclusion of certain terrorism losses will be made part of this policy. |
| --- |

---

_____
Policyholder/Legal Representative/Applicant's
Signature

_____
Print Name of Policyholder/Legal
Representative /Applicant

Date: _____

_____
Refco, Inc.
Named Insured

_____
Arch Insurance Company
Insurance Company

Policy Number: DOX0009322-00

Exhibit I

Policy Number:    **ELU089673-05**
Renewal of Number

☐ **Greenwich Insurance Company**
☒ **XL Specialty Insurance Company**
Members of the XL America Companies

---

**CLASSIC A-SIDE MANAGEMENT LIABILITY
INSURANCE POLICY DECLARATIONS**

Executive Offices
70 Seaview Avenue
Stamford, CT 06902-6040
Telephone 877-953-2636

---

THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

**Item 1. Name and Mailing Address of Insured Entity:**
Refco Inc.
550 W. Jackson Blvd., Suite 1300
Chicago, IL 60661

**Item 2. Policy Period:  From:** August 11, 2005 **To:** August 11, 2006
At 12:01AM Standard Time at your Mailing Address Shown Above

**Item 3. Limit of Liability:**
$20,000,000 Aggregate each Policy Period (including **Defense Expenses**)

**Item 4. Optional Extension Period and Premium:**
Length of Optional Extension Period:   One Year
Optional Extension Premium:               $740,600.00

**Item 5. Notices required to be given to the Insurer must be addressed to:**
Executive Liability Underwriters
One Constitution Plaza, 16th Floor
Hartford, CT 06103
Toll Free Telephone: 877-953-2636

**Item 6. Premium:**
Premium                                    $370,300.00
Taxes, Surcharges or Fees:          $0.00
Total Policy Premium:                  $370,300.00

**Item 7. Policy Forms and Endorsements Attached at Issuance:**
CL 71 00 03 00   CL 72 02 05 00   CL 83 08 09 02   XL 83 07 01 00   XL 80 24 03 03   XL 80 39 04 05
CL 83 06 07 02   CL 83 14 10 03   CL 80 34 12 02   CL 80 18 09 02   XL 80 34 10 04   XL 83 25 10 00
Manuscript 3027 12 05   XL 80 04 04 00

Countersigned: _____  By: _____
                            Date                                              Authorized Representative

---

THESE DECLARATIONS AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE APPLICATION SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE INSURED RELATING TO THIS INSURANCE.

CL 70 00 11 01

CLAS( )A-SIDE MANAGEMENT LIABILITY ( )ICY

In Witness Whereof, the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations page, if required by law, by a duly authorized representative of the Insurer.


Nicholas M. Brown Jr.
President                                    Theresa M. Morgan
                                             Secretary

**XL Specialty Insurance Company**


Nicholas M. Brown Jr.
President                                    Theresa M. Morgan
                                             Secretary

**Greenwich Insurance Company**


CL 70 00 11 01

Page 2 of 2

# EXECUTIVE LIABILITY UNDERWRITERS
**A Member of the XL Capital Group of Companies**

# CLASSIC A-SIDE MANAGEMENT LIABILITY

Executive Liability Underwriters
One Constitution Plaza
16th Floor
Hartford, CT 06103
Phone: 860-246-1863
Fax: 860-246-1899
www.xlelu.com
email: elusubmissions@xlelu.com

# CLASSIC A-SIDE MANAGEMENT LIABILITY INSURANCE COVERAGE FORM

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to Executive Liability Underwriters, the Underwriting Manager for the Insurer identified on the Declarations Page (hereinafter, the "Insurer") including the Application and subject to all of the terms, conditions and limitations of all the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:

## I. INSURING AGREEMENT

The Insurer will pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act**, except to the extent that such **Loss** is paid by any other **Insurance Program** or as indemnification from any source. If **Loss** is not paid by such other **Insurance Program** or as indemnification from any source, the Insurer will pay covered **Loss** on behalf of the **Insured Persons**, subject to all of the terms, conditions (including but not limited to Condition IV(B)) and limitations of the Policy.

## II. DEFINITIONS

(A) **"Application"** means:

    (1) the **Application** attached to and forming part of this Policy; and

    (2) any materials submitted therewith, which shall be retained on file by the Insurer and shall be deemed to be physically attached to this Policy.

(B) **"Change In Control"** means:

    (1) the merger or acquisition of the **Parent Company**, or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity;

    (2) the acquisition by any person, entity, or affiliated group or persons or entities of the right to vote for, select, or appoint more than fifty percent (50%) of the directors of the **Parent Company**; or

    (3) the appointment of a Receiver, Conservator, Liquidator, Trustee, Rehabilitator, or any comparable authority, with respect to the **Parent Company**.

(C) **"Claim"** means:

    (1) a written demand for monetary or non-monetary relief;

    (2) any civil or criminal judicial proceeding in a court of law or equity, or arbitration; or

    (3) a formal civil, criminal, or administrative regulatory proceeding or formal investigation against an **Insured Person**.

(D) **"Company"** means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to CONDITIONS IV(C).

(E)    "Defense Expenses" means reasonable legal fees and expenses incurred in the defense of any Claim. Defense Expenses will not include the Company's overhead expenses or any salaries, wages, fees, or benefits of its directors, officers, or employees.

(F)    "Employment Practices Claim" means a Claim alleging an Employment Practices Wrongful Act.

(G)    "Employment Practices Wrongful Act" means any actual or alleged:

    (1)    wrongful termination of employment whether actual or constructive;

    (2)    employment discrimination of any kind;

    (3)    sexual or other harassment in the workplace; or

    (4)    wrongful deprivation of career opportunity, employment related misrepresentations, retaliatory treatment against an employee of the Company, failure to promote, demotion, wrongful discipline or evaluation, or refusal to hire.

(H)    "Insurance Program" means

    (1)    any existing Management Liability insurance, Directors' and Officers' Liability insurance, or similar insurance, and

    (2)    any other existing insurance under which coverage may be owed.

(I)    "Insured Person" means:

    (1)    any past, present, or future director or officer, or member of the Board of Managers, of the Company and those persons serving in a functionally equivalent role for the Parent Company or any Subsidiary operating or incorporated outside the United States;

    (2)    any individual identified in (I)(1) above who, at the specific written request of the Company, is serving as a director, officer, trustee, regent, or governor of any Outside Entity; or

    (3)    the lawful spouse of any person set forth in the above provisions of this definitions, but only to the extent the spouse is a party to any Claim solely in their capacity as a spouse of such persons and only for the purposes of any Claim seeking damages recoverable from marital community property, property jointly held by any such person and spouse, or property transferred from any such person to the spouse.

In the event of the death, incapacity or bankruptcy of an individual identified in (I)(1), (2), and (3) above, any Claim against the estate, heirs, legal representatives or assigns of such individual for a Wrongful Act of such individual will be deemed to be a Claim against such individual.

(J)    "Interrelated Wrongful Acts" means any Wrongful Act based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related, or series of related, facts circumstances, situations, transactions, or events.

(K)    "Loss" means damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law) and Defense Expenses that the Insured Persons are obligated to pay. Loss will not include:

    (1)    the multiplied portion of any damage award;

    (2)    fines, penalties or taxes imposed by law; or

    (3)    matters which are uninsurable under the law pursuant to which this Policy is construed.

CLASSIC A-SIDE
CL 71 00 03 00

Note: With respect to judgments in which punitive damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for an **Insured Person**, punitive damages are insurable under applicable law, the Insurer will not dispute the written opinion of counsel for the **Insured Person**.

(L)    "**Parent Company**" means the entity named in Item 1 of the Declarations.

(M)    "**Policy Period**" means the period form the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.

(N)    "**Outside Entity**" means any corporation or organization other than the **Company** of which any **Insured Person** serves as a director, officer, trustee, regent, or governor, but only if such service is at the specific written direction of the **Company**.

(O)    "**Subsidiary**" means any entity during any time in which the **Parent Company** owns, directly or through one of more **Subsidiary(ies)**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors.

(P)    "**Wrongful Act**" means:

    (1)    any actual or alleged act, error, or omission, misstatement, misleading statement, neglect, or breach of duty by any **Insured Person** while acting in his or her capacity as an:

        (i)    **Insured Person** of the **Company** or a person serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary**;

        (ii)    **Insured Person** of the **Company** who at the specific written request of the **Company** is serving as a director, officer, trustee, regent or governor or an **Outside Entity**; and

    (2)    any Employment Practices Wrongful Act.

## III. EXCLUSIONS

(A)    Except for **Defense Expenses**, the Insurer shall not pay **Loss** in connection with any **Claim**:

    (1)    by, on behalf of, or at the direction of the **Company** or **Outside Entity**, except and to the extent such **Claim**:

        (i)    is brought by a security holder of the **Company** or **Outside Entity** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of the **Company** or any **Outside Entity**.

        (ii)    is brought by the Bankruptcy Trustee or Examiner of the **Company** or **Outside Entity**, or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Company** or **Outside Entity**;

    (2)    brought about or contributed to in fact by any:

        (i)    intentionally dishonest, fraudulent, or criminal act or omission or any willful violation of any statute, rule, or law; or

        (ii)    profit or remuneration gained by any **Insured Person** to which such **Insured Person** is not legally entitled;

    as determined by a final adjudication in the underlying action or in a separate action or proceeding;

(B)    The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured Person**:

    (1)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, defamation, slander, libel, disease or death of any person, or damage or destruction of any tangible property including **Loss** of use thereof.  EXCLUSION (B) shall not apply to any **Claim**:

        (i)    brought by a security holder of the **Company or Outside Entity** for any actual or alleged violation of the Securities Act of 1933, the Securities Act of 1934, or any state securities statute; or

        (ii)    a derivative action brought by or on behalf of, or in the name or right of, the **Company**, and brought and maintained independently of, and without solicitation, assistance, participation or invention of the **Company, Insured Person, or Outside Entity.**

    (2)    based upon, arising out of, directly or indirectly resulting from, in  consequence of, or in any way involving any fact, circumstance or situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability insurance, Directors' and Officers' insurance, or any other similar insurance.

Note:  EXCLUSION (B)(1) will not apply to any allegation of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of an **Employment Practices Claim** for an **Employment Practices Wrongful Act.**

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

## IV.    CONDITIONS

(A)    **Limit of Liability**

The amount set forth in ITEM 3 of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer under this Policy.  Payment of **Loss**, including **Defense Expenses**, by the Insurer shall reduce the Limit of Liability.

(B)    **Indemnification and Other Insurance**

    (1)    The **Insured Persons** and the **Company** understand and agree that all coverage under this Policy shall be specifically excess over, and shall not contribute with:

        (i)    all indemnification to which an **Insured Person** may be entitled from any source, including but not limited to the **Company** or any **Outside Entity**; and

        (ii)    any **Insurance Program** maintained by the **Company** or any **Outside Entity**, whether such other insurance is stated to be primary, contributing, excess, or otherwise.

    (2) .  This Policy shall not be subject to the terms or conditions of any other insurance.  The Insurer does not waive compromise or release any of its rights to recover **Loss** paid under this Policy from the issuers of any other insurance under which coverage may be owed, or from any person or entity from which an **Insured Person** is entitled to indemnification.

(C)    **Mergers and Acquisitions**

    (1)    If during the **Policy Period**, the **Company** acquires any assets, acquires a **Subsidiary**, or acquires any entity by merger, consolidation or otherwise, or assumes any liability of another entity, coverage

shall be provided for any **Loss** involving a **Claim** for a **Wrongful Act** occurring after the consummation of the transaction.

(2)   With respect to the acquisition, assumption, merger, consolidation or other of any entity, asset, **Subsidiary** or liability as described in (C)(1) above, there will be no coverage available under this Policy for any **Claim** made against the acquired, assumed, merged, or consolidated entity, asset, **Subsidiary**, liability, or **Insured Person** for a **Wrongful Act** committed at any time during which such entity, asset, liability, or **Subsidiary** is not insured under this Policy.

(3)   If during the **Policy Period** any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who because of their service with such **Subsidiary** were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Company**.

(4)   If, during the **Policy Period**, there is a **Change In Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** for a **Wrongful Act** committed or allegedly committed prior to the time of the **Change In Control**; and

(i)   coverage will cease with respect to any **Claim** for a **Wrongful Act** committed subsequent to the **Change In Control**; and

(ii)   the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change In Control**.

(D)   **Notice**

(1)   As a condition precedent to any right to payment under this policy with respect to any **Claim**, the **Insured Persons** or the **Company** shall give written notice to the Insurer of any **Claim** as soon as practicable after it is first made.

(2)   If, during the **Policy Period**, the **Insured Persons** or the **Company** first becomes aware of a specific **Wrongful Act** and if, during the **Policy Period**, the **Insured Persons** or the **Company**:

(i)   provide the Insurer with written notice of the specific **Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, and the circumstances by which the **Insured Persons** first became aware of such **Wrongful Act**; and

(ii)   request coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act**;

then any **Claim** subsequently made arising out of such **Wrongful Act** will be treated as if it had been first made during the Policy Period.

All notices under CONDITIONS (D) (1) and (2) must be sent by certified mail or the equivalent to the address set forth in ITEM 5 of the Declarations;   Attention:  Claim Department.

(E)   **Defense and Settlement of Claims**

(1)   It shall be the duty of the **Insured Persons** and not the duty of the Insurer to defend **Claims**. No **Insured Person** may incur any **Defense Expenses** or admit liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably withheld.

(2)   Upon written request, the Insurer will pay on a current basis any **Defense Expenses** before the disposition of the **Claim** for which this Policy provides coverage. As a condition of the advancement of

Defense Expenses, the Insurer may require a written undertaking, in a form satisfactory to the Insurer, which will guarantee the repayment of any Loss including Defense Expenses paid to or on behalf of the Insured Persons if it is finally determined that the Loss incurred is not covered under this Policy.

(3)    Except for such Defense Expenses, the Insurer shall pay Loss only upon the final disposition of any Claim.

(F)    **Assistance, Cooperation and Subrogation**

(1)    The Insured Persons and the Company agree to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request, and further agree that they will do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery.

(2)    In the event of any payment under this Policy, the Insurer shall be subrogated to all of the potential or actual rights of recovery of the Insured Persons. The Insured Persons and the Company shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in their name, and will provide all other assistance and cooperation which the Insurer may reasonably require.

(G)    **Interrelated Claims**

All Claims arising from the same Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have be made at the earliest time at which the earliest such Claim is made or deemed to have been made pursuant to CONDITION (D)(1) and (2) above, if applicable.

(H)    **Exhaustion**

If the Insurer's Limit of Liability as set forth in ITEM 3 of the Declarations is exhausted by the payment of Loss, the premium as set forth in ITEM 6 of the Declarations will be fully earned, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy.

(I)    **Cancellation and Renewal of Coverage**

(1)    Except for the nonpayment of premium, as set forth in (I)(2) below, the Parent Company has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations. In such event, the Insurer shall retain the customary short rate portion of the earned premium. Return or tender of the unearned premium is not a condition of cancellation.

(2)    The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than twenty (20) days written notice stating the reason for cancellation and when the Policy will be canceled. Notice of cancellation will be sent to the Parent Company and the agent of record for the Insured Person, if applicable.

(3)    The Insurer is under no obligation to renew this Policy upon its expiration. Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the Parent Company written notice stating such at least sixty (60) days before the Expiration Date set forth in ITEM 2 of the Declarations.

(J)    **Optional Extension Period**

(1)    If either the Parent Company or the Insurer does not renew this Policy, the Parent Company shall have the right, upon payment of an additional premium set forth in ITEM 4 of the Declarations, to an

CLASSIC A-SIDE
CL 71 00 03 00

extension of the coverage provided by this Policy with respect only to any **Claim** first made during the period of time set forth in ITEM 4 of the Declarations after the Policy Expiration Date, but only with respect to a **Wrongful Act** occurring prior to the Policy Expiration Date.

(2)    As a condition precedent to the right to purchase the Optional Extension Period the total premium for this Policy must have been paid in full.  The right of the **Parent Company** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Parent Company** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)    If the **Parent Company** elects to purchase the Optional Extension Period as set forth in (J)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date for the Optional Extension Period.

(4)    The purchase of the Optional Extension Period will not in any way increase the Limit of Liability set forth in ITEM 3 of the Declarations, and the Limit of Liability with respect to **Claims** made during the Optional Extension Period shall be part of and not in addition to the Limit of Liability for all **Claims** made during the **Policy Period**.

(K)    **Representation Clause**

Each **Insured Person** represents that the statements and particulars contained in the **Application** are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are the basis of this Policy.  No knowledge or information possessed by any **Insured Person** will be imputed to any other **Insured Person** for the purposes of determining the availability of coverage with respect to **Claims** made against any other **Insured Person**.

(L)    **Action Against the Insurer, Assignment, and Changes to Policy**

(1)    No action may be taken against the Insurer unless, as a condition precedent thereto:

(i)    there has been full compliance with all of the terms and conditions of this Policy; and

(ii)    the amount of the obligation of the **Insured Person** has been finally determined either by judgment against the **Insured Person** after actual trial, or by written agreement of the **Insured Person**, the claimant and the Insurer.

(2)    Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the **Insured Person** to determine their liability, nor may the **Insured Person** implead the Insurer in any **Claim**.

(3)    Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

(4)    Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy.  The terms, conditions and limitations of this Policy may only be waived or changed by written endorsement signed by the Insurer.

(M)    **Authorization and Notices**

It is understood and agreed that the **Parent Company** will act on behalf of the **Company** and the **Insured Persons** with respect:

CL 71 00 03 00

(1)    the payment of the premiums,

(2)    the receiving of any return premiums that may become due under this Policy,

(3)    the giving of all notices to the Insurer as provided herein, and

(2)    the receiving of all notices from the Insurer.

(N)    **Entire Agreement**

The **Insured Persons** agree that the Declarations, Policy, including the endorsements, attachments and the **Application** shall constitute the entire agreement between the Insurer or any of its agents and the **Insured Persons** relation to the insurance.

## POLICYHOLDER DISCLOSURE

### NOTICE OF TERRORISM
### INSURANCE COVERAGE

Coverage for acts of terrorism is already included in your current policy. You should know that, effective November 26, 2002, under your existing coverage, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The portion of your annual premium that is attributable to coverage for acts of terrorism is: $ waived. Any premium waiver is only valid for the current Policy Period.

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT OF 2002, ANY LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE WILL BE PARTIALLY REIMBURSED BY THE UNITED STATES AND I HAVE BEEN NOTIFIED OF THE AMOUNT OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Name of Insurer:  **XL Specialty Insurance Company**
Policy Number:   **ELU089673-05**

# IN WITNESS ENDORSEMENT

XL SPECIALTY INSURANCE COMPANY

ADMINISTRATIVE OFFICE:  SEAVIEW HOUSE
70 SEAVIEW AVENUE
STAMFORD, CT 06902-6040

STATUTORY HOME OFFICE:  1201 NORTH MARKET STREET
SUITE 501
WILMINGTON, DE 19801

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

Richard S. Banas
President

Kenneth P. Meagher
Secretary

IL MP 9104 0704 XLS



XL Specialty Insurance Company – Illinois Policyholder Notice

## IMPORTANT NOTICE TO ALL ILLINOIS POLICYHOLDERS

In the event you need to contact someone about this Policy for any reason, please contact us at:

*XL Specialty Insurance Company*
*c/o XL Insurance Underwriters*
*100 Constitution Plaza, 17th Floor*
*Hartford, Connecticut 06103*

If you have been unable to contact or obtain satisfaction from the Insurer, you may contact the Illinois Department of Insurance to obtain information or make a complaint at:

*Illinois Department of Insurance*
*Consumer Division of Public*
*Services Section*
*Springfield, Illinois 62767*

CL 72 02 05 00

Endorsement No.: 1
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# ILLINOIS AMENDATORY ENDORSEMENT

DIRECTORS & OFFICERS PROFESSIONAL LIABILITY COVERAGE FORM

I.    Section IV., CONDITIONS, paragraph (I), CANCELLATION AND RENEWAL OF COVERAGE, is deleted and replaced by: Cancellation -- "The Insured" may cancel this policy by returning the policy to "The Company," or by giving "The Company" written notice and stating at what future date coverage is to stop.

"The Company" may cancel this policy by mailing written notice of cancellation to "The Insured" and any mortgagee or lienholder at the last mailing address known to "The Company."

"The Company" will mail the notice to "The Insured" and any mortgagee or lienholder at least ten (10) days before the effective date of the cancellation when cancellation is for nonpayment of premium. When cancellation is for any other reason, "The Company" will mail the notice of cancellation to "The Insured" and any mortgagee or lienholder at least 30 days prior to the effective date of the cancellation during the first 60 days of coverage or 60 days prior to the effective date of the cancellation if the coverage has been in effect for more than 60 days.

If this policy has been in effect 60 days or more, or if it is a renewal of a policy issued by "us" effective immediately, "we" may cancel this policy only if one or more of the following reasons apply:

      a.    nonpayment of premium;

      b.    the policy was obtained through a material misrepresentation;

      c.    any "insured" has violated any of the "terms" and conditions of the policy;

      d.    the risk originally accepted has measurably increased;

      e.    certification of the Director of the loss of reinsurance by the insurer which provided coverage to "us" for all or a substantial part of the underlying risk insured; or

      f.    a determination by the Director that the continuation of the policy could place "us" in violation of the insurance laws of this state.

"Our" notice will include the reason or reasons for cancellation. "We" will also mail a copy of the notice to "your" broker, if known, or to the agent of record. Proof of mailing is sufficient proof of notice.

"Your" return premium, if any, will be calculated according to "our" rules. It will be refunded to "you" with the cancellation notice or within a reasonable time. Payment or tender of the unearned premium is not a condition of cancellation.

Nonrenewal -- If "we" decide not to renew this policy, "we" will mail "our" notice of nonrenewal to "you" at least 60 days before the end of the policy period or anniversary date.

"Our" notice will include the reasons for nonrenewal. "We" will also mail a copy of the notice to "your" broker, if known, or to the agent of record and any mortgagee or lienholder at the last mailing address known to "us". Proof of mailing is sufficient proof of notice.

CL 72 02 05 00

**Endorsement No.: 1**
**Named Insured: Refco Inc.**
**Policy No: ELU089673-05**

CL 72 02 05 00

**Effective: August 11, 2005**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

Renewal -- If "we" decide to renew this policy with premium increases of 30% or higher, or impose changes in deductible or coverage that materially alter the policy, "we" will mail to "you" written notice of such increase or change in deductible or coverage at least 60 days prior to the renewal or anniversary date.

All other terms and conditions of the Policy remain the same.

**Endorsement No.: 2**
**Named Insured: Refco Inc.**
**Policy No: ELU089673-05**

**Effective: August 11, 2005**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

CL 83 08 09 02

# PRIOR ACTS EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any act, error, omission, misstatement, misleading statement, neglect, breach of duty, or Wrongful Act, committed or allegedly committed prior to August 5, 2004.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

Endorsement No.: 3
Named Insured: Refco Inc.
Policy No: ELU089673-05

XL 83 07 01 00

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# SPECIFIED CLAIMS EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, in connection with any proceeding set forth below, or in connection with any Claim based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any such proceeding or any fact, circumstance or situation underlying or alleged therein:

Edward McElwreath Case

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

 

Endorsement No.: 4
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

XL 80 24 03 03

# TERRORISM PREMIUM ENDORSEMENT

Please note: The portion of your annual premium set forth in Item 6. of the Declarations that is attributable to coverage for acts of terrorism is: $ waived.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

James Koval
Print Name

Sr. Vice President
Title

XL 80 39 04 05

Endorsement No.: 5
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# CHANGE OF ADDRESS OF INSURER ENDORSEMENT

In consideration of the premium charged, as of the effective date of this Endorsement:

Notices required to be given to the Insurer must be addressed to:

**Notice to Claim Dept:**

XL Professional

One Hundred Constitution Plaza, 18th Floor
Hartford, CT 06103
Attn: Claim Dept.

**All other Notices:**

XL Professional

One Hundred Constitution Plaza, 17th Floor
Hartford, CT 06103
Attn: Underwriting

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

Endorsement No.: 6
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

CL 83 06 07 02

# AMEND INSURED V. INSURED EXCLUSION

In consideration of the premium charged, Section III Exclusions (A)(1) of the Policy is amended to read in its entirety as follows:

"(1)     by, on behalf of, or at the direction of the Company, Outside Entity or any Insured Person, except and to the extent such Claim:

(i)     is brought by a security holder of the Company or Outside Entity who, when such Claim is made and maintained is acting independently of, and without the solicitation, assistance, participation or intervention of the Company or any Outside Entity;

(ii)     is brought by the Bankruptcy Trustee or Examiner of the Company or Outside Entity, or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Company or Outside Entity;

(iii)     is in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an Insured Person which is part of or results directly from a Claim which is not otherwise excluded by the terms of this Policy; or

(iv)     is an Employment Practices Claim;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

CL 83 14 10 03

Endorsement No.: 7
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# PENDING AND/OR PRIOR LITIGATION EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act, underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration which was brought prior to August 11, 2005.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

Endorsement No.: 8
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

CL 80 34 12 02

# AMEND MERGERS AND ACQUISITIONS ENDORSEMENT

In consideration of the premium charged, Section IV Conditions (C)(1) of the Policy is amended to read in its entirety as follows:

"(1)    If during the Policy Period, the Company acquires any assets, acquires a Subsidiary, or acquires any entity by merger, consolidation or otherwise, or assumes any liability of another entity, coverage shall be provided for any Loss involving a Claim for a Wrongful Act occurring after the consummation of the transaction; provided however, if by reason of the transaction (or series of transactions) the entity, assets, Subsidiary or liabilities so acquired or so assumed, exceed thirty five percent (35%) of the total assets or liabilities of the Company, as represented in the Company's most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days for any Loss involving a Claim for a Wrongful Act that occurred after the transaction has been consummated.  Coverage beyond the ninety (90) day period will be provided only if:

(a)    the Insurer receives written notice containing full details of the transaction(s); and

(b)    the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

Endorsement No.: 9
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

CL 80 18 09 02

# AMEND CONDITIONS (B)(1) ENDORSMENT

In consideration of the premium charged, Section IV Conditions (B)(1) of the Policy is amended to read in its entirety as follows:

"(1)    The Insured Persons and the Company understand and agree that all coverage under this Policy shall be specifically excess over, and shall not contribute with:

(i)    all indemnification to which an Insured Person may be entitled from any source, including but not limited to the Company or any Outside Entity; and

(ii)    any Insurance Program maintained by the Company or any Outside Entity, whether such other insurance is stated to be primary, contributing, excess or otherwise.

However, if Loss is not paid by such other insurance or as indemnification, this Policy will respond on behalf of the Insured Persons as if it were primary, subject to all of its terms, conditions and limitations and without prejudice to the Insurer's excess position."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

Endorsement No.: 10
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

XL 80 34 10 04

# RESCISSION ENDORSEMENT

In consideration of the premium charged, the Insurer shall not be entitled under any circumstances to rescind this Policy, other than for non-payment of premium.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

XL 83 25 10 00

**Endorsement No.: 11**
**Named Insured: Refco Inc.**
**Policy No: ELU089673-05**

**Effective: August 11, 2005**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# SPECIFIED ACTS EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, in connection with any fact, circumstance, situation, transaction, event or Wrongful Act set forth below or in connection with any Claim, based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

　　　　Wells Notice/ SEC Investigation

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

James Koval
Print Name

Sr. Vice President
Title

Endorsement No.: 12
Named Insured: Refco Inc.
Policy No: ELU089673-05

Manuscript 3027 12 05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# CONTROLLING SHAREHOLDER ENDORSEMENT

In consideration of the premium charged:

(1)   The term "Insured Person," as defined in Section II. DEFINITIONS (I) of the Policy, is amended to include Philip Bennett in his capacity as a controlling shareholder of the Company, but only with respect to Securities Claims to the extent and during such time that such Securities Claims are also made and maintained against any other Insured Person or the Company.

(2)   With respect to Philip Bennett only, the definition of "Wrongful Act" in Section II. DEFINITIONS (P) of the Policy is amended to include the following:

    (a)   any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by Philip Bennett while acting in his capacity as controlling shareholder of the Company, or

    (b)   any matter claimed against Philip Bennett solely by reason of his status as controlling shareholder of the Company.

