John H. Eickemeyer (JE-8302)
Daniel C. Green (DG-0059)
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019

Daniel J. Standish (*pro hac vice*)
Marc E. Rindner (*pro hac vice*)
Cara Tseng Duffield (*pro hac vice*)
WILEY REIN LLP
1776 K Street NW
Washington, D.C. 20006

*Attorneys for Plaintiff Arch Insurance Company*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **ARCH INSURANCE COMPANY,** | ) |
| **Plaintiff,** | ) |
| **v.** | ) **No. 08-CIV-5252 (GEL)** |
|  | ) **ECF Case** |
| **JOHN D. AGOGLIA, et al.,** | ) |
| **Defendants.** | ) |

Annexed hereto are true copies of filings originally made in the Supreme Court of the State of New York, County of New York, in the action *Arch Insurance Co. v. Agoglia, et al.*, Index No. 08/600029, which was removed to this Court on or around June 9, 2008.

The record is supplemented by the undersigned counsel for the plaintiff Arch Insurance Company, pursuant to a letter from such counsel which was So Ordered by the Court on July 21, 2008 and entered into the docket on July 22, where it was assigned ECF No. 26.  The supplementary filings are as follows:

| Document Number | Document Title |
|---|---|
|  |  |
| 1. | Summons and Complaint (and Exhibits A-G thereto) |
| 2. | Amended Summons and First Amended Complaint for Declaratory Judgment (and Exhibits A-J thereto) |

| 3. | Affidavit of Service of Summons and Complaint and of Amended Summons and Complaint Upon Enumerated Defendants (and Exhibits 1-15 thereto) |
|---|---|
| 4. | Request for Judicial Intervention |
| 5. | Statement in Support of Request for Assignment to Commercial Division (and Exhibit A thereto) |
| 6. | Notice of Motion for the *Pro Hac Vice* Admission of Cara Tseng Duffield, Marc E. Rindner and Daniel J. Standish |
| 7. | Affirmation of Daniel C. Green in Support of the *Pro Hac Vice* Admission of Cara Tseng Duffield, Marc E. Rindner and Daniel J. Standish (and Exhibits 1-3 thereto) |
| 8. | Affidavit of Service of Enumerated Filings Upon Defendant Cox |
| 9. | So Ordered Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett with annexed Judgment Entered by Clerk |
| 10. | Notice of Discontinuance as to Defendant Cox |
| 11. | Stipulation of Partial Discontinuance with Prejudice as against Defendant Trosten |
| 12. | Notice of Motion and Affirmation of Richard Cashman (and Exhibits A-Z thereto) |
| 13. | Memorandum of Law in Support of the Insureds' Motion to Dismiss the First Amended Complaint for Declaratory Judgment |
| 14. | Corrected Notice of Motion |
| 15. | Corrected Memorandum of Law in Support of the Insureds' Motion to Dismiss the First Amended Complaint for Declaratory Judgment |
| 16. | Notice of Appearance of Zuckerman Spaeder LLP on Behalf of Defendant Grant |
| 17. | Notice of Motion for Admission *Pro Hac Vice* of Norman L. Eisen and Affirmation of Laura E. Neish in Support Thereof |
| 18. | Affirmation of John H. Eickemeyer in Support of Arch Insurance Company's Opposition to Certain Defendants' Motion to Dismiss the First Amended Complaint (and Exhibits A-M thereto) |

NEWYORK/#198626.1

| 19. | Plaintiff Arch Insurance Company's Opposition to Certain Defendants' Motion to Dismiss the First Amended Complaint |
|---|---|
| 20. | Notice of Entry of So Ordered Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett (annexed as Exhibit A thereto) |
| 21. | Corrected Affidavit of Service of Notice of Entry Upon Enumerated Defendants |
| 22. | Reply Affirmation of Richard Cashman (and Exhibits A-D thereto) |
| 23. | Reply Memorandum of Law in Support of the Insureds' Motion to Dismiss the First Amended Complaint for Declaratory Judgment |
| 24. | Affidavit of Service of Summons and Complaint and of Amended Summons and Complaint upon Defendants Dhillon and Lipoff |
| 25. | Notice of Motion for Voluntary Discontinuance as Against Defendants Thomas H. Dittmer and Stephen Grady; Affirmation of Daniel C. Green in Support of Motion for Voluntary Discontinuance as Against Defendants Thomas H. Dittmer and Stephen Grady |
| 26. | So Ordered Stipulation of Partial Discontinuance with Prejudice as against Defendant Maggio |
| 27. | Order Granting *Pro Hac Vice* Admission of Cara Tseng Duffield, Marc E. Rindner, and Daniel J. Standish |
| 28. | Order Granting *Pro Hac Vice* Admission of Norman Eisen |
| 29. | Notice of Filing of Notice of Removal (annexed as Exhibit A thereto) |

3

Date: July 31, 2008

Respectfully submitted,

By:    s/  John H. Eickemeyer
  John H. Eickemeyer  (JE-8302)
  jeickemeyer@vedderprice.com
  Daniel C. Green  (DG-0059)
  dgreen@vedderprice.com
  VEDDER PRICE P.C.
  1633 Broadway, 47th Floor
  New York, NY 10019
  (212) 407-7700

  Daniel J. Standish (*pro hac vice*)
  dstandish@wileyrein.com
  Marc E. Rindner (*pro hac vice*)
  mrindner@wileyrein.com
  Cara Tseng Duffield (*pro hac vice*)
  cduffield@wileyrein.com
  WILEY REIN LLP
  1776 K Street, N.W.
  Washington, D.C. 20006
  (202) 719-7000

  *Counsel for Plaintiff Arch Insurance Company*

4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------ x
ARCH INSURANCE COMPANY,                          :
                                                 :
                    Plaintiff,                   :      Index No.:  08/600029
                                                 :
          v.                                     :      IAS Part 39 (Freedman, J.)
                                                 :
JOHN D. AGOGLIA, PHILLIP R. BENNETT,             :
LEO R. BREITMAN, EDWIN L. COX,                   :
SUKHMEET DHILLON, THOMAS H.                      :
DITTMER, NATHAN GANTCHER,                        :
STEPHEN GRADY, TONE GRANT,                       :
THOMAS HACKL, DAVID V. HARKINS,                  :
SCOTT L. JAECKEL, DENNIS A. KLEJNA,              :
THOMAS H. LEE, ERIC G. LIPOFF, SANTO             :
C. MAGGIO, PETER MCCARTHY, JOSEPH                :
MURPHY, FRANK MUTTERER, RICHARD                  :
N. OUTRIDGE, RONALD L. O'KELLEY,                 :
SCOTT A. SCHOEN, WILLIAM M. SEXTON,              :
GERALD SHERER, PHILIP SILVERMAN and              :
ROBERT C. TROSTEN,                               :
                                                 :
                    Defendants.                  :
------------------------------------------------ x

**<u>AFFIRMATION OF RICHARD CASHMAN</u>**


          RICHARD CASHMAN, an attorney duly admitted to practice in the

courts of the State of New York, affirms under penalties of perjury the following:

          1.        I am a member of the bar of the State of New York, and am

Special Counsel to Heller Ehrman, LLP ("Heller Ehrman").  Heller Ehrman represents

Defendant Philip Silverman.

2.    I respectfully submit this affirmation in support of the Defendants'

John Agoglia, Leo R. Breitman, Nathan Gantcher, Tone Grant, David Harkins, Scott L.

Jaeckel, Dennis A. Klejna, Thomas H. Lee, Peter McCarthy, Joseph Murphy, Frank

Mutterer, Richard N. Outridge, Ronald L. O'Kelley, Scott A. Schoen, William M.

Sexton, Gerald Sherer, and Philip Silverman (collectively, the "Moving Insureds")

Memorandum of Law In Support of the Insureds' Motion to Dismiss the First Amended

Complaint of Arch Insurance Company for Declaratory Judgment (the "Motion").

3.    The following is a list of the exhibits cited in the Motion.  A true

and correct copy of each document is attached hereto.

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Amended Summons and First Amended Complaint For Declaratory Judgment, dated February 22, 2008, filed in *Arch Insurance Company v. Agoglia, et al.*, Index No. 08/600029 (N.Y. Sup. Ct.). |
| B | Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821 issued to Refco Inc. by U.S. Specialty Insurance Company for the period August 11, 2005 to August 11, 2006. |
| C | Letter dated April 25, 2007 from Leslie S. Ahari at Ross, Dixon & Bell, LLP, counsel for U.S. Specialty Insurance Company, to Luc A. Despins and Dennis C. O'Donnell at Milbank, Tweed, Hadley & McCloy, LLP. |
| D | Directors and Officers Liability and Corporation Reimbursement Follow Form Excess Liability Policy No. 1620924 issued to Refco LLC by Lexington Insurance Company for the period August 11, 2005 to August 11, 2006. |
| E | Letter dated August 8, 2007 from James E. Tolan at D'Amato & Lynch, counsel for Lexington Insurance Company, to Luc A. Despins and Dennis C. O'Donnell at Milbank, Tweed, Hadley & McCloy, LLP. |

| F | SecurExcess Policy No. RNN 506300 issued to Refco Inc. by Axis Reinsurance Company for the period August 11, 2005 to August 11, 2006. |
|---|---|
| G | Excess Directors and Officers Insurance and Company Reimbursement Policy No. AW0418197 issued to Refco Inc. by Allied World Assurance (U.S.), Inc. for the period August 11, 2005 to August 11, 2006. |
| H | Excess Insurance Policy No. DOX009322-00 issued to Refco Inc. by Arch Reinsurance Company for the period August 11, 2005 to August 11, 2006. |
| I | Classic A-Side Management Liability Insurance Policy, No. ELU089673-05 issued to Refco Inc. by XL Specialty Insurance Company for the period August 11, 2005 to August 11, 2006. |
| J | Letter dated March 6, 2006 from Kaufman Borgeest & Ryan LLP, counsel to Axis Reinsurance Company, to Pam Sylwestrzak, Senior Vice President, Marsh USA, Inc. |
| K | Letter dated March 28, 2006 from John D. Hughes of Edwards Angell Palmer & Dodge LLP, counsel to Allied World Assurance (U.S.), Inc., to Ms. Andrea Lieberman of Marsh USA. |
| L | Letter dated March 9, 2006 from Wiley Rein & Fielding LLP, counsel to Arch Insurance Company, to Ms. Andrea Lieberman of Marsh USA. |
| M | Letter dated January 24, 2006 from Boundas, Skarzynski, Walsh & Black, LLC, counsel to XL Specialty Insurance Company, to Ms. Andrea Lieberman of Marsh USA. |
| N | Complaint dated May 24, 2007 filed in *Axis Reinsurance Company v. Bennett et al.*, Adv. Proc. No. 07-0712 (RDD) (Bankr. S.D.N.Y.) (Without Exhibits). |

| O | Bankruptcy Court Order, dated October 19, 2007, and modified on October 22, 2007, Granting Motions for Summary Judgment against Axis on the Issue of Advancement of Defense Costs and Fees, *Axis Reinsurance Co. v. Bennett, et al.,* Adv. Proc. No. 07-01712 (RDD) (Bankr. S.D.N.Y.). |
|---|---|
| P | Motion to Intervene on behalf of Arch Insurance Company, *Axis Reinsurance Co. v. Bennett et al.*, No. 07-01712 (RDD) (Bankr. S.D.N.Y.). |
| Q | Bankruptcy Court Order dated September 6, 2007 Denying Motion of Arch Insurance Company to Intervene, *Axis Reinsurance Co. v. Bennett et al.*, No. 07-01712 (RDD) (Bankr. S.D.N.Y.). |
| R | Complaint dated September 10, 2007 filed in *Axis Reinsurance Co. v. Bennett et al.*, No. 07-cv-7924 (GEL) (Without Exhibits). |
| S | Order of the United States District Court for the Southern District of New York, dated November 13, 2007, *Axis Reinsurance Co. v. Bennett et al.*, No. 07-cv-7924 (GEL) (S.D.N.Y.). |
| T | Letter dated March 6, 2008 from Kaufman Borgeest & Ryan LLP, counsel for Axis Reinsurance Company, to Luc A. Despins and Dennis C. O'Donnell at Milbank, Tweed, Hadley & McCloy, LLP. |
| U | Amended Complaint for Declaratory Judgment dated June 22, 2006 filed in *Arch Ins. Co. v. Bennett, et al.*, No. 600805/06 (N.Y. Sup. Ct.) (Without Exhibits). |
| V | Order dated February 20, 2007 in *Arch Ins. Co. v. Bennett, et al.*, No. 600805/06 (N.Y. Sup. Ct.). |
| W | Complaint dated March 12, 2008 filed in *Murphy, et al. v. Allied World Assurance Company (U.S.), Inc.*, Adv. Proc. No. 08-0133 (RDD) (Without Exhibits). |

| X | Order dated April 21, 2008 Granting Preliminary Injunction Motion to Require Allied World Assurance Company (U.S.), Inc. To Pay Officer and Director Defense Costs In Underlying Litigation and For Relief From the Plan Injunction or Automatic Stay, to the Extent Applicable, For the Advancement of Such Defense Costs and to Permit Movants to Prosecute Claims Against Allied World Assurance Company (U.S.), Inc. in *Murphy, et al. v. Allied World Assurance Company (U.S.), Inc.*, Adv. Proc. No. 08-0133 (RDD). |
|---|---|
| Y | First Amended Complaint dated April 24, 2008 in *Murphy, et al. v. Allied World Assurance Company (U.S.), Inc.*, Adv. Proc. No. 08-0133 (RDD). |
| Z | Complaint dated April 22, 2008 in XL Specialty Insurance Company v. Agoglia, et al., No. 08 Civ. 3821 (S.D.N.Y.) (Without Exhibits). |

Dated:  April 28, 2008
          New York, New York

                                    *Richard Cashman*
                                    Richard Cashman

Exhibit O

10/19/07

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

――――――――――――――――――――――――――――x
In re                                               :
                                                    :    Chapter 11
REFCO, INC., et al.,                                :
                                                    :    Case No. 05-60006 (RDD)
                                                    :
            Debtors.                                :    (Jointly Administered)
――――――――――――――――――――――――――――x
                                                    :
AXIS REINSURANCE COMPANY,                            :
                                                    :
            Plaintiff,                              :
                                                    :
        v.                                          :    Adv. Proc. No. 07-01712 (RDD)
                                                    :
PHILLIP R. BENNETT, et al.,                         :
                                                    :    [caption continued on next page]
            Defendants.                             :
――――――――――――――――――――――――――――x

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**

*402488.1*

```
----------------------------------------x
                                         :
TONE N. GRANT, et al.,                   :
                                         :
             Plaintiffs,                 :
                                         :
      v.                                 :    Adv. Proc. No. 07-2005 (RDD)
                                         :
AXIS REINSURANCE COMPANY,                :
                                         :
             Defendant.                  :
----------------------------------------x
                                         :
LEO R. BREITMAN, et al.,                 :
                                         :
             Plaintiffs,                 :
                                         :
      v.                                 :    Adv. Proc. No. 07-2032 (RDD)
                                         :
AXIS REINSURANCE COMPANY,                :
                                         :
             Defendant.                  :
----------------------------------------x
```

       Upon the motions (the "Motions"), dated September 25, 2007, of Tone N. Grant,

Robert C. Trosten, Phillip R. Bennett, Dennis Klejna, William M. Sexton, Gerald Sherer, Philip

Silverman, Joseph Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L.

Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen (the "Moving Insureds"), for

entry of an order, pursuant to Fed. R. Civ. P. 56, applicable to this proceeding pursuant to Fed. R.

Bankr. P. 7056, granting summary judgment against Axis Reinsurance Company ("Axis"), all as

more fully set forth in the Motions; and the Court having jurisdiction to consider the Motions and

the relief requested therein pursuant to 28 U.S.C. §§ 157, 1334, and 2201; and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motions having been provided; and the Court having reviewed the Motions and the

objections and other pleadings related thereto; and upon the record of the October 12, 2007

hearing thereon; and after due deliberation and sufficient cause appearing therefor, the Court

having found for the reasons stated in Exhibit A hereto, which amends and supersedes the

Court's bench ruling appearing in the October 12, 2007 hearing transcript, that no genuine issue

of material fact exists and that the Moving Insureds are entitled to judgment as a matter of law, it

is hereby

ORDERED that the Motions are granted in all respects; and it is further

ORDERED that under the terms of the Axis Policy Axis shall advance, subject to

a complete reservation of rights, privileges, and defenses of the parties under the Axis Policy,[1]

Defense Costs incurred by the Moving Insureds in defense of the various matters asserted against

them related to the demise of Refco, Inc. (the "Claim"), unless and until: (1) there is a final

determination that (a) the Claim is not covered by the Axis Policy, or (b) such Defense Costs are

not covered under the Axis Policy; or (2) the Limit of Liability of the Axis Policy has been

exhausted; and it is further

ORDERED that Axis shall notify counsel to the Plan Administrators of the

Modified Joint Chapter 11 Plan (the "Refco Plan") of Refco Inc. and Certain of Its Direct and

Indirect Subsidiaries (the "Plan Administrators") when the advancement of Defense Costs

hereunder exceeds $2 million in the aggregate, and in increments of $100,000 thereafter;

provided, that if individual statements for Defense Costs exceed $100,000, Axis need only notify

the Plan Administrators of payment of such bills, without breaking such advances into $100,000

increments; and it is further

ORDERED that entry of this Order shall be without prejudice to the right of the

Plan Administrators or any party in interest to seek the re-imposition of the injunction provided

---

[1] Capitalized terms used but not defined herein having the meanings ascribed to such terms in the Motions and the insurance policies referred to therein.

for in the Refco Plan, on a prospective basis with respect to any advances of Defense Costs not yet made, for cause shown on appropriate notice to the Insureds and Axis; and it is further

ORDERED that nothing in this Order shall modify this Court's Order confirming the Refco Plan, including paragraph 34(b) thereof, or constitute a determination that the automatic stay under 11 U.S.C. § 362(a) applies to the actions described in the third decretal paragraph hereof; and it is further

ORDERED that Axis' (a) motion seeking a declaratory judgment with regard to the Moving Insureds' obligations under the Axis policy to refund advanced Defense Costs and (b) request for a determination of the priority and proper allocation of Defense Costs or other Losses under the Axis Policy and denied without prejudice to the rights of all parties to and beneficiaries of the Axis Policy regarding such issue; and it is further

ORDERED that the requirement pursuant to Local Rule 9013-1(b) that the Moving Insureds file a memorandum of law in support of the Motion is hereby waived, and it is further

ORDERED that this Order shall be deemed to constitute a separate order on each of the Motions.

Dated: October 19, 2007
      New York, New York

                    /s/Robert D. Drain
                    UNITED STATES BANKRUPTCY JUDGE

4



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**EXHIBIT A**

2

1

2          THE COURT:  All right.  I have before me in this

3     adversary proceeding motions for summary judgment in respect of

4     the claim that Axis Reinsurance Company is obligated to advance

5     defense costs to the insureds under its excess liability policy

6     on behalf of directors and officers of Refco, Inc.

7          The movants, all former directors or officers of

8     Refco, are Messrs. Klejna, Sexton, Sherer and Silverman,

9     Murphy, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley and

10    Shoene and Grant, Trosten and Bennett.  I believe that includes

11    all the moving insureds.

12         Federal Rule of Civil Procedure 56(c), which is made

13    applicable in adversary proceedings in bankruptcy cases

14    pursuant to Bankruptcy Rule 7056, controls the standard in

15    respect of these motions for summary judgment.  Rule 56(c)

16    provides that summary judgment shall be granted if the

17    pleadings, depositions, answers to interrogatories and

18    omissions on file together with the affidavits, if any, show

19    that there is no genuine issue as to any material fact and that

20    the moving party is entitled to judgment as a matter of law.

21    Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).

22         In deciding a motion for summary judgment, the Court

23    must determine if there are any material factual issues to be

24    tried while at the same time, since the nonmoving party would

25    be precluded from a trial if the relief were granted, the Court

3

1   should resolve ambiguities and draw reasonable inferences in
2   favor of the party opposing the motion.  <u>Matsushita v. Zenith</u>
3   <u>Radio Corporation</u>, 475 U.S. 574, 587 (1986); <u>Knight v. U.S.</u>
4   <u>Fire Insurance Company</u>, 804 F.2d 911 (2d Cir. 1986).
5           The burden ultimately rests on the moving party to
6   establish the absence of a genuine issue as to any material
7   fact, <u>Celotex</u>, 477 U.S. at 322-23.  The nonmoving party may
8   oppose a summary judgment motion only by making a showing that
9   there's a genuine issue as to a material fact in support of a
10  verdict for that party, <u>Anderson v. Liberty Lobby, Inc.</u>, 477
11  U.S. 242, 247-48 (1986).  That is, the mere existence of a
12  scintilla of evidence in support of its position will be
13  insufficient.  There must be evidence on which a jury could
14  reasonably find for the nonmoving party.  <u>Id.</u>
15          Thus, the nonmoving party may not defeat a summary
16  judgment motion by relying on self-serving or conclusory
17  statements.  There must be something more than some
18  metaphysical doubt as to a material fact.  There needs to be
19  specific evidence of a material fact at issue, although of
20  course, once that evidence is shown, the Court moves on to the
21  trial stage; that is, the evidence need not be probative at the
22  summary judgment stage.  See generally, again, <u>Matsushita v.</u>
23  <u>Zenith</u>, 475 U.S. at 586.
24          In this case, the question before the Court is
25  whether there's a genuine issue of material fact as to whether

4

1   Axis' unilateral decision to deny payment of defense costs to

2   the plaintiff insureds breaches the Axis policy.   In

3   determining that issue on summary judgment, the parties have

4   directed me primarily to the terms of the policy and, in

5   particular, the terms of the provision governing the

6   advancement of defense costs, paragraph (d)(2), as well as

7   various alleged coverage exclusions in the policy and other

8   claimed defenses to payment.   They have submitted their

9   statements of undisputed material facts, and in Axis's case a

10   response in certain instances controverting the plaintiffs'

11   statements.

12        In reviewing that record, it is clear to me that this

13   is a dispute upon which the Court must focus primarily on the

14   language of the relevant provisions of the insurance policy.

15   Accordingly, this type of dispute, involving as it does the

16   scope of insurance coverage for defense costs, is a

17   particularly appropriate vehicle, as noted by numerous courts,

18   for summary judgment. See <u>United Capital Corporation v.</u>

19   <u>Travelers Indemnity Company of Illinois</u>, 237 F. Supp. 2d 270,

20   274 (S.D.N.Y. 2002).  And that is because, generally, insurance

21   policy disputes hinge, as this one does, on the terms of the

22   contract, and contract determination often lends itself to

23   summary judgment analysis.

24        I previously determined in this proceeding that the

25   dispute -- and in particular the interpretation of the contract

5

1  at issue -- is governed by New York law, having applied a New

2  York choice of law analysis and determined, as I set forth on

3  the record of the hearing on August 30, 2007, that New York

4  choice of law principles, given the locus of the dispute and

5  the domicile of the parties, would lead to the application of

6  New York law.

7       That transcript is attached to the parties'

8  submissions, to both Ms. Kim's declaration as well as

9  Ms. Gilbride's declaration in support of Axis's cross motion at

10 Exhibit B.

11      Under New York law, a written contract is to be

12 interpreted so as to give effect to the intention of the

13 parties as expressed in the unequivocal language they've

14 employed, Kruden v. Bank of New York, 957 F.2d 961, 976 (2d

15 Cir. 1992). Under New York law, if a contract is unambiguous

16 on its face its proper construction is a question of law. The

17 Court should not look beyond its confines to extrinsic evidence

18 if its relevant provisions are clear and unambiguous. See

19 generally Metropolitan Life Insurance Company v. RJR Nabisco,

20 Inc., 906 F.2d 884, 889 (2d Cir. 1990); W.W.W. Associates, Inc.

21 v. Giancontieri, 77 NY 2d 157, 162 (1990); and Vermont Teddy

22 Bear Company, Inc. v. 538 Madison Realty Company, 1 NY 3d 470

23 (2004).

24      Giving the terms of the contract their plain meaning,

25 a court should find contractual provisions ambiguous only if

6

1  they are reasonably susceptible to more than one interpretation

2  by reference to the contract alone. <u>Krumme v. Westpoint</u>

3  <u>Stevens, Inc.</u>, 238 F.3d 133, 139 (2d Cir. 2000).  Contract

4  language is unambiguous if it has a definite and precise

5  meaning unattended by danger of misconception in the purport of

6  the contract itself and concerning which there's no reasonable

7  basis for a difference of opinion. <u>Metropolitan Life Insurance</u>

8  <u>v. RJR Nabisco</u>, 986 F.2d at 889.  Language whose meaning is

9  otherwise plain is not ambiguous merely because the parties

10  urge different interpretations in the litigation.  <u>Id.</u>

11       Those contract interpretation rules are generally

12  followed in New York in respect of insurance policies, but, in

13  addition to those general principles, there are specific

14  contract interpretation rules that apply to insurance policies

15  that are relevant to this dispute, or potentially relevant.

16       Thus, with regard to the interpretation of an

17  insurance contract, the courts view the plain language of the

18  contract as the best and, if plain, the only, measure of the

19  parties intentions; and the initial interpretation of the

20  contract is a matter of law for the Court to decide, as set

21  forth in, among other decisions cited by the parties, <u>In Re:</u>

22  <u>WorldCom, Inc. Securities Litigation</u>, 354 F.Supp. 2d 455, 463-

23  464 (S.D.N.Y. 2005).

24       However, in that opinion District Judge Cote goes on

25  to state additional, well-established rules with regard to  the

7

1  interpretation of insurance contracts under the law of New

2  York.  First, to the extent an ambiguity exists in respect of

3  an insurance contract governed by New York law that is

4  unresolved by extrinsic evidence, such ambiguity must be read

5  against the insurer. WorldCom, 354 F.Supp.2d at 464. See also

6  McCostis v. Home Insurance Company of Indiana, 31 F.3d 910, 113

7  (2d Cir. 1994).  Second, Judge Cote notes that the rule that

8  insurance policies are to be construed in favor of the insured

9  is most rigorously applied in construing the meaning of

10  exclusions incorporated into a policy of insurance or

11  provisions seeking to narrow the insurer's liability. WorldCom,

12  354 F.Supp.2d at 464.  And, finally, under New York law where a

13  contract of insurance includes the duty to defend or to pay for

14  the defense of the insured (and I note that Judge Cote makes no

15  distinction between the two concepts, i.e., the duty to defend

16  and the duty to pay for the defense of the insured), that duty

17  is "a heavy one" and, indeed, has been found for many years to

18  apply even if the policy of indemnity does not specifically

19  provide for advancement. Id.  "In sum" -- again I'm quoting

20  from the WorldCom opinion at page 464 -- "the duty to pay

21  defense costs is construed liberally and any doubts about

22  coverage are resolved in the insured's favor."

23      My review of Axis's statement of uncontroverted facts

24  and its response to the statements of undisputed material facts

25  submitted in various of the movants' Rule 7056(1) statements

26  confirms that most of the issues in this case are

8

1    uncontroverted, including, obviously, the terms of the

2    underlying policy, which incorporates, with the specific

3    exceptions stated in the Axis policy, the primary policy issued

4    by the primary insurer.  In addition, Axis does not dispute

5    that claims in the underlying litigation against the insureds

6    constitute "claims" as a defined term in the primary policy for

7    "wrongful acts," as also defined in the primary policy, or that

8    the movants here are insured or are "insureds," and that they

9    have incurred and will continue to incur defense costs under or

10   in response to the underlying litigations.

11          There's also no dispute, and of course the policy

12   speaks for itself, that the term "loss" in the primary policy,

13   as incorporated with specific exceptions by the Axis policy,

14   includes defense costs that an insured is legally obligated to

15   pay as a result of any claim.  It's also not disputed that the

16   insureds have given Axis notice on a timely basis of their

17   claims under the policy.

18          What is disputed by Axis is, first, whether

19   exclusions unique to its policy, which I primarily take to be

20   the prior knowledge exclusion set forth in endorsement number

21   six to the policy, but also other potential exclusions and

22   defenses, apply here to prevent the defense costs from being

23   covered claims under the Axis policy.

24          In addition, the parties also dispute whether, under

25   the language of the primary policy -- specifically paragraph

26   (d)(2) -- Axis is obligated to pay defense costs on an as-

9

1  incurred basis in light of Axis' contention that the exclusions

2  that it has noted apply here to preclude coverage.  The issue

3  was first raised by Axis apparently in a letter, attached as

4  Exhibit 9 to the Kim declaration, disclaiming coverage on the

5  basis of various exclusions as well as an alleged breach of

6  warranty.

7        Notably, Axis has not offered any material fact as to

8  any extrinsic aid to interpretation of paragraph (d)(2) in the

9  primary policy or as to any other provision, for that matter,

10  of the applicable insurance policies.

11        I conclude based on the record before me for purposes

12  of these motions that, in fact, there is a hotly contested

13  dispute as to whether the policy exclusions alleged by Axis

14  would apply here to render the insureds' losses, including

15  defense costs, to not be covered by the policy.  Specifically,

16  each of the movants, each of the insureds, has in this

17  adversary proceeding taken the position that it is not

18  precluded from coverage by the knowledge exclusion in the Axis

19  policy or the prior acts exclusion or breach of warranty

20  defense, and, furthermore, certain of the insureds (as set

21  forth in Exhibits 10, 12 and 13 of the Kim declaration at

22  paragraphs 43 through 45) have in addition taken the position

23  that the knowledge exclusion itself is an improper endorsement

24  to the policy.

25        I previously ruled, as set forth in the transcript of

26  the August 30, 2007 hearing, that the issue of whether, in

10

1  fact, the insureds' losses are covered under the Axis policy in
2  light of the prior knowledge exclusion -- as well as the other
3  exclusions and defenses raised by Axis -- should not be decided
4  at this time in light of the substantial overlap of those
5  issues, *i.e.*, whether in fact there was prior knowledge of a
6  claim and/or loss, with the issues pending before the District
7  Courts in the multi-district securities litigation as well as
8  in respect of certain of the insureds' pending criminal
9  litigation in the Southern District.  I won't repeat that
10 ruling now except to note that in my view it was dictated by
11 clear precedent which, as was brought out at the hearing as set
12 forth in the transcript, essentially subordinates the interest
13 of the insurer to have a prompt determination of such a
14 coverage dispute behind the interest of the insured to pursue
15 its overlapping defense in the primary litigation that
16 allegedly gives rise to the insured claim or loss.
17         That context is important to keep in mind in
18 connection with the present motions, because it sets the stage
19 for the fairly narrow issue before me -- whether Axis is
20 contractually bound to advance defense costs before the final
21 determination of a dispute over whether a claim therefor is
22 covered under the Axis policy.
23         Again, that issue ultimately depends upon the Court's
24 interpretation of the following provision, paragraph (d)(2) of
25 the primary policy, which is incorporated by reference into the
26 Axis policy.  Section (d)(2) states: "The insurer will pay

11

1    covered defense costs on an as-incurred basis.  If it is

2    finally determined that any defense costs paid by the insurer

3    are not covered under this policy, the insured has agreed to

4    repay such noncovered defense costs to the insurer."

5            Axis contends that it is permitted by the foregoing

6    language to determine unilaterally not to pay defense costs on

7    an as-incurred basis if it believes that such defense costs are

8    not covered under its policy, that is, that they would be

9    subject to the exclusion or the exclusions under the policy or

10   another valid defense.  The movants contend, to the contrary,

11   that Axis is obligated under the paragraph that I just read --

12   particularly when construed in light of relevant case law and

13   the presumptions that I noted earlier that apply to exclusions

14   and insurance policies generally -- to advance their defense

15   costs until there is a final determination by an objective fact

16   finder that the defense costs are not covered. They take this

17   position, again, because they contend, and I conclude that the

18   record supports this, that there is a legitimate dispute as to

19   whether defense costs are covered, or not, under the terms of

20   the policy.

21           Both sides have asserted principles or maxims of

22   contract interpretation to assist the Court in determining

23   whether the language that I just quoted is ambiguous or not.

24   Not surprisingly, they both contend that the language is not

25   ambiguous, although, perhaps equally not surprisingly they both

26   contend that it means the opposite of what the other says it

12

1   means.

2          The interpretive principle they rely on primarily is

3   that a court should read a contract as a whole, giving meaning

4   to all of its parts, and should avoid an interpretation that

5   would render other provisions useless and meaningless; and I

6   have looked, as they have urged, at the other provisions of the

7   contract, including paragraph (d)(3) as well as the interplay

8   of the two sentences in paragraph (d)(2), in light of that

9   maxim.

10          Frankly, after having done so, I do not believe,

11   however, that the contract interpretation maxim that I just

12   recited is of much help, in that one could at least conceive of

13   uses for all of the language in paragraph (d)(2) to support

14   both sides' position.  I believe that paragraph (d)(3),

15   moreover, is really a provision going to a separate proposition

16   and consistent with, again, the principles pursuant to which

17   courts in New York interpret insurance policies, and,

18   particularly, policy exclusions bearing on the advancement of

19   defense costs, (d)(3) should be read narrowly, stand on its

20   own, and not be used to extend over, or into, an interpretation

21   of (d)(2).  See <u>Associated Electronic & Gas Insurance Services,</u>

22   <u>Ltd. v. Rigas</u>, 382 F.Supp.2d 685, 696-700 (E.D. Pa. 2004).

23          However, there is a more meaningful point to note

24   about the rest of the policy, which is that nowhere does it

25   state that, or even imply, except in (d)(3) in the specific and

26   limited instance covered thereby, that the insurer can

13

1    unilaterally or in the exercise of its reasonable judgment or

2    in any other way withhold defense costs absent a court

3    determination in the event of a dispute as to whether defense

4    costs are covered.  In light of the case law that I will go

5    into in a minute, which emphasizes the logic and policy behind

6    requiring the advancement of disputed defense costs, I conclude

7    that the absence of such language, in addition to the language

8    of (d)(2), which, again, says that the insurer will pay covered

9    costs and in the next sentence provides for a refund mechanism

10   if defense costs are finally determined to have not been

11   covered, that the reasonable and ordinary course colloquial

12   interpretation of paragraph (d)(2) is that, absent a final

13   determination by an objective fact finder, the insurer is

14   obligated to pay defense costs that the insured reasonably

15   contends are covered, notwithstanding the insurer's view that

16   those costs are excluded or not covered under the policy. In

17   other words, unless the insured's position on coverage is

18   clearly, facially wrong, the agreement contemplates that

19   defense costs will be advanced subject to later refund if the

20   coverage dispute ultimately is determined in the insurer's

21   favor.

22           As I said, I believe this interpretation is clear in

23   the context of the entire agreement, particularly because of

24   the refund mechanism in (d)(2) and the absence in the agreement

25   of any provision conferring on the insurer the unilateral

26   ability to make such a determination, but I note, too, that to

14

1   the extent that an ambiguity exists the insurer has offered up

2   no extrinsic evidence to support its interpretation of

3   paragraph (d)(2).  Consequently, I believe that under the law

4   of New York, in the absence of Axis offering up such evidence,

5   such an ambiguity would have to be interpreted against the

6   insurer.  Again, see McCostis v. Home Insurance Company in

7   Indiana, 31 F.3d 110, 113 (2d Cir. 1994), as well as the

8   discussion in Multi-Foods Corporation v. Commercial Union

9   Insurance Company, 309 F.3d 76, 78 n.7 (2d Cir. 2002).

10          As I alluded to a moment ago, I'm not writing on a

11  clean slate with regard to this issue.  As far as I can tell,

12  every court that has considered the issue (and again I believe

13  it's a narrow issue as to whether, during the pendency of a

14  dispute as to coverage under a policy, an insurer may

15  unilaterally withhold the payment of defense costs) has

16  concluded that, to the contrary, the insurer is obligated to

17  advance the defense costs -- with the caveat that if it is

18  clear from the policy itself that all claims made against the

19  insured would not be covered, for example on a motion to

20  dismiss or summary judgment basis, the defense costs would need

21  to be advanced.

22          Here, as I noted, the applicability of the prior

23  knowledge exclusion and Axis' other defenses are hotly disputed

24  and the resolution of that dispute is not clear from the face

25  of the policy and the undisputed facts and may not be decided

26  until the overlapping issues are resolved in the underlying

15

1  district court securities and criminal litigation against the

2  insureds. Consequently, I believe that the case law would

3  support my conclusion that Axis is obligated to advance the

4  defense costs pending such determination. This issue has most

5  recently been dealt with, quite thoroughly, in <u>Federal</u>

6  <u>Insurance Company v. Tyco International Limited</u>, 784 N.Y.S.2d

7  920 (N.Y.Sup. 2004), <u>aff'd</u> in part <u>mod.</u> in part, <u>Federal</u>

8  <u>Insurance Co. v. Kozlowski</u>, 792 N.Y.S.2d 397 (1ˢᵗ Dep't. 2005),

9  in which the court, after noting numerous cases that considered

10  the issue in other jurisdictions, found that it is "... well

11  settled that the duty of an insurer to defend its insured or

12  pay its defense costs is distinct from and broader than its

13  duty to indemnify.  The duty exists whenever a complaint

14  against the insured alleges claims that may be covered under

15  the insurer's policy.  If any portion of a complaint might

16  result in coverage, the insurer must defend or pay defense

17  expenses for all claims, both covered and noncovered.

18  Conversely, the insurer has no duty if, as a matter of law, the

19  allegations in the complaint could not give rise to any

20  obligation to indemnify, or the allegations fall within the

21  policy exclusion.  But the duty to defend or pay defense costs

22  is construed liberally and any doubts about coverage are

23  resolved in insured's favor.  Furthermore, an insurer can only

24  evoke a policy exclusion to avoid coverage if it can show that

25  the allegations in the complaint cast that pleading solely and

26  entirely within the policy exclusions."  And, as noted in the

16

1  Appellate Division opinion, "[W]hile Federal must pay defense

2  costs as they are incurred in the securities action and the

3  criminal proceeding, its ultimate liability for such costs is

4  only with respect to such liabilities as fall under the

5  coverage provided. To the extent such liabilities are excluded

6  from coverage by the personal profit exclusion, Federal is not

7  required to pay for defense costs. Since this allocation cannot

8  be made at this juncture and the duty to defend is broader than

9  the duty to indemnify, Federal must pay all defense costs as

10  incurred, subject to recoupment when Kozlowski's liabilities,

11  if any, are determined." Federal Insurance Co. v. Kozlowski,

12  792 N.Y.S.2d at 404.

13        Thus, given the doubt raised by Mr. Kozlowski, the

14  insured, in his summary judgment motion as to whether the

15  insurer had met those stringent tests, the Appellate Division

16  concluded that pending a final determination of the disputed

17  coverage issues the insurer would need to advance defense

18  costs.  (I note that the court did so notwithstanding

19  allegations by the insurer regarding the obvious merits of its

20  various alleged defenses to payment, as Axis has alleged in

21  this proceeding that at least with regard to the alleged

22  conduct of Mr. Bennett the prior knowledge exclusion "clearly"

23  applies here.)

24        The New York courts have twice since the Koslowski

25  case adopted its rationale, although in one case in dicta.  In

26  Ghose v. CNA Reinsurance Company Limited, 841 N.Y.S.2d 519 (1st

17

1   Dept. 2007), the court stated, "We note, however, that if the

2   complaint were not being dismissed on grounds of inconvenient

3   forum, the interim award of defense costs would not be

4   disturbed.  New York law requires that a judicial order is a

5   condition precedent to the cessation of payment for defense

6   costs in circumstances where a claim has already been made,"

7   citing Koslowski.

8          Similarly, in Trustees of Princeton University v.

9   National Union Fire Insurance Company of Pittsburgh, 839

10  N.Y.S.2d 437 (Sup. Ct. 2007), the court, after noting many of

11  the same rules of construction that I quoted from the Koslowski

12  and WorldCom cases, stated,  "The insurer's duty to pay defense

13  costs arises when the insured incurs the expenses.  Where

14  coverage is disputed, insurers are required to make

15  contemporaneous interim advances of defense expenses subject to

16  recoupment in the event it is ultimately determined the policy

17  does not cover the claim."

18         A similar finding, albeit in respect of slightly

19  different policy language, was reached by Judge Cote in the

20  WorldCom opinion that I cited earlier, In re WorldCom

21  Securities Litigation, 354 F.Supp.2d at 455.  Axis has

22  attempted to distinguish the WorldCom opinion on two bases,

23  neither of which succeed.  The first is that Judge Cote was

24  dealing with a defense of rescission as opposed to a specific

25  alleged exclusion in the policy.  I don't accept that

26  distinction, however, because I believe that, in either case,

18

1   the key point was that there was a dispute as to whether there

2   was any obligation to pay on the insurer's part.

3        The second basis is that the advancement language in

4   the policy in <u>WorldCom</u> did not contain the word "covered"

5   before "defense costs," and used the word "shall" as opposed

6   to "will" before the word "pay." But, for the same reason that

7   I don't believe the first distinction is meaningful, I don't

8   believe the second one is, either. In either case, the issue

9   hinged upon whether the insurer could unilaterally act to

10  withhold payment based on its interpretation of whether it was

11  obligated to pay: here, whether the claim was excluded from

12  coverage, in <u>WorldCom</u>, whether the policy was void ab initio.

13  I believe Judge Cote's logic in finding a duty to pay pending

14  judicial determination of the underlying dispute would apply

15  under either scenario.

16       The claimed distinction that I just discussed was

17  addressed expressly, moreover, by the District Court for the

18  Eastern District of Pennsylvania in <u>Associated Electric and Gas</u>

19  <u>Insurance Services Limited v. Rigas</u>, 382 F. Supp. 2d 685 (E.D.

20  Pa. 2004). Because of a prior Third Circuit opinion, <u>Little v.</u>

21  <u>MGIC Indemnity Corporation</u>, 836 F.2d 789 (3d Cir. 1987), the

22  court in the <u>Rigas</u> case had little trouble finding that the

23  insurer's rescission allegation did not give it the unilateral

24  right to withhold defense costs. The <u>Rigas</u> court then

25  separately considered, however, whether a unilateral right

26  existed in respect to withholding advancement of defense costs

19

1  because of alleged applicable exclusions from coverage,

2  including a prior knowledge exclusion, which, like the Axis

3  policy exclusion, did not expressly require a final

4  adjudication for the exclusion to take effect.  As here,

5  however, the court in the Rigas case noted that the prior

6  knowledge exclusion also did not contain any language to

7  suggest that it operated at the discretion of the insurer.

8          In the Rigas case, the court determined that the

9  carrier had a duty to contemporaneously pay the disputed

10  defense costs, given the policy's language in respect of

11  defense costs and the generally recognized obligation under an

12  indemnity policy to pay whenever the insured is legally

13  obligated to pay such costs.  As here, there was no dispute in

14  the Rigas case that the insureds owed money to the lawyers

15  defending them and that this was a legal obligation.  Thus, the

16  carriers had a duty to contemporaneously pay such defense costs

17  unless that duty was altered by some other provision in the

18  policy.

19          The Rigas court concluded that the policy's knowledge

20  exclusion and other provisions were ambiguous on this point,

21  permitting two different interpretations of whether a

22  unilateral right to withhold payment was lodged in the insurer

23  (although, here, no other policy provision gave the insurer

24  such a right.)  However, since under Pennsylvania law,

25  similarly to New York law, the policy exclusion had to be

26  construed in favor of the insureds and against the insurer, the

20

1  ambiguity would not be read to permit unilateral insurer

2  action. Rigas, 382 F.Supp.2d at 700.

3          Here, as I said, I go further and find that the

4  absence of a provision giving the insurer the unilateral right

5  to withhold defense costs, especially in light of paragraph

6  (d)(2)'s second sentence, means that (d)(2) is not ambiguous;

7  but as I said before, based on the absence of any extrinsic

8  evidence offered to clarify any alleged ambiguity, under New

9  York law the provision would in any event be construed in favor

10  of the insureds and against the insurer here, as in Rigas.

11          Two recent cases from other jurisdictions which

12  generally have the same basic insurance law contract

13  interpretation principles as New York are also worth noting.

14  First, in G-1 Holdings, Inc. v. Reliance Insurance Company,

15  2006 U.S. District Lexis 17597 (D.N.J. March 22, 2006), the

16  court concluded that although the defendants argued that

17  various exclusions operated to bar coverage, "An insurer's duty

18  to defend is determined by comparing the allegations in the

19  underlying complaint with the language of the policy at issue.

20  Here, the Court has already found that there is a potential for

21  coverage should the alleged facts be proven true... Moreover,

22  should it later be adjudicated that the policy does not apply

23  to the underlying allegations, the policy specifically provides

24  for the insurer to be reimbursed." Thus the insurer was

25  required to advance the defense costs.

26          The court in Sun-Times Media Group, Inc. v. Royal &

21

1  <u>Sunalliance Insurance Company of Canada</u>, 2007 WL 1881 265 (Del.

2  Super. June 20, 2007), makes a similar point: "Furthermore,

3  the personal exclusions do not override a present contractual

4  duty to advance defense costs unless the defendants can

5  unequivocally now show that all of the obligations in the

6  underlying Illinois class action complaint fall within the

7  personal conduct exclusions.... Because the defendants have

8  failed to show at this time the applicability of the exclusions

9  to International, the Court need not decide the potential

10  applicability of the exclusions at this time."  Again, the <u>Sun-</u>

11  <u>Times</u> court noted that the policy provided, as paragraph (d)(2)

12  does here, that "Such advance payments by the insurer shall be

13  repaid to the insurer to the extent that any such insured shall

14  not be entitled under the policy ultimately to such payment."

15  And then it concluded, "Therefore, the plain language of the

16  policy guaranteeing an advancement of defense costs is not

17  precluded by any imputation of exclusions to International, as

18  well as (as explained earlier) to the outside directors."

19          In light of that case law, I find that under the

20  language of the Axis policy -- including its implicit

21  incorporation of the extensive case law regarding how such

22  policies are to be interpreted under New York law -- that

23  pending a resolution of the coverage dispute, Axis is obligated

24  to advance defense costs.  That coverage dispute is an issue

25  that the Court could and would normally decide promptly.

26  However, as I ruled on August 30, 2007, that issue cannot be

22

1   decided by me here because of the substantial overlap doctrine.

2   But that is not a reason for changing the rule that I have just

3   articulated, as is, again, I believe, supported by the Rigas

4   case, where the District Court was precluded by the stay in the

5   Adelphia bankruptcy case from deciding the coverage issue but

6   nevertheless concluded that the insurer was obligated to

7   advance the defense costs pending the resolution of the

8   coverage dispute. 382 F.Supp.2d at 700. The holding also

9   comports with the policy, discussed in WorldCom, Tyco, and

10  Rigas, of not depriving the director and officer insureds of

11  the means to contest their underlying liability.

12          So, for those reasons, I will grant the insureds'

13  motions for summary judgment.

14          Let me turn then to the cross motion for summary

15  judgment by Axis, which seeks a declaratory judgment that if,

16  in fact, it is subsequently determined by a court that the

17  defense costs are not covered, i.e., that an exclusion applies,

18  or for some other reason the defense costs are not covered by

19  the policy, the insureds who have been paid their defense costs

20  by Axis are obligated to reimburse Axis for those costs.

21          Obviously, the contract provision that I quoted

22  earlier, paragraph (d)(2), says what it says. And the fact

23  that it provides for repayment is an element of my reasoning,

24  as were similar refund or recoupment provisions in numerous

25  other cases that I have cited. However, I do not believe that

26  Axis has set forth the basis under the Declaratory Judgment Act

23

1   for a ruling on its motion, given that I believe there is no
2   justiciable controversy before me, as no insured has refused to
3   return any funds (obviously because there's yet to be any
4   determination that such payments were not covered or such
5   losses were not covered under the policy).
6           Nor, to my knowledge, has any insured disclaimed that
7   the refund of defense costs would be the appropriate result if
8   such a determination of non-coverage eventually is made, and
9   Axis has not pointed out any such disclaimer to me or cited
10  another basis to sustain an argument that, notwithstanding the
11  apparent absence of a ripe controversy it has a legitimate
12  concern that such contractual provision would be breached and,
13  therefore, it would be entitled to a determination now.  So,
14  consequently, I will deny that motion, without prejudice, on
15  the basis that, again, it does not set forth the basis under
16  the Declaratory Judgment Act for relief, given the absence of a
17  case or controversy and a lack of ripeness for declaratory
18  judgment purposes.
19          There was no formal motion for an allocation of the
20  priority of the payments to be made by Axis.  I have, I
21  believe, dealt with this issue before in my prior rulings in
22  this matter.  I do not believe that Axis' request on this
23  issue, made at the end of its initial memorandum of law in
24  opposition to the summary judgment motions, is properly before
25  me in the form of a motion or a properly raised controversy.
26  It may ultimately be one, but in the first instance I believe

24

1  that there has to be some actual dispute as to the allocation

2  or priority of payments under the policies and that in the

3  absence of such a dispute the terms of the contract will guide

4  the parties' conduct.

5      So the order granting the summary judgment motions

6  should provide that the Court has not determined any issue with

7  respect to the priority of the advancement of defense costs and

8  that all parties' rights and indeed all nonparties' rights in

9  respect of priority allocations under the Axis policy are fully

10  preserved and reserved.

11      As I normally do when I give a lengthy bench ruling,

12  particularly when I quote cases, I'll go over the transcript of

13  my ruling and reserve the right to amend it, both to correct it

14  and to add something if I believe it should be properly added,

15  but my ruling won't change, which is that the summary judgment

16  motions are granted.

17      So I would ask each of the -- well, not each of you,

18  but the respective counsel for the groups of movants and

19  Mr. Murphy to submit orders for their respective clients

20  consistent with my ruling.

21

Exhibit P

Hearing Date:  **August 30, 2007 at 10:00 a.m.**
Objection Date:  **August 23, 2007 at 5:00 p.m.**
Reply Date:  **August 29, 2007 at 5:00 p.m.**

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000 telephone
(202) 719-7049 facsimile
Daniel J. Standish (DS-0771), *pro hac vice pending*
Jonathan M. Jacobs (JJ-4642), *pro hac vice pending*
Cara T. Duffield (CD-2856), *pro hac vice pending*

**WILEY REIN LLP**
7925 Jones Branch Drive
McLean, VA 22102
(703) 905-2800 telephone
(703) 905-2820 facsimile
Dylan G. Trache (DT-4013), *pro hac vice pending*

*Attorneys for Arch Insurance Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ————————————————X | **Chapter 11** |
| In re:                                                     : | |
|                                                              : | **Case No.:  05-60006 (RDD)** |
| REFCO INC., *et al*.,                           : | |
|                           Debtors.             : | **(Jointly Administered)** |
| ————————————————X | |
|                                                              : | |
| AXIS REINSURANCE COMPANY,       : | **Adv. Proc. No. 07-01712 rdd** |
|                                                              : | |
|                           Plaintiff,             : | **MOTION TO INTERVENE OF** |
|                                                              : | **ARCH INSURANCE COMPANY** |
|                           v.                      : | |
|                                                              : | |
| PHILLIP R. BENNETT, ET AL.              : | |
|                                                              : | |
|                           Defendants.        : | |
| ————————————————X | |

Arch Insurance Company ("Arch"), by its undersigned counsel, Wiley Rein LLP, hereby files this motion for entry of an order, pursuant to Federal Rule of Civil Procedure Rule 24(b)[1], permitting Arch to intervene as a counterclaim defendant in this adversary proceeding.

## PRELIMINARY STATEMENT

1.      The present adversary proceeding is a coverage dispute between Axis Reinsurance Company ("Axis") and various former directors and officers of Refco, Inc. ("Refco"). Axis issued a directors and officers liability insurance policy to Refco (the "Axis Policy"). While the Axis Policy is an excess policy, it appears that the $17.5 million in underlying insurance has been exhausted. Axis's complaint in this action seeks a declaration that the Axis Policy does not afford coverage for various civil, criminal and regulatory proceedings pending against the insureds (the "Underlying Matters"). Certain insureds — specifically, Messrs. Klejna, Murphy, Silverman, Sexton and Sherer (the "Officer Defendants") — have filed counterclaims that seek, *inter alia,* injunctive relief requiring Axis to advance defense costs from the Axis Policy and a motion to compel such advancement ("Motion to Force Advancement").

2.      Arch seeks to intervene as a defendant to the Officer Defendants' counterclaims to the limited extent that the Officer Defendants seek to force the advancement of defense expenses prior to the adjudication of the coverage issues. Arch also issued an excess directors and officers liability insurance policy to Refco (the "Arch Policy"). While the Arch Policy is excess of $40 million in underlying insurance, $17.5 million of that amount already has been exhausted. It is a virtual certainty that, given the number of Underlying Matters, the number of insureds defending those matters, and the nature and procedural posture of the pending matters — which include a federal criminal action scheduled for trial in March 2008 and a federal

---

[1] Federal Rule of Civil Procedure 24(b) is made applicable in adversary proceedings through Rule 7024 of the Federal Rules of Bankruptcy Procedure.

securities class action lawsuit that has survived a motion to dismiss — the insureds will seek to access the limit of the Arch Policy. Arch has an undeniable interest in the resolution of the Officer Defendants' motion to force an insurer to advance defense costs prior to the adjudication of threshold coverage issues. Arch has attached hereto as Exhibit A a memorandum setting forth the grounds for its opposition to the Officer Defendants' Motion to Force Advancement.

3.       Arch does not seek to adjudicate herein the question whether there is coverage for the Underlying Matters under the Arch Policy. In a separate proceeding, the New York Supreme Court held that Arch could not obtain a declaration as to the ultimate question of coverage under the Arch Policy because certain facts relevant to that determination would be decided in the Underlying Matters. However, the New York Supreme Court did not decide whether Arch would have any obligation to advance defense costs in advance of a determination of coverage issues. Arch seeks to intervene as a defendant to the Officer Defendants' counterclaims only to the limited extent that the counterclaims seek injunctive relief forcing advancement of defense costs; thus, its intervention in this litigation would not run afoul of the New York Supreme Court's ruling.

4.       As set forth below, Arch fully satisfies the standards for permissive intervention set forth in Federal Rule of Civil Procedure 24(b). Accordingly, Arch respectfully requests that the Court (1) allow Arch to intervene as a counterclaim-defendant and accept Arch's pleadings in intervention; (2) accept Arch's memorandum in opposition to the Officer Defendants' Motion to Force Advancement; and (3) allow Arch to be heard at the August 30, 2007 hearing on the Officer Defendants' motion.

## BACKGROUND

5.       *The Arch Policy.* The Arch Policy issued to Refco is an excess directors, officers and corporate liability policy. The Arch Policy has a limit of liability of $10 million excess of

3

$40 million in underlying insurance.  A copy of the Arch Policy (without the applications submitted for the policy and the underlying policies and the materials submitted therewith) is attached as Ex. 1 to the Declaration of Jonathan M. Jacobs ("Jacobs Decl."), filed concurrently herewith.  Various other insurers issued underlying insurance policies to Refco.  U.S. Specialty Insurance Company issued a primary policy with limits of $10 million excess of applicable retentions (the "Primary Policy"), a copy of which (without the application submitted for the policy and the materials submitted therewith) is attached to the Jacobs Declaration as Ex. 2.  Lexington Insurance Company issued a first excess policy with limits of $7.5 million excess of $10 million (the "Lexington Policy").  Axis Reinsurance Company issued a second excess policy with limits of $10 million excess of $17.5 million (the "Axis Policy").  Allied World Assurance Company issued a third excess policy with limits of $12.5 million excess of $27.5 million (the "AWAC Policy").

6.     In general, the Arch Policy applies in conformance with the terms and conditions of the Primary Policy and in conformance with the terms and conditions of the Arch Policy or any other underlying insurance "further limiting or restricting coverage."  Arch Policy, Jacobs Decl. Ex. 1, Section I.C.  The Arch Policy provides that "[i]n no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the Underlying Insurance."  *Id.*

7.     Two policy provisions are particularly relevant to the Officer Directors' counterclaims and their Motion to Force Advancement.  First, the Primary Policy, to which the Arch Policy follows form in certain respects, states as follows:

> (1)     The Insurer will have no duty under this Policy to defend any Claim.  The Insureds must defend any Claim made against them. . . .

> (2)    The Insurer will pay *covered* Defense Costs on an as-
> incurred basis. If it is finally determined that any Defense Costs
> paid by the Insurer are not covered under this Policy, the Insureds
> agree to repay such non-covered Defense Costs to the Insurer.

Primary Policy, Conditions (D)(1)-(2) (emphasis added) (the "Advancement Provision").

Second, the Arch Policy contains the following provision:

> If any Insured as of August 11, 2005 has any knowledge of or
> information concerning any act, error, omission, fact, matter or
> circumstance that might give rise to a Claim under this Policy, the
> Excess Insurer shall not be liable to make any payment under this
> Policy as a result of a Claim arising out of, based upon or
> attributable to any such act, error, omission, fact, matter or
> circumstance.

Arch Policy, Endorsement No. 4 (the "Arch Prior Knowledge Exclusion").

8.    ***The Arch Coverage Action.*** The Court is well aware of the events that led to

Refco's bankruptcy filing. Suffice it to say that, in October 2005, a mere two months after its

initial public offering, Refco announced that its financial statements failed to disclose the

existence of a $430 million receivable from an entity controlled by Philip Bennett and therefore

were unreliable. *See, e.g.,* Axis Compl., ¶¶ 56-83. Numerous lawsuits were filed against

Refco's directors and officers. *See id.,* ¶¶ 87-111. Certain directors and officers sought coverage

for these Underlying Matters under the Refco directors and officers insurance policies.

9.    Arch denied coverage for the Underlying Matters citing, among other grounds,

the Arch Prior Knowledge Exclusion. On March 9, 2006, Arch filed a declaratory judgment

action in New York state court seeking a declaration that the Arch Policy did not afford coverage

for the Underlying Matters. *See Arch Ins. Co. v. Bennett, et al.,* Index No. 06/600805 (Supreme

Court of the State of New York, New York County) ("Arch Coverage Litigation"). A copy of

the Amended Complaint Arch filed in that litigation is attached to the Jacobs Declaration as

Ex. 3. Arch sought a declaration that the Arch Prior Knowledge Exclusion barred coverage for

the Underlying Matters.  Because the Arch Policy applies in conformance with the terms and

conditions in the underlying insurance policies "further limiting or restricting coverage" afforded

by the Primary Policy, *see* Arch Policy, Section I.C, Arch also sought declarations of non-

coverage based on certain provisions in the underlying insurance policies.  Specifically, Arch

sought a declaration that a prior knowledge exclusion in the AWAC Policy barred coverage for

the Underlying Matters.  Arch also sought a declaration that a provision in the Lexington Policy

barred coverage for defense costs incurred in the Underlying Matters.  *See* Arch Am. Compl.,

¶¶ 76-79, 84-88.  On June 8, 2006, in response to a motion filed by Arch, this Court held that

Arch was entitled to relief from the automatic stay to prosecute its coverage action.  *See* Jacobs

Decl. Ex. 4.

       10.     In September 2006, the defendant insureds filed motions to stay and/or dismiss

Arch's coverage action.  First, Bennett moved to stay the action in light of his pending criminal

trial.  Second, a number of former Refco officers (Klejna, Murphy, Silverman, Sexton, Sherer

and Trosten) moved to dismiss the action on the grounds that a) the action was not ripe, because

the Arch Policy would not attach until $40 million in underlying insurance had been exhausted

— and the possibility of such exhaustion was remote, and b) adjudication of Arch's coverage

defenses would involve facts disputed in the Underlying Matters.  Contrary to the arguments

they now ask this Court to embrace, the Officer Defendants contended that Arch would not

suffer any prejudice from dismissal of its coverage action because, having denied coverage for

the Underlying Matters, Arch would not need to advance defense costs:

> Arch has already denied coverage based on the prior knowledge
> exclusions.  In the context, its remedy is quite clear and adequate:
> in conformance with its denial letter, it may simply refuse to
> indemnify any of the Defendants when and if their liability ever
> does exceed $40 million so as to trigger the Arch Policy.

Reply Mem. in Supp. of Officer Defs.' Mot. to Dismiss, Jacobs Decl Ex. 5, at 8-9.  Third, the

Director Defendants moved to dismiss on the grounds that the Arch Policy supposedly required

Arch to advance defense costs.

11.     In an Order dated February 20, 2007, (the "Arch Coverage Litigation Order"),

Justice Helen E. Freedman of the New York Supreme Court dismissed Arch's coverage action

without prejudice.  *See* Jacobs Decl. Ex. 6.  The court granted the Officer Defendants' motion to

dismiss, holding that Arch's action was not ripe because the possibility that the underlying

insurance would be exhausted was remote.  The court also held that facts necessary to adjudicate

application of the Arch Prior Knowledge Exclusion were "central to the Underlying Matters and

must be adjudicated in those actions."  Arch Coverage Litigation Order at 3.  The court declined

to reach Bennett's motion to stay or the Director Defendants' motion to dismiss.  *Id.* at 3-4.

12.     In the interim, on October 16, 2006, after they had a filed a motion in the Arch

coverage litigation arguing that Arch's action was not ripe — but before the New York Supreme

Court ruled on the motion — Officer Defendants Klejna and Murphy filed a declaratory

judgment action in New Jersey state court.  *See Murphy, et al*. v. *Lexington Ins. Co., et al.*,

Docket No. L-5004-06 (Sup. Ct. of New Jersey, Hudson County).  In their complaint, Klejna and

Murphy sought a declaration that Lexington was obligated to advance defense costs under the

Lexington Policy.  Klejna and Murphy sought an interpretation of precisely the same provision

of the Lexington Policy that Arch had sought to have interpreted in its coverage action.  Klejna

and Murphy named as defendants Lexington and certain "DOE" defendants.  Although not

explicitly named, the "DOE" defendants clearly were intended to be the excess carriers who had

issued policies to Refco, including Arch.  *See* Compl., Jacobs Decl. Ex. 7, at ¶ 8 ("each

fictitiously named Defendant is an insurance carrier with obligations of indemnity including, but

not limited to, an obligation to pay attorneys' fees, costs and litigation expenses . . . "). In short,
Klejna and Murphy sought to litigate in a different forum the very issues they argued were not
ripe.[2]

13.    On May 23, 2007, Axis instituted the present proceeding before this Court. On
July 13, Klejna, Murphy, Silverman, Sexton and Sherer filed answers, counterclaims, and a
motion to force Axis to advance defense costs in the Underlying Matters. Arch now moves to
intervene in this proceeding, as defendants to the Officer Defendants' counterclaims, to oppose
the Officer Defendants' efforts to force the advancement of defense costs before the adjudication
of coverage issues.

## BASIS FOR RELIEF REQUESTED

14.    Arch satisfies the criteria for permissive intervention under the Federal Rules.
Federal Rule of Civil Procedure 24(b) provides that "[u]pon timely application anyone may be
permitted to intervene in an action . . . when an applicant's claim or defense and the main action
have a question of law or fact in common." Fed. R. Civ. P. 24(b). In addition, a court must
consider whether the intervention will "unduly delay or prejudice the adjudication of the rights of
the original parties." *Id.* Courts determining whether to grant motions for permissive
intervention also may consider the nature and extent of the intervenors' interests; the degree to
which those interests are adequately represented by existing parties; and whether the intervention
will contribute to the "just and equitable adjudication of the legal questions presented." *Int'l
Design Concepts, LLC v. Saks Inc.*, 486 F. Supp. 2d 229, 235 (S.D.N.Y. 2007) (citing *H.L.
Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 797 F.2d 85, 89 (2d Cir. 1986)).

---

[2]    Lexington sought to stay the New Jersey coverage action and intervene in the Arch coverage action.
However, the New York Supreme Court dismissed Arch's action without prejudice without ruling on Lexington's
motion.

A.    **Arch's Intervention is Timely and Would Not Prejudice the Existing Parties**

15.    Arch's motion to intervene is timely.  Courts evaluating the timeliness of motions to intervene examine "how long the applicant had notice of the interest before [he] made the motion to intervene" and "prejudice to the existing parties resulting from any delay."  *D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001).  Arch seeks to intervene to litigate the issue whether the Arch Policy requires Arch to advance defense costs pending a final judicial declaration as to coverage issues, even when Arch has denied coverage.  The Officer Defendants interposed the issue when they filed a counterclaim for advancement of defense costs and motion to advance defense costs on July 12, 2007, less than a month ago.

16.    Arch's motion will not cause any undue delay.  The Court has set an August 30, 2007, hearing date for the Officer Defendants' Motion to Force Advancement.  Arch seeks to have its Motion to Intervene and opposition to the Motion to Force Advancement considered at the August 30th hearing, and does not seek a postponement of the hearing.  Arch has served this Motion to Intervene well in advance of the August 30th hearing and in conformance with the existing parties' schedule for briefing the Officer Defendants' Motion to Force Advancement.

17.    Nor would Arch's intervention prejudice any of the parties.  This action is in its infancy.  No discovery has taken place and no dispositive motions have been decided.  Arch's intervention would not inject issues into this case that would complicate its resolution.  Rather, Arch seeks to be heard on an issue that the Officer Defendants already have interposed in this case by their counterclaims.

B.    **Arch has a Substantial Interest in the Advancement Issue**

18.    Arch easily satisfies the requirement in Federal Rule of Civil Procedure 24(b) that its claim in intervention and the existing action share a "common question of law or fact."  In determining whether Axis and Arch have duties to advance defense costs despite their coverage

denials, the Court will need to interpret the language of the Primary Policy under governing law. Both the Axis Policy and the Arch Policy follow form to the relevant provision in the Primary Policy. *See* Primary Policy, Condition D(2) ("[t]he Insurer will pay *covered* Defense Costs on an as-incurred basis") (emphasis added). Thus, at least part of the Court's analysis of the advancement issue will be identical as to Axis and Arch. Even if Arch were not permitted to intervene, the Court's interpretation of the Primary Policy likely would have a precedential effect on Arch. Accordingly, Arch has a substantial and undeniable interest in the outcome of the advancement issue.

19.    Arch's interests, though similar to those of Axis, would not be adequately represented by Axis here. As the Officer Defendants acknowledge, they must show a likelihood of success on the merits in order to obtain advancement of defense costs. The Primary Policy provides that the insurer shall advance "covered Defense Costs." Thus, the Officer Defendants must show a likelihood of success that the insurers' denial of coverage was incorrect. Axis and Arch have relied upon different policy provisions in denying coverage. Because Arch is a higher-level excess insurer, the Arch Policy contains and/or incorporates provisions and exclusions not present in the Axis Policy. For example, Arch denied coverage for the Underlying Matters based on, among other grounds, the Arch Prior Knowledge Exclusion. While the insureds presumably dispute the application of this exclusion to the Underlying Matters, they do not contend that the provision is not legitimately part of the Arch Policy. *Cf.* Klejna and Murphy Am. Counterclaim, ¶¶ 43-45, 78; Silverman Counterclaim, ¶¶ 43-45, 76; Sexton and Sherer Counterclaim, ¶¶ 43-45, 78.

C.    **Arch's Intervention Would Contribute to the Just and Equitable Adjudication of Legal Questions in this Case**

20.    Based on the specious arguments the Officer Defendants proffered to her, Justice Freedman ruled that "it is unlikely that Arch's obligations to pay defense costs will ever be triggered." Arch's Coverage Litigation Order, Jacobs Decl. Ex. 6, at 4. The Officer Defendants' arguments — advanced by counsel seasoned in complex litigation — that it was "highly unlikely that defense costs will ever reach [the] level [of the Arch Policy], much less in the foreseeable future" were highly inaccurate. Mem. in Supp. of Officer Defs.' Mot. to Dismiss or Stay, Jacobs Decl. Ex. 8. At the time Justice Freedman ruled, motions to dismiss in the major Underlying Matters were pending. Those motions largely have been denied and discovery is now proceeding. In addition, at the time the relevant motions were argued before Justice Freedman in November 2006, Bennett's criminal trial was set for March 2007. The government has since indicted additional defendant-insureds, and the trial has been continued to March 2008. Needless to say, defense costs are mounting quickly. Both the primary and the first excess policies have been exhausted. Arch has been informed by Lexington's counsel that the $7.5 million limit of the Lexington Policy was fully eroded by invoices for defense costs that pertained mainly to the period March - June 2007, which means that insureds are expending approximately $2 million a month in defense costs in the Underlying Matters.

21.    The likelihood that defense costs or settlements will ***not*** implicate Arch's limit is now the remote possibility, not vice versa. If Arch is not permitted to intervene in this case, it undoubtedly will be forced to litigate the same advancement issue against the same insureds at another time in another case. Thus, the interests of judicial economy favor Arch's intervention.

22.    The need for a ruling on the advancement issue from a single court in a single proceeding is particularly pressing given the history of the parties' coverage disputes and the

11

opportunistic litigation tactics of the insureds. Certain Officer Defendants have now twice

sought to capitalize on separate proceedings to make inconsistent arguments before different

courts. In the Arch coverage action, the Officer Defendants argued that the coverage issues in

Arch's complaint were not ripe for adjudication. They also argued that Arch would not be

prejudiced by dismissal of its action because, having denied coverage, Arch would have no

obligation to advance defense costs. Officer Defendants' Reply Mem., Jacobs Decl. Ex. 5, at 8.

Two of the Officer Defendants, Klejna and Murphy, then proceeded to file an action in a

different court seeking adjudication of one of the very issues that Arch had sought to litigate.

And now all of the Officer Defendants come to this Court, arguing that the insurers should be

forced to advance defense costs notwithstanding their coverage denials. Allowing the remaining

insurers to argue the advancement issue now will foreclose the potential for further conflicting

arguments before different judges.[3]

     23.    Finally, Arch's intervention would not interfere with the New York Supreme

Court's ruling in the Arch coverage action. In her opinion, Justice Freedman held that Arch

could not presently litigate the ultimate question of coverage. Justice Freedman declined to

reach the advancement issue raised by the Director Defendants — indeed, she found that the

Director Defendants' motion was procedurally improper. *See* Arch Coverage Order at 4 ("the

Director Defendants' argument [for advancement of defense costs] does not provide an

independent basis for dismissing the complaint"). Here, Arch seeks to litigate only the motion to

force advancement of defense costs.

---

[3]    The AWAC Policy contains an alternative dispute resolution provision and accordingly AWAC has not joined in any of the various coverage actions to date.

## WAIVER OF MEMORANDUM OF LAW

24.    Because this Motion to Intervene presents no novel issues of law and the

authorities relied upon by Arch are set forth herein, Arch respectfully requests that the Court

waive L.B.R. 9013-1(b)'s requirement for the filing of a separate memorandum of law; however,

Arch reserves the right to file a brief in reply to any objection to this motion.

## CONCLUSION

25.    For the reasons set forth above, Arch respectfully requests that the Court (i) grant

this Motion to Intervene, (ii) order that Arch's Opposition to the Officer Defendants' Motion to

Force Advancement, attached hereto as Exhibit A, be deemed filed, (iii) order that Arch's

Replies to the counterclaims of Klejna and Murphy, Sexton and Sherer, and Silverman, attached

hereto as Exhibits B, C and D, respectively, be deemed filed, and (iv) allow Arch to be heard on

the advancement issue at the August 30, 2007 hearing.  A Proposed Order is attached hereto as

Exhibit E.

Date:   August 10, 2007                    Respectfully submitted,

                                             /s/ Daniel J. Standish
                                           Daniel J. Standish (DS-0771), *pro hac vice pending*
                                           Jonathan M. Jacobs (JJ-4642), *pro hac vice pending*
                                           Cara T. Duffield (CD-2856), *pro hac vice pending*
                                           WILEY REIN LLP
                                           1776 K Street, NW
                                           Washington, DC 20006
                                           (202) 719-7000 telephone
                                           (202) 719-7049 facsimile

                                             /s/ Dylan G. Trache
                                           Dylan G. Trache (DT-4013), *pro hac vice pending*
                                           WILEY REIN LLP
                                           7925 Jones Branch Drive
                                           McLean, VA 22102
                                           (703) 905-2800 telephone
                                           (703) 905-2820 facsimile

                                           *Attorneys for Movant Arch Insurance Company*

**Hearing Date:  August 30, 2007 at 10:00 a.m.**
**Reply Date: August 27, 2007 at 5:00 p.m.**

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000 telephone
(202) 719-7049 facsimile
Daniel J. Standish (DS-0771), *pro hac vice pending*
Jonathan M. Jacobs (JJ-4642), *pro hac vice pending*
Cara T. Duffield (CD-2856), *pro hac vice pending*

**WILEY REIN LLP**
7925 Jones Branch Drive
McLean, VA 22102
(703) 905-2800 telephone
(703) 905-2820 facsimile
Dylan G. Trache (DT-4013), *pro hac vice pending*

*Attorneys for Intervenor/Counterclaim Defendant Arch Insurance Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| ————————————————X | | |
| IN RE: | : | **Chapter 11** |
| | : | |
| REFCO INC., *ET AL.*, | : | **Case No.:  05-60006 (RDD)** |
| | : | |
| | : | **(Jointly Administered)** |
| Debtors. | : | |
| ————————————————X | | |
| | : | |
| AXIS REINSURANCE COMPANY, | : | **Adv. Proc. No. 07-01712 rdd** |
| | : | |
| Plaintiff, | : | **ARCH INSURANCE COMPANY'S** |
| | : | **OPPOSITION TO THE OFFICER** |
| v. | : | **DEFENDANTS' MOTION TO FORCE** |
| | : | **ADVANCEMENT OF DEFENSE COSTS** |
| PHILLIP R. BENNETT, ET AL. | : | |
| | : | |
| Defendants. | : | |
| | : | |
| ————————————————X | | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 3

ARGUMENT ........................................................................................................... 3

I.    THE OFFICER DEFENDANTS HAVE NOT DEMONSTRATED A
      LIKELIHOOD OF SUCCESS ON THE MERITS. ........................................... 3

      A.    The Arch Policy Imposes a Duty to Advance Only Covered Defense
            Costs........................................................................................................ 3

            1.    The Officer Defendants' interpretation of the Advancement
                  Provision fails to give effect to all of the terms in the provision and
                  is unreasonable as a matter of law. ............................................... 4

            2.    The Officer Defendants' interpretation of the Advancement
                  Provision fails to harmonize with the Allocation Provision. ..................... 5

            3.    The Officer Defendants have failed to make any showing that their
                  defense costs are "covered" defense costs. ................................. 7

      B.    Under Well-Established Principles of Insurance Law, an Insurer Has No
            Duty to Advance Defense Costs Pending the Outcome of a Coverage
            Action..................................................................................................... 8

            1.    Illinois law expressly rejects the proposition that an insurer must
                  advance defense costs pending a judicial determination of coverage
                  issues. ........................................................................................ 9

            2.    The New York cases the Officer Defendants cite are
                  distinguishable. ......................................................................... 11

      C.    The Officer Defendants Must Show a Substantial Likelihood of Success
            on the Merits. ....................................................................................... 15

II.   THE OFFICER DEFENDANTS HAVE NOT DEMONSTRATED A BALANCE
      OF HARMS IN THEIR FAVOR............................................................... 17

III.  THE OFFICER DEFENDANTS HAVE NOT DEMONSTRATED THAT THE
      EQUITIES WEIGH IN THEIR FAVOR....................................................... 19

IV.   THE CRIMINAL DEFENDANTS' REQUEST FOR ADVANCEMENT IS
      PROCEDURALLY IMPROPER.................................................................. 20

CONCLUSION...................................................................................................... 21

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*America Home Assurance Co. v. Merck & Co.*,
   329 F. Supp. 2d 436 (S.D.N.Y. 2004)................................................................9

*Associated Electric & Gas Insurance Services v. Rigas*,
   382 F. Supp. 2d 685 (E.D. Pa 2004) ..........................................................6, 13

*Brewer v. West Irondequoit Central School District.*,
   212 F.3d 738 (2d Cir. 2000)....................................................................15, 16

*G-I Holdings, Inc. v. Reliance Insurance Co.*,
   No. 00-cv-6189, 2006 WL 776809 (D.N.J. Mar. 24, 2006) .....................13

*Gaon v. Twin City Fire Insurance Co.*,
   No. 05-civ-4477 (S.D.N.Y. Jun. 2, 2005) ............................................17, 18

*Johnson v. Kay*,
   860 F.2d 529 (2d Cir. 1988)....................................................................15, 16

*Jolly v. Coughlin*,
   76 F.3d 468 (2d Cir. 1996).............................................................................16

*Joseph Scott Co. v. Scott Swimming Pools, Inc.*,
   764 F.2d 62 (2d Cir. 1985)...............................................................................3

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
   454 F.3d 108 (2d Cir. 2006).............................................................................4

*National Union Fire Insurance Co. v. Brown*,
   787 F. Supp. 1424 (S.D. Fla. 1991),
   aff'd, 963 F2d 385 (11th Cir. 1992) ...............................................................13

*Sunward Electrics, Inc. v. McDonald*,
   362 F.3d 17 (2d Cir. 2004)...............................................................................3

*Tom Doherty Associate v. Saban Entertainment, Inc.*,
   60 F.3d 27 (2d Cir. 1995) ..............................................................................16

*In re WorldCom, Inc. Securities Litigation*,
   354 F. Supp. 2d 455 (S.D.N.Y. 2005)................................................... passim

# TABLE OF AUTHORITIES

**Page**

## STATE CASES

*America Refining Fuel Co. v. Resources Recycling, Inc.*,
    722 N.Y.S.2d 570 (N.Y. App. Div. 2001) ..................................................................11

*Federal Insurance Co. v. Kozlowski*,
    792 N.Y.S.2d 397 (N.Y. App. Div. 2005) ................................................................12

*McGroarty v. Great America Insurance Co.*,
    329 N.E.2d 172 (N.Y. 1975)......................................................................................11

*Servidone Construction Co. v. Securities Insurance Co.*,
    477 N.E.2d 441 (N.Y. 1985)......................................................................................11

*State Farm Fire & Casualty Co. v. Martin*,
    710 N.E.2d 1228 (Ill. 1999) ...................................................................................9, 10

*Those Certain Underwriters at Lloyd's v.
    Professional Underwriters Agency, Inc.*,
    848 N.E.2d 597 (Ill. App. 2006) ...............................................................................10

Intervenor/counterclaim-defendant Arch Insurance Company ("Arch") opposes the motion to force advancement of defense costs ("Motion to Force Advancement") filed by Defendants Dennis Klejna, Joseph Murphy, William M. Sexton, Gerald Sherer and Philip Silverman (the "Officer Defendants"). In support of that opposition, Arch respectfully states as follows:

## PRELIMINARY STATEMENT

The Officer Defendants advance the remarkable proposition that an insurer is powerless to deny coverage and must advance defense costs for any claim — no matter how plainly and obviously excluded from coverage — until it obtains a judicial declaration of non-coverage. The Officer Defendants assert that insurers will not be harmed because they can simply recoup any amounts that are held to be non-covered, but they ignore the practical reality that such amounts may be unrecoverable, which would result in policyholders obtaining an unbargained-for windfall.

There is no basis in the Arch Policy for the windfall the Officer Defendants seek. The provision in the Arch Policy that governs advancement of defense costs (the "Advancement Provision") states that Arch has a duty to advance only *covered* defense costs. Here, the Officer Defendants' defense costs for the Underlying Matters have not been shown to be covered defense costs. Arch denied coverage for the Underlying Matters and, in an abundance of caution, instituted a declaratory judgment action in the New York Supreme Court to confirm its coverage determination. Ironically, the Officer Defendants sought, and obtained, a dismissal of the coverage proceedings that would have established whether the defense costs they now seek in fact were covered or non-covered.

Nor does Arch have any general duty at law to advance defense costs until it obtains a judicial declaration of non-coverage. Indeed, Illinois law, the law most likely to apply here,

1

specifically rejects this proposition. New York law, which the Officer Defendants implicitly

apply, generally is in accord. Under the law of both states, an insurer may deny coverage

without obtaining a judicial declaration, subject only to the risk (and consequences) that its

coverage denial may be held incorrect. The two New York cases the Officer Defendants cite,

*WorldCom* and *Kozlowski*, are distinguishable from the present case. In both cases, the insurers

sought to rescind the policies they had issued, voiding those policies entirely. Here, Arch is not

seeking to rescind its policy, only to enforce the terms of an unambiguous exclusion.

　　　　Indeed, in the coverage litigation Arch brought in New York Supreme Court, the Officer

Defendants themselves recognized that an insurer may deny coverage and stand on that denial to

refuse to advance defense costs. In their motion papers in that litigation, the Officer Defendants

argued that Arch would suffer no prejudice if its declaratory judgment action were dismissed

because Arch already had denied coverage and therefore could refuse to make any payments

from the Arch Policy. Their prior contradictory stance severely undermines the Officer

Defendants' present position.

　　　　In short, the Officer Defendants fail to meet the standards for granting preliminary

injunctions. The Officer Defendants' interpretation of the Advancement Provision is

unreasonable as a matter of law, and therefore they cannot demonstrate any likelihood of success

on the merits. While the Officer Defendants contend they will suffer irreparable injury if they

cannot defend the Underlying Matters, they proffer no evidence that the insurance proceeds at

issue are their only available source of funding. Nor do they attempt to engage in any balancing

of harms. Finally, the Officer Defendants fail to recognize the inequities inherent in their

position: the Officer Defendants argue the insurers must advance amounts until they obtain a

2

declaration of non-coverage, yet they strenuously seek to block the insurers from obtaining just such a declaration.

For the reasons set forth below, Arch respectfully requests that the Court deny the Officer Defendants' Motion to Force Advancement.

## BACKGROUND

The factual background relevant to Arch's opposition to the Officer Defendants' Motion to Force Advancement is set forth in Arch's Motion to Intervene. Unless otherwise indicated, all terms defined in the Motion to Intervene have the same meaning in this Opposition Brief.

## ARGUMENT

In order to obtain a preliminary injunction, the moving party must show 1) a likelihood of success on the merits; 2) irreparable injury absent the requested injunctive relief; and 3) a balance of hardships weighing in their favor. *See Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). Because a preliminary injunction is an equitable remedy, the decision to grant an injunction must reflect a "careful balancing of the equities." *Id.* at 26 (quoting *Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 67 (2d Cir. 1985)). Where the movant seeks to change — rather than maintain — the status quo, it must show a substantial likelihood of success on the merits. *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006).

## I.    THE OFFICER DEFENDANTS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.    The Arch Policy Imposes a Duty to Advance Only Covered Defense Costs.

The clear and unambiguous language of the Arch Policy refutes the Officer Defendants' argument that Arch is required to advance all defense costs unless and until a court determines that there is no coverage. Instead, the policy language only obligates Arch to advance ***covered***

defense costs. Arch denied coverage for the Underlying Matters based on the Arch Prior

Knowledge Exclusion. The Officer Defendants have made no showing that the defense costs

they seek are covered in light of the Arch Prior Knowledge Exclusion.

      1.    **The Officer Defendants' interpretation of the Advancement Provision fails to give effect to all of the terms in the provision and is unreasonable as a matter of law.**

The Advancement Provision in the Primary Policy to which the Arch Policy generally

follows form provides that:

> The Insurer will pay *covered* Defense Costs on an as-incurred
> basis. If it is finally determined that any Defense Costs paid by the
> Insurer are not covered under this Policy, the Insureds agree to
> repay such non-covered Defense Costs to the Insurer.

Primary Policy, Jacobs Decl. Ex. 2, Condition D(2) (emphasis added).

The Officer Defendants' interpretation fails to give effect to all the language in the

Advancement Provision and therefore must be rejected. The plain language of the Advancement

Provision negates the Officer Defendants' argument that Arch has an unconditional duty to

advance all defense costs on an as-incurred basis. The provision states that the Insurer will pay

only *covered* defense costs on an as-incurred basis. If, as the Officer Defendants argue, the

Primary Policy obligated the Insurer to pay *all* defense costs as they were incurred, the word

"covered" would be rendered meaningless.

The Officer Defendants' interpretation of the Advancement Provision also would render

the provision internally contradictory. The Officer Defendants contend that, until there is a

judicial determination, defense costs are neither covered nor non-covered because the parties

cannot make that determination absent judicial decree. Motion To Force Advancement at 11. If

that were so, how could an insurer pay "covered Defense Costs on an as-incurred basis?" Absent

4

an agreement between them, the parties would not know whether the Defense Costs were covered or not as they were incurred.

The only logical interpretation of the Advancement Provision is that the provision requires the insurer to make an initial determination as to whether defense costs are covered under the terms of the policy. If the defense costs are covered, the insurer will advance them on an as-incurred basis. The second sentence of the Advancement Provision governs circumstances where an insurer has elected to advance defense costs and some or all of those defense costs later are determined to be non-covered. Notably, certain exclusions in the Primary Policy are triggered only "if there has been a final adjudication adverse to [the] Insured." *See* Primary Policy, Exclusion (A) (profit or advantage to which the Insured is not legally entitled), Exclusion (B) (exclusion for criminal, fraudulent or dishonest acts). The second sentence of the Advancement Provision would come into play if the insurer did not deny coverage outright but reserved rights — for instance, as to "final adjudication" exclusions — to recoup advanced defense costs. Unlike the Officer Defendants' proposed interpretation, this interpretation gives effect to all of the terms in the Advancement Provision.

### 2. The Officer Defendants' interpretation of the Advancement Provision fails to harmonize with the Allocation Provision.

Other provisions in the Primary Policy support Arch's interpretation of the Advancement Provision. Specifically, the Primary Policy contains an Allocation Provision that immediately follows the Advancement Provision. The Allocation Provision provides that:

> If Loss covered by this Policy and loss not covered by this Policy are both incurred in connection with a single Claim, either because the Claim includes both covered and uncovered matters, or because the Claim is made both against Insured Persons . . . and against others not included within the definition of Insured Person . . . the Insureds and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts, taking into account the relative legal and financial exposures of the parties to

5

the Claim and the relative benefits to be obtained by the resolution of the Claim. ***The Insurer will be obligated to pay only those amounts or portions of Loss allocated to covered matters*** claimed against Insured Persons . . . If the Insureds and the Insurer are unable to agree upon an allocation, then ***until a final allocation is agreed upon or determined pursuant to the provisions of this Policy and applicable law, the Insurer will be obligated to make an interim payment of that amount or portion of Loss, including Defense Costs, which the parties agree is not in dispute.***

Primary Policy, Jacobs Decl. Ex. 2, Condition (D)(3) (emphasis added).

The Allocation Provision underscores that the insurer need only advance ***covered*** defense costs. And, like the Advancement Provision, the Allocation Provision presumes that the insurer must make a determination as to whether defense costs are covered ***before*** there is a final judicial determination of coverage. If the Officer Defendants were correct, and the insurer were required to advance all defense costs until a court determined coverage, the Allocation Provision simply would never come into play at all. The Officer Defendants' interpretation of the Advancement Provision effectively reads the Allocation Provision out of existence, in violation of well-established canons of contract construction holding that the proper interpretation of a contract must give effect to all of its provisions.

The Officer Defendants may attempt to cite *Associated Electric & Gas Insurance Services v. Rigas*, 382 F. Supp. 2d 685 (E.D. Pa 2004), for a contrary result, but that attempt would be misguided. In *Rigas*, a court ruled that an insurer had a duty to advance defense costs pending a judicial determination of its rescission and coverage defenses. Citing an allocation provision similar to the one in the Arch Policy, the insurer argued it should have the discretion to determine what amounts to advance. *Id.* at 685. The court rejected the argument because, by its terms, the allocation provision only applied to situations where a claim included both covered and non-covered matters. *Id.* at 693. Accordingly, the court held that the allocation provision had no effect when the insurer had denied coverage entirely.

6

While Arch disagrees with the holding in *Rigas*, that holding is inapplicable here.  Unlike the policy at issue in *Rigas*, the Primary Policy contains an explicit Advancement Provision that limits the insurer's duty to advance to ***covered*** defense costs only.  Arch is not relying on the Allocation Provision to determine its advancement obligations.  Rather, the Allocation Provision simply buttresses the interpretation of the Advancement Provision that Arch has proffered — that the insurer must determine in the first instance whether defense costs are covered — and negates the Officer Defendants' contrary interpretation.

### 3.    The Officer Defendants have failed to make any showing that their defense costs are "covered" defense costs.

As set forth above, the Advancement Provision requires the insurer to advance only covered defense costs on a contemporaneous basis.  Thus, if the Officer Defendants wish to obtain a preliminary injunction ordering the insurers to advance defense costs, they must demonstrate a likelihood of success in proving that their defense costs for the Underlying Matters are covered defense costs.  The Officer Defendants' motion is deafeningly silent on this front.

Arch principally denied coverage for the Underlying Matters based on the Arch Prior Knowledge Exclusion.  The Arch Prior Knowledge Exclusion provides that:

> If any Insured as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a Claim under this Policy, the Excess Insurer shall not be liable to make any payment under this Policy as a result of a Claim arising out of, based upon or attributable to such act, error, omission, fact, matter or circumstance.

Arch Policy, Jacobs Decl. Ex. 1, Endorsement No. 4.  Each of the Underlying Matters arises out of facts and circumstances about which Bennett and potentially others had knowledge before August 11, 2005, the date of Refco's initial public offering.  To obtain a preliminary injunction against Arch, the Officer Defendants must show a substantial likelihood that the Arch Prior

7

Knowledge Exclusion will not bar coverage for the Underlying Matters, *i.e.*, that Bennett (or any other Insured) did not have knowledge of the facts and circumstances giving rise to the Underlying Matters.[1]  Here, the Officer Defendants have not even identified any Underlying Matter that would be potentially covered in light of the Arch Prior Knowledge Exclusion.

The Officer Defendants may cite *In re WorldCom, Inc. Securities Litigation*, 354 F. Supp. 2d 455 (S.D.N.Y. 2005), to argue that they need not make any showing regarding coverage at the preliminary injunction stage, but such arguments would be unfounded.  In *WorldCom*, the court held that, at the preliminary injunction stage, the insured was "not … required to show that he will succeed in defeating Continental's rescission argument," but rather that "under the terms of the policies, he is entitled to payment of defense costs as they are incurred, and that as a matter of law, that obligation exists until the rescission issues have been litigated and resolved."  *Id.* at 466-67.  Notably, in *WorldCom*, the insurer's sole basis for its refusal to advance was its view that the policy was void *ab initio* and therefore should be rescinded.  Absent rescission, the insurer conceded that the underlying claims would be covered under the policy.  *WorldCom*, 354 F. Supp. 2d at 462.  Under the terms of the Arch Policy, however, the Officer Defendants must show the defense costs they seek are ***covered*** defense costs.  They have failed to make this showing.

### B.    Under Well-Established Principles of Insurance Law, an Insurer Has No Duty to Advance Defense Costs Pending the Outcome of a Coverage Action.

The Arch Policy is the touchstone for determining the parties' obligations to each other. Accordingly, the Court may deny the Officer Defendants' preliminary injunction based on the

---

[1]    The fact that U.S. Specialty and Lexington, the primary and first excess carriers, advanced defense costs is irrelevant.  Their policies did not contain the Arch Prior Knowledge Exclusion, and therefore they could not have denied coverage on that basis.

8

policy language alone.  Absent some showing that the Advancement Provision violates public policy (and there has been no such showing here), background principles of insurance law cannot trump the policy's plain language.  Nevertheless, it bears emphasis that the Arch Policy's Advancement Provision is fully in accord with well-established principles of both Illinois and New York insurance law.

> **1.    Illinois law expressly rejects the proposition that an insurer must advance defense costs pending a judicial determination of coverage issues.**

Illinois law is likely to govern any coverage dispute under the Arch Policy because the policy was issued to Refco at an Illinois address and contains an Illinois amendatory endorsement.  *See* Arch Policy, Jacobs Decl. Ex. 1, Declarations, Item 1; Endorsement No. 5. *See also Am. Home Assurance Co. v. Merck & Co.*, 329 F. Supp. 2d 436, 444-45 (S.D.N.Y. 2004) (under New York choice of law analysis, Pennsylvania law applied where insured corporation had multiple locations, policy stated it was issued in Pennsylvania, and policy's only state-specific references were to Pennsylvania).

The Illinois Supreme Court explicitly has rejected the Officer Defendants' argument that an insurer must advance defense costs pending the outcome of a coverage action.  In *State Farm Fire & Casualty  Co. v. Martin*, 710 N.E.2d 1228 (Ill. 1999), the court considered whether an insurer's duty to defend was suspended when it filed a declaratory judgment action or when it actually secured a declaration of non-coverage.  The court held that forcing an insurer to advance defense costs until it obtained a judicial determination of non-coverage would "effectively require insurance companies to defend their purported insureds in *all* cases, even where the underlying complaints are clearly outside the scope of the policy" and therefore would represent an "unprecedented and unwarranted expansion of an insurer's duty to defend." *Id.* at 1231.

9

One of the grounds for the *Martin* court's holding is strikingly apposite to the instant case. The court reasoned that forcing insurers to defend until they secured declaratory judgments would incentivize insureds to delay the outcome of coverage proceedings. Under this scenario, a "potential insured with a dubious claim to insurance coverage could effectively force his insurance company to provide him with a defense" simply by seeking to delay coverage proceedings. *Id.* at 1232. This is precisely what the Officer Defendants seek to do here. *See infra*, § III.

In a recent case, an Illinois appellate court cited *Martin* and held an insurer had no duty to defend the putative insureds while it litigated a rescission action. *See Those Certain Underwriters at Lloyd's v. Prof'l Underwriters Agency, Inc.*, 848 N.E.2d 597 (Ill. App. 2006). The court noted the tension in the policyholder's arguments that, on the one hand, only a court could determine whether an insurer had a duty to defend but, on the other hand, an insurer had an "immediate" duty to defend requiring advancement of defense costs before a court determination was entered. *Id.* at 601. As the court recognized, under well-established insurance law principles, an insurer faced with a claim has four basic options: acknowledge coverage; defend under a reservation of rights; deny coverage and institute a declaratory judgment action; or deny coverage and do nothing. The court rejected as "misguided" the policyholder's argument that allowing an insurer to deny coverage without advancing defense costs would give the insurer too much discretion. *Id.* at 603. The court recognized that the law already penalizes insurers for denying coverage incorrectly. Under Illinois law, an insurer that denies coverage "trades . . . the ability to protect [its] potential interest in the underlying litigation." *Id.* at 603. In addition, an insurer whose coverage denial is found to have been in bad faith may face extra-contractual liability. *Id.*

While the Officer Defendants contend that "an insurer's duty to advance defense costs during a coverage dispute has been recognized in numerous jurisdictions," Motion To Force Advancement at 12 n.9, they fail to square with Illinois law, the law most likely to govern any coverage dispute. Under Illinois law, the Officer Defendants' motion would be rejected outright.

### 2. The New York cases the Officer Defendants cite are distinguishable.

The Officer Defendants do not take a position on the choice of law issue but primarily cite New York authority. Arch is unaware of authority from the New York Court of Appeals directly holding, as *Martin* does, that an insurer has no duty to advance defense costs once it has instituted a declaratory judgment action. However, New York follows the basic precept that an insurer may deny coverage, including coverage for defense costs, subject only to the consequences for the wrongful breach of a duty to defend. *See, e.g., McGroarty v. Great Am. Ins. Co.*, 329 N.E.2d 172, 176 (N.Y. 1975) (insurer that denies coverage "assumes the risk in making its own decision as to what is alleged or what might be proved against its insured"); *Servidone Constr. Co. v. Sec. Ins. Co.*, 477 N.E.2d 441, 444 (N.Y. 1985) (insurer that wrongfully refuses to defend may lose right to consent to settlement); *Am. Ref Fuel Co. v. Res. Recycling, Inc.*, 722 N.Y.S.2d 570, 574 (N.Y. App. Div. 2001) (insurer that denies coverage loses right to insist on insured's cooperation). This established case law demonstrates that the Officer Defendants' proposition is not supported by the weight of New York insurance law. If an insurer always had a duty to advance defense costs until a court held there was no coverage, it never would be in a position to have wrongfully breached a duty to defend.

The Officer Defendants appear to imply that *WorldCom* and *Kozlowski* create a general duty under New York law to advance defense costs pending a determination of non-coverage. Even if that were the case (and it is not), both *WorldCom* and *Kozlowski* are distinguishable

11

because the insurance policies in those cases did not explicitly limit the insurer's duty to advance defense costs to a duty to advance only ***covered*** defense costs, as the Arch Policy does.

Moreover, *WorldCom* and *Kozlowski* must be limited to their facts — specifically, the fact that in each case, the insurers were trying to rescind their policies. When an insurer denies coverage, it is merely attempting to enforce the terms of the contract. In a rescission case, the insurer challenges the validity of the policy, attempts to void it and return the parties to the positions they would have occupied had the policy never existed. Both the *WorldCom* and *Kozlowski* courts relied on New York cases holding that rescission cannot be effected unilaterally but rather only takes effect upon a judicial determination that the policy is void. *WorldCom*, 354 F. Supp. 2d at 465-66; *Fed. Ins. Co. v. Kozlowski*, 792 N.Y.S.2d 397, 402 (N.Y. App. Div. 2005). Here, Arch is not attempting to rescind the policy.

Indeed, the court in *Kozlowski* itself applied the rescission/non-rescission distinction. The court's holding that an insurer must advance defense costs pending a judicial declaration only applied to the insurer's attempt to rescind its policy and not to its alternative denial of coverage. In *Kozlowski*, the insurer sought to deny coverage based on a "personal profit" exclusion as an alternative to rescission. The court did not hold that the insurer had a duty to advance because the insurer had not yet obtained a declaration of non-coverage. Rather, the court adjudicated the coverage defense on the merits and found that the personal profit exclusion did not relieve the insurer's duty to defend. *Kozlowski*, 792 N.Y.S.2d at 402-03 (examining allegations of complaint and finding that the "allegations in each of the underlying actions

demonstrate that the claims asserted do not solely and entirely fall within the personal profit exclusion").[2]

The Officer Defendants also cite *Rigas* to support their position. As an initial matter, *Rigas* was decided under Pennsylvania law. There are no Pennsylvania contacts here that would be relevant in a choice of law analysis, so Pennsylvania law could not conceivably apply to this coverage dispute. In *Rigas*, the insurer sought to rescind the policy and to deny coverage based on a fraud exclusion and a prior knowledge exclusion. Like the courts in *WorldCom* and *Kozlowski*, the court held that the insurer could not unilaterally rescind the policy. *Rigas*, 382 F. Supp. 2d at 692. The court further held, and the insurers conceded, that the fraud exclusion did not constitute grounds to withhold advancement of defense costs, because, by its terms, the fraud exclusion only barred coverage "if a final adjudication establish[ed] that acts of active and deliberate dishonesty were committed." *Id.*, 694, 698-99.[3] The court in *Rigas* did, however, address whether a prior knowledge exclusion would relieve the insurers from advancing defense costs. The court noted that, unlike the fraud exclusion, the prior knowledge exclusion did "not require a final adjudication for the exclusion to take effect." *Id.* at 699. The court held, however, that the exclusion was ambiguous because "[t]he Prior Knowledge Exclusion . . . does not . . . contain any language to suggest that it operates at the discretion of the insurer." *Id.*

The prior knowledge exclusion holding in the *Rigas* case is distinguishable because the Arch Policy explicitly limits Arch's duty to advance to advancement of only ***covered*** defense

---

[2]     Similarly, in the case *G-I Holdings, Inc. v. Reliance Insurance Co.*, No. 00-cv-6189, 2006 WL 776809, at *2 (D.N.J. Mar. 24, 2006), the court already had found that the insurer had a duty to defend because "there is a potential for coverage should the alleged facts be proven true."

[3]     The case *National Union Fire Insurance Co. v. Brown*, 787 F. Supp. 1424 (S.D. Fla. 1991), *aff'd*, 963 F2d 385 (11th Cir. 1992), that the Officer Defendants cite also involved a "final adjudication" fraud exclusion.

13

costs and makes clear that an insurer must make an initial determination of coverage.  In any event, the issue was wrongly decided in *Rigas*.  The court was incorrect as a matter of contract construction.  The court held the exclusion was ambiguous because it did not contain explicit language stating the insurer could determine the applicability of the exclusion.  But, as the court itself recognized, when the parties wanted exclusions to apply only after a "final adjudication," they employed the terms "final adjudication."  It was not necessary for the contract to contain cumulative references to the same intent, and the court erred in imposing such a requirement.

In addition, the court was incorrect as a matter of policy.  For example, none of the exclusions in the Arch Policy contains language of the sort the *Rigas* court required, *i.e.*, language stating that the insurer shall have the discretion to determine applicability of the exclusion in the first instance.  Certain exclusions, however, only are applicable upon a "final adjudication."  Thus, the clear implication is that the insurer may deny coverage based on any "non-final adjudication" exclusions at the outset.  To hold otherwise, as the *Rigas* court did, would mean that an insurer could not deny coverage even when a claim clearly and obviously fell within the scope of a "non-final adjudication" exclusion.  For instance, the Primary Policy contains an exclusion for bodily injury.  *See* Primary Policy, Exclusion (C).  Under the *Rigas* court's extreme view, the insurer could not deny coverage if the insured submitted a claim for injuries sustained in a car crash, because the bodily injury exclusion contains no explicit language stating that the insurer has the discretion to determine whether the exclusion applies in the first instance.  The absurdity of a regime where an insurer would need to go to court to obtain a declaration of non-coverage under such circumstances illustrates the fallacy of the *Rigas* court's decision.

**C.    The Officer Defendants Must Show a Substantial Likelihood of Success on the Merits.**

For the reasons set forth above, the Officer Defendants cannot show a likelihood of success on the merits.  It is nevertheless worth noting that the proper standard should be a *substantial* likelihood of success on the merits.  The Officer Defendants acknowledge, as they must, that they seek to change the status quo through an order that Axis must advance monies that it currently is holding.  Motion To Force Advancement at 9.  Nevertheless, citing *WorldCom*, the Officer Defendants contend they must only show a likelihood of success on the merits, rather than a substantial likelihood of success on the merits.  *Id.* (citing *WorldCom*, 354 F. Supp. 2d at 463, for proposition that "[w]here a preliminary injunction grants only part of the relief to which a movant would be entitled on the merits and requires a party "to do what it should have done earlier," then it is judged under the standard for prohibiting injunctions, and not the heightened standard for mandatory injunctions").

The Second Circuit authorities the *WorldCom* court cited do not support its holding.  In *Johnson v. Kay*, 860 F.2d 529, 541 (2d Cir. 1988), and *Brewer v. West Irondequoit Central School District.*, 212 F.3d 738, 755 (2d Cir. 2000), the Second Circuit recognized that in certain cases movants seeking prohibitory injunctions — *i.e.*, seeking to maintain the status quo — may nevertheless be required to make a heightened showing.  These authorities do not hold that a movant can obtain a mandatory injunction under the lower standard, nor do the Officer Defendants cite any such authority.[4]

---

[4]    The *WorldCom* court's holding that an injunction that requires a defendant to "do what it should have done earlier" is necessarily a prohibitory injunction is also an incorrect reading of *Johnson*.  In *Johnson*, the plaintiff sought a prohibitory injunction.  The district court crafted relief that was less than what the plaintiff sought.  In doing so, the court required the defendant union to send out certain mailings to its members after requiring the plaintiff to post a bond for the amount of the mailings.  860 F.2d at 535.  The Second Circuit rejected the

(footnote continued)

15

Even if the Officer Defendants were seeking only to preserve the status quo, they would need to meet the heightened "substantial likelihood" standard. First, as the Second Circuit has recognized, a heightened standard should apply "if a preliminary injunction would make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial." *Tom Doherty Assoc. v. Saban Entmt., Inc.*, 60 F.3d 27, 35 (2d Cir. 1995). If the insurers are forced to advance sums now, the policies may already be exhausted by the time the insurers prevail on the ultimate merits of coverage. While the Officer Defendants would be required to repay the insurers, they have made no showing that they will in fact be able to do so — indeed, the record is bare as to the insureds' financial wherewithal. Second, a heightened showing for injunctive relief also applies where the "injunction sought 'will provide the movant with substantially all the relief sought . . . .' " *Brewer*, 212 F.3d at 744. (quoting *Jolly v. Coughlin,* 76 F3d 468, 473 (2d Cir. 1996)). The Officer Defendants seek to access the entire limits of the remaining insurance for defense costs. Given the insureds' "burn rate" on defense costs, the insurance policy proceeds may, as a practical matter, be entirely consumed through advancement of defense costs if the Court adopts their erroneous position. *See* Motion to Intervene at ¶ 20.

_____

(cont'd)

defendant's argument that, because the relief required an affirmative act (*i.e.*, sending mailings), the district court should have held the plaintiff to a higher standard of proof. In holding that the ordered relief was proper, the Second Circuit noted that "[w]hile the interim relief here was mandatory in the sense that the order required the union to expend funds it perhaps otherwise would not have spent, it actually only required the union to do what it should have done earlier — open channels of communication to dissenting views." *Id.* at 541. The Second Circuit was simply commenting on the circumstances before it, not articulating a new rule of law. To read that context-specific language in the broad manner the Officer Defendants suggest essentially obliterates the distinction between mandatory and prohibitory injunctions, because a party seeking a mandatory injunction will always be seeking to force the defendant to "do what it should have done earlier." Moreover, such an analysis would put the proverbial cart before the horse, requiring a court to make a decision on the merits before addressing the appropriate standard of proof.

## II.    THE OFFICER DEFENDANTS HAVE NOT DEMONSTRATED A BALANCE OF HARMS IN THEIR FAVOR.

As the court in *WorldCom* noted, the inability to defend a lawsuit may cause harm beyond monetary loss, including loss of reputation, stress and other concomitant intangible losses. *WorldCom*, 354 F. Supp. 2d at 469. The Officer Defendants have made no showing, however, that they will be unable to defend the Underlying Matters in the absence of insurance proceeds. The preliminary injunction record is bare of any evidence of the Officer Defendants' financial resources. It also contains no evidence that the Officer Defendants are in any imminent danger of losing their counsel if they cannot obtain insurance funding.

In addition, the preliminary injunction analysis requires the court to balance harm to the parties. The Officer Defendants contend that the insurers will suffer no harm from advancing now because they will be entitled to recoup amounts that are shown to be non-covered. But the Officer Defendants have not made any proffer that they will be able to repay such amounts.

In *Gaon v. Twin City Fire Insurance Co.*, No. 05-civ-4477 (S.D.N.Y. Jun. 2, 2005), the court declined to grant a preliminary injunction to an insured seeking to force an insurer that had declined coverage to advance defense costs. At the preliminary injunction hearing, Judge Kimba Wood noted the tension inherent in the policyholder's attempt to show irreparable injury and a balance of harms in its favor. Judge Wood noted, "there is a disjunction between the proposition that your clients desperately need the money now and that they will have it to pay back later even after they have spent it on litigation." Transcript of June 2, 2005 Hearing, copy attached to Jacobs Decl. as Ex. 9, at 21. The court questioned counsel for the insured, asking "what you are saying is . . . people in the position of your clients have shown that the balance of hardships tips in their favor merely because they don't have money now to pay litigation expenses. To me that doesn't sound like balancing." *Id.* at 30. Judge Wood stated, "If there were some way to make it

likely that your clients will repay X amount . . . then it seems to me the balance of hardships would not tip in favor of the insurer. But without something along those lines it seems that they would tip in favor of the insurer, who would have zero prospect, it sounds like, of being repaid." *Id.* at 28-29. Ultimately, Judge Wood held the insured had failed to show a balance of harms in its favor. *Id.* at 30, 35.

The Officer Defendants contend that the Court also should consider general public interests in determining whether to issue a preliminary injunction. They cite *WorldCom* for the proposition that "[i]f the insureds cannot rely on the coverage provisions of D&O insurance policies, companies will find it difficult to retain capable officer and directors. These policy issues outweigh any harm the insurer may claim it will suffer by paying under the terms of its contract." Motion To Force Advancement at 18-19 (citing *WorldCom*, 354 F. Supp. 2d at 469).

But there also are strong public interests weighing against the preliminary injunction. The Officer Defendants propose that an insurer must file a declaratory judgment action whenever it wishes to deny coverage for defense costs, no matter how clearly excluded the claim is. That is a litigation-maximizing, expensive and burdensome proposition, for insurers, insureds and the court system alike. If insurers are unable meaningfully to deny coverage and must litigate every claim in order to shut off liability for defense costs, policy premiums will necessarily skyrocket. Insureds will suffer the cost of higher premiums, to the extent they are not priced out of the D&O insurance market altogether. Both insurers and insureds will bear the cost of coverage litigation every time a claim is filed. Finally, courts would see their dockets increase substantially.

Because the Officer Defendants have shown neither that they will suffer irreparable injury nor that the balance of harms tips in their favor, the preliminary injunction request should be denied.

18

III.    **THE OFFICER DEFENDANTS HAVE NOT DEMONSTRATED THAT THE EQUITIES WEIGH IN THEIR FAVOR.**

The history of the coverage proceedings relating to the Underlying Matters shows that

equity does not favor the Officer Defendants.  After Arch denied coverage, it promptly sought

leave from this Court to prosecute a declaratory judgment action so that the parties would have

certainty on the coverage issues.  Recognizing the importance of having coverage issues resolved

before the Underlying Matters were fully underway, this Court granted Arch relief from the

automatic stay.  *See* Transcript of June 8, 2006 Hearing, Jacobs Decl. Ex. 4, at 99-102.

In the Arch coverage proceedings, the Officer Defendants argued they should not have to

bear the burden of coverage litigation with Arch because the Underlying Matters were not likely

ever to implicate the Arch Policy.  To buttress these arguments, the Officer Defendants argued

that Arch would not be prejudiced by dismissal because, having denied coverage, Arch could

simply stand on its denial and refuse to make payments under its policy:

> Arch has already denied coverage based on the prior knowledge
> exclusions.  In the context, its remedy is quite clear and adequate:
> in conformance with its denial letter, it may simply refuse to
> indemnify any of the Defendants when and if their liability ever
> does exceed $40 million so as to trigger the Arch Policy.

Officer Defendants' Reply Mem., Jacobs Decl. Ex. 5, at 8-9.  Based on the Officer Defendants'

specious arguments as to the amounts that would be implicated by the Underlying Matters, the

court held that it was "unlikely that Arch's obligations to pay defense costs ever will be

triggered."  *Id.* at 4.

The Officer Defendants' questionable arguments to Judge Freedman in the Arch

coverage proceedings regarding the amount of defense costs that potentially would be consumed

in defense of the Underlying Matters helped them dodge a prompt adjudication of the coverage

issues.  Now that the Officer Defendants have successfully evaded Arch's coverage action, they

seek to force advancement from the insurers with an argument that is in diametric opposition to the one they advanced before the New York Supreme Court, contending that the insurers must advance until they obtain a declaration of non-coverage. Of course, the Officer Defendants continue strenuously to resist any efforts by the insurers to obtain the adjudication of coverage issues that they contend is necessary to cut off their purported duty to advance.

The manner in which the Officer Defendants have litigated the coverage questions relating to the Underlying Matters exemplifies the concerns the Illinois Supreme Court articulated when it declined to impose a duty on insurers to advance defense costs pending a judicial determination of coverage. In *Martin*, the Illinois Supreme Court noted that such a requirement would allow insureds to obtain free, unbargained-for coverage simply by evading or protracting coverage proceedings. This is exactly what the Officer Defendants have sought to do. Equity should not reward their conduct.

## IV.    THE CRIMINAL DEFENDANTS' REQUEST FOR ADVANCEMENT IS PROCEDURALLY IMPROPER.

Criminal Defendants Bennett, Grant and Trosten seek to join in the Officer Defendants' Motion to Force Advancement. The Criminal Defendants, however, have sought to stay these proceedings and have not filed any pleading seeking affirmative relief. Thus, in addition to the reasons set forth above, the Criminal Defendants' request for advancement should be denied as procedurally improper.[5]

---

[5] The Director Defendants have filed a motion to dismiss this action. To the extent that the Director Defendants argue that the insurers have a duty to advance defense costs until they obtain a declaration of non-coverage, Arch opposes those arguments for the reasons set forth herein.

## CONCLUSION

For the reasons set forth above, Arch respectfully requests that the Court deny the Officer

Defendants' Motion to Force Advancement as well as the Criminal Defendants' joinder in that

motion.

Date:    August 10, 2007                          Respectfully submitted,


                                         /s/   Daniel J. Standish
                                        Daniel J. Standish (DS-0771), *pro hac vice pending*
                                        Jonathan M. Jacobs (JJ-4642), *pro hac vice pending*
                                        Cara T. Duffield (CD-2856), *pro hac vice pending*
                                        WILEY REIN LLP
                                        1776 K Street, NW
                                        Washington, DC 20006
                                        (202) 719-7000 telephone
                                        (202) 719-7049 facsimile

                                         /s/   Dylan G. Trache
                                        Dylan G. Trache (DT-4013), *pro hac vice pending*
                                        WILEY REIN LLP
                                        7925 Jones Branch Drive
                                        McLean, VA 22102
                                        (703) 905-2800 telephone
                                        (703) 905-2820 facsimile

                                        *Attorneys for Intervenor/Counterclaim Defendant*
                                        *Arch Insurance Company*

Exhibit Q

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ————————————————X | | **Chapter 11** |
| IN RE: | : | |
| | : | **Case No.:  05-60006 (RDD)** |
| REFCO INC., *ET AL.*, | : | |
| | : | **(Jointly Administered)** |
| Debtors. | : | |
| ————————————————X | : | |
| | : | **Adv. Proc. No. 07-01712 rdd** |
| AXIS REINSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PHILLIP R. BENNETT, ET AL. | : | |
| | : | |
| Defendants. | : | |
| | : | |
| ————————————————X | | |

**ORDER DENYING MOTION OF ARCH INSURANCE COMPANY TO INTERVENE**

Upon the Motion to Intervene ("Motion") of Arch Insurance Company ("Arch"), dated

August 10, 2007, which sought an order, pursuant to Rule 24(b) of the Federal Rules of Civil

Procedure, incorporated by Bankruptcy Rule 7024(b), permitting Arch to intervene in the above-

captioned adversary proceeding as a counterclaim-defendant for the purpose of opposing the

motion made by Dennis Klejna, Joseph Murphy, William M. Sexton, Gerald Sherer and Philip

Silverman to Require Plaintiff Axis Reinsurance Company to Pay Their Defense Costs in

Underlying Litigations (the "Advancement Motion"); and the Court having reviewed the Motion

and the objections related thereto; and upon the record of the hearing held on August 30, 2007

(the "Hearing"); and the Court having jurisdiction to consider the Motion pursuant to 28 U.S.C.

§§ 157 and 1334; and adequate and sufficient notice of the Motion and the Hearing having been

given to all parties in interest; and after due deliberation and consideration, and for the reasons

stated by the Court on the record of the Hearing, it is hereby

ORDERED that:

1.      Arch's Motion is denied;

2.      Arch's pleadings in intervention, which are attached as exhibits to the Motion,

shall not be deemed filed;

3.      Arch's memorandum in opposition to the Advancement Motion, which is attached

to the Motion as an exhibit, shall not be deemed filed; and

4.      Arch's request to be heard on the Advancement Motion at the Hearing is denied.

Dated: New York, New York
       September 6, 2007

                                        _____/s/ Robert D. Drain_____
                                              United States Bankruptcy Judge

Exhibit R

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
AXIS REINSURANCE COMPANY,                          :

        Plaintiff,                                          :
                                                   :
        v.                                              :     Index. No. _____

PHILLIP R. BENNETT, LEO R. BREITMAN,               :
NATHAN GANTCHER, TONE GRANT,                        :
DAVID V. HARKINS, SCOTT L. JAECKEL,                 :
DENNIS A. KLEJNA, THOMAS H. LEE,                    :
SANTO C. MAGGIO, JOSEPH MURPHY,                     :
RONALD L. O'KELLEY,                                 :
SCOTT A. SCHOEN, WILLIAM M. SEXTON,                 :
GERALD SHERER, PHILIP SILVERMAN,                    :
ROBERT C. TROSTEN, AND DOES 1 TO 10,               :
                                                   :
        Defendants.                                    :
------------------------------------------------------------x

## COMPLAINT

    1.    Axis Reinsurance Company ("Axis"), by and through its undersigned

counsel, as and for its Complaint against defendants Phillip R. Bennett, Leo R. Breitman,

Nathan Gantcher, Tone Grant, David V. Harkins, Scott L. Jaeckel, Dennis A. Klejna,

Thomas H. Lee, Santo C. Maggio, Joseph Murphy, Ronald L. O'Kelley, Scott A. Schoen,

William M. Sexton, Gerald Sherer, Philip Silverman, and Robert C. Trosten (collectively

"Insureds"), allege as follows upon personal knowledge as to its own acts and status, and

upon information and belief as to all other matters:

## NATURE OF THE ACTION

2.     This action concerns an actual controversy between Axis and the Insureds,

regarding a contract of excess directors, officers and corporate liability insurance between

Axis and the Insureds.

3.     Refco, Inc. ("Refco"),[1] and at least some of its directors and officers,

engaged in a massive fraud involving hundreds of millions of dollars.  Refco's insurers

were also victims of this fraud.  The representations and documents Axis relied upon

when evaluating the risk and deciding whether or not to insure Refco's directors and

officers, turned out to be false.

4.     Axis bound coverage for an excess directors, officers and corporate

liability insurance policy issued to Refco for claims made during the period from August

11, 2005 to August 11, 2006 (the "Axis Policy").  The Axis Policy follows the terms and

conditions of the primary policy, or more restrictive underlying excess policy.  The Axis

Policy also contains its own terms and conditions which further restrict coverage

otherwise provided by the primary or first excess policies.

---

[1] The name "Refco," as used throughout this complaint, refers to Refco, Inc., the publicly traded company formed pursuant to the August 2005 initial public offering, as well as to Refco Group Ltd., LLC, the company through which Refco's business was primarily conducted prior to the IPO.  "Refco" also refers to subsidiaries of Refco, Inc. and Refco Group Ltd., LLC.

5.    Since October 11, 2005, various lawsuits, criminal, governmental and/or regulatory investigations (the "Noticed Matters") involving certain individuals insured under the Axis Policy have been instituted and those individuals have sought coverage for the Noticed Matters under the Axis Policy.

6.    Axis denied coverage for the Noticed Matters on March 6, 2006, based on various terms and conditions of the Axis Policy, including a warranty received during the underwriting of the Axis Policy.  For over a year, none of the Insureds responded to Axis's declination of coverage.

7.    Since March 6, 2006, Axis has received notice from certain of the Insureds of several other matters related to the Noticed Matters, and Axis has denied coverage for these other matters (the "Related Matters") based on various terms and conditions of the Axis Policy, including a warranty received during the underwriting of the Axis Policy.

8.    Axis is the third layer of directors, officers and corporate liability insurance coverage.  The two layers below Axis have reserved rights, but not declined coverage.

9.    The primary layer has now exhausted its $10 million limit of liability, subject to its reservation of rights, through the payment of Insureds' defense costs.  The $7.5 million first excess insurer has also exhausted its limit of liability, subject to its reservation of rights, through payment of Insureds' defense costs.

10.    The Insureds now seek reimbursement of their defense costs and settlements from Axis.  However, Axis has denied coverage based, in part, on specific

terms and conditions present in the Axis Policy (including a warranty received during the underwriting of the Axis Policy) not present in the primary or first excess policy.

11.     Axis seeks a declaration that the Axis Policy does not provide coverage to Insureds for the Noticed Matters or the Related Matters.  An actual controversy exists between Plaintiff and Defendants, and Plaintiff seeks a declaratory judgment or other relief from the Court resolving this dispute in its favor.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the parties and the subject matter of this complaint pursuant to 28 U.S.C. §1334(a).  Axis filed an adversary proceeding at *In re Refco*, Bankr. S.D.N.Y (07-1712 (RDD)).  Certain Insureds subsequently filed an adversary proceeding at *In re Refco*, Bankr. S.D.N.Y. (07-2005 (RDD)).  Axis has moved by order to show cause to withdraw the reference for Axis's adversary complaint and the Insureds' adversary complaint pursuant to 28 U.S.C. §157(d).

13.     This Court also has jurisdiction over the parties and the subject matter of this complaint pursuant to 28 U.S.C. §1367(a).  The instant complaint is related to and supplemental to *In re Refco, Inc. Securities Litigation*, S.D.N.Y. (05-8626 (GEL)).

14.     Finally, this Court has jurisdiction over the parties and the subject matter of this complaint pursuant to 28 U.S.C. § 1367(a). Certain defendants filed counterclaims to Axis's adversary complaint, filed at *In re Refco*, Bankr. S.D.N.Y (07-1712 (RDD)). Axis has moved by order to show cause to withdraw the reference for the counterclaims to Axis's adversary complaint pursuant to 28 U.S.C. §157(d).  The instant complaint is related to and supplemental to those counterclaims.

15.    Venue is proper pursuant to 28 U.S.C. § 1391(b).

## PARTIES

16.    Axis is an insurance company that is organized and exists pursuant to the laws of the state of New York. Axis has its principal place of business in New York.

17.    Defendant Phillip R. Bennett ("Bennett") served as the Chairman, President and Chief Executive Officer of Refco until October 2005, when he took a leave of absence at the request of the Refco board of directors. Upon information and belief, Bennett is a citizen of New Jersey.

18.    Defendant Leo R. Breitman ("Breitman") served as a Director of Refco and member of the Audit Committee at times relevant to this action. Upon information and belief, Breitman is a citizen of Florida.

19.    Defendant Nathan Gantcher ("Gantcher") served as a Director of Refco and member of the Audit Committee at times relevant to this action. Upon information and belief, Gantcher is a citizen of New York.

20.    Defendant Tone Grant ("Grant") served as President and Chief Executive Officer of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Grant is a citizen of Illinois.

21.    Defendant David V. Harkins ("Harkins") served as a Director of Refco at times relevant to this action. Upon information and belief, Harkins is a citizen of Massachusetts.

22.    Defendant Scott L. Jaeckel ("Jaeckel") served as a Director of Refco at times relevant to this action.  Upon information and belief, Jaeckel is a citizen of Massachusetts.

23.    Defendant Dennis A. Klejna ("Klejna") served as Executive Vice President and General Counsel of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Klejna is a citizen of Washington D.C..

24.    Defendant Thomas H. Lee ("Lee") served as a Director of Refco at times relevant to this action.  Upon information and belief, Lee is a citizen of New York.

25.    Defendant Santo C. Maggio ("Maggio") served as President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd. at times relevant to this action.  Upon information and belief, Maggio is a citizen of Florida.

26.    Defendant Joseph Murphy ("Murphy") served as Executive Vice President of Refco Group and was responsible for global marketing since 1999.  Murphy was also President of various Refco subsidiaries, including Refco Futures and Westminster Refco at times relevant to this action.  Upon information and belief, Murphy is a citizen of New Jersey.

27.    Defendant Ronald L. O'Kelley ("O'Kelley") served as a Director of Refco at times relevant to this action.  Upon information and belief, O'Kelley is a citizen of Florida.

28.    Defendant Scott A. Schoen ("Schoen") served as a Director of Refco at times relevant to this action.  Upon information and belief, Schoen is a citizen of Massachusetts.

29.    Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer of Refco at times relevant to this action. Sexton also briefly served as Chief Executive Officer of Refco. Upon information and belief, Sexton is a citizen of Iowa.

30.    Defendant Gerald Sherer ("Sherer") served as Executive Vice President and Chief Financial Officer of Refco at times relevant to this action. Upon information and belief, Sherer is a citizen of New York.

31.    Defendant Philip Silverman ("Silverman") served as Secretary of Refco Group Holdings, Inc. at times relevant to this action. Silverman also served as Secretary of various Refco subsidiaries and Controller of Refco Group. Upon information and belief, Silverman is a citizen of New Jersey.

32.    Defendant Robert C. Trosten ("Trosten") served as Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Trosten is a citizen of New Jersey.

33.    The true names and capacities of DOES 1 to 10 are currently unknown to Plaintiff, and therefore, Plaintiff sues those Defendants by such fictitious names. Upon information and belief, each fictitiously named Defendant is an Insured which may seek coverage under the Axis Policy. Plaintiff is entitled to the relief sought herein against the fictitious Defendants, and therefore, sues these Defendants by such fictitious names. Plaintiff will seek leave to insert the true names and capacities of these fictitiously named Defendants, together with charging allegations, when obtained, if not already set forth herein.

## THE D&O INSURANCE POLICIES

34.     The Axis Policy is an excess directors, officers and corporate liability policy.  It has a policy period of August 11, 2005 to August 11, 2006 and a limit of liability of $10 million excess of $17.5 million in underlying insurance.  A true, complete and accurate copy of the Axis Policy is attached as Exhibit A.

35.     Various other insurers issued underlying insurance policies to Refco.  U.S. Specialty Insurance Company (the "Primary Insurer") issued a primary policy with a limit of liability of $10 million excess of applicable self insured retentions (the "Primary Policy").  A true, complete and accurate copy of the Primary Policy is attached as Exhibit B.  Lexington Insurance Company (the "First Excess Insurer") issued a first excess policy with a limit of liability of $7.5 million excess of $10 million (the "First Excess Policy").  A true, complete and accurate copy of the First Excess Policy is attached as Exhibit C.

36.     Axis is aware of other policies issued to Refco which are excess of the Axis Policy.  However, the terms and conditions of these policies are not relevant to this action.

37.     In general, the Axis Policy applies "in conformance with the provisions of the applicable Primary Policy and, to the extent coverage is further limited or restricted thereby, to [the First Excess Policy]." Axis Policy, Section I.  However, the Axis Policy also contains its own provisions which further limit or restrict coverage otherwise provided by the Primary Policy or the First Excess Policy.  The Axis Policy provides that "[i]n no event shall this Policy grant broader coverage than would be provided by the most restrictive policy constituting part of the applicable Underlying Insurance." *Id.*

38.     Subject to all of the terms and conditions, the Axis Policy affords five types of specified coverage. First, the Axis Policy insures covered loss incurred by the directors and officers of Refco and its subsidiaries for claims made against them if such loss is not indemnified by Refco. *See* Primary Policy, Insuring Agreement A.  Coverage under Insuring Agreement A, and only coverage under Insuring Agreement A, is deemed non-rescindable. *See* Primary Policy, Endorsement 13.

39.     Second, the Axis Policy insures Refco and its subsidiaries to the extent they indemnify any directors or officers for covered loss in connection with claims made against the officers or directors. *See* Primary Policy Insuring Agreement B(1).

40.     Third, the Axis Policy insures Refco and its subsidiaries for covered loss in connection with "Securities Claims" (as defined in the Primary Policy) asserted against them. *See* Primary Policy, Insuring Agreement B(2).

41.     Fourth, the Axis Policy recognizes depletion of the Primary Policy's limit of liability as a result of the Primary Policy's $250,000 sub-limit for "Derivative Demand Investigative Costs" (as defined in the Primary Policy) incurred in connection with any derivative demand received by Refco's Board of Directors.  *See* Primary Policy Endorsement No. 11.

42.     Fifth, the Axis Policy insures the "Controlling Shareholder" (defined as Bennett in the Primary Policy) for covered loss incurred in connection with "Securities Claims" (as defined in the Primary Policy) asserted against him, provided one or more other individual insureds and/or Refco are, and remain, co-defendants in such "Securities

Claim" along with the "Controlling Shareholder." *See* Primary Policy Endorsement No. 15.

43.     The Axis Policy (and the Primary and First Excess Policies) does not provide a duty to defend the insureds against claims made against them.  Instead, the Primary Policy provides that the "Insureds must defend any Claim made against them." Primary Policy Condition D(1).  The Primary Policy provides that the Primary Insurer will advance <u>covered</u> defense costs on an as-incurred basis in excess of the retention amount. Primary Policy, Condition (D)(2).

44.     Pursuant to the Bankruptcy Court's March 27, 2006 Order in *In re Refco Inc.*, Case No. 05-60006 (Doc. No. 1567, Bankr. S.D.N.Y.), the Primary Insurer has been advancing defense costs to the insureds on an as-incurred basis. The First Excess Insurer has taken the position that the First Excess Policy does not provide coverage for defense costs in connection with claims otherwise covered under the Primary Policy. Nevertheless, the First Excess Insurer has now agreed to advance defense costs, upon exhaustion of the Primary Policy's limit of liability, provided the insureds provide an undertaking – in the event it is determined that the First Excess Policy does not provide coverage for defense costs, each of the insureds must agree to repay defense costs advanced by the First Excess Insurer. *See* July 26, 2006 letter on behalf of Lexington Insurance Company, attached as Exhibit D.

45.     In connection with the underwriting of the Axis Policy, Axis requested and received a warranty letter (the "Warranty") which provides as follows:

> (a) No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose

might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT: [Louis Capital Markets, LP v. Refco Group Ltd., LLC, et al.]

(b) No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

The Warranty is dated January 14, 2005, and was signed by Phillip Bennett, "on behalf of all Insureds under the Policy," on January 21, 2005. A true, accurate, and complete copy of the Warranty is attached as Exhibit E.

46.     The Axis Policy contains a Manuscript Application Endorsement at Endorsement 5, stating:

In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 5 is marked effective August 11, 2005 and is dated September 11, 2005.

47.     The February 8, 2005 application (the "Application") submitted to Axis asks at Question 12:

(a)     Have any claims been made during the last 5 years against any person or entity proposed for this insurance in his or her capacity as a director, officer or trustee of any corporation or organization? __ Yes       __ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

(b)     Is any person or entity proposed for this insurance aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he, she or it has reason to believe might result in a claim being made?

__ Yes  __ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

Without prejudice to any other rights of the Insurer, it is understood and agreed that the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b).

Neither box was checked for Questions 12(a) and 12(b). A true and accurate copy of the

February 8, 2005 application (without attachments) is attached as Exhibit F.

48.     The Application was signed by Phillip Bennett on February 8, 2005.

Under Bennett's signature, the following words appear, "Note: This Application must be

signed by the President and/or CEO of the Applicant **acting as the authorized agent of**

**the persons and entity(ies) proposed for this insurance.**" (emphasis added).

49.     The Axis Policy also contains a Knowledge Exclusion Endorsement at

Endorsement 6 which states:

In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, any Insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

Endorsement 6 is marked effective August 11, 2005 and is dated September 11, 2005.

50.     The Axis Policy provides, at Clause XI:

The Insurer shall not be liable for any amount in any Claim taking place during the Policy Period and arising under any Insurance Product, which is based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

A.     Any demand, suit or other proceeding pending, or order, decree of judgment entered, against any Insured on or prior to the Pending or Prior Claim Date set forth in Item 7 of the Declarations [June 4, 2004] or any wrongful act, fact, circumstance or situation underlying or alleged therein; or

B.     Any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

51.    On March 6, 2006, Axis disclaimed coverage for the Noticed Matters based on: (1) the Warranty; (2) the Manuscript Application Endorsement and question 12 of the Application; (3) the Knowledge Exclusion Endorsement; and (4) the claim made date. A true, accurate, and complete copy of the March 6, 2006 letter denying coverage is attached as Exhibit G.

52.    At various times after March 6, 2006, Insureds provided Axis with notices of the Related Matters and Axis responded that each was related to the Noticed Matters for which Axis denied coverage. Axis's response to each of the Related Matters was to incorporate the March 6, 2006 letter.

## THE REFCO SCANDAL

53.    The Axis Policy incepted on August 11, 2005. On the same day, Refco conducted its initial public offering.

54.    Two months later, on October 10, 2005, Refco issued a press release. The press release announced that Refco had been carrying an undisclosed receivable of $430 million from an entity controlled by Bennett. Refco stated that "[b]ased on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible." Moreover, Refco stated that although the receivable "was reflected on the Company's prior period financials, as well as on the Company's May 31, 2005 balance sheet", the receivable "was not shown as a related party transaction in any such financials. For that

reason, and after consultation by the Audit Committee with the Company's independent accountants, the Company determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

55.    Many of these financial statements were part of the application Axis expressly relied upon when deciding whether or not to enter into the insurance contract.

56.    On October 11, 2005, Refco issued a second press release. The press release announced that Bennett had repaid the $430 million receivable in full. The press release also provided further information on the nature of the receivable: "Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998. These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable from that entity, rather than a receivable from the originating accounts. The fact that the receivable was from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual reporting periods by reason of transfers to a third party customer account that we currently believe is unaffiliated with Mr. Bennett or anyone else at the Company."

57.    On October 11, 2005, Refco filed the October 10, 2005 and October 11, 2005 press releases with the U.S. Securities and Exchange Commission (the "SEC").

58.     On October 17, 2005, Refco and certain of its unregulated subsidiaries filed for protection under Chapter 11 of the Bankruptcy Code.

59.     On November 10, 2005, Bennett was indicted on charges of securities fraud, conspiracy to commit securities fraud, false filings to the SEC, and wire fraud. A true, accurate and complete copy of the publicly available indictment (the "Bennett Indictment") is attached as Exhibit H.

60.     According to the Bennett Indictment, Bennett "sought to hide from, among others, Refco's auditors and investors, losses sustained by Refco through its own and its customers' trading in the financial markets. To that end, Bennett transferred losses from Refco to a company controlled by Bennett, directed a repeated series of transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make false and fraudulent public filings with the [SEC]." Bennett Indictment, at ¶ 4.

61.     The Bennett Indictment alleges that, as part of its brokerage business, Refco extended credit to customers for their securities and commodities trading. When certain customers were unable to repay that credit, rather than noting the losses on Refco's balance sheet, Bennett directed the transfer of those losses to an entity called Refco Group Holdings, Inc. ("RGHI"), which he controlled. As a result, Refco's balance sheet showed a receivable from RGHI.

62.     According to the Bennett Indictment, beginning in or around 1999, Bennett took steps to hide the RGHI receivable from Refco's auditors. Specifically,

Bennett arranged transactions with third parties to temporarily pay down the RGHI receivable at quarter- or year-end and mask the related-party nature of the RGHI debt.

63.    According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2004 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2004 Transactions"). On or about February 20, 2004, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $720 million to a Refco customer. On the same day, the customer loaned $720 million to RGHI. RGHI then used the $720 million to pay down its debt to Refco. These loans were unwound on or about March 4, 2004, after Refco's fiscal year-end.

64.    According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, ltd. would repay the customer $720 million if RGHI defaulted.

65.    According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2005 Transactions)". On or about February 23, 2005, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $345 million to a Refco customer. On the same day, the customer loaned $345 million to RGHI. RGHI then used the $345 million to pay down its debt to Refco. These loans were unwound on or about March 8, 2005, after Refco's fiscal year-end.

66.     According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $345 million if RGHI defaulted.

67.     According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal first quarter end for 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "May 2005 Transactions"). On or about May 25, 2005, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $450 million to a Refco customer. On the same day, the customer loaned $450 million to RGHI. RGHI then used the $450 million pay down its debt to Refco. These loans were unwound on or about June 6, 2005, after Refco's fiscal first quarter-end.

68.     According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $450 million if RGHI defaulted.

69.     On October 24, 2006, Trosten was indicted on charges of conspiracy, securities fraud, and wire fraud. A true, accurate and complete copy of the publicly available indictment (the "Trosten Indictment") is attached as Exhibit I.

70.     According to the Trosten Indictment, Trosten "lied to Refco's auditors about the existence and size of related party debts and transactions between RGHI and Refco."

71.     According to the Trosten Indictment, Trosten "concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers."

72.     According to the Trosten Indictment, on or about April 27, 2004, Trosten "signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors." Nevertheless, on or about August 5, 2004, Bennett transferred approximately $48 million from RGHI to Trosten.

73.     In addition to the foregoing, Bennett and Trosten were not the only people at Refco who knew of the ongoing fraud. On January 16, 2007, Grant was indicted on charges of conspiracy, securities fraud, wire fraud, bank fraud, and money laundering. A true, accurate, and complete copy of the publicly available indictment (the "Grant Indictment") is attached as Exhibit J.

74.     On March 30, 2007, the government filed a memorandum of law detailing some of the evidence the government expected to introduce against Grant at trial. A true, accurate, and complete copy of the government's memorandum of law (the "Grant Memo") is attached as Exhibit K.

75.     According to the Grant Memo, "by February 1999, prior to the close of Refco's fiscal year, Grant was fully briefed, in Refco's offices on the core issues of the fraud: the round-trip loan transactions set forth in the Indictment; that Refco had covered up several of the large losses set forth in the Indictment; and that Refco had been moving

expenses (including a large portion of its computer expenses) off of Refco's books and on to the parent company's books."

76.    According to the Grant Memo, "[d]urring the interval between 1999 and 2004, the evidence will show that Grant continued to discuss with Sandy Maggio, a Refco executive, the continuing financial problems at Refco, including continued rolling fails, where Refco, because it was using customer money to cover its financial losses, purposefully failed to cover its daily cash obligations to its creditors."

77.    According to the Grant Memo, "in May 2004, prior to the LBO, Bennett met with Grant for the purpose of fully discussing with him the structure of the LBO and how, through the LBO, Bennett and Grant were going to deal with the more than $1 billion debt that they (as owners of RGHI) owed to Refco."

78.    According to the Grant Memo, "Grant was a knowing and active participant from as early as 1997, had full knowledge of the means used to hide Refco's losses as of at least February 1999, and stood to reap a 50% share of the rewards of the fraud if it were successful. Between 1999 and 2004, while Grant had no day-to-day role in running Refco, he was intermittently briefed by Bennett and Santo Maggio, another Refco executive, on the status of Refco's ongoing economic troubles, including on the status of the massive debt from RGHI to Refco."

79.    The Grant Memo further notes that Grant "was not on the periphery of the fraud, he was a founding member and had full knowledge of its methods by 1999."

80.    According to the Grant Memo, the government expects Maggio to testify that "on several occasions prior to the May 2004 meeting between Grant and Bennett,

Maggio expressed concern to Bennett about the increasingly dire financial circumstances at Refco. In response, Bennett told Maggio, in substance and in part, that he was keeping Grant abreast of ths [sic] situation at Refco (including that the company's situation was not as reflected on its books), and that Maggio was not alone in that he, Grant and Bennet [sic] were /in [sic] it together.6 [sic] Bennett further stated, in substance, that if the fraud were to be discovered, Bennett told Grant that Bennett was not going to be alone (e.g., Grant would be responsible as well)."

81.    Based on his knowledge of the RGHI receivables to Refco, the February 2004 Transactions, the February 2005 Transactions, the May 2005 Transactions, the allegations in the Trosten Indictment and the allegations in the Grant Memo, as of August 11, 2005, Bennett possessed knowledge of facts, circumstances, situations, transactions, or events, which he had reason to suppose might give rise to a "claim" (as that term is defined in the Primary Policy) that would fall within the scope of the insurance afforded by the Axis Policy.

82.    Based on his knowledge of the RGHI receivables to Refco, the February 2004 Transactions, the allegations in the Trosten Indictment, and the allegations in the Grant Memo, as of January 14, 2005, Bennett possessed knowledge of facts, circumstances, situations, acts, errors or omissions which he had reason to suppose might afford grounds for a "claim" (as that term is defined in the Primary Policy) such as would fall within the scope of the Axis Policy.

83.    Based on his knowledge of the RGHI receivables to Refco, the February 2004 Transactions, the February 2005 Transactions, the allegations in the Trosten

Indictment, and the allegations in the Grant Memo, as of February 8, 2005, Bennett was aware of facts, circumstances or situations involving Refco which Bennett had reason to believe might result in a "claim" (as that term is defined in the Primary Policy) being made.

## THE NOTICED MATTERS

84.    Beginning on October 11, 2005, various lawsuits were filed against the Defendants.

85.    On October 13, 2005, Axis received notice of <u>Frontpoint Financial Services Fund, LP, On Behalf of Plaintiff and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co.</u>, No. 05-cv-08663-GEL, (S.D.N.Y. 10/11/05).

86.    On October 13, 2005, Axis received notice of <u>Jonathan Glaubach, Individually and on Behalf of all Others Similarly Situated v. Refco Inc., Phillip R. Bennett, Gerald Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen</u>, No. 05-cv-08692, (S.D.N.Y. 10/12/05).

87.    On October 13, 2005, Axis received notice of <u>Miriam Lieber, Individually And On Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities, LLC., Merrilly Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank</u>

Securities, Inc., J.P. Morgan Securities Inc., and Grant Thornton LLP, No. 05-cv-08667-LAP, (S.D.N.Y. 10/12/05).

88.     On October 13, 2005, Axis received notice of United States of America v. Phillip R. Bennett, No. 05-MAG-1720, (S.D.N.Y. 10/12/05).

89.     On October 27, 2005, Axis received notice of Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08691-GEL, (S.D.N.Y. 10/12/05).

90.     On October 18, 2005, Axis received notice of Varun Mehta, Derivatively on Behalf of Refco Inc. v. Phillip R. Bennett, William J. Sexton, Gerald M. Sherer, Joseph J. Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston, Goldman, Sachs & Co., Banc Of America Securities LLC, Deutsche Bank Securities, JP Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, L.P., HSBC And Thomas H. Lee Partners, L.P., and Refco, Inc., A Delaware corporation, No. 05-cv-08748, (S.D.N.Y. 10/14/05).

91.     On October 18, 2005, Axis received notice of Anthony L. Wakefield, Individually and on Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald J. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc Of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Inc. Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blaire &

Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., and Utendahl Capital Partners, L.P., No. 05-cv-08742-GEL, (S.D.N.Y. 10/14/05).

92.    On October 28, 2005, Axis received notice of Banesco Holding C.A., Banesco International Bank Corp., Banesco International Bank Inc. and Banesco Banco Universal C.A. Panama Branch v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603681 (Supreme Court of New York, 10/17/05).

93.    On October 28, 2005, Axis received notice of Miura Financial Services v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603682 (Supreme Court of New York, 10/17/05).

94.    On October 28, 2005, Axis received notice of Multiplicas Casa De Bolsa v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603683 (Supreme Court of New York, 10/17/05).

95.    On October 21, 2005, Axis received notice of Jacob Baker, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08923, (S.D.N.Y. 10/19/05).

96.    On October 21, 2005, Axis received notice of Craig Becker, On Behalf of Himself and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Brietman, David H. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton, LLP, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Liberty Corner Capital, Refco Group Holdings Inc., No. 05-cv-08929-GEL, (S.D.N.Y. 10/20/05).

97.    On October 21, 2005, Axis received notice of <u>Bruce Nathanson,</u> <u>Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald</u> <u>M. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel,</u> <u>Thomas H. Lee. Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton LLP, Credit</u> <u>Suisse First Boston, Goldman, Sachs & Co., Banc of America Securities LLC, Merrill</u> <u>Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., JP Morgan</u> <u>Securities Inc., Liberty Corner Capital, and Refco Group Holdings Inc.,</u> No. 05-cv-08926-GEL, (S.D.N.Y. 10/20/05).

98.    On October 25, 2005, Axis received notice of <u>American Financial</u> <u>International Group – Asia, LLC, individually and on behalf of all other similarly situated</u> <u>v. Refco, Inc., Refco F/X Associates, LLC, Phillip R. Bennett and Does 1 through 50, et</u> <u>al.,</u> No. 05-cv-08988-PKC, (S.D.N.Y. 10/21/05).

99.    On October 25, 2005, Axis received notice of <u>Ravindra Mettupatti v.</u> <u>Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David Harkins,</u> <u>Scott L. Jaeckel, Thomas Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First</u> <u>Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Deutsche Bank</u> <u>Securities Inc., JP Morgan Securities Inc., Pierce, Fenner & Smith Inc.,</u> No. 05-cv-09048, (S.D.N.Y. 10/24/05).

100.    On October 27, 2005, Axis received notice of <u>Todd Weiss, Individually</u> <u>and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M.</u> <u>Sherer,</u> No. 05-cv-09126, (S.D.N.Y. 10/26/05).

101.   On November 21, 2005, Axis received notice of <u>Bankruptcy Trust Of Gerard Sillam, Gerard Sillam v. Refco Group LLC, Refco Overseas Ltd., Phillip Bennett, Refco Group Holdings Inc, Liberty Corner Capital, New York Stock Exchange Inc, Grant Thornton LLP, Grant Thornton UK LLP, Thomas H Lee Partners LP, Thomas H Lee Partners Fund V, Thomas H Lee, Scott A Schoen, David V Harkins, Gerald M Sherer, Leo R Breitman, Scott Jaeckel, Nathan Gantcher, Ronald O Kelley, Halim Saad, Dennis A Klejna, Mark Slade, Julian Courtney, Richard Reinert, David Campbell, Credit Suisse First Boston LLC, Goldman Sachs & Co, Bank Of America Securities LLC, Merrill Lynch Pierce Fenner & Smith Inc, Deutsche Bank Securities Inc, JP Morgan Securities Inc, Sandler O Neil & Partners LP, HSBC Securities USA Inc, William Blair & Company LLC, Harris Nesbitt Corp, CMG Institutional Trading LLC, Samuel A Ramirez & Company Inc., Muriel Siebert & Co Inc, The William Capital GLP, Utendahl Capital Partners, et al.</u>, No. 05603931 (Supreme Court of New York 11/04/05).

102.   On November 21, 2005, Axis received notice of <u>Scott K. Weit, Individually and On Behalf of All Others Similarly Situated v Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Credit Suisse First Boston, Goldman, Sachs & Co., Grant Thornton LLP, Banc of America Securities LLC, Merrill Lynch Pierce, Fenner & Smith Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blair & Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P.,</u>

Utendahl Capital Partners, L.P., Liberty Corner Capital, and Refco Group Holdings, Inc., No. 05-cv-09611-GEL, (S.D.N.Y. 11/11/05).

103.  On November 30, 2005, Axis received notice of Bawag P.S.K. Bank Für Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft v. Refco, Inc.; Refco Group Holdings, Inc.; The Phillip R. Bennett Three Year Annuity Trust; Refco Capital Markets, Ltd.; Refco Group Ltd., LLC; Bersec International LLC; Kroeck & Associates, LLC; Marshall Metals LLC; New Refco Group Ltd., LLC; Refco Administration LLC; Refco Capital LLC; Refco Capital Holdings LLC; Refco Capital Management LLC; Refco Capital Trading LLC; Refco Finance Inc.; Refco Financial LLC; Refco Fixed Assets Management LLC; Refco F/X Associates LLC; Refco Global Capital Management LLC; Refco Global Finance Ltd.; Refco Global Futures LLC; Refco Global Holdings LLC; Refco Information Services LLC; Refco Mortgage Securities, LLC; Refco Regulated Companies, LLC; Summitt Management, LLC; Refco Securities LLC; Refco Clearing LLC; Phillip R. Bennett; John Does 1-10; And XYZ Corporations 1-10, The Last Two Names Being Fictitious, Inc., et al., No. 05-03161-rdd (Bankr. S.D.N.Y., 11/16/05).

104.  On November 30, 2005, Axis received notice of Markwood Investments v. Refco Capital Markets, Ltd. and Refco Securities LLC, No. 05-03166-rdd (Bankr. S.D.N.Y., 11/17/05).

105.  On November 30, 2005, Axis received notice of Banco De America Central, S.A. v. Refco Capital Markets, Ltd., No. 05-03171-rdd (Bankr. S.D.N.Y., 11/18/05).

106.    On November 30, 2005, Axis received notice of <u>BAC International Banks,</u>
<u>Inc. v. Refco Capital Markets, Ltd.</u>, No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05).

107.    On November 30, 2005, Axis received notice of <u>Reserve Invest (Cyprus)</u>
<u>Ltd. v. Refco Capital Markets, Ltd., Michael W. Morrison, and Richard Heis, Michael W.</u>
<u>Morrison, and Richard Heis</u>, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

108.    On November 30, 2005, Axis received notice of <u>City of Pontiac General</u>
<u>Employees' Retirement System, On Behalf of Itself and All Others Similarly Situated v.</u>
<u>Phillip R. Bennett, Thomas H. Lee Partners, L.P., Thomas H. Lee, Gerald M. Sherer,</u>
<u>Scott A. Schoen, Bank of America Corp., Banc of America Securities LLC, Deutsche</u>
<u>Bank AG, Deutsche Banc Securities, Inc., Credit Suisse Group, Credit Suisse First</u>
<u>Boston LLC, Goldman Sachs Group, Inc., Goldman Sachs & Co., J.P. Morgan Securities,</u>
<u>Inc., J.P. Morgan Chase & Co., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill</u>
<u>Lynch & Co., Inc. Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC</u>
<u>Holdings plc and Grant Thornton LLP</u>, No. 05-cv-09941, (S.D.N.Y. 11/23/05).

109.    Axis responded to each of the notices received in paragraphs 85 to 108
(the "Noticed Matters") by letter from Axis's counsel on March 6, 2006.  A true, accurate
and complete copy of this letter was previously attached as Exhibit G.

110.    The March 6, 2006 letter noted that the Noticed Matters were interrelated,
as that term is defined in Condition (C) of the Primary Policy, because all of the Noticed
Matters arise out of the financial fraud allegedly orchestrated by Mr. Bennett, and others
whereby unreported loans were made between various entities in an effort to disguise

financial losses.  Accordingly, the Noticed Matters constitute a single "claim," as that term is defined in the Primary Policy.

111.    The March 6, 2006 letter denied coverage for the Noticed Matters based on the January 14, 2005 Warranty.

112.    The March 6, 2006 letter denied coverage for the Noticed Matters based on the Manuscript Application Endorsement and question 12 of the Application.

113.    The March 6, 2006 letter denied coverage for the Noticed Matters based on the Knowledge Exclusion Endorsement in the Axis Policy.

114.    The March 6, 2006 letter denied coverage for the Noticed Matters based on the claim made date.

115.    The March 6, 2006 letter reserved the right to rescind the Axis Policy and an earlier D&O policy issued by Axis to Refco.

116.    The March 6, 2006 letter reserved the right to deny coverage based on various other terms and conditions of the Axis Policy.

117.    After denying coverage for the Noticed Matters on March 6, 2006, Axis continued to receive notice of additional matters related to the Noticed Matters.

## THE RELATED MATTERS

118.    On March 14, 2006, Axis received notice of Klaus Gensheimer, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Thomas H. Lee Partners, L.P., Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Joseph J. Murphy, William M. Sexton, Santo C. Maggio, Dennis Klejna, Perry Rotkowitz, Credit

Suisse First Boston LLC, Credit Suisse First Boston, Goldman Sachs & Co., Goldman Sachs Group Inc., Grant Thornton LLP, Banc of America Securities LLC, Bank of America Corp., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc., Deutsche Bank Securities Inc., Deutsche Bank AG, J.P. Morgan Securities Inc., J.P. Morgan Chase & Co., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc, William Blair & Company LLC, Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co. Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., Liberty Corner Capital Strategies LLC, and Refco Group Holdings, Inc., No. 05-cv-10318 (S.D.N.Y. 12/8/05). On March 27, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

119.    On March 14, 2006, Axis received notice of Teachers' Retirement System of the State of Illinois, Bumper Fund L.P., Irwin Geduld IRA, as Trustee and as Partner of Geduld Capital Management, Brookstreet Securities Corp., and City of Pontiac General Employees' Retirement System, On Behalf of Themselves and All Others Similarly Situated v. Thomas H. Lee, Scott A. Schoen, David V. Harkins, Ronald L. O'Kelley, Scott L. Jaeckel, Thomas H. Lee Partners, L.P., Phillip R. Bennett, Refco Group Holdings, Inc., Gerald M. Sherer, Dennis A. Klejna, Robert Trosten, Nathan Gantcher, Leo R. Breitman, William M. Sexton, Santo Maggio, Liberty Corner Advisors, Liberty Corner Capital, Liberty Corner Capital Strategies, Terry Pigott, Grant Thornton

LLP, Mark A. Ramler, Banc of America Securities LLC, Bank of America Corp., eutsche Bank Securities Inc., Deutsche Bank AG, Credit Suisse First Boston LLC, Goldman Sachs Group, Inc., Goldman Sachs & Co., J.P. Morgan Securities, Inc., J.P. Morgan Chase & Co., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc, Joseph P. Collins, and Mayer Brown, Rowe & Maw, LLP., No. 05-cv-10403 (S.D.N.Y. 12/12/05). On March 27, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

120. On May 10, 2006, Axis received notice of Global Management Worldwide Limited, Individually and on Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Thomas H. Lee Partners, L.P., Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Joseph J. Murphy, William M. Sexton, Santo C. Maggio, Dennis Klejna, Perry Rotkowitz, Thomas H. Lee Partners, L.P., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Credit Suisse Group, Credit Suisse First Boston, Goldman Sachs & Co., Goldman Sachs Group Inc., Banc of America Securities LLC, Bank of America Corp., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc., Grant Thornton LLP, J.P. Morgan Securities Inc., J.P. Morgan Chase & Co., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc, William Blair & Company LLC,

Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., and Refco Securities LLC, No. 06-cv-00643, (S.D.N.Y. 1/26/06).  On July 10, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

121.    On May 10, 2006, Axis received notice of In re Refco Inc., et al. - Leo A. Breitman Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05).  On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

122.    On May 10, 2006, Axis received notice of In re Refco Inc., et. al. - David V. Harkins Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05).  On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

123.    On May 10, 2006, Axis received notice of In re Refco Inc., et. al. - Ronald O'Kelley Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05).  On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

124.    On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - Nathan Gatcher Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05).  On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

125.    On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - Scott L. Jaeckel Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05).  On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

126.    On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - Scott A. Schoen Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05).  On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

127.    On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - Thomas H. Lee Partners, L.P. Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05).  On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

128.   On May 10, 2006, Axis received notice of <u>In the Matter of Refco Inc. - Subpoena of Thomas H. Lee Partners, L.P. for Production of Documents Pursuant to Rule 8</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05).   On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

129.   On May 10, 2006, Axis received notice of <u>Global Management Worldwide Limited v. Refco Capital Markets, Ltd.</u>, No. 05-03144 (Bankr. S.D.N.Y 11/11/05). On May 15, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

130.   On June 16, 2006, Axis received notice of the amended complaint in <u>In re Refco, Inc. Securities Litigation</u>, No. 05-cv8626 (S.D.N.Y. 5/5/06).  On June 5, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

131.   On June 26, 2006, Axis received notice of <u>Gary L. Franzen v. IDS Futures Corporation, Refco Commodity Management, Inc.</u>, No. 06-cv-03012 (N.D.Ill. 6/1/06). On July 10, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.

Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

132.    On March 9, 2006, Axis received notice of <u>Arch Insurance Company v. Phillip R. Bennett, Leo R. Breitman, Nathan Gantcher, Tone Grant, David V. Harkins, Scott L. Jaeckel, Dennis A. Klejna, Thomas H. Lee, Santo C. Maggio, Joseph Murphy, Ronald L. O'Kelley, Perry Rotkowitz, Scott A. Schoen, William M. Sexton, Gerald Sherer, Philip Silverman and Robert C. Trosten</u>, No. 600805/06 (N.Y. Supp. 3/9/06).  On October 12, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

133.    On November 3, 2006, Axis received notice of an SEC inquiry into Refco, Inc.  On January 8, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

134.    On November 3, 2006, Axis received notice of <u>In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation</u>, No. 06-cv-0643 (S.D.N.Y. 1/26/06).  On January 8, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.  Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

135.   On November 3, 2006, Axis received notice of <u>Thomas H. Lee Equity</u> <u>Fund V, LP et al</u>, No. 05-cv-09608 (S.D.N.Y. 11/14/05).   On January 8, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.   Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

136.   On January 27, 2007, Axis received notice of <u>United States of America v.</u> <u>Phillip R. Bennett, Robert C. Trosten and Tone N. Grant</u>, No. S3 05-cr-1192 (S.D.N.Y. 1/16/07).   On February 20, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.   Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

137.   Each of the matters identified in paragraphs 118 through 136 (the "Related Matters") is interrelated, as that term is defined in the Primary Policy, with each of the other Related Matters and with the Noticed Matters.   Axis has denied coverage for each of the Related Matters based on the same reasons enumerated in the March 6, 2006 letter.

## PRIOR LITIGATION

138.   Refco was previously involved in litigation involving the same scheme of improperly shifting client funds between related party accounts – the same type of transactions that Refco allegedly used to hide the fraud alleged in the Noticed Matters and the Related Matters.

139.   Refco was involved in a CFTC enforcement action which alleged that Refco used funds in client accounts to pay off its own debts (the "1994 CFTC Action").

In 1994, the CFTC fined Refco $1.2 million and Refco promised to stop unlawfully commingling funds. As discussed in an October 13, 2005 article available from Bloomberg Newswires, according to the CFTC at the time, Refco improperly availed itself of as much as $123 million in client funds on an "almost daily basis" in order to pay off debts owed by Refco Capital.

## COUNT I

## DECLARATORY JUDGMENT THAT THE AXIS WARRANTY BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

140. Axis incorporates by reference each of the allegations contained in paragraphs 1 through 139 above.

141. As alleged herein, as of January 14, 2005, Bennett possessed knowledge of facts, circumstances, situations, acts, errors or omissions which he had reason to suppose might afford grounds for a "claim" (as that term is defined in the Primary Policy) such as would fall within the scope of the Axis Policy.

142. The Noticed Matters and the Related Matters constitute a "claim" (as that term is defined in the Primary Policy) arise therefrom.

143. The Warranty provides that "It is agreed by the undersigned **on behalf of all Insureds under the Policy,** that with respect to the above statements, that if such knowledge exists, **any claim arising therefrom is excluded** from the proposed insurance." (emphasis added). Accordingly, Bennett's knowledge excludes coverage for all Insureds.

144.   Axis seeks a declaration that as a result of the Axis Warranty, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

## COUNT II

### DECLARATORY JUDGMENT THAT THE AXIS MANUSCRIPT APPLICATION ENDORSEMENT AND QUESTION 12 OF THE APPLICATION BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

145.   Axis incorporates by reference each of the allegations contained in paragraphs 1 through 144 above.

146.   As alleged herein, as of February 8, 2005, Bennett was aware of facts, circumstances or situations involving Refco which Bennett had reason to believe might result in a "claim" (as that term is defined in the Primary Policy) being made.

147.   The Noticed Matters and the Related Matters constitute a "claim" (as that term is defined in the Primary Policy) arising out of, based upon or attributable to such facts, circumstances or situations.

148.   The Application notes that it "must be signed by the President and/or CEO of the Applicant **acting as authorized agent** of the persons and entity(ies) proposed for this insurance." (emphasis added).   Accordingly, Bennett's knowledge, and failure to make the necessary disclosures pursuant to Question 12 of the Application, exclude coverage for all Insureds.

149.   Axis seeks a declaration that as a result of Axis Manuscript Application Endorsement and question 12 of the Application, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

**COUNT III**

**DECLARATORY JUDGMENT THAT THE AXIS KNOWLEDGE EXCLUSION ENDORSEMENT BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS**

150.   Axis incorporates by reference each of the allegations contained in paragraphs 1 through 149 above.

151.   As alleged herein, as of August 11, 2005, Bennett possessed knowledge of facts, circumstances, situations, transactions, or events, which he had reason to suppose might give rise to a "claim" (as that term is defined in the Primary Policy) that would fall within the scope of the insurance afforded by the Axis Policy.

152.   The Noticed Matters and the Related Matters consist of "claims" (as that term is defined in the Primary Policy) based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving such facts, circumstances, situations, transactions or events.

153.   The Knowledge Exclusion excludes coverage for "claims" (as that term is defined in the Primary Policy) based upon, etc. "which as of the inception date of the Policy Period, **any Insured** had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy." (emphasis added). Accordingly, Bennett's knowledge, or the knowledge of *any* insured, excludes coverage for all insureds.

154. Axis seeks a declaration that as a result of the Axis Knowledge Exclusion Endorsement, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

## COUNT IV

### DECLARATORY JUDGMENT THAT CLAUSE XI OF THE AXIS POLICY BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

155. Axis incorporates by reference each of the allegations contained in paragraphs 1 thorough 154 above.

156. As alleged herein, Clause XI of the Axis Policy excludes coverage for any "claim" (as that term is defined in the Primary Policy) based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving, any demand, suit or other proceeding, on or prior to June 4, 2004, or any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation occurring on or prior to June 4, 2004, are causally or logically interrelated by a common nexus.

157. The Noticed Matters and the Related Matters allege many of the same wrongful acts previously alleged in the 1994 CFTC Action.

158. Axis seeks a declaration that, as a result of Clause XI, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

## OTHER COVERAGE DEFENSES/RESCISSION

159.    Other Axis Policy terms, conditions and endorsements may ultimately be implicated. Axis has reserved the right to disclaim coverage for the Noticed Matters and the Related Matters based on various terms, conditions and endorsements of the Axis Policy. Nothing in this Adversary Complaint is intended to waive any rights Axis may have in the Axis Policy, at law or in equity, including the right to rescind the Axis Policy and prior policies issued by Axis to Refco, its subsidiaries or predecessors, based on material misrepresentations in the applications for such other policies. Axis reserves the right to raise such other coverage defenses as appropriate and/or to seek rescission.

WHEREFORE, Axis requests that the Court enter a declaration and final judgment in its favor:

(A)    Declaring that, for the reasons set forth in Count I, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(B)    Declaring that, for the reasons set forth in Count II, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(C)    Declaring that, for the reasons set forth in Count III, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(D)    Declaring that, for the reasons set forth in Count IV, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(E)     Awarding Axis such other and additional relief as shall be found to be reasonable; and

(F)     Awarding Axis its fees and costs incurred in prosecuting this action.

Dated: September 7, 2007

Respectfully submitted,

KAUFMAN BORGEEST & RYAN LLP

By: _____
   Wayne E. Borgeest
   Joan M. Gilbride
   Ann Marie Collins
   Robert A. Benjamin

200 Summit Lake Drive
Valhalla, New York 10595
(914) 741-6100 (Telephone)
(914) 741-0025 (Facsimile)
wborgeest@kbrlaw.com
jgilbride@kbrlaw.com
acollins@kbrlaw.com
rbenjamin@kbrlaw.com

*Attorneys for Plaintiff*
*Axis Reinsurance Company*

Exhibit S

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _11/3/02_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
AXIS REINSURANCE COMPANY,                                    :    No. 07-CV-7924 (GEL)
                                                             :
                          Plaintiff,                         :
              v.                                             :    **ORDER**
                                                             :
PHILLIP R. BENNETT, et al.,                                  :
                                                             :
                          Defendants.                        :
                                                             :
------------------------------------------------------------ X
                                                             :
In re                                                        :    Chapter 11
                                                             :
REFCO, INC., et al.,                                         :    Case No. 05-60006 (RDD)
                                                             :
                          Debtors.                           :    Jointly Administered
                                                             :
------------------------------------------------------------ X
                                                             :
AXIS REINSURANCE COMPANY,                                    :    Adv. Proc. No. 07-1712-RDD
                                                             :
                          Plaintiff,                         :
              v.                                             :
                                                             :
PHILLIP R. BENNETT, et al.,                                  :
                                                             :
                          Defendants.                        :
                                                             :
------------------------------------------------------------ X
                                                             :
TONE N. GRANT, et al.,                                       :    Adv. Proc. 07-2005-RDD
                                                             :
                          Plaintiffs,                        :
              v.                                             :
                                                             :
AXIS REINSURANCE COMPANY,                                    :
                                                             :
                          Defendant.                         :
                                                             :
------------------------------------------------------------ X
[caption continues on next page]

----------------------------------------------------------- X
                                                            :
LEO R. BREITMAN, et al.,                                    :    Adv. Proc. No. 07-2032-RDD
                                                            :
                    Plaintiffs,                             :
          v.                                                :
                                                            :
AXIS REINSURANCE COMPANY,                                   :
                                                            :
                    Defendant.                              :
                                                            :
                                                            :
----------------------------------------------------------- X
                                                            :
AXIS REINSURANCE COMPANY,                                   :    (1) No. 07-CV-9420-GEL
                                                            :    (2) No. 07-CV-9842-GEL
                    Plaintiff,                              :    (3) appeal not yet assigned
          v.                                                :
                                                            :
PHILLIP R. BENNETT, et al.,                                 :
                                                            :
                    Defendants.                             :
                                                            :
----------------------------------------------------------- X
                                                            :
TONE N. GRANT, et al.,                                      :    No. 07-CV-9843-GEL
                                                            :
                    Plaintiffs,                             :
          v.                                                :
                                                            :
AXIS REINSURANCE COMPANY,                                   :
                                                            :
                    Defendant.                              :
                                                            :
----------------------------------------------------------- X

GERARD E. LYNCH, United States District Judge:

       In accordance with the Court's oral directions at the November 8, 2007 status conference

held in the above-captioned matters:

       1.       The appeals now pending before this Court from the decisions of the Bankruptcy

Court (some of which have been docketed as Nos. 07-CV-9420-GEL, 07-CV-9842-GEL and 07-

CV-9843-GEL, and one of which has not yet been assigned a docket number in this Court) shall be briefed on the following schedule, which has been agreed to by all parties: Appellant Axis Reinsurance Company ("Axis") shall serve and file its opening brief on or before November 28, 2007. Appellees shall serve and file their opposition briefs on or before December 21, 2007. Axis shall serve and file its reply brief, if any, on or before January 9, 2008.

2.      Pursuant to the agreement of the parties and 28 U.S.C. § 157(d), the bankruptcy reference is hereby withdrawn with respect to the remaining claims now pending in the Bankruptcy Court as consolidated adversary proceedings No. 07-1712-RDD, 07-2005-RDD and 07-2032-RDD. The Clerk of the Court is directed to assign such proceedings to this Court with appropriate district court docket numbers. The withdrawal of the reference is without prejudice to any party's rights or position regarding the appropriate venue for future coverage litigation (if any) involving carriers other than Axis.

3.      In the event that Dennis Klejna (or any other party) wishes to file a motion for summary judgment in the cases now docketed as consolidated adversary proceedings No. 07-1712-RDD, 07-2005-RDD and 07-2032-RDD, such motion shall be made to this Court. Absent further order of this Court, no discovery shall take place unless such discovery (a) is stipulated to by the parties making and opposing such motion and (b) affects only the parties to such motion.

4.      The civil action pending before this Court as No. 07-CV-7924-GEL is hereby stayed until 30 days have elapsed from this Court's decision regarding the appeals described in paragraph 1 of this Order.

SO ORDERED this 13th day of November, 2007.

_____

UNITED STATES DISTRICT JUDGE

Exhibit T

# KAUFMAN BORGEEST & RYAN LLP

### ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE††
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*†
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER E. DiGIACINTO*
JONATHAN B. BRUNO*
PAUL J. COLUCCI
MARGARET J. DAVINO*††
JEFFREY C. GERSON††
ROCCO P. MATRA◊
JOHN B. MULLAHY*
MELINDA B. MARGOLIES*
JEFFREY S. WHITTINGTON◊
CHRISTINE HEENAN

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN*

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN B. HAMMERMAN
HEATHER LASCHEWER*
CAROL S. DOTY†††
BARBARA-ANN M. COSTELLO
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
BELINDA DODDS-MARSHALL*‡
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER BIRNBAUM
MICHAEL R. JANES
R. EVON HOWARD*
LEONARD B. COOPER††
ANDREW R. JONES
KEITH L. KAPLAN††
VINCENT C. ANSALDI††
DAVID J. VARRIALE††

DOUGLAS J. DOMSKY
TIMOTHY E. MCCARTHY*
JEFFREY A. GRALNICK
TRACEY REISEN-PERTUSO††
KATHERINE J. O'BRIEN††
DAMIEN SMITH
ANDREW S. KOWLOWITZ*◊
MATTHEW M. FERGUSON◊
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA◻
MATTHEW SPERGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN*
KATHRYN C. COLLINS
JANINE C. CIALLELLA††
ELAN R. KANDEL*††
BRIAN M. SHER*
MARGARET M. O'CONNOR
JOSHUA B. SANDBERG
THOMAS L. GALLIVAN
EILEEN R. FULLERTON††
DENNIS J. DOZIS*
LYNN M. DUKETTE
RISA D. TARKOFF*
MILLI SHAH*

KATHRYN M. WALSH
LAURA B. JUFFA
KATELYN B. O'ROURKE
BETSY PHILP
SARA K. WALKER
REMI D. PLAISHMAN*
MELISSA A. MANNING*
THOMAS LOOKSTEIN
ROBERT E. FEKETE
JULIE A. MICKIEWICZ*
LORRAINE C. SYLVESTER*
JESSICA MOLINARES
JENNIFER M. HAMILTON

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
††ALSO ADMITTED IN CT
◊ ALSO ADMITTED IN MA
◻ ALSO ADMITTED IN TX
◆ ALSO ADMITTED IN FL
◻ ALSO ADMITTED IN CA
◼ ADMITTED IN NJ ONLY
◻ ADMITTED IN CA ONLY
◆ ADMITTED IN CT ONLY
✧ BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

March 6, 2008

**VIA EMAIL ONLY**
Luc. A. Despins, Esq.
Dennis C. O'Donnell, Esq.
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005

|     |            |   |                           |
|-----|------------|---|---------------------------|
| Re: | Matter     | : | Refco Insurance Litigation |
|     | Index Nos. | : | various                   |
|     | Our File No. | : | 481.001                 |

Dear Counsel:

As you are aware, this firm is counsel to Axis Reinsurance Company ("Axis"). Pursuant to Judge Drain's October 19, 2007 Order in the captioned adversary proceedings, Axis hereby notifies you that it is in the process of making payments to defense counsel, subject to a full reservation of rights, totaling $819,190.65. Including these payments, Axis will have paid a total of $10,000,000.00. This $10,000,000.00 represents the total Limit of Liability under the Axis Policy.

Regards,

KAUFMAN BORGEEST & RYAN LLP

Joan M. Gilbride
Robert A. Benjamin

cc: all counsel

NEW YORK CITY • WESTCHESTER • LONG ISLAND • NEW JERSEY • CALIFORNIA

Exhibit U

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

NEW YORK
COUNTY CLERK'S OFFICE

JUN 2 2 2006

NOT COMPARED
WITH COPY FILED

ARCH INSURANCE COMPANY,

  Plaintiff,

v.

PHILLIP R. BENNETT, LEO R.
BREITMAN, NATHAN GANTCHER,
TONE GRANT, DAVID V. HARKINS,
SCOTT L. JAECKEL, DENNIS A.
KLEJNA, THOMAS H. LEE, SANTO C.
MAGGIO, JOSEPH MURPHY, RONALD
L. O'KELLEY, PERRY ROTKOWITZ,
SCOTT A. SCHOEN, WILLIAM M.
SEXTON, GERALD SHERER, PHILIP
SILVERMAN and ROBERT C.
TROSTEN

  Defendants.

Index No.: 06/600805

**AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT**

   Plaintiff Arch Insurance Company ("Arch") bound coverage for an excess directors,

officers and corporate liability insurance policy issued to Refco, Inc. ("Refco" or the

"Company") for the period from August 11, 2005 to August 11, 2006 (the "Arch Policy"). Since

August 11, 2005, various lawsuits and governmental and/or regulatory investigations (the

"Underlying Matters") involving certain individuals insured under the Arch Policy have been

instituted and those individuals have tendered the Underlying Matters to Arch for coverage under

the Arch Policy. Arch brings this action against the defendants named herein ("Defendants")

and seeks a declaration that the Arch Policy affords no coverage for the Defendants in

connection with the Underlying Matters. In support of its Amended Complaint, Arch alleges as

follows:

1

## JURISDICTION AND VENUE

1.  This Court has jurisdiction to resolve an actual controversy between Arch and the Defendants pursuant to the New York Declaratory Judgment Act, CPLR § 3001.

2.  Personal jurisdiction over Defendants is proper pursuant to CPLR § 301 and § 302. Defendants possess sufficient minimum contacts with the state of New York to render the exercise of jurisdiction by a New York court permissible under traditional notions of fair play and substantial justice. Defendants were directors or officers of Refco, Inc., a corporation with its principal place of business in New York. As directors and/or officers of Refco, Inc., Defendants transacted business in the state of New York. In addition, Defendants seek coverage under the Arch Policy for the Underlying Matters. Accordingly, Defendants have an ongoing contractual relationship with Arch, a corporation with its principal place of business in New York. Finally, most of the lawsuits comprising the Underlying Matters were filed in the federal courts located in New York. These lawsuits allege that Defendants committed acts in the state of New York and/or acts outside the state of New York that could reasonably be expected to have consequences in the state of New York.

3.  Venue is proper in this County under CPLR § 503 because Arch has its principal place of business in this County.

## PARTIES

4.  Arch is an insurance company that is organized and exists pursuant to the laws of the state of Missouri. Arch has its principal place of business in New York County, New York.

5.  Defendant Phillip R. Bennett ("Bennett") served as the Chairman, President and Chief Executive Officer of Refco until October 2005, when he took a leave of absence at the request of the Refco board of directors. Upon information and belief, Bennett is a citizen of New Jersey.

6. Defendant Leo R. Breitman ("Breitman") served as a Director of Refco at times relevant to this action. Upon information and belief, Breitman is a citizen of Florida.

7. Defendant Nathan Gantcher ("Gantcher") served as a Director of Refco at times relevant to this action. Upon information and belief, Gantcher is a citizen of New York.

8. Defendant Tone Grant ("Grant") served as President of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Grant is a citizen of Illinois.

9. Defendant David V. Harkins ("Harkins") served as a Director of Refco at times relevant to this action. Upon information and belief, Harkins is a citizen of Massachusetts.

10. Defendant Scott L. Jaeckel ("Jaeckel") served as a Director of Refco at times relevant to this action. Upon information and belief, Jaeckel is a citizen of Massachusetts.

11. Defendant Dennis A. Klejna ("Klejna") served as Executive Vice President and General Counsel of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Klejna is a citizen of Washington, D.C.

12. Defendant Thomas H. Lee ("Lee") served as a Director of Refco at times relevant to this action. Upon information and belief, Lee is a citizen of New York.

13. Defendant Santo C. Maggio ("Maggio") served as President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd. at times relevant to this action. Upon information and belief, Maggio is a citizen of Florida.

14. Defendant Joseph Murphy ("Murphy") served as President of Refco from October 2005 to November 28, 2005, when he resigned. Murphy also served as Chief Executive Officer of Refco Global Futures and President of Refco, LLC at times relevant to this action. Upon information and belief, Murphy is a citizen of New Jersey.

3

15. Defendant Ronald L. O'Kelley ("O'Kelley") served as a Director of Refco at times relevant to this action. Upon information and belief, O'Kelley is a citizen of Florida.

16. Defendant Perry Rotkowitz ("Rotkowitz") served as Secretary of Refco Capital LLC at times relevant to this action. Upon information and belief, Rotkowitz is a citizen of New York.

17. Defendant Scott A. Schoen ("Schoen") served as a Director of Refco at times relevant to this action. Upon information and belief, Schoen is a citizen of Massachusetts.

18. Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer of Refco at times relevant to this action. Upon information and belief, Sexton is a citizen of Iowa.

19. Defendant Gerald Sherer ("Sherer") served as Executive Vice President and Chief Financial Officer of Refco at times relevant to this action. Upon information and belief, Sherer is a citizen of New York.

20. Defendant Philip Silverman ("Silverman") served as Secretary of Refco at times relevant to this action. Upon information and belief, Silverman is a citizen of New Jersey.

21. Robert C. Trosten ("Trosten") served as Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Trosten is a citizen of New Jersey.

## FACTUAL ALLEGATIONS

### The Arch Policy

22. The Arch Policy is an excess directors, officers and corporate liability policy. It has a policy period of August 11, 2005 to August 11, 2006 and a limit of liability of $10 million excess of $40 million in underlying insurance. A copy of the Arch Policy is attached as Exhibit A.

23. Various other insurers issued underlying insurance policies to Refco. U.S. Specialty Insurance Company issued a primary policy with limits of $10 million excess of applicable retentions (the "Primary Policy"). A copy of the Primary Policy is attached as Exhibit B. Lexington Insurance Company issued a first excess policy with limits of $7.5 million excess of $10 million (the "Lexington Policy"). A copy of the Lexington Policy is attached as Exhibit C. Axis Reinsurance Company issued a second excess policy with limits of $10 million excess of $17.5 million (the "Axis Policy"). A copy of the Axis Policy is attached as Exhibit D. Allied World Assurance Company issued a third excess policy with limits of $12.5 million excess of $27.5 million (the "AWAC Policy"). A copy of the AWAC Policy is attached as Exhibit E. Each of the underlying policies has a policy period of August 11, 2005 to August 11, 2006.

24. In general, the Arch Policy applies in conformance with the terms and conditions of the Primary Policy and in conformance with the terms and conditions in the Arch Policy or any other underlying insurance "further limiting or restricting coverage." Arch Policy, Section I.C. The Arch Policy provides that "[i]n no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the Underlying Insurance." *Id.*

25. Subject to all of its terms and conditions, the Arch Policy affords five types of specified coverage. First, the Arch Policy affords specified coverage to Insured Persons for "**Loss** arising from **Claims** first made during the **Policy Period** . . . for **Wrongful Acts**, except when and to the extent that the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement." Primary Policy, Insuring Agreement (A). [1]

---

[1] Policy language appearing herein in bold typeface is defined in the policy being quoted, and appears in bold typeface in that policy.

26. Second, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the Company for "**Loss** arising from . . . **Claims** first made during the **Policy Period** . . . against the **Insured Persons** for **Wrongful Acts**, if the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement." Primary Policy, Insuring Agreement (B)(1).

27. Third, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the Company for "**Loss** arising from **Securities Claims** first made during the **Policy Period** . . . against the **Company** for **Wrongful Acts**." Primary Policy, Insuring Agreement (B)(2).

28. Fourth, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the "**Controlling Shareholder**," defined as Bennett, for "**Loss** arising from a **Securities Claim** first made during the **Policy Period** . . . against such **Controlling Shareholder** for **Wrongful Acts**, provided, that one or more **Insured Persons** and/or the **Company** are and remain co-defendants in such **Securities Claim** along with such **Controlling Shareholder**." Primary Policy, Endorsement No. 15.

29. Fifth, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the Company for "all **Derivative Demand Investigation Costs** incurred by the **Company** as a result of a **Derivative Demand** first received by the **Company's** Board of Directors and reported in writing to the Insurer during the **Policy Period** . . . up to the amount of the **Derivative Demand Investigation Costs Sub-Limit**" of $250,000. Primary Policy, Endorsement No. 11.

30. The Lexington Policy contains the following provision: "The word 'Loss' shall be understood to mean the sums paid or payable in settlement of claims for which the Insured is

liable after making deductions for all other recoveries, salvages or other insurance (other than recoveries under underlying insurance, whether recoverable or not) and shall exclude all expenses and costs." Lexington Policy, Section XII. The Lexington Policy further provides that the word "Costs" shall mean "interest on judgments, investigations, adjustments and legal expenses." *Id.*

31. The AWAC Policy contains the following provision: "It is hereby understood and agreed that the **Insurer** shall not be liable for **Loss** in connection with any claim or claims made against the **Insureds** alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which any Insured had knowledge as of inception and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage hereunder; or (ii) which indicate the probability of any such claim." AWAC Policy, Endorsement No. 3 ("AWAC Prior Knowledge Exclusion").

32. The Arch Policy contains the following provision: "If any **Insured** as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a **Claim** under this Policy, the **Excess Insurer** shall not be liable to make any payment under this Policy as a result of a **Claim** arising out of, based upon or attributable to any such act, error, omission, fact, matter or circumstance." Arch Policy, Endorsement No. 4 (the "Arch Prior Knowledge or Information Exclusion").

33. The Arch Policy and underlying insurance policies contain other terms, conditions and limitations that may ultimately be implicated in this action.

**The Events at Refco**

34. The Arch Policy incepted on August 11, 2005. On the same day, Refco conducted its initial public offering.

35. On October 10, 2005, Refco issued a press release. The press release announced that the Company had been carrying an undisclosed receivable of $430 million from an entity controlled by Bennett. Refco stated that "[b]ased on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible." Moreover, the company stated that although the receivable "was reflected on the Company's prior period financials, as well as on the Company's May 31, 2005 balance sheet," the receivable "was not shown as a related party transaction in any such financials. For that reason, and after consultation by the Audit Committee with the Company's independent accountants, the Company determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

36. On October 11, 2005, Refco issued a second press release. The press release announced that Bennett had repaid the $430 million receivable in full. The press release also provided further information on the nature of the receivable: "Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998. These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable from that entity, rather than a receivable from the originating accounts. The fact that the receivable was from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual

8

reporting periods by reason of transfers to a third party customer account that we currently believe is unaffiliated with Mr. Bennett or anyone else at the Company."

37. On October 17, 2005, Refco and certain of its unregulated subsidiaries filed for Chapter 11 bankruptcy protection.

38. On November 10, 2005, Bennett was indicted on charges of securities fraud, conspiracy to commit securities fraud, false filings to the SEC, and wire fraud. A copy of the indictment (the "Bennett Indictment") is attached as Exhibit F.

39. According to the Bennett Indictment, Bennett "sought to hide from, among others, Refco's auditors and investors, losses sustained by Refco through its own and its customers' trading in the financial markets. To that end, Bennett transferred losses from Refco to a company controlled by Bennett, directed a repeated series of transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make false and fraudulent public filings with the [SEC]." Bennett Indictment ¶ 4.

40. The Bennett Indictment alleges that, as part of its brokerage business, Refco extended credit to customers for their securities and commodities trading. When certain customers were unable to repay that credit, rather than noting the losses on Refco's balance sheet, Bennett directed the transfer of those losses to an entity called Refco Group Holdings, Inc. ("RGHI"), which he controlled. As a result, Refco's balance sheet showed a receivable from RGHI.

41. According to the Bennett Indictment, beginning in or around 1999, Bennett took steps to hide the RGHI receivable from Refco's auditors. Specifically, Bennett arranged transactions with third parties to temporarily pay down the RGHI receivable at quarter- or year-end and mask the related-party nature of the RGHI debt.

42. According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2004 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2004 Transactions"). On or about February 20, 2004, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $720 million to a Refco customer. On the same day, the customer loaned $720 million to RGHI. RGHI then used the $720 million to pay down its debt to Refco. These loans were unwound on or about March 4, 2004, after Refco's fiscal year-end.

43. According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $720 million if RGHI defaulted.

44. According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2005 Transactions"). On or about February 23, 2005, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $345 million to a Refco customer. On the same day, the customer loaned $345 million to RGHI. RGHI then used the $345 million to pay down its debt to Refco. These loans were unwound on or about March 8, 2005, after Refco's fiscal year-end.

45. According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $345 million if RGHI defaulted.

46. According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal first quarter end for 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "May 2005 Transactions"). On or about May 25,

2005, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $450 million

to a Refco customer. On the same day, the customer loaned $450 million to RGHI. RGHI then

used the $450 million to pay down its debt to Refco. These loans were unwound on or about

June 6, 2005, after Refco's fiscal first quarter-end.

47. According to the Bennett Indictment, Bennett executed the loan agreement between

the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating

that Refco Group, Ltd. would repay the customer $450 million if RGHI defaulted.

48. Based on his knowledge of the RGHI receivables to Refco, the February 2004

Transactions, the February 2005 Transactions and the May 2005 Transactions, as of August 11,

2005, Bennett had knowledge of or information concerning any acts, errors, omissions, facts,

matters or circumstances that might give rise to a Claim under the AWAC Policy or the Arch

Policy.

**The Underlying Matters**

49. Beginning on October 12, 2005, various lawsuits were filed against the Defendants.

50. The suit *United States v. Bennett*, No. 05-1720 (S.D.N.Y.), is a criminal action

against Bennett (the "Bennett Criminal Action"). Bennett was subsequently indicted on or about

November 10, 2005 by the Grand Jury for the Southern District of New York.

51. The complaint in the Bennett Criminal Action alleges that Bennett knowingly "hid

from investors in [Refco's] August 2005 initial public offering of stock . . . the existence of

hundreds of millions of dollars of related party transactions between Refco and a company

controlled by Bennett, including causing Refco to file a false and fraudulent S-1 registration

statement with the Securities and Exchange Commission." Bennett Criminal Action Complaint,

¶ 9. As set forth more fully above, the Bennett Indictment expanded the allegations of criminal

conduct against Bennett.

52. The Bennett Criminal Action was tendered to Arch for coverage under the Arch Policy on or about October 13, 2005. The Bennett Indictment was tendered to Arch for coverage on or about February 22, 2006.

53. The suits *Mazur et al. v. Refco, Inc. et al.*, No. 05-8626 (S.D.N.Y.), *Frontpoint Fin. Serv., Inc. v. Refco, Inc. et al.*, No. 05-8663 (S.D.N.Y.), *Lieber v. Refco, Inc. et al.*, No. 05-8667 (S.D.N.Y.), *Weiss v. Refco, Inc. et al.*, No. 05-8691 (S.D.N.Y.), *Glaubach v. Refco, Inc. et al.*, No. 05-8692 (S.D.N.Y.), *Gross v. Refco, Inc. et al.*, No. 05-8697 (S.D.N.Y.), *Salamone v. Refco, Inc. et al.*, No. 05-8716 (S.D.N.Y.), *RD Partners LLC v. Refco, Inc. et al.*, No. 05-8737 (S.D.N.Y.), *Wakefield v. Refco, Inc. et al.*, No. 05-8742 (S.D.N.Y.), *Gaugler v. Bennett et al.*, No. 05-8886 (S.D.N.Y.), *Baker v. Bennett et al.*, No. 05-8923 (S.D.N.Y.), *Nathanson v. Bennett et al.*, No. 05-8926 (S.D.N.Y.), *Becker v. Refco, Inc. et al.*, No. 05-8929 (S.D.N.Y.), *Mettupatti v. Bennett et al.*, No. 05-9048 (S.D.N.Y.), *Weiss v. Bennett et al.*, No. 05-9126 (S.D.N.Y.), *Weit v. Bennett et al.*, No. 05-9611 (S.D.N.Y.), *Esses v. Bennett et al.*, No. 05-9654 (S.D.N.Y.), *City of Pontiac General Employees Retirement System v. Bennett et al.*, No. 05-9941 (S.D.N.Y.), *Gensheimer v. Bennett*, No. 05-10318 (S.D.N.Y) and *Teachers' Retirement System of the State of Illinois et al. v. Lee, et al.*, No. 05-10403 (S.D.N.Y.) are purported class action securities fraud lawsuits (the "Securities Litigation"). The suits comprising the Securities Litigation have been consolidated for pre-trial purposes under Case No. 05-8626. The First Amended Consolidated Class Action Complaint ("FAC") was filed in the consolidated proceedings on May 5, 2006.

54. The FAC alleges that Refco's initial public offering registration statement and prospectus were materially false and misleading. Specifically, the FAC alleges that the registration statement and prospectus failed to disclose the existence of large receivables owed to Refco by an entity controlled by Bennett. The FAC further alleges that the Refco financial

statements incorporated in Refco's registration statement and prospectus were inaccurate because they failed to disclose the related-party transactions between Refco and the entity controlled by Bennett. All of the Defendants other than Rotkowitz are named as defendants in the FAC.

55. Beginning on or about October 14, 2005, some of the lawsuits comprising the Securities Litigation were tendered to Arch for coverage under the Arch Policy. The FAC was tendered to Arch by letter dated April 28, 2006.

56. The suits *David Fine v. Bennett, et al.*, No. 05-8701 (S.D.N.Y), and *Mehta v. Bennett et al.*, No. 05-8748 (S.D.N.Y.), are shareholder derivative complaints (the "Derivative Litigation"). Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen, Sexton and Murphy, among others, are named as defendants in the Derivative Litigation.

57. The complaints in the Derivative Litigation allege that Refco's initial public offering registration statement and prospectus were materially false and misleading. Specifically, the complaints allege that the registration statement and prospectus failed to disclose the existence of large receivables owed to Refco by an entity controlled by Bennett. The complaints further allege that the Refco financial statements incorporated in its registration statement and prospectus were inaccurate because they failed to disclose the related-party transactions between Refco and the entity controlled by Bennett.

58. The *Mehta* complaint was tendered to Arch for coverage under the Arch Policy on or about October 17, 2005.

59. The suit *Bawag P.S.K. Bank v. Refco Inc. et al.*, No. 05-60006 (S.D.N.Y. Bkr.), Adv. No. 05-03161, was filed on November 16, 2005 (the "Bawag Action"). The Bawag Action names Bennett (among others) as a defendant.

60. The complaint in the Bawag Action alleges that the plaintiff was fraudulently induced to loan approximately $420 million to Bennett on October 10, 2005. The complaint alleges that Bennett failed to disclose that he sought the loan to pay off RGHI's receivable to Refco, a "related-party receivable resulting from the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to Refco [that] likely was impaired and not collectible." Bawag Action Complaint, § 17. The complaint alleges that Bennett "knew that if BAWAG had been aware of any of the key facts set forth in [Refco's] October 10, 2005 Press Release, BAWAG would not have made the Loan." *Id.*, § 30.

61. The Bawag Action was tendered to Arch for coverage under the Arch Policy on or about November 30, 2005.

62. The suit *Thomas H. Lee Equity Fund V, L.P. et al. v. Bennett et al.*, No. 05-9608 (S.D.N.Y.), was filed on November 14, 2005 (the "THL Funds Action"). The THL Funds Action names Bennett, Grant and Maggio, among others, as defendants.

63. The complaint in the THL Funds Action alleges that in June 2004, the plaintiffs invested approximately $507 million in Refco. The complaint alleges that despite the plaintiffs' due diligence efforts, they were unaware that "Bennett intentionally and deliberately engaged in accounting fraud in order to mask a group of largely worthless receivables, bad debts and questionable obligations that, if accurately portrayed on the Company's financial statements, would have materially reduced Refco's value." THL Funds Action Complaint, § 4. Specifically, the complaint alleges that Bennett "nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of million dollars [sic] of customer losses and obligations that would never be repaid to the Company." *Id.*, § 30. The complaint alleges

14

that the Refco financial statements provided to the plaintiffs during their due diligence review in 2003 and 2004 were materially false and misleading.

64. The THL Funds Action was tendered to Arch for coverage under the Arch Policy on or about February 13, 2006.

65. The complaint in *Unovalores Ltd. v. Bennett,* No. L1564-05 (Sup. Ct. of New Jersey, Somerset County, Law Division) (the "Unovalores Action") was filed in New Jersey state court on or about November 1, 2005.

66. The plaintiff in the Unovalores Action, which identifies itself as a Refco Capital account holder, names only Mr. Bennett as a defendant. Plaintiff alleges that it entered into a Repurchase Transaction with Refco on August 31, 2005, in reliance upon representations in Refco's registration statement and other filings concerning Refco's financial health. Those representations were false, according to the complaint, because they concealed massive receivables owed by an entity controlled by Mr. Bennett and at least one-half billion dollars of related party transactions with Mr. Bennett.

67. The Unovalores Action was tendered to Arch for coverage under the Arch Policy on or about February 13, 2006.

68. The complaint in *American Financial International Group v. Refco, Inc. et al.*, No. 05-8988 (S.D.N.Y.) (the "American Financial Action"), was filed in the Southern District of New York on or about October 21, 2005, and an amended complaint was filed on April 13, 2006.

69. The plaintiff in the American Financial Action identifies itself as a Delaware LLC that traded currencies through an account at Refco F/X Associates, LLC ("RefcoFX"). The suit is a purported class action brought on behalf of all persons who traded currencies through, or had currency trading accounts with, RefcoFX from August 11, 2005 through the date the amended

complaint was filed and who have been damaged. Included among the defendants named in the amended complaint are Bennett, Sherer, Sexton, Maggio, Murphy and Klejna. The amended complaint generally alleges the same conduct that is the subject of the Bennett Criminal Complaint and the Securities Litigation.

70. The complaint in the American Financial Action was tendered to Arch for coverage under the Arch Policy on or about October 25, 2005, and the amended complaint was tendered to Arch in May 2006.

71. The complaint in *Global Management Worldwide Limited v. Philip R. Bennett, et al.*, No. 06-0643 (S.D.N.Y.) (the "Global Management Action"), was filed in the Southern District of New York on or about January 26, 2006.

72. The plaintiff in the Global Management Action identifies itself as a corporation organized under the laws of Nassau, the Bahamas, that was a brokerage customer of Refco Capital Markets, Ltd. ("RCM"). The suit is a purported class action brought on behalf of all brokerage customers of RCM who, at any time from October 17, 2000 to October 17, 2005, entrusted securities to RCM and/or Refco Securities, LLC, directly or indirectly, as custodian and broker for safe-keeping, and continued to hold positions with RCM on October 17, 2005 or thereafter. The complaint names as defendants all the Defendants herein other than Grant, Silverman and Trosten. The complaint generally alleges that, during the purported class period, Refco, either directly or through its affiliates, incurred billions of dollars in losses, and tried to hide those losses by surreptitiously selling securities held by RCM in custody for class members. Plaintiffs allege that the financial statements filed by the Refco Group with the SEC during the purported class period were false and misleading because they fraudulently omitted these losses, as well as the scheme to cover the losses by selling securities stolen from plaintiffs. Plaintiffs

further allege that they relied upon these false and misleading financial statements and the purported financial integrity of the Refco Group in entrusting securities to RCM.

73. The Global Management Action was tendered to Arch for coverage under the Arch Policy on or about March 14, 2006.

74. Upon information and belief, various governmental and/or regulatory investigations of or proceedings involving one or more of the defendants are ongoing, and one or more of the defendants has sought or may seek coverage for such matters (the "Regulatory Matters").

75. The Bennett Criminal Action, the Bennett Indictment, the Securities Litigation, the Derivative Litigation, the Bawag Action, the THL Funds Action, the Unovalores Action, the American Financial Action, the Global Management Action, and the Regulatory Matters collectively are referenced herein as the "Underlying Matters."

**COUNT I**

**DECLARATORY JUDGMENT THAT THE AWAC PRIOR KNOWLEDGE EXCLUSION BARS COVERAGE FOR THE UNDERLYING MATTERS**

76. Arch incorporates by reference each of the allegations of paragraphs 1 through 75 above.

77. As alleged herein, as of August 11, 2005, Bennett possessed knowledge of facts and circumstances that a reasonable person would suppose might afford valid grounds for a claim or that would indicate the probability of any such claim.

78. The Underlying Matters consist of Claims alleging, arising out of, based upon, in consequence of, or attributable to such facts and circumstances.

79. Arch seeks a declaration that as a result of the AWAC Prior Knowledge Exclusion, the Arch Policy does not provide coverage for any loss arising out of the Underlying Matters.

17

## COUNT II

## DECLARATORY JUDGMENT THAT THE
## ARCH PRIOR KNOWLEDGE OR INFORMATION EXCLUSION
## BARS COVERAGE FOR THE UNDERLYING MATTERS

80. Arch incorporates by reference each of the allegations of paragraphs 1 through 79 above.

81. As alleged herein, as of August 11, 2005, Bennett possessed knowledge or information concerning acts, errors, omissions, facts, matters or circumstances that might give rise to a Claim under the Arch Policy.

82. The Underlying Matters consist of Claims arising out of, based upon, or attributable to such acts, errors, omissions, facts, matters or circumstances.

83. Arch seeks a declaration that, as a result of the Arch Prior Knowledge or Information Exclusion, the Arch Policy does not provide coverage for any loss arising out of the Underlying Matters.

## COUNT III

## DECLARATORY JUDGMENT THAT THE ARCH POLICY AFFORDS NO
## COVERAGE FOR DEFENSE COSTS FOR THE UNDERLYING MATTERS

84. Arch incorporates by reference each of the allegations of paragraphs 1 through 83 above.

85. The Lexington Policy does not afford any coverage for "expenses and costs," including "legal expenses." Lexington Policy, Section XII.

86. The Arch Policy applies in conformance with the terms and conditions of any underlying insurance policy "further limiting or restricting coverage" beyond that provided by the Primary Policy. Arch Policy, Section I.C.

87. The Arch Policy provides that "[i]n no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the Underlying Insurance." Arch Policy, Section I.C.

88. Arch seeks a declaration that the Arch Policy does not afford coverage for any defense fees or costs incurred by Defendants in connection with the Underlying Matters.

## OTHER COVERAGE DEFENSES

89. Other Arch Policy terms and conditions may ultimately be implicated. Nothing in this Amended Complaint should be construed as a waiver by Arch of any other coverage defenses under the Arch Policy or underlying policies with respect to any claim or potential claim and Arch reserves the right to raise all other terms and conditions of the Arch Policy and underlying policies as defenses to coverage as appropriate.

WHEREFORE, Arch requests that the Court enter a declaration and judgment in its favor:

A.    Declaring that, for the reasons set forth in Count I, the Arch Policy does not provide coverage to any Defendant for any Loss incurred in connection with the Underlying Matters;

B.    Declaring that, for the reasons set forth in Count II, the Arch Policy does not provide coverage to any Defendant for any Loss incurred in connection with the Underlying Matters;

C.    Declaring that, for the reasons set forth in Count III, the Arch Policy does not provide coverage to any Defendant for defense fees or costs in the Underlying Matters;

D.    Awarding Arch such additional declaratory and other relief as shall be found to be appropriate under the circumstances; and

E.    Awarding Arch its fees and costs incurred in prosecuting this action.

Dated:  June 22, 2006

Respectfully submitted,

VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.

By: _____
      John H. Eickemeyer

805 Third Avenue
New York, New York  10022-2203
(212) 407-7700

Of Counsel:

Daniel J. Standish
Jonathan M. Jacobs
Cara Tseng Duffield
WILEY REIN & FIELDING LLP
1776 K Street, NW
Washington, DC 20006
202-719-7000

*Attorneys for Plaintiff*
*Arch Insurance Company*

20

Exhibit V

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:     __HELEN E. FREEDMAN__      PART __39__

*Justice*

| | |
|---|---|
| Arch Ins. Co., | |
| **Plaintiff,** | INDEX NO. _600805/06_ |
| | MOTION DATE _____ |
| - v - | |
| Phillip R. Bennett et al., | |
| **Defendants** | MOTION SEQ. NO. _005_ |
| | MOTION CAL. NO. _____ |

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:** ☐ Yes ☒ No

**MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):**

The motions with sequence numbers 001, 002, and 005 are consolidated for joint disposition.

In this lawsuit, plaintiff Arch Insurance Company ("Arch") seeks declaratory judgments that its excess liability insurance policy does not afford coverage to former directors and officers of a now-bankrupt corporation, Refco, Inc. ("Refco, Inc."), and Refco affiliates. Defendants now move for orders dismissing or staying this action primarily on the grounds that it is premature and unripe, and that it should await the outcome of a related criminal trial. For the reasons set forth below, the motions are granted to the extent that the complaint is dismissed without prejudice.

*Background* – Refco, a publicly-traded corporation which provided services to financial markets, collapsed immediately after the company announced on October 10, 2005 that its financial statements failed to disclose that it carried an undisclosed receivable of $ 430 million from an entity that Refco's CEO, Phillip Bennett, controlled. On the following day, Refco announced that the receivable derived largely from uncollectible debt that that third parties owed to Refco.

Refco filed for bankruptcy on October 12. In November 2005, a federal grand jury indicted Bennett on charges of securities fraud and related charges; the indictment alleged that Bennett

sought to hide from, among others, Refco's auditors and investors, losses sustained by Refco through its own and its customers' trading in the financial

markets. To that end, Bennett transferred losses from Refco to a company controlled by Bennett, directed a repeated series of transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make false and fraudulent public filings with the [SEC].

In addition, Refco shareholders, bondholders, customers, and others have filed at least six civil lawsuits (the "Underlying Lawsuits") which, like the criminal proceeding, accuse Bennett of concealing Refco's bad debt through a series of sham transactions. The defendants in this action are defendants in some or all the Underlying Lawsuits.

*Insurance Policies* – Refco and its affiliates simultaneously held five primary and excess "Directors and Officers" insurance policies that provided one year of coverage beginning on August 11, 2005. The primary carrier, U.S. Specialty Insurance Company ("U.S. Specialty"), covers liability of up to an aggregate of $ 10 million for a number of types of claims. The first tier excess carrier, Lexington Insurance Company ("Lexington"), covers the next $ 7.5 million of liability; Lexington and its insureds dispute whether the policy covers legal defense costs. The second tier excess carrier, Axis Reinsurance Company ("Axis"), covers the next $ 10 million of aggregate liability, inclusive of defense costs. The third tier excess carrier, Allied World Assurance Company ("AWAC"), provides an aggregate liability limit of $ 12.5 million, including defense costs.

The fourth tier excess carrier, plaintiff Arch, issued a policy that limits liability, including defense costs and expenses, to an aggregate of $ 10 million for "Claims." The Arch policy also states that its coverage extends no further than that provided by the most restrictive underlying policy.

Certain defendants have tendered their defense of the Underlying Lawsuits to, and demanded indemnification from, the aforementioned insurers. U.S. Specialty has reserved its rights to deny coverage but has paid or reimbursed several defendants for defense costs totaling about $ 4.9 million as of October 2006. None of the excess coverage has been reached. Lexington initially reserved its rights and denied coverage for defense costs on the ground that its policy did not cover them. However, Lexington later agreed to advance defense costs if defendants agreed to repay them if they were later determined not to be covered.

AWAC denied coverage, in part, based on its policy's "Prior Knowledge Exclusion," which excludes coverage for all of its insureds with respect to claims that arose from circumstances which any insured knew about as of August 11, 2005, if the insured expected or should have expected those circumstances to lead to future insurance claims against AWAC. In addition, the AWAC policy mandates that any coverage disputes under its policy are subject to alternative dispute resolution ("ADR").

Arch responded to defendants' coverage demands by filing this declaratory judgment action. The first count in the amended complaint seeks a declaration that, since Arch's policy incorporates any coverage restrictions in the underlying insurance policies, the AWAC's Prior Knowledge Exclusion bars coverage for the Underlying Lawsuits. Arch asserts that the AWAC Prior Knowledge Exclusion applies because of what Bennett knew as of August 11, 2005.

In the second count, Arch seeks a declaration that the Prior Knowledge Exclusion in its own policy bars coverage, due to Bennett's knowledge as of August 11, 2005.

The third count seeks a declaration that the Arch policy does not cover defense costs because the Lexington policy excludes them.

*Motions: Officer Defendants* – In motion number 001, defendants Tone Grant, Dennis A. Klejna, Joseph Murphy, Perry Rotkowitz, William M. Sexton, Gerald Sherer, Philip Silverman and Robert C. Trosten (the "Officer Defendants") move for an order dismissing the complaint on the ground that no justiciable dispute currently exists between Arch and the movants, because it is unlikely that coverage under the Arch policy will ever be reached. That could not occur until defendants' claims exceed $ 40 million and exhaust the coverage that U.S. Specialty, Lexington, Axis, and AWAC provide.

To maintain a declaratory judgment action, a plaintiff must have an "interest sufficient to constitute standing to maintain the action," and must face "present, rather than hypothetical, contingent or remote, prejudice." *Am. Ins. Assoc. v. Chu*, 64 N.Y.2d 379, 383 (1985). This lawsuit is dismissed as premature because at present the chances of Arch's policy being triggered are too remote. The primary carrier has paid out less than half of its policy limit, and none of the other excess carriers' coverage has been reached. Moreover, Arch fails to show that potential judgments, settlements and defense costs related to the Underlying Lawsuits are likely to exceed $ 40 million. It is particularly unlikely that the movants will incur defense costs that exceed $ 40 million, and accordingly the third count in Arch's complaint, which pertains only to defense costs, is especially unripe.

As an additional ground for dismissal, the Officer Defendants point out that the first and second counts, which invoke the Prior Knowledge Exclusion in the AWAC and Arch policies, are unripe because they are predicated on claims against Bennett that will be determined in the Underlying Lawsuits. "The general rule is that a declaratory judgment as to a carrier's obligation to indemnify may be granted in advance of trial of the underlying tort action only if it can be concluded as a matter of law that there is no factual or legal basis on which the insurer may eventually be held liable under its policy." *First St. Ins. Co. v. J & S United Amusement Corp.*, 67 N.Y.2d 1044, 1046 (1986). If a carrier's obligation to indemnify its insured turns on an issue of fact that the underlying action will determine, the carrier cannot bring a declaratory judgment action to determine the issue. *See Allstate Ins. Co. v. Santiago*, 98 A.D.2d 608, 608 (1st Dept. 1983). Arch seeks a declaration that the Prior Knowledge Exclusion bars coverage because Bennett concealed related party transactions and uncollectible receivables, and accordingly knew that Refco's financial statements were misleading. However, these accusations against Bennett are central to the Underlying Lawsuits and must be adjudicated in those actions.

The Officer Defendants' final argument is that the first count, which invokes the AWAC policy's Prior Knowledge Exclusion, should be dismissed or stayed because litigating Arch's claim would conflict with the Officer Defendants' right to resolve coverage issues with AWAC through ADR. This issue does not need to be reached because the Prior Knowledge Exclusion in the Arch policy, which the second count invokes, does not afford movants a right to ADR, and because the first count is dismissed for other reasons.

*Director Defendants* – In motion number 002, defendants Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A Schoen (the "Director Defendants") seek dismissal on the ground that "Arch has ignored that it is contractually obligated to advance defense costs." In support, the Director Defendants cite to *Fed. Ins. Co. v. Kozlowski*, 18 A.D.3d 33 (1st Dept. 2005), in which the Appellate Division

recognized that a liability insurer must pay defense costs as they are incurred, and cannot defer payment because the claims against the insured in the underlying litigation, if proven, would bar coverage. However, the Director Defendants' argument does not provide an independent basis for dismissing the complaint. As discussed above, this action is unripe and it would be premature to determine the merits in favor of Arch or against it. Also, it is unlikely that Arch's obligations to pay defense costs will ever be triggered, and its duty to pay defense costs, if any, has no bearing upon its duty to indemnify defendants in the Underlying Lawsuits.

*Stephen Bennett* – In motion 005, defendant Stephen Bennett separately moves for a stay of this action on the ground that he is being criminally prosecuted, and defending Arch's lawsuit would require him to waive his right against self-incrimination and jeopardize his criminal defense. While it appears that the relevant factors weigh in favor of staying this action until the criminal proceedings against Bennett conclude, this action is being dismissed as premature and accordingly the question of a stay need not be reached.

ORDERED that the motions are granted to the extent that the complaint is dismissed without prejudice, and it is further

ORDERED that the Clerk is directed to enter judgment accordingly.

Dated: __February 20, 2007_____

_____
Helen E. Freedman, *J.S.C.*

**Check one:**  ☒ **FINAL DISPOSITION**    ☐ **NON-FINAL DISPOSITION**

**Check if appropriate:**    ☐ **DO NOT POST**

Exhibit W

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                  :
In re:                 :      Chapter 11
REFCO, INC., et al.,      :      Case No. 05-60006 (RDD)
                 :      (Jointly Administered)
      Debtors.        :

------------------------------------------------------  :

JOSEPH MURPHY, WILLIAM M. SEXTON,  :
DENNIS A. KLEJNA, GERALD SHERER,   :
PHILIP SILVERMAN, RICHARD N.     :
OUTRIDGE, TONE GRANT, LEO R.     :      Adv. Proc. No. _____ rdd
BREITMAN, NATHAN GANTCHER,      :
DAVID V. HARKINS, SCOTT L. JAECKEL, :
THOMAS H. LEE, RONALD L. O'KELLEY, :
AND SCOTT A. SCHOEN,         :      **COMPLAINT**

          Plaintiffs,    :

     v.              :

ALLIED WORLD ASSURANCE COMPANY :
(U.S.), INC.,             :

          Defendant.   :
------------------------------------------------------- x

       Plaintiffs Joseph Murphy, Dennis A. Klejna, William M. Sexton, Gerald Sherer, Philip

Silverman, Richard N. Outridge, Leo R. Breitman, Nathan Gantcher, Tone Grant, David Harkins,

Scott L. Jaeckel, Thomas H. Lee, Ronald O'Kelley, and Scott A. Schoen (collectively,

"Plaintiffs"), by and through their undersigned counsel, allege as follows for their Complaint

against defendant Allied World Assurance Company (U.S.), Inc. ("AWAC"):

## INTRODUCTION

1.      AWAC is the third excess insurer in the "tower" of Directors and Officers

("D&O") liability insurance obtained by Refco, Inc. for the policy period August 11, 2005 to

August 11, 2006 (the "Policy Period").  Plaintiffs are former officers and directors of Refco, Inc.,

its predecessor Refco Group Ltd., LLC, and/or the subsidiaries of these entities.  (Refco, Inc.,

Refco Group Ltd., LLC and their subsidiaries are collectively referred to herein as "Refco.").

Refco was a publicly traded company formed pursuant to an August 2005 initial public offering.

Plaintiffs (collectively, the "Insureds") have been named as defendants in various civil

proceedings, and in the case of Tone Grant a criminal proceeding, related to the collapse of

Refco (collectively, the "Underlying Actions").

2.      The Insureds have requested advancement of their defense costs incurred in

connection with the Underlying Actions from AWAC.  Nothwithstanding that the claims made

against Plaintiffs in the Underlying Actions clearly constitute "claims" for "Wrongful Acts"

under the "Excess Directors and Officers Insurance and Company Reimbursement Policy, policy

number AW0418197, issued by AWAC to Refco (the "AWAC Policy," a true copy of which is

attached as Exhibit A hereto), AWAC has refused to advance the defense costs of any of its

Insureds.

3.      On October 19, 2007, this Court granted the Plaintiffs' motions for summary

judgment in Axis Reinsurance Co. v. Bennett, et al., Adv. Proc. No. 07-1712-RDD (Bankr.

S.D.N.Y.); Grant, et al. v. Axis Reinsurance Company, Adv. Proc. No. 07-2005-RDD (Bankr.

S.D.N.Y.); and Breitman, et al. v. Axis Reinsurance Company, Adv. Proc. No. 07-2032-RDD

(Bankr. S.D.N.Y.) on, inter alia, the issue of advancement of defense costs.[1]  Specifically, this Court determined that, under the terms of the second excess D&O policy issued by Axis Reinsurance Company ("Axis") to Refco, Axis must advance defense costs to the Plaintiffs in connection with the Underlying Actions.

4.     Plaintiffs' defense costs exhausted Refco's primary and first excess D&O policies months ago, and recently exhausted the second excess D&O policy.  On February 5, 2008, Plaintiffs received communication from counsel for Axis notifying Plaintiffs that Axis had received defense bills in excess of the policy issued by Axis and that all invoices received by Axis in excess of Axis' limit of liability would be forwarded to the next excess carrier (i.e., AWAC).  On March 6, 2008, Axis notified Plaintiffs by letter that it is in the process of making payments reaching the $10,000,000 total limit of liability under its policy.  Since the March 6 letter, Axis has issued checks for such payment.

5.     Plaintiffs have now submitted invoices for defense costs to AWAC.  However, despite this Court's advancement ruling with respect to the policy issued by Axis, the relevant terms of which are identical to those of the AWAC Policy, AWAC still refuses to advance Plaintiffs' defense costs.

6.     An actual controversy exists between Plaintiffs and AWAC.  Plaintiffs seek a declaration from this Court that the AWAC Policy requires AWAC to advance their defense costs incurred in connection with the Underlying Actions, and preliminary and permanent

---

[1]   Plaintiff Richard N. Outridge was not a party to the litigation with Axis Reinsurance Company, but Axis agreed to treat him the same as the Plaintiffs in the Axis litigation after he was named as a defendant in subsequently-filed Underlying Actions.

injunctive relief directing AWAC to advance such defense costs in accordance with the requirements of the AWAC Policy.

## JURISDICTION AND VENUE

7.      This adversary proceeding is brought pursuant to Rules 7001(1), (2), (7), and (9) of the Federal Rules of Bankruptcy Procedure, 11 U.S.C. §§ 105, et seq. and 28 U.S.C. § 2201.

8.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334 and 2201.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## PARTIES

Plaintiffs

10.     Joseph Murphy is a former officer of Refco who, at times relevant to this action, served as Executive Vice President of Refco Inc. and President of Refco LLC. Murphy is a resident of the State of New Jersey.

11.     Dennis Klejna is a former officer of Refco who, at times relevant to this action, served as Executive Vice President and General Counsel of Refco. Klejna is a resident of the State of New York.

12.     William Sexton is a former officer of Refco who, at times relevant to this action, served as Executive Vice President and Chief Operating Officer of Refco. Sexton is a resident of the State of New York.

4

13.    Gerald Sherer is a former officer of Refco who, at times relevant to this action, served as Executive Vice President and Chief Financial Officer of Refco.  Sherer is a resident of the State of New York.

14.    Philip Silverman is a former officer at Refco who, at times relevant to this action, served as Secretary of Refco.  Silverman is a resident of the State of New Jersey.

15.    Richard N. Outridge is a former officer of Refco Capital Markets, Ltd. who, at times relevant to this action, served as Chief Financial Officer and/or Controller of Refco Capital Markets, Ltd.  Outridge is a resident of the State of Pennsylvania.

16.    Tone Grant is a former officer of Refco who served as President and Chief Executive Officer of Refco Group Ltd., LLC until 1998.  Grant is a resident of the State of Illinois.

17.    Leo R. Breitman served, at times relevant to this action, as a director of Refco and member of the audit committee.  Breitman is a citizen of the State of Florida.

18.    Nathan Gantcher served, at times relevant to this action, as a director of Refco and a member of Refco's audit committee.  Gantcher is a citizen of the State of New York.

19.    David V. Harkins served, at times relevant to this action, as a director of Refco.  Harkins is a citizen of the State of Massachusetts.

20.    Scott L. Jaeckel served, at times relevant to this action, as a director of Refco.  Jaeckel is a citizen of the State of Massachusetts.

21.     Thomas H. Lee served, at times relevant to this action, as a director of Refco.  Lee is a citizen of the State of New York.

22.     Ronald L. O'Kelley served, at times relevant to this action, as a director of Refco. O'Kelley is a citizen of the State of Florida.

23.     Scott A. Schoen served, at times relevant to this action, as a director of Refco. Schoen is a citizen of the State of Massachusetts.

<u>Defendant</u>

24.     Upon information and belief, AWAC is an insurance company that is organized and exists pursuant to the laws of the State of Delaware.  Upon information and belief, AWAC has its principal place of business in Boston, Massachusetts.

25.     The AWAC Policy contains a "Service of Suit" Endorsement, which provides that "[i]n the event of failure of the Company [AWAC] to pay any amount claimed to be due hereunder, the Company [AWAC], at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States."

## **GENERAL ALLEGATIONS**

**A.     <u>The Underlying Actions</u>**

26.     On October 17, 2005, Refco, Inc., and many of its direct and indirect subsidiaries filed voluntary petitions for relief in this Court under Chapter 11 of the United States Bankruptcy Code.

27.     Thereafter, Plaintiffs were named as defendants in various civil actions (the "Civil

Actions").  Plaintiff Grant is also a defendant in one criminal action, in which trial is scheduled

to begin on March 24, 2008.

28.     The Civil Actions include:  <u>In re Refco, Inc. Securities Litigation</u>, No. 05 Civ.

8626 (GEL) (S.D.N.Y.); <u>In re Refco Capital Markets, Ltd. Brokerage Customer Securities</u>

<u>Litigation</u>, No. 06 Civ. 643 (GEL) (S.D.N.Y.); <u>American Financial International Group, et al. v.</u>

<u>Bennett</u>, et al., No. 05 Civ. 8988 (S.D.N.Y.); <u>V.R. Global Partners, L.P. v. Bennett, et al.</u>, No. 07

Civ. 8686 (GEL) (S.D.N.Y.); <u>Capital Management Select Fund Ltd. v. Bennett, et al.</u>, No. 07

Civ. 8688 (GEL) (S.D.N.Y.); <u>Kirschner v. Agoglia, et al.</u>, Adv. Proc. No. 07-3060 (RDD)

(Bankr. S.D.N.Y.); <u>Kirschner v. Thomas H. Lee Partners, L.P., et al.</u>, No. 07-7074 (GEL)

(S.D.N.Y.); and <u>Kirschner v. Grant Thornton LLP, et al.</u>, No. 2007-1-008818 (Il. Circuit Ct.).

29.     The Plaintiffs properly gave notice of the Underlying Actions to the insurers on

the Refco "tower" of liability insurance, including AWAC, and requested, among other things,

that such insurers advance their defense costs incurred in connection with the Underlying

Actions under the policies described below.

**B.     The Refco "Tower" of D&O Insurance**

30.     As indicated above, Refco procured a "tower" of D&O insurance coverage.  Such

coverage consists of a primary policy and five excess policies for the Policy Period.

The U.S. Specialty Policy

31.     U.S. Specialty Insurance Company ("U.S. Specialty") issued the primary policy,

Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821, for the

Policy Period with a $10 million limit of liability (the "U.S. Specialty Policy," or "Primary Policy," a true copy of which is attached as Exhibit B).

32.     The U.S. Specialty Policy names as "Insured Persons" under the Policy "any past, present or future director or officer of the Company." (Exhibit B at Definition (F)). The "Company" is defined as Refco Inc. and any subsidiary thereof. (Id. at Definitions (C) and (H), Item 1). The U.S. Specialty Policy provides those directors and officers with coverage for "Loss arising from Claims . . . against the Insured Persons for Wrongful Acts." (Id. at Insuring Agreement (A)).

33.     The Underlying Actions are Claims for "Wrongful Acts," as defined in the U.S. Specialty Policy. (Id. at Definition (P)).

34.     "Loss" is defined by the U.S. Specialty Policy so as to include defense costs. (Id. at Definition (G) and Endorsement No. 4).

35.     The U.S. Specialty Policy further requires the Insurer to advance defense costs incurred during the pendency of Claims:

> **The Insurer will pay covered Defense Costs on an as-incurred basis. If it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer.**

(Id. at Condition (D)(2)) (emphasis added).

36.     The U.S. Specialty Policy also includes a "Full Severability" Endorsement, which provides that "[n]o knowledge or information possessed by any Insured will be imputed to any other Insured." (Id. at Endorsement No. 10).

8

37.     The U.S. Specialty Policy also provides that for purposes of determining the application of exclusions, "no Wrongful Act of any Insured Person will be imputed to any other Insured Person who did not have actual knowledge of, or directly participate in the commission of, such Wrongful Act . . . ." (Id. at Exclusions).

38.     The U.S. Specialty Policy further provides that "notwithstanding anything in this Policy to the contrary, the Insurer shall not be entitled under any circumstances to rescind the coverage provided under Insuring Agreement (A) of this Policy." (Id. at Endorsement No. 13).

39.     U.S. Specialty recognized its coverage obligations to Plaintiffs as well as other Insureds.  After obtaining approval from this Court to comply with the terms of its policy and advance defense costs to the Insureds, U.S. Specialty paid the defense costs of the Insureds until the limits of the U.S. Specialty Policy were exhausted last year.

The Lexington Policy

40.     Lexington Insurance Company ("Lexington") issued the first excess policy above the U.S. Specialty Policy, Directors and Officers Liability and Corporation Reimbursement Follow Form Excess Liability Policy No. 1620924, for the Policy Period with a $7.5 million limit of liability in excess of $10 million (the "Lexington Policy," or "First Excess Policy").

41.     The Lexington Policy "follows form" to the U.S. Specialty Policy.  This means that the Lexington Policy "indemnify[ies] the Insured named in the Declarations . . . in accordance with the applicable insuring agreements, terms, conditions and exclusions . . . of the Underlying Policy."

42.     After obtaining approval from this Court to comply with the terms of its policy and advance defense costs to Insureds, Lexington paid the defense costs of the Insureds in connection with the Underlying Actions, including Plaintiffs, until the limits of the Lexington Policy were exhausted in July 2007.

The Axis Policy

43.     Axis is the second excess insurer on the Refco "tower" of D&O liability insurance.  Axis issued the second excess policy above the Lexington Policy, SecureExcess Policy No. RNN 506300, for the Policy Period with a $10 million limit of liability in excess of $17.5 million (the "Axis Policy, or "Second Excess Policy").

44.     Like the Lexington Policy, the Axis Policy also "follows form" to the U.S. Specialty Policy.  Accordingly, the Axis Policy states that it provides coverage "in conformance with the provisions of" the U.S. Specialty Policy.

The Axis Adversary Proceeding

45.     On or about May 23, 2007, Axis commenced an adversary proceeding in the U.S. Bankruptcy Court for the Southern District of New York, Axis Reinsurance Company v. Bennett et al., Adv. Proc. No. 07-0712 (Bankr. S.D.N.Y.) (the "Axis Adversary Proceeding"), seeking a declaration that it had no obligations to its Insureds under the Axis Policy.  The Axis Complaint named the Plaintiffs in this action, among others, as defendants.[2]  All defendants were former Refco officers or directors.

---

[2]   For purpose of this section describing the "Axis Adversary Proceeding," use of the term "Plaintiffs" includes all Plaintiffs herein, except for plaintiff Richard N. Outridge, who was not a party to the Axis Adversary Proceeding.

10

46.    In response to the Axis Complaint in the Axis Adversary Proceeding, Plaintiffs

herein filed various pleadings seeking advancement and the Plaintiffs herein made motions for

preliminary injunctive relief to compel Axis to advance defense costs under the Axis Policy,

which this Court granted.

47.    Plaintiffs subsequently moved for summary judgment against Axis, seeking, inter

alia, summary judgment and a permanent injunction compelling Axis to pay the defense costs as

incurred, pending a final determination of coverage under the Axis Policy or until the Axis

Policy is exhausted.

48.    Following a hearing on the motions, by Order dated October 19, 2007, as

amended on October 22, 2007, the Bankruptcy Court granted the Plaintiffs' motions for

summary judgment.

49.    Following the October 19 decision granting summary judgment, Axis advanced

Plaintiffs' (including Outridge's) defense costs in connection with the Underlying Actions.

50.    At present, as indicated above, the Axis Policy has been exhausted by reason of

advancement.

The AWAC Policy

51.    AWAC is the third excess insurer on the Refco "tower" of D&O liability

insurance.

52.    The AWAC Policy was issued to Refco for the Policy Period with a $12.5 million

limit of liability in excess of $27.5 million.

53.    Upon information and belief, Refco paid the premium of $339,449 that is set forth in the AWAC Policy and thereby obtained coverage from AWAC.  (See Ex. A at Item 7).

54.    Like the Lexington Policy and the Axis Policy, the AWAC Policy "follows form" to the U.S. Specialty Policy.  Specifically, the AWAC Policy states that it "shall provide the Insured(s) . . . coverage . . . pursuant to the terms of this policy in accordance with the same warranties, terms, conditions, exclusions and limitations of the [U.S. Specialty Policy] . . . ." (Ex. A at (I) Insuring Agreement.  See also id. at (II)(a) Definitions, Item 2).

55.    The AWAC Policy specifically defines "Insureds" as the same persons who may be entitled to insurance under the U.S. Specialty Policy.  (Id. at (II)(d) Definitions).

56.    The AWAC Policy further provides that terms not defined therein "shall have the same meaning in this policy as is attributed to them in the [U.S. Specialty Policy]."  (Ex. A at (II) Definitions).

57.    Any "Claim" for a "Wrongful Act" brought against Plaintiffs that falls within Insuring Agreement (A) of the U.S. Specialty Policy also falls within the "Insuring Agreement" of the AWAC Policy.  (See id.)

58.    Each of the Underlying Actions is a "Claim" against Plaintiffs (and other Insureds) for "Wrongful Acts" covered by Insuring Agreement (A) in the U.S. Specialty Policy and by the Insuring Agreement in the AWAC Policy.

59.    The AWAC Policy specifically states that when the policies underlying it are exhausted, it will "continue in force as primary insurance."  (Ex. A at (IV) Limit of Liability). Specifically, the Policy provides that "in the event of . . . exhaustion of the Underlying

12

Aggregate Limit by reason of the Underlying Insurers . . . paying . . . Loss or Damages otherwise covered hereunder . . . this policy shall . . . continue in force as primary insurance . . . ." (Id.).

60.    The AWAC Policy clearly provides coverage for defense costs. The AWAC Policy specifically provides that the term "Loss" shall have the same meaning as attributed to it in the U.S. Specialty Policy. (See Ex. A at (II)(c) Definitions). "Loss" is defined by the U.S. Specialty Policy to include defense costs. (See Ex. B at Definition (G) and Endorsement No. 4).

61.    The Declarations Page of the AWAC Policy further acknowledges, in capital letters, that it covers defense costs:

> THE LIMIT OF LIABILITY AVAILABLE TO PAY
> JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED
> BY AMOUNTS INCURRED FOR LEGAL DEFENSE.
> AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL
> BE APPLIED AGAINST THE RETENTION AMOUNT.

(Ex. A at Declarations Page).

Other Excess Insurance

62.    There are two additional excess policies above (i.e., in excess of) the AWAC Policy in the Refco D&O insurance "tower."

**C.    Attempts by AWAC To Avoid Its
        Advancement Obligations under the AWAC Policy**

63.    By letter dated March 28, 2006 and in subsequent correspondence, AWAC has denied coverage for Plaintiffs under the AWAC Policy.

64.    In the letter of March 28, 2006, AWAC denied coverage based upon (1) Endorsement No. 3 to the AWAC Policy, described as the "AWAC Prior Knowledge

Exclusion," (2) the purported Knowledge Exclusion Endorsement of the Axis Policy, (3) a purported "warranty letter" from Refco Group Ltd. LLC dated January 15, 2005 (the "Axis Warranty Letter"), and (4) the failure to answer Question 12 in Refco's application for the Primary Policy.

65.    The March 28, 2006 letter from AWAC asserts that Phillip "Bennett's knowledge prior to the inception of the [AWAC] Policy, of facts or circumstances which a reasonable person or persons would suppose might afford valid grounds for a claim which would fall within the scope of the coverage afforded by the Policy," is grounds for denial on each of the bases described above.

66.    AWAC reiterated its denial of coverage, as initially outlined in its March 28, 2006 letter, by subsequent letters, including letters dated September 11, 2007 and November 12, 2007. For example, the letter dated September 11, 2007 states that "because the Refco matters all arise from and are premised upon Mr. Bennett's knowledge, prior to the inception of the [AWAC] Policy, of facts or circumstances which a reasonable person or persons would suppose might afford valid grounds for a claim which would fall within the scope of the coverage afforded by this Policy, coverage for these Claims is excluded under the Policy for all Insureds."

67.    Bennett's knowledge of any facts or circumstances that might afford grounds for a claim within the scope of the AWAC Policy does not provide a basis for AWAC to deny coverage as to Plaintiffs.

68.    Based upon its denials of coverage, as set forth above, AWAC has refused to advance Plaintiffs' defense costs.

14

## COUNT I

### (Declaratory Relief)

69.     Plaintiffs repeat and reallege paragraphs 1 through 68 of this Complaint as if fully set forth herein.

70.     Pursuant to the terms of the AWAC Policy, AWAC is contractually obligated to advance defense costs to Plaintiffs with respect to the Underlying Actions, upon exhaustion of the limits of liability of the underlying U.S. Specialty Policy, Lexington Policy and Axis Policy.

71.     The U.S. Specialty Policy, the Lexington Policy and the Axis Policy have been fully exhausted.

72.     AWAC has denied and continues to deny its contractual obligations and has refused and continues to refuse to advance defense costs under the AWAC Policy.

73.     Upon information and belief, Refco paid all premiums for the AWAC Policy and had and has performed all of the terms and conditions of the AWAC Policy on its part to be performed with respect to the relief here sought, unless otherwise excused.

74.     Plaintiffs, as Insureds under the AWAC Policy and, therefore, parties to the insurance contract, have performed all the terms and conditions of the AWAC Policy on their part(s) to be performed with respect to the relief here sought, unless otherwise excused.

75.     At all relevant times mentioned herein, the AWAC Policy was, and is, in full force and effect.

76.     An actual controversy exists between AWAC and Plaintiffs as to whether the Plaintiffs are entitled to advancement of their defense costs in the Underlying Actions under the AWAC Policy, and judicial resolution of the parties' rights and obligations is necessary.

77.     This Court should issue a judgment declaring that the Plaintiffs are entitled to advancement of defense costs under the AWAC Policy unless and until there is a final determination that Plaintiffs are not entitled to coverage or the AWAC Policy is exhausted.

## COUNT II

### (Preliminary Injunctive Relief)

78.     Plaintiffs repeat and reallege paragraphs 1 through 77 of the Complaint as if fully set forth herein.

79.     Upon the exhaustion of the Axis Policy, AWAC became obligated to make payments to the Plaintiffs for defense costs in the Underlying Actions.

80.     AWAC has expressed its refusal to make such payments, notwithstanding that Plaintiffs' defense costs are mounting as the Underlying Actions proceed.

81.     Absent preliminary injunctive relief, Plaintiffs face an imminent risk of irreparable harm, including, but not limited to, the risk of an adverse outcome in the Underlying Actions caused by their inability to mount an adequate defense.

82.     Plaintiffs are entitled to preliminary injunctive relief requiring AWAC to advance their defense costs in the Underlying Actions in accordance with AWAC's contractual obligations.

## COUNT III

### (Permanent Injunctive Relief)

83.    Plaintiffs repeat and reallege paragraphs 1 through 82 of the Complaint as if fully set forth herein.

84.    Upon the exhaustion of the Axis Policy, AWAC became obligated to make payments to the Plaintiffs for defense costs in the Underlying Actions.

85.    AWAC has expressed its refusal to make such payments, notwithstanding that Plaintiffs' defense costs are mounting as the Underlying Actions proceed.

86.    Absent permanent injunctive relief, Plaintiffs face an imminent risk of irreparable harm, including, but not limited to, the risk of an adverse outcome in the Underlying Actions caused by their inability to mount an adequate defense.

87.    Plaintiffs are entitled to permanent injunctive relief requiring AWAC to advance their defense costs in the Underlying Actions in accordance with AWAC's contractual obligations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request entry of judgment in their favor as follows:

1.    On Count I, declaring that Plaintiffs are entitled to advancement of defense costs under the AWAC Policy;

2.    On Count II, requiring AWAC to make payments to Plaintiffs for defense costs in the Underlying Actions, in accordance with the AWAC Policy;

3.    On Count III, requiring AWAC to make payments to Plaintiffs for defense costs

in the Underlying Actions, in accordance with the AWAC Policy.

4.    Awarding Plaintiffs their attorneys' fees and costs and disbursements of this

action; and

5.    Granting such other and further relief as the Court may deem proper.

Dated: March 12, 2008

HELEN B. KIM (HK-8757)                    STUART I. FRIEDMAN (SF-9186)
KATTEN MUCHIN ROSENMAN LLP                IVAN KLINE (IK-9591)
                                          FRIEDMAN & WITTENSTEIN
                                          A Professional Corporation

/s/ Helen B. Kim                          /s/ Ivan Kline
Helen B. Kim                              Ivan Kline

2029 Century Park East, Suite 2600        600 Lexington Avenue
Los Angeles, CA 90067                     New York, NY 10022
Telephone:  (310) 788-4525               Telephone:    (212) 750-8700
Facsimile:  (310) 788-4471               Facsimile:    (212) 223-8391

*Attorneys for Plaintiff Dennis A. Klejna*    *Attorneys for Plaintiffs William M. Sexton
                                              and Gerald M. Sherer*

RICHARD CASHMAN (RC-4769)
HELLER EHRMAN LLP


/s/ Richard Cashman
Richard Cashman

Times Square Tower
7 Times Square
New York, NY  10036-6524
Telephone:      (212) 832-8300
Facsimile:      (212) 763-7600

*Attorneys for Plaintiff Philip Silverman*

JOHN J. JEROME (JJ-2413)
TIMOTHY E. HOEFFNER (TH-4195)
SAUL EWING LLP


/s/ Timothy E. Hoeffner
Timothy E. Hoeffner

245 Park Avenue, 24th Floor
New York, NY  10167
Telephone:      (212) 672-1996
Facsimile:      (212) 672-1920

*Attorneys for Plaintiff Joseph Murphy*

CLAIRE P. GUTEKUNST (CG-0117)
PROSKAUER ROSE LLP


/s/ Claire P. Gutekunst
Claire P. Gutekunst

1585 Broadway
New York, NY  10036
Telephone:      (212) 969-3421
Facsimile:      (212) 969-2900

*Attorneys for Plaintiff Richard N. Outridge*

NORMAN L. EISEN (NE 1198)
ZUCKERMAN SPAEDER LLP


/s/ Norman L. Eisen
Norman L. Eisen

1540 Broadway, Suite 1604
New York, NY  10036
Telephone:      (212) 704-9600
Facsimile:      (212) 740-4256

*Attorneys for Plaintiff Tone N. Grant*

GREG A. DANILOW (GD 1621)
MICHAEL F. WALSH (MW-8000)
WEIL, GOTSHAL & MANGES LLP


/s/ Michael F. Walsh
Michael F. Walsh

767 Fifth Avenue
New York, NY  10153-0119
Telephone:      (212) 310-8000
Facsimile:      (212) 310-8007

*Attorneys for Plaintiffs Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen*

Exhibit X

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------- x        Chapter 11
-                                                         :
In re                                                     :        Case No. 05-60006 (RDD)
REFCO INC., et al.,                                       :
                                                          :        Jointly Administered
                        Debtors.                          :
-------------------------------------------------------- x
JOSEPH MURPHY, WILLIAM M. SEXTON, DENNIS :
A. KLEJNA, GERALD SHERER, PHILIP                          :        Adv. Proc. No. 08-01133 (RDD)
SILVERMAN, RICHARD N. OUTRIDGE, TONE                      :
GRANT, LEO R. BREITMAN, NATHAN GANTCHER, :
DAVID V. HARKINS, SCOTT L. JAECKEL, THOMAS :
H. LEE, RONALD L. O'KELLEY, AND SCOTT A.                  :
SCHOEN,                                                   :
                                                          :
                        Plaintiffs,                       :
                                                          :
               v.                                         :
                                                          :
ALLIED WORLD ASSURANCE COMPANY (U.S.),                    :
INC.,                                                     :
                                                          :
                        Defendant.                        :
                                                          :
-------------------------------------------------------- x
```

**ORDER GRANTING PRELIMINARY INJUNCTION MOTION TO REQUIRE ALLIED
WORLD ASSURANCE COMPANY (U.S.), INC. TO PAY OFFICER AND DIRECTOR
DEFENSE COSTS IN UNDERLYING LITIGATIONS AND FOR RELIEF FROM THE
PLAN INJUNCTION OR AUTOMATIC STAY, TO THE EXTENT APPLICABLE, FOR
THE ADVANCEMENT OF SUCH DEFENSE COSTS AND TO PERMIT MOVANTS TO
PROSECUTE CLAIMS AGAINST ALLIED WORLD ASSURANCE COMPANY**

Upon the motion (the "Motion") dated March 13, 2008, as amended, of Dennis A.

Klejna, William M. Sexton, Gerald Sherer, Philip Silverman, Richard N. Outridge, Joseph

Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H.

Lee, Ronald L. O'Kelley, Scott A. Schoen and Tone N. Grant (the "Movants") for a preliminary

injunction to require Allied World Assurance Company (U.S.), Inc. ("Allied World") to pay

defense costs in underlying litigations and for relief from the Plan Injunction, to the extent

applicable, to permit Allied World to pay such defense costs and to permit Movants to prosecute claims against Allied World, pursuant to 11 U.S.C. § 362(d), and Rules 4001(a) and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and the Court having reviewed the Motion and the objections and other pleadings related thereto; and upon the record of the hearing thereon (the "Hearing"); and the Court having found that (i) the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334, (ii) adequate and sufficient notice of the Motion and the Hearing were given to all parties in interest and no other or further notice is necessary or required, and (iii) the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor for the reasons stated by the Court in its bench ruling attached as Exhibit A hereto, which modifies and supercedes the Court's bench ruling issued at the close of the Hearing.

Therefore, it is hereby ORDERED that:

1.      The Motion is granted.

2.      All capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the Allied World Policy, as may be the case.

3.      Allied World is directed, upon the exhaustion of the Axis Policy, to advance, subject to the terms of, and a complete reservation of rights, privileges and defenses of the parties under, the Allied World Policy, the payment of the Defense Costs of Movants in the Underlying Actions, pending a final determination as to coverage for the Movants under the Allied World Policy, or until further order of this Court.

4.      The injunction imposed by Section 10.5 of the Modified Joint Chapter 11 Plan of Refco, Inc. and Certain of Its Direct and Indirect Subsidiaries (the "Refco Plan") and issued by

paragraphs 20 and 34(c) of the Confirmation Order (together, the "Plan Injunction") and the automatic stay imposed by 11 U.S.C. § 362(a), to the extent applicable, is hereby modified (a) to permit the foregoing advancement of Defense Costs and (b) to permit the Movants to bring actions seeking declaratory judgments or monetary or equitable relief against Allied World relating to Side A of the Allied World Policy and matters related thereto.

5.      Allied World shall notify counsel to the Plan Administrators under the Refco Plan (the "Plan Administrators") when the advancement of Defense Costs hereunder exceeds $1,000,000 in the aggregate, and in increments of $1,000,000 thereafter.

6.      Entry of this Order shall be without prejudice to the right of the Plan Administrators or any party in interest to seek the reimposition of the Plan Injunction or automatic stay, to the extent they apply, on a prospective basis with respect to any advances of Defense Costs not yet made, for cause shown on appropriate notice to Movants and Allied World.

7.      Nothing in this Order shall modify this Court's Order confirming the Refco Plan, including paragraph 34(b) thereof, or constitute a determination that the automatic stay under 11 U.S.C. § 362(a) applies to the actions described in paragraph 4 hereof.

8.      Nothing in this Order shall constitute a determination of or affect the priority of payments to which insureds are entitled under the Allied World Policy.

Dated: April 21, 2008
       New York, New York


                                        /s/ Robert D. Drain
                                        UNITED STATES BANKRUPTCY JUDGE



**Exhibit "A"**

1

Also before me is a motion by the plaintiffs for a preliminary injunction requiring Allied World Assurance Company, or AWAC, to pay defense costs in numerous underlying litigations against them and, relatedly, for relief from the injunction under Refco's Chapter 11 plan to permit AWAC to pay such defense costs. As to the latter request for relief, I believe there's no separate objection by AWAC, and even if there were I do not believe it would be merited were I to conclude that the defense costs are properly due and owing and should be paid by the insurer.

The stay, of course, under Refco's confirmed Chapter 11 plan is intended to protect the successor to the debtor and, as potentially applicable here, its interest in the relevant insurance policy and its proceeds. As the movants point out, that interest under the terms of the policy is subordinate to their interest in the proceeds, and pursuant to the case law that they cite, consequently, to the extent that the plan's stay applies at all to the proceeds of the policy, cause would exist to lift it under the terms of the proposed order that they have submitted. This, frankly, is the law of the case in regard to these particular movants and prior policies in the tier of coverage that Refco purchased on their behalf.

That leaves, of course, the main issue, which is whether the preliminary injunction should be granted. As I've just noted, there's a considerable backdrop to the present matter. AWAC is only the most recent insurer susceptible to having to pay defense costs under its excess policy on behalf of the moving insureds. I previously ruled in respect of the prior excess carrier, Axis Insurance, that the primary policy here requires the advancement of

2

defense costs until a final determination that such defense costs are not covered claims or "losses" under the policy.

As the movants have pointed out, either in light of that prior ruling or the case law upon which it relied the dispute here is limited to a narrow issue. Thus, there is no dispute that generally the causes of action against the insureds would be covered claims and consequently that defense costs incurred by the insureds would be "losses" covered by the AWAC policy.

There's also no dispute that under the terms of the AWAC policy, which, with the exception of explicitly referenced amendments or changes, follows the terms of the primary policy, the movants' defense costs would have to be paid by AWAC until there is a final determination of an absence of coverage therefor by an objective factfinder, at which point, if it is concluded that the losses were not properly covered under the policy, the insureds are under an obligation, under the policy, to reimburse the carrier.

There also appears to be no dispute, at least it's not been argued in the papers or before me today, that the failure to pay defense costs would result in irreparable harm to the movants and would reflect a balance of harm tipping decidedly in favor of the movants. The rationale for that proposition was set forth by Judge Cote in the WorldCom case, In Re: WorldCom and Securities Litigation, 354 F.Supp.2d 455, 470 (S.D.N.Y. 2005).

The rationale for the proposition with which I started, which is that an insurance carrier with a policy like this must advance defense costs pending a final determination of coverage is also set forth in the WorldCom case, as well as in numerous other cases upon which I relied in the Axis decision and upon which I also rely here, including Federal

3

Insurance Company v. Kozlowski, 792 N.Y.S.2d 397 (1ˢᵗ Dep't 2005); G-I Holdings, Inc. v.

Reliance Insurance Company, 2006 U.S. Dist. LEXIS 17597 (D.N.J. March 24, 2006); and

Pepsi-Cola v. Continental Gas Company, 640 F.Supp. 656, 659 (S.D.N.Y. 1986).

The standard for the issuance of a preliminary injunction is also not in dispute.  It's

set forth in the WorldCom case and only requires, I believe, one remark beyond noting the

general requirements, which is that the movants must show a likelihood of irreparable harm,

that they are likely to succeed on the merits or that there are sufficiently serious questions

going to the merits to make them a fair ground for litigation, and, finally, that the balance of

hardships tips in favor of the movants. The additional point made in the WorldCom case,

which has been followed by other courts, including in Great American Insurance Company v.

Gross, 2005 WL 1048752 (E.D. Va. Mar 3, 2005), is that a request for an injunction of this

kind -- that is, one to maintain the status quo or to require, in other words, the insurer do what

the insureds contend it is bound to do under its agreement -- does not require the additional,

heightened showing required by a request for a mandatory injunction. In re WorldCom, 345

F.Supp. 2d at 463.

The basis for AWAC's denial of coverage here, including denial of its obligation to

advance defense costs, is, instead, premised upon facts that did not exist at the time of my

preliminary injunction ruling in the Axis litigation -- that is, that three senior managers of

Refco, including its principal, Mr. Bennett, have now pled guilty to various crimes, including

violations of the securities laws.  The guilty pleas are attached as exhibits to the movants' and

AWAC's papers.  None of those three individuals, Bennett, Maggio or Trosten, has yet been

4

sentenced. Consequently, their guilty pleas are just that: there is no final determination of guilt and no final judgment entered. But in light of those pleas AWAC has contended that the "prior knowledge exclusion" attached to its policy as a modification of the primary policy would exclude the movants' defense costs from coverage under the AWAC policy.

That exclusion states, "It is hereby understood and agreed that the Insurer shall not be liable for a Loss in connection with any claim or claims made against the Insureds: alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which any Insured had knowledge as of inception and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage hereunder, or (ii) which indicate the probability of any such claim."

The record does not contain the underlying complaints against the moving insureds. However, the letter dated March 28, 2006 from AWAC's counsel to Refco's broker denying coverage, which appears at Exhibit P of Ms. Kim's declaration, lists a number of the then-pending actions against various insureds, including in respect of certain of the actions against the movants before me (who, to be clear, do not include Messrs. Bennett, Trosten or Maggio). I'm informed, however, that -- and I can take judicial notice of at least one such action -- since the date of this letter, other actions have been brought against the insureds, including the movants before me.

The movants contend, to the contrary, that notwithstanding the guilty plea, the prior knowledge exclusion that I've quoted does not operate as an exclusion from coverage of AWAC's obligation to pay their losses, which include their defense costs, pursuant to the

5

terms of the U.S. Specialty policy, which is the primary policy which would apply in respect

of advancement of defense costs.  They assert five separate and in some cases related grounds

for that proposition, but before going through those grounds I should note exceptions to or

permutations of general contract construction principles as they apply specifically to the

construction of insurance contracts, and, more specifically, to the construction of exclusions in

insurance contracts, and, even more particularly, as such exclusions apply to either a duty to

defend or to pay defense costs as noted in the WorldCom case and also in the Kozlowski case

and also by Judge Cote in Fuchsberg and Fuchsberg v. Chicago Insurance Company, 2001 WL

484013 (S.D.N.Y. May 7, 2001).

      To negate coverage by virtue of an exclusion, an insurer must establish that the

exclusion is stated in clear and unmistakable language, is subject to no other reasonable

interpretation, and applies in the particular case.  This burden is "heavy" especially where the

insurer is relying on an exclusion in the policy to avoid the duty to defend.  Accordingly, the

insurer can be excused from its duty to defend only if it can be determined as a matter of law

that there is no possible basis in law or fact upon which it might be held to indemnify. Id.

Judge Cote in the Fuchsberg case also states the general New York law proposition that where

an insured's complaint contains allegations to bring the claim against the insured even

potentially within the policy's coverage, the insurer is obligated to defend even though facts

outside the four corners of the pleadings indicate that the claim may be meritless or not

covered.  That general proposition arguably has a limitation to it, however, as discussed in the

case of International Business Machines Corporation v. Liberty Mutual Fire Insurance

6

Company, 303 F.3d 419, 426-27 (2d Cir. 2002), as well as at greater length by the Supreme

Court of Hawaii in Dairy Road Partners v. Island Insurance Company Limited, 992 P.2d 93,

113, 116-17 (Haw. 2000): if it is completely clear from facts outside of the underlying

complaint and the policy that the policy would not cover the claim without any question as to

the exclusion's clarity, the court might consider such facts.  The movants are correct, however,

that it is not entirely clear that even that exception applies in New York; but for purposes of

this motion I've assumed it does.  See also the discussion in Federal Insurance Company v.

Tyco International Limited, 784 N.Y.S.2d 920 (N.Y. Sup. 2004), affirmed in part, modified in

part, Federal Insurance Company v. Kozlowski, 792 N.Y.S.2d 397 (1st Dep't. 2005), where

the court said that the duty to defend or to pay defense costs is distinct from and broader than

the insurer's duty to indemnify and exists whenever a complaint against the insured alleges

claims that may be covered under the insurer's policy.  If any portion of a complaint might

result in coverage, the insurer must defend or pay defense expenses for all claims, both

covered and not covered.  Conversely, the insurer has no duty if as a matter of law the

allegations in the complaint could not give rise to any obligation to indemnify, where the

allegations fall within the policy exclusion.  Id.  Continuing, the Tyco court says, "But the duty

to defend or pay defense costs is construed liberally, and any doubts about coverage will result

in the insured's favor.  Furthermore, an insurer can only evoke a policy exclusion to avoid

coverage if it can show that the allegations in the complaint cast that pleading solely and

entirely within the policy exclusion." See also Villa Charlotte Bronte, Inc. v. Commercial

Union Insurance Company, 64 N.Y. 2d 846 (1985), in which the New York Court of Appeals

7

held that the insurer could only be excused from defending the insured because of the language of the policy exclusion if it could establish as a matter of law that there is no possible factual or legal basis on which the insurer might eventually be obligated to indemnify him under any provision contained in the policy.

So, with the backdrop of those interpretive principles, which I believe are well established, the movants offer five reasons why the insurer is improperly denying an obligation under the policy to pay defense costs based upon the knowledge exclusion.

First is the movants' contention that the guilty pleas by Messrs. Bennett, Trosten and Maggio are not even admissible as hearsay in this proceeding, except to show the basis upon which AWAC is purporting to withhold or claiming rights to withhold payment of defense costs.

Because the prior knowledge exclusion requires an objective showing of prior knowledge, movants contend that AWAC is relying upon those pleas to establish the truth of the statements by Bennett, Maggio and Trosten, thus triggering the hearsay exclusion of Federal Rule of Evidence 802. As I noted, none of those three individuals is a party to this adversary proceeding, and consequently the party admission exception to the definition of hearsay under Federal Rule of Evidence 802(d)(2) would not be applicable. Nor would the pleas fit within 801(d)(1), since none of those three individuals is subject to cross-examination.

I also do not believe that the pleas would fall within any of the hearsay exceptions listed in Rule 803. In that regard, Rule 803(22) would permit evidence of a final judgment to prove any fact essential to sustain that judgment, but, as I've said, there has been no final

8

judgment entered yet; the pleas clearly do not rise to that level under Federal Rule of Criminal

Procedure 32(d).  See In re Enron Corporation, Securities Derivative & ERISA Litigation, 391

F.Supp. 541, 575 (S.D. Tex. 2005).

Where a declarant is unavailable, his or her former testimony given as a witness at

another hearing could be admissible if the party against whom the testimony is now offered

had an opportunity or similar motive to develop the testimony by direct, cross or redirect, see

Rule 804(b)(1), but it's not at all clear to me that that would be the case here, because,

consistent with the "substantial overlap" doctrine, which I ruled on at the very beginning of my

exposure to these fascinating insurance law issues in the Axis matter, I believe it would have

been improper for the parties in this litigation to have been required to engage Messrs.

Bennett, Trosten and Maggio in that type of exercise during their pleas.  Nor has it been

established that they are unavailable to testify here.

There is one last exception which might apply here -- at least assuming that Bennett,

Trosten or Maggio were not available to testify (and there's no showing on that point one way

or the other) -- and that appears at F.R.E. 804(b)(3), regarding statements against interest.

Rule 804(b)(3) provides that a statement which was at the time of its making so far contrary to

the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to

civil or criminal liability, or to render invalid a claim by the declarant against another, that a

reasonable person in the declarant's position would not have made the statement unless

believing it to be true.  But it's not clear to me, leaving aside the unavailability issue, how it

9

would apply to all of the crimes to which each of the three pled, or the circumstances of the pleas.

Thus it appears to me that in light of the hearsay objection and AWAC's inability today to overcome it since any of the potential exceptions would require a showing that AWAC has not made, the three pleas are admissible only insofar as they are offered to show that in fact they were made. They would be inadmissible, however, to establish the truth of what was set forth therein, which of course is necessary for the prior knowledge exclusion to apply.

However, I would not want to base my ruling solely on that basis, because I believe there are other reasons going to the merits why the movants are correct that on this record AWAC has an obligation to pay their defense costs.

First, I believe that because of the wording of the primary policy, which requires the payment of defense costs until a final determination by an objective factfinder has been made that they do not constitute a claim, the fact that the three pleas are not yet final judgments would preclude AWAC from relying on them under the rational of my Axis decision as well as WorldCom, Kozlowski and all the other cases that preclude in this context an insurer from unilaterally refusing to advance defense costs where there is not a clearcut rationale for doing so that's not open to any doubt.

I appreciate that in making their argument the movants have relied upon the Great American Insurance Company v. Gross and Enron cases, which, AWAC points out, relied on or construed policy language where the exclusion itself required a final adjudication, but I

10

believe that what AWAC has ignored is that the key provision of the policy here -- the

provision that requires the advancement of defense costs -- also requires a "final

determination," which I believe under the guidelines of Rule 32 and the Enron case these pleas

do not rise to. I cannot make a final determination as a matter of law based on please of third

parties to this proceeding that are not final.

Given that alternative basis for my ruling, it wouldn't necessarily be required for me

to go further, but I also note that, again as set forth in the case law that I previously quoted, in

order to rely on the prior knowledge exclusion AWAC must show that the exclusion would

apply in every instance unambiguously, or as a matter of law, and I do not accept AWAC's

argument that the policy exclusion can be read, in the context of the three guilty pleas, to do

so.

Rather, it seems to me that the prior knowledge exclusion, when sought to be applied

in light of the guilty pleas, raises at best for AWAC an issue similar to the issue considered by

the District Court in Great American Insurance Company v. Gross, 2008 WL 1048752 at *6,

as well as the Delaware Superior Court in Sun-Times Media Group, Inc. v. Royal and Sun

Alliance Insurance Companies of Canada, 2007 W.L. 1811265 (Del. Super. June 20, 2007).

That is, I believe that AWAC's March 2006 coverage disclaimer letter, which is the only thing

in the record to support AWAC's disclaimer of coverage here (the underlying complaints

against the insureds not being in the record) facts to show that every claim asserted against the

movants clearly or as a matter of law would be barred or excluded under the prior knowledge

exclusion in light of the guilty pleas.

11

AWAC contends to the contrary, I believe, only by reading the exclusion too broadly. AWAC's interpretation of the exclusion would have it apply to any claim asserted against any of the insureds that had as one allegation in it any of the charges in the Bennett, Trosten or Maggio criminal complaints that those people pled guilty to. I simply do not read the exclusion that broadly. Rather, I believe that by merely examining the March 2006 disclaimer letter and the various causes of action set forth therein, leaving aside the fact that AWAC has not offered up the complaints themselves to permit a detailed analysis of whether, in fact, all of the claims therein would be precluded, it is evident that not every claim brought against the movants would be conclusively excluded from the policy's coverage after the guilty pleas, as required by Tyco and Villa Charlotte Bronte and Ogden Corp v. Travelers Indemnity Company, 924 F.2d 39, 41 (2d Cir. 1991), among numerous other cases, including specifically the Gross and Sun-Times cases that I previously cited.

The provision at issue, again, excludes coverage for loss in connection with any claim or claims made against the insureds "alleging, or arising out of, based upon, in consequence of, or attributable to facts or circumstances which any insured had knowledge as of inception, and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of coverage hereunder or (ii) which indicate the probability of any such claim."

Similar exclusion language appears in the Gross case and the Sun-Times case, the Gross case referring to a policy provision that would exclude claims brought about or "contributed to" by the fraudulent, dishonest or criminal acts of directors or officers, and the

12

Sun-Times case referring to acts "arising out of, based upon, or attributable" to the excluded coverage. In each case, the courts held, among other things, that the defendants, that is, the insurers, could not unequivocally show that all the allegations in the underlying complaints against the insureds fell within such exceptions. This was the result notwithstanding a guilty plea by the insureds in Gross and guilty pleas by certain insureds in Sun-Times.

I believe a similar rationale should apply here, as well, based on two things. First, the AWAC provision has as its introductory clause the "arising out of, based upon, in consequence of, or attributable to" language that AWAC wants to be read broadly, but then it qualifies that rather broad language by saying "which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage or indicate the probability of any such claims." Now, among the claims asserted in AWAC's denial of coverage letter from 2006 are claims in the shareholder derivative action against various of the moving insureds for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and aiding and abetting. To my mind, even giving the "arising out of" language a broad construction, which is contrary to the case law that I have just cited, that language is qualified and narrowed by the phrase "which a reasonable person would suppose might afford valid grounds for a claim or indicate the probability of any such claim." Given that the pleas by Bennett, Trosten and Maggio do not identify by name any of the moving insureds or refer to any of such insureds' individual fiduciary or other duties or allege any facts as to why those particular insureds were unjustly enriched, I cannot conclude that the exclusion as a matter of law applies to all of the claims

13

against the movants identified in AWAC's 2006 letter. The guilty pleas neither reasonably

afford valid grounds for such claims against the moving insureds nor indicate the probability

of such claims.

Moreover, as the case law that I've cited makes clear, it would be wrong to interpret

the introductory "arising out of" clause in the exclusion broadly, given the policy behind the

duty to pay defense costs. So, for that reason as well -- that is, assuming that I would admit

the three pleas into evidence and even if I were to construe justifying a final binding

determination, I do not see them as necessarily precluding all of the claims that are asserted in

the denial of coverage letter as a matter of law, and, therefore, precluding a duty to pay all

defense costs in respect of the complaints.

That, I think, is dispositive enough and does not require me to consider in as much

detail the remaining two arguments by the movants, which are (1) that I should not consider

any extrinsic evidence that would force me to undertake a factual determination of the

relationship between the particular claims asserted against these insureds and the criminal

charges pled to by the three individuals, and (2) that the prior knowledge exclusion is

ambiguous as to whether the knowledge of any insured is binding to exclude coverage of all

insureds.

I will note, however, that the latter point does raise a serious issue for determination,

particularly given the very broad interpretation that AWAC would impose on this prior

knowledge exclusion. That issue would include not simply consideration of whether coverage

for all insureds is meant to be excluded by one insured's knowledge, an issue that is not

14

uniformly treated in the case law, but also whether, in the context of the interplay of the

introductory clause of the AWAC policy's prior knowledge exclusion with subclauses (i) and

(ii), AWAC's interpretation is at least ambiguous and therefore requires interpretation against

the insurer.  At a minimum it would seem to me to be ambiguous -- particularly given the

primary policy's provisions for severability -- when one realizes that AWAC's interpretation

would require payment of defense costs to be precluded to a board member as a result of a

manager's prior knowledge where the board member is, as here, being sued for breach of

fiduciary duty, unjust enrichment and the like and the board member claims, as do a number of

the movants, that the manager defrauded him or her as much as the public.

So for those reasons, I'll grant the motion for a preliminary injunction, having

determined that in addition to showing irreparable harm and a balance of harm tipping in favor

of the movants, the movants have also shown at a minimum a sufficiently close question going

to the merits, which, combined with the very serious harm to them of not receiving payment of

defense costs and the clear policy in favor of paying defense costs, would entitle them to an

injunction, or, as I have also found, the clear likelihood on this record that the movants will

prevail on the defense costs issue.

So, Mr. Walsh, you can submit an order to that effect.  I'm assuming it will be like

the most recent order that I entered in the Illinois International matter with Mr. Grant.

MR. WALSH:  We will check the order that we did attach to our papers and make

sure that it's similar.

15

THE COURT:  Okay.  As I often do, I will go over the transcript of this matter.  My ruling won't change, but I'm sure I combined three or four sentences in one and may have the desire to add a cite or subtract a citation, so I may do that.  If I do that, that revision will be attached to my order, but my ruling won't change.

MR. WALSH:  Thank you, Your Honor.

16

Exhibit Y

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                          :

| | |
|---|---|
| In re: | Chapter 11 |
| REFCO, INC., et al., | Case No. 05-60006 (RDD) |
|        Debtors. | (Jointly Administered) |

------------------------------------------------------- x

JOSEPH MURPHY, WILLIAM M. SEXTON,
DENNIS A. KLEJNA, GERALD SHERER,
PHILIP SILVERMAN, RICHARD N.
OUTRIDGE, TONE GRANT, LEO R.
BREITMAN, NATHAN GANTCHER,
DAVID V. HARKINS, SCOTT L. JAECKEL,
THOMAS H. LEE, RONALD L. O'KELLEY,
and SCOTT A. SCHOEN,

              Plaintiffs,

     v.

ALLIED WORLD ASSURANCE COMPANY
(U.S.), INC. and ARCH INSURANCE
COMPANY,

              Defendants, and

JOHN D. AGOGLIA, EDWIN L. COX,
SUKHMEET DHILLON, THOMAS H.
DITTMER, STEPHEN GRADY, THOMAS
HACKL, ERIC G. LIPOFF, PETER
MCCARTHY and FRANK MUTTERER,

              Nominal Defendants.

------------------------------------------------------- x

Adv. Proc. No. 08-01133-rdd

**<u>FIRST AMENDED
COMPLAINT</u>**

Plaintiffs Joseph Murphy, William M. Sexton, Dennis A. Klejna, Gerald Sherer, Philip

Silverman, Richard N. Outridge, Tone Grant, Leo R. Breitman, Nathan Gantcher, David V.

Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen

(collectively, "Plaintiffs"), by and through their undersigned counsel, allege as follows for their

First Amended Complaint against defendants Allied World Assurance Company (U.S.), Inc.

("AWAC") and Arch Insurance Company ("Arch"):

## INTRODUCTION

1.      AWAC and Arch are the third and fourth excess insurers, respectively, in the

"tower" of Directors and Officers ("D&O") liability insurance obtained by Refco Inc. for the

policy period August 11, 2005 to August 11, 2006 (the "Policy Period").  Plaintiffs are former

officers and directors of Refco Inc., its predecessor Refco Group Ltd., LLC, and/or the

subsidiaries of these entities.  (Refco Inc., Refco Group Ltd., LLC and their subsidiaries are

collectively referred to herein as "Refco.")  Refco was a publicly traded company formed

pursuant to an August 2005 initial public offering.  Plaintiffs (collectively, the "Insureds") have

been named as defendants in various civil proceedings, and in the case of Tone Grant a criminal

proceeding, related to the collapse of Refco (collectively, the "Underlying Actions").

2.      The Insureds have requested coverage for such actions, including advancement of

their defense costs incurred in connection with the Underlying Actions, from AWAC and Arch.

Notwithstanding that the claims made against Plaintiffs in the Underlying Actions clearly

constitute "claims" for "Wrongful Acts" under the "Excess Directors and Officers Insurance and

Company Reimbursement Policy," policy number AW0418197, issued by AWAC to Refco (the

"AWAC Policy," a true copy of which is attached as Exhibit A hereto), AWAC has denied

coverage to the Insureds and refused to advance the defense costs of any of its Insureds.

Likewise, Arch has also denied coverage to the Insureds under the Excess Insurance Policy,

policy number DOX0009322-00, issued by Arch to Refco (the "Arch Policy," a true copy of

which is attached as Exhibit B hereto).

3.     On October 19, 2007, this Court granted the Plaintiffs' motions for summary judgment in Axis Reinsurance Co. v. Bennett, et al., Adv. Proc. No. 07-1712-RDD (Bankr. S.D.N.Y.); Grant, et al. v. Axis Insurance Company, Adv. Proc. No. 07-2005-RDD (Bankr. S.D.N.Y.); and Breitman, et al. v. Axis Insurance Company, Adv. Proc. No. 07-2032-RDD (Bankr. S.D.N.Y.) on, *inter alia*, the issue of advancement of defense costs.[1]  Specifically, this Court determined that, under the terms of the second excess D&O policy issued by Axis Reinsurance Company ("Axis") to Refco, Axis must advance defense costs to the Plaintiffs in connection with the Underlying Actions.

4.     Plaintiffs' defense costs exhausted Refco's primary and first excess D&O policies months ago, and recently exhausted the second excess D&O policy.  On February 5, 2008, Plaintiffs received communication from counsel for Axis notifying Plaintiffs that Axis had received defense bills in excess of the policy issued by Axis and that all invoices received by Axis in excess of Axis' limit of liability would be forwarded to the next excess carrier (*i.e.*, AWAC).  On March 6, 2008, Axis notified Plaintiffs by letter that it was in the process of making payments reaching the $10,000,000 total limit of liability under its policy.  Since the March 6 letter, Axis has issued checks for such payment.

5.     Plaintiffs have submitted invoices for defense costs to AWAC.  However, despite this Court's advancement ruling with respect to the policy issued by Axis, the relevant terms of which are identical to those of the AWAC Policy, AWAC continues to deny coverage and still refused to advance Plaintiffs' defense costs.

6.     On April 21, 2008, following a hearing held on April 11, 2008, this Court entered an order granting the Plaintiffs' motion for a preliminary injunction, and directing AWAC to

---

[1]   Plaintiff Richard N. Outridge was not a party to the litigation with Axis.

advance the Plaintiffs' defense costs in the Underlying Actions pending a final determination as to coverage for the Plaintiffs under the AWAC Policy, or until further order of this Court.

7.      Arch also continues to deny coverage and cites as a ground for denial, *inter alia*, a provision in the AWAC Policy.

8.      An actual controversy exists between Plaintiffs, on the one hand, and AWAC and Arch, on the other.  Plaintiffs seek a declaration from this Court that the AWAC and Arch Policies provide coverage for them for the Underlying Actions, require AWAC and Arch to advance their defense costs incurred in connection with the Underlying Actions, and preliminary and permanent injunctive relief directing AWAC and Arch to pay their losses, including defense costs, in accordance with the requirements of the AWAC and Arch Policies.

## JURISDICTION AND VENUE

9.      This adversary proceeding is brought pursuant to Rules 7001(1), (2), (7), and (9) of the Federal Rules of Bankruptcy Procedure, 11 U.S.C. §§ 105, et seq. and 28 U.S.C. § 2201.

10.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334 and 2201.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## PARTIES

### Plaintiffs

12.     Joseph Murphy is a former officer of Refco who, at times relevant to this action, served as Executive Vice President of Refco Inc. and President of Refco LLC.  Murphy is a resident of the State of New Jersey.

13.     William M. Sexton is a former officer of Refco who, at times relevant to this action, served as Executive Vice President and Chief Operating Officer of Refco.  Sexton is a resident of the State of New York.

4

14.     Dennis A. Klejna is a former officer of Refco who, at times relevant to this action, served as Executive Vice President and General Counsel of Refco.  Klejna is a resident of the State of New York.

15.     Gerald Sherer is a former officer of Refco who, at times relevant to this action, served as Executive Vice President and Chief Financial Officer of Refco.  Sherer is a resident of the State of New York.

16.     Philip Silverman is a former officer at Refco who, at times relevant to this action, served as Secretary of Refco.  Silverman is a resident of the State of New Jersey.

17.     Richard N. Outridge is a former officer of Refco Capital Markets, Ltd. who, at times relevant to this action, served as Chief Financial Officer and/or Controller of Refco Capital Markets, Ltd.  Outridge is a resident of the State of Pennsylvania.

18.     Tone Grant is a former officer of Refco who served as President and Chief Executive Officer of Refco Group Ltd., LLC until 1998.  Grant is a resident of the State of Illinois.

19.     Leo R. Breitman served, at times relevant to this action, as a director of Refco and member of the audit committee.  Breitman is a resident of the State of Florida.

20.     Nathan Gantcher served, at times relevant to this action, as a director of Refco and a member of Refco's audit committee.  Gantcher is a resident of the State of New York.

21.     David V. Harkins served, at times relevant to this action, as a director of Refco. Harkins is a resident of the State of Massachusetts.

22.     Scott L. Jaeckel served, at times relevant to this action, as a director of Refco. Jaeckel is a resident of the State of Massachusetts.

23.     Thomas H. Lee served, at times relevant to this action, as a director of Refco.  Lee

5

is a resident of the State of New York.

24.    Ronald L. O'Kelley served, at times relevant to this action, as a director of Refco. O'Kelley is a resident of the State of Florida.

25.    Scott A. Schoen served, at times relevant to this action, as a director of Refco. Schoen is a resident of the State of Massachusetts.

**Defendants**

26.    Upon information and belief, AWAC is an insurance company that is organized and exists pursuant to the laws of the State of Delaware.  Upon information and belief, AWAC has its principal place of business in Boston, Massachusetts.

27.    Upon information and belief, Arch is an insurance company that is organized and exists pursuant to the laws of the State of Missouri.  Upon information and belief, Arch has its principal place of business in New York, New York.

28.    The AWAC Policy contains a "Service of Suit" Endorsement, which provides that "[i]n the event of failure of the Company [AWAC] to pay any amount claimed to be due hereunder, the Company [AWAC], at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States."

29.    Upon information and belief, John D. Agoglia, Edwin L. Cox, Sukhmeet Dhillon, Thomas H. Dittmer, Stephen Grady, Thomas Hackl, Eric G. Lipoff, Peter McCarthy and Frank Mutterer are nominal defendants who are potential insureds under the AWAC Policy and Arch Policy whose contractual rights may be affected by this litigation.

## GENERAL ALLEGATIONS

A.    **THE UNDERLYING ACTIONS**

30.    On October 17, 2005, Refco Inc., and many of its direct and indirect subsidiaries filed voluntary petitions for relief in this Court under Chapter 11 of the United States Bankruptcy

Code.

31.     Thereafter, Plaintiffs were named as defendants in various civil actions (the "Civil Actions").  Plaintiff Grant was also a defendant in one criminal action, in which trial began on March 24, 2008 and concluded on April 17, 2008.

32.     The Civil Actions include:  In re Refco, Inc. Securities Litigation, No. 05 Civ. 8626 (GEL) (S.D.N.Y.); In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, No. 06 Civ. 643 (GEL) (S.D.N.Y.); American Financial International Group, et al. v. Bennett, et al., No. 05 Civ. 8988 (S.D.N.Y.); V.R. Global Partners, L.P. v. Bennett, et al., No. 07 Civ. 8686 (GEL) (S.D.N.Y.); Capital Management Select Fund Ltd. v. Bennett, et al., No. 07 Civ. 8688 (GEL) (S.D.N.Y.); Kirschner v. Agoglia, et al., Adv. Proc. No. 07-3060 (RDD) (Bankr. S.D.N.Y.); Kirschner v. Thomas H. Lee Partners, L.P., et al., No. 07-7074 (GEL) (S.D.N.Y.); and Kirschner v. Grant Thornton LLP, et al., No. 2007-1-008818 (Ill. Cir. Ct.).

33.     The Plaintiffs properly gave notice of the Underlying Actions (including the Civil Actions) to the insurers in the Refco "tower" of D&O liability insurance, including AWAC and Arch, and requested, among other things, that such insurers advance their defense costs incurred in connection with the Underlying Actions under the policies described below.

**B.     THE REFCO "TOWER" OF D&O INSURANCE**

34.     As indicated above, Refco procured a "tower" of D&O liability insurance coverage.  Such coverage consists of a primary policy and five excess policies for the Policy Period.

**The U.S. Specialty Policy**

35.     U.S. Specialty Insurance Company ("U.S. Specialty") issued the primary policy, Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821, for the Policy Period with a $10 million limit of liability (the "U.S. Specialty Policy," or "Primary

Policy," a true copy of which is attached as Exhibit C).

36.     The U.S. Specialty Policy names as "Insured Persons" under the Policy "any past, present or future director or officer of the Company." (Exhibit C at Definition (F)).  The U.S. Specialty Policy provides those directors and officers with coverage for "Loss arising from Claims . . . against the Insured Persons for Wrongful Acts."  (*Id.* at Insuring Agreement (A)).

37.     The Underlying Actions are Claims for "Wrongful Acts," as defined in the U.S. Specialty Policy.  (*Id.* at Definition (P)).

38.     "Loss" is defined by the U.S. Specialty Policy so as to include defense costs.  (*Id.* at Definition (G) and Endorsement No. 4).

39.     The U.S. Specialty Policy further requires the Insurer to advance defense costs incurred during the pendency of Claims:

> **The Insurer will pay covered Defense Costs on an as-incurred basis.  If it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer.**

(*Id.* at Condition (D)(2)) (emphasis added).

40.     The U.S. Specialty Policy also includes a "Full Severability" Endorsement, which provides that "[n]o knowledge or information possessed by any Insured will be imputed to any other Insured."  (*Id.* at Endorsement No. 10).

41.     The U.S. Specialty Policy also provides that for purposes of determining the application of exclusions, "no Wrongful Act of any Insured Person will be imputed to any other Insured Person who did not have actual knowledge of, or directly participate in the commission of, such Wrongful Act . . . ."  (*Id.* at Exclusions).

42.     The U.S. Specialty Policy further provides that "notwithstanding anything in this Policy to the contrary, the Insurer shall not be entitled under any circumstances to rescind the

coverage provided under Insuring Agreement (A) of this Policy." (*Id.* at Endorsement No. 13).

43.    U.S. Specialty recognized its coverage obligations to Plaintiffs as well as other Insureds.  After obtaining approval from this Court to comply with the terms of its policy and advance defense costs to the Insureds, U.S. Specialty paid the defense costs of the Insureds until the limits of the U.S. Specialty Policy were exhausted last year.

**The Lexington Policy**

44.    Lexington Insurance Company ("Lexington") issued the first excess policy above the U.S. Specialty Policy, Directors and Officers Liability and Corporation Reimbursement Follow Form Excess Liability Policy No. 1620924, for the Policy Period with a $7.5 million limit of liability in excess of $10 million (the "Lexington Policy," or "First Excess Policy").

45.    The Lexington Policy "follows form" to the U.S. Specialty Policy.  This means that the Lexington Policy "indemnify[ies] the Insured named in the Declarations . . . in accordance with the applicable insuring agreements, terms, conditions and exclusions . . . of the Underlying Policy."

46.    After obtaining approval from this Court to comply with the terms of its policy and advance defense costs to Insureds, Lexington paid the defense costs of the Insureds in connection with the Underlying Actions, including Plaintiffs, until the limits of the Lexington Policy were exhausted in July 2007.

**The Axis Policy**

47.    Axis is the second excess insurer on the Refco "tower" of D&O liability insurance.  Axis issued the second excess policy above the Lexington Policy, SecurExcess Policy No. RNN 506300, for the Policy Period with a $10 million limit of liability in excess of $17.5 million (the "Axis Policy," or "Second Excess Policy").

48.    Like the Lexington Policy, the Axis Policy also "follows form" to the U.S. Specialty Policy.  Accordingly, the Axis Policy states that it provides coverage "in conformance with the provisions of" the U.S. Specialty Policy.

**The Axis Adversary Proceeding**

49.    On or about May 23, 2007, Axis commenced an adversary proceeding in the U.S. Bankruptcy Court for the Southern District of New York, <u>Axis Reinsurance Company v. Bennett et al.</u>, Adv. Proc. No. 07-0712 (Bankr. S.D.N.Y.) (the "Axis Adversary Proceeding"), seeking a declaration that it had no obligations to its Insureds under the Axis Policy.  The Axis Complaint named the Plaintiffs in this action, among others, as defendants.[2]  All defendants were former Refco officers or directors.

50.    In response to the Axis Complaint in the Axis Adversary Proceeding, Plaintiffs herein filed various pleadings seeking advancement and the Plaintiffs herein made motions for preliminary injunctive relief to compel Axis to advance defense costs under the Axis Policy, which this Court granted.

51.    Plaintiffs subsequently moved for summary judgment against Axis, seeking, *inter alia*, summary judgment and a permanent injunction compelling Axis to pay the defense costs as incurred, pending a final determination of coverage under the Axis Policy or until the Axis Policy is exhausted.

52.    Following a hearing on the motions, by Order dated October 19, 2007, as amended on October 22, 2007, the Bankruptcy Court granted the motions for summary judgment.

53.    Following the October 19 decision granting summary judgment, Axis advanced

---

[2]  For purpose of this section describing the "Axis Adversary Proceeding," use of the term "Plaintiffs" includes all Plaintiffs herein, except for plaintiff Richard N. Outridge, who was not a party to the Axis Adversary Proceeding.

Plaintiffs' defense costs in connection with the Underlying Actions.

54.     At present, as indicated above, the Axis Policy has been exhausted by reason of advancement.

**The AWAC Policy**

55.     AWAC is the third excess insurer in the Refco "tower" of D&O liability insurance.

56.     The AWAC Policy was issued to Refco for the Policy Period with a $12.5 million limit of liability in excess of $27.5 million.

57.     Upon information and belief, Refco paid the premium of $339,449 that is set forth in the AWAC Policy and thereby obtained coverage from AWAC.  (*See* Ex. A at Declarations, Item 7).

58.     Like the Lexington Policy and the Axis Policy, the AWAC Policy "follows form" to the U.S. Specialty Policy.  Specifically, the AWAC Policy states that it "shall provide the Insured(s) with . . . coverage . . . pursuant to the terms of this policy in accordance with the same warranties, terms, conditions, exclusions and limitations of the [U.S. Specialty Policy] . . . ." (Ex. A at (I) Insuring Agreement. *See also id.* at Definition (II)(a) and Declarations, Item 2).

59.     The AWAC Policy specifically defines "Insureds" as the same persons who may be entitled to insurance under the U.S. Specialty Policy.  (*Id.* at Definition (II)(d)).

60.     The AWAC Policy further provides that terms not defined therein "shall have the same meaning in this policy as is attributed to them in the [U.S. Specialty Policy]." (Ex. A at (II) Definitions).

61.     The terms "Claim" and "Wrongful Act(s)" are not specifically defined in the AWAC Policy.  Accordingly, any "Claim" for a "Wrongful Act" brought against Plaintiffs that

falls within Insuring Agreement (A) of the U.S. Specialty Policy also falls within the "Insuring Agreement" of the AWAC Policy. (*See id.*)

62.     Each of the Underlying Actions is a "Claim" against Plaintiffs (and other Insureds) for "Wrongful Acts" covered by Insuring Agreement (A) in the U.S. Specialty Policy and by the Insuring Agreement in the AWAC Policy.

63.     The AWAC Policy specifically states that when the policies underlying it are exhausted, it will "continue in force as primary insurance." (Ex. A at (IV) Limit of Liability). Specifically, the Policy provides that "[i]n the event. . . of the . . . exhaustion of the Underlying Aggregate Limit by reason of the Underlying Insurers . . . paying . . . Loss or Damages otherwise covered hereunder, this policy shall . . . continue in force as primary insurance . . . ." (*Id.*).

64.     The AWAC Policy clearly provides coverage for defense costs. The AWAC Policy specifically provides that the term "Loss" shall have the same meaning as attributed to it in the U.S. Specialty Policy. (*See* Ex. A at Definition (II)(c)). "Loss" is defined by the U.S. Specialty Policy to include defense costs. (*See* Ex. C at Definition (G) and Endorsement No. 4).

65.     The Declarations Page of the AWAC Policy further acknowledges, in bold, capital letters, that it covers defense costs:

> **THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

(Ex. A at Declarations Page).

**The Arch Policy**

66.     Arch is the fourth excess insurer in the Refco "tower" of D&O liability insurance.

67.     The Arch Policy was issued to Refco for the Policy Period with a $10 million

limit of liability in excess of $40 million.

68.    Upon information and belief, Refco paid the premium of $241,693.00 that is set forth in the Arch Policy and thereby obtained coverage from Arch.  (*See* Ex. B at Item 6).

69.    Like the Lexington Policy, Axis Policy and the AWAC Policy, the Arch Policy "follows form" to the U.S. Specialty Policy.  Specifically, the Arch Policy states that it "shall apply in conformance with the terms and conditions of the [U.S. Specialty Policy] and in conformance with any terms and conditions further limiting or restricting coverage in this Policy or in any other Underlying Insurance . . . ."  (Ex. B at Insuring Agreement § I(C); *see also id.* at Definitions §§ (II)(C) and (D) and Declarations, Items 4 and 5).

70.    The Arch Policy specifically defines "Insureds" as the same persons who may be entitled to insurance under the U.S. Specialty Policy.  (*Id.* at Definitions § (II)(B)).

71.    The term "Claim" is defined as having "the same meaning" in the Arch Policy "as given to it in the [U.S. Specialty Policy]."  (*Id.* at II(A) Definitions).  Accordingly, any "Claim" brought against Plaintiffs that falls within Insuring Agreement (A) of the U.S. Specialty Policy also falls within the "Insuring Agreement" of the Arch Policy.  (*See id.*)

72.    Each of the Underlying Actions is a "Claim" against Plaintiffs (and other Insureds) for "Wrongful Acts" covered by Insuring Agreement (A) in the U.S. Specialty Policy and by the Insuring Agreement in the Arch Policy.

73.    The Arch Policy specifically states that Arch "shall provide the Insureds coverage for Claims in excess of the Underlying Insurance."  (Ex. B at I(A) Insuring Agreement).  The Arch Policy further provides that "the insurance coverage afforded by [the Arch] Policy shall apply" "after exhaustion of the Underlying Limit..." (Ex. B at (I)(B) Insuring Agreement).

74.    The Declarations Page of the Arch Policy further acknowledges, in bold, capital

letters, that it covers defense costs:

**THE LIMITS OF LIABILITY SHALL BE REDUCED
BY AMOUNTS INCURRED AS DEFENSE COSTS AND EXPENSES.**

(Ex. B at Declarations Page).

**Other Excess Insurance**

75.    There is one additional excess policy above (*i.e.*, in excess of) the Arch Policy in

the Refco D&O liability insurance "tower."

**C.    ATTEMPTS BY AWAC TO AVOID ITS
ADVANCEMENT OBLIGATIONS UNDER THE AWAC POLICY**

76.    By letter dated March 28, 2006 and in subsequent correspondence, AWAC has

denied coverage for Plaintiffs under the AWAC Policy.

77.    In the letter of March 28, 2006, AWAC denied coverage based upon (1)

Endorsement No. 3 to the AWAC Policy, described as the "AWAC Prior Knowledge

Exclusion," (2) the purported Knowledge Exclusion Endorsement of the Axis Policy, (3) a

purported "warranty letter" from Refco Group Ltd. LLC dated January 15, 2005 (the "Axis

Warranty Letter"), and (4) the failure to answer Question 12 in Refco's application for the

Primary Policy.

78.    The March 28, 2006 letter from AWAC asserts that Phillip "Bennett's knowledge

prior to the inception of the [AWAC] Policy, of facts or circumstances which a reasonable

person or persons would suppose might afford valid grounds for a claim which would fall within

the scope of the coverage afforded by the Policy," is grounds for denial on each of the bases

described above.

79.    AWAC reiterated its denial of coverage, as initially outlined in its March 28, 2006

letter, by subsequent letters dated September 11, 2007 and November 12, 2007.  For example,

the letter dated September 11, 2007 states that "because the Refco matters all arise from and are

14

premised upon Mr. Bennett's knowledge, prior to the inception of the [AWAC] Policy, of facts or circumstances which a reasonable person or persons would suppose might afford valid grounds for a claim which would fall within the scope of the coverage afforded by this Policy, coverage for these Claims is excluded under the Policy for all Insureds."

80.    Bennett's knowledge of any facts or circumstances that might afford grounds for a claim within the scope of the AWAC Policy does not provide a basis for AWAC to deny coverage as to Plaintiffs.

81.    Based upon its denials of coverage, as set forth above, AWAC has refused to advance Plaintiffs' defense costs.

**D.    ATTEMPTS BY ARCH TO AVOID ITS
    OBLIGATIONS UNDER THE ARCH POLICY**

82.    By letter dated March 9, 2006 and in subsequent correspondence, Arch has denied coverage for Plaintiffs under the Arch Policy.

83.    In the letter of March 9, 2006, Arch denied coverage based upon (1) the "Prior Knowledge Exclusion Endorsement" that Arch understood would be contained in the AWAC Policy, "when issued," (2) the purported "Inverted Representation Endorsement" that Arch understood would be contained in the AWAC Policy, (3) Endorsement No. 4 to the Arch Policy, described as the "Arch Prior Knowledge or Information Exclusion," (4) the Lexington Policy's definition of "Loss," which Arch construed as precluding coverage for defense costs, and (5) the Axis Warranty Letter.

84.    The March 9, 2006 letter from Arch asserts that Phillip "Bennett, at the time of the inception of the [Arch] Policy, had knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a Claim," which knowledge is grounds for denial on each of the bases described above.

15

85.     Arch reiterated its denial of coverage, as initially outlined in its March 9, 2006 letter, by subsequent letter dated May 22, 2006.

86.     Bennett's knowledge of any facts or circumstances that might afford grounds for a claim within the scope of the Arch Policy does not provide a basis for Arch to deny coverage as to Plaintiffs.

87.     Based upon its denials of coverage, as set forth above, Arch has asserted that it has no obligation to advance Plaintiffs' defense costs.

## COUNT I

### (Declaratory Relief Against AWAC)

88.     Plaintiffs repeat and reallege paragraphs 1 through 87 of this Complaint as if fully set forth herein.

89.     Pursuant to the terms of the AWAC Policy, AWAC is contractually obligated to provide coverage to Plaintiffs for all Loss (as defined in the U.S. Specialty Policy) arising from the Underlying Actions, including but not limited to defense costs, upon exhaustion of the limits of liability of the underlying U.S. Specialty Policy, Lexington Policy and Axis Policy.

90.     The U.S. Specialty Policy, the Lexington Policy and the Axis Policy have been fully exhausted.

91.     AWAC has denied and continues to deny its contractual obligations, has denied coverage under the AWAC Policy, and has refused and continues to refuse to advance defense costs.

92.     None of the grounds asserted by AWAC for the denial of coverage under the AWAC Policy provides a valid basis for denying coverage to the Plaintiffs.

93.     Upon information and belief, Refco paid all premiums for the AWAC Policy and

16

had and has performed all of the terms and conditions of the AWAC Policy on its part to be performed with respect to the relief here sought, unless otherwise excused.

94.    Plaintiffs, as Insureds under the AWAC Policy, and therefore, parties to the insurance contract, have performed all the terms and conditions of the AWAC Policy on their part(s) to be performed with respect to the relief here sought, unless otherwise excused.

95.    At all relevant times mentioned herein, the AWAC Policy was, and is, in full force and effect.

96.    An actual controversy exists between AWAC and Plaintiffs as to whether the Plaintiffs are entitled to coverage under the AWAC Policy in the form of advancement of their defense costs in the Underlying Actions, and judicial resolution of the parties' rights and obligations is necessary.

97.    This Court should issue a judgment declaring that the Plaintiffs are entitled to coverage under the AWAC Policy for Loss arising out of the Underlying Actions, including but not limited to defense costs as they are incurred.

## COUNT II

### (Preliminary Injunctive Relief Against AWAC)

98.    Plaintiffs repeat and reallege paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.    Upon the exhaustion of the Axis Policy, AWAC became obligated to make payments to the Plaintiffs for defense costs in the Underlying Actions.

100.  AWAC has expressed its refusal to make such payments, notwithstanding that Plaintiffs' defense costs are mounting as the Underlying Actions proceed.

101.  Absent preliminary injunctive relief, Plaintiffs face an imminent risk of irreparable

17

harm, including, but not limited to, the risk of an adverse outcome in the Underlying Actions caused by their inability to mount an adequate defense.

102. Plaintiffs are entitled to preliminary injunctive relief requiring AWAC to advance their defense costs in the Underlying Actions in accordance with AWAC's contractual obligations.

## COUNT III

### (Permanent Injunctive Relief Against AWAC)

103. Plaintiffs repeat and reallege paragraphs 1 through 102 of this Complaint as if fully set forth herein.

104. Upon the exhaustion of the Axis Policy, AWAC became obligated to make payments to the Plaintiffs for Losses, including defense costs in the Underlying Actions.

105. AWAC has expressed its refusal to make such payments.

106. Plaintiffs are entitled to permanent injunctive relief requiring AWAC to make payments for Losses, including defense costs, in the Underlying Actions in accordance with AWAC's contractual obligations.

## COUNT IV

### (Breach of Contract Against AWAC)

107. Plaintiffs repeat and reallege paragraphs 1 through 106 of this Complaint as if fully set forth herein

108. Pursuant to the terms of the AWAC Policy, AWAC is contractually obligated to provide coverage to Plaintiffs for all Loss (as defined in the U.S. Specialty Policy) arising from the Underlying Actions upon exhaustion of the limits of liability of the underlying U.S. Specialty Policy, the Lexington Policy and the Axis Policy.

109.    As of the present date, AWAC has denied its contractual obligations and has denied coverage under the AWAC Policy.

110.    Upon information and belief, Refco paid all premiums for the AWAC Policy and has performed all of the terms and conditions of the AWAC Policy on its part to be performed, unless otherwise excused.

111.    Plaintiffs, as Insureds under the AWAC Policy, have performed all the terms and conditions of the AWAC Policy on their part to be performed, unless otherwise excused.

112.    At all relevant times mentioned herein, the AWAC Policy was, and is, in full force and effect.

113.    None of the grounds asserted by AWAC for the denial of coverage under the AWAC Policy provides a valid basis for denying coverage to Plaintiffs.

114.    By denying coverage to Plaintiffs for the Underlying Actions, AWAC has breached the AWAC Policy.

115.    Plaintiffs have suffered and will continue to suffer damages as a direct and consequential result of AWAC's breach of its contractual duties and obligations under the AWAC Policy.

116.    Plaintiffs are entitled to recover their damages from AWAC under the terms of the AWAC Policy in an amount to be determined at trial.

## COUNT V

### (Declaratory Relief Against Arch)

117.    Plaintiffs repeat and reallege paragraphs 1 through 116 of this Complaint as if fully set forth herein.

118.    Pursuant to the terms of the Arch Policy, Arch is contractually obligated to provide

coverage to Plaintiffs for all Loss (as defined in the U.S. Specialty Policy) arising from the Underlying Actions, including but not limited to defense costs, upon exhaustion of the limits of liability of the underlying U.S. Specialty Policy, the Lexington Policy, the Axis Policy and the AWAC Policy.

119.  Arch has denied and continues to deny its contractual obligations.

120.  None of the grounds asserted by Arch for the denial of coverage under the Arch Policy provides a valid basis for denying coverage to Plaintiffs.

121.  Upon information and belief, Refco paid all premiums for the Arch Policy and has performed all of the terms and conditions of the Arch Policy on its part to be performed, unless otherwise excused.

122.  Plaintiffs, as Insureds under the Arch Policy, have performed all the terms and conditions of the Arch Policy on their part to be performed, unless otherwise excused.

123.  At all relevant times mentioned herein, the Arch Policy was, and is, in full force and effect.

124.  An actual controversy exists between Arch and the Plaintiffs as to whether the Plaintiffs are entitled to coverage under the Arch Policy for the Underlying Actions, and judicial resolution of the parties' rights and obligations is necessary.

125.  This Court should issue a judgment declaring that Plaintiffs are entitled to coverage under the Arch Policy for Loss arising out of the Underlying Actions, including, but not limited to, defense costs as they are incurred.

## COUNT VI

### (Permanent Injunctive Relief Against Arch)

126.  Plaintiffs repeat and reallege paragraphs 1 through 125 of this Complaint as if fully

set forth herein.

127.  Upon the exhaustion of the AWAC Policy, Arch will become obligated to make payments to the Plaintiffs for Losses, including defense costs in the Underlying Actions.

128.  Arch has expressed its refusal to make such payments.

129.  Plaintiffs are entitled to permanent injunctive relief requiring Arch to make payments for Losses, including defense costs, in the Underlying Actions in accordance with Arch's contractual obligations.

## <u>COUNT VII</u>

### (Breach of Contract Against Arch)

130.    Plaintiffs repeat and reallege paragraphs 1 through 129 of this Complaint as if fully set forth herein

131.    Pursuant to the terms of the Arch Policy, Arch is contractually obligated to provide coverage to Plaintiffs for all Loss (as defined in the U.S. Specialty Policy) arising from the Underlying Actions upon exhaustion of the limits of liability of the underlying U.S. Specialty Policy, the Lexington Policy, the Axis Policy and the AWAC Policy.

132.    As of the present date, Arch has denied its contractual obligations and has denied coverage under the Arch Policy.

133.    Upon information and belief, Refco paid all premiums for the Arch Policy and has performed all of the terms and conditions of the Arch Policy on its part to be performed, unless otherwise excused.

134.    Plaintiffs, as Insureds under the Arch Policy, have performed all the terms and conditions of the Arch Policy on their part to be performed, unless otherwise excused.

135.    At all relevant times mentioned herein, the Arch Policy was, and is, in full force

and effect.

136.    None of the grounds asserted by Arch for the denial of coverage under the Arch

Policy provides a valid basis for denying coverage to Plaintiffs.

137.    By denying coverage to Plaintiffs for the Underlying Actions, Arch has breached

the Arch Policy.

138.    Plaintiffs have suffered and will continue to suffer damages as a direct and

consequential result of Arch's breach of its contractual duties and obligations under the Arch

Policy.

139.    Plaintiffs are entitled to recover their damages from Arch under the terms of the

Arch Policy in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request entry of judgment in their favor as

follows:

140.    On Count I, declaring that Plaintiffs are entitled to  coverage under the AWAC

Policy for Loss arising out of the Underlying Actions, including but not limited to defense costs;

141.    On Count II, requiring AWAC to advance Plaintiffs' defense costs in the

Underlying Actions pending a final determination of coverage under the AWAC Policy;

142.    On Count III, requiring AWAC to make payments to Plaintiffs for Losses,

including defense costs, in the Underlying Actions, in accordance with the AWAC Policy;

143.    On Count IV, awarding Plaintiffs damages against AWAC for its breach of the

AWAC Policy;

144.    On Count V, declaring that Plaintiffs are entitled to coverage under the Arch Policy

for Loss arising out of the Underlying Actions, including but not limited to defense costs;

145. On Count VI, requiring Arch to make payments to Plaintiffs for Losses, including defense costs, in the Underlying Actions, in accordance with the Arch Policy;

146. On Count VII, awarding Plaintiffs damages against Arch for its breach of the Arch Policy;

147. Awarding Plaintiffs their attorneys' fees and costs and disbursements of this action; and

148. Granting such other and further relief as the Court may deem proper.

Dated: April 24, 2008

HELEN B. KIM (HK-8757)
KATTEN MUCHIN ROSENMAN LLP

STUART I. FRIEDMAN (SF-9186)
IVAN KLINE (IK-9591)
FRIEDMAN & WITTENSTEIN
A Professional Corporation

/s/ Helen B. Kim
Helen B. Kim
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: (310) 788-4525
Facsimile: (310) 788-4471

/s/ Ivan Kline
Ivan Kline
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 750-8700
Facsimile: (212) 223-8391

*Attorneys for Plaintiffs William M. Sexton and Gerald M. Sherer*

PHILIP A. NEMECEK (PN-3319)
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Telephone: (212) 940-8834
Facsimile: (212) 940-8776

*Attorneys for Plaintiff Dennis A. Klejna*

23

RICHARD CASHMAN (RC-4769)
HELLER EHRMAN LLP


/s/ Richard Cashman
Richard Cashman
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone:    (212) 832-8300
Facsimile:    (212) 763-7600

*Attorneys for Plaintiff Philip Silverman*

JOHN J. JEROME (JJ-2413)
SAUL EWING LLP

/s/ John J. Jerome
John J. Jerome
245 Park Avenue, 24th Floor
New York, NY 10167
Telephone:    (212) 672-1996
Facsimile:    (212) 672-1920

*Attorneys for Plaintiff Joseph Murphy*
CLARE P. GUTEKUNST (CG-0117)
PROSKAUER ROSE LLP

/s/ Claire P. Gutekunst
Claire P. Gutekunst
1585 Broadway
New York, NY 10036-8299
Telephone:    (212) 969-3421
Facsimile:    (212) 969-2900

*Attorneys for Plaintiff Richard N. Outridge*

NORMAN L. EISEN (NE 1198)
LAURA E. NEISH (LN-0040)
ZUCKERMAN SPAEDER LLP

/s/ Norman L. Eisen
Norman L. Eisen
1540 Broadway, Suite 1604
New York, NY 10036
Telephone:    (212) 704-9600
Facsimile:    (212) 740-4256

And

BLAKE T. HANNAFAN (BH-7054)
HANNAFAN & HANNAFAN

/s/ Blake T. Hannafan
One East Wacker Dr.
Suite 2800
Chicago, IL 60601
Telephone:    (312) 527-0055
Facsimile:    (312) 527-0220

*Attorneys for Plaintiff Tone N. Grant*
GREG A. DANILOW (GD-1621)
MICHAEL F. WALSH (MW-8000)
WEIL, GOTSHAL & MANGES LLP

/s/ Michael F. Walsh
Michael F. Walsh
767 Fifth Avenue
New York, NY 10153-0119
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007

*Attorneys for Plaintiffs Leo R. Breitman, Nathan*
*Grantcher, David V. Harkins, Scott L. Jaeckel,*
*Thomas H. Lee, Ronald L. O'Kelley, and Scott*
*A. Schoen*

24

Exhibit Z

JS 44C/SDNY
REV. 12/2005

# CIVIL COVER SHEET

08 CIV 3821

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**PLAINTIFFS**
XL SPECIALTY INSURANCE COMPANY

**DEFENDANTS**
SEE ATTACHED RIDER

APR 22 2008

**ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Boundas, Skarzynski, Walsh & Black LLC (212) 820-7700
One Battery Park Plaza, 32nd Floor New York, NY 10004

**ATTORNEYS (IF KNOWN)**

**CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)

28 U.S.C. § 2201 – Declaratory Judgment Insurance Contract

Has this or a similar case been previously filed in SDNY at any time? No ☒ Yes? ☐   Judge Previously Assigned

If yes, was this case Vol.☐ Invol. ☐ Dismissed. No☐ Yes ☐   If yes, give date _____ & Case No. _____

**(PLACE AN [x] IN ONE BOX ONLY)**   NATURE OF SUIT

### ACTIONS UNDER STATUTES

**TORTS**

**CONTRACT**
- [X] 110 INSURANCE
- [ ] 120 MARINE
- [ ] 130 MILLER ACT
- [ ] 140 NEGOTIABLE INSTRUMENT
- [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
- [ ] 151 MEDICARE ACT
- [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
- [ ] 153 RECOVERY OF OVERPAYMENT OF VETERANS BENEFITS
- [ ] 160 STOCKHOLDERS SUITS
- [ ] 190 OTHER CONTRACT
- [ ] 195 CONTRACT PRODUCT LIABILITY
- [ ] 196 FRANCHISE

**PERSONAL INJURY**
- [ ] 310 AIRPLANE
- [ ] 315 AIRPLANE PRODUCT LIABILITY
- [ ] 320 ASSAULT, LIBEL & SLANDER
- [ ] 330 FEDERAL EMPLOYERS' LIABILITY
- [ ] 340 MARINE
- [ ] 345 MARINE PRODUCT LIABILITY
- [ ] 350 MOTOR VEHICLE
- [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
- [ ] 360 OTHER PERSONAL INJURY

**PERSONAL INJURY**
- [ ] 362 PERSONAL INJURY - MED MALPRACTICE
- [ ] 365 PERSONAL INJURY PRODUCT LIABILITY
- [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**
- [ ] 370 OTHER FRAUD
- [ ] 371 TRUTH IN LENDING
- [ ] 380 OTHER PERSONAL PROPERTY DAMAGE
- [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**FORFEITURE/PENALTY**
- [ ] 610 AGRICULTURE
- [ ] 620 FOOD & DRUG
- [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
- [ ] 630 LIQUOR LAWS
- [ ] 640 RR & TRUCK
- [ ] 650 AIRLINE REGS
- [ ] 660 OCCUPATIONAL SAFETY/HEALTH
- [ ] 690 OTHER

**LABOR**
- [ ] 710 FAIR LABOR STANDARDS ACT
- [ ] 720 LABOR/MGMT RELATIONS
- [ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
- [ ] 740 RAILWAY LABOR ACT
- [ ] 790 OTHER LABOR LITIGATION
- [ ] 791 EMPL RET INC SECURITY ACT

**BANKRUPTCY**
- [ ] 422 APPEAL 28 USC 158
- [ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**
- [ ] 820 COPYRIGHTS
- [ ] 830 PATENT
- [ ] 840 TRADEMARK

**SOCIAL SECURITY**
- [ ] 861 MIA (1395FF)
- [ ] 862 BLACK LUNG (923)
- [ ] 863 DIWC (405(g))
- [ ] 863 DIWW (405(g))
- [ ] 864 SSID TITLE XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 TAXES
- [ ] 871 IRS-THIRD PARTY 20 USC 7609

**OTHER STATUTES**
- [ ] 400 STATE REAPPORTIONMENT
- [ ] 410 ANTITRUST
- [ ] 430 BANKS & BANKING
- [ ] 450 COMMERCE/ICC RATES/ETC
- [ ] 460 DEPORTATION
- [ ] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO)
- [ ] 480 CONSUMER CREDIT
- [ ] 490 CABLE/SATELLITE TV
- [ ] 810 SELECTIVE SERVICE
- [ ] 850 SECURITIES/COMMODITIES/EXCHANGE
- [ ] 875 CUSTOMER CHALLENGE 12 USC 3410
- [ ] 891 AGRICULTURE ACTS
- [ ] 892 ECONOMIC STABILIZATION ACT
- [ ] 893 ENVIRONMENTAL MATTERS
- [ ] 894 ENERGY ALLOCATION ACT
- [ ] 895 FREEDOM OF INFORMATION ACT
- [ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
- [ ] 950 CONSTITUTIONALITY OF STATE STATUTES
- [ ] 890 OTHER STATUTORY ACTIONS

### ACTIONS UNDER STATUTES

**REAL PROPERTY**
- [ ] 210 LAND CONDEMNATION
- [ ] 220 FORECLOSURE
- [ ] 230 RENT LEASE & EJECTMENT
- [ ] 240 TORTS TO LAND
- [ ] 245 TORT PRODUCT LIABILITY
- [ ] 290 ALL OTHER REAL PROPERTY

**CIVIL RIGHTS**
- [ ] 441 VOTING
- [ ] 442 EMPLOYMENT
- [ ] 443 HOUSING ACCOMMODATIONS
- [ ] 444 WELFARE
- [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
- [ ] 446 AMERICANS WITH DISABILITIES -OTHER
- [ ] 440 OTHER CIVIL RIGHTS

**PRISONER PETITIONS**
- [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
- [ ] 530 HABEAS CORPUS
- [ ] 535 DEATH PENALTY
- [ ] 540 MANDAMUS & OTHER
- [ ] 550 CIVIL RIGHTS
- [ ] 555 PRISON CONDITION

648885

Check if demanded in complaint:

CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $_____  OTHER _Dec. Relief_

Check YES only if demanded in complaint
JURY DEMAND: ☒ YES ☐ NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

JUDGE _GEL_   DOCKET NUMBER _05 CV 8626_

NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

(SEE REVERSE)

*(PLACE AN x IN ONE BOX ONLY)*                    **ORIGIN**

[x] 1 Original
Proceeding

[ ] 2a. Removed from State Court

[ ] 2b. Removed from State Court AND at least one party is a pro se litigant

[ ] 3 Remanded from Appellate Court

[ ] 4 Reinstated or Reopened

[ ] 5 Transferred from (Specify District)

[ ] 6 Multidistrict Litigation

[ ] 7 Appeal to District Judge from Magistrate Judge Judgment

*(PLACE AN x IN ONE BOX ONLY)*          **BASIS OF JURISDICTION**

[ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)    [x] 4 DIVERSITY

*IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1332, 1441)*

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF DEF |  | PTF DEF |  | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ]1 [ ]1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ]3 [ ]3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [x]5 [ ]5 |
| CITIZEN OF ANOTHER STATE | [ ]2 [x]2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ]4 [ ]4 | FOREIGN NATION | [ ]6 [ ]6 |

**PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)**

XL Specialty Insurance Company
Seaview House
70 Seaview Avenue
Stamford, CT 06902-6040
Fairfield County

**DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)**

See Attached Rider

**DEFENDANT(S) ADDRESS UNKNOWN**
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [x] FOLEY SQUARE
(DO NOT check either box if this a PRISONER PETITION.)

DATE          SIGNATURE OF ATTORNEY OF RECORD          ADMITTED TO PRACTICE IN THIS DISTRICT
                                                       [ ] NO
RECEIPT #                                              [x] YES (DATE ADMITTED Mo. 09 Yr. 1987 )
                                                       Attorney Bar Code # JS-8944

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

## Rider to Civil Cover Sheet

| Defendant | Residence |
|---|---|
| John D. Agoglia | 3 Sweet Hollow Ct.<br>Saint James, NY 11780-3524<br>Suffolk County |
| Phillip R. Bennett | 125 Colt Lane<br>Gladstone, NJ 07934-2027<br>Somerset County |
| Leo R. Breitman | 7767 Wind Key Dr.<br>Boca Raton, FL 33434-5704<br>Palm Beach County |
| Edwin L. Cox | c/o Brian O'Connor, Esq.<br>Willkie Farr & Gallagher LLP<br>787 Seventh Ave.<br>New York, NY 10019-6099<br>New York County |
| Sukhmeet Dhillon | 2 Glastonbury Pl<br>Laguna Niguel, CA 92677-5310<br>Orange County |
| Thomas H. Dittmer | 3594 Rockerman Rd.<br>Miami, FL 33133<br>Miami-Dade County |
| Nathan Gantcher | 86 Birchall Dr.<br>Scarsdale, NY 10583-4503<br>Westchester County |
| Stephen Grady | c/o Lawrence J. Kotler, Esq.<br>Duane, Morris & Heckscher, LLP<br>30 South 17th Street<br>Philadelphia, PA 19103<br>Philadelphia County |
| Tone Grant | 680 N. Lake Shore Dr.<br>Apt. 514<br>Chicago, IL 60611-4414<br>Cook County |
| Thomas Hackl | c/o Avraham C. Moscowitz, Esq.<br>Moscowitz and Book, LLP<br>1372 Broadway<br>New York, NY 10018<br>New York County |
| David V. Harkins | 12140 SE Birdkdale Ru<br>Jupiter, FL 33469-1740<br>Palm Beach County |
| Scott L. Jaeckel | 2 Avery St. 37H<br>Boston, MA 02111-1021<br>Suffolk County |

## Rider to Civil Cover Sheet

| Defendant | Residence |
|---|---|
| Dennis A. Klejna | 2301 E Street NW, Apt. A1010<br>Washington, D.C. 2003-2839<br>District of Columbia |
| Thomas H. Lee | 322 E. 57th St.<br>New York, New York<br>New York County |
| Eric G. Lipoff | 16 Clay<br>Irvine, CA 92620-3322<br>Orange County |
| Santo C. Maggio | 1825 8th Street South<br>Naples, FL 34102<br>Collier County |
| Peter McCarthy | 38 South Bridge Street<br>Poughkeepsie, NY 12601<br>Dutchess County |
| Joseph Murphy | 1038 Bloomfield Street<br>Hoboken, NJ 07030<br>Hudson County |
| Frank Mutterer | 2043 Bay Blvd.<br>Seaside Heights, NJ 08751-1001<br>Ocean County |
| Ronald L. O'Kelley | 6001 Trophy Drive, Apt. 1002<br>Naples, FL 34110<br>Collier County |
| Richard N. Outridge | 24 Pennbrook Dr.<br>Lincoln University, PA 19352-1227<br>Chester County |
| Scott A. Schoen | 191 Kings Grant Road<br>Weston, MA 02493-2176<br>Middlesex County |
| William M. Sexton | c/o Stuart I. Friedman, Esq.<br>Ivan Kline, Esq.<br>Friedman & Wittenstein, P.C.<br>600 Lexington Avenue<br>New York, NY 10022<br>New York County |
| Gerald Sherer | 333 Central Park West, Apt. 81<br>New York, NY 10025-7105<br>New York County |
| Philip Silverman | 3 Edie Drive<br>Marlboro, NJ 07746-2314<br>Monmouth County |
| Robert C. Trosten | 1345 Westway Dr.<br>Sarasota, FL 34236-1122<br>Sarasota County |

James A. Skarzynski (JS-1068)
James T. Sandnes (JS-8944)
Jill M. Levy (JL-6040)
BOUNDAS, SKARZYNSKI,
  WALSH & BLACK LLC
One Battery Park Plaza
New York, New York 10004
(212) 820-7700 (Telephone)
(212) 820-7740 (Facsimile)
jsandnes@bswb.com

Attorneys for XL Specialty Insurance Company

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

XL SPECIALTY INSURANCE COMPANY,               :
                                              :
                    Plaintiff,                :
                                              :
          v.                                  :    No. 08-CV-_____ (    )
                                              :
JOHN D. AGOGLIA, PHILLIP R. BENNETT,          :
LEO R. BREITMAN, EDWIN L. COX,                :
SUKHMEET DHILLON, THOMAS H.                   :
DITTMER, NATHAN GANTCHER, STEPHEN:
GRADY, TONE GRANT, THOMAS HACKL,              :
DAVID V. HARKINS, SCOTT L. JAECKEL,           :
DENNIS A. KLEJNA, THOMAS H. LEE,              :
ERIC G. LIPOFF, SANTO C. MAGGIO,              :    **JURY TRIAL DEMANDED**
PETER MCCARTHY, JOSEPH MURPHY,                :
FRANK MUTTERER, RONALD L. O'KELLEY,:
RICHARD N. OUTRIDGE, SCOTT A.                 :
SCHOEN, WILLIAM M. SEXTON, GERALD             :
SHERER, PHILIP SILVERMAN, AND                 :
ROBERT C. TROSTEN,                            :
                                              :
                    Defendants.               :

--------------------------------------------------------------x

## COMPLAINT FOR DECLARATORY JUDGMENT

1.    XL Specialty Insurance Company ("XL"), by and through its undersigned counsel, as and for its Complaint for Declaratory Judgment against defendants John D. Agoglia, Phillip R. Bennett, Leo R. Breitman, Edwin L. Cox, Sukhmeet Dhillon, Thomas H. Dittmer, Nathan Gantcher, Stephen Grady, Tone Grant, Thomas Hackl, David V. Harkins, Scott L. Jaeckel, Dennis A. Klejna, Thomas H. Lee, Eric G. Lipoff, Santo C. Maggio, Peter McCarthy, Joseph Murphy, Frank Mutterer, Ronald L. O'Kelley, Richard N. Outridge, Scott A. Schoen, William M. Sexton, Gerald Sherer, Philip Silverman, and Robert C. Trosten (collectively "Defendants"), allege as follows:

## NATURE OF ACTION

2.    XL issued a directors and officers management liability insurance policy number ELU089673-05 to Refco Inc. ("Refco") for the period of August 11, 2005 to August 11, 2006 (the "XL Policy"). XL issued the XL Policy in reliance on, among other things, the accuracy and integrity of the representations in the application and other materials and information that Refco provided to XL, as well as the important limitation on coverage created by Endorsement 13 (to the XL Policy (titled "Inverted Representation Endorsement" quoted and discussed in detail in ¶47 below), which provides that there is no coverage for any claims arising from facts, circumstances and situations known to any of the Defendants as of the inception of the XL Policy (the "IRE Limitation").

3.    The XL Policy incepted on August 11, 2005, on the same day Refco conducted its initial public offering. However, entirely unbeknownst to XL at that time,

2

Refco's directors and officers were engaged in a widespread and massive scheme to conceal hundreds of millions of dollars of uncollectible receivables, including $430 million owed to Refco by an off-balance sheet entity controlled by Refco Chairman, President and Chief Executive Officer Phillip R. Bennett ("Bennett"). As a result of the fraud and the misconduct, on October 17, 2005, Refco filed for Chapter 11 bankruptcy protection.

4.      In the wake of the collapse of Refco and the devastating financial losses to investors, numerous lawsuits and governmental and/or regulatory investigations and/or criminal actions were initiated against Refco and certain individuals, including the Defendants (the "Underlying Matters" as more fully defined below). The Underlying Matters allege, in part, that the Defendants engaged in a massive scheme in violation of federal securities laws and victimized the investing public.

5.      In connection with the Underlying Matters, three of Refco's highest executive officers, CEO Bennett, Vice President and Chief Financial Officer Robert C. Trosten ("Trosten") and CEO of Refco Securities and Refco Capital Markets, Santo C. Maggio ("Maggio") have pled guilty to various federal charges, including conspiracy, securities fraud, wire fraud, bank fraud and money laundering. As disclosed in the plea transcripts, all three officers, Bennett, Trosten and Maggio, were aware of, and actively sanctioned and participated in this scheme, beginning as early as 2004. In addition, on April 17, 2008, the former President of Refco Group Ltd. LLC, Tone Grant ("Grant"), was convicted by a jury, in this Court, of conspiracy, securities fraud, wire

3

fraud, bank fraud and money laundering arising out of the same wrongdoing to which

Bennett, Trosten and Maggio confessed.

6.    The Defendants have sought coverage under the XL Policy in connection

with the Underlying Matters.  XL has denied coverage for the Underlying Matters based

on various terms and conditions in the XL Policy, including, *inter alia*, the IRE

Limitation.  The IRE Limitation provides that there is no coverage for any Insured

Person under the XL Policy for any claims arising out of any facts, situation or

circumstances that were known to *any* Insured Person as of the inception of the

insurance.

7.    The guilty pleas by Bennett, Trosten and Maggio, and Grant's conviction,

definitively establish that Bennett, Trosten, Maggio and Grant had precisely the type of

knowledge that vitiates coverage under the IRE Limitation for all Defendants.

8.    Accordingly, XL brings this action against the Defendants named herein

to seek a declaration that the XL Policy affords no coverage for the Defendants in

connection with the Underlying Matters.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in

that there is complete diversity of citizenship between the Plaintiff, on the one hand,

and each of the Defendants, on the other hand, and the amount in controversy exceeds

$75,000 exclusive of interest and costs. The particulars of the citizenship of each of the

Defendants are alleged in paragraphs 16 to 41 and XL is a Delaware corporation with its

principal place of business in Connecticut.

4

10.     In the alternative, jurisdiction exists pursuant to 28 U.S.C. § 1367 because: (1) the claims are so related to claims in *In re Refco, Inc. Securities Litigation*, No. 05-8626 (GEL)(S.D.N.Y.), over which this Court has original jurisdiction pursuant to 28 U.S.C. § 1331, that the claims are all part of the same case or controversy; or  (2) the claims are so related to the claims in *Axis Reinsurance Co. v. Bennett, et al.*, No. 07-1712 (RDD)(Bankr. S.D.N.Y), *Grant, et al. v. Axis Reinsurance Co.*, No. 07-2005 (RDD)(Bankr. S.D.N.Y.) and *Axis Reinsurance Co., v. Bennett, et al.*, No. 07-07924 (GEL)(S.D.N.Y.) over which this Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) (inasmuch as this Court has withdrawn the reference pursuant to 28 U.S.C. § 157(d)) that the claims are all part of the same case or controversy.

11.     This Court also has *in personam* jurisdiction over the Defendants pursuant to CPLR §§ 301 and 302.  Each of the Defendants is a former officer and/or director of a Corporation with its principal place of business in New York, specifically Refco Inc. or an affiliated company.  As such, each Defendant transacted business in New York or otherwise engaged in a sufficient course of conduct in the State to make the exercise of personal jurisdiction proper.

12.     Jurisdiction pursuant to § 302 is also proper because this action relates to insurance coverage for a series of civil lawsuits and criminal Indictments (or Informations) alleging that Defendants committed wrongful acts in the State of New York and/or acts outside of New York that could reasonably be expected to have consequences in the State.  One of the largest of those civil actions is a class action pending before this Court (*In re Refco, Inc. Securities Litigation*, No. 05-8626 (GEL)).  The

criminal proceedings against various of the Defendants have likewise been conducted in this judicial district. The attorneys' fees for which the defendants have demanded advancement from XL are, therefore, being incurred primarily in New York. Similarly, any indemnification obligation would arise upon entry of the judgment by the Court in New York. Performance or non-performance of the contract of insurance in issue in this suit would, in turn, necessarily occur in New York with respect to those Underlying Matters.

13.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in New York and, in the alternative, at least one Defendant resides in the Southern District of New York.

14.     A declaratory judgment is authorized in this case by 28 U.S.C. § 2201.

## PARTIES

15.     XL is an insurance company that is organized and exists pursuant to the laws of the state Delaware. XL has its principal place of business in Hartford, Connecticut.

16.     Defendant John D. Agoglia ("Agoglia") served as a senior vice president at Refco Securities, LLC, a subsidiary of Refco, Inc. at times relevant to this action. Upon information and belief, Agoglia is a citizen of New York.

17.     Bennett served as the Chairman, President and Chief Executive Officer of Refco until October 2005, when he took a leave of absence at the request of the Refco board of directors. Upon information and belief, Bennett is a citizen of New Jersey.

6

18.     Defendant Leo R. Breitman ("Breitman") served as a Director of Refco at times relevant to this action.  Upon information and belief, Breitman is a citizen of Florida.

19.     Defendant Edwin L. Cox ("Cox") served as a Director of Refco Group Ltd., LLC at times relevant to this action.  Upon information and belief, Cox is a citizen of Texas.

20.     Defendant Sukhmeet Dhillon ("Dhillon") served as Executive Vice President of Refco Group Ltd., LLC ("RGL") and as Executive Vice President of the entity that became Refco LLC, during times relevant to this complaint.  Upon information and belief, Dhillon is a citizen of California.

21.     Defendant Thomas H. Dittmer ("Dittmer") served as Chairman and Chief Executive Officer of Refco at times relevant to this action.  Upon information and belief, Dittmer is a citizen of Florida or Illinois.

22.     Defendant Nathan Gantcher ("Gantcher") served as a Director of Refco at times relevant to this action.  Upon information and belief, Gantcher is a citizen of New York.

23.     Defendant Stephen Grady ("Grady") was Chief Operating Officer of Refco Global Futures LLC, a Refco subsidiary, during times relevant to this action.  Upon information and belief, Grady is a citizen of New Jersey.

24.     Grant served as President of Refco Group Ltd., LLC at times relevant to this action.  Upon information and belief, Grant is a citizen of Illinois.

7

25.     Defendant Thomas Hackl ("Hackl") served as Executive Vice President of RGL at times relevant to this action.  Upon information and belief, Hackl is a citizen of Geneva, Switzerland.

26.     Defendant David V. Harkins ("Harkins") served as a Director of Refco at times relevant to this action.  Upon information and belief, Harkins is a citizen of Florida.

27.     Defendant Scott L. Jaeckel ("Jaeckel") served as a Director of Refco at times relevant to this action.  Upon information and belief, Jaeckel is a citizen of Massachusetts.

28.     Defendant Dennis A. Klejna ("Klejna") served as Executive Vice President and General Counsel of Refco Group Ltd., LLC at times relevant to this action.  Upon information and belief, Klejna is a citizen of New York.

29.     Defendant Thomas H. Lee ("Lee") served as a Director of Refco at times relevant to this action.  Upon information and belief, Lee is a citizen of New York.

30.     Defendant Eric G. Lipoff ("Lipoff") served as Executive Vice President of a Refco subsidiary at times relevant to this action.  Upon information and belief, Lipoff is a citizen of California.

31.     Maggio served as an Executive Vice President of Refco and as President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd. at times relevant to this action.  Upon information and belief, Maggio is a citizen of Florida.

32.     Defendant Peter McCarthy ("McCarthy") served as Executive Vice-president of Refco Securities at times relevant to this action.  Upon information and belief, McCarthy is a citizen of New York.

33.     Defendant Joseph Murphy ("Murphy") served as President of Refco from October 2005 to November 28, 2005, when he resigned.  Murphy also served as Chief Executive Officer of Refco Global Futures and President of Refco, LLC at times relevant to this action.  Upon information and belief, Murphy is a citizen of New Jersey.

34.     Defendant Frank Mutterer ("Mutterer") served as Controller of Refco Group Ltd., LLC, during times relevant to this action.  Upon information and belief, Mutterer is a citizen of New Jersey.

35.     Defendant Ronald L. O'Kelley ("O'Kelley") served as a Director of Refco at times relevant to this action.  Upon information and belief, O'Kelley is a citizen of Florida.

36.     Defendant Richard N. Outridge ("Outridge") served as Chief Financial Officer of Refco Capital Management at times relevant to this action.  Upon information and belief, Outridge is a citizen of Pennsylvania.

37.     Defendant Scott A. Schoen ("Schoen") served as a Director of Refco at times relevant to this action.  Upon information and belief, Schoen is a citizen of Massachusetts.

38.     Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer of Refco at times relevant to this action.  Upon information and belief, Sexton is a citizen of New York.

9

39.    Defendant Gerald Sherer ("Sherer") served as Executive Vice President and Chief Financial Officer of Refco at times relevant to this action.  Upon information and belief, Sherer is a citizen of New York.

40.    Defendant Philip Silverman ("Silverman") served as Secretary of Refco at times relevant to this action.  Upon information and belief, Silverman is a citizen of New Jersey.

41.    Trosten served as Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC at times relevant to this action.  Upon information and belief, Trosten is a citizen of Florida.

## FACTUAL ALLEGATIONS

### The XL Policy

42.    The XL Policy is a directors and officers management liability policy with a policy period of August 11, 2005 to August 11, 2006 and a limit of $20 million.  A true and correct copy of the XL Policy is attached hereto as Exhibit A.  The XL Policy provides coverage to directors and officers for non-indemnifiable claims in excess of any other insurance program maintained by Refco, including an underlying program of insurance providing $50 million of directors' and officers' management liability insurance.[1]

43.    Various other insurers issued that $50 million in underlying directors, officers and corporate liability insurance policies to Refco.  U.S. Specialty Insurance

---

[1] XL seeks a declaration of no coverage for the Underlying Matters under the XL Policy.  To the extent one or more of the Underlying Matters may have been also noticed under any other XL policy of insurance, XL hereby reserves all of its rights and defenses under any such policy.

Company ("U.S. Specialty") issued a primary policy with limits of $10 million excess of

applicable retentions (the "Primary Policy"). Lexington Insurance Company

("Lexington") issued a first excess policy with limits of $7.5 million excess of $10 million

(the "Lexington Policy"). Axis Reinsurance Company ("Axis") issued a second excess

policy with limits of $10 million excess of $17.5 million (the "Axis Policy"). Allied

World Assurance Company ("AWAC") issued a third excess policy with limits of $12.5

million excess of $27.5 million (the "AWAC Policy"). Arch Insurance Company

("Arch") issued a fourth excess policy with limits of $10 million excess of $40 million

(the "Arch Policy"). Each of the underlying policies has a policy period of August 11,

2005 to August 11, 2006. Collectively the Primary Policy, Lexington Policy, Axis Policy

and the AWAC Policy are referred to as the "Underlying Coverage." [2]

44. Subject to all of its terms and conditions, the XL Policy affords specified

coverage to Insured Persons[3] for "Loss resulting from a Claim first made against the

Insured Persons[4] during the Policy Period . . . for a Wrongful Act, except to the extent

---

[2] Illinois National Insurance Company ("Illinois National") also issued a separate policy to part of the
Refco group of companies. Although that policy had been canceled prior to the inception of the XL
Policy, because of an extended discovery period endorsement, the Illinois National policy continued to
provide coverage for parts of the Underlying Matters. To the extent the Illinois National policy does
prove such coverage, the XL policy is also be excess to the Illinois National policy.

[3] Unless otherwise defined herein, all capitalized terms are as defined in the XL Policy.

[4] Insured Persons is defined in relevant part as "any past, present or future director or officer of the
Company . . . ." Exhibit A (XL Policy) Section II (I).

that such Loss is paid by any other Insurance Program[5] or as indemnification from any

source." Exhibit A, (XL Policy) Insuring Agreement (I).

45.    In addition to coverage provided under Insuring Agreement I, and subject

to all of its terms and conditions, the XL Policy provides coverage to the "Controlling

Shareholder," defined as Bennett, "but only with respect to Securities Claims, to the

extent and during such time that such Securities Claims are also made and maintained

against any other Insured Person or the Company." *Id.* at Endorsement No. 12.

46.    The XL Policy provides coverage to Insured Persons in excess of the

Underlying Coverage.  The XL Policy states that coverage

> shall be specifically excess over, and shall not contribute with…all
> indemnification to which an Insured Person may be entitled from any
> source, including but not limited to the Company or any Outside Entity;
> and any Insurance Program maintained by the Company or any Outside
> Entity, whether such other insurance is stated to be primary, contributing,
> excess, or otherwise.

*Id.* at Endorsement No. 9.

47.    Notably, the XL Policy does not "follow form" to the underlying policies

and, thus, the coverage defenses advanced by XL are unique to this action.  In

particular, Endorsement 13 to the XL Policy (the IRE Limitation, mentioned above)

excludes claims arising from matters which any of the Insured Persons knew might

afford grounds for a claim.  The IRE Limitation provides as follows:

> In consideration of the premium charged, *no coverage will be
> available* under this Policy for Loss, including Defense Expenses,

---

[5] The Insurance Program is defined as "any existing Management Liability Insurance, Directors' and Officers' Liability Insurance, or similar insurance and any other existing insurance under which coverage may be owed."  Exhibit A, Section II (H).

> *from Claims arising from any fact, circumstance or situation of which*, as of the effective date of this Policy, *any Insured had knowledge* and had *reason to suppose might afford grounds for any Claim* that would fall within the scope of the insurance afforded by this Policy.

Exhibit A (emphasis added), XL Policy, Endorsement No. 13. Thus, pursuant to the IRE Limitation, if *any* Insured Person had knowledge of a fact, circumstance or situation that such Insured Person "had reason to suppose might give rise to a Claim," no coverage is available under the XL Policy for any Loss for any Insured Person arising out of those facts, circumstances and/or situations.

48.     Defense Costs have been advanced to certain Defendants under the Primary Policy, the Lexington Policy and the Axis Policy.[6] As of the filing of this complaint, advancement of defense costs has been at least $27.5 million (fully eroding the Primary, Lexington and Axis Policies)[7] and the law firms representing the defendants in the Underlying Matters are currently generating attorneys' fees and costs in the vicinity of $2 million per month. Moreover, two of the Defendants have reached settlements in connection with one of the Underlying Matters, and both of those settlements have received preliminary approval from this Court. Collectively, the two

---

[6] The fact that U.S. Specialty and Lexington advanced fees and costs has no bearing on the coverage issues presented in this case. Axis was ordered by the Refco bankruptcy Court to advance fees and costs despite its denial of coverage. Axis has appealed the order to this Court which appeal is still pending.

[7] On April 11, 2008, AWAC was ordered by the Bankruptcy Court to advance fees and costs and on, information and belief, millions in fees and costs have already been tendered to AWAC for payment.

settlements require a $15.1 million contribution from the insurers.[8]  Thus, it is necessary

to promptly adjudicate the coverage issues presented in this case.

**The Events at Refco**

49.    On August 11, 2005, Refco conducted its initial public offering.

50.    Less than two months later, on October 10, 2005, Refco issued a press

release announcing that the Company had been carrying an uncollectible receivable of

$430 million from an entity controlled by Bennett.  Refco stated that "[b]ased on the

results of the review to date, the Company believes that the receivable was the result of

the assumption by an entity controlled by Mr. Bennett of certain historical obligations

owed by unrelated third parties to the Company, which may have been uncollectible."

Moreover, in the October 10, 2005 press release, Refco stated that although the

receivable "was reflected on the Company's prior period financials, as well as on the

Company's May 31, 2005 balance sheet," the receivable

> was not shown as a related party transaction in any such financials.
> For that reason, and after consultation by the Audit Committee
> with the Company's independent accountants, the Company
> determined, on October 9, 2005, that its financial statements, as of,
> and for the periods ended, February 28, 2002, February 28, 2003,
> February 28, 2004, February 28, 2005, and May 31, 2005, taken as a
> whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco
> Finance, Inc. should no longer be relied upon.

51.    On October 11, 2005, Refco issued a second press release announcing that

Bennett had repaid the $430 million receivable in full.  In addition, the October 11, 2005

press release provided further information on the nature of the receivable:

---

[8] None of the insurers has consented to fund either of the two settlements.

> Based on the results of the internal investigation to date, the
> Company believes that the receivable consisted in major part of
> uncollectible historical obligations owed by unrelated third parties
> to the Company that arose as far back as at least 1998. These
> obligations were transferred periodically to the entity controlled by
> Mr. Bennett, and the Company's books and records then reflected a
> receivable from that entity, rather than a receivable from the
> originating accounts. The fact that the receivable was from a
> company controlled by Mr. Bennett was hidden at the end of
> quarterly and annual reporting periods by reason of transfers to a
> third party customer account that we currently believe is
> unaffiliated with Mr. Bennett or anyone else at the Company.

52.     On October 17, 2005, Refco and certain of its unregulated subsidiaries filed

for Chapter 11 bankruptcy protection.

53.     On January 16, 2007, a federal Grand Jury returned a third superseding

indictment against Bennett, Trosten and Grant (the "S3 Indictment"). The S3

Indictment charged Bennett, Trosten and Grant with securities fraud, conspiracy to

commit securities fraud, wire fraud, bank fraud and money laundering. The S3

Indictment also charged Bennett with making false filings with the SEC and making

false statements to Refco's auditors. A true and correct copy of the S3 Indictment is

attached hereto as Exhibit B.

54.     On February 15, 2008, CEO and President Bennett, who is an Insured

Person under the XL Policy, pled guilty to all charges against him in the S3 Indictment.

Five days later, on February 20, 2008, Trosten, who also is an Insured Person under the

XL Policy, similarly pled guilty to charges of conspiracy, securities, wire and bank fraud

and money laundering.

55.     The S3 Indictment charged that, beginning in the mid 1990's, Bennett,

Trosten and their co-conspirators engaged in a scheme to mask the true financial

performance of Refco. Specifically,

> [f]rom at least as early as in or about the mid 1990s, PHILLIP R.
> BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the
> defendants, together with others known and unknown, schemed to
> hide the true financial health of Refco from its banks,
> counterparties, auditors, and investors.  Starting at least as early as
> the late 1990s, BENNETT and GRANT embarked on a strategy to
> mask the true performance of Refco's business in order to sell the
> company for their own benefit and that of Refco's other owners.  To
> that end, over the ensuing years, BENNETT, TROSTEN, GRANT
> and others known and unknown systematically (1) covered up both
> Refco's own losses and customer losses for which Refco became
> responsible; (2) moved Refco operating expenses off the company's
> books; and (3) padded Refco's revenues, all in an effort to mislead
> Refco's banks, counterparties, auditors and investors, with the
> goals of keeping Refco in business and then selling it for the
> maximum benefit to its owners and senior management.

Exhibit B (S3 Indictment) at ¶7.

56.     According to the S3 Indictment, in furtherance of the scheme, Bennett,

Trosten and their co-conspirators "made and caused Refco and others on its behalf to

make false and fraudulent statements to Refco's banks, counterparties, customers,

auditors and investors, and to create false audited financial statements and false public

filings" with the SEC.  *Id.* at ¶8.

57.     The S3 Indictment charged that the scheme permitted Refco to engage in,

among other things, Refco's August 2005 initial public offering of stock, "in which the

public purchased approximately $583 million of Refco common stock based on a false

and fraudulent registration statement."  *Id.*

16

58.    According to the S3 Indictment, the scheme was hatched in 1997, when "Refco directly and indirectly incurred a series of substantial trading losses that threatened the continued viability of Refco's business." *Id.* at ¶9. In response to those losses, Bennett, Trosten and others "moved losses and expenses out of Refco" and into Refco Group Holdings, Inc. ("RGHI"), an entity that owned Refco and that was owned by, among others, Bennett and Grant, in an effort to mask Refco's financial condition. This strategy increased the debt owed by RGHI to Refco (the "RGHI Receivable"), which eventually totaled more than $1 billion. *Id.*

59.    The S3 Indictment charged that, beginning at least as early as February 1998, Bennett and others directed a series of transactions designed to hide the "huge and growing" RGHI Receivable from, among others, Refco's auditors, by temporarily paying down all or part of the RGHI Receivable over Refco's fiscal year-end and replacing it with a receivable from one or more other entities not related to Bennett or Refco. *Id.* at ¶21. Bennett and others caused this cover-up to occur "at every fiscal year-end from at least the fiscal year-end on February 28, 1998 through the fiscal year-end on February 29, 2004." *Id.* Beginning in August 2004 and continuing until the August 2005 IPO, Bennett and others began causing these cover-up loan transactions to occur at each quarter and year-end period. *Id.* at ¶46.

60.    The S3 Indictment further charged that Bennett, Trosten and others participated in a scheme to defraud participants in the 2004 leveraged buyout of Refco, which was led by private equity fund Thomas H. Lee Partners, by misleading the fund

and purchasers of the $600 million in notes and $800 million in bank debt about the true

financial health of Refco. *Id.* at ¶¶ 36 – 44.

61.     Based on these and other allegations, the S3 Indictment charged Bennett as

follows:

| Count | Charge |
|-------|--------|
| 1 | Conspiracy to commit securities fraud, wire fraud, bank fraud, to make false filings with the SEC, to make material misstatements to auditors, to commit bank fraud and money laundering |
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 3 | Securities fraud in connection with the purchase and sale of Refco common stock |
| 4 | False filing with the SEC in connection with the filing of Refco's Form 10-K under the Exchange Act of 1934 on July 19, 2005 |
| 5,6 | False filing with the SEC in connection with the filing of certain registration statements under the Securities Act of 1933 on April 6, 2005 and August 8, 2005 |
| 7 – 13 | Wire fraud in connection with certain electronic communications between June 22, 2004 and August 8, 2005, including the transmission of Refco's Form 10-K on July 19, 2005 and its registration statements on April 6, 2005 and August 8, 2005 |
| 14 | Material misstatements to auditors |
| 15 | Bank fraud in connection with the 2004 leveraged buyout transaction |
| 16 – 20 | Money laundering in connection with proceeds of the 2004 leveraged buyout transaction |

62.     On February 15, 2008, Bennett pled guilty to all twenty counts against him

in the S3 Indictment.  A true and correct copy of the transcript of the hearing ("Bennett

Tr.") is attached hereto as Exhibit C.  During his plea allocution, the following exchange

occurred between the Court and Bennett:

18

THE COURT:  Mr. Bennett, did you commit the crimes for which you've been charged with in the indictment?

THE DEFENDANT:  I did, your Honor.

THE COURT:  Would you tell me in your own words what you did?

THE DEFENDANT:  Your Honor, during the period that I served as CEO of Refco, I agreed with other Refco executives to enter into a series of transactions at the end of Refco's financial reporting periods to make it appear as if a receivable due to Refco from Refco Upholdings, Inc. [sic], a related party, was instead due from an independent third-party customer.

The IGHI [sic] receivable was composed of, amongst other things, historical customer losses, bad debts, and expenses that IGHI [sic] had incurred on behalf of Refco.

I, along with other Refco executives, have caused Refco to enter into these transactions in order to conceal the size and nature of the IGHI [sic] receivable.  We concealed the receivable from, amongst others, Refco's auditors, Thomas H. Lee Partners, various lenders who, in 2004, participated in Refco's senior secured credit facility, and the issuance of 9 percent senior subordinated notes, and also investors in Refco's common stock.

Among the lenders to whom I knowingly caused the IGHI [sic] receivable to be misrepresented was HSBC Bank, referenced in Count Fifteen of the indictment.  I and other Refco executives also used the interstate wires to accomplish these acts within this district, as referenced in Counts Seven through Thirteen.  Furthermore, I caused funds obtained from the transaction with Thomas H. Lee Partners, referenced in paragraph 34 of the indictment, to be wired to various parties receiving proceeds from the transaction, as referenced in Counts Sixteen through Twenty, knowing that this money had been unlawfully obtained.

The IGHI [sic] receivable and related party transaction used to conceal it were material information that Refco investors and lenders would have wanted to have known prior to investing in or lending money to Refco. While I believed that I would be able to pay the IGHI [sic] receivable down over time, and did, in fact, ultimately pay off the receivable balance in its entirety, I knew that obtaining funds from

19

Refco's investors and lenders based on misleading financial statements
was also wrong.

I also caused Refco to file documents with the SEC, namely S1, S4, and
10-K that did not disclose the full extent of the IGHI [*sic*] receivable or
the transactions used to conceal it; and, thus, were false and
misleading with respect to material facts. I knew that failing to
disclose these facts in public filings and in connection with Refco's sale
and registration of Refco's notes and common stock was wrong, and I
deeply regret having done so.

Your Honor, I take full responsibility for my actions . . . .

Exhibit C (Bennett Tr.) at pp. 16 – 19.

63.     At the conclusion of the February 15, 2008 hearing, the Court found that
Bennett pled guilty voluntarily and knowingly:

THE COURT: Mr. Bennett, I'm satisfied that you understand the
nature of the charge against you and the consequences of your plea;
and that your plea is made voluntarily and knowingly; and that there
is a factual basis for it. Accordingly, I will accept your plea of guilty. . .

*Id.* at p. 20.

64.     The S3 Indictment charged Trosten as follows:

| Count | Charges |
|-------|---------|
| 1 | Conspiracy to commit securities fraud, wire fraud, bank fraud, to make false filings with the SEC, to make material misstatements to auditors, to commit bank fraud and money laundering |
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 7, 8 | Wire fraud in connection with certain electronic communications between June 22, 2004 and August 3, 2004 |
| 15 | Bank fraud in connection with the 2004 leveraged buyout transaction |
| 17 – 18 | Money laundering in connection with proceeds of the 2004 leveraged buyout transaction |

20

65.    On February 20, 2008, Trosten pled guilty to Counts 1, 2, 7, 15 and 17

against him in the S3 Indictment.  A true and correct copy of the transcript of the

hearing ("Trosten Tr.") is attached hereto as Exhibit D.  During the hearing at which

Trosten pled guilty, the following exchange occurred between the Court and Trosten:

> THE COURT: Mr. Trosten, did you commit the offenses that you are
> pleading guilty to?
>
> THE DEFENDANT: I did, your honor.
>
> THE COURT: Would you tell me, please, what you did?
>
> *    *    *
>
> THE DEFENDANT: Your Honor, while I was employed at Refco, I
> agreed with other Refco executives to hide the true nature of Refco's
> finances on Refco's financial statements.  I knew that Refco's financial
> statements did not accurately reflect Refco's financial condition,
> because the financial statements did not disclose the full amount that
> Refco Group Holdings, Inc., a related party, owed to Refco.  I
> understood that the RGHI receivable was underreported because
> Phillip Bennett, Refco's former chief executive officer, and other Refco
> executives, including me, were involved in a series of transaction at the
> end of Refco's financial reporting periods to make it appear as if a
> receivable was due from third-party customers rather than from a
> related party.
>
> The RGHI receivable was composed of, amongst other things, historic
> customer losses, bad debts, and expenses that RGHI incurred on behalf
> of Refco.
>
> In addition, I participated in a number of transactions that padded or
> inflated Refco's income.  For example, I participated in transactions
> that shifted expenses off the books of Refco and onto the books of
> Refco Group Holdings, Inc.
>
> I, along with other Refco executives, agreed to conceal the true size
> and nature of the RGHI receivable from, amongst others, Refco's
> auditors, Thomas H. Lee Partners; HSBC, which, in 2004, participated
> in Refco's senior secured credit facility, as referenced in . . . paragraph

41 and Count Fifteen of the indictment; and investors who purchased bonds that Refco issued in 2004, as referenced in Count Two of the indictment.

I left the company in August 2004, one year before the IPO of Refco. I and other executives used the interstate wires to accomplish these acts within this district, as referenced in Count Seven of the indictment.

Furthermore, I received funds obtained from the transaction with Thomas H. Lee Partners, referenced in paragraph 34 of the indictment, which I knew were proceeds from unlawful activity, as referenced in Count Seventeen.

The RGHI receivable and the transactions used to conceal it were material information that Refco investors and lenders would have wanted to know before investing in or lending money to Refco.

I knew that obtaining funds from Refco investors and lenders based on misleading financial information was wrong.

*   *   *

Your Honor, I take full responsibility for my actions and my conduct. . . .

Exhibit D (Trosten Tr.) at pp. 17 – 19.

66.     At the conclusion of the February 20, 2008 hearing, the Court found that

Trosten pled guilty voluntarily and knowingly:

THE COURT: All right. Mr. Trosten, I am satisfied that you understand the nature of the charge against you and the consequences of your plea, and that your plea is made voluntarily and knowingly, and that there is a factual basis for your plea. I will therefore accept your plea of guilty.

*Id.* at p. 20.

67.     Meanwhile, on December 19, 2007, Maggio, who is an Insured Person

under the XL Policy, pled guilty to a separate four-count criminal Information (the

22

"Maggio Information") charging him with conspiracy, securities fraud and wire fraud. A true and correct copy of the Maggio Information is attached hereto as Exhibit E.

68.     The Maggio Information, which mirrored the same claimed misconduct as the S3 Indictment, charged that Maggio was one of Bennett's and Trosten's co-conspirators and that he participated in the conduct underlying the conspiracy. In particular, the Maggio Information charged that Maggio participated in the scheme to hide the RGHI Receivable and to mask the true financial condition of Refco in the several years prior to the August 11, 2005 initial public offering.

69.     Based on these and other allegations, the Maggio Information charged Maggio as follows:

| Count | Charges |
|-------|---------|
| 1 | Conspiracy to commit securities fraud, wire fraud, to make false filings with the SEC, to make material misstatements to auditors, bank fraud and money laundering |
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 3 | Securities fraud in connection with the purchase and sale of Refco common stock |
| 4 | Wire fraud in connection with the electronic transmission of Refco's Form 10-K on July 19, 2005 |

70.     On December 19, 2007, Maggio pled guilty to every count in the Maggio Information. A true and correct copy of the transcript of the hearing ("Maggio Tr.") is attached hereto as Exhibit F. During the hearing at which Maggio pled guilty, the following exchange occurred between the Court and Maggio:

> THE COURT: Did you commit the offenses for which you have been charged, Mr. Maggio?
>
> THE DEFENDANT: Yes.

THE COURT:  Tell me what you did.

\*   \*   \*

THE DEFENDANT:  Your Honor, from the late 1990s to October 2005 I was a senior executive at Revko [sic] Ink [sic]. During that period I participated with others to hide the true financial health of Revko [sic] from banks, counter-parties, auditors and investors.  With my knowledge and active participation Revko's [sic] substantial losses were covered up as revenues padded [sic] and certain operating expenses were moved off its book.  Among the acts I personally engaged in [sic] the signing of loan agreements referencing paragraphs 61-D [loan agreement signed in furtherance of the conspiracy on or about February 20, 2004] and 61-P [loan agreement signed in furtherance of the conspiracy on or about February 23, 2005] of the indictment.

As a result of my conduct and that of my coconspirators false financial statements were issued to obtain debt financing from the public including 9 percent senior subordinated notes referenced in Count Two of the indictment [sic].

To consummate the sale of 57 percent of Revko [sic] to a group headed by Thomas H. Lee in 2004 and to obtain $800 million in bank financing the same year and to effect the Revko [sic] initial public offering in 2005. [sic]  Moreover, with my knowledge false financial statements were filed with the SEC including form 10K referencing Count Four. The mails and interstate wires were used as part of the fraudulent scheme.

I deeply regret my conduct and the harm that it has caused.

THE COURT: First of all, with respect to all of the activities that you've indicate you participated in it knowingly?

THE DEFENDANT: Yes.

\*   \*   \*

THE COURT:  And the intent of this scheme was to defraud?

THE DEFENDANT:     Yes.

24

Exhibit F (Maggio Tr.) at pp. 17 – 19.

71.     At the conclusion of the December 19, 2007 hearing, the Court found that

Maggio pled guilty knowingly and voluntarily:

> THE COURT:  Based on defendant's allocution and the
> recommendations by the government I find that the defendant
> understands the nature, the charges and consequences of his guilty
> plea. I also find that the plea is voluntary and that there is a factual
> basis for the plea. I, therefore, recommend that the plea be accepted . .
> . .

*Id.* at 20.

72.     Grant chose not to plead guilty to the charges in the S3 indictment and

was tried, before a jury, in this Court.  At trial the United States Attorney showed that

Grant knew of the fraud.  The government introduced into evidence, *inter alia*, a

memorandum with respect to a 2004 meeting between Grant and Bennett on which

Grant hand-wrote "1.111 real debt," referring to the RGHI transaction.  On April 17,

2008 the jury found Grant guilty of conspiracy, securities fraud, wire fraud, bank fraud

and money laundering, as alleged in the S3 Indictment.

73.     As demonstrated by each of the three guilty pleas and the Grant

conviction, on counts that alleged knowledge of, *inter alia*, efforts to hide the RGHI

Receivable from the investing public prior to 2005, Bennett, Trosten, Maggio and Grant,

as of August 11, 2005, had knowledge of or information concerning acts, errors,

omissions, facts, matters or circumstances that might give rise to a Claim under the XL

Policy.

**The Underlying Matters**

74.     Beginning on October 12, 2005, various lawsuits were filed against the Defendants.

75.     The criminal action discussed above, *United States v. Bennett*, No. 05-1720 (S.D.N.Y.) (the "Bennett Criminal Complaint"), was brought on October 12, 2005.

76.     The Bennett Criminal Complaint alleged that Bennett knowingly "hid from investors in [Refco's] August 2005 initial public offering of stock . . . the existence of hundreds of millions of dollars of related party transactions between Refco and a company controlled by Bennett, including causing Refco to file a false and fraudulent S-1 registration statement with the Securities and Exchange Commission." Bennett Criminal Complaint, ¶9. A federal grand jury in New York subsequently returned a criminal Indictment against Bennett that was filed on or about November 10, 2005 in *United States v. Bennett, et al.*, No. 05-1192 (S.D.N.Y.). This indictment repeated and expanded upon the allegations in the Bennett Criminal Complaint. On or about October 24, 2006, the Grand Jury returned a superseding indictment that named both Bennett and Trosten, and a second superseding indictment was handed up against them on or about November 16, 2006. On January 16, 2007, the third superseding indictment was handed up, adding Grant as a defendant – referred to above as the "S3 Indictment." On December 19, 2007, the Information against Maggio was filed. Each of these filings alleged, among other things, that the defendant(s) named therein engaged in a scheme to hide the RGHI receivable from the investing public. Collectively, the

proceedings initiated by these filings will be referred to herein as the "Criminal Proceedings."

77.    The Bennett Criminal Complaint was tendered to XL for coverage under the XL Policy on or about October 13, 2005, and the indictment, the superseding indictment, the second superseding indictment and/or the third superseding indictment were tendered to XL for coverage under the XL Policy thereafter.

78.    The suits *Mazur et al. v. Refco, Inc., et al.*, No. 05-8626 (S.D.N.Y.), *Frontpoint Fin. Serv., Inc. v. Refco, Inc.*, et al., No. 05-8663 (S.D.N.Y.), *Lieber v. Refco, Inc., et al.*, No. 05-8667 (S.D.N.Y.), *Weiss v. Refco, Inc., et al.*, No. 05-8691 (S.D.N.Y.), *Glaubach v. Refco, Inc., et al.*, No. 05-8692 (S.D.N.Y.), *Gross v. Refco, Inc., et al.*, No. 05-8697 (S.D.N.Y.), *Salamone v. Refco, Inc. et al.*, No. 05-8716 (S.D.N.Y.), *RD Partners LLC v. Refco, Inc., et al.*, No. 05-8737 (S.D.N.Y.), *Wakefield v. Refco, Inc., et al.*, No. 05-8742 (S.D.N.Y.), *Gaugler v. Bennett, et al.*, No. 05-8886 (S.D.N.Y.), *Baker v. Bennett, et al.*, No. 05-8923 (S.D.N.Y.), *Nathamon v. Bennett, et al.*, No. 05-3926 (S.D.N.Y.), *Becker v. Refco, Inc., et al.*, No. 05-8929 (S.D.N.Y.), *Mettupatti v. Bennett, et al.*, No. 05-9048 (S.D.N.Y.), *Weiss v. Bennett, et al.*, No. 05-9126 (S.D.N.Y.), *Weit v. Bennett, et al.*, No. 05-9611 (S.D.N.Y.), *Esses v. Bennett, et al.*, No. 05-9654 (S.D.N.Y.), *City of Pontiac General Employees Retirement System v. Bennett et al.*, No. 05-9941 (S.D.N.Y.), *Gensheimer v. Bennett*, No. 05-10318 (S.D.N.Y.) and *Teacher' Retirement System of the State of Illinois et al. v. Lee, et al.*, No. 05-10403 (S.D.N.Y.) are purported class action securities fraud lawsuits that have been consolidated for pre-trial purposes under Case No. 05-8626 (GEL) and captioned *In re Refco, Inc. Securities Litigation* (the "Securities Litigation"). The First Amended Consolidated Class Action

Complaint ("FAC") was filed in the consolidated proceedings on May 5, 2006, and the

Second Amended Consolidated Class Action Complaint ("SAC") was filed on or about

December 3, 2007.

79.     The FAC and SAC allege that Refco's initial public offering registration

statement and prospectus were materially false and misleading. Specifically, they

allege that the registration statement and prospectus failed to disclose the existence of

the RGHI Receivable. The SAC further alleges that the Refco financial statements

incorporated in Refco's registration statement and prospectus were inaccurate because

they failed to disclose the related-party transactions between Refco and RGHI that were

allegedly designed to hide the RGHI Receivable. Included among the defendants

named in the SAC are Bennett, Sherer, Sexton, Maggio, Murphy, Silverman, Klejna,

Trosten, Grant, O'Kelley, Breitman, Gantcher, Lee, Harkins, Jaeckel, and Schoen.

80.     Beginning on or about October 14, 2005, some of the lawsuits comprising

the Securities Litigation were tendered to XL for coverage under the XL Policy. The

FAC was tendered to XL by letter dated June 16, 2006.

81.     The suits *David Fine v. Bennett, et al.*, No. 05-8701 (S.D.N.Y.), and *Mehta v.

Bennett, et al.*, No. 05-8748 (S.D.N.Y.), which were shareholder derivative actions (the

"Derivative Litigation"), have been dismissed. Bennett, Sherer, Breitman, Gantcher,

Harkins, Jaeckel, Lee, O'Kelley, Schoen, Sexton and Murphy, among others, were

named as defendants in the Derivative Litigation.

82.     The complaints in the Derivative Litigation alleged that Refco's initial

public offering registration statement and prospectus were materially false and

misleading. Specifically, the complaints alleged that the registration statement and prospectus failed to disclose the existence of the RGHI Receivable. The complaints further alleged that the Refco financial statements incorporated in its registration statement and prospectus were inaccurate because they failed to disclose the related-party transactions between Refco and RGHI that were designed to hide the RGHI Receivable.

83.    The *Mehta* complaint was tendered to XL for coverage under the XL Policy on or about October 18, 2005. It does not appear that any party has given notice of the *Fine* action to XL.

84.    The suit *BAWAG P.S.K. Bank v. Refco Inc., et al.*, No. 05-60006 (Bankr. S.D.N.Y.), Adv. No. 05-03161, was filed on November 16, 2005 (the "BAWAG Action"). The BAWAG Action names Bennett (among others) as a defendant.

85.    The complaint in the BAWAG Action alleges that the plaintiff was fraudulently induced to loan approximately $420 million to Bennett on October 10, 2005. The complaint alleges that Bennett failed to disclose that he sought the loan to pay off the RGHI Receivable, a "related party receivable resulting from the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to Refco [that] likely was impaired and not collectible." BAWAG Action Complaint, ¶17. The complaint alleges that Bennett "knew that if BAWAG had been aware of any of the key facts set forth in [Refco's] October 10, 2005 Press Release, BAWAG would not have made the Loan." *Id.*, ¶30.

86.    The BAWAG Action was tendered to XL for coverage under the XL Policy on or about November 30, 2005.

87.    The suit *Thomas H. Lee Equity Fund L.P., et al. v. Bennett, et al.*, No. 05-9608 (S.D.N.Y.), was filed on November 14, 2005 (the "THL Funds Action"). The THL Funds Action names Bennett, Grant and Maggio, among others, as defendants.

88.    The complaint in the THL Funds Action alleges that in June 2004, the plaintiffs invested approximately $507 million in Refco. The complaint alleges that despite the plaintiffs' due diligence efforts, they were unaware that "Bennett intentionally and deliberately engaged in accounting fraud in order to mask a group of largely worthless receivables, bad debts and questionable obligations that, if accurately portrayed on the Company's financial statements, would have materially reduced Refco's value." THL Funds Action Complaint, ¶4. Specifically, the complaint alleges that Bennett "nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of million dollars [*sic*] of customer losses and obligations that would never be repaid to the Company." *Id.* at ¶30. The complaint alleges that the Refco financial statements provided to the plaintiffs during their due diligence review in 2003 and 2004 were materially false and misleading.

89.    The THL Funds Action was tendered to XL for coverage under the XL Policy on or about February 10, 2006.

90.     The complaint in *Unovalores Ltd. v. Bennett*, No. L1564-05 (Sup. Ct. of New

Jersey, Somerset County, Law Division) (the "Unovalores Action") was filed in New

Jersey state court on or about November 1, 2005.

91.     The plaintiff in the Unovalores Action, which identifies itself as a Refco

Capital account holder, names only Mr. Bennett as a defendant.  Plaintiff alleges that it

entered into a Repurchase Transaction with Refco on August 31, 2005, in reliance upon

representations in Refco's registration statement and other filings concerning Refco's

financial health.  Those representations were false, according to the complaint, because

they concealed massive receivables owed by an entity controlled by Mr. Bennett and at

least one-half billion dollars of related party transactions with Mr. Bennett.

92.     The Unovalores Action was tendered to XL for coverage under the XL

Policy on or about February 10, 2006.

93.     The complaint in *American Financial International Group v. Refco, Inc., et al.*,

No. 05-8988 (S.D.N.Y.) (the "American Financial Action"), was filed in the Southern

District of New York on or about October 21, 2005, an amended complaint was filed on

April 13, 2006, and a second amended complaint was filed on June 30, 2006.

94.     The plaintiff in the American Financial Action identifies itself as a

Delaware LLC that traded currencies through an account at Refco F/X Associates, LLC

("Refco F/X").  The suit is a purported class action brought on behalf of all persons who

traded currencies through, or had currency trading accounts with, Refco F/X from

August 11, 2005 through the date the second amended complaint was filed, and who

have been damaged thereby.  Included among the defendants named in the second

31

amended complaint are Bennett, Sherer, Sexton, Maggio, Trosten, Mutterer and

Silverman. The second amended complaint generally alleges the same conduct that is

the subject of the Criminal Proceedings and the Securities Litigation.

95.     The complaint in the American Financial Action was tendered to XL for

coverage under the XL Policy on or about October 25, 2005, and the amended complaint

was tendered to XL on June 16, 2006.

96.     The complaint in *Global Management Worldwide Limited v. Philip R. Bennett,*

*et al.*, No. 06-0643 (S.D.N.Y.) (the "Global Management Litigation"), was filed in the

Southern District of New York on or about January 26, 2006, and a Consolidated

Amended Class Action Complaint was filed in September 2006.

97.     The plaintiff in the Global Management Litigation identifies itself as a

corporation organized under the laws of Nassau, the Bahamas that was a brokerage

customer of Refco Capital Markets, Ltd. ("RCM"). The suit is a purported class action

brought on behalf of all brokerage customers of RCM who, at any time from October 17,

2000 to October 17, 2005, entrusted securities to RCM and/or Refco Securities, LLC,

directly or indirectly, as custodian and broker for safe-keeping, and continued to hold

positions with RCM on October 17, 2005 or thereafter. Plaintiffs generally allege that,

during the purported class period, Refco, either directly or through its affiliates,

incurred billions of dollars in losses, and tried to hide those losses by surreptitiously

selling securities held by RCM in custody for class members. Plaintiffs allege that the

financial statements filed by Refco with the SEC during the purported class period were

false and misleading because they fraudulently omitted these losses, as well as the

scheme to hide the losses by selling securities stolen from plaintiffs and by building up and hiding the RGHI Receivable. Plaintiffs further allege that they relied upon these false and misleading financial statements and the purported financial integrity of Refco in entrusting securities to RCM.

98.    The Global Management Litigation was tendered to XL for coverage under the XL Policy on or about March 14, 2006.

99.    On or about October 9, 2007, two separate lawsuits were brought by seven investment entities that maintained accounts at RCM: (1) *VR Global Partners L.P., et al. v. Bennett, et al.*, Case No. 07-8686 (S.D.N.Y.) and (2) *Capital Management Select Fund Ltd., at al., v. Bennett, et al.*, Case No. 07-8688 (S.D.N.Y.). The complaints, which were tendered to XL in October 2007, also allege that Refco insiders schemed to hide the RGHI Receivable, thereby inducing plaintiffs to maintain accounts at RCM, and converted securities owned by plaintiffs to hide losses incurred by Refco. The defendants in the VR Global and Capital Management litigations include Bennett, Sexton, Maggio, Murphy, Silverman, Trosten, Grant, Lee, Harkins, Jaeckel, Schoen and Outridge. By order dated November 20, 2007, the Global Management Litigation was consolidated for pre-trial purposes with the VR Global and Capital Management litigations. The consolidated proceedings will be referred to herein as the "RCM Brokerage Customer Securities Litigation."

100.    The complaint in *Kirschner v. Thomas H. Lee Partners, L. P.*, No. 07-7074 (S.D.N.Y.) (the "Trustee/THL Partners Litigation"), was filed in the Southern District of New York on or about August 8, 2007.

33

101.    The plaintiff in the Trustee/THL Partners Litigation identifies himself as the trustee of the Refco Litigation Trust (the "Trustee"). The individual defendants named in the complaint are Lee, Harkins, Jaeckel, and Schoen. The Trustee generally alleges that the individual defendants breached fiduciary duties owed to Refco by failing to inform themselves of Refco's true financial state - including efforts to hide the RGHI Receivable – before making business decisions on behalf of Refco.

102.    The complaint in the Trustee/THL Partners Litigation was tendered to XL for coverage under the XL Policy by letter dated August 16, 2007.

103.    The complaint in *Kirschner v. Grant Thornton LLP, et al.*, No. 2007L008818 (Cook County, Ill.) (the "Grant Thornton Litigation"), was filed in Illinois state court on August 21, 2007, and was removed to federal court on or about September 19, 2007 as Case No. 07-cv-05306 (N.D. Ill.).

104.    The Grant Thornton Litigation was brought by the Trustee. The individual defendants named in the complaint include Bennett, Maggio, Trosten, and Grant. The Trustee generally alleges that these defendants engaged in a scheme to hide Refco's true financial condition, which included efforts to hide the RGHI Receivable.

105.    The complaint in the Grant Thornton Litigation was tendered to XL for coverage under the XL Policy by letter dated September 20, 2007.

106.    The complaint in *Kirschner v. Agoglia, et al.*, Adv. Pro. No. 07-3060 (Bankr. S.D.N.Y.) (the "Agoglia Litigation") was filed on or about October 15, 2007.

107.    The Agoglia Litigation was brought by the Trustee. The individual defendants named in the complaint are Agoglia, Bennett, Cox, Dittmer, Dhillon, Grady,

34

Grant, Lipoff, Maggio, McCarthy, Murphy, Mutterer, Sexton, and Trosten. The Trustee alleges that Bennett and others "orchestrated a massive financial fraud designed to inflate Refco's financial position artificially until such time as it could be sold," Agoglia Litigation Compl. ¶59, a fraud that included the hiding of the RGHI Receivable. The Trustee seeks to recover transfers made to defendants under avoidance provisions of the Bankruptcy Code and to recover the value of the transfers under a theory of unjust enrichment.

108.    The complaint in the Agoglia Litigation was tendered to XL for coverage under the XL Policy by letters dated October 24 and November 21, 2007.

109.    The complaint in *Kirschner v. Thomas Hackl, et al.*, No. 07-9238 (S.D.N.Y.) (the "Hackl Litigation"), was filed on or about October 15, 2007.

110.    The Hackl Litigation was brought by the Trustee. The only individual defendant named in the complaint is Hackl. The Trustee alleges that Bennett, Hackl and others engaged in a scheme to hide the true financial condition of Refco, including efforts to hide the RGHI Receivable, and seeks recovery from Hackl under counts alleging, *inter alia*, breach of fiduciary duty, civil conspiracy, aiding and abetting fraud, and unjust enrichment.

111.    The complaint in *Kirschner v. Bennett, et al.*, Case No. 602869 (New York County, New York) (the "Trustee/Bennett Litigation"), was filed in the Supreme Court of New York on or about August 27, 2007, and was removed to federal court on or about September 17, 2007 as Case No. 07-08165 (S.D.N.Y.).

112.    The plaintiff in the Trustee/Bennett Litigation identifies himself as the
trustee of the Refco Private Actions Trust and assignee of all claims related to Refco
belonging to, among others, certain former Refco customers who maintained accounts
at, and entrusted funds to, RCM.  The individual defendants named in the complaint
are Bennett, Maggio, Trosten and Grant.  The complaint alleges, *inter alia*, that these
defendants engaged in a scheme to hide Refco's true financial condition, including
engaging in steps to hide the RGHI Receivable.  This conduct allegedly induced RCM
customers to entrust assets with RCM, which allegedly were later converted for Refco's
use.

113.    The complaint in the Trustee/Bennett Litigation was tendered to XL for
coverage under the XL Policy by letter dated October 24, 2007.

114.    The Trustee/THL Partners Litigation, the Grant Thornton Litigation, the
Trustee/Bennett Litigation, the Agoglia Litigation and the Hackl Litigation are
collectively referred to herein as the "Trustee Litigation."

115.    Upon information and belief, various governmental and/or regulatory
investigations of or proceedings involving one or more of the Defendants (the
"Regulatory Matters") are ongoing, and one or more of the Defendants has sought or
may seek coverage for such matters.

116.    A seizure warrant pursuant to 18 U.S.C §§ 981(a)(1)(C) and 984 in *U.S. v.*
*Funds on Deposit at Bear Stearns, Account Number 893-86267 In The Name of "Dennis A.*
*Klejna," Up To And Including $5,800,000, And All Funds Traceable Thereto* was filed on or
about December 19, 2007 (the "Klejna Seizure Warrant").

36

117.    The Klejna Seizure Warrant was tendered to XL for coverage under the XL Policy by letter dated January 29, 2008.

118.    The complaint in *Krys, et al. v. Sugrue, et al.*, Index No. 600653/08 (New York County, New York) (the "Krys Litigation"), was filed on or about March 5, 2008.

119.    The complaint in the Krys Litigation was tendered to XL for coverage under the XL Policy by letter dated March 7, 2008.

120.    The proceedings discussed above, including the Criminal Proceedings, the Securities Litigation, the Derivative Litigation, the BAWAG Action, the THL Funds Action, the Unovalores Action, the American Financial Action, the Global Management Litigation, the RCM Brokerage Customer Securities Litigation, the Trustee Litigation, the Regulatory Matters, the Klejna Seizure Warrant and the Krys Litigation, and or any other notice of claim or potential claim are collectively referred to herein as the "Underlying Matters," as that term has been used throughout this complaint. If and to the extent additional civil, criminal or regulatory actions are instituted or come to XL's attention after the filing of this complaint, such additional actions shall also be deemed "Underlying Matters" to the extent they arise out of the same or related transactions or occurrences raised in the Underlying Matters detailed in this complaint.

## CLAIM FOR RELIEF

### (FOR A DECLARATORY JUDGMENT AGAINST ALL DEFENDANTS)

121.    XL incorporates by reference each of the allegations of paragraphs 1 through 120 above.

122.    As of August 11, 2005, the XL Policy's inception date, the Defendants, or at least many of them, unquestionably possessed knowledge of facts, situations and/or circumstances that gave such Defendants reason to suppose such facts, situations and/or circumstance might afford grounds for a Claim under the XL Policy.

123.    Under the XL Policy, if any Insured Person had such knowledge as of the inception of the XL Policy, no coverage for any Loss, including Defense Expenses, is afforded under the XL Policy.

124.    These facts, situations and circumstances include, *inter alia*, the facts alleged in the S-3 Indictment and in the Maggio Information.

125.    Indeed, the guilty plea by Bennett judicially establishes, beyond any reasonable doubt, his knowledge of such facts, situations and circumstances.

126.    Bennett is estopped from denying such knowledge.

127.    Similarly, the guilty plea by Trosten judicially establishes, beyond a reasonable doubt, his knowledge of such facts, situations and circumstances.

128.    Trosten is collaterally estopped from denying such knowledge.

129.    The guilty plea by Maggio also judicially establishes, beyond a reasonable doubt, his knowledge of such facts, situations and circumstances.

130.    Maggio is estopped from denying such knowledge.

131.    The conviction of Grant similarly judicially establishes, beyond a reasonable doubt, Grant's knowledge of such facts, situations and circumstances.

132.    Grant is estopped from denying such knowledge.

133.    The Underlying Matters all consist of charges or causes of action arising from "fact, circumstance or situation" of which the Insured Persons "had knowledge" – as is already judicially established as to Bennett, Trosten, Maggio and Grant – and "had reason to suppose might afford grounds" for a Claim under the XL Policy.  In turn, the Claims with respect to the Underlying Matters are all subject to the restriction in coverage dictated by the IRE Limitation.

134.    Accordingly, no coverage for any Loss, including Defense Expenses, with respect to the Underlying Matters is afforded by the XL Policy.

135.    Moreover other terms and conditions of the XL Policy prevent or limit the availability of coverage for the Underlying Matters for some or all of the Defendants.

136.    This action provides a ripe and justiciable case or controversy.

137.    It is just and equitable that the Court declare the rights and other legal relationships of the parties.

138.    XL is entitled to a declaration, based upon the IRE Limitation and the other limiting and restrictive terms and conditions of the XL Policy, that the XL Policy does not provide coverage for any Loss (including Defense Expenses or advancement of Defense Expenses) arising out of the Underlying Matters.

WHEREFORE, XL requests that the Court enter a Judgment in its favor as follows:

A.      Declaring that the XL Policy does not provide coverage to any Defendant for any Loss incurred in connection with the Underlying Matters including Defense Expenses (or advancement of Defense Expenses);

39

B.    Awarding XL such additional declaratory and other relief as shall be

found to be just and appropriate under the circumstances; and

C.    Awarding XL its fees and costs incurred in prosecuting this action.

### JURY DEMAND

Plaintiff XL demands trial by jury on all claims for which a jury trial is available.

Dated:    New York, New York
          April 22, 2008

Respectfully submitted,

BOUNDAS, SKARZYNSKI, WALSH &
  BLACK LLC

By _____
          James Sandnes (JS-8944)
One Battery Park Plaza, 32nd Floor
New York, NY 10004
(212) 820-7700

Attorneys for Plaintiff
  XL Specialty Insurance Company

40

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

------------------------------------------------ x

ARCH INSURANCE COMPANY,    :

          Plaintiff,    :    Index No.:  08/600029

            :

       v.    :    IAS Part 39 (Freedman, J.)

            :

JOHN D. AGOGLIA, PHILLIP R. BENNETT,  :
LEO R. BREITMAN, EDWIN L. COX,  :
SUKHMEET DHILLON, THOMAS H.  :
DITTMER, NATHAN GANTCHER,  :
STEPHEN GRADY, TONE GRANT,  :
THOMAS HACKL, DAVID V. HARKINS,  :
SCOTT L. JAECKEL, DENNIS A. KLEJNA,  :
THOMAS H. LEE, ERIC G. LIPOFF, SANTO  :
C. MAGGIO, PETER MCCARTHY, JOSEPH  :
MURPHY, FRANK MUTTERER, RICHARD  :
N. OUTRIDGE, RONALD L. O'KELLEY,  :
SCOTT A. SCHOEN, WILLIAM M. SEXTON,  :
GERALD SHERER, PHILIP SILVERMAN and  :
ROBERT C. TROSTEN,  :

          Defendants.    :

------------------------------------------------ x

## MEMORANDUM OF LAW IN SUPPORT OF
## THE INSUREDS' MOTION TO DISMISS THE FIRST
## AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone:    (212) 832-8300
Facsimile:    (212) 763-7600

FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022-6003
Telephone:    (212) 750-8700
Facsimile:    (212) 223-8391

KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2504
Telephone:    (212) 940-8800
Facsimile:    (212) 940-8776

*Attorneys for Defendant Philip Silverman*

*Attorneys for Defendants William M. Sexton and Gerald M. Sherer*

*Attorneys for Defendant Dennis A. Klejna*

ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604-4021
New York, NY 10036
Telephone:        (212) 704-9600
Facsimile:        (212) 740-4256

*Attorneys for Defendant Tone N. Grant*

SAUL EWING LLP
245 Park Avenue, 24th Floor
New York, NY 10167
Telephone:        (212) 672-1996
Facsimile:        (212) 672-1920

*Attorneys for Defendant Joseph Murphy*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone:        (212) 310-8000
Facsimile:        (212) 310-8007

*Attorneys for Defendants Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen*

PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8299
Telephone:        (212) 969-3421
Facsimile:        (212) 969-2900

*Attorneys for Defendant Richard N. Outridge*

GAGE SPENCER & FLEMING, LLP
410 Park Avenue, 9th Floor
New York, NY 10022-4407
Telephone:        (212) 768-4900
Facsimile:        (212) 768-3629

*Attorneys for Defendants John D. Agoglia and Peter McCarthy*

GIBBONS P.C.
One Pennsylvania Plaza, 37th Floor
New York, NY 10119-3701
Telephone:        (212) 649-4700
Facsimile:        (212) 333-5980

*Attorneys for Defendant Frank Mutterer*

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT .......................................................................... 1

STATEMENT OF FACTS ................................................................................ 3

    A.    The Parties ...................................................................................... 3

    B.    Refco Background .......................................................................... 3

    C.    The Underlying Actions.................................................................. 4

    D.    Refco's D&O Liability Insurance "Tower" .................................... 5

        1.    U.S. Specialty Insurance Company ................................... 5

        2.    Lexington Insurance Company ......................................... 6

        3.    Axis Reinsurance Company.............................................. 7

        4.    Allied World Assurance Company (U.S.), Inc. ................ 7

        5.    Arch Reinsurance Company ............................................. 8

        6.    XL Specialty Insurance Company .................................... 8

    E.    The Denials of Coverage by Axis, AWAC, Arch and XL........................... 8

    F.    The Insurance Actions .................................................................. 10

        1.    The Axis Litigation......................................................... 10

        2.    The Arch State Court Actions.......................................... 11

        3.    The Adversary Proceeding Against AWAC and Arch ................. 12

        4.    The XL District Court Action .......................................... 13

    G.    The Moving Insureds' Motion to Dismiss ................................... 14

ARGUMENT  THE COURT SHOULD DISMISS THIS ACTION IN FAVOR OF THE ADVERSARY PROCEEDING TO AVOID DUPLICATIVE LITIGATION AND POTENTIALLY CONFLICTING RULINGS CONCERNING THE AWAC POLICY. 14

CONCLUSION ............................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

Ace Fire Underwriters Ins. Co. v. ITT Indus., Inc.,
    14 Misc. 3d 1211(A), 836 N.Y.S.2d 483
    (text available at 2006 WL 3849060) (Sup. Ct., N.Y. Cnty., July 19, 2006),
    aff'd, 44 A.D.3d 404, 843 N.Y.S.2d 579 (1st Dep't 2007) ........................................14, 16, 18

Cont'l Ins. Co. v. Polaris Indus. Partners L.P.,
    199 A.D.2d 222, 606 N.Y.S.2d 164 (1st Dep't 1993) ............................................................16

Cont'l Ins. Cos. v. Wickes Cos.,
    No. 90 Civ. 8215 (KMW), 1991 WL 183771 (S.D.N.Y. Sept. 6, 1991) ...............................18

Fleet Capital Corp. v. Mullins,
    No. 03 Civ. 6660 (RJH) (KNF), 2004 WL 548240 (S.D.N.Y. Mar. 18, 2004) ...............15, 16

Howard v. N.Y. State Dep't of Social Services
    142 A.D.2d 773, 774 (3d Dep't 1988) ,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, ..................1, 19

L-3 Communications Corp. v. Safenet, Inc.,
    45 A.D.3d 1, 841 N.Y.S.2d 82 (1st Dep't 2007) ............................................................18, 19

Maier-Schule GMC, Inc. v. Gen. Motors Corp.,
    210 A.D.2d 963, 620 N.Y.S.2d 684 (4th Dep't 1994)..........................................................14

White Light Prods., Inc. v. On the Scene Prods. Inc., 231 A.D.2d 90, 660
    N.Y.S.2d 568 (1st Dep't 1997) ...........................................................................................18

**Statutes & Rules:**

N.Y. C.P.L.R. 3211(a)(4)....................................................................................1, 14,15, 16, 19

N.Y. C.P.L.R. 2201………………………………………………………..…….....................1, 19

Defendants John Agoglia, Leo R. Breitman, Nathan Gantcher, Tone Grant, David Harkins, Scott L. Jaeckel, Dennis A. Klejna, Thomas H. Lee, Peter McCarthy, Joseph Murphy, Frank Mutterer, Richard N. Outridge, Ronald L. O'Kelley, Scott A. Schoen, William M. Sexton, Gerald Sherer, and Philip Silverman (collectively, the "Moving Insureds")[1] respectfully submit this Memorandum of Law in support of their motion, pursuant to C.P.L.R. 3211(a)(4) and C.P.L.R. 2201, to dismiss, or, in the alternative, to stay the First Amended Complaint For Declaratory Judgment (the "Arch Complaint") in favor of another action that is pending between the parties for the same causes of action.

## PRELIMINARY STATEMENT

This insurance action for declaratory relief arises out of the 2005 collapse of Refco, a provider of brokerage and clearing services in the international derivatives, currency and futures markets. Refco's collapse spawned numerous lawsuits (the "Underlying Matters" or "Underlying Actions"), almost all of which are pending in the United States District Court for the Southern District of New York (the "District Court").

Plaintiff Arch Insurance Company ("Arch") is the fourth tier excess carrier for a tower of Directors & Officers liability insurance under which the Defendants are additional insureds. The Arch Complaint seeks a declaratory judgment that Arch's excess policy (the "Arch Policy") "affords no coverage for the Defendants in connection with the Underlying Matters." (Arch Compl. at ¶ 1).[2] Specifically, Arch seeks a declaration that no coverage is available under its policy because of a "prior-knowledge" exclusion contained in the third tier excess policy issued by Allied World Assurance Company (U.S.), Inc. ("AWAC") (Count I), and

---

[1] The Moving Insureds are all former officers or directors of Refco, Inc. ("Refco") or its affiliates.

[2] The Arch Complaint is submitted as Exhibit A to the accompanying Affirmation of Richard Cashman, dated April 28, 2008, filed contemporaneously herewith (the "Cashman Aff.").

1

because of a similar "prior knowledge" exclusion in the Arch Policy itself (Count II). (See Arch Compl. at ¶¶ 113-20).

AWAC, the insurer whose prior knowledge exclusion is in issue in Count I of the Arch Complaint, is not a party to this action. However, AWAC has also denied coverage based on its prior knowledge exclusion, and the insureds have commenced an action in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking coverage under the AWAC Policy (the "Adversary Proceeding").[3] Critically, the insureds' amended complaint (the "Amended Complaint") in that action also names Arch as a defendant, and seeks coverage under the Arch Policy. In addition, coverage litigation with two other excess carriers, which have also denied coverage based on "prior knowledge" exclusions in their policies, is pending in the Southern District of New York.

While Arch filed this declaratory judgment action shortly before the action brought by the insureds against AWAC and Arch, its status as "first filed" is of little significance under the circumstances, as both actions were filed "close in time," and are presently in their "earliest stages." Rather, as shown below, dismissal of the instant action in favor of the Adversary Proceeding is appropriate here, as it would clearly serve to promote judicial efficiency, conserve judicial resources, and avoid inconsistent results. For example, if this action is not dismissed, there is a real possibility of inconsistent results because both actions will separately address coverage under the Arch and AWAC Policies. The AWAC prior knowledge exclusion is of particular concern in this respect because Arch has relied on the provision as a basis for its request for declaratory judgment, yet AWAC is not a party to this litigation. As a result, if dismissal is denied, the Moving Insureds here, already injured as a result of Arch's

---

[3] The Bankruptcy Court has jurisdiction because Refco, the named insured under the AWAC and Arch policies, filed for bankruptcy in the Southern District of New York.

improper denial of coverage for their Claims, face the expense of having to litigate whether the

AWAC prior knowledge exclusion provides a basis for denying coverage in two separate forums.

In addition, dismissal of this action would also promote judicial efficiency because, not only are

the issues in the Adversary Proceeding much more comprehensive, but discovery could be

sought in one forum.  Moreover, the District Court, where the Adversary Proceeding will in all

likelihood be determined following a withdrawal of the reference to the Bankruptcy Court,[4] is

already familiar with the underlying facts surrounding the collapse of Refco, as well as Refco's

D&O insurance tower.  For all of these reasons, dismissal of the present action is warranted

under settled law.

## STATEMENT OF FACTS

**A.    The Parties**

Plaintiff Arch is an insurance company that is organized and exists pursuant to the

laws of the State of Missouri, with a principal place of business in New York, New York.

(Cashman Aff. Ex. A (Arch Compl.) at ¶ 7).  As indicated above, Arch was the fourth excess

insurer in a "tower" of D&O liability insurance obtained by Refco.  (See id. at ¶¶ 34-35).

Defendants, including the Moving Insureds, are former officers and/or directors of Refco or its

direct and indirect subsidiaries.  (See id. at ¶¶ 8-33).

**B.    Refco Background**

On or about August 11, 2005, Refco conducted its initial public offering ("IPO").

(Id. at ¶ 47).  Two months later, on October 10, 2005, Refco disclosed in a press release that it

had been carrying an undisclosed $430 million receivable from an entity controlled by Phillip R.

---

[4] As noted below, the Moving Insureds have agreed with AWAC to support a motion in the District Court pursuant to 28 U.S.C. § 157(d) to withdraw the reference for the Adversary Proceeding from the Bankruptcy Court.

Bennett, the CEO of Refco. (Id. at ¶ 48).  On October 11, 2005, Refco issued a second press release relating to the $430 million receivable.  (Id. at ¶ 49).

On or about October 17, 2005, Refco and many of its direct and indirect subsidiaries filed voluntary petitions for relief under chapter 11 of the United States Code in the Bankruptcy Court.  (Id. at ¶ 50).

## C.    <u>The Underlying Actions</u>

The collapse of Refco in October 2005 and the bankruptcy filings that quickly followed led to the commencement of various proceedings against certain of Refco's officers and directors, including the Moving Insureds.  (See Cashman Aff. Ex. A (Arch Compl.) at ¶ 71).  A number of these Underlying Actions remain pending.  Civil actions against some or all of the Moving Insureds include the following:  <u>In re Refco, Inc. Securities Litigation</u>, No. 05 Civ. 8626 (GEL) (S.D.N.Y.) (the "Securities Litigation"); <u>In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation</u>, No. 06 Civ. 643 (GEL) (S.D.N.Y.); <u>American Financial International Group, et al. v. Bennett, et al.</u>, No. 05 Civ. 8988 (S.D.N.Y); <u>V.R. Global Partners, L.P. v. Bennett, et al.</u>, No. 07 Civ. 8686 (GEL) (S.D.N.Y.); <u>Capital Management Select Fund Ltd. v. Bennett, et al.</u>, No. 07 Civ. 8688 (GEL) (S.D.N.Y.); <u>Kirschner v. Agoglia, et al.</u>, Adv. Proc. No. 07-3060 (RDD) (Bankr. S.D.N.Y.); <u>Kirschner v. Thomas H. Lee Partners, L.P.</u>, et al., No. 07-7074 (GEL) (S.D.N.Y) and <u>Kirschner v. Grant Thornton LLP, et al.</u>, No. 07-11604 (GEL) (S.D.N.Y.) (originally filed in Illinois) (Id. at ¶¶ 75, 90, 93, 96, 97, 100, 103).  Tone Grant, along with defendants Phillip Bennett and Robert Trosten, was also named as a defendant in one criminal action, entitled <u>United States v. Phillip Bennett, Robert Trosten and Tone Grant</u>, S3 05 Cr. 1192 (NRB) (S.D.N.Y.) (the "Criminal Action").  (Id. at ¶¶ 72-73).[5]

---

[5]  On December 19, 2007, defendant Santo Maggio ("Maggio") pled guilty to a four-count criminal information. (See Cashman Aff. Ex. A at ¶ 65).  Thereafter, on February 15, 2008, Bennett pled guilty to the counts against him

**D.    Refco's D&O Liability Insurance "Tower"**

At or about the time of its IPO, Refco procured D&O liability insurance for the benefit of its directors and officers.  Refco's D&O insurance is structured as a "tower," consisting of a primary policy and five excess policies providing for a total of $70 million in coverage for the policy period from August 11, 2005 to August 11, 2006 (the "Policy Period"). (See Cashman Aff. Ex. A (Arch Compl.) at ¶¶ 35-36).

1.    U.S. Specialty Insurance Company

U.S. Specialty Insurance Company ("U.S. Specialty") issued the primary policy, Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821, for the Policy Period with a $10 million limit of liability (the "U.S. Specialty Policy" or "Primary Policy").  (Cashman Aff. Ex. B (U.S. Specialty Policy)).

The U.S. Specialty Policy names as "Insured Persons" under the policy "any past, present or future director or officer of the Company . . . ." (Cashman Aff. Ex. B at Definition (F)). "Company" is defined as Refco Inc. and any subsidiary thereof.  (Id. at Definitions (C) and (H), Item 1).  The U.S. Specialty Policy provides those directors and officers with coverage for "Loss arising from Claims . . . against the Insured Persons for Wrongful Acts . . . ." (Id. at Insuring Agreement (A)).  The Underlying Actions are Claims for "Wrongful Acts," as defined in the U.S. Specialty Policy.  (Id. at Definition (P)).  "Loss" is defined by the U.S. Specialty Policy so as to include defense costs.  (Id. at Definition (G) and Endorsement No. 4).

The U.S. Specialty Policy includes a "Full Severability" Endorsement, which provides that "[n]o knowledge or information possessed by any Insured will be imputed to any

---

in the Criminal Action.  (Id. at ¶¶ 52, 60).  On February 20, 2008, defendant Robert Trosten ("Trosten") also pled guilty to certain of the charges against him in the Criminal Action.  (Id. at ¶ 52, 63).  Maggio, Bennett and Trosten have agreed not to pursue any claim under the Arch Policy, and have been or will soon be dismissed from this action.  On information and belief, certain additional defendants who are not among the Moving Insureds on the instant motion to dismiss also do not plan to pursue coverage under the Arch Policy.

other Insured." (Id. at Endorsement No. 10).  The U.S. Specialty Policy also provides that for

purposes of determining the application of exclusions, "no Wrongful Act of any Insured Person

will be imputed to any other Insured Person who did not have actual knowledge of, or directly

participate in the commission of, such Wrongful Act . . . ." (Id. at Exclusions).  It further

provides that "notwithstanding anything in this Policy to the contrary, the Insurer shall not be

entitled under any circumstances to rescind the coverage provided under Insuring Agreement (A)

of this Policy." (Id. at Endorsement No. 13).

   U.S. Specialty recognized its coverage obligations to the Insureds.  After

obtaining approval from the Bankruptcy Court to comply with the terms of its policy and

advance defense costs to the Insureds, U.S. Specialty paid the defense costs of the Insureds until

the limits of the U.S. Specialty Policy were exhausted last year.  (Cashman Aff. Ex. C).

  2. Lexington Insurance Company

   Lexington Insurance Company ("Lexington") issued the first excess policy above

the U.S. Specialty Policy, Directors and Officers Liability and Corporation Reimbursement

Follow Form Excess Liability Policy No. 1620924, for the Policy Period with a $7.5 million

limit of liability in excess of $10 million (the "Lexington Policy" or "First Excess Policy").

(Cashman Aff. Ex. D).

   The Lexington Policy "follows form" to the U.S. Specialty Policy.  This means

that the Lexington Policy "indemnify[ies] the Insured named in the Declarations . . . in

accordance with the applicable insuring agreements, terms, conditions and exclusions, of the

Underlying Policy . . . . ." (Id. at Insuring Agreements).

   After obtaining approval from the Bankruptcy Court to comply with the terms of

its policy and advance defense costs to its insureds, Lexington paid the defense costs of the

insureds in connection with the Underlying Actions, until the limits of the Lexington Policy were exhausted in July 2007.  (Cashman Aff. Ex. E).

     3.     <u>Axis Reinsurance Company</u>

     Axis Reinsurance Company ("Axis") issued the second excess policy above the Lexington Policy, SecureExcess Policy No. RNN 506300, for the Policy Period with a $10 million limit of liability in excess of $17.5 million (the "Axis Policy, or "Second Excess Policy").  (Cashman Aff. Ex. F).   Like the Lexington Policy, the Axis Policy also "follows form" to the U.S. Specialty Policy.  (<u>Id.</u> at Insuring Agreement).  Accordingly, the Axis Policy states that it provides coverage "in conformance with the provisions of" the U.S. Specialty Policy.  (<u>Id.</u>)

     4.     <u>Allied World Assurance Company (U.S.), Inc.</u>

     Allied World Assurance Company (U.S.), Inc. ("AWAC") is the third excess insurer on the Refco "tower" of D&O liability insurance.  AWAC issued its Excess Directors and Officers Insurance and Company Reimbursement Policy No. AW0418197 to Refco for the Policy Period with a $12.5 million limit of liability in excess of $27.5 million (the AWAC Policy").  (<u>See</u> Cashman Aff. Ex. G).

     Like the Lexington Policy and the Axis Policy, the AWAC Policy "follows form" to the U.S. Specialty Policy.  (Cashman Aff. Ex. G at (I) Insuring Agreement. <u>See also</u> <u>id.</u> at Item 2; (II) Definitions (a)).  Any "Claim" for a "Wrongful Act" brought against insureds that falls within Insuring Agreement (A) of the U.S. Specialty Policy also falls within the "Insuring Agreement" of the AWAC Policy.  (<u>See</u> <u>id.</u> at (II) Definitions).

7

5.    <u>Arch Reinsurance Company</u>

Arch is the fourth excess insurer in the Refco "tower" of D&O liability insurance. Arch issued its Excess Insurance Policy No. DOX009322-00 to Refco for the Policy Period with a $10 million limit of liability in excess of $40 million. (Cashman Aff. Ex. H).

Like the Lexington Policy, the Axis Policy and the AWAC Policy, the Arch Policy "follows form" to the U.S. Specialty Policy. (<u>Id.</u> at Insuring Agreement A). Specifically, the Arch Policy states that it "shall apply in conformance with the terms and conditions of the [U.S. Specialty Policy] and in conformance with any terms and conditions further limiting or restricting coverage in this Policy or in any other Underlying Insurance." (<u>Id.</u> at Insuring Agreement C; <u>see also id.</u> at Declarations, Items 4 and 5; Definitions §§ (III)(C) and (D)).

The Arch Policy specifically defines "Insureds" as the same persons who may be entitled to insurance under the U.S. Specialty Policy. (<u>Id.</u> at Definitions § (III)(B)). The term "Claim" is defined as having "the same meaning" in the Arch Policy "as given to it in the [U.S. Specialty Policy]." (<u>Id.</u> at Definitions (III)(A)). Accordingly, any "Claim" brought against insureds that falls within Insuring Agreement (A) of the U.S. Specialty Policy also falls within the "Insuring Agreement" of the Arch Policy. (<u>See id.</u>)

6.    <u>XL Specialty Insurance Company</u>

There is one additional excess policy above the Arch Policy in the Refco D&O insurance "tower." The fifth excess carrier, XL Specialty Insurance Company ("XL") issued its Classic A-Side Management Liability Insurance Policy, No. ELU089673-05, to Refco for the Policy Period with a $20 million limit of liability. (Cashman Aff. Ex. I).

E.    **The Denials of Coverage by Axis, AWAC, Arch and XL**

Beginning in early 2006, Axis, AWAC, Arch and XL denied coverage for the

Underlying Actions, relying upon similar and/or overlapping grounds.

By letter dated March 6, 2006 (the "Denial Letter"), and by subsequent letters, Axis purported to deny coverage to the Insureds for "Claims" made against them for "Wrongful Acts" as defined in the Primary Policy. (Cashman Aff. Ex. J). In the Denial Letter, Axis asserted several grounds for denying coverage. One such ground was a purported "Knowledge Exclusion" endorsement, that Axis claimed to be part of its Policy. (Id. at p. 9). The Denial Letter asserted that former Refco CEO Phillip Bennett had knowledge, when the Axis Policy was issued, of facts that might give rise to claims under the Policy, and that such knowledge barred coverage not only for Bennett, but also for all other insureds for each of the matters for which notice had been given. (Id. at p. 11). Axis also relied upon a purported "Warranty Letter" that was submitted to Axis by Bennett, and upon Bennett's failure to answer Question 12(b) in the Application to U.S. Specialty for coverage, which inquired as to whether any proposed Insured was "aware of any fact, circumstance or situation involving the Application . . . which he . . . has reason to believe might result in a claim being made." (See id. at 9-10).

By letter dated March 28, 2006 and in subsequent correspondence, AWAC denied coverage for Plaintiffs under the AWAC Policy. (See Cashman Aff. Ex. K). Specifically, AWAC denied coverage based upon: (1) Endorsement No. 3 to the AWAC Policy, described as the "AWAC Prior Knowledge Exclusion;" (2) the purported Knowledge Exclusion Endorsement of the Axis Policy; (3) Axis's purported "Warranty Letter"; and (4) Bennett's failure to answer Question 12(b) in the Application for the Primary Policy. (See id.). The March 28, 2006 letter from AWAC asserted that "Bennett's knowledge, prior to the inception of the [AWAC] Policy, of facts or circumstances which a reasonable person or persons would suppose might afford valid

grounds for a claim which would fall within the scope of the coverage afforded by [the] Policy," is grounds for denial on each of the bases described above. (<u>Id.</u> at p. 13).

By letter dated March 9, 2006 and in subsequent correspondence, Arch denied coverage under its Policy. Specifically, the March 9, 2006 letter denied coverage based upon, among other things: (1) the "Prior Knowledge Exclusion Endorsement" that Arch understood would be contained in the AWAC Policy "when issued;" (2) Endorsement No. 4 to the Arch Policy, described as the "Arch Prior Knowledge or Information Exclusion;" and (3) the purported "Warranty Letter" delivered to Axis. (Cashman Aff. Ex. L).

By letter dated January 24, 2006, and in subsequent correspondence, XL denied coverage under its policy, relying principally on a prior knowledge (or "Inverted Representation") endorsement to the Policy. (<u>See</u> Cashman Aff. Ex. M).

**F.    The Insurance Actions**

As set forth above, both U.S. Specialty and Lexington – the primary and first excess carriers – recognized their coverage obligations and advanced defense costs to Refco's former officers and directors. (<u>See</u> pp. 5-6, <u>supra</u>). However, the other excess carriers, in accordance with their letters set forth above, are litigating coverage. The various pending proceedings are as follows:

1.    <u>The Axis Litigation</u>

On or about May 24, 2007, Axis, the second excess carrier, commenced an adversary proceeding in the Bankruptcy Court against certain of the Insureds entitled <u>Axis Reinsurance Company v. Bennett et al.</u>, Adv. Proc. No. 07-0712 (Bankr. S.D.N.Y.) (the "Axis Adversary Proceeding), seeking a declaration that it had no obligations under the Axis Policy with respect to the Underlying Actions. (Cashman Aff. Ex. N). Axis' Complaint largely tracked

its March 6, 2006 Denial Letter, and included a Count premised on the prior knowledge

exclusion purportedly in its Policy. Pleadings were filed by the defendants seeking the

advancement of defense costs, and the defendants successfully moved to compel Axis to pay

their defense costs as incurred, pending a final determination of coverage under the Axis Policy

or until the Axis Policy is exhausted. (See Cashman Aff. Ex. O).[6]

The coverage dispute with Axis is presently before the Honorable Gerard E.

Lynch in the United States District Court for the Southern District of New York. Axis filed a

complaint in that Court, No. 07-cv-7924 (GEL) (the "Axis Complaint") (Cashman Aff. Ex. R),

seeking a declaration of no coverage for the Insureds in connection with the Underlying Actions

on the same grounds as its complaint in the Axis Adversary Proceeding. Thereafter, by Order

dated November 13, 2007, the District Court withdrew the bankruptcy reference for the litigation

with Axis in the Bankruptcy Court so that all coverage issues would be determined by the

District Court. (Cashman Aff. Ex. S).

In accordance with the Bankruptcy Court Order on advancement, referred to

above, Axis advanced defense costs in connection with the Underlying Actions until the Axis

Policy was exhausted in March 6, 2008. (See Cashman Aff. Ex. T).

2.    The Arch State Court Actions

On or about March 9, 2006, Arch commenced a declaratory judgment action,

Arch Insurance Co. v. Bennett, et al., No. 600805/06 (N.Y. Sup. Ct.) (the "2006 Arch DJ

Action"), against certain Insureds in this Court seeking a declaration of no coverage for the

Insureds under the Arch Policy. Arch's amended complaint, dated June 22, 2006, alleged, inter

alia, that the AWAC prior knowledge exclusion barred coverage due to facts and circumstances

---

[6] Arch sought to intervene in the Axis Adversary Proceeding in order to oppose the Insureds' request for the
advancement of defense expenses prior to the adjudication of coverage issues. (See Cashman Aff. Ex. P). The
Bankruptcy Court denied Arch's motion. (Cashman Aff. Ex. Q).

allegedly known to Bennett as of August 11, 2005, and that the Arch prior knowledge exclusion barred coverage for the same reason.  (Cashman Aff. Ex. U at ¶¶ 76-79).

On or about September 18, 2006, many of the defendants moved to dismiss the 2006 Arch DJ Action on grounds that it, inter alia, failed to allege a justiciable controversy because the counts alleged therein were premature and unripe.  By Order dated February 20, 2007, this Court granted that motion and dismissed the 2006 Arch DJ Action.  (See Cashman Aff. Ex. V).

The instant declaratory judgment action was filed on or about January 4, 2008, though the Complaint was not served at that time, and the Amended Complaint was filed on or about February 22, 2008 (the "2008 Arch DJ Action").  The two Counts of Arch's Complaint again seek a declaratory judgment based upon the prior knowledge exclusions of both the AWAC Policy (Count I) and the Arch Policy (Count II).  (See Cashman Aff. Ex. A at ¶¶ 113-120).  Specifically, Arch alleges that the AWAC and Arch prior knowledge exclusions are triggered because "[a]s of August 11, 2005, Bennett, Trosten and Maggio possessed knowledge of facts and circumstances that a reasonable person would suppose might afford valid grounds for a claim," and the Underlying Actions consist of Claims arising out of such facts or circumstances.  (Id. at ¶¶ 114-16, 118-20).

3.    The Adversary Proceeding Against AWAC and Arch

On or about March 12, 2008, the Moving Insureds herein other than McCarthy, Agoglia and Mutterer filed an action in the Bankruptcy Court against AWAC, Murphy, et al. v. Allied World Assurance Company (U.S.), Inc., Adv. Proc. No. 08-01133 (RDD) (the "Adversary Proceeding"), seeking the advancement of defense costs under the AWAC Policy.  (Cashman Aff. Ex. W).  That same day, the insureds filed a motion for a preliminary injunction to require

12

advancement. At the hearing on April 11, 2008, and by Order dated April 21, 2008, the Bankruptcy Court granted the plaintiffs' motion for a preliminary injunction to require AWAC to advance defense costs pending a final determination as to coverage under the AWAC Policy. (See Cashman Aff. Ex. X at ¶ 3).

On April 24, 2008, the plaintiffs in the Adversary Proceeding filed their First Amended Complaint naming Arch, in addition to AWAC, as a defendant. (Cashman Aff. Ex. Y). The First Amended Complaint seeks, inter alia, a declaration from the Bankruptcy Court that the AWAC and Arch Policies provide coverage for the Underlying Actions, and injunctive relief requiring AWAC and Arch to pay losses incurred by the plaintiffs in connection with the Underlying Actions. (Id. at ¶¶ 88-97 (Count I); 117-125 (Count II)). The Adversary Proceeding thus seeks to resolve the same issues regarding coverage under the Arch Policy and the AWAC Policy as the instant action, but the Adversary Proceeding, unlike the instant action, includes both Arch and AWAC as parties.

4.    The XL District Court Action

On April 22, 2008, XL, the fifth excess carrier, filed an action in the District Court, XL Specialty Insurance Company v. Agoglia, et al., No. 08 Civ. 3821 (S.D.N.Y.), seeking a declaratory judgment that the XL Policy provides no coverage for Insureds in connection with "Underlying Matters." (See Cashman Aff. Ex. Z). XL contends that a "prior knowledge" exclusion which it alleges to be part of the XL Policy "provides that there is no coverage for any Insured Person under the XL Policy for any claims arising out of any facts, situation or circumstances that were known to any Insured Person as of the inception of the insurance." (Id. at ¶ 6).

In sum, currently pending are:

13

(1)    Coverage litigation with AWAC and Arch in the Bankruptcy Court in which the "prior knowledge" exclusions in both the AWAC and Arch policies are in issue;[7]

(2)    The instant declaratory judgment action commenced by Arch, also premised on the prior knowledge exclusions in the AWAC and Arch policies; and

(3)    Coverage litigation with Axis and XL in the District Court, both of which involve "prior knowledge" exclusions.

## G.    The Moving Insureds' Motion to Dismiss

The Moving Insureds now bring the instant motion to dismiss the Arch Complaint against them, pursuant to Rule 3211(a)(4) of New York's C.P.L.R., on the ground that there is another action currently pending between the same parties and for the same causes of action, i.e., the Adversary Proceeding against AWAC and Arch.

## ARGUMENT

## THE COURT SHOULD DISMISS THIS ACTION IN FAVOR OF THE ADVERSARY PROCEEDING TO AVOID DUPLICATIVE LITIGATION AND POTENTIALLY CONFLICTING RULINGS CONCERNING THE AWAC POLICY

Pursuant to N.Y. C.P.L.R. 3211(a)(4), a party may move for dismissal of a complaint where "there is another action pending between the same parties for the same cause of action in a court of any state or the United States." The trial court is allowed "broad discretion" in determining whether dismissal is appropriate under this Rule. Maier-Schule GMC, Inc. v. Gen. Motors Corp., 210 A.D.2d 963, 620 N.Y.S.2d 684 (4th Dep't 1994). See also Ace Fire Underwriters Ins. Co. v. ITT Indus., Inc., 14 Misc. 3d 1211(A), 836 N.Y.S.2d 483 (text available at 2006 WL 3849060, at *5) (Sup. Ct. N.Y. Cnty., July 19, 2006), aff'd, 44 A.D.3d 404, 843 N.Y.S.2d 579 (1st Dep't 2007) ("a court has broad discretion as to the disposition of an action

_____

[7] The Moving Insureds anticipate that, as occurred in the Axis litigation, the reference to the Bankruptcy Court for this action will be withdrawn and, as noted above, have agreed with AWAC to support a motion doing so, so that coverage litigation with all four excess carriers disputing coverage will be in the District Court.

when another is pending"). For the reasons set forth below, this Court should exercise its discretion and dismiss the instant action pursuant to C.P.L.R. 3211(a)(4) in favor of the Adversary Proceeding.

The requirements of Rule 3211(a)(4) are clearly satisfied here, as both actions are between the same parties, for the same causes of action. The instant action was commenced by Arch in early 2008 seeking a declaration that the Arch policy affords no coverage for Defendants based on the prior knowledge exclusions in the AWAC and Arch Policies. (Arch Compl. at ¶ 1). Soon thereafter, on April 24, 2008, the Plaintiff-Insureds in the Adversary Proceeding amended their complaint therein in order to, inter alia, add Arch as a defendant. (See Cashman Aff. Ex. Y (Amended Adversary Complaint)). The Adversary Proceeding includes causes of action for declaratory relief regarding coverage under the AWAC and Arch Policies. (Id. at ¶¶ 88-97, 117-125). The two actions are thus sufficiently similar "so as to pose a risk of conflicting judgments and duplication of judicial efforts should both proceedings go forward simultaneously." Fleet Capital Corp. v. Mullins, No. 03 Civ. 6660 (RJH) (KNF), 2004 WL 548240, at *5 (S.D.N.Y. Mar. 18, 2004)

The totality of the circumstances demonstrate that dismissal of the instant action in favor of the Adversary Proceeding would serve to promote judicial efficiency, conserve judicial resources, and avoid potentially inconsistent results. In particular, the 2008 Arch DJ Action should be dismissed because (i) both suits involve interpretation of the AWAC policy, thus putting the Insureds at risk that the two courts will reach inconsistent results, (ii) the scope of the Adversary Proceeding is more comprehensive than the 2008 Arch DJ Action, and AWAC is a party to the Adversary Proceeding, (iii) discovery in the Adversary Proceeding and the 2008 Arch DJ Action concerning the AWAC prior knowledge exclusion will overlap, and

15

(iv) dismissal will allow all the insurance actions – Axis, AWAC, Arch and XL – to be

determined in a single forum – the District Court, where the Axis litigation, the XL action and

almost all the Underlying Actions are pending.

       First, Arch relies on the prior knowledge exclusion that is part of the AWAC

policy.  Because it is not a party to this action, AWAC will undoubtedly claim that it is not

bound by a ruling in favor of the moving Insureds on Count I herein (i.e., holding that the

AWAC prior knowledge exclusion is not a proper basis for denying coverage to the Moving

Insureds), which would force the Moving Insureds to re-litigate the same issue in the Adversary

Proceeding.  Similarly, if the Adversary Proceeding went forward only as against AWAC, with

this action also going forward, Arch would undoubtedly claim not to be bound by a ruling in the

insureds' favor in the Adversary Proceeding, thereby again requiring the Moving Insureds to

litigate the effect of the AWAC prior knowledge exclusion a second time.

       Second, the scope of the issues in the Adversary Proceeding are more

comprehensive than the issues in the 2008 Arch DJ Action.  Courts have considered this factor in

determining whether dismissal under C.P.L.R. 3211(a)(4) is appropriate. See Ace Fire

Underwriters Ins. Co., 14 Misc. 3d 1211, 836 N.Y.S.2d 483 (text available at 2006 WL 3849060,

at *11) (noting that courts look to factors such as "the comprehensiveness of the different

actions"). See also Cont'l Ins. Co. v. Polaris Indus. Partners, 199 A.D.2d 222, 223, 606

N.Y.S.2d 164, 165 (1st Dep't 1993) (dismissing first-filed action because the second action, inter

alia, "offers more than the action herein"); Fleet Capital Corp., 2004 WL 548240, at *5 (staying

first-filed action because, inter alia, the second action "contains issues broader than" the first).

The Adversary Proceeding, and not the instant action, is thus the more appropriate forum to

determine whether the AWAC Prior Knowledge Exclusion provides coverage for any loss arising out of the Underlying Actions.

Third, efficiency of discovery strongly supports dismissal of this action in favor of the Adversary Proceeding. As Arch relies upon the AWAC prior knowledge exclusion, discovery with respect to such exclusion will have to be sought in this action from AWAC as a non-party.[8] Moreover, without dismissal, the Insureds will have to engage in discovery relating to the AWAC Policy in two separate actions. In contrast, if only the Adversary Proceeding goes forward, discovery relating to the AWAC Policy can be sought in one forum, with AWAC as a party to the litigation.

Finally, judicial efficiency is also promoted by dismissal in favor of the Adversary Proceeding because the District Court, where the Adversary Proceeding will in all likelihood be heard, following a withdrawal of the reference to the Bankruptcy Court, is already familiar with the underlying facts surrounding the collapse of Refco, as well as Refco's D&O insurance tower. Not only is Judge Lynch presiding over the vast majority of the Underlying Actions themselves, but he also has before him the coverage dispute with Axis, which includes issues as to the Axis Prior Knowledge Exclusion. Moreover, the XL action, based on the XL prior knowledge exclusion, was just filed in the District Court as a related case to actions before Judge Lynch, and will thus in all likelihood end up before him as well. (See Cashman Aff. Ex. Z, at Civil Cover Sheet).[9] In light of the importance of conserving judicial resources, it clearly

---

[8] AWAC is headquartered in Massachusetts. (See Cashman Aff., Ex. G at 1).

[9] Judicial efficiency would be served even if the Adversary Proceeding were to remain in the Bankruptcy Court, as that court is also already familiar with the matters at issue here. Judge Drain, whom the Adversary Proceeding is before, has presided over Refco's bankruptcy cases, as well as various adversary proceedings brought in connection with that action, including one of the Underlying Actions, Kirschner v. Agoglia, et al., Adv. Proc. No. 07-3060 (RDD) (Bankr. S.D.N.Y.) Moreover, having previously considered whether Axis and AWAC were required to advance defense costs under their policies, Judge Drain is also knowledgeable regarding Refco's D&O insurance tower, including provisions of the Primary Policy and the AWAC Policy, both at issue here.

makes no sense to duplicate the efforts of the District Court and/or the Bankruptcy Court in this action.

In addition to the reasons outlined above, it is the Moving Insureds who are the putative injured parties and should be entitled to their choice of forum, not Arch. In improperly denying coverage under its Policy, Arch has deprived the Moving Insureds (along with the other Insureds) of insurance coverage to which they are entitled, leaving them without coverage at a critical juncture in the Underlying Actions. And by anticipating the possible filing of a suit by the Insureds, Arch has reversed the usual roles of plaintiff and defendant. As a result, Arch has improperly deprived the Moving Insureds of having this dispute heard in the forum of their choice, further warranting dismissal in favor of the Adversary Proceeding. See Cont'l Ins. Cos. v. Wickes Cos., No. 90 Civ. 8215 (KMW), 1991 WL 183771, at *5 (S.D.N.Y. Sept. 6, 1991).

The mere fact that the present action was filed before the Adversary Proceeding is insufficient to avoid dismissal. "New York courts have consistently held that even though the first-in-time rule is a factor to be considered in choosing the appropriate forum for litigation, [this alone] is not controlling, especially when commencement of the competing action[s] has been reasonably close in time." L-3 Communications Corp. v. Safenet, Inc., 45 A.D.3d 1, 9, 841 N.Y.S.2d 82, 89 (1st Dep't 2007) (internal quotations omitted); see Ace Fire Underwriters Ins. Co., 14 Misc. 3d 1211(A), 836 N.Y.2d 483 (text available at 2006 WL 3849060, at *10). See also Cont'l Ins. Co., 199 A.D. 2d 222, 606 N.Y.S.2d 164 (dismissing first-filed action pursuant to C.P.L.R. 3211(a)(4)); White Light Prods., Inc. v. On the Scene Prods., Inc., 231 A.D.2d 90, 97, 660 N.Y.S.2d 568, 573 (1st Dep't 1997) (instructing that "[t]he practice of determining priorities between pending actions on the basis of dates of filing is a general rule, not to be

applied in a mechanical way, regardless of other considerations" and reversing decision

dismissing second-filed action based only on filing dates) (citations omitted).

Here, both actions are "close in time," as the instant action was initiated only

three months prior to the filing of the First Amended Complaint in the Adversary Proceeding.  In

addition, both actions are in their "earliest stages," with no discovery yet taking place in either

case.  See L-3 Communications Corp., 45 A.D.3d at 9, 841 N.Y.S.2d at 9 (short time period

between filing of actions and that both actions were in their earliest stages at the time the motion

to dismiss weighed against application of the first-in-time rule).

In sum, notwithstanding the fact that the present action was "first-filed," dismissal

in favor of the Adversary Proceeding is warranted, and would promote efficiency, conserve

judicial resources, and avoid potentially inconsistent results.[10]

---

[10] In the alternative, this Court may stay the present action pending further proceedings in the Adversary Proceeding
pursuant to C.P.L.R. 3211(a)(4) and/or C.P.L.R. 2201.  See Howard v. N.Y. State Dep't of Social Services, 142
A.D.2d 773, 774 (3d Dep't 1988) (granting stay in favor of "broader and more extensive" action that "will provide 'a
more complete and appropriate disposition of the underlying issues.'")

## CONCLUSION

For all of the foregoing reasons, this Court should dismiss the present action, or in the alternative, stay it in favor of the Adversary Proceeding pursuant to C.P.L.R. 3211(a)(4) and C.P.L.R. 2201.

Dated: April 28, 2008
       New York, New York

HELLER EHRMAN LLP

*Richard Cashman*
Richard Cashman
Times Square Tower
7 Times Square
New York, NY  10036-6524
Telephone:    (212) 832-8300
Facsimile:    (212) 763-7600

*Attorneys for Defendant Philip Silverman*


FRIEDMAN & WITTENSTEIN
A Professional Corporation

*Ivan Kline* / NB
Ivan Kline
600 Lexington Avenue
New York, NY  10022-6003
Telephone:    (212) 750-8700
Facsimile:    (212) 223-8391

*Attorneys for Defendants William M. Sexton and Gerald M. Sherer*


KATTEN MUCHIN ROSENMAN LLP

*Helen Kim* / NB
Helen B. Kim
575 Madison Avenue
New York, NY  10022-2504
Telephone:    (212) 940-8800
Facsimile:    (212) 940-8776

*Attorneys for Defendant Dennis A. Klejna*


ZUCKERMAN SPAEDER LLP

*Norman Eisen* / NB
Norman L. Eisen
1540 Broadway, Suite 1604-4021
New York, NY  10036
Telephone:    (212) 704-9600
Facsimile:    (212) 740-4256

*Attorneys for Defendant Tone N. Grant*

SAUL EWING LLP

_Suh Jerome /MB_

John J. Jerome
245 Park Avenue, 24th Floor
New York, NY  10167
Telephone:     (212) 672-1996
Facsimile:     (212) 672-1920

*Attorneys for Defendant Joseph Murphy*

WEIL, GOTSHAL & MANGES LLP

_Greg Danilow /MB_

Greg A. Danilow
Michael F. Walsh
767 Fifth Avenue
New York, NY  10153-0119
Telephone:     (212) 310-8000
Facsimile:     (212) 310-8007

*Attorneys for Defendants Leo R. Breitman,
Nathan Gantcher, David V. Harkins, Scott L.
Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and
Scott A. Schoen*

PROSKAUER ROSE LLP

_Claire Gutekunst /MB_

Claire P. Gutekunst
1585 Broadway
New York, NY  10036-8299
Telephone:     (212) 969-3421
Facsimile:     (212) 969-2900

*Attorneys for Defendant Richard N.
Outridge*

GAGE SPENCER & FLEMMING, LLP

_William Flemming /MB_

William Flemming
410 Park Avenue, 9th Floor
New York, NY  10022-4407
Telephone:     (212) 768-4900
Facsimile:     (212) 768-3629

*Attorneys for Defendants John D. Agoglia and
Peter McCarthy*

GIBBONS P.C.

_Lawrence Lustberg /MB_

Lawrence S. Lustberg
One Pennsylvania Plaza, 37th Floor
New York, NY  10119-3701
Telephone:     (212) 649-4700
Facsimile:     (212) 333-5980

*Attorneys for Defendant Frank Mutterer*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

J-1-0 ?

------------------------------------------------- x
ARCH INSURANCE COMPANY,                          :
                                                 :
                        Plaintiff,               :        Index No.:  08/600029
                                                 :
            v.                                    :        IAS Part 39 (Freedman, J.)
                                                 :
JOHN D. AGOGLIA, PHILLIP R. BENNETT,             :        **CORRECTED**
LEO R. BREITMAN, EDWIN L. COX,                   :
SUKHMEET DHILLON, THOMAS H.                      :        **NOTICE OF MOTION**
DITTMER, NATHAN GANTCHER,                        :
STEPHEN GRADY, TONE GRANT,                       :        Oral Argument Requested
THOMAS HACKL, DAVID V. HARKINS,                  :
SCOTT L. JAECKEL, DENNIS A. KLEJNA,              :
THOMAS H. LEE, ERIC G. LIPOFF, SANTO             :
C. MAGGIO, PETER MCCARTHY, JOSEPH                :
MURPHY, FRANK MUTTERER, RICHARD                  :
N. OUTRIDGE, RONALD L. O'KELLEY,                 :
SCOTT A. SCHOEN, WILLIAM M. SEXTON,              :
GERALD SHERER, PHILIP SILVERMAN and              :
ROBERT C. TROSTEN,                               :
                                                 :
                        Defendants.              :
------------------------------------------------- x

**PLEASE TAKE NOTICE** that upon the affirmation of Richard Cashman, Esq., the

exhibits attached thereto, and the memorandum of law submitted herewith, Defendants John

Agoglia, Leo R. Breitman, Nathan Gantcher, Tone Grant, David Harkins, Scott L. Jaeckel,

Dennis A. Klejna, Thomas H. Lee, Peter McCarthy, Joseph Murphy, Frank Mutterer, Richard N.

Outridge, Ronald L. O'Kelley, Scott A. Schoen, William M. Sexton, Gerald Sherer, and Philip

Silverman will move this Court on May 15, 2008, at 9:30 a.m., in the Supreme Court of the State

of New York, New York County, Motion Support Office Courtroom (Room 130), for an order

pursuant to CPLR 3211(a)(4) dismissing this action, or, in the alternative, for an order pursuant

1

to CPLR 3211(a)(4) and CPLR 2201 staying this action, and granting such other and further relief as the Court deems appropriate.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to CPLR 2214(b), answering papers, if any, must be served upon counsel to the defendants no later than seven days prior to the return date set forth herein. Any reply papers must be served upon counsel to plaintiff no later than one day prior to the return date set forth herein.

Dated: May 1, 2008
　　　New York, New York


HELLER EHRMAN LLP

_Richard Cashman_
Richard Cashman
Times Square Tower
7 Times Square
New York, NY  10036-6524
Telephone:　　(212) 832-8300
Facsimile:　　(212) 763-7600

*Attorneys for Defendant Philip Silverman*


FRIEDMAN & WITTENSTEIN
A Professional Corporation

_Ivan Kline_ /NB
Ivan Kline
600 Lexington Avenue
New York, NY  10022-6003
Telephone:　　(212) 750-8700
Facsimile:　　(212) 223-8391

*Attorneys for Defendants William M. Sexton
and Gerald M. Sherer*


KATTEN MUCHIN ROSENMAN LLP

_Helen Kim_ /NB
Helen B. Kim
575 Madison Avenue
New York, NY  10022-2504
Telephone:　　(212) 940-8800
Facsimile:　　(212) 940-8776

*Attorneys for Defendant Dennis A. Klejna*


ZUCKERMAN SPAEDER LLP

_Laura Neish_ /NB
Laura E. Neish
1540 Broadway, Suite 1604-4021
New York, NY  10036
Telephone:　　(212) 704-9600
Facsimile:　　(212) 740-4256

*Attorneys for Defendant Tone N. Grant*

SAUL EWING LLP

_John Jerome /NB_

John J. Jerome
245 Park Avenue, 24th Floor
New York, NY 10167
Telephone:    (212) 672-1996
Facsimile:    (212) 672-1920

*Attorneys for Defendant Joseph Murphy*

WEIL, GOTSHAL & MANGES LLP

_Michael Walsh /NB_

Greg A. Danilow
Michael F. Walsh
767 Fifth Avenue
New York, NY 10153-0119
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007

*Attorneys for Defendants Leo R. Breitman,
Nathan Gantcher, David V. Harkins, Scott L.
Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and
Scott A. Schoen*

PROSKAUER ROSE LLP

_Claire Gutekunst /NB_

Claire P. Gutekunst
1585 Broadway
New York, NY 10036-8299
Telephone:    (212) 969-3421
Facsimile:    (212) 969-2900

*Attorneys for Defendant Richard N.
Outridge*

GAGE SPENCER & FLEMING, LLP

_William Fleming /NB_

William Fleming
410 Park Avenue – 9th Floor
New York, NY 10022-4407
Telephone:    (212) 768-4900
Facsimile:    (212) 768-3629

*Attorneys for Defendants John D. Agoglia and
Peter McCarthy*

GIBBONS P.C.

_Lawrence Lustberg /NB_

Lawrence S. Lustberg
One Pennsylvania Plaza, 37th Floor
New York, NY 10119-3701
Telephone:    (212) 649-4700
Facsimile:    (212) 333-5980

*Attorneys for Defendant Frank Mutterer*

TO:    CLERK OF THE COURT

John A. Eickemeyer
VEDDER, PRICE, KAUFMAN &
KAMMHOLZ, P.C.
1633 Broadway
New York, New York  10019-6705
Telephone:    (212) 407-7700
Facsimile:    (212) 407-7799

Daniel J. Standish
Cara Tseng Duffield
WILEY REIN & FIELDING LLP
1776 K Street, NW
Washington, DC  20006-2304

*Attorneys for Plaintiff Arch
Insurance Company*

Jeffrey T. Golenbock
GOLENBOCK EISEMAN ASSOR
   BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022-7001
Telephone:    (212) 907-7378
Facsimile:    (212) 754-0330

*Attorneys for Defendant Philip R. Bennett*

Scott E. Hershman
HUNTON & WILLIAMS
200 Park Avenue
New York, New York 10166-0005
Telephone:    (212) 309-1054
Facsimile:    (212) 309-1100

*Attorneys for Defendant Santo C.
Maggio*

Barbara Moses
MORVILLO, ABRAMOWITZ,
   GRAND, IASON, ANELLO &
   BOHRER, P.C.
565 Fifth Avenue
New York, New York 10017-2413
Telephone:    (212) 856-9600
Facsimile:    (212) 856-9494

*Attorneys for Defendant Robert Trosten*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------- x

ARCH INSURANCE COMPANY,                            :

    Plaintiff,                              :  Index No.:  08/600029

             :

  v.                                            :  IAS Part 39 (Freedman, J.)

             :

JOHN D. AGOGLIA, PHILLIP R. BENNETT,               :
LEO R. BREITMAN, EDWIN L. COX,                     :
SUKHMEET DHILLON, THOMAS H.                        :
DITTMER, NATHAN GANTCHER,                          :
STEPHEN GRADY, TONE GRANT,                         :
THOMAS HACKL, DAVID V. HARKINS,                    :
SCOTT L. JAECKEL, DENNIS A. KLEJNA,                :
THOMAS H. LEE, ERIC G. LIPOFF, SANTO               :
C. MAGGIO, PETER MCCARTHY, JOSEPH                  :
MURPHY, FRANK MUTTERER, RICHARD                    :
N. OUTRIDGE, RONALD L. O'KELLEY,                   :
SCOTT A. SCHOEN, WILLIAM M. SEXTON,                :
GERALD SHERER, PHILIP SILVERMAN and                :
ROBERT C. TROSTEN,                                 :

    Defendants.                             :

-------------------------------------------------------- x

**CORRECTED
MEMORANDUM OF LAW IN SUPPORT OF
THE INSUREDS' MOTION TO DISMISS THE FIRST
<u>AMENDED COMPLAINT FOR DECLARATORY JUDGMENT</u>**

| | | |
|---|---|---|
| HELLER EHRMAN LLP | FRIEDMAN & WITTENSTEIN | KATTEN MUCHIN ROSENMAN LLP |
| Times Square Tower | A Professional Corporation | 575 Madison Avenue |
| 7 Times Square | 600 Lexington Avenue | New York, NY 10022-2511 |
| New York, NY 10036-6524 | New York, NY 10022-6000 | Telephone: (212) 940-8800 |
| Telephone: (212) 832-8300 | Telephone: (212) 750-8700 | Facsimile: (212) 940-8776 |
| Facsimile: (212) 763-7600 | Facsimile: (212) 223-8391 | |

*Attorneys for Defendant Philip
Silverman*

*Attorneys for Defendants William M.
Sexton and Gerald M. Sherer*

*Attorneys for Defendant Dennis A.
Klejna*

ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604-4021
New York, NY 10036-4039
Telephone:        (212) 704-9600
Facsimile:        (212) 740-4256

*Attorneys for Defendant Tone N.
Grant*


PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8200
Telephone:        (212) 969-3421
Facsimile:        (212) 969-2900

*Attorneys for Defendant Richard N.
Outridge*

SAUL EWING LLP
245 Park Avenue, 24th Floor
New York, NY 10167-4299
Telephone:        (212) 672-1996
Facsimile:        (212) 672-1920

*Attorneys for Defendant Joseph
Murphy*


GAGE SPENCER & FLEMING, LLP
410 Park Avenue, 9th Floor
New York, NY 10022-4900
Telephone:        (212) 768-4900
Facsimile:        (212) 768-3629

*Attorneys for Defendants John D.
Agoglia and Peter McCarthy*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0023
Telephone:        (212) 310-8000
Facsimile:        (212) 310-8007

*Attorneys for Defendants Leo R.
Breitman, Nathan Gantcher, David
V. Harkins, Scott L. Jaeckel, Thomas
H. Lee, Ronald L. O'Kelley, and Scott
A. Schoen*


GIBBONS P.C.
One Pennsylvania Plaza, 37th Floor
New York, NY 10119-3701
Telephone:        (212) 649-4700
Facsimile:        (212) 333-5980

*Attorneys for Defendant Frank
Mutterer*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT ....................................................................... 1

STATEMENT OF FACTS ............................................................................. 3

    A.    The Parties ....................................................................................... 3

    B.    Refco Background ............................................................................ 3

    C.    The Underlying Actions .................................................................... 4

    D.    Refco's D&O Liability Insurance "Tower" ....................................... 5

        1.    U.S. Specialty Insurance Company ........................................ 5

        2.    Lexington Insurance Company ................................................ 6

        3.    Axis Reinsurance Company .................................................... 7

        4.    Allied World Assurance Company (U.S.), Inc. ....................... 7

        5.    Arch Reinsurance Company .................................................... 8

        6.    XL Specialty Insurance Company .......................................... 8

    E.    The Denials of Coverage by Axis, AWAC, Arch and XL .................. 8

    F.    The Insurance Actions ...................................................................... 10

        1.    The Axis Litigation ............................................................... 10

        2.    The Arch State Court Actions ................................................ 11

        3.    The Adversary Proceeding Against AWAC and Arch ............ 12

        4.    The XL District Court Action ................................................ 13

    G.    The Moving Insureds' Motion to Dismiss ........................................ 14

ARGUMENT  THE COURT SHOULD DISMISS THIS ACTION IN FAVOR OF THE ADVERSARY PROCEEDING TO AVOID DUPLICATIVE LITIGATION AND POTENTIALLY CONFLICTING RULINGS CONCERNING THE AWAC POLICY. 14

CONCLUSION ........................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

Ace Fire Underwriters Ins. Co. v. ITT Indus., Inc.,
    14 Misc. 3d 1211(A), 836 N.Y.S.2d 483
    (text available at 2006 WL 3849060) (Sup. Ct., N.Y. Cnty., July 19, 2006),
    aff'd, 44 A.D.3d 404, 843 N.Y.S.2d 579 (1st Dep't 2007) .........................14, 16, 18

Cont'l Ins. Co. v. Polaris Indus. Partners L.P.,
    199 A.D.2d 222, 606 N.Y.S.2d 164 (1st Dep't 1993) ..............................................16

Cont'l Ins. Cos. v. Wickes Cos.,
    No. 90 Civ. 8215 (KMW), 1991 WL 183771 (S.D.N.Y. Sept. 6, 1991) ...............................18

Fleet Capital Corp. v. Mullins,
    No. 03 Civ. 6660 (RJH) (KNF), 2004 WL 548240 (S.D.N.Y. Mar. 18, 2004)...............15, 16

Howard v. N.Y. State Dep't of Social Services
    142 A.D.2d 773, 774 (3d Dep't 1988) .. ................................................................ 19

L-3 Communications Corp. v. Safenet, Inc.,
    45 A.D.3d 1, 841 N.Y.S.2d 82 (1st Dep't 2007) ..............................................18, 19

Maier-Schule GMC, Inc. v. Gen. Motors Corp.,
    210 A.D.2d 963, 620 N.Y.S.2d 684 (4th Dep't 1994)............................................14

White Light Prods., Inc. v. On the Scene Prods. Inc., 231 A.D.2d 90, 660
    N.Y.S.2d 568 (1st Dep't 1997) ...........................................................................18

**Statutes & Rules:**

N.Y. C.P.L.R. 3211(a)(4).........................................................................1, 14, 15, 16, 19

N.Y. C.P.L.R. 2201.............................................................................................1, 19

Defendants John Agoglia, Leo R. Breitman, Nathan Gantcher, Tone Grant, David

Harkins, Scott L. Jaeckel,  Dennis A. Klejna, Thomas H. Lee, Peter McCarthy, Joseph Murphy,

Frank Mutterer, Richard N. Outridge, Ronald L. O'Kelley, Scott A. Schoen, William M. Sexton,

Gerald Sherer, and Philip Silverman (collectively, the "Moving Insureds")[1] respectfully submit

this Memorandum of Law in support of their motion, pursuant to C.P.L.R. 3211(a)(4) and

C.P.L.R. 2201, to dismiss, or, in the alternative, to stay the First Amended Complaint For

Declaratory Judgment (the "Arch Complaint") in favor of another action that is pending between

the parties for the same causes of action.

## PRELIMINARY STATEMENT

This insurance action for declaratory relief arises out of the 2005 collapse of

Refco, a provider of brokerage and clearing services in the international derivatives, currency

and futures markets.  Refco's collapse spawned numerous lawsuits (the "Underlying Matters" or

"Underlying Actions"), almost all of which are pending in the United States District Court for

the Southern District of New York (the "District Court").

Plaintiff Arch Insurance Company ("Arch") is the fourth tier excess carrier for a

tower of Directors & Officers liability insurance under which the Defendants are additional

insureds.  The Arch Complaint seeks a declaratory judgment that Arch's excess policy (the

"Arch Policy") "affords no coverage for the Defendants in connection with the Underlying

Matters." (Arch Compl. at ¶ 1).[2]  Specifically, Arch seeks a declaration that no coverage is

available under its policy because of a "prior-knowledge" exclusion contained in the third tier

excess policy issued by Allied World Assurance Company (U.S.), Inc. ("AWAC") (Count I), and

---

[1]  The Moving Insureds are all former officers or directors of Refco, Inc. ("Refco") or its affiliates.

[2]  The Arch Complaint is submitted as Exhibit A to the accompanying Affirmation of Richard Cashman, dated April 28, 2008, filed contemporaneously herewith (the "Cashman Aff.").

1

because of a similar "prior knowledge" exclusion in the Arch Policy itself (Count II). (See Arch Compl. at ¶¶ 113-20).

AWAC, the insurer whose prior knowledge exclusion is in issue in Count I of the Arch Complaint, is not a party to this action. However, AWAC has also denied coverage based on its prior knowledge exclusion, and the insureds have commenced an action in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking coverage under the AWAC Policy (the "Adversary Proceeding").[3] Critically, the insureds' amended complaint (the "Amended Complaint") in that action also names Arch as a defendant, and seeks coverage under the Arch Policy. In addition, coverage litigation with two other excess carriers, which have also denied coverage based on "prior knowledge" exclusions in their policies, is pending in the Southern District of New York.

While Arch filed this declaratory judgment action shortly before the action brought by the insureds against AWAC and Arch, its status as "first filed" is of little significance under the circumstances, as both actions were filed "close in time," and are presently in their "earliest stages." Rather, as shown below, dismissal of the instant action in favor of the Adversary Proceeding is appropriate here, as it would clearly serve to promote judicial efficiency, conserve judicial resources, and avoid inconsistent results. For example, if this action is not dismissed, there is a real possibility of inconsistent results because both actions will separately address coverage under the Arch and AWAC Policies. The AWAC prior knowledge exclusion is of particular concern in this respect because Arch has relied on the provision as a basis for its request for declaratory judgment, yet AWAC is not a party to this litigation. As a result, if dismissal is denied, the Moving Insureds here, already injured as a result of Arch's

---

[3] The Bankruptcy Court has jurisdiction because Refco, the named insured under the AWAC and Arch policies, filed for bankruptcy in the Southern District of New York.

improper denial of coverage for their Claims, face the expense of having to litigate whether the AWAC prior knowledge exclusion provides a basis for denying coverage in two separate forums. In addition, dismissal of this action would also promote judicial efficiency because, not only are the issues in the Adversary Proceeding much more comprehensive, but discovery could be sought in one forum. Moreover, the District Court, where the Adversary Proceeding will in all likelihood be determined following a withdrawal of the reference to the Bankruptcy Court,[4] is already familiar with the underlying facts surrounding the collapse of Refco, as well as Refco's D&O insurance tower. For all of these reasons, dismissal of the present action is warranted under settled law.

## STATEMENT OF FACTS

### A.    The Parties

Plaintiff Arch is an insurance company that is organized and exists pursuant to the laws of the State of Missouri, with a principal place of business in New York, New York. (Cashman Aff. Ex. A (Arch Compl.) at ¶ 7). As indicated above, Arch was the fourth excess insurer in a "tower" of D&O liability insurance obtained by Refco. (See id. at ¶¶ 34-35). Defendants, including the Moving Insureds, are former officers and/or directors of Refco or its direct and indirect subsidiaries. (See id. at ¶¶ 8-33).

### B.    Refco Background

On or about August 11, 2005, Refco conducted its initial public offering ("IPO"). (Id. at ¶ 47). Two months later, on October 10, 2005, Refco disclosed in a press release that it had been carrying an undisclosed $430 million receivable from an entity controlled by Phillip R.

---

[4] As noted below, the Moving Insureds have agreed with AWAC to support a motion in the District Court pursuant to 28 U.S.C. § 157(d) to withdraw the reference for the Adversary Proceeding from the Bankruptcy Court.

Bennett, the CEO of Refco. (Id. at ¶ 48). On October 11, 2005, Refco issued a second press release relating to the $430 million receivable. (Id. at ¶ 49).

On or about October 17, 2005, Refco and many of its direct and indirect subsidiaries filed voluntary petitions for relief under chapter 11 of the United States Code in the Bankruptcy Court. (Id. at ¶ 50).

## C.    The Underlying Actions

The collapse of Refco in October 2005 and the bankruptcy filings that quickly followed led to the commencement of various proceedings against certain of Refco's officers and directors, including the Moving Insureds. (See Cashman Aff. Ex. A (Arch Compl.) at ¶ 71). A number of these Underlying Actions remain pending. Civil actions against some or all of the Moving Insureds include the following: In re Refco, Inc. Securities Litigation, No. 05 Civ. 8626 (GEL) (S.D.N.Y.) (the "Securities Litigation"); In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, No. 06 Civ. 643 (GEL) (S.D.N.Y.); American Financial International Group, et al. v. Bennett, et al., No. 05 Civ. 8988 (S.D.N.Y); V.R. Global Partners, L.P. v. Bennett, et al., No. 07 Civ. 8686 (GEL) (S.D.N.Y.); Capital Management Select Fund Ltd. v. Bennett, et al., No. 07 Civ. 8688 (GEL) (S.D.N.Y.); Kirschner v. Agoglia, et al., Adv. Proc. No. 07-3060 (RDD) (Bankr. S.D.N.Y.); Kirschner v. Thomas H. Lee Partners, L.P., et al., No. 07-7074 (GEL) (S.D.N.Y) and Kirschner v. Grant Thornton LLP, et al., No. 07-11604 (GEL) (S.D.N.Y.) (originally filed in Illinois) (Id. at ¶¶ 75, 90, 93, 96, 97, 100, 103). Tone Grant, along with defendants Phillip Bennett and Robert Trosten, was also named as a defendant in one criminal action, entitled United States v. Phillip Bennett, Robert Trosten and Tone Grant, S3 05 Cr. 1192 (NRB) (S.D.N.Y.) (the "Criminal Action"). (Id. at ¶¶ 72-73).[5]

---

[5]  On December 19, 2007, defendant Santo Maggio ("Maggio") pled guilty to a four-count criminal information. (See Cashman Aff. Ex. A at ¶ 65). Thereafter, on February 15, 2008, Bennett pled guilty to the counts against him

**D.**    **Refco's D&O Liability Insurance "Tower"**

At or about the time of its IPO, Refco procured D&O liability insurance for the benefit of its directors and officers. Refco's D&O insurance is structured as a "tower," consisting of a primary policy and five excess policies providing for a total of $70 million in coverage for the policy period from August 11, 2005 to August 11, 2006 (the "Policy Period"). (See Cashman Aff. Ex. A (Arch Compl.) at ¶¶ 35-36).

1.    U.S. Specialty Insurance Company

U.S. Specialty Insurance Company ("U.S. Specialty") issued the primary policy, Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821, for the Policy Period with a $10 million limit of liability (the "U.S. Specialty Policy" or "Primary Policy"). (Cashman Aff. Ex. B (U.S. Specialty Policy)).

The U.S. Specialty Policy names as "Insured Persons" under the policy "any past, present or future director or officer of the Company . . . ." (Cashman Aff. Ex. B at Definition (F)). "Company" is defined as Refco Inc. and any subsidiary thereof. (Id. at Definitions (C) and (H), Item 1). The U.S. Specialty Policy provides those directors and officers with coverage for "Loss arising from Claims . . . against the Insured Persons for Wrongful Acts . . . ." (Id. at Insuring Agreement (A)). The Underlying Actions are Claims for "Wrongful Acts," as defined in the U.S. Specialty Policy. (Id. at Definition (P)). "Loss" is defined by the U.S. Specialty Policy so as to include defense costs. (Id. at Definition (G) and Endorsement No. 4).

The U.S. Specialty Policy includes a "Full Severability" Endorsement, which provides that "[n]o knowledge or information possessed by any Insured will be imputed to any

---

in the Criminal Action. (Id. at ¶¶ 52, 60). On February 20, 2008, defendant Robert Trosten ("Trosten") also pled guilty to certain of the charges against him in the Criminal Action. (Id. at ¶ 52, 63). Maggio, Bennett and Trosten have agreed not to pursue any claim under the Arch Policy, and have been or will soon be dismissed from this action. On information and belief, certain additional defendants who are not among the Moving Insureds on the instant motion to dismiss also do not plan to pursue coverage under the Arch Policy.

other Insured." (Id. at Endorsement No. 10). The U.S. Specialty Policy also provides that for purposes of determining the application of exclusions, "no Wrongful Act of any Insured Person will be imputed to any other Insured Person who did not have actual knowledge of, or directly participate in the commission of, such Wrongful Act . . . ." (Id. at Exclusions). It further provides that "notwithstanding anything in this Policy to the contrary, the Insurer shall not be entitled under any circumstances to rescind the coverage provided under Insuring Agreement (A) of this Policy." (Id. at Endorsement No. 13).

U.S. Specialty recognized its coverage obligations to the Insureds. After obtaining approval from the Bankruptcy Court to comply with the terms of its policy and advance defense costs to the Insureds, U.S. Specialty paid the defense costs of the Insureds until the limits of the U.S. Specialty Policy were exhausted last year. (Cashman Aff. Ex. C).

2.    Lexington Insurance Company

Lexington Insurance Company ("Lexington") issued the first excess policy above the U.S. Specialty Policy, Directors and Officers Liability and Corporation Reimbursement Follow Form Excess Liability Policy No. 1620924, for the Policy Period with a $7.5 million limit of liability in excess of $10 million (the "Lexington Policy" or "First Excess Policy"). (Cashman Aff. Ex. D).

The Lexington Policy "follows form" to the U.S. Specialty Policy. This means that the Lexington Policy "indemnify[ies] the Insured named in the Declarations . . . in accordance with the applicable insuring agreements, terms, conditions and exclusions, of the Underlying Policy . . . . ." (Id. at Insuring Agreements).

After obtaining approval from the Bankruptcy Court to comply with the terms of its policy and advance defense costs to its insureds, Lexington paid the defense costs of the

6

insureds in connection with the Underlying Actions, until the limits of the Lexington Policy were exhausted in July 2007. (Cashman Aff. Ex. E).

       3.    <u>Axis Reinsurance Company</u>

       Axis Reinsurance Company ("Axis") issued the second excess policy above the Lexington Policy, SecureExcess Policy No. RNN 506300, for the Policy Period with a $10 million limit of liability in excess of $17.5 million (the "Axis Policy, or "Second Excess Policy"). (Cashman Aff. Ex. F). Like the Lexington Policy, the Axis Policy also "follows form" to the U.S. Specialty Policy. (<u>Id.</u> at Insuring Agreement). Accordingly, the Axis Policy states that it provides coverage "in conformance with the provisions of" the U.S. Specialty Policy. (<u>Id.</u>)

       4.    <u>Allied World Assurance Company (U.S.), Inc.</u>

       Allied World Assurance Company (U.S.), Inc. ("AWAC") is the third excess insurer on the Refco "tower" of D&O liability insurance. AWAC issued its Excess Directors and Officers Insurance and Company Reimbursement Policy No. AW0418197 to Refco for the Policy Period with a $12.5 million limit of liability in excess of $27.5 million (the AWAC Policy"). (<u>See</u> Cashman Aff. Ex. G).

       Like the Lexington Policy and the Axis Policy, the AWAC Policy "follows form" to the U.S. Specialty Policy. (Cashman Aff. Ex. G at (I) Insuring Agreement. <u>See</u> <u>also</u> <u>id.</u> at Item 2; (II) Definitions (a)). Any "Claim" for a "Wrongful Act" brought against insureds that falls within Insuring Agreement (A) of the U.S. Specialty Policy also falls within the "Insuring Agreement" of the AWAC Policy. (<u>See</u> <u>id.</u> at (II) Definitions).

5.    <u>Arch Reinsurance Company</u>

Arch is the fourth excess insurer in the Refco "tower" of D&O liability insurance. Arch issued its Excess Insurance Policy No. DOX009322-00 to Refco for the Policy Period with a $10 million limit of liability in excess of $40 million. (Cashman Aff. Ex. H).

Like the Lexington Policy, the Axis Policy and the AWAC Policy, the Arch Policy "follows form" to the U.S. Specialty Policy. (<u>Id.</u> at Insuring Agreement A). Specifically, the Arch Policy states that it "shall apply in conformance with the terms and conditions of the [U.S. Specialty Policy] and in conformance with any terms and conditions further limiting or restricting coverage in this Policy or in any other Underlying Insurance." (<u>Id.</u> at Insuring Agreement C; <u>see also id.</u> at Declarations, Items 4 and 5; Definitions §§ (III)(C) and (D)).

The Arch Policy specifically defines "Insureds" as the same persons who may be entitled to insurance under the U.S. Specialty Policy. (<u>Id.</u> at Definitions § (III)(B)). The term "Claim" is defined as having "the same meaning" in the Arch Policy "as given to it in the [U.S. Specialty Policy]." (<u>Id.</u> at Definitions (III)(A)). Accordingly, any "Claim" brought against insureds that falls within Insuring Agreement (A) of the U.S. Specialty Policy also falls within the "Insuring Agreement" of the Arch Policy. (<u>See id.</u>)

6.    <u>XL Specialty Insurance Company</u>

There is one additional excess policy above the Arch Policy in the Refco D&O insurance "tower." The fifth excess carrier, XL Specialty Insurance Company ("XL") issued its Classic A-Side Management Liability Insurance Policy, No. ELU089673-05, to Refco for the Policy Period with a $20 million limit of liability. (Cashman Aff. Ex. I).

E.    **The Denials of Coverage by Axis, AWAC, Arch and XL**

Beginning in early 2006, Axis, AWAC, Arch and XL denied coverage for the

8

Underlying Actions, relying upon similar and/or overlapping grounds.

By letter dated March 6, 2006 (the "Denial Letter"), and by subsequent letters, Axis purported to deny coverage to the Insureds for "Claims" made against them for "Wrongful Acts" as defined in the Primary Policy. (Cashman Aff. Ex. J). In the Denial Letter, Axis asserted several grounds for denying coverage. One such ground was a purported "Knowledge Exclusion" endorsement, that Axis claimed to be part of its Policy. (Id. at p. 9). The Denial Letter asserted that former Refco CEO Phillip Bennett had knowledge, when the Axis Policy was issued, of facts that might give rise to claims under the Policy, and that such knowledge barred coverage not only for Bennett, but also for all other insureds for each of the matters for which notice had been given. (Id. at p. 11). Axis also relied upon a purported "Warranty Letter" that was submitted to Axis by Bennett, and upon Bennett's failure to answer Question 12(b) in the Application to U.S. Specialty for coverage, which inquired as to whether any proposed Insured was "aware of any fact, circumstance or situation involving the Application . . . which he . . . has reason to believe might result in a claim being made." (See id. at 9-10).

By letter dated March 28, 2006 and in subsequent correspondence, AWAC denied coverage for Plaintiffs under the AWAC Policy. (See Cashman Aff. Ex. K). Specifically, AWAC denied coverage based upon: (1) Endorsement No. 3 to the AWAC Policy, described as the "AWAC Prior Knowledge Exclusion;" (2) the purported Knowledge Exclusion Endorsement of the Axis Policy; (3) Axis's purported "Warranty Letter"; and (4) Bennett's failure to answer Question 12(b) in the Application for the Primary Policy. (See id.). The March 28, 2006 letter from AWAC asserted that "Bennett's knowledge, prior to the inception of the [AWAC] Policy, of facts or circumstances which a reasonable person or persons would suppose might afford valid

grounds for a claim which would fall within the scope of the coverage afforded by [the] Policy," is grounds for denial on each of the bases described above. (Id. at p. 13).

By letter dated March 9, 2006 and in subsequent correspondence, Arch denied coverage under its Policy. Specifically, the March 9, 2006 letter denied coverage based upon, among other things: (1) the "Prior Knowledge Exclusion Endorsement" that Arch understood would be contained in the AWAC Policy "when issued;" (2) Endorsement No. 4 to the Arch Policy, described as the "Arch Prior Knowledge or Information Exclusion;" and (3) the purported "Warranty Letter" delivered to Axis. (Cashman Aff. Ex. L).

By letter dated January 24, 2006, and in subsequent correspondence, XL denied coverage under its policy, relying principally on a prior knowledge (or "Inverted Representation") endorsement to the Policy. (See Cashman Aff. Ex. M).

**F.    The Insurance Actions**

As set forth above, both U.S. Specialty and Lexington – the primary and first excess carriers – recognized their coverage obligations and advanced defense costs to Refco's former officers and directors. (See pp. 5-6, supra). However, the other excess carriers, in accordance with their letters set forth above, are litigating coverage. The various pending proceedings are as follows:

1.    The Axis Litigation

On or about May 24, 2007, Axis, the second excess carrier, commenced an adversary proceeding in the Bankruptcy Court against certain of the Insureds entitled Axis Reinsurance Company v. Bennett et al., Adv. Proc. No. 07-0712 (Bankr. S.D.N.Y.) (the "Axis Adversary Proceeding), seeking a declaration that it had no obligations under the Axis Policy with respect to the Underlying Actions. (Cashman Aff. Ex. N). Axis' Complaint largely tracked

its March 6, 2006 Denial Letter, and included a Count premised on the prior knowledge

exclusion purportedly in its Policy. Pleadings were filed by the defendants seeking the

advancement of defense costs, and the defendants successfully moved to compel Axis to pay

their defense costs as incurred, pending a final determination of coverage under the Axis Policy

or until the Axis Policy is exhausted. (See Cashman Aff. Ex. O).[6]

  The coverage dispute with Axis is presently before the Honorable Gerard E.

Lynch in the United States District Court for the Southern District of New York. Axis filed a

complaint in that Court, No. 07-cv-7924 (GEL) (the "Axis Complaint") (Cashman Aff. Ex. R),

seeking a declaration of no coverage for the Insureds in connection with the Underlying Actions

on the same grounds as its complaint in the Axis Adversary Proceeding. Thereafter, by Order

dated November 13, 2007, the District Court withdrew the bankruptcy reference for the litigation

with Axis in the Bankruptcy Court so that all coverage issues would be determined by the

District Court. (Cashman Aff. Ex. S).

  In accordance with the Bankruptcy Court Order on advancement, referred to

above, Axis advanced defense costs in connection with the Underlying Actions until the Axis

Policy was exhausted in March 6, 2008. (See Cashman Aff. Ex. T).

  2. The Arch State Court Actions

  On or about March 9, 2006, Arch commenced a declaratory judgment action,

Arch Insurance Co. v. Bennett, et al., No. 600805/06 (N.Y. Sup. Ct.) (the "2006 Arch DJ

Action"), against certain Insureds in this Court seeking a declaration of no coverage for the

Insureds under the Arch Policy. Arch's amended complaint, dated June 22, 2006, alleged, inter

alia, that the AWAC prior knowledge exclusion barred coverage due to facts and circumstances

---

[6] Arch sought to intervene in the Axis Adversary Proceeding in order to oppose the Insureds' request for the advancement of defense expenses prior to the adjudication of coverage issues. (See Cashman Aff. Ex. P). The Bankruptcy Court denied Arch's motion. (Cashman Aff. Ex. Q).

allegedly known to Bennett as of August 11, 2005, and that the Arch prior knowledge exclusion barred coverage for the same reason. (Cashman Aff. Ex. U at ¶¶ 76-79).

On or about September 18, 2006, many of the defendants moved to dismiss the 2006 Arch DJ Action on grounds that it, inter alia, failed to allege a justiciable controversy because the counts alleged therein were premature and unripe. By Order dated February 20, 2007, this Court granted that motion and dismissed the 2006 Arch DJ Action. (See Cashman Aff. Ex. V).

The instant declaratory judgment action was filed on or about January 4, 2008, though the Complaint was not served at that time, and the Amended Complaint was filed on or about February 22, 2008 (the "2008 Arch DJ Action"). The two Counts of Arch's Complaint again seek a declaratory judgment based upon the prior knowledge exclusions of both the AWAC Policy (Count I) and the Arch Policy (Count II). (See Cashman Aff. Ex. A at ¶¶ 113-120). Specifically, Arch alleges that the AWAC and Arch prior knowledge exclusions are triggered because "[a]s of August 11, 2005, Bennett, Trosten and Maggio possessed knowledge of facts and circumstances that a reasonable person would suppose might afford valid grounds for a claim," and the Underlying Actions consist of Claims arising out of such facts or circumstances. (Id. at ¶¶ 114-16, 118-20).

3.    The Adversary Proceeding Against AWAC and Arch

On or about March 12, 2008, the Moving Insureds herein other than McCarthy, Agoglia and Mutterer filed an action in the Bankruptcy Court against AWAC, Murphy, et al. v. Allied World Assurance Company (U.S.), Inc., Adv. Proc. No. 08-01133 (RDD) (the "Adversary Proceeding"), seeking the advancement of defense costs under the AWAC Policy. (Cashman Aff. Ex. W). That same day, the insureds filed a motion for a preliminary injunction to require

advancement.  At the hearing on April 11, 2008, and by Order dated April 21, 2008, the

Bankruptcy Court granted the plaintiffs' motion for a preliminary injunction to require AWAC to

advance defense costs pending a final determination as to coverage under the AWAC Policy.

(See Cashman Aff. Ex. X at ¶ 3).

On April 24, 2008, the plaintiffs in the Adversary Proceeding filed their First

Amended Complaint naming Arch, in addition to AWAC, as a defendant.  (Cashman Aff. Ex.

Y).  The First Amended Complaint seeks, inter alia, a declaration from the Bankruptcy Court that

the AWAC and Arch Policies provide coverage for the Underlying Actions, and injunctive relief

requiring AWAC and Arch to pay losses incurred by the plaintiffs in connection with the

Underlying Actions.  (Id. at ¶¶ 88-97 (Count I); 117-125 (Count II)).  The Adversary Proceeding

thus seeks to resolve the same issues regarding coverage under the Arch Policy and the AWAC

Policy as the instant action, but the Adversary Proceeding, unlike the instant action, includes

both Arch and AWAC as parties.

    4.    The XL District Court Action

On April 22, 2008, XL, the fifth excess carrier, filed an action in the District

Court, XL Specialty Insurance Company v. Agoglia, et al., No. 08 Civ. 3821 (S.D.N.Y.), seeking

a declaratory judgment that the XL Policy provides no coverage for Insureds in connection with

"Underlying Matters."  (See Cashman Aff. Ex. Z).  XL contends that a "prior knowledge"

exclusion which it alleges to be part of the XL Policy "provides that there is no coverage for any

Insured Person under the XL Policy for any claims arising out of any facts, situation or

circumstances that were known to any Insured Person as of the inception of the insurance."  (Id.

at ¶ 6).

In sum, currently pending are:

13

(1)    Coverage litigation with AWAC and Arch in the Bankruptcy Court in which the "prior knowledge" exclusions in both the AWAC and Arch policies are in issue;[7]

(2)    The instant declaratory judgment action commenced by Arch, also premised on the prior knowledge exclusions in the AWAC and Arch policies; and

(3)    Coverage litigation with Axis and XL in the District Court, both of which involve "prior knowledge" exclusions.

## G.    The Moving Insureds' Motion to Dismiss

The Moving Insureds now bring the instant motion to dismiss the Arch Complaint against them, pursuant to Rule 3211(a)(4) of New York's C.P.L.R., on the ground that there is another action currently pending between the same parties and for the same causes of action, i.e., the Adversary Proceeding against AWAC and Arch.

## ARGUMENT

### THE COURT SHOULD DISMISS THIS ACTION IN FAVOR OF THE ADVERSARY PROCEEDING TO AVOID DUPLICATIVE LITIGATION AND POTENTIALLY CONFLICTING RULINGS CONCERNING THE AWAC POLICY

Pursuant to N.Y. C.P.L.R. 3211(a)(4), a party may move for dismissal of a complaint where "there is another action pending between the same parties for the same cause of action in a court of any state or the United States." The trial court is allowed "broad discretion" in determining whether dismissal is appropriate under this Rule. Maier-Schule GMC, Inc. v. Gen. Motors Corp., 210 A.D.2d 963, 620 N.Y.S.2d 684 (4th Dep't 1994). See also Ace Fire Underwriters Ins. Co. v. ITT Indus., Inc., 14 Misc. 3d 1211(A), 836 N.Y.S.2d 483 (text available at 2006 WL 3849060, at *5) (Sup. Ct. N.Y. Cnty., July 19, 2006), aff'd, 44 A.D.3d 404, 843 N.Y.S.2d 579 (1st Dep't 2007) ("a court has broad discretion as to the disposition of an action

---

[7] The Moving Insureds anticipate that, as occurred in the Axis litigation, the reference to the Bankruptcy Court for this action will be withdrawn and, as noted above, have agreed with AWAC to support a motion doing so, so that coverage litigation with all four excess carriers disputing coverage will be in the District Court.

when another is pending"). For the reasons set forth below, this Court should exercise its discretion and dismiss the instant action pursuant to C.P.L.R. 3211(a)(4) in favor of the Adversary Proceeding.

The requirements of Rule 3211(a)(4) are clearly satisfied here, as both actions are between the same parties, for the same causes of action. The instant action was commenced by Arch in early 2008 seeking a declaration that the Arch policy affords no coverage for Defendants based on the prior knowledge exclusions in the AWAC and Arch Policies. (Arch Compl. at ¶ 1). Soon thereafter, on April 24, 2008, the Plaintiff-Insureds in the Adversary Proceeding amended their complaint therein in order to, <u>inter alia</u>, add Arch as a defendant. (<u>See</u> Cashman Aff. Ex. Y (Amended Adversary Complaint)). The Adversary Proceeding includes causes of action for declaratory relief regarding coverage under the AWAC and Arch Policies. (<u>Id.</u> at ¶¶ 88-97, 117-125). The two actions are thus sufficiently similar "so as to pose a risk of conflicting judgments and duplication of judicial efforts should both proceedings go forward simultaneously." <u>Fleet Capital Corp. v. Mullins</u>, No. 03 Civ. 6660 (RJH) (KNF), 2004 WL 548240, at *5 (S.D.N.Y. Mar. 18, 2004)

The totality of the circumstances demonstrate that dismissal of the instant action in favor of the Adversary Proceeding would serve to promote judicial efficiency, conserve judicial resources, and avoid potentially inconsistent results. In particular, the 2008 Arch DJ Action should be dismissed because (i) both suits involve interpretation of the AWAC policy, thus putting the Insureds at risk that the two courts will reach inconsistent results, (ii) the scope of the Adversary Proceeding is more comprehensive than the 2008 Arch DJ Action, and AWAC is a party to the Adversary Proceeding, (iii) discovery in the Adversary Proceeding and the 2008 Arch DJ Action concerning the AWAC prior knowledge exclusion will overlap, and

(iv) dismissal will allow all the insurance actions – Axis, AWAC, Arch and XL – to be determined in a single forum – the District Court, where the Axis litigation, the XL action and almost all the Underlying Actions are pending.

First, Arch relies on the prior knowledge exclusion that is part of the AWAC policy. Because it is not a party to this action, AWAC will undoubtedly claim that it is not bound by a ruling in favor of the moving Insureds on Count I herein (i.e., holding that the AWAC prior knowledge exclusion is not a proper basis for denying coverage to the Moving Insureds), which would force the Moving Insureds to re-litigate the same issue in the Adversary Proceeding. Similarly, if the Adversary Proceeding went forward only as against AWAC, with this action also going forward, Arch would undoubtedly claim not to be bound by a ruling in the insureds' favor in the Adversary Proceeding, thereby again requiring the Moving Insureds to litigate the effect of the AWAC prior knowledge exclusion a second time.

Second, the scope of the issues in the Adversary Proceeding are more comprehensive than the issues in the 2008 Arch DJ Action. Courts have considered this factor in determining whether dismissal under C.P.L.R. 3211(a)(4) is appropriate. See Ace Fire Underwriters Ins. Co., 14 Misc. 3d 1211, 836 N.Y.S.2d 483 (text available at 2006 WL 3849060, at *11) (noting that courts look to factors such as "the comprehensiveness of the different actions"). See also Cont'l Ins. Co. v. Polaris Indus. Partners, 199 A.D.2d 222, 223, 606 N.Y.S.2d 164, 165 (1st Dep't 1993) (dismissing first-filed action because the second action, inter alia, "offers more than the action herein"); Fleet Capital Corp., 2004 WL 548240, at *5 (staying first-filed action because, inter alia, the second action "contains issues broader than" the first). The Adversary Proceeding, and not the instant action, is thus the more appropriate forum to

determine whether the AWAC Prior Knowledge Exclusion provides coverage for any loss arising out of the Underlying Actions.

Third, efficiency of discovery strongly supports dismissal of this action in favor of the Adversary Proceeding. As Arch relies upon the AWAC prior knowledge exclusion, discovery with respect to such exclusion will have to be sought in this action from AWAC as a non-party.[8] Moreover, without dismissal, the Insureds will have to engage in discovery relating to the AWAC Policy in two separate actions. In contrast, if only the Adversary Proceeding goes forward, discovery relating to the AWAC Policy can be sought in one forum, with AWAC as a party to the litigation.

Finally, judicial efficiency is also promoted by dismissal in favor of the Adversary Proceeding because the District Court, where the Adversary Proceeding will in all likelihood be heard, following a withdrawal of the reference to the Bankruptcy Court, is already familiar with the underlying facts surrounding the collapse of Refco, as well as Refco's D&O insurance tower. Not only is Judge Lynch presiding over the vast majority of the Underlying Actions themselves, but he also has before him the coverage dispute with Axis, which includes issues as to the Axis Prior Knowledge Exclusion. Moreover, the XL action, based on the XL prior knowledge exclusion, was just filed in the District Court as a related case to actions before Judge Lynch, and will thus in all likelihood end up before him as well. (See Cashman Aff. Ex. Z, at Civil Cover Sheet).[9] In light of the importance of conserving judicial resources, it clearly

---

[8] AWAC is headquartered in Massachusetts. (See Cashman Aff., Ex. G at 1).

[9] Judicial efficiency would be served even if the Adversary Proceeding were to remain in the Bankruptcy Court, as that court is also already familiar with the matters at issue here. Judge Drain, whom the Adversary Proceeding is before, has presided over Refco's bankruptcy cases, as well as various adversary proceedings brought in connection with that action, including one of the Underlying Actions, Kirschner v. Agoglia, et al., Adv. Proc. No. 07-3060 (RDD) (Bankr. S.D.N.Y.) Moreover, having previously considered whether Axis and AWAC were required to advance defense costs under their policies, Judge Drain is also knowledgeable regarding Refco's D&O insurance tower, including provisions of the Primary Policy and the AWAC Policy, both at issue here.

makes no sense to duplicate the efforts of the District Court and/or the Bankruptcy Court in this action.

In addition to the reasons outlined above, it is the Moving Insureds who are the putative injured parties and should be entitled to their choice of forum, not Arch. In improperly denying coverage under its Policy, Arch has deprived the Moving Insureds (along with the other Insureds) of insurance coverage to which they are entitled, leaving them without coverage at a critical juncture in the Underlying Actions. And by anticipating the possible filing of a suit by the Insureds, Arch has reversed the usual roles of plaintiff and defendant. As a result, Arch has improperly deprived the Moving Insureds of having this dispute heard in the forum of their choice, further warranting dismissal in favor of the Adversary Proceeding. See Cont'l Ins. Cos. v. Wickes Cos., No. 90 Civ. 8215 (KMW), 1991 WL 183771, at *5 (S.D.N.Y. Sept. 6, 1991).

The mere fact that the present action was filed before the Adversary Proceeding is insufficient to avoid dismissal. "New York courts have consistently held that even though the first-in-time rule is a factor to be considered in choosing the appropriate forum for litigation, [this alone] is not controlling, especially when commencement of the competing action[s] has been reasonably close in time." L-3 Communications Corp. v. Safenet, Inc., 45 A.D.3d 1, 9, 841 N.Y.S.2d 82, 89 (1st Dep't 2007) (internal quotations omitted); see Ace Fire Underwriters Ins. Co., 14 Misc. 3d 1211(A), 836 N.Y.2d 483 (text available at 2006 WL 3849060, at *10). See also Cont'l Ins. Co., 199 A.D. 2d 222, 606 N.Y.S.2d 164 (dismissing first-filed action pursuant to C.P.L.R. 3211(a)(4)); White Light Prods., Inc. v. On the Scene Prods., Inc., 231 A.D.2d 90, 97, 660 N.Y.S.2d 568, 573 (1st Dep't 1997) (instructing that "[t]he practice of determining priorities between pending actions on the basis of dates of filing is a general rule, not to be

applied in a mechanical way, regardless of other considerations" and reversing decision dismissing second-filed action based only on filing dates) (citations omitted).

Here, both actions are "close in time," as the instant action was initiated only three months prior to the filing of the First Amended Complaint in the Adversary Proceeding. In addition, both actions are in their "earliest stages," with no discovery yet taking place in either case. See L-3 Communications Corp., 45 A.D.3d at 9, 841 N.Y.S.2d at 9 (short time period between filing of actions and that both actions were in their earliest stages at the time the motion to dismiss weighed against application of the first-in-time rule).

In sum, notwithstanding the fact that the present action was "first-filed," dismissal in favor of the Adversary Proceeding is warranted, and would promote efficiency, conserve judicial resources, and avoid potentially inconsistent results.[10]

---

[10] In the alternative, this Court may stay the present action pending further proceedings in the Adversary Proceeding pursuant to C.P.L.R. 3211(a)(4) and/or C.P.L.R. 2201. See Howard v. N.Y. State Dep't of Social Services, 142 A.D.2d 773, 774 (3d Dep't 1988) (granting stay in favor of "broader and more extensive" action that "will provide 'a more complete and appropriate disposition of the underlying issues.'")

## CONCLUSION

For all of the foregoing reasons, this Court should dismiss the present action, or in the alternative, stay it in favor of the Adversary Proceeding pursuant to C.P.L.R. 3211(a)(4) and C.P.L.R. 2201.

Dated: May 1, 2008
      New York, New York

HELLER EHRMAN LLP

*Richard Cashman*

Richard Cashman
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone:    (212) 832-8300
Facsimile:    (212) 763-7600

*Attorneys for Defendant Philip Silverman*


KATTEN MUCHIN ROSENMAN LLP

*Helen Kim /NB*

Helen B. Kim
575 Madison Avenue
New York, NY 10022-2511
Telephone:    (212) 940-8800
Facsimile:    (212) 940-8776

*Attorneys for Defendant Dennis A. Klejna*


FRIEDMAN & WITTENSTEIN
A Professional Corporation

*Ivan Kline /NB*

Ivan Kline
600 Lexington Avenue
New York, NY 10022-6000
Telephone:    (212) 750-8700
Facsimile:    (212) 223-8391

*Attorneys for Defendants William M. Sexton and Gerald M. Sherer*


ZUCKERMAN SPAEDER LLP

*Laura Neish /NB*

Laura E. Neish
1540 Broadway, Suite 1604
New York, NY 10036-4039
Telephone:    (212) 704-9600
Facsimile:    (212) 740-4256

*Attorneys for Defendant Tone N. Grant*

SAUL EWING LLP

WEIL, GOTSHAL & MANGES LLP

_John Jerome /mg_

John J. Jerome
245 Park Avenue, 24th Floor
New York, NY 10167-2499
Telephone:    (212) 672-1996
Facsimile:    (212) 672-1920

*Attorneys for Defendant Joseph Murphy*

_Michael Walsh /mg_

Greg A. Danilow
Michael F. Walsh
767 Fifth Avenue
New York, NY 10153-0023
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007

*Attorneys for Defendants Leo R. Breitman,
Nathan Gantcher, David V. Harkins, Scott L.
Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and
Scott A. Schoen*

PROSKAUER ROSE LLP

GAGE SPENCER & FLEMING, LLP

_Claire Gutekunst /mg_

Claire P. Gutekunst
1585 Broadway
New York, NY 10036-8200
Telephone:    (212) 969-3421
Facsimile:    (212) 969-2900

*Attorneys for Defendant Richard N.
Outridge*

_William Fleming /mg_

William Fleming
410 Park Avenue, 9th Floor
New York, NY 10022-4407
Telephone:    (212) 768-4900
Facsimile:    (212) 768-3629

*Attorneys for Defendants John D. Agoglia and
Peter McCarthy*

GIBBONS P.C.

_Lawrence Lustberg /mg_

Lawrence S. Lustberg
One Pennsylvania Plaza, 37th Floor
New York, NY 10119-3701
Telephone:    (212) 613-2000
Facsimile:    (212) 333-5980

*Attorneys for Defendant Frank Mutterer*