UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
ARCH INSURANCE COMPANY,                          :
                                                 :
                                                 :        No. 08-cv-5252 (GEL)
                    Plaintiff,                   :
                                                 :
                                                 :
             v.                                  :
                                                 :
JOHN D. AGOGLIA, PHILLIP R. BENNETT, LEO         :
R. BREITMAN, EDWIN L. COX, SUKHMEET              :
DHILLON, THOMAS H. DITTMER, NATHAN               :
GANTCHER, STEPHEN GRADY, TONE GRANT,             :
THOMAS HACKL, DAVID V. HARKINS, SCOTT            :
L. JAECKEL, DENNIS A. KLEJNA, THOMAS H.          :
LEE, ERIC G. LIPOFF, SANTO C. MAGGIO,            :
PETER MCCARTHY, JOSEPH MURPHY, FRANK             :
MUTTERER, RICHARD N. OUTRIDGE, RONALD            :
L. O'KELLEY, SCOTT A. SCHOEN, WILLIAM M.         :
SEXTON, GERALD SHERER, PHILIP                    :
SILVERMAN and ROBERT C. TROSTEN,                 :
                                                 :
                    Defendants.                  :
------------------------------------------------------------------- x

### DECLARATION OF PAMELA SYLWESTRZAK

I, PAMELA SYLWESTRZAK, hereby declare:

1.      I am a Senior Vice President of Marsh USA, Inc. ("Marsh") and I respectfully

submit this declaration in opposition to the motion made by defendant Allied World Assurance

Company (U.S.), Inc. ("Arch") for summary judgment in the above-captioned litigation. This

declaration is based on my personal knowledge and belief and my review of certain documents

in Marsh's files.

2.      Marsh was the broker of record for a program of Directors and Officers ("D&O")

liability insurance that was placed with various insurers for Refco Inc. ("Refco") for the policy

period August 11, 2005 through August 11, 2006 (the "2005-2006 Program"). I was the

principal contact person at Marsh for the Refco entities with respect to the binding of the 2005-

2006 Program. In such capacity, I was involved in the purchase of insurance coverage for the Refco entities and their directors and officers.

      3.      For the 2005-2006 Program, the tower of Refco's D&O insurance was as follows: (1) U.S. Specialty Insurance Company Directors, Officers and Corporation Liability Insurance Policy No. 24-MGU-05-A10821 ($10 million primary coverage) (the "U.S. Specialty Policy"); (2) Lexington Insurance Company Directors and Officers Liability and Corporation Reimbursement Follow Form Excess Liability Policy No. 1620924 ($7.5 million excess of $10 million); (3) Axis Reinsurance Company SecurExcess Policy No. RNN 506300 ($10 million excess of $17.5 million); (4) AWAC Excess Directors and Officers Insurance and Company Reimbursement Policy No. AW0418197 ($12.5 million excess of $27.5 million); (5) Arch Insurance Company Excess Insurance Policy No. DOX0009322-00 ($10 million excess of $40 million) (the "Arch Policy"); and (6) XL Specialty Insurance Company Classic A-Side Management Liability Insurance Policy No. ELU089673-05 ($20 million excess of $50 million).

     **ARCH**

      4.      Arch is the fourth excess carrier in the 2005-2006 Program.

      5.      When Refco first submitted claims to Arch in October 2005, Arch had not yet issued the Arch Policy. To the best of my knowledge, Arch did not issue the Arch Policy until on or shortly after March 7, 2006 – approximately five months after Marsh first submitted claims to Arch on behalf of Refco. Attached as Exhibit A is a true and accurate copy of the Arch Policy issued to Refco by Arch on or shortly after March 7, 2006, the date appearing on the second page of the Declarations.

31450245

**THE SEVERABILITY PROVISION IN THE U.S. SPECIALTY POLICY
AND THE INCLUSION OF A PRIOR KNOWLEDGE OR
INFORMATION EXCLUSION IN THE ARCH POLICY**

6.    In connection with the 2005-2006 Program, Marsh requested that U.S. Specialty

Insurance Company ("U.S. Specialty") include broad severability language in its primary policy.

U.S. Specialty responded by agreeing to include a "full severability" endorsement, which

became part of the U.S. Specialty Policy as Endorsement No. 10. Endorsement No. 10

specifically amended Condition (M) of the main policy form, entitled "Representations and

Severability." Condition (M) set forth the sole limitation on severability under the main policy

form: that knowledge of "material facts or information known to the person or persons who

signed the Application" could be imputed to innocent officers and directors. Endorsement No.

10 deleted the language in the third sentence of Condition (M) relating to the application, such

that the sentence provides that "No knowledge or information possessed by any Insured will be

imputed to any other Insured." This sentence contains no reference to the insurance application,

and there was no indication from U.S. Specialty that the sentence was intended to be limited to

statements in the application..

7.    Attached as Exhibit B is a true and accurate copy of the application, executed by

Philip Bennett, on behalf of Refco Group Ltd., LLC ("Refco Group"), dated February 5, 2005

(the "Application"), which Marsh submitted to U.S. Specialty in connection with U.S.

Specialty's policy insuring Refco Group for the policy period August 5, 2004 to August 11,

2005. (U.S. Specialty had issued a policy binder prior to its receipt of the Application, and

issued its policy for the 2004-05 policy period thereafter.) Question 12(b) in the Application

asks whether any proposed insured is aware of any fact, circumstance or situation that he, she or

it has reason to believe might result in a claim being made. Following Question 12(b), the

Application states that the insurer will not be liable under any policy issued on the basis of the

Application to make any payment of Loss "in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to" Question 12(b). In completing the Application, Mr. Bennett failed to check either the "yes" or "no" box in response to Question 12(b).

8.     In issuing its policy for the 2005-2006 Program, U.S. Specialty did not require a new application from Refco Inc., relying, instead, upon the Application submitted for the prior year by Refco Group.

9.     Mr. Bennett had left Question 12(b) of the Application blank, Refco was not providing any warranty as to the absence of facts or circumstances that might result in a claim being made. Accordingly, Marsh advised Arch and other excess insurers that they could add an inverted warranty "[s]hould you need one to bind." A true and accurate copy of an email from Kenny Li of Marsh, dated August 9, 2005, is attached as Exhibit C.

10.     Although Marsh advised Arch that it could add an inverted warranty to its policy "[s]hould [Arch] need one to bind" (see Ex. C hereto), Marsh was not advised by any of the insurers that this would affect the applicability of the "full severability" provided in Endorsement No. 10 of the U.S. Specialty Policy for those excess insurers, including Arch, that followed form to the U.S. Specialty Policy. Moreover, to the best of my knowledge, at no time prior to binding did Arch or any of the other excess carriers in the 2005-2006 Program request modification of the severability language in the U.S. Specialty Policy. Therefore, it is my understanding that Arch follows form to the "full severability" provision of the U.S. Specialty Policy.

11.     Attached as Exhibit D is a letter dated March 9, 2006 received by Marsh from counsel for Arch.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: Chicago, Illinois
       August 7, 2008

_Pamela Sylwestrzak_
Pamela Sylwestrzak

31450245

# EXHIBIT A



**Arch**
Insurance Group

## ARCH INSURANCE COMPANY
(A Missouri Corporation)

Home Office Address:
3100 Broadway, Suite 511
Kansas City, MO 64111

Administrative Address:
One Liberty Plaza, 53rd Floor
New York, NY 10006
Tel: (800) 817-3252

### EXCESS INSURANCE POLICY

**UNLESS OTHERWISE PROVIDED IN THE UNDERLYING POLICY(IES), THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS AND EXPENSES.**

### DECLARATIONS

Terms appearing in **bold** in these Declarations are defined in the Policy.

| | |
|---|---|
| Policy No.: DOX0009322-00 | |

Item 1. **Named Entity:** Refco, Inc.
**Principal Address:** 550 W. Jackson Blvd. Suite 1300
Chicago, IL 60661

Item 2. **Policy Period:**

    From:  August 11, 2005    at 12:01 a.m. (local time at the address stated in Item 1.)

    To:    August 11, 2006    at 12:01 a.m. (local time at the address stated in Item 1.)

Item 3. Limit of Liability (inclusive of defense costs and expenses):

    a.    Each **Claim**:    $10,000,000

    b.    Maximum aggregate Limit of Liability for
        all **Claims** during the **Policy Period**:    $10,000,000

Item 4. **Followed Policy:**

    Issuing Carrier:  U.S. Specialty Insurance Company

    Form:    USSIC 991 (03/2004)

    Policy Number:  24-MGU-05-A10821

    Limit of Liability: $10,000,000

    Deductible or Self Insured Retention:  $0/$300,000/$500,000

**Item 5.  Underlying and Excess Insurer Policy(ies):**

| | Issuing Company | Policy No. | Limits of Liability | Attachment |
|---|---|---|---|---|
| **A.  Primary Policy:** | | | | |
| | U.S. Specialty Insurance Company | 24-MGU-05-A10821 | $10,000,000 | $0 |
| **B.  Underlying Excess Policy(ies)** | | | | |
| First Excess: | Lexington Insurance Company | 162-0924 | $7,500,000 | $10,000,000 |
| Second Excess: | Axis Reinsurance Company | TBD | $10,000,000 | $17,500,000 |
| Third Excess: | Allied World Assurance Company (U.S.), Inc. | AW0418197 | $12,500,000 | $27,500,000 |
| Fourth Excess: | | | | |
| Fifth Excess: | | | | |
| Sixth Excess: | | | | |
| Seventh Excess: | | | | |
| Eighth Excess: | | | | |
| **C.  Excess Insurer** | | | | |
| | Arch Insurance Co. | DOX0009322-00 | $10,000,000 | $40,000,000 |

| | |
|---|---|
| Item 6.  Premium: | $241,693 |
| Premium Attributable to Terrorism Risk Insurance: | $0 |
| (Included In Policy Premium    ☒) | |
| (In Addition To Policy Premium  ☐) | |

Item 7.  Endorsements Applicable to Coverage at Inception of Policy:  (See attached Schedule of Forms and Endorsements.)

