**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- x
**ARCH INSURANCE COMPANY,**                                          :
                                                                     :
       **Plaintiff,**                                  :
                                                                     :
      **v.**                                              :   **Case No. 08-CIV-5252 (GEL)**
                                                                     :   **ECF Case**
**JOHN D. AGOGLIA, et al.,**                                         :
                                                                     :
      **Defendants.**                                     :
-------------------------------------------------------------------- x

## INSUREDS' MEMORANDUM OF LAW IN OPPOSITION TO ARCH INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: (310) 788-4525

   -and-

575 Madison Avenue
New York, NY 10022-2585
Telephone: (212) 940-8834

*Attorneys for Defendant*
*Dennis A. Klejna*

PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
Telephone: (212) 969-3000

*Attorneys for Defendant Richard N.*
*Outridge*

FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 750-8700

*Attorneys for Defendants William M.*
*Sexton and Gerald M. Sherer*

HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone: (212) 832-8300

*Attorneys for Defendant Philip*
*Silverman*

GAGE SPENCER & FLEMING, LLP
410 Park Avenue, 9th Floor
New York, New York 10022
Telephone: (212) 768-4900

*Attorneys for Defendants John D.*
*Agoglia and Peter McCarthy*

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000

*Attorneys for Defendants Leo R.*
*Breitman, Nathan Gantcher, David*
*V. Harkins, Scott L. Jaeckel, Thomas*
*H. Lee, Ronald L. O'Kelley and*
*Scott A. Schoen*

SAUL EWING LLP
245 Park Avenue, 24th Floor
New York, New York 10167
Telephone: (212) 672-1996

*Attorneys for Defendant Joseph*
*Murphy*

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................................................. ii

Preliminary Statement ....................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

    A.    Refco Background ......................................................................................... 2

    B.    The Underlying Actions ................................................................................ 2

    C.    The Refco Inc. D&O Liability Insurance "Tower" ..................................... 3

    D.    The Arch Policy and the Addition of a Prior Knowledge Exclusion ............ 4

    E.    Arch's Initial Denial of Claims .................................................................... 5

    F.    Procedural History of Arch Litigation ......................................................... 6

ARGUMENT ...................................................................................................................... 7

I.    THE FULL SEVERABILITY ENDORSEMENT OF THE U.S.
    SPECIALTY POLICY CREATES A GENUINE ISSUE OF
    MATERIAL FACT AS TO WHETHER THE INSUREDS ARE
    BARRED FROM COVERAGE UNDER THE "PRIOR
    KNOWLEDGE EXCLUSION" PROVISION OF THE ARCH POLICY ........................ 8

    A.    The Full Severability Endorsement of the Primary Policy Bars
        the Imputation of One Insured's Knowledge to Other Insureds ..................... 9

        1.    Endorsement No. 10 Removed from the
            Primary Policy the Sole Limitation on Non-Imputation ................. 9

        2.    Endorsement No. 10 is a General Non-Imputation
            Clause and is Not Limited to Statements in the Application ........... 11

    B.    The Full Severability Endorsement in the Primary Policy
        and Arch's Prior Knowledge Exclusion Must Be Read Together .................. 14

II.    ARCH HAS FAILED TO DEMONSTRATE THAT EVERY
    SINGLE CAUSE OF ACTION ASSERTED IN THE
    UNDERLYING LITIGATIONS "ARISING OUT OF" BENNETT'S FRAUD ............. 18

III.    ARCH'S STIPULATION WITH BENNETT IS NOT
    RELEVANT TO THE APPLICABILITY OF THE
    PRIOR KNOWLEDGE EXCLUSION AGAINST OTHER INSUREDS ...................... 22

CONCLUSION ................................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*A.D. Juilliard & Co. v. Johnson,*
   166 F. Supp. 577 (S.D.N.Y. 1957)..................................................................23-24

*Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.,*
   60 N.Y.2d 390, 469 N.Y.S.2d 655 (1983)..........................................................14

*Allianz Ins. Co. v. Lerner,*
   296 F. Supp. 2d 417 (E.D.N.Y. 2003)................................................................22

*Axis Reinsurance Company v. Bennett,*
   Nos. 07 Civ 7924 (GEL), 08 Civ. 3242 (GEL),
   2008 WL 2485388 (S.D.N.Y. June 18, 2008) ..............................................*passim*

*Canfield v. Elmer E. Harris & Co.,*
   252 N.Y. 502, 17 N.E. 121 (N.Y. 1930).............................................................22

*Capital Mgmt Select Fund Ltd v. Bennett, et al.,*
   07-8688 (S.D.N.Y.) (GEL) .................................................................................20

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986), *cert denied*, 484 U.S. 1066 (1988)....................................7

*City of New York v. Evanston Ins. Co.,*
   39 A.D.3d 153, 830 N.Y.S.2d 299 (2d Dep't 2007) ...........................................18

*County of Columbia v. Continental Ins. Co.,*
   83 N.Y.2d 618, 612 N.Y.S.2d 345 (1994)..........................................................16

*DaPuzzo v. Globalvest Mgmt. Co., L.P.,*
   263 F. Supp. 2d 714 (S.D.N.Y. 2003)................................................................16

*Energy Transp., Ltd. v. M.V. San Sebastian,*
   348 F. Supp. 2d 186 (S.D.N.Y. 2004)................................................................13

*Fifty CPW Tenants Corp. v. Epstein,*
   16 A.D.3d 292 (N.Y. Sup. Ct. App. Div. 2005) ..................................................23

*Gaetan v. Firemen's Ins. Co.,*
   264 A.D.2d 806, 695 N.Y.S.2d 608 (2d Dep't 1999) .........................................14

*In re HealthSouth Corp. Ins. Litig.,*
   308 F. Supp. 2d 1253 (N.D. Ala. 2004) .............................................................15

*In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation,*
    06-643 (S.D.N.Y.) (GEL) .......................................................................................3, 20-21

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.,*
    309 F.3d 76 (2d Cir. 2002) ................................................................................ 13-14

*Japour v. Ed Ryan & Sons Agency,*
    215 A.D.2d 817, 625 N.Y.S.2d 750 (3d Dep't 1995) ...........................................12

*Kirschner v. Agoglia, et al.,*
    Adv. Pro. No. 07-3060 (RDD) .......................................................................3, 21

*Krys v. Sugrue,*
    08-3065 and 08-3086 (S.D.N.Y.) (GEL) ..............................................................20

*Manley v. AmBase Corp.,*
    337 F.3d 237 (2d Cir. 2003) ................................................................................13

*Mishkin v. Peat, Marwick, Mitchell & Co.,*
    No. 86 Civ. 4301 (KMW), 1988 WL 391648 (S.D.N.Y. Nov. 7, 1988)........................... 23-24

*Morgan Stanley Group Inc. v. New England Ins. Co.,*
    225 F.3d 270 (2d Cir. 2000) ................................................................................13

*New York v. Hendrickson Brothers, Inc.,*
    840 F.2d 1065 (2d Cir. 1988), *cert denied*, 488 U.S. 848 (1988)............................................20

*Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.,*
    472 F.3d 33 (2d Cir. 2006) .......................................................................14, 17-19

*Pescatore v. Pan Am. World Airways, Inc.,*
    97 F.3d 1 (2d Cir. 1996) ......................................................................................23

*Ramos v. City of New York,*
    No. 05 Civ. 3155 (GEL), 2006 WL 2871969 (S.D.N.Y. Oct. 5, 2006) ....................................23

*Salamina v. Tartaglia,*
    106 N.Y.S.2d 487 (N.Y. Sup. Ct. 1951).................................................................23

*Scholastic Inc. v. Harris,*
    259 F.3d 73 (2d Cir. 2001) ..................................................................................12

