UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                        :

XL SPECIALTY INSURANCE COMPANY,  :

                        :

           Plaintiff,       :

                        :

       -v-            :      08 Civ. 3821 (GEL)

                        :

JOHN D. AGOGLIA et al.,         :

                        :

          Defendants.     :

                        :

--------------------------------------------------------------x
                        :

JOSEPH MURPHY et al.         :

                        :

          Plaintiffs,      :

                        :

       -v-            :      08 Civ. 4196 (GEL)

                        :

ALLIED WORLD ASSURANCE COMPANY  :     **OPINION AND ORDER**
(U.S.), INC. and ARCH INSURANCE    :
COMPANY,                     :

                        :

          Defendants.     :

                        :

--------------------------------------------------------------x
                        :

ARCH INSURANCE COMPANY,     :

                        :

          Plaintiff,       :

       -v-            :      08 Civ. 5252 (GEL)

                        :

JOHN D. AGOGLIA et al.,         :

                        :

          Defendants.     :

                        :

--------------------------------------------------------------x

James A. Skarzynski, James T. Sandnes, Jill M.
Levy, Ari R. Magedoff, Boundas, Skarzynski,
Walsh & Black LLC, New York, NY,
for XL Specialty Insurance Company.

John D. Hughes, Robert W. DiUbaldo, Edwards
Angell Palmer & Dodge LLP, New York, NY,
for Allied World Assurance Company
(U.S.), Inc..

John H. Eickemeyer, Daniel C. Green, Vedder
Price P.C., New York, NY and Daniel J. Standish,
Marc E. Rindner, Cara Tseng Duffield, Wiley
Rein LLP, Washington, D.C., for Arch
Insurance Company.

Helen B. Kim, Philip A. Nemecek, Katten Muchin
Rosenman LLP, Los Angeles, CA, and New York,
NY, for Dennis A. Klejna.

Stuart I. Friedman, Ivan Kline, Friedman &
Wittenstein, New York, NY, for William M.
Sexton and Gerald M. Sherer.

Greg A. Danilow, Michael F. Walsh, Weil, Gotshal
& Manges LLP, New York, NY, for Leo R.
Breitman, Nathan Gantcher, David V.
Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L.
O'Kelley, and Scott A. Schoen.

Richard Cashman, Heller Ehrman LLP, New York,
NY, for Philip Silverman.

John J. Jerome, Timothy E. Hoeffner, Saul Ewing
LLP, New York, NY, for Joseph Murphy.

Claire P. Gutekunst, Jessica Mastrogiovanni,
Proskauer Rose LLP, New York, NY, for
Richard N. Outridge.

William Fleming, Gage Spencer & Fleming, LLP,
New York, NY, for John D. Agoglia and
Peter McCarthy.

Norman L. Eisen, Laura E. Neish,
Zuckerman Spaeder LLP, New York, NY,
for Tone N. Grant.

2

GERARD E. LYNCH, District Judge:

In three separate actions, Allied World Assurance Company ("AWAC"), Arch Insurance Company ("Arch"), and XL Specialty Insurance Company ("XL") (collectively, "the insurers") move for summary judgment declaring that they are not obliged to provide coverage to various former directors & officers of Refco[1] (collectively, "the insureds") under the terms of the 2005-2006 Directors and Officers ("D&O") liability insurance policies they issued to Refco.[2]  For the reasons stated below, AWAC's and Arch's motion will be granted.  XL's motion will be denied.

## BACKGROUND

### I.    Refco's Collapse and Bankruptcy

Prior to its implosion in the fall of 2005, Refco was one of the world's largest providers of brokerage and clearing services in the international derivatives, currency, and futures markets. See In re Refco, Inc. Sec. Litig., No. 07 Civ. 11604, 2008 WL 1827644, at *1 (S.D.N.Y. April 21, 2008).  On October 10, 2005, two months after its initial public offering ("IPO"), Refco announced that it had been carrying an undisclosed $430 million receivable from Refco Group Holdings, Inc. (the "RGHI Receivable"), an entity controlled by Refco's CEO, Phillip R. Bennett.  Refco revealed that the receivable consisted of uncollectible debts originating in the

---

[1] Refco Inc. and its various subsidiaries will be referred to collectively in this Opinion as "Refco" without further differentiation, except where the context requires greater specificity.

[2] The insureds in the AWAC action are Leo Breitman, Nathan Gantcher, Tone Grant, David Harkins, Scott Jaeckel, Dennis Klejna, Thomas Lee, Joseph Murphy, Ronald O'Kelley, Richard Outridge, Scott Schoen, William Sexton, Gerald Sherer, and Phillip Silverman.  The insureds in the Arch action are John Agoglia, Breitman, Sukhmeet Dhillon, Gantcher, Grant, Harkins, Jaeckel, Klejna, Lee, Eric Lipoff, Peter McCarthy, Murphy, Frank Mutterer, O'Kelley, Schoen, Sexton, Sherer and Silverman.  The insureds in the XL action are Agoglia, Breitman, Dhillon, Thomas Dittmer, Gantcher, Grant, Thomas Hackl, Harkins, Jaeckel, Klejna, Lee, Lipoff, McCarthy, Murphy, Mutterer, O'Kelley, Schoen, Sexton, Sherer and Silverman.

late 1990s, and that the related-party nature of the receivable had been hidden from the company's auditors for years by fraudulent loan transactions entered at the end of Refco's quarterly financial reporting periods.  The company announced that, as a result of the RGHI Receivable, its prior financial statements, including those incorporated into its IPO registration statement, could not be relied upon.  See Axis Reinsurance Co. v. Bennett, Nos. 07 Civ. 7924, 08 Civ. 3242, 2008 WL 2485388, at *1 (S.D.N.Y. June 19, 2008).  Following these disclosures, Refco's stock plummeted and was de-listed by the New York Stock Exchange, leading to over $1 billion in lost market capitalization.  See In re Refco, 2008 WL 1827644, at *1.

On or about October 17, 2005, Refco Inc. and many of its subsidiaries filed for protection under Chapter 11 of Title 11 of the United States Code.  See Axis, 2008 WL 2485388, at *1.

## II.    The Underlying Actions

The collapse and ensuing bankruptcy of Refco in October 2005 triggered an onslaught of litigation (the "Underlying Actions") against certain Refco officers and directors.  Many of the Underlying Actions were or are now pending before this Court, including In re Refco, Inc. Securities Litigation, No. 05 Civ. 8626 (GEL) (S.D.N.Y.); American Financial International Group et al. v. Bennett et al., No. 05 Civ. 8988 (GEL) (S.D.N.Y.); In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, No. 06 Civ. 643 (GEL) (S.D.N.Y.); VR Global Partners, L.P. v. Bennett et al., No. 07 Civ. 8686 (GEL) (S.D.N.Y.); Capital Management Select Fund Ltd. v. Bennett et al., No. 07 Civ. 8688 (GEL) (S.D.N.Y.); Kirschner v. Thomas H. Lee Partners, L.P. et al., No. 07 Civ. 7074 (GEL) (S.D.N.Y.); Kirschner v. Bennett et al., No. 07 Civ. 8165 (GEL) (S.D.N.Y.); and Kirschner v. Grant Thornton LLP et al., No. 07 Civ. 11604 (GEL) (S.D.N.Y.).  The government also initiated criminal proceedings against several Refco officers.

Bennett, Robert C. Trosten, and Santo Maggio each pled guilty to criminal charges arising out of the fraud at Refco.  (IJX 17, 20-22.)[3]  Tone E. Grant was convicted by a jury at his criminal trial. (IJX 24 at 3095-97.)