(3)   "Securities Claim" means a Claim which is brought by or on behalf of one or more of the securities holders of the Company in their capacities as such, or which arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

Manuscript 3027 12 05

Page 1 of 1

Endorsement No.: 13
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

XL 80 04 04 00

# INVERTED REPRESENTATION ENDORSEMENT

In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, from Claims arising from any fact, circumstance or situation of which, as of the effective date of this Policy, any Insured had knowledge and had reason to suppose might afford grounds for any Claim that would fall within the scope of the insurance afforded by this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

XL 80 04 04 00

Page 1 of 1

EXECUTIVE LIABILITY UNDERWRITERS    ☐ Indian Harbor Insurance Company
Member of the XL America Companies

## APPLICATION FOR CLASSIC A-SIDE MANAGEMENT LIABILITY INSURANCE POLICY

**NOTICE: THE POLICY FOR WHICH THIS APPLICATION IS MADE APPLIES, SUBJECT TO ITS TERMS, ONLY TO "CLAIMS" FIRST MADE DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED BY "DEFENSE EXPENSES," AND "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION.  THE INSURER WILL HAVE NO DUTY UNDER THE POLICY TO DEFEND ANY "CLAIM."  THE ENTIRE APPLICATION SHOULD BE CAREFULLY READ BEFORE IT IS EXECUTED.**

1.   a) Name of Applicant: _Refco, Inc._
     (Whenever used in this Application, the term "Applicant" shall mean the Parent Company)

     b) Principal Address: _550 W. Jackson Blvd_
     City: _Chicago_                    State: _Il_   Zip Code: _60661_

     c) Name and title of the officer of the Applicant designated as the representative to receive all notices from the Insurer on behalf of all person(s) and entity(s) proposed for this Insurance:

     _____

2.   Has the Applicant or any Subsidiary in the past thirty-six (36) months completed or agreed to, or does it contemplate within the next (12) months, any of the following, whether or not such transaction was or will be completed?  If "Yes," please describe the significant provisions of the transaction(s) as an attachment to this Application.

     a)   Any registration for a public placement of securities?                              ☒ Yes   ☐ No

     b)   Reorganization or arrangement with creditors under federal or state law? _See above_   ☐ Yes   ☐ No

3.   Prior Activities:

     a)   Has any person(s) or entity(s) proposed for this insurance been a party to any of the following?

          1)   Any civil, criminal or administrative proceeding alleging or investigating a violation of any securities or regulation?
                                                                                              ☐ Yes   ☒ No

          2)   Any representative actions, class actions or derivative suits?                  ☐ Yes   ☐ No

          If "Yes" to 1) or 2) above, a statement to the Application providing full details must be attached.

     b)   No claims have been made against any persons or entity(s) proposed for this insurance in their capacity as a director or officer of the Applicant, except as follows (provide detail as to defense costs, settlements, judgments, or other amounts). If answer is "none" so state:

          _McElwreath v. Refco Securities — Marsü will_
          _forward documents_

     c)   No persons or entity(s) proposed for this insurance is cognizant of any fact, circumstance or situation which they have reason to suppose might afford grounds for any claim such as would fall within the scope of the proposed insurance, except as follows.  If answer is "none," so state:

          _____

**Without prejudice to any other rights and remedies of the Insurer, any claim arising from any claims, facts, circumstances or situations disclosed or required to be disclosed in response to 3. b) and 3. c) is excluded from the proposed insurance.**

4.   As part of this Application, please submit the following documents with respect to the Applicant:

     a)   Latest 10-Q report filed and any 8-K or 13D reports filed with the SEC within the last 12 months.

     b)   Each prospectus, offering circular or private placement memorandum within the last 12 months.

     c)   Last proxy statement, 10-K and annual report, including audited financial statements with all notes and schedules.

     d)   Copies of all provisions of the Applicant's charter and bylaws relating to the indemnification of its directors and officers.

CL 95 00 03 00                                                                        Page 1 of 3

EXECUTIVE LIABILITY UNDERWRITERS    ☐    Indian Harbor Insurance Company
Member of the XL America Companies

FOR THE PURPOSE OF THIS APPLICATION, THE UNDERSIGNED AUTHORIZED AGENT OF THE PERSONS AND ENTITY(S) PROPOSED FOR THIS INSURANCE DECLARES THAT TO THE BEST OF THEIR KNOWLEDGE AND BELIEF, AFTER REASONABLE INQUIRY, THE STATEMENTS HEREIN ARE TRUE AND COMPLETE. THE INSURER IS AUTHORIZED TO MAKE ANY INQUIRY IN CONNECTION WITH THIS APPLICATION. SIGNING THIS APPLICATION DOES NOT BIND THE INSURER TO COMPLETE THE INSURANCE.

THE UNDERSIGNED DECLARES THAT THE PERSON(S) AND ENTITY(S) PROPOSED FOR THIS INSURANCE UNDERSTAND:

(A)    THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE COMPLETELY EXHAUSTED BY THE PAYMENT OF "DEFENSE EXPENSES," AND IN SUCH EVENT, THE INSURER WILL NOT BE RESPONSIBLE FOR ANY ONGOING DEFENSE EXPENSES OR FOR THE AMOUNT OF ANY JUDGEMENT OR SETTLEMENT TO THE EXTENT THAT ANY OF THE FOREGOING EXCEED ANY APPLICABLE LIMIT OF LIABILITY;

(B)    "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION;

(C)    THIS POLICY APPLIES ONLY TO "CLAIMS" FIRST MADE OR DEEMED MADE DURING THE "POLICY PERIOD," OR, IF PURCHASED, ANY EXTENDED REPORTING PERIOD;

(D)    THE INSURER HAS NO DUTY UNDER THIS POLICY TO DEFEND ANY "CLAIM."

IF THE INFORMATION IN THIS APPLICATION MATERIALLY CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE POLICY EFFECTIVE DATE, THE APPLICANT WILL NOTIFY THE INSURER WHO MAY MODIFY OR WITHDRAW ANY QUOTATION.

THE INFORMATION CONTAINED AND SUBMITTED WITH THIS APPLICATION IS ON FILE WITH THE INSURER AND, ALONG WITH THE APPLICATION, IS CONSIDERED TO BE PHYSICALLY ATTACHED TO THE POLICY AND WILL BECOME PART OF THE POLICY IF ISSUED.

NOTICE TO COLORADO APPLICANTS:  IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY.  PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES.  ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

NOTICE TO FLORIDA APPLICANTS:  ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY EMPLOYER OR EMPLOYEE, INSURANCE COMPANY, OR SELF-INSURED PROGRAM, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE OR MISLEADING INFORMATION IS GUILTY OF A THIRD DEGREE FELONY.

NOTICE TO KENTUCKY APPLICANTS:  ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES ANY APPLICATION FOR INSURANCE CONTAINING ANY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

NOTICE TO MINNESOTA, OHIO AND ARKANSAS APPLICANTS:  ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD, WHICH IS A CRIME.

NOTICE TO NEW JERSEY APPLICANTS:  ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

CL 95 00 03 00                                                                                      Page 2 of 3

**EXECUTIVE LIABILITY UNDERWRITERS** ☐ **Indian Harbor Insurance Company**
Member of the XL America Companies

NOTICE TO NEW YORK APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION. NO COVERAGE EXISTS FOR CLAIMS FIRST MADE AFTER THE END OF THE POLICY PERIOD UNLESS, AND TO THE EXTENT, THE EXTENDED REPORTING PERIOD APPLIES. UPON TERMINATION OF COVERAGE FOR ANY REASON, A 60-DAY AUTOMATIC EXTENDED REPORTING PERIOD WILL APPLY. FOR AN ADDITIONAL PREMIUM CALCULATED AS INDICATED IN ITEM 5 OF THE DECLARATION, AN EXTENDED REPORTING PERIOD CAN BE PURCHASED FOR A PERIOD OF AT LEAST ONE YEAR. NO COVERAGE WILL EXIST AFTER THE EXPIRATION OF THE EXTENDED REPORTING PERIOD WHICH MAY RESULT IN A POTENTIAL COVERAGE GAP IF PRIOR ACTS COVERAGE IS NOT SUBSEQUENTLY PROVIDED BY ANOTHER CARRIER. DURING THE FIRST SEVERAL YEARS OF CLAIMS MADE RELATIONSHIPS, CLAIMS MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND THE INSURED CAN EXPECT SUNSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE INCREASES UNTIL THE CLAIMS MADE RELATIONSHIP REACHES MATURITY.

NOTICE TO OKLAHOMA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

NOTICE TO PENNSYLVANIA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

APPLICANT:

_Pres. Chairman and CEO._          8/15/05.

BY (Signature of Chairman and/or President)          TITLE          DATE

It is agreed and understood that the Application will only be executed by the Chairman and/or President of the Applicant acting in their capacity(s) as the authorized agent of the individual(s) and entity(s) proposed for this insurance.

PRODUCER (Insurance Agent or Broker):          INSURANCE AGENCY OR BROKERAGE:

INSURANCE AGENCY OR BROKERAGE TAXPAYER ID OR SOCIAL SECURITY NO.:          AGENT OR BROKER LICENSE NO.:

ADDRESS OF AGENT OR BROKER (include Street, City, and Zip Code):

E-MAIL ADDRESS OF AGENT OR BROKER:

SUBMITTED BY (Insurance Agency or Brokerage):

INSURANCE AGENCY OR BROKERAGE TAXPAYER ID OR SOCIAL SECURITY NO.:          AGENT OR BROKER LICENSE NO.:

ADDRESS OF AGENT OR BROKER (include Street, City, and Zip Code):

CL 95 00 03 00          Page 3 of 3

Exhibit J

# KAUFMAN BORGEEST & RYAN LLP

ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE‡†
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL F. MEZZACAPPA*†
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER*
CHRISTOPHER E. DiGIACINTO*
ANN MARIE COLLINS*†
JONATHAN B. BRUNO*
PAUL J. COLUCCI

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN*
MARGARET J. DAVINO*††

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
THOMAS GIBBONS
HEATHER LASCHEVER*
CAROL L. DOTY†‡
ADEOLA I. ADELE
BARBARA-ANN M. COSTELLO
MELINDA B. MARGOLIES*
JEFFREY S. WHITTINGTON
ROCCO D. MATRA◊
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
CHRISTINE HEENAN
BELINDA DODDS-MARSHALL*†
JULIE A. KEEGAN
STEPHANEE B. GITNIK
JEFFREY W. KLEINER*
FRANK K. STADANO†
JACQUELINE B. TOMASSO
JENNIFER PILZ
GINA M. HOGUE*
MICHAEL R. JANES
YAEL WEPMAN*

R. EVON HOWARD*◊
LEONARD B. COOPER†‡
JULIE ANN LEVINSOHN*†
JOHN B. MULLANY*
JEFFREY C. GERSON†‡
CATHERINE KELLEHER*
REBECCA GOODMAN
PETER IANNACERT
ANDREW R. JONES
CHRISTOPHER GOMFRECHT
JAMES T. DE SILVA
KEITH L. KAPLAN*◊
DANIEL C. LYNCH*
VINCENT C. ANSALDI†‡
BRENDA CORREA*
DAVID J. VARRIALE*††
DOUGLAS J. DOMSKY
KIMBERLY CRESPO
TIMOTHY S. MCCARTHY*
JEFFREY A. GRAUNICK
TRACEY REISER-SERTOSIO‡
KATHERINE J. HOOPER††
DAMIEN SMITH
ANDREW S. KOSLOWITZ*◊

MATTHEW M. FERGUSON*◊
JEANNE M. VALENTINE
EDWARD R. NORIEGA*
MATTHEW SPENCER
PAUL T. CURLEY

† ALSO ADMITTED IN PA
◊ ALSO ADMITTED IN NJ
☆ ALSO ADMITTED IN DC
†† ALSO ADMITTED IN CT
‡ ALSO ADMITTED IN MA
◇ ALSO ADMITTED IN TX
★ ADMITTED IN FL
☆ ADMITTED IN FL ONLY
● ADMITTED IN NJ ONLY
○ ADMITTED IN CA ONLY
◊ ADMITTED IN NJ & MA ONLY
‡ ADMITTED IN CA, VA, DC ONLY
◊ BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

March 6, 2006

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Pam Sylwestrzak
Senior Vice President
Marsh USA, Inc.
500 West Monroe Street
Chicago, IL 60661-3630

| | | | |
|---|---|---|---|
| Re: | Insured | : | Refco, Inc. |
| | Claimant | : | Various – *See* Exhibit A, attached |
| | Policy No. | : | 506300 |
| | Claim No. | : | BH 9826 |
| | Our File No. | : | 481.001 |

Dear Pam:

As you know, we represent AXIS US Insurance ("Axis"). This is further to our December 16, 2005 letter, wherein we generally reserved all of Axis's rights in law and equity, as well as our March 1, 2006 letter attaching the issued policy. We are attaching to this letter, as Exhibit A, a schedule of all matters for which Axis has received notice under the captioned policy (the "Noticed Matters"). **We request that you immediately review the attached Exhibit A and advise us if you believe any matter noticed to Axis is not listed.** We again also ask that all communications on this matter be directed to the undersigned, on behalf of Axis.

We are directing this letter to you as the authorized agent of the Insureds, including the individual Insured Persons. To the extent that you are not acting as the authorized representative for any of the Insureds, please immediately advise us of the proper representative for any such Insureds.

The purpose of this letter is to describe the workings of the Axis Policy, to convey Axis's position regarding coverage, and to reserve Axis's rights. Axis has reviewed the Noticed Matters in light of the Policy provisions. Please be aware that we do not

NEW YORK CITY OFFICE
99 PARK AVENUE
NEW YORK, NEW YORK 10016
TELEPHONE: 212-980-9600
FACSIMILE: 212-980-9291

LONG ISLAND OFFICE
1305 FRANKLIN AVENUE
GARDEN CITY, NEW YORK 11530
TELEPHONE: 516-248-6000
FACSIMILE: 516-248-0677

CALIFORNIA OFFICE
CORPORATE CENTER1 AT MALIBU CANYON
26635 WEST AGOURA ROAD
CALABASAS, CALIFORNIA 91302
TELEPHONE: 818-880-0992
FACSIMILE: 818-880-0995

NEW JERSEY OFFICE
9 CAMPUS DRIVE
PARSIPPANY, NEW JERSEY 07054
TELEPHONE: 973-451-9600
FACSIMILE: 973-451-0150

attribute any merit to the Noticed Matters, and reference them herein only to describe the matter submitted for coverage. In this letter we also make certain requests for information. Those requests are generally in bold. Should further pertinent information come to light, Axis may revise its position accordingly, and it reserves the right to do so. Nothing in this letter, including any requests for information, is intended to waive any rights Axis may have under the Policy, at law, or in equity, all of which are expressly reserved. Axis's position is necessarily based upon information that has been made available to us at this point. If you have any other information we should consider, please let us know. Axis will reevaluate its coverage position described herein upon the receipt of any relevant information.

We have had the opportunity to review the Noticed Matters, as well as the various coverage letters submitted by the primary carrier, US Specialty Insurance Company ("HCC" and the "Primary Policy") and the first excess carrier, Lexington Insurance Company ("Lexington" and the "Lexington Policy"). For the reasons set forth below, Axis is denying coverage for each of the Noticed Matters. Additionally, Axis expressly reserves its right to rescind the captioned policy and any prior policy.

## THE LITIGATION
### Noticed Matters

To date, Axis has received notice of twenty-four matters. *See* Schedule of Litigation, attached at Exhibit A. The Noticed Matters consist of: (1) federal securities putative class actions; (2) a derivative action; (3) a criminal action; (4) state court tort actions; (4) a breach of contract and fraud action (Sillam); (5) adversary proceedings brought in bankruptcy court; and (6) an action based on fraudulently obtaining a loan (BAWAG).

### Securities Class Actions

1. Frontpoint Financial Services, Inc., et al. v. Refco Inc., et al., No. 05-cv-08663-GEL, complaint filed (S.D.N.Y., 10/11/05);

2. Jonathan Glaubach, et al. v. Refco Inc., et al., No. 05-cv-08692, complaint filed (S.D.N.Y., 10/12/05);

3. Miriam Lieber, et al. v. Refco Inc., et al., No. 05-cv-08667-LAP, complaint filed (S.D.N.Y., 10/12/05);

4. Sandra E. Weiss, et al. v. Refco Inc., et al., No. 05-cv-08691-GEL, complaint filed (S.D.N.Y., 10/12/05);

5. Anthony L. Wakefield, et al. v. Refco Inc., et al., No. 05-cv-08742-GEL, complaint filed (S.D.N.Y., 10/14/05);

6. Jacob Baker, et al. v. Phillip R. Bennett, et al., No. 05-cv-08923, complaint filed (S.D.N.Y., 10/19/05);

7. Craig Becker, et al. v. Refco Inc., et al., No. 05-cv-08929-GEL, complaint filed (S.D.N.Y., 10/20/05);

8. Bruce Nathanson, et al. v. Phillip R. Bennett, et al., No. 05-cv-08926-GEL, complaint filed (S.D.N.Y., 10/20/05);

9. American Financial International Group – Asia, LLC, et al. v. Refco Inc., et al., No. 05-cv-08988-PKC, complaint filed (S.D.N.Y., 10/21/05);

10. Ravindra Mettupatti, et al. v. Phillip R. Bennett, et al., No. 05-cv-09048, complaint filed (S.D.N.Y., 10/24/05);

11. Todd Weiss, et al. v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-09126, complaint filed (S.D.N.Y., 10/26/05);

12. Scott K. Weit, et al. v. Phillip R. Bennett, et al., No. 05-cv-09611-GEL, complaint filed (S.D.N.Y., 11/11/05);

13. City of Pontiac General Employees' Retirement System, et al. v. Phillip R. Bennett, et al., No. No. 05-cv-09941, complaint filed (S.D.N.Y., 11/23/05).

**Shareholder Derivative Action**

14. Verun Mehta, et al. v. Phillip R. Bennett, et al., No. 05-cv-08748, complaint filed (S.D.N.Y. 10/14/05).

**Criminal Proceedings**

15. United States of America v. Phillip R. Bennett, et al., No. 05-MAG 1720, complaint filed (S.D.N.Y. 10/12/05).

**State Court Actions**

16. Banesco Holding C.A., et al. v. Refco Inc., et al., No. 05603681 (Supreme Court of New York, 10/17/05);

17. Miura Financial Services v. Refco Inc., et al., No. 05603683 (Supreme Court of New York, 10/17/05);

18. Multiplicas Casa De Bolsa v. Refco Inc., et al., No. 05603683 (Supreme Court of New York, 10/17/05).

**The Sillam Action**

19. Bankruptcy Trust of Gerard Sillam v. Refco Group, LLC, et al., No. 05603931 (Supreme Court of New York 11/04/05).

**Adversary Actions**

20. Markwood Investments v. Refco Capital Markets, Ltd and Refco Securities LLC, No. 05-03166-rdd (Bankr. S.D.N.Y., 11/17/05);

21. Banco De America, S.A. v. Refco Capital Markets, Ltd., No. 05-03171-rdd (Bankr. S.D.N.Y., 11/18/05);

22. BAC International Bank v. Refco Capital Markets, Ltd., No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05);

23. Reserve Invest (Cyprus) Ltd v. Refco Capital Markets, Ltd., Michael W. Morrison, and Richard Heis, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

**The BAWAG Action**

24. BAWAG P.S.K., et al. v. Refco, Inc., et al., No. 05-03161-rdd (Bankr. S.D.N.Y., 11/16/05).

## D&O INSURANCE PROGRAM

Refco, through its broker Marsh, approached various insurers in July 2004 attempting to place a tower of Private Company D&O insurance in anticipation of an eventual public offering. As a result of this solicitation, Refco Group Ltd., LLC was insured by a tower of D&O insurance with a Policy Period from August 5, 2004 to August 5, 2005. This was later extended to August 11, 2005 (the "04/05 Policy"). After the August 11, 2005 IPO, Refco, Inc. ("Refco") was insured by a tower of Public Company D&O insurance with a Policy Period from August 11, 2005 to August 11, 2006 (the "05/06 Policy").

### Private Company Policy Tower – The 04/05 Policy

**HCC Primary** – The Primary Policy on the 04/05 Policy tower (the "04/05 Primary") was written by HCC. The 04/05 Primary provided a $10 million Limit of Liability, excess a retention of $500,000. This 04/05 Primary provided coverage pursuant to two Insuring Agreements:

(A) The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made against them during the Policy Period or Discovery Period (if applicable) for Wrongful Acts.

(B) The Insurer will pay to or on behalf of the Insured Organization Loss arising from Claims first made against it during the Policy Period or Discovery Period (if applicable) for Wrongful Acts.

The 04/05 Primary excluded Claims based on Wrongful Acts allegedly committed prior to June 4, 2004. Coverage for E&O clams also was excluded.

**Greenwich First Excess** – The Greenwich first excess layer to the 04/05 Policy tower (the "Greenwich 04/05 Policy") insured $10 million excess of the $10 million 04/05 Primary. The Greenwich 04/05 Policy followed form to the terms and conditions of the 04/05 Primary Policy.

The Greenwich 04/05 Policy included a Pending and/or Prior Litigation Exclusion at Endorsement 5 which excludes Claims related to litigation pending prior to August 5, 2004.

**Axis Second Excess** – The Axis second excess layer to the 04/05 Policy tower (the "Axis 04/05 Policy") insured $10 million excess of the $20 million in Underlying Limits. The Axis 04/05 Policy followed form to the 04/05 Primary, or any more restrictive Underlying Policy. The Axis 04/05 Policy repeats the exclusion for Pending and/or Prior Litigation as of August 5, 2004.

The Axis 04/05 Policy also contains a Manuscript Application Endorsement at Endorsement 2, stating:

In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal dated February 8, 2005 and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 2 is marked effective August 5, 2004 and is dated April 25, 2005.

**Public Company Policy Tower – The 05/06 Policy**

**HCC Primary** – The Primary Policy on the 05/06 Policy tower (the "05/06 Primary") was written by HCC. The 05/06 Primary provided a $10 million Limit of Liability, excess retentions of nil/$500,000/$500,000. This 05/06 Primary provided coverage pursuant to two Insuring Agreements:

(A) The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made during the Policy Period or Discovery Period (if applicable), against the Insured Persons for Wrongful Acts, except when and to the extent that the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement.

(B) The Insurer will pay to or on behalf of the Company Loss arising from:

    (1) Claims first made during the Policy Period or the Discovery Period (if applicable) against the Insured Persons for Wrongful Acts, if the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement, and/or

    (2) Securities Claims first made during the Policy Period or the Discovery Period (if applicable) against the Company for Wrongful Acts.

Coverage also was extended pursuant to Endorsement 11, to include Derivative Demand Investigative Costs:

The Insurer will pay to or on behalf of the Company all Derivative Demand Investigation Costs incurred by the Company as a result of a Derivative Demand first received by the Company's Board of Directors and reported in writing to the Insurer during the Policy Period or the Discovery Period, if purchased, up to the amount of the Derivative Demand Investigation Costs Sub-Limit [$250,000].

Coverage was further extended pursuant to Endorsement 15, to include Controlling Shareholder Coverage:

The Insurer will pay to or on behalf of the Controlling Shareholder Loss arising from a Securities Claim first made during the Policy Period or the Discovery Period (if applicable) against such Controlling Shareholder for Wrongful Acts, provided, that one or more Insured Persons and/or the Company are and remain co-defendants in such Securities Claim along with such Controlling Shareholder.

Phillip Bennett was defined as the Controlling Shareholder. A $300,000 retention was to apply to Defense Costs under this coverage extension, but did not apply to any other Loss under the extension.

**Lexington First Excess** – The Lexington first excess layer to the 05/06 Policy tower (the "Lexington 05/06 Policy") insures $7.5 million excess of the $10 million 05/06 Primary. The Lexington 05/06 Policy follows form to the terms and conditions of the 05/06 Primary Policy.

The Lexington 05/06 Policy also includes a Pending and Prior Litigation Exclusion at Endorsement 5 which excludes Claims related to litigation pending on or prior to August 4, 2004.

**Axis Second Excess** – The Axis second excess layer to the 05/06 Policy tower (the "Axis 05/06 Policy") provides a Limit of Liability of $10 million excess of $17.5 million in Underlying Limits. The Axis 05/06 Policy follows form to the terms and conditions of the 05/06 Primary Policy, or any more restrictive Underlying Policy.

The Axis 05/06 Policy contains a Manuscript Application Endorsement at Endorsement 5, stating:

> In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

> Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 5 is marked effective August 11, 2005 and is dated September 11, 2005.

The Axis 05/06 Policy also contains a Knowledge Exclusion Endorsement at Endorsement 6 which states:

> In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, any Insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

Endorsement 6 is marked effective August 11, 2005 and is dated September 11, 2005.

The Axis 05/06 Policy notes a Prior and Pending Claim Date of June 4, 2004.

**February 8, 2005 HCC Application**

Phillip Bennett completed an HCC application "for Directors, Officers and Private Organization Liability Coverage" and signed it on February 8, 2005. This application asks at Question 12:

(a) Have any claims been made during the last 5 years against any person or entity proposed for this insurance in his or her capacity as a director, officer or trustee of any corporation or organization? __ Yes      __ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

(b) Is any person or entity proposed for this insurance aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he, she or it has reason to believe might result in a claim being made? __ Yes    __ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

Without prejudice to any other rights of the Insurer, it is understood and agreed that the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b).

Bennett did not check either box for Questions 12(a) and 12(b).

**January 14, 2005 Axis Warranty**

Axis requested and received a warranty (the "Axis Warranty"). The Axis Warranty states:

(a) No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT: [Louis Capital Markets, LP v. Refco Group Ltd., LLC, et al.]

(b) No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

The Axis Warranty is dated January 14, 2005, and was signed by Phillip Bennett, "on behalf of all Insureds under the Policy," on January 21, 2005.

### COVERAGE DISCUSSION

The Noticed Matters are excluded from coverage under both the Axis 04/05 Policy and the Axis 05/06 Policy based on: (1) the Axis Warranty; and (2) the Application for the Axis 04/05 Policy and the Axis 05/06 Policy. Moreover, the Noticed Matters are additionally excluded under the Axis 05/06 Policy based on: (1) the Claim made date; and (2) the Knowledge Exclusion. Axis also reserves its rights to rescind both Policies based on material misrepresentation in the application. Finally, additional terms and conditions further serve to exclude or limit coverage if coverage were otherwise available, which it is not. All of the foregoing is detailed below.

Each of the Noticed Matters is excluded from coverage under the Axis 04/05 Policy and the Axis 05/06 Policy pursuant to the Axis Warranty, attached at Exhibit B. Each of the Noticed Matters is brought in connection with the alleged financial fraud orchestrated by Mr. Bennett, among others. It is inconceivable that Mr. Bennett was not aware of the alleged fraud when he executed the Axis Warranty "on behalf of all Insureds under the Policy." The Axis Warranty explicitly excludes coverage for all Insureds for any Claim arising from the undisclosed knowledge. Accordingly, each of the Noticed Matters is excluded from coverage for all Insureds and Axis hereby denies coverage.

Each of the Noticed Matters also is excluded from coverage based on the Application for the Axis 04/05 Policy and the Axis 05/06 Policy.[1] Question 12(b) to the Application required disclosure of any known "fact, circumstance or situation. . . [which]

---

[1] The Axis 04/05 Policy contains a Manuscript Application Endorsement at Endorsement 2, stating:

In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal dated February 8, 2005 and submitted to Axis Reinsurance Company on U.S. Specialty Insurance Company's form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

The Axis 05/06 Policy also contains similar wording at Endorsement 5. Accordingly, the February 8, 2005 application was explicitly incorporated as the application for the Axis 04/05 Policy (Private Company) and again when Axis issued the Axis 05/06 Policy (Public Company).

might result in a claim being made." The Application further states that Axis will not be "liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b)." Mr. Bennett had a duty to disclose the alleged financial fraud in answer to Application question 12(b). His failure to disclose such fraud excludes coverage for any Claim brought in connection with the financial fraud. Accordingly, Axis is further denying coverage for each of the Noticed Matters because each is brought in connection with information which should have been disclosed in Application question 12(b).

We note that the Axis Warranty and the Application do not contain an adjudication requirement. We further note that Axis's denial of coverage on these two grounds is as to all Insureds. The Axis Warranty and the Application were filed on behalf of all Insureds. Accordingly, Axis denies coverage for each of the Noticed Matters because each of the Noticed Matters arises out of information which was known to Mr. Bennett, and others, at the time he completed the Axis Warranty and the Application, on behalf of all Insureds.

In addition to the Axis Warranty and the Application, Axis separately denies coverage under the Axis 05/06 Policy for each of the Noticed Matters because each is a Claim first made before the inception of the Axis 05/06 Policy, on August 11, 2005. The Noticed Matters are interrelated, as defined in Condition (C) of the 05/06 Primary Policy.[2] All of the Noticed Matters arise out of the financial fraud allegedly orchestrated by Mr. Bennett, and others whereby unreported loans were made between various entities in an effort to disguise financial losses. This alleged fraud was reflected in the financial statements which are the subject of the Noticed Litigation. Additionally, the BAWAG action concerns Mr. Bennett's loan transactions in connection with the alleged fraud. The bankruptcy court adversary proceedings and state court tort actions arise from Refco customers' inability to access assets held by Refco – which assets were inaccessible due to the alleged fraud. Finally, the Sillam action alleged fraud in the Refco financial statements issued in connection with the IPO. Accordingly, each of the Noticed Matters is connected to the allegedly fraudulent scheme to manipulate Refco's financial results and Axis is treating each of the Noticed Matters as a single interrelated Claim. The Noticed Matters are deemed a Claim first made on the date the first such Noticed Matter was made. The Sillam action raised related allegations in its earlier June 30, 2005 complaint. This places a Claim made date for the Noticed Matters at least as early as June 30, 2005.[3] As this is prior to the August 11, 2005 inception of the Axis 05/06

---

[2] Condition (C) of the 05/06 Primary Policy states:

> All Claims alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single Claim and will be considered to have been made at the time the earliest such Claim was made.