Item 8.  Notices to **Excess Insurer:**

| Notice Of Claim(s) To Be Sent To: | All Other Notices To Be Sent To: |
|---|---|
| Executive Assurance Claims | Executive Assurance Underwriting |
| Arch Insurance Company | Arch Insurance Company |
| One Liberty Plaza, 53rd Floor | One Liberty Plaza, 53rd Floor |
| New York, NY 10006 | New York, NY 10006 |
| Fax: (646) 746-8111 | Fax: (212) 651-6499 |

THESE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION FOR THIS POLICY, THE APPLICATIONS FOR ALL **UNDERLYING INSURANCE,** ALL MATERIALS SUBMITTED THEREWITH AND THE POLICY FORM ATTACHED HERETO, CONSTITUTE THE EXCESS INSURANCE POLICY.

The **Excess Insurer** has caused this Policy to be signed and attested to by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the **Excess Insurer.**

_____          _____
Authorized Representative          Date   3/7/06

_____          _____
Secretary                          President

05 DOXD111 00 07 03                                    Page 2 of 2

## EXCESS INSURANCE POLICY

In consideration of the payment of the premium set forth in Item 6. of the Declarations of this Policy, and in reliance upon all statements made in the Application for this Policy, in the applications for all **Underlying Insurance** and in any other materials submitted to the Insurer designated in the Declarations of this Policy (hereinafter "the **Excess Insurer**"), which are incorporated into and constitute part of this Policy, and subject to the Limit of Liability set forth in Item 3. of the Declarations of this Policy, the **Excess Insurer** agrees with the **Insureds** as follows:

### SECTION I

INSURING AGREEMENT.

A.  The **Excess Insurer** shall provide the **Insureds** coverage for **Claims** in excess of the **Underlying Insurance**.

B.  The insurance coverage afforded by this Policy shall apply only after exhaustion of the **Underlying Limit** solely as a result of actual payment, in legal currency, under the **Underlying Insurance** in connection with **Claim(s)** and after the **Insureds** shall have paid the full amount of any applicable deductible or self insured retentions.

C.  Except with respect to premium and Limit of Liability and as provided in this Policy, the insurance coverage afforded by this Policy shall apply in conformance with the terms and conditions of the **Followed Policy** and in conformance with any terms and conditions further limiting or restricting coverage in this Policy or in any other **Underlying Insurance**. In no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the **Underlying Insurance**.

### SECTION II

LIMIT OF LIABILITY.

A.  The amount stated in Item 3.b. of the Declarations of this Policy shall be the maximum amount payable by the **Excess Insurer** on account of all **Claims** during the **Policy Period**.

B.  All payments by the **Excess Insurer** in connection with a **Claim** shall be part of and not in addition to the Limit of Liability set forth in Item 3. of the Declarations of this Policy, and shall reduce such Limit of Liability.

### SECTION III

DEFINITIONS.

All terms defined in this Policy appear in **bold**.

A.  **Claim(s)** shall have the same meaning in this Policy as given to it in the **Followed Policy**.

B.  **Insured(s)** means any person(s) or entity(ies) that are entitled to coverage under the **Followed Policy** at its inception.

C.  **Followed Policy, Named Entity, Primary Policy, Policy Period** and **Underlying Excess Policies**, are as identified in the Declarations of this Policy.

D.  **Underlying Insurance** means the **Primary Policy** and any **Underlying Excess Policies** listed in Item 5. of the Declarations of this Policy.

E.  **Underlying Limit** means an amount equal to the aggregate of all limits of liability for all **Underlying Insurance**, plus the deductible or self insured retention, if any, applicable under the **Primary Policy**.

## SECTION IV

MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE**.

A.  As a condition to the coverage of this Policy, the **Insureds** shall maintain all **Underlying Insurance** in full force and effect with solvent insurers during the **Policy Period**, except for reduction or exhaustion of the **Underlying Limit** by payment in connection with **Claims**.

B.  In the event of depletion of the **Underlying Limit** by payment in connection with **Claim(s)**, this Policy shall, subject to the Limit of Liability stated in Item 3. of the Declarations of this Policy, continue to apply as excess insurance over the amount of insurance remaining under such **Underlying Insurance**.

C.  In the event of exhaustion of all of the **Underlying Limit** by payment in connection with **Claim(s)**, this Policy shall, subject to the Limit of Liability stated in Item 3. of the Declarations of this Policy, continue in force as primary insurance subject to the terms and conditions and the deductible or self insured retention under the **Primary Policy**, which deductible or self insured retention shall be applied to any subsequent **Claim** in the same manner as specified in the **Primary Policy**.

D.  This Policy shall drop down only in the event of reduction or exhaustion of all of the **Underlying Limit** by payment in connection with **Claim(s)**, and shall not drop down for any other reason including, but not limited to: (i) any exhaustion of a sublimit of any **Underlying Insurance**; or (ii) uncollectibility, in whole or in part, of any **Underlying Insurance** whether due to financial impairment or insolvency, liquidation, or for any other reason; or (iii) failure of the **Insured** to maintain any **Underlying Insurance**. The risk of any gaps in coverage or uncollectibility for any reason is expressly retained by the **Insured**, and is not assumed or insured by the **Excess Insurer**.

E.  As a condition precedent to coverage under this Policy, the **Insureds** shall give to the **Excess Insurer** written notice and the full particulars of: (i) cancellation of any **Underlying Insurance**; (ii) reduction and or exhaustion of the **Underlying Limit**; (iii) additional or return premium in connection with any **Underlying Insurance**; (iv) any changes to the **Underlying Insurance** by rewrite, endorsement or otherwise; and (v) the initiation of any receivership, liquidation, dissolution, rehabilitation or similar proceeding by any regulatory authority or any other person or entity against the issuing company of any **Underlying Insurance**. Such notice shall be sent to the **Excess Insurer** immediately upon receipt of such notice by the **Named Entity** or any **Insured**.

F.  In the event of any changes to any **Underlying Insurance** during the Policy Period, this Policy shall become subject to any such changes upon the effective date of the changes in the **Underlying Insurance** only if and to the extent that consent of the **Excess Insurer** is expressly endorsed hereon and provided that the **Insureds** shall pay any additional premium reasonably required by the **Excess Insurer** for such changes.

G.  This Policy shall terminate immediately upon the termination of any **Underlying Insurance**, whether by the **Insured** or by the issuer of the **Underlying Insurance**. Notice of cancellation or non-renewal of all or part of the **Underlying Insurance** duly given by any such Insurer shall serve as notice of the cancellation or non-renewal of this Policy by the **Excess Insurer**. Return premium, if any, shall be as provided in Section VIII.C. below.

## SECTION V

DUTIES IN THE EVENT OF A **CLAIM**.

A.  With respect to any **Claim(s)** that, alone or combined, might result in payment pursuant to the insurance coverage afforded under this Policy, the **Insured** shall not admit liability and shall not agree to settle any **Claim** without the **Excess Insurer's** consent.

B.  The **Insured** shall give notice under this Policy as provided in the **Followed Policy** and at the address shown in Item 8. of the Declarations of this Policy. Notice to the issuer of the **Followed Policy**, the **Primary Policy**, or any other **Underlying Insurer** shall not constitute notice to the **Excess Insurer**.

C.  With respect to any **Claim(s)** that, alone or combined, might result in payment pursuant to the insurance coverage afforded under this Policy, no costs, charges or expenses for investigation or defense of any **Claim** shall be incurred, or settlements made, without the **Excess Insurer's** consent, such consent not to be unreasonably withheld.

D.  If legal proceedings are begun, the **Insured** shall forward to the **Excess Insurer** a copy of each pleading or document received by the **Insured** or the **Insured's** representatives, together with copies of reports or investigations made by the **Insured** or the **Insured's** representatives with respect to such proceedings.

E.  The **Excess Insurer** may, at its sole option, elect to effectively participate in the investigation, settlement or defense of any **Claim** against any **Insured** for matters covered by this Policy even if the **Underlying Limit** has not been exhausted. The **Excess Insurer** may, at its own expense, elect to appeal any judgment which may involve the insurance provided by this Policy.

## SECTION VI

COOPERATION. The **Insured** shall give the **Excess Insurer** such information and cooperation as the **Excess Insurer** may reasonably require.

## SECTION VII

SUBROGATION AND RECOVERIES. In the event of any payment under this Policy, the **Excess Insurer** shall be subrogated to all of the **Insureds'** rights of recovery against any person or organization, and the **Insured** shall execute and deliver all instruments and papers and do whatever else may be necessary to secure such rights.

Any amount recovered after payment under this Policy shall be apportioned in the inverse order of payment to the extent of actual payment. The expenses of all such recovery proceedings shall be apportioned in the same ratio as the recoveries.

## SECTION VIII

CANCELLATION.

A.  This Policy may be cancelled by the **Named Entity** at any time by written notice or by surrender of this Policy to the **Excess Insurer** at the address listed in Item 8. of the Declarations of this Policy, stating when thereafter the cancellation shall be effective.

B.  Except as provided in Section IV.G. above, this Policy may be cancelled by or on behalf of the **Excess Insurer** by mailing or delivering to the **Named Entity** at the address shown in Item 1. of the Declarations of this Policy written notice stating when such cancellation shall be effective. Notice of cancellation will be provided at least ten (10) days before the effective date of cancellation if the **Excess Insurer** is cancelling this Policy for nonpayment of premium. Notice of cancellation will be

provided at least sixty (60) days before the effective date of cancellation if this Policy is cancelled for any other reason. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall become the end of the **Policy Period**. Delivery of such notice shall be equivalent to mailing.

C.  If this Policy is cancelled by the **Named Entity**, the **Excess Insurer** shall retain the customary short-rate portion of the premium. If this Policy is cancelled by the **Excess Insurer**, the **Excess Insurer** shall send the applicable portion of the pro-rata premium refund to the **Named Entity** at the address shown in Item 1. of the Declarations of this Policy. Premium adjustment may be made as soon as practicable after cancellation is effective and payment or tender of any unearned premium by the **Excess Insurer** shall not be a condition precedent to the effectiveness of cancellation.