*Schwartzreich v. E.P.C. Carting Co., Inc.,*
    246 A.D.2d 439 (N.Y. Sup. Ct. App. Div. 1998) ..................................................24

*Scotto v. Almenas,*
    143 F.3d 105 (2d Cir. 1998) ..................................................................................7

*Seaboard Sur. Co. v. Gillette Co.,*
    64 N.Y.2d 304, 486 N.Y.S.2d 873 (1984)..............................................................15

*Sun-Times Media Group, Inc. v. Royal Sunalliance Ins. Co. of Canada,*
    2007 WL 1811265 (Del. Super. June 20, 2007) ..................................................21

*Westport Ins. Corp v. Hanft & Knight, P.C.,*
    523 F. Supp. 2d 444 (M.D. Pa. 2007) ..................................................................19

*Westview Assocs. v. Guar. Nat'l Ins. Co.,*
    95 N.Y.2d 334, 717 N.Y.S.2d 75 (2000)..............................................................12

*Weyant v. Okst,*
    101 F.3d 845 (2d Cir. 1996) ..................................................................................7

*Wise v. Westchester Fire Ins. Co.,*
    463 F.2d 386 (10th Cir. 1972) ..............................................................................14

*Wright v. Evanston Ins. Co.,*
    14 A.D.3d 505, 788 N.Y.S.2d 416 (2d Dep't 2005) ............................................18

## **Statutes**

Fed. R. Civ. P. 56(b) ......................................................................................................7

Fed. R. Civ. P. 56(c)........................................................................................................7

Fed. R. of Evid. 803(22).................................................................................................19

Defendants John D. Agoglia, Peter McCarthy, Dennis A. Klejna, William M. Sexton, Gerald Sherer, Joseph Murphy, Richard N. Outridge, Philip Silverman, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen (collectively, the "Insureds"), by and through their undersigned counsel, respectfully submit this memorandum of law in opposition to the motion for summary judgment filed by plaintiff Arch Insurance Company ("Arch"). By its motion, made prior to any discovery in this action, Arch seeks a declaration that it has no obligation to provide the Insureds with coverage under the terms of the excess insurance policy it issued to Refco, Inc. ("Refco").

## Preliminary Statement

Arch is the fourth excess insurer in a tower of Directors and Officers ("D&O") liability insurance obtained by Refco for the policy period August 11, 2005 through August 11, 2006. The Insureds were officers and directors of Refco or its affiliates, and are insured under the terms of the Arch policy (the "Arch Policy"). Since March 9, 2006, however, Arch has denied any obligation to provide coverage under the Arch Policy for claims made against the Insureds.

Arch has never disputed that the claims made against the Insureds fall squarely within the definition of "Claims" that are covered by the Arch Policy. Arch instead contends that a "Prior Knowledge Exclusion" allows Arch to deny coverage to all of the Insureds based upon knowledge that Phillip Bennett, Refco's former CEO, had of certain facts or circumstances at the time the Arch Policy incepted.

Arch's motion for summary judgment should be denied, however, because the Prior Knowledge Exclusion is subject to severability provisions in the primary policy to which it follows form that prevent Arch from denying coverage to insureds who had no knowledge of matters that might give rise to a claim. As set forth below, Refco's insurance broker requested, and obtained from the primary insurer a "full severability" endorsement that specifically modified the standard policy provision regarding severability so as to make clear that the knowledge of one insured could not be the basis for denying coverage to another insured. Arch never requested modification of the "full severability" provision, and never provided the

1

requisite clear and unambiguous indication that its policy would allow it to deny coverage to "innocent" insureds. At the very least, there are material questions of fact as to "severability" that preclude the granting of summary judgment to Arch.

In addition, even if Arch could show as a matter of law that it may use the Prior Knowledge Exclusion to deny coverage to the Insureds, there are still questions of fact as to whether the exclusion has been triggered with respect to each claim in the underlying actions referred to in Arch's motion. Specifically, Arch has not shown that each claim as to which it denies coverage arose out of the same facts or circumstances as to which Bennett has admitted knowledge.

Accordingly, this Court should deny Arch's motion for summary judgment and permit discovery to proceed in this action.

## STATEMENT OF FACTS

### A.    Refco Background

On or about August 11, 2005, Refco conducted its initial public offering ("IPO"). (*See* Plaintiff Arch Insurance Company's Statement of Undisputed Facts Pursuant to Local Rule 56.1 in Support of its Motion for Summary Judgment ("Arch Rule 56.1 Statement") ¶ 9.) Two months later, on October 10, 2005, Refco disclosed in a press release that it had been carrying an undisclosed $430 million receivable from an entity controlled by Phillip Bennett, the then-CEO of Refco. (*Id.* ¶ 10.)

On or about October 17, 2005, Refco and many of its direct and indirect subsidiaries filed with the United States Bankruptcy Court for the Southern District of New York voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. (*Id.* ¶ 12.)

### B.    The Underlying Actions

The collapse of Refco in October 2005 and the bankruptcy filings that quickly followed led to the commencement of a series of civil actions, government investigations, and criminal proceedings against certain of Refco's officers and directors (the "Underlying Actions"). (*Id.* ¶ 13.) A number of these Underlying Actions remain pending. Civil actions against the

Insureds were filed as early as October 2005 and include the following:  *In re Refco, Inc.*
*Securities Litigation*, 05 Civ. 8626 (S.D.N.Y.) (GEL) (the "Securities Litigation"); *In re Refco*
*Capital Markets, Ltd. Brokerage Customer Securities Litigation,* No. 06 Civ. 643 (GEL)
(S.D.N.Y.); *V.R. Global Partners L.P. v. Bennett, et al,* No. 07 Civ. 8686 (GEL) (S.D.N.Y.);
*Capital Management Select Fund Ltd. v. Bennett, et al.,* No. 07 Civ. 8688 (GEL) (S.D.N.Y.);
*Kirschner v. Thomas H. Lee Partners, L.P., et al,* No. 07-7074 (GEL)(S.D.N.Y.); and *Kirschner*
*v. Grant Thornton LLP, et al.,* No. 2007-1-008818 (filed in Illinois Circuit Ct, removed to federal
court). (*Id.*; Declaration of Pamela Sylwestrzak submitted in opposition to Arch's summary
judgment motion ("Sylwestrzak Decl."), Ex. D at 1-9.)  Bennett, as well as subsequently Robert
Trosten and plaintiff Tone Grant were also named as defendants in a criminal action entitled
*United States v. Phillip Bennett, Robert Trosten and Tone Grant,* 05 Cr. 1192 (NRB) (S.D.N.Y.)
(the "Criminal Action").  (*See* Arch Rule 56.1 Statement ¶¶ 13-14, 34-35.)[1]

C.    **The Refco Inc. D&O Liability Insurance "Tower"**

In 2005, in preparation for its initial public offering, Refco obtained D&O liability
insurance for the benefit of its directors and officers (the "Insureds") for the policy period
August 11, 2005 to August 11, 2006 (the "2005-2006 Policy Period").  Refco's D&O insurance
was structured as a "tower," consisting of a primary policy and five excess policies providing for
a total of $70 million of coverage.  (Sylwestrzak Decl. ¶ 3.)[2]  The primary policy issued by U.S.
Specialty Insurance Company (the "Primary Policy" or "U.S. Specialty Policy"), to which the

---

[1]   On February 15, 2008, Bennett pled guilty to the counts against him in the Criminal Action.  On February 20, 2008, Robert Trosten, Refco's former Chief Financial Officer, also pled guilty to certain of the charges against him in the Criminal Action.