## III.    Bennett's Guilty Plea

On February 15, 2008, Bennett pled guilty to all twenty charges against him in the Criminal Action as set forth in the third superseding indictment (the "S3 Indictment"), including conspiracy, money laundering, making false statements to the SEC, and securities, wire and bank fraud.  The S3 Indictment alleged, among other things, that Bennett had knowledge of, and actively participated in, the scheme by which Refco packaged its uncollectible debts into a receivable from RGHI and disguised the nature of the debt through a series of transactions at the end of each financial quarter ("the RGHI Receivable Scheme") before August 11, 2005.  (IJX 18, S3 Indictment, ¶¶ 7-9, 13-17, 21-25, 31-36, 38-55.)  At his plea allocution, Bennett explicitly admitted his knowledge of and role in the RGHI Receivable Scheme.  (IJX 21, 2/15/08 Tr. 16-20.)  The court found that Bennett's plea was made voluntarily and knowingly and that a sufficient factual basis for the plea existed.  (Id. 20.)

In his sentencing memorandum to the court, Bennett reconfirmed his role in the RGHI Receivable Scheme.  The memorandum states that

> [i]n the late 1990s, Mr. Bennett – recognizing that Refco's very existence was at stake following several business reversals . . . came up with a plan, admittedly ill-conceived, and indeed unlawful, to keep the company in business, by eventually absorbing these losses into the RGHI receivable and then disguising the related-party nature of the receivable.

---

[3] IJX refers to the Insurers' Joint Exhibits.

5

(Declaration of John H. Eickemeyer in support of Arch Insurance Company's motion for summary judgment ("Eickemeyer Decl."), Ex. G, Bennett Sentencing Memorandum at 20.)

On July 3, 2008, Bennett was sentenced to sixteen years in prison.  (IJX 23.)

**IV.    Refco's D&O Liability Insurance "Tower"**

In advance of its August 2005 IPO, Refco obtained D&O insurance for the period from August 11, 2005 to August 11, 2006.  The insurance was structured as a tower, consisting of a primary policy and five excess policies totaling $70 million in coverage.  U.S. Specialty Insurance Company issued the primary policy with limits of $10 million in excess of applicable retentions.  (IJX 26.)  Lexington Insurance Company issued a first excess policy with limits of $7.5 million in excess of $10 million.  Axis Reinsurance Company issued a second excess policy with limits of $10 million in excess of $17.5 million.  AWAC issued a third excess policy with limits of $12.5 million in excess of $27.5 million.  Arch provided the fourth excess layer of $10 million in excess of $40 million.  XL provided the fifth excess layer of $20 million in excess of $50 million.  (IJX 29.)

**V.    The AWAC, Arch, and XL Policies**

A.    <u>The AWAC and Arch Policies</u>

The AWAC and Arch Policies both "follow the form" of the underlying insurance policies, meaning that they provide coverage in conformance with the provisions of the U.S. Specialty Policy, except to the extent that they contain limitations or restrictions beyond those outlined in the underlying insurance.  (IJX 29, Insuring Agreement; IJX 30, Section I.C.)  The Arch Policy specifically provides that "[i]n no event shall this Policy grant broader coverage than that provided by the most restrictive policy included in the Underlying Insurance."  (IJX 30,

Section I.C.)

The Primary Policy to which the AWAC and Arch Policies follow form contains the

following endorsement, labeled "Full Severability:"

> The Insureds represent that the particulars and statements
> contained in the Application are true, accurate and complete and
> are deemed material to the acceptance of the risk assumed by the
> Insurer under this Policy.  This Policy is issued in reliance upon
> the truth of such representations.  *No knowledge or information
> possessed by any Insured will be imputed to any other Insured*.  If
> any of the particulars or statements in the Application is untrue,
> this Policy will be void with respect to any Insured who knew of
> such untruth.

(IJX 26, End. No. 10; emphasis added.)

The AWAC Policy, which was issued on March 16, 2006, includes as an endorsement a

Prior Knowledge Exclusion ("PKE") which provides:

> It is hereby understood and agreed that the Insurer shall not be
> liable for Loss in connection with any claim or claims made
> against the Insureds: (a) alleging, arising out of, based upon, in
> consequence of, or attributable to facts and circumstances *of which
> any Insured had knowledge as of inception* and (I) which a
> reasonable person would suppose might afford valid grounds for a
> claim which would fall within the scope of the coverage hereunder,
> or (ii) which indicate the probability of any such claim.

(IJX 29 at Endorsement No. 3; emphasis added.)   AWAC's August 10, 2005 policy binder – i.e.,

the document that served as the temporary or interim policy until the issuance of the formal

policy, see Springer v. Allstate Life Ins. Co. of New York, 94 N.Y.2d 645, 649 (2000), lists

among the applicable endorsements an "Inverted Warranty Exclusion as of Inception" but does

not refer to a PKE.  (Declaration of Jerome W. Brendle in support of Allied World's motion for

summary judgment ("Brendle Decl."), Ex. B.)

The Arch Policy issued on March 7, 2006.  It includes the following PKE among its endorsements:

> If *any Insured* as of August 11, 2005 has any knowledge of or information concerning any act, error, omission, fact, matter, or circumstance that might give rise to a Claim under this Policy, the [] Insurer shall not be liable to make any payment under this Policy as a result of a Claim arising out of, based upon or attributable to any such act, error, omission, fact, matter or circumstance.

(IJX 30, Endorsement No. 4; emphasis added.)  Arch's binder, issued on August 10, 2005, did refer to a PKE.  (Eickemeyer Decl., Ex. J.)

   2.   The XL Policy

XL issued its Policy on December 27, 2005.  (Declaration of Pamela Sylwestrzak in connection with XL's motion for summary judgment ("Sylwestrzak XL Decl.") ¶ 6 and Ex. B.) XL's Policy, which does not follow form to the U.S. Specialty Policy, includes a severability provision in its "Representation Clause:"

> Each Insured Person represents that the statements and particulars contained in the Application are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are the basis of this Policy.  *No knowledge or information possessed by any Insured Person will be imputed to any other Insured Person for the purposes of determining the availability of coverage with respect to Claims made against any other Insured Person*.

(IJX 31, Condition (K); emphasis added.)

The XL Policy also contains a knowledge exclusion, termed an Inverted Representation Endorsement ("IRE"), which provides as follows:

8

> In consideration of the premium charged, no coverage will be
> available under this Policy for Loss, including Defense Expenses,
> from Claims arising from any fact, circumstance or situation *of
> which, as of the effective date of this Policy, any Insured had
> knowledge* and had reason to suppose might afford grounds for any
> Claim that would fall within the scope of the insured afforded by
> this Policy.

(Sworn Declaration of Henry Toolan in support of XL's motion for summary judgment ("Toolan Decl."), Ex. A, End. No. 13; emphasis added.)_____

The binder which XL issued on August 10, 2005 did not refer to any type of knowledge exclusion.

## VI.     Procedural History of the Litigations

A.     <u>AWAC Procedural History</u>

By letter dated March 28, 2006, AWAC denied coverage for all the Underlying Actions arising from the collapse of Refco.  AWAC's denial of coverage was based on, among other grounds, the Prior Knowledge Exclusion contained in its Policy.  (<u>See</u> Declaration of Robert W. DiUbaldo in support of AWAC's motion for summary judgment ("DiUbaldo Decl."), Ex. E.) AWAC reaffirmed its coverage denial after Bennett's guilty plea on February 15, 2008.  (<u>Id</u>., Ex. F.)