[3] The Sillam action references an earlier September 8, 2004 complaint which would also potentially bring the Claim Made date prior to the inception of the Axis 05/06 Policy.

KAUFMAN BORGEEST & RYAN LLP

Policy, the Noticed Matters would constitute a Claim Made prior to the Axis 05/06 Policy Period.

Axis further denies coverage under the Axis 05/06 Policy based on the Knowledge Exclusion Endorsement. The Knowledge Exclusion Endorsement excludes coverage for any Claims based on facts any Insured had knowledge of at the inception of the Policy. Each of the Noticed Matters is brought in connection with the alleged financial fraud orchestrated by Mr. Bennett, among others. As with the Axis Warranty, we think it inconceivable that Mr. Bennett was not aware that his actions "might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy" on the inception date of the Axis 05/06 Policy, August 11, 2005. Coverage on this basis is not only denied as to Mr. Bennett, but also as to all Insureds under the Policy.

In addition to the above grounds for denial of coverage for the Noticed Matters, Axis reserves its right to rescind the Axis 04/05 Policy and the Axis 05/06 Policy on the basis of fraud in the Application. The Application required Refco to attach, as part of the Application, audited financial statements for the two years preceding the Application. Refco has since admitted that its financial statements from 2002 through 2005 cannot be relied on. As noted above, both the Axis 04/05 Policy and the Axis 05/06 Policy were issued in material reliance upon the Insured's representations in all parts of the Application, including the attached financial statements. Accordingly, Axis reserves its right to rescind the Axis 04/05 Policy and the Axis 05/06 Policy. Axis explicitly reiterates our March 1, 2006 letter wherein Axis issued the Axis 05/06 Policy, which letter is hereby incorporated by reference. In that letter Axis noted that the issuance and delivery of the Axis 05/06 Policy should not be interpreted as a ratification of the existence of a valid insurance contract.

*      *      *

While the foregoing is dispositive of Axis's coverage responsibilities in connection with the Noticed Matters, additional terms and conditions would serve to limit or exclude coverage if the Noticed Matters were not excluded in their entirety, which they are. For the sake of completeness, we will detail those terms and conditions which would also limit or exclude coverage of the Noticed Matters.[4]

---

The Sillam action further references an earlier April 25, 2003 complaint brought in France. We do not currently have a translated version of this April 25, 2003 complaint, but it may contain related allegations which would dictate a Claim Made date for the Noticed Matters of April 25, 2003, prior to the inception of the 04/05 Policy. Accordingly, coverage would also be denied under the Axis 04/05 Policy.

[4] The Noticed Matters have only been submitted to Axis for coverage under the Axis 05/06 Policy. Accordingly, our discussion in this section focuses only on the Axis 05/06 Policy. Axis has herein denied coverage for the Noticed Matters under the Axis 04/05 Policy, but other coverage limitations may exist if coverage were otherwise afforded under the Axis 04/05 Policy, which it is not. Axis will provide a more detailed coverage analysis under the Axis 04/05 Policy if Insureds were to submit the Noticed Matters for coverage under the Axis 04/05 Policy. Axis reserves all rights available in the Axis 04/05 Policy, in law, and in equity, including, but not limited to, the right to rescind the Axis 04/05 Policy.

The Axis 05/06 Policy follows form to the Primary Policy, or more restrictive Underlying Insurance. Axis directs your attention to the definition of Loss in the Lexington 05/06 Policy. The Lexington 05/06 Policy does not include Defense Costs within its definition of Loss. Accordingly, Axis adopts this more restrictive definition of Loss. As such, Defense Costs are not covered by the Axis 05/06 Policy.

The Axis 05/06 Policy, at Clause IX(A), requires that the Insured give notice of any Claim to Axis contemporaneously and in the same manner as notice is required to be given to HCC. The Primary Policy, at Condition B(1) and (4), requires that notice of Claims be given as soon as practicable, in writing, and by certified mail. To the extent that Axis did not receive notice as soon as practicable and in the prescribed manner, Axis reserves its rights.

As noted above, the 05/06 Primary Policy only insures the Refco entity (and Refco Subsidiaries) for Securities Claims and Derivative Demand Investigative Costs. Certain of the Noticed Matters do not name individual defendants and do not qualify as Securities Claims. The 05/06 Primary Policy, at Condition D(3), provides for an allocation where a Claim contains covered and non-covered matters. Axis reserves its right to exclude from coverage any Claims that are not Securities Claims against Refco or any of its Subsidiaries.

The 05/06 Primary Policy provides coverage pursuant to Insuring Agreements A and B(1) for Insured Persons. Insured Persons is defined to include present and past directors or officers of Refco, and employees solely with respect to Securities Claims. **For each individual named as a defendant in the Noticed Matters at Exhibit A, please identify: (1) current position, if currently employed; (2) date the current position was assumed; (3) any prior positions and dates prior positions were held; and (4) whether Refco will be indemnifying the individual. If Refco is permitted or required to indemnify and/or if Refco has determined that it will or will not indemnify any of the individual defendants, please provide us with a copy of the Board resolution providing such indemnification decision.**

The 05/06 Primary Policy also provides coverage based on Refco Subsidiaries. Subsidiary is defined at Definition (O) of the 05/06 Primary Policy as any entity:

(1) during any time on or before the inception of the Policy Period in which [Refco Inc] owns or owned more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries; or

(2) created or acquired during the Policy Period during any time in which, as a result of such creation or acquisition, [Refco Inc.] owns more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent

thereof), either directly or indirectly through one or more other Subsidiaries.

An entity ceases to be a Subsidiary when [Refco Inc.] ceases to own more than 50% of its issued and outstanding securities representing the right to vote for the election of such entity's directors (or legal equivalent thereof), wither directly or indirectly through one or more other Subsidiaries. The coverage afforded under this Policy will respect to Claims against a Subsidiary or any Insured Person thereof will apply only in respect of Wrongful Acts committed or allegedly committed after the effective date that such entity becomes a Subsidiary and prior to the time that such entity ceases to be a Subsidiary.

**For each entity named as a defendant in any of the Noticed Matters at Exhibit A, please identify: (1) whether such entity is or ever was a Subsidiary; (2) the effective date such entity became a Subsidiary; and (3) if applicable, the effective date such entity ceased to be a Subsidiary.** Axis reserves its right to deny coverage for any entity named as a defendant in the Noticed Matters which is not Refco Inc. or a Subsidiary, as defined above.

Endorsement 15 of the 05/06 Primary Policy extends coverage to Philip Bennett as Controlling Shareholder for Securities Claims where he is co-defendant with another Insured Person or the Company. To the extent that certain of the Noticed Matters are not Securities Claims, coverage would not be available under this Endorsement. Also, even if certain of the Noticed Matters are Securities Claims, coverage under this Endorsement 15 would only be available where, and so long as, another Insured Person and/or the Company is a co-defendant with Mr. Bennett. Axis also notes Clause (8) of Endorsement 15 which amends the Change in Control section of the 05/06 Primary Policy. This change limits coverage under Endorsement 15 to Wrongful Acts allegedly committed prior to Refco's bankruptcy filing on October 17, 2005. Axis reserves its rights to deny coverage under this Endorsement 15 for any Claims based on Wrongful Acts allegedly committed on or after October 17, 2005.

Additionally, the definition of Loss is limited to amounts insurable by law. It is well-settled that Loss does not include the restoration or disgorgement of ill-gotten gain. Thus, insurance cannot be used to pay an Insured for amounts an Insured wrongfully acquires or is forced to return, or to pay the corporate obligations of the Insured. Accordingly, pursuant to the well-known Vigilant, Conseco, and Level 3 cases, any amounts eventually sought as disgorgement would not be recoverable as Loss.

Exclusion (A) of the 05/06 Primary Policy excludes Loss in connection with a Claim:

Arising out of based upon or attributable to the gaining by any Insured of any profit or advantage to which such Insured was not legally entitled; provided, that this EXCLUSION (A) will apply only if there has been a

final adjudication adverse to such Insured establishing that the Insured gained such a profit or advantage

To the extent that any Insured is subject to a final adjudication establishing that the Insured received any profit or advantage to which such Insured was not legally entitled, Axis reserves the right to deny coverage for such Insured.

Exclusion (B) of the 05/06 Primary Policy excludes Loss in connection with a Claim:

Arising out of, based upon or attributable to the commission by any Insured of any criminal or deliberately fraudulent or dishonest act; provided that this EXCLUSION (B) will apply only if there has been a final adjudication adverse to such Insured establishing that the Insured so acted

To the extent that any Insured is subject to a final adjudication establishing that the Insured committed a criminal or deliberately fraudulent or dishonest act, Axis reserves the right to deny coverage for such Insured.

Axis has not yet identified and established the relationship between or among each of the parties to each of the Noticed Matters. The "Insured vs. Insured" exclusion at Exclusion (F) of the 05/06 Primary Policy, as modified by Endorsement 15, may serve to exclude certain of the Noticed Matters from coverage. Axis reserves its rights accordingly.

Further to Axis's above denial based on the Claim made date of this interrelated Claim, Axis specifically notes Exclusion (H) of the 05/06 Primary Policy which excludes Claims:

Arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time

**Please provide us with copies of any notices of claims or circumstances sent in respect of any policy of which this Policy is a renewal or replacement, including, but not limited to, the 04/05 Policy tower.** Axis reserves its rights to deny coverage for any matters excluded subject to this Exclusion (H).

The Axis 05/06 Policy only applies excess of and does not contribute with any other valid and collectable insurance, pursuant to Condition (G)(1) of the 05/06 Primary Policy. **Please provide us with a schedule of any applicable insurance available to Refco, Inc., any Subsidiaries, or any Insured Persons which is not otherwise noted in**

this letter. To the extent that other insurance is available to such Insureds, Axis reserves it right to deny coverage.

Certain of the Noticed Matters allege that Refco improperly denied access to customer accounts as a result of the alleged fraud orchestrated by Mr. Bennett, and others. Endorsement 6 to the 05/06 Primary Policy excludes Claims, in relevant portion:

> Arising out of, based upon or attributable to any actual or alleged rendering of or failure to render, whether by the Company or by any Insured Person, any service for others for a fee; provided, that this exclusion will not apply to a Claim against an Insured Person for a Wrongful Act in connection with the management or supervision of the Company or any division or group therein.

Axis reserves its right to deny coverage for any matter properly excluded by this Endorsement 6.

Refco has been the subject of a well-publicized SEC investigation.[5] Endorsement 14 to the 05/06 Primary Policy notes that the "Insurer will not be liable to make any payment of Loss in connection with a Claim arising out of, based upon or attributable to any [Wells Notice or SEC Investigation]." It appears that several of the Noticed Matters are based upon the SEC Investigation. Accordingly, any Claim "arising out of, based upon or attributable to" the SEC Investigation would be excluded and Axis reserves its rights.

Axis reminds Insureds of Condition (D)(1) of the 05/06 Primary Policy which states, in relevant part:

> The Insureds may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the Insurer's prior written consent. Only those settlement, stipulated judgments and Defense Costs to which the Insurer has consented will be recoverable as Loss under this Policy. The Insurer's consent may not be unreasonably withheld; provided, that the Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

No settlement of a covered Claim will be binding upon Axis without Axis's express consent and Axis reserves its rights accordingly. Axis specifically notes that consent by an Underlying Insurer is not a substitute for Axis's consent.

Axis further reminds Insureds, especially given the Insured's bankruptcy posture, of Condition (K) to the 05/06 Primary Policy which states that "[n]o assignment of

---

[5] We are also aware that Refco received a Wells Notice during the Policy Period, but are not privy to the subject matter thereof. Please provide us with a copy of the Wells Notice and any response thereto. Axis reserves its rights in connection with this Wells Notice accordingly.

interest under this Policy will bind the Insurer without the Insurer's written consent." Axis specifically notes that consent by an Underlying Insurer is not a substitute for Axis's consent and Axis specifically reserves its rights in this regard.

Finally, Axis notes Condition (H)(1) to the 05/06 Primary Policy which notes, in relevant part, that "the Insureds will give the Insurer all information, assistance and cooperation that the Insurer my reasonably request."

This letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions or exclusions of the Axis 04/05 Policy or the Axis 05/06 Policy. Nothing in this letter is intended to, or does waive any of Axis's rights, privileges or defenses under the Axis 04/05 Policy or the Axis 05/06 Policy, at law, or in equity, all of which are expressly reserved. Axis reserves the right to alter, supplement or modify this statement of its coverage position as other and additional information may become available. Axis's denial of coverage of the Noticed Matters is necessarily based upon information that has been made available at this point. If you have any other information we should consider, please let us know.

If you have any questions in connection with the foregoing, please do not hesitate to contact the undersigned.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Wayne E. Borgeest

Enclosures
Exhibit A – Noticed Matters
Exhibit B – Axis Warranty

cc:
Tracy Forsyth, Axis
Leslie Ahari, Ross Dixon & Bell LLP, Counsel to US Specialty
Barbara Seymour, D'Amato & Lynch, Counsel to Lexington

## EXHIBIT A

### Schedule of Noticed Litigation

1.  Frontpoint Financial Services Fund, LP, On Behalf of Plaintiff and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., No. 05-cv-08663-GEL, (S.D.N.Y. 10/11/05).

2.  Jonathan Glaubach, Individually and on Behalf of all Others Similarly Situated v. Refco Inc., Phillip R. Bennett, Gerald Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen, No. 05-cv-08692, (S.D.N.Y. 10/12/05).

3.  Miriam Lieber, Individually And On Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities, LLC., Merrilly Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., and Grant Thornton LLP, No. 05-cv-08667-LAP, (S.D.N.Y. 10/12/05).

4.  United States of America v. Phillip R. Bennett, No. 05-MAG-1720, (S.D.N.Y. 10/12/05).

5.  Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08691-GEL, (S.D.N.Y. 10/12/05).

6.  Varun Mehta, Derivatively on Behalf of Refco Inc. v. Phillip R. Bennett, William J. Sexton, Gerald M. Sherer, Joseph J. Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston, Goldman, Sachs & Co., Banc Of America Securities LLC, Deutsche Bank Securities, JP Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, L.P., HSBC And Thomas H. Lee Partners, L.P., and Refco, Inc., A Delaware corporation, No. 05-cv-08748, (S.D.N.Y. 10/14/05).

7.  Anthony L. Wakefield, Individually and on Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald J. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc Of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Inc. Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., Sandler O'Neill

& Partners, L.P., HSBC Securities (USA) Inc., William Blaire & Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., and Utendahl Capital Partners, L.P., No. 05-cv-08742-GEL, (S.D.N.Y. 10/14/05).

8. Banesco Holding C.A., Banesco International Bank Corp., Banesco International Bank Inc. and Banesco Banco Universal C.A. Panama Branch v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603681 (Supreme Court of New York, 10/17/05).

9. Miura Financial Services v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603682 (Supreme Court of New York, 10/17/05).

10. Multiplicas Casa De Bolsa v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603683 (Supreme Court of New York, 10/17/05).

11. Jacob Baker, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08923, (S.D.N.Y. 10/19/05).

12. Craig Becker, On Behalf of Himself and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Brietman, David H. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton, LLP, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Liberty Corner Capital, Refco Group Holdings Inc., No. 05-cv-08929-GEL, (S.D.N.Y. 10/20/05).

13. Bruce Nathanson, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton LLP, Credit Suisse First Boston, Goldman, Sachs & Co., Banc of America Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., JP Morgan Securities Inc., Liberty Corner Capital, and Refco Group Holdings Inc., No. 05-cv-08926-GEL, (S.D.N.Y. 10/20/05).

14. American Financial International Group – Asia, LLC, individually and on behalf of all other similarly situated v. Refco, Inc., Refco F/X Associates, LLC, Phillip R. Bennett and Does 1 through 50, et al., No. 05-cv-08988-PKC, (S.D.N.Y. 10/21/05).

15. Ravindra Mettupatti v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David Harkins, Scott L. Jaeckel, Thomas Lee, Ronald L.

O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Deutsche Bank Securities Inc., JP Morgan Securities Inc., Pierce, Fenner & Smith Inc., No. 05-cv-09048, (S.D.N.Y. 10/24/05).

16. Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-09126, (S.D.N.Y. 10/26/05).

17. Bankruptcy Trust Of Gerard Sillam, Gerard Sillam v. Refco Group LLC, Refco Overseas Ltd., Phillip Bennett, Refco Group Holdings Inc, Liberty Corner Capital, New York Stock Exchange Inc, Grant Thornton LLP, Grant Thornton UK LLP, Thomas H Lee Partners LP, Thomas H Lee Partners Fund V, Thomas H Lee, Scott A Schoen, David V Harkins, Gerald M Sherer, Leo R Breitman, Scott Jaeckel, Nathan Gantcher, Ronald O Kelley, Halim Saad, Dennis A Klejna, Mark Slade, Julian Courtney, Richard Reinert, David Campbell, Credit Suisse First Boston LLC, Goldman Sachs & Co, Bank Of America Securities LLC, Merrill Lynch Pierce Fenner & Smith Inc, Deutsche Bank Securities Inc, JP Morgan Securities Inc, Sandler'O Neil & Partners LP, HSBC Securities USA Inc, William Blair & Company LLC, Harris Nesbitt Corp, CMG Institutional Trading LLC, Samuel A Ramirez & Company Inc., Muriel Siebert & Co Inc, The William Capital GLP, Utendahl Capital Partners, et al., No. 05603931 (Supreme Court of New York 11/04/05).

18. Scott K. Weit, Individually and On Behalf of All Others Similarly Situated v Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Credit Suisse First Boston, Goldman, Sachs & Co., Grant Thornton LLP, Banc of  America Securities LLC, Merrill Lynch Pierce, Fenner & Smith Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blair & Company, L.L.C., Harris Nesbitt Corp., CMG  Institutional Trading LLC, Samuel  A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., Liberty Corner Capital, and Refco Group Holdings, Inc., No. 05-cv-09611-GEL, (S.D.N.Y. 11/11/05).

19. Bawag P.S.K. Bank Für Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft v. Refco, Inc.; Refco Group Holdings, Inc.; The Phillip R. Bennett Three Year Annuity Trust; Refco Capital Markets, Ltd.; Refco Group Ltd., LLC; Bersec International LLC; Kroeck & Associates, LLC; Marshall Metals LLC; New Refco Group Ltd., LLC; Refco Administration LLC; Refco Capital LLC; Refco Capital Holidings LLC; Refco Capital Management LLC; Refco Capital Trading LLC; Refco Finance Inc.; Refco Financial LLC; Refco Fixed Assets Management LLC; Refco F/X Associates LLC; Refco Global Capital Management LLC; Refco Global Finance Ltd.; Refco Global Futures LLC; Refco Global Holdings LLC; Refco Information Services LLC; Refco

Mortgage Securities, LLC; Refco Regulated Companies, LLC; Summitt Management, LLC; Refco Securities LLC; Refco Clearing LLC; Phillip R. Bennett; John Does 1-10; And XYZ Corporations 1-10, The Last Two Names Being Fictitious, Inc., et al., No. 05-03161-rdd (Bankr. S.D.N.Y., 11/16/05).

20. Markwood Investments v. Refco Capital Markets, Ltd. and Refco Securities LLC, No. 05-03166-rdd (Bankr. S.D.N.Y., 11/17/05).

21. Banco De America Central, S.A. v. Refco Capital Markets, Ltd., No. 05-03171-rdd (Bankr. S.D.N.Y., 11/18/05).

22. BAC International Banks, Inc. v. Refco Capital Markets, Ltd., No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05).

23. Reserve Invest (Cyprus) Ltd. v. Refco Capital Markets, Ltd., Michael W. Morrison, and Richard Heis, Michael W. Morrison, and Richard Heis, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

24. City of Pontiac General Employees' Retirement System, On Behalf of Itself and All Others Similarly Situated v. Phillip R. Bennett, Thomas H. Lee Partners, L.P., Thomas H. Lee, Gerald M. Sherer, Scott A. Schoen, Bank of America Corp., Banc of America Securities LLC, Deutsche Bank AG, Deutsche Banc Securities, Inc., Credit Suisse Group, Credit Suisse First Boston LLC, Goldman Sachs Group, Inc., Goldman Sachs & Co., J.P. Morgan Securities, Inc., J.P. Morgan Chase & Co., Merrilly Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc. Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc and Grant Thornton LLP, No. 05-cv-09941, (S.D.N.Y. 11/23/05).

**EXHIBIT B**

Axis Warranty[1]

 **REFCO**

Refco Group Ltd., LLC
550 West Jackson Boulevard
Suite 1300
Chicago, IL 60661
ph 312 759 2000
www.refco.com

January 14, 2005

Axis
Connell Corporate Park
Three Connell Drive
Berkeley Heights, NJ 07922

To Whom It May Concern:

With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true:

    a.  No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT:

            *See attached*

    b.  No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

This letter, together with other documents and information publicly available to and obtained by the Insurer, shall be deemed incorporated into and become part of the Application and the Policy.

Company name: *Refco Group STD. LLC*

Signature: _____

Title: PRESIDENT OF CEO.
       (Chairman of the Board or President)

Date: Jan 21. 2005.

---

[1] Also attached to the Axis Warranty, but not included here are: (1) a January 14, 2005 memo from Ellen Brooks to Phillip Bennett requesting Bennett complete the warranty; and (2) a January 14, 2005 letter from Grant Cornehls to Ellen Brooks describing and attaching the Louis Capital Markets, L.P. v. Refco Group Ltd., LLC, et al. suit. It appears the letter and suit were both attached to the memo sent to Bennett. Axis does not contend that the Luis Capital Markets suit is related to the Noticed Matters.

Exhibit K

# EDWARDS ANGELL PALMER & DODGE LLP

111 Huntington Avenue  Boston, MA  02199  617.239.0100  *fax* 617.227.4420  eapdlaw.com

John D. Hughes

617.951.3373
*fax* 617.227.4420
jhughes@eapdlaw.com

March 28, 2006


Andrea Lieberman
Marsh USA
500 West Monroe Street
Chicago, IL 60661


Re:    Insured:          Refco, Inc.
       Excess Policy No.:  418197
       Policy Period:     8/11/05 – 8/11/06
       Claim No.:         648-010578
       Matters:           See attached list.

Dear Ms. Lieberman:

As you know, this firm represents Allied World Assurance Company ("Allied World") in connection with Excess Directors and Officers and Company Reimbursement Policy No. AW0418197 (the "Policy") issued to Refco, Inc. for the claims-made policy period August 11, 2005 to August 11, 2006. We are directing this letter to you as the authorized insurance representative for all of the Insureds, including the individual Insured Persons, under the Policy. To the extent that you are not acting as the authorized representative for any of the Insureds, we request that you forward a copy of this letter to that Insured or his or her insurance representative, and advise us with whom we should communicate in the future concerning this matter.

By our October 25, 2005 letter, Allied World acknowledged receipt of and generally reserved its rights with respect to the complaints filed in the following seven lawsuits: (1) *Glaubach v. Refco, Inc., et al.*, No. 05 CV 8692 (S.D.N.Y.); (2) *FrontPoint Financial Services, Inc. v. Refco, Inc., et al.*, No. 05 CV 8663 (S.D.N.Y.); (3) *Lieber v. Refco, Inc., et al.*, No. 05 CV 8667 (S.D.N.Y.); (4) *Sandra Weiss v. Refco, Inc., et al.*, No. 05 CV 8691 (S.D.N.Y.); (5) *Mehta v. Bennett, et al.*, No. 05 CV 8748 (S.D.N.Y.); (6) *Wakefield v. Refco, Inc., et al.*, No. 05 CV 8742 (S.D.N.Y.); and (7) *United States of America v. Bennett*, No. 05 MAG 1720 (S.D.N.Y.); Following our October 25, 2005 letter, Allied World received and, by our letter of November 1, 2005, acknowledged and generally reserved its rights with respect to the following six lawsuits: (1) *American Financial International Group -Asia, LLC v. Refco, Inc., et al.*, No. 05 CV 8988 (S.D.N.Y.); (2) *Mettupatti v. Bennett, et al.*, No. 05 CV 9048 (S.D.N.Y.); (3) *Todd Weiss v. Bennett, et al.*, No. 05 CV 9126 (S.D.N.Y.); (4) *Banesco Holding C.A., et al. v. Refco, Inc., et al.*, No. 05-603681 (Supreme Court of N.Y.); (5) *Miura Financial Services v. Refco, Inc., et al.*, No.

# EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 2

05-603682 (Supreme Court of N.Y.); and (6) *Multiplicas Casa De Bolsa v. Refco, Inc., et al.*, No. 05-603683 (Supreme Court of N.Y.).

Following our November 1, 2005 letter, Allied World received and, by our letter of November 30, 2005, acknowledged and generally reserved its rights with respect to the following three lawsuits: (1) *Baker v. Bennett, et al.*, No. 05 CV 8923 (S.D.N.Y.); (2) *Becker v. Refco, Inc., et al.*, No. 05 CV 8929 (S.D.N.Y.); and (3) *Nathanson v. Bennett, et al.*, No. 05 CV 8926 (S.D.N.Y.). By our letter of February 9, 2006, Allied World acknowledged receipt of and generally reserved rights with respect to the following two lawsuits: (1) *Klaus Gensheimer v. Phillip R. Bennett, et al.*, No. 05 CV 10318 (S.D.N.Y.); and (2) *Teachers' Retirement System of the State of Illinois, et al. v. Thomas H. Lee, et al.*, (S.D.N.Y.).

Finally, by this letter Allied World acknowledges receipt of: (1) *Thomas H. Lee Equity Fund V, L.P. et al. v. Phillip R. Bennett, et al.*, (S.D.N.Y.); (2) *Bawag P.S.K. v. Refco, Inc. et al.*, No. 05-03161 (Bankr. S.D.N.Y.), (3) *Unovalores Ltd. v. Bennett*, No. L15464-05 (N.J. Sup. Ct., Somerset County), (4) the November 11, 2005 Indictment in the *U.S. v. Bennett* matter referenced above; (5) the CFTC Subpoena; and (6) the SEC Investigation.

These are the matters for which Allied World has received notice in connection with the above-referenced policy. If your records indicate that any other matters have been sent to Allied World, please advise immediately. On Allied World's behalf, this will set forth Allied World's position on coverage for these matters under the Policy. For the reasons set forth below, Allied World denies coverage for each of these matters.

## I.     The Litigation

Please note that Allied World's review of these matters necessarily is based on the unsubstantiated allegations in the complaints, and that Allied World is not expressing any view on the truth of such allegations.

### A.     The Securities Class Action Lawsuits

Twelve of the suits listed above (*Glaubach, FrontPoint, Lieber, Sandra Weiss, Wakefield, Baker, Becker, Nathanson, Mettupatti, Todd Weiss, Gensheimer* and *Teachers' Retirement*) are purported shareholder class actions alleging violations of the securities laws. All of these suits were filed in the federal district court for the Southern District of New York, with all but *Gensheimer* and *Teachers' Retirement* being filed in October 2005, the latter two being filed in December 2005.

Several of the shareholder class action complaints purport to sue on behalf of the class of all purchasers of Refco's publicly traded common stock, while other complaints seek to sue on behalf of the purchasers of all of Refco's securities. *Gensheimer* and *Teachers' Retirement* further sue on behalf of those purchasing Refco bonds pursuant to Refco's August 5, 2004 bond

# EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 3

offering or April 13, 2005 prospectus and exchange offer. The alleged class periods in the complaints differ somewhat, with all alleging a beginning of August 11, 2005 (except *Gensheimer* and *Teachers' Retirement*, which start August 5, 2004), and an ending varying between October 7 and October 18, 2005.

Refco, Inc. is named as a defendant in several of the complaints. One or more of the following individuals, who are identified as Refco directors and/or officers, also are named in some or all of the lawsuits: Phillip Bennett, Gerald Sherer, Lee Brietman, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley, Nathan Gantcher and Scott Schoen. Various other defendants are named in some of the complaints, including: Grant Thornton, Credit Suisse First Boston LLC, Goldman Sachs & Co., Banc of America Securities, Merrill Lynch Pierce Fenner & Smith, Deutsche Bank Securities, J.P. Morgan Securities, Liberty Corner Capital, Sandler O'Neill & Partners, HSBC Securities (USA) Inc., William Blair & Co., Harris Nesbitt Corp., CMG Institutional Trading, Samuel A. Ramirez & Co., Muriel Siebert & Co., The Williams Capital Group, Utendahl Capital Group, Refco Group Holdings Inc. and Refco F/X Associates, LLC.