## SECTION IX

ASSIGNMENT. This Policy and any and all rights hereunder are not assignable without the prior written consent of the **Excess Insurer**.

## SECTION X

**NAMED ENTITY** AUTHORIZATION CLAUSE. By acceptance of this Policy, the **Insureds** and the **Named Entity** agree that the **Named Entity** will act on behalf of all of the **Insureds** as well as the **Named Entity** with respect to the giving and receiving of all notices, the payment of premiums, and the receiving of any return premium that may become due.

## SECTION XI

CAPTIONS. The headings or captions used in this Policy are for the purposes of reference only and shall not otherwise affect the meaning of this Policy.

## SCHEDULE OF FORMS AND ENDORSEMENTS

INSURED: Refco, Inc.
POLICY NUMBER: DOX0009322-00

TERM: 8/11/2005 to 8/11/2006

| ENDT. NO. | FORM NO. | TITLE |
|---|---|---|
| | 00 DOX0112 00 04 03 | EXCESS INSURANCE POLICY |
| 1 | 00 DOX0047 00 01 03 | PENDING AND PRIOR LITIGATION EXCLUSION (EXCESS) |
| 2 | 00 DOX0051 00 01 03 | PRIOR NOTICE EXCLUSION (EXCESS) |
| 3 | 00 DOX0004 00 04 03 | APPLICATION ENDORSEMENT (EXCESS) |
| 4 | 00 DOX0050 00 01 03 | PRIOR KNOWLEDGE OR INFORMATION EXCLUSION (EXCESS) |
| 5 | 00 DOX0129 14 08 03 | ILLINOIS AMENDATORY ENDORSEMENT |
| | 00 MLT0027 00 01 05 | TERRORISM COVERAGE DISCLOSURE NOTICE |

00 ML0012 00 09 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PENDING AND PRIOR LITIGATION EXCLUSION (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

1. The **Excess Insurer** shall not be liable to make any payment in connection with a **Claim** arising out of, based upon or attributable to:

   a. any litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured** occurring prior to, or pending as of, August 11, 2005;

   b. any subsequent litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured** arising from or based on any matter alleged in such prior or pending litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured**; or

   c. any **Wrongful Act** which gave rise to such prior or pending litigation, formal or informal investigations, administrative proceedings, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any **Insured**, or any other **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** described above, constitute **Interrelated Wrongful Acts**.

2. "**Wrongful Act**" means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act.

3. "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  1

Policy Number:          DOX0009322-00

Named Insured:         Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0047 00 01 03                                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**PRIOR NOTICE EXCLUSION (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

1.  The **Excess Insurer** shall not be liable to make any payment in connection with a **Claim** alleging, arising out of, based upon or attributable to:

    a.  any **Wrongful Act** or any matter, fact, circumstance, situation, transaction, or event which has been the subject of any notice given under any policy, the term of which incepted prior to the inception date of this Policy; or

    b.  any **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** described in a. above, constitute **Interrelated Wrongful Acts**.

2.  "**Wrongful Act**" means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act.

3.  "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  2

Policy Number:          DOX0009322-00

Named Insured:         Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0051 00 01 03                                                                                     Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**APPLICATION ENDORSEMENT (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

The term "Application" or "Renewal Application," as used in this Policy or any **Underlying Insurance** shall mean:

1.  Each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this Policy or any **Underlying Insurance** or the underwriting of any other directors and officers and/or corporation (or equivalent) liability policy issued by the **Excess Insurer** or an insurer of any **Underlying Insurance**, or any of their affiliates, of which this Policy or any **Underlying Insurance** is a renewal, replacement or which it succeeds in time;

2.  Any public documents filed by the **Insureds** with the Securities and Exchange Commission ("SEC") or any similar state, local, or foreign regulatory agency, including, but not limited to, the Annual Report(s), 10Ks, 10Qs, 8Ks and proxy statements of an entity that is an **Insured**; and

3.  Any other written public statement or certification required by law to be made by the chief executive officer, chief financial officer or other executive officer of an entity that is an **Insured** regarding the accuracy, completeness or adequacy of such **Insured's** financial statements, SEC filings, or internal controls.

All such applications, attachments, materials, filings and certifications, whether or not furnished to the **Excess Insurer**, are deemed attached to and incorporated into this Policy.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  3

Policy Number:          DOX0009322-00

Named Insured:          Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0004 00 04 03                                                          Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PRIOR KNOWLEDGE OR INFORMATION EXCLUSION (EXCESS)**

In consideration of the premium charged, it is hereby understood and agreed that:

If any **Insured** as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a **Claim** under this Policy, the **Excess Insurer** shall not be liable to make any payment under this Policy as a result of a **Claim** arising out of, based upon or attributable to any such act, error, omission, fact, matter or circumstance.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  4

Policy Number:         DOX0009322-00

Named Insured:         Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0050 00 01 03

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ILLINOIS AMENDATORY ENDORSEMENT**

1. **SECTION IV**, MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE.**, A. is amended by deleting the phrase "with solvent insurers".

2. **SECTION IV**, MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE.**, E. is amended by the addition of the following:

   The **Insureds'** failure to provide the foregoing notice shall not invalidate this Policy, but in the event the **Insureds** fail to provide such notice the **Excess Insurer** shall be liable under this Policy only to the extent that the **Excess Insurer** would have been liable had the **Insureds** provided adequate notice under this provision.

3. **SECTION IV**, MAINTENANCE OF AND CHANGES TO **UNDERLYING INSURANCE.**, G. is deleted in its entirety.

4. **SECTION VIII**, CANCELLATION., B. is deleted and replaced by the following:

   B. After this Policy has been in effect for sixty (60) days, this Policy may be cancelled by or on behalf of the **Excess Insurer** only for one of the following reasons:

   1) nonpayment of premium;

   2) this Policy was obtained through a material misrepresentation;

   3) any **Insured** violated any of the terms and conditions of this Policy;

   4) the risk originally accepted has measurably increased;

   5) certification to the Director of the Department of Insurance of the loss of reinsurance by the **Excess Insurer** which provided coverage to the **Excess Insurer** for all or a substantial part of the underlying risk insured; or

   6) a determination by the Director of the Department of Insurance that the continuance of the Policy could place the **Excess Insurer** in violation of the insurance laws of Illinois.

   The **Excess Insurer** shall mail written notice of cancellation to the **Named Entity** and the **Named Entity's** agent or broker of any record at the last address known to the **Excess Insurer** and any mortgagee or lienholder, if known. Notice of cancellation shall be provided at least ten (10) days before the effective date of cancellation if cancellation is for nonpayment of premium. If cancellation is for any of the reasons listed in 2) through 6) above, and the Policy has been in effect for sixty (60) days or less, then notice of cancellation shall be provided at least thirty (30) days before the effective date of cancellation. After the Policy has been in effect for sixty-one (61) days or more, notice of cancellation shall be provided at least sixty (60) days before the effective date of cancellation. The mailing of such notice shall be sufficient and the effective date of cancellation shall become the end of the **Policy Period**. The **Excess Insurer** shall maintain proof of mailing on a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service. The notice shall state the reason or reasons for cancellation.

00 DOX0129 14 08 03                                                          Page 1 of 2

5. **SECTION VIII** is amended by the addition of the following:

NONRENEWAL.    Should the **Excess Insurer** decide to nonrenew this Policy, then the **Excess Insurer** shall mail written notice of nonrenewal to the **Named Entity** at the principal address shown in Item 1. of the Declarations of this Policy, the agent or broker of record and any mortgagee or lienholder, if known.  The **Excess Insurer** shall mail or deliver such notice at least sixty (60) days before the end of the **Policy Period**.  The notice shall state the reason or reasons for nonrenewal.  The mailing of such notice shall be sufficient and the **Excess Insurer** shall maintain proof of mailing on a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial delivery service.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:  5

Policy Number:         DOX0009322-00

Named Insured:        Refco, Inc.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: August 11, 2005

00 DOX0129 14 08 03                                                          Page 2 of 2

# TERRORISM COVERAGE DISCLOSURE NOTICE

### TERRORISM COVERAGE PROVIDED UNDER THIS POLICY

The Terrorism Risk Insurance Act of 2002 established a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. The Act provides that, to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States.

In accordance with the Terrorism Risk Insurance Act of 2002, we are required to offer you coverage for losses resulting from an act of terrorism **that is certified under the federal program** as an act of terrorism committed by an individual(s) acting on behalf of a foreign person or foreign interest. The policy's other provisions will still apply to such an act. Your decision is needed on this question: do you choose to pay the premium for terrorism coverage stated in this offer of coverage, or do you reject the offer of coverage and not pay the premium? You may accept or reject this offer.

If your policy provides commercial property coverage, in certain states, statutes or regulations may require coverage for fire following an act of terrorism. In those states, if "terrorism" results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements that apply to those coverage forms, or to Legal Liability coverage forms or Leasehold Interest coverage forms.

**Your premium <u>will</u> include the additional premium for terrorism as stated in the section of this Notice titled DISCLOSURE OF PREMIUM.**

### DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. **The federal share equals 90% of that portion of the amount of such insured losses that exceeds the pplicable insurer retention.**

### DISCLOSURE OF PREMIUM

Your premium for terrorism coverage is: **Included in Policy Premium**
(This charge/amount is applied to obtain the final premium.)

**You may choose to reject the offer by signing the statement below and returning it to us. Your policy will be changed to exclude the described coverage. If you chose to accept this offer, this form does not have to be returned.**

### REJECTION STATEMENT

I hereby decline to purchase coverage for certified acts of terrorism. I understand that an exclusion of certain terrorism losses will be made part of this policy.