[2]   The tower of Refco Inc.'s D&O insurance for the policy period August 11, 2005 through August 11, 2006 was as follows:  (1) U.S. Specialty Insurance Company Directors, Officers and Corporation Liability Insurance Policy No. 24-MGU-05-A10821 ($10 million primary coverage); (2) Lexington Insurance Company Directors and Officers Liability and Corporation Reimbursement Follow Form Excess Liability Policy No. 1620924 ($7.5 million excess of $10 million); (3) Axis Reinsurance Co. SecurExcess Policy No. RNN 506300 ($10 million excess of $17.5 million); (4) Allied World Assurance Company Excess Directors and Officers Insurance and Company Reimbursement Policy No. AW0418197 ($12.5 million excess of $27.5 million); (5) Arch Insurance Company Excess Insurance Policy No. DOX0009322-00 ($10 million excess of $40 million); and (6) XL Specialty Insurance Company Classic A-Side Management Liability Insurance Policy NO. ELU089673-05 ($20 million excess of $50 million). (Sylwestrzak Decl. ¶ 3.)

Arch Policy "follows form" (Sylwestrzak Decl. ¶ 10 and Ex. A at Section 1, Insuring Agreement "C" ("Insuring Agreement")), provides coverage in Insuring Agreement "A" to officers and directors of Refco for "Claims" asserted against them based upon alleged "Wrongful Acts." There is no dispute that the Underlying Actions are Claims for Wrongful Acts within the scope of Insuring Agreement "A."

In order to ensure that Refco's D&O insurance would provide coverage to "innocent" insureds, Marsh USA, Inc. ("Marsh"), Refco's insurance broker, requested that the Primary Policy include a broad "severability" endorsement. (Sylwestrzak Decl. ¶ 6.) The result of this request was Endorsement No. 10 to the U.S. Specialty Policy, which provides, inter alia, that "[n]o knowledge or information possessed by any Insured will be imputed to any other Insured." (Id.; see Insurers' Joint Exhibit ("IJX"), Ex. 26 at Endorsement No. 10.)

In issuing its policy for the 2005-2006 Policy Period, U.S. Specialty did not require a new application from Refco, relying, instead, upon the Application submitted for the prior year. (Sylwestrzak Decl. ¶ 8.) Question 12(b) in the Application asks whether any proposed insured is aware of any fact, circumstance or situation that he, she or it has reason to believe might result in a claim being made. Following Question 12(b), the Application states that the insurer will not be liable under any policy issued on the basis of the Application to make any payment of Loss "in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to" Question 12(b). (Id. ¶ 7 and Ex. B.) In completing the Application, Mr. Bennett failed to check either the "yes" or "no" box in response to Question 12(b). (Id.)

### D.    The Arch Policy and the Addition of a Prior Knowledge Exclusion

As set forth above, Arch is the fourth excess insurer in the Refco D&O tower for the 2005-06 policy period, and its policy "follows form" to the Primary Policy.

Because Mr. Bennett had left Question 12(b) of the Application blank, Refco was not providing any warranty as to the absence of facts or circumstances that might result in a claim

being made.  Accordingly, on August 9, 2005, Marsh advised Arch and other excess insurers that they could add an inverted warranty "[s]hould you need one to bind." (Sylwestrzak Decl. ¶ 9.)

On August 10, 2005, Arch issued its Binder.  (Declaration of John H. Eickemeyer in Support of Plaintiff Arch Insurance Company's Motion for Summary Judgment ("Eickemeyer Decl.") Ex. J.)  The Binder lists among the applicable endorsements a "Prior Knowledge or Information Exclusion" with no elaboration as to the intended effect of such an exclusion.

On or about March 7, 2006, almost five months after the Insureds gave notice to Arch of claims, Arch issued the Arch Policy. (Sylwestrzak Decl. ¶ 5 and Ex. A.)  The Arch Policy includes as an endorsement a Prior Knowledge or Information Exclusion that provides:

> In consideration of the premium charged, it is hereby understood and agreed that:
>
> If any **Insured** as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a **Claim** under this Policy, the **Excess Insurer** shall not be liable to make any payment under this Policy as a result of a **Claim** arising out of, based upon or attributable to any such act, error, omission, fact, matter or circumstance.
>
> All other terms and conditions of this Policy remain unchanged.

(*Id.* at Endorsement No. 4 (bold in original).)

### E.    **Arch's Initial Denial of Claims**

By letter dated March 9, 2006 (the "Denial Letter"), Arch denied coverage to the Insureds regarding the claims made against them.  (Sylwestrzak Decl. Ex. D.)  The Denial Letter cited to the "Prior Knowledge Exclusion" to the Arch Policy.  Relying upon the alleged knowledge of Bennett, Arch contended that this exclusion eliminated coverage under the Policy for all Insureds for all Claims.  (*Id.* at 14.)   Arch also relied on a "Prior Knowledge Exclusion Endorsement" that Arch stated it understood would be in the policy to be issued by Allied World Assurance Company (the "AWAC Prior Knowledge Exclusion"), an underlying excess insurer.  (*Id.* at 13.)

### F.        Procedural History of Arch Litigation

On March 9, 2006, the same day on which it issued its Denial Letter, Arch commenced a declaratory judgment action against various of the insureds in New York Supreme Court, seeking a declaration that, based on the Arch and AWAC Prior Knowledge Exclusions, the Arch Policy did not afford coverage to any of the insureds for any of the Underlying Actions that had been tendered to it by that date.  (Arch Rule 56.1 Statement ¶ 25.)  By order dated February 20, 2007, the New York Supreme Court dismissed Arch's action as premature and unripe.  (*Id.* ¶ 28; *see* Eickemeyer Decl. Ex. F.)

Arch filed its present action in New York Supreme Court on January 4, 2008, and filed its First Amended Complaint in that court on February 21, 2008.  (Arch Rule 56.1 Statement ¶ 36.) In Count I of its Amended Complaint, Arch seeks a declaration that there is no coverage under the Arch Policy for any of the Insureds, for any of the Underlying Actions, based upon the Prior Knowledge Exclusion in the AWAC Policy, relying upon the alleged knowledge of Bennett, Trosten and Santo Maggio, another former Refco officer who pleaded guilty to certain charges. Count II of the Amended Complaint seeks the same declaration of no coverage, based upon the Prior Knowledge Exclusion in the Arch Policy, again citing to the alleged knowledge of Bennett, Trosten and Maggio.

On July 11, 2008, prior to any discovery, Arch filed the instant motion for summary judgment, seeking a declaration that it has no obligation under the terms of the Arch Policy to provide coverage to the Insureds for the Underlying Actions.[3]  In arguing in its motion that coverage is precluded by the Prior Knowledge Exclusion in its own Policy, and by the AWAC Prior Knowledge Exclusion, Arch relies solely on Bennett's purported knowledge of facts and circumstances.  (*See* Memorandum of Law in Support of Plaintiff Arch Insurance Company's Motion for Summary Judgment ("Arch Mem.") at 9.)[4]

---

[3]  Arch is also a defendant in an action in this Court brought by the Insureds against it and AWAC, *Murphy, et al  v. Allied World Insurance Co. (U.S.), Inc. and Arch Insurance Co.*, Case No. 1:08-cv-4196 (GEL).

[4]  The Insureds address the separate issues relating to the AWAC Prior Knowledge Exclusion in their opposition to AWAC's motion for summary judgment being filed simultaneous herewith (the "AWAC Opposition"), and have not
*(continued)*

On July 29, 2008, the Insureds served their First Request for Production of Documents on Arch.  (Declaration of Ivan Kline Pursuant to Fed. R. Civ. P. 56(f) ("Kline Decl.") Ex. A.)  To date, Arch has not responded or produced responsive documents, though it has produced what it purports to be its underwriting file.   (Kline Decl. ¶ 3.)

## ARGUMENT

When ruling on a motion for summary judgment, the court "is required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996).  In addition, all ambiguities must be resolved in favor of the party opposing the motion.  *See, e.g, Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998).

Granting summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986), *cert. denied*, 484 U.S. 1066 (1988).