On March 13, 2008, the insureds filed an adversary proceeding in the U.S. Bankruptcy Court for the Southern District of New York seeking a preliminary injunction requiring AWAC to advance defense costs in the Underlying Actions.  (<u>Id</u>., Ex. G.)  Simultaneously, they sought declaratory and injunctive relief with respect to the payment of defense costs in the Underlying Actions.  The Bankruptcy Court granted the insureds' motion and ordered AWAC to advance the costs pending a determination of whether the insureds' claims were covered under the Policy.

9

(Id. at 3.)

On April 24, 2008, the insureds filed a First Amended Complaint, which added Arch as a defendant and sought (1) a declaration that the insureds are covered under both the AWAC and Arch Policies with respect to the Underlying Actions, and (2) an injunction requiring both AWAC and Arch to pay for Losses incurred in the Underlying Actions in accordance with their respective policies.

On April 30, 2008, AWAC moved this Court to withdraw the reference of the adversary proceeding to the Bankruptcy Court.  The order was granted on June 4, 2008.  On July 11, 2008, prior to discovery, AWAC filed the instant motion for summary judgment, seeking a declaration that it has no obligation under the terms of its Policy to provide coverage to the insureds for the Underlying Actions.  As of that date, AWAC had advanced $5.8 million of its $12.5 million limit and was continuing to advance funds at the rate of approximately $1 million every two weeks.  (AWAC Mem. 14.)

B.    Arch Procedural History

By letter dated March 9, 2006, Arch denied coverage to the insureds for all the Underlying Actions.  On that same day, Arch commenced a declaratory judgment action against various insureds in New York Supreme Court, seeking a declaration that, based on the Arch and AWAC Prior Knowledge Exclusions, the Arch Policy did not afford coverage to any of the insureds for any of the Underlying Actions.  (Arch Rule 56.1 Statement ¶ 25.)  The court granted the insureds' motion to dismiss, holding that Arch's action was not ripe because the possibility that the underlying insurance would be exhausted was remote.  The court also held that facts necessary to adjudicate application of the AWAC and Arch PKEs were "central to the

Underlying Lawsuits and must be adjudicated in those actions."  (Eickemeyer Decl., Ex. F, Feb. 20, 2007 Order at 3.)

Following Maggio's guilty plea, Arch reinstated its coverage action in the New York Supreme Court on January 4, 2008.  After Bennett and Trosten pled guilty, Arch filed a First Amended Complaint on February 21, 2008.  (Arch Rule 56.1 Statement ¶ 36.)

On April 17, 2008, Bennett stipulated "that the Arch Policy does not afford him any coverage whatsoever for any of the Underlying Matters."  (Eickemeyer Decl., Ex. H, Stip. of Judgment against Defendant Phillip R. Bennett.)  Bennett also "agree[d] to the entry of judgment against him on Counts I and II of [Arch's Amended Complaint]."  (Id.)  The state court entered a declaratory judgment that the AWAC and Arch PKEs barred coverage for the Underlying Matters against Bennett on April 24, 2008.  (Id., Ex. I, Judgment against Phillip R. Bennett.)

After the proceedings were removed to this Court, and prior to the commencement of discovery, Arch filed the instant motion for summary judgment on July 11, 2008, seeking a declaration that it has no obligation under the terms of the Arch Policy to provide coverage to the insureds for the Underlying Actions.

C.     XL Procedural History

By letter dated January 24, 2006, XL denied coverage to the insureds regarding the claims made against them in the Underlying Actions.  (See Sylwestrzak XL Decl., Ex. E.)  On April 22, 2008, XL filed a complaint containing a single claim for declaratory relief that there is no coverage under its Policy for the Underlying Matters.  On July 11, 2008, prior to the insureds responding to the complaint and the commencement of discovery, XL filed the instant motion for summary judgment.

11

**DISCUSSION**

I.      **Summary Judgment Standards**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court's responsibility is to determine if there is a genuine issue to be tried, and not to resolve disputed issues of fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party. Id. at 254-55. However, summary judgment may be granted "[i]f the evidence is merely colorable, or is not significantly probative." Id. at 249 (citations omitted).

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists. See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995). Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact. Anderson, 477 U.S. at 250. A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the nonmoving party. Id. at 248.

While Rule 56 permits a party to move for summary judgment "at any time," Fed. R. Civ. P. 56(b), pre-discovery summary judgment is the exception rather than the rule and will be granted "only in the clearest of cases." Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A., 247 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) (internal quotation marks omitted); see Hellstrom v. United States Dep't of Veterans Affairs, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in

the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery.").  "The nonmoving party must have . . . the opportunity to discover information that is essential to his opposition to the motion for summary judgment."  Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989) (internal quotation marks omitted).  However, where it is clear that the nonmoving party cannot defeat the motion by showing facts sufficient to require a trial for resolution, summary judgment may be granted notwithstanding the absence of discovery.  See Gottlieb v. County of Orange, 84 F.3d 511, 519 (2d Cir. 1996).

## II.    The Summary Judgment Motions

AWAC, Arch, and XL each rely on the same argument in support of their motions for summary judgment.  All three insurers assert that the knowledge exclusions in their Policies (in AWAC's and Arch's Policies, the operative provision is a PKE, in XL's, it is an "Inverted Representation Endorsement") unambiguously exclude coverage for all claims that arise out of facts or circumstances (1) which a reasonable person would suppose might afford valid grounds for a claim and (2) which were actually known by any of the insureds prior to the inception of the Policy.  (See IJX 29, End. No. 3; IJX 30, End. No. 4; IJX 31, End. No. 13.)

### A.    The Knowledge Exclusions

There are three requirements for the knowledge exclusions to be triggered in each of the Policies.  The first is that, as of August 11, 2005, "any insured" had to have knowledge of facts and circumstances[4] that might give rise to a claim under the respective Policies.  Second, that

---

[4] The AWAC wording refers to "facts and circumstances."  Arch's refers to "any act, error, omission, fact, matter, or circumstance."  XL's refers to "any fact, circumstance or situation."  (IJX 29, End. No. 3; IJX 30, End. No. 4; IJX 31, End. No. 13.)

insured must have had a reason to suppose that the fact might afford grounds for a claim.[5]
Finally, the claims must have arisen out of, or be based upon or attributable to, the facts and
circumstances of which the insured had knowledge.[6]  AWAC, Arch, and XL assert that all of
these requirements have been met because (1) Phillip Bennett, an insured under each of the
Policies, pled guilty to, and was convicted of, various federal felonies involving the fraudulent
concealment of the RGHI Receivable – an act which occurred prior to the Policies' inceptions;
(2) any reasonable person would have had grounds to believe that such a fraud could give rise to
claims under the D&O Policies; and (3) the claims for which the insureds seek coverage all arise
from the fraudulent concealment of which Bennett admitted knowledge in his plea allocution.

       1.     The "Knowledge" Requirement

There is no real dispute that Bennett, at least, had knowledge of the RGHI Receivable
Scheme prior to August 11, 2005.  He has pled guilty to orchestrating that scheme, and the
insureds do not seriously contest his knowledge.

New York courts routinely consider admissions by insureds in underlying actions to
determine the existence of insurance coverage.  See Northville Indus. Corp. v. Nat'l Union Fire

_____

[5] AWAC's specific language is: "which a reasonable person would suppose might afford
valid grounds for a claim which would fall within the scope of the coverage hereunder, or which
indicate the probability of any such claim."  Arch's Policy states simply "that might give rise to a
Claim under this Policy."  XL's language is: "which . . . any insured . . . had reason to suppose
might afford grounds for any Claim that would fall within the scope of the insured afforded by
this Policy."  (IJX 29, End. No. 3; IJX 30, End. No. 4; IJX 31, End. No. 13.)