The securities class action complaints generally allege that on August 11, 2005, Refco completed its IPO, selling 26.5 million shares of common stock at $22/share for proceeds totaling $583 million. At that time, Mr. Bennett and other Refco insiders allegedly sold 5.375 shares, and received $145 million in personal gross proceeds. Mr. Bennett also allegedly gained from a provision that allowed him and other insiders to divide up the proceeds when the underwriters exercised options to purchase additional shares.

The securities class action complaints further allege that in connection with the IPO, Refco filed a Form S-1 Registration Statement and Prospectus in August 2005. Plaintiffs allege that Refco's Registration Statement and Prospectus were materially false and misleading. The complaints allege that on October 10, 2005, Refco announced that it had discovered a $430 million receivable owed to it by an entity controlled by Mr. Bennett, that Mr. Bennett was stepping down as Refco's Chief Executive Officer and that Refco's financial statements issued since 2002 could no longer be relied on. The *Gensheimer* and *Teachers' Retirement* complaints further allege that statements made in connection with the sale of Refco bonds were misleading for failing to disclose the debt owed by the entity controlled by Mr. Bennett.

Plaintiffs allege that by the market's close on October 10, 2005, Refco's common stock fell $12.96 per share, or 45.3%, to close at $15.60. The common stock fell further on October 11, 2005, after a five hour trading halt on the New York Stock Exchange was lifted, following the additional disclosure that the $430 million receivable was largely comprised of uncollectible debts dating back to 1998. Refco's shares closed at $13.85/share on October 11, 2005.

The securities class action complaints further allege that on October 12, 2005, *The Wall Street Journal* reported that an investment firm controlled by Mr. Bennett had paid Liberty Corner Capital to help him hide his debt to Refco of hundreds of millions of dollars, and that the Securities Exchange Commission ("SEC") had launched an investigation. That same day, the

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 4

United States Attorney announced that Mr. Bennett had been arrested and indicted for securities fraud in connection with the IPO.

Plaintiffs allege that on October 12, 2005, the stock fell further to close at $10.85/share. On October 13, 2005, trading in Refco's stock was delayed at the opening of the market. Later that morning, Refco announced that it had hired advisors and imposed a 15-day moratorium on customer withdrawals at Refco Capital Markets. When the NYSE again halted trading, Refco's stock was trading at $7.90/share. Then, on October 18, 2005, Refco filed for Chapter 11 bankruptcy protection.

The securities class action complaints allege violations by the various defendants of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5. The complaints seek class certification, unspecified damages, attorneys' fees and costs.

B.    The Shareholder Derivative Action

The *Mehta* lawsuit is a shareholder derivative action filed on October 14, 2005 in federal court in New York. The *Mehta* complaint names as defendants eleven individuals identified as directors and/or officers of Refco: Phillip Bennett, William Sexton, Gerald Sherer, Joseph Murphy, Leo Breitman, Nathan Gantcher, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley and Scott Schoen. The *Mehta* complaint also names as defendants Credit Suisse First Boston, Goldman Sachs, Banc of America Securities, Deutsche Bank, J.P. Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, HSBC and Thomas H. Lee Partners.

The *Mehta* complaint is based generally on the same allegations contained in the securities class action complaints. It alleges that demand on Refco's board to file suit against the defendants on behalf of the company would be futile.

The complaint contains six counts: (1) breach of fiduciary duty against the individual defendants and Thomas H. Lee Partners; (2) abuse of control against the individual defendants and Thomas H. Lee Partners; (3) gross mismanagement against the individual defendants and Thomas H. Lee Partners; (4) waste of corporate assets against the individual defendants and Thomas H. Lee Partners; (5) unjust enrichment against the individual defendants and Thomas H. Lee Partners; and (6) aiding and abetting against the IPO Underwriter Defendants.

The complaint seeks unspecified damages, equitable and/or injunctive relief, the imposition of a constructive trust on defendants' assets and restriction of defendants' trading activities, restitution, disgorgement, corporate reforms, enhanced shareholder representation on the board of directors, attorneys' fees and costs.

## EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 5

C.    **The Criminal Proceedings**

On October 12, 2005, the United States of America filed a criminal complaint against Mr. Bennett in federal court in New York, alleging one count for violation of the federal securities laws, 15 U.S.C. §78j(b). *See United States of America v. Bennett*, No. 05 MAG 1720 (S.D.N.Y.).

The six page complaint alleges that from at least in or about 2004 up to October 2005, Mr. Bennett hid from investors in the August 2005 IPO the existence of hundreds of millions of dollars of related party transactions between Refco and Refco Group Holdings, Inc. ("RGHI"), a company controlled by Mr. Bennett. The complaint alleges that Mr. Bennett caused Refco to file a false and fraudulent S-1 Registration Statement with the SEC in August 2005 in connection with the IPO. Specifically, the S-1, which contained Refco's audited financial statements as of February 28, 2005 and unaudited financial statements as of May 31, 2005, did not disclose hundreds of millions of dollars of transactions with and debts owed to Refco by RGHI.

The complaint asserts that Refco's books show a "multi-hundred million dollar receivable" from RGHI throughout 2005, including in late February 2005, except for quarter-end periods. In this regard, in February 2005, Mr. Bennett allegedly caused Refco to engage in a series of transactions designed to disguise the related-party nature of this $300 million-plus debt owed to Refco by RGHI by temporarily paying off the debt and transferring it from RGHI to another entity unrelated to Mr. Bennett. The complaint alleges that this temporary re-positioning of debt was carried out so that the debt would not appear to be owed by RGHI over Refco's February 28, 2005 fiscal-year end.

More particularly, the complaint alleges that on February 23, 2005, Refco Capital Markets, a subsidiary of Refco, loaned $335 million to a Refco customer unrelated to Mr. Bennett, to be repaid on March 8, 2005. On the same day, the Refco customer loaned $335 million to RGHI, with a March 8, 2005 repayment date. The loan agreement allegedly was executed by Mr. Bennett on behalf of RGHI, and the interest rate was 75 basis points higher than the loan from Refco Capital Markets to the customer, thereby assuring the customer a profit. Also on February 23, 2005, Mr. Bennett allegedly signed a letter of guaranty to the customer on behalf of Refco Group, Ltd., providing assurance that should RGHI default, Refco Group Ltd. would make the customer whole.

The $335 million loan to RGHI allegedly was used to pay down a portion of the existing RGHI debt to Refco. The result of these transactions allegedly was to substitute a $335 million debt to Refco by the customer for a $335 million debt by RGHI. The transactions allegedly then were unwound on March 8, 2005, after the end of Refco's fiscal year on February 28, 2005. The complaint further alleges that similar transactions took place at the close of the quarters ended May 31, 2005, November 30, 2004, and August 31, 2004.

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 6

Finally, the government's complaint asserts that on October 10, 2005, Refco issued a press release announcing that it had discovered a $430 million debt owed by an entity controlled by Mr. Bennett, and that Mr. Bennett had repaid the entire sum to Refco that day. Following this announcement, the market price of Refco's common stock plummeted from its October 7, 2005 closing price of $28.56/share to $13.85/share, its closing price on October 11, 2005, allegedly resulting in a market capitalization loss of over $1 billion.

On November 10, 2005, the Grand Jury for the Southern District of New York indicted Mr. Bennett on charges of securities fraud, conspiracy to commit securities fraud, false filings to the SEC, and wire fraud. The indictment is based upon the same financial fraud orchestrated by Mr. Bennett as is alleged in the criminal complaint.

### D.     The Customer Actions

The complaints in the *Banseco Holding*, *Miura Financial* and *Multiplicas Casa De Bolsa* lawsuits all were filed on October 17, 2005 in New York Supreme Court. Refco, Inc. and Refco Capital Markets, Ltd. - referred to collectively in the complaints as "Refco" - are the only two named defendants in each of the three lawsuits. The plaintiffs in each of the lawsuits identify themselves as owners of brokerage accounts with Refco.

The three complaints, which are substantially similar to each other, allege that pursuant to separate brokerage agreements between plaintiffs and Refco, Refco was obligated to invest, transfer and return funds and investments in plaintiffs' accounts as instructed by plaintiffs. Each of the complaints alleges that on or about October 12, 2005, plaintiffs instructed Refco to transfer the funds in their accounts to other institutions, but that Refco failed and/or refused to do so, and instead announced a "moratorium" on account withdrawals.

Each of the complaints contains four causes of action: (1) breach of contract; (2) conversion; (3) imposition of a constructive trust; and (4) unjust enrichment. Plaintiffs each seek compensatory damages in excess of the amounts in their respective Refco accounts (which vary from $2.5 million to $50 million), the imposition of a constructive trust over the funds in the accounts, punitive damages in excess of $100 million, attorneys' fees, costs and pre-judgment interest.

### E.     American Financial

*American Financial* was filed in the Southern District of New York on or about October 21, 2005. The plaintiff identifies itself as a Delaware LLC that trades currencies through an account at Refco F/X Associates, LLC ("RefcoFX"). The suit is a purported class action brought on behalf of all persons who traded currencies through, or had currency trading accounts with, RefcoFX from August 11, 2005 through the date the complaint was filed, and who have been damaged. The complaint names as defendants Refco, RefcoFX, and Mr. Bennett; it also names a number of John Doe defendants.

EDWARDS ANGELL PALMER&DODGE LLP

March 28, 2006
Page 7

The complaint generally alleges the same conduct that is the subject of the Criminal Proceedings and the other civil lawsuits. It further alleges that Refco, Refco FX, and various Refco affiliates filed a voluntary petition for bankruptcy protection on October 17, 2005, and that, on the same day, RefcoFX notified its customers that they could no longer make withdrawals from or deposits to their currency trading accounts. As a result, plaintiffs were prevented from depositing funds to maintain appropriate account balances and were forced to sell currency positions to avoid having RefcoFX close leveraged positions automatically. This and other alleged consequences of RefcoFX's actions allegedly caused plaintiffs transactional costs and other losses.

Based on this alleged conduct, the complaint asserts causes of action for (1) fraud and misrepresentation, (2) negligence and negligent misrepresentation, (3) unjust enrichment and restitution, (4) quantum meruit, (5) breach of contract, (6) breach of warranty, and (7) unfair competition.

### F.   Bawag

*Bawag*, an adversary proceeding instituted in connection with Refco's bankruptcy proceedings, was filed on November 16, 2005. The plaintiff identifies itself as a bank located in Austria. Among the defendants named in the complaint are Refco, numerous Refco affiliates and Mr. Bennett.

The complaint alleges that plaintiff was fraudulently induced to loan approximately $420 million to Mr. Bennett on October 10, 2005. The complaint alleges that Mr. Bennett failed to disclose that he sought the loan to pay off RGHI's receivable to Refco, a "related-party receivable resulting from the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to Refco [that] likely was impaired and not collectible." Complaint, § 17. The complaint alleges that Mr. Bennett "knew that if BAWAG had been aware of any of the key facts set forth in [Refco's] October 10, 2005 Press Release, BAWAG would not have made the Loan." Complaint, § 30. It also alleges that the Refco defendants had knowledge of the related-party receivable but nonetheless assisted Mr. Bennett in his effort to obtain the loan to repay the receivable.

The complaint asserts seven causes of action: (1) Constructive Trust, (2) Fraud in the Inducement, (3) Fraud, (4) Civil Conspiracy, (5) Unjust Enrichment, (6) Breach of Contract, and (7) Conversion.

### G.   Thomas H. Lee

*Thomas H. Lee* was filed in the Southern District of New York on November 11, 2005. Plaintiffs are the Thomas H. Lee Equity Fund V, L.P., the Thomas H. Lee Parallel Fund V, L.P., and the Thomas H. Lee Equity (Cayman) Fund V, L.P. (collectively, the "THL Funds"). Defendants are Mr. Bennett, Tone Grant, Santo Maggio, and Refco Group Holdings, Inc. and John Does 1-10.

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 8

The complaint in *Thomas H. Lee* alleges that in June 2004, the plaintiffs invested approximately $507 million in Refco. The complaint alleges that despite the plaintiffs' due diligence efforts, they were unaware that "Bennett intentionally and deliberately engaged in accounting fraud in order to mask a group of largely worthless receivables, bad debts and questionable obligations that, if accurately portrayed on the Company's financial statements, would have materially reduced Refco's value." Complaint, § 4. Specifically, the complaint alleges that Mr. Bennett "nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of million dollars [sic] of customer losses and obligations that would never be repaid to the Company." Complaint, § 30. The complaint alleges that the Refco financial statements provided to the plaintiffs during their due diligence review in 2003 and 2004 were materially false and misleading.

Based on these and other allegations, the complaint asserts causes of action for (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, (2) fraud, (3) negligent misrepresentation, (4) breach of contract, and (5) contribution and indemnification.

### H.  SEC Investigation

Allied World is in receipt of a letter dated January 24, 2006 from Mr. Bennett's counsel, Debora K. Grobman, to the primary carrier, that provides notice of a purported claim filed against Mr. Bennett. Specifically, the letter states that pursuant to a formal Order Directing Private Investigation And Designating Officers To Take Testimony dated October 12, 2005, entitled the Matter of Refco, Inc. HO-1-337, the SEC is conducting an investigation into whether "Refco, certain of its present and former officers, directors or employees" (and others), "have committed substantially the same Wrongful Acts set out against Mr. Bennett in the Complaint and the various civil suits filed against him." Ms. Grobman's letter states that her firm, Kramer Levin, cannot provide a copy of the order due to use restrictions imposed by the SEC.

### I.  CFTC Subpoena

Allied World has received a copy of a subpoena issued by the U.S. Commodity Futures Trading Commission to Mr. Bennett and dated October 19, 2005 (the "CFTC Subpoena"). The subpoena indicates that it was issued in the matter of "Refco, Inc., Refco LLC, Refco FX, LLC, Refco Capital Markets, Ltd., Refco Group, Ltd., Liberty Corner Asset Management, LLC, Liberty Corner Capital Strategies, LLC and Phillip R. Bennett," and seeks production of documents relating to various Refco affiliated entities as well as documents related to Mr. Bennett's financial assets and holdings.

In a letter to the primary carrier dated January 9, 2006, Ms. Grobman represented that the CFTC subpoena was issued pursuant to a formal investigative order. The letter stated that the CFTC would not provide Kramer Levin with a copy of the order, but had permitted the firm to review the order at the CFTC's offices. According to the letter, the order was dated

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 9

October 13, 2005 - days after Refco's public announcements regarding the receivables owed to Refco by an entity controlled by Mr. Bennett and the related party transactions designed to conceal those receivables. The letter stated that the order is to determine whether, in or in connection with the transfer of funds by and between various Refco entities and/or various hedge funds, or the reporting of or representations made about such transfers, Refco, Inc., Refco LLC, Refco FX, Refco Capital Markets, Refco Group, Liberty Corner Asset Management, Liberty Corner Capital Strategies, Mr. Bennett or any other persons or entities, have engaged, are engaging or are about to engage in acts and practices in violation of Sections 9(a)(3) or 9(a)(4) or Commission Regulations 1.14 and 1.15.

### J.    Unovalores

The complaint in *Unovalores* was filed in New Jersey state court on or about November 1, 2005. The plaintiff, which identifies itself as a Refco Capital account holder, names only Mr. Bennett as a defendant. Plaintiff alleges that it entered into a Repurchase Transaction with Refco on August 31, 2005, in reliance upon representations in Refco's registration statement and other filings concerning Refco's financial health. Those representations were false, according to the complaint, because they concealed massive receivables owed by an entity controlled by Mr. Bennett and at least one-half billion dollars of related party transactions with Mr. Bennett. Based on the above, the complaint asserts causes of action for (1) fraud, (2) New Jersey RICO, (3) RICO conspiracy, (4) breach of fiduciary duty, (5) tortious interference with contract, and (6) writ of attachment.

## II.    Coverage Analysis

### A.    The Policy

The Policy has a Limit of Liability, per claim and in the aggregate, of $12,500,000, which is excess of a total underlying limit, per claim and in the aggregate, of $27,500,000. There are three Underlying Policies: U.S. Specialty Insurance Company ("U.S. Specialty") Primary Policy No. 24-MGU-05-A10821 (the "Followed Policy"), with limits of $10,000,000; Lexington Insurance Company ("Lexington") First Excess Policy No. 162-0924, with a limit of $7,500,000; and AXIS Reinsurance Company ("Axis") Second Excess Policy No. RNN 506300 (the "Axis Excess Policy"), with a limit of $10,000,000.

We call your attention to the following terms in the Policy. The Policy, § I ("INSURING AGREEMENT") states:

> This policy shall provide the Insured(s) with Excess Directors and Officers
> Insurance and Company Reimbursement coverage for Loss or Damages resulting
> from any claim or claims first made against the Insured(s) and reported to the
> Insurer pursuant to the terms of this policy in accordance with the same

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 10

> warranties, terms, conditions, exclusions and limitations of the Followed Policy
> identified in Item 2 of the Declarations as they were in existence on the inception
> date of this policy subject to the premium, limits of liability, Policy Period,
> warranties, exclusions, limitations and other terms and conditions of this policy
> including any and all endorsements attached hereto; provided always that this
> policy shall, in no event and notwithstanding any other provision, provide
> coverage broader than that provided by any Underlying Policy unless such
> broader coverage is specifically agreed to by the Insurer herein or in a written
> endorsement attached hereto.[1]

(Emphasis added.)

As indicated by the words "subject to," although the Policy provides coverage in accordance with
the Followed Policy, that coverage is then limited by the warranties, exclusions, limitations and
other terms and conditions of the Policy. Further, § IV of the Policy ("LIMITS") states, among
other terms:

> In the event any Underlying Policy contains terms and conditions more restrictive
> than the Followed Policy, then the Insurer's coverage shall under no
> circumstances be broader than the most restrictive terms and conditions contained
> in the Followed Policy or any Underlying Policy.

> It is agreed that if any warranty signed by or on behalf of any Insured, whether or
> not contained in any Underlying Insurer's application or warranty statement,
> applies to the Limit of Liability covered by the Insurer or any Underlying Insurer,
> then any representations or warranties made in said application or warranty,
> whether or not it is assigned to the Insurer, will be deemed to be treated as though
> it was assigned to the Insurer.

Thus, not only is the coverage offered under the Policy limited by the Policy's own terms and
conditions, the coverage is also limited by any restrictive terms or conditions in any Underlying
Policy, as well as by any warranty letter applying to any of those policies.

In addition, we call your attention to Endorsement No. 3 to the Policy ("Prior Knowledge
Exclusion"), which states as follows:

> It is hereby understood and agreed that the Insurer shall not be liable for Loss in
> connection with any claim or claims made against the Insureds: (a) alleging,
> arising out of, based upon, in consequence of, or attributable to facts or

---

[1] With regard to the coverage afforded by the Followed Policy to the Securities Class Action Lawsuits, we direct
your attention to the November 10, 2005 letter to you by Ross, Dixon & Bell, LLP on behalf of U.S. Specialty,
which is incorporated herein by reference.

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 11

circumstances of which any Insured had knowledge as of inception and (i) which a reasonable person would suppose might afford valid grounds for a Claim which would fall within the scope of the coverage hereunder, or (ii) which indicate the probability of any such claim.

### B.    The Axis Policy

The Axis Second Excess Policy (the "Axis Policy") insures $10 million excess of $17.5 million in underlying limits. The Axis Policy contains a Manuscript Application Endorsement (Endorsement No. 5), which states:

> In consideration of the premium charged, it is agreed by the Insurer and Insureds that the application or proposal signed February 8, 2005 and submitted to Axis Reinsurance Company on U.S. Specialty Insurance Company's form shall be accepted by the Insurer as the Application for this Policy.

> Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Phillip Bennett completed an HCC application "for Directors, Officers and Private Organization Liability Coverage" and signed it on February 8, 2005. In the application, Mr. Bennett did not answer the questions posed as Question 12: (a) "Have any claims been made during the last 5 years against any person or entity proposed for this insurance in his or her capacity as director, officer or trustee of any corporation or organization?"; or (b) "Is any person or entity proposed for this insurance aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he, she or it has reason to believe might result in a claim being made?"

The Axis Policy also contains a Knowledge Exclusion Endorsement (Endorsement 6), which states:

> In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, any Insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 12

    **C.**    <u>The Axis Warranty Letter</u>

Axis received a warranty letter from Refco Group Ltd. LLC (Refco's operating entity prior to the formation of Refco, Inc.), signed by Phillip Bennett, dated January 14, 2005 (the "Axis Warranty Letter"). It states, among other things:

> With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true: (a) No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT [unrelated matter described]. . . .
>
> It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.
>
> This letter, together with other documents and information publicly available to and obtained by the Insurer, shall be deemed incorporated into and become part of the Application and the Policy.

Based upon the language in § IV ("LIMITS") of the Policy, this warranty letter was assigned to Allied World.

    **D.**    <u>The Securities Class Actions, Derivative Action, Criminal Proceedings, the CFTC Subpoena, the SEC Investigation, the American Financial Action, the Bawag Action, the Thomas H. Lee Action and the Unavalores Action</u>

The *Glaubach, FrontPoint, Lieber, Sandra Weiss, Wakefield, Baker, Becker, Nathanson, Mettupatti, Todd Weiss, Mehta, Gensheimer* and *Teachers' Retirement* lawsuits, the Criminal Proceedings, the CFTC Subpoena, the SEC Investigation, the *American Financial* action, the *Bawag* action, the *Thomas H. Lee* action and the *Unavalores* action all arise from a common nucleus of alleged facts. The plaintiffs in these matters contend that during the time period prior to and leading up to the inception of the Policy on August 11, 2005, at least Mr. Bennett knew, but concealed, the outstanding debt of hundreds of millions of dollars that he, through an entity he controlled, owed to Refco, Inc. The existence of this debt, its concealment and nondisclosure in annual and quarterly filings that were made prior to the inception of the Policy Period, have been admitted by Refco, Inc. in public statements and filings since October 10, 2005.

Mr. Bennett, as Chief Executive Officer of Refco Group, LLC, signed the public filings and the prospectus for the public offering on which the cases of the plaintiffs and the government are based. Each of the actions referenced above is premised upon the knowledge of Mr. Bennett –

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 13

and possibly other Insureds – of the existence of his debt and its concealment from the existing and prospective shareholders of the company. Indisputably, Mr. Bennett knew that the concealment of a debt of hundreds of millions that he owed to the company would afford grounds for a claim that would fall within the scope of coverage afforded by the Policy. Mr. Bennett personally signed a number of documents in connection with obtaining coverage under the Policy, including, but not limited to, an application signed February 8, 2005.

Mr. Bennett clearly is an Insured as the term is defined in the Followed Policy, and, by incorporation, in the Policy. The Prior Knowledge Exclusion eliminates coverage under the Policy "for Loss in connection with any Claim or Claims made against the Insureds: . . . alleging, arising out of, based upon, in consequence of , or attributable to facts or circumstances of which any Insured had knowledge as of inception and . . . which a reasonable person would suppose might afford valid grounds for a Claim which would fall within the scope of the coverage hereunder. . . ." (emphasis added).

Because the *Glaubach, FrontPoint, Lieber, Sandra Weiss, Wakefield, Baker, Becker, Nathanson, American Financial, Mettupatti, Todd Weiss, Mehta, Gensheimer* and *Teachers' Retirement* lawsuits, the Criminal Proceedings, the CFTC Subpoena, the SEC Investigation, the *American Financial* Action, the *Bawag* Action, the *Thomas H. Lee* Action and the *Unavalores* Action all arise from and are premised upon Mr. Bennett's knowledge, prior to the inception of the Policy, of facts or circumstances which a reasonable person or persons would suppose might afford valid grounds for a claim which would fall within the scope of the coverage afforded by this Policy, coverage for these Claims is excluded under the Policy for all Insureds.

Likewise, because the coverage under the Policy is limited by any restrictive terms or conditions in any Underlying Policy, as well as by any warranty letter applying to any of those policies, Mr. Bennett's knowledge, prior to the inception of the Policy, of facts or circumstances which a reasonable person or persons would suppose might afford valid grounds for a claim which would fall within the scope of the coverage afforded by the Policy, is also grounds for denial on the basis of the terms and conditions of the Axis Policy, the Axis Warranty and the application. Allied World incorporates herein by reference Axis' March 6, 2006 coverage declination letter, which sets forth the grounds for denying coverage to all Insureds under the Axis Policy for matters brought in connection with the alleged financial fraud orchestrated by Mr. Bennett, among others.[2]

---

[2] Some of the matters noticed to Allied World do not appear to have been noticed to Axis, including, the *Gensheimer* and *Teachers' Retirement* lawsuits, the CFTC Subpoena, the SEC Investigation, the *Thomas H. Lee* action and the *Unavalores* action. However, these matters all appear to arise from the same facts alleged in the matters that were specifically addressed by Axis in its letter. Therefore, Allied World adopts the positions taken by Axis in its letter as applying to the matters noticed to Allied World and referenced herein, but apparently not noticed to Axis. Note; however, that to the extent the Axis March 6, 2006 letter takes any position relating exclusively to any matter not noticed to Allied World and referenced herein, Allied World does not adopt such position at this time, but reserves the right to do so in the future.

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 14

There is also no coverage under the Policy for any Defense Costs incurred by Insureds in connection with these Claims for an additional reason. Subject to all of its terms and conditions, the Policy affords specified coverage for certain Loss, as that term is defined in the Primary Policy, and as that definition is restricted by other Underlying Insurance. The Lexington Policy's definition of Loss excludes legal expenses and costs:

> The word "Loss" shall be understood to mean the sums paid or payable in settlement of claims for which the Insured is liable after making deductions for all other recoveries, salvages or other insurance (other than recoveries under underlying insurance, whether recoverable or not) and **shall exclude all expenses and costs.**

Lexington Policy § XII (emphasis added). This section of the Lexington Policy further provides that the word "Costs" includes "interest on judgments, investigations, adjustments and legal expenses." Further, the Lexington Policy, § I, notes that it does not incorporate Primary Policy provisions regarding costs and expenses incident to defense of claims. Because the Allied World Policy does not provide broader coverage than that provided by the most restrictive policy included in the Underlying Insurance, there is no coverage for Defense Costs under the Allied World Policy.

Without prejudice to its denial of coverage for these Claims, Allied World reserves its right to raise other terms and conditions from the Policy, the Followed Policy or any Underlying Policy as either a defense to coverage or as a basis for rescission of the Policy.

### E.    The Customer Actions

By a letter dated November 10, 2005, Ross, Dixon & Bell, LLP on behalf of U.S. Specialty denied coverage for the *Banseco Holding, Miura Financial* and *Multiplicas Casa De Bolsa* lawsuits. Allied World hereby expressly adopts and fully incorporates herein the positions stated in that letter on the basis thereof, and denies coverage with respect to the *Banseco Holding, Miura Financial* and *Multiplicas Casa De Bolsa* lawsuits.

Furthermore, coverage for the Customer Actions is not available under the Policy by virtue of:

- the Prior Knowledge Exclusion, which applies to the extent that the "moratorium" on customer account withdrawals that is the basis for these complaints arose from facts known by Mr. Bennett prior to the inception of the Policy; and,

- the provisions of the Axis Policy, the Axis Warranty and the application, as set forth in the March 6 Axis coverage declination letter.

On behalf of Allied World, we reserve all of its rights and defenses under the Policy, the Followed Policy, the Underlying Policies and available at law and in equity, including, but not

# EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 15

limited to, the right to rescind the Policy as to any and all Insureds. Likewise, we recognize that the Insureds reserve their rights as well.

Should you or the insureds have any questions or concerns regarding the above, please do not hesitate to contact me.

Very truly yours,

*John D. Hughes (aa)*

John D. Hughes

cc:    R. Damian Brew, Marsh USA

BOS_528836_2.DOC/JHUGHES

# EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 16

## LIST OF MATTERS

*Glaubach v. Refco, Inc., et al.*
*FrontPoint Financial Services, Inc. v. Refco, Inc., et al.*
*Lieber v. Refco, Inc., et al.*
*Sandra Weiss v. Refco, Inc., et al.*
*Mehta v. Bennett, et al.*
*Wakefield v. Refco, Inc., et al.*
*United States of America v. Bennett*
*American Financial International Group -Asia, LLC v. Refco, Inc., et al.*
*Mettupatti v. Bennett, et al.*
*Todd Weiss v. Bennett, et al.*
*Banesco Holding C.A., et al. v. Refco, Inc., et al.*
*Miura Financial Services v. Refco, Inc., et al.*
*Multiplicas Casa De Bolsa v. Refco, Inc., et al.*
*Baker v. Bennett, et al.*
*Becker v. Refco, Inc., et al.*
*Nathanson v. Bennett, et al.*
*Klaus Gensheimer v. Phillip R. Bennett, et al.*
*Teachers' Retirement System of the State of Illinois, et al. v. Thomas H. Lee, et al.*
*Thomas H. Lee Equity Fund V, L.P. et al. v. Phillip R. Bennett, et al.*
*Bawag P.S.K. v. Refco, Inc. et al,*
*Unovalores Ltd. v. Bennett*
The November 11, 2005 Indictment in the *U.S. v. Bennett* matter referenced above
The CFTC Subpoena
The SEC Investigation.