---

Policyholder/Legal Representative/Applicant's
Signature

Refco, Inc.
Named Insured

---

Print Name of Policyholder/Legal
Representative /Applicant

Arch Insurance Company
Insurance Company

Date:

Policy Number: DOX0009322-00

00 MLT0027 00 01 05

# EXHIBIT B

# U.S. SPECIALTY INSURANCE COMPANY



HCC Global Financial Products

8 Forest Park Drive
P.O. Box 4016
Farmington, CT 06034

## THE MAG
### APPLICATION FOR DIRECTORS, OFFICERS AND PRIVATE ORGANIZATION LIABILITY COVERAGE (INCLUDING EMPLOYMENT PRACTICES LIABILITY)

**NOTICE: THE POLICY FOR WHICH THIS APPLICATION IS MADE APPLIES, SUBJECT TO ALL OF ITS TERMS, CONDITIONS AND LIMITATIONS, ONLY TO CLAIMS MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION. THE INSURER WILL HAVE NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED.**

The term "Applicant" means the Named Organization and all Subsidiaries.

1.  (a)  Named Organization:      Refco Group Ltd., LLC
         Address:                          200 Liberty Street, Tower A
         City, State, Zip Code:         New York, NY 10281
    (b)  Name and title of the officer of the Applicant designated as the representative to receive all notices from the Insurer on behalf of all persons and entities proposed for this insurance:     Ellen Brooks
         E-mail address:                EBrooks@Refco.com
    (c)  The Named Organization has been in continuous operation since: 1985

2.  Please identify each Subsidiary and the date on which it became a Subsidiary:
    Schedule Attached

3.  Please provide the following information regarding the outstanding common stock of the Named Organization and of each Subsidiary, if any common stock thereof is held by any person(s) or entity (ies) other than the Named Organization or another Subsidiary:
    (a)  Total number of voting shares outstanding? 100,000,000
    (b)  Total number of voting shareholders: 2
    (c)  Total number of voting shares owned by the Applicant's Directors & Officers: 43,124,430.25
    (d)  Are 5% or more of the Applicant's voting shares owned, directly or beneficially, by any single shareholder or group of shareholders?     ☒Yes
         ☐No
         If yes, please provide names and percentages of holdings by such shareholders or groups: Refco Group Holdings, Inc. 43%, TH Lee 57%

4.  Have any of the Applicant's current D&O or EPL carriers indicated an intent not to offer renewal terms?     ☐Yes ☒No
         If yes, please provide complete details:_____
         (QUESTION NO. 4 NOT APPLICABLE TO MISSOURI INSUREDS)

USSIC 1451 (04/2002)
Page 1 of 5

**U.S. SPECIALTY INSURANCE COMPANY**

5.  Have there been any changes in the Applicant's board of directors or within the
    Applicant's senior management during the past 3 years for any reason other than death
    or retirement?                                                    ☒Yes ☐No
        If yes, please provide complete details as an attachment.

6.  Have the Applicant's outside auditors stated that there are no material weaknesses in the
    Applicant's system of internal controls?  (see below *)              ☒Yes ☐No
        If so, please provide the latest CPA letter to management and management's
        response thereto.

7.  Within the last 36 months, has the Named Organization or any Subsidiary completed
    or agreed to any of the following, whether or not any such transaction was completed?

    (a)  merger or consolidation with or acquisition of another entity whose consolidated
         assets exceeded 25% of the Applicant's consolidated assets?      ☐Yes ☒No
    (b)  sale, distribution or divestiture of any assets or stock in an amount exceeding 25%
         of the Applicant's consolidated assets?                          ☐Yes ☒No
    (c)  registration for public offering of securities?                  ☒Yes ☐No
    (d)  private placement of securities?                                 ☒Yes ☐No
    (e)  reorganization or arrangement with creditors under federal or state law?
                                                                          ☐Yes ☒No

        If yes to any of the foregoing, please provide complete details (use a separate
        sheet of paper, if necessary):

8.  Please give details of the present insurance. If none, so state:

|                  | Insurer               | Limit        | Premium       |
|------------------|-----------------------|--------------|---------------|
| D&O              | HCC, ELU XL, AXIX     | $30,000,000  | $393,393.00   |
| EPL (if separate)| AIG, STARR EXCELL     | $10,000,000  | $195,500.00   |
| GL               | The HARTFORD          | $ 1,000,000  | $ 42,441.36   |

9.  (a)  Total number of employees: Current 1,738  1 year ago 1,725
    (b)  How many employees have been terminated during the past 2 years? 492

10. Does the Applicant anticipate any plant, facility, branch or office closing, consolidations
    or layoffs with the next 24 months?                                 ☐Yes ☒No
        If yes, please provide complete details (use a separate sheet of paper, if
        necessary):

* Point 6.  The question is poorly worded.  The auditors would only issue a
  statement if there were material weaknesses.  The auditors made no such
  statement to management.

USSIC 1057 (042002)
Page 2 of 3

**U.S. SPECIALTY INSURANCE COMPANY**

11.  Does the Applicant:
(a)  Have a full-time human resources coordinator?  ☒Yes ☐No
(b)  Have a written policy with respect to sexual harassment?  ☒Yes ☐No
(c)  Have written annual evaluations for employees?  ☒Yes ☐No
(d)  Have a written policy with respect to progressive discipline for employees?  ☒Yes ☐No
(e)  Have a written policy for Family Medical Leave?  ☒Yes ☐No
(f)  Have a written human resources manual or equivalent written guidelines?  ☒Yes ☐No
(g)  Use outside counsel for employment advice?  ☐Yes ☒No

District of Columbia -- refer to 3 years:

12.  (a)  Have any claims been made during the last 5 years against any person or entity proposed for this insurance in his or her capacity as a director, officer or trustee of any corporation or organization?  ☐Yes ☐No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

(b)  Is any person or entity proposed for this insurance aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he, she or it has reason to believe might result in a claim being made?  ☐Yes ☐No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

Without prejudice to any other rights of the Insurer, it is understood and agreed that the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b).

13.  Documents Required:

Please submit one copy of each of the following documents, all of which will be deemed to be attached to and to be a part of this Application.
(a)  Attachments providing complete details and/or additional information where required as a result of the Applicant's response to questions in this Application.
(b)  The Applicant's most recent Annual Report (including complete audited financial statements for the last 2 years).
(c)  Any registration statements filed with the SEC or any private placement memoranda within the last 12 months.
(d)  Audited financial statements with any notes and schedules.

USSIC 1057 (04/2002)
Page 3 of 3

**U.S. SPECIALTY INSURANCE COMPANY**

(e)     Summary and status of any litigation filed within the last 24 months against any person or entity proposed for this insurance (including any litigation that has been resolved).

FOR PURPOSES OF THIS APPLICATION, THE UNDERSIGNED AUTHORIZED AGENT OF ALL PERSONS AND ENTITIES PROPOSED FOR THIS INSURANCE DECLARES THAT, TO THE BEST OF HIS/HER KNOWLEDGE AND BELIEF, AFTER REASONABLE INQUIRY, THE STATEMENTS CONTAINED HEREIN, AND IN ANY ATTACHMENTS HERETO, ARE TRUE AND COMPLETE. THE INSURER IS AUTHORIZED TO MAKE ANY INQUIRY IN CONNECTION WITH THIS APPLICATION. ACCEPTING THIS APPLICATION DOES NOT BIND THE INSURER TO COMPLETE THE INSURANCE.

THE INFORMATION CONTAINED IN AND SUBMITTED WITH THIS APPLICATION IS ON FILE WITH THE INSURER, AND IS CONSIDERED TO BE PHYSICALLY ATTACHED TO AND PART OF THIS APPLICATION. THIS APPLICATION, INCLUDING ALL ATTACHMENTS THERETO, WILL BE CONSIDERED TO BE PHYSICALLY ATTACHED TO ANY POLICY ISSUED ON THE BASIS OF THIS APPLICATION AND WILL BECOME PART OF ANY SUCH POLICY. THE INSURER WILL HAVE RELIED UPON THIS APPLICATION, INCLUDING ALL ATTACHMENTS THERETO, IN ISSUING ANY SUCH POLICY.

IF ANY INFORMATION IN THIS APPLICATION, INCLUDING ANY ATTACHMENT THERETO, CHANGES MATERIALLY BEFORE THE EFFECTIVE DATE OF THE POLICY FOR WHICH APPLICATION IS MADE, THE APPLICANT MUST NOTIFY THE INSURER, AND THE INSURER MAY MODIFY OR WITHDRAW ANY QUOTATION.

NOTICE TO COLORADO APPLICANTS: IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

NOTICE TO NEW YORK APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

NOTICE TO PENNSYLVANIA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING,

**U.S. SPECIALTY INSURANCE COMPANY**

INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

NOTICE TO APPLICANTS OF FLORIDA, KENTUCKY, MINNESOTA, NEW JERSEY, OHIO AND OKLAHOMA: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUDS OR DECEIVES ANY INSURER OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, IS GUILTY OF A FELONY AND IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

NOTICE TO APPLICANTS OF VIRGINIA, MAINE AND NEW MEXICO: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS. IF DISCOVERY IS ELECTED THE LIMIT WILL NOT BE REINSTATED. MATERIALS SUBMITTED IN CONNECTION WITH THE APPLICTION WILL FORM A PART OF THE POLICY.

NOTICE TO APPLICANTS OF TENNESSEE: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

WARNING TO APPLICANTS OF DISTRICT OF COLUMBIA: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT.

| APPLICANT: | | | |
|---|---|---|---|
| BY: _[signature]_ | TITLE: Pres. + Ceo. | DATE: 2/5/05. |

Note: This Application must be signed by the President and/or CEO of the Applicant acting as the authorized agent of the persons and entity(ies) proposed for this insurance.