Although a party may move for summary judgment "at any time," Fed. R. Civ. P. 56(b), this Court has held that a motion for summary judgment filed prior to discovery should be granted only "in the clearest of cases."  *Axis Reinsurance Company v. Bennett*, Nos. 07 Civ. 7924 (GEL), 08 Civ. 3242 (GEL), 2008 WL 2485388, *7 (S.D.N.Y. June 18, 2008); *Celotex Corp.*, 477 U.S. at 322 (summary judgment typically granted only after adequate time for discovery).  Under Rule 56(f), summary judgment is inappropriate where the party opposing the motion establishes that it cannot currently present facts essential to justify its opposition.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986); *Celotex Corp.,* 477 U.S. at 326 (summary judgment motion should be denied or continued when a reasonable opportunity to develop the record has not been provided).

---

repeated those points here.  Because, as shown in the AWAC Opposition, AWAC is not entitled to summary judgment, Arch is also not entitled to summary judgment based on the AWAC Prior Knowledge Exclusion.

**I.    THE FULL SEVERABILITY ENDORSEMENT OF THE
U.S. SPECIALTY POLICY CREATES A GENUINE ISSUE OF
MATERIAL FACT AS TO WHETHER THE INSUREDS ARE
BARRED FROM COVERAGE UNDER THE "PRIOR
KNOWLEDGE EXCLUSION" PROVISION OF THE ARCH POLICY**

Arch cannot establish as a matter of law that it may rely upon the Prior Knowledge or

Information Exclusion ("Prior Knowledge Exclusion") in its Policy to bar coverage for

"innocent" insureds.

Arch contends that for purposes of its motion for summary judgment the Prior

Knowledge Exclusion in its policy overrides the severability provisions in the U.S. Specialty

Policy to which the Arch Policy follows form.  Arch relies on this Court's decision in *Axis* in

which the Court, in declining to grant summary judgment in favor of the Insureds, concluded that

"even though the [non-imputation language in Endorsement No. 10] itself contains no restrictive

language, when read in context with the surrounding clauses, the provision 'admits of only one

reasonable interpretation' – *i.e.* that it extends only to the statements Refco made in the

Application."  *Axis*, 2008 WL 2485388 at *10 (citation omitted).

In *Axis,* however, the Insureds did not argue, and the Court did not consider, the meaning

of the non-imputation clause in Endorsement No. 10 in the context of the full policy and in the

context of the provision it modified, Condition (M) of the main policy form.  Specifically,

Endorsement No. 10, titled **"FULL SEVERABILITY,"** deleted a clause in the original version

of Condition (M) that provided an exception to non-imputation under the Policy with respect to

representations made in the application.  When Endorsement No. 10 is read in this context, one

must conclude either that (i) the provision was intended by the parties to broaden severability

beyond the representations in the application or (ii) the scope of the intended severability is

ambiguous.  In the latter case, such ambiguity either should be resolved in favor of coverage, or

should result in a denial of the summary judgment motion because extrinsic evidence is required

to determine the intent of the parties.  In fact, extrinsic evidence demonstrates that broad

severability in Refco's D&O insurance program was central to the negotiations between Refco's

broker and the carriers, including U.S. Specialty and Arch.

Moreover, the Prior Knowledge Exclusion itself creates an ambiguity within the Arch Policy. The Arch Policy states that it provides coverage in accordance with the U.S. Specialty Policy, subject to any terms or conditions in the Arch Policy or underlying excess policies further limiting or restricting coverage. However, the Prior Knowledge Exclusion fails to explicitly contradict or displace the "Full Severability" Endorsement in the U.S. Specialty Policy. Indeed, to the contrary, the Prior Knowledge Exclusion explicitly states that "All other terms and conditions of this Policy remain unchanged." The most logical construction of these two policies, when read together, is that they exclude coverage for any insured who had knowledge of any fact, circumstance, or situation that might afford grounds for a claim, yet maintain coverage for those insureds who had no such knowledge. But at the very least, these competing provisions create an ambiguity that cannot be resolved without discovery, thus precluding summary judgment.

A.    **The Full Severability Endorsement of the Primary Policy Bars the Imputation of One Insured's Knowledge to Other Insureds**

1.    **Endorsement No. 10 Removed from the Primary Policy the Sole Limitation on Non-Imputation**

As initially drafted, the U.S. Specialty Policy came close to providing for complete non-imputation. The Policy provided with respect to its enumerated exclusions that "no wrongful act of any Insured Person will be imputed to any other Insured Person who did not have knowledge of, or directly participate in the communication of, such Wrongful Act." (*See* IJX Ex. 26 at 5 (Exclusions)). Condition (M) in the initial draft of the Policy, however, allowed a single exception: non-imputation would not apply if the signer of the application knew of false statements in the application. (*See* IJX Ex. 26 at 10 (Condition (M).) Refco's insurance broker, Marsh, requested complete non-imputation, and U.S. Specialty complied by substituting for its original Condition (M), an Endorsement No. 10, titled "**FULL SEVERABILITY.**" (Sylwestrzak Decl. at ¶ 6; IJX Ex. 26 at Endorsement No. 10.) Endorsement No. 10 provides,

9

without exception, that "[n]o knowledge or information possessed by any Insured will be imputed to any other Insured." (*See* IJX Ex. 26 at Endorsement No. 10.)

Endorsement No. 10 specifically amends Condition (M) in the main policy form to expand the severability provisions of the Primary Policy as it was initially drafted. (*Id.*) Condition (M) of the main policy form, entitled "Representations and Severability," had set forth a single exception to non-imputation: statements made in the application that were known to the signer to be false could be imputed to the other Insureds in order to preclude coverage. In pertinent part, Condition (M) originally provided:

> No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** *except for material facts or information known to the person or persons who signed the **Application***. If any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth *or to whom such knowledge is imputed.*

(IJX Ex. 26 at 11) (bold original; italics added). Condition (M), as initially drafted, therefore provided that knowingly false statements in the application would effectively void the Policy and preclude coverage for all Insureds, including innocent Insureds. Except for that one circumstance, however, the knowledge of one Insured could not be imputed to another Insured as a basis for denying coverage.

By amending Condition (M) of the main policy form to delete the single exception to non-imputation, Endorsement No. 10 provides for complete severability, creating, in effect, a separate insurance policy for each of the individual insureds. Endorsement No. 10's amendments to Condition (M) in the main policy form are illustrated in the table below, with the deleted and additional language highlighted:

**Table Highlighting Changes to Condition (M) of the US SPECIALTY POLICY**

| **Main Policy Form** | **ENDORSEMENT NUMBER:  10** |
|---|---|
| Condition M | **FULL SEVERABILITY** |
|  | To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company. In consideration of the premium charged, CONDITION (M) Representations and Severability is amended to read as follows: |
| (M)   Representations and Severability | (M)   Representations and Severability |
| The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy.  This Policy is issued in reliance upon the truth of such representations.  No knowledge or information possessed by any **Insured** will be imputed to any other Insured except for material facts or information known to the person or persons who signed the **Application**.  If any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed." | The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy.  This Policy is issued in reliance upon the truth of such representations.  No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**.  If any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth. |
| * Deleted language highlighted | * Added language highlighted |

**2.     Endorsement No. 10 is a General Non-Imputation Clause and is Not Limited to Statements in the Application**

Arch contends that the non-imputation clause in Endorsement No. 10 applies only to statements made in the application, relying on the Court's Opinion and Order in *Axis.  See Axis*, WL 2485388 at *9-*11.  As explained below, however, this conclusion can be reached only by reading Endorsement No. 10 as a stand-alone provision, rather than in the context of the policy as a whole and, specifically, as an amendment to Condition (M) that extended non-imputation beyond just the application.