[6] In AWAC's language, the claim must be "alleging, arising out of, based upon, in
consequence of, or attributable to" facts and circumstances of which any insured had knowledge.
Arch's Policy excludes coverage for any claim "arising out of, based upon or attributable to"
facts of which an insured had knowledge.  XL's language simply excludes claims "arising from"
facts of which an insured had knowledge.  (IJX 29, End. No. 3; IJX 30, End. No. 4; IJX 31, End.
No. 13.)

Ins. Co., 89 N.Y.2d 621, 635 (1997) (in determining duty to defend, "court may look to judicial

admissions in the insured's responsive pleadings in the . . . underlying litigation to confirm or

clarify the nature of the underlying claims"); Technicon Electronics Corp. v. Am. Home

Assurance Co., 74 N.Y.2d 66, 72 (1989) (insurer owed no duty to defend where insured's

certified answer in underlying proceedings established that pollution was intentional, not

accidental); see also Westport Resources Investment Serv., Inc. v. Chubb Custom Ins. Co., No.

02 Civ. 3096, 2003 WL 22966305 (S.D.N.Y. Dec. 16, 2003) (one insured's criminal conviction

established application of dishonesty exclusion to another insured).

   The predicate for each count of the S3 Indictment to which Bennett pled guilty on

February 15, 2008 involved his knowledge of and/or participation in the RGHI Receivable

Scheme before August 11, 2005.  (IJX 18, S3 Indictment ¶¶ 7-9, 13-17, 21-25, 31-36, 38-55.)

Bennett's guilty plea and admissions in the Criminal Action therefore establish his prior

knowledge of facts and circumstances that might give rise to a claim.

   Furthermore, Bennett stipulated on April 17, 2008 to a judgment that both the AWAC

and Arch PKEs bar coverage for the Underlying Matters.  Bennett agreed that he was not entitled

to any coverage under the Arch Policy and that Arch was entitled to the declarations it sought in

Counts One and Two of its First Amended Complaint.  Count One of Arch's First Amended

Complaint, "Declaratory Judgment that the AWAC Prior Knowledge Exclusion Bars Coverage

for the Underlying Matters," alleges in relevant part: "As of August 11, 2005, Bennett, Trosten

and Maggio possessed knowledge of facts and circumstances that a reasonable person would

suppose might afford valid grounds for a claim or that would indicate the probability of any such

claim."  (Arch First Am. Compl. ¶¶ 114-16.)  Count Two, "Declaratory Judgment that the Arch

Prior Knowledge or Information Exclusion Bars Coverage for the Underlying Matters," alleges in relevant part: "As of August 11, 2005, Bennett, Trosten and Maggio possessed knowledge or information concerning acts, errors, omissions, facts, matters or circumstances that might give rise to a Claim under the Arch Policy." (Id. ¶¶ 118-20.)  On April 21, 2008, Justice Freedman of the New York Supreme Court signed the parties' stipulation, and the judgment was entered on April 24, 2008.  (Eickemeyer Decl., Exs. H, I.)

Under New York law, a stipulated judgment "has the same force and effect as any other judgment," constitutes a "final adjudication," and is "equivalent to an admission that the facts exist on which the [stipulation] rests." A.D. Julliard & Co. v. Johnson, 166 F. Supp. 577, 585 (S.D.N.Y. 1957).  In other words, a stipulated judgment has the same preclusive effect as a judgment on the merits.  Schwartzreich v. E.P.C. Carting Co., 246 A.D.2d 439, 441 (1st Dep't 1998).  The judgment entered against Bennett therefore conclusively establishes that, as of August 11, 2005, Bennett had knowledge of facts and circumstances that would trigger the AWAC and Arch PKEs.[7]

### 2.    The "Reason To Suppose" Requirement

Bennett's judgment of conviction also satisfies the second requirement of the knowledge exclusions which is that Bennett had "reason to suppose" that a fact, circumstance or situation of which he admittedly had knowledge "might afford grounds" for a claim under the Policies.

---

[7] The insureds contend that, because only Bennett and Arch were parties to the Bennett stipulated judgment, the judgment "has no impact on Arch's claims against other defendants." (Insureds' Arch Opp'n 22.)  Bennett's stipulated judgment, however, is being used not for collateral estoppel purposes against the other insureds but rather as evidence that, as of August 11, 2005, Bennett himself had knowledge of facts and circumstances giving rise to each of the Underlying Matters.

This "reason to suppose" element is an objective standard; the appropriate line of inquiry is whether a reasonable person would understand that, given the facts or circumstances, there may be grounds for a claim to be made under the Policy.  Coregis Ins. Co. v. Lewis, Johs, Avallone, Aviles & Kaufman, LLP, No. 01 Civ. 3844, 2006 WL 2135782, at *11-12 (E.D.N.Y. July 28, 2006).  A reasonable person who had devised and executed a scheme to create hundreds of millions in phony receivables to cover losses, and then used client funds to revolve the receivable to hide its true nature, would manifestly have reason to know that a claim might occur.  In any event, Bennett has affirmatively acknowledged that he subjectively knew of the illegality of his conduct.[8]  Id. at *10; IJX 21.

### 3.    The "Arising out of" Requirement

The insureds do not put up too much of a fight with respect to the first two requirements of the knowledge exclusions.  They do, however, vigorously argue that the insurers have not satisfied the "arising out of" requirement.  The insureds assert that AWAC, Arch, and XL must "rigorously demonstrat[e] causal links between the facts admitted by Bennett in his . . . plea allocution . . . and the *claims* in each Underlying Matter."  (Insureds' Opp'n 20 (AWAC); 19 (Arch and XL).)  In other words, the insureds assert that the three insurers must show that each and every individual claim in each of the Underlying Matters arises out of facts to which Bennett has admitted knowledge.

---

[8] As noted above, Bennett stated at his plea allocution that, "I knew that failing to disclose the receivable was wrong; I knew that obtaining funds from Refco's investors and lenders based on misleading financial statements was also wrong . . . I knew that failing to disclose these facts in public filing and in connection with Refco's sale and registration of Refco's notes and common stock was wrong, and I deeply regret having done so."  (IJX 21 at 18:14-17, 18:22-25.)

17

The insurers, for their part, dispute the unit of measurement that a "claim" represents. They maintain that a "claim" is synonymous with a "lawsuit" and that it is therefore sufficient for them to demonstrate that the Underlying Actions, *taken as a whole*, arise out of the RGHI Receivable Scheme.

The insurers have the stronger position.  First, the term "claim" is actually defined in both the U.S. Specialty Policy, to which the AWAC and Arch Policies follow form, and the XL Policy.  The Primary Policy defines a "Claim," in relevant part, as "any civil proceeding commenced by service of a complaint or similar pleading" or "a criminal proceeding commenced by return of an indictment."  (IJX 26, Definitions (B)(2), (B)(4).)  Similarly, XL's Policy defines a "Claim" to mean, in relevant part, "any civil or criminal judicial proceeding in a court of law or equity, or arbitration."  (IJX 31, II(C)(2).)  According to the Policies themselves, then, a "claim" is defined as a legal proceeding and not, as the insureds would have it, as each separate portion of a complaint specifying the legal theories defining a cause of action or the relief the plaintiff seeks.[9]

The insurers find further support in the case law.  In the context of other types of insurance, New York courts have given the phrase "arising out of" a "broad" interpretation, defining it as "originating from, incident to, or having connection with."  Maroney v. New York Cent. Mut. Fire Ins. Co., 2005 NY Slip Op 7865, 3 (N.Y. 2005).  This broad interpretation, the

_____

[9] In fact, the insureds in the AWAC action themselves initially took the position that each of the Underlying Matters constitutes a single claim, alleging in their First Amended Complaint that "[e]ach of the Underlying Actions is a 'Claim' against Plaintiffs . . . ."  (First Am. Compl. ¶ 62, Murphy et al. v. Allied World Assurance Co. (U.S.), Inc., No. 08 Civ. 4196 (GEL) (S.D.N.Y. Apr. 24, 2008).)  These allegations constitute binding judicial admissions.  See Official Comm. of Unsecured Creditors v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003).