Exhibit L



Wiley Rein & Fielding LLP

RECEIVED

MAR 1 0 2006

**MARSH**
CHICAGO, ILLINOIS

1776 K STREET NW
WASHINGTON, DC 20006
PHONE   202.719.7000
FAX     202.719.7049

Virginia Office
7925 JONES BRANCH DRIVE
SUITE 6200
McLEAN, VA 22102
PHONE   703.905.2800
FAX     703.905.2820

www.wrf.com

March 9, 2006

Daniel J. Standish
202.719.7130
dstandish@wrf.com

Cara Tseng Duffield
202.719.7407
cduffiel@wrf.com

**VIA OVERNIGHT DELIVERY**

Andrea D. Lieberman, Esq.
Marsh USA Inc.
500 West Monroe
Chicago, IL 60661

Debora K. Grobman, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Re:     Insured:     Refco, Inc. ("Refco" or the "Company")
        Policy No.:  DOX000932200 (the "Arch Policy")
        Matters:     See attached list

Dear Ms. Lieberman and Ms. Grobman:

As you know, this firm represents Arch Insurance Company ("Arch") in connection with the above-referenced matters ("Matters"). On behalf of Arch, this letter acknowledges or further acknowledges receipt of notice of the Matters. Based on the information made available to date, Arch sets forth herein its views regarding the availability of coverage for the Matters under the Arch Policy. Please note that this analysis is based upon information received to date and is subject to modification if additional information is received.

We understand that Ms. Grobman represents Phillip R. Bennett in connection with the Matters, and ask that Ms. Lieberman furnish a copy of this letter to all other insureds under the Arch Policy. If there is someone else to whom we should direct this letter, please let us know.

I.     **DESCRIPTION OF THE MATTERS**

A.     **The Bennett Criminal Action**

On or about October 12, 2005, the United States filed a criminal complaint against Mr. Bennett in the Southern District of New York for violation of the federal securities laws. *United States v. Bennett*, No. 05 MAG 1720 (S.D.N.Y.). The complaint alleges that Mr. Bennett knowingly failed to disclose to investors in Refco's August 2005 initial public offering the existence of hundreds of millions of dollars of receivables owed to Refco by Refco Group Holdings, Inc. ("RGHI"), a

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 2

company allegedly controlled by Mr. Bennett, as well as related-party transactions that were designed to hide these receivables.

On November 10, 2005, the Grand Jury for the Southern District of New York indicted Mr. Bennett on charges of securities fraud, conspiracy to commit securities fraud, false filings to the SEC, and wire fraud. According to the indictment (the "Bennett Indictment"), Mr. Bennett

> sought to hide from, among others, Refco's auditors and investors, losses sustained by Refco through its own and its customers' trading in the financial markets. To that end, Bennett transferred losses from Refco to a company controlled by Bennett, directed a repeated series of transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make false and fraudulent public filings with the [SEC].

Bennett Indictment ¶ 4.

The Bennett Indictment alleges that, as part of its brokerage business, Refco extended credit to customers for their securities and commodities trading. When certain customers were unable to repay that credit, rather than noting the losses on Refco's balance sheet, Mr. Bennett directed the transfer of those losses to Refco Group Holdings, Inc., which he controlled. As a result, Refco's balance sheet showed a receivable from RGHI. According to the Bennett Indictment, beginning in or around 1999, Mr. Bennett took steps to hide the RGHI receivable from Refco's auditors. Specifically, Mr. Bennett arranged transactions with third parties to temporarily pay down the RGHI receivable at quarter- or year-end and mask the related-party nature of the RGHI debt.

According to the Bennett Indictment, Mr. Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2004 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2004 Transactions"). On or about February 20, 2004, Mr. Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $720 million to a Refco customer. On the same day, the customer loaned $720 million to RGHI. RGHI

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 3

then used the $720 million to pay down its debt to Refco. These loans were unwound on or about March 4, 2004, after Refco's fiscal year-end. According to the Bennett Indictment, Mr. Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Mr. Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $720 million if RGHI defaulted.

The Bennett Indictment further alleges that Mr. Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2005 Transactions"). On or about February 23, 2005, Mr. Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $345 million to a Refco customer. On the same day, the customer loaned $345 million to RGHI. RGHI then used the $345 million to pay down its debt to Refco. These loans were unwound on or about March 8, 2005, after Refco's fiscal year-end. According to the Bennett Indictment, Mr. Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Mr. Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $345 million if RGHI defaulted.

According to the Bennett Indictment, Mr. Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal first quarter end for 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "May 2005 Transactions"). On or about May 25, 2005, Mr. Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $450 million to a Refco customer. On the same day, the customer loaned $450 million to RGHI. RGHI then used the $450 million to pay down its debt to Refco. These loans were unwound on or about June 6, 2005, after Refco's fiscal first quarter-end. According to the Bennett Indictment, Mr. Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Mr. Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $450 million if RGHI defaulted.

The criminal complaint and the indictment against Mr. Bennett will be referred to herein as the "Bennett Criminal Action."

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 4

### B.    The Customer/Account Holder Lawsuits

The complaints in *Banseco Holding*, *Miura Financial* and *Multiplicas Casa De Bolsa* were filed in New York Supreme Court on October 17, 2005. The only defendants named in the suits are Refco, Inc. and Refco Capital Markets, Ltd. ("RCM"). Plaintiffs in the suits purport to be owners of brokerage accounts with Refco. The complaints allege that brokerage agreements between plaintiffs and Refco obligated Refco to invest, transfer and return funds and investments in plaintiffs' accounts pursuant to plaintiffs' instructions, and that Refco failed to fulfill this obligation. Based on this alleged failure, the complaints assert causes of action for breach of contract, conversion, imposition of constructive trust, and unjust enrichment.

The complaints in *Bac International Bank, Inc.* and *Banco de America Central, S.A.*, which were filed in November 2005, name only RCM as defendant. Plaintiffs allege that they are parties to customer agreements with RCM and hold assets in accounts at RCM, and that since Refco Securities, LLC declared a 15-day moratorium on customer withdrawals at RCM on October 13, 2005, RCM has failed to comply with plaintiffs' instructions that RCM transfer their assets to accounts at other institutions. The complaints assert causes of action for (1) declaratory judgment, (2) return of property, (3) conduit, (4) constructive trust, (5) unjust enrichment, (6) resulting trust, and (7) replevin.

The complaint in *Markwood Investments*, which was filed on or about November 17, 2005, names RCM and Refco Securities LLC as defendants. Plaintiff alleges that it is an investment firm that maintained an account at RCM, and that RCM wrongfully transferred various securities in Markwood's account and in the accounts of others to Refco Securities to allow Refco Securities to satisfy certain financial obligations. Plaintiff further alleges that RCM has not responded to plaintiff's demand that RCM reverse the transfer of its assets and return the assets to plaintiff's account. The complaint asserts causes of action for (1) avoidance and recovery of transfers of Markwood Assets, (2) avoidance and recovery of transfers of non-Markwood assets, (3) conversion, (4) constructive trust, (5) unjust enrichment, (6) replevin, (7) accounting, and (8) permanent injunction.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 5

The complaint in *Reserve Invest (CYPRUS) Ltd.*, which was filed on or about November 18, 2005, names RCM, Michael W. Morrison and Richard Heis as defendants. Messrs. Morrison and Heis are alleged to be Joint Provisional Liquidators of RCM. Plaintiff alleges that it is an investment company and a customer of RCM, and that it entered into a Global Master Repurchase Agreement and an International Swap Dealers Association Master Agreement with RCM. Plaintiff alleges, inter alia, that RCM seized and has refused plaintiff's demand for return of certain of its securities held by RCM, and that RCM withheld dividend payments due to plaintiff. The complaint asserts causes of action for (1) declaratory relief, (2) return of property, (3) replevin (4) conversion, (5) constructive trust, and (6) accounting.

## C.    The Derivative Action

The complaint in *Mehta v. Bennett et al.*, No. 05-8748 (S.D.N.Y.), a shareholder derivative action (the "Derivative Action"), was filed in the Southern District of New York on October 14, 2005. Plaintiff, a purported Refco shareholder, purports to bring the Derivative Action on behalf of Refco. Defendants include Mr. Bennett and a number of other directors and officers of Refco (collectively, the "Individual Defendants") and certain underwriters involved in Refco's IPO (the "IPO Underwriter Defendants").

The Derivative Action generally alleges the same conduct alleged in the Bennett Criminal Matter. Based on that conduct, it asserts five causes of action against the Individual Defendants: (1) breach of fiduciary duty, (2) abuse of control, (3) gross mismanagement, (4) waste of corporate assets, and (5) unjust enrichment. It also asserts a cause of action against the IPO Underwriter Defendants.

## D.    The Securities Litigation

The Securities Litigation consists of eleven purported class action securities suits that were filed in the Southern District of New York in October 2005, as well as all other class action securities suits that are consolidated with those actions. Defendants include Mr. Bennett and other directors and officers of Refco. Refco, Inc. is named as a defendant in several of the actions, as are a number of other entities, including Refco Group Holdings Inc., and Refco F/X Associates, LLC.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 6

The complaints in the Securities Litigation generally allege the same conduct alleged in the Bennett Criminal Action — that Refco failed to disclose to investors in its August 2005 IPO the $430 million receivable owed to Refco by an entity controlled by Mr. Bennett, as well as related-party transactions designed to conceal that debt. Based on this conduct, plaintiffs allege that Refco's initial public offering registration statement and prospectus were materially false and misleading. The complaints assert causes of action for violations of Section 11, 12(a)(2) and 15 of the Securities Act of 1933 and violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5.

E.    **Miscellaneous**

1.    **The American Financial Action**

The complaint in *American Financial International Group v. Refco, Inc. et al.*, No. 05-8988 (S.D.N.Y.) (the "American Financial Action") was filed in the Southern District of New York on or about October 21, 2005. The plaintiff identifies itself as a Delaware LLC that trades currencies through an account at Refco F/X Associates, LLC ("RefcoFX"). The suit is a purported class action brought on behalf of all persons who traded currencies through, or had currency trading accounts with, RefcoFX from August 11, 2005 through the date the complaint was filed, and who have been damaged. The complaint names as defendants Refco, RefcoFX, and Mr. Bennett; it also names a number of John Doe defendants.

The complaint generally alleges the same conduct that is the subject of the Bennett Criminal Matter and the Securities Litigation. It further alleges that Refco, Refco FX, and various Refco affiliates filed a voluntary petition for bankruptcy protection on October 17, 2005, and that, on the same day, RefcoFX notified its customers that they could no longer make withdrawals from or deposits to their currency trading accounts. As a result, plaintiffs were prevented from depositing funds to maintain appropriate account balances and were forced to sell currency positions to avoid having RefcoFX close leveraged positions automatically. This and other alleged consequences of RefcoFX's actions allegedly caused plaintiffs transactional costs and other losses.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 7

        Based on this alleged conduct, the complaint asserts causes of action for
(1) fraud and misrepresentation, (2) negligence and negligent misrepresentation, (3)
unjust enrichment and restitution, (4) quantum meruit, (5) breach of contract,
(6) breach of warranty, and (7) unfair competition.

## 2.      The Bawag Action

        *Bawag P.S.K. Bank v. Refco Inc. et al.*, No. 05-60006 (S.D.N.Y. Bkr.), Adv.
No. 05-03161 (the "Bawag Action"), an adversary proceeding instituted in
connection with Refco's bankruptcy proceedings, was filed on November 16, 2005.
The plaintiff identifies itself as a bank located in Austria. Among the defendants
named in the complaint are Refco, numerous Refco affiliates and Mr. Bennett.

        The complaint alleges that plaintiff was fraudulently induced to loan
approximately $420 million to Mr. Bennett on October 10, 2005. The complaint
alleges that Mr. Bennett failed to disclose that he sought the loan to pay off RGHI's
receivable to Refco, a "related-party receivable resulting from the assumption by an
entity controlled by Mr. Bennett of certain historical obligations owed by unrelated
third parties to Refco [that] likely was impaired and not collectible." Complaint,
§ 17. The complaint alleges that Mr. Bennett "knew that if BAWAG had been
aware of any of the key facts set forth in [Refco's] October 10, 2005 Press Release,
BAWAG would not have made the Loan." *Id.*, § 30. It also alleges that the Refco
defendants had knowledge of the related-party receivable but nonetheless assisted
Mr. Bennett in his effort to obtain the loan to repay the receivable.

        The complaint asserts seven causes of action: (1) Constructive Trust,
(2) Fraud in the Inducement, (3) Fraud, (4) Civil Conspiracy, (5) Unjust
Enrichment, (6) Breach of Contract, and (7) Conversion.

## 3.      The THL Funds Action

        *Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*, 05-CV-9608
(the "THL Funds Action"), was filed in the Southern District of New York on
November 11, 2005. Plaintiffs are the Thomas H. Lee Equity Fund V, L.P., the
Thomas H. Lee Parallel Fund V, L.P., and the Thomas H. Lee Equity (Cayman)
Fund V, L.P. (collectively, the "THL Funds"). Defendants are Mr. Bennett, Tone
Grant, Santo Maggio, and Refco Group Holdings, Inc. and John Does 1-10.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 8

The complaint in the THL Funds Action alleges that in June 2004, the plaintiffs invested approximately $507 million in Refco. The complaint alleges that despite the plaintiffs' due diligence efforts, they were unaware that "Bennett intentionally and deliberately engaged in accounting fraud in order to mask a group of largely worthless receivables, bad debts and questionable obligations that, if accurately portrayed on the Company's financial statements, would have materially reduced Refco's value." Complaint, § 4. Specifically, the complaint alleges that Mr. Bennett "nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of million dollars [sic] of customer losses and obligations that would never be repaid to the Company." *Id.*, § 30. The complaint alleges that the Refco financial statements provided to the plaintiffs during their due diligence review in 2003 and 2004 were materially false and misleading.

Based on these and other allegations, the complaint asserts causes of action for (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, (2) fraud, (3) negligent misrepresentation, (4) breach of contract, and (5) contribution and indemnification.

### 4.    The Sillam Action

The complaint in *Bankruptcy Trust of Gerard Sillam v. Refco Group LLC et al.*, No. 05603931 (Supreme Court, New York County, New York) (the "Sillam Action") was filed in New York state court on November 4, 2005. Plaintiffs are the bankruptcy trust of Gerard Sillam and Gerard Sillam, a citizen of France. The suit names as defendants numerous entities and individuals, including Refco-related entities and Refco directors and officers. Plaintiffs allege that Mr. Sillam was entitled to certain commissions for arranging business transactions for Refco overseas entities but that the Refco entities refused to honor those arrangements. Plaintiffs alleges that between October 2000 and June 2005, Mr. Sillam made various demands and took various legal actions in France and the U.S. — including the filing of various suits — to force Refco to honor its contracts. The complaint asserts causes of action against defendants for (1) fraud, (2) fraudulent misrepresentation, (3) tortious interference with contract, and (4) unjust enrichment.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 9

5.      **The CFTC Subpoena**

Arch has received a copy of a subpoena issued by the U.S. Commodity Futures
Trading Commission to Mr. Bennett and dated October 19, 2005 (the "CFTC
Subpoena"). The subpoena indicates that it was issued in the matter of "Refco, Inc.,
Refco LLC, Refco FX, LLC, Refco Capital Markets, Ltd., Refco Group, Ltd.,
Liberty Corner Asset Management, LLC, Liberty Corner Capital Strategies, LLC
and Phillip R. Bennett," and seeks production of documents relating to various
Refco affiliated entities as well as documents related to Mr. Bennett's financial
assets and holdings.

In a letter to the primary carrier dated January 9, 2006, Ms. Grobman represented
that the CFTC was issued pursuant to a formal investigative order. The letter stated
that the CFTC would not provide Kramer Levin with a copy of the order, but had
permitted the firm to review the order at the CFTC's offices. According to the
letter, the order was dated October 13, 2005 - days after Refco's public
announcements regarding the receivables owed to Refco by an entity controlled by
Mr. Bennett and the related party transactions designed to conceal those receivables.
The letter stated that the order is to

> determine whether, in or in connection with the transfer of
> funds by and between various Refco entities and/or various
> hedge funds, or the reporting of or representations made
> about such transfers[,] Refco, Inc., Refco LLC, Refco FX,
> Refco Capital Markets, Refco Group, Liberty Corner Asset
> Management, Liberty Corner Capital Strategies, Mr. Bennett
> or any other persons or entities, have engaged, are engaging
> or are about to engage in acts and practices in violation of
> Sections 9(a)(3) or 9(a)(4) or Commission Regulations 1.14
> and 1.15.

6.      **The Unovalores Action**

The complaint in the *Unovalores Ltd. v. Bennett*, No. L1564-05 (Sup. Ct. of
New Jersey, Somerset County, Law Division) (the "Unovalores Action") was filed
in New Jersey state court on or about November 1, 2005. The plaintiff, which
identifies itself as a Refco Capital account holder, names only Mr. Bennett as a

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 10

defendant. Plaintiff alleges that it entered into a Repurchase Transaction with Refco on August 31, 2005, in reliance upon representations in Refco's registration statement and other filings concerning Refco's financial health. Those representations were false, according to the complaint, because they concealed massive receivables owed by an entity controlled by Mr. Bennett and at least one-half billion dollars of related party transactions with Mr. Bennett. Based on the above, the complaint asserts causes of action for (1) fraud, (2) New Jersey RICO, (3) RICO conspiracy, (4) breach of fiduciary duty, (5) tortious interference of contract, and (6) writ of attachment.

## II.    THE ARCH POLICY

Subject to all of its terms and conditions, the Arch Policy contains a limit of liability of $10 million that is excess of $40 million in **Underlying Insurance**[1] and the applicable retention for the period August 11, 2005 to August 11, 2006. The coverage available under the Arch Policy attaches only after all such **Underlying Insurance** has been exhausted by the actual payment of loss and after Insureds have paid the full amount of any applicable deductible or self-insured retentions. Arch Policy, § I.B. In general, the Arch Policy applies in conformance with the terms and conditions of the **Primary Policy** and in conformance with the terms and conditions in the Arch Policy or in any other underlying insurance "further limiting or restricting coverage." Arch Policy, Section I.C. The Arch Policy provides that "[i]n no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the **Underlying Insurance**." *Id.*

The **Primary Policy**, which was issued by U.S. Specialty Insurance Company, has a limit of liability of $10 million. The first excess policy (the "Lexington Policy"), which was issued by Lexington Insurance Company, has a limit of liability of $7.5 million excess of $10,000,000. The second and third layer excess policies have not yet been issued, but Axis Reinsurance Company bound coverage for the second excess policy (the "Axis Policy"), with a limit of liability of $10 million excess of $17.5 million, and Allied World Assurance Company has bound coverage for a third excess policy (the "AWAC Policy") with limits of $12.5 million excess of $27.5 million. Arch reserves its rights to supplement this

---

[1] Terms that appear in bold in this letter are defined in the policy being quoted or discussed, and appear in bold therein.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 11

letter once the Axis Policy and the AWAC Policy are issued and any coverage positions are issued by those carriers.

Subject to all of its terms and conditions, the Arch Policy contains five insuring agreements. First, the Arch Policy affords specified coverage to **Insured Persons** for "**Loss** arising from **Claims** first made during the **Policy Period** . . . for **Wrongful Acts**, except when and to the extent that the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement." Primary Policy, Insuring Agreement (A). Second, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the **Company** for "**Loss** arising from . . . **Claims** first made during the **Policy Period** . . . against the **Insured Persons** for **Wrongful Acts**, if the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement." **Primary Policy**, Insuring Agreement (B)(1).

Third, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the **Company** for "**Loss** arising from . . . **Securities Claims** first made during the **Policy Period** . . . against the **Company** for **Wrongful Acts**." **Primary Policy**, Insuring Agreement (B)(2). Fourth, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the "**Controlling Shareholder**," defined as Philip Bennett, for "**Loss** arising from a **Securities Claim** first made during the **Policy Period** . . . against such **Controlling Shareholder** for **Wrongful Acts**, provided, that one or more **Insured Persons** and/or the **Company** are and remain co-defendants in such **Securities Claim** along with such **Controlling Shareholder**." **Primary Policy**, Endorsement No. 15.

Fifth, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the Company for "all **Derivative Demand Investigation Costs** incurred by the **Company** as a result of a **Derivative Demand** first received by the **Company's** Board of Directors and reported in writing to the Insurer during the **Policy Period** . . . up to the amount of the **Derivative Demand Investigation Costs Sub-Limit**" of $250,000. **Primary Policy**, Endorsement No. 11.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 12

III.    **COVERAGE DISCUSSION**

   A.    **Denial of Coverage for the Bennett Criminal Action, the CFTC Subpoena, the Securities Litigation, the Derivative Action, the American Financial Action, the Bawag Action, the THL Funds Action and the Unovalores Action**

Refco conducted its initial public offering on August 11, 2005, the same day the Arch Policy incepted.

On October 10, 2005, Refco issued a press release in which it announced that the Company had been carrying an undisclosed receivable of $430 million from an entity controlled by Mr. Bennett. Refco stated that "[b]ased on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible." The Company stated that although the receivable "was reflected on the Company's prior period financials, as well as on the Company's May 31, 2005 balance sheet," the receivable "was not shown as a related party transaction in any such financials, and that "for that reason, and after consultation by the Audit Committee with the Company's independent accountants, the Company determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

The next day, Refco issued a second press release that announced that Mr. Bennett had repaid the $430 million receivable in full, and that provided further information on the nature of the receivable:

   Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998. These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 13

from that entity, rather than a receivable from the
originating accounts. The fact that the receivable was from
a company controlled by Mr. Bennett was hidden at the end
of quarterly and annual reporting periods by reason of
transfers to a third party customer account that we currently
believe is unaffiliated with Mr. Bennett or anyone else at
the Company.

On October 17, 2005, Refco and certain of its unregulated subsidiaries filed
for Chapter 11 bankruptcy protection.

As noted above, the Arch Policy applies in conformance with the terms and
conditions of the **Primary Policy** and in conformance with the terms and conditions
in the Arch Policy or any other **Underlying Insurance** "further limiting or
restricting coverage." Arch Policy, Section I.C.

Arch understands that the underlying AWAC Policy, when issued, will
contain the following Prior Knowledge Exclusion Endorsement ("AWAC Prior
Knowledge Exclusion"):

It is hereby understood and agreed that the **Insurer** shall
not be liable for **Loss** in connection with any claim or
claims made against the **Insureds** . . . alleging, arising out
of, based upon, in consequence of, or attributable to facts or
circumstances of which any Insured had knowledge as of
inception and (i) which a reasonable person would suppose
might afford valid grounds for a claim which would fall
within the scope of the coverage hereunder; or (ii) which
indicate the probability of any such claim.

Arch also understands that the AWAC Policy will contain the following
Inverted Representation Endorsement ("AWAC Inverted Representation
Endorsement"):

In consideration of the premium charged, no coverage will
be available under this Policy for Loss, including Defense
Expenses, from Claims arising from any fact, circumstance

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 14

or situation of which, as of the effective date of this Policy, any Insured had knowledge and had reason to suppose might afford grounds for any Claim that would fall within the scope of the insurance afforded by this Policy.

The AWAC Prior Knowledge Exclusion and the AWAC Inverted Representation Endorsement are incorporated into the Arch Policy by virtue of Section I.C. of the Arch Policy.

The Arch Policy also contains a Prior Knowledge or Information Exclusion Endorsement (the "Arch Prior Knowledge or Information Exclusion") that provides:

If any **Insured** as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a **Claim** under this Policy, the **Excess Insurer** shall not be liable to make any payment under this Policy as a result of a **Claim** arising out of, based upon, or attributable to any such act, error, omission, fact, matter or circumstance.

Arch Policy, Endorsement No. 4.

Based on his knowledge, as of August 11, 2005, of the RGHI receivables to Refco, the February 2004 Transactions, the February 2005 Transactions and the May 2005 Transactions, as alleged in the Bennett Indictment and corroborated, in large measure, by the Company's statements in its October 10 and 11, 2005 press releases regarding the results to date of its internal investigation, and as further corroborated by its announcement that certain financial statements should not be relied upon, it appears that Mr. Bennett, at the time of the inception of the Policy, had knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a Claim.

The undisclosed RGHI receivables to Refco and the undisclosed related party transactions did in fact give rise to Claims. As discussed above, the Bennett Criminal Action, the Securities Litigation, the Derivative Action, the American Financial Action, the Bawag Action, the THL Funds Action and the Unovalores Action each arise from the alleged failure of Mr. Bennett and/or Refco to disclose

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 15

the existence of the receivables owed to Refco by RGHI, an entity controlled by Mr. Bennett, and/or to disclose related-party transactions designed to hide those receivables. For these reasons, there is no coverage under the Arch Policy for these Claims by virtue of the AWAC Prior Knowledge Exclusion, the AWAC Inverted Representation Endorsement, and the Arch Prior Knowledge or Information Exclusion.

There is also no coverage under the Arch Policy for any **Defense Costs** incurred by Insureds in connection with these Claims for an additional reason. Subject to all of its terms and conditions, the Arch Policy affords specified coverage for certain **Loss**, as that term is defined in the **Primary Policy**, and as that definition is restricted by other **Underlying Insurance**. The Lexington Policy's definition of **Loss** excludes legal expenses and costs:

> The word "Loss" shall be understood to mean the sums paid or payable in settlement of claims for which the Insured is liable after making deductions for all other recoveries, salvages or other insurance (other than recoveries under underlying insurance, whether recoverable or not) and *shall exclude all expenses and costs*.

Lexington Policy, § XII (emphasis added). The Lexington Policy further provides that the word "Costs" includes "interest on judgments, investigations, adjustments and legal expenses." *Id. See also* Lexington Policy, § I (noting that policy does not incorporate Primary Policy provisions regarding costs and expenses incident to defense of claims). Because the Arch Policy does not provide "broader coverage than that provided by the most restrictive policy included in the **Underlying Insurance**," there is no coverage for **Defense Costs** under the Arch Policy.

Please note that, in light of the conclusions regarding coverage described in this letter, Arch has filed suit in New York state court to obtain a declaratory judgment regarding the lack of coverage for the Matters addressed in § III.A of this letter. A courtesy copy of the complaint is enclosed.

Even if coverage under the Arch Policy were not precluded on the grounds set forth above, there are numerous additional terms, conditions and exclusions of the Arch Policy and the **Underlying Insurance** that would preclude or limit

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 16

coverage for the Matters.  Arch reserves the right also to deny or limit coverage based on these terms, conditions and exclusions, including the right to deny or limit coverage based on terms, conditions and exclusions discussed in the letters to Ms. Lieberman from Leslie S. Ahari, Esq. of Ross, Dixon & Bell, LLP, on behalf of U.S. Specialty, dated November 10, December 7 and 13, 2005, and January 3 and 25, 2006.  Included among the reservations of rights discussed in those letters which Arch adopts and incorporates by reference are the following:

- The right to deny or limit payments under Insuring Agreements (B)(1) and/or (B)(2) pursuant to Condition (D)(4) of the **Primary Policy**, the Priority Of Payments Provision;

- The right to deny coverage for any person or entity who or which is not an **Insured**, including without limitation the right to deny coverage for any person who is not an **Insured Person** and for any entity other than Refco and its **Subsidiaries**, as those terms are in the **Primary Policy**[2];

- The right to deny or limit coverage based on the Insured v. Insured, dishonesty, and/or profit or advantage exclusions of the **Underlying Insurance**;

- The right to deny coverage for any amount that does not constitute **Loss** or is uninsurable as a matter of law, including but not limited to amounts paid as restitution or disgorgement, amounts attributable to intentional wrongdoing and/or intentional harm, and taxes, fines or penalties, and for punitive, exemplary or multiplied damages if uninsurable under the law of the jurisdiction applicable to the **Claim**;

- The right to deny coverage for **Loss** that does not result from a **Wrongful Act**, including without limitation **Loss** resulting from actual or alleged conduct undertaken other than in an insured capacity;

---

[2] We note that other than Refco and its **Subsidiaries**, the Policy does not provide coverage for any of the entities named as defendants in the Matters.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 17

- The right to deny or limit coverage, pursuant to Endorsement 14 of the U.S. Specialty Policy, for **Loss** in connection with a **Claim** arising out of, based upon or attributable to a Wells Notice or SEC Investigation;

- The right to deny or limit coverage for **Loss** pursuant to U.S. Specialty Policy Condition (G) to the extent that there is insurance other than the **Underlying Insurance** for such **Loss**;

- The right to deny coverage to the extent that the **Claims** are deemed to have been "first made" before the inception date of the Policy;

- The right to deny or limited coverage pursuant to the **Primary Policy**'s Pending and Prior Litigation Exclusion;[3] and

- The right to determine an appropriate allocation between covered **Loss** and uncovered loss pursuant to Condition (D)(3) of the **Primary Policy**.