Companies House Direct

Page 1 of 1

**COMPANIES HOUSE**

HELP | COMPANY SELECTION | DIR/SEC ENQUIRES | DOCUMENT DOWNLOAD | MONITOR SERVICE | MENU

Directors & Secretary enquiries
PERSONAL APPOINTMENTS WITH
LIMITED COMPANIES

Go Back

| | |
|---|---|
| **Name:** | PHILLIP ROGER BENNETT |
| **Nationality:** | BRITISH |
| **Latest Address:** | 125 COLT LANE |
| | GLADSTONE |
| | NEW JERSEY 07934 USA |
| **Date of Birth:** | 22/07/1948 |

Company Appointments: Current 5

To view company details, click on the appropriate company number.
Click HERE to include Resigned and Dissolved appointments

| | |
|---|---|
| **DIRECTOR** | Appointed: pre 15/08/1992 |
| **Occupation:** | FINANCIER |
| **Company Number:** | 01575017 |
| **Company Name:** | REFCO EUROPE LIMITED |
| | Active |

| | |
|---|---|
| **DIRECTOR** | Appointed: pre 14/07/1992 |
| **Occupation:** | FINANCIER |
| **Company Number:** | 02671852 |
| **Company Name:** | REFCO OVERSEAS LIMITED |
| | Active |

| | |
|---|---|
| **DIRECTOR** | Appointed: 22/02/1999 |
| **Occupation:** | FINANCIER |
| **Company Number:** | 03692631 |
| **Company Name:** | TILNEY HOLDINGS LIMITED |
| | Active |

| | |
|---|---|
| **DIRECTOR** | Appointed: 21/03/2003 |
| **Occupation:** | FINANCIER |
| **Company Number:** | 04388773 |
| **Company Name:** | REFCO TRADING SERVICES (UK) LIMITED |
| | Active |

| | |
|---|---|
| **DIRECTOR** | Appointed: 03/10/2003 |
| **Occupation:** | FINANCIER |
| **Company Number:** | 03928615 |
| **Company Name:** | WESTMINSTER CLEARING LIMITED |
| | Active |

This screen does not include appointments with LLPs or European Companies.

UK COMPANIES ONLY

NW

http://chd3.companieshouse.gov.uk/a04ad6dbd6a05bd7a0d9524377473d76/frms?na...  02/02/2005

# EXHIBIT C



**Kenny**
**Li/NYC-NY/US/Marsh/MMC**
08/09/2005 10:15 AM

To

cc

bcc  frank.forde@aig.com
sean.Lukac@axiscapital.com
jerome.brendle@awac.com
mfisher@archinsurance.com
Hank.Toolan@xlgroup.com

Subject  Refco - warranty

Refco prefers not to sign any warranties. Should you need one to bind, please include an inverted warranty endorsement on your revised quote.

kl

Kenny Li
Marsh USA Inc.
Private Equity and Mergers & Acquisitions Svcs.
1166 Avenue of the Americas – 38th Floor
New York, NY 10036
Phone: 212-345-1989   Fax: 212-345-8491
Email: Kenny.Li@marsh.com

All Recipients
To:
cc:
From:    Kenny Li/NYC-NY/US/Marsh/MMC

Confidential
M-CHI 001037

# EXHIBIT D



Wiley Rein & Fielding LLP

RECEIVED

MAR 1 0 2006

**MARSH**
CHICAGO, ILLINOIS

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX    202.719.7049

Virginia Office
7925 JONES BRANCH DRIVE
SUITE 6200
McLEAN, VA 22102
PHONE  703.905.2800
FAX    703.905.2820

www.wrf.com

March 9, 2006

Daniel J. Standish
202.719.7130
dstandish@wrf.com

Cara Tseng Duffield
202.719.7407
cduffiel@wrf.com

**VIA OVERNIGHT DELIVERY**

Andrea D. Lieberman, Esq.
Marsh USA Inc.
500 West Monroe
Chicago, IL 60661

Debora K. Grobman, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Re:    Insured:    Refco, Inc. ("Refco" or the "Company")
       Policy No.:  DOX000932200 (the "Arch Policy")
       Matters:    See attached list

Dear Ms. Lieberman and Ms. Grobman:

As you know, this firm represents Arch Insurance Company ("Arch") in connection with the above-referenced matters ("Matters"). On behalf of Arch, this letter acknowledges or further acknowledges receipt of notice of the Matters. Based on the information made available to date, Arch sets forth herein its views regarding the availability of coverage for the Matters under the Arch Policy. Please note that this analysis is based upon information received to date and is subject to modification if additional information is received.

We understand that Ms. Grobman represents Phillip R. Bennett in connection with the Matters, and ask that Ms. Lieberman furnish a copy of this letter to all other insureds under the Arch Policy. If there is someone else to whom we should direct this letter, please let us know.

## I.   DESCRIPTION OF THE MATTERS

### A.   The Bennett Criminal Action

On or about October 12, 2005, the United States filed a criminal complaint against Mr. Bennett in the Southern District of New York for violation of the federal securities laws. *United States v. Bennett*, No. 05 MAG 1720 (S.D.N.Y.). The complaint alleges that Mr. Bennett knowingly failed to disclose to investors in Refco's August 2005 initial public offering the existence of hundreds of millions of dollars of receivables owed to Refco by Refco Group Holdings, Inc. ("RGHI"), a

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 2

company allegedly controlled by Mr. Bennett, as well as related-party transactions that were designed to hide these receivables.

On November 10, 2005, the Grand Jury for the Southern District of New York indicted Mr. Bennett on charges of securities fraud, conspiracy to commit securities fraud, false filings to the SEC, and wire fraud. According to the indictment (the "Bennett Indictment"), Mr. Bennett

> sought to hide from, among others, Refco's auditors and investors, losses sustained by Refco through its own and its customers' trading in the financial markets. To that end, Bennett transferred losses from Refco to a company controlled by Bennett, directed a repeated series of transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make false and fraudulent public filings with the [SEC].

Bennett Indictment ¶ 4.

The Bennett Indictment alleges that, as part of its brokerage business, Refco extended credit to customers for their securities and commodities trading. When certain customers were unable to repay that credit, rather than noting the losses on Refco's balance sheet, Mr. Bennett directed the transfer of those losses to Refco Group Holdings, Inc., which he controlled. As a result, Refco's balance sheet showed a receivable from RGHI. According to the Bennett Indictment, beginning in or around 1999, Mr. Bennett took steps to hide the RGHI receivable from Refco's auditors. Specifically, Mr. Bennett arranged transactions with third parties to temporarily pay down the RGHI receivable at quarter- or year-end and mask the related-party nature of the RGHI debt.

According to the Bennett Indictment, Mr. Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2004 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2004 Transactions"). On or about February 20, 2004, Mr. Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $720 million to a Refco customer. On the same day, the customer loaned $720 million to RGHI. RGHI

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 3

then used the $720 million to pay down its debt to Refco. These loans were unwound on or about March 4, 2004, after Refco's fiscal year-end. According to the Bennett Indictment, Mr. Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Mr. Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $720 million if RGHI defaulted.

The Bennett Indictment further alleges that Mr. Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2005 Transactions"). On or about February 23, 2005, Mr. Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $345 million to a Refco customer. On the same day, the customer loaned $345 million to RGHI. RGHI then used the $345 million to pay down its debt to Refco. These loans were unwound on or about March 8, 2005, after Refco's fiscal year-end. According to the Bennett Indictment, Mr. Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Mr. Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $345 million if RGHI defaulted.

According to the Bennett Indictment, Mr. Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal first quarter end for 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "May 2005 Transactions"). On or about May 25, 2005, Mr. Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $450 million to a Refco customer. On the same day, the customer loaned $450 million to RGHI. RGHI then used the $450 million to pay down its debt to Refco. These loans were unwound on or about June 6, 2005, after Refco's fiscal first quarter-end. According to the Bennett Indictment, Mr. Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Mr. Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $450 million if RGHI defaulted.

The criminal complaint and the indictment against Mr. Bennett will be referred to herein as the "Bennett Criminal Action."

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 4

### B.    The Customer/Account Holder Lawsuits

The complaints in *Banseco Holding*, *Miura Financial* and *Multiplicas Casa De Bolsa* were filed in New York Supreme Court on October 17, 2005. The only defendants named in the suits are Refco, Inc. and Refco Capital Markets, Ltd. ("RCM"). Plaintiffs in the suits purport to be owners of brokerage accounts with Refco. The complaints allege that brokerage agreements between plaintiffs and Refco obligated Refco to invest, transfer and return funds and investments in plaintiffs' accounts pursuant to plaintiffs' instructions, and that Refco failed to fulfill this obligation. Based on this alleged failure, the complaints assert causes of action for breach of contract, conversion, imposition of constructive trust, and unjust enrichment.

The complaints in *Bac International Bank, Inc.* and *Banco de America Central, S.A.*, which were filed in November 2005, name only RCM as defendant. Plaintiffs allege that they are parties to customer agreements with RCM and hold assets in accounts at RCM, and that since Refco Securities, LLC declared a 15-day moratorium on customer withdrawals at RCM on October 13, 2005, RCM has failed to comply with plaintiffs' instructions that RCM transfer their assets to accounts at other institutions. The complaints assert causes of action for (1) declaratory judgment, (2) return of property, (3) conduit, (4) constructive trust, (5) unjust enrichment, (6) resulting trust, and (7) replevin.

The complaint in *Markwood Investments*, which was filed on or about November 17, 2005, names RCM and Refco Securities LLC as defendants. Plaintiff alleges that it is an investment firm that maintained an account at RCM, and that RCM wrongfully transferred various securities in Markwood's account and in the accounts of others to Refco Securities to allow Refco Securities to satisfy certain financial obligations. Plaintiff further alleges that RCM has not responded to plaintiff's demand that RCM reverse the transfer of its assets and return the assets to plaintiff's account. The complaint asserts causes of action for (1) avoidance and recovery of transfers of Markwood Assets, (2) avoidance and recovery of transfers of non-Markwood assets, (3) conversion, (4) constructive trust, (5) unjust enrichment, (6) replevin, (7) accounting, and (8) permanent injunction.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 5

The complaint in *Reserve Invest (CYPRUS) Ltd.*, which was filed on or about November 18, 2005, names RCM, Michael W. Morrison and Richard Heis as defendants. Messrs. Morrison and Heis are alleged to be Joint Provisional Liquidators of RCM. Plaintiff alleges that it is an investment company and a customer of RCM, and that it entered into a Global Master Repurchase Agreement and an International Swap Dealers Association Master Agreement with RCM. Plaintiff alleges, inter alia, that RCM seized and has refused plaintiff's demand for return of certain of its securities held by RCM, and that RCM withheld dividend payments due to plaintiff. The complaint asserts causes of action for (1) declaratory relief, (2) return of property, (3) replevin (4) conversion, (5) constructive trust, and (6) accounting.