In *Axis*, this Court correctly emphasized that the non-imputation clause in Endorsement No. 10 must be read "not as if isolated from [its] context." *Axis* at *10.  In concluding that the

11

severability language in Endorsement No. 10 was limited to the particulars and statements in the application, however, the Court looked no further than the language of the Endorsement itself for context: "when the severability provision is read, 'not as if isolated from the context *but in the light of the [Endorsement] as a whole,*' it is clear the scope of the provision is limited to the statements Refco made in the Application it submitted to U.S. Specialty." *Id.* at *10 (citation omitted) Specifically, the Court focused on the clauses surrounding the non-imputation clause in Endorsement No. 10, emphasizing that it is sandwiched between sentences specifically addressing the application. *Id.*

In order to fully understand what the parties intended the unrestricted, non-imputation clause in Endorsement No. 10 to mean, however, the Court needs to look beyond just the sentences in Endorsement No. 10. The proper context in which to construe Endorsement No. 10 is as an amendment to the original Condition (M), and, indeed, as it fits within the context of the Primary Policy as a whole. *See Scholastic Inc. v. Harris,* 259 F.3d 73, 83 (2d Cir. 2001) (under New York law, to determine "whether a contract is ambiguous, a court must look at 'the entire integrated agreement,' 'to safeguard against adopting an interpretation that would render any individual provision superfluous.'").

The Insureds did not make this point in *Axis.* That does not mean, however, that the Court should not consider this point as presented here. Indeed, unlike in *Axis,* where the Court was considering *the Insureds'* motions for summary judgment, here, it is a carrier – Arch – moving for summary judgment. Hence, it is Arch's burden to demonstrate summary judgment is appropriate. And Arch has not met its burden. An insurance carrier may prevail on its interpretation of an insurance policy on summary judgment only if it can "demonstrate that its interpretation is not only reasonable, but the only fair interpretation." *Japour v. Ed Ryan & Sons Agency*, 215 A.D.2d 817, 818, 625 N.Y.S.2d 750, 752 (3d Dep't 1995). Any ambiguities in an insurance policy that cannot be resolved by extrinsic evidence must be strictly construed against the insurer. *See, e.g., Westview Assocs. v. Guar. Nat'l Ins. Co.*, 95 N.Y.2d 334, 340, 717 N.Y.S.2d 75, 78 (2000); *Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 276

12

(2d Cir. 2000).  As illustrated below, Arch's interpretation of Endorsement No. 10, when considered in the context of the entire policy and, specifically, as it amended Condition (M), is not the only reasonable interpretation.  And at the very least, there is an ambiguity that renders summary judgment inappropriate.

If one accepts Arch's position that the non-imputation clause applies merely to "the particulars and statements made in the Application," that clause would have been superfluous under the original version of Condition (M).  Indeed, the "exception" to non-imputation would have swallowed the rule:  knowledge with respect to statements in the application will not be imputed, except that it will be imputed.  Had the parties intended Condition (M) to provide that intentional misrepresentations in the application would void the policy *ab initio*, they could have done so more directly and simply, without a non-imputation clause.  Arch's construction of the non-imputation clause renders the original version of Condition (M) a circular and redundant provision, a disfavored construction of provisions in insurance contracts.  *See Manley v. AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003) ("New York law . . . disfavors interpretations that render contract provisions meaningless or superfluous."); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) ("We disfavor contract interpretations that render provisions of a contract superfluous.") *Energy Transp., Ltd. v. M.V. San Sebastian*, 348 F. Supp. 2d 186, 203 (S.D.N.Y. 2004) ("[C]ourts should avoid an interpretation that makes a contractual provision superfluous.").

As such, Arch clearly has not met its burden of demonstrating that its interpretation of the non-imputation clause is the only fair interpretation.  Indeed, when viewed as an amendment to Condition (M), it is more logically viewed as a general non-imputation clause, just as it is written.  At the very least, when Endorsement No. 10 is read in this light, there is an ambiguity that cannot be resolved without extrinsic evidence, thus precluding summary judgment.  As evidenced by the declaration of Pam Sylwestrzak, the Marsh representative who negotiated the terms of the Arch Policy on behalf of the Insureds, expansive severability was a critical objective in negotiating Refco's 2005-2006 Program of D&O Insurance.  (*See* Sylwestrzak Decl. at ¶¶ 6,

13

10.)  Thus, Endorsement No. 10 was added to expand the scope of severability under the Primary Policy by eliminating imputation completely.  (*See Id.* at ¶ 6.)  The title of Endorsement No. 10, in capital and bold letters, plainly supports the interpretation that "**FULL SEVERABILITY**" was to be provided under the Policy.  *See Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 309 F.3d at 86 ("We must consider the caption in tandem with the actual contractual provision."); *see also Wise v. Westchester Fire Ins. Co.*, 463 F.2d 386, 389 (10th Cir. 1972) ("captions should not be repugnant or misleading as to the . . . coverage in the policy.") (internal citation omitted).

Accordingly, when considered in the context of the provision it modified as well as the entire Primary Policy, the non-imputation provision in the "Full Severability" Endorsement must be applied as it is written – as a general non-imputation clause, affording separate insurance for each individual insured so that the knowledge of any insured would not nullify coverage for other insureds under any circumstances.  At the very least, there is a material question of fact as to the scope of the non-imputation provision, making summary judgment on this point inappropriate.

B.    **The Full Severability Endorsement in the Primary Policy and Arch's Prior Knowledge Exclusion Must Be Read Together**

The rule of strict construction against the insurance carrier's interpretation of a policy applies with particular force with respect to exclusions, exceptions, and words of limitation.  *See, e.g.*, *Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 398, 469 N.Y.S.2d 655, 658 (1983).  To negate coverage based on a purported exclusion, the insurer bears the burden of establishing that the exclusion is stated in "clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon."  *Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (internal citations omitted).[5]

---

[5] *See also Gaetan v. Firemen's Ins. Co.,* 264 A.D.2d 806, 808, 695 N.Y.S.2d 608, 610 (2d Dep't 1999):

*(continued)*

14

The Arch policy states that it provides coverage under the same terms and conditions as the Primary Policy, "and in conformance with any terms and conditions further limiting or restricting coverage in this Policy or in any other Underlying Insurance"  (Arch Policy at 1, Section I.C.) Where, as here, the excess policy is a "follow form" policy, the terms and conditions of the underlying policy apply unless the excess policies "*specifically provide otherwise.*"  *In re HealthSouth Corp. Ins. Litig.*, 308 F. Supp. 2d 1253, 1282 (N.D. Ala. 2004) (emphasis in original).  There is absolutely no indication that Arch intended to supersede or replace the severability provisions in the Primary Policy, let alone "clear and unmistakable language" to that effect.  Had Arch intended to negate the coverage provided to innocent insureds by virtue of the "Full Severability" Endorsement of the Primary Policy, it was required to explicitly state that intention.  By way of example, the Prior Knowledge Exclusion could have stated clearly that it would apply in lieu of any severability provisions in the Primary Policy. The Prior Knowledge Exclusion, however, is expressly to the contrary.  It specifically states that "ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED" (Sylwestrzak Decl. Ex. B at Endorsement No.3) (caps in original)); it thus fails to negate the coverage provided by Endorsement No. 10 of the Primary Policy.[6]

---

Generally, *when an insurer wishes to exclude certain coverage from its policy obligations, it must do so in clear and unmistakable language.*  Such exclusions or exceptions from policy coverage must be specific and clear in order to be enforceable, and they are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction.  Thus, *the insurance company bears the burden of establishing that the exclusions apply in a particular case and that they are subject to no other reasonable interpretation.*

(emphasis added) (internal citations omitted); *Seaboard Sur. Co. v. Gillette Co.,* 64 N.Y.2d 304, 311, 486 N.Y.S.2d 873, 876 (1984) ("[B]efore an insurance company is permitted to avoid policy coverage, it must satisfy the burden . . . of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation.").