Maroney court reasoned, would allow an insurer to reasonably define the "universe of possibilities to which it can apply its risk analysis methods" so as to appropriately determine its premium.  Id.

It is therefore sufficient that the insurers have analyzed the operative complaints in each of the Underlying Matters to determine whether each lawsuit, as a whole, arises out of the acts, errors, omissions, facts, matters or circumstances of which Bennett had prior knowledge.  If, as the insureds assert, some of the claims in the so-called Refco Capital Markets Actions – In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, No. 06 Civ. 643 (GEL) (S.D.N.Y.); VR Global Partners L.P., et al. v. Bennett, et al., No. 07 Civ. 8686 (GEL) (S.D.N.Y.); Capital Mgmt. Select Fund Ltd. v. Bennett, et al., 07 Civ. 8688 (GEL) (S.D.N.Y.); and Krys v. Sugrue, 08 Civ. 3065 and 08 Civ. 3086 (GEL) (S.D.N.Y.) – could be said to arise out of an entirely separate fraud from the one to which Bennett pled guilty (see AWAC Insureds' Opp'n 21-22), this would not be fatal to the insurers' position so long as the suit *as a whole* arises from the fraud of which Bennett had knowledge.  See LISN, Inc. v. Gulf Underwriters Ins. Co., No. 02 Civ. 01646, 2006 WL 753102, at *3 (N.D. Ohio Mar. 22, 2006) (inquiry centers on whether the claim arises from the "same *nexus* of facts").[10]

---

[10] As it happens, the insurers contend that the claims in the Refco Capital Markets Actions do indeed arise from the Refco Receivable Scheme.  For example, AWAC describes the lawsuit brought in In re Refco Capital Markets as follows:

> Plaintiffs were securities brokerage customers of Refco Capital Markets [("RCM")] and allege that the defendants named in the complaint (including Bennett and certain insureds) perpetrated a fraudulent scheme through which they converted for their own benefit customer securities owned by plaintiffs and entrusted to RCM for safekeeeping.  Plaintiffs further allege that the purpose behind the conversion of the plaintiffs' securities was to fund

The insurers have demonstrated that each Underlying Action arose from the fraudulent concealment of the Refco Receivable.  Bennett admitted in his plea allocution that he had known of that fraud.  The facts in the S3 Indictment to which Bennett pled guilty include:

> From at least as early as in or about the mid 1990s, [Bennett, together with others,] schemed to hide the true financial health of Refco from its banks, counterparties, auditors, and investors. Starting at least as early as the mid 1990s, Bennett [and others] . . . embarked on a strategy to mask the true performance of Refco's business in order to sell the company for their own benefit and that of Refco's other owners.  To that end, over the ensuing years, Bennett . . . systematically (1) covered up both Refco's own losses and customer losses for which Refco became responsible; (2) moved Refco operating expenses off the company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping Refco in business and then selling it for the maximum benefit to its owners and senior management.

(IJX 18 at ¶ 7; see also id. at ¶¶ 8-18, 21-27, 33, 38, 41, 46, 49.)

The insurance companies' case-by-case analysis is sufficient to demonstrate that, but for Bennett's fraudulent scheme to conceal the existence of the Refco Receivable, the insureds would not be subject to any of the claims alleged in the Underlying Actions and the criminal proceedings.  For example, AWAC describes the fraud at issue in In re Refco, Inc. Securities Litigation, No. 05 Civ. 8626, as follows:

------------------------------------------------

> Refco's trading losses and portray Refco as a financially strong and healthy company by concealing the Refco Receivable from RCM's customers, as well as the public and regulators so that defendants could take Refco public as soon as possible and reap a huge financial windfall.

(AWAC Mem. 16 (citing IJX 6 at ¶¶ 2-7, 25, 28-29, 72-72, 109, 366-71, 375, 380).)

> Plaintiffs allege that the defendants (including Bennett) schemed to conceal the Refco Receivable resulting in materially false SEC filing.  The complaint states that there are two sets of claims emanating from the fraudulent scheme to conceal the Refco Receivable: (1) A series of strict liability and negligence claims against defendants who were "statutorily responsible for untrue statements in the prospectuses and registration statements pursuant to which Refco issued securities to the public" and (2) claims against defendants who directly participated in the fraudulent scheme and those who knew about or were reckless with respect to discovering the fraud.

(AWAC Mem. 15 (citing IJX 1 at ¶ 1, 3-7, 9-10, 12, 428-587).)  It would be tedious and unnecessary to track through the other Underlying Matters, all of which equally clearly arise from the basic fraud to which Bennett admitted.[11]  At any rate, the insureds do not seriously contest the connection between the Refco Receivable fraud and the *lawsuits* which comprise the claims at issue here.

The above discussion demonstrates that Bennett had knowledge of specific facts and circumstances (i.e., the Refco Receivable Scheme) and that the Underlying Matters arose from those facts and circumstances.  The PKEs in the insurance Policies have therefore been triggered and Bennett's knowledge is imputed to the other insureds.

B.    The Severability Provision in the AWAC and Arch Policies

1.    Applicability of the Severability Provision

The insureds, however, adduce other grounds for asserting that coverage should not be barred as to them.  First, they assert that the severability provision found in the Primary Policy prevents AWAC and Arch from imputing Bennett's knowledge to the other insureds, or at the very least raises enough ambiguity so as to preclude summary judgment.

---

[11] See AWAC Mem. 15-19 for the full case-by-case analysis.

21

As noted above, Endorsement No. 10 to the U.S. Specialty Policy to which the AWAC and Arch Policies follow form, provides:

> The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy.  This Policy is issued in reliance upon the truth of such representations.  No knowledge or information possessed by any Insured will be imputed to any other Insured.  If any of the particulars or statements in the Application is untrue, this Policy will be void with respect to any Insured who knew of such untruth.

(IJX 26, End. No. 10.)  The insureds claim that this severability provision was intended by the parties to be a general non-imputation clause and, as such, applies to – and conflicts with – the imputation language of the PKEs in the AWAC and Arch Policies.

AWAC and Arch maintain that the severability provision applies only to statements made in the Application, i.e., to the ability of the insurers to rescind their Policies *ab initio* – and is therefore not relevant to any exclusionary language found in the Policies.  To support this construction, AWAC and Arch cite to <u>Axis Reinsurance Co. v. Bennett</u>, Nos. 07 Civ. 7924, 08 Civ. 3242, 2008 WL 2485388 (S.D.N.Y. June 19, 2008), in which this Court examined the same severability provision now at issue.