In addition, Arch reserves the right to deny or limit coverage based on the January 14, 2005 warranty letter ("Warranty Letter") from Refco Group Ltd. LLC to Axis, which was signed by Mr. Bennett. The letter states, in relevant part:

> With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true:
>
> a.    No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT:

---

[3] Arch also reserves its rights under the Pending and Prior Litigation Exclusions in other **Underlying Insurance** and in the Arch Policy. *See, e.g.*, Arch Policy, Endorsement No. 1.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 18

        b.        No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation, or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.[4]

Arch reserves its right to deny coverage based on the Warranty Letter and the exclusion set forth therein to the extent they apply to the August 11, 2005 to August 11, 2006 policy period.

Arch also reserves the right to deny coverage for the Unjust Enrichment and Restitution, Quantum Meruit, Breach of Contract, Breach of Warranty, and Unfair Competition causes of action asserted in the American Financial Litigation to the extent, inter alia, that they do not allege a Wrongful Act, and to the extent they seek amounts that do not, as a matter of law, constitute Loss under the Policy, including but not limited to the disgorgement of funds to which Insured Persons are not legally entitled, and to loss arising from any defendant's alleged breach of contract.

---

[4] Refco attached to the Warranty Letter, and incorporated by reference after the word "EXCEPT" in part "a." of the letter, information regarding litigation captioned *Louis Capital Markets, L.P. v. Refco Group Ltd., LLC, et al.* The Louis Capital Markets litigation involves allegations of corporate espionage, tortious interference with business relations and breach of fiduciary duty, and appears unrelated to the receivables owed to Refco by an entity controlled by Mr. Bennett and the related party transactions that the Company disclosed in October 2005.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 19

### B.    DENIAL OF COVERAGE FOR THE CUSTOMER/ACCOUNT HOLDER LAWSUITS

In letters to Ms. Lieberman dated November 10 and December 7, 2005, U.S. Specialty's counsel denied coverage for the Customer/Account Holder Lawsuits on the grounds that (1) potential coverage for claims asserted against Refco entities under the **Primary Policy** is limited to **Securities Claims**, and none of the suits is a **Securities Claim**, and (2) even assuming the lawsuits were potentially within the scope of any of the Insuring Agreements, coverage would be excluded by the **Primary Policy**'s Errors and Omissions Exclusion. The same policy provisions and exclusion upon which U.S. Specialty based its denial of coverage apply to the potential coverage under the Arch Policy. For this reason, Arch adopts and incorporates by reference U.S. Specialty's coverage position with respect to the Customer/Account Holder Lawsuits. Arch also denies coverage for **Defense Costs** incurred in connection with the Customer/Account Holder Lawsuits based on the additional reason set forth above concerning the exclusion of such costs from the definition of Loss in the underlying Lexington Policy.

Even if coverage for the Customer/Account Holder Suits under the Arch Policy were not precluded on the grounds set forth above — which it is — there are numerous additional terms, conditions and exclusions of the policies and the **Underlying Insurance** that would preclude or limit coverage. Arch reserves the right also to deny or limit coverage based on these terms, conditions and exclusions, including but not limited to terms, conditions and exclusions discussed above in connection with Arch's reservation of its rights with respect to its denial of coverage for the **Claims** discussed in § III.A.

### C.    DENIAL OF COVERAGE FOR *BANKRUPTCY TRUST OF GERARD SILLAM V. REFCO GROUP LLC ET AL.*

In a letter to Ms. Lieberman dated December 1, 2005, U.S. Specialty's counsel noted that all of the **Primary Policy**'s potentially applicable insuring agreements apply only to **Claims** "first made" during the Policy Period, which is August 11, 2005 to August 11, 2006. The December 1st letter further noted that the complaint in the Sillam Action states that Mr. Sillam made demands and filed several lawsuits before the Policy's inception date, both in the United States and in

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 20

France, based on the same facts, circumstances, situations, transactions and events that are the subject of the Sillam Action. The letter also noted that, pursuant to the **Primary Policy**'s Interrelationship of **Claims** provision, the Sillam Action is considered to have been made at the time Mr. Sillam made those demands and filed those suits. Based on the above, U.S. Specialty concluded that the Sillam Action is a **Claim** that was "first made" before the **Primary Policy**'s inception date, and thus does not fall within the **Primary Policy**'s Insuring Agreements. U.S. Specialty also denied coverage for the Sillam Action on the grounds that it is excluded from coverage by the **Primary Policy**'s Prior and Pending Litigation Exclusion and denied coverage for the Refco entity defendants because the suit is not a **Securities Claim**.

The same policy provisions upon which U.S. Specialty based its denial of coverage apply to the potential coverage under the Arch Policy. For this reason, Arch adopts and incorporates by reference U.S. Specialty's coverage position with respect to the Sillam Action. Given the interrelated demands made and litigation filed prior to the inception of the Policy Period, Arch also denies coverage for the Sillam Action based on the Pending and Prior Litigation Exclusion set forth in Endorsement No. 1. of the Arch Policy and on the Arch Prior Knowledge or Information Exclusion. Finally, Arch also denies coverage for **Defense Costs** incurred in connection with the Sillam Action based on the exclusion of such costs from the definition of Loss in the underlying Lexington Policy, as discussed above.

Even if coverage for the Sillam Action were not precluded on the grounds set forth above — which it is — there are numerous additional terms, conditions and exclusions of the policies and the **Underlying Insurance** that would preclude or limit coverage. Arch reserves the right also to deny or limit coverage based on these terms, conditions and exclusions, including but not limited to terms, conditions and exclusions discussed above in connection with Arch's reservation of its rights with respect to its denial of coverage for the **Claims** discussed in § III.A., and including but not limited to the any additional reservations of rights set forth in the December 1, 2005 letter from U.S. Specialty's counsel, which Arch adopts and incorporates herein.

\* \* \*

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 21

　　　　To the extent that there is additional information or materials that you believe bear on the coverage issues outlined in this letter, Arch would be pleased to consider any additional materials that you may wish to submit. In the interim, this letter, as well as all past, present, and future communications, is sent pursuant to a complete reservation of all of Arch's rights under the Arch Policy, the underlying insurance, at law, and in equity, including, without limitation, the right to assert additional rights as the underlying carriers issue additional coverage letters. Please do not hesitate to contact us should you have any questions.

Sincerely,

Daniel J. Standish
Cara Tseng Duffield

Enclosure
cc:　　Claudia Cinardo (with enclosure)

Wiley Rein & Fielding LLP

## LIST OF MATTERS

### THE BENNETT CRIMINAL ACTION

*United States of America v. Bennett*, 05 MAG 1720
*United States of America v. Bennett*, November 11, 2005 Indictment

### THE CUSTOMER OR ACCOUNT HOLDER LAWSUITS

*BAC Int'l Bank v. Refco Capital Markets, Ltd.*
*Banco de America Central v. Refco Capital Markets, Ltd.*
*Banesco Holding C.A. et al. v. Refco, Inc. et al.*
*Markwood Investments v. Refco Capital Markets, Ltd. et al.,*
*Miura Fin. Serv. v. Refco, Inc. et al.*
*Multiplicas Casa de Bolsa v. Refco, Inc. et al.*
*Reserve Invest (CYPRUS) Ltd. v. Refco Capital Markets, Ltd. et al.*

### THE DERIVATIVE ACTION

*Mehta v. Bennett et al.*

### THE SECURITIES LITIGATION

*Baker v. Bennett et al.*
*Becker v. Refco, Inc. et al.*
*City of Pontiac General Employees Retirement System v. Bennett et al.*
*Frontpoint Fin. Serv., Inc. v. Refco, Inc. et al.*
*Glaubach v. Refco, Inc. et al.*
*Lieber v. Refco, Inc. et al.*
*Mettupatti v. Bennett et al.,*
*Nathanson v. Bennett et al.*
*Wakefield v. Refco, Inc. et al.*
*Sandra Weiss v. Refco, Inc. et al.*
*Todd Weiss v. Bennett et al.*
*Weit v. Bennett et al.*

### OTHER MATTERS

*American Financial International Group v. Refco, Inc. et al.*

Wiley Rein & Fielding LLP

*Bankruptcy Trust of Gerard Sillam v. Refco Group LLC et al.*, No. 05603931 (N.Y. Sup. Ct.)

*Bawag P.S.K. Bank v. Refco Inc. et al.*

CFTC Subpoena

*Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*

*Unovalores Ltd. v. Bennett*, No. L1564-05 (Sup. Ct. of New Jersey, Somerset County, Law Division)

Exhibit M

**BSWB**

Attorneys at Law

Chicago
New York
London

**Boundas, Skarzynski, Walsh & Black, LLC**

One Battery Park Plaza   22nd Floor   New York, New York 10004
P: 212 821 7750    F: 212 820 7740/7788    W: www.bswb.com

James A. Skarzynski, Esq.
Direct Dial 212 820 7720
Direct Fax 212 820 7775
jskarzynski@bswb.com

Cecilia W. Kaiser, Esq.
Direct Dial 212 820 7710
ckaiser@bswb.com

January 24, 2006

<u>**VIA E-MAIL & FIRST CLASS MAIL**</u>
Ms. Andrea Lieberman
Marsh USA
500 West Monroe Street
Chicago, Illinois 60661

Re:    Insured:    Refco, Inc.
        Issuing Co.:  XL Specialty Insurance Company
        Policy No.:  ELU089673-05
        <u>Our File No.:  13304</u>

Dear Andrea:

As you know, we have been retained by XL Specialty Insurance Company ("XL") to represent its interests in connection with Classic A-Side Management Liability Insurance Policy No. ELU089673-05 (the "Policy") issued to Refco, Inc. ("Refco") for the claims-made policy period of August 11, 2005 to August 11, 2006. We are directing this letter to you as the authorized insurance representative for all of the Insureds.[1] To the extent that you are not acting as the authorized representative for any of the Insureds, we ask that you please advise us and forward a copy of this letter to the appropriate party(ies).

On XL's behalf, this letter will acknowledge receipt of letters dated October 13, 2005, October 18, 2005, October 21, 2005, October 25, 2005, October 27, 2005, November 21, 2005 and November 30, 2005 from Marsh enclosing the complaints filed in the following matters (collectively, the "Lawsuits"):

(1)    *Glaubach v. Refco, Inc., et al.*, Case No. 05CV8692 (S.D.N.Y.);
(2)    *Frontpoint Financial Servs., Inc. v. Refco, Inc., et al.*, Case No.05CV8663 (S.D.N.Y.);
(3)    *Lieber v. Refco, Inc., et al.*, Case No. 05CV8667 (S.D.N.Y.);
(4)    *United States of America v. Bennett*, Case No. 05MAG1720 (S.D.N.Y.);
(5)    *Sandra Weiss v. Refco, Inc., et al.*, Case No. 05CV8691 (S.D.N.Y.);
(6)    *Mehta v. Bennett, et al.*, Case No. 05CV8748 (S.D.N.Y.);

---
[1] By "Insureds" we mean Refco and **Insured Persons**.

**BSWB**

Ms. Andrea Lieberman
January 24, 2006
Page 2

(7)   *Wakefield v. Refco, Inc., et al.*, Case No. 05CV8742 (S.D.N.Y.);

(8)   *Baker v. Bennett, et al.*, Case No. 05CV8923 (S.D.N.Y.);

(9)   *Becker v. Refco, Inc., et al.*, Case No. 05CV8929 (S.D.N.Y.);

(10)  *Nathanson v. Bennett, et al.*, Case No. 05CV8926 (S.D.N.Y.);

(11)  *American Financial Int'l Group – Asia, LLC v. Refco, Inc., et al.*, Case No. 05CV8988 (S.D.N.Y.);

(12)  *Mettupatti v. Bennett, et al.*, Case No. 05CV9048 (S.D.N.Y.);

(13)  *Todd Weiss v. Bennett, et al.*, Case No. 05CV9126 (S.D.N.Y.);

(14)  *Weit v. Bennett, et al.*, Case No. 05CV9611 (S.D.N.Y.);

(15)  *Bankruptcy Trust of Gerard Sillam, et al. v. Refco Group LLC, et al.*, Case No. 05/603931 (N.Y. Sup.);

(16)  *City of Pontiac General Employees' Retirement Sys. v. Bennett, et al.*, Case No. 05CV9941 (S.D.N.Y.); and

(17)  *BAWAG P.S.K. Bank Für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft v. Refco, Inc., et al. (In re Refco Inc., et al.)*, Case No. 05-60006 (Bankr. S.D.N.Y.).

## I.   The Litigation

### A.   The Securities Class Action Lawsuits

*Glaubach, Frontpoint, Lieber, Sandra Weiss, Wakefield, Baker, Becker, Nathanson, Todd Weiss, American Financial, Mettupatti, Weit* and *City of Pontiac* are purported shareholder class action lawsuits filed in the United States District Court for the Southern District of New York beginning in October 2005. With the exception of *American Financial*, each of these Lawsuits alleges violations of the federal securities laws.

*Glaubach, Becker, Nathanson* and *Mettupatti* are purportedly brought on behalf of a class of all purchasers of Refco securities, whereas *Frontpoint, Lieber, Sandra Weiss, Wakefield, Baker, Todd Weiss, Weit* and *City of Pontiac* are purportedly brought on behalf of a class of all purchasers of Refco common stock (collectively the "Securities Class Actions"). The purported class in *City of Pontiac* also specifically includes those who purchased bonds pursuant to Refco's August 5, 2004 bond offering. *American Financial* is purportedly brought on behalf of a class of persons who traded currencies through or had currency trading accounts with Refco F/X Associates, LLC ("Refco FX"), which is alleged to be the currency trading arm of Refco. With the exception of the class period alleged in *City of Pontiac*, the alleged class periods all commence on August 11, 2005 but vary in their ending dates from October 7, 2005 to October 18, 2005. The alleged class period in *City of Pontiac* runs from August 5, 2004 to October 18, 2005.

Both Refco and Refco Group Holdings, Inc. ("RGHI") are named in several of these complaints. The following individuals, who are identified as Refco directors and/or officers are also named in some or all of the Securities Class Actions: Philip Bennett, Gerald Sherer, Leo Breitman, Nathan Gantcher, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley and Scott Schoen. Other defendants

**BSWB**

named in the Securities Class Actions include Credit Suisse First Boston LLC, Goldman Sachs & Co., Banc of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith, Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc., Grant Thornton, LLP, Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blair & Co., LLC, Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Co., Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P. and Liberty Corner Capital.

The complaints in the Securities Class Actions generally allege that on August 11, 2005, Refco sold 26.5 million shares at $22 per share in its initial public offering ("IPO") for proceeds of $583 million. The complaints further allege that, in connection with the IPO, Refco filed a Form S-1 Registration Statement and Prospectus in August 2005, which were materially false and misleading. The *City of Pontiac* complaint additionally alleges that Refco's offering statement issued in connection with the August 2004 bond offering was false and misleading. As set forth in the complaints, just nine weeks after the IPO, on October 10, 2005, Refco revealed that Mr. Bennett, Refco's CEO, Chairman and controlling shareholder, owed Refco $430 million and was being placed on a leave of absence. Refco also acknowledged at that time that, based on the undisclosed related party transaction, its prior financial statements for the fiscal years ending 2002 through 2005 and the quarter ended May 31, 2005 should not be relied upon. As a result, the price of Refco's common stock fell $12.96 per share, or 45.3%, to close at $15.60 per share on October 10, 2005. The complaints allege that, following Refco's further announcement on October 11, 2005 that the $230 million receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties dating back to 1998, Refco's common stock fell further, to close at $13.85 per share on October 11, 2005, after a five-hour halt on trading Refco shares on the New York Stock Exchange ("NYSE") was lifted. The next day, the *Wall Street Journal* reported that Mr. Bennett had paid Liberty Corner Capital to help him hide hundreds of millions of dollars of debt to Refco and that the Securities Exchange Commission ("SEC") had launched an investigation. The same day, the United States Attorney for the Southern District of New York announced that Mr. Bennett had been arrested and charged in a criminal complaint with having defrauded investors in the IPO, and shares of Refco fell an additional $3.00 dollars per share, to close at $10.85 per share. On October 13, 2005, Refco announced that it had hired advisors and was imposing a 15-day moratorium on customer withdrawals at Refco Capital Markets, Ltd. Following this announcement, at which time Refco's stock was trading at $7.90 per share, the NYSE again imposed a trading halt. On October 17, 2005, Refco announced that it was filing for bankruptcy, after negotiating a deal to sell its primary business to a group led by J.C. Flowers & Co., LLC, and on October 18, 2005, the NYSE lifted the trading ban on Refco stock, which closed at $0.65 per share.

The Securities Class Actions complaints allege violations by the defendants of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5. The complaints seek class certification, unspecified damages and attorneys' fees and costs.

The complaint in *American Financial* alleges that, in connection with the above, on or about October 17, 2005, Refco FX advised plaintiffs and other purported class members that they could not deposit and/or withdraw funds from their currency trading accounts at Refco FX and that Refco FX did

**BSWB**

not know when customers would be able to resume deposits to and withdrawals from their accounts. The complaint in *American Financial* alleges fraud, misrepresentation, negligence, negligent misrepresentation, unjust enrichment, restitution, quantum meruit, breach of contract, breach of warranty and unfair competition against Mr. Bennett, Refco and Refco FX. As relief, the complaint in *American Financial* seeks class certification, unspecified rescissory and compensatory damages, equitable and/or injunctive relief, including the imposition of a constructive trust on defendants' assets and restriction of defendants' trading activities, and attorneys' fees and costs.

**B. The Shareholder Derivative Action**

*Mehta* is a shareholder derivative action also filed in the United States District Court for the Southern District of New York in October 2005. As defendants, the *Mehta* complaint names the following individuals, who are identified as directors and officers of Refco: Philip Bennett, William Sexton, Gerald Sherer, Joseph Murray, Leo Breitman, Nathan Gantcher, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley and Scott Schoen. Also named as defendants in the *Mehta* complaint are Credit Suisse First Boston LLC, Goldman Sachs & Co., Banc of America Securities, LLC, Deutsche Bank Securities, Inc., J.P. Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, L.P., and HSBC (the "IPO Defendants") and Thomas H. Lee Partners, L.P.

In connection with the same allegations contained in the Securities Class Actions, the *Mehta* complaint alleges the following counts against the individual defendants and Thomas H. Lee Partners: (1) breach of fiduciary duty; (2) abuse of control; (3) gross mismanagement; (4) waste of corporate assets; and (5) unjust enrichment. The *Mehta* complaint further alleges aiding and abetting against the IPO Defendants. In addition, the complaint alleges demand futility. As relief, the *Mehta* complaint seeks unspecified damages, equitable and/or injunctive relief, the imposition of a constructive trust on defendants' assets and restriction of defendants' trading activities, restitution, disgorgement, improved corporate governance and internal procedures and attorneys' fees and costs.

**C. The Criminal Complaint**

*United States of America v. Phillip Bennett* is a criminal complaint filed on October 12, 2005 in the United States District Court for the Southern District of New York, alleging one count of securities fraud, in violation of 15 U.S.C. §78j(b) (the "Criminal Complaint"). Specifically, the Criminal Complaint alleges that Mr. Bennett caused Refco to file a false and fraudulent S-1 Registration Statement with the SEC in August 2005, which failed to disclose hundreds of millions of dollars of transactions with and debts owed to Refco by RGHI, a company Mr. Bennett controlled. Moreover, the Criminal Complaint alleges that Mr. Bennett caused Refco to engage in a series of transactions designed to disguise the related-party nature of a $300 million-plus debt owed to Refco by RGHI by temporarily paying off the debt and transferring it from RGHI to another entity unrelated to Mr. Bennett and that this temporary re-positioning of debt was carried out so that the debt would not appear to be owed by RGHI over Refco's February 28, 2005 year-end. Additionally, the Criminal Complaint alleges that on October 10, 2005, Refco issued a press release announcing that it had discovered a $430 million debt owed by an entity controlled by Mr. Bennett, and that he had repaid the entire sum the same day, but that following

**BSWB**

this announcement, the market price of Refco stock fell from its October 7, 2005 closing price of $28.56 per share to its October 11, 2005 closing price of $13.85 per share, resulting in a market capitalization loss of over $1 billion. The Criminal Complaint charges Mr. Bennett with one count of securities fraud under 15 U.S.C. §78j(b).

### D. The *Sillam* Action

*Bankruptcy Trust of Gerard Sillam, et al. v. Refco Group LLC, et al.*, is an action based on business tort allegedly committed by the numerous defendant companies and their directors and/or officers on a worldwide basis, which seeks restitution for unjust enrichment allegedly conferred to the Refco Group of companies. The plaintiff is a French businessman, who alleges that he had filed a related complaint on September 8, 2004, also in the New York Supreme Court, against Refco Group and Mr. Bennett but "lost his capacity to sue for pecuniary losses," further to a September 28, 2004 order by a French tribunal and therefore brings the present action through his bankruptcy trust.[2] Based on the allegations in the *Sillam* complaint, the earlier complaint appeared to concern certain introductions and business contacts allegedly made by Mr. Sillam on behalf of the Refco companies for which Mr. Sillam asserts in this complaint that he was not paid.

As defendants, the complaint in *Sillam* names Refco Group, Refco Overseas Ltd. ("Refco Overseas") and RGHI (collectively, the "Refco Entities"), and the following individuals identified as directors and/or officers of Refco: Phillip Bennett, Thomas Lee, Scott Schoen, David Harkins, Gerald Sherer, Leo Breitman, Scott Jaeckel, Nathan Gantcher and Ronald O'Kelley. The complaint also names the following individuals identified as directors of Refco Overseas: Mark Slade, Julian Courtney, Richard Reinert, and David Campbell. Defendant Halim Saad is identified as a former Refco Overseas officer, and defendant Dennis Klejna is identified as the general counsel of Refco LLC. Also named as defendants are Grant Thornton, LLP; Liberty Corner Capital; Thomas H. Lee Partners, L.P. and Thomas H. Lee Partners Fund V; the NYSE; and the following financial institutions that are identified as having underwritten Refco's IPO: Credit Suisse First Boston LLC, Goldman Sachs & Co., Banc of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith, Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blair & Co., LLC, Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Co., Inc.,

---

[2] Mr. Sillam also alleges that numerous other, related actions have been pending for some time, to wit, "joint and several cases against [Refco Overseas Ltd.] and Refco Securities S.A. have been in progress since April 25, 2003 before the Commercial Court ('Tribunal de Commerce') in Paris at the request of Gerard Sillam" and "two criminal lawsuits, in the form of two writs have been issued against X at the High Court in Paris ('Tribunal de Grande Instance'), one by the Finance Section, for obtaining judgments by false pretenses and various related offenses which may have been committed before the courts in France during hearings before the 'Juge de l'Execution' (the judge handling the execution of judgments) of the High Court in Paris in April 2002 and before the 'Premier President' (chief presiding judge) of the Court of Appeals in Paris in November 2003." *Sillam*, ¶¶ 63-64. Mr. Sillam further alleges that he has filed "a criminal complaint with civil action regarding the essence of this case, namely possible breach of trust and fraud aggravated by receiving stolen goods," *id.* at ¶ 66, and refers to numerous other demands he has made, *see, e.g., id.* at ¶¶45, 47, 51, 60, 61, 70.

**BSWB**

Ms. Andrea Lieberman
January 24, 2006
Page 6

Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P (the "Underwriter Defendants").[3]

In a nutshell, the complaint in *Sillam* alleges that Mr. Sillam is owed money for helping the Refco Entities set up and develop their new securities business in Europe beginning in 1997. The *Sillam* complaint alleges that, relying on a letter dated September 1, 1997 from Halim Saad, director of Refco Overseas's institutional commercial trade office (the "September Contract Letter"), Mr. Sillam introduced Imad Lahoud to Refco Overseas and organized a meeting in the office of Mr. Lahoud's company, Investment Management Services ("IMS"). The Sillam complaint alleges that the September Contract Letter set out commissions and rebates payable to Mr. Sillam for acting as an introducing agent regarding Mr. Lahoud. The complaint further alleges that, as a result of this introduction, significant business relationships developed between Mr. Lahoud and Refco SA, the French affiliate of the Refco Group and that Refco Group, Refco Overseas and Refco SA benefited from the goodwill contribution of HL Gestion, which took over IMS's business. Additionally, the complaint alleges that on June 29, 1999, HL Holding (another company controlled by Mr. Lahoud) entered into a Memorandum of Understanding with Refco Global Holdings and Refco SA for the joint formation of Refco HL Securities to engage in the business of clearing French stocks and developing a clearing business for financial futures by Refco SA and HL Securities, an affiliate of HL Holding. The complaint alleges that Refco HL Securities took over the business and goodwill of IMS and HL Gestion. The complaint further alleges that, as soon as he learned of the negotiations for this business combination, Mr. Sillam contacted Mr. Saad and asserted his entitlement to commissions under the September Contract Letter. The complaint alleges that Mr. Saad pronounced the September Contract Letter null and void.

The complaint further alleges that Mr. Sillam accordingly undertook legal action to recover amounts allegedly owed to him under the September Contract Letter, including causing a writ to be served on Mr. Lahoud on October 16, 2000 and a summons to be forwarded to Mr. Bennett on November 15, 2000. Following the execution of a Merger Treaty among various Refco companies on November 28, 2000, the complaint alleges that Refco Group and Mr. Sillam met in December 2000. Mr. Sillam allegedly believed the meetings to be settlement discussions; it is alleged that they were, instead, intended to uncover Mr. Sillam's evidence in ongoing criminal proceedings involving Refco Group. The merger was completed in December 2000 or January 2001 and resulted in the formation of Refco Securities SA and the liquidation of SNC Refco Securities. The complaint states that Mr. Sillam sued Refco Overseas and Refco Securities SA in France in April 2003 and instituted various criminal complaints involving Refco Group, the Merger Treaty and the September Contract Letter, as well as a criminal complaint against Refco Overseas filed by Mr. Sillam in June 2005, alleging that the Refco Entities, Mr. Bennett, Mr. Lee, Mr. Schoen and Thomas H. Lee Partners, L.P. and Thomas H. Lee Partners Fund V, as well as Refco's auditors, Grant Thornton, issued false and fraudulent statements in disclosures filed with the French authorities prior to Refco's IPO. Additionally, the complaint alleges that the Underwriter Defendants and Grant Thornton failed to exercise due diligence in underwriting Refco's IPO.

---

[3] The NYSE and Liberty Corner Capital are alleged to be defendants in this action but are not included in the case caption. *See Sillam*, ¶¶ 90 & 92.

**BSWB**

The *Sillam* complaint asserts the following specific counts: (1) fraud against Refco Group, Mr. Bennett and Mr. Saad; (2) fraudulent misrepresentation against Refco Group and Mr. Bennett; (3) tortious interference with contract against Refco Group and Mr. Bennett; and (4) unjust enrichment against all defendants, other than Mr. Saad. As relief, the *Sillam* complaint seeks compensatory damages of $150 million, plus interest; punitive damages; restitution for unjust enrichment in the sum of $800 million, plus interest; and attorneys' fees and costs.

### E. The *BAWAG* Action

*BAWAG P.S.K. Bank Für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft v. Refco, Inc., et al. (In re Refco Inc., et al.)* ("*BAWAG*") is an adversary proceeding filed on November 16, 2005 by an Austrian Bank, BAWAG, in Refco's Chapter 11 bankruptcy proceeding. Named as defendants in *BAWAG* are Refco, Refco Group and 25 other Refco entities that are also debtors in the Refco bankruptcy, RGHI, Mr. Bennett, the Phillip R. Bennett Three Year Annuity Trust (the "Bennett Trust"), John Does 1-10 and XYZ Corporations 1-10.