### C.   The Derivative Action

The complaint in *Mehta v. Bennett et al.*, No. 05-8748 (S.D.N.Y.), a shareholder derivative action (the "Derivative Action"), was filed in the Southern District of New York on October 14, 2005. Plaintiff, a purported Refco shareholder, purports to bring the Derivative Action on behalf of Refco. Defendants include Mr. Bennett and a number of other directors and officers of Refco (collectively, the "Individual Defendants") and certain underwriters involved in Refco's IPO (the "IPO Underwriter Defendants").

The Derivative Action generally alleges the same conduct alleged in the Bennett Criminal Matter. Based on that conduct, it asserts five causes of action against the Individual Defendants: (1) breach of fiduciary duty, (2) abuse of control, (3) gross mismanagement, (4) waste of corporate assets, and (5) unjust enrichment. It also asserts a cause of action against the IPO Underwriter Defendants.

### D.   The Securities Litigation

The Securities Litigation consists of eleven purported class action securities suits that were filed in the Southern District of New York in October 2005, as well as all other class action securities suits that are consolidated with those actions. Defendants include Mr. Bennett and other directors and officers of Refco. Refco, Inc. is named as a defendant in several of the actions, as are a number of other entities, including Refco Group Holdings Inc., and Refco F/X Associates, LLC.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 6

The complaints in the Securities Litigation generally allege the same conduct alleged in the Bennett Criminal Action — that Refco failed to disclose to investors in its August 2005 IPO the $430 million receivable owed to Refco by an entity controlled by Mr. Bennett, as well as related-party transactions designed to conceal that debt. Based on this conduct, plaintiffs allege that Refco's initial public offering registration statement and prospectus were materially false and misleading. The complaints assert causes of action for violations of Section 11, 12(a)(2) and 15 of the Securities Act of 1933 and violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5.

E.    **Miscellaneous**

1.    **The American Financial Action**

The complaint in *American Financial International Group v. Refco, Inc. et al.*, No. 05-8988 (S.D.N.Y.) (the "American Financial Action") was filed in the Southern District of New York on or about October 21, 2005. The plaintiff identifies itself as a Delaware LLC that trades currencies through an account at Refco F/X Associates, LLC ("RefcoFX"). The suit is a purported class action brought on behalf of all persons who traded currencies through, or had currency trading accounts with, RefcoFX from August 11, 2005 through the date the complaint was filed, and who have been damaged. The complaint names as defendants Refco, RefcoFX, and Mr. Bennett; it also names a number of John Doe defendants.

The complaint generally alleges the same conduct that is the subject of the Bennett Criminal Matter and the Securities Litigation. It further alleges that Refco, Refco FX, and various Refco affiliates filed a voluntary petition for bankruptcy protection on October 17, 2005, and that, on the same day, RefcoFX notified its customers that they could no longer make withdrawals from or deposits to their currency trading accounts. As a result, plaintiffs were prevented from depositing funds to maintain appropriate account balances and were forced to sell currency positions to avoid having RefcoFX close leveraged positions automatically. This and other alleged consequences of RefcoFX's actions allegedly caused plaintiffs transactional costs and other losses.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 7

     Based on this alleged conduct, the complaint asserts causes of action for (1) fraud and misrepresentation, (2) negligence and negligent misrepresentation, (3) unjust enrichment and restitution, (4) quantum meruit, (5) breach of contract, (6) breach of warranty, and (7) unfair competition.

### 2.     The Bawag Action

     *Bawag P.S.K. Bank v. Refco Inc. et al.*, No. 05-60006 (S.D.N.Y. Bkr.), Adv. No. 05-03161 (the "Bawag Action"), an adversary proceeding instituted in connection with Refco's bankruptcy proceedings, was filed on November 16, 2005. The plaintiff identifies itself as a bank located in Austria. Among the defendants named in the complaint are Refco, numerous Refco affiliates and Mr. Bennett.

     The complaint alleges that plaintiff was fraudulently induced to loan approximately $420 million to Mr. Bennett on October 10, 2005. The complaint alleges that Mr. Bennett failed to disclose that he sought the loan to pay off RGHI's receivable to Refco, a "related-party receivable resulting from the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to Refco [that] likely was impaired and not collectible." Complaint, § 17. The complaint alleges that Mr. Bennett "knew that if BAWAG had been aware of any of the key facts set forth in [Refco's] October 10, 2005 Press Release, BAWAG would not have made the Loan." *Id.*, § 30. It also alleges that the Refco defendants had knowledge of the related-party receivable but nonetheless assisted Mr. Bennett in his effort to obtain the loan to repay the receivable.

     The complaint asserts seven causes of action: (1) Constructive Trust, (2) Fraud in the Inducement, (3) Fraud, (4) Civil Conspiracy, (5) Unjust Enrichment, (6) Breach of Contract, and (7) Conversion.

### 3.     The THL Funds Action

     *Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*, 05-CV-9608 (the "THL Funds Action"), was filed in the Southern District of New York on November 11, 2005. Plaintiffs are the Thomas H. Lee Equity Fund V, L.P., the Thomas H. Lee Parallel Fund V, L.P., and the Thomas H. Lee Equity (Cayman) Fund V, L.P. (collectively, the "THL Funds"). Defendants are Mr. Bennett, Tone Grant, Santo Maggio, and Refco Group Holdings, Inc. and John Does 1-10.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 8

The complaint in the THL Funds Action alleges that in June 2004, the plaintiffs invested approximately $507 million in Refco. The complaint alleges that despite the plaintiffs' due diligence efforts, they were unaware that "Bennett intentionally and deliberately engaged in accounting fraud in order to mask a group of largely worthless receivables, bad debts and questionable obligations that, if accurately portrayed on the Company's financial statements, would have materially reduced Refco's value." Complaint, § 4. Specifically, the complaint alleges that Mr. Bennett "nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of million dollars [sic] of customer losses and obligations that would never be repaid to the Company." *Id.*, § 30. The complaint alleges that the Refco financial statements provided to the plaintiffs during their due diligence review in 2003 and 2004 were materially false and misleading.

Based on these and other allegations, the complaint asserts causes of action for (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, (2) fraud, (3) negligent misrepresentation, (4) breach of contract, and (5) contribution and indemnification.

## 4.    The Sillam Action

The complaint in *Bankruptcy Trust of Gerard Sillam v. Refco Group LLC et al.*, No. 05603931 (Supreme Court, New York County, New York) (the "Sillam Action") was filed in New York state court on November 4, 2005. Plaintiffs are the bankruptcy trust of Gerard Sillam and Gerard Sillam, a citizen of France. The suit names as defendants numerous entities and individuals, including Refco-related entities and Refco directors and officers. Plaintiffs allege that Mr. Sillam was entitled to certain commissions for arranging business transactions for Refco overseas entities but that the Refco entities refused to honor those arrangements. Plaintiffs alleges that between October 2000 and June 2005, Mr. Sillam made various demands and took various legal actions in France and the U.S. — including the filing of various suits — to force Refco to honor its contracts. The complaint asserts causes of action against defendants for (1) fraud, (2) fraudulent misrepresentation, (3) tortious interference with contract, and (4) unjust enrichment.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 9

5.    **The CFTC Subpoena**

Arch has received a copy of a subpoena issued by the U.S. Commodity Futures Trading Commission to Mr. Bennett and dated October 19, 2005 (the "CFTC Subpoena"). The subpoena indicates that it was issued in the matter of "Refco, Inc., Refco LLC, Refco FX, LLC, Refco Capital Markets, Ltd., Refco Group, Ltd., Liberty Corner Asset Management, LLC, Liberty Corner Capital Strategies, LLC and Phillip R. Bennett," and seeks production of documents relating to various Refco affiliated entities as well as documents related to Mr. Bennett's financial assets and holdings.

In a letter to the primary carrier dated January 9, 2006, Ms. Grobman represented that the CFTC was issued pursuant to a formal investigative order. The letter stated that the CFTC would not provide Kramer Levin with a copy of the order, but had permitted the firm to review the order at the CFTC's offices. According to the letter, the order was dated October 13, 2005 - days after Refco's public announcements regarding the receivables owed to Refco by an entity controlled by Mr. Bennett and the related party transactions designed to conceal those receivables. The letter stated that the order is to

> determine whether, in or in connection with the transfer of funds by and between various Refco entities and/or various hedge funds, or the reporting of or representations made about such transfers[,] Refco, Inc., Refco LLC, Refco FX, Refco Capital Markets, Refco Group, Liberty Corner Asset Management, Liberty Corner Capital Strategies, Mr. Bennett or any other persons or entities, have engaged, are engaging or are about to engage in acts and practices in violation of Sections 9(a)(3) or 9(a)(4) or Commission Regulations 1.14 and 1.15.

6.    **The Unovalores Action**

The complaint in the *Unovalores Ltd. v. Bennett*, No. L1564-05 (Sup. Ct. of New Jersey, Somerset County, Law Division) (the "Unovalores Action") was filed in New Jersey state court on or about November 1, 2005. The plaintiff, which identifies itself as a Refco Capital account holder, names only Mr. Bennett as a

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 10

defendant. Plaintiff alleges that it entered into a Repurchase Transaction with Refco on August 31, 2005, in reliance upon representations in Refco's registration statement and other filings concerning Refco's financial health. Those representations were false, according to the complaint, because they concealed massive receivables owed by an entity controlled by Mr. Bennett and at least one-half billion dollars of related party transactions with Mr. Bennett. Based on the above, the complaint asserts causes of action for (1) fraud, (2) New Jersey RICO, (3) RICO conspiracy, (4) breach of fiduciary duty, (5) tortious interference of contract, and (6) writ of attachment.