[6] At most the Arch Policy is completely silent  on the issue of severability, and, thus, "cannot supply a specific term . . . contrary [to the Primary Policy]" because "[s]ilence does not provide the insured with the notice needed that the excess carrier is not following the form of the severability clause."  *In re HealthSouth Corp.,* 308 F. Supp. 2d at 1282.

In *In re HealthSouth*, the excess carriers attempted to rescind their policies for all insureds based on allegedly misleading financial information provided in the insurance applications.  *Id.* at 1257.  The primary policy, however, provided for full severability.  *Id.* at 1261.  Although the excess policies were "follow form" policies, the excess carriers argued that their policies did not include severability provisions, so their policies did not "follow form" to

*(continued)*

This result is fully consistent with the negotiations for Refco's 2005-2006 D&O insurance program. At no time prior to binding did Arch ever request a modification of the severability provisions in the Primary Policy. (Sylwestrzak Decl. ¶ 10.) As a result, the understanding of Refco's broker was that the Arch Policy would "follow form" to the Full Severability Endorsement in the Primary Policy. (*Id.*) In interpreting a contract, "courts must endeavor to read a contractual document in a manner that gives effect to all of its provisions and that causes them to be consistent with one another." *DaPuzzo v. Globalvest Mgmt. Co., L.P.*, 263 F. Supp. 2d 714, 729 (S.D.N.Y. 2003). Accordingly, if there is a reasonable interpretation that gives meaning to both the Primary Policy's "Full Severability" Endorsement and Arch's Prior Knowledge Exclusion, that interpretation must control. The Full Severability Endorsement of the Primary Policy and Arch's Prior Knowledge Exclusion can easily and logically be read together so as to exclude coverage to any insured who had knowledge of any fact, circumstance, or situation that might afford grounds for a claim, while maintaining coverage for insureds who had no such knowledge. Not only would such an interpretation clearly comport with the reasonable business expectations of the parties, it would also obviate the need to render the severability provisions meaningless. *See County of Columbia v. Continental Ins. Co.*, 83 N.Y.2d 618, 628, 612 N.Y.S.2d 345, 349 (1994) ("An insurance contract should not be read so that some provisions are rendered meaningless.")[7]

Arch's claim that its Prior Knowledge Exclusion overrides the Full Severability Endorsement of the Primary Policy also is untenable because the Prior Knowledge Exclusion was not intended to fundamentally alter the coverage provided to innocent insureds. To the

---

the severability provisions in the primary policy. *Id.* at 1281-82. The court held that even in the absence of severability provisions in an excess policy, a severability provision of the primary policy would be part of a follow-form excess policy unless the excess policy "specifically designates a different term." *Id.* at 1282.

[7] In *Axis*, the Court, in *dicta*, stated in a footnote that "even if the severability provision [in Endorsement No. 10 of the Primary Policy] extends beyond the 'particulars or statements in the Application' to function as a general non-imputation clause," the excess carrier's "follow form" language would serve to override the provision. *Axis*, 2008 WL 2485388 at *10 n.13. There, because the Court had already determined that the severability provisions of the Primary Policy did not apply to exclusions in the excess carrier's policy, it had no occasion to address the ways in which the severability provisions of the Primary Policy could be read in harmony with the "followed form" Arch policy.

contrary, the Prior Knowledge Exclusion was included in the Arch Policy merely as a substitute for Bennett's failure to sign the warranty provision of the Primary Policy application, and was intended to put the parties in the very same position as they would have been had the warranty been signed. (*See* Sylwestrzak Decl. at ¶ 7-9.) Because Refco was not providing any warranty as to the absence of facts or circumstances that might result in a claim being made, Marsh advised Arch and other excess insurers that they could add an inverted warranty in their policies "[s]hould you need one to bind." (*Id.* at ¶ 9.) Had Refco signed the warranty provision of the Primary Policy application, Arch would not have included a Prior Knowledge Exclusion, and there would be no dispute that the Arch Policy follows form to the Full Severability Provision of the Primary Policy. It simply defies common sense – and the reasonable business expectations of the parties – that by allegedly substituting one warranty for another, the Insureds expected to be, or should be placed in a far worse position – and entitled to no coverage – than if the alleged substitution had not taken place. Indeed, the most reasonable and obvious expectation of the Insureds was that by substituting a warranty for the warranty contained in the application, they would be placed in the exact same position as they would have been had the entire application been completed and no substitution had taken place. *See, e.g., Parks Real Estate Purchasing Group*, 472 F.3d at 42 ("An insurance policy should be read in light of common speech and the reasonable expectations of a businessperson.") (internal citation omitted).

Moreover, Arch's interpretation of the Prior Knowledge Exclusion would render its Policy illusory. Arch asserts that if any insured had knowledge of any circumstances that might give rise to a claim, then there is no coverage for any other insured for such claim. The Arch Policy, however, is an excess policy that is triggered only after four underlying policies in Refco's D&O "tower" of insurance providing $40 million in coverage. The only claims that could trigger coverage requests under this tier of the tower would necessarily involve massive fraud-like scenarios, about which at least one director or officer would have to have had some relevant knowledge. Indeed, it is virtually inconceivable that any claim that could potentially

17

trigger coverage under the Arch Policy could arise from facts or circumstances about which not one officer or director at Refco had any relevant knowledge.

Thus, to accept Arch's interpretation of the Policy is to permit Arch to have received a large premium with the understanding that it would never be required to provide coverage to any insured. Such a result is untenable, and contrary to public policy. *City of New York v. Evanston Ins. Co.,* 39 A.D.3d 153, 156, 830 N.Y.S.2d 299, 302 (2d Dep't 2007) ("[The insurer's] interpretation would indiscriminately exclude coverage in every case in which any person or entity other than the named insured is in any degree at fault for the accident, irrespective of whether the putative additional insured bears any responsibility for it at all. *Such extremely narrow coverage would be, at best, of minimal value to the reasonable businessperson.*" (emphasis added)); *Wright v. Evanston Ins. Co.,* 14 A.D.3d 505, 506, 788 N.Y.S.2d 416, 417 (2d Dep't 2005) (rejecting interpretation of policy advanced by insurer as it would render policy illusory, in contravention of public policy of state); *Parks Real Estate Purchasing Group,* 472 F.3d at 45, 48 (finding the term "contamination" ambiguous where, under insurer's construction of the term, the exclusion could "be applied in a limitless variety of situations" and the "all-risk policy would insure against virtually nothing"). As set forth above, Refco and its insurance broker Marsh's understanding was that the Arch Policy would "follow form" to the Full Severability Endorsement in the Primary Policy. (*See* Sylwestrzak Decl. at ¶ 10.)

Accordingly, Arch cannot rely on its Prior Knowledge Exclusion to deny coverage to the Insureds, who, themselves, did not have the requisite knowledge. At a minimum, there is a genuine issue of material fact as to this issue. Summary judgment is not appropriate.

## II.    ARCH HAS FAILED TO DEMONSTRATE THAT EVERY SINGLE CAUSE OF ACTION ASSERTED IN THE UNDERLYING LITIGATIONS "ARISES OUT OF" BENNETT'S FRAUD

Over twenty separate suits have been filed against the Insureds and other parties that relate to Refco. These suits, most of which are pending before this Court, involve such diverse claims as securities fraud, misuse of customer property, breach of fiduciary duties, fraudulent transfers, and preferences. Even assuming that Arch could demonstrate that the Prior

Knowledge Exclusion imputes Bennett's knowledge to the Insureds as a matter of law, Arch has failed to demonstrate that the Prior Knowledge Exclusion bars coverage for each and every claim asserted in each of the Underlying Matters as a matter of law.  In order for the Prior Knowledge Exclusion to be triggered, Arch must demonstrate, *inter alia*, that the *claims* asserted against the Insureds in each suit that it seeks an order relieving it of its coverage obligation to the Insureds "arises out of" facts or circumstances known by an Insured (*i.e.*, Bennett) prior to the Arch Policy's inception.  Arch bears the burden of demonstrating the "arising out of" link between each of the claims asserted in the Underlying Matters and Bennett's knowledge.[8]  (*See* Arch Br. at 14-15 (citing New York cases interpreting "arising out of").)