In <u>Axis</u>, this Court concluded that Endorsement No. 10 in the U.S. Specialty Policy, to which the Axis Policy also followed form, had no bearing on Axis's ability to impute Bennett's knowledge to the other insureds.  In <u>Axis</u>, the insureds had argued that the severability provision consisted of only the words "[n]o knowledge or information possessed by any Insured will be imputed to any other Insured," and that that provision operated as a general non-imputation clause applicable without restriction.  <u>Axis</u>, 2008 WL 2485388, at *10.  Axis, however, pointed

out that the opening clauses of Endorsement No. 10 specifically limited the scope of the

representations made by the insureds, and the insurer's reliance upon those representations, to

the "particulars and statements contained in the Application," and that the clause immediately

following the severability provision similarly voided the Primary Policy only with respect to any

insured who knew of untruths in the "particulars or statements in the Application."  (IJX 26,

End. No. 10.)  Axis therefore argued, and this Court agreed, that, even though the severability

provision itself contained no restrictive language, when read "not as if isolated from the context,

but in the light of the [Endorsement] as a whole," the provision "admits of only one reasonable

interpretation – i.e., that it extends only to the statements Refco made in the Application."  Axis,

2008 WL 2485388, at *10 (internal citations omitted).

     Despite this Court's conclusion in Axis, the insureds here renew their contention that

Endorsement No. 10 to the Primary Policy is actually a general non-imputation clause.  The

insureds urge that the meaning of the severability provision must be considered not just within

the context of Endorsement No. 10 as a whole but within the context of the full U.S. Specialty

Policy and particularly the provision of the main policy form which Endorsement No. 10

modified.

     Endorsement No. 10 was added explicitly to amend Condition (M) in the main policy

form.  Where the severability language in Condition (M) reads in relevant part, "[n]o knowledge

or information possessed by any Insured will be imputed to any other Insured *except for material

facts or information known to the person or persons who signed the Application*," Endorsement

No. 10 simply reads, "[n]o knowledge or information possessed by any Insured will be imputed

to any other Insured."  (IJX 26, Condition (M); End. No. 10; emphasis added.)  Thus, the only

23

change Endorsement No. 10 made to Condition (M) was to delete the clause that provided that representations made in the Application would be imputed to other insureds.  The insureds argue that, if Endorsement No. 10 is read to apply merely to the particulars and statements made in the Application, then the original Condition (M) would have been internally contradictory because it would essentially have read, "no knowledge or information possessed by any Insured [in the context of signing the Application] will be imputed to any other Insured except [in the context of the Application]."  In other words, the exception would have swallowed the rule and would, the insureds argue, have resulted in a circular and redundant provision – a disfavored construction of provisions in insurance contracts.  See Manley v. AmBase Corp., 337 F.3d 237, 250 (2d Cir. 2003) ("New York law . . . disfavors interpretations that render contract provisions meaningless or superfluous").

AWAC and Arch, however, counter that, under the unamended Condition (M), U.S. Specialty would have been permitted to rescind its Policy as to all insureds based on Bennett's knowledge alone while, under Endorsement No. 10, U.S. Specialty would have had to prove separately the knowledge of each insured in order to rescind the policy as to that individual.  The insurance companies thus present a way to square the change Endorsement No. 10 made to Condition (M) with the fact that Endorsement No. 10 is meant to apply only in the rescission context.

AWAC and Arch also argue that the existence of a separate severability provision in the Primary Policy specifically addressing exclusions further undercuts the insureds' argument that Endorsement No. 10 applies beyond the rescission context to exclusions.  With regard to exclusions, the Policy states, in relevant part:

> For purposes of determining the application of the above
> EXCLUSIONS, no Wrongful Act of any Insured Person will be
> imputed to any other Insured Person who did not have actual
> knowledge of, or directly participate in the commission of, such
> Wrongful Act.

(IJX 26, Exclusions.)[12]  AWAC and Arch point out that, if the insureds were correct that

Endorsement No. 10 was intended to apply to severability with regard to exclusions as well as to

severability in the rescission context, the severability-of-exclusions provision would be rendered

superfluous.

According to New York law, any ambiguities in an insurance policy must be strictly

construed against the insurer.  See, e.g., Westview Assocs. v. Guar. Nat'l Ins. Co., 95 N.Y.2d

334, 340 (2000).  The rule of strict construction against an insurance company's interpretation of

a policy applies with particular force with respect to exclusions and words of limitation.  See,

e.g., Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co., 60 N.Y.2d 390, 398 (1983).  To negate

coverage based on an exclusion, the insurer bears the burden of establishing that the exclusion is

stated in "clear and unmistakable language, is subject to no other reasonable interpretation, and

applies in the particular case and that its interpretation of the exclusion is the only construction

that [could] fairly be placed thereon."  Parks Real Estate Purchasing Group v. St. Paul Fire &

Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006) (internal citations omitted).

Although the severability provision is not itself an exclusion, its interpretation affects the

reach of the Policies' exclusionary language.  AWAC and Arch therefore bear the burden of

demonstrating that their interpretation of the severability provision is "the only construction that

---

[12] This severability provision does not bear on the issue at hand because it applies only to
the "above" exclusions – i.e., those found in the Primary Policy.  The PKEs here are found not in
the Primary Policy but in the AWAC and Arch Policies.

[could] fairly be placed thereon." Id.  AWAC's and Arch's assessment that the severability

provision is limited to the rescission context may well prevail at the trial stage, but the insureds

have highlighted enough ambiguity in the severability provision's scope to preclude a definitive

finding that the severability provision is not a general non-imputation clause.


      2.    <u>Interaction of the Severability Provision and the Prior Knowledge
Exclusion</u>

Even if Endorsement No. 10 is construed to apply to exclusions as well as in the

rescission context, however, that construction only leads to the question of how such a provision

is meant to interact with the PKEs.  The insureds suggest that the severability provision and the

PKEs in the excess Policies can "easily and logically be read together so as to exclude coverage

to any insured who had knowledge of any fact, circumstance, or situation that might afford

grounds for a claim, while maintaining coverage for insureds who had no such knowledge."

(Insureds' AWAC Opp'n 17; Insureds' Arch Opp'n 16.)  They are incorrect.  Both the AWAC

and Arch Policies expressly provide that coverage is excluded for a claim if "*any* insured" had

knowledge of facts or circumstances that might give rise to a claim.  (IJX 29, End. No. 3; IJX 30,

End. No. 4; emphasis added.)  In the context of the PKEs, the words "any insured"

unambiguously preclude coverage for innocent co-insureds.  See <u>Duane Reade Inc. v. St. Paul

Fire and Marine Ins. Co.</u>, 411 F.3d 384, 390 (2d Cir. 2005) (whether a contract is ambiguous is a

question for the courts).  As this Court held in <u>Axis</u>:

> it is well established that the language "any insured" has been
> consistently interpreted as expressing a contractual intent to create
> joint obligations and to prohibit recovery by an innocent co-
> insured.  Indeed, unlike the phrase "the insured," the phrase "any
> insured" *unambiguously* expresses a contractual intent to create

joint obligations and to prohibit recovery by an innocent co-insured.

Axis, 2008 WL 2485388, at *15 (internal citations omitted; emphasis added).

Furthermore, as this Court noted in Axis, even if the severability provision in the underlying policy is read as a general non-imputation clause, the knowledge exclusion found in the Axis policy would nevertheless supercede it because the Axis Policy provided coverage in conformance with the provisions of the underlying insurance policies "*except as specifically set forth in the provisions of this Policy*." Axis, 2008 WL 2485388, at *10, n.13 and *14, n.17 (emphasis added). The Second Circuit has also held that, where an excess policy states that it is "subject to the same warranties, terms and conditions (*except as otherwise provided herein)* as are contained in . . . the Underlying Coverage," then the excess policy controls the insurer's obligations if there is any conflict between the two insuring agreements. Home Ins. Co. v. American Home Prods. Corp., 902 F.2d 1111, 1113 (2d Cir. 1990) (emphasis added).