The *BAWAG* complaint alleges that, after Refco completed its IPO on August 10, 2005, a Refco employee and/or Grant Thornton questioned whether a Refco receivable in the amount of $430 million had been properly accounted for as a third-party receivable when it appeared to be a related-party receivable from RGHI, which was privately held by Mr. Bennett. The *BAWAG* complaint further alleges that, by late September or early October 2005, Refco knew not only that the receivable was, in fact, a related-party receivable but also that it was likely impaired and not collectible. The complaint alleges that Refco and its related entities nevertheless undertook to support and assist Mr. Bennett in his effort to obtain a $420 million loan from *BAWAG*, which was to be used to repay the receivable. The complaint alleges that, on October 6, 2005, Mr. Bennett requested that BAWAG make the loan to RGHI and the Bennett Trust, and as inducement to make the loan, Mr. Bennett offered to pledge as collateral Refco stock then valued at over $1.2 billion that he, RGHI and the Bennett Trust owned. The complaint alleges that, following Mr. Bennett's urging, BAWAG wired €350 million into a Refco Capital Markets account at approximately 6 a.m. on October 10, 2005, secured by the pledged shares. The complaint further alleges that, less than two hours later, Refco issued a press release disclosing the $430 million receivable owed to Refco by a company controlled by Mr. Bennett and the repayment of the receivable in cash, that Refco's financial statements could no longer be relied upon and that Mr. Bennett would be placed on leave. The complaint alleges that at no time did the defendants disclose to BAWAG the facts relating to the receivable, the unreliability of Refco's financial statements, Mr. Bennett's imminent leave of absence, or the impending public disclosure of these facts. The complaint alleges that the defendants wrongfully and intentionally concealed the facts disclosed in the October 10 press release from BAWAG and had BAWAG been aware of any of the key facts set forth in that press release, it would not have made the loan. The complaint alleges that, as soon as BAWAG learned of press release, it immediately tried to stop the wire transfer but could not. On October 21, BAWAG delivered a notice of default under the loan asserting that misrepresentations and omissions had been made by the borrowers and demanding an immediate return of the funds. The complaint alleges that the shares pledged as collateral, which had been worth $1.2 billion, now trade for less than $1.00 per share.

**BSWB**

Based on the above, the complaint asserts seven causes of action: (1) imposition of a constructive trust against Refco, Refco Capital Markets and any John Doe and XYZ Corporation defendants in possession of the loan proceeds; (2) fraud in the inducement against Mr. Bennett, RGHI and the Bennett Trust; (3) fraud against Refco, Mr. Bennett and Refco Capital Markets; (4) civil conspiracy against Refco, Mr. Bennett, RGHI and the Bennett Trust; (5) unjust enrichment against Refco, Mr. Bennett, RGHI, the Bennett Trust, Refco Capital Markets, Refco Group and any John Doe and XYZ Corporation defendants in possession of the loan proceeds; and (7) conversion against Refco, Refco Capital Markets and any John Doe and XYZ Corporation defendants in possession of the loan proceeds. As relief, BAWAG seeks the imposition of a constructive trust on the loan proceeds, rescission, judgment of not less than €350 million, interest, punitive and exemplary damages, attorneys' fees and costs.

## II. Coverage Discussion

The Policy provides a $20 million maximum aggregate limit of liability, inclusive of **Defense Expenses**. XL has reviewed the Lawsuits for potential coverage under the Policy based on the information the Insureds have made available to it. Based on that information, XL is denying coverage for the Lawsuits, as explained below.

First, coverage for each of the Lawsuits is excluded by the Policy's Inverted Representation Endorsement, which provides:

> In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, from Claims arising from any fact, circumstance or situation of which, as of the effective date of this Policy, any Insured had knowledge and had reason to suppose might afford grounds for any Claim that would fall within the scope of the insurance afforded by this Policy.

> All other terms, conditions and limitations of this Policy shall remain unchanged.

*See* The Policy, End. No. 13. Based on allegations in the Securities Class Actions, the *Mehta* complaint, the Criminal Complaint, the *Sillam* complaint, the *BAWAG* complaint, and as admitted by Refco in its press releases, Mr. Bennett had knowledge as far back as 1998 of uncollectible historical obligations owed by third parties unrelated to Refco that make up the $430 million receivable, revelation of which is the subject of each of the Lawsuits. The effective date of the Policy is August 11, 2005. Given that Mr. Bennett (if not others) had knowledge of the hidden receivable as of August 11, 2005, the Policy's Inverted Representation Endorsement bars coverage for each of the Lawsuits.

Second, coverage under the Policy is only available for "a **Claim** first made against the **Insured Persons** during the **Policy Period** … for a **Wrongful Act**, except to the extent that such **Loss** is paid by any other **Insurance Program** or as indemnification from any source." *See* The Policy, I. Because it is not a **Claim** first made during the **Policy Period**, there is no coverage for the *Sillam* complaint under the Policy. The **Policy Period** of the Policy is August 11, 2005 to August 11, 2006. The *Sillam* complaint

**BSWB**

Ms. Andrea Lieberman
January 24, 2006
Page 9

makes clear that, before the Policy incepted on August 11, 2005, Mr. Sillam made several demands for monetary and non-monetary relief and filed lawsuits, both in the United States and in France, based on the same or related, or series of related, facts, circumstances, situations, transactions or events as those alleged in the *Sillam* complaint. *See Sillam* Complaint, ¶8 (referring to "a related complaint" filed in September 2004 in New York state court, alleging the same injuries alleged in the *Sillam* complaint); ¶45 (referring to a writ served in France in October 2000); ¶47 (referring to an "answering letter" dated November 6, 2000 demonstrating Mr. Bennett's knowledge of Mr. Sillam's claims); ¶48 (referring to a letter communicating summons and answer to Refco Group and Mr. Bennett); ¶51 (referring to a certified letter dated December 18, 2000 giving "formal notice" to SNC Refco Securities of Mr. Sillam's rights under the September Contract Letter); ¶60 (referring to Refco Overseas's January 10, 2001 letter rejecting Mr. Sillam's rights to commissions); ¶61 (referring to January 2001 $50,000 offer of settlement to Mr. Sillam); ¶63 (referring to litigation against Refco Overseas and Refco Securities SA in progress since April 2003 in France); ¶64 (referring to two criminal lawsuits filed in France in 2002 and 2003); ¶66 & Exh. L (referring to a "criminal complaint with civil action regarding the essence of [this] case" filed in France on March 4, 2004); and ¶70 (referring to a criminal complaint filed on June 30, 2005 in France alleging that Refco Overseas and Refco Securities filed false and misleading financial statements in relation to Refco's August 2005 IPO).

Third, even assuming the *Sillam* complaint was a **Claim** first made during the **Policy Period** – which it is not – coverage for the *Sillam* complaint would be excluded under the Policy's Pending and/or Prior Litigation Exclusion, which provides as follows:

> In consideration of the premium charged, no coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act, underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration which was brought prior to August 11, 2005.

> All other terms, conditions and limitations of this Policy shall remain unchanged.

*See* The Policy, End. No. 7. As detailed above, the *Sillam* complaint arises out of and is based upon the same facts, circumstances, situations, transactions, events or **Wrongful Acts** alleged in litigation filed prior to August 11, 2005. Therefore, coverage for the *Sillam* complaint would be excluded under the Policy's Pending and/or Prior Litigation Exclusion.

Fourth, to the extent that the *Sillam* complaint is based upon or arises out of conduct by any Insured prior to August 5, 2004, coverage for the *Sillam* complaint would be excluded under the Policy's Prior Acts Exclusion, which provides as follows:

> In consideration of the premium charged, no coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any act, error, omission, misstatement,

**BSWB**

Ms. Andrea Lieberman
January 24, 2006
Page 10

misleading statement, neglect, breach of duty, or Wrongful Act, committed or
allegedly committed prior to August 5, 2004.

*See* The Policy, End. No. 2.  As set forth above, the *Sillam* complaint arises out of alleged conduct by
several Insured Persons occurring prior to August 4, 2005, including Refco Overseas's and Mr. Saad's
refusal to honor the September Contract Letter beginning in 1999.  Therefore, coverage for the *Sillam*
complaint would be additionally excluded under the Policy's Prior Acts Exclusion.

Fifth, to the extent that the *Sillam* complaint is based on, arises out of, directly or indirectly
results from, is in consequence of, or in any way involves any fact, circumstance or situation,
transaction, event or **Wrongful Act** that was the subject of any notice given under any other insurance
policy before the inception date of the Policy, Exclusion (B)(2) of the Policy would exclude coverage
for the *Sillam* complaint.  *See* The Policy, V.(B)(2).

Sixth, to the extent that they constitute a **Claim**, the Securities Class Actions, the *Mehta*
complaint, the Criminal Complaint, the *Sillam* complaint, and the *BAWAG* complaint are deemed to be
one **Claim** as they appear to involve the same **Wrongful Acts** or **Interrelated Wrongful Acts** relating
to alleged misrepresentations concerning Refco's IPO.  *See* The Policy, IV.(G).  The Policy defines
**Interrelated Wrongful Acts** as "any Wrongful Act based on, arising out of, directly or indirectly
resulting from, in consequence of, or in any way involving any of the same or related, or series of
related, facts, circumstances, situations, transactions or events."  *See* The Policy, II.(J).  Based on
allegations in the *Sillam* complaint that Mr. Sillam filed an action in France in June 2005 against one or
more of the Insureds alleging that Refco's public filings in connection with its August 2005 IPO were
false and misleading, XL reserves its right to deny coverage for each of the Lawsuits as **Claims** first
made prior to the inception of the Policy and/or pursuant to the Policy's exclusions for Pending and/or
Prior Litigation and **Claims** noticed under prior insurance policies.

Based on the foregoing, XL is denying coverage for the Lawsuits.  Without prejudice to its
denial of coverage, XL specifically reserves the right to raise any other terms and conditions of the
Policy as defenses to coverage.

Please feel free to contact us with any questions.

Very truly yours,

James A. Skarzynski
Cecilia W. Kaiser

cc:    R. Damian Brew, Esq. (via email)

N:\13306\Correspondence\Coverage\Lieberman 1.doc

Exhibit N

Wayne E. Borgeest (WB-3034)
Joan M. Gilbride (JG-6238)
Robert A. Benjamin (RB-9891)
KAUFMAN BORGEEST & RYAN LLP
200 Summit Lake Dr
Valhalla, New York 10595
(914) 741-6100 (Telephone)
(914) 741-0025 (Facsimile)
wborgeest@kbrlaw.com
jgilbride@kbrlaw.com
rbenjamin@kbrlaw.com

*Attorneys for Axis Reinsurance Company*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                              :    Chapter 11
REFCO, INC., et al.,                                :    Case No. 05-60006(RDD)
                            Debtors.                :    (Jointly Administered)
------------------------------------------------------------x
AXIS REINSURANCE COMPANY,                           :
                                                    :
                            Plaintiff,              :
                                                    :
              v.                                    :    Adv. Proc. No. _____
                                                    :
PHILLIP R. BENNETT, LEO R. BREITMAN,                :
NATHAN GANTCHER, TONE GRANT,                        :
DAVID V. HARKINS, SCOTT L. JAECKEL,                 :
DENNIS A. KLEJNA, THOMAS H. LEE,                    :
SANTO C. MAGGIO, JOSEPH MURPHY,                     :
RONALD L. O'KELLEY, PERRY ROTKOWITZ,                :
SCOTT A. SCHOEN, WILLIAM M. SEXTON,                 :
GERALD SHERER, PHILIP SILVERMAN,                    :
ROBERT C. TROSTEN, AND DOES 1 TO 10,                :
                                                    :
                            Defendants.             :
------------------------------------------------------------x

591172_1                          1

## COMPLAINT

Axis Reinsurance Company ("Axis"), by and through its undersigned counsel, as and for its Complaint against defendants Phillip R. Bennett, Leo R. Breitman, Nathan Gantcher, Tone Grant, David V. Harkins, Scott L. Jaeckel, Dennis A. Klejna, Thomas H. Lee, Santo C. Maggio, Joseph Murphy, Ronald L. O'Kelley, Perry Rotkowitz, Scott A. Schoen, William M. Sexton, Gerald Sherer, Philip Silverman, and Robert C. Trosten (collectively "Insureds"), allege as follows upon personal knowledge as to its own acts and status, and upon information and belief as to all other matters:

### NATURE OF THE ACTION

1.      This action concerns an actual controversy between Axis and the Insureds, regarding a contract of excess directors, officers and corporate liability insurance between Axis and the Insureds.

2.      Refco, Inc. ("Refco"),[1] and at least some of its directors and officers, engaged in a massive fraud involving hundreds of millions of dollars.  Refco's insurers were also victims of this fraud.  The representations and documents Axis relied upon when evaluating the risk and deciding whether or not to insure Refco's directors and officers, turned out to be false.

3.      Axis bound coverage for an excess directors, officers and corporate liability insurance policy issued to Refco for claims made during the period from August

---

[1] The name "Refco," as used throughout this complaint, refers to Refco, Inc., the publicly traded company formed pursuant to the August 2005 initial public offering, as well as to Refco Group Ltd., LLC, the company through which Refco's business was primarily conducted prior to the IPO.  "Refco" also refers to subsidiaries of Refco, Inc. and Refco Group Ltd., LLC.

11, 2005 to August 11, 2006 (the "Axis Policy"). The Axis Policy follows the terms and conditions of the primary policy, or more restrictive underlying excess policy. The Axis Policy also contains its own terms and conditions which further restrict coverage otherwise provided by the primary or first excess policies.

4.      Since October 11, 2005, various lawsuits, governmental and/or regulatory investigations (the "Noticed Matters") involving certain individuals insured under the Axis Policy have been instituted and those individuals have sought coverage for the Noticed Matters under the Axis Policy.

5.      Axis denied coverage for the Noticed Matters on March 6, 2006, based on various terms and conditions of the Axis Policy, including a warranty received during the underwriting of the Axis Policy.

6.      Since March 6, 2006, Axis has received notice from certain of the Insureds of several other matters related to the Noticed Matters, and Axis has denied coverage for these other matters (the "Related Matters") based on various terms and conditions of the Axis Policy, including a warranty received during the underwriting of the Axis Policy.

7.      To date, none of the Insureds has responded to Axis's declination of coverage.

8.      Axis is the third layer of directors, officers and corporate liability insurance coverage. The two layers below Axis have reserved rights, but not declined coverage. Accordingly, the $10 million primary layer had been providing Insureds with reimbursement of defense costs.

9.     The primary layer has now exhausted its $10 million limit of liability, subject to its reservation of rights, through the payment of Insureds' defense costs. It is expected that the $7.5 million first excess insurer will exhaust its limit of liability, subject to its reservation of rights, through continued payment of Insureds' defense costs prior to the end of 2007.

10.     Once the first excess insurer exhausts its $7.5 million limit of liability, Axis expects that the Insureds will seek reimbursement of their defense costs from Axis. However, Axis has denied coverage based, in part, on specific terms and conditions present in the Axis Policy (including a warranty received during the underwriting of the Axis Policy) not present in the primary or first excess policy.

11.     Axis has also reserved the right to partially rescind the Axis Policy, and a prior directors, officers and corporate liability insurance policy issued to Refco by Axis.

12.     Axis seeks a declaration that the Axis Policy does not provide coverage to Insureds for the Noticed Matters or the Related Matters. Axis seeks this declaration given the following facts: (1) the likely exhaustion of the $7.5 million first excess limit of liability, ending the Insureds' reimbursement of defense costs; (2) the commencement of the criminal trial against certain of the Insureds; (3) increased litigation activity (and associated defense costs), including commencement of discovery, in certain of the Noticed Matters and Related Matters; and (4) possible settlement demands in one or more of the Noticed Matters or Related Matters.

13.     An actual controversy exists between Plaintiff and Defendants, and Plaintiff seeks a declaratory judgment or other relief from the Court resolving this dispute in its favor.

## JURISDICTION AND VENUE

14.     This adversary proceeding is brought pursuant to Rules 7001(1), (2), (7) and (9) of the Federal Rules of Bankruptcy Procedure, section 105 of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 105, et seq. (the "Bankruptcy Code") and 28 U.S.C. § 2201.

15.     This Court has jurisdiction over the parties and the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 2201.

16.     Venue is proper pursuant to 28 U.S.C. § 1409.

## PARTIES

17.     Axis is an insurance company that is organized and exists pursuant to the laws of the state of New York. Axis has its principal place of business in New York.

18.     Defendant Phillip R. Bennett ("Bennett") served as the Chairman, President and Chief Executive Officer of Refco until October 2005, when he took a leave of absence at the request of the Refco board of directors. Upon information and belief, Bennett is a citizen of New Jersey.

19.     Defendant Leo R. Breitman ("Breitman") served as a Director of Refco and member of the Audit Committee at times relevant to this action. Upon information and belief, Breitman is a citizen of Florida.

20.    Defendant Nathan Gantcher ("Gantcher") served as a Director of Refco and member of the Audit Committee at times relevant to this action. Upon information and belief, Gantcher is a citizen of New York.

21.    Defendant Tone Grant ("Grant") served as President and Chief Executive Officer of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Grant is a citizen of Illinois.

22.    Defendant David V. Harkins ("Harkins") served as a Director of Refco at times relevant to this action. Upon information and belief, Harkins is a citizen of Massachusetts.

23.    Defendant Scott L. Jaeckel ("Jaeckel") served as a Director of Refco at times relevant to this action. Upon information and belief, Jaeckel is a citizen of Massachusetts.

24.    Defendant Dennis A. Klejna ("Klejna") served as Executive Vice President and General Counsel of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Klejna is a citizen of Washington D.C..

25.    Defendant Thomas H. Lee ("Lee") served as a Director of Refco at times relevant to this action. Upon information and belief, Lee is a citizen of New York.

26.    Defendant Santo C. Maggio ("Maggio") served as President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd. at times relevant to this action. Upon information and belief, Maggio is a citizen of Florida.

27.    Defendant Joseph Murphy ("Murphy") served as Executive Vice President of Refco Group and was responsible for global marketing since 1999. Murphy was also

President of various Refco subsidiaries, including Refco Futures and Westminster Refco at times relevant to this action. Upon information and belief, Murphy is a citizen of New Jersey.

28.    Defendant Ronald L. O'Kelley ("O'Kelley") served as a Director of Refco at times relevant to this action. Upon information and belief, O'Kelley is a citizen of Florida.

29.    Defendant Perry Rotkowitz ("Rotkowitz") served as Secretary of Refco Capital LLC at times relevant to this action. Upon information and belief, Rotkowitz is a citizen of New York.

30.    Defendant Scott A. Schoen ("Schoen") served as a Director of Refco at times relevant to this action. Upon information and belief, Schoen is a citizen of Massachusetts.

31.    Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer of Refco at times relevant to this action. Sexton also briefly served as Chief Executive Officer of Refco. Upon information and belief, Sexton is a citizen of Iowa.

32.    Defendant Gerald Sherer ("Sherer") served as Executive Vice President and Chief Financial Officer of Refco at times relevant to this action. Upon information and belief, Sherer is a citizen of New York.

33.    Defendant Philip Silverman ("Silverman") served as Secretary of Refco Group Holdings, Inc. at times relevant to this action. Silverman also served as Secretary

of various Refco subsidiaries and Controller of Refco Group. Upon information and belief, Silverman is a citizen of New Jersey.

34. Defendant Robert C. Trosten ("Trosten") served as Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Trosten is a citizen of New Jersey.

35. The true names and capacities of DOES 1 to 10 are currently unknown to Plaintiff, and therefore, Plaintiff sues those Defendants by such fictitious names. Upon information and belief, each fictitiously named Defendant is an Insured which may seek coverage under the Axis Policy. Plaintiff is entitled to the relief sought herein against the fictitious Defendants, and therefore, sues these Defendants by such fictitious names. Plaintiff will seek leave to insert the true names and capacities of these fictitiously named Defendants, together with charging allegations, when obtained, if not already set forth herein.

## THE D&O INSURANCE POLICIES

36. The Axis Policy is an excess directors, officers and corporate liability policy. It has a policy period of August 11, 2005 to August 11, 2006 and a limit of liability of $10 million excess of $17.5 million in underlying insurance. A true, complete and accurate copy of the Axis Policy is attached as Exhibit A.

37. Various other insurers issued underlying insurance policies to Refco. U.S. Specialty Insurance Company (the "Primary Insurer") issued a primary policy with a limit of liability of $10 million excess of applicable self insured retentions (the "Primary Policy"). A true, complete and accurate copy of the Primary Policy is attached as Exhibit

B. Lexington Insurance Company (the "First Excess Insurer") issued a first excess policy with a limit of liability of $7.5 million excess of $10 million (the "First Excess Policy"). A true, complete and accurate copy of the First Excess Policy is attached as Exhibit C.

38.    Axis is aware of other policies issued to Refco which are excess of the Axis Policy. However, the terms and conditions of these policies are not relevant to this action.

39.    In general, the Axis Policy applies "in conformance with the provisions of the applicable Primary Policy and, to the extent coverage is further limited or restricted thereby, to [the First Excess Policy]." Axis Policy, Section I. However, the Axis Policy also contains its own provisions which further limit or restrict coverage otherwise provided by the Primary Policy or the First Excess Policy. The Axis Policy provides that "[i]n no event shall this Policy grant broader coverage than would be provided by the most restrictive policy constituting part of the applicable Underlying Insurance." *Id.*

40.    Subject to all of the terms and conditions, the Axis Policy affords five types of specified coverage. First, the Axis Policy insures covered loss incurred by the directors and officers of Refco and its subsidiaries for claims made against them if such loss is not indemnified by Refco. *See* Primary Policy, Insuring Agreement A. Coverage under Insuring Agreement A, and only coverage under Insuring Agreement A, is deemed non-rescindable. *See* Primary Policy, Endorsement 13.

41.    Second, the Axis Policy insures Refco and its subsidiaries to the extent they indemnify any directors or officers for covered loss in connection with claims made against the officers or directors. *See* Primary Policy Insuring Agreement B(1).

591172_1                    9

42.    Third, the Axis Policy insures Refco and its subsidiaries for covered loss in connection with "Securities Claims" (as defined in the Primary Policy) asserted against them. *See* Primary Policy, Insuring Agreement B(2).

43.    Fourth, the Axis Policy recognizes depletion of the Primary Policy's limit of liability as a result of the Primary Policy's $250,000 sub-limit for "Derivative Demand Investigative Costs" (as defined in the Primary Policy) incurred in connection with any derivative demand received by Refco's Board of Directors.    *See* Primary Policy Endorsement No. 11.

44.    Fifth, the Axis Policy insures the "Controlling Shareholder" (defined as Bennett in the Primary Policy) for covered loss incurred in connection with "Securities Claims" (as defined in the Primary Policy) asserted against him, provided one or more other individual insureds and/or Refco are, and remain, co-defendants in such "Securities Claim" along with the "Controlling Shareholder." *See* Primary Policy Endorsement No. 15.

45.    The Axis Policy (and the Primary and First Excess Policies) does not provide a duty to defend the insureds against claims made against them.  Instead, the Primary Policy provides that the "Insureds must defend any Claim made against them." Primary Policy Condition D(1).  The Primary Policy provides that the Primary Insurer will advance defense costs on an as-incurred basis in excess of the retention amount.  As a condition for advancement, the insureds have agreed that if "it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds

agree to repay such non-covered Defense Costs to the Insurer." Primary Policy, Condition (D)(2).

46.     Pursuant to this Court's March 27, 2006 Order in *In re Refco Inc.*, Case No. 05-60006 (Doc. No. 1567, Bankr. S.D.N.Y.), the Primary Insurer has been advancing defense costs to the insureds on an as-incurred basis.

47.     The First Excess Insurer has taken the position that the First Excess Policy does not provide coverage for defense costs in connection with claims otherwise covered under the Primary Policy.   Nevertheless, the First Excess Insurer has now agreed to advance defense costs, upon exhaustion of the Primary Policy's limit of liability, provided the insureds provide an undertaking – in the event it is determined that the First Excess Policy does not provide coverage for defense costs, each of the insureds must agree to repay defense costs advanced by the First Excess Insurer.  *See* July 26, 2006 letter on behalf of Lexington Insurance Company, attached as Exhibit D.

48.     In connection with the underwriting of the Axis Policy, Axis requested and received a warranty letter (the "Warranty") which provides as follows:

> (a) No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT: [Louis Capital Markets, LP v. Refco Group Ltd., LLC, et al.]

> (b) No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

> It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

The Warranty is dated January 14, 2005, and was signed by Phillip Bennett, "on behalf of all Insureds under the Policy," on January 21, 2005. A true, accurate, and complete copy of the Warranty is attached as Exhibit E.

49.    The Axis Policy contains a Manuscript Application Endorsement at Endorsement 5, stating:

> In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.
>
> Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 5 is marked effective August 11, 2005 and is dated September 11, 2005.

50.    The February 8, 2005 application (the "Application") submitted to Axis asks at Question 12:

> (a)    Have any claims been made during the last 5 years against any person or entity proposed for this insurance in his or her capacity as a director, officer or trustee of any corporation or organization? ___ Yes        ___ No
> If yes, please provide complete details (use a separate sheet of paper, if necessary):
>
> (b)    Is any person or entity proposed for this insurance aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he, she or it has reason to believe might result in a claim being made?
> ___ Yes ___ No
> If yes, please provide complete details (use a separate sheet of paper, if necessary):
>
> Without prejudice to any other rights of the Insurer, it is understood and agreed that the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b).

Neither box was checked for Questions 12(a) and 12(b). A true and accurate copy of the February 8, 2005 application (without attachments) is attached as Exhibit F.

51.  The Application was signed by Phillip Bennett on February 8, 2005. Under Bennett's signature, the following words appear, "Note: This Application must be signed by the President and/or CEO of the Applicant **acting as the authorized agent of the persons and entity(ies) proposed for this insurance.**" (emphasis added)

52.  The Axis Policy also contains a Knowledge Exclusion Endorsement at Endorsement 6 which states:

> In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, any Insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

Endorsement 6 is marked effective August 11, 2005 and is dated September 11, 2005.

53.  The Axis Policy provides, at Clause XI:

> The Insurer shall not be liable for any amount in any Claim taking place during the Policy Period and arising under any Insurance Product, which is based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:
>
> A.   Any demand, suit or other proceeding pending, or order, decree of judgment entered, against any Insured on or prior to the Pending or Prior Claim Date set forth in Item 7 of the Declarations [June 4, 2004] or any wrongful act, fact, circumstance or situation underlying or alleged therein; or
>
> B.   Any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

54.  On March 6, 2006, Axis disclaimed coverage for the Noticed Matters based on: (1) the Warranty; (2) the Manuscript Application Endorsement and question 12 of the Application; (3) the Knowledge Exclusion Endorsement; and (4) the claim made date.  A true, accurate, and complete copy of the March 6, 2006 letter denying coverage is attached as Exhibit G.

55.    At various times after March 6, 2006, Insureds provided Axis with notices of the Related Matters and Axis responded that each was related to the Noticed Matters for which Axis denied coverage.  Axis's response to each of the Related Matters was to incorporate the March 6, 2006 letter.

## THE REFCO SCANDAL

56.    The Axis Policy incepted on August 11, 2005.  On the same day, Refco conducted its initial public offering.

57.    Two months later, on October 10, 2005, Refco issued a press release.  The press release announced that Refco had been carrying an undisclosed receivable of $430 million from an entity controlled by Bennett.  Refco stated that "[b]ased on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible." Moreover, Refco stated that although the receivable "was reflected on the Company's prior period financials, as well as on the Company's May 31, 2005 balance sheet", the receivable "was not shown as a related party transaction in any such financials.  For that reason, and after consultation by the Audit Committee with the Company's independent accountants, the Company determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

58.    Many of these financial statements were part of the application Axis expressly relied upon when deciding whether or not to enter into the insurance contract.

59.    On October 11, 2005, Refco issued a second press release.  The press release announced that Bennett had repaid the $430 million receivable in full.  The press release also provided further information on the nature of the receivable: "Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998.  These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable from that entity, rather than a receivable from the originating accounts.  The fact that the receivable was from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual reporting periods by reason of transfers to a third party customer account that we currently believe is unaffiliated with Mr. Bennett or anyone else at the Company."

60.    On October 11, 2005, Refco filed the October 10, 2005 and October 11, 2005 press releases with the U.S. Securities and Exchange Commission (the "SEC").

61.    On October 17, 2005, Refco and certain of its unregulated subsidiaries filed for protection under Chapter 11 of the Bankruptcy Code.

62.    On November 10, 2005, Bennett was indicted on charges of securities fraud, conspiracy to commit securities fraud, false filings to the SEC, and wire fraud.  A true, accurate and complete copy of the publicly available indictment (the "Bennett Indictment") is attached as Exhibit H.

63.    According to the Bennett Indictment, Bennett "sought to hide from, among others, Refco's auditors and investors, losses sustained by Refco through its own and its customers' trading in the financial markets.   To that end, Bennett transferred losses from Refco to a company controlled by Bennett, directed a repeated series of transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make false and fraudulent public filings with the [SEC]." Bennett Indictment, at ¶ 4.

64.    The Bennett Indictment alleges that, as part of its brokerage business, Refco extended credit to customers for their securities and commodities trading.   When certain customers were unable to repay that credit, rather than noting the losses on Refco's balance sheet, Bennett directed the transfer of those losses to an entity called Refco Group Holdings, Inc. ("RGHI"), which he controlled.   As a result, Refco's balance sheet showed a receivable from RGHI.