## II.    THE ARCH POLICY

Subject to all of its terms and conditions, the Arch Policy contains a limit of liability of $10 million that is excess of $40 million in **Underlying Insurance**[1] and the applicable retention for the period August 11, 2005 to August 11, 2006. The coverage available under the Arch Policy attaches only after all such **Underlying Insurance** has been exhausted by the actual payment of loss and after Insureds have paid the full amount of any applicable deductible or self-insured retentions. Arch Policy, § I.B. In general, the Arch Policy applies in conformance with the terms and conditions of the **Primary Policy** and in conformance with the terms and conditions in the Arch Policy or in any other underlying insurance "further limiting or restricting coverage." Arch Policy, Section I.C. The Arch Policy provides that "[i]n no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the **Underlying Insurance**." *Id.*

The **Primary Policy**, which was issued by U.S. Specialty Insurance Company, has a limit of liability of $10 million. The first excess policy (the "Lexington Policy"), which was issued by Lexington Insurance Company, has a limit of liability of $7.5 million excess of $10,000,000. The second and third layer excess policies have not yet been issued, but Axis Reinsurance Company bound coverage for the second excess policy (the "Axis Policy"), with a limit of liability of $10 million excess of $17.5 million, and Allied World Assurance Company has bound coverage for a third excess policy (the "AWAC Policy") with limits of $12.5 million excess of $27.5 million. Arch reserves its rights to supplement this

---

[1] Terms that appear in bold in this letter are defined in the policy being quoted or discussed, and appear in bold therein.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 11

letter once the Axis Policy and the AWAC Policy are issued and any coverage positions are issued by those carriers.

Subject to all of its terms and conditions, the Arch Policy contains five insuring agreements. First, the Arch Policy affords specified coverage to **Insured Persons** for "**Loss** arising from **Claims** first made during the **Policy Period** . . . for **Wrongful Acts**, except when and to the extent that the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement." **Primary Policy**, Insuring Agreement (A). Second, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the **Company** for "**Loss** arising from . . . **Claims** first made during the **Policy Period** . . . against the **Insured Persons** for **Wrongful Acts**, if the **Company** has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement." **Primary Policy**, Insuring Agreement (B)(1).

Third, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the **Company** for "**Loss** arising from . . . **Securities Claims** first made during the **Policy Period** . . . against the **Company** for **Wrongful Acts**." **Primary Policy**, Insuring Agreement (B)(2). Fourth, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the "**Controlling Shareholder**," defined as Philip Bennett, for "**Loss** arising from a **Securities Claim** first made during the **Policy Period** . . . against such **Controlling Shareholder** for **Wrongful Acts**, provided, that one or more **Insured Persons** and/or the **Company** are and remain co-defendants in such **Securities Claim** along with such **Controlling Shareholder**." **Primary Policy**, Endorsement No. 15.

Fifth, subject to all of its terms and conditions, the Arch Policy affords specified coverage to the Company for "all **Derivative Demand Investigation Costs** incurred by the **Company** as a result of a **Derivative Demand** first received by the **Company's** Board of Directors and reported in writing to the Insurer during the **Policy Period** . . . up to the amount of the **Derivative Demand Investigation Costs Sub-Limit**" of $250,000. **Primary Policy**, Endorsement No. 11.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 12

### III.    COVERAGE DISCUSSION

#### A.    Denial of Coverage for the Bennett Criminal Action, the CFTC Subpoena, the Securities Litigation, the Derivative Action, the American Financial Action, the Bawag Action, the THL Funds Action and the Unovalores Action

Refco conducted its initial public offering on August 11, 2005, the same day the Arch Policy incepted.

On October 10, 2005, Refco issued a press release in which it announced that the Company had been carrying an undisclosed receivable of $430 million from an entity controlled by Mr. Bennett. Refco stated that "[b]ased on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible." The Company stated that although the receivable "was reflected on the Company's prior period financials, as well as on the Company's May 31, 2005 balance sheet," the receivable "was not shown as a related party transaction in any such financials, and that "for that reason, and after consultation by the Audit Committee with the Company's independent accountants, the Company determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

The next day, Refco issued a second press release that announced that Mr. Bennett had repaid the $430 million receivable in full, and that provided further information on the nature of the receivable:

> Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998. These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 13

from that entity, rather than a receivable from the originating accounts. The fact that the receivable was from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual reporting periods by reason of transfers to a third party customer account that we currently believe is unaffiliated with Mr. Bennett or anyone else at the Company.

On October 17, 2005, Refco and certain of its unregulated subsidiaries filed for Chapter 11 bankruptcy protection.

As noted above, the Arch Policy applies in conformance with the terms and conditions of the **Primary Policy** and in conformance with the terms and conditions in the Arch Policy or any other **Underlying Insurance** "further limiting or restricting coverage." Arch Policy, Section I.C.

Arch understands that the underlying AWAC Policy, when issued, will contain the following Prior Knowledge Exclusion Endorsement ("AWAC Prior Knowledge Exclusion"):

It is hereby understood and agreed that the **Insurer** shall not be liable for **Loss** in connection with any claim or claims made against the **Insureds** . . . alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which any Insured had knowledge as of inception and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage hereunder; or (ii) which indicate the probability of any such claim.

Arch also understands that the AWAC Policy will contain the following Inverted Representation Endorsement ("AWAC Inverted Representation Endorsement"):

In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, from Claims arising from any fact, circumstance

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 14

> or situation of which, as of the effective date of this Policy, any Insured had knowledge and had reason to suppose might afford grounds for any Claim that would fall within the scope of the insurance afforded by this Policy.

The AWAC Prior Knowledge Exclusion and the AWAC Inverted Representation Endorsement are incorporated into the Arch Policy by virtue of Section I.C. of the Arch Policy.

The Arch Policy also contains a Prior Knowledge or Information Exclusion Endorsement (the "Arch Prior Knowledge or Information Exclusion") that provides:

> If any **Insured** as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a **Claim** under this Policy, the **Excess Insurer** shall not be liable to make any payment under this Policy as a result of a **Claim** arising out of, based upon, or attributable to any such act, error, omission, fact, matter or circumstance.

Arch Policy, Endorsement No. 4.

Based on his knowledge, as of August 11, 2005, of the RGHI receivables to Refco, the February 2004 Transactions, the February 2005 Transactions and the May 2005 Transactions, as alleged in the Bennett Indictment and corroborated, in large measure, by the Company's statements in its October 10 and 11, 2005 press releases regarding the results to date of its internal investigation, and as further corroborated by its announcement that certain financial statements should not be relied upon, it appears that Mr. Bennett, at the time of the inception of the Policy, had knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a Claim.

The undisclosed RGHI receivables to Refco and the undisclosed related party transactions did in fact give rise to Claims. As discussed above, the Bennett Criminal Action, the Securities Litigation, the Derivative Action, the American Financial Action, the Bawag Action, the THL Funds Action and the Unovalores Action each arise from the alleged failure of Mr. Bennett and/or Refco to disclose

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 15

the existence of the receivables owed to Refco by RGHI, an entity controlled by
Mr. Bennett, and/or to disclose related-party transactions designed to hide those
receivables. For these reasons, there is no coverage under the Arch Policy for these
Claims by virtue of the AWAC Prior Knowledge Exclusion, the AWAC Inverted
Representation Endorsement, and the Arch Prior Knowledge or Information
Exclusion.

There is also no coverage under the Arch Policy for any **Defense Costs**
incurred by Insureds in connection with these Claims for an additional reason.
Subject to all of its terms and conditions, the Arch Policy affords specified coverage
for certain **Loss**, as that term is defined in the **Primary Policy**, and as that definition
is restricted by other **Underlying Insurance**. The Lexington Policy's definition of
**Loss** excludes legal expenses and costs:

> The word "Loss" shall be understood to mean the sums
> paid or payable in settlement of claims for which the
> Insured is liable after making deductions for all other
> recoveries, salvages or other insurance (other than
> recoveries under underlying insurance, whether recoverable
> or not) and *shall exclude all expenses and costs.*

Lexington Policy, § XII (emphasis added). The Lexington Policy further provides
that the word "Costs" includes "interest on judgments, investigations, adjustments
and legal expenses." *Id. See also* Lexington Policy, § I (noting that policy does not
incorporate Primary Policy provisions regarding costs and expenses incident to
defense of claims). Because the Arch Policy does not provide "broader coverage
than that provided by the most restrictive policy included in the **Underlying
Insurance**," there is no coverage for **Defense Costs** under the Arch Policy.

Please note that, in light of the conclusions regarding coverage described in
this letter, Arch has filed suit in New York state court to obtain a declaratory
judgment regarding the lack of coverage for the Matters addressed in § III.A of this
letter. A courtesy copy of the complaint is enclosed.