Arch has not met its burden.  Arch contends – as do AWAC and XL in their respective motions for summary judgment – that each of the claims in the Underlying Matters arises out of facts admitted by Bennett in connection with his criminal conviction.  (Arch Br. at 13-19.)  But rather than rigorously demonstrating causal links between the facts admitted by Bennett in his February 15, 2008 plea allocution ("Bennett's guilty plea") and the *claims* in each Underlying Matter – as it must do in order to be entitled to summary judgment – Arch briefly summarizes the gist of the allegations on a case-by-case basis, without differentiating between the numerous (and often widely divergent) claims asserted against each defendant.[9]  (Arch Br. at 15-19.)

---

[8] *See Parks Real Estate Purchasing Group*, 472 F.3d at 42 ("'[T]o 'negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] be fairly placed thereupon.'") (emphasis added; second alteration original) (citation omitted); *Westport Ins. Corp v. Hanft & Knight, P.C.*, 523 F. Supp. 2d 444, 452 (M.D. Pa. 2007) ("Where an insurer relies upon on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such a defense.") (citation omitted).

[9] Under Federal Rule of Evidence 803(22), only facts "essential to sustain the judgment" against Bennett are admissible against the Defendants.  *See* Fed. R. Evid. 803(22) (2008) ("Evidence of a final judgment, entered after a trial or upon a plea of guilty . . . adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, *to prove any fact essential to sustain the judgment* . . .") (emphasis added); *see also New York v. Hendrickson Brothers, Inc.*, 840 F.2d 1065, 1081 (2d Cir. 1988), *cert denied*, 488 U.S. 848 (1988) ("A prior judgment of conviction may be used as prima facie evidence in a subsequent civil suit only with respect to matters of fact or law 'necessarily decided by the conviction and the verdict on which it was based.'") (quoting *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 569 (1951)).  Here, all facts "essential to sustain the judgment" were admitted by Bennett during his guilty plea.  Therefore, any facts relied upon by Arch outside Bennett's guilty plea should be deemed inadmissible hearsay.

19

Based on these brief summaries, Arch argues that "allegations concerning the RGHI Receivable Scheme form the centerpiece of each of the operative complaints in the Underlying Matters." (*Id.* at 15.)  But in order to trigger the Prior Knowledge Exclusion, Arch is required to demonstrate that the specific claims for which it seeks to avoid coverage – not the allegations in the complaints taken as a whole – "arise out of the RGHI Receivable Scheme."  (*Id.* at 14.) Arch's summaries plainly fail to demonstrate that each claim, taken one at a time, and defendant-by-defendant, "arise out of "the RGHI Receivable Scheme *as a matter of law.*

By way of illustration, an examination of the claims asserted in four Underlying Matters related to the alleged misuse of customer funds at Refco Capital Markets ("RCM") aptly demonstrates why Arch's case-by-case approach cannot satisfy its burden of demonstrating that each *claim* "arises out of" the RGHI receivable scheme.  *See In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, 06-643 (S.D.N.Y.) (GEL); *VR Global Partners L.P., et al. v. Bennett*, et al., 07-8686 (S.D.N.Y.) (GEL); *Capital Mgmt Select Fund Ltd v. Bennett*, et al.., 07-8688 (S.D.N.Y.) (GEL); and *Krys v. Sugrue*, 08-3065 and 08-3086 (S.D.N.Y.) (GEL) (collectively, the "RCM Actions").  (IJX Exs. 4, 6, 12 and 16.)  Rather than dealing with each specific claim asserted in the RCM Actions, Arch uses case summaries that point to a handful of allegations in each of the RCM action complaints (each of which contain hundreds of paragraphs of allegations) that attempt to plead some relationship between the RCM fraud and RGHI Receivable Scheme.  But those isolated allegations, without more, cannot satisfy Arch's burden to demonstrate that each *specific claim* for which it seeks to avoid coverage is not simply "related" but actually "arises out of" the RGHI receivable scheme *as a matter of law.*[10]   Indeed,

---

[10] *See* Arch Br. at 15-17 (citing *e.g.*, *VR Global Partners* Compl. at ¶ 2 ("This action arises out of two related fraudulent schemes"); *id.* ¶ 30 ("In addition to the RCM Securities Scheme to convert customer securities to finance Refco's operations, Bennett, Grant, Maggio and Trosten . . . perpetrated *another related scheme* to improve falsely the appearance of Refco's financial condition (the "RGHI Scheme")."); *id.* ¶ 200 ("Further, many Refco affiliates lacked the ability to repay the Intercompany Loans to RCM as a result of the RGHI Scheme."); *In re Refco Capital Markets* Compl. at ¶¶ 72-73 (the "RGHI Scheme" was operated "at times using the proceeds from converted customer securities in furtherance of the scheme"; "[a]s part of the RTL's, RCM would make loans, sometimes in cash, to third parties" which "were funded by the proceeds of the conversion of RCM's customers' securities."); Sphinx Compl.  ¶ 8 ("Bennett diverted customer assets held at RCM, including [Sphinx Managed Futures Fund SPC's] cash to fund a series of "round-trip loan" transactions . . . .")).

the claims asserted in the RCM actions, when read on a stand-alone basis, may fairly be said to "arise out of" an entirely separate fraud, unconnected to the RGHI Receivable Scheme – *i.e.*, Refco's alleged improper use of securities on deposit at RCM to finance daily operations, trading losses, and significant acquisitions (the "RCM fraud").[11] Having failed to demonstrate an "arises out of" link on a claim-by-claim, defendant-by-defendant basis, Arch's motion simply cannot be granted.

Moreover, none of the facts underlying the RCM fraud are even referenced in Bennett's guilty plea. Arch's attempt to expand the scope of Bennett's guilty plea to encompass facts outside those expressly admitted during his plea allocution fails on the facts and as a matter of law. *See Sun-Times Media Group, Inc. v. Royal Sunalliance Ins. Co. of Canada*, 2007 WL 1811265, *11 (Del. Super. June 20, 2007) (holding that an insurer's "attempt to expand the scope of [a former officer's] guilty plea" to exclude coverage for an insured company was not proper because the underlying action included transactions that were not part of the guilty plea.).

As another example, Arch wholly fails to explain how the avoidance claims (*i.e.*, fraudulent and/or preferential transfers) asserted against certain officers in *Kirschner v. Agoglia, et al.*, Adv. Pro. No. 07-3060 (RDD) ("*Kirschner v. Agoglia*"), (IJX Ex. 7), based upon various payments made to them pursuant to allegedly "clandestine" or "secret" arrangements entered into well prior to Refco's August 2004 LBO, "arise out of" the facts admitted by Bennett. (Compl. ¶¶ 7-8, 93-102, 171-77, 217-30, 243-71.) During his plea allocution, Bennett said absolutely nothing that addressed the agreements with these officers or the transfers to them, or that addressed the bases for the claims against them (*e.g.*, in the case of the constructive fraud claims, Refco's solvency or the consideration provided by recipients of transfers, and in the case of the actual fraud claims, the alleged intention to defraud creditors through the agreements and transfers in issue).

---

[11] In fact, the plaintiffs in *In re Refco Capital Markets* explicitly refer to the RCM fraud as "another fraudulent scheme." *See In re Refco Capital Markets* Compl. at ¶ 72 ("In addition, Bennett, Maggio, and others, were perpetrating *another fraudulent scheme* (the "RGHI Scheme") . . . .") (emphasis added).