The same analysis applies here. AWAC's Policy states that it provides coverage "in accordance with the same warranties, terms, conditions, exclusions and limitations of the Followed Policy . . . *subject to* the premium, limits of liability, Policy Period, warranties, *exclusions*, limitations and other terms and conditions of this policy including any and all endorsements attached hereto." (IJX 29, Insuring Agreement; emphasis added.) Arch's Policy similarly stipulates that: "*Except . . . as provided in this Policy*, the insurance coverage afforded by this Policy shall apply in conformance with the terms and conditions of the Followed Policy and in conformance with any terms and conditions further limiting or restricting coverage in this Policy or in any other Underlying Insurance." (IJX 30, Insuring Agreement; emphasis added.)

Although pre-discovery summary judgment is rare, a Rule 56(f) request should be denied

27

where additional discovery[13] will not uncover a genuine issue of material fact.  See, e.g., Trebor Sportswear Co., Inc. v. The Ltd. Stores, Inc., 865 F.2d 506, 511-12 (2d Cir. 1989).  Here, as a straightforward matter of contract interpretation, the language of the AWAC and Arch Policies provides that any provisions in the excess policies, including the PKEs, supercede any contradictory provision, including the severability provision, in the Primary Policy.  As a matter of law, therefore, since the PKEs exclude coverage where the existence of facts giving rise to a claim was known to *any* insured, Bennett's knowledge of the Refco Receivable Scheme precludes coverage for all of the insureds under the AWAC and Arch Policies.  Accordingly, summary judgment must be granted in favor of AWAC and Arch.

### 3.   Inclusion of the PKE in the AWAC Policy

The insureds in the AWAC Action make a final argument that the PKE is not properly a part of the AWAC Policy because its binder did not list a PKE among its applicable endorsements.  The issue of the extent to which the language of a Policy may deviate from the language of the binder – in other words, the extent to which an insurance binder is actually binding – need not be reached here because the Policy did not deviate from the terms of the binder.  The AWAC binder did not include a PKE per se but it did list as an applicable endorsement an "Inverted Warranty Endorsement as of Inception."  Although an Inverted Warranty Exclusion ("IWE") and a Prior Knowledge Exclusion may seem to refer to different things, the terms are in fact used interchangeably.  See Axis, 2008 WL 2485388 at *12 ("an 'inverted warranty' is simply another name for a 'knowledge exclusion'").  While AWAC's

---

[13] Some discovery has been conducted in this case.  AWAC and Arch have produced copies of their underwriting files to the insureds.  (See AWAC Reply 5; Arch Reply 6.)

binder did not elaborate as to exactly what the language of the contemplated IWE would have

been, the 2004-2005 U.S. Specialty Policy includes an example of an IWE, which states in

relevant part that:

> the Insurer shall not be liable to make any payment of Loss in
> connection with any Claim arising out of, based upon or
> attributable to any actual or alleged fact, circumstance, situation or
> Wrongful Act that occurred prior to 8/5/2004, if as of that date,
> any Insured knew or could have reasonably foreseen that such fact,
> circumstance, situation or Wrongful Act could give rise to a Claim
> against an Insured for a Wrongful Act.

(DiUbaldo Decl., Ex. D, End. 7.)  The language of this IWE is materially identical to the PKE

which AWAC ended up including in its Policy.  (Compare IJX 29 at End. 3.)

Correspondence between the parties indicates that Refco knew that such an IWE would

be added to the AWAC Policy.  On August 9, 2005, Kenny Li at Marsh, Refco's broker, wrote to

the excess insurance companies that were to make up the insurance tower, "Refco prefers not to

sign any warranties.  Should you need one to bind, please include an inverted warranty

endorsement on your revised quote."  (Declaration of Pamela Sylwestrzak in connection with

AWAC's motion for summary judgment ("Sylwestrzak AWAC Decl."), ¶ 10 and Ex. D.)

AWAC's revised Quote Confirmation, issued that same day, includes among its endorsements a

"warranty exclusion date as of inception (wording to follow)."  (Brendle Decl., Ex. A.)[14]

The fact that the IWE was added to the Binder at the suggestion of Refco's broker further

---

[14] AWAC asserts that the wording that "followed" the Quote Confirmation was a draft of
the PKE.  (Brendle Decl. ¶ 3 and Ex. A.)   The insureds, however, maintain that the Quote
Confirmation received by Refco from AWAC did not include a page with the language of the
PKE.  (Sylwestrzak Decl. ¶ 11.)  On a motion for summary judgment, this Court must construe
disputed facts in the light most favorable to the non-moving party and will therefore assume that
the Quote Confirmation which Refco received did not include as its last page the text of a PKE.

underscores Marsh's awareness that the endorsement to the AWAC Policy would operate to exclude coverage for claims that arose out of facts or circumstances known by an insured prior to the inception of the Policy and which a reasonable person might have known would give rise to a claim – whether such an endorsement was called an "inverted warranty" or a "prior knowledge" exclusion.[15]  Refco's broker, Pamela Sylwestrzak, does not actually dispute that the PKE was properly part of the AWAC Policy at its inception or that Marsh agreed on behalf of the insureds that the Policy would contain this exclusion.  (See generally Sylwestrzak AWAC Decl.)  The insureds' argument that the PKE was not properly part of the AWAC Policy is therefore insufficient to defeat AWAC's motion for summary judgment.

C.    The XL Policy

_____As discussed above in Part II, Section A, the IRE in the XL Policy has been triggered by Bennett's guilty plea.  The insureds, however, assert that a number of facts unique to the XL Policy preclude granting summary judgment to the insurer.

1.    The Severability Provision

The severability provision which this Court analyzed in Axis, and revisited above, is not directly at issue in the XL motion, since XL's Policy does not follow the form of the U.S.

_____

[15] AWAC also asserts that the insureds are estopped from claiming that the PKE was not part of the AWAC Policy because the insureds' First Amended Complaint attached a "true copy" of the AWAC Policy, which included the text of the PKE.  (See Declaration of Robert W. DiUbaldo in further support of Allied World's motion for summary judgment ("DiUbaldo Decl."), Ex. 2 at ¶ A, End. No. 3.)  Accordingly, AWAC argues, the insureds are bound by their judicial admission that a "true copy" of the AWAC Policy includes the PKE.  See Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003).  AWAC's argument is inapposite.  A "true copy" is merely an exact copy of a document with no alterations or changes.  The insureds do not argue that the AWAC Policy did not include the PKE; rather, they are claiming that they should not be bound by the Policy's terms because the PKE did not appear in the *binder*.

Specialty Policy.  Instead, XL's "Representation Clause" includes its own severability language:

> Each Insured Person represents that the statements and particulars contained in the Application are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are the basis of this Policy.  No knowledge or information possessed by any Insured Person will be imputed to any other Insured Person for the purposes of determining the availability of coverage with respect to Claims made against any other Insured Person.

(IJX 31, Condition (K).)

The insureds assert that, unlike the severability provision at issue in Axis, the severability language in the XL Policy is not limited to particulars and statements contained in the Application.  First, the insureds contend that, unlike the U.S. Specialty severability provision, which simply states that "[n]o knowledge or information possessed by any Insured will be imputed to any other Insured," the XL severability provision specifically provides that knowledge of one insured cannot be imputed to another insured "for the purposes of determining the availability of coverage with respect to Claims made against any other Insured Person." (Sylwestrzak XL Decl., Ex. B, at § IV, Conditions (K), "Representation Clause.")  This wording, the insureds argue, applies more broadly than the severability provision in Axis and cannot be said to restrict itself to the rescission context.  The insureds also distinguish the XL severability provision on the basis that, in contrast to the U.S. Specialty severability provision, the XL Policy lacks a subsequent sentence modifying the severability language to restrict it to statements and particulars in the Application.[16]

_____

[16] Compare U.S. Specialty's severability provision: "The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are

Further buttressing the insureds' position is the fact that, in <u>Axis</u>, the severability provision appeared in the Underlying Policy to which the Axis Policy followed form.  This Court noted that the terms of the Axis Policy, which included the knowledge exclusion, explicitly overrode the terms of the U.S. Specialty Policy, which included the severability provision, and that inconsistencies between the two policies were therefore to be resolved in favor of the excess policy.  <u>Axis</u>, 2008 WL 2485388, at *10 n.13.  As noted above, the same is true of the AWAC and Arch Policies.  In the case of the XL Policy, the severability provision and the IRE *both* appear in the XL Policy.  The IRE, which specifically states that all other terms of the Policy "shall remain unchanged," therefore does not automatically override the severability provision as it did in <u>Axis</u>.  As noted above, any ambiguities in an insurance policy must be strictly construed against the insurer.  <u>See</u> <u>Westview Assocs</u>, 95 N.Y.2d at 340.  By this standard, XL has not met its burden of showing that its interpretation of the effect of the severability provision on the IRE is the "only construction that [could] fairly be placed thereon."  <u>Parks Real Estate Purchasing Group</u>, 472 F.3d at 42.