65.    According to the Bennett Indictment, beginning in or around 1999, Bennett took steps to hide the RGHI receivable from Refco's auditors.   Specifically, Bennett arranged transactions with third parties to temporarily pay down the RGHI receivable at quarter- or year-end and mask the related-party nature of the RGHI debt.

66.    According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2004 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2004 Transactions"). On or about February 20, 2004, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $720 million to a Refco customer.   On the same day, the customer

loaned $720 million to RGHI. RGHI then used the $720 million to pay down its debt to Refco. These loans were unwound on or about March 4, 2004, after Refco's fiscal year-end.

68.    According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, ltd. would repay the customer $720 million if RGHI defaulted.

68.    According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2005 Transactions)". On or about February 23, 2005, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $345 million to a Refco customer. On the same day, the customer loaned $345 million to RGHI. RGHI then used the $345 million to pay down its debt to Refco. These loans were unwound on or about March 8, 2005, after Refco's fiscal year-end.

69.    According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $345 million if RGHI defaulted.

70.    According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal first quarter end for 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "May 2005 Transactions"). On or

about May 25, 2005, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $450 million to a Refco customer. On the same day, the customer loaned $450 million to RGHI. RGHI then used the $450 million pay down its debt to Refco. These loans were unwound on or about June 6, 2005, after Refco's fiscal first quarter-end.

71.    According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $450 million if RGHI defaulted.

72.    On October 24, 2006, Trosten was indicted on charges of conspiracy, securities fraud, and wire fraud. A true, accurate and complete copy of the publicly available indictment (the "Trosten Indictment") is attached as Exhibit I.

73.    According to the Trosten Indictment, Trosten "lied to Refco's auditors about the existence and size of related party debts and transactions between RGHI and Refco."

74.    According to the Trosten Indictment, Trosten "concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers."

75.    According to the Trosten Indictment, on or about April 27, 2004, Trosten "signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the

auditors." Nevertheless, on or about August 5, 2004, Bennett transferred approximately $48 million from RGHI to Trosten.

76.     In addition to the foregoing, Bennett and Trosten were not the only people at Refco who knew of the ongoing fraud.  On January 16, 2007, Grant was indicted on charges of conspiracy, securities fraud, wire fraud, bank fraud, and money laundering.  A true, accurate, and complete copy of the publicly available indictment (the "Grant Indictment") is attached as Exhibit J.

77.     On March 30, 2007, the government filed a memorandum of law detailing some of the evidence the government expected to introduce against Grant at trial.  A true, accurate, and complete copy of the government's memorandum of law (the "Grant Memo") is attached as Exhibit K.

78.     According to the Grant Memo, "by February 1999, prior to the close of Refco's fiscal year, Grant was fully briefed, in Refco's offices on the core issues of the fraud: the round-trip loan transactions set forth in the Indictment; that Refco had covered up several of the large losses set forth in the Indictment; and that Refco had been moving expenses (including a large portion of its computer expenses) off of Refco's books and on to the parent company's books."

79.     According to the Grant Memo, "[d]urring the interval between 1999 and 2004, the evidence will show that Grant continued to discuss with Sandy Maggio, a Refco executive, the continuing financial problems at Refco, including continued rolling fails, where Refco, because it was using customer money to cover its financial losses, purposefully failed to cover its daily cash obligations to its creditors."

80.    According to the Grant Memo, "in May 2004, prior to the LBO, Bennett met with Grant for the purpose of fully discussing with him the structure of the LBO and how, through the LBO, Bennett and Grant were going to deal with the more than $1 billion debt that they (as owners of RGHI) owed to Refco."

81.    According to the Grant Memo, "Grant was a knowing and active participant from as early as 1997, had full knowledge of the means used to hide Refco's losses as of at least February 1999, and stood to reap a 50% share of the rewards of the fraud if it were successful. Between 1999 and 2004, while Grant had no day-to-day role in running Refco, he was intermittently briefed by Bennett and Santo Maggio, another Refco executive, on the status of Refco's ongoing economic troubles, including on the status of the massive debt from RGHI to Refco."

82.    The Grant Memo further notes that Grant "was not on the periphery of the fraud, he was a founding member and had full knowledge of its methods by 1999."

83.    According to the Grant Memo, the government expects Maggio to testify that "on several occasions prior to the May 2004 meeting between Grant and Bennett, Maggio expressed concern to Bennett about the increasingly dire financial circumstances at Refco. In response, Bennett told Maggio, in substance and in part, that he was keeping Grant abreast of ths [sic] situation at Refco (including that the company's situation was not as reflected on its books), and that Maggio was not alone in that he, Grant and Bennet [sic] were /in [sic] it together.6 [sic] Bennett further stated, in substance, that if the fraud were to be discovered, Bennett told Grant that Bennett was not going to be alone (e.g., Grant would be responsible as well)."

84.    Based on his knowledge of the RGHI receivables to Refco, the February 2004 Transactions, the February 2005 Transactions, the May 2005 Transactions, the allegations in the Trosten Indictment and the allegations in the Grant Memo, as of August 11, 2005, Bennett possessed knowledge of facts, circumstances, situations, transactions, or events, which he had reason to suppose might give rise to a "claim" (as that term is defined in the Primary Policy) that would fall within the scope of the insurance afforded by the Axis Policy.

85.    Based on his knowledge of the RGHI receivables to Refco, the February 2004 Transactions, the allegations in the Trosten Indictment, and the allegations in the Grant Memo, as of January 14, 2005, Bennett possessed knowledge of facts, circumstances, situations, acts, errors or omissions which he had reason to suppose might afford grounds for a "claim" (as that term is defined in the Primary Policy) such as would fall within the scope of the Axis Policy.

86.    Based on his knowledge of the RGHI receivables to Refco, the February 2004 Transactions, the February 2005 Transactions, the allegations in the Trosten Indictment, and the allegations in the Grant Memo, as of February 8, 2005, Bennett was aware of facts, circumstances or situations involving Refco which Bennett had reason to believe might result in a "claim" (as that term is defined in the Primary Policy) being made.

**THE NOTICED MATTERS AND THE RELATED MATTERS**

87.    Beginning on October 11, 2005, various lawsuits were filed against the Defendants.

591172_1                                21

88.     On October 13, 2005, Axis received notice of <u>Frontpoint Financial</u>
<u>Services Fund, LP, On Behalf of Plaintiff and All Others Similarly Situated v. Refco.</u>
<u>Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L.</u>
<u>Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First</u>
<u>Boston LLC, Goldman, Sachs & Co.</u>, No. 05-cv-08663-GEL, (S.D.N.Y. 10/11/05).

89.     On October 13, 2005, Axis received notice of <u>Jonathan Glaubach,</u>
<u>Individually and on Behalf of all Others Similarly Situated v. Refco Inc., Phillip R.</u>
<u>Bennett, Gerald Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L.</u>
<u>Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen</u>, No. 05-cv-08692,
(S.D.N.Y. 10/12/05).

90.     On October 13, 2005, Axis received notice of <u>Miriam Lieber, Individually</u>
<u>And On Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald</u>
<u>M. Sherer, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America</u>
<u>Securities, LLC., Merrilly Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank</u>
<u>Securities, Inc., J.P. Morgan Securities Inc., and Grant Thornton LLP</u>, No. 05-cv-08667-
LAP, (S.D.N.Y. 10/12/05).

91.     On October 13, 2005, Axis received notice of <u>United States of America v.</u>
<u>Phillip R. Bennett</u>, No. 05-MAG-1720, (S.D.N.Y. 10/12/05).

92.     On October 27, 2005, Axis received notice of <u>Todd Weiss, Individually</u>
<u>and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M.</u>
<u>Sherer</u>, No. 05-cv-08691-GEL, (S.D.N.Y. 10/12/05).

93.    On October 18, 2005, Axis received notice of Varun Mehta, Derivatively on Behalf of Refco Inc. v. Phillip R. Bennett, William J. Sexton, Gerald M. Sherer, Joseph J. Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston, Goldman, Sachs & Co., Banc Of America Securities LLC, Deutsche Bank Securities, JP Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, L.P., HSBC And Thomas H. Lee Partners, L.P., and Refco, Inc., A Delaware corporation, No. 05-cv-08748, (S.D.N.Y. 10/14/05).

94.    On October 18, 2005, Axis received notice of Anthony L. Wakefield, Individually and on Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald J. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc Of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Inc. Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blaire & Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., and Utendahl Capital Partners, L.P., No. 05-cv-08742-GEL, (S.D.N.Y. 10/14/05).

95.    On October 28, 2005, Axis received notice of Banesco Holding C.A., Banesco International Bank Corp., Banesco International Bank Inc. and Banesco Banco Universal C.A. Panama Branch v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603681 (Supreme Court of New York, 10/17/05).

96.     On October 28, 2005, Axis received notice of <u>Miura Financial Services v.</u> <u>Refco, Inc. and Refco Capital Markets, Ltd.</u>, No. 05603682 (Supreme Court of New York, 10/17/05).

97.     On October 28, 2005, Axis received notice of <u>Multiplicas Casa De Bolsa</u> <u>v. Refco, Inc. and Refco Capital Markets, Ltd.</u>, No. 05603683 (Supreme Court of New York, 10/17/05).

98.     On October 21, 2005, Axis received notice of <u>Jacob Baker, Individually</u> <u>and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M.</u> <u>Sherer</u>, No. 05-cv-08923, (S.D.N.Y. 10/19/05).

99.     On October 21, 2005, Axis received notice of <u>Craig Becker, On Behalf of</u> <u>Himself and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M.</u> <u>Sherer, Leo R. Brietman, David H. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L.</u> <u>O'Kelley, Scott A. Schoen, Grant Thornton, LLP, Credit Suisse First Boston LLC,</u> <u>Goldman, Sachs & Co., Banc of America Securities LLC, Liberty Corner Capital, Refco</u> <u>Group Holdings Inc.</u>, No. 05-cv-08929-GEL, (S.D.N.Y. 10/20/05).

100.    On October 21, 2005, Axis received notice of <u>Bruce Nathanson,</u> <u>Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald</u> <u>M. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel,</u> <u>Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton LLP, Credit</u> <u>Suisse First Boston, Goldman, Sachs & Co., Banc of America Securities LLC, Merrill</u> <u>Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., JP Morgan</u>

Securities Inc., Liberty Corner Capital, and Refco Group Holdings Inc., No. 05-cv-08926-GEL, (S.D.N.Y. 10/20/05).

101.    On October 25, 2005, Axis received notice of American Financial International Group – Asia, LLC, individually and on behalf of all other similarly situated v. Refco, Inc., Refco F/X Associates, LLC, Phillip R. Bennett and Does 1 through 50, et al., No. 05-cv-08988-PKC, (S.D.N.Y. 10/21/05).

102.    On October 25, 2005, Axis received notice of Ravindra Mettupatti v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David Harkins, Scott L. Jaeckel, Thomas Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Deutsche Bank Securities Inc., JP Morgan Securities Inc., Pierce, Fenner & Smith Inc., No. 05-cv-09048, (S.D.N.Y. 10/24/05).

103.    On October 27, 2005, Axis received notice of Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-09126, (S.D.N.Y. 10/26/05).

104.    On November 21, 2005, Axis received notice of Bankruptcy Trust Of Gerard Sillam, Gerard Sillam v. Refco Group LLC, Refco Overseas Ltd., Phillip Bennett, Refco Group Holdings Inc, Liberty Corner Capital, New York Stock Exchange Inc, Grant Thornton LLP, Grant Thornton UK LLP, Thomas H Lee Partners LP, Thomas H Lee Partners Fund V, Thomas H Lee, Scott A Schoen, David V Harkins, Gerald M Sherer, Leo R Breitman, Scott Jaeckel, Nathan Gantcher, Ronald O Kelley, Halim Saad, Dennis A Kleina, Mark Slade, Julian Courtney, Richard Reinert, David Campbell, Credit Suisse

First Boston LLC, Goldman Sachs & Co, Bank Of America Securities LLC, Merrill Lynch Pierce Fenner & Smith Inc, Deutsche Bank Securities Inc, JP Morgan Securities Inc, Sandler O Neil & Partners LP, HSBC Securities USA Inc, William Blair & Company LLC, Harris Nesbitt Corp, CMG Institutional Trading LLC, Samuel A Ramirez & Company Inc., Muriel Siebert & Co Inc, The William Capital GLP, Utendahl Capital Partners, et al., No. 05603931 (Supreme Court of New York 11/04/05).

105.   On November 21, 2005, Axis received notice of Scott K. Weit, Individually and On Behalf of All Others Similarly Situated v Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Credit Suisse First Boston, Goldman, Sachs & Co., Grant Thornton LLP, Banc of America Securities LLC, Merrill Lynch Pierce, Fenner & Smith Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blair & Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., Liberty Corner Capital, and Refco Group Holdings, Inc., No. 05-cv-09611-GEL, (S.D.N.Y. 11/11/05).

106.   On November 30, 2005, Axis received notice of Bawag P.S.K. Bank Für Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft v. Refco, Inc.; Refco Group Holdings, Inc.; The Phillip R. Bennett Three Year Annuity Trust; Refco Capital Markets, Ltd.; Refco Group Ltd., LLC; Bersec International LLC; Kroeck & Associates, LLC; Marshall Metals LLC; New Refco Group Ltd., LLC; Refco

Administration LLC; Refco Capital LLC; Refco Capital Holdings LLC; Refco Capital Management LLC; Refco Capital Trading LLC; Refco Finance Inc.; Refco Financial LLC; Refco Fixed Assets Management LLC; Refco F/X Associates LLC; Refco Global Capital Management LLC; Refco Global Finance Ltd.; Refco Global Futures LLC; Refco Global Holdings LLC; Refco Information Services LLC; Refco Mortgage Securities, LLC; Refco Regulated Companies, LLC; Summitt Management, LLC; Refco Securities LLC; Refco Clearing LLC; Phillip R. Bennett; John Does 1-10; And XYZ Corporations 1-10, The Last Two Names Being Fictitious, Inc., et al., No. 05-03161-rdd (Bankr. S.D.N.Y., 11/16/05).

107.    On November 30, 2005, Axis received notice of Markwood Investments v. Refco Capital Markets, Ltd. and Refco Securities LLC, No. 05-03166-rdd (Bankr. S.D.N.Y., 11/17/05).

108.    On November 30, 2005, Axis received notice of Banco De America Central, S.A. v. Refco Capital Markets, Ltd., No. 05-03171-rdd (Bankr. S.D.N.Y., 11/18/05).

109.    On November 30, 2005, Axis received notice of BAC International Banks, Inc. v. Refco Capital Markets, Ltd., No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05).

110.    On November 30, 2005, Axis received notice of Reserve Invest (Cyprus) Ltd. v. Refco Capital Markets, Ltd., Michael W. Morrison, and Richard Heis, Michael W. Morrison, and Richard Heis, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

111.    On November 30, 2005, Axis received notice of City of Pontiac General Employees' Retirement System, On Behalf of Itself and All Others Similarly Situated v.

Phillip R. Bennett, Thomas H. Lee Partners, L.P., Thomas H. Lee, Gerald M. Sherer,

Scott A. Schoen, Bank of America Corp., Banc of America Securities LLC, Deutsche

Bank AG, Deutsche Banc Securities, Inc., Credit Suisse Group, Credit Suisse First

Boston LLC, Goldman Sachs Group, Inc., Goldman Sachs & Co., J.P. Morgan Securities,

Inc., J.P. Morgan Chase & Co., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill

Lynch & Co., Inc. Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC

Holdings plc and Grant Thornton LLP, No. 05-cv-09941, (S.D.N.Y. 11/23/05).

   112. Axis responded to each of the notices received in paragraphs 88 through

111 (the "Noticed Matters") by letter from Axis's counsel on March 6, 2006.  A true,

accurate and complete copy of this letter was previously attached as Exhibit G.

   113. The March 6, 2006 letter noted that the Noticed Matters were interrelated,

as that term is defined in Condition (C) of the Primary Policy, because all of the Noticed

Matters arise out of the financial fraud allegedly orchestrated by Mr. Bennett, and others

whereby unreported loans were made between various entities in an effort to disguise

financial losses.  Accordingly, the Noticed Matters constitute a single "claim," as that

term is defined in the Primary Policy.

   114. The March 6, 2006 letter denied coverage for the Noticed Matters based

on the January 14, 2005 Warranty.

   115. The March 6, 2006 letter denied coverage for the Noticed Matters based

on the Manuscript Application Endorsement and question 12 of the Application.

   116. The March 6, 2006 letter denied coverage for the Noticed Matters based

on the Knowledge Exclusion Endorsement in the Axis Policy.

117.    The March 6, 2006 letter denied coverage for the Noticed Matters based on the claim made date.

118.    The March 6, 2006 letter reserved the right to rescind the Axis Policy and an earlier D&O policy issued by Axis to Refco.

119.    The March 6, 2006 letter reserved the right to deny coverage based on various other terms and conditions of the Axis Policy.

120.    After denying coverage for the Noticed Matters on March 6, 2006, Axis continued to receive notice of additional matters related to the Noticed Matters.

121.    On March 14, 2006, Axis received notice of <u>Klaus Gensheimer, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Thomas H. Lee Partners, L.P., Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Joseph J. Murphy, William M. Sexton, Santo C. Maggio, Dennis Klejna, Perry Rotkowitz, Credit Suisse First Boston LLC, Credit Suisse First Boston, Goldman Sachs & Co., Goldman Sachs Group Inc., Grant Thornton LLP, Banc of America Securities LLC, Bank of America Corp., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc., Deutsche Bank Securities Inc., Deutsche Bank AG, J.P. Morgan Securities Inc., J.P. Morgan Chase & Co., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc, William Blair & Company LLC, Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co. Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., Liberty Corner Capital Strategies LLC, and Refco Group Holdings, Inc.</u>, No. 05-cv-10318 (S.D.N.Y.

12/8/05). On March 27, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

122.    On March 14, 2006, Axis received notice of <u>Teachers' Retirement System of the State of Illinois, Bumper Fund L.P., Irwin Geduld IRA, as Trustee and as Partner of Geduld Capital Management, Brookstreet Securities Corp., and City of Pontiac General Employees' Retirement System, On Behalf of Themselves and All Others Similarly Situated v. Thomas H. Lee, Scott A. Schoen, David V. Harkins, Ronald L. O'Kelley, Scott L. Jaeckel, Thomas H. Lee Partners, L.P., Phillip R. Bennett, Refco Group Holdings, Inc., Gerald M. Sherer, Dennis A. Klejna, Robert Trosten, Nathan Gantcher, Leo R. Breitman, William M. Sexton, Santo Maggio, Liberty Corner Advisors, Liberty Corner Capital, Liberty Corner Capital Strategies, Terry Pigott, Grant Thornton LLP, Mark A. Ramler, Banc of America Securities LLC, Bank of America Corp., eutsche Bank Securities Inc., Deutsche Bank AG, Credit Suisse First Boston LLC, Goldman Sachs Group, Inc., Goldman Sachs & Co., J.P. Morgan Securities, Inc., J.P. Morgan Chase & Co., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc, Joseph P. Collins, and Mayer Brown, Rowe & Maw, LLP.,</u> No. 05-cv-10403 (S.D.N.Y. 12/12/05). On March 27, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the

Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

123. On May 10, 2006, Axis received notice of Global Management Worldwide Limited, Individually and on Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Thomas H. Lee Partners, L.P., Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Joseph J. Murphy, William M. Sexton, Santo C. Maggio, Dennis Klejna, Perry Rotkowitz, Thomas H. Lee Partners, L.P., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Credit Suisse Group, Credit Suisse First Boston, Goldman Sachs & Co., Goldman Sachs Group Inc., Banc of America Securities LLC, Bank of America Corp., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc., Grant Thornton LLP, J.P. Morgan Securities Inc., J.P. Morgan Chase & Co., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc, William Blair & Company LLC, Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., and Refco Securities LLC, No. 06-cv-00643, (S.D.N.Y. 1/26/06). On July 10, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

124. On May 10, 2006, Axis received notice of In re Refco Inc., et al. - Leo A. Breitman Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis

denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

125.    On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - David V. Harkins Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

126.    On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - Ronald O'Kelley Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

127.    On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - Nathan Gatcher Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

128.    On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - Scott L. Jaeckel Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in

Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

129. On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - Scott A. Schoen Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

130. On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - Thomas H. Lee Partners, L.P. Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

131. On May 10, 2006, Axis received notice of <u>In the Matter of Refco Inc. - Subpoena of Thomas H. Lee Partners, L.P. for Production of Documents Pursuant to Rule 8</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

132. On May 10, 2006, Axis received notice of <u>Global Management Worldwide Limited v. Refco Capital Markets, Ltd.</u>, No. 05-03144 (Bankr. S.D.N.Y 11/11/05). On May 15, 2006, Axis denied coverage for this matter noting that it was

interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

133. On June 16, 2006, Axis received notice of the amended complaint in In re Refco, Inc. Securities Litigation, No. 05-cv8626 (S.D.N.Y. 5/5/06). On June 5, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

134. On June 26, 2006, Axis received notice of Gary L. Franzen v. IDS Futures Corporation, Refco Commodity Management, Inc., No. 06-cv-03012 (N.D.Ill. 6/1/06). On July 10, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

135. On March 9, 2006, Axis received notice of Arch Insurance Company v. Phillip R. Bennett, Leo R. Breitman, Nathan Gantcher, Tone Grant, David V. Harkins, Scott L. Jaeckel, Dennis A. Klejna, Thomas H. Lee, Santo C. Maggio, Joseph Murphy, Ronald L. O'Kelley, Perry Rotkowitz, Scott A. Schoen, William M. Sexton, Gerald Sherer, Philip Silverman and Robert C. Trosten, No. 600805/06 (N.Y. Supp. 3/9/06). On October 12, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.

Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

136.    On November 3, 2006, Axis received notice of an SEC inquiry into Refco, Inc.    On January 8, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.    Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

137.    On November 3, 2006, Axis received notice of In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, No. 06-cv-0643 (S.D.N.Y. 1/26/06).    On January 8, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.    Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

138.    On November 3, 2006, Axis received notice of Thomas H. Lee Equity Fund V, LP et al, No. 05-cv-09608 (S.D.N.Y. 11/14/05).    On January 8, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.    Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

139.    On January 27, 2007, Axis received notice of United States of America v. Phillip R. Bennett, Robert C. Trosten and Tone N. Grant, No. S3 05-cr-1192 (S.D.N.Y. 1/16/07).    On February 20, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the

Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

140.    Each of the matters identified in paragraphs 121 through 139 (the "Related Matters") is interrelated, as that term is defined in the Primary Policy, with each of the other Related Matters and with the Noticed Matters.  Axis has denied coverage for each of the Related Matters based on the same reasons enumerated in the March 6, 2006 letter.

## PRIOR LITIGATION

141.    Refco was previously involved in litigation involving the same scheme of improperly shifting client funds between related party accounts – the same type of transactions that Refco allegedly used to hide the fraud alleged in the Noticed Matters and the Related Matters.

142.    Refco was involved in a CFTC enforcement action which alleged that Refco used funds in client accounts to pay off its own debts (the "1994 CFTC Action").  In 1994, the CFTC fined Refco $1.2 million and Refco promised to stop unlawfully commingling funds.  As discussed in an October 13, 2005 article available from Bloomberg Newswires, according to the CFTC at the time, Refco improperly availed itself of as much as $123 million in client funds on an "almost daily basis" in order to pay off debts owed by Refco Capital.

## COUNT I

## DECLARATORY JUDGMENT THAT THE AXIS WARRANTY BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

143.    Axis incorporates by reference each of the allegations contained in paragraphs 1 thorough 142 above.

144.    As alleged herein, as of January 14, 2005, Bennett possessed knowledge of facts, circumstances, situations, acts, errors or omissions which he had reason to suppose might afford grounds for a "claim" (as that term is defined in the Primary Policy) such as would fall within the scope of the Axis Policy.

145.    The Noticed Matters and the Related Matters constitute a "claim" (as that term is defined in the Primary Policy) arise therefrom.

146.    The Warranty provides that "It is agreed by the undersigned **on behalf of all Insureds under the Policy**, that with respect to the above statements, that if such knowledge exists, **any claim arising therefrom is excluded** from the proposed insurance." (emphasis added).  Accordingly, Bennett's knowledge excludes coverage for all Insureds.

147.    Axis seeks a declaration that as a result of the Axis Warranty, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

### COUNT II

### DECLARATORY JUDGMENT THAT THE AXIS MANUSCRIPT APPLICATION ENDORSEMENT AND QUESTION 12 OF THE APPLICATION BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

148.    Axis incorporates by reference each of the allegations contained in paragraphs 1 thorough 147 above.

591172_1                              37

149.    As alleged herein, as of February 8, 2005, Bennett was aware of facts, circumstances or situations involving Refco which Bennett had reason to believe might result in a "claim" (as that term is defined in the Primary Policy) being made.

150.    The Noticed Matters and the Related Matters constitute a "claim" (as that term is defined in the Primary Policy) arising out of, based upon or attributable to such facts, circumstances or situations.

151.    The Application notes that it "must be signed by the President and/or CEO of the Applicant **acting as authorized agent** of the persons and entity(ies) proposed for this insurance." (emphasis added).   Accordingly, Bennett's knowledge, and failure to make the necessary disclosures pursuant to Question 12 of the Application, exclude coverage for all Insureds.

152.    Axis seeks a declaration that as a result of Axis Manuscript Application Endorsement and question 12 of the Application, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

## COUNT III

### DECLARATORY JUDGMENT THAT THE AXIS KNOWLEDGE EXCLUSION ENDORSEMENT BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

153.    Axis incorporates by reference each of the allegations contained in paragraphs 1 thorough 152 above.

154.    As alleged herein, as of August 11, 2005, Bennett possessed knowledge of facts, circumstances, situations, transactions, or events, which he had reason to suppose

might give rise to a "claim" (as that term is defined in the Primary Policy) that would fall within the scope of the insurance afforded by the Axis Policy.

155.    The Noticed Matters and the Related Matters consist of "claims" (as that term is defined in the Primary Policy) based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving such facts, circumstances, situations, transactions or events.

156.    The Knowledge Exclusion excludes coverage for "claims" (as that term is defined in the Primary Policy) based upon, etc. "which as of the inception date of the Policy Period, **any Insured** had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy." (emphasis added).    Accordingly, Bennett's knowledge, or the knowledge of *any* insured, excludes coverage for all insureds.

157.    Axis seeks a declaration that as a result of the Axis Knowledge Exclusion Endorsement, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

## COUNT IV

### DECLARATORY JUDGMENT THAT CLAUSE XI OF THE AXIS POLICY BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

158.    Axis incorporates by reference each of the allegations contained in paragraphs 1 thorough 157 above.

159.    As alleged herein, Clause XI of the Axis Policy excludes coverage for any "claim" (as that term is defined in the Primary Policy) based upon, arising out of, directly

or indirectly resulting from, in consequence of or in any way involving, any demand, suit or other proceeding, on or prior to June 4, 2004, or any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation occurring on or prior to June 4, 2004, are causally or logically interrelated by a common nexus.

160.    The Noticed Matters and the Related Matters allege many of the same wrongful acts previously alleged in the 2004 CFTC Action.

161.    Axis seeks a declaration that, as a result of Clause XI, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

## OTHER COVERAGE DEFENSES/RESCISSION

162.    Other Axis Policy terms, conditions and endorsements may ultimately be implicated.  Axis has reserved the right to disclaim coverage for the Noticed Matters and the Related Matters based on various terms, conditions and endorsements of the Axis Policy.  Nothing in this Adversary Complaint is intended to waive any rights Axis may have in the Axis Policy, at law or in equity, including the right to rescind the Axis Policy and prior policies issued by Axis to Refco, its subsidiaries or predecessors, based on material misrepresentations in the applications for such other policies.  Axis reserves the right to raise such other coverage defenses as appropriate and/or to seek rescission.

WHEREFORE, Axis requests that the Court enter a declaration and final judgment in its favor:

(A)    Declaring that, for the reasons set forth in Count I, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(B)    Declaring that, for the reasons set forth in Count II, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(C)    Declaring that, for the reasons set forth in Count III, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(D)    Declaring that, for the reasons set forth in Count IV, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(E)    Awarding Axis such other and additional relief as shall be found to be reasonable; and

(F)    Awarding Axis its fees and costs incurred in prosecuting this action.

Dated: May 23, 2007

Respectfully submitted,

KAUFMAN BORGEEST & RYAN LLP

By _____
Wayne E. Borgeest (WB-3034)
Joan M. Gilbride (JG-6238)
Robert A. Benjamin (RB-9891)

200 Summit Lake Drive
Valhalla, New York 10595
(914) 741-6100 (Telephone)
(914) 741-0025 (Facsimile)
wborgeest@kbrlaw.com
jgilbride@kbrlaw.com
rbenjamin@kbrlaw.com

*Attorneys for Plaintiff*
*Axis Reinsurance Company*

591172_1                    42