Even if coverage under the Arch Policy were not precluded on the grounds
set forth above, there are numerous additional terms, conditions and exclusions of
the Arch Policy and the **Underlying Insurance** that would preclude or limit

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 16

coverage for the Matters.  Arch reserves the right also to deny or limit coverage based on these terms, conditions and exclusions, including the right to deny or limit coverage based on terms, conditions and exclusions discussed in the letters to Ms. Lieberman from Leslie S. Ahari, Esq. of Ross, Dixon & Bell, LLP, on behalf of U.S. Specialty, dated November 10, December 7 and 13, 2005, and January 3 and 25, 2006.  Included among the reservations of rights discussed in those letters which Arch adopts and incorporates by reference are the following:

- The right to deny or limit payments under Insuring Agreements (B)(1) and/or (B)(2) pursuant to Condition (D)(4) of the **Primary Policy**, the Priority Of Payments Provision;

- The right to deny coverage for any person or entity who or which is not an **Insured,** including without limitation the right to deny coverage for any person who is not an **Insured Person** and for any entity other than Refco and its **Subsidiaries**, as those terms are in the **Primary Policy**[2];

- The right to deny or limit coverage based on the Insured v. Insured, dishonesty, and/or profit or advantage exclusions of the **Underlying Insurance**;

- The right to deny coverage for any amount that does not constitute **Loss** or is uninsurable as a matter of law, including but not limited to amounts paid as restitution or disgorgement, amounts attributable to intentional wrongdoing and/or intentional harm, and taxes, fines or penalties, and for punitive, exemplary or multiplied damages if uninsurable under the law of the jurisdiction applicable to the **Claim**;

- The right to deny coverage for **Loss** that does not result from a **Wrongful Act**, including without limitation **Loss** resulting from actual or alleged conduct undertaken other than in an insured capacity;

---

[2] We note that other than Refco and its **Subsidiaries**, the Policy does not provide coverage for any of the entities named as defendants in the Matters.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 17

- The right to deny or limit coverage, pursuant to Endorsement 14 of the U.S. Specialty Policy, for **Loss** in connection with a **Claim** arising out of, based upon or attributable to a Wells Notice or SEC Investigation;

- The right to deny or limit coverage for **Loss** pursuant to U.S. Specialty Policy Condition (G) to the extent that there is insurance other than the **Underlying Insurance** for such **Loss**;

- The right to deny coverage to the extent that the **Claims** are deemed to have been "first made" before the inception date of the Policy;

- The right to deny or limited coverage pursuant to the **Primary Policy's** Pending and Prior Litigation Exclusion;[3] and

- The right to determine an appropriate allocation between covered **Loss** and uncovered loss pursuant to Condition (D)(3) of the **Primary Policy**.

In addition, Arch reserves the right to deny or limit coverage based on the January 14, 2005 warranty letter ("Warranty Letter") from Refco Group Ltd. LLC to Axis, which was signed by Mr. Bennett. The letter states, in relevant part:

> With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true:
>
> a. No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT:

---

[3] Arch also reserves its rights under the Pending and Prior Litigation Exclusions in other **Underlying Insurance** and in the Arch Policy. *See, e.g.,* Arch Policy, Endorsement No. 1.

**Wiley Rein & Fielding LLP**

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 18

      b.     No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation, or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.[4]

Arch reserves its right to deny coverage based on the Warranty Letter and the exclusion set forth therein to the extent they apply to the August 11, 2005 to August 11, 2006 policy period.

Arch also reserves the right to deny coverage for the Unjust Enrichment and Restitution, Quantum Meruit, Breach of Contract, Breach of Warranty, and Unfair Competition causes of action asserted in the American Financial Litigation to the extent, inter alia, that they do not allege a Wrongful Act, and to the extent they seek amounts that do not, as a matter of law, constitute Loss under the Policy, including but not limited to the disgorgement of funds to which Insured Persons are not legally entitled, and to loss arising from any defendant's alleged breach of contract.

---

[4] Refco attached to the Warranty Letter, and incorporated by reference after the word "EXCEPT" in part "a." of the letter, information regarding litigation captioned *Louis Capital Markets, L.P. v. Refco Group Ltd., LLC, et al.* The Louis Capital Markets litigation involves allegations of corporate espionage, tortious interference with business relations and breach of fiduciary duty, and appears unrelated to the receivables owed to Refco by an entity controlled by Mr. Bennett and the related party transactions that the Company disclosed in October 2005.

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 19

B.    **DENIAL OF COVERAGE FOR THE CUSTOMER/ACCOUNT HOLDER LAWSUITS**

In letters to Ms. Lieberman dated November 10 and December 7, 2005, U.S. Specialty's counsel denied coverage for the Customer/Account Holder Lawsuits on the grounds that (1) potential coverage for claims asserted against Refco entities under the **Primary Policy** is limited to **Securities Claims**, and none of the suits is a **Securities Claim**, and (2) even assuming the lawsuits were potentially within the scope of any of the Insuring Agreements, coverage would be excluded by the **Primary Policy**'s Errors and Omissions Exclusion. The same policy provisions and exclusion upon which U.S. Specialty based its denial of coverage apply to the potential coverage under the Arch Policy. For this reason, Arch adopts and incorporates by reference U.S. Specialty's coverage position with respect to the Customer/Account Holder Lawsuits. Arch also denies coverage for **Defense Costs** incurred in connection with the Customer/Account Holder Lawsuits based on the additional reason set forth above concerning the exclusion of such costs from the definition of Loss in the underlying Lexington Policy.

Even if coverage for the Customer/Account Holder Suits under the Arch Policy were not precluded on the grounds set forth above — which it is — there are numerous additional terms, conditions and exclusions of the policies and the **Underlying Insurance** that would preclude or limit coverage. Arch reserves the right also to deny or limit coverage based on these terms, conditions and exclusions, including but not limited to terms, conditions and exclusions discussed above in connection with Arch's reservation of its rights with respect to its denial of coverage for the **Claims** discussed in § III.A.

C.    **DENIAL OF COVERAGE FOR *BANKRUPTCY TRUST OF GERARD SILLAM v. REFCO GROUP LLC ET AL.***

In a letter to Ms. Lieberman dated December 1, 2005, U.S. Specialty's counsel noted that all of the **Primary Policy**'s potentially applicable insuring agreements apply only to **Claims** "first made" during the Policy Period, which is August 11, 2005 to August 11, 2006. The December 1st letter further noted that the complaint in the Sillam Action states that Mr. Sillam made demands and filed several lawsuits before the Policy's inception date, both in the United States and in

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 20

France, based on the same facts, circumstances, situations, transactions and events that are the subject of the Sillam Action. The letter also noted that, pursuant to the **Primary Policy**'s Interrelationship of **Claims** provision, the Sillam Action is considered to have been made at the time Mr. Sillam made those demands and filed those suits. Based on the above, U.S. Specialty concluded that the Sillam Action is a Claim that was "first made" before the **Primary Policy**'s inception date, and thus does not fall within the **Primary Policy**'s Insuring Agreements. U.S. Specialty also denied coverage for the Sillam Action on the grounds that it is excluded from coverage by the **Primary Policy**'s Prior and Pending Litigation Exclusion and denied coverage for the Refco entity defendants because the suit is not a **Securities Claim**.

The same policy provisions upon which U.S. Specialty based its denial of coverage apply to the potential coverage under the Arch Policy. For this reason, Arch adopts and incorporates by reference U.S. Specialty's coverage position with respect to the Sillam Action. Given the interrelated demands made and litigation filed prior to the inception of the Policy Period, Arch also denies coverage for the Sillam Action based on the Pending and Prior Litigation Exclusion set forth in Endorsement No. 1. of the Arch Policy and on the Arch Prior Knowledge or Information Exclusion. Finally, Arch also denies coverage for **Defense Costs** incurred in connection with the Sillam Action based on the exclusion of such costs from the definition of Loss in the underlying Lexington Policy, as discussed above.

Even if coverage for the Sillam Action were not precluded on the grounds set forth above — which it is — there are numerous additional terms, conditions and exclusions of the policies and the **Underlying Insurance** that would preclude or limit coverage. Arch reserves the right also to deny or limit coverage based on these terms, conditions and exclusions, including but not limited to terms, conditions and exclusions discussed above in connection with Arch's reservation of its rights with respect to its denial of coverage for the Claims discussed in § III.A., and including but not limited to the any additional reservations of rights set forth in the December 1, 2005 letter from U.S. Specialty's counsel, which Arch adopts and incorporates herein.

\* \* \*

Wiley Rein & Fielding LLP

Andrea D. Lieberman, Esq.
Debora K. Grobman, Esq.
March 9, 2006
Page 21

      To the extent that there is additional information or materials that you believe bear on the coverage issues outlined in this letter, Arch would be pleased to consider any additional materials that you may wish to submit. In the interim, this letter, as well as all past, present, and future communications, is sent pursuant to a complete reservation of all of Arch's rights under the Arch Policy, the underlying insurance, at law, and in equity, including, without limitation, the right to assert additional rights as the underlying carriers issue additional coverage letters. Please do not hesitate to contact us should you have any questions.

Sincerely,

Daniel J. Standish
Cara Tseng Duffield

Enclosure
cc:    Claudia Cinardo (with enclosure)

Wiley Rein & Fielding LLP

## LIST OF MATTERS

### THE BENNETT CRIMINAL ACTION

*United States of America v. Bennett*, 05 MAG 1720
*United States of America v. Bennett*, November 11, 2005 Indictment

### THE CUSTOMER OR ACCOUNT HOLDER LAWSUITS

*BAC Int'l Bank v. Refco Capital Markets, Ltd.*
*Banco de America Central v. Refco Capital Markets, Ltd.*
*Banesco Holding C.A. et al. v. Refco, Inc. et al.*
*Markwood Investments v. Refco Capital Markets, Ltd. et al.,*
*Miura Fin. Serv. v. Refco, Inc. et al.*
*Multiplicas Casa de Bolsa v. Refco, Inc. et al.*
*Reserve Invest (CYPRUS) Ltd. v. Refco Capital Markets, Ltd. et al.*

### THE DERIVATIVE ACTION

*Mehta v. Bennett et al.*

### THE SECURITIES LITIGATION

*Baker v. Bennett et al.*
*Becker v. Refco, Inc. et al.*
*City of Pontiac General Employees Retirement System v. Bennett et al.*
*Frontpoint Fin. Serv., Inc. v. Refco, Inc. et al.*
*Glaubach v. Refco, Inc. et al.*
*Lieber v. Refco, Inc. et al.*
*Mettupatti v. Bennett et al.,*
*Nathanson v. Bennett et al.*
*Wakefield v. Refco, Inc. et al.*
*Sandra Weiss v. Refco, Inc. et al.*
*Todd Weiss v. Bennett et al.*
*Weit v. Bennett et al.*

### OTHER MATTERS

*American Financial International Group v. Refco, Inc. et al.*

Wiley Rein & Fielding LLP

*Bankruptcy Trust of Gerard Sillam v. Refco Group LLC et al.*, No. 05603931 (N.Y. Sup. Ct.)

*Bawag P.S.K. Bank v. Refco Inc. et al.*

CFTC Subpoena

*Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.*

*Unovalores Ltd. v. Bennett*, No. L1564-05 (Sup. Ct. of New Jersey, Somerset County, Law Division)