In sum, Arch's overly general, case-by-case approach falls far short of demonstrating that each claim for which it seeks to avoid its coverage obligations to the Insureds "arises out of" the facts stated in Bennett's guilty plea. In the absence of a clear and unequivocal demonstration of the "arising out of" requirement as to each claim, Arch is not entitled to judgment as a matter of law. As such, its motion must be denied.

### III. ARCH'S STIPULATION WITH BENNETT IS NOT RELEVANT TO THE APPLICABILITY OF THE PRIOR KNOWLEDGE EXCLUSION AGAINST OTHER INSUREDS

Arch's Stipulation of Judgment with Bennett (Eickemeyer Decl. Ex. H) does not in any way assist Arch in establishing that the Arch or AWAC prior knowledge exclusions have been triggered. Rather, the Stipulation is irrelevant to, and does not relieve Arch of its burden to prove, the applicability of the prior knowledge exclusions as against the other defendants. Although the stipulation conclusively resolves the claims between Arch and Bennett, it has no impact on Arch's claims against other defendants.

Although its legal theory is unclear, Arch appears to argue that its stipulation with Bennett should be given res judicata effect, which indeed it could be if Bennett were to file an action seeking coverage under the Arch Policy. It is axiomatic, however, that "the res judicata effect of a stipulation of discontinuance can affect only claims . . . between the parties signing the stipulation." *Allianz Ins. Co. v. Lerner*, 296 F. Supp. 2d 417, 422 (E.D.N.Y. 2003). Every case Arch cites on page 11 of its brief involves garden-variety preclusion in which a party to a stipulated judgment later sought to bring a new action premised on the same facts.[12] None of

---

[12] *See Canfield v. Elmer E. Harris & Co.*, 252 N.Y. 502, 505, 17 N.E. 121, 122 (N.Y. 1930) (plaintiff precluded from relitigating issue of whether tenant held-over when had already agreed to consent judgment on that issue); *Fifty CPW Tenants Corp. v. Epstein*, 16 A.D.3d 292, 293 (N.Y. Sup. Ct. App. Div. 2005) ("[T]he stipulated discontinuance 'with prejudice' [of plaintiff's claims] . . . was correctly given res judicata effect to bar [the] claims . . . in this action."); *Schwartzreich v. E.P.C. Carting Co., Inc.*, 246 A.D.2d 439, 441 (N.Y. Sup. Ct. App. Div. 1998) (holding that counterclaim asserted in second action between parties was barred by claim preclusion); *Salamina v. Tartaglia*, 106 N.Y.S.2d 487, 489 (N.Y. Sup. Ct. 1951) (holding that "[t]he judgment entered in accordance with the stipulation of the parties, dismissing the counterclaims" in a prior action barred the plaintiff from re-litigating the counterclaims in subsequent action); *A.D. Juilliard & Co. v. Johnson*, 166 F. Supp. 577, 585 (S.D.N.Y. 1957) (rejecting plaintiff's arguments that its consent judgment with defendant in a prior action should be set aside as a mistake of fact).

these authorities apply here for the simple reason that none of the Defendants other than Bennett were parties to Arch's stipulation with Bennett.

Further, Bennett's stipulation, and the judgment subsequently entered against him, did not constitute an adjudication of the prior knowledge exclusions, and Arch cannot invoke it as such, whether under a theory of law of the case or collateral estoppel. Under the law of the case doctrine, once "a court decides on a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 7-8 (2d Cir. 1996) (internal quotation marks omitted). Here, no court has decided the legal issue of the applicability of the prior knowledge exclusions to the Underlying Matters, and the doctrine therefore does not apply.

Similarly, collateral estoppel, or issue preclusion, "applies only where an identical issue was litigated and decided in a prior proceeding and was necessary to a judgment on the merits in that proceeding." *Ramos v. City of New York*, No. 05 Civ. 3155 (GEL), 2006 WL 2871969, at *6 (S.D.N.Y. Oct. 5, 2006). The stipulation between Arch and Bennett was not entered in a prior proceeding, but in this lawsuit. Moreover, "[i]ssues decided by consent judgments do not normally have collateral estoppel effect because they do not meet the requirement that the issue be actually litigated." *Mishkin v. Peat, Marwick, Mitchell & Co.*, No. 86 Civ. 4301 (KMW), 1988 WL 391648, at *2 (S.D.N.Y. Nov. 7, 1988) (citation omitted). Arch's reliance on *Canfield v. Elmer E. Harris & Co.*, 252 N.Y. 502, 504-05 (1930), which found collateral estoppel where the facts at issue had been fully litigated and adjudicated in a prior action between the parties, is misplaced.

Finally, even if the doctrine of collateral estoppel could somehow apply in this action, Arch's attempt to bootstrap Bennett's consent judgment into an admission of facts purportedly underlying the judgment is plainly improper. Bennett stipulated that judgment should be entered against him but he did not stipulate to any of the facts underlying the judgment. (Eickemeyer Decl. Ex. H). While Arch cites a 50-year old case holding that a party could not re-litigate facts it had specifically stipulated to in a prior action, *see A.D. Juilliard & Co. v. Johnson*, 166 F.

23

Supp. 577, 584-86 (S.D.N.Y. 1957), courts decline to infer a stipulation of underlying facts from a consent judgment. *See DeTrano v. DeTrano*, 266 B.R. 282, 291 (E.D.N.Y. 2001) (where debtor had stipulated to nondischargeability of debt, refusing to find that debtor had stipulated to underlying facts of nondischargeability); *Mishkin*, 1988 WL 391648 at *2 (finding no preclusive effect where court's findings of fact "were based solely on the parties' stipulations").

Accordingly, Bennett's stipulation with Arch simply has no effect on Arch's claims against the remaining Defendants in this action, and the Court should disregard it.

## CONCLUSION

For the foregoing reasons, Arch's motion for summary judgment should be denied.

Dated: New York, New York
      August 8, 2008

/s/ Helen B. Kim
HELEN B. KIM (HK-8757)
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90027
Telephone: (310) 788-4525
Facsimile: (310) 788-4471

KATTEN MUCHIN ROSENMAN LLP
Philip A. Nemecek (PN-3319)
575 Madison Avenue
New York, NY 10022-2585
Telephone:    212-940-8834
Facsimile:    212-940-8776
*Attorneys for Plaintiff Dennis A. Klejna*

/s/ Michael F. Walsh
GREG A. DANILOW (GD-1621)
MICHAEL F. WALSH (MW-8000)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
*Attorneys for Plaintiffs Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen*

/s/ John J. Jerome
JOHN J. JEROME (JJ-2413)
TIMOTHY E. HOEFFNER
SAUL EWING LLP
245 Park Avenue, 24th Floor
New York, NY 10167
Telephone: (212) 672-1996
Facsimile:  (212) 672-1920
*Attorneys for Plaintiff*
*Joseph Murphy*

/s/ Richard Cashman
RICHARD CASHMAN (RC-4769)
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone: (212) 832-8300
Facsimile: (212) 763-7600
*Attorneys for Plaintiff Philip Silverman*

24

/s/ Ivan Kline

STUART I. FRIEDMAN (SF-9186)
IVAN KLINE (IK-9591)
FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 750-8700
Facsimile: (212) 223-8391

*Attorneys for Plaintiffs William M. Sexton and Gerald M. Sherer*


/s/ William Fleming

WILLIAM FLEMING (WF-0411)
GAGE SPENCER & FLEMING, LLP
410 Park Avenue, 9th Floor
New York, New York 10022
Tel: (212) 768-4900
*Attorneys for Nominal Defendants John D. Agoglia and Peter McCarthy*

/s/ Claire P. Gutekunst

CLAIRE P. GUTEKUNST (CG-0117)
JESSICA MASTROGIOVANNI
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
*Attorneys for Plaintiff Richard N. Outridge*

25