B.     <u>Inclusion of the IRE in the XL Policy</u>

---

deemed material to the acceptance of the risk assumed by the Insurer under this Policy.  This Policy is issued in reliance upon the truth of such representations.  No knowledge or information possessed by any Insured will be imputed to any other Insured.  *If any of the particulars or statements in the Application is untrue, this Policy will be void with respect to any Insured who knew of such untruth.*" (IJX 26, End. No. 10; emphasis added) <u>with</u> XL's severability provision: "Each Insured Person represents that the statements and particulars contained in the Application are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are the basis of this Policy.  No knowledge or information possessed by any Insured Person will be imputed to any other Insured Person for the purposes of determining the availability of coverage with respect to Claims made against any other Insured Person." (IJX 31, Condition (K).)

Although the ambiguity in relationship between XL's IRE and its severability provision is sufficient to preclude summary judgment, the insureds also argue that the IRE is not properly part of the XL Policy because it was not included in the binder which XL issued on August 10, 2005, and which was the operative insurance contract at the time the claims arose. The facts here are distinguishable from those in the AWAC motion in that the XL binder did not refer to any provision that was equivalent to a knowledge exclusion.

The insureds assert that the XL Policy's departure from the terms of the binder cannot be used to deny coverage with respect to claims that arose while the binder was effective. See, e.g., World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 167-68 (2d Cir. 2003) (as of September 11, 2001, parties could not be bound to policies, because policies had not yet been issued). The insureds also insist that an insurance company has a "legal duty to 'draft a policy in accordance with the binder.'" (Insureds' XL Opp'n 8 (quoting National Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Group, No. 84 Civ. 7481, 1997 WL 148231, *3 (S.D.N.Y. Mar. 31, 1997)).)

As the Second Circuit has noted, however, "a binder, while an enforceable contract in its own right, is necessarily incomplete in some respects." World Trade Ctr. Props., 345 F.3d at 169. Furthermore,

> [i]t is a common and necessary practice in the world of insurance, where speed often is of the essence, for the agent to use this quick and informal device to record the giving of protection pending the execution and delivery of a more conventionally detailed policy of insurance. Courts, recognizing that the cryptic nature of binders is born of necessity and that many policy clauses are either stereotypes or mandated by public regulation, are not loath to infer that conditions and limitations usual to the contemplated coverage were intended to be part of the parties' contract during the binder period.

33

World Trade Ctr. Props., 345 F.3d at 166-167 (citing Employers Commercial Union Ins. Co. v.

Firemen's Fund Ins. Co., 45 N.Y.2d 608 (1978)).  Other New York courts have distinguished

between

> the terms unique to the deal, over which the parties bargain and
> memorialize in a binder; and the terms that are the "usual" or
> "stereotypical" conditions and limitations, which are not bargained
> over and which are spelled out fully for the first time in the policy.
> . . . [I]f terms may fairly be characterized as "usual" or
> "stereotypical," they form a part of the policy even if not referred
> to in the binder; if not, not.

Hartford Fire Ins. Co. v. Bonsera, Inc., 675 N.Y.S.2d 827, 827 (Sup. Ct. N.Y. Co. 1998)

(citations and internal quotation marks omitted).


Because binders are, "by definition, not full documents," courts "must often look beyond

the plain terms of the binder to discern the precise scope of the liabilities and obligations."  In re

September 11th Liability Ins. Coverage Cases, 458 F. Supp. 2d 104, 115 (S.D.N.Y. 2006).

Accordingly, it is "well settled in New York that extrinsic evidence is admissible to determine

the parties' intentions with respect to the incomplete and unintegrated terms of a binder" and that

"negotiations are examined to determine what terms the parties intended to incorporate into the

binder."  World Trade Ctr. Props., 345 F.3d at 184-85, 169.  See also SR Intern. Business Ins.

Co., Ltd. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 125 (2d Cir. 2006).  Stressing the

importance of pre-binder negotiations, the Second Circuit explained that "any policy form that

was exchanged in the process of negotiating the binder . . . is likely the most reliable

manifestation of the terms by which the parties intended to be bound."  World Trade Ctr. Props.,

345 F.3d at 154.  The issue for the Court, then, is not simply what the actual binder says, but

"what terms the parties *intended* to incorporate."  <u>Id</u>. at 169 (emphasis added).

The insureds note that extrinsic evidence may not be used to contradict clearly unambiguous language contained in an insurance binder, <u>World Trade Ctr. Props.</u>, 345 F.3d at 184, and that the language in the XL binder is unambiguous in its omission of any sort of knowledge exclusion.  The insureds are correct that, to the extent a document – such as an endorsement – is intended to be incorporated into the contract of insurance, that document is controlled by its plain language.  But the clarity the insureds assert here is not based on something that the binder says but rather what it fails to say.  The *absence* of a term in a document that, by its nature, is a temporary, quick, and informal device is not equivalent to the *presence* of unambiguous language.

There is evidence in the record suggesting that the parties did intend to incorporate the IRE in the XL Policy – at least as of the day before the binder was issued.  On August 9, 2005, Kenny Li, the Marsh representative brokering the deal for Refco, and Henry Toolan, XL's representative, exchanged e-mails regarding the inclusion of an IRE.  Li asked Toolan to include, if XL "need[ed] one to bind," an IRE (which they refer to as an "inverted warranty" or "IWE") in XL's revised quote (Toolan Decl., Ex. B); Toolan confirmed that XL's Policy would include an IRE (<u>Id</u>.); Pamela Sylwestrzak, the principal contact person at Marsh for Refco with respect to the binding of the 2005-2006 Policies, wrote to Li, "I'm assuming . . . [XL is] using an inverted warranty – please confirm" (<u>Id</u>., Ex. D); and Toolan e-mailed to Li as an attachment the text of all the endorsements, including the IRE (<u>Id</u>., Exs. C and E).  Toolan also stated that "I can say on personal knowledge that there was a clear, explicit, and unequivocal agreement, prior to

discovery is needed as to what exactly the parties intended with respect to an "inverted warranty," and why XL issued the binder the day after Li's e-mail without an inverted warranty. (See Sylwestrzak XL Decl., Ex. A).  XL therefore has not presented one of "the rarest of cases" in which summary judgment may be granted against a party who has not yet been afforded opportunity to conduct discovery.  Hellstrom, 201 F.3d at 97.

**CONCLUSION**

For the reasons stated above, AWAC's and Arch's motions for summary judgment are granted.  XL's motion for summary judgment is denied.


SO ORDERED.

Dated: New York, New York
      March 2, 2009

                                      GERARD E. LYNCH
                               United States District Judge